Page 1

**Exhibit A**

```
1    Witness

2    London Lewis

3

4    Friday 09/23/2011 at 08:30 by: Barbara Joseph

5

6    Cross Law Firm, S.C.

7    845 N. 11th St.

8    Milwaukee, WI  53233

9

10   United States of America v. AseraCare, Inc

11   08-C-384

12   United States District Court

13   Eastern District of Wisconsin

14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  A P P E A R A N C E S
 2     James F. Barger, Jr. and Elliott Walthal
 3     Frohsin & Barger, LLC
 4     2151 Highland Ave. #310
 5     Birmingham, AL  35205
 6     On behalf of the Plaintiffs
 7
 8     Jack W. Selden
 9     Bradley, Arant, Boult, Cummings, LLP
10     1819 Fifth Ave. North
11     Birmingham, AL  35203-2119
12     On behalf of the Defendants
13
14     Charles H. Bohl
15     Whyte Hirschboeck Dudek S.C.
16     555 E. Wells St. #1900
17     Milwaukee, WI  53202
18     On behalf of the Defendants
19
20     Also Present:  Jeanne Crone, Roberta Manley
21
22
23
24
25
```

Page 42

```
 1    Q    You don't see any documentation in front of you that
 2         discloses who patient R.K.'s physician was.
 3    A    No.
 4    Q    You would have to go back to the chart --
 5    A    Something.
 6    Q    -- to locate that?
 7    A    Mm-hmm.
 8    Q    Ms. Lewis, I'd like now to go through some basic
 9         background questions that we ask in depositions.
10    A    Okay.
11    Q    Are you married?
12    A    No.
13    Q    Are you divorced?
14    A    No.
15    Q    Where do you reside?
16    A    In Phoenix, Arizona.
17    Q    How long have you been in Phoenix, Arizona?
18    A    For about three and a half years.  Three years.
19    Q    Do you recall the date when you moved to Arizona?
20    A    I moved in June.
21    Q    Of 2008?
22    A    In 2008, yeah.
23    Q    And what took you to Arizona?
24    A    My daughter was sick.
25    Q    And your best recollection is that was June of 2008.
```

```
 1    A    Mm-hmm.
 2    Q    And are you employed in Arizona at this time?
 3    A    Yes.
 4    Q    And you may have already told me this, but tell me
 5         your employment.
 6    A    Maricopa County.
 7    Q    And what do you do for Maricopa County?
 8    A    I work with Corrections.
 9    Q    With the Department of Corrections?
10    A    Mm-hmm.
11    Q    Do you work as a nurse with the Department of
12         Corrections?
13    A    That's correct.
14    Q    And are you a licensed RN?
15    A    Yes.
16    Q    And how long have you been a licensed RN?
17    A    Since '96, 1996.
18    Q    Ever any issues in regard to your licensing that
19         you've had?
20    A    No.
21    Q    And when did you take on the job with Maricopa County
22         in the Department of Corrections?
23    A    I took it on, on June 3rd.
24    Q    Of 2008?
25    A    Mm-hmm.
```

| | | |
|---|---|---|
| 1 | A | Milwaukee.  And so I transferred jobs.  So I was still |
| 2 | | with Vitas, but I put in a transfer. |
| 3 | Q | And joined Vitas in Milwaukee. |
| 4 | A | Mm-hmm. |
| 5 | Q | Is that correct? |
| 6 | A | That's correct. |
| 7 | Q | And how long were you with Vitas in Milwaukee? |
| 8 | A | I'm thinking I got back in October, November, so maybe |
| 9 | | I started in November. |
| 10 | Q | Of 2006? |
| 11 | A | 2007.  No.  2006.  It had to be '06.  And left there |
| 12 | | and went to AseraCare. |
| 13 | Q | In January of 2007. |
| 14 | A | Mm-hmm. |
| 15 | Q | Is that correct? |
| 16 | A | That's correct. |
| 17 | Q | And then you stayed with AseraCare until you resigned |
| 18 | | in May of 2008. |
| 19 | A | Right. |
| 20 | Q | With Hospice of Arizona, what type of hospice work |
| 21 | | were you doing? |
| 22 | A | I was a patient care coordinator, so it was my |
| 23 | | responsibility to oversee the nursing staff, the CNAs, |
| 24 | | oversee the chaplain and the social workers. |
| 25 | Q | How would you describe the patient mix at Hospice of |

```
1         question, because when you're dealing with people,
2         sick people, you know, they all have various
3         diagnoses, so they're not going to have, you know,
4         predominating -- There's not going to be, you know, a
5         similar focus for the clientele.
6    Q    So at any of these employers, there was no -- in your
7         best judgment and recollection -- diagnosis such as
8         cancer versus --
9    A    Right.
10   Q    -- ALS versus Alzheimer's versus COPD versus end-stage
11        cardiac disease. None of those seem to make up a
12        significant percentage of the terminal diagnoses
13        versus other diagnoses.
14   A    That's correct.
15   Q    Okay. Thank you. Ms. Lewis, do you agree that
16        terminal illness does not always have a predictable
17        course and can be extended beyond the initial six-
18        month certification?
19             MR. BARGER: Object to the form.
20   A    Can you restate that question?
21   BY MR. SELDEN:
22   Q    Certainly. Do you agree, first, that terminal illness
23        does not always have a predictable course?
24   A    Yes.
25   Q    Do you agree that terminal illness can be extended
```

| | | |
|---|---|---|
| 1 | | beyond the initial six-month certification in hospice? |
| 2 | A | Terminal illness being extended beyond the six |
| 3 | | months... |
| 4 | Q | Well, let me rephrase that.  Do you understand that |
| 5 | | under the hospice regulations that patients are not |
| 6 | | limited to the initial six-month certification period |
| 7 | | for their hospice benefit? |
| 8 | A | They are not limited to it.  They can come back on |
| 9 | | service at any time.  If they appear to be stabilized |
| 10 | | under hospice care, then they are to be released.  And |
| 11 | | if they should become ill again under the exact same |
| 12 | | diagnosis, they start to decline again, there is no |
| 13 | | statute of limitation as to how often and frequently |
| 14 | | they can be brought back on. |
| 15 | Q | And they can also be extended beyond six months.  That |
| 16 | | is, they can continue to be determined to be terminal |
| 17 | | at the end of the initial six-month certification |
| 18 | | period and simply continue into the next certification |
| 19 | | period on a recertification. |
| 20 | | MR. BARGER:  Object to the form. |
| 21 | A | I'm confused as to what you're asking me.  So when you |
| 22 | | say "terminal illness" -- |
| 23 | | BY MR. SELDEN: |
| 24 | Q | Well, let me rephrase it.  If a patient is diagnosed |
| 25 | | with a terminal illness -- |

|     |   |                                                                    |
| --- | - | ------------------------------------------------------------------ |
| 1   |   | CMS sees this issue as one requiring physician and IDG             |
| 2   |   | judgment." Do you agree with those statements from                 |
| 3   |   | Medicare, generally?                                               |
| 4   | A | No.                                                                |
| 5   | Q | You disagree with --                                               |
| 6   | A | I disagree.                                                        |
| 7   | Q | Okay. And what do you disagree with from those                     |
| 8   |   | statements from Medicare?                                          |
| 9   | A | Can you read the first part of that paragraph again?               |
| 10  |   | There was something that you said.                                 |
| 11  | Q | Certainly. "That merely the attention that hospice                 |
| 12  |   | services give to a patient can have a beneficial                   |
| 13  |   | effect, creating the impression that the individual                |
| 14  |   | may no longer be actively dying --"                                |
| 15  | A | Pardon me. Right there, sir.                                       |
| 16  | Q | Okay.                                                              |
| 17  | A | When you use the -- When they use the word                         |
| 18  |   | "impression," that makes medicine seem just willy-                 |
| 19  |   | nilly and that anything can be interpreted as being                |
| 20  |   | accurate, almost like statistics. It leaves room for               |
| 21  |   | statistical data as opposed to factual data, in the                |
| 22  |   | way that I'm interpreting it. And so it doesn't --                 |
| 23  |   | That's why I say I disagree, because when you're                   |
| 24  |   | dealing with a human being, there's going to be                    |
| 25  |   | specific things that they're presenting with and                   |

1   either they're presenting with them or they're not.
2           And when they say that a person can get better
3   under hospice care, this is a fact of the matter.
4   They can get better. So are they getting better onto
5   stabilized medical care, or are they having a good
6   day, getting better and having a few good days, but
7   they're still declining and dying? So...
8  Q  Okay. So a patient can appear to, on a given day, to
9     have improved when they're on hospice care, but that
10    doesn't necessarily mean they've stabilized or they're
11    no longer dying. Is that a fair statement?
12 A  That's a fair statement.
13 Q  Okay. And does -- In your experience, do many
14    patients, say, go on hospice care when they begin
15    receiving the combined care that hospice provides: the
16    attention from nurses such as yourself, social
17    workers, chaplains, etcetera. Do some of them appear
18    to improve, in your experience, at least for short
19    periods of time?
20          MR. BARGER: Object to the form.
21 A  Yeah. That -- That is a dual question.
22    BY MR. SELDEN:
23 Q  Have you ever had a patient who appeared to have a
24    good day, improve, that in fact was continuing to die?
25 A  I've had patients who have had a more lucid day, and

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | -- on eligibility or lack thereof in conjunction with |
| 3 | | the medical director. |
| 4 | A | Correct. |
| 5 | Q | All right.  Do you agree that the prognostication of |
| 6 | | when a patient might die can be complex and |
| 7 | | necessarily involves the exercise of clinical |
| 8 | | judgment? |
| 9 | | MR. BARGER:  Object to the form. |
| 10 | A | Well, I can answer one of those questions.  Anytime |
| 11 | | you're dealing with a human being, it's complex. |
| 12 | | BY MR. SELDEN: |
| 13 | Q | Okay.  Fair enough. |
| 14 | A | It's never simple. |
| 15 | Q | Fair enough.  And does the prognostication of when a |
| 16 | | patient might die involve clinical judgment? |
| 17 | A | Yes, it does. |
| 18 | Q | All right.  And are evaluations of hospice eligibility |
| 19 | | in your experience always clear-cut or black-and- |
| 20 | | white? |
| 21 | A | In medicine, this is why they have the -- this is why |
| 22 | | the government set it up to be evaluated by two |
| 23 | | physicians to determine if a person is terminally ill |
| 24 | | unto death with six months or less to live.  Because |
| 25 | | they're -- It's hard to be specific until a person has |

|  |  |  |
|---|---|---|
| 1 |   | presented with the proper, the proper diagnosis and |
| 2 |   | term of care and different things that have been done |
| 3 |   | for them to help sustain them and to keep them alive. |
| 4 |   | This is why it's based on compiling facts and evidence |
| 5 |   | of care. |
| 6 | Q | Is the evaluation of hospice eligibility always clear- |
| 7 |   | cut? |
| 8 | A | Yes, it is. |
| 9 | Q | All right.  So it's yes or no, and in your judgment |
| 10 |   | there can be no disagreement over it. |
| 11 | A | There's no disagreement, because either they're |
| 12 |   | terminally ill unto death or they're not. |
| 13 | Q | And as you said before, making that determination |
| 14 |   | involves clinical judgment; is that correct? |
| 15 | A | Right.  It is left to doctors to decide. |
| 16 | Q | And can two physicians disagree over an eligibility |
| 17 |   | determination and neither be wrong? |
| 18 | A | It sounds like a "yes."  Yes. |
| 19 | Q | Okay.  In other words, you could have two physicians |
| 20 |   | -- |
| 21 | A | Yes. |
| 22 | Q | -- evaluating the same patient and they can come to |
| 23 |   | differing opinions on whether or not that patient is |
| 24 |   | terminal within the next six months. |
| 25 | A | Yes. |

Page 82

| | | |
|---|---|---|
| 1 | A | How -- |
| 2 | Q | -- how it was set up? |
| 3 | A | No, I don't. |
| 4 | Q | Okay.  Do you know what the PPS scale is? |
| 5 | A | No. |
| 6 | Q | Have you ever heard of a palliative performance scale? |
| 7 | A | Yes, I have. |
| 8 | Q | What is that? |
| 9 | A | I don't recall what it is.  I've heard of it before. |
| 10 | Q | Do you recall anything whatsoever about it?  How it's |
| 11 | | structured?  How it's used?  Anything? |
| 12 | A | That's a problem for me.  No, I don't. |
| 13 | Q | Have you ever heard of the Karnafsky scale? |
| 14 | A | Yes, I have. |
| 15 | Q | What is that? |
| 16 | A | I don't recall what that scale is, sir. |
| 17 | Q | Do you recall anything whatsoever about the Karnafsky |
| 18 | | scale? |
| 19 | A | I don't. |
| 20 | Q | Do you have any reason to believe that -- well, strike |
| 21 | | that.  Can you identify by name any referring |
| 22 | | physician on an initial admission to hospice that you |
| 23 | | believe knowingly falsified any patient information? |
| 24 | A | I didn't have to deal with referring physicians at |
| 25 | | all. |

Page 83

1   Q   So you have no reason, you have no reason to believe
2       that a referring physician falsified anything.
3   A   No. I only dealt with Dr. Mateo.
4   Q   Okay. Who is Dr. Ali Malik? A-l-i, and then last
5       name, M-a-l-i-k.
6   A   Yeah. MAH-leek.
7   Q   Malik, M-a-l-i-k. Thank you.
8   A   It seems that he may have been the doctor for one of
9       these patients. I'm thinking Ms. R.K. I don't know.
10  Q   Okay. And do you recall Dr. Ali Malik, or ma-LIK? Do
11      you recall that doctor?
12  A   I've never spoken with him or interacted with him.
13  Q   Okay.
14           MR. SELDEN: Let's go off the record just a
15      second.
16           REPORTER: Off the record.
17           (Off the record 11:49 - 11:51)
18           REPORTER: Back on the record.
19      BY MR. SELDEN:
20  Q   Ms. Lewis, did you know who the Medicare contractor or
21      fiscal intermediary for AseraCare was while you were
22      employed there?
23  A   Those titles, no, not that I can recall.
24  Q   Do you know what a fiscal intermediary or Medicare
25      contractor is?

Page 121

```
 1    A    At that time I, you know, it looks like I mentioned a
 2         patient here, but other than if it wasn't written --
 3         There's so many people we care for, it -- no. There's
 4         no particular person that stands out.
 5    Q    And she also discussed with you, according to
 6         paragraph 8, the use of forged documents to circumvent
 7         the need for physician certification. Do you see that
 8         in your affidavit?
 9    A    Yes, sir.
10    Q    All right. Is that statement based upon what Ms.
11         Paradies told you?
12    A    Yes, sir.
13    Q    All right. You don't have any independent knowledge
14         of the use of forged documents to circumvent the need
15         for physician certification?
16    A    No. Just told about it.
17    Q    Okay. And then you go on to state that in February
18         2008 you discussed a patient by the initials of C.M.
19         who was due to be recertified in February of '08, and
20         that one of the staff overdosed patient C.M. Do you
21         see that reference?
22    A    Yes, sir.
23    Q    What is your recollection of your reference to an
24         overdosing of that patient? Do you have any
25         independent recollection of what happened there?
```

Page 229

```
 1    Q    Are you familiar with the allegation concerning
 2         Comfort Pacs which is contained in paragraphs 36
 3         through 34 -- excuse me -- through 44 of the
 4         complaint?
 5    A    I have to read it.
 6    Q    Okay.  Why we don't do this, which may speed it along.
 7         I'll just pose questions as we press through the
 8         paragraphs themselves.  Do you have any knowledge that
 9         prescriptions are presigned by Dr. Mateo?
10    A    No.
11    Q    Do you have any knowledge that Mary Reynolds, as
12         alleged here, signed Dr. Mateo's name on these -- on
13         certain forms?
14    A    I have no direct knowledge.
15    Q    Have you ever discussed that issue with anyone other
16         than your co-relators?
17    A    No.
18    Q    Do you have any direct knowledge of allegedly forged
19         forms being maintained in Gayle Hurt's desk drawer?
20    A    No.
21    Q    Or any knowledge of the allegation that Mary Reynolds
22         kept forged forms in folders on her desk?
23    A    Direct knowledge, no.
24    Q    And would your knowledge of that be based upon what
25         you've been told by Roberta Manley or Debra Paradies?
```