Page 1

**Exhibit C**

1    Witness

2    Debra Paradies

3

4    Thursday 09/22/2011 at 08:30 by: Jeff and Barbara Joseph

5

6    Cross Law Firm, S.C.

7    845 N. 11th St.

8    Milwaukee, WI   53233

9

10   United States of America v. AseraCare, Inc.

11   08-C-384

12   United States District Court

13   Eastern District of Wisconsin

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                              Page 2
 1                    A P P E A R A N C E S

 2        James F. Barger, Jr. and Elliott Walthal

 3        Frohsin & Barger, LLC

 4        2151 Highland Ave. #310

 5        Birmingham, AL  35205

 6        On behalf of the Plaintiffs

 7

 8        Jack W. Selden

 9        Bradley, Arant, Boult, Cummings, LLP

10        1819 Fifth Ave. North

11        Birmingham, AL  35203-2119

12        On behalf of the Defendants

13

14        Charles H. Bohl and Andrew A. Jones

15        Whyte Hirschboeck Dudek S.C.

16        555 E. Wells St. #1900

17        Milwaukee, WI  53202

18        On behalf of the Defendants

19

20        Also Present:  Jeanne Crone

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | | whom, where? |
| 2 | A | All the special admitting packets with Dr. Mateo's signature were kept in Mary Reynolds' desk. They were also kept in a file cabinet drawer in Mary -- or Gayle Hurt's office. And in the interim that Dr. Mateo was leaving on vacation, if I had to go out and do admissions within a week or two-week period of time, I was told to use those admitting packets with his signatures on them. |
| 10 | Q | Okay. Did you in fact make use of the blank forms with his signature on them? |
| 12 | A | Yes, I did. |
| 13 | Q | Can you identify any patients that you used those with? |
| 15 | A | I cannot recall them. |
| 16 | Q | Did you make any sort of record of when you made use of any of these forms that you allege were presigned by Dr. Mateo? |
| 19 | A | No. |
| 20 | Q | Is there any evidence that you can turn to other than your recollection and this copy of this form to base your assertion on? |
| 23 | A | Well, I guess what you could do is you could find out when Dr. Mateo took his vacations throughout my employment and pull all of those patient records. |

1  Q  Is that correct?
2  A  Working for AseraCare, no, they did not.
3  Q  And do you understand what the regulatory requirement
4     is, whether it's something AseraCare implemented,
5     whether it was from a prior hospice employer, or
6     anything you've learned since?  Do you understand what
7     the rule on certificates of terminal illness is under
8     the regulations, that is, who is required to sign upon
9     original referral and admission?
10 A  I always believed it was the physician that was
11    working for AseraCare, the medical director in our
12    organization that ultimately made that decision.
13 Q  Do you have any reason to believe that any attending
14    physician who recommended to their patient, his or her
15    patient, that they cease curative care and go on to
16    hospice had any fraudulent intent in doing so?
17 A  No.
18        MR. BARGER:  Object to the form.
19 A  No.
20    BY MR. SELDEN:
21 Q  In other words, was doing anything that was
22    deliberate:  "I don't believe this patient really
23    ought to be on hospice, but I'm going to send him
24    there anyway."
25        MR. WALTHAL:  Object to the form.

Page 200

```
 1         any heart condition, did their heart get better, did
 2         it get worse, you know.
 3     Q   Some patients die of a very specific diagnosis;
 4         others, particularly as they're elderly, have many
 5         combinations of things that you as a nurse have to
 6         evaluate...
 7     A   Right.
 8     Q   ...what is the total picture on this patient.
 9     A   Mm-hmm.
10     Q   And based on that total picture, "Is the physician's
11         judgment that this patient is likely to die within the
12         next six months supportable in my judgment?"
13     A   And that should be, yes, correct.
14     Q   Okay.  We started with me asking you about your
15         function as an admissions nurse.  I think you've
16         pretty well described it.  Is there anything else of
17         particular significance that we haven't covered on
18         your function as an admissions nurse, or is that a
19         good overview?
20     A   That's a very good overview.
21     Q   Okay.  What about your function in conducting patient
22         chart audits?  Tell us about that function, which I
23         assume is separate and apart from your admissions
24         nurse function.
25     A   Correct.
```

Page 211

1   Q   Do you understand or know the legal structure of any
2       relationship between AseraCare as a company and any of
3       the other corporate defendants you've named in this
4       lawsuit?
5   A   No.
6   Q   You have asserted that Golden Living or GGNSC has done
7       billing work on behalf of AseraCare.  Do you -- Well,
8       I say you have asserted.  In the complaint it's
9       asserted, and I realize there's three relators.
10  A   Mm-hmm.
11  Q   Do you have any knowledge of what function GGNSC or
12      Golden Living play, if any, in relation to AseraCare's
13      billing?
14  A   No.
15  Q   Do you agree that terminal illness does not always
16      have a predictable course and can be extended beyond
17      the initial six-month certification?
18  A   Yes.
19  Q   Do you agree that CMS recognizes that making medical
20      prognostication of life expectancy is not always an
21      exact science?
22  A   That is correct.
23  Q   What about these statements?  Do you agree that the
24      Medicare program recognizes that terminal illnesses do
25      not have an entirely predictable course, and that in

Page 212

1  recognition of the difficulty of making exact
2  predictions, physicians certifying Medicare patients
3  for hospice are expected only to use their best
4  clinical judgment regarding the normal course of the
5  patient's illness?
6  A  Yes.
7         MR. BARGER:  Object to the form.
8  BY MR. SELDEN:
9  Q  Do you agree that as long as a physician continues to
10     properly and conscientiously certify the six-month
11     prognosis, the beneficiary can continue to receive the
12     hospice benefit?
13 A  Yes.
14 Q  I'll read a statement put out by -- I'll represent to
15    you was put out by CMS and then ask you questions
16    about it.  "That merely the attention that hospice
17    services give to a patient can have a beneficial
18    effect, creating the impression that the individual
19    may no longer be actively dying and therefore
20    ineligible for the Medicare hospice benefit.
21    Therefore, CMS cannot offer a specific number of days
22    or weeks that a patient may be stable and thus not
23    eligible.  CMS sees this issue as one requiring
24    physician and IDG judgment."  Do you agree with those
25    statements?

1   A   Yes.

2   Q   So there is no particular period of stability that's defined such that it would exclude or make a patient no longer eligible for hospice.

5   A   I have to disagree. I do believe there comes a period of time after so many recertifications that if a patient is actually doing well, they're thriving, they're putting on weight, they're not showing a significant decline in their health, I believe that to be an ineligible person. They're obviously doing very well that they don't need hospice services.

12   Q   Are you aware of any guidance out there, CMS, Palmetto, LCD, that actually states that after a particular number of days or weeks or what have you of relative stability that a patient is no longer eligible?

17   A   I'm not aware of such documentation per se as what I had been told throughout my employment with AseraCare.

19   Q   Did anyone ever give you a particular number of days or weeks that once you hit that point, the patient automatically was ineligible?

22   A   No.

23   Q   Okay. Do you agree that the prognostication of when a patient might die is complex and necessarily involves the exercise of clinical judgment?

Page 214

1   A   Yes.
2   Q   Would it be fair to say, then, that evaluations of
3       hospice eligibility are not always clear-cut or black
4       and white?
5   A   I would have to agree with that, yes.
6   Q   And can two physicians disagree over an eligibility
7       determination and neither of them be wrong?
8               MR. BARGER:  Object to the form.
9   A   Yes, there can.
10  BY MR. SELDEN:
11  Q   In other words, there are gray areas and there are
12      areas in which there has to be the application of
13      professional medical judgment.
14  A   That is correct.
15  Q   Would the same apply to nurses?  Two nurses can
16      disagree in looking at a patient or looking at the
17      chart information over whether or not that patient is
18      eligible for hospice care, and neither one is
19      necessarily wrong?
20  A   I would believe so, yes.
21  Q   Because it's not always black and white.
22  A   Correct.
23  Q   In talking about the LCDs, are there in your judgment
24      gray areas, if you will, of interpretation in the
25      guidance for hospice eligibility?

Page 317

1           recertification.
2      Q    So would you say it's inaccurate to say that
3           recertifications have nothing to with improvement or
4           stabilization or decline?
5      A    Well, I would say that you definitely wouldn't
6           recertify somebody if they're showing improvement or
7           have stabilized over a period of time.
8      Q    Okay. And he goes on to clarify. On 27, the first
9           bullet point, it says, "Let's say it another way. A
10          patient who improves or stabilizes but still has a
11          prognosis of less than six months should remain under
12          hospice care." That's true, isn't it?
13     A    Can be, yes.
14     Q    But is that a fair way of restating --
15     A    No.
16     Q    -- the statement that nothing -- that decline has
17          nothing to do with recertifications?
18     A    No. These two don't --
19               MR. SELDEN: Objection to form.
20     A    These two don't make...
21          BY MR. BARGER:
22     Q    Okay.
23     A    ...sense.
24     Q    So is it fair to say upon closer examination, you do
25          have some problems with the training that...

Video Deposition of Debra Paradies  9/22/2011

Page 320

| | | |
|---|---|---|
| 1 | A | This one is okay. |
| 2 | Q | Okay. |
| 3 | A | Because essentially this is what we're trying to |
| 4 | | accomplish. |
| 5 | Q | Keeping the patient comfortable? |
| 6 | A | Comfortable, teaching family how to help, teaching |
| 7 | | family to improve and provide care and offer |
| 8 | | emotional/spiritual support. |
| 9 | Q | And you say that's the five-second nutshell, right? |
| 10 | A | It should be, yes. |
| 11 | Q | Okay. This is No. 68. It says "Can't decide." I |
| 12 | | assume that's the patient that can't decide; is that |
| 13 | | right? |
| 14 | A | It's either/or. |
| 15 | Q | Do you have any problems with this? |
| 16 | A | This, this is about having a patient come on, and this |
| 17 | | is some of the things and tactics that we were being |
| 18 | | told, that they should think about it for a few days |
| 19 | | and talk about "Well, at least you'll be covered at |
| 20 | | night by a nurse." They made it sound really |
| 21 | | beautiful and we're your advocate, give us a try, your |
| 22 | | doctor is the best. You know, all these things. This |
| 23 | | is what they've printed, but how they presented it was |
| 24 | | they added things to it, and.... |
| 25 | Q | Is it appropriate to try hospice for just a few days? |

Page 327

1           MR. BARGER: Object to the form.
2     A     Well, I'll tell you one thing. I knew that families
3           have a right to choose which hospice agency they want.
4           BY MR. SELDEN:
5     Q     Well, I'm not -- That's not my question.
6     A     What is your question?
7     Q     I'm asking you are there -- Is it your understanding
8           that there are patients, that there are citizens in
9           this country who are Medicare eligible who are dying
10          and eligible for hospice benefits who never receive
11          hospice benefits?
12    A     I agree --
13                MR. BARGER: Object to the form.
14    A     I agree there are.
15          BY MR. SELDEN:
16    Q     Okay. Look at the last page of the Peggy Durkin
17          PowerPoint that Mr. Barger referred you to, which is
18          Bates No. 71. Are you at 71?
19    A     "Time management"?
20    Q     No.
21    A     Nope. Next one.
22    Q     It's the last page of the PowerPoint. What is the
23          final statement on that slide?
24    A     "Want to further our mission"?
25    Q     No, the final statement. I'm sorry.