FILED
2012 Nov-02  PM 02:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, et al.** | ) | |
| | ) | |
| **Plaintiffs** | ) | **Case No. 2:12-cv-0245-KOB** |
| | ) | **(LEAD)** |
| **v.** | ) | |
| | ) | |
| **ASERACARE, INC. et al.** | ) | |
| | ) | |
| **Defendants** | ) | |

------------------------------------------------------------------------------------

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA, et al.** | ) | |
| | ) | **Case No. 2:12 -cv-2264-KOB** |
| **Plaintiffs** | ) | **(CONSOLIDATED)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GGNSC HOLDINGS, LLC, et al.** | ) | |
| | ) | |
| **Defendants** | ) | |

------------------------------------------------------------------------------------

| | | |
|---|---|---|
| **DAWN RICHARDSON, et al.** | ) | |
| | ) | **Case No. 2:09-cv-0627-KOB** |
| **Plaintiffs** | ) | **(CONSOLIDATED)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GOLDEN GATE NATIONAL SENIOR CARE, LLC, et al.** | ) | |
| | ) | |
| **Defendants** | ) | |

## UNITED STATES' CONSOLIDATED COMPLAINT IN INTERVENTION

The United States of America, by and through its undersigned counsel, files this Consolidated Complaint in Intervention against Defendants GGNSC Administrative Services, LLC, Hospice Preferred Choice, Inc., and Hospice of Eastern Carolina, Inc., doing business as

AseraCare Hospice. [1]  The United States alleges as follows:

## I.    INTRODUCTION

1.      The United States brings this fraud action against the for-profit business known as AseraCare Hospice ("AseraCare" or the "Defendant") to recover losses sustained by the Medicare Program.  Not to be confused with Medicaid, Medicare is a federally-funded health care program that provides basic medical insurance to qualified residents of the United States who are age 65 or older, younger people with disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant).  Medicare is not a free health care program, as a majority of the Medicare Program's costs are paid by United States citizens through their taxes.  In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare pays for what is known as hospice care for eligible Medicare recipients.

2.      AseraCare is a for-profit national chain of hospice providers.  AseraCare significantly funds its operations and its employees through receipt of Medicare dollars on behalf of individuals who are supposed to be eligible to receive Medicare hospice benefits.  To be eligible for hospice care paid by Medicare, an individual must be "terminally ill," meaning that that "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  42 C.F.R. § 418.3.  While elderly patients may qualify for a variety of other medical services paid by Medicare, for-profit hospice companies like AseraCare are entitled to receive Medicare dollars only for Medicare recipients who are "terminally ill." When a business such as AseraCare admits a Medicare recipient to hospice care, that individual

---

[1] The United States previously intervened and filed its First Amended Complaint in Intervention in *United States ex rel. Richardson and Brown v. GGNSC Administrative Services, LLC, et al.*, (09-CV-00627-KOB), prior to the consolidation of that action with *United States ex rel. Paradies et al. v. AseraCare, Inc., et al.* (2:12-cv-0245-KOB) and *United States ex rel. Micca v. GGNSC Holdings, LLC* (2:12-cv-2264-KOB).

no longer receives, or is entitled to receive, services that would help to cure his or her illness. Instead the individual receives what is called palliative care, or care that is aimed at relieving pain, symptoms, or stress of terminal illness, which includes a comprehensive set of medical, social, psychological, emotional, and spiritual services.  It is clear that Congress authorized funding from limited Medicare funds for this specialized benefit during the last several months of an individual's life.

3.     The United States alleges that AseraCare, through its reckless business practices, admitted and retained individuals across the United States who were not eligible to receive Medicare hospice benefits, because it was financially lucrative—and did so even after AseraCare's auditor alerted AseraCare to troubling problems.  AseraCare misspent millions of Medicare dollars intended for Medicare recipients who have a prognosis of six months or less to live and need hospice care.

4.     Specifically, the United States alleges that AseraCare is liable under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, due to AseraCare's conduct in submitting false and fraudulent records, statements, and claims for payment by the United States to the Medicare Program from at least January 2007.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

6.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a).  Jurisdiction is proper over the Defendant because the Defendant can be found in,

resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

7.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

## III.     THE PARTIES

8.      Plaintiff in this action is the United States of America, suing on behalf of the United States Department of Health & Human Services ("HHS") and its operating division, the Centers for Medicare & Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS was an operating division of HHS that administered and supervised the Medicare Program.

9.      Defendants Hospice Preferred Choice, Inc. and Hospice of Eastern Carolina, Inc. d/b/a AseraCare Hospice are subsidiaries of HomeCare Preferred Choice, Inc., which is a subsidiary of Golden Gate Ancillary LLC, which is a subsidiary of GGNSC Holdings, LLC.

10.     GGNSC Holdings, LLC also owns Defendant GGNSC Administrative Services, LLC, which has an administrative service agreement with HomeCare Preferred Choice, Inc. and performs billing services on behalf of AseraCare.

11.     AseraCare is a for-profit business with approximately sixty providers in nineteen states, including Alabama.  It is a privately-owned company, which receives most of its revenue from Medicare.  At all times relevant to the events described in this Complaint, AseraCare was engaged in the business of providing hospice care to individuals who were eligible to receive Medicare.

4

## IV.    THE FALSE CLAIMS ACT

12.    The False Claims Act provides, in pertinent part, that any person who

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

*** 

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. §§ 3729(a)(1)-(2) (2006), amended by, 31 U.S.C. §§ 3729(a)(1)(A)-(B) (West 2010).

13.    The False Claims Act further provides that "knowing" and "knowingly"

(A)    mean that a person, with respect to information--
(i)    has actual knowledge of the information;
(ii)    acts in deliberate ignorance of the truth or falsity of the information; or
(iii)    acts in reckless disregard of the truth or falsity of the information; and
(B)    require no proof of specific intent to defraud.

31 U.S.C. § 3729(b) (2006), amended by, 31 U.S.C. § 3729(b)(1) (West 2010).

## V.    THE MEDICARE PROGRAM

14.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

15.    The Medicare Program is comprised of four parts.  Medicare Parts B, C and D are not directly at issue in this case.

16.    Part A of the Medicare Program is a 100 percent federally funded health insurance program for qualified residents of the United States aged 65 and older, younger people

with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant).  The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes.  The benefits covered by Part A of the Medicare Program include hospice care under 42 U.S.C. §1395x(dd).

17.    The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through CMS.  CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as "fiscal intermediaries" (hereinafter "MACs") to review, approve, and pay Medicare bills, called "claims," received from health care providers, such as AseraCare providers.  In this capacity, the MACs act on behalf of CMS.

18.    Payments are typically made directly to health care providers, such as AseraCare providers, rather than to the patient.  This occurs when the Medicare recipient assigns his or her right to payment to the provider, such as AseraCare providers.  In that case, the provider submits its bill directly to Medicare for payment.

19.    In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form.  When the CMS-1500 form is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

20.    On the CMS-1500 form, the provider must state, among other things, the procedure(s) for which it is billing Medicare, the identity of the patient, the provider number, and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

21.    All healthcare providers, including AseraCare providers, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part A.  A

provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following:

    a.  Medicare reimburses only reasonable and necessary medical services furnished to beneficiaries. *See* 42 U.S.C. § 1395y(a)(1)(A); and

    b.  Providers must assure that they provide economical medical services, and then, only when, and to the extent, medically necessary. *See* 42 U.S.C. § 1320c-5(a)(1).

22.    Medicare regulations exclude from payment services that are not reasonable and necessary. *See* 42 C.F.R. § 411.15(k).

23.    Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment under Medicare Part A on the basis of the providers' certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient." The claims are paid from the Medicare Trust Funds, funded by American taxpayers.

## VI.   APPLICABLE REGULATIONS

24.    Hospice is a program to provide what is called palliative care to patients instead of curative care. Palliative care is aimed at relieving pain, symptoms, or stress of terminal illness. It includes a comprehensive set of medical, social, psychological, emotional, and spiritual services provided to a terminally ill individual. Medicare recipients who elect hospice care agree to forego curative treatment of their terminal illnesses. In other words, patients who receive the Medicare hospice benefit no longer receive care that leads to a cure of their illnesses.

25.     Pursuant to 42 C.F.R. § 418.20, in order to be eligible to elect hospice care under Medicare, an individual must be—(a) Entitled to Part A of Medicare; and (b) Certified as terminally ill in accordance with § 418.22.

26.     According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

27.     Hospice is available to individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period.

28.     The initial 90-day period must be certified by (a) the Medical Director of the hospice or physician-member of the hospice inter-disciplinary group and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, certification requires only one of the aforementioned physicians. 42 C.F.R. § 418.22.

29.     The written certification requires: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (3) the signature(s) of the physician(s). *Id.*; Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1.

30.     Hospices are paid a per diem rate based on the number of days and level of care provided during the election period. Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302. To be covered, hospice services must be:

> Reasonable and necessary for the palliation and management of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with § 418.24. A plan of care must be established and periodically

8

reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200.

31.    It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information."  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

32.    Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms."  42 C.F.R. § 418.22(b)(2) and (3).

33.    Local coverage determinations ("LCD") specify under what clinical circumstances a service is considered to be reasonable and necessary and thus covered by Medicare.  Medicare administrative contractors ("MAC") issue LCDs to provide guidance to the public and medical community within their jurisdictions.  MACs develop LCDs by "considering medical literature, the advice of local medical societies and medical consultants, public comments, and comments from the provider community."  Medicare Program Integrity Manual, Chapter 13, § 13.1.3.

34.    Palmetto is the MAC responsible for processing claims submitted by AseraCare for payment by Medicare.  Palmetto has issued LCDs that set forth medical criteria for

determining whether individuals with certain diagnoses have a prognosis of six months or less to live.

## VII.     The Submission of False Claims

35.     From at least January 2007, AseraCare knowingly submitted or caused the submission of false claims to Medicare and created false records and statements to receive reimbursement from Medicare for hospice care.

36.     During this time, AseraCare falsely certified on electronic claim forms submitted to Medicare that hospice care provided to Medicare recipients across the United States was "medically indicated and necessary for the health of the patient."  AseraCare created and/or submitted documentation that falsely represented that certain Medicare recipients were "terminally ill," meaning that the "individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  Many of the Medicare recipients were not eligible for hospice care paid for by the Medicare Program because they did not have a prognosis of six months or less to live if the illness runs its normal course.

37.     A sophisticated hospice provider such as AseraCare is expected to fully know and appreciate the Medicare statute, the definition of "terminally ill," and the local coverage determinations that set out medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less to live.  The purpose of the Medicare requirements is to ensure that the limited Medicare funds are properly spent on services actually needed by Medicare beneficiaries.  AseraCare has a duty to deal honestly with the Government. "Men must turn square corners when they deal with the Government."  *Rock Island A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920).

38.     AseraCare knew, deliberately ignored, or recklessly disregarded that the claims it submitted to Medicare falsely represented the medical condition and hospice eligibility of the beneficiaries.  In addition, AseraCare knew or recklessly disregarded that its business practices would lead to the submission of false claims to Medicare for hospice services provided to ineligible beneficiaries.

**a.  AseraCare pressured staff to admit and retain patients for whom it could bill Medicare, even though the patients were not eligible for Medicare hospice benefits.**

39.     AseraCare set aggressive targets for the number of patients for whom it could bill Medicare or other insurance that it wanted each of its providers to achieve, known as census targets, and pressured its employees to meet those targets.

40.     AseraCare's corporate organization has two divisions that share responsibility for providing hospice care—a business operations division and a clinical operations division.  The business operations division is responsible for the financial success of the company, while the clinical operations division is charged with both quality of care of the patients and also compliance with Medicare's rules and regulations.  On the business operations side, each AseraCare provider has an executive director who reports to the director of operations for the region in which the AseraCare provider is located.  The directors of operations report to the President of AseraCare.

41.     On the clinical operations side, each AseraCare provider has several nurses, who report to the director of clinical services.   While AseraCare's clinical employees were responsible for ensuring compliance with Medicare's rules and regulations, including eligibility

criteria, the director of clinical services reported directly to the executive director.  Both the executive director and the director of clinical services were pressured to meet census goals established by the corporate office of AseraCare.

42.     For example, on October 31, 2008, a regional vice president emailed the executive directors and directors of clinical services of the numerous AseraCare providers, stating "[i]n order to make our admission goal for the month, we are down to the wire, and need today to be a huge admit day for every region."  The regional vice president urged the executive directors and directors of clinical services to "[m]obilize your teams, get them into the game this morning[;] when we call on them they always respond with referrals and a push to convert those referrals into admits ASAP."

43.     On October 31, 2008, the director of operations for AseraCare hospice region 3 forwarded the same email from the regional vice president to the executive directors and directors of clinical services within region 3 urging them to find more patients to admit.  "The highest admit day ever was in Region 1 with 16.  We can get there too—today is the day for really focused action.  Go around the barriers and make this happen now, your families need you," the director of operations wrote.

44.     AseraCare rewarded providers that met their admission goals.  For example, in June 2006, a massage chair was the prize offered to the provider in the central region that "wins the game" by meeting its admission goal and being the first to admit a patient in July 2006.

45.     AseraCare disciplined its staff who failed to meet admission goals.  For example, in November 2007, a regional sales director was placed on a corrective action plan based, at least in part, on his failure to admit at least 33 people for hospice care per week for the region.

46.     Job retention at AseraCare was linked to maintaining census, or the number of patients for whom AseraCare could bill Medicare or other insurance.   An auditor that AseraCare hired to review its internal hospice operations observed in its December 28, 2007 report that a decline in the number of patients was accompanied by a "reduction-in-force," which in turn, made staff, concerned about losing their jobs, resistant to discharging patients.  Specifically, the auditor, in its review of the Monroeville, Alabama office, cautioned that "[AseraCare] [s]taff are resistant to patient discharge" and are "concerned about layoffs if census drops."

47.     The clinical services regional manager responsible for compliance of eleven AseraCare providers within the region of Alabama, Mississippi, and Tennessee during the period from approximately October 2007 to April 2008 stated that the message from high level AseraCare management was to increase census, or the number of patients for whom it could bill Medicare or other insurance.

48.     The clinical services regional manager responsible for the region of Alabama, Mississippi and Tennessee said that nurses admitted patients without evaluating them and medical directors signed admissions of patients who did not meet the local coverage determinations issued by the Medicare administrative contractor that set forth medical criteria for determining whether individuals with certain diagnoses have a prognosis of six months or less to live.

49.     An admissions nurse for AseraCare in Wisconsin during the period from approximately April 2007 to February 2008 was told on numerous occasions to admit more patients.  If this nurse determined that a patient did not qualify for hospice under Medicare, she said that another nurse was sent to re-evaluate the patient.

13

**b. AseraCare avoided having physicians make all determinations that a patient was terminally ill and expected to die in six months or less.**

50.     AseraCare established a business model that allowed admission nurses and not always physicians to make the initial determination of a patient's eligibility for hospice.

51.     In a July 2005 newsletter for physicians, referral sources, and communities, for example, AseraCare stated that guidelines designed to assist in determining the course of a patient's illness "have limited value" and encouraged physicians to rely on AseraCare's admission nurses to determine whether a patient is eligible for hospice benefits under Medicare.

52.     In the December 28, 2007 report, AseraCare's auditor warned AseraCare that "Medical Directors [who are physicians] are not adequately involved in making initial eligibility determination[s]." The auditor cautioned AseraCare that there was "[l]ittle participation from Medical Director" in inter-disciplinary team meetings and certification and recertification decisions. AseraCare's auditor recommended that AseraCare "[i]nstruct all Medical Directors on their role in certifying and recertifying patients for hospice services."

**c. AseraCare did not adequately train its staff on the regulations and local coverage determinations concerning eligibility for Medicare hospice benefits.**

53.     Shortly after joining AseraCare in October 2007, the clinical services regional manager responsible for the region of the Alabama, Mississippi, and Tennessee discovered that staff was not familiar with the local coverage determinations ("LCD"), which are issued by Medicare administrative contractors to assist providers in determining whether patients have a prognosis of six months or less to live. She found that while some AseraCare providers had

14

evaluation forms with the LCD criteria, as adopted by AseraCare as a matter of policy, nurses were not always using them.

54.    AseraCare was warned of these troubling concerns by its own auditor but it appears that it ignored them.

55.    In its December 28, 2007 report, AseraCare's auditor informed it that "[m]any [directors of clinical services] and [patient care coordinators] do not demonstrate good understanding of initial and ongoing assessment for eligibility."  AseraCare's auditor also reported that AseraCare was providing insufficient orientation for its medical directors as they are "[u]nable to guide staff in appropriate admission/recertification."  For example, in its review of AseraCare's Nashville, Tennessee provider, the auditor observed that the clinical services regional manager reported that the medical director in Nashville "did not know what LCDs are."

56.    In its December 28, 2007 audit report, AseraCare's auditor recommended that AseraCare provide "extensive training in assessment for eligibility [for Medicare hospice benefits] for all clinical staff including Medical Directors."  For all members of the inter-disciplinary team, which identifies and coordinates the services provided to hospice patients, the auditor recommended that AseraCare "[c]reate a culture of 'eligibility'" by providing "extensive training assessment for eligibility" and "[u]se of LCDs at [the] time of admission and certification."

57.    AseraCare has provided no information or documentation to the Government to show that it responded to or took seriously the warnings and concerns expressed by its auditor.

**d. AseraCare disregarded concerns expressed by its staff and auditor that AseraCare was admitting and retaining patients who were not eligible for Medicare hospice benefits.**

58.     When the clinical services regional manager for the region of Alabama, Mississippi and Tennessee reported to the regional director that certain patients receiving hospice care were not eligible for Medicare-reimbursed hospice benefits because they did not have a prognosis of six months or less to live, the regional director told the clinical services regional manager it was not the clinical services regional manager's responsibility to discharge patients who were not eligible.

59.     The clinical services regional manager for the region of Alabama, Mississippi and Tennessee audited patient medical charts to assess patients' eligibility for Medicare hospice benefits and reported her findings to management.  She found that only approximately 20 percent of the patients from the Birmingham, Alabama provider were eligible for Medicare hospice benefits.  The clinical services regional manager reported her findings to the vice president of clinical affairs who she stated acknowledged that some of the patients were inappropriate for hospice, but that the number of hospice patients, or the census, would drop if they were discharged.

60.     On June 5, 2008, a director of operations in Atlanta, Georgia wrote to management within her region about whether patients with long lengths of stay should be discharged.  Management in the Atlanta provider replied to the director of operations that "[m]ost are not to be discharged—they are eligible NOW—*They were admitted too soon*." (emphasis added)

16

61.    In an email dated July 25, 2007, with the subject "Resignation Letter," a nurse wrote that she did "not want to be associated with an agency that admits and keeps inappropriate patients for the sake of 'census.'"

62.    The auditor's findings, communicated to AseraCare in its report dated December 28, 2007, included:   conflict between compliance and "push for higher census and more profitability"; AseraCare lacked sufficient orientation for medical directors so they are unable to guide staff in appropriate admission and recertification determinations; and there was little participation by AseraCare medical directors in eligibility determinations.

63.    AseraCare's auditor also reviewed patient medical records and reported to AseraCare that many of its patient records did not adequately document eligibility and did not support continued hospice services.   For example, the auditor reported "[i]nadequate documentation of eligibility" in four of seven records of the Memphis, Tennessee AseraCare provider; the auditor reported that five of ten records of the Monroeville, Alabama AseraCare provider "do not support continued hospice service—recommend discharge"; and the auditor reported "[i]nadequate documentation of eligibility" in three of six records of the Decatur, Georgia AseraCare provider.

64.    In spite of these warnings and red flags raised by AseraCare's auditor and staff, AseraCare continued to admit and retain patients who were not eligible for Medicare hospice benefits.  It has provided no information or documentation to show that it made changes to its business practices or took corrective actions.  It did not contact Medicare officials to request guidance or to report errors or overpayments of Medicare dollars.

**e. Examples of Medicare-eligible patients who AseraCare knew were not eligible for Medicare hospice benefits.**

65.     Patient 1 was admitted to hospice by AseraCare in January 2007, purportedly for "debility."  The diagnosis of debility can be end-stage if it is characterized by progressive weight loss and declining functional status.  At the time of Patient 1's hospice admission, AseraCare's dietician indicated that her ideal body weight was 110 lbs.  In January 2007, Patient 1 weighed between 110 and 112 lbs.  Patient 1's weight remained stable throughout her hospice stay.  For example:

    a.  April 2007:  Weight was 111 lbs and the nursing documentation noted "no new problems";

    b.  November 2007: Nursing documentation noted that patient weight is "relatively stable" for the last 180 days;

    c.  December 2008: the inter-disciplinary team update to the plan of care indicated  that the patient weighed 109 lbs; and

    d.  August 2009: the inter-disciplinary team update indicated that the patient's condition was stable.

In addition, Patient 1 did not experience any functional decline during the course of her hospice admission.  Patient 1 was still alive and on hospice in September 2009.  Patient 1 was not eligible for Medicare hospice benefits at any time during her hospice admission with AseraCare.

66.     Between January 2007 and September 2009, AseraCare submitted the following claims to Medicare for Patient 1 and received the following payments:

| From Date | Through Date | Paid Date | Charged | Paid Amount |
|-----------|--------------|-----------|---------|-------------|
| 1/5/2007 | 1/31/2007 | 2/23/2007 | 3,631.77 | 3,631.77 |
| 2/1/2007 | 2/28/2007 | 3/28/2007 | 3,766.28 | 3,766.28 |

| 3/1/2007 | 3/31/2007 | 4/18/2007 | 4,169.81 | 4,169.81 |
| 4/1/2007 | 4/30/2007 | 5/22/2007 | 4,035.30 | 4,035.30 |
| 5/1/2007 | 5/31/2007 | 6/20/2007 | 4,169.81 | 4,169.81 |
| 6/1/2007 | 6/30/2007 | 7/20/2007 | 4,035.30 | 4,035.30 |
| 7/1/2007 | 7/31/2007 | 8/22/2007 | 4,169.81 | 4,169.81 |
| 8/1/2007 | 8/31/2007 | 9/24/2007 | 4,169.81 | 4,169.81 |
| 9/1/2007 | 9/30/2007 | 10/18/2007 | 4,035.30 | 4,035.30 |
| 10/1/2007 | 10/31/2007 | 11/20/2007 | 4,307.14 | 4,307.14 |
| 11/1/2007 | 11/30/2007 | 12/26/2007 | 4,168.20 | 4,168.20 |
| 12/1/2007 | 12/31/2007 | 1/22/2008 | 4,307.14 | 4,307.14 |
| 1/1/2008 | 1/31/2008 | 2/21/2008 | 4,307.14 | 4,307.14 |
| 2/1/2008 | 2/29/2008 | 3/24/2008 | 4,029.26 | 4,029.38 |
| 3/1/2008 | 3/31/2008 | 4/23/2008 | 4,307.14 | 4,307.27 |
| 4/1/2008 | 4/30/2008 | 5/20/2008 | 4,168.20 | 4,168.33 |
| 5/1/2008 | 5/31/2008 | 6/19/2008 | 4,307.14 | 4,307.27 |
| 6/1/2008 | 6/30/2008 | 7/21/2008 | 5,318.20 | 4,168.33 |
| 7/1/2008 | 7/31/2008 | 8/20/2008 | 6,147.14 | 4,307.27 |
| 8/1/2008 | 8/31/2008 | 9/22/2008 | 6,207.14 | 4,307.27 |
| 9/1/2008 | 9/30/2008 | 10/23/2008 | 6,198.20 | 4,168.32 |
| 10/1/2008 | 10/31/2008 | 11/26/2008 | 6,603.31 | 4,433.27 |
| 11/1/2008 | 11/30/2008 | 12/29/2008 | 6,190.30 | 4,290.26 |
| 12/1/2008 | 12/31/2008 | 1/26/2009 | 6,543.31 | 4,433.27 |
| 1/1/2009 | 1/31/2009 | 2/23/2009 | 6,333.31 | 4,433.27 |
| 2/1/2009 | 2/28/2009 | 3/23/2009 | 6,104.28 | 4,004.24 |
| 3/1/2009 | 3/31/2009 | 4/20/2009 | 6,873.31 | 4,481.89 |

67.     Patient 2 was admitted to hospice by AseraCare on May 7, 2007 purportedly for end-stage heart disease.  Although Patient 2 had heart disease, he did not meet the criteria for end-stage heart disease at any time during his hospice admission.  End-stage heart disease patients are typically unable to walk due to extreme shortness of breath.  Patient 2's medical records documented that he was stable and able to walk on a regular basis including but not limited to notes that indicated that he was "wandering" in the nursing home.  For example:

a.  June 2007:  the nursing notes indicated that the patient left the nursing home and went to his granddaughter's graduation with no noted problems;

b.  August 2007:  the inter-disciplinary team considered the patient's continued

19

eligibility for hospice but no discharge planning was undertaken;

    c.    August 2007:  the inter-disciplinary team notes indicated that the patient went out with a family friend and picked berries;

    d.    December 2007:  the notes from a social worker indicated that the patient left the facility for Christmas, "had a good time," and ate a lot; and

    e.    June 2008:  the inter-disciplinary team notes indicated that the patient had no chest pain, was not using oxygen, and was still able to walk to the dining room.

Patient 2 was discharged from hospice in July 2008, after more than a year on hospice, as a result of his need to be treated for other medical conditions.  Patient 2 was not eligible for Medicare hospice benefits at any time during his hospice admission with AseraCare.

    68.    Between May 2007 and July 2008, AseraCare submitted the following claims to Medicare for Patient 2 and received the following payments:

| From Date | Through Date | Paid Date | Charged | Paid Amount |
|---|---|---|---|---|
| 5/15/2007 | 5/31/2007 | 6/20/2007 | 2,487.44 | 2,487.44 |
| 6/1/2007 | 6/30/2007 | 7/23/2007 | 4,389.60 | 4,389.60 |
| 7/1/2007 | 7/31/2007 | 8/20/2007 | 4,535.92 | 4,535.92 |
| 8/1/2007 | 8/31/2007 | 9/24/2007 | 4,535.92 | 4,535.92 |
| 9/1/2007 | 9/30/2007 | 10/18/2007 | 4,389.60 | 4,389.60 |
| 10/1/2007 | 10/31/2007 | 11/21/2007 | 4,601.95 | 4,601.95 |
| 11/1/2007 | 11/30/2007 | 12/21/2007 | 4,453.50 | 4,453.50 |
| 12/1/2007 | 12/31/2007 | 1/22/2008 | 4,601.95 | 4,601.95 |
| 1/1/2008 | 1/31/2008 | 2/21/2008 | 4,601.95 | 4,601.95 |
| 2/1/2008 | 2/29/2008 | 3/26/2008 | 4,305.05 | 4,305.05 |
| 3/1/2008 | 3/31/2008 | 4/21/2008 | 4,601.95 | 4,601.95 |
| 4/1/2008 | 4/30/2008 | 5/20/2008 | 4,453.50 | 4,453.50 |
| 5/1/2008 | 5/31/2008 | 6/23/2008 | 4,601.95 | 4,601.95 |
| 6/1/2008 | 6/30/2008 | 7/31/2008 | 6,013.50 | 4,453.50 |
| 7/1/2008 | 7/1/2008 | 9/2/2008 | 218.45 | 148.45 |

69. Patient 3 was admitted to hospice in January 2007 purportedly for end-stage debility. The diagnosis of debility can be end-stage if it is characterized by progressive weight loss and declining functional status. At the time of admission, Patient 3 did not meet either the weight loss or functional impairment criteria for being admitted to hospice with a debility diagnosis. Patient 3 weighed 159 lbs at the time of admission and had a usual weight before admission of 150 to 190 lbs. Throughout her hospice admission, Patient 3 weighed between 154 and 220 lbs. The patient's chart reflected her on-going stable condition. For example:

    a. April 2007: the nursing documentation indicated that the patient had improved;

    b. May 2007: the inter-disciplinary team notes indicated that the patient should be considered for discharge in June if there was no change in her condition;

    c. June 2007: the nursing documentation indicated that the patient was going to many activities but discharge planning was not undertaken;

    d. January 2008: the nursing documentation indicated that her nutrition and hydration were "usually 100%" and that she went for a walk to see the birds;

    e. September 2008: the home health aide documented that the patient was taken to Wendy's for lunch.

She was discharged from hospice in April 2009 because she did not meet hospice eligibility criteria. Patient 3 was not eligible for Medicare hospice benefits at any time during her hospice admission with AseraCare.

70. Between January 2007 and April 2009, AseraCare submitted the following claims to Medicare for Patient 3 and received the following payments:

| From Date | Through Date | Paid Date | Charged | Paid Amount |
| --- | --- | --- | --- | --- |

21

| | | | | |
|---|---|---|---|---|
| 1/15/2007 | 1/31/2007 | 2/20/2007 | 2,132.65 | 2,132.65 |
| 2/1/2007 | 2/28/2007 | 3/20/2007 | 3,512.60 | 3,512.60 |
| 3/1/2007 | 3/31/2007 | 4/30/2007 | 3,888.95 | 3,888.95 |
| 4/1/2007 | 4/30/2007 | 5/18/2007 | 3,763.50 | 3,763.50 |
| 5/1/2007 | 5/31/2007 | 6/27/2007 | 3,888.95 | 3,888.95 |
| 6/1/2007 | 6/30/2007 | 7/23/2007 | 3,763.50 | 3,763.50 |
| 7/1/2007 | 7/31/2007 | 8/21/2007 | 3,888.95 | 3,888.95 |
| 8/1/2007 | 8/31/2007 | 9/21/2007 | 3,888.95 | 3,888.95 |
| 9/1/2007 | 9/30/2007 | 10/24/2007 | 3,763.50 | 3,763.50 |
| 10/1/2007 | 10/31/2007 | 11/20/2007 | 3,973.27 | 3,973.27 |
| 11/1/2007 | 11/30/2007 | 12/20/2007 | 3,845.10 | 3,845.10 |
| 12/1/2007 | 12/31/2007 | 1/22/2008 | 3,973.27 | 3,973.27 |
| 1/1/2008 | 1/31/2008 | 2/21/2008 | 3,973.27 | 3,973.27 |
| 2/1/2008 | 2/29/2008 | 3/25/2008 | 3,716.93 | 3,716.81 |
| 3/1/2008 | 3/31/2008 | 4/25/2008 | 6,470.77 | 3,973.14 |
| 4/1/2008 | 4/30/2008 | 5/20/2008 | 3,845.10 | 3,844.98 |
| 5/1/2008 | 5/31/2008 | 6/19/2008 | 3,973.27 | 3,973.14 |
| 6/1/2008 | 6/8/2008 | 7/21/2008 | 1,565.36 | 1,025.33 |
| 6/16/2008 | 6/30/2008 | 8/28/2008 | 3,532.55 | 1,922.49 |
| 7/1/2008 | 7/31/2008 | 9/3/2008 | 6,733.27 | 3,973.14 |
| 8/1/2008 | 8/31/2008 | 9/22/2008 | 6,263.27 | 3,973.14 |
| 9/1/2008 | 9/30/2008 | 10/21/2008 | 6,335.10 | 3,844.98 |
| 10/1/2008 | 10/31/2008 | 11/24/2008 | 6,785.66 | 4,025.75 |
| 11/1/2008 | 11/30/2008 | 12/18/2008 | 6,185.80 | 3,895.88 |
| 12/1/2008 | 12/31/2008 | 1/21/2009 | 6,585.66 | 4,025.75 |
| 1/1/2009 | 1/31/2009 | 2/19/2009 | 6,645.66 | 4,025.75 |

71.     Patient 4 was admitted to hospice by AseraCare in January 2008, purportedly for end-stage dementia.   End-stage dementia is also characterized by declining function and nutritional impairment and associated weight loss.  Patient 4's weight had been as low as 85 lbs in 2007.  However, when she was admitted to hospice her weight had improved to 105 lbs. Patient 4's weight improved steadily while on hospice and her functioning remained stable throughout her hospice admission.  For example:

> a.   July 2008:  the inter-disciplinary team noted that Patient 4's weight was 119 lbs and her functional score remained the same;

b.  February 2009:  the nursing documentation reflects that Patient 4 weighed 127

lbs and that her functional score remained the same; and

c.  In April 2009, Patient 4 weighed 126 lbs and her functional score remained

the same.

She was discharged from hospice by AseraCare in May 2009 because she did not meet hospice

eligibility criteria.  Patient 4 was not eligible for Medicare hospice benefits at any time during

her hospice admission with AseraCare.

72.     Between January 2008 and May 2009, AseraCare submitted the following claims

to Medicare for Patient 4 and received the following payments:

| From Date | Through Date | Paid Date | Charged | Paid Amount |
|-----------|--------------|-----------|---------|-------------|
| 1/8/2008 | 1/31/2008 | 2/21/2008 | 3,102.24 | 3,102.24 |
| 2/1/2008 | 2/29/2008 | 3/24/2008 | 3,748.54 | 3,748.58 |
| 3/1/2008 | 3/31/2008 | 4/18/2008 | 4,007.06 | 4,007.10 |
| 4/1/2008 | 4/30/2008 | 5/19/2008 | 3,877.80 | 3,877.85 |
| 5/1/2008 | 5/31/2008 | 6/20/2008 | 4,007.06 | 4,007.11 |
| 6/1/2008 | 6/30/2008 | 7/17/2008 | 4,697.80 | 3,877.84 |
| 7/1/2008 | 7/31/2008 | 8/19/2008 | 5,587.06 | 4,007.11 |
| 8/1/2008 | 8/31/2008 | 9/19/2008 | 5,577.06 | 4,007.10 |
| 9/1/2008 | 9/30/2008 | 10/20/2008 | 5,237.80 | 3,877.85 |
| 10/1/2008 | 10/31/2008 | 11/24/2008 | 6,211.61 | 4,101.75 |
| 11/1/2008 | 11/30/2008 | 12/22/2008 | 6,139.30 | 3,969.42 |
| 12/1/2008 | 12/31/2008 | 1/22/2009 | 6,211.61 | 4,101.75 |
| 1/1/2009 | 1/31/2009 | 2/18/2009 | 5,741.61 | 4,101.74 |
| 2/1/2009 | 2/28/2009 | 3/19/2009 | 5,474.68 | 3,704.80 |
| 3/1/2009 | 3/31/2009 | 4/17/2009 | 5,871.61 | 4,145.01 |

73.     Patient 5 was initially admitted to hospice by AseraCare in December 2005 with a

diagnosis of prostate cancer but was discharged from hospice in September 2007 because he did

not meet the hospice eligibility criteria for cancer.   Patient 5 was re-admitted to hospice by

AseraCare just two months later, in November 2007, with a new diagnosis of "failure to thrive"

or debility.   Again, the diagnosis of debility can be end-stage if it is characterized by progressive

weight loss and declining functional status.  Patient 5 did not meet these criteria during his

second admission to hospice.  For example:

  a. June 2007 (during Patient 5's first hospice admission):  the inter-disciplinary
     team note indicated that his weight is stable.  A note from Patient 5's
     physician in October 2007 did not mention weight loss or a failure to thrive.
     Patient 5 was re-admitted to hospice in November 2007.

  b. Although Patient 5 lost weight between November 2007 and June 2008, his
     functional status remained stable based on an evaluation tool commonly used
     by the hospice industry.

  c. Between June 2008 and March 2009, Patient 5 did not lose any weight and
     there was no documented function decline.

AseraCare discharged Patient 5 from hospice in March 2009 because he had an "extended

prognosis" and did not meet the hospice eligibility criteria.  Patient 5 was not eligible for

Medicare hospice benefits at any time during his hospice admission with AseraCare.

  74.   Between November 2007 and March 2009, AseraCare submitted the following

claims to Medicare for Patient 5 and received the following payments:

| From Date | Through Date | Paid Date | Charged | Paid Amount |
|-----------|--------------|-----------|---------|-------------|
| 11/15/2007 | 11/30/2007 | 12/20/2007 | 1,879.04 | 1,879.11 |
| 12/1/2007 | 12/31/2007 | 1/24/2008 | 3,640.64 | 3,640.78 |
| 1/1/2008 | 1/31/2008 | 2/27/2008 | 3,640.64 | 3,640.78 |
| 2/1/2008 | 2/29/2008 | 4/23/2008 | 3,405.76 | 3,405.89 |
| 3/1/2008 | 3/31/2008 | 4/23/2008 | 3,640.64 | 3,640.77 |
| 4/1/2008 | 4/30/2008 | 5/16/2008 | 3,523.20 | 3,523.33 |
| 5/1/2008 | 5/31/2008 | 6/19/2008 | 3,640.64 | 3,640.77 |
| 6/1/2008 | 6/30/2008 | 7/17/2008 | 5,093.20 | 3,523.33 |
| 7/1/2008 | 7/31/2008 | 8/21/2008 | 3,780.64 | 3,640.77 |
| 8/1/2008 | 8/31/2008 | 9/24/2008 | 3,640.64 | 3,640.77 |
| 9/1/2008 | 9/30/2008 | 10/21/2008 | 5,283.20 | 3,523.33 |
| 10/1/2008 | 10/31/2008 | 11/24/2008 | 6,852.94 | 3,742.81 |

| 11/1/2008 | 11/30/2008 | 12/29/2008 | 6,122.20 | 3,622.08 |
|-----------|------------|------------|----------|----------|
| 12/1/2008 | 12/31/2008 | 1/27/2009 | 6,232.94 | 3,742.81 |
| 1/1/2009 | 1/31/2009 | 2/20/2009 | 6,302.94 | 3,742.81 |
| 2/1/2009 | 2/28/2009 | 3/19/2009 | 5,200.72 | 3,380.60 |
| 3/1/2009 | 3/20/2009 | 4/17/2009 | 3,564.80 | 2,420.88 |

75.    A list of additional patients admitted to hospice by AseraCare and who were not eligible for the hospice benefit for all or part of their hospice admission is being provided under separate cover to the Defendant.

76.    With respect to the claims where AseraCare received reimbursement but the beneficiaries were not eligible for hospice services, Medicare would not have paid these claims if they had known that the beneficiaries' actual conditions did not meet Medicare's requirements for reimbursement.

77.    Officials of the Centers for Medicare & Medicaid Services charged with responsibility to act did not know and could not reasonably have known the true medical condition of the beneficiaries for whom false or fraudulent claims for payment as described in this Complaint were submitted by AseraCare to Medicare.

**FIRST CAUSE OF ACTION**
**(False Claims Act-31 U.S.C. § 3729(a)(1)(A) (West 2010),**
**formerly 31 U.S.C. § 3729(a)(1)(2006))**

78.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 77.

79.    By virtue of the acts described above, defendant AseraCare knowingly presented or caused to be presented to the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(2006), amended by 31 U.S.C. § 3729(a)(1)(A) (West 2010); that is, defendant AseraCare knowingly made or presented,

or caused to be made or presented, to the United States claims for payment for hospice services for patients across the United States who were not eligible for Medicare hospice benefits during all or part of the time.

80.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**SECOND CAUSE OF ACTION**
**(False Claims Act-31 U.S.C. § 3729(a)(1)(B) (West 2010),**
**formerly 31 U.S.C. § 3729(a)(2) (2006))**

81.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 77.

82.     By virtue of the acts described above, defendant AseraCare knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2) (2006), amended by 31 U.S.C. § 3729(a)(1)(B) (West 2010); that is, defendant AseraCare knowingly made or used or caused to be made or used false Medicare claim forms and supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States, in

that the hospice services claimed were for patients across the United States who were not eligible for Medicare hospice benefits during all or part of the time.

83.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**THIRD CAUSE OF ACTION**
**(Payment Under Mistake of Fact)**

84.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 77.

85.     This is a claim for the recovery of monies paid to defendant AseraCare under mistake of fact.

86.     The above-described false claims and false statements which defendant AseraCare submitted to the United States through the Medicare Program or used as a basis for Medicare reimbursement constituted misrepresentations of material fact in that they misrepresented the eligibility of the patient beneficiaries, as well as other facts necessary to establish entitlement to reimbursement for hospice benefits under the Medicare Program.

87.     As a consequence of the conduct and the acts set forth above, defendant AseraCare was paid by mistake by the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

27

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

88.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 77.

89.     This is a claim for recovery of monies by which defendant AseraCare has been unjustly enriched.

90.     By virtue of the conduct and the acts described above, defendant AseraCare was unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully prays for judgment in its favor as follows:

a.     As to First and Second Causes of Action (False Claims Act), against AseraCare for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

b.     As to the Third Cause of Action (Payment Under Mistake of Fact), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to AseraCare and illegally retained by AseraCare, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

c.     As to the Fourth Cause of Action (Unjust Enrichment), for:  (i) an amount equal to the money paid by the United States through the Medicare Program to

28

AseraCare, or the amount by which AseraCare was unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at trial.

d.      for all other and further relief as the Court may deem just and proper


Respectfully submitted this the 2nd day of November, 2012.

STUART F. DELERY
ACTING ASSISTANT ATTORNEY GENERAL

JOYCE WHITE VANCE
UNITED STATES ATTORNEY

/s/ Holly H. Snow
LANE HINES WOODKE
JASON EHRLINSPIEL
Assistant United States Attorney
1801 4th Avenue North
Birmingham, AL 35203
Telephone: (205) 244-2107

MICHAEL D. GRANSTON
RENÉE BROOKER
HOLLY H. SNOW
CAROLYN B. TAPIE
WILLIAM E. OLSON
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-2879

Counsel for the United States

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 2, 2012, I electronically filed the foregoing United States' Consolidated Complaint in Intervention with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record in the consolidated actions, and further certify that the document will be mailed by United States Postal Service to the following:

Stephen Cusick
Senior Assistant Attorney General
Building One, Suite 200
2100 East Exchange Place
Tucker, GA 30084

                      /s/ Holly H. Snow
                      Holly H. Snow
                      Trial Attorney
                      U.S. Department of Justice
                      P.O. Box 261, Ben Franklin Station
                      Washington, D.C. 20044
                      Telephone: (202) 616-2879
                      Counsel for the United States