1

FILED
2014 Apr-25  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,   CV-12-KOB-245-S
et al.,

                    Plaintiff,      February 13, 2014

     V.                          Birmingham, Alabama

ASERACARE INC., et al.,

                    Defendant.

* * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S OFFICIAL TRANSCRIPT OF
HEARING

BEFORE THE HONORABLE KARON O. BOWDRE
UNITED STATES DISTRICT JUDGE

COURT REPORTER:
Teresa Roberson, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
1                    * * * * *

2              A P P E A R A N C E S

3                    * * * * *

4    FOR THE PLAINTIFF:

5    Holly Howell Snow
     U.S. Department of Justice
6    P.O. Box 261
     Ben Franklin Station
7    Washington, DC  20044

8    Lane H. Woodke
     U.S. Attorney's Office
9    1801 4th Avenue North
     Birmingham, AL  35203
10

11   James Barger, Jr.
     Henry Frohsin
12   Elliott Walthall
     Frohsin & Barger
13   3430 Independence Drive, Suite 40
     Birmingham, AL  35209
14

15   Nola Cross
     Cross Law Firm
16   845 N. 11th Street
     Milwaukee, WI  35233
17

18   FOR THE DEFENDANT:

19   James S. Christie
     Kim Martin
20   Bradley, Arant, Boult & Cummings
     1819 Fifth Avenue North
21   Birmingham, AL  35203

22

23

24

25
```

```
1                        * * * * *
2                 P R O C E E D I N G S
3                        * * * * *
4            THE COURT:  All right.  We have got a
5    bunch of things to talk about today.  Before we
6    get to the big discovery motion, I want to take
7    up the one that was just recently filed by the
8    defendant as far as motion for leave to
9    supplement the expert report.  I like to take up
10   the easier ones first.
11           Chris, I'm not sure that you really need
12   leave to do this.  I think it is in compliance
13   with Rule 26(a) and (e) to supplement
14   Dr. Palmer's report.
15           So to the extent you need leave, I'll
16   give it, but I'm not sure that you need it.
17           MR. CHRISTIE:  All right.  My read of
18   the rule was if he is changing his report or
19   adding to the report that you need leave to
20   supplement his report.
21           But that if you're just disclosing that
22   he has looked at additional information or
23   something, that is something to serve on the
24   other party.  I was just being careful.
25           THE COURT:  The way I read it it's
```

1  answering questions or filling in additional information

2  based upon the testimony of Dr. Liao, right?

3          MR. CHRISTIE:  It is making changes based on

4  Dr. Liao's testimony.

5          THE COURT:  Changes as opposed to just --

6          MR. CHRISTIE:  It's three or four pages and

7  it's going to be explaining his answers to questions

8  that he had raised but couldn't answer but now can

9  because Dr. Liao has testified.

10          THE COURT:  Well, I don't know.  Whichever way

11  it goes, I will grant it and do it, get it done.

12          All right.  Y'all have had a very busy

13  February.  And the question I have is how much of an

14  impact on your schedule, if any, has the weather had?

15          MS. SNOW:  It has impacted a deposition that we

16  intended to take yesterday that was cancelled due to the

17  witness' inability to travel.

18          THE COURT:  Just one?

19          MR. CHRISTIE:  We had others that were

20  rescheduled but actually we have already taken the

21  others that were rescheduled.  We have been working

22  hard.

23          THE COURT:  Any anticipated problems in getting

24  that one rescheduled in the next couple of weeks?

25          MS. SNOW:  There is -- yes, there is an issue

1   with that, Your Honor.

2          We are prepared to take that individual's

3   deposition on Monday.  The witness lives in Montana.

4   The deposition had been scheduled to occur in

5   Birmingham.

6          We are willing to go to Montana to take that

7   individual's deposition Monday, if she is available and

8   if the attorney is available.

9          AseraCare has informed us that the attorney

10  they would have representing AseraCare at that

11  deposition is not available on Monday.

12         So AseraCare had indicated that it may request

13  or a request may need to be made to have this deposition

14  after the close of discovery.  We are prepared to take

15  it on Monday.

16         THE COURT:  Whose depo is it?

17         MS. SNOW:  It's a deposition that the United

18  States is taking of a former employee of AseraCare.

19         THE COURT:  Who is the person to be deposed?

20         MS. SNOW:  Her name is Marie Enfante.

21         MR. CHRISTIE:  She was the former inhouse

22  counsel when I started this litigation who was my

23  primary contact at the client.

24         It's going to be a very difficult deposition in

25  terms of privilege issues.  And Marie Enfante was a

1  client representative when there were meetings in

2  Washington with the Department of Justice, she was also

3  the client representative when we had mediation in front

4  of Judge Ott here in the Northern District of Alabama,

5  and all the way up through the time the case was

6  transferred in front of this court.

7       So Jack Selden really is the only lawyer we

8  have whose history with the case extends back to

9  negotiation with the Department of Justice.

10       If the government's willing not to depose one

11  of the experts or push his deposition until after the

12  discovery deadline, we could do that as an alternative.

13       But Jack is planning on being in Birmingham for

14  Beau Martin's, one of our expert's, deposition, which he

15  is responsible for.  I can't take the responsibility for

16  that because in the same week we are also having another

17  expert whose deposition I am responsible for.

18       And we do have twelve depositions, not counting

19  Ms. Enfante's, scheduled between now and the end of the

20  month.

21       So we just do not have the manpower to both

22  cover the expert depositions we have scheduled and to

23  take Ms. Enfante's deposition on Monday.

24       I will say that Monday is President's Day.

25  Montana is a ski resort destination.  And when we

1    looked, there were no flights.  We could get on

2    standby.  So we could schedule this deposition and not

3    be able to arrive because of the scheduling issue.

4         We have that additional wrinkle in terms of

5    scheduling a deposition at this point in time in Montana

6    for President's Day.

7         THE COURT:  So can we agree to an alternative

8    time for that deposition?

9         MS. SNOW:  Your Honor, we are very cognitive of

10   the Court's desire that we complete discovery by the end

11   of February.

12        THE COURT:  But the Court has no control over

13   the weather and none of the parties do either.  And

14   that's why that was my first question was whether the

15   weather had caused any problems.  To give leave to take

16   one deposition after the expiration of discovery, when

17   y'all obviously are working very hard to get those

18   depositions done, I don't see as a real problem.

19        The problem I have in extending deadlines is

20   when lawyers have not been doing everything within their

21   power to get depositions done.  That's when I'm an oger,

22   not when you have done everything you can and it's

23   outside your control that it's an issue.

24        I know you have got Dr. Cooney's deposition

25   some time in March before the 31st, the deadline for

1    that one.

2            So why couldn't we work this one in some time

3    then as well?

4            MR. CHRISTIE:  AseraCare is agreeable to do

5    that some time in March.

6            MS. SNOW:  That is fine with us.  The only

7    wrinkle is the attorney taking the deposition is

8    pregnant and unable to travel after the end of February

9    and the witness will need to be deposed in D.C.

10            MR. CHRISTIE:  Again, if the witness is willing

11    to do it, we don't have an objection to that.  That's

12    between AseraCare and her counsel and the witness.

13            So yes, we're fine, as a matter of fact, D.C.

14    would be easier than Montana.

15            THE COURT:  For everybody except Ms. Enfante.

16            MR. CHRISTIE:  Yes.

17            THE COURT:  Okay.  And I'm not even going to do

18    an order to that effect.  We have got it on the record

19    here.  We're all in agreement that it will be done as

20    soon as possible in March then.

21            MR. CHRISTIE:  If you wanted to take up all

22    issues other than the motion, there is one other minor

23    issue I thought of that would be helpful to discuss with

24    the court.

25            For filing dispositive motions and for their

1  motions, there is going to be a lot of protected health

2  information, PHI.

3       And at times I have handled that by filing

4  documents under seal when there is a lot of mention of

5  patient's names.  And other times you can have people

6  spend hours going through and redacting names.

7       I really have one I would like to discuss what

8  the Court's preference would be.

9       And then second, I know with the motion that I

10  just filed, on the request for admissions, there were

11  some patient names, and the way I handled that was

12  redacting names, other than the first letter and the

13  second letter, so you couldn't identify who it was, and

14  making sure that if we were going to redact the name

15  that the court thinks that's sufficient.

16       THE COURT:  Well, just using initials?

17       MR. CHRISTIE:  No.  Actually, because we have

18  too many people that would have the same two initials.

19  It's like if your name was Chris, it would be CH and the

20  last, like if it was Johns, would be JO is what I did.

21       You couldn't identify who the person was, but

22  it would be clear to the parties which one of the people

23  with C and J you're talking about.

24       THE COURT:  Generally, when a document can be

25  filed openly with redactions, that's my preference,

1  because this is an open court.  But we also have the

2  competing obligation, as y'all are aware, in maintaining

3  privacy of individuals and particularly with health

4  information.

5          Chris, I'm just not sure I can cross that

6  bridge now because I don't know how often y'all will be

7  designating individual's specific medical records.  I'm

8  anticipating it may be quite extensive.

9          MR. CHRISTIE:  In the briefs, it's not going to

10 be hard to do.

11         For example, if you took Dr. Liao's deposition,

12 there's patient names mentioned so many times on every

13 page.  So it depends on whether you are talking about

14 the exhibits or the briefs -- for the briefs, it's

15 easy.  We can do it relatively easy.

16         For summary exhibits -- and the court's

17 preference is to file the entire deposition --

18         THE COURT:  No.

19         MR. CHRISTIE:  Just excerpts?

20         THE COURT:  Excerpts are fine, especially on

21 lengthy ones, as long as the other side files theirs as

22 well.

23         But if it's going to be a situation where you

24 use fifty percent of the deposition and the government

25 uses forty-nine percent of it, you might as well file

1   the whole thing.

2          That is the kind of thing I would anticipate

3   that y'all would talk out before you get to that point

4   so that if you're only going to be using a total of ten

5   pages of a hundred page depo, it's fine with me not to

6   file the whole dadgum thing.

7          I prefer full depositions when I don't have

8   good lawyers on both sides, frankly.  I mean, there have

9   been times when in reading like a plaintiff's

10  deposition, we find genuine issues that the plaintiff's

11  own lawyer may not have pointed out.

12         But I don't see that as being a problem in this

13  case where we have got good lawyers on both sides who

14  will make sure that the appropriate pages are called to

15  my attention.  Does that make sense?

16         MR. CHRISTIE:  It does.

17         THE COURT:  So you're correct that that is my

18  stated preference, but it covers when there is not good

19  lawyers on both sides.

20         Now, it may be that we'll just have to have

21  exhibits filed under seal if they're replete with that

22  private health information.  I mean, we have Social

23  Security records, for example, filed under seal for that

24  very reason.  But we'll take a look at it when we get a

25  little closer.

1          I don't want to burden folks with that task of

2   going through and redacting much of a page.  If we can

3   just redact a little bit, I think that makes more sense

4   than the other.

5          Anything else?  That is May 1st, right?

6          MR. CHRISTIE:  This was our last status

7   conference scheduled --

8          THE COURT:  We may well have another one.  I

9   just like meeting with y'all.  You're so much fun and we

10  can get -- I think we can get some things done by

11  meeting face-to-face.  So we'll see.

12         I think I agree with the government on the

13  supplementation of Dr. Liao's report and y'all have done

14  that and that's -- even if you did need leave, I'm

15  granting it.

16         Another thing I wanted to talk about on the

17  status report and just find out if y'all have had any

18  discussions with it.

19         I know you still have twelve more depositions

20  to get done in the next couple of weeks.  But the last

21  item about mediation and that y'all will consider

22  further mediation an option after discovery is

23  completed.  You're getting close to that point.

24         Have y'all had any other discussions about

25  whether mediation would be worthwhile or are you just

1  barreling down to the end of the race and trying to get

2  all the depositions done?

3          MS. SNOW:  That is what we're doing.

4          MR. CHRISTIE:  We have been focusing on

5  completing discovery.

6          THE COURT:  I would encourage y'all while

7  you're together, at the end of the day, after deposition

8  or whatever, maybe go have a drink together and calm

9  down and talk about what the options are.  Because I do

10 think that we need to decide, first of all, whether

11 y'all think mediation would be beneficial.  And if so,

12 when it would be most beneficial.  In many cases before

13 the expense of motions is incurred is a good time.  In

14 other cases I think while the motion is pending and

15 y'all know or the parties know what each side is going

16 to be arguing and you kind of can see each other's case

17 in black and white, sometimes that gives more impetus to

18 getting a case settled.

19         I don't know the dynamics of this case.  Y'all

20 do.  But if you decide that mediation would be helpful,

21 I will be glad to work with you in terms of figuring out

22 when, how, with whom, whatever.  If you think going back

23 to Judge Ott would be beneficial or if you think getting

24 someone else would be better, those are the kinds of

25 questions that only y'all can really answer.

1   So I encourage you to at least spend a little

2   time looking at that.  So do that and keep me posted on

3   that.  And as I said, we may end up getting together

4   again to hash out some things.

5   A lot of those things y'all could probably hash

6   out just among yourselves, but if I'm here cracking the

7   whip, then I know for sure you're talking about some of

8   them.

9   Like, I don't know how this shakes out in this

10  particular case, but if there are aspects of the claims

11  that could be narrowed or there could be more focus

12  given on what issues we're really going to need to hash

13  out in motions, you know, talking through -- and like

14  the idea of, okay, what exhibits are we going to need,

15  would it be beneficial in this case to have some joint

16  exhibits.

17  For example, if it's going to be the deposition

18  of one of the experts or, I don't know what else, I am

19  kind of reaching at straws because I don't know what

20  there might be out there, but some discussions to try to

21  streamline how we present the case.

22  I guess I have postponed long enough jumping

23  into the briar patch here with the motion.

24  As I read the motion for protective order, it's

25  addressed to three different category of requests made

by the government.  And we'll take up first the request

for production.

As I understand it, the original request could

encompass a hundred or more personnel files, but the

government has proposed a compromise in its response

which would limit that request for production to 42 --

no, 45 specific personnel files, right?  It's forty

something, 43.  I will get the right number in a

minute.

And also it's amenable to have that production

done after February 28th, at least that was what --

MS. SNOW:  That's correct, Your Honor.

THE COURT:  Chris, what's y'all's take on that

proposal to compromise?

MR. CHRISTIE:  In the past year and a half in

this court, we produced about 20 personnel files.  So we

have an idea of how long it takes to get them.  It is

difficult to find them.  Personnel files are not

normally producible.

And if the government had identified --

THE COURT:  Well, it depends upon the kind of

case.

MR. CHRISTIE:  Yes.  If the government had

identified anything other than a fishing expedition, we

would have a different reaction.  There has not been any

1  particular reason.  As a matter of fact, the one thing

2  they did do, for example, is they used one of the

3  depositions where AseraCare used the personnel file when

4  it was deposing one of its former employees.  And in

5  that deposition, the former employee was somebody who

6  had been terminated for cause and had things in her

7  personnel file showing that there was some conflict as

8  she left.  And she now works as a consultant holding

9  herself out as an expert in this area.

10      And so going into her background and why she

11  was terminated was relevant to that deposition.  And so

12  if the government has identified particular people that

13  they have those kinds of reasons to have their personnel

14  file, then we would be glad to talk to them about it.

15      But they're just saying we want 43 people's

16  personnel files without having identified any specific

17  reason for any particular individual.

18      So that's part of what the concern is here.

19  You know, we originally, rather than having an issue to

20  be litigated in front of the court, we compromised and

21  agreed to provide them with personnel files for specific

22  individuals and --

23      THE COURT:  Those are the ones that were being

24  deposed, right?

25      MR. CHRISTIE:  Yes.  And I understand that the

1  government doesn't think that we had an informal

2  agreement.  But I will point out that the parties have

3  operated as if that was the informal agreement the

4  entire time the case has been in front of this court.

5        So, in addition to not having specific reasons

6  for taking these people's depositions, for being more

7  than twice as many as we have actually produced over the

8  life of the case, I feel like we're getting punished for

9  having compromised with the government on the initial

10  point in providing the personnel files for people that

11  are going to be deposed because they have gotten the

12  whole group of them and now they're trying to get

13  another group after we compromised, saying, okay, rather

14  than argue about these issues, we will give you the

15  people that you are going to depose.

16        THE COURT:  Why do you need the personnel files

17  of these additional 43 people just because they have

18  been identified as individuals who may have information?

19        MS. SNOW:  Your Honor, they are individuals who

20  were identified by either party as potential witnesses

21  in this case.

22        But in addition, Your Honor, we narrowed that

23  list of people further to this list of 43.  For many of

24  these people, we have reason to believe that their

25  personnel file contains information relevant to the

1   claims that the United States is bringing in this case.

2          Because, for example, we have information that

3   they expressed concerns or complained about issues

4   relevant to the case and in some cases were thereafter

5   terminated or resigned.  Or they were put on corrective

6   action plans or had negative employment repercussions

7   because they did not meet the company's expectations for

8   admitting a certain number of patients.

9          So we selected these individuals because we

10  believe that their personnel files, in many cases, would

11  contain information relevant to the government's

12  claims.  And our complaint in this case specifically

13  alleges one of the practices of AseraCare that is

14  evidence that AseraCare knew or should have known that

15  it was submitting false claims and the pressure that

16  AseraCare placed on its employees to meet the

17  expectations.

18         And we specifically alleged that included

19  putting on corrective action plans or terminating

20  employees because they didn't meet their expectations.

21         We also allege in the complaint that the

22  company disregarded concerns expressed by employees.

23         So the fact that individuals expressed concerns

24  and what action, if any, was taken to address those

25  concerns may be illustrated in the personnel files.

1          And I have a particular example, Your Honor,

2     for one of these individuals who is on this list.

3     AseraCare produced to us an email with the subject line

4     resignation letter by this individual indicating that

5     she had been suspended without explanation and that she,

6     in any event, no longer wanted to be associated with the

7     company that allows unprofessional and unethical

8     behavior to continue and admits inappropriate patients

9     for the sake of census.

10          We asked one of the individuals who received

11     this email in her deposition about this -- these

12     circumstances surrounding this resignation letter and

13     the person's employment and she said that we don't have

14     all the story, if you have her personnel file, we could

15     probably look at what's going on here.

16          And then in response to additional questions,

17     she said, I think that the personnel file for this

18     person would be a good place for us to start to look

19     into that.  Maybe it would refresh me.  I don't remember

20     at this point what's going on there.

21          THE COURT:  Who is this individual?

22          MS. SNOW:  This is Vickie Stutts, Your Honor.

23          MR. CHRISTIE:  If they can come up with

24     something specific like that for each one of the

25     43, I will discuss each one of the 43 with my client,

1  and I suspect that we'll produce them.

2         But that's -- first of all, let me say that the

3  relevance that the government's arguing there is I think

4  inconsistent with the statute and the law here.  All

5  right.

6         But we're not trying to preclude the government

7  from making the arguments that it thinks are relevant

8  before summary judgment.

9         The statute here says that the person is

10  eligible if the physician certifies them as eligible.

11  Their expert made clear that it is the physician and

12  only the physician's opinion that matters.

13         As we were going into his deposition, I was

14  asking him questions about, look, you'll see things in

15  the medical records where other people who work for the

16  company may think somebody is ineligible and then there

17  will be a debate and then the physician will make a

18  decision.

19         And their expert took the position there's no

20  sides.  The physician and only the physician makes the

21  decision.  He even admitted that it's not the nurse,

22  it's not the president, it's only the physician who

23  makes the decision about whether or not somebody is

24  eligible.

25         THE COURT:  Well, let's get back to this

1   particular physician.

2          Do you have that kind of information for all 43

3   people whose personnel files you're searching for?

4          MS. SNOW:  I believe that we have information

5   that many, if not most of them, we understand left the

6   company under circumstances after raising concerns or

7   because they did not meet the expectations.

8          I don't know that all of them are in those

9   circumstances.  But all of these individuals were people

10  we identified that we believe that their personnel file

11  would be relevant.  And they're all individuals who

12  either side has identified as a witness in this case.

13         And this is a significant narrowing from the

14  initial request that we had made.  We believe this is

15  reasonable.

16         THE COURT:  I'm not sure I followed that.  Do

17  you have specific kind of information like you gave me

18  on Vickie Stutts for each of these 43 people or are

19  these just 43 people who somewhere along the line were

20  terminated from their employment?

21         MS. SNOW:  I would say for most of these

22  individuals we do have specific information indicating

23  that they raised concerns and there is a question about

24  how, if at all, those concerns were addressed or if they

25  were put on corrective action plans or terminated

1   because they didn't meet those expectations.

2          I can't represent that we have that information

3   with respect to all 43.

4          But we believe that these were a reasonable

5   number of personnel files to request that would be

6   likely to contain information relevant to the claims.

7          THE COURT:  Holly, I heard Chris say that if

8   you've got that kind of specific information, they're

9   willing to talk to you about producing those files.

10         But I'm not sure that they have an obligation

11  just to produce blanket personnel files.

12         So y'all talk about each of those 43 and what

13  you have and why you think they're appropriately

14  discoverable.

15         MR. CHRISTIE:  Some of these people are

16  salespeople, basically, that's not what they call them,

17  but that's what their job is to go out and have

18  relationship with the community so people refer hospice

19  patients to the hospice.

20         And if they are not doing their job, in other

21  words, if they are not building the relationship where

22  people are getting referred to the hospice, then they

23  get on the corrective action plan, that has nothing to

24  do with patient's eligibility.

25         The clinical people and primarily and actually

1  solely the physician makes the decision as to whether or

2  not somebody is eligible.

3          This is not a bad business practices case.

4  This is a False Claims Acts case.  And for a False

5  Claims Acts case, there is no liability unless the

6  patient was admitted and was not eligible for the

7  hospice benefit.  That's what falsity requires.

8          And there's no connection between any of these

9  kinds of census things that the government's identified

10  and the physician decisions.  All right.  So we have --

11  there are two physician --

12          THE COURT:  Explain to me the category of

13  people whose personnel files you're seeking.

14          MS. SNOW:  They do not fall into one certain

15  category.  They are not all salespeople.  Some of them

16  are clinical people.

17          THE COURT:  Let's talk about salespeople.  Why

18  would a salesperson's personnel file be relevant at all?

19          MS. SNOW:  Your Honor, we allege in our

20  complaint that AseraCare pressured employees to meet

21  census expectations and that is among the conduct that

22  demonstrates that AseraCare knew or should have known

23  that it was submitting claims for ineligible patients.

24          THE COURT:  Because they encouraged their

25  salespeople to go out there and see who you can bring in

1   but it's the doctor who has to certify, not the

2   salesperson, that the patient is eligible, right?

3            MS. SNOW:  Your Honor, there are two separate

4   issues that are being discussed.  One is the falsity and

5   whether or not the claim was false.  And one is whether

6   or not the submission of the false claim was knowing.

7   And our allegations are against the hospice company in

8   this case and it has an obligation in the payment of the

9   physicians and the physician's certification to ensure

10  that it's only requesting payment from Medicare for

11  hospice patients who are terminally ill and for

12  reasonable hospice services.

13           So setting aside the physician certification,

14  the fact that the patient is terminally ill and that

15  hospice services are reasonable and necessary, that is

16  suppose to be documented in the medical record.

17           THE COURT:  Right.  But a salesperson isn't

18  responsible for doing that documentation and that

19  certification of what the patient's life expectancy is.

20           MS. SNOW:  Well, Your Honor, the salespeople

21  were part of the process in which the patients were

22  coming on to the hospice.  And it's part of the story

23  that they were being pressured to admit a certain number

24  of patients or their job was at risk, to bring a number

25  of patients in, and then the patients were being

1  admitted without obtaining a certificate of terminal

2  illness from the physician.

3       There is evidence that physicians were not

4  receiving any information about the patient before

5  signing the certification of terminal illness.  And

6  there were broader issues about information that the

7  company received from its own internal audit, there were

8  outside auditor indicating that it had problems, that

9  its documentation did not support the patients were

10 terminally ill and needed hospice care and how the

11 company responded to that.

12      So part of this was information that

13 individuals expressed concern, some of the clinicians,

14 not salespeople --

15      THE COURT:  I'm talking right now just about

16 salespeople.  We'll talk about clinicians in a minute.

17      MS. SNOW:  Part of the story, Your Honor, that

18 we're alleging that the company engaged in business

19 practices that we allege were reckless and from, you

20 know, based on this conduct, it knew or should have

21 known that it was submitting claims for patients who

22 were not terminally ill.

23      And the cases in the hospice context have

24 acknowledged that pressure on employees can be part of

25 evidence of scienter that the hospice company knew or

1  should have known that it was engaging in this conduct

2  that could have led or, in fact, did lead, that it knew

3  or should have known that it was submitting false

4  claims.

5          MR. CHRISTIE:  I'm unaware of any case law that

6  suggests what you just said.

7          MS. SNOW:  The Landis case and the Walls case.

8          MR. CHRISTIE:  They do not say -- look, the

9  government's complaint is based on the patients being

10  ineligible.  There is no administrative type claims in

11  there.

12          For example, there's no claims that we double

13  billed for patients; there are no claims -- there's no

14  allegations, although there was some testimony by one of

15  the ex-relators, but there is no allegations that there

16  was false documentation created so the physician had the

17  wrong information in front of them, neither have there

18  been any allegations, which is something that I have

19  read for the first time in the response that we got to

20  our motion for protective order, and that you've

21  repeated, that there were physicians who were certifying

22  patients without having reviewed medical records.

23          MS. SNOW:  That's in the Corridor Group report.

24          MR. CHRISTIE:  Well, there is not a single

25  patient that they have an expert who is going to testify

1  that they were not eligible because of any of the

2  reasons she just talked about.

3          They have one physician expert, that physician

4  expert said these patients are not eligible based on the

5  medical records that I'm reviewing.

6          The same medical records that the hospice

7  medical director had and our experts have looked it.

8          That is a separate issue.  They do not have any

9  expert testimony that says, because this happened,

10  something that's like what -- whatever it is she is

11  trying to talk about, there was a patient who was not

12  eligible for hospice who was admitted.  There is no

13  evidence, much less allegations, of that nature in this

14  case.  It does not exist.

15          Now, they do have this theory, and what their

16  theory, I think, boils down to is, we have one physician

17  who says these patients were not eligible.  And we can

18  talk another time about his opinions.  Okay.

19          We have one physician -- and on the other hand,

20  Palmetto, our contractor, the government's contractor

21  found the same patients eligible.  The hospice medical

22  directors found the patients eligible.

23          We have got our own experts who have found

24  almost all the patients eligible.

25          So there's a difference in opinion.  Their

1  view, I think, is that because we have a difference in

2  opinion, in other words, physicians disagree, we get to

3  show all these other bad business practices and,

4  therefore, get to the jury, one, all we need for falsity

5  is two physicians disagreeing, and then the bad business

6  practices show reckless disregard.

7        In this circumstance, Congress has said that

8  hospice eligibility is based on physician's

9  certification.  It's unique among medicare benefits.

10       Medical necessity, if you think of it that way,

11  is based upon physician's certification.  From

12  AseraCare's perspective, as a matter of fact, one of the

13  things I thought was particularly interesting, the

14  government, in its response, said that AseraCare's

15  defense is to shift blame to unnamed and unwitting

16  (non-defendant) physicians who signed certifications of

17  terminal illness.  This is on Page 2 of their response

18  in the second paragraph.

19       They say that AseraCare's defense, which I'm

20  not sure what they mean by defense, is to shift blame to

21  unnamed and unwitting (non-defendant) physicians who

22  signed certifications of terminal illness.

23       Now, when the person is initially eligible,

24  there's an attending physician.  And that physician has

25  to certify -- the treating physician, has to certify

1  them as eligible.

2         In addition to that initial certification, the

3  hospice medical director has to certify the patient is

4  eligible.

5         From AseraCare's perspective, the company, the

6  corporation, acts through individuals.  The individuals

7  who make these decisions for AseraCare are the hospice

8  medical directors.  AseraCare is not liable for mistakes

9  made or reckless disregard by the attending physician.

10        AseraCare would be liable for the false claims

11  submitted by the physicians through its agent and if

12  those false claims are submitted with reckless

13  disregard.

14        So the person whose reckless disregard matters

15  here is the medical director, AseraCare's medical

16  director.

17        We're not shifting the blame to them.  We're

18  accepting them as our agents.  They're the people whom

19  we're responsible for.

20        As a matter of fact, if you take it one step

21  further, if the AseraCare medical director certifies

22  somebody is eligible, AseraCare can't take them off

23  hospice.  We have to keep them on hospice.

24        I mean, the government would jump all over

25  AseraCare -- they are in the regulations, right, there

1    are a number of places where you can see if the patient

2    is certified as eligible, is certified as terminally

3    ill, then you have to write them hospice benefits.

4             You cannot sign them up in the first place, if

5    you don't want to.  But once that type of patient is on

6    your hospice roll and the physician certifies them as

7    eligible, you're not allowed to take them off.

8             MR. BARGER:  Your Honor, if I may --

9             THE COURT:  We're getting far afield from the

10   issue of these personnel files.

11            MR. BARGER:  I do think, though, some things

12   need to be clarified in response to what Mr. Christie

13   has said.  As we go forward in the case and as we start

14   thinking about how the case works and the Court is

15   hearing things that at least the relators and the

16   government adamantly disagree with.

17            THE COURT:  I understand that.

18            MR. BARGER:  One of which is the condition of

19   payment for hospice care is conditioned upon the hospice

20   maintaining, in the medical record, information to

21   support the physician's diagnosis.  That's what this

22   case is about.  It's not about what he's trying to tell

23   you that it's about.  And we fundamentally disagree

24   about that.  And we can, reasonable minds can disagree.

25            But we have our position clearly stated in the

1  complaint and other courts, including the Walls case,

2  which our firm is lead trial counsel in in Texas, have

3  upheld that.

4         So that is what this case is about.  And the

5  reason the sales staff are so relevant to this case is

6  if you take the idea that AseraCare is not maintaining

7  information in these records to support eligibility,

8  then AseraCare chooses the medical directors that it

9  wants to and that all throughout independent auditors

10  are telling AseraCare, you're not compliant, you're not

11  training your medical directors, they don't know what

12  the eligibility criteria is, they are not paying

13  attention in the meetings where the nurses present them

14  with the information, and a large portion of your

15  patients, there is no -- nothing in the medical records

16  to support the decision of the doctor.

17         AseraCare is on notice of that.  What they are

18  doing at the same time, when they hear that, with their

19  salespeople is entirely relevant to scienter which is --

20         THE COURT:  Why do you need anything about the

21  sales staff if, as you tell me, you have got their

22  independent auditors telling them that; isn't that

23  evidence of scienter?

24         MR. BARGER:  It should be.  But we need to

25  present the entire picture of scienter.  And they're

1   going to try to minimize those things and they are going

2   to respond to those.

3        But if at the same time that they're hearing

4   that, they have, and the salespeople who are being given

5   unrealistic quotas in places where the demographics

6   don't support that many terminally ill people, and the

7   salespeople are being terminated for not meeting those

8   quotas, the very same time the internal auditors --

9        THE COURT:  Don't we have lots and lots and

10  lots of other businesses, other kinds of businesses

11  where the employer places unrealistic expectations and

12  quotas on their salespeople and terminate them when they

13  can't make them also?

14       MR. BARGER:  Absolutely.  But not at the same

15  time that they're being told that those sales -- those

16  salespeople are already generating patients that you

17  can't support payment criteria and you're asking for

18  payment from the federal government.

19       Now, at that moment, it's the government's

20  position, it's certainly reasonably calculated to lead

21  to the discovery of admissible evidence in this case,

22  what is happening inside the sales force, what the sales

23  force -- and it's important to realize how the system

24  works at Aseracare.

25       The salespeople are the ones who generate the

1  lead.  It's not just -- they go and get that patient.

2  That patient then, they talk to the referring physician

3  and they say, you got any patients for me.  I need some

4  patients.  Anybody who's sick, who is not getting

5  better, anybody who you wouldn't be surprised might die

6  this year, let me look at them.  I will let my

7  admissions nurses take a look at it, we're experts in

8  hospice, and we'll let you know what we think.  So it

9  starts with the salesperson.

10         And that salesperson gets that patient, they

11  take that -- they send out a nurse to evaluate the

12  patient -- the doctor is not going -- the medical

13  director is not going to see this patient.  Never even

14  sees them.  That nurse, who is getting pressure and

15  whose colleague across the table from them, the

16  salesperson, may lose their job if they don't sign that

17  person up, is then going to the medical director in a

18  once a week meeting with a stack of papers talking

19  about, well, yeah, I think this patient is eligible for

20  hospice.  I think you should sign them up.  Signs them

21  up.

22         And then they go back to the referring

23  physician and say AseraCare and its knowledgeable staff

24  and experts in hospice have determined that your patient

25  is eligible, here's the form that we have pre setup for

1    you, please sign right here.  Patient decided to do it,

2    you're on.

3         Now, what's happening at the top of the chain

4    in this entire business is not only relevant, it's

5    critical to the practices that are happening at

6    AseraCare that the government and the relators and

7    multiple witnesses, including independent auditors, have

8    said are problems at AseraCare.

9         THE COURT:  Well, if this information is so

10   dadgum critical, why did you wait until thirty days

11   before the end of discovery to request it?  And you told

12   me in your response that most of it has been requested

13   before but not produced.  Yet, I have not seen one

14   single motion to compel the production of these

15   personnel files.

16        If they were so critical, why do you wait to

17   the last minute to request them, in what I view as a

18   discovery dump or discovery request dump, excuse me.

19        MS. SNOW:  Your Honor, we have taken very

20   seriously Your Honor's order that we make all effort to

21   exhaust negotiation among ourselves before bringing any

22   motions.

23        So we have particularly tried to obtain the

24   information that we have needed through other means.

25   For example, we had served a 30(b)(6) topic requesting

1  information, testimony about this issue of negative
2  compliant consequences due to failure to meet census
3  expectations.  And a witness was not designated for
4  that.
5          We had a discussion about this.  We understood
6  that this information was difficult to obtain because it
7  was only contained in personnel records and it was too
8  difficult to search those files.
9          So in part, Your Honor, we were identifying a
10 particular set of individuals whose personnel files we
11 believe would contain this information, in part in
12 response to the objection from AseraCare to providing
13 30(b)(6) testimony on this issue.
14         So we have been trying to get the information
15 in different ways and didn't want to burden the court
16 with motions.  We have been trying to work with the
17 other side to get it.
18         And as we're nearing the end of discovery,
19 these requests were developed as we took stock of where
20 we were and what we needed to make out our case, and we
21 identified gaps that we believe that we needed to try
22 and fill, that we believe were reasonable requests that
23 were relevant to our case.  And that's what these
24 requests are.
25         They were intended to be specific to obtain

1  information that in many cases we had tried to obtain in

2  other ways and had not.

3       MR. BARGER:  Your Honor, this may not be

4  something you want to consider, but as we litigate with

5  this company, one of the things I would like the court

6  to know, at least, that this company is saying that

7  requests for documents that could be produced by the end

8  of the discovery period are way too late, our firm and

9  the government is also litigating against this company's

10  therapy center, therapy branch, totally separate sort of

11  False Claims Act fraud in Savannah, and the very company

12  that's complaining about that, they issued document

13  requests, interrogatories on the last day of discovery.

14       THE COURT:  That sounds like a real problem for

15  the judge in Savannah to deal with.

16       MR. BARGER:  And I understand it's not your

17  concern.  But I do want you to understand that they're

18  taking vastly different positions in different areas of

19  the country -- they are telling you that they think it's

20  too late, even though they could produce it within the

21  discovery period, and at the same time --

22       THE COURT:  How can they produce hundreds,

23  which is what the request was for, hundreds of personnel

24  files, 227 request for admission, plus a bunch of

25  interrogatories in thirty days' time when y'all are

1   taking how many depositions at the same time around the

2   country?

3           MR. CHRISTIE:  Around 20 in the month.

4           THE COURT:  The government may have tons of

5   resources available to it, and certainly Bradley, Arant

6   is not a little bitty law firm.  But these kinds of

7   requests can't be delegated to some law clerk or first

8   year associate who is not familiar with the specific

9   issues involved in this case.

10          I understand logistical problems.  And that's

11  why I'm saying, if these things were so all important to

12  the government's case, why did you wait until the last

13  day to request them.

14          That causes more problems to me and the timing

15  of it than the specifics that are being requested.

16          And at the very least, I think additional time

17  is due the defendants to respond to these.

18          But I want to see if there is not a way we can

19  cut this list even shorter to address the burdens.  I

20  understand the cases that y'all have cited, that these

21  kinds of requests, and I'm getting into the request for

22  admissions, as well as the interrogatories on contention

23  issues and things of that nature, are important and you

24  are entitled to that information.

25          But the problem that I see is dumping all of

1  these requests into such a short time period when y'all

2  already are stretched thin in getting the rest of the

3  stuff done.  That's where I see the biggest problem in

4  the government's discovery request.

5          MR. CHRISTIE:  These are the documents that

6  were served on us yesterday (indicating).  These are

7  documents that we requested in July of 2012.

8          Some of these documents should have been on the

9  privilege log and were not.  The reason they weren't

10  produced earlier is because they were privileged.

11          MS. SNOW:  Excuse me, but are you referring to

12  the relator disclosures?

13          MR. CHRISTIE:  Well, but Micca is not a

14  relator.  There is a statement from --

15          MS. SNOW:  They were submitted --

16          MR. CHRISTIE:  There is a statement in here

17  from Micca that they produced --

18          THE COURT:  Who is Micca?

19          MR. CHRISTIE:  Dr. Micca was one of the

20  ex-relators.

21          MR. BARGER:  It's actually Dr. Micca.

22          MR. CHRISTIE:  Okay.  I will try not to --

23          THE COURT:  How do you spell it?

24          MR. CHRISTIE:  M-I-C-C-A.  The government

25  produced these documents yesterday.

1      We filed a motion to compel for statements that

2  the government had that they had not yet produced.  In

3  response to that motion to compel, the parties reached a

4  compromise.  If they were going to use these people or

5  these statements as evidence, then go ahead and produce

6  the documents -- I see Ms. Snow shaking her head.  So

7  I'm willing to provide an email to the court that she --

8      THE COURT:  What does that have to do with the

9  discovery request?

10      MR. CHRISTIE:  We are still getting documents

11  from them they've had for years.  We got yesterday --

12  this thing from Dr. Micca is a mediation statement

13  which -- I know they must have had for at least two

14  years, of course, we just now got it.

15      If their original position was that it was

16  privileged, and that's the reason why we didn't produce

17  it because we're now waiving our privilege, it was not

18  on the privilege log.

19      And I am just pointing out to you that we're

20  continuing to get additional, I mean, unfortunately,

21  instead of spending the time that I was going to on

22  another case, I spent my time trying to figure out what

23  this stack of documents was.  And some of this is the

24  most helpful to AseraCare in preparing its defense

25  information that we've received this entire case.

1         And they didn't provide it to us back when we

2   asked for it so we could prepare Dr. Avery or our other

3   witnesses for their depositions, they produced it here

4   two weeks before the close of discovery.

5         Now, I will give them credit for having

6   produced it before we take Dr. Micca's deposition.

7         MR. BARGER:  Micca.

8         MR. CHRISTIE:  Micca.  I'm sorry.

9         MS. WOODKE:  I am offended --

10        MR. BARGER:  I am, too.

11        MS. WOODKE:  -- at the implication that you

12   think that we're playing a game with your case and that

13   we're not producing documents that are helpful.  That is

14   not what we are doing.  And I will not let you say that

15   about me.

16        MR. CHRISTIE:  No, no.  I don't care whether

17   you did it on purpose or not.  I'm just pointing out the

18   facts --

19        MS. WOODKE:  No, you made it purposeful in your

20   argument.

21        THE COURT:  All right, children.

22        MR. FROHSIN:  Judge, may I make one

23   observation.  I think I have been through more than one

24   discovery battle in forty-seven years.

25        The scheduling order is the scheduling order.

1    Nobody -- everybody has been working diligently.  There

2    is no cat and mouse here.  They have got as many lawyers

3    on this case as we do.  They have got the biggest firm

4    in the state and they have got another one in

5    Wisconsin.

6           Nobody is trying to take advantage of size or

7    anything else.

8           But the court has published a scheduling

9    order.  And things happen during depositions and, as you

10   well know, discovery is ongoing until it cuts off.  And

11   you just can't impute bad faith to either side because

12   during the course and before the discovery expires

13   people do things.  And they do things for the case and

14   they do things to try to get prepared and to do things

15   before discovery expires.

16          And this business of trying to say, well, they

17   can't throw this on us because they are doing it two

18   weeks before discovery, the court has sanctioned

19   discovery being the cut off when it is.

20          And in the absence of bad faith, which I don't

21   think Mr. Christie can sit there and say that this side

22   of the table is acting in bad faith, the Court should

23   give some deference to the fact that we are all working

24   and we're all trying to present a very complicated

25   case.

1          It's not as easy as he says all the physician

2     has to do is certify it.  That is bologna.  I have

3     talked to physician after physician who says I don't

4     know anything about hospice.  If they tell me that he's

5     appropriate for hospice, then it's all right.  It's

6     almost a ministerial thing.  That's not what Congress

7     intended.

8          And so all of this who shot John about oh, we

9     are disadvantaged, just will not hold -- will not bear

10    credulity.  It's just not --

11         THE COURT:  Well, it seems to me, Mr. Frohsin,

12    and I don't appreciate being lectured by you.

13         MR. FROHSIN:  I'm not lecturing the Court.  I'm

14    lecturing the fact that we've got a scheduling order

15    here that I'm just urging the Court to recognize its

16    scheduling order.  And in the absence of bad faith on

17    the part of the parties, that the Court will enforce the

18    scheduling order that is promulgated.

19         I don't mean to lecture the Court.  Who am I to

20    lecture the Court.

21         But I have been around this block a little time

22    -- a few times on discovery.

23         THE COURT:  I have, too, Mr. Frohsin.  And I

24    started this conference by commending y'all for working

25    very, very hard to get the discovery done within the

1  discovery deadline.  And I appreciate that.

2       But I also appreciate that there are

3  limitations on what individuals can do all at one time.

4  And taking twenty depositions in a twenty-eight day

5  month, plus respond to all of the requests that were

6  filed within a thirty day response period, I think is

7  stretching the limits of human ability.

8       And I want to work with y'all in getting the

9  discovery that both sides need but in a time frame where

10  we're not so exhausted and fragile and frazzled that any

11  opportunity to work through issues is destroyed.  And

12  that's kind of what I'm hearing in here today.

13       And I think we need to step back and see how we

14  can work it out to get the discovery that's needed in a

15  timely fashion.  And if that means extending that thirty

16  day response time, I want to work with y'all in doing

17  that.

18       And that's kind of unusual for me, and my staff

19  will tell you, to say all right, we can work in

20  extending a deadline, but I can do it because y'all have

21  been busting your butts to try to get all the discovery

22  done that needs to be done in this case.

23       So I'm commending y'all in that, but I'm also

24  raising issues about what I view to be a large and

25  difficult discovery request to be responded to within

 1    the time that you're also doing all these other things.

 2         I think we need to step back and look at what

 3    we can get done by the 28th and what realistically we

 4    can extend beyond that deadline.

 5         I think where we left off were the personnel

 6    files is that of the 43 that the government has now

 7    identified that there needs to be some conversation

 8    about exactly why each of those 43 has some relevance to

 9    this case.

10         And I'm convinced that salespeople who were

11    pressured and were terminated for not meeting their

12    quota may have some relevance to this theory.

13         But I expect y'all to talk through and identify

14    why it is that you expect the personnel file of each of

15    those 43 to somehow support that theory.

16         MS. SNOW:  Just so there's no misunderstanding,

17    Your Honor, not all of those individuals were

18    salespeople.  Some of them had other --

19         THE COURT:  Clinicians and other

20    responsibilities.  Right.  But I see more relevance to

21    clinicians.

22         MS. SNOW:  I understand.  Just so I'm clear,

23    we're not limited to discussing salespeople and their

24    relevance.

25         THE COURT:  No.  But 43 people you identified,

1   relevance as to each.

2           And can those be produced by the 21st of March?

3           MR. CHRISTIE:  I thought you were going to say

4   the 21st of February.

5           THE COURT:  I'm not cutting it shorter.

6           MR. CHRISTIE:  We should be able to produce a

7   portion of those.  We can negotiate which ones -- that's

8   something that we can discuss with government's counsel,

9   if we have that additional time, and if they identify

10  some portion of the 43.

11          MR. BARGER:  What if we can demonstrate

12  relevance for all of them, we should be able to get all

13  of them, correct?  That is what the court said.  It's

14  based --

15          THE COURT:  There has got to be --

16          MR. BARGER:  For what we demonstrate.  If we

17  can't demonstrate for more than the one, we only get the

18  one.

19          I heard Mr. Christie say as long as the

20  government agrees to some portion, the portion of which

21  we have information to demonstrate.

22          THE COURT:  To substantiate the relevance.  And

23  I thought the request for production was going to be the

24  easier one.

25          Request for admission, 227 seems to me to be a

1   huge number.  I once spent an entire summer trying to
2   respond to 100 request for admissions that involved the
3   review of probably around a million documents.
4        So I have some experience in the time that can
5   be required for request for admissions.  So I think we
6   need to try to come up with a more relevant time line
7   for a response for those requests.
8        Frankly, Chris, as I was reading your
9   objections to them, it seemed to me to be more of the
10  burdensomeness and the time that would be required as
11  opposed to the appropriateness of the request
12  themselves.  Or did I read that wrong?
13       MR. CHRISTIE:  I thought the burdensomeness was
14  so much.  There are certain things that can be said.
15  For example, first, based on their comments, the first
16  26 are about testimony by Dr. Finn.
17       Well, they have Dr. Finn's testimony.  Why do
18  they need to restate his testimony with additional
19  request for admissions?
20       THE COURT:  I had wondered about that as well.
21       MS. SNOW:  Your Honor, I think as a practical
22  matter, we want to be able to have the admission read to
23  the jury, that AseraCare's counsel has represented that
24  it embraces that testimony and we want to be able to use
25  that as an admission.

1          And if AseraCare's counsel agrees with it, it

2    certainly wouldn't be burdensome to admit to it.  And

3    then we have it so we can use it.

4          Moreover, having an admission has legal

5    consequences that relying on a person's testimony does

6    not have.

7          MR. CHRISTIE:  Many of the requests we

8    characterize as testimony.

9          THE COURT:  That's what I was going to ask

10   about.  Is it a direct quote from his testimony or is it

11   a paraphrase that could be interpreted more than one

12   way?

13         MS. SNOW:  It was intended to track the

14   testimony.  There was some cases there may have been the

15   pauses or the repeated words that sometimes happen when

16   someone is speaking in conversation and that was omitted

17   for it to be a clean statement.

18         If there are concerns that AseraCare has about

19   how it's been stated in the admission, then we're

20   certainly happy to discuss that with them.  But it was

21   intended to track the testimony of Dr. Finn that we

22   excerpted in our opposition to the previous motion and

23   that we understood AseraCare agreed with.

24         So we would think that this would not be

25   burdensome to have them admit to it and then we have

1  that admission that we can use at trial.

2       THE COURT:  Well, I think a lot would depend

3  upon how it's phrased and whether it is something that

4  AseraCare says yeah, that's one hundred percent it, or

5  there's something else that needs to be included in that

6  statement.

7       Just because he said it doesn't mean that there

8  isn't more that needs to be included in such a statement

9  or something.  I don't know.

10      MR. CHRISTIE:  A lot of these are quasi legal

11  conclusions.  So we have an expert witness who states

12  something about, well, he understands what the physical

13  intermediary does, that's not an appropriate way to use

14  the request for admission either.

15      So a physician expert talks about what the

16  physical intermediary does, and actually is a Medicare

17  administrative contractor, and, you know, his

18  understanding is what it is.

19      MR. BARGER:  Well, it sounds like you have

20  already looked at them and you are prepared to admit or

21  deny --

22      MR. CHRISTIE:  No, this is just number one.  I

23  just read number one while I'm sitting here.

24      MR. BARGER:  I think, though, it just seems to

25  me that the objection itself demonstrates that they can

1   look at these and they can admit them or deny them.  If

2   they don't think that it properly -- the whole exercise

3   of determining whether it properly meets his -- matches

4   his testimony would be what would tell them that it's a

5   denial and they would deny it.

6           THE COURT:  That's one through 26 of 227.  So

7   we've got 200 more to go with.

8           MR. BARGER:  We should be able to dispense with

9   those --

10           MR. CHRISTIE:  Those seem to be the ones that

11   are the least likely to be appropriate at this late

12   stage of the discovery.

13           MR. BARGER:  Just to recharacterize his

14   testimony --

15           MS. SNOW:  If AseraCare is already representing

16   to the Court that it embraces the testimony, then we

17   would expect AseraCare would admit it.

18           MR. CHRISTIE:  But you have recharacterized it.

19           THE COURT:  Yeah.  And I think it depends upon

20   what testimony AseraCare embraces.

21           Those seem to be less problematic.  Let's look

22   at the other 200.

23           MR. CHRISTIE:  Based on their response to our

24   motion for protective order, request 29 through 178 seek

25   admissions about whether AseraCare as a whole and

1    specific agency met its patient census and profitability
2    goals in specific time frames.
3           The case that we cited as to interrogatories,
4    actually, reversed a jury verdict because the financial
5    ability of the defendant was allowed into testimony.
6    And I can't imagine that this information is not going
7    to get into that same kind of slippery slope.  The
8    profitability of AseraCare is not a topic that ought to
9    be discoverable when we're in a False Claims Act case.
10          THE COURT:  I think the point has already been
11   discussed about the government's allegations of
12   AseraCare pressuring staff to meet those goals and that
13   goes to scienter and whatever.
14          But how is AseraCare's financial status a
15   blatant statement about that in and of itself proof of
16   what you're trying to prove?  And could it not be -- and
17   I guess that goes more to admissibility of it.  But it
18   seems to me that it could be a very deceptive kind of
19   admission, depending upon how it's used at trial.
20          MS. SNOW:  Your Honor, the admission, which
21   addressed -- that we're discussing, 29 through 178, are
22   admissions of facts regarding the expected or budgeted
23   census or revenue goals and that the goals were not met
24   but, yet, were increased year over year.  And this is
25   relevant to our allegations that the company expected

1 its employees to meet unrealistic expectations about the

2 number of patients that they had, as demonstrated by

3 their failure to meet it or not meeting it, and yet it

4 being increased year over year.

5          In addition, although this is a large --

6 largest portion of the admission pertain to this topic,

7 there are specific documents that are cited by Bates

8 number in this section and most of these admissions are

9 taken from these specific documents that are referred to

10 by Bates number.

11          Some of them were exhibits in depositions where

12 some of these questions were asked of witnesses and

13 witnesses could not remember.

14          So, again, this is another example of us trying

15 to obtain information that we had attempted to obtain,

16 in part, through depositions.

17          It appears to be a significant number of

18 admissions, but there are specific documents that are

19 quoted here that --

20          THE COURT:  I see a few that make reference to

21 Bates numbers.  But the vast majority of the ones that

22 I'm seeing do not have Bates numbers reflected on them.

23          MS. SNOW:  For example, 54 through 89 are

24 taken from -- and I appreciate this could have been

25 clearer -- are taken from the document that is referred

1   to at paragraphs 132, 133 and 134 spreadsheet.

2          So I appreciate it could have been more clear

3   that there were -- from which document these were taken

4   from.

5          And we are happy to provide that information,

6   if that would assist in processing and preparing

7   responses to this.  But --

8          THE COURT:  I think that that at a minimum

9   would need to be provided, if you want this

10  information.  And specifically --

11         MS. SNOW:  We're happy to provide that.

12         THE COURT:  -- if your basis for it comes from

13  a particular document or series of documents, by all

14  means, I think you need to identify those documents in

15  your request.  And I don't see that it's anywhere near

16  as clear as you state that it is.

17         MS. SNOW:  I agree, Your Honor.  It should have

18  been stated more clearer.  I agree.

19         MR. CHRISTIE:  The document itself is probably

20  admissible.  I don't know what documents they are

21  talking about.

22         They don't need to have over a hundred requests

23  that are giving the information that's already in a

24  document.

25         MS. SNOW:  We are requesting the admission of

1    the facts in the document.  It's different.

2         And we have tried to get some of this

3    information from witnesses and they couldn't remember.

4         MR. BARGER:  Including 30(b)(6) witnesses, who

5    is tasked with learning this.  Or am I wrong about

6    that?

7         MS. SNOW:  Not this specific one.

8         MR. CHRISTIE:  I have to admit that I'm at a

9    loss because this isn't a part of the case that I have

10   been responsible for.  And it's confusing to me looking

11   at it.  And I'm unclear as to whether or not it would

12   be -- continue to be confusing and would need to have

13   more information.

14        I also am going to raise the question about

15   whether or not the information would be admissible --

16        MR. BARGER:  Admissibility is not a standard.

17        THE COURT:  Thank you.  I was going to say

18   that.

19        MR. BARGER:  Sorry, Judge.

20        THE COURT:  I would have to make a

21   determination later on as to whether that information

22   would be admissible or whether it in and of itself would

23   be misleading.

24        MS. SNOW:  Understood, Your Honor.  The intent

25   here was to obtain the admission of facts that there

1   were goals that were set year after year and specific

2   for the company and for particular agencies which is why

3   there are, in part, so many different items, some of

4   them are with respect to individual agencies, the goals

5   were set, that they were not met and that they were yet

6   increased year after year.  That is the purpose.

7           THE COURT:  But don't a lot of these do that,

8   too, Ms. Snow, set goals and know that the reaching of

9   that goal probably isn't going to happen this year, but

10  we have got to keep working, we have got to keep

11  pushing, we have got to keep trying.

12          MS. SNOW:  Certainly, Your Honor.  But not all

13  companies submit claims for patients who are not

14  terminally ill and this is part of the story that we are

15  intending to present that we have alleged in our

16  complaint to show that they knew or should have known

17  that they were doing that.

18          MR. CHRISTIE:  It's a balancing test and some

19  things are more relevant.  We are really tangentially at

20  best here in terms of relevance.

21          MR. BARGER:  Well, it's going to be really

22  interesting if we try this case and the defendant

23  attacks the scienter as its main element, if it chooses

24  to, and a lot of the business practices are the only way

25  that you can demonstrate how -- what a company's mind

1   set is.  It's not like a person.

2          THE COURT:  You have already told me that you

3   have got all these reports from their auditors telling

4   them about the problems.  So I don't think that's going

5   to be the only --

6          MR. CHRISTIE:  His statements are not correct,

7   Your Honor, I just want to make that clear.  The parties

8   will disagree about that.  We don't even have an

9   auditor.

10         Now --

11         MR. BARGER:  The Corridor report is not your

12  audit?

13         MR. CHRISTIE:  They are not an auditor.  They

14  say on the face of the document that it's not an audit.

15         MR. FROHSIN:  They didn't conduct an audit?

16         MR. CHRISTIE:  They did --

17         MR. FROHSIN:  I think that --

18         THE COURT:  All right.  We're not here for that

19  kind of stuff.

20         MR. BARGER:  The point is that --

21         THE COURT:  The point is that the government

22  will provide you with -- provide the defendants with the

23  specific documents that relate to 29 through 178,

24  request for admissions, but the mere fact that I'm

25  requiring the defendants to answer those does not

1  necessarily mean that I find that they would be

2  admissible.

3       A lot would depend on how confusing they may be

4  or misleading in terms of information that would not be

5  relevant.

6       201 to 227 appear to me -- the ones dealing

7  with complaints about the documentation and things,

8  those are the ones that appear to me to be the most

9  relevant of the ones that were being requested.

10      Again, for example, 201, how the heck is an

11 attorney with a case where I am betting there are

12 millions and millions of documents and tons and tons of

13 testimony to be able to determine whether on March 5,

14 2007 the hotline received an anonymous call about

15 AseraCare's Corinth, Mississippi, hospice agency?

16      MS. SNOW:  Your Honor, the complaint document

17 is referred to by the Bates number at paragraph 207.

18 Again, this is where we might have been more specific to

19 refer to the document number in every admission.

20      But this is regarding this 201 complaint on

21 March 5th, and then the document produced at that Bates

22 number is -- referred to in paragraph 207.

23      MR. CHRISTIE:  Your Honor, if they want to ask

24 just 207, then why do they also need 201, 202, 203 and

25 204, 205 and 206 which I guess are just repeating what

1   is on 207.

2          MS. SNOW:  Again, there's one thing to request

3   whether it's a true or accurate copy and another to

4   admit that the facts therein is true and correct.

5          THE COURT:  Is it not just appropriate to say

6   the document speaks for itself?

7          MS. SNOW:  Well, Your Honor, we believe it's

8   reasonable to request admissions of these facts with

9   respect to these particular complaints, which have been

10  specifically identified and are relevant to the United

11  States' claims.

12         MR. CHRISTIE:  Your Honor, I do not believe

13  there's going to be a human being alive who can remember

14  what they were doing on March 5th, 2007 with the

15  specificity that the other request -- in other words,

16  the document is there.  AseraCare can look at the

17  document and make a request for admission response based

18  on whether or not the document says what the prior

19  paragraph say.

20         There is not going to be a human being, I don't

21  think, who can add to that.  We can answer those, but

22  it's going to take time and it's not going to be

23  productive.

24         MS. SNOW:  Well, if AseraCare's information is

25  what is reflected in the document, then it should be

1    able to admit the facts therein.

2              MR. BARGER:  Uh-huh.

3              MR. CHRISTIE:  You are getting us to try to --

4    the document speaks for itself.  Whether the document is

5    accurate or not is not something that AseraCare is going

6    to have additional knowledge about at this point in time

7    is what my guess would be.

8              Again, I don't know.  But I'm just -- I'm

9    making a judgment from having worked on similar issues

10   before and what happened seven years ago is not

11   something that there's likely to be someone who can go

12   and have any memory of what went on on that date.

13             MS. SNOW:  Based on the company's practices and

14   policies with respect to complaints, if it's in a

15   position to admit facts based on what its policy would

16   have been with respect to documenting facts --

17             THE COURT:  That is not what this is

18   requesting.

19             MS. SNOW:  I'm just addressing the comment that

20   it would require an interview of someone who was

21   personally involved in the complaint on March 5, 2007.

22             THE COURT:  Are you requesting that they admit

23   that the complaint was accurate and true or just that

24   they received such a complaint?

25             MS. SNOW:  Well, with respect to paragraph 207,

 1    that is a request for the accuracy of the complaint,

 2    which I think is what you meant by your --

 3          THE COURT:  No.  A true and accurate copy of

 4    the report.

 5          MS. SNOW:  Yes.

 6          THE COURT:  Okay.  But are you wanting them to

 7    admit that this information from the anonymous caller

 8    was correct?

 9          MS. SNOW:  To admit that the hotline was

10    received on this date.  But the call -- I mean, what the

11    specific facts are, that this person held that position

12    on that date; that this is what was alleged in the call;

13    to admit the specific facts pertaining to the

14    complaints.  And in addition, that it's a true and

15    correct copy of the hotline report.

16          THE COURT:  I don't know why number 207

17    wouldn't be sufficient.

18          MR. CHRISTIE:  Your Honor, we made the offer to

19    respond to the same number of requests that we made to

20    them.

21          THE COURT:  I don't think that that's an

22    appropriate way to handle it.

23          MR. CHRISTIE:  But if they had to -- make them

24    -- if they had to choose some number as opposed to just

25    227.

1          MR. BARGER:  That would be just as arbitrary,

2     Chris, this is a productive exercise that the court is

3     entertaining right now.

4          MR. CHRISTIE:  Yeah.  And I'm thinking some

5     portion of this.  Let them prioritize it.

6          MR. BARGER:  Seems like that series of

7     questions have been answered in less time than it's

8     taken us to talk about it.

9          THE COURT:  I don't think so, Mr. Barger.

10         MR. BARGER:  Okay.

11         THE COURT:  As to 201 through 227, I'm going to

12    limit the defendant's response to that be numbers -- and

13    I'm not going to go through and pick them out -- but for

14    ones that -- well, to ones that actually identify

15    documents.

16         For example, I guess, starting with 201, that

17    does not have to respond to 201 through 206, but would

18    have to respond to 207 as to whether that document is

19    true and accurate copy of the report.

20         And the same with the other such reports, but I

21    was looking -- I think that would be 207, 213, 219, 222

22    and 227, and I may have overlooked another one.  I don't

23    know.

24         And the ones before that y'all are going to

25    identify which documents go to the specific request.

1          Given the timing, and, again, I don't think

2    that it's realistic to expect a response to, even now

3    down to maybe two hundred, or a few less than two

4    hundred requests within thirty days.

5          So when would be reasonable?  And certainly

6    these would need to be done -- you mentioned, Ms. Snow,

7    needing them for trial.

8          Are these something you anticipate needing for

9    your dispositive motion?

10         MS. SNOW:  It's possible, yes.

11         THE COURT:  Could we get these done by the

12   first of April?

13         MR. CHRISTIE.  I believe so.  We can discuss

14   that with governments's counsel and maybe get an extra

15   week or two.

16         THE COURT:  I will put the request for

17   admissions due April 1st.  I don't know what day of the

18   week that might be, but whatever that is.

19         MR. BARGER:  April Fools Day.

20         THE COURT:  I think that is appropriate.  Don't

21   you?

22         MR. BARGER:  I do.

23         THE COURT:  Then the interrogatories.

24         MR. CHRISTIE:  I have one other, request for

25   admissions, we may need to have thirty days after they

1   give us the document, at least thirty days after they

2   give us the numbers that go with them.

3        For example, if they don't get us that until

4   March 14th and we have until April 14th, I don't have a

5   problem with that.

6        I am thinking I need to have the discovery that

7   we're going through, with February over, and I need the

8   document numbers thirty days after that in order to be

9   able --

10       THE COURT:  You need the document numbers

11  thirty days before your response?

12       MR. CHRISTIE:  I didn't say that correctly.

13       THE COURT:  How quickly could you get those?

14       MS. SNOW:  I suspect we could get them in the

15  next week.

16       MR. CHRISTIE:  Then April 1st will be fine.

17       THE COURT:  Interrogatories.  The first four

18  dealing with the communication of patients referenced in

19  emails.

20       MS. SNOW:  Which were questions we asked the

21  witness from Excelas and she was unable to answer the

22  question.

23       THE COURT:  Yeah.  And you had served a

24  subpoena on Excelas for that but haven't gotten it yet

25  but no motion to compel compliance.

1          MS. SNOW:  Correct.  I did actually receive

2     yesterday a letter indicating that response to the

3     subpoena was being sent to me.

4          THE COURT:  Okay.

5          MS. SNOW:  I haven't reviewed the documents and

6     I don't know whether or not the document answer these

7     questions.

8          THE COURT:  So if that answers your questions,

9     then those first four would be, in essence, moot?

10          MS. SNOW:  Well, I think that would assist in

11    providing the information.  I think we would still -- I

12    think we would want to have the opportunity to still

13    obtain answers to interrogatories, if that doesn't

14    answer the question.

15          THE COURT:  That's what I was saying.  If the

16    documents do answer it, though, will you need

17    interrogatories to answer it as well?

18          MS. SNOW:  I think if the documents are

19    sufficient to answer it, then we wouldn't need the

20    interrogatory.

21          THE COURT:  So they would, in essence, be

22    moot?

23          MS. SNOW:  Yes.

24          THE COURT:  So you'll let Mr. Christie know

25    when you review those documents whether you still need

1    answers to interrogatories one through four?

2         MS. SNOW:  Okay.

3         THE COURT:  Then five through eleven, again,

4    deals with revenues and profits.  And --

5         MS. SNOW:  Your Honor, this is information,

6    again, requested in part to address opinions by

7    AseraCare's experts.

8         For example, one of AseraCare's experts gives

9    an opinion that downplays the significance of

10   AseraCare's marketing not providing information about

11   the Medicare hospice benefit on the basis that Medicare

12   is not the only provider of hospice.

13        So, in part, this is information to show, we

14   expect, that most of their revenue is coming from

15   Medicare and most of their profit is coming from

16   Medicare.

17        So it should have been communicating the

18   Medicare requirements and its marketing materials.

19        In addition, one of AseraCare's expert reports

20   is providing an opinion about the population of patients

21   that is the focus of the litigation and that is patients

22   who had a length of stay of a year or more.  And this

23   report is providing information about how that

24   population compares to the whole population of

25   AseraCare.

1          And this information is relevant to put that

2     into context, that while the percentage of patients who

3     lived a year or more might be a lower percent, those

4     people represented a much higher percent of the profits

5     and the revenues that AseraCare received from Medicare.

6          So, in part, we're obtaining information to

7     respond to AseraCare's expert reports.

8          MR. CHRISTIE:  I don't understand what she

9     said, Your Honor.  I'm sorry.

10          MR. BARGER:  If I can clarify real quickly.  It

11    looks like you're having trouble following it, too.  I

12    don't want to impute that to you.

13          The basic allegation that we're dealing with

14    here is that AseraCare targeted patients -- not all

15    hospice patients represent the same type of

16    profitability.  Hospice is a complex profit -- if you

17    are trying to make a profit, it's complex as to how you

18    do that.  And certain patients are more profitable than

19    others.  And AseraCare targeted patients based on their

20    profitability rather than on their eligibility for the

21    Medicare hospice benefit.  And their marketers were

22    taught to seek certain types of patients based on

23    profitability.

24          Now, in and of itself, that's not bad, as the

25    Court, I mean, we are all seeking profit.

1          But if they do that at the cost of ignoring the

2    payment conditions for Medicare, and then AseraCare's

3    expert said we don't have to because lots of people pay

4    for hospice, other insurance companies do, and they have

5    different payment criteria than Medicare.

6          Well, turns out that AseraCare, most of its

7    patients are Medicare, so that is clearly relevant to

8    address this sort of rebuttal by their expert.

9          But also the way that they target patients in

10   their marketing, and it just so happens to be that the

11   most profitable patients are also the ones that are

12   least likely to be terminal in the time frame.

13         So all of that is really relevant.  It's just

14   not as simple as AseraCare would like it -- to make it

15   out here.

16         But their internal documents demonstrate a very

17   serious understanding about how complex it is.  They

18   know exactly what types of patients, they set criteria

19   and quotas for exactly certain types of patients, do

20   they need those, those are the ones that are the highest

21   risk of being nonpayable under Medicare's guidelines;

22   meanwhile, they know they are pushing up against the

23   envelope against Medicare's types of patients that are

24   payable by Medicare, they are being put on notice by

25   several, whether you call them an auditor or not,

1    different avenues.

2        In addition to the fact that they are pushing

3    up against the absolute cap in numerous of their cites

4    for what Medicare will pay period because they are so on

5    the edge.

6        I think all of that is relevant and it's

7    important.

8        MR. CHRISTIE:  To be frank, Your Honor, I don't

9    understand what he said either.

10       THE COURT:  I generally think I do.  But the

11   issue of the specific interrogatory, annual revenue,

12   annual profit, why is that relevant?  And certainly I

13   don't think that would be admissible.

14       MS. SNOW:  Well, Your Honor, those are designed

15   to obtain information about what percent of the revenue

16   is coming from Medicare.  We understand that 95 to 96

17   percent of the revenue was Medicare derived.

18       So if a company is essentially almost entirely

19   funded by Medicare, that is relevant information in that

20   one would expect such a company to be particularly

21   knowledgeable about the Medicare requirements and

22   particularly attuned to complying with it, if that is

23   almost the entire source of revenue.

24       MR. BARGER:  If they want to stipulate, I'm not

25   speaking for the government, if they want to stipulate

1  that almost their entire revenue comes from Medicare,

2  then maybe that would be a solution.

3        MR. CHRISTIE:  We already had a corporate

4  representative testify on that topic.

5        MS. SNOW:  She could not provide the

6  information requested here.

7        MR. CHRISTIE:  But she gave information more

8  than sufficient for the purposes they're seeking here.

9        THE COURT:  To go back and determine the

10  specific profit generated by each Medicare patient

11  identified in a subpoena duces tecum that was issued in

12  2009 -- how many patients are you talking about there?

13        MS. SNOW:  These two requests are seeking the

14  information about the profit for the patients that are

15  the subject of the litigation.

16        THE COURT:  How many patients?

17        MS. SNOW:  I apologize.  In total, 233.

18        THE COURT:  233 patients.

19        MS. SNOW:  236, but on the medical records were

20  obtained for 233.

21        MR. CHRISTIE:  Three of them were not

22  AseraCare's patients, not that they didn't have the

23  medical records.  They were not AseraCare patients.

24        THE COURT:  Again, I have problems not so much

25  with information sought there but it being requested at

1  such a late point in discovery and how they're suppose

2  to generate that information for 233 patients in thirty

3  days' time in the midst of such a huge push for getting

4  all this other discovery in.

5        MR. CHRISTIE:  I will tell you, Your Honor, I

6  don't think those numbers can be calculated without

7  hiring an outside consultant basically being an expert

8  coming in and doing an analysis.  That is not

9  information that the company normally keeps.

10        So you're going to have to have someone come in

11  and do some kind of estimation, it's probably not going

12  to have inhouse capabilities of doing this and they're

13  basically requiring us to hire an expert.

14        MR. BARGER:  Well, that would be an appropriate

15  response to the interrogatory from the company if

16  somebody is willing to sign that that's the case.

17        But having -- I mean, that's how you respond to

18  an interrogatory.  They don't have that information and

19  they can say that and then we can have somebody from the

20  company certifying that that is the case, rather than

21  just doing this and having Mr. Christie say that.

22        MR. CHRISTIE:  If that's going to be the

23  answer, then that will be the answer.  We can answer

24  questions -- the government objected to us saying that

25  these -- we didn't think these things were going to be

1  possible but not incalculable.  We have to make an

2  estimate.  And it's going to take a lot of work for

3  someone at AseraCare to come up with the types of

4  information that's being requested.  And for something

5  that --

6          MR. BARGER:  That's a little different than an

7  expert, Chris, you said an expert would have to come in.

8          MR. CHRISTIE:  I said I don't know if they have

9  the inhouse capability or not, especially for something

10 that the Miller case says is both irrelevant and highly

11 prejudicial.

12         MR. BARGER:  We know that AseraCare has the

13 proprietary software to try all sorts of financial

14 data.

15         I think the more appropriate thing would be to

16 go find out if that's available and if it is, answer;

17 and if not, answer that they don't have it.

18         And then we have a real statement by the

19 company of what they track and what they don't; what

20 they have; what they don't.  Rather than this exercise

21 and Chris telling us that he doesn't know whether they

22 have it or not or whether it's an expert --

23         THE COURT:  I have got some real questions

24 about interrogatory eight through 12, certainly if that

25 information is available, without having to hire outside

1   people to do it, I think it needs to be provided.

2           But if it can't be, then I think that needs to

3   be stated.  And if there is a motion to compel

4   additional resources to be placed on it, we will take

5   that up.

6           But the contention interrogatories I think are

7   due to be answered, if they're appropriate, 13 through

8   23, I believe.  Then 24 through 42 -- 24 through 42 is

9   specifically identify the documents that you're talking

10  about.

11          MS. SNOW:  Yes.

12          THE COURT:  Okay.  And you're merely asking

13  identification of specific person identified in those

14  documents; is that --

15          MS. SNOW:  And patients.  Yes.

16          THE COURT:  Those were from a report of the

17  Corridor Group?

18          MS. SNOW:  That's correct.

19          THE COURT:  You say those were requested of the

20  Corridor Group in November of 2012?

21          MS. SNOW:  Your Honor, we subpoenaed the

22  Corridor Group in November of 2012 and then again in May

23  of 2013 and we also requested documents regarding the

24  Corridor's reviews from AseraCare.

25          And we have not, to our knowledge, received in

1    the production from the Corridor Group documents that

2    would answer these questions.

3         What we expect existed or exists are interview

4    reports or documentation that would indicate who was

5    interviewed by the Corridor Group and so who is

6    discussed in the Corridor Group's report to AseraCare

7    and for the patients, which medical records did the

8    Corridor Group review, presumably AseraCare would have

9    had the information about which patients the Corridor

10   Group found were ineligible, and we want to know who

11   were those patients and what happened to them, were they

12   discharged or did they stay on for another two or three

13   years, and were any of those patients also reviewed as

14   part of the litigation and was Corridor's finding

15   perhaps consistent with our expert's finding that

16   patient was ineligible.

17        So it's important information that we identify

18   the patients and these particular individuals.  There

19   were lots of individuals identified by their title in

20   the Corridor Group reports and we selected particular

21   individuals based on the comments that either expressed

22   concern or identified problems or were, for example,

23   medical directors who were noted to not be knowledgeable

24   about the guidelines for assessing eligibility or to not

25   be involved in assessing whether the patients were

1   eligible.

2          So there are particular individuals that we

3   selected from numerous reports that we believe were

4   particularly relevant to identify.

5          MR. BARGER:  Your Honor, I will just add before

6   the government intervened, the relators requested this

7   information as early as 2011 and issued subpoenas to the

8   Corridor Group in Kansas and were stonewalled right up

9   until the government took over and we haven't received

10  them.

11         THE COURT:  Were there ever any motions to

12  compel Corridor to produce those documents?

13         MR. BARGER:  Your Honor, the government

14  intervened before we had a chance to do that, but that

15  was probably going to be our next step.

16         THE COURT:  So the answer is no.

17         MR. BARGER:  No.  That's correct.

18         MS. SNOW:  We have been communicating with the

19  Corridor Group, as well as AseraCare, about the

20  production of Corridor documents to try and obtain

21  information, if it exists.

22         But we have not obtained it nor do we have

23  confirmation that it does not exist.

24         MR. CHRISTIE:  Your Honor, I'm not handling

25  this part of it.  But my understanding that the Corridor

1    Group confirmed that it's given the documents it has.  I

2    know AseraCare provided documents that it has.

3           I don't do -- there are no other documents that

4    I'm aware of.  And I know that AseraCare produced the

5    documents that it has.  And I obviously can't speak for

6    the Corridor Group.  But my understanding is they have

7    produced what they have.

8           MS. WOODKE:  The conversation that we had with

9    the Corridor's Group attorney, he did not state with

10   certainty they have produced what we have.  My

11   understanding is they are still looking which is the

12   last conversation we had with Mr. Powers.

13          MR. CHRISTIE:  I'm not part of -- this is not

14   part of the case that I'm responsible for.  But that

15   is -- you know, I do know that AseraCare doesn't have

16   more information than we have already provided.

17          MR. BARGER:  And it seems to me that AseraCare

18   should have to answer that it has no records and no idea

19   of who these patients were, what they did in response to

20   this, that no record exists.  That in and of itself

21   would be demonstrative evidence.

22          MR. CHRISTIE:  In 2014, we can't identify

23   something we knew in 2007.

24          MR. BARGER:  And the government -- AseraCare

25   has known that it has been under investigation for this

1  since -- at that same time period.  I mean, it's a

2  little disingenuous to act like they are just now

3  finding out about this or they didn't keep any record

4  about what they did with regard to patients that were

5  identified to be inappropriate.

6       THE COURT:  I think it is very difficult to ask

7  one entity to identify who another entity was referring

8  to in 2007.

9       I think that, you know, efforts should be

10  redoubled in terms of getting the information from

11  Corridor Group who is the one who was making the

12  reference.

13       Now, in terms of who a medical director might

14  have been, they may be able to identify that, and

15  certainly I think should be able to give the best

16  effort, if you will, Mr. Christie, to identify these

17  people.

18       But, again, the person who is doing the

19  referencing would be your better source in terms of who

20  they missed.

21       But I do think it's a bit problematic to wait a

22  year and a half and almost another year before pursuing

23  some kind of motion to compel as to the Corridor Group

24  for not responding.

25       MS. SNOW:  Again, we have been in communication

1    and we hope to be able to contain the information

2    through our requests and our communications with

3    counsel.

4         THE COURT:  Well, if it doesn't look like it's

5    going to be forthcoming, then you need to step up your

6    action.  Give it your best shot.  Or have somebody give

7    it their best shot.

8         But if AseraCare doesn't have that information,

9    then I certainly understand that.

10        But if there is a reference to medical director

11   by a certain name or a certain location, certain date,

12   you know, I think the answer may be James Smith was the

13   medical director, whether that's the medical director

14   they're referring to, I mean, you know, you don't always

15   know that just because that person was in a position or

16   something.

17        I'm not sure how much information that is going

18   to give you.

19        We then get back down to timing.  Can you do

20   that by April 1st?  Best shot guess.

21        MR. CHRISTIE:  We will try, recognizing that we

22   have the documents and the request for admission and

23   this and at the same time prepare dispositive motions

24   and motions to prepare, we can make an effort.

25        THE COURT:  Given all these issues, I do think

1    we probably need to set another conference around the

2    first of April.

3            I have no idea what's going on with my

4    calendar, I will need to take a look at it.  But I think

5    it would be good for us to meet again to see where we

6    are, to see what's still up in the air and have some

7    serious conversations about what, if anything, will be

8    filed on May 1st.  And also hopefully by then y'all

9    would have conversation about whether mediation would be

10   viable; and if so, timing for that.

11           Anything else?  I'm hesitant to ask that.

12           MS. SNOW:  I do have a question, Your Honor,

13   related to discovery and also exhibits similar to the

14   question Chris asked earlier.

15           With respect to the presentation of summary

16   evidence under Federal Rule of Evidence 1006, to the

17   extent the parties are anticipating presenting summary

18   evidence through a summary witness, would Your Honor

19   expect that the parties exchange written summaries to

20   the extent there might be some written analysis of the

21   voluminous writings, would Your Honor expect those to be

22   exchanged before the close of discovery or right at the

23   time that trial exhibits are discussed?

24           MR. CHRISTIE:  The Excelas people, that's all

25   they've done and they have taken their depositions.  So

1    if the government is getting ready to serve 1006

2    summaries, we won't have had an opportunity to take that

3    person's deposition like they have already taken

4    Excelas' deposition and they're seeking more information

5    relating to Excelas.

6           I don't know what they are talking about and

7    what they have in mind.  All Excelas did was summarize

8    medical records.

9           MS. SNOW:  There are a lot of voluminous

10   documents in this case including audit documents and

11   other materials that may -- the parties may choose to

12   present through a summary witness.

13          So the question was if there was a -- some

14   summary, would the court expect that would be exchanged

15   before the close of discovery or some later point.

16          THE COURT:  I would expect counsel to discuss

17   those issues among yourself and determine how best to

18   approach that.  Because I don't know what kind of

19   documents you're talking about to have summarized and

20   that kind of stuff.

21          I will say this, if that summary

22   witness/summary document is something that would only be

23   necessary for trial, if that is something that y'all

24   would like to pursue after the close of discovery,

25   formal close of discovery, I would have no problem with

1    y'all pursuing that.

2          For example, in cases where we're going to have

3    to have the deposition of a doctor for trial purposes,

4    but it's not relevant to summary judgment issues, I give

5    the parties leave to do that deposition after summary

6    judgment or whatever.  Not that this is the same kind of

7    witness or the same kind of discovery, but I see it sort

8    of related.

9          If it's not discovery that you have to have

10   prior to your dispositive motions but it's something

11   that y'all would like to discover from each other prior

12   to trial, I think y'all can work that out and do it

13   after dispositive motions while we're trying to wade

14   through all of that stuff, if you want to work that

15   out.

16         I do think that disclosure of summary

17   testimony, summary information prior to a thirty-day

18   exhibit before trial would probably behoove both sides.

19   And we're probably looking at disclosure of trial

20   exhibits sooner than the standard thirty day before

21   trial because I have a feeling we may have more issues

22   to deal with than we might could get done thirty days

23   before trial.

24         Anything else?  Okay.  Thank you.

25                  (COURT ADJOURNED)

1

2

3                    C E R T I F I C A T E

4

5          I hereby certify that the foregoing is a

6      correct transcript from the record of proceedings

7      in the above-referenced matter.

8

9

     _____
10     Teresa Roberson, RPR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25