FILED
2014 Jun-21 AM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit

# 18

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,
ex rel. DEBORA PARADIES, et al.

Plaintiffs,

v.

GGNSC ADMINISTRATIVE
SERVICES LLC, et al.

Defendants.

CASE NO. 2:12-cv-0245-KOB

## PLAINTIFF UNITED STATES OF AMERICA'S
## RESPONSE TO DEFENDANTS'
## DECEMBER 6, 2013 INTERROGATORY

Pursuant to Federal Rules of Civil Procedure 26 and 33, the United States responds and objects to Defendants' December 6, 2013 interrogatory.[1]

### PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

1.  Plaintiff the United States of America ("United States") submits this response subject to, and without intending to waive, any objections as to the

---

[1] During a December 6, 2013 teleconference, the parties agreed to treat topic 6 in Defendants' May 29, 2013, Notice of Rule 30(b)(6) Deposition of the United States (HHS-OIG) as an interrogatory served on December 6, 2013, and that the United States would not need to designate a 30(b)(6) witness for topic 6.

1

competency, relevance, materiality, privilege (or protections), confidentiality, or admissibility of any response to Defendants' December 6, 2013 interrogatory.

2.  The United States submits this response subject to, and without intending to waive, the right to object to other discovery procedures involving or relating to the subject matter of Defendants' December 6, 2013 interrogatory.

3.  The United States submits this response subject to, and without intending to waive, the right at any time to revise, correct, supplement, amend, or clarify any of the response herein. Said response is at all times without prejudice subject to such additional or different information that discovery or further investigation may disclose.

4.  The United States objects to the interrogatory to the extent that it seeks information or documents protected from disclosure by privilege or doctrine, including the attorney-client privilege, the investigative files privilege, the work product doctrine, the joint prosecution/common interest doctrine, informant's privilege, the deliberative process privilege, the law enforcement privilege, protections afforded by Fed. R. Civ. P. 26(b), or any other applicable basis for invoking privilege or doctrine that may be lawfully asserted without limitation. The United States reserves the right to object to the introduction into evidence before the Court at any time before or at trial of information that is protected under law and that has been revealed or produced inadvertently. The United States does

not, by responding to this interrogatory, waive any claim of privilege or the protection of any doctrine.

5. The United States objects to this interrogatory to the extent it requires the United States to draw legal conclusions or otherwise seek to impose upon the United States any requirements beyond those established by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of Alabama.

6. The United States objects to this interrogatory to the extent it requires the United States to identify and enumerate information and documents that are equally available to Defendants.

## OBJECTIONS AND RESPONSE

### DECEMBER 6, 2013 INTERROGATORY:

Any policies, programs, or procedures of Defendants that the Government contends caused or contributed to the submission of false claims.

### RESPONSE TO DECEMBER 6, 2013 INTERROGATORY:

The United States objects to this interrogatory on the bases that it is vague, premature, cumulative, unduly burdensome, may seek information not relevant to claims or defenses, and may establish a burden or legal standard that the United States does not allege and is not required to meet under the False Claims Act ("FCA"). Moreover, the United States objects to this interrogatory to the extent

3

that it seeks information protected by: the attorney-client privilege, the work product doctrine, the law enforcement privilege, the investigative files privilege, deliberative process privilege, Fed. R. Civ. P. 26(b), or any privilege that may be lawfully asserted, Fed. R. Evid. 408, and Fed. R. Civ. P. 26(b)(4)(D).

The interrogatory is vague because the terms "policies," "programs," or "procedures" are not defined in the interrogatories, the FCA, or 42 C.F.R. Part 418. The United States interprets the terms "policies," "programs," or "procedures" to broadly refer to AseraCare's business practices including, but not limited to, those alleged in the United States' Consolidated Complaint in Intervention (Dkt. No. 156, ¶¶ 39-64).

This interrogatory is unduly burdensome and premature to the extent it can be interpreted to require the United States to provide a complete catalog of all specific AseraCare business actions or activities or AseraCare's internal company documents or other documents that the United States may introduce as evidence or otherwise raise at trial. This interrogatory is also unduly burdensome to the extent that it requires the United States to reproduce information in the possession, custody, or control of AseraCare or to produce information not relevant to claims or defenses. This interrogatory is cumulative to the extent that response information is included in the United States' Consolidated Complaint in Intervention (Dkt. No. 156), expert reports, and completed depositions.

Moreover, this interrogatory is not relevant to claims or defenses in this case because the United States, to establish that AseraCare violated the FCA when it submitted, or caused to be submitted, claims to Medicare for hospice patients who were not eligible to receive Medicare hospice benefits, does not need to allege or show that any specific AseraCare policy, program, procedure caused or contributed to the submission of false claims. Specifically, the United States alleges in this action that AseraCare violated the FCA by "knowingly" submitting, or causing to be submitted, false or fraudulent claims for payment from the Medicare Program for hospice care for individuals who were not "terminally ill." To sustain its burden of proof, the United States must prove, by a preponderance of the evidence, the following elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *See United States ex rel. Walker v. R&F Properties of Lake County*, 433 F.3d 1349, 1355 (11th Cir. 2005).

The first element of a cause of action under the FCA is a false or fraudulent claim. A claim is any request or demand for money or property from the United States. 31 U.S.C. § 3729(b)(2). As the Eleventh Circuit has observed, without a claim there is no FCA violation. *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). The claims that the United

5

States intends to establish at trial are claims that AseraCare submitted, or caused to be submitted, for money from the Medicare Program for hospice services provided to individuals, who were not terminally ill, in two statistically valid random samples.

The United States also must prove by a preponderance of the evidence that AseraCare submitted, or caused to be submitted, false claims "knowingly." The FCA defines the terms "knowing" and "knowingly" to mean (i) "actual knowledge," (ii) "deliberate ignorance", or (iii) "reckless disregard," and expressly provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1). The United States intends to prove that AseraCare knew, deliberately ignored, or recklessly disregarded that the Medicare claims that it submitted were false by showing, among other things, that AseraCare engaged in reckless business practices, as generally discussed below.

Subject to these specific objections and its general objections set forth above, the United States responds that it contends that AseraCare had marketing practices; training practices; incentive programs; census and admissions expectations; patient admission, recertification, and discharge practices; employee discipline, termination, and layoff procedures that show AseraCare knew, deliberately ignored, or recklessly disregarded that it was submitting false claims to Medicare. Examples of these practices include, but are not limited to:

6

- AseraCare targeted the admission of patients who would be most profitable to AseraCare.

- AseraCare's marketing materials provided incomplete and inaccurate information about the Medicare hospice benefit. The materials did not inform patients, their families, or potential referral sources that Medicare only reimburses for hospice care if the patient has a prognosis of six months or less if his or her illness follows its normal course.

- AseraCare's marketing materials did not emphasize, and usually did not even mention, the Medicare eligibility requirements for hospice.

- AseraCare's marketing materials gave the impression that hospice benefits may routinely be provided for indefinite periods.

- In the 2006-2008 timeframe, AseraCare did not have a written policy requiring pre-approval of all AseraCare marketing material.

- AseraCare marketed hospice to community physicians, patients, facilities, and families as "extra help."

- AseraCare instructed its Provider Relations Managers to ask potential referrals sources if they had patients with general symptoms to refer to AseraCare for potential admission for hospice care when those general symptoms did not establish that the patient had a prognosis of six months or less to live.

- AseraCare distributed marketing materials to referral sources, which described general symptoms that did not establish that the patient had a prognosis of six months or less to live, as being "hospice triggers" that could indicate that a patient was terminally ill.

- AseraCare did not have a compliance department separate from Golden Living's compliance department.

- Golden Living's compliance department did not retain records showing whether it reviewed marketing pieces used by AseraCare.

- Since 2006, AseraCare has not been required to submit to Golden Living's compliance department education programs on hospice it proposed for physician offices or community audiences.

- AseraCare did not provide wallet cards to its employees with the telephone number of the Golden Living/AseraCare compliance hotline.

- AseraCare agencies did not visibly post the HHS-OIG hotline telephone number within the agency.

- Rebecca Smith, a Golden Living compliance department employee with responsibility over AseraCare, did not record all AseraCare compliance issues reported to her in a hotline call report.

- Rebecca Smith, a Golden Living compliance department employee with responsibility over AseraCare, did not monitor the results of Level III audits.

- Rebecca Smith, a Golden Living compliance department employee with responsibility over AseraCare, did not regularly ask for the results of AseraCare's Agency Performance Assessments.

- AseraCare encouraged referring physicians to rely on AseraCare's expertise in determining whether a patient was terminally ill and eligible for Medicare hospice benefits.

- AseraCare prioritized getting Medicare admissions needed to maximize its Medicare revenue above ensuring that all of its patients were terminally ill, needed hospice care, and met the Medicare hospice eligibility criteria.

- AseraCare prioritized financial goals instead of Medicare hospice eligibility when identifying potential patients for admission to hospice.

- AseraCare focused on admitting Medicare patients who had never before received hospice and were more profitable to AseraCare, with little focus on whether such patients were terminally ill.

- When facing potential cap liability, AseraCare discouraged its employees from admitting Medicare patients who had previously received Medicare hospice benefits.

8

- AseraCare discharged Medicare patients when they threatened AseraCare's profitability.

- AseraCare encouraged its employees to screen nursing home patient charts for potential hospice patients when census dropped.

- Medical directors were not adequately involved in admission and certification decisions.

- AseraCare admitted patients before obtaining the medical director's certification of terminal illness.

- Medical directors did not consistently receive information about patients' conditions prior to initial certification of terminal illness.

- AseraCare management pressured medical directors to certify or recertify and discouraged them from recommending discharge.

- AseraCare physicians signed certifications and recertifications without seeing patients.

- AseraCare failed to obtain proper physician certifications for patients who were admitted or recertified for hospice services.

- AseraCare admitted and retained patients when documentation in the patients' medical records did not support their eligibility for the Medicare hospice benefit.

- AseraCare admitted and retained patients when physicians, nurse practitioners and AseraCare's own staff documented that patients were ineligible for the Medicare hospice benefit.

- AseraCare admitted and retained patients whose documented condition did not meet the criteria in the Palmetto hospice local coverage determinations ("LCDs").

- Based on the medical records, AseraCare admitted and retained patients with treatable and reversible causes of their decline.

9

- AseraCare failed to ensure that its staff accurately documented functional scores. The Palliative Performance Scale (PPS), New York Heart Association (NYHA) and Functional Assessment Staging (FAST) scores in AseraCare's medical records were commonly inconsistent with and reflected a lower functional status than the descriptions of the patients' functional status in the records.

- AseraCare offered bonuses and incentives to clinical employees based on EBITDA, revenue, admissions, and census.

- AseraCare regularly pressured its employees to maintain and increase census.

- AseraCare's incentive programs did not prioritize complying with Medicare eligibility requirements; in fact, the disclaimer language regarding admissions not being counted towards incentives if they did not meet Medicare criteria was never enforced.

- AseraCare's incentive programs and bonus structure prioritized admissions and census over regulatory compliance.

- Contests and competitions between agencies were held to drive admissions.

- AseraCare senior management established unrealistic admission/census goals for agencies.

- AseraCare pressured employees to admit patients to hospice by terminating or placing on action plans employees who did not meet admissions goals.

- Management caused staff to fear layoffs if census fell below expectations.

- AseraCare chastised staff for discharging patients before 180 days had passed, without regard to whether those patients were eligible for Medicare hospice benefits.

- AseraCare management discouraged nurses from finding patients ineligible for the Medicare hospice benefit or voicing eligibility concerns.

- AseraCare's sales trainings did not emphasize, and usually did not mention, the Medicare requirement that patients must be terminally ill with a prognosis of six months or less to be eligible for hospice benefits.

- AseraCare instructed staff to document facts that supported Medicare hospice benefit eligibility and did not equally instruct clinicians to documents facts that indicated the patient was not eligible or should be considered for discharge.

- AseraCare hired inexperienced nurses and medical directors and provided inadequate training on Medicare hospice benefit eligibility criteria.

- AseraCare medical directors lacked knowledge of hospice LCDs and eligibility criteria.

- AseraCare's staff training downplayed the importance of the prognosis of six months or less and focused on the admission and recertification of patients whose conditions do not meet the criteria in the LCDs.

- AseraCare trained its staff that meeting the criteria in the LCDs is a lifetime ticket to hospice even if the patient's condition is not declining.

- AseraCare did not change its eligibility training that downplayed the importance of the prognosis of six months or less, focused on the admission and recertification of patients whose conditions did not meet the criteria in the LCDs, and conveyed that meeting the criteria in the LCDs is a lifetime ticket to hospice even if the patient's condition is not declining, despite The Corridor Group audit showing that AseraCare had ineligible patients and that AseraCare's Medicare hospice eligibility training was deficient.

- AseraCare did not change or consider changing its eligibility training in response to AseraCare's cap liability.

- No one at the AseraCare agency level reported directly to AseraCare's Clinical Services Regional Managers. Instead, AseraCare agency Directors of Clinical Services (DOCS) reported directly to the agency Executive Directors. The agency Executive Directors reported directly to the regional Director of Operations.

11

- Despite the Corridor Group, in its report on its 2007 – 2008 review, observing that Clinical Services Regional Managers lacked authority to implement plans of correction on clinical issues in response to agency assessments that they conducted, AseraCare did not change the reporting relationship between Clinical Services Regional Managers and agency Directors of Clinical Services.

- AseraCare failed to inform its national medical advisor that it had experienced cap liability and that an outside auditor had found that AseraCare had patients who were not terminally ill or otherwise not eligible for hospice.

- AseraCare did not change its marketing practices despite The Corridor Group audit showing that AseraCare had ineligible patients.

- AseraCare disregarded staff findings or concerns of ineligibility.

The United States will supplement its response based on additional information obtained and reviewed during discovery or any amendments to the expert reports.

## WITH RESPECT TO THE ANSWERS

I, Carolyn B. Tapie, declare under penalty of perjury, that I have read and reviewed the Plaintiff United States of America's Response to Defendants' December 6, 2013 Interrogatory. I am verifying that those responses are true and correct, after reasonable investigation, to the best of my knowledge, information, and belief.

*Carolyn B. Tapie*

Carolyn B. Tapie
Trial Attorney
U.S. Department of Justice

WITH RESPECT TO THE OBJECTIONS

Respectfully submitted,

STUART F. DELERY
ASSISTANT ATTORNEY GENERAL

JOYCE WHITE VANCE
UNITED STATES ATTORNEY

LANE HINES WOODKE
JASON EHRLINSPIEL
Assistant United States Attorney
1801 4th Avenue North
Birmingham, AL 35203
Telephone: (205) 244-2107

MICHAEL D. GRANSTON
RENÉE BROOKER
HOLLY H. SNOW
CAROLYN B. TAPIE
WILLIAM E. OLSON
EVA U. GUNASEKERA
DEREK C. JULIUS
OLGA YEVTUKHOVA
Attorneys, Civil Division
Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-2879

Counsel for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2014, the foregoing was served by email to the following counsel for Defendants and Relators. Copies to follow by U.S. Mail.

Jack W. Selden
James S. Christie, Jr.
Kimberly Bessiere Martin
Tiffany J. deGruy
Bradley Arant Boult Cummings LLP
1819 5th Avenue North
Birmingham, AL 35203

Charles H. Bohl
Andrew A. Jones
Whyte Hirschboeck Dudek SC
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819

Nola J. Hitchcock Cross
Mary C. Flanner
Cross Law Firm SC
845 N. 11th St.
Milwaukee, WI 53233

Henry I. Frohsin
James F. Barger, Jr.
J. Elliott Walthall
Carrie M. Motes
Ronald R. Brunson
Frohsin & Barger LLC
3430 Independence Drive, Suite 40
Birmingham, AL 35209

*Holly Snow*
Holly H. Snow
Trial Attorney
U.S. Department of Justice