FILED

2015 May-05  PM 03:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

1            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ALABAMA
2                 SOUTHERN DIVISION

3

4    UNITED STATES OF AMERICA,        2:12-CV-0245-KOB
     ET AL,
5
              Plaintiffs,             April 24, 2015
6
              V.                      Birmingham, Alabama
7
     ASERACARE, INC., ET AL,              4:15 p.m.
8
              Defendant.
9
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10

11            REPORTER'S OFFICIAL TRANSCRIPT OF
                  STATUS CONFERENCE
12

13      BEFORE THE HONORABLE KARON O. BOWDRE
          CHIEF UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21   COURT REPORTER:

22   Julie Martin, CRR, CSR
     Federal Official Court Reporter
23   1729 Fifth Avenue North, Ste 325
     Birmingham, Alabama  35203
24

25

```
 1                    * * * * *

 2              A P P E A R A N C E S

 3                    * * * * *

 4   FOR THE PLAINTIFF UNITED STATES:

 5   Lane H. Woodke
     U.S. Attorney's Office
 6   1801 4th Avenue North
     Birmingham, AL  35203
 7
     Jeffrey Wertkin
 8   Carolyn B. Tapie (Telephonically)
     Holly H. Snow (Telephonically)
 9   William Edward Olson (Telephonically)
     U.S. Department of Justice
10   P.O. Box 261
     Washington, DC  20044
11
     FOR THE PLAINTIFFS PARADIES AND LEWIS:
12
     Nola J. Hitchcock Cross (Telephonically)
13   CROSS LAW FIRM
     845 North 11th Street
14   Milwaukee, WI  35233

15   James F. Barger, Jr. (Telephonically)
     FROSHIN & BARGER
16   2421 2nd Avenue North, Suite 1
     Birmingham, AL  35253
17

18   FOR THE DEFENDANT ASERACARE:

19   James Sturgeon Christie, Jr.
     Kimberly Bessiere Martin
20   Matthew H. Lembke
     BRADLEY, ARANT, BOULT & CUMMINGS
21   1819 5th Avenue North
     Birmingham, AL  35203
22

23

24

25
```

```
1                    * * * * *

2               P R O C E E D I N G S

3                    * * * * *

4       (Proceedings held in the court's jury room.)

5            THE COURT:  The 11th Circuit didn't help us

6   out except with a two sentence order, and that was

7   pretty terse.  So we're back to where we were in

8   February, and the government saying told you so, told

9   you so.

10           All right.  We've got two motions from the

11  defendant, but I don't think the government has had

12  an opportunity to respond to either; right, other

13  than in --

14           MR. WERTKIN:  Your Honor, they were just

15  filed.

16           THE COURT:  Yeah.  But I think one of the

17  big things that we need to talk about is a trial

18  date, and then we can look at what we want to do with

19  any of these other things.  I did have something from

20  the --

21           LAW CLERK:  A status report.

22           THE COURT:  Realistically, the earliest date

23  that I think I could try this would be the last week

24  of July, starting the last week of July, which is the

25  27th, I think.  I've got a boat load of trials set
```

1   between now and then.  It seems like they're all in

2   Anniston.  We generally have two cases set almost

3   every week, almost between now and then, if I'm in

4   town.  So that will be the earliest that we could get

5   it done.  Would that work with y'all's schedules?

6          MR. WERTKIN:  Your Honor, in light of

7   everything that needs to have happen and our expert

8   is out of the country and unavailable in August, so

9   what we were talking about during a call that we had

10  before filing the status report, what where we were

11  looking at is a fall trial date.

12         THE COURT:  Okay.  Fall being, what,

13  September?

14         MR. WERTKIN:  September, October.

15         MR. CHRISTIE:  They told us that they were

16  concerned about witnesses being unavailable, but July

17  works for us.  If the court wants to do it later, we

18  can do that, too.  Our main concern is not running

19  into Christmas or even Thanksgiving because, with a

20  trial of this length, we're concerned about jurors

21  not continuing with the trial.  And getting into the

22  holidays exacerbates that problem.  So I'm very

23  concerned about starting late enough before we get

24  into the holidays.

25         THE COURT:  That was another reason I was

1 looking for as soon as we can get it done.  I will

2 say this:  I already have commitments in August and

3 September when I would be unavailable.  In August, my

4 best friend's only daughter is having a wedding in

5 Montana, and we've already -- that's one of the few

6 weddings that my husband has actually been excited

7 about going to, but the mother of the bride and I

8 have been best friends since before we remember,

9 before we have a memory.  So I've got to go to that

10 one.  It's almost like my own daughter is getting

11 married since I don't have one.  So that is like the

12 last weekend in August, and I would be gone Thursday

13 through Monday.  Well, actually it may take longer,

14 but that would be kind of the minimum.

15        But if we have been trying a case for three

16 or four weeks, the jurors always like to have a break

17 anyway.  Then in September, and I'm drawing a blank

18 right now on the dates, there is a re-entry symposium

19 underway at the last --

20        THE CLERK:  29th and 30th.

21        THE COURT:  Of September.  And there's a

22 very large likelihood it may be held here in

23 Birmingham.  And if so, I would be kind of tapped as

24 the hostess judge and would need to participate.  It

25 may go to Atlanta.  If it goes to Atlanta, I probably

1  wouldn't go.  But if it's here, I would need to be

2  available.  So those are the two things that I need

3  to know, and I really didn't look too far in October.

4  I don't know if I've got anything there.

5       THE CLERK:  We've got the MDL the 26th

6  through the 29th.

7       THE COURT:  So it seems like every month

8  I've got something that would take me away, but

9  there's not going to be a three month time period

10  when I don't have some conflict.  And my conflicts,

11  y'all just get a break.

12       THE CLERK:  And it goes into our criminal

13  settings that we might have.

14       THE COURT:  We may see if we can get

15  somebody to cover criminal for us, which we've done

16  before when we've had lengthy trials.  But you've got

17  an expert who is going to be out for how long?

18       MR. WERTKIN:  I don't know the exact

19  schedule, but I think it's most of August, and it's

20  our principal, our medical expert, our principal

21  medical expert on the case.

22       THE COURT:  Dr. Liao?

23       MR. WERTKIN:  Liao, that's right.

24       THE COURT:  If we start July 27th, you can

25  put him on and get him off.

1        MR. CHRISTIE:  If the motion to bifurcate is

2   granted, that actually will be what I suspect will

3   happen.

4        MR. WERTKIN:  Well, I think that that

5   actually raises an interesting point because the

6   court, when these are ruled on, the motion to

7   bifurcate, that decision will impact what the

8   witnesses look like, what the exhibits look like.  So

9   really, for all practical purposes, we wouldn't be

10  able to engage in the exchange as required in the

11  pretrial until such time as the motion to bifurcate

12  is ruled on.

13       So I think that we may be pushing that time

14  period anyway.  We may be -- it may be that July, end

15  of July, is even aggressive to deal with all those

16  other pretrial issues.  So what we would propose is a

17  September 1 or October 1 start, recognizing that

18  there could be a few days break in between.

19       MR. CHRISTIE:  Your Honor  --

20       THE COURT:  I don't foresee trying a case

21  October, November, December, January.  I think that's

22  asking too much of a group of jurors.  So it's kind

23  of like if we can't get it slotted so that we can be

24  reasonably anticipating being through before

25  Thanksgiving or close to it, then I would say we

1   would be looking at a January trial date.

2          I don't want to be responsible for having

3   delayed this for a whole year, because I told you

4   that I would get it tried as soon as I could after it

5   came back.  I don't see why we couldn't get the issue

6   of bifurcation resolved fairly quickly.  I've got the

7   submission from the defendant.  It's not that

8   terribly long.

9          MR. CHRISTIE:  Your Honor, I don't believe

10  that the bifurcation issue would change the witness

11  and exhibit issues in the same way Mr. Wertkin does.

12  The way, for due process purposes, to handle a

13  bifurcated trial is the same jury hears both phases.

14         And so my expectation would be that, even if

15  we bifurcate the trial, that we would provide one

16  witness list and one exhibit list, and so all of that

17  would be done at the same time frame.  And so there's

18  not a break between the two to go back and then redo

19  your exhibit list and redo your witness list.  You

20  roll from one phase to the second phase.

21         So to the extent that we're discussing these

22  scheduling issues, I did want to bring up that my

23  understanding is different as to how a bifurcation

24  would work than --

25         MR. WERTKIN:  I think that's a fair point.

1    I don't want to overplay the -- we were prepared to

2    go forward with this case when we met in December.  I

3    do think that our main expert being unavailable is a

4    key factor here, and that's really my main concern as

5    opposed to -- you know, it could be, and we haven't

6    sat down and worked out the information.

7         I know that in the status report one of the

8    points that we made and we talked about was that it

9    may make sense to extend some of the deadlines to let

10   the court hear and us to brief, if the court would

11   require, some of the issues in the case.  A longer

12   deadline would allow for that.

13        I think our position at this point is that,

14   you know, our expert being critically important to

15   this case that we would -- you know, we would be okay

16   with a January 15th, you know, or February 1st date

17   so that he can participate as opposed to a July date.

18        THE COURT:  Okay.  Well, if I were to

19   bifurcate, you don't know whether he would be

20   available the week of July 27th or the first week in

21   August?  You just said in August.  So I need to know

22   specifics of when Dr. Liao would not be available.

23        MR. WERTKIN:  Okay.  That's fair.  And I'm

24   sorry I don't know them off top of my head.  We can

25   get that information to you.  I do think that,

1  although the submission for bifurcation is relatively

2  short, I don't want to -- there's not a ton of

3  authority in the decision -- I think that our

4  response would prove to be lengthy, and I think

5  there's a lot of authority that we would be able to

6  cite against the issue.  So it might be a more

7  involved briefing than Your Honor contemplates.

8          THE COURT:  But isn't it basically an issue

9  that falls within the discretion of the court?

10          MR. WERTKIN:  Well, it is a review for abuse

11  of discretion, that's right.  But I think that we

12  just got the motion on Wednesday, and so I'm not at

13  this time prepared to go into it in detail, but I do

14  think there is a lot of authority out there that is

15  -- or that we would be able to bring to your

16  attention in response.

17          THE COURT:  Okay.  Could you have it by May

18  4th?

19          MR. WERTKIN:  We had proposed --

20          THE COURT:  Like the end of May or something

21  like that.

22          MR. WERTKIN:  Yeah, May 15th, I believe, is

23  the date we had proposed.

24          MR. CHRISTIE:  Y'all proposed May 22nd.

25          MR. WERTKIN:  Is it May 22nd?

1           THE COURT:  Yes.  And I don't see any reason

2   to wait that long to tee this up.  I would want to

3   have it resolved by then, so we know what we're doing

4   and where we're going and how we're going to get

5   there.

6           May 4th is a week from Monday, which would

7   be a week and a half after you got the motion.  You

8   don't think that's enough with all the lawyers you've

9   got working on this case?

10          MR. WERTKIN:  We are -- actually, everyone

11  on this phone is going to be fully engaged in

12  something from Tuesday to Friday of next week, which

13  is the only reason why I hesitate.  Under normal

14  circumstances -- when Your Honor asked us to turn

15  around the interlocutory appeal in three days, I

16  think we were able to do that.  So under normal

17  circumstances, I would say that would be okay, but I

18  know we will be engaged, and that's the only reason I

19  hesitate.

20          THE COURT:  What about May 11th?

21          MR. WERTKIN:  I think that would be fine,

22  and we will do our best to get it in earlier than

23  that date.

24          THE COURT:  Okay.  And could defense turn

25  around a brief in a week?

1       MR. CHRISTIE:  Yes, Your Honor.

2       THE COURT:  So that if they submit theirs by

3  May 11th, you could have your reply by the 18th?

4       MR. CHRISTIE:  Yes.

5       THE COURT:  Okay.  Now, we've got a bizarre

6  case set for trial that week, don't we?

7       (Discussion off the record)

8       THE COURT:  Why don't we plan on reconvening

9  on the 26th unless the submissions are so great that

10  I can make my decision just reviewing them?  And if

11  so, I will let you know and we will cancel, but at

12  least we will have something on the calendar.

13  Frankie, do you want to pick a time on the 26th?

14       THE CLERK:  Do y'all want first thing in the

15  afternoon or first in the morning?

16       MR. WERTKIN:  The afternoon allows the

17  people from Washington to fly in.

18       THE COURT:  Why don't we say 1:30?  Will

19  that do?  I will have a hearing if we need it on the

20  motion to bifurcate.  I would like, Jeff, if you

21  would, as soon as possible, to find out and let me

22  know what Dr. Liao's schedule is, and we'll see what

23  we need to do to work around that.

24       MR. WERTKIN:  I will do that.

25       THE COURT:  I am inclined to try to get

1    things started.  And, like I said, I'm not going to

2    wait until October to start a trial.  Dealing with

3    jurors during the holidays, it's just bizarre, you

4    know.  And we want the jurors to be paying attention

5    to this case and not, oh, my goodness, I've got to

6    get out of here so I can do my Christmas shopping

7    before the stores close or what am I going to do

8    about my Thanksgiving turkey and all those other

9    stressful things.  I've got family coming or I'm

10   supposed to catch a plane.

11           MR. WERTKIN:  It's our position, we totally

12   agree and want this case to be tried the right way

13   with everybody paying attention.  And, as I

14   mentioned, if necessary, we would -- to accommodate

15   both the interest of the jurors and also our interest

16   in presenting our case in full, we would be willing

17   to go beyond the first of the year.

18           THE COURT:  All right.  I will see what we

19   can do.  On the defendant's motion for pretrial

20   charge conference, I tend to agree with the

21   government that it's a bit premature.  I do think we

22   need to determine that very critical issue that the

23   11th Circuit wouldn't help us any on.  But rather

24   than having proposals just pass each other like ships

25   in the night, I really would like for you all to

1  spend some time at least trying to come up with a

2  joint charge.  I don't know that it's going to be

3  productive on that one, but I think that that could

4  be beneficial.

5          And in light of that, I really want to back

6  up when y'all submit your joint proposed jury

7  charges, and that is going to depend a whole lot on

8  what our trial date is.  So I need -- right now, I'm

9  looking at July 27th.  Okay.  But if Dr. Liao is not

10  going to be available any time in that first four

11  weeks or so, we may have to change that, but that's

12  what I'm looking at now.

13          So I would anticipate that by the middle of

14  June we have joint proposed charges.  And on this

15  particular issue, if there cannot be some kind of

16  agreement at all, then we would start the briefing

17  then.

18          MR. CHRISTIE:  Perhaps we could try to reach

19  agreement before May 26th.  And if we're here on May

20  26th and we have been able to reach agreement, we

21  could discuss the briefing schedule at that point.

22  Is that --

23          THE COURT:  Yes, we could do that when we're

24  back together, but it does sound like the

25  government's team is not going to be available much

1   or at least next week you won't be available.

2          MR. WERTKIN:  That's right.  And there's

3   other practical reasons.  I think that it makes a lot

4   of sense to consider all the jury instructions

5   together, you know, follow the court's pretrial order

6   and tried and true procedure for sorting it out.

7          You know, one of the things that I noticed

8   about the motion is there could be a number of

9   instructions that touch on this question that the

10  defendants are concerned about.  I know that in the

11  past, when you have jury instructions, sometimes

12  there's a section on falsity defined, and there's a

13  section on false claims, and there could even be one

14  on fraudulent claims.  There may be more than just

15  one instruction.

16         So I think it really makes sense to follow

17  this court's standard procedure, the procedure that's

18  followed in most courts by submitting one single

19  proposed joint instruction, and then having the court

20  resolve any disputes.

21         MR. CHRISTIE:  Doing all the instructions at

22  the same time is fine, and that makes sense.  There

23  has not been any other cases where there's been a

24  hospice eligibility jury charge.  And so it is

25  unique, and it is an issue that the defendants were

1   trying to highlight.  And so the normal procedure in

2   the pretrial order is five business days before the

3   start of the trial.  And so if we wait until July

4   20th for a July 27th trial date, which is what we --

5         THE COURT:  I thought I had said June 15th.

6         MR. CHRISTIE:  You had indicated June 15th,

7   but he was indicating we ought to do the normal

8   procedure in the pretrial order, and I'm just

9   pointing out that would take us to July 20th.  The

10   15th of June works for us.

11         MR. WERTKIN:  Right.  And as I mentioned, we

12   are okay with moving up deadlines within the standard

13   procedure.  What we're concerned about is breaking

14   from the standard procedure for doing jury trials --

15   jury instructions.  If you want to move the deadline

16   up, that certainly makes sense.

17         MR. CHRISTIE:  And from the defendant's

18   perspective, a June 15th date for all jury

19   instructions would resolve our concerns.

20         THE COURT:  And at that point then, when the

21   charge is submitted with any disagreement, you can

22   then file it with your briefs on why I should go with

23   one charge over the other or whatever, and we will

24   take it from there.

25         I do think that there's some benefit in at

1    least having some conversation if possible between

2    now and May 26th on this critical question.  I don't

3    think there's going to be a whole lot of debate, or I

4    would hope not, on the other aspects of the case

5    where there are pattern jury charges that would fit,

6    but the question of what is false when you're

7    predicting what's going to happen in the future, you

8    know, that causes me some concern as to how that

9    needs to be presented to a jury so that a jury

10   understands what's false and what's just a bad

11   crystal ball.

12          MR. WERTKIN:  Your Honor, I think that if we

13   do -- I will definitely get back to you with the

14   dates about when Dr. Liao is available -- but even if

15   the case were bifurcated, I think the government

16   would still want to put on its witnesses that go to

17   exactly the question that you're asking.  You know,

18   if, in fact, the doctor did not make that prediction,

19   if, in fact, AseraCare had cut the doctor out of the

20   prediction and that the certificate of terminal

21   illness was not based on a reasonable decision, then

22   we think that the jury should know that as well.

23          And so we do think there's going to be

24   evidence that we're going to want to put on before

25   Dr. Liao even in a bifurcated trial.

1      MR. CHRISTIE:  I'm not sure if Mr. Wertkin

2  is familiar with the government's discovery

3  responses.  What he's suggesting is a surprise to me.

4  The government has specifically said that, as to

5  eligibility, their experts and the medical records

6  are the only evidence that they are relying on to

7  show ineligibility.

8        And so these other witnesses that he's

9  talking about, I'm completely unaware of what they

10  will be talking about.  And if you go to their answer

11  to Interrogatory Number 59 and even their response,

12  and we quoted, Your Honor, parts of Interrogatory 59

13  during summary judgment proceedings, they're not

14  relying on any other type of evidence.  I mean, the

15  government has not disclosed that they are relying on

16  any of this other type of evidence.

17        I realize in the pretrial order they put in

18  a couple of sentences that seem to be along this

19  line, but this is not consistent with the discovery

20  responses through discovery, and it is also not

21  consistent with the responses to the summary judgment

22  proceedings.  And if you remember, we went through

23  the whole summary judgment process, and this is not a

24  ground that they argued against summary judgment.

25      MR. WERTKIN:  Well, I mean, Your Honor, I

1  don't know if you want to engage in this, but I'm

2  very familiar with this issue.  And, in fact, our

3  discovery responses in total were very clear and I

4  think gave AseraCare a very good view about what this

5  case is about and how we intend to prove it.

6          I think what AseraCare is trying to do is

7  play a little gotcha.  This is one discovery response

8  in response to just related to the sample, and we

9  answered that in a very organized way.  What I think

10 is clear from our response in the summary judgment,

11 as we said, we denied that part of it.  You know,

12 this is a little bit of feigned ignorance.

13         This is a well-established issue that we've

14 known for about -- for quite a long time.  The

15 government's position is that an admissions nurse,

16 for example, who calls a doctor and gives the doctor

17 misinformation or false information, so that the

18 doctor can't make a reasonable decision, that is

19 clearly -- and AseraCare's practice of encouraging

20 that behavior, that goes directly to whether or not a

21 claim is false.

22         This case is not about a doctor making a

23 decision, and then the government going back with the

24 benefit of hindsight and second guessing that

25 doctor's decision.  That's not what this case is

1  about at all, not even close.  This case is about a

2  systematic fraudulent scheme, an effort by AseraCare

3  to run in and around these doctors.

4       We wouldn't bring this case if this was just

5  about a doctor who just maybe guessed wrong, but

6  that's not the case we would bring, because it raises

7  the court's concern.  The doctor doesn't have a

8  crystal ball.  We know that.

9       This is a case about a company that has

10  systematically set up a system through admissions

11  nurses and other types of people providing clinical

12  care to make it so that the doctor is not exercising

13  his or her expert medical judgment.  And this is not

14  our attempt to just go back in time.  That's not what

15  this case is about.

16       And I know that AseraCare would like to make

17  this case about it, because they know if we start

18  calling those folks, then this case -- then it shows

19  what the company is doing and that they're sunk.

20       THE COURT:  This is the first time I've

21  heard this theory.  I've heard a different theory

22  about the efforts at recruiting people into hospice

23  and the pressure that's put on the people who are

24  supposed to be selling the product.  Okay.

25       So now the theory is not that that's the bad

1  conduct that they're doing, but that the bad conduct

2  is that they've got these people who are not telling

3  the certifying doctors the correct information.

4          MR. WERTKIN:  Yeah.  And, Your Honor, just

5  to be clear, there's certainly no change in theory.

6  That other part is an important part of the story,

7  because how is it the admissions nurse is getting in

8  front of those people in the first place?  Because

9  the marketers are recommending those folks to say,

10  oh, you should go see this person, and that's how the

11  process worked.

12          And the government -- the United States

13  wants to give you and the jury a full picture of what

14  is going on here.  We've been in the defensive

15  posture responding to a motion to dismiss, responding

16  to summary judgment.  And we haven't had the

17  opportunity to tell you the whole story of how this

18  --

19          THE COURT:  Well, I have been asking for it

20  every time I've met with y'all, and we certainly had

21  an opportunity for y'all to tell me the whole story

22  at summary judgment.  And it does seem to me that

23  we've got a bit of a moving picture.

24          And I know you have not been in this case

25  from the beginning, but there were many times when we

1   have sat in this room, and all one lawyer wanted to

2   tell me about was these marketing problems, and that

3   that was the source and marketing and marketing and

4   marketing, and that's what we've got to look at, and

5   that shows the fraud.

6            And when I've specifically asked, show me a

7   fraudulent certification and why it's fraudulent, and

8   that's a lot of what I was asking at summary judgment

9   as well, and this idea of it's now the admissions

10  nurses that are committing the fraud, that is kind of

11  new.

12           MR. WERTKIN:  Well, we're not -- we don't

13  want to put the doctors on trial, and we don't want

14  to put the admissions nurses on trial.  They're not

15  on trial here, because it was the pressure that was

16  created from the company that caused them to act this

17  way.

18           And maybe Holly can chime up, because I was

19  not at the summary judgment hearing so I cannot speak

20  to specifically what this was about, although I know

21  we did talk about it at length at the pretrial

22  conference and it's all on the record as far as what

23  -- this story.

24           This story has not changed at all from the

25  beginning of the time that I was involved in the

1  case, which is the marketing people funneled

2  ineligible people to the admissions nurse.  The

3  admissions nurse made decisions.  And I don't know if

4  you know this, but a doctor never has to see a

5  patient before they certify one being terminally ill.

6  The admissions nurse goes and sees the patient, calls

7  the doctor and reports to the doctor.  A doctor

8  doesn't have to see a patient.

9        Now, you asked for specific examples.  The

10  way that we've presented this case is in using a

11  statistical sample, because otherwise we have to have

12  a trial that lasts maybe ten years, and so that

13  causes maybe some of the disconnect here.  But our

14  plan is to present pattern and practice evidence that

15  shows how this company admitted patients who are

16  ineligible, how and why.

17        And this is what I said to you during the

18  pretrial.  The jury needs to know how and why a

19  patient can be admitted who is not eligible.  My

20  grandfather lived with Alzheimers from '91 to '96.

21  Okay.  And I need to know and I think most people

22  want to know that a doctor is making a decision about

23  his care, whether he should go into hospice care

24  based on what he needs and not based on something

25  else that's going on.  And if I found out that my

1  grandfather was admitted to hospice care and he

2  wasn't terminally ill, I would want to know how that

3  happened and why did that happen, and that's the

4  evidence that we have, and not just from one witness

5  or two witnesses.  We have it from a lot of

6  witnesses.  And that's really what this case is

7  about.

8            MR. BARGER:  Your Honor --

9            THE COURT:  Who is that?

10            MR. BARGER:  This is Jim Barger.  I would

11  just remind everyone at the table, and I'm sorry that

12  I'm not there at the table, but this case was brought

13  by admissions nurses who made that theory allegation

14  in the complaint.

15            The complaint is what governs the case.

16  It's what started the case, and it was brought by

17  admissions nurses to allege that they were instructed

18  to falsify information.  Their depositions were

19  taken, and they reiterated that fact.  There was also

20  another case that was initially joined with this case

21  where two other -- where another admissions nurse was

22  told to do these things.  This has always been what

23  the case was about from the very day that it was

24  first filed.

25            MR. WERTKIN:  And the relater in Atlanta

1    that was joined as the third relator, that was a

2    doctor who had said that his opinions were always

3    circumvented, were routinely circumvented.  When he

4    would say this person is not eligible, AseraCare

5    would get someone else to say they were.  That's what

6    this case has always been about from the very

7    beginning, from the initial filing of the complaint.

8         MR. CHRISTIE:  First of all, Mr. Wertkin has

9    not described Dr. Miescke's testimony correctly.

10   Second, the complaint that Mr. Barger talks about has

11   allegations in it that the government dropped.  And

12   these arguments that the government is making now do

13   not appear in the current complaint.

14        Third, we served contention interrogatories

15   so we could target the discovery that we were going

16   to provide.  And I had considerable telephone

17   conversations back and forth with the government,

18   because the government wanted to wait until the end

19   of the discovery to file answers to the contention

20   interrogatories.

21        I objected to that, and I gave them a lot of

22   time to answer them, but I needed enough time after

23   they served the contention interrogatories, so

24   AseraCare could do the discovery reflected as to how

25   they are were going to show hospice patient

1   ineligibility.

2          And if you look at their answers to their

3   discovery, all of which were filed as part of the

4   summary judgment proceedings, these new arguments

5   that he is making are not part of it.

6          And so, whereas the government has suggested

7   that I was feigning surprise, I am not feigning

8   surprise.  The government is changing horses in

9   midstream, and they are changing horses to an

10  argument that is not in the current complaint.

11         MR. WERTKIN:  And, Holly, please jump in

12  here.  If you would like to jump in here, please do.

13         MS. SNOW:  Well, I think it is in the

14  complaint and I think --

15         THE COURT:  Wait a minute.  Holly, can you

16  speak up?

17         MS. SNOW:  Yes, ma'am, I apologize.

18         THE COURT:  Well, we're just trying to make

19  sure our court reporter can get it down.

20         MS. SNOW:  Sure, yes.  I think that theory

21  is in the complaint and that we can make that clear

22  to the court in our responses in which we can also

23  address the interrogatory argument and the other

24  issues that have been raised earlier.

25         MR. CHRISTIE:  These issues, as raised in

1    the complaint, are as to knowledge.  There's nothing

2    along these lines that is in the complaint that is

3    suggested as to a falsity.  And we asked specific

4    interrogatory questions about how the government

5    intended to show falsity.  They relied on Dr. Liao,

6    Dr. Miescke and medical records.

7            MR. WERTKIN:  Well, Your Honor, I think this

8    is -- I wanted to -- I started down this road because

9    I wanted to make sure that, when we talked about

10   trial dates, we left enough time to show some of this

11   very relevant admissible evidence, even if there was

12   a bifurcated trial.

13           I think we're now moving on to briefing.

14   And we have just got the -- we just got the motion

15   from AseraCare two days ago and would like, as Holly

16   said, for the opportunity to respond.

17           THE COURT:  Well, I think I've set a date

18   for that; right?

19           MR. WERTKIN:  Great, excellent.

20           MR. LEMBKE:  Your Honor, it raises the

21   question though, this argument, why do we even have

22   discovery?  If contention interrogatories are

23   meaningless, why do we have it?  We have it so there

24   are no unfair surprises.  And I don't know how they

25   do it in Washington, D.C., throwing around charges of

1    feigned ignorance, but our ignorance is based on

2    their answers to the discovery period.

3           MR. WERTKIN:  Your Honor, that's a pretty

4    blatant attack, and I don't think that -- I don't

5    think it really merits a response.  I will say that

6    we answered our interrogatory responses completely.

7    We identified every witness that that we want to

8    call.

9           AseraCare had the opportunity to depose

10   those witnesses because we identified them.  And we

11   identified individual witnesses, categories of

12   witnesses.  That interrogatory that they're referring

13   to taken completely out of context, read in a certain

14   way, you know, that's something that does not fall on

15   the government.

16          There is no surprise here.  There are no

17   surprises.  I understand that you all don't want to

18   try a case where you hear from all these people, and

19   that's really what you're trying to do, but there is

20   not a surprise here.

21          THE COURT:  All right.

22          MS. CROSS:  Your Honor, if I may, this is

23   Nola Hitchcock Cross talking.  I think because this

24   has stretched out so long and the defense has gotten,

25   you know, more recently on the issue with the experts

1    and the marketing, that they have kind of gotten lost

2    on that.

3         But when they look at the depositions and

4    the pleadings in the case, I think, as Jim Barger put

5    it, it comes from the admissions nurses.  And, you

6    know, once the government got more into it and he

7    gets all the marketing issues to round out the

8    picture.

9         It's one package.  It's not this little

10   piece here and that little piece there.  It's the

11   whole package to put together, you know, so the jury

12   gets the full picture.  And part of it is the intake

13   nurses, and part of it is the marketing.  And part of

14   it is the way that the doctors aren't allowed to

15   actually review documents and make medical decisions.

16        THE COURT:  The key part of the False Claims

17   Act is a false claim.  And it seems to me very

18   reasonable that the government be put to the task of

19   proving a false claim, and that a claim is either

20   false or it's not regardless of what marketing

21   schemes there are or other kind of pressures.

22        And it seems to me that the government

23   should be able to prove that a particular claim is

24   false without proving marketing efforts or pressures

25   to get people in.  It's either false or it's not.

1   MR. WERTKIN:  Well, Your Honor, our

2   position, and I think this has been clear, is that if

3   the medical records don't support eligibility, then

4   the claim is false, and that's what Your Honor

5   decided in the summary judgment.

6   Part of that medical record is a certificate

7   of terminal illness, and AseraCare would certainly

8   introduce evidence that shows that a doctor signed a

9   certificate of terminal illness.  Now, that's pretty

10  relevant, and that's something that we expect will

11  come up in front of the jury.

12  So I think that the government has, you

13  know, the right and should be able to show how it was

14  that a doctor could have signed that document and the

15  claim could still be false.  And if the answer is

16  that AseraCare had a practice of circumventing

17  doctors, then that goes to certainly explain why.  So

18  then the jury can then say --

19  THE COURT:  Did they circumvent this doctor

20  in this claim?  I mean, when we're looking at a

21  particular claim to determine if it is false, then I

22  think the evidence has to be or should be directed to

23  that particular claim and the circumstances in which

24  it was submitted.

25  MR. WERTKIN:  That would be certainly

1   sensible.  You know, the way that our case is being

2   presented is we're using a statistical sample.  So

3   the way you get one is you take a random sample --

4   you take your universe of claims, and you create a

5   random sample.  So the randomness of it changes the

6   dynamic a little bit.

7            THE COURT:  Well, the randomness of it

8   doesn't change whether that claim is false, does it?

9            MR. WERTKIN:  No, it doesn't.  In fact, what

10  we are going to show is that -- Dr. Liao is going to

11  show that this medical record does not support the

12  finding of eligibility, the certificate of terminal

13  illness.

14           But also what we're going to show is that

15  the pattern and practice of this company to

16  circumvent doctors is critical and relevant and

17  admissible to whether or not the jury should give

18  weight to that COTI, that certificate of terminal

19  illness.

20           MR. LEMBKE:  Your Honor, that goes to

21  knowledge.

22           MR. CHRISTIE:  I don't see how it goes to

23  anything other than knowledge.

24           MR. LEMBKE:  What they're trying to say is

25  they've drawn this sample, and they've got it down to

1   what they say is from the sample about half or 124

2   that they say are false claims.  But then they say if

3   one of the 124 is Joe Smith in Birmingham, well, they

4   want to show some practice that occurred in

5   Cincinnati that had nothing to do with one of the 124

6   claims to try to prove falsity.  Well, that won't

7   work.

8          I think Your Honor is right.  Either the 124

9   claims, each of them is false or it's not false, and

10  then you extrapolate from there is their theory.  We

11  preserve our position on that.

12         MR. WERTKIN:  We totally -- I'm sorry.

13         MR. LEMBKE:  What they're wanting to do is

14  bring in all this evidence about what went on

15  elsewhere to try to prove if the 124 are false, and I

16  don't think they can do that.

17         MR. WERTKIN:  I agree with that.  And, Your

18  Honor, we totally agree that we have to show false

19  claims.  We're proceeding under the False Claims Act.

20  But I think what Mr. Lembke is talking about is

21  admissibility questions.

22         Whether or not -- it's hard for me because I

23  don't think the case law distinguishes knowledge and

24  falsity as separate situations.  It's hard for me to

25  say one is the other.  All that evidence goes to

1   knowledge and falsity.  Our knowledge evidence --

2        THE COURT:  If it's not false, it doesn't

3   matter what they knew, does it?

4        MR. WERTKIN:  And, again, are we talking

5   about admissions nurses, or are we talking about

6   other types of evidence that AseraCare knew they were

7   submitting false claims?

8        THE COURT:  I'm talking about all the

9   marketing stuff that I have been led to believe was

10  one of the key bases for the government saying that

11  AseraCare knew that they were submitting claims that

12  were false.

13       MR. WERTKIN:  Well, Your Honor, I think that

14  to -- again, I think we're back on this track.  What

15  we can do in our response is layout -- and I think

16  this is probably advisable because I don't have all

17  my materials here -- is layout in our responsive

18  brief to this motion what this case is about and

19  where it comes from, and we would be happy to do

20  that.

21       THE COURT:  Okay.  You don't have to go back

22  and reiterate everything that has been iterated about

23  where the case comes from.  But the issue that I see

24  that's before us is whether we should first have the

25  jury determine whether there are any false claims at

1   all.

2          Then if there are, let you have carte

3   blanche at showing the knowledge element and the

4   extent of damages and all those other things.  But

5   before the jury -- I suggested this back in January

6   or December or whenever, prior to the time we were

7   set before, that I'm concerned about bringing in all

8   of this evidence about the pressures and the

9   marketing and the efforts to improve admissions and

10  all these rewards and incentives that were going on,

11  that that would confuse the jury.

12         MR. WERTKIN:  Can someone put their phone on

13  mute please?  It's giving a lot of feedback.

14         THE COURT:  Thank you.  Bringing all that in

15  before the jury has decided the key issue, are there

16  false claims, can easily result in a verdict that's

17  not based upon falsity, but on all these other

18  issues.  And I only want to try this case once.

19         MR. WERTKIN:  That's totally understandable,

20  Your Honor.  As I said when I was talking about what

21  this case is not about, this is not about the U.S.

22  trying to use marketing or the fact that AseraCare is

23  a for-profit company and cares about making money as

24  a basis for a False Claims Act case.  That's not what

25  we're doing.

1            And I think, Your Honor, after our briefing,

2    you will see that the evidence about how these

3    ineligible people get into the system and how they're

4    admitted even though they're ineligible and how

5    they're kept on even though they're ineligible, will

6    not confuse the jury but illuminate for the jury how

7    it is that 50 percent of the claims that AseraCare

8    submitted are false.

9            THE COURT:  Why is "how" relevant to the

10   issue of whether the claims themselves are false?

11           MR. WERTKIN:  So if -- maybe I'm not

12   understanding your question.

13           THE COURT:  Okay.  I thought the claim was

14   either false or it's not false based upon the medical

15   records.

16           MR. WERTKIN:  Right, yes.

17           THE COURT:  So why is how the patients were

18   recruited or kept on for longer or whatever, why is

19   that key to a determination of were the claims false?

20   Not whether AseraCare knew they were submitting false

21   claims, but whether the claims themselves were false.

22           MR. WERTKIN:  Well, at the risk of answering

23   a question with a question, if the jury is reviewing

24   a medical record and they see that there is a doctor

25   who signed off and they see that the whole record, as

1    pointed out by our expert, doesn't support that sign

2    off, isn't it directly relevant to help the jury

3    weigh whether or not this entire record is false?

4           You've got a certificate on one hand where

5    the doctor signed the eligibility.  You've got the

6    whole record, months of progress reports that don't

7    support that final determination.  Evidence about how

8    that doctor may have gotten to the point of signing

9    that form, that would be relevant to help the jury

10   weigh the progress reports against the certificate.

11          MR. BARGER:  Your Honor, this is Jim Barger

12   again.  I'm sorry, I've got a bit of a cold.  But

13   taking Your Honor's statement a little bit further,

14   the doctor's certification then shouldn't even be

15   relevant.  They shouldn't be able to bring in

16   evidence that the physician looked at this and

17   certified it unless we're able to show under what

18   circumstances that occurred.

19          There's no question that AseraCare is going

20   to say -- their defense is going to say, and their

21   defense has always been, that a doctor certified

22   every one of these.  Well, it is certainly going to

23   make it more or less likely that the claim is false

24   if the doctor certified these under a system created

25   by AseraCare where doctors were not given the full

1    picture and where nurses were the ones making the

2    decisions and were pushing doctors.

3         I agree with you, Your Honor, either it's

4    false or not false.  But just looking at the medical

5    records, perhaps we should take the physician

6    certification out of it as well.

7         THE COURT:  But the requirement for hospice

8    eligibility is that a doctor has to certify; right?

9    So if you don't have a certification in there, then

10   clearly it's false, because it doesn't meet the

11   requirement of the Medicare regs.

12        MR. WERTKIN:  We're not advocating that,

13   Your Honor, to disregard the COTIs or exclude them

14   from evidence.  That's not our position.  We're just

15   looking for the opportunity to present evidence about

16   how that came to be and why AseraCare is

17   circumventing that whole process.

18        THE COURT:  I think the real key is whether

19   the authorities as cited by the defendants, the

20   manual for complex litigation and the cases that

21   recognize the judge's discretion, whether there are

22   countervailing authorities and arguments for me not

23   to exercise my discretion to bifurcate the trial.

24        And as Mr. Christie said, my intent would

25   be, as I stated previously, would be to have the same

1  jury resolve the issues, but to look at presenting

2  the question of falsity before we get into all of the

3  stuff that's relevant to knowledge and to the scheme

4  to defraud and pattern and practice and all the

5  bigger issues.  But you have until May whatever that

6  date is, May 15th.

7        MR. WERTKIN:  We will do our best to

8  convince you otherwise.

9        THE COURT:  Anything else we need to talk

10  about today?  Mr. Lembke.

11        MR. LEMBKE:  I didn't know if you were

12  trying to send a subtle message to me, but I noticed

13  in the list of who is going to be counsel at trial in

14  the pretrial order, I was not on there, and I don't

15  know if that means I'm out or whether it was just an

16  oversight.

17        THE COURT:  I'm not the one that prepared

18  that order.

19        MR. CHRISTIE:  And let me just fill Matt in

20  on what's happened here.  He was planning on being

21  the person who takes the medical witnesses other than

22  myself.  And Tiffany is now expecting in early

23  September.

24        So if we have a trial date of July 27th, she

25  probably is still going to be able to do what she was

1   planning on doing.  But if she doesn't, then

2   Mr. Lembke is going to be our backup.  And so I

3   wasn't using that as part of the argument for the

4   July 27th date, but Ms. deGruy is going to be very

5   disappointed if we start in September, because that

6   is her due date.

7           So I'm sorry, Matt.  Matt was looking for

8   his name, because he was brought into the case to

9   substitute for Ms. deGruy if she's unavailable.

10          THE COURT:  I thought he was brought in the

11  case to handle all the briefing and all that stuff.

12          MR. CHRISTIE:  Originally, he was, but see

13  he's looking for his role.  He wants to get some

14  witnesses.  Anyway, that's --

15          MR. WERTKIN:  And just for the record, our

16  position, we're very sensitive on our team to that

17  kind of thing and would be willing to push the trial

18  date again --

19          THE COURT:  Of course you would.  But the

20  key is we can modify that pretrial order, and we may

21  need to modify it some anyway, particularly if we do

22  a bifurcation.  But we will make sure that

23  Mr. Christie makes sure that Mr. Lembke's name is

24  listed as trial counsel.

25          MR. LEMBKE:  Thank you, Your Honor.

1       MR. CHRISTIE:  Sorry about that.

2       MS. WOODKE:  I was just in my head thinking

3  about the calendar and not knowing Dr. Liao's

4  schedule.  If he is unavailable, and my recollection

5  is it was like three weeks in August he was

6  unavailable.  If we were to start when he got back,

7  when would you want to start the trial in September?

8  That's --

9       THE COURT:  Okay.  I figure it's going to

10  take us more than a day or two to get a jury.

11       MS. WOODKE:  Right.

12       THE COURT:  Okay.  We could even strike a

13  jury or have voir dire and have a week and then start

14  or whatever.  But until we know exactly when Dr. Liao

15  is available, I don't know that it does us any good

16  to be throwing dates around.  I do think we need to

17  keep in mind that it would take us a few days to get

18  a jury probably.

19       MS. WOODKE:  All right.

20       THE COURT:  Okay.  So if you all could give

21  us a call as soon as you hear from Dr. Liao or send a

22  joint email or something just so we know exactly what

23  those dates are, then we can all be trying to figure

24  out how the heck we can make this work before

25  Christmas holidays if possible.

1          Okay.   Anything else we need to talk about?

2   Any other major places where your name doesn't

3   appear, Mr. Lembke?

4          MR. LEMBKE:   Judge, I think that's it for

5   today.

6          THE COURT:   Okay.   Great.

7          (Court adjourned.)

42

C E R T I F I C A T E


I hereby certify that the foregoing transcript in the
above-styled cause is true and correct.


Date:  5/1/2015



*Julie A. Martin*

Julie A. Martin, RMR, CRR
Federal Official Court Reporter