FILED

2015 May-19 PM 02:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


UNITED STATES OF AMERICA,
EX REL., ET AL.,                 CV-12-KOB-245-S


          Plaintiffs,    December 11, 2014

     vs.                  Birmingham, Alabama

ASERACARE, INC., ET AL.,

          Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *


REPORTER'S OFFICIAL TRANSCRIPT OF
PRETRIAL CONFERENCE
IN CHAMBERS

BEFORE THE HONORABLE KARON O. BOWDRE
UNITED STATES DISTRICT CHIEF JUDGE


COURT REPORTER:
Teresa Roberson, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
 1                        * * * * *

 2                   A P P E A R A N C E S

 3                        * * * * *

 4   FOR THE PLAINTIFF:

 5   Holly Snow
     Carolyn Tapie
 6   Renee Brooker
     Jeff Wertkin
 7   U.S. Department of Justice
     Civil Division
 8   P.O. Box 261 Ben Franklin Station
     Washington, DC  20044

 9

10   Lane Woodke
     U.S. Attorney's Office
11   1801 4th Avenue North
     Birmingham, Alabama  35203

12

13   Nola Cross
     Cross Law Firm
14   845 North 11th Street
     Milwaukee, WI  53233

15

16   James Barger, Jr.
     Frohsin & Barger
17   3430 Independence Drive
     Birmingham, Alabama  35209

18

19   FOR THE DEFENDANT:

20   James Sturgeon Christie, Jr.
     Matthew H. Lembke
21   Bradley, Arant, Boult & Cummings
     1819 Fifth Avenue North
22   Birmingham, Alabama  35203

23   Kimberly Martin
     Bradley, Arant, Boult & Cummings
24   200 Clinton Avenue
     Huntsville, Alabama  35801

25
```

```
                        *  *  *  *  *

                  P R O C E E D I N G S

                        *  *  *  *  *
```

THE COURT:  We have this motion filed yesterday that the government hasn't had an opportunity to respond to but I understand intends to.

But it's kind of like, do we need to go through pretrial, if I'm going to grant this motion.  And I will be very candid, I think it's a very well taken motion. It's one that I had thought about myself but didn't want to certify a question if it's not going to be appealed.

So I'm telling y'all that so you know you have got an uphill road in terms of convincing me that I shouldn't.

I think you all know how seriously I took the defendant's motions and struggled with them extensively.  I think the law in this case, whose name I can't yet pronounce, is a solid approach to the problem.  But for me, I didn't feel like I could go further than I had direction from the Eleventh Circuit to do.

And I think ultimately it is a question the Eleventh Circuit is going to need to address, somebody is going to need to address.  So it makes sense to me to certify it.

1          But I certainly want to hear what the

2    government has to say about it and why the motion

3    doesn't meet the standards for interlocutory

4    certification.

5          If you have got anything you want to say on it

6    today, I would love to hear it.  But technically, under

7    my rule, you have until Monday to respond.

8          Any guidance?

9          MS. SNOW:  Yes, Your Honor.  We definitely want

10   to respond and would request that we might have a little

11   bit longer than this coming Monday to do so.  If Your

12   Honor would allow us until the end of next week.

13         THE COURT:  Then that means I have to work

14   Christmas to do it.  And, frankly, I'm not planning on

15   being in here much at all that week.  I have got the

16   world coming to my house.  And I would love to have this

17   resolved before Christmas.

18         I think time is critical to find out whether

19   the Eleventh Circuit will take it.

20         MS. SNOW:  We will respond when the Court

21   requests us to.  We will do Monday, if that's when the

22   Court would like to hear our response to receive it.

23         THE COURT:  I don't know if Tuesday would help

24   you much, but it's kind of like I want to get it out by

25   next Friday myself, so I would love to have anything

1    from you as soon as we can get it.

2         MS. SNOW:  If we could have until Tuesday, that

3    would assist us.

4         And, yes, we will intend to request the Court

5    to decline to certify this, that it does not present the

6    exceptional circumstances that warrant piecemeal

7    litigation for a number of reasons, and that we are

8    ready to go to trial on February 2nd and are very

9    concerned about any delay in our proceeding ahead with

10   trial with approximately fifty-five witnesses, we plan

11   to serve trial subpoenas on, witnesses who we have been

12   communicating with for months who are ready to be in

13   Birmingham.

14        It would prejudice the United States' case for

15   this to be delayed at this point.

16        So we will respond fully in writing for all the

17   reasons why we think Your Honor's opinion was correct

18   and there is not a substantial ground for difference of

19   opinion on the legal question of your decision that

20   whether the documentation supports terminal illness is a

21   prerequisite to payment and there are disputes of fact

22   in this case on that issue.

23        THE COURT:  I'm not going to relitigate that

24   issue here today.  But I do have substantial concerns

25   and I think that they were reflected in the questioning

1   at the hearing, about one doctor, with the benefit of

2   hindsight, being able to create a question, that -- you

3   talk about the prejudice to the government, I mean, if

4   that is the legal standard for a False Claim Act case in

5   the hospice context, I think that's -- that can be very

6   disruptive to the entire industry.

7          And I understand the government's concerns

8   about paying claims that it shouldn't have to pay.  But

9   as I indicated at the hearing, I think a fair amount of

10  that problem comes from the law itself and the regs that

11  require a clinical judgment for a prognosis, looking

12  into the future.

13         And it's a problem area, I think, for both

14  sides.  And I do feel right now with what I have now

15  without the benefit of the government's response that it

16  is an issue that can be resolved purely as a question of

17  law and would be beneficial to get that from the

18  circuit.

19         But until the circuit, if I decide to certify

20  it, until the circuit says it will take it, I think we

21  do need to proceed forward towards our February trial

22  date.

23         And I'll be looking at how best I can make

24  myself available for what looks like a three-month

25  trial.

1          There will be some times in there that I
2   already have commitments that I have to honor with out
3   of town stuff that I am not in charge of the dates.
4          So there will be some times when we have a few
5   days off.  But my experience has been that jurors
6   usually like having a little time off and lawyers get a
7   chance to regroup with that as well.
8          I will let you know what those dates are as we
9   get closer to a trial date.
10          Anything else anyone wants to say on that
11   particular issue?  Although this isn't a hearing on the
12   motion.
13          MS. SNOW:  We will respond by Tuesday, Your
14   Honor.  Thank you.
15          MS. BROOKER:  Does Your Honor anticipate having
16   oral argument on those motions?
17          THE COURT:  No, ma'am.
18          MS. BROOKER:  Just for planning I wanted to be
19   sure.
20          THE COURT:  I think I have heard enough and
21   know the issues very well.  If you throw something in
22   there and I go, wait a minute, I may holler and have a
23   phone conference about it.  I don't plan on scheduling
24   an actual hearing at this time.
25          MR. CHRISTIE:  I do have one question.  From

1  your comments, did you indicate that you intend to stay

2  the case when the Eleventh Circuit accepted it or when

3  you certified it?

4         THE COURT:  We will see if the Eleventh Circuit

5  certifies it.

6         MR. CHRISTIE:  Then you would enter a stay.

7         THE COURT:  Yes.

8         MR. CHRISTIE:  That's what I expected.  I

9  wanted to make sure I understood what you were saying.

10         THE COURT:  We will proceed on until the

11  Eleventh Circuit tells me it wants it.  If the Eleventh

12  Circuit wants it, I will gladly let it have it.

13         Y'all have done a great job with the proposed

14  pretrial order.  We'll make sure we get all of the

15  appearances listed, and I hope we'll have the names

16  spelled correctly for that.  We can pull from the docket

17  sheet the law firms and offices of the counsel for trial

18  because I will need that for voir dire.

19         What I usually do at a pretrial conference is

20  kind of walk through the proposed pretrial order and how

21  I use it at trial.  But I think we're going or I would

22  like to propose that we try some things that have been

23  recognized by other judges and by the ABA and other

24  groups as being best practices for complex trials, and

25  so I haven't thought completely through exactly how I

1  would be using the pretrial order at different stages or

2  phases.

3          So what I say about this we may tweak a little

4  later.

5          I will be using your statement of the case, the

6  agreed summary during voir dire when we have the jury in

7  and we always ask do you know anything about this case,

8  have you heard anything about this case.  And if all we

9  give them is the name of the case, that might not ring a

10 bell.

11         So I always use the agreed summary to say this

12 is what it's really about, does that cause any bells to

13 go off in your head.

14         And I think we do also need to talk in terms of

15 voir dire, while I'm raising that at this point.

16         Generally we bring in a large pool of jurors.

17 The longer the trial, the larger the pool, and generally

18 have oral voir dire.

19         We do have a piece of paper that Ms. Callahan

20 gives to each juror.  And the first thing we do, after

21 they're sworn, is have them stand up and tell us the

22 information requested on that sheet.  Things like have

23 you ever been on a jury before.

24         Some questions that aren't easy to get a yes or

25 no answer for because if they have been on a jury

1  before, we want to know what kind of case was it, what

2  was the verdict and all that kind of stuff.

3          If they say yes, I always pull out that

4  information from them.

5          What their vocation is, what their spouse does,

6  their hobbies, their interests, the most recent book

7  they have been reading, those kinds of things that

8  aren't easy to get a hand up to indicate a yes or no

9  answer.

10          I think anyone who has tried a case in front of

11  me knows I'm pretty good at getting follow-up

12  information from them, like when somebody says they were

13  a plaintiff in a car accident case or plaintiff in a

14  case, I will get more information about it so that you

15  don't have to then come back to that person or have

16  questions.

17          I don't always follow up with the information

18  that you might want to, so I give everybody an

19  opportunity at the end of my questioning to ask any

20  follow-up questions to the individuals.

21          That would be like, Mrs. Smith, you told us you

22  had a medical malpractice lawsuit, who was your attorney

23  or who was the doctor or whatever other information that

24  I didn't ask that you want to get.

25          But I do not allow additional "do any of you"

1   type questions directed to the whole panel.

2           If there is something that I have omitted from

3   the questions that you have given me that you believe

4   you're entitled to ask, I give you an opportunity to let

5   me know because I may have just overlooked it, if there

6   are a lot of them.

7           I have on occasion had some written voir dire

8   questions in extraordinary cases.  I don't know that

9   this would be one of those.  But if y'all want to have

10  some written questions answered by the jury, let me

11  know.  And if y'all can agree on what they should be --

12  I want to work with you.  This is y'all's case to try.

13  And I want to facilitate the trial as being an efficient

14  trial but one where, like in voir dire, you get the kind

15  of information you want so that you have the jury that

16  you're confident will render a fair verdict.

17          I am open to suggestions on how to improve the

18  process that I have generally used.  So do not hesitate

19  to make a suggestion.

20          MR. WERTKIN:  We had a call on Tuesday, and the

21  government broached an idea of using a supplemental

22  juror questionnaire that would go out to the pool and

23  they would return it actually before --

24          THE COURT:  I'm not good at that.  And let me

25  explain to you why.  I have no problem with bringing

1   them in to answer the questions.

2        But sending it out -- in this case it may not

3   be as problematic as some of the others where that issue

4   has come up.  I gave you a knee jerk reaction.  We'll

5   talk about it and think about it.

6        Let me tell you my concern in sending a

7   questionnaire out, especially if it's asking specific

8   questions that would give them some idea that this case

9   involves hospice or medical issues or things of that

10  nature.  They may be inclined to say hey, Janice, I

11  heard that your mama was in hospice, you know, what

12  happened.  Do you understand what I'm saying?

13       MR. WERTKIN:  Absolutely.

14       THE COURT:  Or inclined to get help from

15  somebody else to answer the questionnaire.  They don't

16  understand a question and they may say John, what does

17  this question mean?  How should I answer it?

18       Whereas if we have them all in a room where

19  they're answering the questions, if they have got

20  questions or need clarification, then we'll have

21  somebody there who can give them that clarification

22  without influencing them.

23       MR. WERTKIN:  That makes a lot of sense.  That

24  is along the lines of what, at least, the government was

25  thinking about, we wouldn't include questions that have

1   anything to do with substance or to let them know what

2   the case was about.

3          It would be questions more along the lines of

4   the ones you discussed earlier about your hobbies, your

5   profession, if you had ever done this kind of thing.

6          And that way what we can do is have all that,

7   have all that information for what might be a sizable

8   jury pool in advance, we can process it and look at it.

9   And I wouldn't anticipate that would affect in any way

10  what you would do normally to draw out more information

11  from them.

12         But it would give both parties an opportunity

13  to get some of the information about these jurors that

14  again have nothing to do with the substance.

15         If it would be of assistance, we could prepare

16  something and do it jointly, of course, and give you

17  something that you could look at and, of course, if you

18  said I think this is too close to what I'm concerned

19  about, we would take it out.

20         THE COURT:  We have not historically done that

21  much in this district.

22         Frankie, do you know of any cases where they

23  have actually sent out questions?

24         THE CLERK:  I don't.  I can find out.  I don't

25  know of any.

1          THE COURT:  One of the problems that I have

2   heard that has been some pushback in not wanting to do

3   that is the work involved in making sure the people get

4   those questionnaires back in.

5          I mean, we don't know until the day of who is

6   going to show up for jury duty.  Getting them here in

7   problematic.

8          MR. WERTKIN:  I think if, I did a little bit

9   of, not a lot, a tiny bit of research, but you allowed a

10  supplemental jury questionnaire in the Scrushy case.

11         THE COURT:  They were all filled out in the

12  court.

13         MR. WERTKIN:  In the court?

14         THE COURT:  Yes.  That was why, for those two

15  reasons.  And because a lot of the questions that were

16  being asked in that case were of the nature of what do

17  you know about this or what do you think about this and

18  it was obvious that it was the Scrushy case.

19         MR. WERTKIN:  It seems to me that we would be

20  perfectly amenable to letting them fill them out in

21  court.  That would address the problems that you

22  mentioned about them not showing up and any question

23  would encourage them to reach out to someone, they can't

24  do it if they're here.

25         We could put something together that would be

1   used for the -- that would be filled out at the time,

2   that would also serve the purpose that we're trying to

3   do.

4           THE COURT:  Off the record.

5                   (Off-the-record)

6           THE COURT:  As I said, I'm certainly amenable

7   to discussing that further.  And I think we can do that

8   and figure out a way to get information to y'all that

9   you need in a timely fashion so that you can make good

10  decisions.  So we'll work on that.

11          MR. LEMBKE:  Just an experience I had in state

12  court in September with Judge Boohaker with a written

13  questionnaire, they came in in the morning and filled it

14  out, and then it was distributed, and then we adjourned

15  for the day and did the voir dire the next morning.

16          It gave both sides an opportunity to spend the

17  afternoon combing through the -- it was a large case and

18  so there were lots of those questionnaires.

19          That is just one --

20          THE COURT:  That is the way I would suggest

21  that we would do it, if we were going to use it.

22          Now, in the Scrushy case, we were using it

23  primarily to weed out people before we got to the

24  regular voir dire session and find people who already

25  had strong opinions or any opinions about the case.  And

1    then we spent several days bringing those people in to

2    have conversations with them to determine whether they

3    would even stay on the panel for further questioning.

4         But I don't see this as necessarily being what

5    you're proposing to use the questionnaire for,

6    especially if we're doing it in court, we could include

7    those kind of questions as well.

8         MR. WERTKIN:  Your Honor, we are very

9    comfortable with that.  That is not what I proposed, but

10   that is something we're very comfortable with.

11        THE COURT:  We will talk some more about that

12   as we progress.

13        Your agreed summary is longer than I usually

14   read, but I don't know how it could be any shorter.  So

15   I think it's appropriate.

16        We do need to discuss the size of the jury

17   pool.  Y'all are basically saying ten weeks, so I'm

18   taking that to a full three months in terms of my

19   prognosis.

20        Now, I might be wrong when we end up with a

21   four-month trial or a two-month trial.  But that's my

22   prognosis at this point based upon the information in

23   the records I have.

24        For a trial that long, I think we definitely

25   need to have a pool much bigger than what we start

1  with.  And we generally start with how many jurors,

2  Frankie, for a normal every --

3          THE CLERK:  18 to 20.

4          THE COURT:  That's for a seven member jury.  I

5  would anticipate that if we're going to have three

6  months, we need to have more than one extra.

7          Let me explain.  In civil cases, we don't

8  select alternates, unless we have more than 12.  Because

9  we can have a jury of any size over six.

10          So if we were to, say, decide we wanted to have

11  a nine person jury so that we would have three extras,

12  if at the end of the trial we have eight people left,

13  those eight would deliberate.

14          The reason I do that is to keep our jurors

15  happy, for one thing.  Y'all would be, or maybe you

16  wouldn't be, amazed at how disappointed the alternates

17  in the criminal cases are when I say, I am so sorry,

18  Mr. Jones, thank you for your service, get the heck out

19  of here and we don't want to know your opinion about

20  this case.

21          So when I can keep all the people who have paid

22  attention, then we'll do it.

23          I have had a situation where there was a juror

24  who was not an alternate who had not been paying

25  attention and who had been sleeping a good bit and we

1    decided together that that person should become the

2    alternate and not be asked to deliberate.  But that's

3    the very, very rare case.

4         So however many jurors we end up at the end of

5    the case would be the number who will deliberate.

6         But I would love some suggestions, some input

7    from y'all as to what you think that number should be

8    that we should start with.

9         And when we figure that amount out, then we

10   would know how large of a pool we'll need.

11        MR. CHRISTIE:  For a two week trial, we have

12   had eight jurors before and that seemed to be fine.

13        For a three month trial, I don't think eight

14   would be sufficient.  You mentioned nine, I'm thinking

15   maybe 10.  That is just my reaction.

16        MR. WERTKIN:  What happens if you fall below

17   six?

18        THE COURT:  Fall below six, we start over.  We

19   have to have six.

20        MS. MARTIN:  In that instance, 12 might be the

21   right number.

22        MR. CHRISTIE:  How many chairs do we have out

23   here?  I have not counted the number of chairs.

24        THE COURT:  We have 12 or 13.

25        THE CLERK:  14.

```
 1            THE COURT:  So we will have a jury of 12 and
 2    Ms. Callahan will do the math, you should know from
 3    criminal, what we start with in criminal?
 4            THE CLERK:  Thirty-five to 38.
 5            THE COURT:  Thirty-eight would be where we
 6    would start.  We would probably bring a pool of 40
 7    something people in just to make sure that we'll have
 8    enough, if we have some folks that don't show or have
 9    conflicts.
10            MR. LEMBKE:  We have spring break and Easter.
11            THE COURT:  Well, you know, we may not, we may
12    not try the case during spring break.  So we may end up
13    with four months.  We'll have to work around that if we
14    have a large number of people who are going to be out,
15    particularly.  Drawing from three counties we may have
16    different spring breaks.
17            I think we're looking at 50 something for that
18    pool.  We'll talk some more about it.  But we'll have a
19    good pool.  And that is another reason to have some of
20    the preliminary stuff done, too.
21                     (Off the record)
22            THE COURT:  There's going to be issues.  But we
23    will work around them and move forward.
24            Any other issues on voir dire or selection of
25    the jury?
```

1        If you have any questions about the actual

2   process, Ms. Callahan is the expert and she'll tell you

3   how we do that.

4        MR. CHRISTIE:  Do we back strike?  No back

5   strike?

6        THE COURT:  We don't have that anymore.  You

7   fill out your little form and you turn it in to

8   Frankie.  And if everybody agrees that Mr. Jones

9   shouldn't be on the panel, then that's great.  We take

10  the first 12 jurors that are not struck.

11       MR. CHRISTIE:  Showing my age again.

12       THE COURT:  You don't have to worry about those

13  funky rules.

14       MS. MARTIN:  And strikes will be turned in

15  simultaneously?

16       THE COURT:  Theoretically.  If you get through

17  and they're still working on theirs and you want to go

18  to lunch, you give yours to Frankie.

19       MS. MARTIN:  We don't see what their --

20       THE COURT:  No, no.

21       MR. LEMBKE:  Judge, how long do you usually

22  give after the conclusion of voir dire until the form is

23  due?

24       THE COURT:  Well, when we have 40 or 50 jurors,

25  that's longer than a normal civil case.  What we usually

1   do is give about 30 minutes, 20, 30 minutes or so.  But

2   we could easily end up in a situation -- and it kind of

3   depends on where we are during the day.

4          It may be a situation where it's 4:00 o'clock,

5   we finish with all the answers, so we'll let the jury go

6   and come back the next day and that will give you plenty

7   of time.

8          But if it's 3:00 o'clock, we may want to let

9   the jury know before they go.  I will give you plenty of

10  time.  Probably not as much as you think you absolutely

11  totally need, but I'll give you some time.

12         Any other issues on voir dire?

13         I do understand the importance of hearing from

14  the jurors and, too, that is one reason why I have given

15  them this little form where they stand up and tell you

16  something about themselves.

17         Even if we do give a written questionnaire, we

18  will hold back a few of those kind of questions so that

19  you'll get to actually hear from every juror a little

20  something and get a little flare for their personality.

21  Maybe something about their favorite hobbies or what

22  book they have read, something like that where they can

23  actually stand and talk.

24         It's often revealing what they tell us about

25  themselves and those situations.  And you can oftentimes

1    figure out who is going to be someone who will speak out

2    and who is going to be real quiet.

3         Your stipulated facts are very good, very

4    thorough.  And what I usually do with those is work with

5    the lawyers to determine when the appropriate time is in

6    the case to share those with the jury, whether it's

7    first thing after opening statements or first thing

8    after my preliminary instructions or whether it's at the

9    end of the case.

10        But I usually, and particularly with a list

11   this long, would give the jurors a copy of the

12   stipulated facts so that it would sink in as something

13   that is to be taken by them as proven.

14        Throughout here you make reference to documents

15   by your pretrial identification thing.  Before trial or

16   before we share this with the jury, we would need to

17   substitute the actual trial exhibit.  But y'all don't

18   know those magic numbers yes.  That would be something

19   we would fix shortly before trial, like the day of or

20   whatever.

21        But I really am going to leave it to y'all,

22   one, whether we actually give the stipulated facts to

23   the jury; and two, when we should do it and the method.

24        I do give preliminary instructions to the jury

25   after they have been selected and seated.  And I do that

1    with a power point presentation.

2              As a visual learner myself, I think it's

3    helpful to have some key information up on the screen in

4    front of the jurors.  You will be given a full copy of

5    my preliminary instructions along with a copy of the

6    power point.

7              So if there's any issues that you have with it,

8    you can let me know.  But the actual -- the general

9    preliminary instructions are on the web site, right,

10   Frankie?

11             THE CLERK:  Yes.

12             THE COURT:  So you can read those.  And then I

13   would fill in the specifics for this case in terms of,

14   as much as we can come up with, kind of a thumbnail

15   sketch, if you will, of what the law is that they will

16   be asked to apply at the end of the case.

17             And you have given me your agreed applicable

18   propositions of law and that's what I would use at that

19   point.

20             I know that your ultimate jury charges will be

21   much longer than that.  But it never made sense to me

22   one hundred years ago when I was trying cases that we

23   pull in a group of lay people who know nothing about the

24   law and we sometimes, in a hodgepodge sort of way,

25   present facts to them through the different witnesses,

1  and then after a several week trial, several months

2  trial, at the end we tell them, by the way, this is the

3  law that you should have been looking for to be able to

4  answer these legal questions now.

5          So I give them kind of the legal questions up

6  front so they have some basis to hang your facts on as

7  they come in.  I think it helps.  I hope it does.  But

8  that's how we will be doing that.

9          After I do the preliminary instructions you

10  would make your opening statements.  And I know each

11  side wants about three hours for that, but I just

12  encourage you to remember that jurors have short

13  attention spans and we want to try to get that as short

14  as possible.

15          Unlike one of my former colleagues, Lane, I do

16  give you more than five minutes, right?

17          MS. WOODKE:  Right.

18          THE COURT:  So we'll work together on that to

19  come up with something reasonable.

20          Off the top of my head, I can't figure out what

21  that would be in this case.

22          My overriding rule is to make every effort to

23  have a just and fair trial.

24          But the next most important issue for me is to

25  keep the jury in mind and to try the case in a way that

1   our jury will be inconvenienced as least as possible and

2   that we try to make every effort to make the case

3   attainable for the jury.

4          So, with that in mind, I have given some

5   serious thought, again, to trying to do some of the

6   things that come from ABA best practices for jury trials

7   several years ago, if we want to do these things.  Like

8   have a series of statements to the jury, not arguments,

9   but like if we're going to be doing the case in phases,

10  or at the end of the government's case, have another

11  opportunity for statements to the jury before going into

12  the defendant's case.

13         Any ways that we can break up the presentation

14  of evidence so that there are explanations given about

15  it to the jury.  I want to work with y'all in doing

16  that.

17         And I encourage you to present any suggestions

18  that you may have to me.  Y'all have tried cases more

19  recently than I have been a lawyer and in more venues

20  than just here.

21         So if you have seen some things that have

22  worked in other cases elsewhere that you would like to

23  try here, bring them to me, and we'll talk about them

24  and see how we can make it work.  Because I do want this

25  to be a trial where we only have to try it once when we

1   get there and a trial where the jurors can truly

2   understand the material that you're presenting to them.

3          And with a long trial, it seems to make sense

4   to me to have some legal breaks where we kind of step

5   back and say to the jury, okay, you have heard this,

6   this is what it means in the context of this case and

7   both sides get to say something.  So bring me your ideas

8   and we'll try the case as best we can.

9          Again, I'm talking more in terms of how I

10  normally do things, but I'm open for suggestions.

11         After your opening statements, of whatever

12  length we agree on, then the government would begin with

13  its case.  I do have a standing rule that lawyers talk

14  with each other about what witnesses, what exhibits are

15  coming up when.  Again, with the idea of inconveniencing

16  the jury as little as possible.

17         If Chris knows that Holly is going to be

18  putting on so and so this afternoon and will be bringing

19  in or offering these documents and you have got issues

20  with some of the testimony or some of the documents, we

21  can take those issues up now at a regular break before

22  the jury gets put in the box.

23         Y'all know the case, y'all know what's coming

24  up, I don't.  So I don't know when to say let's have a

25  conference about some evidentiary issues.

1          I do not like it if we get a witness on the

2     stand that Chris knew was coming up and Holly offers an

3     exhibit that Chris knew was coming in with that witness

4     and then we end up in the back hall for 15 minutes

5     arguing about whether that document should come in with

6     that witness.

7          So y'all let each other know the game plan so

8     that we can take up the issues outside the presence of

9     the jury at a normal break and not have our jury sitting

10    there wondering about what we're arguing about.

11         I do not allow speaking objections.  You know

12    what I mean by that?  Where you argue your objection or

13    you give a hint to your witness as to what they're

14    suppose to be doing and things of that nature.

15         If I don't understand why you say that your

16    objection is hearsay, I'll call you to the bench and

17    we'll talk about it outside the presence of the jury.

18         If I cut you off, that's why I'm doing it.  And

19    I don't want the objection to give any suggestion to the

20    jury about one side or the other side's point on that.

21         MR. WERTKIN:  On those same lines, some courts

22    now are taking -- using a procedure whereby if the

23    parties agree that there's no objections to an exhibit,

24    exhibit has been presented and neither party disagrees

25    what the exhibit is, it's considered in evidence, you

1  know, at the start of the trial or after you rule on the

2  objections by either party, that streamlines the process

3  of instead of, I'm showing the witness, and you have to

4  cut the kill switch -- is that something that you --

5       THE COURT:  Absolutely.  Absolutely.  As many

6  documents as y'all can agree are admissible, let us know

7  and we'll go on.  Frankie gets excited when we have

8  those pre-admitted.

9       I anticipate that we will have a couple more

10  little pretrial conferences.  This, of course, being the

11  official one for the pretrial order.  We'll work on

12  those kind of things.

13       But absolutely.  Very, very good idea, Jeff,

14  that we have used in other cases and I just haven't

15  gotten to yet.  And that way, we also know which

16  exhibits are going to be problematic and we'll take

17  those up, maybe not all at once because that can be

18  overwhelming, but definitely before whichever side would

19  be tendering that exhibit.

20       And along that line, I have generally not liked

21  the idea of jury notebooks for several reasons.  But I

22  am amenable to trying them, if you think it is a good

23  idea.

24       My concern with jury notebooks is that, well,

25  for one thing, I don't want them reading ahead, I don't

1  want them reading when they should be listening and have

2  concerns of that elk.

3          But if y'all all agree that you think that a

4  jury notebook in this case would be appropriate and it

5  would contain pre-admitted exhibits or give them -- I

6  don't know.  I have just never felt very comfortable

7  with them.  But I can be persuaded otherwise, if y'all

8  think it's good.

9          As I was saying, as you're presenting the

10  evidence, just let people know who is going to be coming

11  up.

12          In a case this large, it's probably good to

13  know at least twenty-four hours in advance who is going

14  to be coming up when and y'all will know that because

15  you'll have your -- however many witnesses subpoenaed

16  that will be coming in at different times, right?

17          Again, think about and let me know what your

18  preferences are in terms of when we might want to have

19  breaks and statements from the lawyers to explain what's

20  going on to the jury and where we are.

21          And I do think that this may be a good case for

22  kind of a second round of opening statements after the

23  end of the government's case before we move to the

24  defense.

25          But if y'all don't want to do it, I'm fine.

1    It's your trial.

2           At the end of all the evidence, when we finally

3    get to that point, y'all will have given me, in advance

4    and we'll be working on them as we go, your agreed jury

5    charges, and I'll talk a little bit more about how I

6    expect y'all to reach those.

7           I will then charge the jury before you make

8    your closing arguments.  The reason I do that is you can

9    then say, instead of, as I think Judge Bowdre might tell

10   you the law is, you'll have it out there and you'll be

11   able to refer to it.

12          Oftentimes good lawyers in closing arguments

13   will put excerpts from it and, again, I will be using a

14   power point for the closing instructions as well.  And

15   you'll be able to say, for example, the government has

16   the burden of showing this, this and this and they

17   didn't.  Or you'll say, we were able to show this and

18   this and this and we did and here.

19          It's worked pretty well for more than a dozen

20   years.  So I plan on continuing that way.

21          I then give them, after the government's

22   stinging rebuttal, I give them some follow-up

23   instructions of how they are to select their foreperson

24   and conduct themselves so that won't be the last thing

25   they heard.

1       I was once a defense attorney and I know how

2   the plaintiff's rebuttals can be.  We put a little

3   distance there.  And that's kind of the way we work

4   through.

5       I haven't told you all the ways in which we use

6   the pretrial order to get there, but basically I use the

7   agreed propositions of law, as I said, for the initial

8   instructions.

9       I don't really do anything with the plaintiff's

10  position and the defendant's position, that is just

11  there so that both parties know what the other one is

12  contending, as if you didn't already by now.

13      On Page 16 of your proposal under number seven,

14  discovery and other pretrial procedures --

15      MR. LEMBKE:  May I ask, do you give them a copy

16  of the written charge?

17      THE COURT:  I absolutely do.  Absolutely do.

18  Again, we have got these lay people, we have these

19  complex legal concepts, and we expect them to understand

20  them hearing them once or twice.

21      It took me more than that in law school to

22  grasp some of those things.  So yes.  Thanks, Matt, for

23  reminding me about that.

24      Under pending motions, I had marked all those

25  out and wrote "none" because those have been ruled on,

1   but now we do have that motion for interlocutory

2   appeal.

3           So depending upon when I get this order

4   entered, it will either be "none" or that one will be

5   referenced there.

6           I'm going to come back to the time frames,

7   don't let me forget.

8           On number nine, the advisory for limiting

9   personal information.  Y'all are going to be having

10  medical records of people.  Y'all need to figure out how

11  you're going to refer to those individual patients and

12  definitely need to redact personal information in there

13  that shouldn't be disclosed.

14          But I don't remember all of the names and

15  whether there are overlapping first and last names, but

16  maybe you could figure out a way to refer to each

17  patient either by the first name or by just the last

18  name or something like that.

19          MS. SNOW:  We have discussed this, Your Honor,

20  and that was what we thought made sense to refer by the

21  first name unless more than one patient had the same

22  first name, in which case we would add the initial of

23  the last name in open court.

24          MR. CHRISTIE:  I would prefer first name and

25  initial typically, but yes.  We had discussed that.  And

1   I think we agreed that is what we would try to do.

2          The other question that's really related is a

3   lot of documents have the names on them.  And would we

4   be allowed to have the names redacted before the

5   documents were made public but not before the jury

6   perhaps got to see them.

7          If you redact all the names, it may be

8   confusing to the jury when they see the documents.

9          MS. SNOW:  Our thought was to leave them

10  unredacted for use at trial and then to redact after,

11  before it's made public.

12         THE COURT:  Okay.  Well, how are you going to

13  use it without it being made public at trial?

14         MS. SNOW:  We thought that it could be arranged

15  with the technology that the jurors and the witness, of

16  course, and the court would be seeing the document but

17  not the audience.

18         MR. CHRISTIE:  My own reaction is that I have

19  tried cases before where nobody redacted any names and

20  everybody just understood it was confusing and they just

21  went forward and you can do that, it's in your

22  discretion.

23         But I'm not concerned about people in the

24  audience hearing the names, it's having the information

25  available online that somebody could go and mine.  That

1  is really, I think, the privacy concern that we have

2  here.

3          So that's the reason why we were thinking that

4  redacting the names after admission of the document

5  would be a good step that would at least cut down on the

6  confusion.

7          MR. WERTKIN:  The HIPAA law is not very clear

8  -- it doesn't prohibit the jury, for example, from

9  seeing these names.

10         We need to use -- the United States is not a

11  covered entity, but we are under directives to try to

12  minimize whatever information gets out there.

13         We agree with counsel that limiting it to just

14  the jury but making sure it doesn't go public in a way

15  that, you know, whether it be online or even in the

16  court's record, we would do the redaction after.

17         And that would --

18         THE COURT:  But in the transcript --

19         MS. SNOW:  We would just be referring to the

20  first name.

21         MR. CHRISTIE:  Recognizing that people will

22  slip up and you'll have to go back and have some

23  redactions in the transcript.

24         But by using the first name or the first name

25  and the initial, the redactions in the transcript would

1  be greatly limited hopefully.

2      THE COURT:  Is there a way, so that it's clear

3  to the jury, that Ann M is Ann Morris and these records

4  that say -- in other words, maybe a coversheet for all

5  the records involving Ann M and have them all together.

6      MR. CHRISTIE:  We could possibly do that.  My

7  own preference of having the first name and the first

8  initial is because at least then they know where

9  alphabetically the person falls, and if they were

10  looking for it, it would be easier.

11      If you just had the first names, if they had

12  some alphabetical list, then they will be lost.

13      I do think that perhaps having a key, if you

14  were to think of it that way, both of all the patients

15  and then perhaps for each patient you could have a group

16  of exhibits for them that might have the full name which

17  would not be a public document.  That may make sense.

18      THE COURT:  Like the coversheet would be Ann M

19  and then the actual records would have the whole thing,

20  that way they would know.

21      But even those records, not just names, Social

22  Security numbers have got to be redacted.  And I'm

23  uncomfortable showing on the screen in the courtroom a

24  document that's got somebody's Social Security number on

25  it.

1          So, regardless of what you do with names,

2    Social Security numbers need to be redacted because

3    you're not going to be using those for any purpose.

4          And I don't know about, I mean, generally after

5    an exhibit is admitted, it's public from the perspective

6    of the open court, open trial, and it's shown on the

7    screen for the spectators as well as for the jury and

8    the witness.

9          MR. CHRISTIE:  There is the additional issue,

10   too, that the depositions, which we will be playing

11   deposition excerpts, will use the full name.  I'm just

12   telling you.  There are those issues.

13         MR. WERTKIN:  Your Honor, we are committed to

14   do -- make our best efforts to balance this, as you

15   said, making this case attainable for the jury so they

16   are not looking at what could be a very important

17   document and more than half of it is blacked out, but at

18   the same time following our directives to reduce the --

19   and we have talked together and we do think that by

20   referring to these patients just with the first name and

21   the last initial, and then doing everything we can to

22   redact out whatever we need to so that anyone coming

23   back in can't find it, that the balancing there would

24   suggest that even if -- even if there was someone in the

25   audience who was able to do it, it would still comport

1    with AseraCare's responsibility under HIPAA and our

2    responsibility under the directives.

3         MR. CHRISTIE:  The additional balance issue, if

4    the Social Securities were removed, there's not any

5    financial motive that anyone might have to try to mine

6    these documents and get the information.  It's not like

7    we have bank account numbers or something like that that

8    would give someone a motive to possibly be able to use

9    the information.

10        THE COURT:  That's why I'm saying, Social

11   Security numbers have got to be removed.  I have been

12   appalled at the number of healthcare workers who have

13   been in front of me on criminal charges of identity

14   theft because they take the patient's name and Social

15   Security number.  Those folks make me very mad, Lane, as

16   you probably know.

17        MS. WOODKE:  Very mad.

18        THE COURT:  I'm very sensitive to that.  So if

19   all Social Security numbers --

20        Why, Jeff, would you be redacting half the

21   document if you're just, say, we're using Ann Morris, as

22   an example, and you have Ann M and just redact the rest

23   of her name?

24        MS. SNOW:  It becomes a bit more complicated

25   when you're looking at the entire medical record and

1    what information on that record is potentially protected

2    health information.

3          We had discussed that both sides would likely

4    want the full medical record for the patient admitted

5    into evidence, but that it would likely be impractical

6    to redact the full medical records in those cases and

7    may be more appropriate to put the full record under

8    seal.

9          THE COURT:  I think we can probably do that.

10         MS. SNOW:  I think we're --

11         THE COURT:  For purposes of the actual

12   exhibits.

13         MS. SNOW:  Right.  So I think we're -- we're in

14   agreement that if it's one patient's name on it, on an

15   email or something of that sort, that that wouldn't --

16   would be practical for us to redact.  It's really where

17   it becomes too burdensome and potentially confusing to

18   try to redact all of the identifying information where

19   we might request it to be placed under seal.

20         THE COURT:  Okay.  Y'all are very cognizant of

21   those issues, as you should be, and will work together

22   to make sure that there's enough information that the

23   jury understands who we're talking about and that as far

24   as possible privacy can be addressed and no Social

25   Security numbers.

1           And Frankie is real good about making sure that

2   there are no Social Security numbers left unredacted.

3   That will be the big thing there.

4           On timing of issues, the general practice, as

5   reflected in your proposed pretrial order, is that we

6   file motions in limine two weeks in advance.  I'm not

7   sure that is going to be enough time.  I'm anticipating

8   that there's probably going to be more than one or two

9   motions in limine from each side.

10          I would propose that instead we do it three

11  weeks in advance, that way the week before we can have

12  the final pretrial or if there are motions in limine

13  that y'all feel need to be addressed sooner rather than

14  later so that you know what is going to be coming in,

15  just file them as soon as you want to so that we can get

16  them under advisement and resolved.

17          I think we took up, I think, as many Daubert

18  motions as I hope we'll have to deal with, so at least

19  you have got that behind you.

20          Again, it's y'all's case.  Y'all know it far

21  better than I.  I don't know what y'all know in terms of

22  anticipated issues.  And there may be something as big

23  as a Daubert motion would otherwise be out there that

24  y'all know of and if so, tell me so that we can address

25  those things sooner rather than later.

1           MR. CHRISTIE:  You want to, I mean --

2           THE COURT:  You got something?

3           MR. CHRISTIE:  Yes, we do.  If you read the

4    government's position statement, they have got, I will

5    just -- it's similar to some of the comments that we

6    have -- some of the discussion we had at the hearing on

7    the 17th of November.

8           But a lot of -- half the government's case,

9    perhaps, seems to be about marketing.  And even the

10   sentence or the phrase, I guess, that is particularly

11   telling is they say that AseraCare quote went trolling

12   for sick people who met their arbitrary financial

13   goals.

14          And, of course, you know, we're going to have a

15   mini trial probably on whether or not there was any

16   trolling for sick people.

17          But even if there was trolling for sick people,

18   if they were sick enough to be on hospice, then it

19   wouldn't be a false claim.  This wouldn't be relevant.

20          I'm just pointing out to you that there's a lot

21   of the witnesses and the evidence that the government is

22   intending on using that are not related to eligibility.

23          So there is going to be a motion in limine that

24   is going to address those issues.

25          THE COURT:  And that's a concern that I've

1  had.  If you will recall, I had suggested that we may

2  want to look at bifurcating some of the issues because

3  this business practice argument and evidence, as I ruled

4  at our hearing, I think, goes to the question of

5  knowledge.

6          But I don't think it is relevant on the issue

7  of eligibility, as Chris was saying, and how we can get

8  a determination based on the actual medical records and

9  in evaluating them as to whether there was falsity

10  without infecting the jury with arguments about trolling

11  for sick people.  That is a problem that I see.

12          MS. SNOW:  Your Honor, we feel strongly that

13  the evidence is, in a significant way, interrelated and

14  that before the jury hears Dr. Liao's testimony about

15  the medical records, they need to understand where the

16  information in the medical record came from and how the

17  patient was admitted and who decided what diagnosis they

18  would be given and what are the LCD worksheets and the

19  eligibility assessments that he found reflected the

20  patients were doing worse than they actually were, what

21  information the doctors received, why it might be that

22  doctors were recording in the medical records and other

23  staff that they thought the patient was stable and doing

24  well and should be discharged.

25          So we feel like there are important contextual

1    facts about the company's business practices that are

2    necessary for the jury to hear before hearing Dr. Liao's

3    testimony for them to be able to understand it.

4              MR. CHRISTIE:  There is nothing in Dr. Liao's

5    opinion that is based on any of the type of factors that

6    she just discussed.

7              What she just discussed is inconsistent with

8    the government's focus on the documents that are in the

9    medical records.

10             MS. SNOW:  It is the documents in the medical

11   record but his opinion is, for example, that those

12   documents in some cases inaccurately evaluate the

13   patient, that they're stating that the patient's level

14   of function is much worse than clinical notes.

15             So we think that that is just one example of

16   why it's important that they hear first from people who

17   were preparing the documents and understand why they

18   were preparing them and for what purpose and how they

19   were used and what information went to the individuals

20   who were making the decision to certify.

21             All of that is relevant to understanding

22   Dr. Liao's opinion and why he found that the medical

23   records didn't support that the patients were terminally

24   ill.

25             THE COURT:  Well, it seems to me either the

1  medical records support that the patient was terminally

2  ill, as some doctors have testified they do, or the

3  medical records don't support the prognosis, as Dr. Liao

4  has said.

5      And I don't see how the business practices

6  determine whether the medical records support or don't

7  support.

8      I understand what you're saying in terms of the

9  context of how the government claims these medical

10 records were not supporting those prognoses, but the

11 business practices of aggressively marketing the hospice

12 and trying to meet quotas or whatever like that, I don't

13 see what relevance that has to whether the claim itself

14 was false.

15     I see it totally relevant to the knowledge.

16 Did these people know when they were making these

17 certifications or were they recklessly ignoring what

18 they knew in making those certifications, because of the

19 pressure, as the government puts it, to bring people in

20 that might not be eligible.

21     MR. WERTKIN:  To put a finer point on it.

22 Dr. Liao is going to review the records and he is going

23 to testify about the objective facts that the records

24 don't support.

25     The jury is also going to see there is a

 1   certification of terminally ill that goes along with

 2   it.  They have to balance that.

 3        This is not a case, Your Honor, where one

 4   doctor can come in and just, you know, Monday morning

 5   quarterback and say we have a False Claims Act case.

 6        You have to view it in conjunction with the

 7   fact that these nurses that we plan on putting on, who

 8   are going to testify about quotas and about their

 9   pressure, they are the ones creating the record, they

10   are the ones passing the information to the doctor.

11        And when the jury hears that the doctor never

12   saw the patient, in fact, relied exclusively on what

13   those nurses were telling the doctor, to sign that piece

14   of paper, that is, I mean, that is extremely relevant,

15   it's right on point to let the jury evaluate the

16   difference between what the doctor signed in a

17   certificate and what Dr. Liao is saying is in the

18   medical record.  It's the same issue.

19        MR. CHRISTIE:  Most of these --

20        THE COURT:  I think we're talking about two

21   different things.  Okay?

22        MR. WERTKIN:  Okay.

23        THE COURT:  The compilation of the medical

24   records and the medical records, in my mind, is

25   different from what I have heard for years in this case

1   when I would ask where is the false claim, where is the

2   false document, and I was told repeatedly that AseraCare

3   had this major marketing program of going out and

4   getting patients in that weren't eligible.

5        That is what I'm talking about as being

6   relevant perhaps to knowledge, not to the question of

7   the falsity.

8        And I think there may be something else that

9   Chris was having in mind when he raised that, but that

10  is what I thought he was talking about.

11       Like the pressure, if we don't meet our

12  numbers, we're going to have to lay off people and those

13  kinds of things.  I see that as separate from what the

14  medical records said, what the doctor knew or had access

15  to when he was making the --

16       MR. WERTKIN:  Well, feel free to answer.  When

17  you're talking about medical records, just to give a

18  hypothetical, and Holly really does know the patients on

19  an individual level, so maybe you can come up with a

20  specific example.

21       But if you have medical record notes that say

22  this patient is walking around, this patient is having

23  conversation, having dinner and the diagnosis is adult

24  failure to thrive, which -- and so Dr. Liao looks at it

25  and says the medical records and the diagnosis, they

1  don't match, the objective facts in the medical records

2  say this diagnosis is representation that the patient

3  was terminally ill is false.

4        How does the -- how does the jury evaluate at

5  that point who is correct?

6        Well, if you have a nurse who is testifying,

7  yeah, I was pressured to inaccurately evaluate this

8  patient and give them a higher score, you know, on the

9  FAST scale or whatever in order to get them on, is that

10 relevant to the idea of is this one doctor Monday

11 morning quarterbacking or is this doctor making an

12 evaluation of the objective facts in the record that the

13 jury is now listening to and evaluating based on how

14 that record -- how the record was created and how the

15 diagnosis was arrived at.

16 MR. CHRISTIE:  The description he is giving

17 right now is completely inconsistent with the

18 government's interrogatory answers.

19       We specifically asked in interrogatory answers

20 how are you going to prove knowledge.  And the answer

21 was, we're going to use Dr. Liao's report, knowledge and

22 falsity.

23       So all this discussion that you're hearing

24 right now contradicts their interrogatory answers.  That

25 is the first point.

1        Second, he mentioned specific examples.  And I

2  think it's important to recognize that none of the

3  evidence they're talking about ties to any patient that

4  Dr. Liao says is ineligible.

5        I'm not aware of any person, salesperson or

6  nurse, most of the evidence that they're talking about

7  is not nurses, there is some evidence they have that is

8  related from nurses, but none of the nurse evidence ties

9  to any of the patients that Dr. Liao says are

10 ineligible.

11        We have a disconnect between what the

12 government has said in their interrogatory answers and

13 what they're intending to show at trial and what is

14 being discussed right now.

15        MR. WERTKIN:  I think the confusion is that

16 knowledge and falsity are completely intertwined.  That

17 is why we have to have one trial and we can't separate

18 them.

19        Knowledge can be shown by reckless disregard

20 and deliberate ignorance.  So if that Dr. Liao testifies

21 that fifty percent of these patients are ineligible,

22 that can help go to show that AseraCare was being

23 deliberately ignorant of the numerous fifty percent

24 false claims that were being submitted.

25        Of course he is also being put on for falsity

1   for the reasons that we just discussed.

2         Likewise, these nurses are going to testify

3   about the practice and how they were pressured to funnel

4   certain types of information to these doctors and they

5   were pressured to -- and I mean, Chris hasn't seen our

6   witness list, but we are going to be talking about this

7   a lot, about how these records were created, how they

8   were maintained and how they lay the foundation for

9   Dr. Liao's conclusions.

10         And they are also going to talk about how they

11   talked about their concerns to their management and how

12   they passed along the concerns that these patients were

13   being admitted and they were ineligible.

14         So it's all intertwined, knowledge and falsity,

15   from just about all the witnesses.

16         THE COURT:  Jeff, you haven't been here for all

17   this time.

18         MR. WERTKIN:  That is true.

19         THE COURT:  Like I said, oftentimes when I have

20   asked where are the false claims, I have been told about

21   the marketing, the marketing practices and that that

22   shows the falsity of the claims and the knowledge of

23   it.

24         So that's what I'm referencing.  Not the nurses

25   who are preparing the documents.

1          Do you understand what I'm saying?  And I

2     forgot who the expert was that I excluded.

3          MR. CHRISTIE:  Dr. Perri.

4          THE COURT:  Dr. Perri.  In that testimony,

5     which I held was summarization of all these other

6     people's testimony and documents about the marketing.

7     But what you're talking about is the nurses themselves,

8     right?

9          MR. WERTKIN:  Yes, the nurses themselves that

10    are --

11         MR. CHRISTIE:  The government is getting ready

12    to ambush us, if what he is saying is correct.  We have

13    asked in interrogatory answers what are you relying on

14    and this discussion has not been part of their

15    interrogatory answers.

16         MS. SNOW:  There may be some misunderstanding.

17    We're certainly relying on the facts in the medical

18    records to show that the claims were false.  That has

19    always been our position.  And Dr. Liao, of course, is

20    opining to assist the jury in reaching that assessment.

21         I think what we're saying is that we think that

22    it's important that the jury have context to how the

23    company was getting patients and how it was documenting

24    how those patients were doing, and what information went

25    to doctors or didn't go to them, and what pressure the

1   people who were documenting were feeling to make the

2   patients look worse than they actually were.

3        All of that is important to understanding

4   Dr. Liao's testimony about the facts in the medical

5   records and what they show as to falsity.

6        MR. CHRISTIE:  Your Honor, I can just tell you,

7   we can go get the interrogatory answers and look at it,

8   but this is news to me.

9        MR. WERTKIN:  Well, I mean, I can't -- I can't

10  get inside their head.

11       But this has been -- always been a case about

12  AseraCare's business practices.  That is very, very

13  clear from our complaint and how those led to the

14  submission of false claims.

15       I mean, that is plain from the face of every

16  document that we have ever filed.

17       THE COURT:  I will say I have heard more about

18  business practices, business practices, marketing and

19  aggressive marketing and all that kind of stuff

20  throughout this case until very recently when we were

21  getting ready for summary judgment, that was the first

22  time I saw any specifics in terms of a false claim.  And

23  I have been asking for that for years.

24       So I --

25       MR. CHRISTIE:  The nurses that he is talking

1   about is what I was referring to.  I agree, the

2   marketing, they have been talking about the marketing

3   all along.  Our position has been this case is about

4   whether or not the patients are eligible.

5           He just made a number of comments about nursing

6   and this kind of stuff.  And that's not been in their --

7           MS. SNOW:  I believe it's in our complaint that

8   AseraCare's business was structured so that not doctors,

9   but nurses and other clinicians were making the decision

10  about whether the patient got admitted and that they

11  were pressured.  Many of our relators were nurses, all

12  of them, except for Dr. Seco (phonetic) who was a

13  doctor.

14          This has always been part of the allegations in

15  the case.

16          MR. CHRISTIE:  We're not going to resolve the

17  differences between the way the parties see this at this

18  point in time.

19          There is one additional point that I wanted to

20  make.  When they start talking about knowledge, they

21  have got two different things they have to be able to

22  show.  They have got to be able to show the doctor knew

23  that the patient was ineligible and that AseraCare

24  didn't know that the doctors were certifying people who

25  weren't eligible.

1          In order to keep all of this evidence out,

2   AseraCare will agree that they are not going to defend

3   the case on not knowing what the doctors were doing.

4          So really it's just the doctor's knowledge that

5   is going to be at issue in this case.

6          MR. WERTKIN:  I think that is where we're

7   having the disconnect because -- and that might be why

8   you feel ambushed in some way.

9          I think it's been clear to us that AseraCare's

10  position always has been if you can get a doctor to sign

11  the form, it immunes the company in some way from a

12  False Claims Act.

13         MR. CHRISTIE:  That's never been our position.

14  And we have stated numerous times we are not taking the

15  position that having a doctor certify is not -- is not

16  -- that is not our position.

17         MR. WERTKIN:  I'm sorry for mischaracterizing

18  it, that the doctors have to have some kind of actual

19  knowledge for the doctors to have committed fraud.

20         And that is really what was put before you in

21  summary judgment and that is what you denied.

22         And we have put down on our witness -- we

23  disclosed tons of witnesses that AseraCare decided not

24  to take depositions of.  And the ones that they did take

25  depositions of, all of this is very clear in terms of

1  how the nurses played a role and how that works into

2  falsity and that is a choice that AseraCare made.

3         Now that we are passed the legal side of it,

4  now that we are passed, okay, can the government present

5  a case whereby they show that the objective facts on the

6  record don't indicate terminal illness and AseraCare

7  knew about it --

8         THE COURT:  With hindsight.

9         MR. WERTKIN:  What do you mean?  Knew about it

10  or -- objective facts?

11        THE COURT:  Objective facts with hindsight,

12  knowing that every one of the patients that was

13  evaluated was on hospice for more than a year.

14        MR. WERTKIN:  What makes the facts objective is

15  that they're the same at the time, they're the same

16  afterwards and they are the same before.  That's what

17  makes them objective facts.

18        And what we would argue is that these

19  criteria -- these criteria are very clear.

20        And the reason why these patients were

21  ineligible is, you know, and yet, these patients were

22  nonterminal and the reason why they were put on has

23  everything to do with the whole rest of our case and

24  that is why it's relevant.

25        THE COURT:  I'm not saying it's not relevant.

1   But I'm saying I don't believe it goes to the question

2   of the veracity of the claims.

3          It goes, in my opinion, more to the question of

4   knowledge of the company.

5          And I keep talking about the marketing stuff,

6   and I see a distinction between all this stuff I heard

7   for years about these aggressive marketing techniques

8   and pressure on nurses.  I think that is different.

9          But I agree with Chris, never have I seen any

10  evidence that any of the nurses' testimony is linked to

11  any of Dr. Liao's patients that he concluded that for

12  some period of time were ineligible.

13         MS. SNOW:  I think what we're saying is for the

14  matter of the presentation of our case that we feel it's

15  critical that before considering the evidence that does

16  go to falsity, Dr. Liao's testimony in the medical

17  record, that they have the context for how the company

18  conducted its business, how it admitted patients, how it

19  documents those conditions, how these particular

20  documents that Dr. Liao is going to be testifying in

21  detail about were created, how they were used, what the

22  intent was, you know, why it would be that certain

23  individuals would be documenting in the records certain

24  things, patient is doing well, the patient should be

25  discharged, then the patient isn't.

1          All of it, we think, is important in terms of

2     how we're presenting our case, that the jurors be able

3     to hear about how the company conducted its business

4     before it hears Dr. Liao explain the medical records.

5          THE COURT:  Of course, because you want to get

6     the jury thinking about these business practices before

7     they have to think about whether a claim is false.

8          And that's why I had suggested that we

9     bifurcate it and first determine whether the claim is

10    false.

11         But AseraCare didn't want to take me up on that

12    and no surprise there.

13         MR. CHRISTIE:  We agreed to bifurcate the

14    falsity and the knowledge issue.

15         MR. HARTLEY:  They didn't want to bifurcate the

16    sampling part.

17         MR. CHRISTIE:  The government didn't want to

18    bifurcate the knowledge and falsity.

19         MR. LEMBKE:  They are being very forthright

20    today in telling you why they don't want to bifurcate

21    because they want to poison the well.  That's what

22    they're saying.

23         MR. WERTKIN:  Well, it's just a matter of

24    characterization.

25         In our view, it provides context.  How can the

1    jury understand what it is that Dr. Liao is testifying

2    about if you don't understand what it is and where it

3    comes from.

4              They're saying it's poisoning the well.  Just

5    turn it back around, I mean, our view is these are --

6    there's no debate that there were quotas and that there

7    were pressuring, all these things existed, and if

8    they're arguing that you have to show falsity by the

9    doctors or the objective facts on the record to show

10   terminal illness, it doesn't matter what the business

11   practices are.  They can argue that to the jury.

12             THE COURT:  After you have already poisoned the

13   jury.

14             MR. WERTKIN:  Again, I wouldn't -- providing

15   them with truthful and under oath testimony about what

16   it is that Dr. Liao is going to be reviewing, I don't

17   understand how that can be poisoning the well.

18             THE COURT:  Dr. Liao didn't review business

19   practice, did he?  I don't remember that being disclosed

20   in his deposition or his report.

21             MS. SNOW:  The medical records.  It's all

22   interrelated.  The business was to have hospice

23   patients.  And the business -- the way the company

24   conducted its business is reflected in the medical

25   records as well, and the LCD worksheets and what

1   criteria they were assessing.

2          And going back to the same points that we made,

3   it's all interrelated, in our view.

4          THE COURT:  Well, I think this discussion

5   further emphasizes to me the need to have the Eleventh

6   Circuit determine what the legal standard is to be

7   applied here.  But we have already talked about that a

8   little bit.

9          MR. CHRISTIE:  Your Honor, you asked were there

10  major issues that the parties were going to address in

11  motions in limine.  I realize that we're not deciding a

12  motion in limine at this point.  But AseraCare did want

13  to bring to the Court's attention that this issue really

14  does not only -- not only is important in terms of time

15  the Court might want to spend on motions in limine, but

16  from what I'm hearing, the reason why we have a three

17  month trial instead of a two month trial is because the

18  amount of marketing and business practices evidence not

19  tied to any specific patient that the government is

20  intending on presenting.

21         MS. SNOW:  It's all tied to all the patients,

22  Your Honor, and it's the way the company conducted its

23  business and it's reflected in the patients that were

24  randomly selected, in the way that the -- all of our

25  witnesses will be discussing in various levels how the

1   company was conducting its business that led to the

2   submission of false claims for patients who were not

3   terminally ill.

4        MR. WERTKIN:  If the Eleventh Circuit, we think

5   the Eleventh Circuit is going to agree with your

6   decision and come back and say that they agree with what

7   you say, I am not sure how that would resolve this

8   conversation anyway.

9        Because our position is that the -- that all

10  this testimony about how AseraCare operated itself lays

11  the foundation, it's tied directly, as Holly just said,

12  to the, you know, evaluating Dr. Liao's testimony.

13       And I brought this up earlier, and I don't want

14  to repeat myself, but we want to do, as you do, the most

15  efficient and just trial.  We want the jury to see

16  everything.

17       If they want to testify that a doctor signed

18  this form, you know, we don't want to stop that evidence

19  from coming in.

20       And also, they are going to see that Dr. Liao

21  said the objective facts say that this is false.  The

22  jury has to make a decision about that.

23       For us, how AseraCare was running its business

24  and how we got to that point where Dr. Liao is saying

25  one thing and the certificate says another thing, that

1    is going to help the jury determine who is right and who

2    is wrong.

3          THE COURT:  Either it's objectively false or

4    it's not.  And I don't see how the business practices

5    have anything to do with something being objectively

6    false.

7          I totally see how it deals with the knowledge

8    issue.  I understand that.  Even though I may disagree

9    with the government's position that when AseraCare says

10   if we don't fill these beds, we're going to have to lay

11   off people, as being indicative of submitting false

12   claims, when any business knows if you don't have the

13   income you have got to cut the out go.

14         But I understand how there are arguments there

15   and inferences that the jury could draw that that showed

16   knowledge that they were filling beds with people that

17   weren't eligible.  I understand that.

18         But I don't understand why the jury has to hear

19   that information before they can make a determination of

20   the threshold issue of has the government established an

21   objectively false admission or for some period of time

22   that the patient was not eligible.

23         I'm inclined to bifurcate it to make that

24   determination.  And I think we may need to have, if

25   y'all want to brief on that, I will let you do that.

1   Maybe we can brief that while the Eleventh Circuit is

2   deciding whether to take your case.

3         But I think that that is critical.  And I think

4   it makes sense to have the jury determine whether they

5   are -- there are claims that are false.

6         MR. BARGER:  If I may, just briefly.  It seems

7   to me that this is basically an evidentiary ruling

8   that's being made that this information is not probative

9   of falsity.

10         And it seems to me that the way AseraCare's

11   marketers talked to treating physicians, the standards

12   that they told them, if they said to a treating

13   physician who is going to sign a certificate of terminal

14   illness, if all of their marketing materials told those

15   people, the standard is would you be surprised if they

16   died within the next year, well, that is going to be

17   something that would make it more or less likely that

18   the claims themselves are false.

19         And so it doesn't just go to knowledge, it goes

20   to falsity.

21         And just like where they did, if you cast a

22   wide net, it makes it more or less likely that you are

23   going to catch a larger variety of fish.

24         If you cast a small thin grain net, you are

25   going to catch smaller variety of fish.  And I think

1  AseraCare had a wide net philosophy.  They described it

2  as that.

3          It does make it more or less likely that false

4  claims were being submitted.

5          Now, what Dr. Liao is going to be talking about

6  is the particular false claims.  But how they went about

7  doing what they did is definitely -- those are facts

8  that will make it more or less likely, just as if their

9  marketing materials, if they had said to doctors, by

10 God, they have got to be dying within 180 days and here

11 are the criteria and if they had been very strict in

12 their marketing and tried to -- that would be probative

13 that maybe they weren't submitting false claims.

14         THE COURT:  But, Jim, if all you had was this

15 wide net information, you wouldn't get anywhere because

16 you wouldn't have evidence of a false claim ever being

17 submitted.

18         They could have a very big net, catching every

19 kind of fish in the world, but if they threw back the

20 ones that weren't eligible, that wouldn't establish that

21 there was a false claim.

22         You have to establish a false claim to have a

23 False Claim Act case.  And falsity is one element;

24 knowledge is another.

25         It's like, you know, very clear, if you can't

1   establish one element of your claim, you don't have a

2   cause of action to go forward.

3          MR. WERTKIN:  Your Honor is exactly right.  You

4   don't have one without the other.  Likewise, you don't

5   have a False Claims Act case with just Dr. Liao, you

6   don't have it with just the wide net, you have it with

7   both.

8          That is what we are trying to bring.  That's

9   why this is a -- is both.

10         Dr. Liao is going to testify about objective

11  facts in the record and the jury can buy that or the

12  jury can't buy it, that's a decision for the trier of

13  fact.

14         But really, you know, and you talk about

15  earlier making this understandable, attainable for the

16  jury and trying to put them in your shoes and

17  remembering they are not all lawyers.  The question, I

18  think, every juror is going to ask, why, if the

19  objective facts that Dr. Liao testifying say not

20  terminal, why is it that the doctor signed the

21  certification of terminal illness?  That is a critical

22  question.

23         THE COURT:  Because they get paid for them.

24         MR. WERTKIN:  Who?

25         THE COURT:  AseraCare.

```
 1          MR. WERTKIN:  Why did the doctors do it?  Why
 2    did a doctor sign that form?
 3          And AseraCare can put on and will put on
 4    evidence that the doctor followed their best practices
 5    and they did everything they can.
 6          We are going to put on evidence that shows the
 7    doctor didn't get all the information, funneled the
 8    information, didn't see patients and was making a
 9    determination that had nothing to do with their view --
10          THE COURT:  Jeff, you can put on that
11    information without going into all of the marketing
12    stuff.  That's what I'm trying to say.  Yes, you can
13    have a nurse testify that, you know, I was pressured to
14    meet quota or something another like that.
15          But you don't need to get into all of this
16    other business practice stuff that has nothing to do
17    with what information is in that medical record.
18          MR. WERTKIN:  I --
19          THE COURT:  Do you understand?
20          MS. TAPIE:  If we have to separate falsity and
21    knowledge, we are going to have the same witness
22    speaking to both.  Then the trial will be longer.  We
23    have people that are speaking about what went into the
24    medical report and how they marketed to the physicians
25    and the pressures that were on them when they were
```

1  putting in the record what the physician would

2  consider.

3          So we would have to call them all again for our

4  knowledge case.

5          THE COURT:  I don't think you would.  I thought

6  you were relying on the salespeople and the marketing

7  people for all of that stuff.

8          MS. SNOW:  As we said, the whole team, the

9  clinicians were salespeople.  They were expected to go

10  out and market and get more hospice patients.  They were

11  all marketers in that sense.

12          It's not a discreet set of just salespeople

13  that were doing this.  It was everyone.

14          MS. BROOKER:  To pick out the example that the

15  defense counsel just read, the trolling he read, that is

16  the word the nurses testified to, about trolling, not

17  PRMs or other marketers.

18          One of the things that Dr. Perri would have

19  explained, that we will have fact witnesses talk about,

20  and maybe the misnomer or misunderstanding is in the

21  word "marketing" which is what we had hoped to

22  illuminate through Dr. Perri's report, it's a very broad

23  concept.

24          For AseraCare, maybe it's not the best word to

25  use, or maybe we're all getting misled by the word

1   "marketing."

2          A lot of the conduct, evidence of pattern and

3   practice that we saw in this case, which Jeff and Holly

4   are talking about, is what we describe in a very, very

5   broad way as marketing.

6          So when we talk about business practices and

7   marketing, we're really talking about the same thing.

8   We're talking about nurses being pressured, salespeople

9   being pressured, managers pressuring AseraCare, audits

10  being conducted and that not being disclosed and sent

11  throughout and disseminated throughout the

12  organization.

13         Maybe we're all just sort of getting too

14  focused on the word "marketing."

15         And I just think that for us, we believe that

16  all of this is an integral part of how the company did

17  business.

18         And Your Honor is absolutely correct that

19  Dr. Liao is talking solely about falsity and he is going

20  to talk about the objective facts in the record.

21         But from the government's point of view, it's

22  important for us to present to the jury, as Holly has

23  been saying, how this company did business and that

24  these two issues are intertwined, even though we accept

25  the burden that we are going to have to prove separately

and persuade the jury on knowledge and persuade them on falsity.

Because you're right, if they agree with us entirely on knowledge but at the end of the day discount entirely Dr. Liao's opinion and believe that the sample patients do not present a picture of false claims, of course, we would lose.

We have to prove both elements.  And we agree with that.  We just disagree that it would be either efficient or stream lined or the best presentation of the case to the jury to present them as two isolated separate sort of pieces of the case.

THE COURT:  We could easily work through what information can come in from nurses versus other business practices or things of that nature.

But I think that a fair and just trial may well be one where the jury first has to determine are there any false claims.  And if that means it takes six months to do it, we'll take six months to do it.  Because I think that otherwise we run the risk of jurors getting all caught up with this argument that I have heard so much about the marketing and the business practices and all those kind of things that may, yes, have some relevance, but still does not establish that any claim was false.

1          So I am concerned that if we go the route the

2     government wants to go, the jury is going to be so

3     overwhelmed with all of the business practices that it

4     loses sight of were any of these claims actually false.

5          But I think it makes sense to have some

6     briefing on that and the benefit of any legal arguments

7     on that.

8          I do know that the Court generally has a lot of

9     discretion in determining how the case will proceed and

10    that's my impression right now as to the best way to try

11    this case.

12         But I would anticipate, perhaps, that if we

13    have a motion to do it that way, that we brief, not a 90

14    page brief, but shrink it substantially from the

15    normal.

16         But I think the first order is to deal with the

17    question of interlocutory appeal and see where we are on

18    that.  I don't want to order a motion and a brief right

19    now when we need to get that.

20         But I would anticipate early January, while

21    we're waiting to hear from the Eleventh Circuit, that

22    that would be a good time to look at briefing on

23    bifurcation.

24         MR. CHRISTIE:  You indicated that motion in

25    limine would be a week earlier, January 12th.

```
 1            THE COURT:  Off the record.
 2                      (Off the record)
 3            THE COURT:  January 15th for motions in limine
 4     should work.
 5            MR. OLSON:  May I ask you a question about your
 6     bifurcation process?
 7            THE COURT:  Okay.
 8            MR. OLSON:  Is it Your Honor's suggestion that
 9     there would be two separates juries and two separate
10     decisions?
11            THE COURT:  No.  No.  We would use the same
12     jury for everything but have the jury make a
13     determination of falsity, then go back and try the other
14     stuff, the knowledge and everything else like that.
15            MR. OLSON:  Would the jury be able to -- would
16     the -- and I think we need to look at the elements, but
17     potentially could the jury make a determination on the
18     common law claims at the point of the bifurcation under
19     your proposal?
20            THE COURT:  Maybe.  I don't know.  I really
21     haven't focused on the elements of the common law
22     claims.  And I don't know that there's really much
23     dispute on the presentation issues because, I mean,
24     AseraCare presented the question whether they were
25     false.  Right?  So I don't know that we need a whole lot
```

1    on that.

2          But the first thing that -- so maybe we look at

3    did AseraCare make a false or fraudulent claim, which

4    was presented or caused to be presented.

5          So that it's actually the two elements and then

6    we look at knowledge separately.  Does that make sense?

7    Because if they weren't presented, they wouldn't be in

8    front of us from Dr. Liao, right?

9          MS. BROOKER:  Earlier Your Honor was suggesting

10   something along the lines of interim summations or

11   interim statements.  And I have done that in a nine

12   month trial where we had interim summations.

13         And I think that another way that we might

14   propose to try this case is to take your first

15   suggestion which is, again, the government feels very

16   strongly that the best way for us to present our case is

17   by putting on our knowledge evidence before we put on

18   our specific evidence of Dr. Liao and then before we put

19   on the testimony of the statistician and on the

20   extrapolation and perhaps to address Your Honor's

21   comment, which I think is a very excellent point, this

22   is going to be a long trial and so interim points where

23   we can summarize each side and have an interim summation

24   opportunity, that would be an opportunity for both sides

25   to explain that we have only gotten to the knowledge

element and explain where we're going on the falsity.
And that would avoid Your Honor's concern about
confusing the jury or having them conflict the issues on
knowledge and falsity in a way that Your Honor doesn't
want to happen.

So without thinking a lot more through the
interim summation idea, which I immediately liked and
thought was a good idea, I think for us that is going to
be our proposal contrary to a bifurcation, even though I
think we have some of the same goals and concerns that
Your Honor has with not confusing the jury.

It's in the government's interest, obviously,
since we have the burden that we make this streamlined
and as least confusing and most transparent and
understandable to the jury.

So we share that goal as well.

THE COURT:  I do think that even if we do go
with the bifurcation, there needs to be some kind of
preliminary testimony to the jury as to what hospice is
or how it's involved and that kind of stuff so that they
understand the business.

But I think we can do that without jumping into
the business practices that the government and the
relators have characterized as way out there and
indicative of a whole big effort to defraud the

1    government.

2            I think if we work together, we can come up

3    with a way to do it that is just and fair.

4            MR. WERTKIN:  Would Your Honor consider

5    testimony about the clinical choices that nurses make?

6    If the nurse is going to testify about a particular

7    doctor never looking at records before signing a

8    certificate, would that be something that you would

9    think would go to the falsity element, the --

10           MS. SNOW:  Or comprehend before they hear from

11   Dr. Liao.  If we are --

12           MR. CHRISTIE:  Any evidence that ties to a

13   patient that Dr. Liao is going to testify about --

14           MR. LEMBKE:  If we're talking about a doctor in

15   Dubuque and the patient is Ann M in Birmingham, I don't

16   see how that goes to the question of whether there is

17   falsity as to Ann M.  That's the problem.

18           MR. WERTKIN:  Well, our --

19           MR. LEMBKE:  Ann M's doctor isn't what they are

20   talking about, what relevance does it have.

21           MR. WERTKIN:  Count one of our complaint is

22   AseraCare violated the False Claim Act.  The jury is

23   only going to be asked to determine liability under

24   count one that AseraCare violated the False Claims Act.

25           And then the jury is going to be asked to

1  figure out how many claims there were and what the

2  damages were.

3      We are presenting statistical -- we're

4  presenting a sample and asking the jury to extrapolate

5  the whole thing.

6      But the idea of how AseraCare ran its business

7  practice is going to be relevant to the whole universe

8  of claims that we're asking --

9      THE COURT:  I think it definitely is relevant

10  to the extrapolation.  But you really shouldn't be

11  extrapolating until there is a false claim or a

12  percentage of false claims that you then can

13  extrapolate.

14      And I think at that point the evidence that the

15  doctor in -- where did you say, Matt?

16      MR. LEMBKE:  Dubuque.

17      THE COURT:  Dubuque never read the record or

18  saw a patient or whatever, that certainly supports the

19  government's argument that it wasn't just this small

20  number that Dr. Liao reviewed and said were false that

21  were false.

22      MR. WERTKIN:  Well, maybe I'm a little

23  confused.  Your Honor, in our office, where several of

24  us from D.C., we are in False Claims Act cases all the

25  time and there is often in the procurement context or

1    Medicare or crop insurance fraud, there is tons of

2    invoices about claims that get submitted.  And the

3    government doesn't in these cases -- sometimes these

4    cases have bigger than 124 patients.  The jury isn't

5    asked to make 124 separate determinations on liability.

6         The way that the complaint is written and the

7    way the False Claims Act contemplates is the jury is

8    asked to determine liability and that is a matter of

9    falsity and knowledge.

10        We would present evidence on both of those

11   things and the jury would make reasonable inferences and

12   make a determination whether or not there's liability

13   under the False Claims Act and we would ask the jury to

14   do damages.  What you are proposing that the jury has to

15   do, we'd have literally hundreds of lines in a verdict

16   form to determine liability under the False Claims Act,

17   that would be contrary to a lot of practice -- False

18   Claims Act practice.

19        THE COURT:  Those other kind of claims that you

20   talked about are not based on a statute that requires a

21   physician's clinical judgment in certifying.

22        MR. WERTKIN:  Some were.  But I understand,

23   some Medicare cases are certainly like that.

24        But I think I see your -- you're saying this is

25   different, that there has to be a patient by patient

1    determination of liability; is that what you're

2    suggesting?

3         THE COURT:  Not necessarily.  Because I have

4    agreed and denied their summary judgment on the

5    extrapolation aspect.

6         But I still think that there has to be proof

7    that there was a false claim and a determination that

8    there is false claim before you get to extrapolate the

9    rest of the universe or world.  I guess universe is

10   bigger than the world.

11        MR. WERTKIN:  That is consistent.  We would

12   anticipate what a verdict form looks like, is there

13   liability under count one, is there liability under

14   count two.  If so, if the answer to one or two is yes,

15   what are the damages.  Of course, we wouldn't somehow

16   put damages first.

17        MR. CHRISTIE:  Your Honor, this is completely

18   contrary to, I mean, it's a claim by claim.  They have

19   to prove a false claim.  And in the Clausen case and the

20   sine qua non, however you pronounce that, of the False

21   Claims Act.  So we have got 124 patients, there is a

22   different physician every time.  Not only do you have

23   different physicians, you have different amounts for

24   each patient by months.  In other words, amounts vary by

25   patient by months, usually based on geography because

1   they pay different amounts depending on where the

2   patient lives.

3          And so the proposal that he says is just going

4   to mask everything.  What we need to have is some kind

5   of determination on each patient and each benefit period

6   for each patient.

7          THE COURT:  Particularly when Dr. Liao says

8   this patient was eligible but not for the whole period

9   of time.

10         MS. SNOW:  We would only be asking, of course,

11  that the jury find false claim for the period where

12  Dr. Liao says they were not terminally ill.

13         THE COURT:  How do they do that without the

14  individual determination that Jeff was saying we don't

15  have to do?

16         MR. WERTKIN:  Well, I'm afraid we're moving far

17  afield of --

18         THE COURT:  Oh, we definitely are.  We always

19  do.

20         MR. WERTKIN:  Your Honor, of course, the

21  defense wants to bifurcate the case into false --

22  bifurcate the case and make the jury fill out verdict

23  forms of hundreds of patients for however long, I can't

24  imagine what the jury form would look like.  This is far

25  afield of the way that False Claims Act cases have been

1   tried for literally decades.  Jurors are asked to

2   determine liability under the False Claims Act.

3            If you look at our complaint, we don't name

4   every patient in that complaint.

5            THE COURT:  I know.  How many False Claims Act

6   cases have been tried involving prognosis for hospice

7   eligibility?

8            MR. WERTKIN:  In briefing, I don't know off the

9   top of my head.

10           MR. LEMBKE:  We know of the Geschrey and we

11  know how that turned out.

12           But I'm saying --

13           MR. WERTKIN:  In terms of analogies -- perhaps

14  not this case.  But in terms of analogies, you know,

15  forget about extrapolation.  We have 124 patients here.

16  I can think every -- almost every single case, False

17  Claims Act trial that's happened in the last ten years

18  will involve around that number of, I shouldn't over

19  generalize, this is not a huge number, this is not an

20  uncommon thing that would be 124 patients.  I'm not

21  aware of any cases where you have a verdict form where

22  you break out each individual invoice.

23           Procuring claims come to mind.  Where you have

24  a procurement fraud case, you could potentially have

25  thousands of claims or invoices that are submitted.  And

1    juries -- and each one of them might be different in a

2    unique way, maybe different by time periods of who

3    worked on it or depends on what the nature of the case

4    is.  But these cases not every single invoice is exactly

5    the same.  And juries are asked, as triers of facts in a

6    False Claims Act, to find liability on our counts.

7    Count one, is AseraCare liable under the False Claims

8    Act for submitting -- for knowingly submitting false

9    claims or creating false statements material to a false

10   claim.  That is what juries are asked to do in almost

11   every case.

12          So I do think we're -- I don't -- I know why

13   they would want to have a jury form that is 100 pages

14   long or includes a line for every single patient, but

15   that is now moving even further afield of what would be

16   standard practice.

17          MS. BROOKER:  This is the first hospice case

18   that will actually be tried.  But there are medical

19   necessity cases that depends upon opinions of physicians

20   in the medical context that have been tried in other

21   districts.

22          THE COURT:  I understand that.  And it is one

23   thing about making an opinion about what the need is of

24   the patient today for this service versus a prognosis of

25   how long this patient is going to live with this

1  diagnosed illness.  And that is why I am really

2  concerned about this case and making sure that we don't

3  do something here that totally undercuts the hospice

4  industry so that you never have anyone wanting to give a

5  prognosis about the life expectancy of someone with an

6  illness when you are going to be coming back and looking

7  at it another time.  And that concerns me.  Because I

8  hope we all agree that hospice care is a wonderful thing

9  for people who are terminally ill and who will be dying

10  from this illness at some point.  But each patient is

11  different.

12       And as I said early on when many of you were

13  not here, the stubbornness factor is hard to account

14  for.  There are some people who are so dadgum stubborn,

15  they are going to hang on much longer than folks -- and

16  to ask doctors to make that certification and then come

17  back with the ability of hindsight and say, well, if you

18  looked at this and this and this, that patient is not

19  eligible.

20       MS. BROOKER:  And we fully appreciate your

21  concern for the industry and certainly the people

22  sitting on this side of this table, I can speak for us,

23  that we are passionate about this case as Your Honor

24  is.  For the very, I think, same reason in that we

25  believe strongly in the integrity of the hospice

1    Medicare benefits.  And from our perspective, we are

2    weeding out a bad apple.  We are not attacking the

3    entire industry.

4         That is how we intend to present our case.  And

5    so we do share that goal.  And I guess we, you know,

6    respectfully disagree that the way that we are planning

7    to present this case will somehow smear or harm the

8    entire industry.

9         Instead, we believe it will protect the entire

10   industry.  And I think Dr. Liao testified about that at

11   his deposition and will probably testify again at trial,

12   that the reason why he has offered his services almost

13   for free, the university was paid, all of his testimony

14   commitment is because he feels very important about the

15   integrity of this benefit.

16        That is just the perspective that I just want

17   you to appreciate coming from our side of the table, we

18   do want the hospice industry to continue to thrive and

19   provide this very important benefit.

20        And we just do not see AseraCare as playing

21   that important role in the benefits as obviously I'm

22   sure my colleagues on the other side of the table would

23   disagree.  They probably feel passionate about AseraCare

24   from their point of view.

25        THE COURT:  You understand my concerns, Renee,

1    about having a precedent out there that deters good

2    people from being in an industry that I think is

3    becoming more and more important to quality and

4    end-of-life situations.  And that is why I'm trying to

5    thread gingerly because I don't want to end up with

6    something that can be detrimental to that industry.

7         I agree there shouldn't be businesses out there

8    making false claims.  And that is why at the summary

9    judgment hearing I started off by saying is this a case

10   where there are phantom patients or phantom services and

11   all those other kind of things where I have seen cases

12   going for in that context.  If that were the case here,

13   I would be much more willing to say have at it, do

14   whatever you want.

15        MS. BROOKER:  We haven't had the opportunity to

16   present evidence to you, obviously, at this point.  We

17   do believe we have been very conservative in our

18   selection of patients.  And I do think that when Your

19   Honor and the jury sees the medical records, it will

20   become clear that these are not cases where two

21   physicians would have really agonized over whether this

22   person had this terminal illness.

23        These are pretty egregious examples where it is

24   very clear that the patient was not terminally ill or

25   was not properly diagnosed and nonetheless they were put

1  into this hospice benefit, did not continue to receive

2  curative care and submitted a false claim.

3        When you see that, we don't think -- I

4  appreciate Your Honor's point of view.  Without seeing

5  all the evidence I, too, would be concerned are we just

6  talking about two really good doctors with lots of

7  integrity and one missing the mark and one getting it

8  right.  That's not what we think this case is.

9        We think the evidence will show that AseraCare

10  is a bad apple and those medical records do not come

11  close to supporting terminal illness for the patients

12  that we have selected and that are false claims.

13        MR. WERTKIN:  Can I add one more thing to

14  that:  Our client is not here today, HHS.  And HHS

15  certainly cares about this benefit and doesn't want to

16  do anything along the lines of what you suggested.

17        Let me throw something out there, I don't know

18  if this occurred to you, but we think about this case,

19  we're not going after doctors, we think about it

20  different from two doctors disagreeing because of the

21  business, because of the way that AseraCare put the

22  pressure on their clinicians and on their salespeople.

23  That is what makes it different.

24        If we bifurcate this case, and we had a trial

25  on falsity and it turned out that the jury came back and

1  said yes, a claim is false, that could encourage whistle

2  blowers to come forward and say, oh, let's just get a

3  doctor to review the documents.  That is all you need to

4  show a claim is false.

5       What I think separated this case, the reason

6  why we're going after this case so hard, the reason that

7  Renee was talking about is because you have both things

8  and that is what makes this a False Claims Act case.

9       I would think that a ruling from a jury that

10  all you have to do is look at the objective medical

11  records and then you have got yourself falsity for a

12  False Claims Act case, could harm the industry even

13  more, because what you need is objective facts and you

14  also need the facts that the company was encouraging

15  this, they knew about and they kept going.

16       THE COURT:  But that gets to your other issue,

17  your other element of knowledge.  You don't have a False

18  Claims Act case unless you have got both.

19       MR. WERTKIN:  Right.  Exactly.  But again, you

20  know, falsity is, you know, two doctors can disagree.  I

21  know Dr. Liao has said that, you know, that is not for

22  debate.

23       But what I think makes this case a lot

24  different, you don't just have disagreements over

25  doctors, you have a whole system and structure set up to

1   funnel nonterminally ill patients into the hospice

2   program.  That is part of the determination about

3   whether or not this claim was false or fraudulent.

4          MR. LEMBKE:  That goes to knowledge.

5          MR. WERTKIN:  I didn't want to reopen a can of

6   worms.  But in terms of protecting the industry and

7   protecting the standards of what is a false claim in the

8   hospice world that we wouldn't be bringing this case if

9   it was just one or the other.  It's both.  It's a bad

10  apple.

11         THE COURT:  I would hope not.  Because you have

12  to have knowledge and falsity to have a claim.  Frankly,

13  I'm pretty convinced that if there were false claims,

14  you have got enough evidence from which a jury could

15  certainly infer knowledge.

16         I had no problem on denying that aspect of the

17  summary judgment motion.

18         My whole issue was if we get to this and we

19  rehash it and rehash it and we have a lot of hash out

20  there, I don't -- I wanted to make sure that the jury is

21  not tainted in determining falsity before.  But --

22         MR. CHRISTIE:  The government stated the

23  medical records do not come close.  That indicates that

24  they think that they can engage on the falsity issue

25  alone.

1          MR. LEMBKE:  I think what Renee just argued to

2    you is a good argument for bifurcation because she says

3    it's going to be crystal clear to the jury that you

4    could only read those medical records one way.

5          MR. WERTKIN:  The outstanding question is why

6    would a doctor sign a form.  That is why we want to put

7    on the clinician evidence.

8          MR. LEMBKE:  That goes to knowledge.

9          MR. WERTKIN:  Why would it be inaccurate -- why

10   would the certificate say one thing when the record is

11   crystal clear?

12         If we ask the jury to make that determination

13   without giving them that evidence, they are going to

14   have incomplete information.  They are not going to have

15   everything they need to make that decision.

16         THE COURT:  We really are getting ahead of

17   ourselves.  I don't have a motion to that effect on the

18   table.  But I'm sure we will.

19         What I would anticipate us doing is having a

20   conference call early January after I determine whether

21   to certify the legal issue to the Eleventh Circuit

22   before we even hear from the Eleventh Circuit because we

23   are on a fast track.

24         MR. LEMBKE:  I am very worried about the timing

25   just because, Your Honor, in my experience, if Your

1  Honor decides to certify it, and if we very promptly

2  file a petition, and if the government then, presumably

3  within their 10 day limit, is going to file theirs,

4  we're at or after the first of January and the Eleventh

5  Circuit doesn't do a whole lot in 30 days.

6           THE COURT:  Right.

7           MR. LEMBKE:  That is just a serious concern.

8           THE COURT:  I'm assuming it would be styled an

9  emergency interlocutory appeal, right?

10          MR. LEMBKE:  We would certainly inquire of the

11  clerk's office how you get it expedited.  But I can tell

12  you with the Jefferson County bankruptcy, we needed

13  something done immediately and it took three weeks for

14  them to grant a joint motion to dismiss.

15          So we had to amend the bankruptcy final

16  documents to take account of the fact that it hadn't

17  been done yet.

18          But we certainly, I can assure you, we will

19  make inquires to find out if it's a separate motion

20  called an emergency motion.  But my experience is 30

21  days is very short for the Eleventh Circuit.

22          THE COURT:  Well, let's regroup in January and

23  just see where we are.  I will have Frankie set a status

24  conference by phone not to conflict with January --

25          MR. LEMBKE:  1st or 12th.

1          THE COURT:  Well, we generally don't do

2    anything on the 1st around here.  We won't do it on the

3    2nd either.  Somewhere around the 3rd, 4th or 5th and

4    have a conversation at that time in terms of timing.

5          MR. CHRISTIE:  The 3rd and 4th are the weekend.

6          THE COURT:  Thank you for keeping me straight.

7    Probably the 5th.

8          MR. LEMBKE:  I will be back on the 2nd, Your

9    Honor.

10          THE COURT:  Anything else we need to talk about

11    today on this issue?

12          MS. TAPIE:  In your report on the summary

13    judgment motions, you mentioned on affirmative defenses

14    that it would be better to discuss now during the

15    pretrial conference what, if any, affirmative defenses

16    or defenses of AseraCare.

17          So we were hoping, obviously for purposes of

18    preparing our case, that AseraCare would clarify if it

19    intends to present any affirmative defenses at trial.

20          THE COURT:  What is stated in their position?

21    If they haven't stated it in their position, I don't

22    think they have any affirmative defenses going forward;

23    right, Chris?

24          MR. CHRISTIE:  We do refer to the answer at the

25    end of our position and that is what the intent was by

1   incorporating the answer with the last sentence in our
2   position which is on Page 15.
3           THE COURT:  Well, I think you need to include
4   any affirmative defense that you intend to go forward
5   with so that the government is on notice of those.  You
6   have stated in the paragraph before basically statute of
7   limitations and laches -- does that mean you're
8   asserting all other --
9           MR. CHRISTIE:  We have two different types of
10  things to talk about in this regard, which we have
11  already communicated with the government about.
12          And one is it depends on were the burden of
13  proof on some issues falls.  I believe the government's
14  position is that government knowledge and showing that
15  there is not government knowledge is part of the
16  government's case.  If it is part of the government's
17  case, then it's not an affirmative defense.  We have
18  asserted as an affirmative defense in case the
19  government takes a different position on that.
20          Another group of defenses we had all deal with
21  issues from AseraCare's perspective because when they
22  filed Liao's declaration, Dr. Liao took a different
23  position.  At his deposition, Dr. Liao said if you don't
24  meet the LCD, you cannot be eligible.  In his
25  declaration, he said that was not what he said, even

1    though you go back and read the transcript and see what

2    it says.  In his deposition, if you do not have decline,

3    you are not eligible.  In his declaration, he changed

4    his position.  Position above those are consistent with

5    the government's considerations outside of this

6    lawsuit.  If the government is going to stick to

7    Dr. Liao's positions in terms of in the declaration,

8    then some of the defenses, what we were trying to pull

9    in those issues, are not going to be asserted.  If the

10   government goes back to what appears to be his position

11   during his deposition, then we would still have that

12   issue.

13         So I have raised these issues with the

14   government and they haven't had time to respond.

15         THE COURT:  Are those affirmative defenses?

16         MR. CHRISTIE:  I don't know how else you would

17   raise the fact that the government changed positions in

18   terms of what they are putting in their published

19   materials and relying on their experts to do.

20         MS. TAPIE:  We have briefed -- offered a lot of

21   briefing papers on this issue.  Our point is that

22   AseraCare is entitled to make the defenses to the United

23   States' prima facie case.

24         Our concern is going to trial we are not going

25   to know if the jury is going to be instructed on an

1    affirmative defense that AseraCare intends to present.

2         We would obviously want to begin -- have

3    someone address an affirmative defense that AseraCare

4    intends to assert.  Knowledge is not to False Claims Act

5    cases.  Obviously if they want to present evidence to

6    defend themselves and say that it's part of the reason

7    the government can't prove its False Claims Act case is

8    due to knowledge -- obviously our concern is what is the

9    jury going to see and how do we prepare our case.

10        MR. CHRISTIE:  As you can see from our

11   discussion, I have already told them in writing the same

12   thing I just repeated to you.  They know what I'm

13   talking about.  That is not any new issue here.

14        MR. WERTKIN:  We are confused.  That is why we

15   brought it up today.

16        THE COURT:  How is government's knowledge an

17   affirmative defense?

18        MR. CHRISTIE:  It isn't.  It is their

19   obligation to show they didn't know the type of the

20   claims.  If they agree, not an affirmative defense.

21   It's not an element of the False Claims Act case that --

22        MS. TAPIE:  I don't know what you mean we have

23   the burden on that.  We have the burden to show

24   AseraCare's knowledge, but not the False Claims Act to

25   show knowledge.

1          THE COURT:  I'm confused on that.  And I was

2    confused on it when we had it in summary judgment.  I

3    don't understand how it comes in at all.  And I don't

4    think this is an affirmative defense either.  If the

5    government is changing position in this case from its

6    prior publications, then I certainly think that's a

7    defense, but not so much an affirmative one.  And the

8    statute of limitations is an affirmative defense that

9    you have got to plead.

10         MR. CHRISTIE:  I don't believe that AseraCare

11   has any affirmative defenses.  We are being cautious in

12   these two regards.  So I don't know how else to explain

13   it.

14         THE COURT:  I would suggest that instead of

15   this last paragraph that you have got there, that

16   instead, make a couple of sentences saying that if the

17   government contends such and such or if the government

18   -- then AseraCare intends to challenge.  But I'm not

19   sure -- that AseraCare takes the position that the

20   government has changed its position from the published

21   requirements to --

22         MR. CHRISTIE:  If that is --

23         MS. SNOW:  Your defense of Dr. Liao's testimony

24   and his declaration, you will be able to cross-examine

25   on both of those things and he will be able to explain

1  his position is not inconsistent and it's being

2  misunderstood.

3        MR. CHRISTIE:  I don't think it's an

4  affirmative defense.

5        MS. TAPIE:  That is what we want.  We want a

6  clarification that there is not an affirmative defense

7  presented to the jury that we would need to prepare for.

8        MR. CHRISTIE:  I told them that in writing

9  already.

10        MR. WERTKIN:  Perhaps another line that says

11  AseraCare doesn't have affirmative defenses, but

12  reserves all its defenses at trial.

13        THE COURT:  Off the record a minute.

14                  (Off the record)

15        THE COURT:  We will regroup first of January to

16  discuss specifically timing of other things as we go

17  forward depending upon whether I certify this issue to

18  the Eleventh Circuit.  And that's about as early as I

19  can anticipate that we do that.

20        Let's go back to page nine under the agreed

21  applicable propositions of law.  I'm trying to make that

22  a little more readable for the jury.  I want to propose

23  a couple of changes.

24        But before I make changes that would be then

25  kind of binding on y'all, I wanted to make sure.  I

1   would propose, in that first paragraph, having it read,

2   United States must prove the following elements by a

3   preponderance of the evidence.  First, AseraCare made a

4   false or fraudulent claim, because you just have a false

5   or fraudulent claim.  That could be anybody's.  The

6   worst apple down the street, Renee, made a false claim.

7   That is not what we need.

8           And then, two, which AseraCare presented or

9   caused to be presented.

10          Are y'all okay with those two changes?

11          MS. SNOW:  Made and presented?

12          THE COURT:  That AseraCare made a false or

13  fraudulent claim which AseraCare presented or caused to

14  be presented.

15          MS. SNOW:  I wonder if it might be confusing to

16  indicate that made and present are two potentially

17  different elements.

18          THE COURT:  Okay.

19          MS. SNOW:  Using two different verbs.

20          THE COURT:  I'm open for something else.  You

21  understand what I'm saying that -- well, actually,

22  nowhere in here -- well, presented by AseraCare.

23          MS. BROOKER:  Maybe AseraCare presented or

24  caused to be presented a false or fraudulent claim for

25  payment of approval with knowledge that the claim was

1  false.

2          THE COURT:  Switching one and two, in essence,

3  which changes the order of the elements.  I have no

4  problem with doing that.  I think it may --

5          MR. WERTKIN:  Actually, this doesn't track the

6  statute really anyway.

7          MR. CHRISTIE:  Tracks Eleventh Circuit case.

8          THE COURT:  Okay.  That first AseraCare

9  presented or caused to be presented, two, a false or

10  fraudulent claim with the knowledge; three, with

11  knowledge -- does that work for everybody?

12          MS. BROOKER:  AseraCare submitted or leave that

13  out?

14          THE COURT:  To the United States for payments

15  or approval to a false or fraudulent claim with the

16  knowledge that the claim was false.

17          Then down in three, instead of using passive

18  voice, if AseraCare presented claims to the -- is that

19  okay with y'all?

20          MR. CHRISTIE:  (Nods head).

21          MS. SNOW:  (Nods head).

22          THE COURT:  I think then the only other -- I

23  did have this on page three, number five dealing with

24  pleadings, under the Court's order that dismissed the

25  consolidated related actions, actually that is not, you

 1    know, the Court's order is not a pleading.

 2           MR. CHRISTIE:  If the Court takes that out,

 3    that is fine.  I asked to have that in there because it

 4    made clear that the consolidated complaint was modified

 5    and it wasn't the consolidated complaint as referred to

 6    in the prior phrase.

 7           THE COURT:  Okay.

 8           MR. CHRISTIE:  That was the intent that I had.

 9           THE COURT:  That would be the modification.

10    Because there are no other modifications of pleadings in

11    this -- contained in this order.

12           With your permission, I will work on taking

13    that last part and saying, the Court's order, da, da, da

14    modified the consolidated complaint by dismissing or

15    something to that effect.

16           MR. CHRISTIE:  That is fine.

17           MS. SNOW:  Okay.

18           THE COURT:  The only thing I would need from

19    y'all would be, I don't want to put words in Chris'

20    mouth on the defenses, no affirmative defenses, if you

21    would just shoot Todd the sentence or two that you want

22    to substitute for that last paragraph and your position

23    and then we can incorporate that in and get the pretrial

24    order out.

25           I am trying very hard, perhaps maybe too hard,

1  to try really to be fair to both sides because I do

2  understand both sides are very passionate.

3          I agree with the government, I don't want the

4  government paying false claims either.  But I am

5  concerned about making sure that the way we present this

6  case is one that doesn't get the cart before the horse

7  in the jury's mind in making a determination.

8          There's too much at stake, not just for the

9  government, not just for AseraCare, but for the

10  industry, too.  And I want to make sure that we do it in

11  a way that other courts can look to or the industry can

12  look to and say, yeah, this was a fair way to do it.

13          And I understand that all along I'm going to

14  make rulings that both sides may disagree, neither side

15  may agree with, but I'm trying my best.  It may not be

16  the best of someone else or it may not be the right way,

17  but I'm trying to do the best I can to assure that

18  everybody gets a fair trial and that we can look back

19  and say, regardless of the outcome, we had a fair

20  trial.

21          I will have your response on Tuesday and we'll

22  have something out by the end of next week.  Won't we,

23  Todd?

24          MR. HARTLEY:  We will.

25          THE COURT:  Great.  Thank y'all.

1          (COURT ADJOURNED)

2

3          C E R T I F I C A T E

4

5          I hereby certify that the foregoing is a

6     correct transcript from the record of proceedings in the

7     above-referenced matter.

8

9     _____

10    Teresa Roberson, RPR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25