1

FILED

2015 May-28 AM 11:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
EX REL., ET AL.,                    CV-12-KOB-245-S

                Plaintiffs,     May 26, 2015

        vs.                     Birmingham, Alabama

ASERACARE, INC., ET AL.,

                Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S OFFICIAL TRANSCRIPT OF
IN CHAMBERS STATUS CONFERENCE

BEFORE THE HONORABLE KARON O. BOWDRE
UNITED STATES DISTRICT CHIEF JUDGE

COURT REPORTER:
Teresa Roberson, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
1                    *  *  *  *  *

2              A P P E A R A N C E S

3                    *  *  *  *  *

4    FOR THE PLAINTIFF:

5    Jeff Wertkin
     Renee Brooker
6    U.S. Department of Justice
     Civil Division
7    P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
8
     Lane Woodke
9    U.S. Attorney's Office
     1801 4th Avenue North
10   Birmingham, Alabama  35203

11

12   Nola Cross (via telephone)
     Cross Law Firm
13   845 North 11th Street
     Milwaukee, WI  53233
14

15   James Barger, Jr.
     Frohsin & Barger
16   3430 Independence Drive
     Birmingham, Alabama  35209
17

18   FOR THE DEFENDANT:

19   James Sturgeon Christie, Jr.
     Jack Wright Selden
20   Matt Lembke
     Bradley, Arant, Boult & Cummings
21   1819 Fifth Avenue North
     Birmingham, Alabama  35203
22

23   Kimberly Martin
     Bradley, Arant, Boult & Cummings
24   200 Clinton Avenue
     Huntsville, Alabama  35801
25
```

```
1                          * * * * *

2                    P R O C E E D I N G S

3                          * * * * *

4           THE COURT:  All right.  We're going to have a

5      bifurcated trial, not two trials, two phases.  Y'all all

6      know that.

7              And I think the government was reading my mind

8      because the main reason I converted our hearing to a

9      status conference was to talk about evidentiary kinds of

10     issues.

11             The defendant's motion to bifurcate did not

12     present specific evidentiary issues for me to rule on.

13     So I made no specific evidentiary rulings and tried not

14     to.

15             I think it would be premature for me to do so

16     in that order or even here today.

17             But much of the government's opposition to the

18     motion to bifurcate focused on what evidence would and

19     wouldn't be allowed and how much they needed and all

20     this kind of stuff, so I felt like I needed to at least

21     say I'm not making a blanket decision that none of it

22     comes in.

23             But we have to look to see which of it may be

24     relevant to the one hundred and twenty-four allegedly

25     false claims.
```

1          In other words, what was the general practice
2      in Timbuktu may have no relevance to a false claim
3      coming out of Muskogees, I use those names because I
4      have no idea where the claims are.
5          Anyway, I think we're going to probably have to
6      flesh out a whole lot of this in motions in limine.  But
7      I thought perhaps today I could give you kind of the
8      general parameters of what I'm thinking about in terms
9      of what general practice evidence might be relevant and
10     admissible regarding those one hundred twenty-four
11     claims.
12         I'm not requiring that it has to be precisely
13     dealing with that one specific claim, but there's got to
14     be some time and place connection.
15         For example, if I recall correctly, the
16     government said that there were three claims from
17     Atlanta and Dr. Micca was the relator from Atlanta.
18     Well, I don't know whether those three claims occurred
19     five years after he left, two years before, or during
20     the time period that he was there.
21         That kind of information would be relevant to
22     me in trying to determine whether any evidence from
23     Dr. Micca about how he was pressured or any of that kind
24     of stuff would be relevant.  I don't know.  We'll have
25     to see.

1         The same thing with the, how many is it, I

2    can't remember numbers, the eleven allegedly false

3    claims from Monroeville.  Again, I don't know if those

4    occurred during the time that Ms. Brown was there or

5    before or after.

6         So we'll need to look at those kinds of factors

7    to determine whether any of the general practices at a

8    particular location are relevant.

9         But just some broad overall theory that this

10   was happening here, therefore, there are false claims at

11   a different place, I'm not going to let that kind of

12   information in unless you can show me precisely and how

13   that would have an impact on the particular claim that

14   is at issue.

15        Does that make sense?

16        MR. WERTKIN:  So a time and place connection is

17   what you're looking for, but doesn't necessarily have to

18   be tied to, you know, a specific claim.

19        THE COURT:  No.  You don't have to have

20   testimony from -- well, from anybody that says, I

21   participated in this claim and the information here was

22   false and it was deliberately false or something like

23   that.

24        I mean, I'm not that rigid, but there has to be

25   some connection to a claim that's at issue.  How

1  tangential that connection is, I don't know because I

2  haven't seen the specific information as you're trying

3  to relate it to any specific claim.  And I don't know,

4  like the time frame of the eleven allegedly false claims

5  in Monroeville, and I don't know how that relates.

6         So those are some things you're going to have

7  to let me know so we can work on those.

8         MR. WERTKIN:  Your Honor specifically mentioned

9  the script --

10        THE COURT:  Yeah.  I wasn't quite sure exactly

11 what Ms. Brown meant by the script, whether it was

12 something in writing and they generally kind of followed

13 that, or whether it was verbally saying, you need to

14 have this, this and this and this kind of language in

15 there, but if there's some evidence that whatever it was

16 that she meant by a script is somehow showing up in some

17 of those claims, you know, that evidence may be

18 relevant.

19        I was trying to address the government's

20 concern that basically all our good evidence is going to

21 be excluded by saying, in essence, if you can show me

22 some connection to the claims that are at issue, you

23 know, that's going to be relevant and I'm going to let

24 it in.  And I do understand that general practices can

25 be used to show certain conduct.

1          But even there, it's got to have some time and
2    place connection, I think.
3          Does that help in terms of giving a little bit
4    of clarity as to what I think may be admissible in the
5    falsity part?
6          MR. WERTKIN:  I think it's very helpful.
7          THE COURT:  I know you may not agree with it.
8    I'm not asking you to agree, but everybody understand
9    that.
10          MR. WERTKIN:  I appreciate the clarification.
11    With regard to that -- the first issue that we had
12    raised also, which is a slightly different than
13    evidentiary, what issue is going to be before the jury,
14    you know, we had -- what the issue -- what we identified
15    in the request for clarification is, it seems as though
16    phase one is going to be limited to just the two hundred
17    thirty-three patients; is that right, as opposed to the
18    universe of patients?
19          THE COURT:  Okay.  As I understand it, the
20    claim is that there were one hundred twenty-four false
21    claims from the two hundred and thirty-three -- y'all
22    have to catch me on numbers.
23          MR. WERTKIN:  You got it.
24          MR. CHRISTIE:  You got it.
25          THE COURT:  That were false, therefore, we can

1   expect that about fifty percent of the claims in the

2   other universe are false, right?

3          MR. WERTKIN:  Yes.

4          THE COURT:  So why do we need to get to this

5   big overall universe before we determine what our

6   numerical factors are going to be to determine the

7   percentage of claims?

8          MR. WERTKIN:  It's really more -- it's truly a

9   clarification question, Your Honor.

10          The way that we presented the case was that

11   for -- there were two thousand one hundred eighty-one

12   patient admissions for patients who had been on hospice

13   for over a year during this time period.

14          What we're alleging is that roughly half of

15   those are -- the claims submitted for roughly half of

16   those are false claims.

17          The way we intend to prove it is through

18   sampling.  So we had a statistician pick a sample and

19   then we had the expert review the statistical sample.

20          This is truly just a clarification question

21   whether the two hundred thirty-three patients that were

22   in the sample, is that going to be all that the jury is

23   asked to opine on as opposed to the two thousand one

24   hundred eighty-one patient admissions that our complaint

25   identifies.

1          MR. CHRISTIE:  Are you trying to ask -- is he

2    trying to ask whether or not Dr. Miescke is going to

3    testify during the first phase or the second phase; is

4    that what you're trying to ask?

5          MR. WERTKIN:  He would be one of the -- he

6    would certainly be an important person to testify during

7    the first phase, if we were going to be talking about

8    all the patient.  Admissions, if we're only talking

9    about the two hundred thirty-three patients, then he

10    probably -- then we wouldn't need the statistician to

11    testify.

12          THE COURT:  I wouldn't see any reason why you

13    would get into statistical information until we first

14    determine that we have false claims.

15          MR. BARGER:  Your Honor, if I may, I think what

16    we're -- the government has the burden of proving all of

17    the claims that they say are false, meaning all, to the

18    entire universe.  And the order has bifurcated the trial

19    in terms of falsity and knowledge.

20          But the government has the burden of proving

21    this entire claim -- the entire universe is false.

22          And so it seems as if the statistical analysis

23    goes to falsity -- should be in the falsity phase.

24    We're not arguing -- I'm not saying whether it should or

25    shouldn't be, but based on the fact that we're having

1    one part of the trial on falsity and the other part is

2    on knowledge, that information --

3            THE COURT:  Well, the other part is on

4    everything else that you have got to claim.

5            MR. BARGER:  We still have to prove falsity for

6    those patients outside the sample.

7            THE COURT:  And I thought that you were using

8    the statistical analysis to prove the falsity of the

9    rest of those claims.

10           MR. BARGER:  It is falsity, though, right?  So

11   the first phase is falsity.

12           So does that come under the first phase or does

13   it not?  We're -- we sort of -- I mean, I understand

14   what you're saying.  I think we should maybe, to try to

15   make it a discreet case and to get this first phase, we

16   want to try to make it as compact as possible and it

17   should maybe be limited to the -- to that small subset

18   of patients.

19           But the fact of the matter is, the burden is on

20   the government to prove falsity for the entire --

21           THE COURT:  Right, I understand what you're

22   saying.

23           MR. BARGER:  If we move to the next phase and

24   say well, falsity is over with, we haven't presented

25   that yet.

1          THE COURT:  I think, and I don't know what the

2    defendants were thinking, but I was thinking about just

3    that discreet universe of the sample when I was talking

4    about or thinking about falsity in a separate phase.

5          Frankly, it seems to me that, depending upon

6    how many, if any, false claims the jury finds, then it

7    seems to me basically we extrapolate it to the universe

8    and maybe that's part of the second phase, where you

9    explain that to the jury.

10          That's kind of the way I was thinking about it.

11    But y'all know the case and I --

12          MR. CHRISTIE:  Your Honor, maybe this would

13    help.  We could work with it either way.

14          My understanding of the Court's order was that

15    the focus of the first phase was going to be on patients

16    that Dr. Liao says are ineligible, that does not include

17    Dr. Miescke's testimony.

18          From AseraCare's perspective, we have a number

19    of physicians who are going to be able to testify as to

20    patients who are not in the sample that they were

21    eligible.

22          We would not intend to offer those during the

23    first phase, but we would intend to offer those during

24    the second phase, because our understanding was is that

25    that would be the phase, if we got to that phase, where

1   we would be talking about the extrapolation issues.

2        MR. WERTKIN:  We are just looking for

3   clarification.  The order says falsity and knowledge.

4   What I'm trying to express, as Jim eloquently put it --

5        THE COURT:  Falsity and everything else.

6        MR. WERTKIN:  Yeah, there's falsity for the

7   sample and then there's -- so it's really not -- it's

8   bifurcating it between knowledge and falsity and again

9   really a double bifurcation between falsity of just the

10  sample and falsity of the whole universe.

11       THE COURT:  Well, I don't see it as a separate

12  bifurcation.  I would see that as part of the all other

13  aspects of the government's claim.  Let's first

14  determine falsity as to these two hundred thirty-three,

15  that's phase one.  That's the whole focus of phase one.

16  Then we cover everything else in phase two, which I

17  would anticipate now, since y'all brought it to my

18  attention, that that would include the statistical stuff

19  about extrapolating it to the whole universe.

20       Does that work?  Is that workable?

21       MS. BROOKER:  I think a lot of this is going to

22  be driven by what specifically the jury will be asked to

23  decide at the end of phase one.

24       So I feel like if we can get clarity on what

25  the question is for the jury, that will help us to

1  determine what goes in.

2          Now, I think that in the papers that we filed,

3  we suggested, through clarification, one question that

4  the jury could be asked.  I think we suggested it in the

5  motion for clarification, which is whether or not the

6  medical records support a finding of eligibility.

7          And so if that is the only question that the

8  jury is asked at the end of phase one, then I would

9  agree that everything else could be moved to phase two.

10          But if the jury is going to be asked to make a

11  finding that a claim is fraudulent or that there's a

12  scheme or a course of conduct or that --

13          THE COURT:  Didn't I exclude course of conduct

14  and scheme, I said that comes in later, right?

15          MS. BROOKER:  Right.

16          THE COURT:  So the question that I anticipate

17  the jury being asked is, are any of these claims false

18  in, you know, one through thirty-four, I guess.

19          MS. BROOKER:  As dictated by the standard that

20  we set forth, which is whether or not the medical

21  records support determination of eligibility?

22          THE COURT:  No.  I don't know what the standard

23  is for false under a hospice claim which is exactly what

24  I was asking the Eleventh Circuit to tell us.

25          Yes, Mr. Lembke.

1          MR. LEMBKE:  Your Honor, to some extent what

2     this goes to is what are the jury instructions going to

3     say.

4          It's a little bit sort of taken us by surprise

5     that the government is asking you in their paper they

6     filed last night how are you going to instruct the jury

7     when you told us when we were here on April 24th you

8     wanted us to engage in a discussion about the falsity

9     elements and, regrettably, the government has not done

10    that.  The government told us they would have suggested

11    instructions to us a week ago and then we would have a

12    discussion.  Late Friday, they told us they were now on

13    track to have them some time this week.

14         So we are nowhere in having that discussion.

15    But until we have that discussion, it seems premature to

16    ask Your Honor how you are going to instruct the jury.

17         THE COURT:  I would agree.  But my idea that I

18    thought was fairly well stated in our order is that the

19    first question for the jury will be, are any of these

20    claims false.

21         How that is structured, what instructions I

22    give the jury on that, I don't know yet.

23         But the question about whether the issue about

24    the doctor's certificate, the physician's certificate,

25    whether that comes in in the first phase, isn't that

1   part of the claim that was submitted --

2           MR. WERTKIN:  Your Honor --

3           THE COURT:  -- that the government now claims

4   is false?

5           MR. WERTKIN:  As you know, there's two parts of

6   any claim.  So Walker says the claims are false if they

7   seek payment for services that are not reimbursable,

8   that's pretty clear.

9           And then the regulation lays out, in order for

10  it to be reimbursable, it needs to have two things:

11  Needs to have the physician certification, and it needs

12  to have documentation to support the diagnosis.

13          So --

14          THE COURT:  And a claim would not be approved

15  if either of those were missing, right?

16          MR. WERTKIN:  Correct.  But our position is,

17  and always has been there, there's no dispute that a

18  doctor -- that the certifications exist for these.

19          So that, in our perspective, that's not a

20  matter really for the jury to decide.  We will readily

21  acknowledge that there's no dispute that the doctor

22  signed certification.  That is an issue that we wouldn't

23  expect to be before the fact finder.

24          What we're trying to do is narrow the issues to

25  what the jury would decide, which is, does the records

1    support the diagnosis.  And --

2          THE COURT:  So you want to cut out from the

3    claim that's presented to the jury to review part of

4    what had to go in for review?

5          MR. WERTKIN:  Well, actually, Your Honor, if

6    Your Honor --

7          THE COURT:  Because it hurts your claim that a

8    doctor certified it.

9          MR. WERTKIN:  Well, frankly, if Your Honor --

10   if Your Honor is going to find admissible the evidence

11   that undercuts the reliability of those certifications,

12   then, you know, and all the evidence comes in, they

13   could present the evidence of the COTI and we could

14   present the evidence that they're not -- and I

15   understand the limitation of time and space, you know,

16   all of our relators would have to meet the burden of

17   saying we were working there at the time.  But if that

18   evidence is going to come in, then, and that's what our

19   position was in the opposition was that if they can

20   present evidence about the COTIs, then we should be able

21   to present the evidence rebutting the reliability of the

22   COTIs.

23          So I think where we come out is, we're looking

24   for clarification that that's the trial that we're going

25   to have.  They can talk about the COTIs, we can talk

1    about how they lack reliability, and then the fact

2    finder can decide the issue.

3         If the evidence about the reliability can't

4    come in, then what we were asking the Court is to limit

5    the evidence of the COTIs because we wouldn't be able to

6    challenge the reliability.

7         MR. CHRISTIE:  When we were here on the 24th,

8    there was issues raised, and I was accused of feigning

9    ignorance.  The government has never suggested that

10   they're going to prove falsity by challenging the

11   reliability of the certifications -- the COTIs,

12   certifications of eligibility.

13        If they're going to take the position that a

14   particular certification is not reliable, we would need

15   to know which physician made that certification so we

16   can have that physician here to testify that the reason

17   that you say this isn't reliable.  And they have never,

18   in their discovery, ever identified a particular -- and

19   they were asked, but they said we don't know.

20        So, I mean, we're still at a staying phase

21   where we don't know.  And they will not identify which

22   patient supposedly had certifications that were not

23   reliable.  That's the first point.

24        The other point is, the certification is what

25   Congress said is the keystone that turns everything

1   after that.  And so you can't not talk about the

2   certification.

3            The regulation they're talking about, there's

4   not a separate documentation requirement.  The

5   regulation says the physician certification includes

6   these things, and that includes that the documents

7   support the physician's prognosis that the patient is

8   likely to die within six months.

9            So the certification and the documentation are

10  all part of the same regulation.

11           The third point which is that the government's

12  30(b)(6) witness, the person who was put up to answer

13  the question, how do you determine whether or not

14  somebody is eligible, said well, you take the

15  physician's certification and you see whether or not the

16  documents support that certification.

17           What do you mean by support?  Well, you see

18  whether or not the documentation is consistent with or

19  corroborates the certification.

20           Do you mean it has to prove that the patient is

21  eligible?  The 30(b)(6) witness said no.

22           So what the government is trying to do is

23  they're trying to reduce this case back down to where it

24  contradicts their 30(b)(6) witness.

25           MR. WERTKIN:  That is incorrect.

1       MR. CHRISTIE:  Well --

2       MR. WERTKIN:  That's just not correct.  Your

3   Honor, if we have a trial, you'll hear from our CMS

4   witness who will say that the regulation was written to

5   prevent exactly what AseraCare was doing, which was just

6   getting doctors to sign things without the support.

7   That's the whole point.  Medicare is not going to pay

8   out all this money just based on a doctor certification,

9   because you can have companies that manipulate the

10   situation.  But the record has to support the diagnosis.

11   That's the whole key.  There's really no dispute that

12   these are separate things.

13       And, you know, AseraCare has all these doctors'

14   names, they know who the certifying physicians are

15   better than we do.  They're the ones who submitted the

16   paperwork.  They can call them, if they want.

17       THE COURT:  Let me tell you what I'm going to

18   ask that y'all do when you exchange your witness list,

19   and I had thought that we had bumped it back from the

20   thirty days before trial because your motions in limine

21   are due three weeks before trial.  But I noted our

22   Exhibit A didn't change it and Todd couldn't find any

23   notes from the pretrial conference saying we were going

24   to do it, so that must have been one of those things

25   that was in my mind that never got out.

1          But I'm concerned that just exchanging exhibit

2    and witness lists thirty days before trial is not going

3    to give us enough time to deal with the motions in

4    limine.

5          Could we bump it back a week which would make

6    it like, what would that be, around the 23rd or so of

7    June?

8          MR. WERTKIN:  Your Honor, as we're talking

9    about dates, there is one thing that we wanted to raise,

10   given the Court's recent ruling about bifurcation, and

11   the Court's previous statement that we should expect

12   Dr. Liao's testimony after August 31st, you know, we had

13   Dr. Liao clear his calendar in September, but as we

14   mentioned previously, August he was unavailable for a

15   big slab of that time.

16         So we are prepared to begin this trial as soon

17   as possible in September, but we had relied --

18         THE COURT:  I told you we're setting it in

19   August.  The trial is set in August.

20         MR. WERTKIN:  Well, I understand, Your Honor.

21         THE COURT:  If we start it in September, we'll

22   be in Christmas holidays and you'll have very upset

23   jurors.

24         MR. WERTKIN:  Your Honor, I have an email from

25   Todd that says, given Dr. Liao's situation, the

1   government should anticipate his testimony after August

2   31st.

3          So we were anticipating on putting on our other

4   witnesses before that.

5          Again, I think clarity is helpful.  If we can

6   put our other time and location witnesses on before

7   Dr. Liao, I think that could work.

8          If we -- if we have to put Liao on first, then

9   it wouldn't work.

10          THE COURT:  Well, I don't care who you put on

11   when.  All right.  But, I mean, we're not going to

12   strike a jury in a day.  That's going to take some time.

13   And you'll have to arrange your trial so that you put on

14   the witnesses you can before him.

15          MR. WERTKIN:  I think I'm --

16          THE COURT:  Back to the exchange of exhibit and

17   witness list, please.

18          If we do that, I don't have my calendar in

19   front of me, some time like June 23rd, could y'all do

20   that?

21          MR. CHRISTIE:  Yes, we can do that, Your Honor.

22          THE COURT:  And what I'm going to ask that

23   y'all do is identify in your exhibit list what exhibits

24   will be offered for falsity.  And also, you know, what

25   witnesses you're going to be offering for falsity so

1   that we know what we need to address regarding that.

2           It would help me, and I'm sure it would help

3   opposing counsel as well, if each side would identify,

4   if you're dealing with something that goes to a question

5   of falsity, you know, like the timing of that document

6   or that witness' testimony, and what location it relates

7   to.

8           It would be even better if you could relate it

9   to the specific one hundred thirty-four claims that

10  we're going to be looking at.

11          That would go a long way, I think, in helping

12  all of us see which documents, which witnesses, are

13  really going to have relevant information for that first

14  part of the trial, that first issue, is this claim

15  false.

16          And that also may cut down, I would hope, on

17  perhaps the motions in limine, if it's limited to time

18  and place or identified as to time and place.

19          Any questions about the exchange of exhibit

20  list?

21          And then the motions in limine, that will give

22  you two weeks to get those done.

23          I do want y'all talking to each other during

24  that time about the list and any issues that y'all have

25  with them so that you're not just throwing a motion in

1  limine at every single document the other side
2  addresses.
3          If so, I may just put y'all in this room
4  without a referee and let y'all go at it trying to work
5  on those.
6          MR. CHRISTIE:  Your Honor, when you said two
7  weeks later, I think that would probably be July 6th,
8  the Monday, which is one week earlier than it's under
9  the Exhibit A.
10          I'm trying to make sure that I'm -- that we're
11  all on the same page as to that.
12          THE COURT:  This is why I should never do
13  anything without Frankie.
14          Currently the motions in limine are due July
15  13th.  And that's three weeks before trial, isn't it?
16          MR. CHRISTIE:  That's correct.
17          THE COURT:  So --
18          MR. LEMBKE:  Your Honor, if you did the exhibit
19  exchange and witness list on the 23rd, that would give
20  us one day short of three weeks until the motions in
21  limine are due, but 4th of July holiday is in the
22  middle, so I think that would make -- that would be
23  helpful to leave it the 13th.
24          THE COURT:  Okay.  For the motions in limine.
25  Give me that date again.

1          MR. CHRISTIE:  July 13th is the current date

2     for the motions in limine.

3          THE COURT:  And the exhibit list would be, what

4     date did you say?

5          MR. LEMBKE:  I believe we talked about the 23rd

6     of June.

7          THE COURT:  That is a weekday?

8          MR. LEMBKE:  Yes, ma'am.

9          THE COURT:  We will enter an order modifying

10    the pretrial order to require that those be disclosed

11    then with the identifying information as to which phase

12    of the trial and basically time and place information

13    and claim information, if possible.

14         MR. WERTKIN:  Your Honor, the jury

15    instructions, Mr. Lembke wasn't involved in the

16    discussions, I don't know if he is so up-to-date.  We

17    were in regular communication with Mr. Christie.  When

18    the order came out bifurcating the case, obviously that

19    threw our jury instructions out the window because the

20    jury instructions would look different if there's two

21    phases than one.

22         So in June --

23         THE COURT:  The law is still the same.  You

24    just put it in different places, right?

25         MR. WERTKIN:  For example, the preliminary

1   instructions, all the other pieces of it, we are

2   prepared to -- we would have gotten an earlier start, I

3   think, we had created jury instructions based on one

4   trial and so that's why we didn't send them over because

5   the order came out.

6            THE COURT:  Well, those are due --

7            MR. WERTKIN:  The 16th of June.

8            THE COURT:  So you still have a good bit of

9   time to work on those.  The general pretrial order

10  requires that any special verdict forms be filed like

11  the day of trial.  I would request that we do those

12  earlier, if possible, maybe with the jury charges.  If

13  y'all can't get those done and you can get them to me a

14  week or so after that, that will be fine.

15           But while you're talking about the jury

16  charges, I think also is a good time to be talking about

17  any special verdict forms.  But I'll be a little loose

18  with you on getting those forms in.

19           MR. CHRISTIE:  Your Honor, one of my partners

20  wanted us to make sure that for the witness list, are

21  you still going to be wanting may call and will call --

22           THE COURT:  Yes.

23           MR. CHRISTIE:  The other information that you

24  had already in your Exhibit A?

25           THE COURT:  Right.  Not deleting anything, just

1   adding to.  Adding to your burden in hopes that it will

2   help as we go forward.

3        I do think that the jury charges need to be in

4   two separate sections.  I'll be glad to do a lot of the

5   work on explaining to the jury that we are taking one

6   part at a time, one piece at a time.

7        And as I indicated when we talked about

8   bifurcated trial earlier, I would anticipate that there

9   would be opening and closing statements in both

10  sections.

11       At any time along the path that y'all think it

12  would be helpful for the jury to stop and have some

13  statements by attorneys about what we are about to see

14  or what we have just seen, I'm open for that.  Y'all

15  just let me know.

16       I think that particularly in complex and long

17  trials like this one, having those breaks where we kind

18  of say, time out, let us explain what we're doing now

19  and why we are doing it and what you are going to need

20  to be doing, I think that can help jurors a lot to

21  understand what's going on.  Besides, it kind of breaks

22  up the monotony and wakes them up a little bit, just

23  like a good paragraph break, right, Mr. Lembke?

24       We talked a little bit about statistical

25  evidence and the extrapolation.  Seems to me that

1   depending upon how many false claims the jurors find,

2   then that's going to need to be revised to some extent.

3   So I hope you have got your statistician standing by to

4   redo that.  And that would work on both sides.

5           And we can certainly, if we need to take a day

6   to let them revamp, we certainly can do that at some

7   point.

8           And I do think I told y'all about some

9   conflicts and dates that I have got coming up that I'll

10  be gone, like that last weekend in August.

11          Anything else in terms of what we need to be

12  doing between now and the first of August?

13          MR. LEMBKE:  When do you want a proposed jury

14  questionnaire?  Is that in the order?

15          THE COURT:  That would be along -- for voir

16  dire?

17          MR. LEMBKE:  For voir dire.

18          THE COURT:  I think that's in the --

19          MR. LEMBKE:  I can't remember.

20          THE COURT:  July 13th, special voir dire

21  procedures.

22          MS. BROOKER:  Your Honor, on August 1st, will

23  we begin with bringing in the jury and selecting the

24  jury?

25          THE COURT:  Yes.

1      MS. BROOKER:  Okay.  So that's -- I wasn't sure

2  if that is the date of openings --

3      THE COURT:  No.  That's why I am saying, you

4  know, it will take, I would anticipate, more than, you

5  know, a day to strike a jury in this case.

6      And if you're anticipating written

7  questionnaires, is that what you're anticipating,

8  Mr. Lembke?  My general practice on those is not to send

9  them out in advance.  I think it's better to have the

10  jurors here answering the questions on their own instead

11  of asking, honey, how should I answer this question.

12  That way we make sure it's their answers and that kind

13  of stuff.  So I'll look at it and see.

14      Have you taken a look at my standard questions

15  that are on the website?

16      MR. LEMBKE:  Not yet, but I will, Judge.

17      MR. CHRISTIE:  We have a copy, Judge.

18      THE COURT:  We do have a special little sheet

19  of paper that we give the jurors and we have them stand

20  up and talk about themselves.  I would hate to take that

21  away from y'all because it is a wonderful opportunity

22  for you to actually size up the person and get a feel

23  for that person's personality, which is kind of why we

24  do it that way, instead of just having yes and no

25  questions, raise your hand and don't.  That way

1 everybody has to stand up and say something.

2          MR. WERTKIN:  Switching gears for a minute to

3 juror notebooks, given that there are going to be one

4 hundred twenty-four patients that we're going to be

5 talking about, I don't know, can Your Honor shed some

6 light on whether the jury will be able to keep notes on

7 patients or whether we can provide notebooks that put

8 relevant medical record documents for each patient, how

9 Your Honor feels about that.

10          THE COURT:  Let me ask you this:  When are they

11 suppose to be reading that medical information that you

12 want them to have in their notebook?

13          MR. WERTKIN:  In the jury room.

14          THE COURT:  They don't get to take evidence

15 into the jury room until the case is submitted to them.

16          MR. WERTKIN:  Right.  After they're submitted

17 to them.

18          MR. CHRISTIE:  I have a proposal.  I think what

19 we can do is give each juror a notebook and the notebook

20 could have one hundred twenty-four pages in it.  At the

21 top of the page could be the full name for John Smith

22 and then after that, we could have John S.  And that

23 would help the jury both have a place to take notes for

24 John Smith and then realize when the lawyers or someone

25 else in the courtroom is talking about John S, they

could go to the S's in their notebook and they would

have a place where you could see that it was John Smith.

I think that simple of a notebook is really

what would be appropriate in this case.

THE COURT:  So, in other words, it would be

kind of an --

MR. CHRISTIE:  Alphabetical --

THE COURT:  -- alphabetical pre-organized note

taking place as opposed to the precise medical records.

MS. BROOKER:  Would Your Honor allow us to

maybe discuss that with the other side and make a

proposal?  We might have a couple of proposals that we

think are a good idea.  And I know I have had juries

where they are required to keep their notebooks on the

chair during the entire trial, they are not allowed to

take them home, they are not allowed to take them back

in the jury room.

THE COURT:  They absolutely would not be

allowed to take their notebooks out of the courtroom.

I generally don't allow notebooks because of my

concern that they are going to be reading through this

and not paying any attention to what's being said at

trial.  They get bored with a witness and so they just

start reading ahead as opposed to paying attention.  We

have enough trouble with them doodling, but that is

1    sometimes a way to stay awake.

2         My gut reaction is I don't like notebooks that

3    have the evidence actually in it because I think it

4    distracts from listening to the testimony.  I am

5    amenable to something that helps the jury comprehend and

6    understand.  I have always allowed note taking.

7         Actually, one of the things that we were

8    looking forward to doing in our new courtroom is having

9    I-Pads available for jurors to take notes on I-Pads that

10   are wiped clean, that have no internet access, no games

11   on them.  Because a lot of people nowadays don't hand

12   write much of anything or if they can, they can't read

13   it.  They are so use to typing on computers and things.

14        We're looking forward to doing that.  And it

15   might be that there's some way to load it with that kind

16   of file information, I don't know.

17        MR. LEMBKE:  Would that be ready on August 3rd?

18        THE COURT:  It should.  Yes.  I am waiting on

19   them to replace my I-Pad so that can be used in the jury

20   pool as well.

21        But we may have some folks that are old like me

22   that don't know how to use an I-Pad very well and that

23   may want the paper.

24        But y'all talk about it.  I am open for any

25   kind of innovations that we can come up with to make

1   this case easier for the jury to understand what their

2   job is.

3            Anything else?

4            I was mentioning to Judge Ott a few weeks ago

5   that this case was coming up and I was going to be

6   spending most of my fall with you people.  And he

7   offered, I did not ask, he offered to take another stab

8   at mediation with y'all in case y'all are at a different

9   position than you were when he last attempted that.

10           I'm ready to try this case.  I think it's going

11  to be fun, especially since y'all let me take the day

12  off to go to Montana, and there are going to be other

13  times that I am going to have to take off to do

14  something related to the administration of the court and

15  things of that nature.

16           But I figure I would be negligent if I didn't

17  let you know that the best mediator in the court has

18  offered to take another stab at it, if y'all are

19  interested.

20           There's no need to do it if y'all don't think

21  there's some possibility that he can be fruitful in his

22  time spent with y'all.

23           I think we're probably clearer than we have

24  ever been in terms of what the issues are and how

25  they're going to be presented, so that may give both

1  sides some concern and some reason to maybe talk again.

2  It's up to y'all.

3      MR. CHRISTIE:  Obviously, we have to talk to

4  our client, but we are always willing to discuss

5  settlement.  And I agree with you about Magistrate Judge

6  Ott's skills.

7      THE COURT:  And it would not count as one of my

8  referrals, he said.  Since he had done it before the

9  case was unsealed; is that when y'all met with him?

10      MR. SELDEN:  Yes.

11      MR. BARGER:  Yes, Judge.

12      MS. BROOKER:  Your Honor, the government is

13  always open and amenable to mediation, as I mentioned to

14  Jack a week or two ago before Your Honor entered the

15  bifurcation order, we did reach out to them and suggest

16  that mediation was an option from our point of view.

17      THE COURT:  Let me suggest this, y'all talk and

18  see how far you are and whether there is some room for

19  compromise.  If both sides have your heels dug in, it's

20  not going to matter how hard he pulls.

21      Y'all talk some first.  If you want to use this

22  room now, we'll clear all the interns out and you can go

23  at it.  Just let me know.  I would be hard pressed to

24  stay the deadlines that we have entered today.  Y'all

25  may have to have two teams, one mediating and one doing

trial prep.  I have been in those situations myself, so
we have got to keep pushing on.

Anything else we need to talk about today?
Okay.  Great.  Thank you.

(COURT ADJOURNED)

C E R T I F I C A T E


        I hereby certify that the foregoing is a
correct transcript from the record of proceedings in the
above-referenced matter.


_____
Teresa Roberson, RPR, RMR