FILED
2015 Jul-20  PM 11:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ex rel. DEBORA PARADIES, et al., | |
| Plaintiff, | |
| v. | Civil Action No. |
| GGNSC ADMINISTRATIVE SERVICES, LLC, et al., | 2:12-cv-00245-KOB |
| Defendants. | |

## UNITED STATES' OPPOSITION TO DEFENDANTS' OMNIBUS MOTION IN LIMINE (ECF NO. 342)

*For the United States of America*

U.S. DEPARTMENT OF JUSTICE
United States Attorney's Office
1801 4th Avenue North
Birmingham, AL 35203
Telephone: (205) 244-2107

Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-3911

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

LEGAL STANDARD..............................................................................1

ARGUMENT ..........................................................................................2

   I.    DEATH CERTIFICATES IDENTIFIED BY THE UNITED STATES AS EXHIBITS
       SHOULD NOT BE EXCLUDED. ...........................................................2

   II.   THE COURT SHOULD ALLOW EVIDENCE OF ASERACARE'S PROFITS AND
       MEDICARE BILLINGS BECAUSE IT IS RELEVANT TO ASERACARE'S MOTIVE..3

   III.  THE COURT SHOULD ALLOW RELEVANT EVIDENCE REGARDING
       ASERACARE'S CONDUCT OUTSIDE THE TIME PERIOD FOR WHICH THE
       UNITED STATES SEEKS DAMAGES...............................................6

   IV.  EVIDENCE OF THE TERMINATION OF MARIE INFANTE AND THE GOLDEN
       LIVING CORPORATE INTEGRITY AGREEMENT SHOULD NOT BE EXCLUDED .13

   V.   LORI STRATER'S TESTIMONY REGARDING FACTS IN HER DECLARATION
       SHOULD NOT BE EXCLUDED .......................................................18

   VI.  THE COURT SHOULD ALLOW EVIDENCE OF PALMETTO GBA'S PREPAYMENT
       REVIEW OF ASERACARE'S CLAIMS TO MEDICARE ......................21

   VII.  THE COURT SHOULD ALLOW EVIDENCE RELATED TO THE CAP PROGRAM ..25

   VIII. "TIP" LETTERS FROM PALMETTO GBA TO ASERACARE AGENCIES SHOULD
       NOT BE EXCLUDED..................................................................27

   IX.  EVIDENCE ABOUT ASERACARE'S PARENT COMPANIES AND AFFILIATED
       COMPANIES SHOULD NOT BE EXCLUDED ....................................32

   X.   THE COURT SHOULD ALLOW EVIDENCE THAT THE DEFENDANTS ARE
       CORPORATE ENTITIES AND HAVE OUT OF STATE CORPORATE OFFICES .......37

   XI.  PHASE TWO ISSUES...................................................................39

   XII.  ASERACARE EFFORTS TO BAR MENTION OF DISMISSED CLAIMS RELEVANT
       TO THE FORMER RELATORS' EXPECTED TESTIMONY ...................40

CONCLUSION .......................................................................................41

## INTRODUCTION

The United States hereby opposes AseraCare's Omnibus Motion *In Limine* (ECF No. 342) on the grounds that AseraCare has not met its burden of showing the evidence is clearly inadmissible for any purpose.

## LEGAL STANDARD

In considering motions *in limine,* "[t]he Federal Rules of Evidence can aptly be characterized as evidentiary rules of inclusion, which are designed to broadly permit fact-finders to consider pertinent factual information while searching for the truth." *Univac Dental Co. v. Dentsply Int'l, Inc.*, 268 F.R.D. 190, 196 (M.D. Pa. 2010). This inclusiveness is demonstrated by way of Rule 401's expansive definition of relevant evidence, Rule 402's definition of the admissibility of relevant evidence in sweeping terms, and Rule 403's description of the grounds for exclusion as an exception to the general rule favoring admission of relevant evidence. *Id.* at 196-97. These broad principles define the court's discretion in considering motions *in limine.*

Evidence may only be excluded on a motion *in limine* when it is clearly inadmissible for any purpose. *See United States v. Wright*, 2012 U.S. Dist. LEXIS 68324 at *5, 2012 WL 1753666 at *2 (S.D. Ala. May 16, 2012) ("The purpose of a motion *in limine* is to omit evidence that is clearly inadmissible."); *StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, 2015 U.S. Dist. LEXIS 79971 at *4, 2015

1

WL 3824170 at *1 (M.D. Fla. June 19, 2015) ("A court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds.").  "Accordingly, if evidence is not clearly inadmissible, evidentiary rulings must be deferred until trial to allow questions of foundation, relevancy, and prejudice to be resolved in context."  *Houston v. S. Mgmt. Corp.*, 2013 U.S. Dist. LEXIS 161115 at *7-8, 2013 WL 6050738 at *2 (M.D. Fla. Nov. 12, 2013) (citing *Stewart v. Hooters of Am., Inc.*, 2007 U.S. Dist. LEXIS 44056, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007)).

As the party moving to exclude evidence in *limine*, AseraCare has the burden of establishing the evidence is not admissible for any purpose.  *See, e.g., Mason v. City of Chi.*, 631 F. Supp. 2d 1052 (N.D. Ill. 2009) ("Thus, the party moving to exclude evidence *in limine* has the burden of establishing the evidence is not admissible for any purpose.").  AseraCare has not met this burden.

## ARGUMENT

### I.  DEATH CERTIFICATES IDENTIFIED BY THE UNITED STATES AS EXHIBITS SHOULD NOT BE EXCLUDED.

AseraCare seeks to exclude the death certificates of patients without any articulable basis.  ECF 342 at 2-4.  The United States expects AseraCare to attempt to undermine the testimony of Dr. Liao by eliciting testimony that a handful of the sample patients Dr. Liao determined were ineligible for hospice died while on hospice.  To rebut this evidence, the United States may seek to introduce death

certificates for other patients who Dr. Liao determined were ineligible and were still alive several years after they were admitted to AseraCare's hospice. Because the death certificates indicate the date of death for the sample patients, this information should also help complete the picture for those patients whose medical records will be discussed at trial. For these reasons, AseraCare cannot show that this evidence is inadmissible for any purpose, and its motion should be denied.

## II. THE COURT SHOULD ALLOW EVIDENCE OF ASERACARE'S PROFITS AND MEDICARE BILLINGS BECAUSE IT IS RELEVANT TO ASERACARE'S MOTIVE.

AseraCare seeks to exclude evidence of its total profits and total Medicare billings. AseraCare, however, can cite no precedent for excluding financial evidence in a fraud case or False Claims Act case. Courts have broad discretion to admit wealth evidence under Rule 401 so long as the evidence helps to prove or disprove a fact in issue. *United States v. Bradley*, 644 F.3d 1213, 1272 (11th Cir. 2011). Numerous courts hearing fraud cases have admitted such evidence, recognizing that such evidence is probative of the issue of motive, which is relevant to all elements of a False Claims Act case. *See United States v. Hawley*, 562 F. Supp. 2d 1017, 1033 (N.D. Iowa 2008) (FCA case holding that "defendants' financial condition and income were relevant to defendants' motive for a fraudulent scheme"); *United States v. Wainright*, 351 F.3d 816, 821 (8th Cir. 2003) (affirming the district court's admission of evidence of the "defendant's financial

condition as relevant to his motive for the fraudulent scheme"); *United States v. Hussein Amr*, 132 F. App'x 632, 635 (6th Cir. 2005) ("[S]ince the evidence [of profits] was relevant to establishing the Defendant's motive [in Medicare eligibility case], the district court properly admitted the evidence pursuant to Rule 401."). Such is the case here, as whether AseraCare was motivated financially to admit ineligible hospice patients is highly relevant to the issues in this case. *See* FED. R. EVID. 401[1].

Similarly, courts have rejected AseraCare's argument that financial information relative to motive nevertheless should be excluded under Rule 403. "[T]he court's discretion to exclude evidence under Rule 403 is limited." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990). "Evidence may only be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* (quoting Fed. R. Evid. 403). "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence." *United States v. Bonds,* 12 F.3d 540, 567 (citations and quotation marks omitted); *see also Hussein Amr,* 132 F. App'x at 635 ("In this case, the evidence of the high profit margin was prejudicial against

---

[1] *See also McCarthney v. Griffin-Spalding Cnty. Bd. of Educ.*, 791 F.2d 1549, 1553 (11th Cir. 1986) (noting that, in an employment law case, the defendants' motive—or lack thereof—was relevant); *see also United States v. Hill*, 643 F.3d 807, 843 (11th Cir. 2011) ("'[M]otive is always relevant in a criminal case, even if it is not an element of the crime.' *And with financial crimes, the more money, the more motive*.") (emphasis added and internal citations omitted).

the defendant only in the sense that it was damaging to the defendant's case, and not in that it suggested a decision to the jury on an improper basis").  Because exclusion under Rule 403 is a drastic remedy, the balance "should be struck in favor of admissibility." *Terzado-Madruga*, 897 F.2d at 1117.

Notably, none of the three cases relied upon by AseraCare in their motion addresses the admissibility of financial evidence as it relates to motive in a Medicare fraud case.  *See Alimenta (U.S.A.), Inc. v. Cargill,* 861 F.2d 650 (11th Cir. 1988) (concerning a dispute between small corporation and Cargill involving a delivery of peanuts and the discreet issue of a "commercial impracticality" under U.C.C. Section 2-615); *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.,* 608 F.3d 871, 896-98 (D.C. Cir. 2010) (plaintiff attempted to use financial information to contrast the vast wealth of an American company to the poverty-stricken third world people affected by its fraud);  *St. Cyr v. Flying J Inc*., No. 3:06-CV-13-J-33TEM, 2007 WL 2696791, at *2 (M.D. Fla. Sept. 12, 2007) (a personal injury case about a propane explosion where the injured defendant sought to introduce a comparison of the relative wealth of a gas station company).

Because evidence of AseraCare's profits and Medicare billings may demonstrate the motive of the company and its employees to admit ineligible patients, the financial evidence makes it more or less likely (1) that the patients at issue were, in fact, ineligible and; (2) that AseraCare knew or should have known

its claims for such ineligible patients were false.  Even if there exists a potential

undue prejudice under Rule 403, excluding this evidence would be a "drastic

remedy."  *See Terzado-Madruga*, 897 F.2d at 1117 ("[T]he court's discretion to

exclude evidence under Rule 403 is limited.").  Although unnecessary for the

reasons stated above, the court could use less drastic means than exclusion to

alleviate any substantially outweighing undue prejudice, such as a limiting

instruction.  *See United States v. Hawley*, 562 F. Supp. 2d 1017, 1034 (N.D. Iowa

2008) ("any potential for undue prejudice from the financial evidence could be

limited by an appropriate limiting instruction that such evidence may be considered

by the jury only in its determination of Hawley's motive to engage in fraudulent

activity or recklessness as to the possibility of fraud, and not to find against him

simply because of his wealth or because the jury may believe he is

overcompensated for the work he does").

## III.    THE COURT SHOULD ALLOW RELEVANT EVIDENCE REGARDING ASERACARE'S CONDUCT OUTSIDE THE TIME PERIOD FOR WHICH THE UNITED STATES SEEKS DAMAGES.

AseraCare seeks to exclude all evidence of its corporate practices and events

outside of the time period in which the United States alleges that AseraCare

knowingly submitted false claims.[2]  ECF No. 342 at 5-6.  The evidence which the

---

[2] While AseraCare has moved for exclusion of evidence of corporate practices and events before 2007 and after September 2012 on remoteness grounds, the United States only seeks damages for AseraCare's conduct for the January 1, 2007 through February 28, 2012 time-frame.  ECF No.

United States intends to introduce about AseraCare's conduct or events outside of that time frame should not be excluded because it is probative to facts of consequence in this action, and its probative value outweighs any prejudicial effect.

### A. Legal Standard

Evidence is not irrelevant solely because it pre-dates or post-dates the time period for which a plaintiff seeks damages for a defendant's conduct. *See United States v. Pollock*, 926 F.2d 1044, 1048 (11th Cir. 1991) (noting that "decisions as to impermissible remoteness are so fact-specific that a generally applicable litmus test would be of dubious value" in finding that the trial court did not abuse its discretion in permitting admission of evidence of a defendant's five year old conviction); *see also Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 525 (3d Cir. 2003) ("There is, however, no bright line rule for determining when evidence is too remote to be relevant."). Rather, evidence which is remote in time to the period for which a plaintiff seeks damages should not be excluded based on relevancy if the evidence makes the existence of any fact that is of consequence more or less probable than it would be without the evidence. *See Ansell*, 347 F.3d at 525 (holding that a determination of whether remote in time evidence is relevant

---

342 at 5. In this response, the United States addresses the admissibility of AseraCare's conduct evidence before 2007 and after February 28, 2012.

"must be based on the potential the evidence has for giving rise to reasonable inferences of fact which are 'of consequence to the determination of the action'") (quoting Fed. R. Evid. 401); *see also Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1206, 1210 (2d Cir. 1993) (affirming the admission, in an age and retaliatory discrimination case, of plaintiff's employment history prior to the alleged discrimination).[3]  While it identifies a few examples of the United States' evidence outside of the time period in which the United States alleges that AseraCare knowingly submitted false claims, AseraCare provides no explanation why such evidence is not probative as to issues of consequence in this action.[4]

### B. Evidence of AseraCare's Programs and Clinical Practices Are Relevant Even if Outside the Damages Window

The United States intends to present evidence of AseraCare's incentive programs and clinical practices in 2006 of the same type which contributed to AseraCare's submission of false claims to Medicare in between January 2007 and

---

[3] Of the cases which AseraCare cited, only the *Brown v. Bray & Gillespie III Management LLC* court's opinion contains any explanation about when a Court should exclude evidence as irrelevant on the basis that it is remote in time.  No. 6:06-cv-661-Orl-22GJK, 2008 WL 2397601, at *10 (M.D. Fla. June 10, 2008).  The *Brown* court recognized that evidence outside of the time period for which the plaintiff seeks damages can be relevant.  *Id*. (refusing, in a case where plaintiffs allege they were exposed to Legionella bacteria during their stay in defendants' hotel, to exclude maintenance issues and inspections close in time to plaintiffs' last check-out from the hotel while granting a motion to exclude evidence of events eight months later).

[4] The United States does not intend to present evidence on the 2013 state inspection of the Evansville agency referenced in AseraCare's motion.  *See* ECF No. 342 at 5.

February 28, 2012.  These incentive programs and clinical practices included, but

were not limited to:[5]

> (a)  Setting stringent admissions quotas and high census expectations for AseraCare's agency management, including the heads of nursing in its agencies (the Directors of Clinical Services), to meet admissions and census expectations.  *See e.g.,* Gov't Trial Exs. 928-929 (e-mails about AseraCare's Central Region's June 2006 admissions contest among the region's agencies for a massage chair); Gov't Trial Ex. 707 (June 1, 2006 P. Durkin e-mail to the East Region Executive Directors, Directors of Clinical Services, and Provider Relations Managers about census);

> (b) Placing pressure on AseraCare's nurses to admit referred patients when there were questions about whether patients are terminally ill. *See* Gov't Trial Ex 22 (Regional nurse, reporting in a November 12, 2006 e-mail to the AseraCare Director of Operations and the Vice President of Clinical Operations, that a nurse "meets some resistance when she made a call 'not to admit inappropriate patients'"); *see also* ECF No. 251-53, T. Spiegel declaration ¶¶ 10-11 ( Norfolk agency Executive Director Wismer ordered RN Case Manager Tamara Spiegel to admit to AseraCare's Norfolk agency a patient residing at Golden Living's Columbus, Nebraska nursing facility who was not terminally ill based on an adult failure to thrive terminal diagnosis);

> (c) AseraCare employees attempted to override the clinical decisions of AseraCare's Atlanta agency Medical Director during IDT meetings and situations where that medical director could not get AseraCare employees to discharges patient who he thought were ineligible.  *See* ECF No. 295-1 (J. Micca Dep:  84:5-10, 176:17-23), and

> (d) AseraCare nurses failed to obtain and document information about patients' conditions needed to evaluate whether the patients have a terminal prognosis and, specifically, AseraCare employees provided AseraCare's Atlanta agency Medical Director inaccurate or

---

[5] The United States discusses the relevant evidence in the 2006 time-frame in its Opposition to Defendants' First Motion in Limine (ECF No. 329) at pages 15-18, 25-27.

incomplete information about patients.  *See* ECF No. 295-1 (J. Micca Dep:  117:9-13); Gov't Trial Ex, 628 ((Regional nurse, reporting in a November 25, 2006 e-mail to an AseraCare's Director of Operations and the Vice President of Clinical Operations and the Corinth agency management that a Corinth nurse did not have her LMRP form when conducting an admission and that "We must have LMRP's and PPS scores in the chart . . . [because] [t]hese tell us if the patient is eligible and how they are declining when they come up for recert."); Gov't Trial Ex, 21 (Level III Audit of the Concord/Stockton agency finding that LMRP documentation was incomplete).

The United States also intends to present evidence that AseraCare employees were aware in the 2006 time-frame that they lacked documentation supporting terminal prognoses in the medical records for certain hospice patients. Gov't Trial Ex. 21 at 2, 5 (Level III Audit of the Concord/Stockton agency finding that "hospice eligibility" was not verified because of lack of documentation). Because the jury can draw reasonable inferences from this 2006 evidence that AseraCare engaged in business practices that led to the submission of false claims after January 1, 2007, and that AseraCare, at a minimum, should have known it was at risk of submitting false claims because of these practices in the period after January 1, 2007, such evidence is relevant.

1. The 2004 Corridor Reports are relevant because they demonstrate knowledge.

The United States also may introduce the Corridor Group's reports on its 2004 review of Hospice South hospice agencies that AseraCare's corporate parent purchased, and that were part of AseraCare in between January 1, 2007 and

February 28, 2012.  *See* Gov't Trial Ex. 676-693; ECF. No. 251-32 (C. Susienka Depo. 50:18-51:1).  The Corridor Group's 2004 reports disclosed reasons why the agencies reviewed were at risk of submitting false claims for hospice reimbursement.

Specifically, the Corridor Group's May 2004 executive summary reported that the agency personnel "have insufficient knowledge and experience of regulatory requirements upon which they must base day-to-day decisions and ensure adequate documentation" and that it found in its review of medical records of long length of stay non-cancer patients that "documentation did not support ongoing eligibility for all certification periods."  *See* Gov't Trial Ex. 676 at 1, 5. Similarly, the Corridor Group's July 23, 2004, executive summary reported that 345 of the 560 patient medical records reviewed lacked documentation supporting continued hospice eligibility and were "recommended to IDT for further disposition" and observed "a history of caring for chronically ill patients who may or may not meet hospice eligibility criteria for terminal illness.  Gov't Trial Ex. 693 at 2, 6.

The 2004 Corridor Group reports are relevant because the jury may draw reasonable inferences from them about AseraCare's knowledge of the risk in the period after January 1, 2007, that it submitted false claims for payment from hospice.  *See United States v. Certified Env't Serv., Inc*., 753 F.3d 72, 88-90 (2d.

Cir. 2014) (holding that the trial court erred in excluding a conversation which pre-

dated the charged conspiracy by five years which was relevant to whether the

defendants' employees were acting in good faith); *Jackson v. Johns-Manville Sales*

*Corp.*, 750 F.2d 1314, 1317 (5th Cir. 1985) (affirming admission of 1935

correspondence to the defendants about the dangers of asbestos in a case based on

conduct 18 years later because "[e]vidence that the defendants had such knowledge

in 1935 clearly makes [the plaintiff's] allegation that the dangers of asbestos

products were foreseeable in 1953 more probable than it would have been without

such evidence").

2.   Evidence after February 28, 2012 is probative as to earlier conduct

The United States also intends to present testimony of Michelle Bass who

was employed as the Director of Clinical Services of AseraCare's McKenzie

agency in August 2012.  Ms. Bass' testimony is relevant because it will address the

practices of Zandra Cole, Director of Clinical Services of AseraCare's McKenzie

and Clarksville agency in the period prior to February 28, 2012 and therefore is

probative as to the operations of those agencies during the period the United States

seeks damages for AseraCare submitting false claims. *See* United States'

Opposition to Defendants' First Motion in Limine (ECF No. 329), ECF No. 351 at

18-19.  Likewise, the United States plans on introducing Gov't Trial Exhibit 675, a

September 2012 e-mail, which is relevant as to the practices at the Tullahoma agency in the 2007-2012 timeframe.  *See id*. at 38-39.

### C. AseraCare Cannot Demonstrate Undue Prejudice

AseraCare also seeks to exclude all evidence of AseraCare's corporate practices and events outside of the time period in which the United States alleges that AseraCare knowingly submitted false claims based on Federal Rule of Evidence 403.  Such exclusion, however, is not appropriate because AseraCare has not established how any risk of jury confusion, from admission of evidence about conduct or events outside of the time period in which the United States alleges that AseraCare knowingly submitted false claims, substantially outweighs the probative value of such evidence.  To the contrary, this evidence will educate the jury about the issues to be decided in this case.

### IV. EVIDENCE OF THE TERMINATION OF MARIE INFANTE AND THE GOLDEN LIVING CORPORATE INTEGRITY AGREEMENT SHOULD NOT BE EXCLUDED

AseraCare has moved to exclude evidence of, or reference to: (1) the termination of its Chief Compliance Officer Marie Infante during the pendency of this litigation and the testimony of Ms. Infante about the reason for her termination; and (2) the 2012 Corporate Integrity Agreement entered between the Department of Health and Human Services and AseraCare's parent company, Golden Living, that requires specific compliance measures relating to patient care

13

and nursing home operations related to certain Medicare requirements, but outside the hospice context.  AseraCare argues this evidence is irrelevant, impermissible character evidence, and unfairly prejudicial.  ECF No. 342 at 8.

The fact of Ms. Infante's termination, and her testimony that she was terminated for raising issues of compliance failures with the Corporate Integrity Agreement, is highly relevant to the conduct alleged in this case.  Specifically, this evidence is probative as to AseraCare's disregard for the views of its employees when Medicare compliance issues were raised, which the jury will consider in Phase 2 of this case, and to the jury's weighing of the credibility of Ms. Infante's testimony, as AseraCare has named her as a potential witness in phase 2.[6]  As for the Corporate Integrity Agreement, Ms. Infante herself testified that it had "indirect implications" to the "overall effectiveness" of AseraCare's hospice compliance program.  *See* Exhibit 1 (M. Infante Depo. at 277-278).  The Corporate Integrity Agreement may be relevant to AseraCare's compliance operations and not unfairly prejudicial, and it would be premature to determine the extent to which it may become relevant during trial if Ms. Infante testifies, and improper to exclude it *in limine*.

---

[6] The United States intends to call Ms. Infante to testify in both phases of the case.  For Phase 1, the United States expects Ms. Infante to testify regarding the Corridor Reports that are tied by time and location to the 123 sample patients.

### A. Ms. Infante was the Chief Compliance Officer at AseraCare

Marie Infante, an attorney, was employed by AseraCare's parent company,

GGNSC Administrative Services, LLC, a named Defendant in this case.  Ms.

Infante served as the Chief Compliance Officer for AseraCare Hospice and

oversaw AseraCare Hospice's Compliance Program from 2008 until she was fired

in June 2013 (during the pendency of this litigation).  Exhibit 1 (M. Infante Depo.

at 7-8).  Ms. Infante signed a severance agreement requiring her to "cooperate and

assist as necessary" with respect to "any litigation…or other proceeding," and

committing that she will be paid "$155.00 per hour for reasonable time spent and

for expenses she incurs with respect to such cooperation."  Exhibit 2 at 5 (Gov't

Trial Ex. 1280).

Ms. Infante, like many other individuals in upper leadership with AseraCare,

had responsibilities that extended to both the hospice and the nursing home sides of

the business.[7]  In her role as AseraCare's Chief Compliance Officer, Ms. Infante

oversaw employees within AseraCare's hospice operations with responsibilities

including internal audits and Additional Development Request ("ADR") responses,

including Becky Smith and Susan Gerhart.  Exhibit 1 (M. Infante Depo. at 50, 63).

---

[7] And, as discussed more fully in section IX, *infra*, evidence regarding AseraCare's parent company, Golden Living, or other corporate affiliates is relevant to AseraCare's business practices that led to its knowing submission of false claims.

**B.  Ms. Infante's Termination is Probative of AseraCare's Compliance Program.**

Ms. Infante testified that she was terminated during the course of this litigation because she expressed concerns to the upper management of the Board for both Golden Living and AseraCare about compliance risks relating to the Corporate Integrity Agreement, including the elimination of corporate oversight for clinical services departments.  Exhibit 1 (M. Infante Depo. at 31, 19-20).

Regardless of the fact that the particular risks Ms. Infante expressed did not directly relate to AseraCare's hospice operations, the manner in which Ms. Infante's concerns were addressed by the Board that oversaw both the hospice and the nursing home operations is probative as to the manner in which AseraCare's hospice compliance department was supported or hindered by the Board.  When AseraCare offers evidence at trial regarding its compliance program, the jurors should be aware that AseraCare's Chief Compliance Officer believes that her compliance concerns were dismissed by AseraCare's managing Board, and that she was terminated when she refused to withdraw them.

Additionally, the terms of Ms. Infante's separation agreement following her termination are relevant as the jury considers her testimony at trial.  In paragraph 5 of Ms. Infante's severance agreement, Ms. Infante agreed to "cooperate and assist as necessary" with respect to "any litigation…or other proceeding," and that she

will be paid "$155.00 per hour for reasonable time spent and for expenses she incurs with respect to such cooperation." Exhibit 2 at ¶ 5. Any compensation that Ms. Infante receives related to her time spent testifying at trial, as well as her agreement to "cooperate and assist" AseraCare in this case, is relevant for the jury to consider as it relates to her bias and credibility. *See, e.g.*, *Crowe v. Bolduc*, 334 F. 3d 124, 132 (1st Cir. 2003) ("[T]he fact that the witness had financial incentives . . . is, of course, classic evidence of bias, which is routinely permitted on cross-examination").

### C. Ms. Infante's Testimony Will Necessarily Refer to the Golden Living Corporate Integrity Agreement.

To explain the reasons for Ms. Infante's termination, and the compliance concerns she expressed, it will be necessary to at least mention the 2012 Golden Living Corporate Integrity Agreement. The determination of whether, and to what extent, the jury learns about the Corporate Integrity Agreement should be made by the Court at the appropriate time at trial in light of the circumstances presented, if at all.

### D. Conclusion

The termination and bases for the termination of AseraCare's Chief Compliance Office, Marie Infante, including the agreement she entered with the company, and testimony about the existence and scope of the Corporate Integrity Agreement, is highly probative of issues the jury will consider during phase 2 of

17

this trial.  The court should not exclude this evidence on a ruling *in limine* without the benefit of the context in which the evidence may be proffered.

## V.    LORI STRATER'S TESTIMONY REGARDING FACTS IN HER DECLARATION SHOULD NOT BE EXCLUDED

AseraCare moves to exclude any testimony from Palmetto GBA employee Lori Strater that is "similar to the statements she made in the declaration offered by the Government in opposition to AseraCare's motion for summary judgment." ECF 342 at 8.  AseraCare contends that the statements contained in Ms. Strater's declaration (attached as Exhibit 3) constitute expert opinions that were not timely disclosed.  These arguments have no merit.  Ms. Strater's statements in her declaration are statements of fact, and that of a percipient witness under Fed. R. Evid. 602.  Even if the Court determines that they are opinions or inferences, they are well within the bounds of Federal Rule of Evidence 701 for lay witness opinion testimony.  Additionally, AseraCare had notice before the close of discovery of the facts contained in Ms. Strater's declaration.

Ms. Strater is the supervisor of the Medical Review Department for home health and hospice at Palmetto GBA.  Exhibit 3 at ¶ 1.  She has over eighteen years of experience in medical review, which includes reviewing documentation that hospice providers submit in response to Additional Documentation Requests ("ADRs") to determine if claims for Medicare hospice benefits should be paid. Exhibit 3 at ¶¶ 1-2.  When Palmetto GBA conducts a pre-payment review of a

18

hospice claim, it reviews only the documents that a hospice provider chooses to send to support payment of the claim for the dates of service at issue.

During the course of discovery in this case, the parties exchanged both the complete medical records for the beneficiaries in the samples that AseraCare maintained in its files, as well as the Palmetto GBA files that contained the information that AseraCare submitted to Palmetto for any patients in the samples. AseraCare deposed government witnesses, including Mary Jane Schultz and Ms. Strater, regarding Palmetto's decision to pay claims for patients in the sample for whom Dr. Liao determined that AseraCare's documentation did not support that the patients were terminally ill. Both Ms. Schultz and Ms. Strater confirmed in their testimony that Palmetto's decision would have been based only on the documents that AseraCare chose to submit to Palmetto as part of the ADR process, rather than the entire patient file that Dr. Liao reviewed for the patient. *See* Exhibit 4 (M. Schultz Depo. at 148:10-17); Exhibit 5 (L. Strater depo. 186:18-20).

The task of identifying and compiling those contemporaneous documents that were contained in AseraCare's medical records produced by AseraCare in this litigation, but were not provided by AseraCare to Palmetto as part of an ADR for a particular claim period, does not require expertise; it is a simple review to locate and identify any documents that appear in one set of documents but are missing from the other. AseraCare could have undertaken the task of identifying these

documents contained in one filing, but not in another file, just as easily as the United States did, and had the further opportunity to ask both Ms. Strater and Ms. Schultz at their depositions about whether any of the documents that AseraCare omitted from its ADR responses for the sample patients could have impacted Palmetto's decision to pay or deny the claim after medical review. The fact that AseraCare chose not to identify these documents and ask the pertinent questions to these witnesses at their depositions does not mean that the United States should be precluded from introducing this evidence at trial.

Ms. Strater's statement in her declaration that there are documents AseraCare omitted from its ADR responses that may have influenced Palmetto's payment decision is based upon her position, routine job responsibilities and experience as the manager of the medical review department at Palmetto. Exhibit 3 at ¶ 6. But even if this Court deems this particular testimony to be opinions or inferences, her testimony would still be permitted under Eleventh Circuit precedent and Federal Rule of Evidence 701, because lay witnesses may testify regarding "particularized knowledge garnered from years of experience within the field" without being disclosed or qualified as expert witnesses. *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d. 1213, 1223 (11th Cir. 2003). Thus, the Court should deny AseraCare's motion *in limine* to exclude Ms.

Strater's testimony regarding documents that AseraCare omitted in the medical

records of the patients within the 123 sample patients it provided to Palmetto GBA.

## VI.  THE COURT SHOULD ALLOW EVIDENCE OF PALMETTO GBA'S PREPAYMENT REVIEW OF ASERACARE'S CLAIMS TO MEDICARE

AseraCare has moved to exclude all mention of government agency

inquiries, investigations, or findings regarding AseraCare, or its affiliated

companies, their agents or employees, unrelated to the claims in this case.  ECF

No. 342 at 9-10.  AseraCare has neither identified any specific evidence which

falls within this category nor explained whether it seeks to exclude inquires or

actions of Palmetto GBA, the Medicare Administrative Contractor with respect to

AseraCare during the relevant time period, or appeals of any Palmetto findings

with respect to AseraCare's claims.[8]  For this reason alone, AseraCare's motion to

exclude this unidentified evidence should be denied.

### A. Palmetto GBA Pre-payment Reviews are Relevant.

To the extent Palmetto GBA constitutes a "government agency" for

purposes of this motion, the Court should not exclude evidence related to Palmetto

---

[8] AseraCare separately seeks the exclusion of the "Teaching and Instruction for Providers (TIP)" letters which Palmetto GBA sent to AseraCare agencies.  ECF No. 342 at 12-14.  The United States addresses AseraCare's arguments with respect to the TIP letters below.  AseraCare also separately seeks the exclusion of evidence related to the 2012 Corporate Integrity Agreement with respect to Golden Living nursing homes in Georgia.  ECF No. 342 at 6-8.  The United States addresses that argument separately above.

GBA's prepayment reviews of AseraCare's Medicare hospice claims, including appeals of such reviews, because such evidence is relevant and admissible.

Palmetto GBA's responsibilities as a Medicare Administrative Contractor include performing pre-payment reviews of certain Medicare hospice claims. *See* ECF No. 251-10 (M. Shultz 30(b)(6) depo., 71:20-72:5). When a hospice claim is selected for a pre-payment review, nurses at Palmetto GBA review the documents that the hospice chooses to submit to Palmetto GBA for the dates of service of the claim to evaluate whether there is adequate information to support that the patient has a life expectancy of six months or less and hospice care is medically reasonable and necessary. *See* ECF No. 251-10 (M. Schultz 30(b)(6) depo. 69:8-18, 89:2-15, 90:17-91:7, 148:10-17); ECF No. 251-20, (L. Strater depo. 16:3-11, 186:18-20). Palmetto GBA does not pay the Medicare claims at issue if it finds that the documentation from the patient record is inadequate to support that the patient has a life expectancy of six months or less. ECF No. 251-29 (S. Gerhart Dep. 36:15-17). Because Palmetto GBA's prepayment reviews of AseraCare's Medicare hospice claims relate specifically to whether AseraCare's medical records supported the terminal prognosis of patients, evidence related to such reviews is highly probative as to admissions and re-certifications practices in particular AseraCare agencies and whether AseraCare should have known that its business practices were leading to the submission of false claims to Medicare.

22

For example, AseraCare's Evansville agency received additional documentation requests (ADR) from Palmetto GBA with respect to certain claims and Palmetto denied payment on some of those claims based on that documentation.  ECF No. 251-16 at 6, ¶ 18.  According to Jacquelyn Fehd, the Director of Clinical Services for the Evansville agency, "the Evansville agency's experience with Palmetto ADRs confirmed the importance of the Evansville agency having documentation in its patient files that supported the patients' terminal prognosis of six months or less."  *Id*. ¶ 19.  In contrast, AseraCare management provided instructions to its agencies to prevent their experience with Palmetto ADRs from affecting AseraCare's aggressiveness in admitting referred patients when there is a question about their terminal prognosis.  In particular, AseraCare's President, Bob Donovan, endorsed an instruction to AseraCare Region 5 and 7 agency management to "[r]emember that this is not a black and white business; we have to deal with grey areas all the time" and that "ADR is not a negative" and requested that other Directors of Operations provide their agency management similar instructions.  *See* Gov't Trial Ex. 182.

### B. The Probative Value of the Palmetto GBA Reviews Substantially Outweigh Any Prejudicial Effect.

The Eleventh Circuit has recognized the admissibility of government administrative findings when sufficiently probative to facts of consequence in an action over objections that such evidence is unfairly prejudicial.  *See e.g.*

*Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1287-89 (11th Cir 2008)

(affirming the admission of an EEOC determination in a jury trial on civil rights

claims over objections based on Fed. R. Evid. 403 and 803(8)(c)); *Barfield v.*

*Orange Cty.*, 911 F.2d 644, 650-52 (11th Cir. 1990) (same).

      The *Shoppin' Bag of Pueblo* case cited by AseraCare does not support a

contrary finding that evidence related to Palmetto GBA's prepayment review of

AseraCare claims is unduly prejudicial.  *See Shoppin' Bag of Pueblo, Inc. v. Dillon*

*Companies, Inc*., 783 F.3d 189, 164-65 (10th Cir. 1986).  An anti-trust case, the

court in *Shoppin' Bag of Pueblo* affirmed the exclusion of a Federal Trade

Commission investigation that had little probative value based on Fed. R. Evid.

403, because it "was terminated shortly after it begun and reached no conclusion

about [the defendant's] pricing behavior."  *Id.* at 165.  By contrast, AseraCare's

receipt from Palmetto GBA of the results of its review of AseraCare's patient

medical records is significantly more probative as to issues of consequence in this

case.

### C. Exclusion on Hearsay Grounds is Not Appropriate.

      Because AseraCare has not identified any specific evidence about

government inquiries, investigations, or findings that it seeks to exclude on hearsay

grounds, this Court should not exclude any evidence on hearsay grounds at this

time.

To the extent AseraCare's hearsay arguments relate to Palmetto GBA's prepayment review of AseraCare hospice claims, or appeals of those reviews, these exhibits are not hearsay.  Records or statements of a public office should not be excluded based on the rule against hearsay if they set out the "office's activities" or "factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8); *see City of New York v. Pullman*, 662 F.2d 910, 914-15 (2d Cir. 1981) (affirming that a federal agency report was not admissible under Fed. R. Evid. 803(8) for lack of trustworthiness because it 'did not embody the findings of an agency, but the tentative results of an incomplete staff investigation.").  Unlike in *Pullman*, AseraCare has not made any specific showing that public record evidence which the United States seeks to introduce indicates a lack of trustworthiness that would support exclusion.

## VII.   THE COURT SHOULD ALLOW EVIDENCE RELATED TO THE CAP PROGRAM

AseraCare moves to exclude evidence of the Medicare hospice "cap" and how hospice patients affect cap.  ECF No. 342 at 11.[9]  Since the inception of the hospice benefit, Medicare has included a cap limiting the average annual payment per patient a hospice can receive.  The average annual payment cap is calculated

---

[9] "CAP" is not an acronym but is sometimes referred to using capital letters.

for the period of November 1 through October 31 of each year.  If a hospice provider's total payments divided by its total number of beneficiaries exceeds the cap amount, then the provider must repay the excess to the program.  *See generally* 42 C.F.R. 418.309.

The United States expects AseraCare witnesses to testify about the tactics employed by AseraCare management to manage their agency's cap liability. Specifically, Marsha (Brown) Farmer, former Executive Director of the Monroeville and Mobile agencies, will testify that her agency managed cap by attempting to admit as many new patients as possible:

> Q.  And what, if you know, precipitated the drop in average daily census that occurred at that point in time?
>
> A.  We went up and down, you know, off and on during different times.  And, again, I mean, it -- it really depended on where you were in the company and where you were with CAP, I mean, to be completely putting it on the table.  If it was a point in time where CAP was getting close, your job was to drive census, get patients, get patients, get patients.

ECF No. 251-86 (Farmer Depo. at 57-58).

Because the cap program is relevant to the incentives, tactics and training provided to AseraCare employees, it is admissible at trial.  *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 123 (Roberts, J., concurring) ("evidence of improper incentives" is admissible as evidence of "actual motivation" in denying ERISA claims); *United States v. Smith*, 749 F.3d 465 (6th Cir. 2014) (affirming decision to

allow the government to present clips from the movie, *Boiler Room*, which demonstrated the sales tactics that employees were to adopt).

AseraCare's motion identifies specific emails that it argues are irrelevant and prejudicial. *See* ECF No. 342 at 12. As AseraCare correctly points out, the "emails show AseraCare employees debating the financial effects of admitting certain patients." *Id.* AseraCare states that these emails are irrelevant because they discuss "indisputably eligible" patients. *Id.* However, these emails are relevant precisely because the discussions do not involve a physician who has made a determination regarding whether the patient is "indisputably eligible" for hospice or not. The emails show that the AseraCare business employees who participate in these email exchanges – salespeople, Executive Directors, Directors of Finance – making decisions regarding eligibility and admissions without any input from a physician. For this reason, the emails regarding Medicare cap liability are relevant and their probative value outweighs and potential prejudice.

## VIII.  "TIP" LETTERS FROM PALMETTO GBA TO ASERACARE AGENCIES SHOULD NOT BE EXCLUDED

AseraCare seeks to exclude from evidence the Teaching and Instruction for Provider (TIP) letters which Palmetto sent to AseraCare agencies. ECF No. 342 at 12-13; Gov't Trial Exs. 34, 62, 218. These TIP letters relate directly to the Palmetto pre-payment reviews discussed in the previous section. The TIP letters are snapshot summaries of the results of Palmetto's prepayment reviews, and they

27

also provide information comparing AseraCare's payment denial rates against the payment denial rates of other hospice companies. *See* ECF No. 251-89 (S. Gerhart 30(b)(6) depo. 10:6-20;11:8-13).

### A. The TIP Letters are Relevant

As discussed in the previous section, *see infra* Section VI, the outcomes of Palmetto's prepayment reviews are probative of the reliability of COTIs and also goes to AseraCare's knowledge that it was submitting false claims. Because the TIP letters are simply snapshot summaries of the results of these prepayment reviews, the TIP letters are plainly relevant.

### B. The Probative Value of the TIP Letters Outweigh any Prejudicial Effect

AseraCare contends that these letters should be excluded based on Fed. R. Evid. 403 and 404(b). Because the "federal rules favor admission of evidence over exclusion if the evidence has any probative value," the Eleventh Circuit has recognized that "'Rule 403 is an extraordinary remedy which should be used sparingly.'" *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (quoting *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982)). "[T]he more essential the evidence, the greater its probative value, and the less likely that a trial court should order the evidence excluded" pursuant to Fed. R. Evid. 403. *Id*. at 631.

The TIP letters should not be excluded based on Fed. R. Evid. 403 because any confusion or prejudice created by the denial rates and rankings contained in the

28

letters, or the fact that Palmetto GBA's denials may have been subject to administrative appeal, does not substantially outweigh the letters' probative value. Specifically, the TIP letters make clear on their face that the denial percentage is based only on the denials compared with the total number of claims which Palmetto reviewed during the review period and that the hospice provider rankings are also based on the denial percentages during the review period. Because the letters clearly state how the denial percentage and hospice provider rank are calculated, AseraCare will have ample opportunity to explain to the jury its position on the limited value of those two categories of information.

Moreover, the TIP letters are clear that they report on Palmetto GBA's prepayment review within a certain time period and in no way suggest that they report on any other level of administrative medical review such as appeals of Palmetto's payment denials. The TIP letters are complete as to Palmetto's review, and so they are not unduly prejudicial or confusing about what they report. AseraCare will have the opportunity to contest the weight that the jury should place on the TIP letters by presenting evidence on the appeals process for Palmetto GBA's payment denials.

AseraCare also mischaracterizes how the United States intends to use the TIP letters. The United States does not contend that AseraCare's submission of Medicare claims, subject to Palmetto GBA's medical review, the results of which

29

were reported in the TIP letters, proves that AseraCare acted in conformity when knowingly submitting the claims that the United States contends are false in this action.[10]   Rather, the United States contends that AseraCare's receipt of the results of Palmetto's prepayment reviews reported in the TIP letters support its contention that AseraCare at least should have known its business practices were leading to the submission of false claims.

### C. The TIP Letters Should Not be Excluded Based on Fed. R. Evid. 404(b).

To extent the TIP letters constitute evidence of a "wrong" or "other act" extrinsic to the United States' current case,[11] use of the TIP letters to support the contention that AseraCare acted knowingly, because the letters put AseraCare on notice it was submitting Medicare claims without maintaining documentation in its

---

[10] In particular, the United States contends that Palmetto GBA's payment of a Medicare hospice claim after a pre-payment review does not establish that the claim is not false because AseraCare does not provide the full medical record for reference by Palmetto GBA in conducting its pre-payment reviews.  ECF No. 251 at 118-20.  In denying AseraCare's Motion for Partial Summary Judgment with respect to "claims that
Dr. Liao did review and that Palmetto GBA or administrative law judges found as payable," the Court recognized that there is a genuine issue of material fact with respect whether claims for ineligible sample payments which Palmetto GBA approved for payment after prepayment review are false.  ECF No. 268 at 17.

[11] Federal Rule of Evidence 404(b) applies only to evidence which is "extrinsic" to the conduct at issue in the case in question.  *United States v. Capers*, 708 F.3d 1286, 1395 (11th Cir. 2013).  Rule 404(b) may not apply at all to the TIP letters because the letters reflect AseraCare's submission of Medicare claims in the same period as AseraCare's conduct which is the subject of this case and thus are not extrinsic evidence.  *Id*. at 1304-05 (finding in a conspiracy to distribute cocaine and crack cocaine case that evidence that the defendant, during the same period as the charged conduct, purchased and sold crack to others, was not "extrinsic . . . and therefore not subject to the same requirements for admission as Rule 404(b) evidence").

patient medical records supporting the terminal prognosis, is permitted by Fed. R. Evid. 404(b).  *See United States v. Sroufe*, 579 F. App'x. 974, 978-79 (11th Cir. 2014) (affirming the admission of evidence that the defendant did not file federal tax returns from 1999 and 2007 after previously filing tax returns, which is "highly probative on the issues of knowledge and absence of mistake, because it demonstrates [the defendant] knew he was required to file accurate tax returns"); *see also United States v. Merrill*, 513 F.3d 1293, 1303 (11th Cir. 2008) (affirming admission of data on prescriptions outside of the indictment because the data "is admissible under Rule 404(b) to show evidence of a plan"); *United States v. Allen*, 116 F. App'x. 210, 214-15 (10th Cir. 2004) (affirming, in a criminal false claims case, admission of previous efforts to alter bills to Medicare).

### D. The Indianapolis and Evansville TIP Letters Are Admissible in Phase One

Finally, the United States has identified two TIP letters sent to AseraCare's Indianapolis and Evansville agencies respectively for use in Phase One of the trial. *See* Gov't Trial Exs. 34, 62.  Both of these TIP letters are admissible in Phase One because the jury may draw inferences, based on Palmetto's findings in its medical review of patient medical records submitted by the two agencies, about the information provided to AseraCare physicians for the Indianapolis and Evansville, that these agencies had ineligible sample patients.

## IX.   Evidence About AseraCare's Parent Companies and Affiliated Companies Should Not be Excluded

AseraCare seeks to exclude any argument, evidence, or comments regarding its parent company, Golden Living, or any other company affiliated with AseraCare or Golden Living, based on Federal Rules of Evidence 402 and 403.[12] ECF No. 342 at 14.

The fact that a corporate parent or affiliate of a defendant is not a party to the litigation alone does not make evidence about such entities inadmissible. Rather, evidence regarding a non-party corporate parent or affiliate is admissible to the extent such entities have relevance to factual issues to be decided. *See Lion Oil Trading & Trans., Inc. v. Statoil Mktg. & Trading (US) Inc.*, Nos. 08 CIV 11315 (WHP), 09 CIV.2081 (WHP), 2011 WL 855876, at *4-5 (S.D.N.Y. Feb. 28, 2011) (denying motions to exclude reference to, and evidence related to, the parties' parent corporations); *see also LaFarge North America, Inc. v. Discovery Group, LLC*, No. 05-1110-CV-W-FJG, 2010 WL 2089310, *2 (W.D. Mo. May 25, 2010) (permitting reference to the defendant as being part of a large multinational corporation).

Here, the probative value of evidence showing the connection between AseraCare and Golden Living far outweighs and prejudicial effect because: (1)

---

[12] One of the three named defendants in this case, GGNSC Administrative Services, LLC, provider administrative services to all of Golden Living's operating entities. *See* Exhibit 1 (M. Infante depo. 7:4-7).

ineligible patients resided at Golden Living nursing homes; (2) Golden Living's

Board of Directors was directly involved in setting quotas for AseraCare

admissions and AseraCare employees put pressure on Golden Living to provide

referrals; and (3) several of AseraCare's executives held management roles at

AseraCare and Golden Living simultaneously.

### A. Ineligible patients from the sample resided at Golden Living nursing homes

AseraCare's request to exclude any "argument, evidence, or comment"

regarding its parent company Golden Living should be denied on the basis that

certain ineligible sample patients resided in Golden Living nursing homes. *See,*

*e.g.* Gov't Trial Ex. 346 (patient resided at the Golden Living Center, Rome). It

would be confusing for the jury if the parties could only selectively refer to the

location where the patient received hospice services.

### B. Golden Living played a significant role in AseraCare's businesses and clinical operations

The United States should be entitled to present relevant evidence about how

the quotas approved by Golden Living's Board of Directors. For example, Golden

Living was involved in the following relevant AseraCare business practices:

> (a) As part of AseraCare's annual budget, Golden Living's Board of
> Directors approved average daily census goals for AseraCare's
> hospice operations which AseraCare management pressured its
> employees to meet. ECF No. 251-32 (C. Susienka depo. 97:2-12);
> *see, e.g.*, ECF No. 251-16 (J. Fehd declaration, ¶ ¶ 12, 14 23).

AseraCare management then pressured agency personnel to meet budgeted admissions and census goals.

(b) AseraCare set "Synergy Goals," which were specific goals related to how many Golden Living residents were receiving hospice services from AseraCare.  These goals were another source of pressure faced by AseraCare's agency personnel.  *See* ECF No. 251-16 at 5.

(c) AseraCare employees put pressure on their Golden Living counterparts to refer patients to AseraCare for hospice admission.  *Id.* at 5-6, ¶ 17.  At times when agencies had urgent needs for admissions to meet financial goals, AseraCare personnel solicited their Golden Living counterparts asking for the referrals to meet those goals.  *See* Gov't Trial Ex. 797 (e-mail from an AseraCare Director of Operations to her Golden Living counterpart asking for referrals to AseraCare's Altoona and Johnstown agencies).

## C. There was Significant Overlap at the Executive Level Between AseraCare and Golden Living

Reference to Golden Living and AseraCare's corporate affiliates also cannot be excluded because of the shared management role of individuals who had important involvement in AseraCare operations.  For instance, the AseraCare chief executive officer in the 2007 to 2012 time-frame, Cindy Susienka, was not an AseraCare employee but instead served as CEO of Golden Living affiliate Golden Innovations, and later as the Golden Living Chief Operating Officer, and had executive responsibilities over other Golden Living companies including Aegis Therapies, AseraCare Home Care, and 360 Healthcare Staffing.  ECF No. 251-32, C. Susienka depo. 9:5-6, 17:6-22; 20:10-16, 27:21-28:4.

This shared management is particularly relevant to issues related to AseraCare's corporate compliance operations.  The scope, actions, and effectiveness of AseraCare's corporate compliance operations are relevant to whether AseraCare should have known it was submitting false claims to Medicare.[13]  AseraCare did not have a corporate compliance department separate from its affiliated companies.  The individual with primary corporate compliance responsibility over AseraCare in the 2007-2012 was Rebecca Smith, who held the position of Golden Living's Senior Director of Compliance and Quality, and later Vice President of Compliance. Ms. Smith split her time between AseraCare, AseraCare Home Care, Aegis Therapies and later 360 Healthcare Staffing,  Ms. Smith's direct supervisor from January 2008 through June 2012, Chief Compliance Officer Marie Infante,[14] also had responsibilities with respect all of the Golden Living companies. Exhibit 1 (M. Infante Depo. 7:17-22, 48:1-24).

In particular, the involvement of Golden Living's management is relevant to AseraCare's response to the Corridor Group's 2007-2008 review of AseraCare's hospice operations which found that AseraCare agencies lacked documentation in

---

[13] In particular, AseraCare has identified as Defendants' exhibits AseraCare parent and affiliated company documents related to the corporate compliance functions applicable to AseraCare. *See e.g.,* ECF No. 312-2, Defendants' Exhibit 229, Beverly Enterprises Code of Conduct (identified as an "expected "exhibit); Defendants' Exhibit 230 Golden Living Code of Conduct and Business Ethics Manual (identified as an "expected" exhibit); Golden Ventures Code of Conduct and Business Ethics Manual (identified as an "as needed exhibit).

[14] GGNC Administrative Services, Inc., a named defendant in this case, was Ms. Infante's employer during this time period.  *See* Exhibit 1 (M. Infante Depo. 7:17-25).

its patient medical records supporting the terminal prognosis of patients and other

operational issues.  *See* ECF No. 251-7, A. Hollis 30(b)(6) depo. 35:10-36:9; 37:3-

5.  Cindy Susienka and Marie Infante were among the limited number of

executives with AseraCare management responsibilities who received copies of the

Corridor Group's 2007-2008 review of AseraCare's hospice operations.  *Id.* (A.

Hollis 30(b)(6) depo. 37:9-15);  *see also* ECF No. 251-32 (C. Susienka depo.

179:19-179:25).  Furthermore, Ms. Infante presented the Corridor Group's 2007-

2008 findings to Golden Living's Board of Directors.  *See* ECF No.251-32 (C.

Susienka depo. 206:15-207:1).  Despite Golden Living's management knowledge

of the Corridor Group's findings, Golden Living's Board of Directors continued to

approve budgets imposing aggressive admissions and census goals on individual

AseraCare agencies.

    AseraCare also contends argument, evidence, or comments about

AseraCare's corporate relationship with Golden Living and other affiliates should

be excluded because they would be confusing to the jury and highly prejudicial.

ECF No. 342 at 14.  Evidence, argument or comments about AseraCare's corporate

relationship with Golden Living and other affiliates should also not be excluded

based on Federal Rule of Evidence 403 because the high probative value of such

evidence, described above, substantially outweighs any risk of confusion to the

jury or unfair prejudice.

## X.   THE COURT SHOULD ALLOW EVIDENCE THAT THE DEFENDANTS ARE CORPORATE ENTITIES AND HAVE OUT OF STATE CORPORATE OFFICES

AseraCare seeks the exclusion of any argument, evidence, or comment regarding AseraCare's corporate status.  ECF No. 342 at 14-15.  The status of the named defendants, Hospice Preferred Choice, Inc., Hospice of Eastern Carolina, Inc., and GGNSC Administrative Services, LLC (collectively "AseraCare") as corporate entities is relevant to elements of the United States' causes of action and thus should not be excluded.

In particular, the United States does not need to prove that any particular individual had knowledge of the false claims, but rather must prove that AseraCare knowingly submitted false claims.  *See Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983);*United States ex rel. Christianson v. Everglades College, Inc*., Case No. 12-60185, at 9 (S.D. Fla. May 6, 2014) (previously filed as ECF No. 251-116) (holding in a False Claims Act case against a corporate defendant that "[t]he question, therefore, is not whether a specific individual acting on behalf of [defendant] knowingly submitted false claims; rather, the question is whether [defendant], as an entity, knowingly submitted false claims").  Reference to the Defendants' corporate status is necessary for the United States to meet its burden that AseraCare knowingly submitted false claims, thus the probative value of such evidence outweighs any prejudicial effect.

AseraCare also seeks to prevent the United States "from stating or even alluding to the fact" that the Defendants are out-of-state companies.  ECF No. 342 at 15.  While the United States does not plan to introduce evidence about the jurisdiction in which Defendants are incorporated or organized, the United States should not be precluded from presenting evidence about the geographic scope of the AseraCare's operations and the location of Defendants' corporate offices because relevant events took place where those operations and offices were located.

For example, Lisa Gober may testify about instructions she received about AseraCare financial goals during a February 2007 meeting at AseraCare's then-headquarters in Fort Smith, Arkansas. *See* Gov't Trial Ex. 1281.  AseraCare has also marked as exhibits agendas for trainings identified to have taken place in Fort Smith, Arkansas.  *See* Def. Exs. 893, 900, 3005.  Likewise, trainings and relevant meetings took place at the Golden Innovations' offices in Delafield, Wisconsin. *See* ECF No. 251-56 (K. Kaiser declaration ¶¶ 21-22) (Provider Relation Manager received instructions at a training in Delafield, Wisconsin to ask referral sources if they have patients exhibiting certain types of symptoms which alone did not establish that the patients are terminally ill); Gov't Trial Ex 202 at 2 (December 14-15, 2009 AseraCare senior leadership meeting in Delafield in which there was a discussion about  patient medical record "documentation still being an issue" at

AseraCare's McKenzie agency). The probative value of the location of
AseraCare's operations relevant to this case outweighs any prejudicial effect of the
suggestion from such evidence that Defendants are "out-of-state" companies.

## XI.   PHASE TWO ISSUES

The United States agrees that, in a bifurcated trial, it would be inappropriate
for either party to deliberately elicit testimony on issues that have been designated
as Phase Two issues and are not relevant in Phase One.  However, AseraCare's
motion asks the Court to issue a blanket order to "prevent the Government. . . from
referring to any Phase Two issue" before the commencement of Phase Two.  ECF
No. 342 at 16.

The United States understands that the Court intends to instruct the jury that
this False Claims Act suit has been bifurcated and to further instruct the jury on the
issues to be decided in each phase.  As such, it would be proper for the parties to
refer to any such instructions provided by the Court in an opening or closing
statement.  AseraCare's motion *in limine* is too limiting to the extent that it would
prevent counsel for the United States, in summation, to explain to the jury that
issues such as AseraCare's intent to submit false claims and AseraCare's
knowledge of false claims are not issues that the jury should be concerned with in
Phase One.

## XII.   ASERACARE EFFORTS TO BAR MENTION OF DISMISSED CLAIMS RELEVANT TO THE FORMER RELATORS' EXPECTED TESTIMONY

The United States has disclosed that it may call former relators, Marsha Brown, Dawn Richardson Reeves, and Joseph Micca, to testify at trial. Ms. Brown, Ms. Richardson Reeves, and Dr. Micca previously filed *qui tam* actions against AseraCare that were pending in this Court and later were voluntarily dismissed. *See* 2:09-cv-00627-KOB (N.D. Ala.); 2:12-cv-02264-KOB (N.D. Ala.). AseraCare moves *in limine* to exclude any mention of, or evidence that pertains to, these dismissed claims against AseraCare. In so moving, AseraCare seeks to exclude relevant evidence from being mentioned at trial. In a separate motion *in limine*, Defendant also moved to exclude *any* trial testimony of former relators, Ms. Brown, Ms. Reeves, or Dr. Micca.

This is not a typical civil case where the existence of dismissed claims could be prejudicial. Here, the United States expects Ms. Brown, Ms. Reeves, and Dr. Micca to discuss their experiences at AseraCare and what led them to report this fraud to the Government in the form of a whistleblower complaint. This testimony would certainly be relevant to the issues in the case and not unduly prejudicial.

Moreover, the former relators executed an agreement, titled "Relator Agreement," at the time the three suits were pending, which was disclosed to AseraCare during litigation. The nature, content and purpose of that agreement— which are fairly common in *qui tam* cases—are discussed extensively in the United

40

States' Opposition to Defendants' Motion in Limine to Exclude Trial Testimony of Three Nonparty Fact Witnesses.  *See* ECF No. 344.  At trial, the United States expects it will necessary to refer to the voluntarily dismissed *qui tams* in order to explain the Relator Agreement and why it was executed it.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that AseraCare's Motion should be denied in its entirety because AseraCare has not met its burden of showing the evidence it seeks to exclude is clearly inadmissible for any purpose.

Dated July 20, 2015

Respectfully submitted,

BENJAMIN C. MIZER
PRINCIPAL DEPUTY ASSISTANT
ATTORNEY GENERAL

JOYCE WHITE VANCE
UNITED STATES ATTORNEY

LANE HINES WOODKE
DON B. LONG III
Assistant United States Attorneys
1801 4th Avenue North
Birmingham, AL 35203
Telephone: (205) 244-2107
Lane.Woodke@usdoj.gov

/s/ Jeffrey A. Wertkin
MICHAEL D. GRANSTON
RENÉE BROOKER

41

HOLLY H. SNOW
JEFFREY A. WERTKIN
CAROLYN B. TAPIE
WILLIAM E. OLSON
EVA U. GUNASEKERA
Attorneys, Civil Division
Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-3911
Jeffrey.A.Wertkin@usdoj.gov

*Counsel for the United States*

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey A. Wertkin, Trial Attorney for the United States Department of Justice, hereby certify that on July 20, 2015 (Central Time), I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel for the relators and defendants.

<u>/s Jeffrey A. Wertkin</u>
Jeffrey A. Wertkin
Trial Attorney
U.S. Department of Justice

43