FILED
2015 Aug-04 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

1                UNITED STATES DISTRICT COURT
2                NORTHERN DISTRICT OF ALABAMA
                       SOUTHERN DIVISION

3

4

5    UNITED STATES OF AMERICA,
     EX REL., ET AL.,                CV-12-KOB-245-S
6

7              Plaintiffs,      July 22, 2015

8                               10:15 a.m.

9       vs.                     Birmingham, Alabama

10   ASERACARE, INC., ET AL.,

11             Defendants.

12   * * * * * * * * * * * * * * * * * * * * * * * *

13

14               REPORTER'S OFFICIAL TRANSCRIPT OF
                    FINAL PRETRIAL CONFERENCE
15                         VOLUME I

16       BEFORE THE HONORABLE KARON O. BOWDRE
             UNITED STATES DISTRICT CHIEF JUDGE
17

18

19

20

21

22

23   COURT REPORTER:
     Teresa Roberson, RMR
24   Federal Official Court Reporter
     1729 Fifth Avenue North
25   Birmingham, Alabama  35203

```
 1                        *  *  *  *  *

 2                   A P P E A R A N C E S

 3                        *  *  *  *  *

 4   FOR THE PLAINTIFF:

 5   Jeff Wertkin
     Renee Brooker
 6   Will Olsen
     Carolyn Tapie
 7   Eva Ganasekena
     U.S. Department of Justice
 8   Civil Division
     P.O. Box 261 Ben Franklin Station
 9   Washington, DC  20044

10

11   Don Long
     U.S. Attorney's Office
12   1801 4th Avenue North
     Birmingham, Alabama  35203
13

14

15   James Barger, Jr.
     Elliott Walthal
16   Frohsin & Barger
     3430 Independence Drive
17   Birmingham, Alabama  35209

18

19   Megan Marcello
     Ben Beason
20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S  (continued)

 2    FOR THE DEFENDANT:

 3    James Sturgeon Christie, Jr.
      Jack Wright Selden
 4    Matt Lembke
      Bradley, Arant, Boult & Cummings
 5    1819 Fifth Avenue North
      Birmingham, Alabama  35203
 6

 7    Kimberly Martin
      Bradley, Arant, Boult & Cummings
 8    200 Clinton Avenue
      Huntsville, Alabama  35801
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                        *  *  *  *  *

                  P R O C E E D I N G S

                        *  *  *  *  *
```

THE COURT:  We are going to try to work through all of the priority motions.  I'm actually going to defer, probably until this afternoon, the defendant's omnibus motion dealing with all the evidence that lacks a sufficient nexus, document 329.  We'll probably take that one up after lunch.

Joseph was glad to hear that I was talking about a lunch break, so he will keep me on schedule for that.

I wanted to first address the juror questionnaire.  I'm glad that we finally have some agreement.  I will be granting the -- okay.  I forgot to grant your consent motion on using juror notebooks.  We will get that entered today.  I think what y'all have come up with is the best use of juror notebooks I have ever seen, and I think it will be very helpful for the jurors to have a place where they can take notes about the specific patients.

I think that's going to be helpful and I will be granting that.  That is not to appear as precedent for granting motions for just any kind of juror notebook in the future.

1          The defendant's motion for pretrial charge

2   conference I think is sort of moot, because we've kind

3   of talked about what we're going to do and I've given

4   you the nutshell instruction.  We'll be working on

5   modifying it and I will have it to you certainly before

6   we start the case.

7          So, we'll be looking at those other motions in

8   limine today.  I was thinking that there was a motion

9   for the written questionnaire, but I don't see that

10  pending.

11         Did I grant it?

12         MR. WERTKIN:  You granted it.

13         THE COURT:  In principle, but not as to

14  specific -- I wanted to make sure that was covered.  I

15  do approve the written questionnaire that the government

16  submitted and that I think AseraCare has kind of

17  conceded to.

18         MR. CHRISTIE:  Yes, Your Honor.

19         THE COURT:  There are a few things with it that

20  I would like to comment on.

21         First, I think there needs to be a little more

22  white space.  And I will show you this later, Jeff,

23  where I have just suggested putting some spaces.  Even

24  though it will make it a page or two longer, I don't

25  think it's as daunting when there's some white space on

1    the paper.

2         Question number thirty-four about how do you

3    feel about size of money awards.  That is one of the

4    only "how do you feel" things that doesn't have a place

5    for comment.  And I think it would be good to add, like

6    you have in the other ones, explain your view or

7    something like that, I think that would be helpful.

8         MR. WERTKIN:  Yes, ma'am, we'll add that.

9         THE COURT:  Then the last question about any

10   reason you feel you would be unable to serve for ten to

11   twelve weeks, everybody will write something, if you do

12   that.

13        I would request that that be modified to say,

14   you know, other than the general inconvenience that

15   every juror will face, do you have a special reason.

16        And also I will have told them at that point

17   that we're going to be trying the case Monday through

18   Thursday, 8:30 to 5:30.  But I think it would be good to

19   add that as well.

20        So that in this question where they're asked

21   for specific reasons, they know the hours.  If they live

22   in north Blount County and they have child care issues

23   and have to pick up a kid by 6:00, they won't be able to

24   get there.

25        So, I mean, that kind of thing we would need to

1    know as well.  But they'll also know that they will have

2    Fridays to put four days worth of work into at the

3    office or whatever.

4          But those were the only comments that I made.

5    And, Jeff, I'll just give you those things with the --

6          MR. WERTKIN:  We'll get those to you.  And

7    we'll send a Word Perfect version or just PDF?

8          THE COURT:  Send those to Frankie and we'll get

9    those to the jury section and we'll get those ready.

10   And we discussed organizing our jury and doing the

11   questionnaires on Tuesday, August 4th.

12         I would anticipate that we may need to meet

13   some on that Monday, if we have got issues that have

14   kind of hung over.  I have to go to Washington all day

15   Wednesday on chief judge issues, so that kind of

16   interrupts my week next week for time to get with you on

17   remaining issues.

18         So, I'm just kind of looking at Monday as a

19   clean up day for any issue that we still have remaining.

20         I wanted to look at a document that wasn't on

21   the list for today, and if y'all aren't prepared to talk

22   about it, we can deal with it.  The United States'

23   objections and cross designations to defendant's

24   deposition designations.  I don't generally get involved

25   with these cross designation things, y'all work those

1    out.

2           But in terms of the objection to the three

3    witnesses being presented by deposition, I don't think

4    that Rule 32(a)(4) precludes that, even though the

5    government has nationwide subpoena power in these qui

6    tam actions because Rule 32(a)(4) is written in the

7    disjunctive "or."  And these witnesses are more than one

8    hundred miles away.  So that falls within 32(1)(4)(b).

9           So, I think that the defense is entitled to put

10   them on by depositions.

11          MR. WERTKIN:  Some of those witnesses, I

12   believe, are -- and this was not on my list of things to

13   discuss today --

14          THE COURT:  I know.  I apologize.

15          MR. WERTKIN:  But I believe some of those

16   witnesses are actually government witnesses.

17          MR. OLSON:  Not of that group.  And I

18   understand the position of the Court on that.  I think

19   the United States' only comment on that would be that

20   the evaluation of whether the witness is within one

21   hundred miles should be made at the time the witness is

22   called.

23          So if the witness happened to be in the

24   district, it wouldn't be unavailable.  That would be the

25   only, I think, caveat to your observation on the rule is

1    if there is case law that says it's at the time, at the

2    time --

3                THE COURT:  Right.

4                MR. OLSON:  We don't dispute that they are

5    outside the district.  As far as we know they still

6    reside outside the district.  That is as -- that is what

7    we understand the facts to be.

8                THE COURT:  Well, certainly if they are within

9    one hundred miles of the courthouse, instead of using

10   their deposition, you should put them on live.

11               But in terms of just a general across the board

12   that you can't use a deposition of Dr. Feliciano,

13   Dr. Arcieri and Dr. Chua, and I felt like it was

14   important for the defense to know up front whether they

15   would be able to use those witnesses by deposition.  And

16   I don't know if that is phase one or not.

17               MR. WERTKIN:  I think Dr. Feliciano is on our

18   list.  We intend to call him.  So, for those witnesses

19   --

20               THE COURT:  If you have subpoenaed him and he

21   can get here, okay.  I don't know how that works.  But

22   the objection was based on the defense using their

23   deposition.  So that was the only thing that was in

24   front of me.

25               We will do 329 this afternoon.  There are a

1  couple more things on there that I want to look at.  The

2  government's response is a bit long, so I needed a

3  little bit more time to work on it.

4       Defendant's motion in limine number 331 to

5  exclude undisclosed expert opinions and Government

6  Exhibits 300-A through 300-E, these deal with the

7  testimony of Dr. Liao.

8       As I understand, the government has categorized

9  the patients that he says are ineligible into -- is it

10  four different categories?

11       MR. CHRISTIE:  Yes, Your Honor.

12       THE COURT:  And the defense said he did not

13  include those categories in his opinion.  Is that --

14       MR. CHRISTIE:  He actually has different

15  categories in his report.  Would you like me to --

16       THE COURT:  Yes.

17       MR. CHRISTIE:  Your Honor, the government, in

18  its response, points out that there were patterns where

19  examples were given in Dr. Liao's report.  Those

20  patterns are, one, ineligible admissions and

21  recertifications; two, ignoring clinician's assessments;

22  three, impact of hospice admission on ineligible

23  patients; and four, inaccurate functional scores.

24       At his deposition, there was some discussion of

25  the pattern, but the only one of those that was

1   discussed at his deposition was ignoring the clinician

2   assessments.

3          And so if you go to the pages that they cite or

4   that they include in their deposition, the only part of

5   the pattern that there was more information provided

6   about had to do with ignoring clinician assessments.

7          The four groups that the government now has are

8   chronic but not terminal, improving, inaccurately

9   evaluated and treatable.  All right.  So you can see the

10  names are different.

11         Being perfectly frank, though, inaccurate

12  functional scores and inaccurately evaluated seem to be

13  about the same thing.  So there is that overlap.

14         You can make an argument that the impact of

15  hospice admissions on ineligible patients while -- and

16  treatable overlap somewhat.  That's a stretch, but that

17  one, at least, I will grant there is a good bit of

18  overlap between those two.

19         Of the four patterns that were named in his

20  report, two of them -- one of them overlaps, one of them

21  arguably overlaps and two do not.

22         We do have additional, not only categorization,

23  but a type of, I guess, opinions being added.

24         Now, I will also say that if you go to the

25  descriptions of the number of the patients that they

1  have improving, about half of them, somewhere in his

2  description he says improving.

3         And we're not trying to say that if he said the

4  patient was improving when he provided his report, they

5  can't have him testify about the patient improving now.

6         But to come up with a category, you're adding

7  patients to it that he never said were improving and

8  adding those to it.  The chronic but not terminal one is

9  even more unusual in the sense that there was -- there

10 were -- there were actually five patients where he used

11 the word "chronic" somewhere in their description and

12 only one of those appears in the chronic but not

13 terminal category.

14        So, it seems just to be a catch all for just

15 not terminal under Dr. Liao's opinion.  So, if they want

16 to call all these people not terminal, that's fine.  But

17 the chronic part doesn't come from his report.

18        Now, the final part about this is that they

19 have got these summaries, I mean, this has my

20 handwriting on it (indicating) --

21        THE COURT:  That's okay.

22        MR. CHRISTIE:  They're not summaries of

23 anything.  So clearly --

24        THE COURT:  They are just lists of patients

25 that fall under that category.

1          MR. CHRISTIE:  Yes.

2          THE COURT:  And I wanted to ask of the

3  government where those lists within each category came

4  from and how were these lists compiled.  Did Dr. Liao

5  compose them or did somebody else compose them?

6          MR. WERTKIN:  Eva, you can respond to that.

7          MS. GUNASEKERA:  Dr. Liao actually created

8  these, these lists in an attempt to help streamline his

9  expert opinion for the jury so that they would have a

10  framework that would be easier to understand than just

11  his opinions on any one patient.

12          And so to respond to --

13          THE COURT:  Did he come up with these new

14  category names?

15          MS. GUNASEKERA:  They're not new, Your Honor.

16  They actually are consistent with the patterns that

17  Chris spoke about.

18          So, when he has describing a chronic patient,

19  he didn't necessarily use the term chronic, he would

20  reference the patient as stable --

21          THE COURT:  My question is whether these

22  categories appear anywhere in his report.

23          MS. GUNASEKERA:  They do, Your Honor.

24          THE COURT:  As categories with these titles.

25          MS. GUNASEKERA:  Yes.

1          THE COURT:  Show me his report and show me

2   where he says that.

3          MR. WERTKIN:  I mean, first, it's helpful, at

4   least internally, that we have been talking about these

5   as groupings as opposed to categories because Dr. Liao

6   is not going to say this person was chronic but not

7   terminal, but not improving or not inaccurately

8   evaluated.

9          He might actually stand up and be able to say,

10  based on his report, the actual findings in his report,

11  that they -- while this patient is also inaccurately

12  evaluated but also improving and also chronic.

13         The reason why we don't think about them in

14  terms of categories is because we're not --

15         THE COURT:  Use the term groupings.  Where in

16  his report did he use these grouping labels?  Show me

17  his report --

18         MR. WERTKIN:  In his report, he identifies in

19  the first section --

20         THE COURT:  Do you have his report?

21         MS. GUNASEKERA:  I do, Your Honor.

22         THE COURT:  I want you to show it to me.

23         MS. GUNASEKERA:  I have notations on mine.  I

24  apologize.

25         THE COURT:  That's fine.

1          MS. GUNASEKERA:  This is Dr. Liao's report,

2    Your Honor.  And then if you turn the page, these are

3    the patterns that he identified.

4          THE COURT:  Okay.  Let me -- those are the ones

5    that you were referring to?

6          MS. GUNASEKERA:  Yes.

7          THE COURT:  Ineligible admissions and

8    recertifications is one.  Where on these new lists do

9    these patients that are listed under the pattern

10   ineligible admissions and recertifications, where do

11   they appear?

12         MS. GUNASEKERA:  So, as Jeff mentioned, Your

13   Honor, these patients fall within multiple categories.

14         So, some of these patients --

15         THE COURT:  I want you to show me which list

16   they are on.

17         MS. GUNASEKERA:  This might take a moment, Your

18   Honor, if you can let me find them because they are not

19   listed alphabetically.

20         Mr. Michael Berba, Your Honor, I have

21   highlighted at number 32.

22         THE COURT:  Under what?

23         MS. GUNASEKERA:  Under chronic but not

24   terminal.

25         THE COURT:  Do the others under this list fall

1  in this same grouping of chronic but not terminal?  Or

2  has he changed his placement of patients as well as

3  changing the title of the pattern?

4      MS. GUNASEKERA:  So, he hasn't actually changed

5  the placement.  Many of these patients actually fall

6  within multiple categories.

7      So, in an attempt to just --

8      THE COURT:  Okay.  I want to know if Margaret

9  Wilkinson is also on chronic but not terminal.

10      MS. GUNASEKERA:  She appears, Your Honor --

11      MR. CHRISTIE:  No, she is not, she is

12  inaccurately evaluated.

13      MS. GUNASEKERA:  But Dr. Liao's opinion is that

14  she is both inaccurately evaluated and a patient who had

15  a chronic condition that wasn't terminal.

16      THE COURT:  Well, why did he change the

17  placement where he put her?

18      MS. GUNASEKERA:  So he didn't, Your Honor.  He

19  could actually speak about Ms. Wilkinson in chronic but

20  not terminal.  But to avoid talking about patients

21  twice, he's decided to place them within a category that

22  would be easy for the jury to understand.

23      THE COURT:  Does Margaret Wilkinson in his

24  report appear under another pattern as well?

25      MS. GUNASEKERA:  In his report, he discusses

1  how Ms. Wilkinson has a chronic but not terminal

2  condition.

3            MR. CHRISTIE:  Your Honor, go to --

4            THE COURT:  Wait a minute.  And this goes for

5  all of y'all, please, if y'all will listen specifically

6  to the question that I ask and answer my specific

7  question, this goes not for just today, but forever,

8  we'll be able to move things along a lot quicker because

9  I'm trying to get to the real heart of the issues and I

10  know y'all want to tell me other things.

11            But until you answer my question, I'm not going

12  to let you tell me other things.

13            MS. GUNASEKERA:  Okay.

14            THE COURT:  So, does Margaret Wilkinson appear

15  in Dr. Liao's report under another pattern?

16            MS. GUNASEKERA:  She does.  Yes, Your Honor.

17            THE COURT:  Where?  Show me.

18            MS. GUNASEKERA:  So, he just summarized some

19  examples in the beginning.

20            MR. WERTKIN:  He doesn't identify the

21  patterns --

22            MS. GUNASEKERA:  A pattern for every single one

23  of the 123 patients.

24            THE COURT:  That is not my question.  My

25  question is, he has identified her here under ineligible

1  admissions and recertifications.

2        Does her name appear in his report under

3  another pattern that he identified in his report?

4        MS. GUNASEKERA:  No, Your Honor, it does not.

5        THE COURT:  So, he is not only changing the

6  titles for his patterns, he's also changing which

7  patients fall under which title of his groupings.

8        MS. GUNASEKERA:  No, Your Honor.  Because if

9  you go to his opinion on Ms. Wilkinson, he talks about

10  both patterns.

11        THE COURT:  Okay.  But he doesn't have her

12  listed in his report under any pattern other than

13  ineligible admissions and recertifications; yet, she's

14  identified at the same place as Michael Berba who is

15  listed under chronic but not terminal.

16        MS. GUNASEKERA:  This was intended to only

17  provide examples.  So, not all 123 patients were

18  identified in the beginning of his report under patterns

19  identified.

20        MR. WERTKIN:  If I can just clarify because I

21  think the disconnect is with the question.

22        What he --

23        THE COURT:  No.  The disconnect, I think, is

24  with what he said in his report and what he is now

25  saying in terms of categories or groupings of patients.

1          MR. WERTKIN:  If I may, if he had put together

2    a list of four groupings, and if he had categorized it,

3    for example, and said these patients are here, these

4    patients are here, these patients are here and then, two

5    weeks before trial, we said, oh, we're moving those

6    patients around, they're not really here, they're really

7    here, then arguably that would be a situation where

8    there would be a new opinion.

9          Your Honor, he didn't do that in his initial

10   report.  He didn't say all these patients are under this

11   category.  What he did --

12         THE COURT:  But he said that some of them --

13         MR. WERTKIN:  He identified --

14         THE COURT:  -- were under certain patterns

15   identified in certain groupings.

16         MR. WERTKIN:  Exactly right.

17         THE COURT:  Now he is changing which pattern

18   and grouping he is listing the patient in.

19         MR. WERTKIN:  Not really because he didn't list

20   all the patients in the first place.

21         THE COURT:  But the ones that he did list --

22         MR. WERTKIN:  Okay.

23         THE COURT:  -- some of those he is changing in

24   putting --

25         MR. WERTKIN:  I see your --

1          MS. GUNASEKERA:  You're absolutely correct, he

2     could talk about Ms. Wilkinson under chronic but not

3     terminal.  You are correct.  He can --

4          MR. WERTKIN:  We can put her in that category.

5          THE COURT:  Okay.  How does ineligible

6     admissions and recertifications fall under chronic but

7     not terminal?

8          MS. GUNASEKERA:  Dr. Liao's opinion, Your

9     Honor, is that a patient who had a chronic condition, a

10    stable condition, they weren't losing weight, they were

11    ineligible then for hospice for the time that they were

12    on it for that period.

13         So they had a chronic condition.  They had a

14    chronic heart condition that was stable for the entire

15    period that they were on hospice and, thus, they were

16    not terminal, so it was an ineligible period.

17         THE COURT:  Isn't he saying that all of these

18    are ineligible admissions?

19         MS. GUNASEKERA:  So, arguably, Your Honor, all

20    of them could fall within chronic but not terminal.  But

21    in the interest of explaining his opinion and

22    highlighting the specific issues that he saw in the

23    patient's medical record, Dr. Liao has grouped them in a

24    way where he's going to be highlighting a few of the

25    patients for the jury, and then he is going to be

1    generally describing the other patients that follow

2    those same clinical patterns.

3           THE COURT:  Is he going to be highlighting in

4    these groupings the patients that he highlighted in his

5    report or is he going to be highlighting some other

6    patients that weren't identified in his report?

7           MS. GUNASEKERA:  He can highlight the patients

8    that appear in the patterns identified in his report.

9           THE COURT:  Okay.  He can.  But is he going to

10   go beyond that in highlighting patients that were not

11   highlighted in his report?

12          MS. GUNASEKERA:  I mean, ideally, he would like

13   to.  But we can -- I mean, because patients fall within

14   multiple categories, and so, even though he highlights a

15   patient who is chronic but not terminal but isn't listed

16   here, that doesn't mean that they, I mean, he can talk

17   about the other categories --

18          THE COURT:  I'm not talking about talking about

19   other categories.  I'm talking about talking about or

20   highlighting patients in his testimony and in his

21   listing that he did not highlight in his report.

22          MS. GUNASEKERA:  Right.  So as --

23          THE COURT:  Are you anticipating him doing

24   that?

25          MR. WERTKIN:  Yes, we are.

1           MS. GUNASEKERA:  We are.  Because he didn't

2    identify all 123 patients with one of the patterns.  So

3    this was just intended to be an example.

4           So he didn't actually put them in this form,

5    all 123.  So yeah.

6           MR. WERTKIN:  Eva put this together, but I have

7    a little bit of --

8           THE COURT:  Eva put what together?

9           MR. WERTKIN:  This argument.

10          THE COURT:  But Dr. Liao did this or did y'all

11   do this?

12          MS. GUNASEKERA:  Dr. Liao did that.  That is

13   Dr. Liao's work.

14          MR. WERTKIN:  I think from the ten thousand

15   foot view, and I think this might help because it

16   certainly helped me understand it.  Dr. Liao identified

17   patterns in his report.  He didn't go through and list

18   every patient that was under the pattern.  He then

19   provided --

20          THE COURT:  I understand that.  And I'm not as

21   concerned about the ones that he didn't specifically

22   list as falling within a pattern.  I'm more concerned

23   about the ones that he identified as being within a

24   pattern that he's now identifying as being in a

25   different pattern.

1          And I think that that is, in essence, a

2    different opinion being expressed by him about that

3    particular patient.

4          MR. WERTKIN:  Your Honor should know that

5    Dr. Liao is not going to be offering any new opinions

6    about anything.  Everything he is going to testify to is

7    going to come straight from his narrative in his report.

8          Now, to the extent that he is going to -- to

9    the extent that they fall to multiple categories, we

10   expect him to say, well, this patient also has this

11   problem but we put her here because of this.

12         If Your Honor thinks that -- and we are happy

13   to do this.  If they have been identified there, we can

14   move them to the other pattern and he can explain just

15   on the flip side, well, this person could also be

16   discussed as inaccurately evaluated, but we're going to

17   talk about them in chronic.  That is completely fine.

18         To be clear, there is no new opinions that are

19   being offered here.  It's just a censuses of what he's

20   done in his narratives.

21         THE COURT:  I will say that I appreciate this

22   effort to streamline the testimony and to present it in

23   a way that would be easier for the jury to follow.  I

24   do.

25         But I am concerned about what appear to me to

1   be, and I think appear to the defense to be --

2          MR. CHRISTIE:  A supplemental expert report.

3          THE COURT:  Yeah.  And changing the

4   classifications or the placement of the patients.

5          But I will say this for the defense, I think

6   that gives you a heck of a lot of room in

7   cross-examination.  And depending upon what, if

8   anything -- what, if any, changes are made with this,

9   with the consent of defense between now and trial day, I

10  may even give the defense an opportunity to take

11  Dr. Liao on voir dire before any such exhibits come in.

12         So, that is kind of my thinking on this.  That

13  while it's questionable that there may be new opinions,

14  I think that the best way to handle it is in

15  cross-examination.  And, frankly, I would have a lot of

16  fun with that, if I were being the attorney.

17         Off the record.

18             (Off-the-record discussion)

19         THE COURT:  Back on.

20         MR. CHRISTIE:  Your Honor, there are two parts

21  to this.  One part is is that these exhibits, 300-A all

22  the way through 300-E are not summaries and they should

23  not go to the jury under any circumstance.

24         What we're really talking about is whether or

25  not Dr. Liao gets to use them to categorize the

1    patients.  And that, again, I see as a topic for

2    cross-examination would be appropriate.

3            But this is a supplemental report, these are

4    not summaries of anything that you can find, there is no

5    document that they can point to that says this is a

6    summary of Liao's report, Exhibit A, that does not

7    exist.

8            So, at least as to the exhibits themselves,

9    they are not appropriate Rule 1006 summaries.  They are

10   not summaries of anything.

11           MS. GUNASEKERA:  Your Honor, the pattern that

12   we're using and the groupings that we're using do appear

13   in Dr. Liao's report by patient.

14           So, all of the patients --

15           THE COURT:  But not all of them.

16           MS. GUNASEKERA:  Well, not at the beginning of

17   his report.  So when you go to the actual patient

18   opinion, and again, I apologize, ignore my chicken

19   scratch --

20           THE COURT:  That's fine.

21           MS. GUNASEKERA:  If you go to the actual

22   patient summaries, Your Honor, which are part of his

23   report, he describes the pattern for those patients that

24   are consistent with what is reflected on the

25   government's exhibit.

1          THE COURT:  But he did not put them into one of

2     these categories.

3          MS. GUNASEKERA:  He describes the category.

4          MR. WERTKIN:  You're right, Your Honor, he

5     didn't put them into one of the categories.

6          THE COURT:  But in reading this, you have to

7     then somehow discern where the heck he would be putting

8     them in one of his patterns.  And now the patterns are

9     changing names, too.  So --

10         MS. GUNASEKERA:  The intent is exactly what

11    you're saying, so that the jury isn't totally

12    overwhelmed with all these individual little opinions of

13    each patient, Dr. Liao had the foresight of wanting to

14    group them so that he can talk about, this is what I

15    mean by chronic not terminal, this is a patient who had

16    a chronic but not terminal heart condition.  He can talk

17    to the jury in detail about that one patient and then

18    talk about the other examples that follow of why that --

19    those other patients are also chronic but not terminal.

20         So it's all in the interest of helping the jury

21    understand his opinions.

22         THE COURT:  I'm going to reserve ruling on the

23    exhibits themselves.  Like I said, we may have voir dire

24    on him about it before it's admitted.

25         My leaning would be that at least they would be

1  demonstrative, whether they would actually be admitted

2  as exhibits, I'm going to reserve ruling on because I

3  want more information from Dr. Liao as to how he came up

4  with these new categories or groupings.

5          MR. WERTKIN:  We don't want the jury to think

6  they are categories --

7          THE COURT:  Groupings.  I will try to remember

8  that that is the term to use.

9          MS. GUNASEKERA:  Thank you, Your Honor.

10          THE COURT:  So, as to the -- actually, this

11  really wasn't aimed at the testimony as much as the

12  exhibits themselves.

13          MR. CHRISTIE:  Yes.

14          THE COURT:  So, I'm going to withhold ruling --

15          MR. WERTKIN:  Can I ask a clarification

16  question?

17          THE COURT:  Yes.

18          MR. WERTKIN:  With regard to in opening

19  statement or previewing the jury --

20          THE COURT:  Before we go on to something else,

21  let me go back to this.  Actually, I'm going to deny the

22  motion but require that before he starts talking about

23  any of these charts or before they're shown, we'll have

24  a conversation.  Okay?

25          MR. WERTKIN:  What about in terms of previewing

1  the case for the jury in an opening statement about the

2  groupings?

3       THE COURT:  My standing procedure in terms

4  of -- are you talking about utilizing these exhibits?

5       MR. WERTKIN:  Not utilizing the exhibits, but

6  just saying to the jury, you're going to hear from the

7  government's expert and he is going to talk about how

8  there are all these patients that are ineligible, he has

9  grouped them together into four groupings, they are not

10  categories, but they are just groupings, this is what

11  you're going to hear.  Very summary --

12       THE COURT:  As to his testimony, which is not

13  really a part of this motion, you can tell them what you

14  anticipate his testimony being.

15       Again, I think defense will have a lot of fun

16  in cross-examining him about the changing of the

17  groupings or the placement of the patients and things of

18  that nature.

19       While we're talking about opening and use of

20  things, my standing procedure is if the parties can

21  agree on use of an exhibit prior to it being admitted,

22  everybody knows it's going to come in and y'all want to

23  use it or demonstrative to be used in opening statement

24  or Power Point or anything like that, as long as y'all

25  agree with each other, my hands are off and y'all can do

 1   what you want.

 2          MR. WERTKIN:  Those exhibits would be deemed

 3   admitted for trial as well --

 4          THE COURT:  If y'all agree that something is

 5   coming in.

 6          MR. WERTKIN:  If we agree.

 7          THE COURT:  And we have, I think, talked before

 8   about pre-admitting some exhibits.  You just need to get

 9   with Frankie on that.  If y'all agree that one, two and

10   three are all coming in and we can go on and get them

11   done, that can streamline the process as well.

12          MR. WERTKIN:  We will work on that, Your Honor.

13   Thank you.

14          THE COURT:  All right.  Any other questions or

15   need for any clarification on 331?

16          MR. LEMBKE:  Your Honor, you're not making a

17   definitive ruling on whether it's a 1006 summary at this

18   point, right?

19          THE COURT:  No, I'm not.  I'm saying -- sorry.

20   Give me a minute.

21                    (Brief pause)

22          THE COURT:  I have brought Michelle Wales in to

23   also help on this case.  This isn't Joseph's first

24   trial, it's certainly his first big one, and Michelle

25   has been around a while and is going to help us some,

1    too.  If y'all haven't met her, you need to.

2           Number 334, which is AseraCare's motion in

3    limine to exclude undisclosed expert opinions and audit

4    summary exhibits.

5           We're talking about apparently Rebecca Rivers

6    who is in the office of audit services for who -- who is

7    she with?

8           MS. GUNASEKERA:  Department of Health and Human

9    Services.

10          THE COURT:  She prepared Government's Exhibit

11   600 to 608, right, which are at the heart or the

12   basis --

13          MS. GUNASEKERA:  That's correct, Your Honor.

14          THE COURT:  -- of the motion.  And what she

15   did, as I understand, was take the internal audits,

16   these were the internal audits, not the ones by the

17   Corridor, that's a separate --

18          MS. GUNASEKERA:  Different issue.

19          THE COURT:  -- issue.  According to the

20   government, summarized them; according to the defense,

21   they're not summaries.  And this is something that she

22   regularly does in her job as senior auditor for the

23   Office of Audit Services, Office of Inspector General at

24   DHHS.

25          MS. GUNASEKERA:  That's correct, Your Honor.

1          THE COURT:  Okay.  I'm trying to figure out

2     which one of these briefs I'm referring to.

3          This is what I wanted to ask you about.  Her

4     summaries don't exactly track the audits, the R&O

5     audits; is that what they're called?

6          MS. GUNASEKERA:  It's short for reimbursement

7     and outcome audit.

8          THE COURT:  Right.  But her summary focuses on,

9     if I'm not mistaken, I'm looking at the exhibit to the

10    defense submission, Exhibit A that deals with Neva, I

11    think, if I'm not mistaken, her audit looks at the

12    section that deals with documentation.

13         MS. GUNASEKERA:  Correct, Your Honor.

14         THE COURT:  Where it says documentation

15    supports hospice eligibility according to terminal

16    illness and co-morbidities; right?

17         MS. GUNASEKERA:  Yes, Your Honor.

18         THE COURT:  But is that section of the audit

19    addressing the patient's eligibility or addressing what

20    records were actually provided to that auditor?

21         MS. GUNASEKERA:  It's both, Your Honor.

22    AseraCare's reimbursement and outcome audit evaluated a

23    patient's hospice eligibility based on the documentation

24    in the patient's record.

25         So, if you're looking at Defendant's Exhibit A,

1   it says, specifically, documentation supports hospice

2   eligibility according to terminal illness and

3   co-morbidity.  That is the language from AseraCare.

4          THE COURT:  But you also have the -- what am I

5   looking at, Exhibit B, where it reflects hospice

6   eligibility, specifically, right?

7          MS. GUNASEKERA:  It begins with -- and am I

8   looking at the --

9          THE COURT:  Exhibit B.

10          MS. GUNASEKERA:  It begins with documentation,

11   it references documentation.  And Exhibit B is based on

12   an AseraCare auditor who reviewed the patient's medical

13   record, the documentation in the patient's medical

14   record, and then they rendered an opinion that the

15   patient was or was not eligible for hospice.

16          THE COURT:  Right.  And the hospice eligibility

17   portion reflects, yes, one hundred, right?

18          MS. GUNASEKERA:  That's correct, Your Honor.

19          THE COURT:  So, the determination of that

20   auditor was, in fact, that Neva C. was eligible.

21          MS. GUNASEKERA:  That's correct, Your Honor.

22          THE COURT:  Yet, in the so-called summary

23   report that Ms. Rivers did, it only focuses on that

24   question about whether there was documentation that was

25   provided.  And I read somewhere that they were looking

1  at information that was emailed to them or something

2  for -- to the auditor, not looking at the full medical

3  record at that point.  Right?

4          MS. GUNASEKERA:  Your Honor, you are correct

5  that the summaries are a summary of this document of

6  what's under Exhibit A and of that --

7          THE COURT:  Under the section that deals with

8  documentation.

9          MS. GUNASEKERA:  That's correct.

10          THE COURT:  But that's not necessarily

11  reviewing all the documentation that's in the medical

12  records or all the documentation that was sent to HHS on

13  Neva C., right?

14          MS. GUNASEKERA:  So, Your Honor, all that was

15  sent to Ms. Rivers was this -- were thousands of pages

16  of what you see as Exhibit A.  And all that she was

17  doing --

18          THE COURT:  Okay.  Wait.  That's not what I'm

19  asking.

20          The person who did this audit, what

21  documentation did that person have to do this audit and,

22  if they're doing an audit, somebody has to give them the

23  information to review.

24          MS. GUNASEKERA:  Absolutely, Your Honor.

25          THE COURT:  And I read somewhere about that

1   audit being done based upon information that was emailed

2   to them --

3          MS. MARTIN:  It's in Exhibit C, Your Honor, to

4   our motion where it talks about what was actually

5   received by R&O at the time.  Which may or may not --

6          THE COURT:  Okay.  Scanned for us, all

7   documentation scanned for us.

8          MS. GUNASEKERA:  You're absolutely right, Your

9   Honor.  To the extent that AseraCare wants to argue that

10  their own R&O audit, this conclusion is incorrect --

11         THE COURT:  That's not a conclusion, though.

12         MS. GUNASEKERA:  Or this listing of

13  documentation supports hospice eligibility based on what

14  they see in -- provide in Exhibit C, they can do that.

15         But what Ms. Rivers did was she was given these

16  thousands of pages of audits and all she did was take

17  what was listed here and provide a summary and just

18  notate no or yes, whatever is reflected there.

19         THE COURT:  Isn't that taking one item totally

20  out of context when the auditor actually reached a

21  different result about eligibility of the patient?

22         MS. GUNASEKERA:  Well, based on this record,

23  Your Honor, it appears that way.  But these are both

24  records from AseraCare.

25         So, AseraCare's conclusions for the

1   reimbursement and outcome audits appear on Exhibit A.

2           THE COURT:  This is not a conclusion.

3           MS. GUNASEKERA:  AseraCare's findings of the

4   audit appear on Exhibit A.  We have chosen to take these

5   thousands of pages of records and summarize one line,

6   essentially.  To the extent they want to cross-examine

7   her or the auditors themselves on what they reviewed to

8   come to that conclusion, they can certainly do that and

9   they can also put into evidence any other documents

10  related that didn't go to their own auditors, to their

11  own reimbursement and outcome auditors.  Because that's

12  the argument that they are making for Exhibit C is that

13  the reimbursement and outcome auditors didn't receive

14  all the documentation.

15          THE COURT:  But they said that they did before

16  coming up with the ultimate conclusion that the patient

17  was eligible.

18          MS. GUNASEKERA:  And we would beg to disagree,

19  Your Honor, as to whether this is an ultimate

20  conclusion.  I mean, just as they're maintaining this

21  isn't a conclusion on Exhibit A, it is unclear to us

22  whether Exhibit B is a conclusion either.

23          THE COURT:  Okay.  But it says results, doesn't

24  it?  Agency summary for score card results.

25          MS. GUNASEKERA:  That's correct, Your Honor.

1          THE COURT:  So, they take this entire score

2     card, check sheet and review it in its entirety instead

3     of pulling one line item out and reach the conclusion

4     that the person is eligible.

5          MS. GUNASEKERA:  Well, Ms. Rivers isn't going

6     to be providing any opinion testimony.  So you're

7     absolutely right.  She's not going to be concluding

8     anything.  She is simply going to be informing the jury

9     that she pulled this line and summarized it.  Because

10    the alternative, Your Honor, is that the United States

11    would have to then put thousands of pages of R&O audits

12    in front of the jury and highlight that line page after

13    page after page.

14          To avoid that, Your Honor, we just took all of

15    those lines and put it into one document.  And to the

16    extent that AseraCare wants to dispute us taking that

17    one line, they certainly can do that with this other

18    documentation that they append to their motion.

19          But we don't want to be in a position where

20    we're having to put on thousands of pages of R&O audit

21    in front of the jury to highlight this one line when

22    it's already pulled out in Ms. Rivers' exhibits.

23          THE COURT:  Well, I'm not sure that that one

24    line addresses the finding of ineligibility that you

25    want to use it for.

1          MS. GUNASEKERA:  Ms. Rivers isn't going to be

2   providing an opinion on a finding of ineligibility or

3   not.  She is simply going to say this is what -- this is

4   the line that I pulled from.

5          And so again, to the extent that AseraCare

6   wants to draw any kind of inference about what she did

7   was incomplete or inaccurate, they can certainly do

8   that.

9          THE COURT:  Where is the exhibit?

10          MS. GUNASEKERA:  I have a copy of it, Your

11   Honor.  Here is one of the summary exhibits

12   (indicating.)

13          So, you'll see all she simply said was, take

14   what was on that line and notate what AseraCare's

15   auditor notated on that record.

16          MR. CHRISTIE:  Your Honor, these words don't

17   appear on the page that she supposedly is summarizing

18   (indicating).  That's the problem.

19          MS. GUNASEKERA:  Your Honor, the case law

20   provides that it doesn't need to be a verbatim copy.

21          THE COURT:  No.  But it also doesn't need to be

22   misleading.

23          MS. GUNASEKERA:  Of course, Your Honor.

24          THE COURT:  There are a lot of cautions about

25   using summary exhibits, I think precisely for this

1    reason.

2           MS. GUNASEKERA:  Absolutely.

3           THE COURT:  It's taking one item out of -- I

4    don't know how many entries are on that score card, and

5    highlighting it for a purpose other than its intended

6    one and using language that is intended to convey to the

7    jury that these patients were not eligible for hospice

8    --

9           MS. GUNASEKERA:  Your Honor --

10          THE COURT:  -- when we don't know what records

11   they were reviewing to make a notation, one out of one

12   hundred or so on there, that the -- and the section

13   dealing with documentation, like documentation reflects

14   needs, goals of patient family representative.  That

15   doesn't have anything to do with eligibility.  That has

16   to do with the quality of hospice care that's being

17   provided.  But looking only at the documentation, not

18   whether it's actually being done.

19          MS. GUNASEKERA:  And, Your Honor, I should have

20   mentioned, we are planning to call Ms. Susan Gerhart who

21   was AseraCare's director of reimbursement and outcome

22   audits, and she will explain the document that

23   Ms. Rivers was pulling from even before Ms. Rivers

24   testifies about her summary document.

25          So, we intend to elicit testimony from

1   Ms. GERHART that explains why what Ms. Rivers did is in

2   fact accurate and correct and can be used to describe

3   the audits and the manner in which Ms. Rivers is

4   describing them.

5         So, Ms. GERHART, we're intending for

6   Ms. GERHART to go through the big spreadsheet, an

7   exemplar of the big spreadsheet, that Ms. Rivers then

8   took to create the summary and explain what each of

9   those lines mean and explain what the auditors -- what

10  the documentation was that was sent to them and explain

11  what each of those entries of yes, no, N/A mean for each

12  of those line items.

13        So, we will have set all of that up for the

14  jury, Your Honor, well before Ms. Rivers is going to be

15  called by the United States to talk about these summary

16  exhibits.

17        And at that time if AseraCare wants the

18  opportunity to cross Ms. GERHART as to what each of

19  these line entries mean and whether, in fact, they are

20  accurate or not, they are absolutely entitled to do

21  that.

22        But we intend to lay that foundation before we

23  have Ms. Rivers testify as to these exhibits.

24        MR. CHRISTIE:  Ms. GERHART is the author of the

25  email that is Exhibit C that you were looking at

1    earlier.  What Ms. Gunasekera is suggesting is that

2    Ms. GERHART is going to testify in a way that is

3    inconsistent with the email that she provided because

4    the only way that you could get to the result that she

5    is suggesting is for testimony that is inconsistent with

6    the way that AseraCare actually used the audits.

7              THE COURT:  And what they were actually looking

8    for.

9              MR. CHRISTIE:  Yes.

10             MS. GUNASEKERA:  Respectfully, Your Honor,

11   Chris is making an assumption that that's what we intend

12   to do.

13             We intend for Ms. GERHART to explain the

14   document that Ms. Rivers was using to make the summary.

15   How she explains that and how AseraCare chooses to rebut

16   that explanation, further explain, they can certainly do

17   that.  They can put exhibits in front of Ms. GERHART and

18   how she testifies, the United States will just have to

19   wait and see.

20             For that reason, Your Honor, we would

21   respectfully request that you reserve ruling on these

22   exhibits until we hear from Ms. GERHART.

23             THE COURT:  I will reserve ruling on it to

24   this, except to this extent:  I think the heading is

25   misleading.  If it said documentation supports hospice

1   eligibility, I think that would address at least one of

2   the objections by the defense.

3           MR. CHRISTIE:  Your Honor, she actually is

4   summarizing probably five different wordings, and so

5   it's not just that one phrasing that you use, the

6   documents that you used was about half of them and that

7   was used for 2009 to about 2011, I believe.  There were

8   variations within that time period, and then there was a

9   different document used after that and a different

10  document before that.  And she is summarizing all of

11  them as if they're saying the same thing, paraphrasing

12  or rewording them as the government wants to have it

13  worded.  But it's not even the same words.

14          THE COURT:  But the score card, I think, is

15  what it's referred to at one point, it's looking at

16  something different in those subsequent years?

17          MS. MARTIN:  I mean, there were -- this form

18  that is Exhibit C was not used until 2009.  And there

19  are forms that were used earlier in 2008 that contain

20  completely different wording and language and do not

21  contain any of the language that is found on the summary

22  exhibit.

23          This form was used from 2009 till about 2011

24  when it became an electronic form.  So, the language

25  changed from the -- from 2009 to 2011, it was consistent

1    with what is in front of the Court there, it then

2    changed to be an electronic form, and there was

3    different language and different wording on that form.

4           So, these 600 to 608 exhibits take all three of

5    those forms, lump them together and focus on different

6    categories from each, none of which say what the

7    headings are on top of that form.

8           THE COURT:  Okay.  Can somebody show me the

9    language that was used on the different ones -- that

10   would be something I would want to also see before

11   making a ruling on that.

12          MS. GUNASEKERA:  In our response, Your Honor,

13   we actually provided you, in twenty -- so 2009 and 2011,

14   you have before you, Your Honor.

15          In 2012, in the United States' reply, the title

16   was --

17          THE COURT:  Okay.  I remember this one.

18   Documentation is legible and supports hospice

19   eligibility.  That is where I really started focusing on

20   the documentation itself that was provided.  And that

21   said to me that they're looking to see that the

22   documentation is there and can be read.

23          MS. GUNASEKERA:  Again, Your Honor, we would

24   maintain, Ms. GERHART can explain these titles and she

25   can actually inform the jury as to the titles that's

1   been changed over the years and she can further inform

2   the jury what that title means as the AseraCare

3   reimbursement and outcome director of audits.

4          THE COURT:  In Ms. Rivers' declaration that was

5   attached to your docket 352, which is the response to

6   these, under item five, she says that the specific

7   information that she entered into excel included C,

8   AseraCare's auditors' determination of whether the

9   patient's medical records supported hospice eligibility.

10         MS. GUNASEKERA:  So, Your Honor, she is

11  intending to just capture the title.  So the title that

12  we were looking at, Your Honor, was documentation

13  supports appropriateness of continuing hospice.

14  Documentation is legible and supports hospice

15  eligibility.

16         So she is just simply paraphrasing from that

17  title.

18         Again, Your Honor makes a fair inference that

19  can be discovered through Ms. GERHART, what does that

20  title mean, does it mean what Your Honor is inferring

21  that it means, or does it mean some other conclusion.

22         THE COURT:  That the auditor determined that

23  the patient was not eligible for hospice.

24         MS. GUNASEKERA:  Absolutely, Your Honor.

25  Ms. GERHART can explain that.

1    THE COURT:  Which I don't see how that one
2  entry does that, particularly when the calculation or
3  the results, summary of the results, shows otherwise.
4  That is, in my opinion, the determination, we'll hear
5  from Ms. GERHART as to how it actually works.  But I
6  have real reservations about your exhibit with the
7  heading and the form that it is in.  Because I think it
8  improperly suggests something to the jury that right now
9  I'm not buying as what that one item is suppose to be.
10    And you say she's not making any opinions or
11  drawing any conclusions.  Yet, she did make an
12  independent determination that that one field reflected
13  the auditor's determination of whether the patient --
14  the patient's medical records, when we don't know if
15  they looked at them all, determined that the patient was
16  not eligible.
17    In other words, she made the determination that
18  that one item was the one that the auditor used to score
19  eligibility.
20    MS. GUNASEKERA:  Your Honor, actually when she
21  wrote determination, she was intending to reference the
22  AseraCare auditor's determination.
23    So, again, Ms. GERHART can explain what that
24  means, what that line entry is intended to mean.
25    Your Honor, we would maintain, and we are happy

1   to revise these exhibits so that they reflect the actual

2   language from that line item by year, if we are given

3   the allowance to resubmit these exhibits to the

4   defendants and to the Court.  We would maintain -- we

5   can change that title so that it is verbatim, what

6   appears on --

7           THE COURT:  It doesn't have to be the whole

8   entire thing.  But certainly capture what it was that

9   that line item was examining.

10          MS. GUNASEKERA:  We can do that.

11          THE COURT:  Do that and I will consider it

12  after I hear from Ms. GERHART.

13          MR. CHRISTIE:  Your Honor, there's the whole

14  issue about we're having someone put together what

15  they're calling summaries and she is a senior auditor.

16  This is not something that a layperson can do.  She is

17  providing expert testimony.

18          Can I address this issue some more?

19          THE COURT:  Yes.

20          MR. CHRISTIE:  If you go to the government's

21  opposition on Pages 7 and 8, starts on Page 7 and flips

22  over to Page 8, they say, as Ms. Rivers has stated, she

23  never analyzed nor interpreted the information in

24  creating the summaries, Rivers' declaration at paragraph

25  eleven.

1    Do you see where I am?

2    THE COURT:  Starting at the bottom.  Okay.

3    MR. CHRISTIE:  All right.  So, go to her

4    declaration now --

5    THE COURT:  Neither analyzed nor interpreted.

6    And it seems to me that she's making an interpretation

7    as to what that line item means and is about.

8    MS. GUNASEKERA:  So, Your Honor --

9    MR. CHRISTIE:  Yes.

10    MS. GUNASEKERA:  -- as I explained, she is just

11    taking that entry and she is noting did they write a

12    yes, a Y, N or N/A.

13    THE COURT:  Who came up with the title for that

14    column?

15    MS. GUNASEKERA:  So, that was something that in

16    Ms. Rivers' review of the audit she recognized that the

17    title that AseraCare used changed.

18    So, to be consistent and to again summarize,

19    she created that title.

20    Now, Your Honor, again, we would maintain, we

21    are able and happy to change that title that appears on

22    that exhibit as it changed through the years by

23    AseraCare's auditors as reflected there.

24    THE COURT:  You understand what I'm saying,

25    that she did interpret the information or she --

1          MR. CHRISTIE:  Analyzed.

2          THE COURT:  In coming up with the title that

3    she put on that column, she did analyze it.  But I will

4    say this to kind of short circuit it.  I think she can

5    testify the same way that a police officer can testify

6    about what codes mean in drug cases because it's part of

7    his business to know that and it's an opinion but it's a

8    lay opinion that I think is admissible in this kind of

9    case.

10         Now, that is not to say that I don't still see

11   problems with it because we're going to have to figure

12   out what it was she was working on.

13         MR. LEMBKE:  Your Honor, she didn't write these

14   documents.  So it's not like she's telling us the

15   meaning of the document she wrote.

16         THE COURT:  Exactly.

17         MR. LEMBKE:  And it seems like sort of a

18   consistent theme throughout all of this is a very

19   expansive and I think overbroad use of Rule 1006

20   summaries.

21         When you start talking about -- we're going to

22   need the testimony of another witness to explain what

23   the meaning of the summary is, the summary is suppose to

24   be clear from just the documents alone, on the face of

25   the rule, you are suppose to be able to go to the

1  documents, which are suppose to be in the courtroom,

2  look at them and there they are.

3       When you start saying, well, we are going to

4  need a witness to explain and connect the dots, I don't

5  think that is what Rule 1006 is suppose to be.  And they

6  are making it into an advocacy piece for argument sake

7  rather than a true summary.

8       MR. WERTKIN:  That point is well taken by, you

9  know, saying that if it doesn't accurately -- if it

10 doesn't have the verbatim words, it could be seen as an

11 interpretation.  And that certainly is not our purpose

12 here.

13      We have got thousands and thousands of pages

14 that we're just trying to present in a summary way.

15 Those pages will be in the courtroom, the jurors or Your

16 Honor will be able to say, okay, this notation comes

17 exactly from this page and that's all that we're trying

18 to do.

19      I think Eva's suggestion to go ahead and change

20 it to the verbatim words will alleviate that concern and

21 ultimately, you know, is exactly what Rule 1006 is

22 suppose to do, if it's exactly what it's in those pages

23 themselves.

24      THE COURT:  As I said, I'm going to reserve

25 ruling on the exhibits themselves until I hear what that

1   item is suppose to be reflecting.  And if it is suppose

2   to be the determination of the auditor as to whether the

3   patient was eligible, that would be one thing.

4          But if it is merely a reflection of what

5   documentation they specifically had at the time that

6   they were looking at that, then that exhibit and that

7   testimony of Ms. Rivers may not be coming in.

8          MS. GUNASEKERA:  Thank you, Your Honor.  Would

9   we also be granted leave to revise the exhibits?

10          THE COURT:  Yes.

11          MS. GUNASEKERA:  As you have suggested.

12          THE COURT:  Defense has to -- to break them out

13   by the years and the language -- we'll see.

14          MS. GUNASEKERA:  Okay.  Thank you, Your Honor.

15          MR. WERTKIN:  Before we switch seats, which one

16   do you want to do next?

17          THE COURT:  Number 335.  One thing I didn't

18   mention on that exhibit is I think the key question that

19   the Court has to answer in determining whether a summary

20   exhibit is entered is whether it is an accurate summary

21   of what they purport to summarize.  And that's where I

22   have got the real problem with that column.

23          MS. GUNASEKERA:  Understood, Your Honor.

24          THE COURT:  Number 335 is AseraCare's motion as

25   it relates to former relators and their financial

1    interest.

2           This is another one where I was getting all

3    excited about cross-examination.  And I really do think

4    that this information is more appropriate for cross than

5    for excluding of their testimony.

6           I did think it was interesting that the

7    government made a big deal that their agreement was not

8    contingent upon agreeing to testify truthfully.  I

9    thought that was kind of interesting and distinguishing

10   it from another case.

11          Anyway, I'm going to deny that one and, again,

12   I think that just makes it very fertile for

13   cross-examination.

14          Now, there is a related issue that may be in

15   the government's omnibus.

16          MR. LEMBKE:  There is, Your Honor, about the

17   magnitude of the money.

18          THE COURT:  Magnitude.  And I'm going to deny

19   that as to the government's motion to preclude defense

20   from questioning the relators about how much money they

21   expect to get.

22          I'm not going to allow the defense to talk

23   specifically about trebling damages and those kind of

24   things, but they're not going to be limited to the

25   sixty-seven million that the government is talking about

1   as the single layer of damages.

2          MR. LEMBKE:  We understand, Your Honor.

3          THE COURT:  Okay.

4          MR. LEMBKE:  Thank you.

5          MR. BARGER:  Your Honor, if I may, the relators

6   have filed a motion to strike that pleading as well.

7          THE COURT:  What?

8          MR. BARGER:  The relators have filed a motion

9   to strike that entire motion in limine because it

10  improperly references ethics rules and it casts

11  dispersions on counsel, it suggests that we have

12  violated the Alabama ethics rules.

13         THE COURT:  When was that motion filed?

14         MR. BARGER:  It was filed on Monday, the same

15  day that the --

16         THE COURT:  It's not on my motions report that

17  we ran last night.

18         MR. BARGER:  It was opposition and motion to

19  strike, relator's opposition and motion to strike.

20         MR. LEMBKE:  Number 358.

21         THE COURT:  It didn't show up as a motion.

22  What is the number of it?

23         MR. LEMBKE:  It's 358, Your Honor.

24         THE COURT:  I can't rule on something I haven't

25  seen.

1      MR. BARGER:  The reason that we moved that, as

2  you can understand, all of the relator's counsel and the

3  Department of Justice counsel, we -- this is our --

4      THE COURT:  What is it you are seeking to

5  strike?

6      MR. BARGER:  We just want any reference to the

7  fact that people -- that counsel for relators have

8  violated Alabama ethics rules to be struck.

9      THE COURT:  What document is it that you're

10  seeking to strike?

11     MR. BARGER:  The entire motion in limine that

12  we were just discussing.

13     MR. WERTKIN:  Number 335.

14     THE COURT:  The one I just denied?

15     MR. BARGER:  Yes, Your Honor.

16     THE COURT:  I'm not going to strike it because

17  I do think it goes to a lot of things that could bear on

18  the bias of the witnesses.

19     MR. BARGER:  We absolutely agree.

20     THE COURT:  And I think it's absolutely totally

21  fair game.

22     MR. BARGER:  We agree as well.  But I think

23  references to the Alabama ethics rules are what is

24  concerning to counsel.

25     I completely agree, I agree with Your Honor, I

1   would love to be the person using that cross-examination

2   of witnesses.  I think it's fertile ground for

3   cross-examination.  If I were on the other side, that

4   would be a fun thing to do.  I believe that.

5          But to the pleading itself, the motion itself,

6   suggests that counsel for relators and counsel for the

7   United States of America have violated Alabama Ethics

8   Rule 3.4.

9          And that is inflammatory, that is casting

10  dispersions on Officers of this Court, it threatens my

11  livelihood.  It is -- it has no bearing in this.

12         And I don't think anybody is going to suggest

13  that cross-examination based on an Alabama ethics rule

14  would be a legitimate cross-examination.  Certainly that

15  a witness may receive money may be but not some

16  reference to the Alabama ethics rules.

17         That is a publicly filed document that will

18  live forever casting dispersions on everyone on this

19  side of the table.

20         MR. CHRISTIE:  The document was carefully

21  drafted not to do what Mr. Barger says it is doing.  We

22  just pointed out the fact that you are not suppose to

23  pay fact witnesses and these are fact witnesses.

24         MR. BARGER:  Well, our brief points out the

25  language that is extremely inflammatory, suggesting that

1  the honor of the Court has been compromised, that

2  lawyers have -- it's right there in your brief, Chris.

3        MR. CHRISTIE:  You are merely talking about

4  quotes from -- Your Honor, he is talking about quotes

5  from another case.

6        THE COURT:  Yeah.  And quotes from the Golden

7  Door case from Florida and also quotes from the former

8  Alabama Rules of Professional Conduct, right?

9        MR. CHRISTIE:  As quoted in the motion, yes,

10 Your Honor.

11       MR. BARGER:  I don't see what it serves anybody

12 at this table to have that language remain on the

13 docket.  We asked counsel, through email, to elaborate

14 for us if any of us -- if they believed we had violated

15 any ethics rule, and they said that the document spoke

16 for itself, they couldn't identify any ethics

17 violations.

18       As part of my duty, I contacted the State Bar

19 and asked them if there was an ethics violation and they

20 were sort of flabbergasted and didn't understand and

21 said absolutely not.

22       So, I don't think that this needs to be out

23 there.  And I'm offended by it and I don't want it on

24 the record.

25       MR. LEMBKE:  Your Honor, for purposes of the

1    appellate record in this case, if there is an appellate

2    record, if he is talking about expunging it from the

3    record, that's not proper because while we understand

4    and respect the Court's ruling, I mean, it's a ruling

5    that would be one of many rulings that who knows if it

6    would ever become relevant on any appeal in the case.

7            So, I don't think you can just expunge it from

8    the record, since the Court has ruled on the motion.

9            THE COURT:  I don't think I can either.  And I

10   do think it is an important issue that certainly is

11   relevant.  I did not read that language when I read it

12   as impugning the character of the attorneys involved.  I

13   mean, it would be like every time you cite an ethics

14   rule it would have to be stricken or expunged or

15   whatever.  And I'm not going to do that.

16           You have got your opposition there and that's,

17   I'm sure, will speak for itself when and if I get to see

18   it.

19           I will look at it over the lunch break and if

20   there is anything in there or any further thoughts that

21   I have, since I haven't seen it, I'll address it after

22   lunch.

23           MR. BARGER:  Thank you, Your Honor.

24           THE COURT:  The next one in order is the

25   government's omnibus motion which is number 336.

1          Is that okay to jump to that one or do you want

2   to finish with defense motions first and then come back

3   to the government?

4          MR. LEMBKE:  Your Honor, that's mine and I'm

5   fine to jump to it.  If we are going to do that one

6   which has eight parts, I would like to take a short

7   restroom break before we start on an eight part motion.

8          THE COURT:  We can certainly do that.  But also

9   since it is 11:30, should we wait for after lunch to

10  take up this one and see if we can do a couple of

11  others?

12         MR. LEMBKE:  That suits us fine, Your Honor.

13         THE COURT:  Y'all want to take a short restroom

14  break first?

15         MR. LEMBKE:  That would be fine.

16         THE COURT:  And we'll come back and talk about

17  339 then.

18                    (Break taken)

19         THE COURT:  Number 339, defendant's motion

20  regarding non-physician's opinions on terminal illness.

21         As I understand, these are not the comments by

22  any of these witnesses on any of the specific patients

23  that are on the list; is that correct?

24         MR. LEMBKE:  Well, Your Honor, to the extent

25  that they want to ask one of the non-physicians about

1  was Joe W. able to walk, we're not talking about that.

2       This is a very focused motion on whether a

3  non-physician can come in and say that a patient was not

4  terminally ill.

5       So, a lot of what's discussed in the

6  government's opposition, that's not what we're talking

7  about, you know, what the nurse or other non-physician

8  observed.

9       In fact, there's no opposition apparently on

10  anything other than nurses, as I read it.

11       Now, the government says on Page 3 of their

12  opposition that the government does not seek to have

13  these nurses review specific patient medical records or

14  opine on specific patient's eligibility under the

15  Medicare hospice requirements.

16       Of course, terminal illness is the trigger for

17  Medicare hospice eligibility.

18       I mean, if the government is saying, we're not

19  going to have a nurse come in and say that a specific

20  patient was not terminally ill, which I think is what

21  that's saying, it sounds like they're agreeing to our

22  motion.

23       MR. WERTKIN:  To be clear, and it's ironic that

24  we start the sentence to be clear, there might be some

25  confusion about it.  But the point of this sentence is

1    that we are not planning on putting medical records in

2    front of nurses and saying -- the way we would do with

3    Dr. Liao, what is your opinion on this patient.  That is

4    not -- that is not what we're trying to do.

5           And so to the extent that there's any confusion

6    about that, I just want to make that point clear, at

7    least now in this hearing.

8           However, if a patient, and it might be helpful

9    to use the only example that AseraCare provided in their

10   motion which is the Jacquelyn Fehd, so --

11          THE COURT:  Who AseraCare referred to as a

12   salesperson who, in fact, was a registered nurse --

13          MR. LEMBKE:  That's correct.  She is also a

14   registered nurse.  That is correct.

15          MR. WERTKIN:  And not a salesperson.

16          MS. MARTIN:  That was a mistake in our motion.

17   He was a registered nurse.  And there are multiple

18   people from that agency and that led to the confusion.

19          THE COURT:  And she was even a DOCS, a director

20   of clinic services.  I'm learning your acronyms.

21          And that reminds me, I was thinking about this

22   last night.  We had talked early on about having some

23   kind of agreed demonstrative for the jury with all these

24   acronyms and what they mean.  Are we going to have that?

25   In what form?

1          MR. LEMBKE:  Do you want it as like a page in

2    the front of the juror notebook?  Like a glossary?

3          THE COURT:  We could do that.  Could we also

4    have -- this is real old fashioned --

5          MR. LEMBKE:  A board?

6          THE COURT:  A blowup board that just is always

7    present so that they don't have to flip back.  But I do

8    think having it in the notebook would be helpful, too.

9          MR. LEMBKE:  We will work on that and see if we

10   can agree on the content of it.

11         THE COURT:  That would be helpful for me, too.

12   Give me a copy of that.

13         I digress.

14         MR. WERTKIN:  Ms. Fehd was a DOCS, Your Honor,

15   and the DOCS, she had the occasion to have firsthand

16   experience and knowledge about it.

17         Now, one of the stories that she's going to

18   tell, some of her testimony, is highlighted in these

19   bullets, is that she and her executive director,

20   Ms. Debbie Waters, had a number of interactions.  And

21   Ms. Fehd would go to Ms. Waters and say, this patient,

22   based on my firsthand experience, shouldn't be on

23   hospice, this patient is not terminally ill.  And

24   Ms. Fehd ultimately didn't listen to her and told her

25   that she would be terminated, and then Ms. Fehd reported

1    that up the chain to Ms. Sandy Miller, and then

2    Ms. Miller discouraged Ms. Fehd from pursuing the matter

3    and then Ms. Fehd decided to resign.

4         So, that's the testimony that -- as summarized

5    here, appears in her declaration that was attached to

6    the summary judgment motion.

7         What we're concerned about, Your Honor, in

8    AseraCare's motion is that she wouldn't be able to give

9    that testimony because she would be somehow limited

10   saying that she can't give her views about what this

11   patient or these group of patients were that were the

12   subject of this dispute with Ms. Waters.

13        THE COURT:  But you're wanting the jury to

14   conclude from that that AseraCare was admitting patients

15   that were not eligible for hospice.

16        MR. WERTKIN:  I mean, Your Honor, I think that

17   the -- that the real point of this testimony is to rebut

18   the reliability of the COTIs.

19        THE COURT:  But she's not, as I understand it,

20   isn't testifying about any of the specific patients that

21   are on Dr. Liao's list of 123.

22        MR. WERTKIN:  That's right.

23        THE COURT:  And it's based upon her view of

24   whether someone was eligible for hospice, right?

25        MR. WERTKIN:  Correct.

1        THE COURT:  CMS doesn't rely on a nurse's

2    opinion as to whether someone is eligible for hospice,

3    correct?

4        MR. WERTKIN:  Correct.

5        THE COURT:  Instead, CMS requires a

6    certification from a physician.

7        MR. WERTKIN:  Correct.

8        THE COURT:  Not a nurse.

9        MR. WERTKIN:  Correct.

10       THE COURT:  So, if CMS requires a doctor's

11   opinion as to eligibility, why should a nurse be allowed

12   to testify to a jury as to whether, in her opinion,

13   patients were or were not eligible for hospice?

14       MR. WERTKIN:  Well, Your Honor, the fact that

15   CMS requires a doctor to certify eligibility really has

16   no relevance, really has no bearing on whether her

17   firsthand testimony about her experiences as a lay

18   witness is relevant to the case.

19       THE COURT:  I have no problems with her

20   observations.  I have no problems with, as Matt said,

21   whether a patient could walk.  I have no problems with

22   those kinds of observations coming in from nurses or

23   from anybody else.

24       But when you're asking me to allow her to

25   express her opinion that someone was not eligible, I

1   have got some problems with that, when that is not the

2   standard for CMS, and also by analogy, if we were

3   dealing with medical malpractice, which to some extent

4   is sort of kind of perhaps maybe implicated here, the

5   testimony of a nurse is not -- her opinion, the nurse's

6   opinion is not admissible in a medical malpractice case

7   as to whether the doctor did what the doctor was suppose

8   to do.

9           So, why should a nurse's opinion be allowed any

10  weight in this case on the ultimate question of

11  eligibility?

12          MR. WERTKIN:  Well, Your Honor, I think that a

13  limiting instruction about her -- about the testimony

14  that nurses give regarding the 123 patients, that could

15  be appropriate.

16          I do think that it's important, you know, to

17  point out that we're going to hear --

18          THE COURT:  Regarding the 123 patients.

19          MR. WERTKIN:  Right.

20          THE COURT:  I thought you said you weren't

21  going to ask any of these people to look at the medical

22  records of the 123 and give you any --

23          MR. WERTKIN:  Exactly.

24          THE COURT:  -- opinion or information on that?

25          MR. WERTKIN:  Right.

1          THE COURT:  Why do we need a limiting

2     instruction on 123 when you're not going to be using

3     them for that?

4          MR. WERTKIN:  I guess I really didn't

5     understand Your Honor's concern then.  Or a limiting

6     instruction that the nurse's opinion doesn't say

7     anything or doesn't have any weight with regard to CMS

8     or Medicare's determination.

9          You know, when we talk in the afternoon about

10    the nexus brief, Your Honor, the United States has what

11    we would consider to be a lot of evidence to show that

12    the doctors were not making these decisions.  In fact,

13    these decisions being made by nurses.  They are being

14    delegated to nurses, nurses were admitting patients and

15    just getting doctors to sign the form when the doctors

16    were not exercising their clinical judgment.

17         For that reason, the testimony, if Ms. Fehd,

18    for example, were going to testify that she would call

19    the doctor's office and she would not talk to the doctor

20    and just talk to the doctor's nurse who answered the

21    phone and say I want to get this patient admitted, the

22    nurse said okay, that is fine, go ahead and do it, so no

23    interaction at all.  I mean, just using --

24         THE COURT:  That is fact.  That is fact.  That

25    is fact.  That is not opinion.

1          MR. WERTKIN:  Right.  And then if she follows,

2     if she follows up with, so I admitted this patient but I

3     didn't think this patient was terminally ill, that is

4     also a relevant fact in the case.

5          MR. LEMBKE:  There we cross the line, Your

6     Honor.  Because when you have a nurse or any other

7     non-physician telling the jury this person was not

8     terminally ill -- we agree, they can go through all the

9     this person could walk, this person could talk, this

10    person, you know, had all the scores, I scored them this

11    way, I scored them that way on these scales, you know, I

12    did the checklist or did not do the checklist for an

13    LCD, whatever, we are not saying they can't say that.

14         THE COURT:  Or I falsified the checklist.

15         MR. LEMBKE:  That is right.

16         THE COURT:  With false information in the

17    record.

18         MR. LEMBKE:  That's exactly right.  I didn't

19    tell the doctor the whole story.  All of that comes in.

20         But when they get the nurse to say, and I did

21    not think the patient was terminally ill, that is no

22    different than the nurse in the medical malpractice case

23    saying, I thought the doctor made a mistake with that

24    surgical procedure.

25         They are not qualified to give that.  It's not

1   relevant evidence because Medicare turns on the
2   physician's clinical judgment.  And to suggest that
3   that's just irrelevant, I'm astounded by the
4   government's position in that regard with -- the false
5   claim is whether it's a false claim.  And the fact that
6   the physician had the clinical judgment that the person
7   was terminally ill, it's not whether the nurse had the
8   physician view that the prognosis was the patient was
9   terminally ill.
10         So bottom line, Your Honor, all those
11  observations, all those facts, fine.  But when the nurse
12  then synthesizes into, and I thought the patient was not
13  terminally ill, that is crossing the line.
14         THE COURT:  Or I thought the patient was not
15  eligible.
16         MR. LEMBKE:  Yeah.  That's the flip side to the
17  same coin.
18         MR. WERTKIN:  Your Honor, certainly the nurse
19  could offer an opinion based on their personal
20  interaction with the patient, their firsthand judgment
21  about whether or not they thought the patient was
22  terminally ill.
23         Taken outside of the context of the Medicare
24  requirement, that would certainly be allowed under
25  Williams vs. Mast Biosurgery, that kind of testimony

1  would certainly be relevant.

2          Under Mast, a treating physician is not

3  considered an expert witness if he or she testified

4  about observations --

5          THE COURT:  A treating physician.

6          MR. LEMBKE:  Exactly.  That's the problem.

7  It's not a nurse.  They're using physician cases.

8          MR. WERTKIN:  It's the -- the parallel, it's

9  exactly parallel.  Because the only reason that it's

10 different in this case is because there's a Medicare

11 requirement.

12         THE COURT:  No, it's not the only reason that

13 it's different.  There are different rolls and

14 responsibilities of doctors versus nurses.

15         And I think the Medicare, I mean, the

16 malpractice standard of requiring a doctor's testimony

17 to rebut the opinion or the actions of a doctor reflects

18 that as well.

19         MR. WERTKIN:  That's why, Your Honor --

20         THE COURT:  Who is it that is suppose to make

21 the analysis of what the diagnosis is?

22         MR. WERTKIN:  I think I understand your point

23 better, Your Honor.  And a limiting --

24         THE COURT:  And who is to make the prognosis --

25         MR. WERTKIN:  Well, in this case, it was the

1    nurses that were doing that.  That's what we're going to

2    show.

3              But, Your Honor --

4              THE COURT:  You can show that.

5              MR. WERTKIN:  Exactly.  And a limiting

6    instruction --

7              THE COURT:  But I have some problems with it.

8    You're going to suggest a limiting instruction.  And are

9    you going to give me one that is applicable this time?

10             MR. WERTKIN:  Let me try.

11             THE COURT:  Okay.

12             MR. WERTKIN:  A limiting instruction that the

13   opinion of the nurses should not be used as proof that

14   they are actually not terminally ill.

15             We are not offering the opinion of these nurses

16   as proof that the patients were not terminally ill.

17   That's not what we're offering them for.

18             What we are doing -- we expect AseraCare's main

19   defense here to be that a doctor signed all of these

20   COTIs.  That's what we understand that -- from the trial

21   brief.

22             What we -- the nurses that we are going to call

23   are going to say that physicians did not exercise their

24   clinical judgment when certifying and the nurse was the

25   one making the decision.

1        So, the nurse can say, provide all these facts

2   as we went through.

3        And if the next question to the nurse is, you

4   know, did you feel uncomfortable about that or what was

5   the next thing you did?  Well, I didn't like that

6   because I didn't think the patient was terminally ill

7   and I didn't think that I should be admitting them, but

8   I did it anyway.  That is the kind of testimony -- now,

9   certainly a limiting instruction that that kind of

10  testimony and those opinions should not go to the proof

11  of whether these patients are terminally ill, I

12  completely agree with that.  That's not what we're

13  offering them for.

14        So I hope that would address the Court's

15  concern.

16        MR. LEMBKE:  Your Honor, I have no idea what

17  they are offering it for other than to absolutely poison

18  the well.

19        I mean, to say -- again, they can say, we

20  didn't give the doctor all the information.  The doctor

21  didn't review the record.  Whatever.

22        But then to have the nurse come along and say,

23  and I didn't think the patient was terminally ill, what

24  are they offering it for other than to convince the jury

25  that the patient wasn't terminally ill.  This is smoke

1   and mirrors.  That's what it's all about.  And it's

2   classic Rule 403.  To the extent they could conjure up

3   some marginal relevance, it absolutely -- the prejudice

4   substantially outweighs any probative value because the

5   reason we all know they are putting it out there is to

6   have the jury hear that the nurse didn't think the

7   doctor -- the nurse didn't think the patient was

8   terminally ill and thus the patient is ineligible and

9   thus it's a false claim, even though the nurse is not

10  qualified to make that conclusion.

11         THE COURT:  And I also want to make sure that I

12  understand who these nurses are going to be testifying

13  about.  Because you say that you don't seek to have them

14  review the specific patient's medical records or opine;

15  instead, will present them for the firsthand account of

16  historical facts involving certain patients.

17         I know I have not read or seen all the

18  deposition testimony of all these nurses.  But the ones

19  that I read somewhere, and I don't remember what they

20  were attached to, were not identifying patients by name,

21  were not identifying them by time, but just, well, you

22  had this experience.

23         How can the defense cross-examine testimony

24  about this amorphous patient that I had, that can't pull

25  the records because they don't know who it was, yet, is

1    that what you are going to be offering?

2         I want to know what you are going to be -- you

3    said certain patients.  I want to know what certain

4    patients they're going to be talking about.

5         Are they identifiable or just out there?

6         MR. WERTKIN:  I think that we're now, however

7    many years, if you start in 2007, we're going to be

8    three, you know, eight years out, so there might be

9    patients -- there might be witnesses who remember

10   patient's individual names, and there might be witnesses

11   that just say I remember there was a woman, I can't

12   remember her name, she lived here, she lived there.  I

13   think what we're trying to, you know, I think that, if

14   we're moving into the 403 analysis because, if we

15   acknowledge that there is some relevance to this

16   testimony, and we're moving over into the 403 analysis,

17   I think that this testimony -- certainly the probative

18   value of this testimony outweighs any prejudicial

19   effect.

20        This case is about whether physicians were

21   exercising their clinical judgment and --

22        THE COURT:  Right.  My question was, what

23   certain patients are they going to be testifying about

24   and have those patients been disclosed to the defense.

25        MR. WERTKIN:  Your Honor, the defense was --

1  every witness on this list was disclosed to the defense.

2  So, if the defense has taken certain depositions, then

3  they have the information about that.  And if the

4  witnesses weren't able to come up with any names, then

5  they can cross them on it.

6       As far as patients, like Jackie Fehd has been

7  on our list from the beginning, they haven't deposed

8  Ms. Fehd.

9       That is something that is not really something

10 that I can talk to about, speak to.  Whether Ms. Fehd

11 can come up with specific patients, I'm not sure.  But

12 AseraCare did not depose her about her testimony in

13 discovery.

14      MR. LEMBKE:  Two quick points.  First, we

15 certainly don't see the relevance.  I want to make that

16 clear.  I mean, 403 is in the alternative.  We don't see

17 the relevance.

18      The second point, and I know Kim will speak to

19 this either now or later in connection with another

20 motion, this whole idea of -- there is a big problem

21 with just -- some patient I seem to remember out in the

22 ether and I don't really know the time, and it may not

23 even be the same time, but it isn't one of the 123 for

24 sure, you know, we sent -- and all this talk about,

25 well, we disclosed in our disclosures early in the case

1    the list of potential fact witnesses.  And exercising

2    our right under Rule 33, we sent contention

3    interrogatories so we would know who to depose.  And

4    they didn't give us names.

5            So, this notion of, well, we gave you this long

6    list of witnesses and you could have gone and deposed

7    any of them, they didn't list any of these people in

8    their contention interrogatories when we tried to get

9    down to the lick log as to who we needed to go depose

10   and they never have supplemented them.

11           So here we are looking at, you know, the

12   classic trial by ambush where they come in, never having

13   answered the contention interrogatories saying, we gave

14   you a list of over one hundred names of people and you

15   should have gone on a treasurer hunt to figure out where

16   our treasure was.

17           THE COURT:  In the contention interrogatories,

18   is that where they answered that they were relying on

19   Dr. Liao's determination?

20           MR. LEMBKE:  That's correct.

21           THE COURT:  For evidence of false claims?

22           MS. MARTIN:  Yes.

23           MR. SELDEN:  Correct.

24           MS. MARTIN:  We asked them seven different

25   ways, tell us who the ineligible patients are and what

1   your factual basis is for that.

2          They supplemented -- they did supplement

3   various ones, seven different times, the last

4   supplementation occurring on the very last day of

5   discovery, February 28th, 2014.

6          Every time they said, we intend to prove the

7   falsity through the statistically valid random sample,

8   through Dr. Liao's review of those patients in the

9   statistically valid random sample, and the facts for the

10  falsity is in his report.

11         And they specifically objected every single

12  time -- well, maybe the first time they didn't, but the

13  others they did, to producing information about

14  ineligible patients who were not in the sample.

15         And now what they're trying to do is to bring

16  in patients who aren't in the sample through these I

17  know a woman who lived somewhere at one time who had

18  these issues or bring in patients who are years before

19  or years after when patients were on service, and use

20  those patients to prove falsity in some way and

21  apparently also to have witnesses who they will use to

22  prove falsity that were never identified in response to

23  our very specific contention interrogatories that were

24  trying to get to this type of information.

25         And I have -- I have the document right here.

1    I can walk you through it.

2         MR. WERTKIN:  Your Honor, I think that the idea

3    of trial by ambush, we disclosed these witnesses, we

4    still maintain --

5         THE COURT:  You disclosed them as fact

6    witnesses early on.

7         MR. WERTKIN:  Right.  We still maintain, Your

8    Honor, if I may address the point, the question of

9    falsity, whether the medical records support a diagnosis

10   of terminal illness, that is something we're going to

11   prove using Dr. Liao.

12        In one of the motions that -- when we were

13   talking about bifurcation, we went through and we said,

14   we cited the complaint that all the relators filed and

15   we cited the consolidated complaint.  And then we went

16   through and cited our summary judgment motion.

17        This case has always been about the fact that

18   doctors were not exercising their clinical judgment.

19   And we have always maintained that the nurses were doing

20   that.

21        And so the idea --

22        THE COURT:  We have no problem with fact

23   statements about what the nurses did versus what the

24   doctors did.

25        The problem is with the opinion.  And if you're

1  wanting the opinions of the nurses that there were

2  ineligible patients on the hospice rolls at AseraCare,

3  why were they not disclosed in response to the

4  contention interrogatories of what are you going to be

5  using to show the falsity of these claims?

6  　　　　　MR. WERTKIN:  Well, and maybe you can help

7  assist -- the answer is that this evidence is to rebut

8  the reliability of the COTIs.  Not to prove --

9  　　　　　THE COURT:  You can do that by saying, I never

10 talked to the doctor about this patient, I just gave

11 them the COTI and he signed it.  Or I didn't give him

12 any information with it.  I just gave him the COTI and

13 he signed it.  Or other kinds of things about -- I

14 improperly scored this person so it would look like he

15 was eligible or other kinds of things.

16 　　　　　But that actual opinion of the nurse that these

17 people were ineligible cannot go but to anything to show

18 that there were ineligible patients.

19 　　　　　If you haven't disclosed this information that

20 they were asking for --

21 　　　　　MR. WERTKIN:  I want to get to the disclosure.

22 Your Honor, if the nurse says, I lied to -- if the nurse

23 said I lied, I called the doctor's office and lied.  And

24 the answer is, what was the lie.

25 　　　　　So, under this motion, she wouldn't be able to

1    say, well, I said I thought that the patient was

2    terminally ill, but I didn't think the patient was

3    terminal ill.  That's --

4            THE COURT:  I told them the patient was

5    terminally ill, but the objective information was

6    different or something to that effect.  That goes to

7    the -- to undercut the reliability of the COTI without

8    the nurse expressing an opinion that really isn't within

9    her position in the business.

10           You refer to the advisory committee notes to

11   701.

12           MR. WERTKIN:  Your Honor, we can't control the

13   testimony -- a lot of these witnesses we're calling,

14   they are not connected to the case, we can't control

15   what they -- sorry.

16           THE COURT:  Well --

17           MR. WERTKIN:  I misspoke.  We don't talk to

18   them on a regular basis.  We are calling a lot of

19   different people.

20           I'm just saying, if the nurse says, you know,

21   and I told the doctor misinformation.  And I say to the

22   thing, what was the misinformation?  I don't know if I

23   would be in a position to go and say, listen, you are

24   not allowed to say what the misinformation was.

25           THE COURT:  You can say what the misinformation

1  was.  Even if it's I told the doctor I thought the

2  person was eligible.

3      MR. WERTKIN:  They could say, I told the doctor

4  the patient -- but that's not what I believed.  They can

5  say that.  But they can't say, that's not what I believe

6  because I believe the patient was not ineligible.

7      MS. BROOKER:  Can I interject here?  I think we

8  are this close (indicating) with what Matt is saying,

9  and I completely am following exactly what Your Honor is

10  saying.  I think we got off on the disclosures.

11      We are not trying to prove the eligibility of

12  these patients to go to our falsity and damages

13  calculation.  So that is how we got talking about

14  disclosure.

15      And I think Matt is right, we are not offering

16  nurse's testimony to prove, for example, that any

17  patient is ineligible, and I would expect the defense to

18  ask any witness where they suggested whether or not they

19  were asked or whether it was a part of their story, the

20  defense would, and I'm sure will, be entitled to say on

21  cross-examination, isn't it a fact that you are a nurse,

22  yes.  And isn't it a fact that you are not qualified to

23  make the determination and that Medicare would not

24  accept claims submitted signed by a nurse?  Yes.  That

25  is correct.

1          We agree with all of that.  I think in response

2    to Your Honor's questions, there are certain times where

3    a witness had the belief, and in the extreme example and

4    we have some of them that Jeff is talking about, where

5    the nurse knows that they provided incorrect

6    information, they know that the patient was walking,

7    talking, going to the beauty shop, clearly not terminal.

8    We are not going to ask that witness, is it your

9    opinion, do you hold the opinion today that the patient

10   in the sample is not eligible for the Medicare hospice

11   benefit.

12         Instead, the testimony is going to show and

13   we're going to be asking the patient or, excuse me, the

14   nurse, what led you to call higher level people within

15   AseraCare and put them on alert that the patient was

16   going to the beauty shop, not terminal, and it explains

17   the state of mind of why the nurse was complaining to

18   others.

19         So, what we have a lot of evidence of is that

20   high level management was getting complaints and reports

21   from their staff, like nurses, that they believe

22   patients weren't eligible.

23         Again, we are not trying to show, therefore, as

24   a matter of fact that patient is not eligible.  But it

25   does explain the story of how it is AseraCare responded

1  at higher level when they had these complaints from

2  nurses, did they ignore the nurse, telling them that the

3  patient --

4          THE COURT:  That goes to knowledge.

5          MS. BROOKER:  And it goes to knowledge as well,

6  yes.  Some of this goes --

7          MR. LEMBKE:  As well.

8          MS. BROOKER:  Here is how it goes to falsity.

9  It doesn't go to the falsity of the specific patient,

10  but it describes and goes to the COTIs and the

11  reliability of them.

12          But, again, we're not asking the jurors to

13  accept our nurse's testimony that the patient, as a

14  matter of fact, is not eligible for the hospice benefit.

15  I agree with Matt on that.  That is not what we are

16  going to elicit.

17          However, the testimony, as I described it, as

18  to their state of mind, their belief that led them to

19  file the complaint or inform the doctor or provide the

20  testimony that they're going to provide, does go to

21  falsity in an indirect way, not to show that the patient

22  was or was not eligible, but to show the unreliability

23  of the COTIs.

24          I agree with Jeff, and I completely appreciate

25  Your Honor's point, I appreciate Matt's point because I

1   agree with him that we should not and we have no

2   intention of -- Dr. Liao is it for us when it comes to

3   having someone testify that this patient is eligible or

4   not.  Dr. Liao is offering that testimony.

5          But the defense is that well, you don't even

6   get to Dr. Liao and Dr. Cooney because you have a

7   certification and once you have that signed

8   certification, that shows the two doctors --

9          MR. LEMBKE:  Your Honor, they keep saying this,

10  that is not our position, you know that is not our

11  position.

12         THE COURT:  I have never understood that to be

13  the position.

14         MR. LEMBKE:  It's a caricature of our position.

15         But I would like to respond and say, when Renee

16  says, we're not offering this to prove whether any of

17  the 123 were ineligible, what in the world is it being

18  offered in phase one for?

19         MS. BROOKER:  For the COTIs.

20         MR. LEMBKE:  What this really is is a back door

21  way to bring in the phase two evidence into phase one.

22  And it is perfectly relevant if they can say, have the

23  nurse say, I told the doctor, you know, X, Y and Z.  But

24  this goes to the disclosure point --

25         MR. WERTKIN:  But --

1          MR. LEMBKE:  May I finish?

2          MR. WERTKIN:  Fair enough.

3          MR. LEMBKE:  We asked the question, what is

4    your evidence to prove falsity.  That's phase one.  And

5    as Renee said, it's Dr. Liao and the medical records.

6          But then why are we talking about all of these

7    anecdotal reports of what went on with other patients

8    outside the 123 on our phase one?

9          They have made the litigation decision in this

10   case that they were going to -- of the 48,000 or so,

11   whatever it is, patients that AseraCare provided

12   services to during the time period, they said, we're

13   going to only look at a sliver, the ones who were there

14   for more than a year, which is 21 or 2200.  Then we're

15   going to take a statistically significant sample of 266.

16   And then Dr. Liao says of those 123 are not eligible and

17   if we can prove to the jury those 123 are not eligible,

18   we are going to extrapolate back out.

19         But now what they're wanting to do is say, but

20   we are not going to limit our proof to these 123.  We

21   are going to talk about random other people.

22         It's a little bit like, if we decided to take

23   an opinion poll in Alabama of 500 people, statistically

24   significant sample.  But we say, you know, we can't get

25   to fifty of them, so we are going to go just stop fifty

1   people on the street and that will be evidence of what

2   the fifty we should have looked at in the sample would

3   be and then we're going to extrapolate from there.

4   That's not what a statistically significant sample is.

5        So the problem we have got here is two-fold:

6   One, we asked them what your falsity evidence, they gave

7   us very limited answers and now they are wanting to

8   bring in a bunch more evidence that they didn't

9   disclose.  And if it's not in that answer, it shouldn't

10  be in phase one.

11       Number two, they're wanting to get into stuff

12  that has nothing to do with the 123.  They are just

13  random things -- they are not even people from the 21 or

14  2200 from which the sample was drawn.  They are just

15  random anecdotal cases and they want to come in in phase

16  one and show, that helps establish that these claims

17  were false, even though we didn't tell you that in

18  discovery so you wouldn't know who to go depose about

19  that.

20       There are just multiple levels of problems with

21  this.  On top of the fact that you can't get a nurse to

22  say, I don't think that patient was terminally ill.

23  That's the problem.

24       MS. BROOKER:  May I respond to one question

25  that Matt asked --

1          THE COURT:  Can't get a nurse to say I don't

2    think what patient was not terminally ill?

3          MR. LEMBKE:  You shouldn't be able to have a

4    nurse say that any patient was terminally ill.  But what

5    they're wanting to do is not have a nurse come in and

6    say one of the 123 was not terminally ill, there was a

7    case back then when I did not think the doctor was

8    right, we don't know who it is, they shouldn't be able

9    to do that.

10         THE COURT:  Not as to the question of the

11   falsity of these 123.

12         MR. LEMBKE:  That's right.

13         MR. WERTKIN:  Right.

14         THE COURT:  I definitely think there is room

15   for that kind of testimony in phase two.  I'm having

16   real problems with it in phase one.

17         MR. WERTKIN:  Your Honor, I think we are

18   getting a little far afield because we are now talking

19   about issues that are in terms of relevance in phase

20   one, phase two and falsity.

21         This question is really narrowly focused on

22   what the non-physician, what the nurses can say.  And I

23   think that really that's ultimately the question that we

24   should be addressing.

25         The nurses are going to --

1          THE COURT:  But at what point can the nurses

2   say that.

3          MR. WERTKIN:  The nurses can say it in phase

4   two that as a matter of relevance, if they can say it in

5   phase two, then it's just in terms of matter of

6   relevance, then we think that they should be able to say

7   it in phase one as well.

8          Because if -- Matt characterized the nurse's

9   testimony as, well, I disagreed with the doctor.  Well,

10  that is not right.  That is not what we're saying.

11         We are not -- the nurses are not going to say

12  that they disagree with the doctor.  We expect the

13  nurses to say the doctor wasn't involved.

14         THE COURT:  Some of them you're saying that

15  that is what they are going to testify, if I recall

16  correctly, that I told the medical director he didn't

17  qualify and he certified him anyway.  I think I saw some

18  reference to something like that somewhere.  That is a

19  nurse's opinion directly disagreeing with the doctor.

20  And I just see some problems with it.

21         MR. WERTKIN:  The idea that the doctor was not

22  exercising their clinical judgment.

23         So, if you accept the premise, just for the

24  sake of argument, if you accept the premise that these

25  decisions were being delegated to the nurse, okay, the

1  doctor was not exercising their clinical judgment, this

2  is central to phase one, right -- if AseraCare, and they

3  probably will try to show that doctors were involved and

4  then when the doctor signed that form, that meant

5  something.

6      What we're going to show is that the fact that

7  there is a signature on the form doesn't mean anything.

8  And the reason -- the way that we're going to show it is

9  we're going to show that these decisions were being

10  delegated to the nurses.

11      Now, once you accept that premise, and the

12  nurse is the one that's saying, I need this form signed,

13  this person is terminally ill, I need this form signed,

14  and that is what they are representing to the doctor.

15      If that testimony is going to be allowed, then

16  it seems to us it's directly relevant, if they are going

17  to say that information that I provided to the doctor,

18  which was usually just I think this patient is

19  terminally ill, was false, was misleading, was

20  inaccurate.

21      The only way they could testify about that is

22  if they say it's inaccurate because I didn't think the

23  patient was eligible.  And a limiting instruction --

24      THE COURT:  Or it's inaccurate because I didn't

25  tell the doctor what the patient was actually doing.

1    MR. WERTKIN:  Right.

2    THE COURT:  Or I told --

3    MR. WERTKIN:  Then arguably incomplete.  So if

4  you --

5    THE COURT:  Or incorrect.

6    MR. WERTKIN:  Right.  If the only information,

7  and this was typical, so what you will hear about, Your

8  Honor, is that nurses sometimes will call and get an

9  order to admit -- sorry, order to evaluation and admit,

10  if appropriate.  So the order would come back, evaluate

11  and admit, if appropriate.  That's the order the doctor

12  would sign.

13        That is in a sense a delegation to the nurse to

14  say, to decide if it's appropriate.

15        At that point, we expect the nurses to come

16  back and the only thing that they are going to say to

17  the doctor is, I thought the patient was appropriate,

18  not any of the other facts.

19        Now, they could provide those facts, if they

20  remember them, I'm not sure.  They could say, they could

21  talk about weight and mobility.  But as far as the

22  information that the nurse is providing directly to the

23  doctor, that information is just going to be, I think

24  this patient is appropriate for hospice.  I think this

25  patient is terminally ill.

1    If they can testify that they didn't actually
2  think that, they are not -- it's lay opinion.  They are
3  not testifying as an expert or giving their judgment.
4    And to the extent that we need a limiting
5  instruction that says any nurse's opinion is not
6  relevant or you shouldn't consider any nurse's opinion
7  about Medicare eligibility to make your determination
8  about medical eligibility, we agree with that.  We are
9  not using it for that.
10    If the nurse is going to stand up on the stand
11  and say, I told the doctor the patient was ineligible,
12  but I actually didn't think the patient was ineligible,
13  that seems to me as 701 and 402 admissible evidence.
14    THE COURT:  On the question of whether these
15  123 patients were not eligible.
16    MR. WERTKIN:  No, on the question of the
17  reliability of the COTI.
18    MR. LEMBKE:  Your Honor, what they are wanting
19  to say is, we are going to prove, purportedly, the lack
20  of reliability of the 123 certifications that were made
21  by just this general corporate practice out there of,
22  well, this nurse in Indianapolis said she had a problem
23  with this and that.
24    That is not what -- I mean, what this really
25  is, Your Honor, is a back door way around your

1  bifurcation ruling.  This is the fourth -- now the third

2  attempt to revisit the bifurcation.  Because this is

3  just a new twist, a new way to package the same thing

4  they have been saying from the beginning that they don't

5  want to have to prove the 123, whether they are

6  objectively false to start, they want to get into

7  general corporate practices, general things of other

8  patients.  And when you are going with the statistical

9  sample, as Your Honor has said, step one is, were these

10 123 false.

11      And they're trying to get the cart before the

12 horse on the knowledge and the other stuff before we

13 figure out whether the 123 were actually false.

14      MS. BROOKER:  Your Honor, may I try to respond

15 to Matt because I feel a little bit, some of us are

16 talking past each other, and I feel like there is some

17 common ground here.

18      We have already gone through the exercise that

19 Your Honor has wanted us to, both sides, of identifying

20 exhibit and witness list, the time and place

21 connections, and so obviously we're going to go through

22 that.

23      But I think what Matt keeps asking is how is

24 the testimony, outside of what Dr. Liao is going to

25 offer, you know, from these nurses, how is it relevant

1    to phase one.

2           Here is how it's relevant, which is what Jeff

3    is pointing out.  It's relevant in two ways because on

4    cross-examination, I expect that they will ask Dr. Liao,

5    among other things, Dr. Liao, isn't it a fact that you

6    are disagreeing with two physicians who signed

7    certifications.  Because we don't dispute that the --

8    there is two certifications in every file.  And so they

9    will ask Dr. Liao that.

10          Dr. Liao has done a very limited job here

11   reviewing the patients and the samples.  He has no idea

12   what all this other evidence is about, nurses and lying,

13   he is not aware of that.  His response is not going to

14   be able to be, well, I didn't rely on the COTIs because

15   I knew they were unreliable for the following reasons.

16          Dr. Liao is going to say, I accept that there

17   are two COTIs in the file and I can't place a value

18   judgment on what the doctors did or why they signed it.

19          Because of that cross-examination and that

20   implication that will necessarily be part of phase one,

21   the government will need to call nurses -- and again, we

22   have gone through the exercise.  It's not anybody and

23   everybody.  It's connection to time and place and we put

24   that on our exhibit list.

25          What we will be doing is calling people who

have a connection to the 123 ineligible patients in the

sample to show, as connected during the time that,

again, time and place, just like Your Honor asked us to,

that they will be able to offer general testimony of how

COTIs, what the practices were, record keeping, number

one, and how COTIs were signed.

Some people will say, with connection to time

and place, that COTIs were signed in the blank or there

was a blank form signed in advance before a patient was

ever deemed eligible and then the information was

included in thereafter.

So that helps the government in phase one to

explain how it is that Dr. Liao could agree with two

patients.

There are other types.  There may be other --

there is the blank forms.  There will be other testimony

from nurses, and I think that some of the relators are

on our list for part of their testimony -- and again,

some of these people are only being called in phase one

for limited pieces and then will be called later for

knowledge.

We really are trying to be mindful and stick

with Your Honor's bifurcation order.  We have done a

tight job of trying to do that.

If there is a connection to time and place of

1   the 123 patients, some nurses may say, you know, I was

2   routinely asked to be the one to go out and evaluate the

3   patient and I am the one who gave the doctor all of the

4   information which the doctor then put on the form and

5   fill in the blank.  People have different experiences

6   and different testimony.

7           I was told to -- I mean, one of the common

8   themes in the case, which defendants know, is that I was

9   told to not write words down on the paper that the

10  doctor reviewed that showed that the patient was

11  improving.

12          I was told only to write words of decline, by

13  way of example.

14          So, again, Dr. Liao is defenseless in a way on

15  cross-examination when he is asked over and over again

16  for every single patient.  But Dr. Liao, two physicians

17  certified, and so you're disagreeing with them.  He

18  cannot respond with what I am telling you because that

19  testimony legitimately has to come from other witnesses.

20          THE COURT:  All that testimony that you just

21  mentioned I think is appropriate, if it's connected time

22  and place.

23          But there was no opinion offered in that about

24  the person not being eligible.  It was, I didn't put

25  anything down about decline.  I didn't put anything down

1    that would be contrary to a finding of -- it's dealing

2    with the information given to the doctor.  And it does

3    undercut the reliability of the COTIs.

4         Where I think everybody is having an issue is

5    whether the nurse can go further and say, in my opinion,

6    this patient was not eligible.

7         MS. BROOKER:  May I ask a question about that,

8    because I am right there with you, Your Honor, I

9    completely understand.

10         I guess the concern that we have is we will

11    have some witness who -- we will have some nurses, for

12    example, who -- again, I'm going to give an extreme

13    example.  But a patient who they went to visit and the

14    patient was at the beauty parlor.  The patient is

15    clearly not terminal.

16         THE COURT:  Why do you say that?  If a person

17    is within like six months of death and that person

18    happens to have a big ego issue of looking as good as

19    she can for as long as she can and going into --

20         MS. BROOKER:  Let me use another example.

21         THE COURT:  You used that one several times.

22         MS. BROOKER:  Sorry.  Let me use another one.

23         MR. BARGER:  It could be, though, just to

24    clarify.

25         MS. BROOKER:  Let me try to respond to Your

1    Honor.  Anyway, I have that example in my mind.

2              Let's just say that the nurse goes --

3              MR. WERTKIN:  Running a marathon.

4              MS. BROOKER:  The nurse goes and finds out that

5    the patient clearly is not exhibiting any signs of

6    illness, right, no signs of decline, is telling the

7    nurse that I'm walking around the block twenty times a

8    day, feeling great, running a marathon.  Let's use an

9    extreme example.  And the nurse goes back and informs,

10   doesn't talk to the doctor, but goes back to her

11   superiors and says, you know, here I am again in this

12   position, I have deep concerns about the eligibility of

13   these patients.  We ask that testimony.  And we say, the

14   next question, as a result, what did you do when you

15   passed that information on.

16             Well, I went -- and this is some of the

17   testimony from some of the relators.  I talked to, you

18   know, they name a specific person, I talked to my

19   superior.  What did your superior say?

20             My superior said, I shouldn't pass that on, or

21   I told the people at your higher levels and they

22   discounted what you have said.  Go back and do your job,

23   you have got to go get these patients on hospice.

24             But the point is that in order for the witness

25   to be able to explain why they passed on that

1    information and how it was reacted to, they have to say,

2    I mean, it would be kind of weird to say, I told them I

3    didn't think the patient was hum, because they weren't

4    allowed to say ineligible, right, and so the point is,

5    that testimony is not offered to show, as a matter of

6    fact, that nurse was right.  It's not.  It is not

7    offered for that.

8            It is offered to show what the nurse believed

9    and what she did, what her next five steps were and what

10   the responses were from AseraCare.

11           So, the instruction that Jeff identified, I

12   think, gets at the problem that Your Honor has

13   identified legitimately.  And I think Your Honor could

14   say, if any testimony does come up to that effect on the

15   patients --

16           THE COURT:  And I think that that testimony is

17   directly relevant to the issue of knowledge of the

18   company about questionable admissions.  Okay.  And

19   certainly when a nurse raises a question about whether a

20   patient is eligible and it's, instead of being looked

21   into, it's swept under the carpet or told ignore it or

22   don't tell the doctor that information, and I understand

23   that it can be used to undercut the COTI.  But you have

24   got a whole lot of information, apparently, about the

25   doctors not having the information that they needed to

1    make that decision or information being withheld that

2    was necessary for the decision, or information being

3    falsified when it was given to the doctors about it.

4         When you go further, I think it really is more

5    appropriate in the question of knowledge.

6         MR. WERTKIN:  In that particular example, Your

7    Honor, I think I would tend to agree with you.

8         But in terms of reporting it up the chain, but

9    this is a very common thing.  And this is what you'll

10   hear from witnesses from all over the country.  I went

11   out and evaluated the patients.  Any time the nurse

12   thought the patient was not eligible, they had to call

13   back to the business people and this is what the nurses

14   will say all the time.  I was told let's put them on and

15   see how they do.  That is something that appeared in

16   some of the deposition testimony, let's put them on for

17   ninety days and see how they do.  This is the direction

18   that would come from an executive director or some other

19   person in the agency.

20        At that point, the nurse now is going back and,

21   well, what did you do next?  Well, I admitted the

22   patient, and I sent over the form for the doctor to

23   sign.  Okay.  What information did you provide to --

24   what, if any, information did you provide to the doctor?

25   I just said I thought the patient was eligible for

1    hospice.  Okay.  And is that true?  Or do you have any

2    concerns about the veracity of that statement?  Yes,

3    that was not a true statement that I said to the doctor.

4          Why did you provide it?  Well, because I was

5    told to let's put them on and see how they do.  At that

6    point, you know, I think it's natural that the witness

7    would say that the witness had a problem with this

8    because it wasn't true, that they told the doctor to put

9    them on, why did they do it, because they were told

10   let's put them on for ninety days.

11          So that kind of testimony, I'm really nervous

12   as a -- as someone who is asking these questions to

13   these people that they are going to say, well, I had a

14   real problem with that instruction and what I did

15   afterwards because I didn't think the patients were

16   eligible.

17          And I don't, you know, I'm not sure I can prep

18   these witnesses enough to say, you can't say that, you

19   can't do that, make sure to just say that in a different

20   way that doesn't express your opinion as to Medicare

21   eligibility.

22          That is my main concern about this.  And I

23   think a limiting instruction that we're not -- that it

24   shouldn't be considered for the -- whether they were

25   actually -- the nurse's opinion doesn't matter with

1   regard to Medicare, that might alleviate the problem.

2          But the nurse who calls and tells -- and gets

3   told to put on, and then puts them on --

4          THE COURT:  And they call why, because they

5   have concerns about whether the patient is eligible?

6          MR. WERTKIN:  When you say call, who, the

7   executive doctor?

8          THE COURT:  I don't know, whoever you said they

9   had to call.

10          MR. WERTKIN:  Because that was the policy.  If

11   a nurse -- and you'll hear testimony about this,

12   specifically, but all -- and there's -- do you know the

13   exhibit off the top of your head, all non-admits, for

14   all non-admits, you must call.

15          I can see the document in my head, I can't

16   remember the exact number of it.  So they would

17   testify --

18          THE COURT:  Who must they call?

19          MR. OLSON:  The director.  There were different

20   instructions over time.  At times there was instruction

21   to director of operations, you are not going to bring a

22   patient on, you have to call the regional sales

23   director, that's a December 1, 2009 email, that has been

24   marked as an exhibit.

25          THE COURT:  All right.  Why would they call, if

1    they are not going to admit, but what would that be

2    based on?

3              MR. WERTKIN:  Right.  Exactly.  That's the key

4    question in the case.

5              And our argument is, and what we think the

6    testimony is going to bear out, is that they were called

7    because they were told, it's not acceptable not to admit

8    these patients.  You have to admit them.  And you have

9    to go and get a doctor to sign off on that decision.

10   That is what this whole case is about.

11             THE COURT:  No.

12             MS. MARTIN:  That is not what this --

13             THE COURT:  No, this whole case in phase one is

14   about whether the 123 patients identified by Dr. Liao

15   are false claims.

16             MR. WERTKIN:  Right.  Right.  That is true.

17   And if you have got -- I mean, when I say this whole

18   case, like the False Claims Act case, is about patients

19   being put on hospice who are not eligible.  That is what

20   I mean when I say whole case.

21             As Renee very eloquently put it, Dr. Liao is

22   going to be confronted with these COTIs.

23             THE COURT:  And I think I have, maybe not so

24   eloquently put it, that the information or the testimony

25   about not giving the doctor information that would be

1    contrary to eligibility or whatever or not putting on

2    there that there's no evidence of decline or all those

3    other kinds of things, that information comes in to

4    undercut the veracity of the COTIs.

5            But how far it goes is what we have to figure

6    out.

7            Matt, I think you have been biting your tongue.

8            MR. LEMBKE:  Your Honor, that's it.  I mean,

9    the issue is, certainly no one suggests that all 48,000

10   patients that were admitted by AseraCare were

11   ineligible.  There were lots and lots of eligible

12   people.

13           As you have made clear, the question in phase

14   one is whether these 123 are eligible.  And practices

15   about, well, if you have a non-admit, it's got to be

16   kicked up the chain and all that, if they can establish

17   evidence for one of these 123, for example, the doctor

18   didn't really sign the form or the doctor was given

19   inaccurate information or whatever, but most of what

20   they're getting at is getting into the knowledge aspect.

21           But the threshold question is, well, what about

22   these 123 that you have drawn as your statistically

23   significant sample are these ineligible.  And this

24   general stuff doesn't really prove that because there

25   are some that are eligible.  And they say there are some

1   that are ineligible, meaning of the universe.

2        Dr. Liao says that over half of the ones he

3   reviewed were eligible.  So, they want to bring in

4   this --

5        THE COURT:  Even though they were there more

6   than a year.

7        MR. LEMBKE:  Even though they were there more

8   than a year.

9        So they want to put on evidence that people who

10  were there less than a year, who aren't even in the

11  universe from which the sample was drawn, to draw these

12  inferences about these 123.

13       And then get into, well, there was this

14  corporate practice that if it was a non-admit, it would

15  get kicked up the chain, that's knowledge.

16       MR. WERTKIN:  No, no, no, it's not a corporate

17  practice.  That is firsthand experience.  And again,

18  remember, we're talking about nurses right now and what

19  nurses can testify about.

20       I think that that is important to keep in mind,

21  you know, we do think that -- I think Your Honor is

22  going to have to give this limiting instruction anyway

23  because I think that some of these -- some of these

24  witnesses are going to come out with this.

25       Your Honor, I don't intend, as we state in our

1    motion, to ask any of these nurses, in your view, in

2    your opinion, did these patients fall -- satisfy the

3    criteria for Medicare eligibility.

4         But my concern is that -- but I do want to ask

5    them, why do you think that the information you provided

6    was inaccurate.  And I think the problem that we're

7    facing with this motion, because I think Renee is right,

8    there's a lot of common ground here, a lot of common

9    ground.

10        I think what our -- what I'm really most

11   concerned about is, if the answer to those two questions

12   are the same, you know, if I said, why do you think that

13   the information you provided was inaccurate and the

14   nurse said, because I didn't think the patient was

15   eligible and I said that they were, that seems to us to

16   be evidence that the nurse should be able to testify as

17   to it's relevant, it's admissible, it's not 702 expert

18   testimony.

19        And that's what we think that they are trying

20   to keep out by this motion.

21        THE COURT:  Matt.

22        MR. LEMBKE:  Your Honor, first of all, this

23   notion that you can't tell a witness, even if it's a

24   witness you're calling, you can't say, the Court has

25   issued a ruling that you are not to say your view that

1    the person was ineligible or terminally ill, there is

2    nothing to prevent a lawyer from doing that before the

3    witness goes on the stand.  I mean, I don't think that

4    is that big a hurdle.

5          Secondly, and then the witness, if you say,

6    why?  I mean, if the witness can go through, well, the

7    person was walking and talking and running a marathon or

8    whatever, but to get into I did not think the witness

9    was terminally ill, we are right back where we started

10   this discussion; that's not the decision that Congress

11   charged the nurse to make.

12         Now, in the Medicare process, there is a well

13   settled procedure where nurses make an initial

14   assessment and they can put someone on the service, but

15   until the doctor actually does the certification, you

16   can't do any billing for it, I mean, that's all part of

17   what the government says is a proper approach.

18         THE COURT:  The government doesn't require the

19   doctor to be the one to go and do the evaluation.

20         MR. WERTKIN:  Certainly not.

21         THE COURT:  There has been at least some

22   insinuation today that the nurse to do it was improper.

23   And we are not going to have any kind of that

24   insinuation.

25         MR. WERTKIN:  If there was an insinuation, that

1    is certainly not what we meant to say.  Not at all.

2            MR. LEMBKE:  But, you know, to say did you do

3    the assessment, what were the factors you saw, those are

4    all fair game questions.

5            But to ask questions that leave the door open

6    to have them say, and I thought the patient was

7    ineligible, that is not what a nurse is suppose to be

8    opining on and is not relevant.  Just like, as we talked

9    about earlier in this discussion, the medical

10   malpractice context.

11           THE COURT:  I am not going to give a blanket

12   order excluding all of this opinion by nurses.  I am

13   concerned about how closely they're going to be able to

14   connect it to the 123, and I think we'll get to that

15   later.

16           But I do think a limiting instruction would be

17   appropriate in terms of the nurses' initial evaluation

18   and asking the doctor to certify something, if that

19   nurse didn't think in her own assessment that the

20   patient was eligible.

21           But I do think the jury should be told that it

22   was not the nurse's decision to make, it was the

23   doctor's.  But if the nurse was not giving the doctor

24   correct information, it certainly, I think, goes to --

25   and the purpose of it would only be not to show that any

1   of these 123 were not eligible, and that needs to be

2   part of the limiting instruction, but to show that in

3   certain cases the COTI might not be reliable or

4   something to that effect.

5          I would appreciate both sides helping me with

6   what all needs to be included in that limiting

7   instruction.  And I would like to have it before we

8   start any testimony.

9          I do think that it's relevant to the validity

10  or reliability of the COTI, but in terms of the up the

11  chain of command stuff, I will rule that that is not

12  appropriate in phase one.

13         We can get up the chain stuff in phase two when

14  we're talking about knowledge.

15         Now, that is not to say that it can never be

16  mentioned that I reported to my DOCS that I didn't think

17  this person was eligible and they told me to do it

18  anyway or something.

19         But we're going to have to see how those fit in

20  terms of time and place.  Does that make sense?

21         MS. BROOKER:  I think so.  Your Honor, as long

22  as it's a fluid process and Your Honor is able to see

23  what the testimony is that comes in, how witnesses are

24  examined and we can proffer it, it's appropriate or not

25  appropriate at a certain point in time to call the next

1    witness or not -- I mean, again, we really did do our

2    level best to go through this exhibit and witness list,

3    and that is not the subject of this particular motion,

4    but we really tried our best to make a connection to

5    time and place and eliminate anything that did not go to

6    the COTIs and was not limited to time and place for the

7    witnesses.

8           THE COURT:  And I appreciate that very much,

9    Renee.  It may be that my view is a little narrower than

10   the government's as to what is connected to time and

11   place.

12          I will require this, before any non-physician

13   witness is asked his or her opinion or question that

14   might lead to that, at least for the first time or two,

15   we approach and have a conversation about where we are

16   going.

17          MR. OLSON:  Your Honor, with respect to the

18   limiting instruction, we have been really focused on the

19   admissions phase.  I would think --

20          THE COURT:  Recertification?

21          MR. OLSON:  Recertification would be the same

22   issue that I would expect that the government would

23   elicit similar type testimony about the recertification

24   process and the IDT, putting the jury in the room with

25   the IDT and --

```
 1              THE COURT:  IDT.

 2              MR. OLSON:  Or IDG, IDT, interdisciplinary

 3   team or --

 4              MR. WERTKIN:  They are the same thing.

 5              MR. OLSON:  They are sometimes used

 6   interchangeably.

 7              MR. WERTKIN:  The ID part is the same,

 8   interdisciplinary is the same.  Some people call it

 9   team, some people call it group.

10              MR. OLSON:  The regulation uses one or the

11   other and I can't remember which.

12              THE COURT:  We need to make sure both of those

13   are on our big board.

14              MR. OLSON:  It would be the same issue and the

15   same type of testimony, but it would -- based on what

16   the -- what the Court is saying about the concern, the

17   limiting instruction, would be needed --

18              THE COURT:  Would apply to both.  Any time

19   there is a certification of eligibility or continued

20   eligibility or whatever.  Okay.

21              Is that one clear as mud?

22              MS. BROOKER:  Clear as mud.

23              THE COURT:  Why don't we take a break for lunch

24   and we will come back at 2:00.

25                        (Lunch break taken)
```

```
 1              THE COURT:  All right.  I have looked back at
 2    the relator's opposition to the defendant's motion in
 3    limine regarding the financial interest of the relators.
 4    And I looked back at the defendant's submission.  And I
 5    did not read it or view it as being an accusation of
 6    professional misconduct on the part of counsel.  I just
 7    really didn't read it that way.
 8              As I mentioned earlier, I certainly think that
 9    the financial interest of the relators is appropriate
10    for cross-examination.  Perhaps I should have said that
11    asking to strike them as witnesses was going a little
12    far, but I do think it was appropriate to at least call
13    to the Court's attention the existence of that
14    information.
15              It did seem a tad strange to me, though,
16    Mr. Barger, that in November of whatever year that was
17    when we had a hearing on the motion to dismiss the cases
18    based upon subject matter jurisdiction that you told me
19    at that time that the relators would stipulate that
20    their claims were barred by subject matter jurisdiction
21    and didn't say anything about any interest at that time.
22    I'm not sure that you had to.
23              Anyway, just a tad contradictory.
24              MR. BARGER:  I haven't reviewed that record.
25    My recollection was that what we were explaining was the
```

1  relators are all in agreement, they don't have a problem

2  with that being barred.

3      If I didn't say that on the record, that was my

4  understanding of -- the whole thing was moot because

5  they're in a sharing agreement from the outset.  The

6  defendants certainly knew that and the government knew

7  that.

8      If I didn't bring that to the attention of the

9  Court in the hearing, if it's not in the transcript,

10  then --

11      THE COURT:  There was, I think, an agreement

12  that the plaintiffs were barred, but there was nothing

13  about any agreement about working together or having a

14  percentage in the outcome or anything of that nature.

15      So this motion was the first time that I had

16  heard about that.

17      MR. BARGER:  I will clarify that I don't think

18  any of the relators agree that their claims were barred,

19  they just agree to dismiss their claims.  It's a very

20  different --

21      THE COURT:  You stated at the hearing, and I

22  can show you the transcript, that those claims were

23  barred, when we were talking about the first filed,

24  first to file rule, but --

25      MR. BARGER:  I would have to look back to that.

1    I trust Your Honor's reading of the transcript.

2              Even at that time, everyone, all parties knew

3    that there was a sharing agreement.  If the Court wasn't

4    made aware of that, then I apologize.

5              MR. CHRISTIE:  Your Honor, the defendants did

6    not know that there was a sharing agreement at that

7    point in time.  We did not know.

8              MR. BARGER:  I just disagree with that.  Okay?

9    I mean, you weren't even in the case when we were in

10   Wisconsin and talked with Jack and Charles Bohl and I

11   was hired to represent all three relators, all three

12   sets of relators.  It's not even possible for me to

13   represent all three sets of relators if there is not a

14   sharing agreement.  They would have -- there would have

15   been conflicts of interest.

16             It was very well known, maybe not, Chris, maybe

17   you don't remember that, but that --

18             MR. CHRISTIE:  The agreement wasn't --

19             MR. BARGER:  I didn't say the written

20   agreement, there was --

21             THE COURT:  Here is the transcript, if you want

22   to see it, but there was nothing mentioned at the time.

23   You say the relators and Richardson and Micca agree the

24   first to file would bar any recovery.  Anyway, if you

25   want to see it.

1          MR. BARGER:  I trust your reading of it, Your

2     Honor.

3          THE COURT:  Okay.  The next one we look at is

4     341, the motion to exclude the Corridor Group reports.

5          As I recall, these were all draft reports, like

6     an external audit; is that basically right?

7          MS. MARTIN:  Yes, Your Honor.

8          MR. LONG:  Just on that point about them being

9     drafts, they are denominated -- well, the 2007 summary

10    report says "draft" on it, but the testimony in the

11    record is undisputed that that was the last thing they

12    received from Corridor in terms of a summary report for

13    all the facilities.

14         MS. MARTIN:  That doesn't mean it wasn't a

15    draft.  I mean, it was a draft -- it was a draft that

16    was provided, it says "draft" on it.  There is no

17    testimony that that was a final report.  And I think

18    only the Corridor Group can say that that was the final

19    report.

20         THE COURT:  2004 and 2007, right?

21         MR. LONG:  Yes, Your Honor.  There are two sets

22    of 2004 Corridor reports.

23         THE COURT:  What?  I'm sorry.

24         MR. LONG:  There are two different sets of 2004

25    -- there are two sets of Corridor prepared reports in

1  2004.

2          THE COURT:  It is my understanding that the

3  government doesn't plan to use a Corridor witness to

4  testify about it, but instead Heidi O'Conner -- is that

5  correct?  I think I picked that up from the government's

6  response.

7          MR. LONG:  She is a Corridor employee, I

8  understand.

9          MS. MARTIN:  Yes.  Heidi O'Conner is a Corridor

10  Group employee.

11          THE COURT:  I may have misunderstood.

12  Sometimes when you're reading at midnight, sometimes

13  things get lost in the fog of the nighttime.

14          But the government does identify her as a phase

15  two witness, though, right?

16          MR. LONG:  That's correct.

17          THE COURT:  So is not the whole Corridor report

18  issue a phase two issue on knowledge?

19          MR. LONG:  No, Your Honor.  I believe that --

20  they have raised that argument in terms of relevancy in

21  the time and nexus motion.  And if you want to talk

22  about the relevancy issue now, we can do that.  And I

23  think Jeff can address that.

24          But the motion, the stand alone Corridor motion

25  they filed was just as to hearsay and admissibility as

1   hearsay evidence.

2        MS. MARTIN:  We do have several arguments with

3   regard to these reports that are in different motions.

4   And I think the stand alone motion that we filed does

5   relate to the hearsay objection.

6        We also have relevancy objections to the

7   reports, particularly the 2004 reports which are years

8   before any of the issues in this case.

9        And then with the 2007 reports, there are time

10  and place arguments, as well as 404(b) arguments, that

11  we make with regard to those reports.

12       But the stand alone motion was really related

13  to the hearsay argument.

14       THE COURT:  Again, I note that the government

15  says that phase two witness Heidi O'Conner will offer

16  testimony --

17       MR. LONG:  As to the 2004 Corridor reports

18  which are phase two.

19       MR. WERTKIN:  The government doesn't plan on

20  talking about 2004 reports in phase one.

21       THE COURT:  That would have been nice to know

22  because from my notes and my recollection --

23       MR. WERTKIN:  On the exhibit list, we put all

24  the 2004, we designate them specifically as phase two

25  documents.

1              MS. MARTIN:  And I think our objection to

2     those, the hearsay objection goes to those regardless of

3     whether they are phase one or phase two.

4              THE COURT:  Right.

5              MS. MARTIN:  And also our argument with regard

6     to the time frame on the 2004 is not really just a phase

7     one issue but an overall relevancy to the litigation

8     because they were 2004, well before any of the patients

9     at issue here were on service.

10             THE COURT:  Those patients, remind me again the

11    time frame, the years?

12             MS. MARTIN:  2007 to, I believe it was

13    September of 2012.

14             THE COURT:  I do think we may have some time

15    connection issues on that.  But I really would be

16    inclined to kind of skip that for today in terms of the

17    admissibility of the 2004 reports in phase two.

18             Explain to me, if you would, Kim, why it is

19    that the business records exception of 803.6 doesn't

20    apply to the 2007 reports.

21             MS. MARTIN:  These reports were created by the

22    Corridor Group, not by AseraCare.  And while it doesn't

23    have to be someone with firsthand knowledge to

24    authenticate the record, the Eleventh Circuit cases do

25    or -- and to lay a predicate for the hearsay exception,

1   the Eleventh Circuit cases do look at the -- someone who

2   is the custodian of the records, who has information

3   about how they were created, what the procedures used to

4   create them were, what the regular course was, and can

5   testify as to how it was the regular practice of the

6   business activity to create them.

7          And they cite to testimony by AseraCare

8   witnesses in their opposition, but none of that

9   testimony laid that predicate for the 803.6 exception.

10         And the one Eleventh Circuit case that they

11  cite does talk about, as a custodian, it was the

12  bankruptcy trustee who was the custodian of the records

13  and interviewed the people who had created the record

14  and was able to testify about all the points under 803.6

15  that allowed for admissibility to be laid.  And that is

16  not what they presented here.  And --

17         THE COURT:  So they don't have a Corridor Group

18  representative as to the 2007 report?

19         MR. WERTKIN:  We listed the custodian of

20  records on our exhibit list.  We didn't anticipate this.

21  I think that they are listed as a phase two witness.

22  But we did reserve the right to call phase two witnesses

23  in phase one.  And we could call the custodian of record

24  if there's a question as to authentication and whether

25  it's a business record or not.

1      MR. OLSON:  There are also a number of Corridor

2  employees who are identified as potential phase one

3  witnesses on AseraCare's exhibit list, and in ours we

4  reserve the right to call those.

5      To the extent we need to call a Corridor

6  employee specifically for the purpose of authenticating

7  these as records of regularly conducted activity, we

8  would like to do that.

9      MS. MARTIN:  I need to look at our list to

10  check the designation, but I didn't recall them being

11  designated as phase one witnesses.

12      THE COURT:  Okay.  If we're talking about phase

13  two, then we can -- I can give you my general thoughts

14  on it, but we can punt till phase two.

15      It also seems to me that under 801(d)(2) that

16  Corridor could be viewed as the agent of AseraCare.

17      MS. MARTIN:  Your Honor, the case law looks at

18  the common law definition of agent and whether there was

19  control over not only what was to be done but how it was

20  to be done.

21      And one starting point, I have got a copy of

22  for you here, Judge, it's marked on the government's

23  exhibit list which is Number 16 which is the engagement

24  letter.  And if you look at the recitals to that letter,

25  on Page 16, it talks about that and specifically lists

1   that the Corridor Group is an independent contractor and

2   is --

3             THE COURT:  Which number are you referring to?

4             MS. MARTIN:  Page 16(1)(a).

5             THE COURT:  I've got it under relationship of

6   parties.

7             MS. MARTIN:  Right.  Independent contractor,

8   that the parties agree that the Corridor Group's

9   relationship is that of an independent contractor and

10  does not constitute the Corridor Group as an employee,

11  partner, co-venturer or agent of the client for any

12  purpose whatsoever.

13            And the testimony was that the Corridor Group

14  was retained to do these reviews, but the Corridor Group

15  went about and conducted the reviews using its own

16  people and in its own manner.

17            And the language of the agreement between the

18  parties clearly defines that they're an independent

19  contractor, not an agent.

20            So that is why the statement within the reports

21  don't come in under 801(c)(2).

22            MR. LONG:  Your Honor, with all due respect, I

23  think that is an inaccurate statement of the law as it

24  is under the Eleventh Circuit.

25            THE COURT:  Give me some Eleventh Circuit law.

1   I sure would like to see Eleventh Circuit law, but I saw

2   a whole lot of citations to cases from around the

3   country.  And I'm assuming that's because you couldn't

4   find Eleventh Circuit law.

5           Did you cite any Eleventh Circuit law in your

6   opposition?

7           MR. LONG:  Yes.

8           THE COURT:  Cite it to me.

9           MR. LONG:  It's on Page 6, we cited a 1980

10  opinion, document 355.

11          So, if you'll indulge me a little, it's not

12  actually from the Eleventh Circuit --

13          THE COURT:  Collins vs. Wayne?

14          MR. LONG:  That's because the Eleventh Circuit

15  did not exist at the time this was published.

16          THE COURT:  1980.  Its equivalent.

17          MR. LONG:  So, in this case, a bus

18  manufacturer, a bus was involved in an accident and the

19  bus manufacturer engaged an independent expert to

20  investigate and analyze what happened in the accident.

21  The consulting expert was then disclosed and deposed.

22  The plaintiff wanted to use the deposition testimony of

23  the consulting expert against the manufacturer who had

24  retained him.  And they argued that it was an admission

25  of the manufacturer under 801(d).

1        And the District Court said it could come in

2   but it could not come in as an admission, so they

3   weren't allowed to comment that it was an admission of

4   the manufacturer.

5        The Fifth Circuit said the District Court

6   abused its discretion in making that ruling.  And we

7   quote the relevant language here, a block quote on Page

8   7, that the manufacturer hired the expert -- and I've

9   replaced manufacturer and expert with the actual party's

10  names to make it more clear, hired the expert to

11  investigate the bus accident and report its conclusions.

12  In giving his deposition, he was performing the function

13  that the manufacturer had performed, his deposition

14  therefore was an admission of the manufacturer.

15        So, the issue is whether or not Corridor Group

16  was retained by AseraCare, which is undisputed, to

17  investigate and report on the conditions of Medicare

18  participation, which is on the first page of their

19  engagement agreement or maybe the second page.  That's

20  the term of their contract.

21        The Corridor reports are reports of explicitly

22  what they were engaged to do.

23        Ms. Martin, I believe, is citing the case, and

24  I may be getting the circuit wrong, but I believe it's

25  from the Third Circuit maybe Rasch or another case

1  similar where the Court reached the exact opposite

2  conclusion of the Fifth Circuit and ruled that an

3  expert, because they're an independent contractor,

4  doesn't constitute an admission of the party.

5      However, they explicitly distinguish or they

6  don't distinguish, they say we are not going to rely on

7  Collins.  Collins reached a different result, and we

8  choose not to follow that result.

9      Well, Collins is what's binding in this Circuit

10 and Collins doesn't make the common law agent versus

11 independent contractor distinction that Ms. Martin has

12 presented to the Court today.

13     MS. MARTIN:  Actually, I'm referring to the

14 Eleventh Circuit case of the City of Tuscaloosa vs.

15 Harcros Chemical.

16     THE COURT:  Is that cited in your brief?

17     MS. MARTIN:  It was not.  It was in response.

18     THE COURT:  City of Tuscaloosa?

19     MS. MARTIN:  City of Tuscaloosa vs. Harcros —

20     MR. CHRISTIE:  Harcros.  I was counsel.

21     MS. MARTIN:  I didn't notice that.

22 H-a-r-c-r-o-s-s or one S?

23     MR. CHRISTIE:  One S.

24     MS. MARTIN:  158 F.3d 548.  In that case, the

25 Court talks about how because Congress did not define

1  the term "agent," that you have to look at the common

2  law definition of agent.  And they cite to an Alabama

3  Supreme Court case defining "agency" and use that in

4  their analysis in that case.

5        Now, the case that the government cites to you,

6  the Collins case, was a case where there was a retained

7  expert to investigate an accident that was the subject

8  of the litigation, and that expert was identified in

9  interrogatory answers as an expert with information

10  about the case, was deposed in the case, and then later,

11  when they did not want to use that expert, the opposing

12  side wanted to use the testimony of the expert and it

13  was found to be an admission of the party.

14        And that circumstance is different to me and my

15  reading of the case law than what we have here with the

16  Corridor Group reports where we have an independent

17  contractor who was retained to look at issues, created a

18  report, that's a draft report, and does not fall within

19  the 801(d)(2) exception to hearsay.

20        THE COURT:  Okay.  I certainly want to look at

21  that City of Tuscaloosa case.

22        MR. LONG:  I apologize, Your Honor, that case

23  was not in their initial motion.

24        THE COURT:  I think it was in response to your

25  argument --

1          MR. LONG:  They brought it up in response.

2    Your Honor, you may be getting to this:  There is also a

3    little distinction, too, the 2007 documents they seek to

4    exclude those documents prepared by Corridor, but

5    they're also a document prepared by an AseraCare

6    employee.

7          THE COURT:  Is that for their motion?

8          MR. LONG:  Yes, Your Honor.

9          THE COURT:  Oh, the email?

10          MR. LONG:  The email and the Power Point.

11          MS. MARTIN:  Email and Power Point that

12    includes hearsay language in it.

13          MR. LONG:  It's a summary of the conclusions of

14    the reports.

15          THE COURT:  And it was prepared by --

16          MR. LONG:  The vice-president of clinical

17    operations of AseraCare.

18          THE COURT:  And the name.

19          MR. LONG:  Angie Hollis, I believe.

20          THE COURT:  I had a real question about that

21    one, Kim, as to why that would not be admissible.

22          MS. MARTIN:  Well, it was created using these

23    reports that have hearsay within hearsay and those

24    hearsay -- you know, hearsay within hearsay was included

25    in the Power Point.

1          So, that was the basis of our objection to that

2     document, was that it included multiple layers of

3     hearsay and could not be cured merely by the fact that

4     it was created by --

5          THE COURT:  And it's not a business document?

6          MS. MARTIN:  Well, even business records have

7     to have exceptions to hearsay that's contained within

8     them.

9          THE COURT:  Within hearsay.

10         MR. LONG:  Your Honor, I'm not exactly sure

11    what the hearsay within the hearsay that is being

12    identified within this document.

13         There is cover emails, and then there's her

14    summary or analysis, her information she's taken from

15    the Corridor reports.  It's our Exhibit 355-2.

16         THE COURT:  That is your Exhibit --

17         MR. LONG:  Our Exhibit Number 2.  So that's the

18    cover email.

19         THE COURT:  Exhibit 199 for trial.

20         MR. LONG:  That is a deposition marker.  It's

21    Government's Exhibit 17 down at the bottom.

22         THE COURT:  It would be very helpful on those

23    that have -- well, I guess you may be using them in the

24    deposition.

25         Was this actually presented at the board of

1  directors meeting?  It said something about preparing it

2  but wasn't sure -- at this board meeting?

3       MR. LONG:  My understanding is we are not one

4  hundred percent clear on that issue.

5       MS. MARTIN:  I think it's not clear whether it

6  was or was not.

7       MR. OLSON:  The evidence does show there was a

8  presentation given but it's not clear if it was exactly

9  that Power Point.  That is our understanding.

10      MR. LONG:  Our understanding is the testimony

11 is clear that it was prepared to be presented to the

12 board.

13      MS. MARTIN:  There is not any evidence that

14 this document was presented to the board.

15      MS. BROOKER:  Your Honor, may I add something?

16      THE COURT:  I would like to know where the

17 hearsay within hearsay is particularly, Kim.

18      MS. MARTIN:  Well, it's contained in the fact

19 that there are statements that were pulled from the

20 reports and that are included in this Power Point

21 document.

22      So, there are things in the recommendations,

23 the findings, things that are pulled from the report

24 included in the Power Point.

25      MR. LONG:  Your Honor, we argue that is just

1  one level of hearsay.  She has prepared her own

2  statement, it's a document that is fully self contained,

3  it relies on the Corridor Group report, but it isn't

4  referring to statements by an out-of-court declarant.

5  There's no additional layer.

6          I think, moreover --

7          THE COURT:  Why are you saying it's not relying

8  on statements by an out-of-court declarant?

9          MS. MARTIN:  Things like, it says right, wrong,

10 poorly -- I mean, that's something that's pulled

11 directly from that report that's put in to this Power

12 Point.

13         So, to the extent that that report is hearsay,

14 and then this is hearsay within hearsay.

15         THE COURT:  Based upon whatever they heard or

16 discovered outside in the report that they prepared.

17         Let me do some more thinking on this email.

18         MR. WERTKIN:  May I say something, please?  I

19 understand Your Honor is going to look at the case law

20 and we also may supplement in terms of whether or not

21 this is an admission.

22         But let's be clear, we're talking about

23 evidence here, getting documents in.  There's no

24 question about their reliability.

25         We can just call a Corridor custodian and get

1   these in as business records.

2          THE COURT:  I thought we had gotten past that.

3          MR. WERTKIN:  Have we?

4          THE COURT:  In that we're not going to be

5   addressing that until phase two.

6          MR. WERTKIN:  Well, no.  The 2007 Corridor

7   reports are phase one documents.

8          THE COURT:  But you referred to phase two

9   witnesses to support those.

10          MR. WERTKIN:  Well, frankly, Your Honor, we did

11   not expect -- since the reliability of the Corridor

12   documents are not in doubt, we did not anticipate on

13   having to establish them as a business record.  We

14   actually thought that they would be -- we thought there

15   was a chance they would be stipulated to.

16          So, we can call a Corridor witness, custodian

17   of records for the purposes of just laying the

18   foundation.  We don't expect the testimony would be very

19   long because there is no question as to the reliability

20   or authenticity of these documents.

21          THE COURT:  How the heck do you plan on using

22   them in phase one?  Both of your responses in this

23   motion address phase two witnesses.

24          MR. WERTKIN:  Well, I think the problem, as Don

25   pointed out, was that we're dealing with two sets of

1   Corridor reports, 2004 and 2007.

2           In our nexus -- this comes up a lot in the

3   nexus, but I can --

4           THE COURT:  Well, I'm looking at this one at

5   document 355 --

6           MR. WERTKIN:  The Corridor report, it says

7   things like, for example, this is a quote from the

8   Government's Trial Exhibit Number 1, medical directors

9   are not adequately involved in making initial

10  eligibility determinations.

11          THE COURT:  Okay.  And we have the hearsay

12  issue about that and whether the statements by an

13  independent contractor can be attributed to the hiring

14  entity.

15          MR. WERTKIN:  It can come in either way.  It

16  can come as an exception under the business records or

17  it can come in as an exception under the admission of

18  party opponent.

19          If it's an admission, then we don't need to --

20  it comes in under that exception.  If the Court rules

21  that it's not an admission, then we can have a custodian

22  of records testify that it's kept in the ordinary

23  course.

24          The point I was trying to make, Your Honor,

25  there is no --

1            THE COURT:  Who is going to testify about the

2      meat of it?  You keep referring to phase two witnesses.

3            MR. WERTKIN:  Well, the Corridor reports were

4      circulated among AseraCare employees, Ms. Angie Hollis

5      is on the email.  She's the one --

6            MS. TAPIE:  We identified phase one witnesses

7      to talk about the Corridor Group.

8            MS. MARTIN:  Who are not AseraCare employees.

9      I mean, sorry, not Corridor Group employees.

10           What they want to do is call an AseraCare

11     employee to lay the foundation under 803.6 --

12           MR. WERTKIN:  No, no, that's not right.  I'm

13     sorry to interrupt.

14           MS. MARTIN:  I am trying to understand what

15     your argument is which I think is that.

16           MR. WERTKIN:  If there is a hearsay objection,

17     then we plan on calling a Corridor custodian of records

18     who can testify that this is a business record.  Then it

19     would come in.

20           Then we would call AseraCare witnesses who

21     could testify about the Corridor report.  And we have

22     many people who we plan on talking about the Corridor

23     report.

24           So --

25           THE COURT:  In phase one?

1      MR. WERTKIN:  Correct.  For example, the

2 Corridor report says, like I just read, medical

3 directors are not adequately involved in making initial

4 eligibility determinations.

5      So, we expect that that would be a, you know,

6 something that phase one witnesses, because as we

7 mentioned earlier, how involved medical directors are is

8 a key issue in terms of signing a COTI.

9      So that's -- again, if the question is --

10      THE COURT:  That goes, does it not, to the

11 notice or knowledge of AseraCare that out in the field

12 medical directors were not engaged.

13      MR. WERTKIN:  Both.  Of course it goes to

14 knowledge because we can show that they knew about it.

15 But it also goes to the fact of the reliability of the

16 COTIs.

17      THE COURT:  Based upon hearsay.  When you have

18 got the testimony of former employees on that same

19 point.

20      MR. WERTKIN:  Your Honor, if it falls under a

21 hearsay exception, then it comes in as a business

22 record.

23      I guess, maybe someone can help me out.  I'm

24 not really understanding Your Honor's question.

25      Witnesses are going to testify in their minds

1    that the doctors were not involved in eligibility

2    determinations and they are going to be heavily

3    cross-examined, I assume, about their testimony.

4           The notion that AseraCare hired an auditor to

5    do an analysis of the agencies that are relevant in this

6    case and also found that the medical directors are not

7    adequately involved in determination, that is really a

8    key important piece of evidence.

9           THE COURT:  As to knowledge.

10          MR. WERTKIN:  No.  As to the reliability of the

11   COTIs.  If the witness --

12          THE COURT:  All right.  We're getting into

13   tying it in terms of time and place.

14          MR. WERTKIN:  Right.  These are same -- yeah,

15   we can put that aside for sure.

16          All I was saying, Your Honor, as far as hearsay

17   goes, Your Honor will review the case law, if it comes

18   in as an admission, then we don't have to worry about

19   getting it as a business record.

20          If Your Honor rules that it can't come in as an

21   admission, then we'll just call a custodian of record.

22   Like I said, there's no question about the authenticity

23   of this document, as far as we know, there is no doubt

24   about its reliability.

25          I was just pointing out that we can get it in

1    either way, and I'm not sure that really what -- we can

2    talk about whether or not it should come in in terms of

3    time and place, we have very strong arguments about

4    that.  But --

5         MS. MARTIN:  And I would just say that in terms

6    of the hearsay objection, they're trying to establish

7    this as an AseraCare business record, but it's not an

8    AseraCare business record.  It's a Corridor Group

9    business record.

10        In terms of phase one relevancy, which we can

11   get to, but, you know, these 2007 audits do not, for the

12   vast majority, do not overlap in time and place with any

13   ineligible patient from the sample.  And it really --

14        THE COURT:  2007 or 2004?

15        MS. MARTIN:  2007.  Sorry, Your Honor.  2007

16   audits are not linked in time and location with any

17   patient in the sample.

18        THE COURT:  Well, before we get to that,

19   because I still want to deal with this hearsay issue.

20        MS. BROOKER:  I would like to briefly address

21   the hearsay.

22        THE COURT:  I think I may take a break.

23                    (Break taken)

24                  (Back on the record)

25        THE COURT:  Okay.

1          MS. BROOKER:  I think I can try to dig us out

2     of this.

3          THE COURT:  I think I might have dug us out of

4     this.  I think that it probably is a business record.

5     And even though it's created by Corridor, it was, at

6     least apparently through this email that we're not sure

7     yet whether that's going to come in, incorporated and

8     relied upon or at least designed to be relied upon by

9     AseraCare.

10          So, I think it probably comes in through that.

11     But that doesn't address the question of relevance at

12     key points.

13          MS. BROOKER:  Correct.  I agree.

14          THE COURT:  We're still going to look at the

15     City of Tuscaloosa case in terms of whether it is an

16     admission.

17          MR. LONG:  I pulled that up on my phone, if I

18     could speak to that case.

19          THE COURT:  I've got it.  But I'm going to read

20     it later.

21          MS. MARTIN:  It's footnote 9 where they talk

22     about the definition of agent and how that worked.

23          MR. LONG:  That footnote only says, "because

24     Federal Rule 801(d)(2) does not define the term agent,

25     we must assume that Congress intended to refer to

1   general common law principles of agency when it used the

2   term", and then it goes on to say that a corporate

3   officer, such as a president, would be an agent for the

4   purpose of that rule.

5        It does not go on to speak about independent

6   contractors within that note.  It doesn't purport to

7   interact with the Collins decision we cited you here.

8   It couldn't purport to overrule it because it's prior

9   precedent that that Court would be bound by.

10        MS. MARTIN:  It does state --

11        THE COURT:  Well, there are quite a few

12  Eleventh Circuit cases that totally ignore prior

13  precedent, if you haven't figured that out by now.

14        Right, Mr. Lembke?

15        MR. LEMBKE:  Right.

16        THE COURT:  Sometimes they don't even

17  acknowledge that prior contradictory precedent on which

18  the lower court relied exists.  I'm sorry.

19        MS. MARTIN:  In that case, though, they were

20  offering these statements of the officer of the company

21  and so it's different from the situation we have here.

22        But they were looking at how do you define and

23  what an agent is under 801(d)(2) and they said you look

24  at the common law and they specifically, because it was

25  an Alabama case, looked at the common law of Alabama

1    which goes to the issue of --

2         THE COURT:  Retaining the right to direct the

3    manner in which business shall be done.

4         MR. WERTKIN:  However the Court rules on

5    whether it comes in as an admission, we'd just like to

6    put the defendants on notice that we will call the

7    Corridor Group custodian of record to get it admitted as

8    a business record, if the Court rules it doesn't come in

9    as an admission.

10        THE COURT:  I don't think it comes in as an

11   admission based upon that footnote that I just read in

12   the City of Tuscaloosa case and the reference to Alabama

13   common law there.

14        It's the most recent statement by the Eleventh

15   Circuit as opposed to the 1980 Fifth Circuit case.  So I

16   think that's the safer one for me to follow.

17        MS. BROOKER:  So, Your Honor's preference is

18   that we do call a custodian?

19        THE COURT:  Oh, I don't care what you do.  But

20   I'm not going to admit it as an admission of a party.

21        MS. BROOKER:  If I just may address Your

22   Honor's other point when you left.  So, the government

23   will be able to call a custodian to admit those records,

24   and then we're going to talk about, in another motion

25   later, just so Your Honor is clear.  Again, we really

1    tried to be mindful of not -- even to the extent that we

2    had to talk about pieces of evidence in two phases, only

3    some of the information in the Corridor report in 2007

4    is relevant to phase one and some witnesses will testify

5    about that and we're going to address that in another

6    motion.  And some of the witnesses will address 2004 and

7    2007 reports, pieces of it, in phase two.

8         So, I think that we're very mindful that this

9    all does not come in in phase one.

10        MS. MARTIN:  We're very happy to discuss their

11   relevance to phase one because we think that they do not

12   come in in phase one for several reasons.  And we can

13   talk about that whenever we get to --

14        THE COURT:  Let's finish 341 before we get to

15   the other ones.

16        MR. WERTKIN:  Maybe we can hold out hope, if

17   there's no question to whether it's a business record,

18   maybe we can hold out hope of a stipulation so we don't

19   have to drag another unnecessary witness in.  Is that

20   too much to hope for, do you think?

21        MS. BROOKER:  The rule does allow for that, for

22   an affidavit by a custodian.

23        MR. WERTKIN:  We could call the business

24   custodian, and we will, certainly.  But if there's no

25   question as to the reliability of this --

1      MS. MARTIN:  It's not our business record.  And

2  we don't have someone who can lay a foundation for you

3  to establish it as a business record.  So that's --

4      MR. WERTKIN:  Maybe we can discuss getting an

5  affidavit from the Corridor custodian and we'll do that

6  at the appropriate time.

7      MS. MARTIN:  We can talk about that, but I

8  don't think that satisfies the requirements of the rule.

9      MR. WERTKIN:  Well, if you stipulate to it, it

10  wouldn't --

11      THE COURT:  Well, I mean, I think the thing is,

12  like whose business records are we talking about?

13      MR. WERTKIN:  The Corridor Group's.  I was just

14  trying to avoid calling a witness where there is not a

15  matter in dispute.  But I think it's probably wise to

16  plan on calling the custodian at this point.

17      THE COURT:  As to the defendant's motion in

18  document 341, I'm going to deny the objections as to the

19  hearsay in part, as to the business record, if the

20  appropriate connections are made.  But I'm going to

21  grant it, and I don't even think it was quite made as to

22  this, but it was an alternative argument, I think,

23  asserted by the government, that it was a statement of

24  an opposing party.

25          And I'm going to grant it as to that aspect,

1   both 2007 and 2004, and then we'll look at the other

2   stuff.

3         Which one do we want to take next?  The

4   defendant's time and place nexus or the government's 336

5   omnibus one?

6         MR. WERTKIN:  Your Honor, I think since so many

7   of these conversations have been coming back to the

8   nexus one, it may make sense that we address that right

9   now.

10        THE COURT:  All right.  I have been trying to

11  figure out how the heck to take little bites of this

12  elephant and it's a major undertaking.

13        We've got a whole variety of bits of evidence

14  and testimony, and I'd like to first kind of look at the

15  question of the testimony of the various witnesses and

16  the time and place relationship because I think that

17  may, in some ways, bleed over to the exhibits.

18        I think I may have a better handle perhaps on

19  witnesses than I do on the exhibits themselves.  I'm not

20  sure I have looked at all the attachments that were

21  submitted.

22        If I'm not mistaken, the first witness in

23  particular is Dr. Micca.  And we're talking about the

24  testimony at or we're talking about the Atlanta

25  facility.  He was there, if I have got my dates correct,

1  February 2005 to August of 2006.  The first ineligible

2  patient is not identified until admitted on January 5th,

3  2007.

4           MS. MARTIN:  That's correct.

5           THE COURT:  We're talking about four months

6  later.

7           MS. MARTIN:  Actually, he left the beginning of

8  August, I think August 6, so it's really about five

9  months later.  And I think that was my math mistake.

10          THE COURT:  All right.  Five months.  And then

11 the government comes in and says that even though he

12 left AseraCare, he continued to work at Golden Living

13 where he was the treating physician and was, this is not

14 clear to me, was he the treating physician for any of

15 the patients identified as one of the 123?

16          MR. WERTKIN:  No, Your Honor.

17          MS. MARTIN:  None of them resided in his Golden

18 Living facility.  We have the pages here to show where

19 they all resided and who their attending doctors were.

20          THE COURT:  So, if none of the -- how many

21 patients were identified in the Atlanta facility

22 beginning January 5, 2007?

23          MR. WERTKIN:  Was it eleven or seven?

24          MS. MARTIN:  Well, ineligible patients in

25 Atlanta --

1          THE COURT:  Allegedly ineligible.

2          MS. MARTIN:  Thank you, Judge.  Sorry.  It's

3  late in the day.  There are seven, seven patients.

4          THE COURT:  And the dates were January 5,

5  '07 --

6          MS. MARTIN:  To April of 2011.

7          THE COURT:  But none of them were at Golden

8  Living.

9          MS. MARTIN:  At Golden Living North Side where

10  Dr. Micca was the medical director.

11          THE COURT:  So how was he then able to continue

12  observing, as you stated in your brief, if he's not at

13  the facility where any of the folks were?

14          MR. WERTKIN:  So, Your Honor, the test, as you

15  know, for relevance is very, very broad -- and I'm going

16  to answer your question, I promise.  But the test is

17  just whether it makes -- the existence of any facts in

18  evidence that is of consequence to the determination of

19  the action more or less probable.

20          We are going to be using as evidence to show

21  that the COTIs that were signed by these doctors were

22  not -- they were not reliable.  That's the purpose of

23  the testimony.

24          He will have observed AseraCare nurses or what

25  the AseraCare staff were doing at that Golden Living

1    facility.

2          The United States is not contending --

3          THE COURT:  But the Golden Living facility

4    didn't have any ineligible patients identified.

5          MR. WERTKIN:  From the sample.  But there were

6    lots of AseraCare patients in the Golden Living facility

7    at the time that Dr. Micca was there.

8          THE COURT:  Okay.  So, what is the place

9    connection to his testimony if none of these -- because

10   we're looking at can you prove that any of these seven

11   patients in Atlanta from January 5, 2007 till April 9,

12   2011 as identified were in fact ineligible.  And none of

13   them were at the facility where he was --

14         MR. WERTKIN:  The place connection is to the

15   Atlanta facility.  So, the DOCS in Atlanta is Margo

16   Marcus.  The intake coordinator's name, AseraCare

17   employee, Mary Olson.  The patient care coordinator's

18   name is an AseraCare employee named Sally Whitley and

19   Melinda Williams.

20         In addition, AseraCare had front line nurses

21   and certifying nursing assistants and chaplains who

22   would visit the Golden Living facility where Dr. Micca

23   was the medical director.

24         So, Dr. Micca's testimony is not about any of

25   the patients in the sample, but the testimony is about

1   his interaction with the nurses and the front line

2   people and the other AseraCare employees from the

3   Atlanta facility.  So the place connection is to the

4   Atlanta facility.

5          THE COURT:  I think the place connection is to

6   the same people who are at all of those facilities.

7          MR. WERTKIN:  When you say those people, you

8   mean the patients, right?

9          THE COURT:  No, I'm talking about AseraCare

10  people.  Isn't that what you just told me?

11         MR. WERTKIN:  Exactly.  Yes.

12         THE COURT:  Okay.  But not vis-a-vis any

13  patients that he had any responsibility for at the

14  Golden Living North Side facility.

15         MR. WERTKIN:  Right.  Your Honor, it may help

16  to understand what Dr. Micca is going to testify about

17  because I think that that helps put it all in context.

18         So, what Dr. Micca was --

19         THE COURT:  I have got that right here on Page

20  12 of your --

21         MR. WERTKIN:  It's 13, that's right.

22         THE COURT:  It starts on Page 12.

23         MR. WERTKIN:  Right, starts on Page 12.

24         THE COURT:  Yes.  And this information about

25  what he received when he was the medical director five

1   months before this patient was placed into hospice care

2   who has been declared by Dr. Liao as ineligible.

3          MR. WERTKIN:  So, his experience in dealing

4   with this Atlanta agency, the same people, he's going to

5   testify that this was his experience, that he couldn't

6   get his opinion listened to and he went to the executive

7   director of the Atlanta agency and said, no more

8   fighting, I don't want to have -- I'm paraphrasing here,

9   but I'm sick of fighting with the AseraCare employees.

10  My clinical judgment should be the one that stands.  And

11  he was fired from AseraCare the next day.  So that's

12  going to be his testimony.

13          Now, he was fired four plus months before the

14  first ineligible patient.  What he will testify to is

15  that all the people that were working at the AseraCare

16  agency, the same people he dealt with, the same ones

17  that he was fighting with, they all were still at

18  AseraCare, the Atlanta agency, and they were still

19  taking care of all the same patients that are the

20  ineligible patients in our sample.

21          MS. MARTIN:  So what --

22          THE COURT:  But they hadn't been admitted then.

23          MS. MARTIN:  Correct.  These patients were not

24  on service at the time that Dr. Micca was in Atlanta.

25  He was not their attending, not their medical director,

1    not even in the same Golden Living facility and not all

2    of these patients that they reference were in Golden

3    Living facilities.

4           So, what the government wants to do here is

5    offer Dr. Micca's testimony of some experience that he

6    had prior to any of the 123 coming on service and offer

7    that to show that, well, it must have happened when

8    there was a patient in the 123 on service.  And that's

9    classic 404(b).  I mean, that is an act at one time

10   shown to -- for conformity therewith at a different time

11   and that's prohibited.

12          Now, they say it goes to the unreliability of

13   the COTIs and that sort of thing, but that's falsity.

14   They're offering it to prove falsity of the patient in

15   the sample by showing an act that occurred outside of

16   the -- and not in relation to a patient in the sample.

17          And they can say that it's not, but the issue

18   that's in phase one is falsity, whether any of these 123

19   patients in the sample were not eligible and their

20   claims were false.

21          So, when you're offering unreliability of the

22   COTIs, you are offering it to show falsity.  Unless it

23   overlaps in time and is related to one of the 123, that

24   is a 404(b) act offered to show conformity therewith.

25          THE COURT:  Let me back up and ask about a

1   question of falsity here, too.

2          Kim, you just told me that none of the

3   ineligible patients were at Golden Living North Side.

4          MS. MARTIN:  Correct.

5          THE COURT:  In the government's brief, it says

6   that when he continued as medical director of Golden

7   Living and treating physician, that this necessitated

8   Dr. Micca's presence in the Golding Living North Side

9   facility where the ineligible patients from the sample

10  resided.  Is that true or false?  In other words, who is

11  telling me the truth here.

12         MS. MARTIN:  I have got the document to show

13  you what I'm saying, Judge.

14         MR. BARGER:  I don't think, Your Honor, my

15  understanding -- that doesn't sound correct to me.  I

16  think that that may be a mistake.

17         I think that what -- where the same -- he's at

18  the same facility where the same caregivers are

19  operating for the patients who are --

20         THE COURT:  But not where the ineligible

21  patients --

22         MR. BARGER:  I think that is an error.

23         THE COURT:  Because when I read that it was

24  like whahooey, yeah, his testimony gets to come in if

25  he's dealing with ineligible patients.  But if he's not,

1  that's a different story.

2        MR. WERTKIN:  Your Honor, let me clarify, that

3  is a mistake.

4        What I said earlier about how there was an

5  overlap of the employees, that is correct, but this is

6  not correct.

7        MR. BARGER:  It's the employees at the same --

8  and I will take some responsibility, Jeff and I were

9  working at this late at night trying to figure out --

10        THE COURT:  Everybody has been working late at

11  night.

12        MR. BARGER:  We were trying to say the same

13  employees that are in the Golden Living North Side

14  facility are the same employees that are taking care of

15  the patients in the sample.

16        MR. WERTKIN:  I reached out to Mr. Barger

17  because he represents Dr. Micca.

18        THE COURT:  That's, in my opinion, a very big

19  and significant mistake that went to a very important

20  part of this argument.

21        MR. WERTKIN:  Your Honor, if I may, relevance

22  is very, very broad, the way that the Eleventh Circuit

23  considers relevance.

24        And what we asked ourselves in this, would the

25  jury benefit from hearing that this doctor couldn't get

1   his views listened to at the Atlanta agency just five

2   months before the first ineligible patient.

3          Arguably, this actually opened, you know, and

4   the jury can infer from that that if the COTIs that were

5   signed under Dr. Micca were not reliable, the jury can

6   infer that since the same AseraCare employees were there

7   at the same agency for the next five months or into that

8   sixth month, they can infer that the COTIs continued not

9   to be reliable.

10         And that goes, I mean, again, the test in the

11  Eleventh Circuit in terms of just basic relevance is

12  very expansive.

13         MS. MARTIN:  But it's relevant to the issue

14  that's in phase one which is falsity.  And what you are

15  proposing is that you would allow the jury to hear this

16  experience and then infer that AseraCare employees were

17  acting in conformity therewith at a time when there were

18  patients on the sample.

19         And you're using a person who had no knowledge

20  of what was going on with Karen K., Julia H., Alice D.,

21  Ann K. or Virginia E. at the time to do that.

22         In fact, you know, wasn't even in the facility

23  where they were.  And that's improper 404(b.)

24         THE COURT:  And you say here, and this is

25  another thing I want to clarify.  On Page 14, you say,

1   Dr. Micca can testify about his firsthand experiences

2   with AseraCare employees at the Golden Living facility,

3   and we have already determined there were no ineligible

4   people there, during the period of ineligibility for the

5   following ineligible Atlanta patients in the sample.

6          MR. WERTKIN:  That is correct, Your Honor.

7          THE COURT:  What firsthand experiences did he

8   have from January 5, 2007 to April 9, 2011 with the

9   AseraCare employees that had anything to do with these

10   ineligible patients at a different location?

11          MR. WERTKIN:  My understanding, and Mr. Barger

12   can -- in his deposition testimony, I believe he did

13   testify that he would, while he was at Golden Living,

14   would find a patient, deem them not to be terminally ill

15   and try to get them off of AseraCare's rolls as being

16   eligible, and that he would be overruled and that that

17   person would be going on -- the same activity that was

18   happening while he was the medical director in the 2006

19   time frame was occurring even afterwards because he was

20   the attending physician for patients at Golden Living.

21          THE COURT:  At the Golden Living Nursing Home.

22          MR. WERTKIN:  Correct.

23          THE COURT:  He was trying to get patients off

24   of --

25          MR. WERTKIN:  Yes, Your Honor.  And that could

1  be either in his testimony, in his deposition testimony,

2  or it could be just something that he has shared when we

3  were talking about this case.  I can't be certain about

4  that.

5       MR. BARGER:  It's in his complaint, I believe.

6       MS. MARTIN:  Your Honor --

7       THE COURT:  It was in his complaint as to that

8  particular time period, Jim?

9       MR. BARGER:  My understanding, Your Honor --

10       THE COURT:  Complaint is not testimony.

11       MR. BARGER:  No.  But this is just trying to

12  tell you what we believe him to be ready to testify to.

13  We believe that he will testify, as a medical director

14  for subacute services at the Golden Living North Side

15  Agency and as a treating physician, he has continued as

16  a treating physician to this, I believe to this day for

17  certain patients, that he witnessed those same employees

18  that are taking care of, admitting and recertifying

19  patients in the sample, those same employees

20  were continuing to resist him as a treating physician

21  throughout the time period.  Not as AseraCare medical

22  director, but as a treating physician.  So he's seeing

23  the same thing.

24       THE COURT:  Throughout what time period?

25       MR. BARGER:  To this day.  But certainly until

1    2011 when he was the medical director at subacute

2    services at North Side -- Golden Living North Side,

3    which was through 2011.

4          MS. MARTIN:  Dr. Micca was no longer the

5    medical director after November 2009 according to what's

6    here in the document.  And he also testified at his

7    deposition that he never certified anyone for hospice

8    care that he did not believe to be eligible.  And he was

9    at, you know, he was at Golden Living North Side and not

10   at any of these places -- there is not any testimony

11   about specific nurses that were involved in the care of

12   Karen K., Julia H., Alice D., Ann K. or Virginia E. and

13   how they acted and things that they did that were

14   improper or not -- information that they communicated

15   that was not accurate.

16         So, we're now going to have apparently

17   Dr. Micca testifying about unnamed patients on service

18   at a different facility that he had concerns about that

19   are patients who are not in the 123 and no link to the

20   people that they have listed here.

21         THE COURT:  To which people?  The patients

22   or --

23         MS. MARTIN:  The patients -- there's no

24   connection in terms of what Dr. Micca has testified to

25   about particular nurses or other people who actually

1    cared for these patients.

2          There's reference to the executive director who

3    didn't go out and see patients, there is the DOCS and

4    the PCC, but there has not been any connection

5    established between these patients and those

6    individuals.

7          What Dr. Micca apparently is going to say is,

8    when I was at North Side, I saw these things happen in

9    North Side so they must have happened at the St. Ives

10   facility, which is not even a Golden Living facility, or

11   they must have happened with Karen K. and that is not

12   proper.

13         MR. WERTKIN:  Your Honor, if I may, if that was

14   what was -- this testimony was being offered for, then

15   certainly that testimony shouldn't come in.

16         But the, you know, I don't know how many times,

17   I can repeat it in a different way that maybe it would

18   make sense.  But this testimony is being offered to

19   rebut the reliability of the COTIs.

20         Dr. Micca is not going to testify about any

21   patient.  There is not going to be any patient

22   testimony.  He's not going to talk specifically about --

23   his testimony is going to be about the AseraCare

24   employees.  And he is going to talk about what he

25   experienced with the AseraCare employees.

1          Because, again, this goes back to our

2    conversation from earlier this morning.  What were the

3    AseraCare employees doing vis-a-vis the medical

4    directors at AseraCare.

5          That is information that he has firsthand

6    experience about, his interaction with the employees.

7          So, he's not going to testify about exact

8    patients.  Your Honor is right --

9          THE COURT:  Is he going to testify that the

10   nurses gave him false information?

11         MR. WERTKIN:  I think that -- Your Honor, I

12   believe we have some of the excerpts -- this is in the

13   motion for reconsideration where he says that, I don't

14   have a copy of it in front of me, but he is going to say

15   that he -- when he was talking to the nurses, he did not

16   believe that he was getting complete information.

17   Because what would happen is, he would listen to what

18   the nurses said at the IDT meeting, sign the form, just

19   like most people did, and then he would either see the

20   patient or review the records and he noticed a

21   disconnect.

22         Again, Your Honor, I'm paraphrasing because I

23   don't have all of the documents in front of me.  So I

24   don't want to overpromise.

25         But, yes, Your Honor, he's going to testify

1   about his interaction with the AseraCare employees from

2   Atlanta just five months before.

3          Your Honor, we're only talking about now

4   relevancy, which the Eleventh Circuit has held --

5          THE COURT:  Relevancy to the particular issue.

6          MR. WERTKIN:  Right.  Exactly.

7          THE COURT:  I have no problem with his

8   testimony being relevant as to knowledge.

9          MR. WERTKIN:  Of course.  We're just --

10         THE COURT:  The question I have is how does it

11  work regarding these particular ones.

12         And I will tell you, Dr. Micca's testimony is

13  the one that I am really most on the fence about in

14  terms of the closer proximity in time, the fact that he

15  did have a continuing relationship, apparently, but I

16  want to hear more about it before I let him get too far

17  into those -- the leadership at the Atlanta agency.

18         I want to find out whether he was also involved

19  in the same nurses at the Golden Living facility as

20  those that were involved at these facilities where the

21  ineligible patients were.

22         MR. WERTKIN:  Absolutely.

23         THE COURT:  That would be one of the first

24  things I would want to hear out of his mouth before I

25  could determine how much further he would go on that.

1        MS. MARTIN:  Judge, if I could just respond to

2   what Mr. Wertkin said.

3        He talks about the reliability of the COTIs.

4   And he doesn't know how many times he needs to say it.

5        I don't know how many times I need to say that

6   if it walks like a duck and talks like a duck, it's a

7   duck.

8        You are talking about the reliability of the

9   COTIs.  But what that is, if you are offering it in

10  phase one, you're offering that for proof of falsity.

11  And they're offering other acts that are not linked to

12  anything other than evidence of falsity.

13       They want the jury to hear this happened at

14  this time, so it must have happened at a different time.

15       Mr. Wertkin said he is not going to talk about

16  any specific patient, but he is going to talk about what

17  happened in IDT with him in 2006, so that the jury can

18  infer and assume that that happened with Dr. Bush at IDT

19  in 2007 or 2009.  And that is -- it's classic 404(b)

20  conformity therewith.

21       And that's why, for Dr. Micca and others, that

22  this is not evidence that should come in in phase one on

23  falsity.

24       MR. OLSON:  Your Honor, on the 404(b) point, in

25  response to the defendant's omnibus motion, we cite case

1  of United States vs. Capers, which discusses 404(b).

2          THE COURT:  Where did you cite it?

3          MR. OLSON:  It's in a footnote, I don't have

4  the page right in front of me.  Cite is 708 F.3d 1286.

5          THE COURT:  What was the case?

6          MR. OLSON:  United States vs. Capers,

7  C-a-p-e-r-s.

8          MR. WERTKIN:  What's the document number?

9          THE COURT:  351 is the response to this big

10  one.

11          MR. OLSON:  It would be our 348.

12          THE COURT:  348?

13          MR. OLSON:  No, I'm sorry, that's not right.

14          MR. WERTKIN:  Well, I'm not sure -- while

15  you're looking for the case, 404(b) again, Your Honor,

16  there are certainly lots of reasons why you can offer a

17  piece of evidence.  And, you know, under the hearsay

18  exception, you can impeach a witness and the information

19  can come in, it can't be used in your affirmative case,

20  but when you impeach a witness, the --

21          THE COURT:  Right.  That was one of the points

22  that, I mean, the government is arguing that various

23  witnesses should be able to testify to discredit

24  AseraCare witnesses.

25          MS. MARTIN:  That we may not even call and many

1    of whom were designated for phase two only; yet, even

2    though the government refers to them as phase one.

3         THE COURT:  I'm trying to remember where they

4    were.  As far as that aspect, when they're not tied to

5    time and place to the ineligible patients, and it does

6    go to the credibility of an AseraCare witness, that

7    wouldn't be in your case in chief.  You don't get to

8    discredit a witness before the witness takes the stand.

9         MR. WERTKIN:  Right, Your Honor.  I understand

10   that.

11        THE COURT:  As to those witnesses, I'm

12   certainly going to reserve ruling.

13        MR. WERTKIN:  Could we address the -- I don't

14   know if you found the case but --

15        MR. OLSON:  360, Page 32.

16        THE COURT:  It's on what exhibit?

17        MR. OLSON:  It's document 360.

18        THE COURT:  Which we're not dealing with yet?

19        MR. OLSON:  No, but it's a case that's on point

20   to this issue because Ms. Martin brought up 404(b) --

21        THE COURT:  What was it filed as to?

22        MR. OLSON:  The defendant's omnibus motion in

23   limine.

24        THE COURT:  What defendant's omnibus motion in

25   limine?

 1          MR. OLSON:  It was in response to 342 --

 2          MR. LEMBKE:  It's not on the list for today,

 3   Judge.

 4          MR. WERTKIN:  May I?  We don't need to get into

 5   the case.

 6          Rule 404(b) on its face allows for evidence of

 7   lack of accident.  Okay.  So we are not, as I said,

 8   we're not offering this to speak to the falsity of the

 9   specific patients.  Dr. Liao is going to testify that

10   the medical records do not support terminal illness.

11   That's the basis for arguing falsity.

12          However, we are going to talk about the

13   reliability -- talk about this evidence in terms of the

14   reliability of the COTIs.

15          Ms. Martin says that violates 404(b).  But

16   404(b) specifically contemplates that you can offer

17   these other acts evidence to offer evidence of motive,

18   intent, knowledge or lack of accident.  And lack of

19   accident, in this particular case, or motive or intent,

20   but I don't want to get off into --

21          THE COURT:  That goes to your knowledge.

22          MR. WERTKIN:  But lack of accident.  We expect

23   --

24          THE COURT:  Lack of accident is intentional.

25          MS. MARTIN:  To knowledge as well.

1          MR. WERTKIN:  Right.  Well, we expect in phase

2     one for AseraCare to make the argument, we got these

3     doctors to sign this form, the doctor signed the form --

4     to the extent, you know, that they are offering that as

5     proof of anything, we are saying that that does not --

6     those COTIs are not reliable.

7          So, Dr. Micca, I mean, I don't want to move on

8     to 404(b) because we are not offering this, we are not

9     offering this as a bad act.

10         Well, they certified ineligible patients at

11    time A, so they must have done it at time B.  That's not

12    what we're offering it for.

13              We're offering it for the fact that --

14              THE COURT:  That you can't rely on the COTIs --

15              MR. WERTKIN:  Correct.

16              THE COURT:  -- as evidence that the patients

17    were eligible.

18              MR. WERTKIN:  Right.

19              THE COURT:  It's the same thing.

20              MR. WERTKIN:  No.

21              MS. BROOKER:  If I could just shed a little bit

22    more light on our position.

23              I think our proffer about Dr. Micca is that he

24    was an impediment to admitting ineligible patients in

25    Atlanta.  That's what he will show.  And then they

1   removed him.  And then a few months later, patients were

2   admitted they weren't eligible, as the first patient in

3   our sample.

4           We appreciate Your Honor's point that there is

5   a several month connection that Your Honor has to make

6   compared to the other witnesses on the list, but what

7   was important to us to have Dr. Micca in particular

8   testify in this case is that he is a relator party and

9   he is a physician.  He is one of the few relators that's

10  a physician.  And since the COTIs are such a significant

11  part of the case, even though, again, there is a, you

12  know, several month connection out, we do think there is

13  a connection and it's, you know, maybe more tenuous than

14  the other witnesses, but it's not so tenuous that he

15  shouldn't be able to testify.

16          Frankly, I think that the only reason that

17  we're talking about 404(b) is because we are in this

18  construct in this particular case of having the two

19  phases.  If we hadn't had a phased approach, he would be

20  able to testify in this case and it would go to falsity

21  and knowledge.

22          Again, I appreciate --

23          THE COURT:  And you can bring in all these

24  horrible bad acts before anybody gets to decide whether

25  there was a false claim to begin with.  And we have

1   already gone through that.

2          MS. BROOKER:  Well, Dr. Micca will testify in

3   phase two about knowledge, Your Honor.  So, you know, we

4   will be very mindful of insuring that he's only talking

5   about falsity in its connection to the COTIs.

6          If Your Honor is on the fence about this, we

7   could proffer him before he takes the stand and you can

8   question him yourself to make sure that there's an

9   appreciation for the connection he has to the patients

10  in the sample.

11         But again, he is a relator party and he is our

12  one physician.

13         THE COURT:  So, those are no evidentiary

14  reasons for me to allow him to testify in the first

15  phase, the mere fact that he is a relator.

16         MR. WERTKIN:  You're right.  But he will

17  testify about the clinical information that he was

18  provided as an AseraCare medical director.  That is

19  information that, you know, we have been arguing about

20  legal standard, and of course we have very different

21  view points, but one thing we can all agree on is that

22  the information that was provided to the doctor and how

23  much the doctor's clinical judgment was respected, that

24  is something that is certainly relevant.

25         Under the Eleventh Circuit's 401 analysis, this

1  goes to that question.  Even if it's five months, the

2  Eleventh Circuit is clear on -- and there's other

3  circuit case law as well, that there is no bright line

4  test in terms of relevance.  You can have remote

5  evidence be relevant.

6          And what the courts do is they apply the same

7  exact test for relevance to remote evidence.

8          So, in this particular case, he will be able to

9  testify about the clinical information he received and

10  his clinical interaction with the nurses.  And that is

11  relevant to phase one certainly.

12          THE COURT:  Are any of those nurses the nurses

13  that were treating any of these seven patients?

14          MR. WERTKIN:  Yes, Your Honor.

15          THE COURT:  That's what I asked you earlier.

16  One of the first things I want to hear from him is the

17  connection to nurses who were treating these patients.

18          MR. WERTKIN:  Yes, Your Honor.

19          THE COURT:  If he can tie that in, but I'm kind

20  of at the point where, first you tell me that he was the

21  treating physician for these ineligible patients, when

22  that was wrong.

23          So, I want to make sure before I make a

24  decision that the facts are correct.

25          MR. WERTKIN:  Yes, Your Honor.

1          MS. MARTIN:  That brings us back to what we

2    talked about before lunch and this whole idea of trial

3    by ambush.

4          We asked them, in discovery, we said, tell us

5    anybody that -- any patient -- tell us, if the

6    government contends that AseraCare's medical records

7    have factually inaccurate information for the patient,

8    identify the patient and the document that the

9    government contain have inaccurate information, identify

10   all information that the government contends is

11   inaccurate and state the factual basis.

12         They answered on November 19, 2012, and they

13   said they would rely on the statistically valid random

14   sample to show the ineligible patients and that that

15   would be based on expert review of the medical records.

16         They then identified one incident in Dexter,

17   there is no patient in the sample from Dexter, and

18   they -- and that's it.

19         THE COURT:  Dexter?

20         MS. MARTIN:  Dexter, Missouri.  And then they

21   never again supplemented those answers -- that answer to

22   that question.  They did on their last supplement, which

23   was the day discovery closed, in answer to our first

24   question about anyone that you contend was ineligible,

25   state the factual basis, the contentions for why the

1  patient was not eligible, and the factual basis.  None
2  of this.  None of this about COTIs being unreliable,
3  anything.

4          It was Dr. Liao, statistically valid random
5  sample, medical records.  And oh, by the way, we object
6  to any -- providing you any information about a patient
7  that's not in the sample.  We object to identifying any
8  ineligible patient for you who is not in the sample.

9          Yet, now they want to come in here and bring in
10  all of this evidence about incidents and patients that
11  weren't in the sample and say that that goes to the
12  falsity of the claims in this case.

13          MR. WERTKIN:  No.

14          MS. MARTIN:  So you want to say it goes to the
15  unreliability of the COTI.  Well, then, why didn't you
16  tell us that when we asked you, tell us any patient who
17  has inaccurate information.  Why didn't they tell us
18  that?

19          I mean, this is a trial by ambush.  When they
20  say that they're going to bring in all of this
21  information and put it in when all they said all along
22  about falsity was Liao, medical records, statistically
23  valid sample, we object to telling you anything about
24  anyone that is not in the sample.

25          So now they are going to come in and say there

1    were nurses that were involved in the care of these

2    patients in Atlanta that Dr. Micca can identify as

3    providing inaccurate information?  And they're doing

4    that to show, to say this happened with Dr. Micca, so it

5    must have happened with Ann K. or whomever the person

6    is, and so that is why Ann K.'s claim is false.  That's

7    what they're trying to do here and it's just not proper.

8         MS. BROOKER:  Your Honor, there is no ambush.

9    They have already won the bifurcation motion.  This is

10   the bifurcation argument that they have already made.

11        MR. WERTKIN:  But they --

12        THE COURT:  I don't think it is.  No.  No.  If

13   they asked the government to tell us this information in

14   terms of your contention and the government didn't tell

15   them about this other theory in terms of the undermining

16   of the COTIs to show falsity, why should the government

17   now be able to go beyond that and point to unnamed,

18   unidentified, undisclosed patients outside of the 123

19   that somebody theorizes were ineligible?

20        MR. WERTKIN:  That's a good question, Your

21   Honor.  Dr. Micca was deposed in this case.  Okay.  So

22   we're only talking about Dr. Micca right now, and we can

23   talk about the other ones.  But right now we're talking

24   about Dr. Micca.

25        THE COURT:  But did you disclose Dr. Micca as

1    the source of evidence of falsity?

2              MS. MARTIN:  No.

3              MR. WERTKIN:  Your Honor --

4              THE COURT:  That's a yes or no question, Jeff.

5              MR. WERTKIN:  No.  Dr. Micca is not going to

6    testify about what the medical records say for any of

7    the 123 sample patients.  He was never intended to do

8    that.

9              THE COURT:  Did you disclose that Dr. Micca was

10   going to talk about any patients outside of the 123 when

11   you objected to provide them information about any

12   patient outside of the sample?

13             MR. WERTKIN:  I don't believe so, Your Honor.

14   But again --

15             THE COURT:  But now you're wanting him to do

16   that.

17             MR. WERTKIN:  No, we're not.  We do not want

18   Dr. Micca to testify about any patients.  Dr. Micca is

19   going to testify about AseraCare employees.

20             MS. MARTIN:  In relation to patients.  It's not

21   in a vacuum.  All of this is related to his experiences

22   with interacting with staff about patients.

23             You can't just put it out there and say this is

24   his experience with the staff and that's why it goes in.

25   I mean, it's got to be -- you're talking about it in

1  relationship to patients and you're talking about it in

2  relationship to proving falsity.  And y'all didn't tell

3  us any of this.

4        MR. WERTKIN:  No, we're talking about it in

5  terms of the information that was provided to physicians

6  by AseraCare employees.  That's what this is going

7  towards.

8        MS. MARTIN:  That's falsity.

9        MR. WERTKIN:  Again, even under Geschrey, even

10  under Geschrey, the information that's given to doctors

11  and the involvement of the doctors is key, under every

12  case that we're talking about in the hospice.  Okay.

13        So, if Dr. Micca is going to testify about the

14  information that he was getting from the AseraCare

15  nurses, he's not going to testify about individual

16  patients.  He's going to testify about how it was at

17  AseraCare that doctors, medical directors, at AseraCare

18  were given information and how their clinical judgments

19  were respected or, in the case of Dr. Micca, not

20  respected.

21        THE COURT:  Then why wasn't he disclosed in

22  response to that question from the defense as a basis or

23  as a source of information about falsity?

24        MR. WERTKIN:  Because he doesn't have any

25  information about the 123 patients.

1          THE COURT:  Then I don't think he should

2    testify.

3          MR. WERTKIN:  But he has a lot of information

4    about the reliability of the COTIs.

5          MS. BROOKER:  The problem is, Your Honor, all

6    of this comes up in the context of the defense.  Right?

7    So, the defense that has now become clear --

8          THE COURT:  No, it comes up in the context of

9    the government's theory of falsity and the government's

10   response to the very appropriate questions from the

11   defense as to, okay, what is your basis for falsity.

12         MS. BROOKER:  So I --

13         THE COURT:  And now that we're trying to focus

14   in on falsity, the government is trying to go beyond

15   what it disclosed as the basis for its evidence of

16   falsity.

17         MR. WERTKIN:  Your Honor --

18         MS. BROOKER:  I think, Your Honor, on some of

19   the responses -- there's no ambush here, Your Honor.

20         We have tried to be very transparent throughout

21   this litigation and we have offered so much documents

22   and evidence in this case.  I think it's unfair for them

23   to say that we ambushed them.

24         When we are talking about falsity in the purest

25   sense before talking about the defenses, we are talking

1   about Dr. Liao, along with our statistician, which is
2   what we said in our responses, calculating the number of
3   false claims and the damages.  Right?

4          So, that's the combination of Dr. Liao and our
5   statistician.

6          If there was no defense about these COTIs, no
7   one ever was going to say on the other side, well, how
8   can there be false claims when you have two doctors
9   certifying, a lot of this evidence may not be relevant
10  to falsity as much as it is to knowledge.

11         But where this evidence becomes important is in
12  responding to the very strong, if unrebutted, there is a
13  very strong defense argument, if unrebutted, that there
14  are two doctors for every single patient in the sample
15  that have certified.

16         THE COURT:  Are you going to be offering these
17  witnesses in rebuttal to their defense in phase one or
18  in your case in chief?

19         MS. BROOKER:  Well, we know that the defense is
20  coming up and it's going to be coming up in the
21  cross-examination of Dr. Liao.  We have already been
22  down this road, Your Honor.  So we know that this is the
23  biggest part of their case in order to defend themselves
24  against Dr. Liao's testimony, in particular.  And so we
25  have already been down this road.

1          I think that all we're really talking about --

2    again, we started out with --

3          THE COURT:  They went down that road and they

4    kind of lost on it at summary judgment, didn't they,

5    Renee?  That all they had to do was show that they had a

6    doctor's certification or that Dr. Liao couldn't say

7    that the doctor certification was false and the

8    reasonable doctor standard and all that kind of stuff,

9    right?

10         So, you think that's the tact they're still

11   going to take?

12         MS. BROOKER:  I do not --

13         MR. WERTKIN:  It's in the final pretrial order.

14         MS. BROOKER:  I do not believe they are not

15   going to cross-examine Dr. Liao.  I believe that a

16   strong part of their cross, and if I am wrong, I should

17   be told, but a strong part of their cross is going to be

18   to ask Dr. Liao if he knows that he disagrees with two

19   physicians for every patient.

20         MR. WERTKIN:  Your Honor, it's in the --

21         THE COURT:  Don't you also have expert

22   witnesses that go and back it up, looking at the medical

23   records?

24         MR. LEMBKE:  Your Honor --

25         MS. MARTIN:  Part of this -- Matt, go ahead.

168

1          MR. LEMBKE:  Your Honor, let me just say this:

2     This whole reliability of the COTIs is a pivot post

3     bifurcation.  Because in December when we were all

4     together and we were talking about the bifurcation

5     argument the first time, Ms. Snow said all this kind of

6     stuff went to knowledge, and then we'll get to our

7     evidence of falsity which is Dr. Liao and the medical

8     records, which is completely consistent with those

9     discovery responses.

10          After Your Honor bifurcated the case, then all

11     of a sudden we have this reliability of the COTIs.

12     Well, if it's coming in phase one, it's got to go to

13     falsity.

14          But they never told us about that when we asked

15     for what is your evidence to show falsity.

16          So this is just a late breaking twist to their

17     argument.

18          But if you go back to what Ms. Snow told you in

19     December, she said the case on falsity was exactly what

20     they put in that discovery response.

21          MR. WERTKIN:  Your Honor --

22          MR. LEMBKE:  And now they want to say something

23     totally different.

24          MR. WERTKIN:  If I could respond, Your Honor.

25     We had no way of knowing that this case was eventually

1  going to be bifurcated.  This is something that was off
2  of our radar.
3        And when we were doing the discovery responses,
4  we did not think -- we weren't anticipating that this
5  matter was going to be bifurcated.
6        THE COURT:  But why --
7        MR. WERTKIN:  If I may --
8        THE COURT:  Why does that make a difference
9  when the question specifically is, what is your basis
10  for falsity?  And this whole dadgum case is a false
11  claims case.
12        MR. WERTKIN:  Right.
13        THE COURT:  So the defense has a right to know
14  what the government is relying on to show that the
15  claims were false.
16        MR. WERTKIN:  Absolutely.  And our answer has
17  been --
18        THE COURT:  And they weren't told all these
19  things that you are now wanting to bring in --
20        MR. WERTKIN:  No.  But this is what my point
21  was, Your Honor, is that they were told.  They were --
22  all of the -- all of the evidence that we are presenting
23  was all disclosed to them, it's in the complaint, it's
24  in all of the documents.
25        This is -- if I may, this evidence was all

1  disclosed.  This is not a trial by ambush in any way,

2  shape or form.  This case wasn't even bifurcated until

3  December.

4       So --

5       THE COURT:  The bifurcation doesn't have

6  anything to do with their question from the very get go

7  as to what is your basis for proving that the claims

8  that were presented were false.

9       MR. WERTKIN:  And our answer has always been

10 consistent that the answer is that the medical records

11 do not support terminal illness and that Dr. Liao is

12 going to show it.

13      Now, as Renee said, in the final pretrial

14 order, we each got to write our summary.  The third or

15 fourth line is, there is a doctor who exercised his

16 clinical judgment, again I'm paraphrasing, exercised his

17 clinical judgment and determined that all these patients

18 were terminally ill.

19      That's the issue that we're addressing with

20 these patients.  That is the sole issue.

21      So, you know, in my mind, I'm having a little

22 bit of trouble because here you have a doctor, let's

23 just, you know, you have a doctor who is a medical

24 director at AseraCare and he is going to talk about how

25 his clinical judgment was being ignored.  That is a part

1  of this case because they're saying that the doctor

2  signing the COTI matters.  We are going to rebut it.

3          As Renee pointed out --

4          THE COURT:  Okay, rebut it.  I think the

5  easiest thing to do would be rule that those things

6  don't come in in your case in chief.  If that is the

7  defense and you need to rebut the reliability of the

8  COTI, then you do it in rebuttal.

9          And the same as to the witnesses that you say

10  go to the credibility of other AseraCare people, they

11  don't come in until after those witnesses testify to

12  determine whether you need to attack their credibility.

13          Then we don't have to worry as much about the

14  time and place nexus of these witnesses who aren't going

15  to testify to the falsity of any of the claims asserted

16  for any of these 123 people.

17          MS. BROOKER:  Well, Your Honor, I think that

18  we -- I mean, I guess we're sort of -- feel like we're

19  in a whirlwind a little bit.

20          I mean, from our perspective, we thought that

21  we could try this case on the falsity piece in one of

22  two ways:  Either you can have a pure falsity case where

23  you talk about nothing other than the battle of the

24  experts, Dr. Liao versus Cooney and Melvin and whether

25  or not -- the only question for them would be is the

1   patient eligible or ineligible under the Medicare

2   requirements.

3          And if that was the only question on falsity

4   one, phase one, no mention of the COTIs, right, just

5   literally purely looking at the medical records --

6          THE COURT:  The COTIs and the medical records

7   go together, don't they, according to the regulations?

8          MS. BROOKER:  They absolutely do, Your Honor,

9   there is no question about it.

10          THE COURT:  So you have to have both.

11          MR. WERTKIN:  Which is why it makes sense --

12          MS. BROOKER:  Which is how we got to this other

13   part.  We're not trying to backtrack at all.  We have

14   accepted --

15          THE COURT:  No, I think you're backtracking on

16   the defense.

17          MS. BROOKER:  No, we're really not, Your Honor.

18   Honestly, if you -- we feel like we have tried to do the

19   best we can to follow Your Honor's order.  So, just like

20   Your Honor just said --

21          THE COURT:  No, I want you to do the best you

22   can to answer the interrogatories that are posed to you

23   by defense.

24          MS. BROOKER:  So, we believe all of the

25   information that we will have at trial is in those

1  interrogatories.

2         What is not perhaps in there is whether the

3  evidence that is in the interrogatory response, whether

4  it goes to falsity or knowledge or both.

5         THE COURT:  I'm talking about your answers to

6  the questions specifically designed for falsity.

7         MS. BROOKER:  You mean interrogatories in this

8  discovery?

9         THE COURT:  Yes.

10        MS. MARTIN:  Judge, I can give you an example

11  of, you know, and there are two doctors that are in our

12  nexus motion.  And they were disclosed on the very last

13  day of discovery, Dr. Brechtelsbauer and Dr. Rifkah, the

14  same day that the government filed supplemental

15  interrogatory answers.  So they were disclosed as Rule

16  26 -- under Rule 26, government files interrogatory

17  answers.

18        The government asserts in their nexus briefing

19  that these doctors will talk about how they felt

20  circumvented and the unreliability and -- but the

21  supplemental interrogatory answers they filed on that

22  day about which patients they contend were not eligible

23  and the factual basis for that, they don't talk about

24  Dr. Rifkah or Dr. Brechtelsbauer, they talk about we

25  will prove falsity through a statistically valid -- the

1   United States intends to prove falsity of claims that

2   AseraCare submitted for hospice services provided to

3   Medicare patients in the two statistically valid random

4   samples by presenting expert medical testimony that

5   medical records that AseraCare maintained for the

6   patients do not contain clinical information and other

7   documentation that support AseraCare's claim that the

8   patients were terminally ill and eligible for the

9   Medicare hospice benefit.

10          That's what they say they're going to use to

11  prove falsity.

12          Then they go on to object to providing

13  information for any patient that is not included within

14  the statistically valid random sample.  And

15  Dr. Brechtelsbauer and Dr. Rifkah are not attending

16  medical directors for any patient within the

17  statistically valid random sample.

18          But yet now they want to use them to prove

19  falsity of claims in the case.  And they didn't tell us

20  that in their interrogatory answers that they

21  supplemented the very day that they filed the

22  disclosures about these doctors.

23          THE COURT:  Who are they and which motion are

24  they in?

25          MS. MARTIN:  They are in this motion that we

1    are talking about right now --

2              THE COURT:  329?

3              MS. MARTIN:  Which is 329, and they are

4    referenced on -- at the end of the government's brief.

5    They are just -- they are two witnesses --

6              THE COURT:  That the government adds --

7              MS. MARTIN:  Right.  Just to respond to

8    Ms. Brooker saying that everything that they intend to

9    present in the falsity phase they told us about and is

10   in the interrogatory answers, it's just not.

11             MS. BROOKER:  That was before the bifurcation,

12   correct?

13             MS. MARTIN:  It doesn't matter --

14             MS. BROOKER:  It explains our perspective.  It

15   does.  It does explain our perspective.

16             Because we did not -- and we have even argued

17   this in our motion for reconsideration and, you know,

18   it's still our position that, you know, these are --

19             THE COURT:  I know.  You think I'm wrong, you

20   think I'm crazy because nobody else in the country has

21   ever done this.

22             MS. BROOKER:  Your Honor, we respect your

23   opinion.  It just explains how we got to where we got to

24   today and we have never thought of a False Claims Act

25   case as two discreet trials:  One on falsity, one on

1    knowledge.  They are intertwined in our minds.

2           Again, that is not to call into question or ask

3    Your Honor to reconsider your ruling on bifurcation.

4    But it explains how we thought we were answering the

5    questions.  Because we're not bringing in doctors, for

6    example, to testify about the 123 patients and that is

7    sort of where we are trying to be clear.

8           We are bringing in Dr. Liao to talk about the

9    eligibility.

10          We are now in a position and again, we have

11   accepted this, Your Honor, we tried to comply with the

12   order by showing a nexus, time and place to the patients

13   in this sample, such that it will explain the COTIs and

14   why there are two COTIs in every file, which is very

15   important in the way that the falsity phase has now been

16   structured for us to be able to talk about.

17          And we have accepted that that is part of the

18   defense, we accepted that they are going to attack

19   Dr. Liao on that, and we have built our case around

20   trying to limit that only, you know, to phase one and to

21   keep all the marketing and all the business evidence in

22   phase two.

23          So, we looked at it from a clinical patient

24   perspective and even more narrowly we looked at it

25   trying to find a time and place connection.

```
1              Again, I know we sort of all got in the weeds
2       on this talking about Dr. Micca.  And again, I think we
3       agree with Your Honor that he is the hardest one because
4       he is, you know, in terms of the -- not in terms of
5       location, but in terms of the time now, he is several
6       months out.  And I appreciate -- I really do, I
7       appreciate that Your Honor is struggling with Dr. Micca.
8       It is, you know, it is the most tenuous.
9              But again, I guess --
10             THE COURT:  No, I think it's the closest.  I
11      don't think it's the most tenuous.  I think there are a
12      lot that are farther out that are far more tenuous in
13      terms of the admissibility.
14             I just am trying to figure out how it really
15      relates.
16             MR. LEMBKE:  Your Honor, let me just say
17      something in response to what Renee just said; that is,
18      the interrogatory question was, tell us your falsity
19      evidence.
20             If they really thought -- and reliability of
21      COTIs is evidence that undermine falsity, that's what it
22      is.
23             If they wanted to present that as evidence on
24      falsity, they needed to list it.  And the fact of
25      bifurcation really makes no difference.
```

1            And I think what's going on here is that's
2   knowledge evidence and they're trying to shoehorn it now
3   back into falsity after the fact.  But that's no excuse
4   for not having listed it as falsity evidence if they
5   wanted to present it as falsity evidence.
6            MR. WERTKIN:  The reason why we are bringing
7   this up, though, Your Honor, is that this is in response
8   to the claim of trial by surprise.  It's not as
9   though -- it's not as though this falsity evidence was
10  the only thing we disclosed, the only thing we provided
11  to them, and then now that it's been bifurcated we're
12  trying to hold -- all of this was disclosed.  What --
13            THE COURT:  But it wasn't disclosed as the
14  basis for saying that any of these --
15            MR. WERTKIN:  Right.  But --
16            THE COURT:  -- claims were ineligible.  That
17  was precisely what the question was that was asked.
18            MR. WERTKIN:  That makes sense because, Your
19  Honor, in our view, this goes back to what makes a claim
20  false.  In our -- under the law, the medical records
21  must support terminal illness.  That's the law.
22            THE COURT:  Must support the clinical judgment.
23            MR. WERTKIN:  Exactly.  That there must be
24  evidence in the medical records, information or other --
25  clinical information or other documentation to support

1    the terminal illness.

2           Our case is that the medical records do not

3    support the terminal illness.  That is all we need to

4    show falsity.  And you have to show knowledge as well,

5    which we will do in phase two.

6           But that's all we need to show, falsity, just

7    the medical records.

8           Now, our case is better than that.  Our case is

9    not just that the medical records don't support, we're

10   saying the medical records actually show the opposite.

11          But all we need to do to show falsity -- it's

12   like, you know, AseraCare has, and there will be

13   testimony about this, if they submit a claim and it gets

14   subject to pre-payment review by Medicare, they go

15   through and they look, there is a COTI in there, okay,

16   that's fine.  Then they look at the medical records.  If

17   the medical records don't support, they don't pay the

18   claim.

19          So, what elevates this to a False Claims Act,

20   because we could just go after, you know, why this is

21   not just an administrative case, is that there was

22   knowledge.  They knowingly submitted the false claim.

23   That's how we have always thought about this case.

24          So, when the question is, how are you going to

25   prove falsity, well, the answer is, we look at the

1    medical records, and we did that through Dr. Liao, and

2    we're going to eventually show that they knowingly

3    submitted the false claims.

4           So, in our affirmative case, that's all that we

5    need to show.

6           Now, we -- I mean, unfortunately, there is

7    no --

8           THE COURT:  Let's go with that.

9           MR. WERTKIN:  This is the rub, okay, as Your

10   Honor knows and points out.  There's no way to talk

11   about these patients without talking about the COTIs

12   because the certification of terminal illness is

13   unseparable from the medical record case that we're

14   going to make.

15          As we know from the final pretrial order,

16   they're going to make the argument that a doctor signed

17   it and that's all you need to do.

18          I don't want to characterize it.  We know --

19   let's just stick with this one.

20          We know that the two things can't be separated.

21   And we know when Dr. Liao is going to be examined, he is

22   going to -- we, you know, he is going to say, yes, it's

23   part of the medical record that there was a COTI.

24          And for that reason, and that reason alone, we

25   are going to talk about how those COTIs were not

1    reliable.

2            THE COURT:  So, why can't you do that in

3    rebuttal then?

4            MR. WERTKIN:  Well, I mean, the biggest reason,

5    I think, is that we're going to have to -- we're going

6    to call these witnesses and they're going to provide

7    information about how the process worked at AseraCare.

8            So, as we explained to Your Honor before, the

9    nurse is going to say that the clinical -- that the

10   doctor was not in, you know, this is how we did it and

11   this is how we did this and this is how we did that, you

12   know, we think that this information is important to the

13   jury.

14           We know it's going to come up.  So, Your Honor,

15   I suppose it would be possible, but if we already know

16   that it's going to come up and we -- because they're

17   inextricably linked, I think it makes sense for us to go

18   ahead and put on our case, right, and we put on our case

19   about the medical records, as Dr. Liao is going to talk

20   about, we put on our case about how the documents, the

21   COTIs are not reliable in anticipation of something we

22   know has to happen because they're inextricably linked,

23   and then we rest.

24           MS. BROOKER:  Your Honor, I think the practical

25   answer to that, too, is that we're less than a week or

1   two out from trial and we have our witnesses lined up

2   and are ready to come in in certain times and,

3   practically speaking, this would require a reordering.

4        And you're talking about putting on rebuttal in

5   phase one before we get to phase two, and you are just

6   talking about reordering witnesses.

7        So, we would put --

8        THE COURT:  I am looking at what you told the

9   defendant was your evidence of falsity.

10       MS. GUNASEKERA:  If I may, Your Honor.  What we

11  told the defendants is not inconsistent with what we are

12  trying to present the case in phase one.

13       So lifting off of what Jeff was saying, Your

14  Honor --

15       THE COURT:  You're going beyond what you told

16  the defendant was your evidence of falsity.

17       MS. GUNASEKERA:  If I may elaborate, Your

18  Honor.

19       We maintain that Dr. Liao is the witness who is

20  going to testify as to the false claims at issue from

21  the sample.

22       As we already represented, Dr. Liao can't speak

23  to the way in which AseraCare put together the medical

24  record, the way in which they admitted patients, he

25  can't speak to the way they used the acronyms and the

1    terms, the glossary chart that you want the jury to

2    become familiar with.  He can't speak to those things.

3         We wanted to present our case in light of the

4    bifurcation by presenting the nurses who were on the

5    front line who can speak to the way clinically patients

6    were admitted, patients were recertified.  This is what

7    we presented to the physician.  This is how it showed up

8    in the medical record.

9         It provides the context for the jury, Your

10   Honor, that then Dr. Liao can pick up that same medical

11   record and begin to talk more specifically about why a

12   patient was or was not eligible.

13        Without that context, Your Honor, the jury,

14   frankly, is going to be quite confused with Dr. Liao's

15   testimony because he can't provide that on the context.

16   He can't speak to what line nurses did and what

17   AseraCare's practices were or the way in which

18   clinically they admitted and recertified patients, what

19   was presented to the physicians and what was discussed

20   in IDT meetings.  He can't speak to that beyond what he

21   did in this case.

22        So, he is going to be the primary witness on

23   falsity, but we need to provide context for that.

24        THE COURT:  I agree with the context.  But

25   context is different than presenting evidence that goes

1  to the question of falsity when that evidence has not

2  been disclosed as being the basis for your falsity.

3         MR. WERTKIN:  That's a fair comment.  And I

4  think a limiting -- we would certainly -- as I said, we

5  are not offering this for falsity, this is merely for

6  the COTI reliability.  And a limiting instruction about

7  that --

8         THE COURT:  What is the difference?

9         MS. BROOKER:  It goes back to what Matt was

10  saying --

11         THE COURT:  If the COTI is not reliable, you're

12  offering that to show that the certification was false.

13         MS. BROOKER:  I think it goes back to what Matt

14  said earlier --

15         MS. MARTIN:  Yes, Your Honor.

16         MS. BROOKER:  -- which is that we are only

17  having Dr. Liao testify as to the eligibility or

18  ineligibility.  This goes back to Matt and Jeff's

19  discussion earlier about how, you know, the support --

20  the medical staff, the clinical staff are not here to

21  testify that the 123 patients were eligible or

22  ineligible, i.e., the claim was false or not false.

23  That is just how we sort of structured it in our mind

24  all the time.  So Dr. Liao, Melvin and Cooney, they will

25  testify about eligibility which is falsity.

1        We do not intend, just as Matt and Jeff argued,

2   to have the nurses to come in and testify that I know

3   the patient was ineligible, they were false, and more

4   testimony on top of Dr. Liao and Melvin and Cooney.

5        Again, it goes to -- it addresses the defense

6   of the COTIs.

7        I know we feel like a broken record, this is

8   how we keep talking about it coming in, but this is all

9   phase one.  It's all related to the way falsity has been

10  constructed in phase one.

11       MR. LEMBKE:  In other words, it is relevant to

12  falsity.

13       MS. MARTIN:  Which you never told us.  You

14  apparently knew, you said it was linked and everyone

15  knew all along, yet, no one put it in the answers when

16  we specifically asked you how are you going to prove

17  falsity.

18       And if all we need to prove falsity is the

19  medical records, then why are you trying to bring all

20  this in now.

21       You say it's rebuttal, so you're going to rebut

22  a defense that we are not even -- a defense that we're

23  not really making in terms of all you need are the

24  COTIs.  That's not our defense.  Our defense is more

25  broad than that.

1          You are trying to bring in evidence of falsity

2     that you never identified, when we specifically asked

3     you seven different questions about falsity, that you

4     supplemented seven different times, and you never gave

5     us any of this.

6          MR. WERTKIN:  You're right in the sense that,

7     you know, we can't meet our burden by just showing that

8     the COTIs were unreliable.  Of course we can't meet our

9     burden.  That was never our intention to do it that way.

10         We are saying that Dr. Liao's testimony about

11    what the medical records say, that's the reason why the

12    claim is unreimbursable.  That is the reason why the

13    claim is false.

14         THE COURT:  And that also, I assume, would

15    demonstrate the unreliability of the COTIs, would it

16    not, if the COTIs aren't in line with the medical

17    evidence?  Isn't that what Liao was saying?

18         MR. WERTKIN:  Liao is not going to be able to

19    say anything about the COTIs.  In fact, as you're

20    probably familiar --

21         THE COURT:  He specifically said he couldn't

22    say that any of the doctors were wrong.

23         MR. WERTKIN:  Exactly.

24         THE COURT:  Because --

25         MR. WERTKIN:  He doesn't know anything about

1    what the doctor -- I'm sorry to interrupt, Your Honor.

2          THE COURT:  Because it's hard to get a doctor

3    to say that another doctor was wrong, isn't it?

4          MR. WERTKIN:  Well, no.  Because he has no idea

5    what information the doctor had.  And that's the point.

6          MR. CHRISTIE:  Your Honor, Dr. Liao testified

7    that he could not say that Dr. Cooney was wrong when

8    Dr. Cooney did a medical review.  So the statement about

9    not knowing what the other physicians knew, that's not

10   the basis for Dr. Liao saying he couldn't say the other

11   physicians were wrong.

12         He was just saying that his judgment was

13   different.  He was shown Dr. Cooney's opinion and he

14   said he could not say that Dr. Cooney only did a medical

15   review was wrong.

16         So before we get too far down that path --

17         MR. WERTKIN:  Chris, we can bring out the

18   deposition transcript.  But he is asked, are you saying

19   that any doctor was wrong.  That was the question.

20         THE COURT:  That was one of the questions,

21   because I remember it on summary judgment.

22         MR. CHRISTIE:  Are you saying that Dr. Cooney

23   was wrong and --

24         MR. WERTKIN:  That's another question.

25         MR. CHRISTIE:  And he said no.  I can't say

1    that.

2              MR. WERTKIN:  Right.

3              MS. BROOKER:  You are misinterpreting what he

4    means by that.  He did not mean that anybody can be

5    right about whether a patient is terminal.  He was very

6    confident at the deposition in his determination of

7    eligibility, but he knows that he doesn't know about

8    what the doctors knew or what information they had when

9    they signed the COTIs.

10             That's completely different than saying, you're

11   right, I'm right, we're all right, everybody can be

12   right about a patient.  That is not his testimony.

13             MR. WERTKIN:  It might even be helpful --

14             THE COURT:  I think it's Matt's turn.

15             MR. LEMBKE:  Your Honor, I just go back to, if

16   they're wanting to put on evidence that the

17   certifications are unreliable, that's falsity evidence.

18   And they didn't list it.  And it can't be in their case,

19   I would submit, because they are under an obligation to

20   supplement their discovery responses, which they did not

21   do before the close of discovery.

22             Here we are with having been told the falsity

23   case is one thing, both here and in December in your old

24   jury room, and now here we are with a vastly different

25   falsity case being put on.  And that's not fair.  That's

1    not the way the Rules of Civil Procedure work.

2           MR. WERTKIN:  If I may.  The evidence was

3    disclosed.  It wasn't identified as to prove falsity

4    because we're not using it to prove falsity.  But it was

5    disclosed.  There's no ambush here.

6           THE COURT:  Then it doesn't come in in the

7    falsity section.

8           MR. WERTKIN:  I think it might be helpful to go

9    to some case law, because we do cite in our brief, and I

10   know these were just filed two days ago.  But there are

11   courts, plenty of courts that have said that evidence of

12   incentive tactics and training are admissible even if

13   the materials don't tie directly to the claim or

14   transaction at issue.

15          Justice Roberts, in a concurring --

16          THE COURT:  All right.  That doesn't address

17   the issue of what was not disclosed in terms of falsity

18   evidence.

19          MR. WERTKIN:  But, Your Honor, we were not

20   using this evidence to meet our burden of falsity.

21          MS. MARTIN:  Why are you offering it in phase

22   one?  Why are you saying it's relevant in phase one if

23   you're not offering it for falsity?  Offered for the

24   unreliability of the COTI which goes to falsity.  And

25   you didn't say, we are going to prove falsity by saying

1    that the COTIs were unreliable.

2         MR. WERTKIN:  It's related and it's certainly

3    probative of the questions to be decided in phase one.

4    That we can agree on.  But it is not --

5         MS. MARTIN:  No, we can't.

6         MR. WERTKIN:  Well, maybe that we can't agree

7    on.  But it is related to the issues.  And that's why

8    it's relevant.  And that's why it comes in in phase one.

9         THE COURT:  All right.

10        MR. WERTKIN:  They asked us how we're going to

11   meet our burden.

12        THE COURT:  I want to know by tomorrow at

13   9:00 a.m. authority from both sides as to whether a

14   party who answers contention interrogatories without

15   disclosing a component of their evidence can or cannot

16   then present additional evidence on that at trial.

17        I think that's a key issue that we now have.

18        MS. BROOKER:  Your Honor, I feel like we have

19   lost the bifurcation motion and we have gotten all past

20   this and so, again, I think that the interrogatories,

21   perhaps a misunderstanding, they were aimed at who was

22   going to testify about eligibility of patients.  And

23   that is only -- that is the only --

24        THE COURT:  Is that the question asked?

25        MS. MARTIN:  No, ma'am.

1    MS. BROOKER:  Again, I think, Your Honor, it's

2    not -- it was not foreshadowing that we would have to

3    divorce these elements of the case.  So, we were not

4    thinking about the defense when we were talking about --

5    now we recognize that there is a broader issue at, you

6    know, now that we're slicing the pie into two sections

7    and we have to talk about the whole section on falsity,

8    it includes the defenses on that, which we are well

9    aware of from the discovery and we're -- Your Honor, we

10   believe that we're past this.

11        If Your Honor would prefer that we take our

12   evidence out of order, because, I mean, we know now that

13   they're going to be raising the COTIs and we're going to

14   have to raise the reliability of it, if we want to first

15   establish that --

16        THE COURT:  I feel like nobody is listening to

17   anybody here today.  Do y'all get that feeling

18   sometimes?

19        MS. BROOKER:  Sometimes yes, Your Honor.

20        MR. LEMBKE:  You will have your brief by

21   9:00 a.m.

22        THE COURT:  I would like Kim to read into the

23   record, if you would not mind, the seven questions that

24   were asked.

25        MS. MARTIN:  Interrogatory number one, "for

1   each patient who the government contends was not

2   eligible for Medicare hospice benefits and for whom the

3   government contends it paid AseraCare hospice benefits,

4   please identify the patient by name and address, the

5   date the government contends the patient was not

6   eligible, the factual basis for the government's

7   contention that the patient was not eligible, and the

8   factual basis for the government's contention that it

9   paid AseraCare".

10          Then interrogatory number two, "for all

11   patients for whom the government contends it paid

12   AseraCare for Medicare hospice benefits and the

13   government contends reimbursement for such benefits

14   should have been denied, please identify the patient and

15   the dates the government contends reimbursement should

16   have been denied and state the factual basis for the

17   government's contention."

18          Interrogatory number three, "for each patient

19   for whom the government paid AseraCare for hospice care

20   and for whom the government contends no physician could

21   have honestly certified the patient as eligible for

22   Medicare hospice benefits, please identify the patient

23   and the date of each certification the government

24   contends was dishonest".

25          Interrogatory number four, "if the government

193

1   contends that it paid AseraCare for Medicare hospice

2   benefits for any patient with forged documents in

3   AseraCare's files for that patient, please identify the

4   patient, each document by Bates number, if numbered, and

5   the purported forgery, stating the factual basis for the

6   government's contention that each document was forged."

7          THE COURT:  And just for clarity, did the

8   government ever identify any forged documents?

9          It's my understanding that's not part of the

10  claim for falsity, right?

11         MS. MARTIN:  It's not part of the claim.

12         MS. BROOKER:  No.

13         THE COURT:  Okay.

14         MS. MARTIN:  Interrogatory number five, "if the

15  government contends that it paid AseraCare for Medicare

16  hospice benefits for any patient for whom AseraCare used

17  or had pre-signed documents in blank, please identify

18  the patient and each document that the government

19  contends was pre-signed in blank and state the factual

20  basis for the government's contentions that AseraCare

21  used or had pre-signed the documents in blank".

22         And they did disclose Dr. Mateo in response to

23  interrogatory number five.

24         MR. CHRISTIE:  But no patient.

25         MS. MARTIN:  No patient, but they just said

1    they were aware of this issue --

2            MR. CHRISTIE:  Contended.

3            MS. MARTIN:  Right.

4            THE COURT:  Did any of the 123 fall into that

5    category with Dr. Mateo?

6            MS. MARTIN:  There are patients from the

7    Milwaukee agency who had Dr. Mateo as their medical

8    director, but they did not identify any of those

9    patients as having had been one that had the pre-signed

10   forms in use, the alleged pre-signed forms.

11           THE COURT:  Okay.

12           MS. MARTIN:  Interrogatory number six, "for

13   each patient for whom the government contends it paid

14   AseraCare for medical hospice benefits, if the

15   government also contends that AseraCare's medical

16   records have factually inaccurate information for the

17   patient, identify the patient and the documents by Bates

18   number, if numbered, that the government contends have

19   inaccurate information, identify all information that

20   the government contends is inaccurate, and state the

21   factual basis for the government's contentions."

22           THE COURT:  And in response to that?

23           MS. MARTIN:  They identified, in a supplement,

24   they identified the incident that I had mentioned that

25   involved Dexter, Missouri.  They said there was an

1   incident that maybe some nurses had altered

2   documentation that related to Dexter, Missouri, which is

3   not in the sample.  There are no patients in the sample

4   from Dexter.

5          Then if you look at the next one, interrogatory

6   number eight, where we asked "for each patient for whom

7   the government contends it paid AseraCare for Medicare

8   hospice benefits, if the government contends that the

9   AseraCare medical records do not have clinical

10  information and other documentation that support medical

11  prognosis that the patient's life expectancy is six

12  months or less if the illness runs its normal course,

13  please identify each patient and each certification that

14  the government contends does not have medical record

15  support, stating the factual basis for the government's

16  contention".

17         THE COURT:  And the answer to that was directed

18  to Dr. Liao and statistical stuff and nothing about --

19         MS. MARTIN:  Right.  And they objected to

20  providing information about any patient that was not

21  within the statistically valid random sample.

22         And the next one that I had included in my

23  count of seven is interrogatory number twelve, "identify

24  each physician the government contends knowingly lied

25  when he or she certified an ineligible patient as

1   eligible for Medicare hospice benefits, each

2   certification that the government contends was a lie and

3   the basis for any such contentions."

4         And again, they just referenced -- well, let me

5   see on their supplement.  They basically said they

6   didn't need to show that any physician lied and then

7   they referenced the statistically valid random sample.

8         MR. WERTKIN:  Is that all of them?

9         MS. MARTIN:  All of the ones that I sort of

10  counted into that framework.

11        MR. WERTKIN:  That's actually very --

12        THE COURT:  Of the contention interrogatories.

13        MR. WERTKIN:  I think that is very helpful and

14  gives us something to ground us.

15        What I think is interesting is, I didn't hear

16  the word "falsity" at all in that recitation.  The

17  defendants didn't ask us, how are you planning on

18  talking about falsity.

19        MS. MARTIN:  You said it in your answer.  You

20  said, we intend to prove falsity through this -- that's

21  what they said when they answered it.

22        THE COURT:  When they answered the eligibility

23  question?

24        MS. MARTIN:  When they answered all of those.

25  "The United States intends to prove the falsity of

claims that AseraCare submitted for hospice services

provided to Medicare patients in the two statistically

valid random samples, by presenting expert medical

testimony that medical records that AseraCare maintained

for the patients do not contain clinical information and

other documentation that support AseraCare's claim that

the patients were terminally ill and eligible for the

Medicare hospice benefit."

          MR. WERTKIN:  And our answer would be the same

today.

          But what's interesting -- the contention

interrogatory is, how do you plan on talking about the

issue of falsity -- all those questions were about the

123 patients and tying it to the 123 --

          MS. MARTIN:  No, they weren't.

          MR. WERTKIN:  No?

          MR. CHRISTIE:  Every patient you contended was

ineligible.

          MS. BROOKER:  If you had just --

          MS. GUNASEKERA:  I think the contention

interrogatory was framed at eligibility.  It was framed

as what evidence did the United States have as to

whether any patient had a six month or less terminal

prognosis.

          And perhaps our answer was -- our answer, when

1  we spoke of it in terms of falsity, we weren't intending

2  to limit ourselves.  We were responding to that specific

3  contention interrogatory about eligibility.

4          THE COURT:  What are you going to use to prove

5  that these patients were not eligible?  Isn't that the

6  same thing as proving that the patients or that the

7  claims were false?

8          MS. GUNASEKERA:  Not necessarily.

9          THE COURT:  If they're not eligible?

10         MS. GUNASEKERA:  Not necessarily.

11         THE COURT:  They can be not eligible and still

12 not be false?

13         MR. WERTKIN:  Yes, actually, knowingly.

14         MS. GUNASEKERA:  Not the knowingly, no.  Our

15 response is consistent in that Dr. Liao is going to

16 opine on the hospice eligibility of the patients.  And

17 that was the way the contention interrogatory was

18 framed.  So we did answer that accurately and we

19 maintain that today.

20         To prove falsity, Your Honor, we need to

21 provide some context for the jury in terms of how those

22 medical records were put together.

23         And we further need to inform the jury about

24 the way in which the COTI was signed, what was given or

25 what was not given to the physician.

1    Dr. Liao cannot speak to that.

2    THE COURT:  With these 123.

3    MS. GUNASEKERA:  Well, not specific to the 123.

4    MR. WERTKIN:  But the key --

5    MS. GUNASEKERA:  But specific to the location

6    and place.  Just as Your Honor had already ruled.  We

7    can provide that evidence specific to the location and

8    place --

9    THE COURT:  Time.

10   MS. GUNASEKERA:  And time.  Thank you, Your

11   Honor.  And time.  For those 123 patients.  That is how,

12   as Ms. Brooker has identified, we've very carefully gone

13   through the exhibit list to make sure we have that nexus

14   connection.

15   THE COURT:  But some of those connections are

16   years apart.

17   MS. GUNASEKERA:  Understood.  We can address

18   that.  But the larger point, Your Honor, is we did

19   answer those interrogatories -- those contention

20   interrogatories accurately based on the way in which

21   they were framed.

22   But it does not limit us in terms of the

23   falsity evidence that we want to put on in phase one

24   because we were responding specifically to the question

25   asked which was eligibility.  And eligibility is a

1    question that is specific to Dr. Liao's opinion.

2         Falsity is a question that addresses these

3    other witnesses, including the nurses, including --

4         THE COURT:  Who you want to testify that the

5    patients were not eligible or that they thought patients

6    were not eligible and that goes to falsity.

7         MS. GUNASEKERA:  No, Your Honor.  Consistent

8    with what you said, we want the nurses and other

9    clinicians to testify as to the patient's condition, not

10   to the alternate question of whether or not they were

11   eligible.

12        We submit that that is correct and we are

13   willing to confine with your limiting instruction, Your

14   Honor, before those witnesses testify in phase one.

15        But the question of falsity deals with more

16   beyond Dr. Liao.  It addresses the clinicians, it

17   addresses, just as Your Honor has already acknowledged,

18   the way in which AseraCare admitted and recertified

19   patients, the way in which they put together the medical

20   record for each of these patients including the sample.

21        And that is what these witnesses are being

22   offered to testify to.

23        MS. MARTIN:  But we asked, we did ask also

24   about which patients have factually inaccurate

25   information.

1       I mean, all of this goes to falsity and they

2   said this is how we're going to prove it.  And they

3   never said we're going to prove, you know, that patient

4   X or patient Y has factually inaccurate information or

5   show that they have factually inaccurate information in

6   their records because a nurse was not telling the

7   physician all of the information.

8       I mean, they didn't answer that when they

9   responded to these interrogatory answers.

10      And they talk about providing context, but they

11  don't want to provide context of patients, of the 123 in

12  the sample, they want to provide context through people

13  who are not connected to any of the 123.

14      MS. GUNASEKERA:  That's incorrect, Your Honor.

15  I have already said time and time again, we have taken

16  painstaking time to go through the exhibit list.  We

17  respect Your Honor's decision, we want to be mindful of

18  Your Honor's decision, we have taken countless hours to

19  go through the exhibit list and be sure that there is a

20  location, time and place connection to the evidence that

21  we intend to offer in phase one.

22      So, it is not accurate to say that we are not

23  making a connection to the 123 sample patients.

24      As Your Honor has already opined, we do not

25  need to have the evidence specific as to Ms. Ann K. or

1  Ms. Karen K.  It only needs to be specific as to

2  location, time and place, and we have done that.

3        MS. MARTIN:  But you have identified Patricia

4  Haas who was in the Valparaiso agency in -- up to, I

5  think it was July 2007.  The first patient that comes on

6  service in Valparaiso is March of 2010.

7        You raise an issue about a Catherine Ashton

8  being the executive director.  She is no longer the

9  executive director after April of 2008.

10       And Patricia Haas also referenced a Dr. Nallari

11  many times in what you have submitted to the Court, but

12  the patient from Valparaiso didn't have a Dr. Nallari as

13  medical director, it was a Dr. Agusti.

14       I hear you saying you took painstaking efforts

15  to cull down your evidence, that's just not the case.

16  And to the extent that it is someone who overlaps with

17  one of the 123, it's not someone that you told us about

18  when we asked you these very specific questions about

19  how are you going to prove the ineligibility and the

20  falsity with regard to these patients.  You said, we're

21  proving falsity through Dr. Liao.

22       MR. WERTKIN:  The answer to that question is

23  that there was painstaking efforts.  There are lots of

24  witnesses that we would -- that we originally planned to

25  call that are not listed on phase one.

1           The witnesses that we are addressing here, we

2    did try, Your Honor, to explain our time and place.  We

3    felt as though we had a colorable argument in terms of

4    our time and place connection.

5           If Your Honor disagrees, then I think it makes

6    sense for us to go through, one by one, and talk about

7    them and figure out, is this evidence too remote in time

8    to be relevant.  Okay.  Fine.

9           But what we got caught up on, you know, is a

10   totally different issue that I think, Your Honor ruled

11   that the evidence doesn't have to tie to a specific

12   claim.  That's consistent with the case law that we cite

13   in our brief and consistent in general.

14          That's what really we have been arguing about

15   for the last hour.  To the extent that this is an

16   argument over what witnesses have evidence that's too

17   remote in time, well, you know, I think that we can go

18   through them.  And I think we are up to Michelle Bass.

19          MR. LEMBKE:  Your Honor, before we move beyond

20   the discovery responses, I mean, there's a lot of

21   bobbing and weaving going on about oh, well, this

22   doesn't really go to it.  But if they're going to put on

23   in their case in chief evidence to show that the

24   certificates for the 123 are not reliable, and that's

25   relevant evidence in phase one, that's evidence of

1   falsity/eligibility and it should have been disclosed.

2         I mean, there is just no way around it.  And

3   they may try to say, you know, and context, I mean, no

4   one is going to argue that they can explain at the

5   beginning of phase one the process, generically, and the

6   terms --

7         THE COURT:  We need to have that.

8         MR. LEMBKE:  Absolutely.  But we are not

9   talking about context.  We are talking about proof to

10  show certificates are not reliable.  That's falsity

11  evidence; that's eligibility evidence.  If it goes in

12  phase one in their case in chief, that's what it has to

13  be.  And if it's going to be in phase one in their case

14  in chief, it should have been in there, and it's not.

15        THE COURT:  Well, I'm going to get your

16  briefing on that in the morning.

17        MS. GUNASEKERA:  Just to briefly respond.  The

18  falsity evidence is just as described.

19        So, putting aside the way in which AseraCare

20  framed their contention interrogatories, they framed it

21  specifically to eligibility.  It sounds like they agree

22  that the evidence that we're trying to get in through

23  the clinician about inaccurate or omitted information

24  that was given to the or not given to the clinician does

25  speak to falsity.

1    Whether or not we were suppose to disclose that

2  in discovery, I don't --

3    MR. WERTKIN:  We did.

4    MS. GUNASEKERA:  We did, it just wasn't

5  disclosed in the response to a specific question.

6    THE COURT:  Can I take control again?  All

7  right.  Whether all of Dr. Micca's testimony comes in,

8  I'm going to hold to see if there is any kind of tie to

9  the nurses that were involved at the locations where the

10  patients were actually being treated, that were declared

11  ineligible by Dr. Liao.  And also until we get this

12  information on the contention interrogatories.

13    As to Michelle Bass, if I have got my notes

14  correct, she was at McKenzie, Tennessee, from August

15  2012 to April 2012 and there were no ineligible patients

16  identified there, and that the last ineligible patient

17  discharged from Clarksville, which was a satellite

18  location, was on May 2nd, 2011 before Ms. Bass was

19  employed.

20    And this is one where the government said, oh,

21  but we should be able to offer Ms. Bass' testimony to go

22  to the credibility of Ms. Cole.  And whether her

23  testimony would be admissible as to the credibility of

24  Ms. Cole cannot be determined until Ms. Cole testifies.

25    So, as to that aspect of her stuff, we'll see.

1   But the last patient identified in Tennessee was

2   discharged more than a year before she ever came to work

3   there.  So I don't see how, other than to go to

4   credibility, if Ms. Cole testifies, that Ms. Bass should

5   be allowed to testify about whatever happened when she

6   was in McKenzie, Tennessee.

7           MR. WERTKIN:  Well, Your Honor, the credibility

8   issue, I understand your position on that.  And it could

9   be that Ms. Cole winds up not being called by AseraCare.

10          However, Ms. Cole was the DOCS of the

11  Clarksville agency during the time of the ineligible

12  patients.  And to the extent that Ms. Bass can testify,

13  and this is in our brief, that Ms. Cole instructed the

14  agency's medical director to admit patients, and that

15  the medical director followed Ms. Cole's directions

16  without taking an independent analysis or otherwise

17  exercising any medical judgment, that will be Ms. Bass'

18  firsthand testimony of how she witnessed Ms. Cole and

19  Ms. Cole's clinical interaction with the physicians.

20          So, she can testify to that, whether or not

21  Ms. Cole testifies or not.

22          THE COURT:  More than a year and a half before

23  -- I mean, after, excuse me, more than a year and a half

24  after the last ineligible patient was discharged at a

25  different location in Tennessee.

1          MR. WERTKIN:  Well, Ms. Cole was at

2    Clarksville.  So it would be the same location.  But --

3          THE COURT:  Ms. Bass was at McKenzie.

4          MR. WERTKIN:  Right.

5          MS. MARTIN:  Different location from where

6    Ms. Bass was employed.  And the Clarksville/Jackson

7    agency and McKenzie agency all had different medical

8    directors, lots of different staff with them.  And

9    testimony by Ms. Bass a year and a half later as to what

10   was going on at a different agency at an earlier point

11   in time is not probative and is really just 404(b)

12   evidence to show that whatever Ms. Bass experienced may

13   have been that Ms. Cole acted in the same manner with

14   different people at an earlier time.  And that's 404(b)

15   bad act evidence.

16         THE COURT:  I'm going to grant it as to her

17   direct testimony.  If Ms. Cole testifies and you want to

18   bring her in to attack her credibility, then I think

19   that's a different question.

20         Jacquelyn Fehd, she was at Evansville, Indiana,

21   until December 11, 2008.  The first ineligible patient

22   was admitted April 29th, 2009, five months after she

23   left.

24         So, we're back in the same time frame as with

25   Dr. Micca.

1          Also goes to the issues involving Debbie
2    Waters, who was the executive director, was that at the
3    same location?
4          MR. WERTKIN:  Yes, Your Honor.
5          THE COURT:  Evansville, from mid 2007 to some
6    time in 2010.
7          Certainly as to the credibility of Ms. Waters,
8    I think, yeah, as to how much relevance her testimony
9    would have as to the ineligible patient that was
10   admitted four or five months later -- how many
11   ineligible patients were identified at Evansville?
12         MS. MARTIN:  There were three.
13         THE COURT:  I got tired of looking back and
14   forth.  I'm sorry.
15         MS. MARTIN:  The first patient alleged to be
16   ineligible from Evansville did go on service in --
17         THE COURT:  I'm looking at your Exhibit C,
18   maybe I'm looking at the wrong one.
19         MS. MARTIN:  Evansville, the physical location
20   was Newburgh --
21         THE COURT:  That's why I couldn't find it.
22         MS. MARTIN:  So, they replaced it, they put
23   in -- we put in Evansville in Exhibit C, but the way it
24   was organized and because of the alphabetizing, it's out
25   of order.

1          THE COURT:  That's why I couldn't find it.

2          MS. MARTIN:  So April 2009 is when the first

3    patient --

4          THE COURT:  Not just April, April 29th, so it's

5    kind of towards the end, to October 15th.  And that was

6    how many patients?

7          MS. MARTIN:  That encompasses three patients on

8    service in Newburgh during that time period.

9          And Ms. Waters was no longer the executive

10   director in April of 2010.

11         But again, this is, you know, Ms. Fehd has no

12   information about any of the one hundred -- any of these

13   three patients, she wasn't involved in any of their care

14   and has no knowledge about what occurred with regard to

15   the certifications of these three patients who are on

16   service in Evansville.  Her name is not in any of their

17   charts and her testimony would simply be offered to show

18   that she -- her interactions with Ms. Waters at an

19   earlier point in time to allege some sort of action in

20   conformity therewith on a later occasion.

21         MR. WERTKIN:  Your Honor, if I may, Ms. Fehd

22   will testify that when Ms. Waters was brought on, she

23   firsthand witnessed Ms. Waters providing inaccurate

24   information about a patient's condition to the medical

25   director, which overstated the patient's symptoms.

1          She signed a declaration to that effect.  She

2     will also say that --

3          THE COURT:  When she was first brought on which

4     was when?

5          MR. WERTKIN:  This is when Debbie Waters was

6     first brought on in mid 2007.

7          THE COURT:  Which was two years before the

8     first admit of ineligible.

9          MS. MARTIN:  Yes.

10         MR. WERTKIN:  Mid 2007 --

11         THE COURT:  April 29, 2009.

12         MR. WERTKIN:  Over the course of the -- she did

13    leave the Evansville, Ms. Fehd did, I believe it was

14    December of 2008; is that right?

15         THE COURT:  Yes.

16         MR. WERTKIN:  So she'll testify that these

17    interactions happened all the way up until December

18    2008.  In fact, she will say that she, Ms. Fehd, that

19    she was reprimanded by Ms. Waters when she refused to

20    admit patients that she didn't believe was terminally

21    ill.

22         Ms. Waters then labeled her quote, unquote,

23    this is from Ms. Fehd's declaration, a census barrier

24    and told her that she would be terminated if she

25    continued to be vocal about her views with regard to

1    these patients.

2          Ms. Fehd will then testify that she reported

3    her concerns up and she resigned because her concerns

4    were ignored.

5          So, this is evidence that Ms. Waters was

6    providing misinformation to the medical directors four

7    months before the first ineligible patient, during the

8    time frame of all of what we're talking about.

9          Now, mind you, we acknowledge that it's not in

10   the time frame of the 123 patients.  But just on the

11   relevancy question, does this evidence make it more

12   likely than not to, you know, does it --

13         THE COURT:  More likely than not what?

14         MR. WERTKIN:  We're going to be offering it --

15   we're going to be offering it for the fact that these --

16   that the COTIs that were signed during this time period

17   are not reliable and they should be given no weight to

18   the jury.

19         THE COURT:  Because they weren't reliable

20   during the time frame that Ms. Fehd was there.

21         MR. WERTKIN:  Ms. Waters was there.

22         THE COURT:  At the time that Ms. Fehd left in

23   December of 2008.

24         MR. WERTKIN:  Well, we anticipate on calling

25   Ms. Fehd to talk about what -- how Ms. Waters interacted

1   with the physicians during that time period.  And

2   Ms. Waters continued to be employed there.

3          THE COURT:  So that the way she was acting,

4   Ms. Waters, before Ms. Fehd left, is evidence that

5   that's the way she acted later?

6          MS. MARTIN:  Yes.

7          MR. WERTKIN:  It shows that there was a motive,

8   that there was a lack of accident, you know, her

9   behavior during that earlier time period is relevant to

10  the question of whether the COTIs were reliable even

11  beyond her time period.

12         The case law, as you say --

13         THE COURT:  Why is that not 404(b)?

14         MR. WERTKIN:  So, we are not using this as

15  evidence to say, okay, the Evansville patients, I can't

16  remember off the top of our head, let's just say --

17         MS. BROOKER:  Dorothy R. --

18         MS. MARTIN:  Mary K.

19         MR. WERTKIN:  If we were going to stand up and

20  say, jury, you heard from -- in closing, jury, you heard

21  from Jackie Fehd, Jackie Fehd testified that she

22  observed Ms. Waters on many occasions telling medical

23  directors, that is proof that Dorothy R. was an

24  ineligible patient.  That's not what we're going to say.

25         THE COURT:  But it's more likely than not that

1   Debbie Waters continued to provide false information

2   that undercuts the reliability of the COTI, which is

3   what you are going to be arguing.

4           MR. WERTKIN:  Your Honor, there's a difference

5   between evidence that's relevant in the case and

6   evidence that goes to meet our burden of proof.  There

7   is a difference of that.

8           We can argue that -- we can argue that the

9   COTIs are not reliable.  We can argue that, jury, you

10  should not give any weight to the COTIs that were signed

11  in Evansville and here's why, because of Jackie Fehd,

12  the Corridor Group, and we plan on showing a bunch of

13  those.

14          That shows the COTIS should not be given -- you

15  should not give any weight to the COTIs.

16          Now, that's a separate question than the

17  falsity question.  You have heard from Dr. Liao that the

18  medical records do not support eligibility.  They are

19  not reimbursable; they're false.  So that's what it is.

20          Now, the question of is it -- so is it

21  determinative -- is it more likely, I mean, the

22  relevancy 401, is it -- is it a fact that's of

23  consequence to the determination of the case?  Yes.

24  Absolutely.

25          But that's a different question than whether it

1  meets our burden to show that the medical records don't

2  support eligibility.

3       MS. MARTIN:  If it's not going to support

4  falsity in phase one, then I don't know, I mean, as I

5  understand what we're doing here in phase one, it's

6  falsity.

7       So, if you're not offering this unreliability

8  of the COTIs for falsity, I'm not sure what it goes to.

9       THE COURT:  It has to go to falsity.

10      MR. WERTKIN:  It is relevant to the question of

11  falsity, absolutely.

12      THE COURT:  So, you're offering testimony or

13  want to offer testimony of these people that five months

14  before the first ineligible patient was identified as

15  having been at this facility, I know that Debbie Waters

16  was giving false information to doctors to get them to

17  certify patients.

18      MR. WERTKIN:  Yes, Your Honor.

19      THE COURT:  And the import of that is to show

20  that it's more likely than not that Debbie Waters

21  continued to do that after Ms. Fehd left and that the

22  COTIs are, therefore, false or unreliable or whatever

23  you want.

24      MR. WERTKIN:  No, Your Honor, that's not --

25      THE COURT:  Then why are you offering it?

1            MR. WERTKIN:  Because we're -- I sound like a

2    broken record.  But, for example, just take it out --

3    take it into a different context.

4            If you were talking about a criminal case and

5    you were saying, oh, the accusation was this person

6    robbed a bank.

7            THE COURT:  And you wanted to offer it to show

8    that it was not an accident, that he had motive or

9    whatever.  Okay.

10           MR. WERTKIN:  No, the idea --

11           THE COURT:  That doesn't go to whether the

12   person actually was present in the bank pointing the gun

13   at somebody.

14           MR. WERTKIN:  Right.  Exactly.  The evidence

15   that we would -- if we had evidence that the same person

16   had robbed the same bank the last three years, we

17   couldn't put that evidence on to show that he committed

18   the crime --

19           THE COURT:  Right.

20           MR. WERTKIN:  Exactly.

21           THE COURT:  But it would be relevant perhaps to

22   these other things of not being an accident or whatever,

23   that he knew what he was doing and that would be the

24   argument that you would make for why it would come in.

25   And you have been hinting around that this stuff comes

1    in to show that it wasn't an accident and all this other

2    kind of stuff, and that goes to knowledge.

3         MR. WERTKIN:  If we did have evidence that the

4    perpetrator of the robbery was planning it and was

5    talking about it and was making plans about it three or

6    four months earlier and was devising seems and tactics

7    and training to do it, that evidence would be relevant.

8    That would be relevant evidence.

9         Not, you know, I think what I'm trying to say

10   here is that just because you have got evidence in this

11   case that pre-dates a time period, okay, it can still --

12   it would still be admitted because it's relevant to

13   issues -- we're not offering it -- we are not offering

14   it to say anything about whether the medical records

15   support.  That is something that Dr. Liao is going to

16   testify about.

17        THE COURT:  But you're offering it to undermine

18   the reliability of the COTIs.

19        MR. WERTKIN:  Right.  Exactly right.

20        THE COURT:  Which is what we have been saying

21   all along.  And the argument is that you are using prior

22   actions to show that it's more likely true than not that

23   on this particular occasion when a false claim was made,

24   five months later, that the COTI was false or not

25   reliable.

1           MR. WERTKIN:  No, Your Honor.

2           THE COURT:  Then we'll give a limiting

3    instruction that they cannot consider this prior

4    testimony as having any bearing on whether any of these

5    (indicating) were incorrect or false or whatever when

6    the doctor signed the COTI.

7           So what would be the relevance of the

8    testimony?  What would it go to instead of showing that?

9           MR. WERTKIN:  I mean, Your Honor, I think we're

10   on the right track here.  The limiting instruction would

11   certainly be --

12          THE COURT:  It would completely negate the

13   purpose of putting the witness on.

14          MR. LEMBKE:  Poison the well.

15          MS. MARTIN:  Back door effort to get knowledge

16   evidence into the falsity case.  That's all it is.

17          MS. GUNASEKERA:  Your Honor, if I may.

18          MR. WERTKIN:  Yes, please.

19          MS. GUNASEKERA:  It's not back door, back door

20   way.  It goes to, and Your Honor has already recognized

21   and acknowledged, we need to provide some context for

22   the jury.  We need to provide framework.

23          And to the extent that that framework reflects

24   that those clinicians were told to omit information,

25   document patients in an inaccurate way, inform

1    physicians about things -- about patients who appear to

2    be eligible when, in fact, the characteristics they

3    observed show the patients weren't eligible, all of that

4    is the way in which these patients had been admitted,

5    recertified and they were maintained on hospice by

6    AseraCare.

7         That context, and that is the way that I am

8    thinking of the context in the framework, that's part of

9    the falsity case.

10        THE COURT:  But you don't need five or six

11   witnesses to establish context.

12        MS. GUNASEKERA:  Agreed, Your Honor.  But in

13   terms of temporal proximity -- as Mr. Wertkin had

14   already referenced, it is a fair point, Your Honor, to

15   say that a witness doesn't have temporal proximity to

16   the false claims that the United States is alleging in

17   this case.  That's a fair point.

18        But it doesn't mean that witness cannot be

19   admitted at all in phase one.  There is something to be

20   said about a witness who has been working, who received

21   direction as to how to admit and recertify patients.

22   And what evidence AseraCare can put on as to, well, we

23   changed our processes, we changed our processes once

24   that purported ineligible patient was admitted.

25        Taking Dr. Micca, for example, Your Honor, he

1  left the company five months before the first patient

2  was ineligible, patient was admitted from the sample,

3  but it would be, I would argue, Your Honor, incumbent

4  upon AseraCare to prove that their processes changed.

5  It would be incumbent upon them to say --

6          THE COURT:  They don't have an obligation to

7  prove that their processes were different; they have an

8  obligation to prove that their claims that the

9  government has identified are eligible and -- okay.

10         The next one, Patricia Haas --

11         MR. WERTKIN:  Did you rule?

12         THE COURT:  I'm granting because it's more than

13  two years and because the doctor she wants to testify

14  about was not one of the treating physicians for any of

15  the patients who were identified as being ineligible.

16         As to Deb Laseter, I'm granting that one

17  because it's more than two years.

18         Spiegel, nine months.  She was last employed at

19  Norfolk, Nebraska, November 2006 and the first -- the

20  person admitted was -- Marilla B. was admitted August of

21  2007.

22         And as I understand, the government wants to

23  use her to talk about a Wismer who was the executive

24  director until August of 2007 when the first patient was

25  admitted.  Is that right?

1          MR. WERTKIN:  Yes, Your Honor.

2          THE COURT:  That's to talk about a patient who

3    is not identified by name who had a feeding tube issue.

4          MR. WERTKIN:  More specifically, the patient

5    had a feeding tube, Ms. Spiegel went to evaluate the

6    patient and talk to the family and they said they had no

7    intention of taking the feeding tube out.  She called

8    and said, well, the diagnosis would be adult failure to

9    thrive but she has a feeding tube, so her weight is

10   stable, the diagnosis doesn't apply.

11         And Ms. Wismer said, I'm instructing you to

12   admit the patient anyway.

13         And then later, when Ms. Spiegel told

14   Ms. Wismer that if they are going to get paid --

15         THE COURT:  All right.  You're missing my

16   point.  It's an unidentified patient that was not

17   disclosed to AseraCare in response to the question about

18   other patients and when you specifically objected to

19   providing any information about other patients than the

20   123.  Right?

21         So how can AseraCare be expected to rebut any

22   kind of testimony about some unnamed patient at some

23   undesignated time period --

24         MS. GUNASEKERA:  If I may.  Again, going back

25   to the discovery response, that was specific to those

1   patients that the United States is alleging have false

2   claims.

3          We are not alleging false claims as to this

4   unidentified patient.

5          So this unidentified patient is not part of --

6   but it goes again to the context issue and to the way in

7   which the nurses and clinicians were admitting

8   ineligible patients on the hospice.

9          MS. MARTIN:  One, that's not what our

10   interrogatories were limited to.

11          But two, I mean, to the Court's point, this is

12   an unidentified patient, I mean, the allegations here

13   are, aside from being inadmissible under 404(b), strike

14   me as highly prejudicial with this allegation of a

15   feeding tube, taking a feeding tube out, in particular

16   when we don't even know the patient, we can't, you know,

17   we have no way to be able to respond to this.

18          And it happened a year and a half before the

19   first patient came on service in Norfolk.

20          So, someone from November of 2006, I'm sorry, a

21   year and a half -- yeah, over -- yeah, no, I'm sorry.

22   Again, my math is challenged.  Nine months until the

23   patient came on service.

24          Still, it's being offered to show that

25   Ms. Wismer acted in a particular way at some point in

1  time prior to November of 2006 and so she must have

2  acted in that fashion in August of 2007.

3        MS. GUNASEKERA:  So the record is clear, the

4  United States did produce a declaration of Ms. Spiegel

5  to the defendant that includes this specific --

6        THE COURT:  Doesn't give the patient's name.

7        MS. GUNASEKERA:  Understood, Your Honor.  We

8  did produce -- just so the record is clear, we did

9  disclose Ms. Spiegel to the defendants together with

10  this fact.

11        MS. BROOKER:  Your Honor, I know Your Honor is

12  clear, but we're not trying to prove the eligibility or

13  ineligibility in this particular patient.

14        THE COURT:  Right.

15        MS. BROOKER:  Your Honor, again, we understood

16  your ruling was that we had to show a time and place

17  connection to the patients in the sample, not only offer

18  testimony about the patients themselves, the 123

19  patients.

20        This is, you know, as much on the, you know,

21  setting aside what we're going to do in phase two on

22  business practices, the clinical practices are critical

23  for phase one for the reasons that we've all been

24  talking about here.

25        THE COURT:  Do you have any, and I asked y'all

1  this before, do you have any witnesses who were actually

2  in any of these facilities during the time when these

3  patients who were identified as being ineligible were,

4  in fact, in those facilities?

5          MR. WERTKIN:  The question is whether any of

6  our witnesses were working at the AseraCare facilities

7  during the time of the eligible -- oh, absolutely.

8          THE COURT:  Ineligible people.

9          MR. WERTKIN:  Absolutely.  We're only talking

10  today about the ones that AseraCare has identified.

11          THE COURT:  As not having that nexus in time.

12          MR. WERTKIN:  That's right.

13          MS. MARTIN:  For those witnesses that

14  Mr. Wertkin talks about, they never disclosed those as

15  providing any information about people who perhaps had

16  clinically inaccurate information or as being people --

17  not disclosed, but identified them in their

18  interrogatory answers as being providing testimony as to

19  falsity and how they were going to prove falsity.

20          MS. BROOKER:  Because they are not talking

21  about the specific patients in the sample.  So that's

22  your interrogatory.

23          Again, to prove the number of false claims and

24  the ultimate damages is Dr. Liao.  So, that's --

25          THE COURT:  The number and the damages.  Who is

1 going to prove that they were false?

2          MS. BROOKER:  So, Dr. Liao is our witness on

3 testifying about eligibility, our sole witness.  Again,

4 we have talked all through this much earlier in the

5 morning, where we are not asking anyone else even, you

6 know, we're not asking any physicians to come in and

7 testify about the eligibility of patients.  Dr. Liao is,

8 as we thought we were informing them in our rogs, he

9 really is our sole witness on the eligibility of the

10 patients in the sample.

11          THE COURT:  As to Ms. Spiegel, I'm going to

12 grant that.

13          In doing this, I'm talking about phase one

14 issues.  Whether these people can come in in phase two

15 is a different question.

16          I think that takes care of all of the

17 witnesses.

18          MR. WERTKIN:  May I ask a clarification

19 question?

20          THE COURT:  Okay.

21          MR. WERTKIN:  For Ms. Fehd --

22          THE COURT:  I was about to say I haven't

23 specifically indicated her.  We discussed about hers.

24          I am going to reserve on her similar to

25 Dr. Micca, and I may end up doing what I swore I wasn't

1  which is hearing from these witnesses before they go,

2  briefly, before they go on the stand.  But I'm going to

3  reserve as to those two.  I'm going to grant it as to

4  the others.  And I think that's being consistent with

5  saying four to five months, you know, may be close

6  enough if they can somehow tie things together.

7          But then we have got a bunch of documentary

8  evidence that has been identified as well that we

9  haven't gotten to.

10         So I guess that's where we will pick up

11  tomorrow.  As I said, 5:00 o'clock and it's 5:15.

12  That's pretty good for me to stay on halfway target.

13         We'll see how far we can get in the morning.  I

14  would encourage y'all to talk about the parameters that

15  we have gotten to and see if there's anything that y'all

16  can kind of agree to.  Somehow I doubt it since we

17  haven't had a whole lot of that.  But we'll see.

18                    (Court in recess)

19

20

21

22

23

24

25

1
2
3                    C E R T I F I C A T E
4
5        I hereby certify that the foregoing is a
6   correct transcript from the record of proceedings in the
7   above-referenced matter.
8
9
    _____
10  Teresa Roberson, RPR, RMR
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25