FILED

2015 Nov-03  PM 06:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA; ex rel., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | **2:12-CV-245-KOB** |
| | ) | |
| **ASERACARE INC, et al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

False Claims Act cases have been particularly hot in 2015—and not only in this court. Several courts within the Eleventh Circuit and across the nation have recently rendered opinions in FCA cases. *See, e.g., Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015); *United States ex rel. Phalp v. Lincare Holdings, Inc.*, No. 10-cv-21094-KMW, 2015 WL 4528955, ___ F. Supp. 3d ___ (S.D. Fla. July 10, 2015); *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, No. 0:12-3466-JFA, 2015 WL 3903675 (D.S.C. June 25, 2015), *order corrected by* 2015 WL 4128919 (D.S.C. July 6, 2015), *appeal docketed*, No. 15-2147 (4th Cir. Sept. 29, 2015); *United States ex rel. Ruckh v. Genoa Healthcare, LLC*, No. 8:11-cv-1303-T-23TBM, 2015 WL 1926417 (M.D. Fla. Apr. 28, 2015); *United States v. Aegis Therapies*, No. CV-210-072, 2015 WL 1541491 (S.D. Ga. Mar. 31, 2015); *United States v. Amin Radiology*, No. 5:10-cv-583-Oc-PRL, 2015 WL 403221 (M.D. Fla. Jan. 28, 2015), *appeal docketed*, No. 15-11044 (11th Cir. Mar. 12, 2015). Yet, the law in this area is still developing. Many key issues

remain undecided, particularly in the arena of False Claims Act cases against hospice care providers for alleged false certification of patient eligibility.

One of the undecided areas of law in the Eleventh Circuit is the legal standard for falsity in a case like this one, where the Government alleges that the hospice provider's medical records do not support its hospice eligibility certifications, and, therefore, the certifications are false. This case does not involve the types of false claims for which the legal standard is well-established: the hospice provider forged physicians' signatures, billed for services that it did not perform, or submitted claims for fictitious patients.

In traversing this uncharted territory, the court has carefully considered each of the novel issues presented by this case, and has attempted to render its decisions in a way that aligns with the current state of the law. Nonetheless, the court misstepped. The court committed reversible error in failing to provide the jury with complete instructions as to what was legally necessary for it to find that the claims before it were false.

Therefore, because the court has realized its mistake, the court has GRANTED AseraCare's oral motion for a new trial. *See* 10/13/15 Hrg. Tr. At 7304-05, 7313.  This Memorandum Opinion outlines the reasons for that decision and charts a course of action that will move this case forward expeditiously, pragmatically, and correctly.

## I.    Background

This case has always been about whether AseraCare submitted false claims to Medicare by certifying patients as eligible for hospice who did not have a prognosis of "a life expectancy of 6 months or less *if* the terminal illness runs its normal course." 42 C.F.R. § 418.22(b)(1) (emphasis added). Both the initial and subsequent certifications of terminal illness are "based on

the physician's or medical director's *clinical judgment* regarding the normal course of the patient's illness." *Id.* at § 418.22(b) (emphasis added).

To prove that these claims were false, the Government has never offered any evidence that AseraCare billed for phantom patients, that it submitted Certificates of Terminal Illness (COTIs) with forged signatures, or that any AseraCare employees lied to or withheld critical information from the certifying doctors about any specific patients. *See* 11/17/14 Hrg. Tr., at 79-80. Instead, to show falsity, the Government has relied on and offered the testimony of its medical expert Dr. Solomon Liao and the patients' medical records, which Dr. Liao contends do not support the patients' prognoses. As such, this case falls into the more amorphous category of "false certification" claims as opposed to the straightforward category of "factually false" or "direct fraud" FCA Claims. *See Amin Radiology*, 2015 WL 403221, at *3 (explaining that factually false or direct fraud claims "occur[] when a provider submitting a claim supplies 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided,'" while false certification claims "occur[] 'when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment.'").

A.    <u>Summary Judgment</u>

At summary judgment, AseraCare argued that it was entitled to summary judgment because Dr. Liao's testimony was insufficient to prove falsity. (Doc. 226, at 22).  Dr. Liao had testified in his deposition that he was not capable of saying that any AseraCare physician's opinion was reckless (doc. 225-8, at 295:21-296:2); that if a medical director signed a physician's certification for the physician, he couldn't say that it was a false certification because

3

he did not "know what was in the mind of the medical director" (*id.*, at 293:17-294:5); and that

he was not able to say "whether a physician's actions were right or wrong" because he "wasn't

asked to do that," "wasn't given sufficient information to make that determination," and would

need "to understand the reasoning of the physician" and "to know what their overall practice

patterns were." (*id.*, at 348:2-349:3). However, Dr. Liao provided a report and deposition

testimony in which he identified, from the sample of 233 patients he reviewed, 124 patients[1] as

ineligible for hospice care despite the physician's certification to the contrary. Therefore, the

court concluded that "questions of fact exist, based on Dr. Liao's testimony, regarding whether

clinical information and other documentation objectively did not support a certification of

terminal illness." (Doc. 268, at 15).

In its motion for summary judgment, AseraCare urged the court to adopt the standard for

falsity recognized in *United States ex rel. Geschrey v. Generations Healthcare, LLC*, 992 F.

Supp. 2d 695 (N.D. Ill. 2012). (Doc. 226, at 21-25). In *Geschrey*, the court dismissed some of the

alleged false claims because the relators had not alleged facts "demonstrating that the certifying

physician did not or could not have believed, based on his or her clinical judgment, that the

patient was eligible for hospice care."[2] *Geschrey*, 992 F. Supp. 2d at 703.

---

[1]  Dr. Liao initially found ineligible 124 of the 233 patients in the sample.  The
Government represented that one of the 124 patients "fell outside the date range," which brought
the number of allegedly ineligible patients to 123.  See 8/6/15 Hrg. Tr. at 249; (Doc. 317, at 2-3).
During the trial, the court granted Judgment as a Matter of Law for two of the 123 because of the
Government's failures in properly presenting its evidence for those two patients. (Doc. 427).  As
such, the jury had 121 patients about which to answer the special interrogatories.

[2]  AseraCare argued that, "[t]o avoid summary judgment, the Government must have
evidence that a physician could not have the honest opinion that the patient was terminally
ill"—in essence a "no reasonable physician" standard.  (Doc. 226 at 23).

This court rejected the *Geschrey* standard urged by AseraCare for several reasons: (1) it was not Eleventh Circuit law; (2) it focused on the "belief" of the certifying physician and established too high a burden for the Government; and (3) because, at that time, the court still understood that the United States was going to link the testimony of the relators and other former AseraCare employees to the allegedly ineligible patients; after all, counsel for the Government repeatedly advised the court that the certifying doctors did not have complete or accurate information and that the doctors were not really involved in the admission and recertification of the patients.  Moreover, some of the relators' testimony in the deposition transcripts offered by the Government at summary judgment could have shown that the certifying doctors did not have accurate information.[3] *See*, *e.g.*, Deposition of Marsha Brown Farmer, Doc. 251-86, 81:20-22, 82:9-10  (explaining that an AseraCare certifying physician would "nod off and on during the meeting" and that she would have to "catch him before he fell out of his chair."); Deposition of Roberta Manley, Doc. 251-55, 152:22-24 (testifying that "Dr. Mateo spent most of the team meeting with a sketch pad and coloring pencils, coloring and drawing pictures.").

Dr. Liao's testimony that, in his opinion, a patient did not have a prognosis of six months or less to live, coupled with anticipated evidence that AseraCare staff falsified information in the records, or withheld or misrepresented information from the certifying doctor, would have created more than an issue of fact; it could have presented a legally sufficient evidentiary basis on which a reasonable jury could find the claim for that patient was false.

---

[3] At the time of summary judgment, the court thought the Government could use Rule 406 "pattern and practice" evidence to make the connection between the relators' testimony and the ineligibility of the patients at issue.  However, as discussed below, the Government represented to AseraCare and the court that it did not plan to use this testimony to prove falsity.

B.     Bifurcation

In May of this year, the court made the decision to bifurcate the trial of this case into two phases: one phase on the falsity element of the Government's claims and a second phase on all other issues and claims, including the knowledge and damage elements of the Government's claims. (Doc. 298). When the court bifurcated these issues for trial, it still anticipated that the Government would have testimony from the relators and other witnesses with a "time and place" nexus to the patients at issue to challenge the reliability of the information provided to the certifying doctors and to support Dr. Liao's disagreement with those doctors' opinions about eligibility of their patients; i.e., that the Government would present more than just a disagreement of opinions among physicians.  The Government continued to represent to the court that it had "pattern and practice" evidence through which it intended to make this showing. (Memorandum Opinion Regarding Pretrial and Trial Evidentiary Rulings, Doc. 432, at 2-3 (recounting the Government's representations regarding its Rule 406 "pattern and practice evidence")).

C.     Motions in Limine

A major obstacle in the Government's proof of falsity in this case results from its own failures in its preparation for trial and its answers to contention interrogatories during discovery. The court and the parties spent the bulk of July working through Motions in Limine.  During those conferences, the court first focused on the ramifications of the Government's answers to contention interrogatories: the Government answered that it would only be using the testimony of Dr. Liao and the medical records to show falsity. *See* 7/22/15 Hrg. Tr. at 170, 180, 182, 184, 197, 224.

In "Defendants' First Discovery Requests to the Government," served on the Government

6

on July 26, 2012, AseraCare stated as Interrogatory No. 1:

> For each patient who the Government contends was not eligible for
> Medicare hospice benefits and for whom the Government contends it
> paid AseraCare hospice benefits, please identify the patient by name
> and address, the dates the Government contends the patient was not
> eligible, **the factual basis for the Government's contentions that
> the patient was not eligible**, and the factual basis for the
> Government's contentions that it paid AseraCare.

(Doc. 367-1, at 3) (emphasis added). In its September 27, 2012 response, the Government

answered Interrogatory No. 1:

> Specifically, the United States will rely upon, in part, an expert review
> of statistically valid random samples ("SVRS") of patient medical files
> to determine the number of false claims and the scope of damages in this
> case. In particular, the United States' statistical and medical expert(s)
> will identify AseraCare patients within the SVRS who were ineligible
> for the Medicare hospice benefit, the factual basis for those patients'
> ineligibility, and the payments made to Defendants for patients who
> were ineligible for the Medicare hospice benefit.

(Doc. 376-2, at 6-7). The Government, on July 23, 2013, supplemented its response to

Interrogatory No.1 by providing its interpretation of the regulations governing Medicare

eligibility and stating:

> The United States intends to prove the falsity of claims that AseraCare
> submitted, or caused to be submitted, for hospice services provided to
> Medicare patients in the two SVRS (each covering a different time
> period) by presenting expert medical testimony that medical records that
> AseraCare maintained for the patients do not contain clinical information
> and other documentation that supports AseraCare's claim that the patients
> were terminally ill and eligible for the Medicare hospice benefit.

(Doc. 367-3, at 7).  The Government, in its supplemental response, also stated:

> Exhibits A-C of Dr. Liao's expert report identify the periods during which
> AseraCare patients within the SVRS for whom Medicare made payments
> to AseraCare were ineligible for the Medicare hospice benefit.  Pages 2-5
> and Exhibits A-C of Dr. Liao's expert report also contain the factual basis

> for the United States' contentions that AseraCare patients within the SVRS
> were ineligible for the Medicare hospice benefit.

(Doc. 367-3, at 12).

The Government represented to the court that it never intended to have the relators and clinicians testify from their personal knowledge about the information provided to or withheld from the certifying physicians of the 123 patients at issue to prove falsity, stating that "their testimony is not going to tie directly to a specific claim." *See* 7/23/15 Hrg. Tr. at 237-41. The Government even admitted that it had not shown the applicable medical records of the 123 patients at issue to any of the relators or clinicians it intended to call as witnesses—even if their names appeared in the medical records. *See* 8/10/15 Hrg. Tr. at 287, 300, 303. Because the Government did not disclose that it would solicit testimony from the relators and clinicians on the issue of falsity or the content of the medical records, the court refused to allow the Government to *now* change course; the court refused the Government's request to show them the medical records of the 123 patients at issue to see if the relators and clinicians could provide direct evidence of objective falsity regarding what the certifying physicians had before them in the medical records of the 123 patients at issue. *See* 8/10/15 Hrg. Tr. at 317-18.

Moreover, the Government has consistently maintained that the *only* evidence it has to prove falsity of the 123 patients at issue is Dr. Liao's testimony and the medical records of those patients. *See* 7/22/15 Hrg. Tr. at 170, 180, 182, 184, 197, 224. In trying to convince the court to allow the testimony of the relators and clinicians regarding the reliability of the COTIs, the Government represented to the court that it did not intend to use their testimony to prove falsity. *See* 7/22/15 Hrg. Tr. at 184 ("[W]e are only having Dr. Liao testify as to the eligibility or

8

ineligibility"; "the clinical staff are not here to testify that the 123 patients were eligible or

ineligible, i.e., the claim was false or not false. . . . So Dr. Liao, Melvin and Cooney, they will

testify about eligibility which is falsity."); 7/2215 Hrg. Tr. at 189 ("[The relators' and clinicians'

testimony] wasn't identified to prove falsity because we're not using it to prove falsity. . . .[W]e

were not using this evidence to meet our burden of falsity.").  The court made clear that it would

not allow the Government to present evidence to prove falsity that went beyond what it had

represented to AseraCare during discovery and on the eve of trial.  *See* 7/22/15 Hrg. Tr. at 189.

      D.     <u>Motions for Judgment as a Matter of Law and Motion for a New Trial</u>

On August 10, Phase One of the trial began. After the Government had presented all of its

evidence on the element of falsity, AseraCare moved for Judgment as a Matter of Law at the close

of the Government's case-in-chief (doc. 419); and again at the close of all of the evidence (doc.

433). The court reserved ruling on these motions and submitted the case to the jury on special

interrogatories.

The court instructed the jury to answer special interrogatories, in which they would decide

whether AseraCare made a false claim for any of the 121 patients then at issue, and if so, for what

time period. (Doc. 440). The jury answered these interrogatories and found that AseraCare

submitted false claims for 104 of the patients during some or all of their hospice stay. (Doc. 445).

After the jury announced its decision, AseraCare renewed its Motion for Judgment as a Matter of

Law. (Doc. 446).

In each of its motions for judgment as a matter of law, AseraCare asserted that the court

should enter judgment for it because the jury did not have a legally sufficient evidentiary basis to

find for the Government on the issue of falsity as to each of the patients in question. AseraCare also

argued that the court erred in failing to adopt the falsity standard urged in its proposed jury instructions. *(See, e.g.,* Doc. 309, at 76, 123) (proposing that the court instruct the jury, that "the Government must prove an objective falsehood" and that "[a] mere difference of opinion among physicians is not an objective falsehood.").

In its response to AseraCare's Motion for Judgment as a Matter of Law, the Government stated that it offered "the testimony of 13 witnesses, including several former AseraCare employees who testified to the actions and instructions that led to the admission of ineligible hospice patients," "the expert testimony of Dr. Solomon Liao," and "approximately 200 exhibits . . ., which included the medical records relevant to each of the 121 patients, the relevant hospice and Medicare guidelines that governed hospice admissions, documents from Medicare's Administrative Contractor, and others."[4] (Doc. 470, at 4).

The Government presented the testimony of Dr. Liao that he found each of the 123 patients ineligible; that he disagreed with some of the patients' FAST scores, PPS scores, or New York Heart Association scores contained in the medical records; and that the medical records for

---

[4] Three of the Government's witnesses provided testimony only on the general context of hospice and how claims are submitted to Medicare for payment. Mary Jane Schultz, the former director of the medical review department at Palmetto GBA, testified regarding Palmetto's responsibilities as a Medicare Administrative Contractor ("MAC") in administering the Medicare Program on behalf of the Center for Medicare and Medicaid Services ("CMS"). *See* 8/17/15 Trial Tr. at 1162-1278.  Katherine Lucas, a health insurance specialist with CMS, testified about the general Medicare hospice laws and regulations. *See* 9/2/15 Trial Tr. at 3492-3555 & 9/3/15 Trial Tr. at 3031-3073.  The Government's rebuttal witness, Phyllis McNicholas, testified regarding Excelas's work in summarizing medical records for the AseraCare patients at issue. *See* 9/29/15 Trial Tr. at 6431-6491.

The testimony from these three witnesses was not connected to the eligibility of any of the patients at issue. Therefore, this testimony did not show that the claims for the patients at issue were *false.*

these patients at issue did not support a prognosis of six months or less to live if the illness ran its normal course. The Government also submitted the medical records of all the patients.

In addition, the Government offered the testimony of nine former Aseracare nurses and employees from eight AseraCare agencies: Sharon Perryman, from the Boston, MA agency; Lauretta Dietrich, from the Concord, CA agency; Vickie Stutts, from the Decatur, AL agency; Sherry Adams and Margie Greer, from the Evansville, IN agency; Marsha Brown Farmer, from the Foley, Mobile, and Monroeville, AL agencies; Dawn Zaragoza, from the Foley and Monroeville, AL agencies; and Debora Paradies and Roberta Manley from the Milwaukee, WI agency. These witnesses testified about general practices in their local agencies, such as nurses admitting patients they did not think were eligible, and about practices at interdisciplinary team (IDT) meetings concerning the involvement or lack thereof of certain medical directors in the certification and recertification of patients in general. Because the Government represented that it would only use Dr. Liao's testimony to prove falsity, the court precluded the Government from directly linking the nurses' and employees' testimony to any of the patients at issue for whom the Government asserted AseraCare presented false claims.[5]  The only evidence of false claims the Government presented is Dr. Liao's opinion and the medical records that on their face contain information to which the expert medical doctors for each side pointed to support their conclusions as to whether each patient

---

[5] Some of the testimony about the practices of some of the nurses and medical directors could conceivably have a connection to information in the medical records.  However, in preparing its case for trial, the Government failed to show the medical records to the AseraCare nurses and employees to prepare its case in a way that would make these important connections. And again, the Government never updated its response to Contention Interrogatory #1 or expressed to AseraCare its intention to use any such testimony to show that the claims for the patients at issue were false.

was eligible.

Even assuming, arguendo, that the Government could present this testimony to prove falsity—which it cannot now do—, the Government failed to make the necessary connections to the 123 patients to show that the claims were objectively false.  For example, the testimony of Roberta Manley, who was AseraCare's Patient Care Coordinator at the Milwaukee agency from April 2007 to January 2008, illustrates the Government's lack of connection.  She testified about how the medical director of that agency, Dr. Mateo, "was doing his drawings" and "wasn't participating" during the interdisciplinary team meetings. *See* 9/17/15 Hrg. Tr. at 1130-32. She further testified that she prepared for meetings by setting up Dr. Mateo's sketch pad, crayons, and coloring pencils and would present papers to Dr. Mateo with "little stickies" where he should sign if he was present to sign them or would use a pre-signed form if he was not at the meeting. *Id.* at 1130-33.

But, here is the rub: Dr. Liao identified two patients from Milwaukee as being ineligible— patient #46 Ingeborg D. and patient #123 Yvonne Y.  The jury did not find that AseraCare's claims for hospice service for patient #123 Yvonne Y. were false.  The jury found Ingeborg D. was ineligible; however, she was not admitted to hospice until November 4, 2010—two–and–a–half years after Ms. Manley left AseraCare. Furthermore, the court has reviewed Ms. Ingeborg D.'s medical records and cannot find Dr. Mateo's name in them.  Therefore, Ms. Manley's testimony does not explain why the opinions of the certifying doctors for Ms. Ingeborg D. lack reliability. Thus, the Government has presented nothing more than Dr. Liao's different opinion as to Ms. Ingeborg D.'s eligibility—an opinion with which AseraCare's expert Dr. Cooney disagreed. *See* 9/9/15 Trial Tr. at 4307-4309.

The Government has repeatedly stated that the *only* evidence it is using to prove falsity of the claims for the patients at issue is the testimony of Dr. Liao, who offered *his opinion*, *based on his clinical judgment*, about the eligibility of the patients at issue, and the accompanying medical records for each patient. *See* 7/22/15 Hrg. Tr. at 170, 180, 182, 184, 197, 224. Dr. Liao even acknowledged that he changed his opinion concerning the eligibility of certain patients from his 2010 review to his 2013 review. The reason for the change of opinion: "Well, I was not the same physician in 2013 as I was in 2010." *See* 9/1/15 Trial Tr. at 3132. AseraCare offered expert testimony, as well as the testimony of three referring doctors, that contradicted Dr. Liao's opinion.

As the court worked through AseraCare's challenges to the sufficiency of the evidence and to the accuracy of its instructions, the court had serious questions as to whether the Government had proven an objective falsehood or had presented any evidence other than Dr. Liao's opinion to show that some or all of the claims were false. In reviewing this evidence, the court became convinced that it had committed reversible error in the instructions it provided to the jury. The court concluded that it should have advised the jury that (1) "the FCA requires 'proof of an objective falsehood,'" *United States ex rel. Parato v. Unadilla Health Care Ctr. Inc.*, 787 F. Supp. 2d 1329, 1339 (M.D. Ga. 2011); *Aegis Therapies*, 2015 WL 1541491, at *12; and (2) a mere difference of opinion, *without more*, is not enough to show falsity, *see, e.g., Lincare Holdings*, 2015 WL 4528955, at *25 ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."). The court's failure to instruct the jury on these key points of law was reversible error.

13

The court is now convinced that the law is clear: a difference of opinion is not enough.[6] *See,*

*e.g., United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004);

*Lincare Holdings*, 2015 WL 4528955, at *25.  However, the court never instructed the jury on this

critical component of the law.  The court cannot let stand decisions that are not based on legally

sufficient evidence. However, the court questions whether it can rule on AseraCare's Motion for

Judgment as a Matter of Law as to any of the patients based on a lack of legally sufficient evidence

when the court did not properly instruct the jury that it needed more than a difference of opinion to

find that AseraCare made a false claim.

After the court informed counsel that it had committed this error, AseraCare, without

waiving its Motion for Judgment as a Matter of Law, orally moved for a new trial. *See* 10/23/15

Hrg. Tr. at 7304-05, 7313.

As will be discussed below, the court found that the only way to cure the prejudice caused

by its reversible error was to conduct a new trial. Therefore, the court orally GRANTED

AseraCare's motion for a new trial. *See* 10/23/15 & 10/26/15 Hrg. Tr. The court will now more

fully explain the justifications behind this ruling.

## II.     Instructions Regarding "False Claims"

As stated, the court determined that the instructions it gave to the jury did not accurately and

completely advise the jury of the legal standard for falsity in a False Claims Act case, especially

one involving the exercise of  clinical judgment when making a prognosis of a patient's life

---

[6]  By so holding, the court is not saying that a difference of opinions among treating physicians and medical experts would always defeat falsity in a FCA case, but that the Government would have to provide more evidence than just a medical expert who disagrees with the certifying physicians.

expectancy.

The court instructed the jury that "[a] claim is 'false' if it is an assertion that is untrue when made or when used." (Doc. 440 at 11).  It further instructed the jury that "[p]ractices that may be improper, standing alone, are insufficient to show falsity without proof that specific claims were in fact false when submitted to Medicare." (Doc. 440 at 14).  *See also Urquilla-Diaz*, 780 F.3d at 1045 (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) ("Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures."); *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009) ("Improper practices standing alone are insufficient to state a claim under [the FCA] absent allegations that a specific fraudulent claim was in fact submitted to the government."); *Amin Radiology*, 2015 WL 403221, at *7 (quoting *United States ex rel. Clausen v. Lab. Corp. Of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)) ("'[T]he False Claims Act does not create liability merely for [] health care providers' disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe.'").

These instructions, while correct statements, were incomplete. The instructions that the court gave did not fully advise the jury about the standard it must apply to find that AseraCare submitted false claims.

As the Eleventh Circuit recently reconfirmed, "'our case law is clear: the submission of a false claim is the *sine qua non* of a False Claims Act violation.'" *Urquilla-Diaz*, 780 F.3d at 1052 (quoting *Clausen,* 290 F.3d at 1311). The law, about which the court did not instruct the jury, establishes that "[T]he FCA requires 'proof of an objective falsehood' to show falsity."*Aegis*

15

*Therapies*, 2015 WL 1541491, at *12; *Parato*, 787 F. Supp. 2d at 1339; *see also United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011) ("A statement may be deemed 'false' for the purposes of the False Claims Act only if the statement represents 'an objective falsehood.'"); *A1 Procurement, LLC v. Hendry Corp.*, No. 11–23582–CIV, 2012 WL 6214546, at *4 (S.D. Fla. 2012) ("A fundamental requirement of the FCA, regardless of the section allegedly violated, is that the false or fraudulent claims or statements at issue must be objectively false.").

And even more important to this case is the law mandating that "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ *cannot be false*." *Lincare Holdings*, 2015 WL 4528955, at *25 (emphasis added); *see also St. Luke's Episcopal Hosp.*, 355 F.3d at 376 ("[E]xpressions of opinion or scientific judgments about which reasonable minds may differ cannot be 'false'."); *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006) ("[C]laims are not 'false' under the FCA when reasonable persons can disagree regarding whether the service was properly billed to the Government."). The jury did not have these essential legal principles to guide it as it examined the evidence and rendered its decision.

In addition to the case law, the guidance from the Centers for Medicare and Medicaid Services ("CMS") in the Federal Register supports the court's conclusion that it should have instructed the jury that a mere difference of opinion is not enough to prove falsity. The court should show deference to CMS's explanations of its rules because "CMS has the relevant expertise and its published guidance and responses to specific comments . . . should be accorded due weight." *Lincare Holdings,* 2015 WL 4528955, at *17.

16

In this guidance, CMS emphasizes the importance of a doctor's *clinical judgment* in the hospice certification process. The final rule from November 22, 2005 states that "the certification of an individual who elects hospice . . . shall be based on the physician's or medical director's *clinical judgment* regarding the normal course of the individual's illness." Hospice Care Amendments Final Rule, 70 Fed. Reg. 70532, 70534 (Nov. 22, 2005) (emphasis added), Gov. Ex. 227. This rule further "recognizes the fact that making medical prognostications of life expectancy is not always exact." *Id.*; *see also* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010), Def. Ex. 752A ("Predicting life expectancy is not an exact science.").

The changes to the CMS rules and regulations over time also demonstrate the importance of clinical judgment to hospice certification. In the November 22, 2005 rule, CMS removed the term "specific" from the proposed rule calling for "specific clinical findings and other documentation." 70 Fed. Reg. 70532, 70537. In doing so, CMS explained:

> It appears that the word "specific" may be skewing the intention of the regulation. . . . We are removing the word "specific" and changing "findings" to "information" so that the phrase would read "clinical information and other documentation." Section 322 of BIPA called for the physician's "clinical judgment," and this regulation simply asks that it be supported.

*Id.*

Similarly, in the June 5, 2008 rule, CMS "removed the term 'criteria'" from proposed rule § 418.102(a) "to remove any implication that there are specific CMS clinical benchmarks in this rule that must be met in order to certify terminal illness." 73 Fed. Reg. 32088, 32138 (June 5, 2008), Def. Ex. 681.

This guidance from CMS shows that physicians applying their clinical judgment about a

patient's projected life expectancy could disagree, and neither physician would be wrong. The Government's own witness, Mary Jane Schultz, from Palmetto, testified that "two doctors using their clinical judgment could come to different conclusions about a patient's prognosis and neither be right or wrong." *See* 8/17/15 Trial Tr. at 1244.  Ms. Schultz's testimony and Dr. Liao's own admission that he changed his opinion regarding several patients at issue support the court's conclusion that a difference of opinion is not enough to show falsity and that a new trial is warranted.

The case law, the regulations, and even the testimony of the Government's witnesses support the court's conclusion that it should have instructed the jury that a mere difference of opinions among physicians, *without more*, is insufficient to show falsity under the False Claims Act.

## III.   **Motion for New Trial**

The court should order a new trial "where [its jury] instructions do not accurately reflect the law, and the instructions as a whole do not correctly instruct the jury so that [the court is] 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations'." *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1288 (11th Cir. 1998); *see also Goodgame v. American Cast Iron Pipe Co.*, 75 F.3d 1516, 1521 (11th Cir. 1996) (finding that the proper remedy for erroneous instructions is a new trial); *Johnson v. Bryant*, 671 F.2d 1276, 1280 (11th Cir.1982) (stating that reversal is warranted where "a substantial and ineradicable doubt" exists as to whether the jury was properly guided in its deliberations).

The court should provide the jury with its "complete charge before it begins any part of its fact deliberations and determinations." *Fan Fare Inc., v. Fourdel Indus., Ltd.*, 563 F. Supp. 754,

758 (M.D. Ala. 1983) (citing *First Nat'l Bank v. Small Bus. Admin.*, 429 F.2d 280, 284 (5th Cir. 1970)). Fundamental error exists "in instructions which mislead the jury or leave the jury to speculate as to an essential point of law." *Cruthirds v. RCI, Inc.*, 624 F.2d 632, 636 (5th Cir. 1980). A district court's failure to give a requested instruction is reversible error if "(1) the contents of the requested instruction are not adequately covered by the jury charge and (2) the requesting party suffers prejudicial harm." *Conroy v. Abraham Chevrolet-Tampa, Inc*., 375 F.3d 1228, 1233 (11th Cir. 2004); *see also Palmer v. Bd. of Regents of Univ. Sys. of Ga.*, 208 F.3d 969, 973 (11th Cir. 2000) ("Reversal is only warranted if the failure to give the instruction resulted in prejudicial harm to the requesting party.").

A motion for a new trial "invoke[s] the discretion of the court . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). In considering a motion for new trial, the court may use its discretion "to estimate the prejudicial impact of the error on the jury." *Cruthird*s, 624 F.2d at 636.

After thorough research and consideration, the court has concluded that its jury instructions did not "accurately reflect the law." *See Broaddus*, 145 F.3d at 1288. While containing correct statements of law, the instructions were incomplete. The instructions should have advised the jury that (1) "the FCA requires 'proof of an objective falsehood'," *Aegis Therapies*, 2015 WL 1541491, at *12; *Parato*, 787 F. Supp. 2d at 1339; and (2) a mere difference of opinion, *without more*, is not enough to show falsity. *See, e.g., Lincare Holdings*, 2015 WL 4528955, at *25 ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."). The court's instructions included neither essential statement of the law.

19

Thus, the court has "substantial and ineradicable doubt as to whether the jury" had proper guidance. *See Broaddus*, 145 F.3d at 1288. The court is convinced it committed fundamental error in failing to instruct the jury on these points.

As a means of remedying this error, the Government asked the court to recharge the jury and allow it to re-deliberate. The court regretfully concluded that doing so (1) would not eradicate the prejudice to AseraCare because the preliminary jury instructions did not alert the jury that it should look for more than just differing medical opinions; and (2) would also not eradicate the prejudice to the Government because the Government did not prepare and try its case along the lines of this legal standard. In addition, to continue with eight or more weeks of trial after the court has realized that it committed reversible error would be unfair to the jurors who have already devoted a substantial amount of time and energy to this case; the continuation of the trial would only delay the inevitable reversal based on the errors in the jury instructions, which are now apparent to the court. Therefore, the court believes that to correct its error and order a new trial *now* is better than to correct its error after eight plus more weeks of trial, then appeal, and reversal by the Eleventh Circuit for a third trial.

Consequently, the court has exercised its discretion and has concluded that the only way to correct the prejudicial impact of its error is to grant AseraCare's motion for a new trial.

Because the court has ordered an entirely new trial, it will also VACATE its previous order (doc. 427) granting Judgment as a Matter of Law as to patients #42 Helen K. and #85 Mary M., which were based on the Government's errors in presenting its evidence.

## IV.  Consideration of Summary Judgment under Rule 56(f)(3)

As discussed above, the court has granted AseraCare's motion for a new trial. However, the

court now questions whether the Government, under the correct legal standard, has sufficient admissible evidence of more than just a difference of opinion to show that the claims at issue are objectively false as a matter of law. Therefore, before the court sets a new trial date, it will consider whether summary judgment is appropriate under Federal Rule of Civil Procedure 56(f)(3). Pursuant to Federal Rule 56(f)(3), "After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties the material facts that may not be genuinely in dispute." The Eleventh Circuit has recognized that this court "possesses the power to enter summary judgment *sua sponte* provided the losing party 'was on notice that [it] had to come forward with all of [its] evidence.'" *Burton v. City of Belle Glade*, 178 F.3d 1175, 1203 (11th Cir. 1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)); *see also Lillo ex rel. Estate of Lillo v. Bruhn*, 413 F. App'x 161(11th Cir. 2011) (affirming order granting summary judgment after district court *sua sponte* raised issue); *Strange v. Travelers Indem. Co.*, 915 F. Supp. 2d 1243, 1245 (N.D. Ala. 2012) ("Rule 56(f)(3) . . . allows the court to act on its own initiative" in considering whether summary judgment is appropriate.); *United States v. Ala. Power Co.*, 274 F.R.D. 686, 692 (N.D. Ala. 2011) (granting summary judgment under Rule 56(f)(3) after informing parties that it "could grant summary judgment as to all claims if there was no admissible evidence" as to a particular part of a claim); *Franks v. Indian Rivers Mental Health Ctr.*, No.7:08-cv-1035-SLB, 2014 WL 514130, at *7 (N.D. Ala. Feb. 7, 2014) ("Pursuant to Rule 56(f), the court may grant a *sua sponte* motion for summary judgment 'after identifying for the parties material facts that may not be genuinely in dispute,' and giving the opponent at least ten days notice and time to respond."); *accord Norse v. City of Santa Cruz*, 629 F.3d 966, 971 (9th Cir. 2010) ("District courts unquestionably possess the power to enter summary judgment *sua sponte*,

even on the eve of trial.").

The court's granting of a new trial does not preclude the *sua sponte* consideration of summary judgment at this juncture in the case.  *See Quinn v. Fresno Cnty. Sheriff*, No. 1:10-cv-01617, 2013 WL 898136, at *5 (E.D. Cal. Mar. 8, 2013) (*sua sponte* considering summary judgment after granting a motion for a new trial).

In this case, after the Government presented *all* of its *admissible* evidence regarding the falsity of the claims at issue in Phase One, the court can find nothing more than a difference of opinion among physicians, which is insufficient to support a finding that a claim is false.

As discussed previously, the Government painted itself into a corner by failing to disclose to AseraCare during discovery that it would use anything other than the testimony of Dr. Liao and the medical records to prove the  falsity of the claims.  (*See* Section I.C *infra*).  The Government has consistently maintained that the *only* evidence it has to prove falsity of the 123 patients at issue is Dr. Liao's testimony and the medical records of those patients.  *See* 7/22/15 Hrg. Tr. at 170, 180, 182, 184, 197, 224. The court will not allow the Government in the second trial to present evidence of falsity that went beyond what it had represented to AseraCare during discovery. *See OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1363 n. 19 (11th Cir. 2008) (explaining that Federal Rule of Civil Procedure 37(c)(1) "provides that '[a] party that *without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1) ... is not, *unless such failure is harmless*, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.'") (emphasis in original).

Unlike the first summary judgment motion hearing and the bifurcation hearing, the court no longer can rely on the Government's representation that it has "pattern and practice" evidence

22

under Federal Rule of Evidence 406 to show that the nurses and clinicians did not give the

certifying physicians correct information or withheld important information from them—the

Government abandoned its reliance on Rule 406 before the trial began. (*See* Doc. 351, at 47 &

Doc. 383, at 74, 78).   In addition, applying Federal Rule of Evidence 404(b)(1), the court refused

to allow the relators or clinicians to testify regarding "any anecdotal evidence that would be

indicative of an effort to show propensity" in Phase One of the first trial because "those specific

acts would be designed to make it more likely that somebody made a false representation" about

the 123 patients at issue.  *See* 8/10/15 Hrg. Tr. at 370.  Based on the Government's representation

to the court that it did not intend to use the relators' and clinicians' testimony to prove falsity, its

abandonment of Rule 406 to admit its "pattern and practice" evidence to show conformity

regarding the 123 patients at issue, and the court's refusal to allow anecdotal evidence to infer bad

conduct in the process of certifying the 123 patients, the Government cannot use the back door to

introduce evidence it cannot admit through the front door.

Furthermore, practices of AseraCare that "may be improper, standing alone, are insufficient

to show falsity without proof that specific claims were in fact false when submitted to Medicare."

(Jury Instructions, Doc. 440 at 14); *see also Urquilla-Diaz*, 780 F.3d at 1045 (quoting *Corsello*,

428 F.3d at 1012) ("Liability under the False Claims Act arises from the submission of a fraudulent

claim to the government, not the disregard of government regulations or failure to maintain proper

internal procedures.").  The *sine qua non* of a FCA case is not the defendant's bad conduct,

procedures, or policies, but the actual false claim.

 So, as the court anticipates starting the second trial, the Government is left with the

testimony of Dr. Liao and the medical records for those patients to prove falsity of the claims for

the 123 patients at issue in this case.  The Government's proof under the FCA for the falsity

element would fail as a matter of law if all the Government has as evidence of falsity in the second

trial is Dr. Liao's opinion based on his *clinical judgment* and the medical records that he contends

do not support the prognoses for the 123 patients at issue in Phase One.  An expert's opinion

disagreeing with the clinical judgments of the certifying physicians, without more, is not enough to

prove falsity under the FCA.  *See Lincare Holdings*, 2015 WL 4528955, at *25 ("Expressions of

opinion, scientific judgments, or statements as to conclusions about which reasonable minds may

differ *cannot* be false.") (emphasis added).

Therefore, the court *sua sponte* will consider summary judgment under Rule 56(f)(3); give

the Government an opportunity to point to objective evidence in the Phase One record that the

court may have overlooked that shows a particular claim was false, other than Dr. Liao's testimony;

give AseraCare an opportunity to respond; and decide whether granting summary judgment prior to

starting a new trial is proper.

## IV.    Conclusion

For the reasons discussed in this memorandum opinion, the court has GRANTED

AseraCare's motion to for a new trial; will VACATE its prior Order (doc. 427) granting Judgment

as a Matter of Law as to patients #42 Helen K. And #85 Mary M; and WILL GIVE NOTICE to the

parties that it will *sua sponte* CONSIDER SUMMARY JUDGMENT pursuant to Federal Rule of

Civil Procedure 56(f)(3).

The court will enter a separate Order in conformity with this Memorandum Opinion, in

which it will set the deadlines for the parties responses to the court's *sua sponte* summary

judgment consideration.

DONE and ORDERED this 3rd day of November, 2015.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE