7   FILED
2016 Jun-08  PM 01:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ALABAMA
                    SOUTHERN DIVISION

3

4

5   UNITED STATES OF AMERICA,
    EX REL., ET AL.,              CV-12-KOB-245-S
6

7            Plaintiffs,      August 5, 2015

8      vs.                    Birmingham, Alabama

9   ASERACARE, INC., ET AL.,

10            Defendants.

11   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12

13        REPORTER'S OFFICIAL TRANSCRIPT OF
                  JURY TRIAL
                  VOLUME II
14

15      BEFORE THE HONORABLE KARON O. BOWDRE
          UNITED STATES DISTRICT CHIEF JUDGE
16

17

18

19

20

21

22

23   COURT REPORTER:
     Teresa Roberson, RMR
     Julie Martin, RMR
24   Federal Official Court Reporter
     1729 Fifth Avenue North
25   Birmingham, Alabama  35203

```
1                          *  *  *  *  *

2                    A P P E A R A N C E S

3                          *  *  *  *  *

4    FOR THE PLAINTIFF:

5    Jeff Wertkin
     Carolyn Tapie
6    U.S. Department of Justice
     Civil Division
7    P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
8

9

10   FOR THE DEFENDANT:

11   James Sturgeon Christie, Jr.
     Jack Wright Selden
12   Matt Lembke
     Bradley, Arant, Boult & Cummings
13   1819 Fifth Avenue North
     Birmingham, Alabama  35203
14

15   Kimberly Martin
     Bradley, Arant, Boult & Cummings
16   200 Clinton Avenue
     Huntsville, Alabama  35801
17

18

19   ALSO PRESENT:

20   David Beck

21   Nick Danella

22

23

24

25
```

```
 1                        * * * * *

 2                P R O C E E D I N G S

 3                        * * * * *

 4          (Proceedings held in judical conference room..)

 5

 6          THE COURT:  All right.  We ended up with

 7   sixty-four questionnaires.  Did you get the kind of

 8   information you were looking for?

 9          MR. LEMBKE:  Very helpful, Your Honor.

10          THE COURT:  Okay.  Y'all were to meet and come

11   up with some agreed upon people to deal with.  Did y'all

12   make much progress with that?

13          MS. TAPIE:  We did, Your Honor.  I identified

14   four that we agreed on.

15          THE COURT:  Let me guess:  Juror number one one

16   of those?  Will Starnes came to me yesterday after I had

17   given the instructions and had the excuses and they

18   broke for a restroom break and as I was leaving and he

19   said, Judge, you didn't ask whether we had any

20   affiliation with AseraCare.  I think my firm has

21   represented them.  I said, answer the questionnaire,

22   Will, and we'll see.  So he's out.

23          And who else?

24          MS. TAPIE:  Juror number or panel number nine,

25   ten and thirty-eight were the other three.
```

1          THE COURT:  Nine, ten and thirty-eight.  Okay.

2     Just for the record, generally, what were the issues

3     with those?  And I have to confess, although I thought

4     several times I was going to get to look at some of

5     these, I did not get to.

6          MS. TAPIE:  For both number nine and ten, we

7     thought it was a hardship because they have child care

8     responsibilities.  One home schools her four children

9     everyday.

10          THE COURT:  Why didn't she tell us that?

11          MS. TAPIE:  And then number ten is her

12     grandchildren and she has to take care of them, get them

13     to and from school.

14          THE COURT:  Okay.  They didn't seem to think it

15     was a hardship, I guess, when they were here yesterday.

16     All right.

17          What was the next one?

18          MS. TAPIE:  Thirty-eight was the last one and

19     it seemed to be a financial hardship.  Self-employed but

20     can't be away from business for ninety days because of

21     the financial burden.

22          MR. LEMBKE:  Thirty-eight, Your Honor, was the

23     juror who had the small security alarm company, as I

24     recall.

25          THE COURT:  Okay.  They didn't ask.  All right.

1   So, I appreciate y'all recognizing that and we will

2   excuse those three.  And I assume that Mr. Starnes will

3   actually be jointly struck for cause; would that be an

4   appropriate way?

5          MR. LEMBKE:  That's correct, Your Honor.

6          MS. TAPIE:  (Shaking head affirmatively).

7          THE COURT:  All right.  Were there any that

8   either side thought should either be excused or had a

9   conflict that y'all didn't agree with each other on?

10          MR. LEMBKE:  Yes, Your Honor.  There were a few

11   from the defense side.  The first one is number three.

12   And in particular, it related to the juror's statement

13   he is hard of hearing --

14          THE COURT:  What page is that on?

15          MR. LEMBKE:  It is question fifty-seven and

16   fifty-eight.

17          MS. WOODKE:  He writes the response to the last

18   two.

19          THE COURT:  Yeah.

20          MR. LEMBKE:  He said, Your Honor, in answer to

21   fifty-seven and fifty-eight, I am hard of hearing but

22   not enough to wear a hearing aid.  I don't read much

23   because I get headache and eyes hurt when reading.

24          That being said, I don't know if I can remember

25   enough to form a good judgment over ninety days.  I sure

1  can't read over that much paperwork.

2       And our view was that in light of those

3  concerns, especially the headaches and the hearing

4  issues, in a case of this length and with as much

5  reading of exhibits is going to be involved, we thought

6  that that was enough that he should be excused.

7       THE COURT:  And I assume that the government

8  didn't want to because he goes on to say he has concerns

9  about big companies and their lawyers.

10       MS. TAPIE:  I forgot that was him.  Really,

11  Your Honor, we kind of wanted to just get your thoughts

12  on whether that was enough to excuse and if it would

13  make better sense to question a witness, but we're fine

14  deferring to you on this really.

15       We think he's obviously laid out his concerns,

16  but we weren't sure where you would draw the line on

17  that type of medical concern.

18       THE COURT:  I don't recall Mr. McAlpine asking

19  for an excuse yesterday.  Do you?

20       MS. KIMBRELL:  I can't remember his name, but I

21  remember someone hard of hearing.  I didn't bring my

22  list with me.

23       THE COURT:  I think we excused someone

24  yesterday because of hearing issues.  And had he brought

25  this to my attention, I would have excused him.  I am

1   going to excuse him because of his hearing issues.

2          Any others from the defense since you started?

3          MR. LEMBKE:  Yes, Your Honor.  Number eight, on

4   Page 9 of this juror's questionnaire, on Page 1, she

5   noted that she lived with her blind brother.  And then

6   on Page 8, she said my blind brother lives with me.  He

7   leaves AIDB, which I think is Alabama Institute for the

8   Deaf and Blind, at 4:30.

9          And we were -- we thought that raised an issue

10  given that Your Honor intends to have court through 5:30

11  Monday through Thursday as to her ability to serve.

12         THE COURT:  She checked other than -- is there

13  any reason you feel you would be unable to serve and she

14  said no.  So --

15         MR. LEMBKE:  Perhaps we need to question her.

16         THE COURT:  We may need to question her more

17  about her brother.

18         MR. LEMBKE:  Our next issue, Your Honor, if

19  you're ready to move on.

20         THE COURT:  Okay.

21         MR. LEMBKE:  Is number twenty-six.  And in

22  particular, again, in answer to question fifty-nine she

23  answered that question yes, and she said --

24         THE COURT:  Wait a minute.  Are we looking at

25  the same?  What number did you say?  I'm sorry.

1          MR. LEMBKE:  This is juror twenty-six.

2          THE COURT:  Okay.  Carolyn --

3          MR. LEMBKE:  Kolar.

4          THE COURT:  Ms. Kolar.

5          MR. LEMBKE:  Page 9.

6          THE COURT:  Okay.

7          MR. LEMBKE:  Question fifty-nine, she answered

8    yes.  And she said, re-occuring at no specific times,

9    occular migraines, very bright lights floaters in vision

10   field with headaches, must lie down, bouts of severe

11   diarrhea.

12         THE COURT:  At days gets shorter, problems

13   driving at night.

14         MR. LEMBKE:  Problems driving at night.  And we

15   thought, in particular, given the length of the trial,

16   migraines and diarrhea problem suggested that she should

17   be excused.

18         MS. TAPIE:  Your Honor, our thought is, once

19   again, we didn't know if she had raised this with you or

20   if this was something you thought was efficient.  We

21   would defer to you on that.

22         THE COURT:  She did not.  I think we probably

23   need to ask her more questions about how frequently and

24   if there are particular triggers for her migraines or

25   severe bouts of diarrhea and this other stuff.  So let's

1  do that.

2          MR. LEMBKE:  All right.

3          THE COURT:  Okay.

4          MR. LEMBKE:  Your Honor, the next one --

5          THE COURT:  Just a minute.  I'm going to make a

6  note.  All right.

7          MR. LEMBKE:  Juror number twenty-nine.

8  Mr. Mahaffey, going to Page 9, question fifty-eight, he

9  says he has a moderate to severe stutter that prevents

10  him from speaking easily, worsens under stress.

11          And given the part of the deliberation process

12  is speaking, we wondered whether this warranted excusing

13  him.

14          THE COURT:  If he presented that to me, I would

15  not automatically excuse him.  I think it's much

16  different than having a severe hearing problem because

17  he could still cast his vote.  He might not participate

18  as much in the verbal deliberation process, but I don't

19  think it's enough to excuse him.

20          If you want to ask him about that further, you

21  may.  But I wouldn't plan on doing that.  All right.

22  Anymore?

23          MR. LEMBKE:  Your Honor, we raised an issue

24  about number forty-four, Mr. Childers.

25          THE COURT:  What is that question?

1        MR. LEMBKE:  Question fifty-eight, on Page 9,

2   and question fifty-nine.  Fifty-eight, I may have

3   difficulty with alertness and concentration during the

4   planned long days.  And then he underlined the word

5   unable in fifty-nine and put no, but then put

6   challenging, yes.

7        THE COURT:  I think it's going to be

8   challenging for all of us.  I don't know about you guys,

9   but that's my view.

10       One of the things that I try to do during a

11  jury trial is make sure that all the jurors are alert.

12  And if, in the middle of examining a witness, there's a

13  slight lull, I may say, let's all stand up and stretch

14  and, you know, do the hokey-pokey or whatever.

15       So don't be alarmed if I do that.  It may be

16  because someone looks like they may be having difficulty

17  with alertness and concentration during the long trial.

18       I think he may be being more honest than some

19  other folks might be in terms of that.

20       Certainly, I will allow you to question him

21  about that.  But I don't see that that's much different

22  than what most jurors may actually be facing.  So you

23  can question him about that.

24       MR. LEMBKE:  Your Honor, those are the only

25  additional ones we wanted to raise with you at this

1  time.

2         THE COURT:  Does the government have any?

3         MS. TAPIE:  We did, Your Honor, have a couple

4  that we wanted to run by you.

5         Number fourteen, this juror said he was

6  investigated during the Jefferson County Sewer case and

7  was investigated by the department.

8         THE COURT:  What page?

9         MS. WOODKE:  Page 6. He also --

10         THE COURT:  Wait a minute.  Wait a minute.

11         MS. WOODKE:  I was not clear if he brought up

12  his concern about his work project deadline.  He's an

13  engineer on the Trinity Hospital.

14         THE COURT:  I don't remember hearing from Kyle

15  Kelly requesting an excuses.

16         MS. KIMBRELL:  We didn't.

17         THE COURT:  He is with Rast Construction doing

18  the Trinity Hospital out on 280.

19         MS. WOODKE:  And I did not specifically work on

20  the prosecutions.  I did generally work on the two Rast

21  brothers that were imprisoned, though, the financial

22  aspects of those cases.  This particular juror would not

23  know me.

24         MR. LEMBKE:  Your Honor, with regard to the

25  issue of the prior investigation, I note that at Page 57

1   -- excuse me, question fifty-seven --

2           THE COURT:  I was about to say, whoa, your

3   questionnaire is a lot longer than mine.

4           MR. LEMBKE:  When asked if he had a concern

5   about being fair, he said no.

6           While I certainly can see why the government

7   might want to ask him questions about that experience, I

8   would think that there's not enough here to excuse him

9   without some further questioning.

10          And with regard to the hospital on 280, while

11  we certainly understand if someone is self-employed and

12  is going to lose all their income, that's one thing.

13  But I think we would at least need some more questioning

14  to find out about this before we excuse someone employed

15  by a rather large company just on the basis of this

16  answer.

17          THE COURT:  Project manager is a very key

18  position, though, in a major construction project like

19  that.

20          MR. LEMBKE:  Your Honor, I don't disagree with

21  that.  But I would like to ask him, do you have an

22  assistant project manager, what is his or her

23  experience, before we let him go on a hardship.

24          THE COURT:  That's the kind of questions that I

25  ask when they want to get out as well.  We will see

1  whether he was one of the ones we wouldn't excuse

2  yesterday.

3          So, I think he is one that we certainly can ask

4  some more questions.

5          And, of course, after we finish here today --

6  have y'all met Cindy Kimbrell, our jury administrator

7  specialist, extraordinaire?  After we finish, she is

8  then going to scramble the names to pull the ones who

9  will come tomorrow --

10          MS. KIMBRELL:  Your Honor, we were going to

11  stick with this list all the way through.  This was

12  already the random.

13          THE COURT:  Okay.  But you won't scramble it,

14  you will just grab from it randomly?

15          MS. KIMBRELL:  No.  The first thirty-five --

16          THE COURT:  We changed the plan.

17          MS. KIMBRELL:  Yeah, when we met Friday

18  afternoon.

19          The first thirty-five on the list that have not

20  been struck or excused right now will be the ones coming

21  in.

22          THE COURT:  All right.  I stand corrected.

23  It's not the first time.  I'm sure it won't be the last.

24          MS. WOODKE:  Thirty-five?

25          THE COURT:  Probably thirty-five, unless we've

1   got a lot of questions about some of those and we may go

2   a little bit more.  But the smaller group we bring in,

3   the more you can ask the individuals and the shorter

4   time period it will take us to get a jury and the less

5   wastage we have to report.

6           So number fourteen, we will ask Mr. Kelly some

7   more questions, if we need to.

8           MS. TAPIE:  Number nineteen, Your Honor, we

9   just wanted to bring to your attention a similar way, he

10  writes a lot about his frustration with the federal

11  government, shutting down banks.

12          THE COURT:  Where does that start?  Give me a

13  page.

14          MS. TAPIE:  So, he starts, I think, on Page 6

15  and he continues on Page 9 and 10.  It's mostly Page 9

16  and Page 10 at the end of his questionnaire.  Again,

17  Your Honor, we would defer to you on this one.

18          THE COURT:  Wait a minute.  He wants to know

19  how he's going to get his exercise during the trial.  I

20  can certainly relate to that.  I can't read some of

21  this.  And then --

22          MS. TAPIE:  He answers on number fifty-seven

23  about his concern about being fair and impartial because

24  the federal government has shut down two of my biggest

25  bank customers.

1      THE COURT:  He was abused by the federal and

2  state government.  They shut down two of my biggest bank

3  customers.  New South Bank and Superior Bank.

4      MS. WOODKE:  He also states his job of

5  installing software is to make it work, otherwise he

6  will not have a job, if I'm reading that correctly.

7      THE COURT:  Yeah.

8      MR. LEMBKE:  Your Honor, may I be heard on this

9  one?

10      THE COURT:  You sure may.

11      MR. LEMBKE:  Your Honor, I certainly think

12  these answers provide ample grounds for follow-up

13  questions.  But with regard to his status at his office,

14  again, I think I would like to ask him, well, do you

15  have someone else working with you on overseeing

16  projects, and you're going to have Fridays off and

17  questions like that, and to dig into that since it is a

18  large enterprise he works for.

19      And on the questions about --

20      THE COURT:  Who does he work for?

21      MR. LEMBKE:  Cadence Bank.

22      THE COURT:  Software developer there.

23      MR. LEMBKE:  He indicates that he's working on

24  some project for software related to Dodd-Frank

25  requirements.

1          THE COURT:  By October 3rd, required deadline

2    from Congress.

3          MS. WOODKE:  I believe his job that he's

4    working on, he is independently employed as a software

5    developer at Shelby Systems, Inc.

6          THE COURT:  On eleven, he says, what is your

7    present occupation.

8          MS. WOODKE:  Yes, installer new system.  I got

9    the impression that he was independent, and he was

10   contracted to Cadence to do this installation for this

11   company, but I may be wrong.

12         MR. LEMBKE:  Your Honor, I think that is

13   something that we should ask him about because I don't

14   think it's clear.  I took it that it's Cadence Bank that

15   he's employed by at the moment because he talks about he

16   only got the job, but I think we need to ask him about

17   that.

18         As for his issues about, I guess, it's the FDIC

19   or the banking aspects, of course, he expressed -- he

20   was asked based on what he knows about the case, does he

21   have a concern?  This case doesn't have anything to do

22   with banking, obviously.  And I would like to ask him

23   questions about, given what the subject matter is, can

24   he listen to the evidence and the law as instructed by

25   the Court and put everything else out of his mind.

1          And I will say that there are lots of jurors

2     who have expressed very favorable views of the federal

3     government and very favorable views of the Department of

4     Justice, and we think that alone doesn't at this stage

5     warrant anyone who expresses strong views one way or the

6     other from being excused.

7          THE COURT:  We'll question Mr. Mason.  And, of

8     course, the defense wouldn't agree to excusing him

9     because I think I saw some favorable comments about

10    hospice in there, too.

11         MR. LEMBKE:  As with most of them, Judge,

12    there's some good and some bad answers.

13         THE COURT:  Okay.  Next one for the government.

14         MS. TAPIE:  I think the next one we wanted to

15    ask you about or just bring to your attention is number

16    16.  He said he believes he's done business with

17    AseraCare.

18         THE COURT:  What page are you on, please,

19    ma'am?

20         MS. TAPIE:  This appears in a couple of places,

21    at the very end of question fifty-seven.

22         THE COURT:  Okay.

23         MS. TAPIE:  He says I know --

24         THE COURT:  Which is Page 9?

25         MS. TAPIE:  Yes, Page 9. It's a little hard to

1   read.  But he says, I know a little about defendant and

2   believe he did some business with Beverly.  So he's made

3   a connection between Beverly and AseraCare.

4           THE COURT:  Is there a connection?

5           MR. LEMBKE:  Beverly is a predecessor entity,

6   Your Honor.  And I believe this juror is a former senior

7   executive at Regions Bank or AmSouth Bank.  And

8   elsewhere he indicates that maybe the health lending

9   group had lent money.

10          MS. TAPIE:  That's on Page 7, I think; is that

11  what you're referring to, question number forty-eight?

12          MS. WOODKE:  He also read an online article.

13          THE COURT:  Where is that?  I know that --

14          MS. WOODKE:  Question fifty-six.

15          THE COURT:  He says maybe Bloomberg.  I don't

16  know about Bloomberg, but I know that it was on al.com.

17  Off the record.

18                  (Off the record)

19          MR. LEMBKE:  Your Honor, from the defense

20  perspective, there are lots of things that warrant

21  questioning for both sides.  This juror talked about had

22  an aunt who was not well cared for in hospice.  So we

23  obviously want to ask about that, too.

24          I don't think anything here rises to the level

25  of an automatic exclusion.  So we would like to have the

1   opportunity to ask him some questions.

2          MS. TAPIE:  Your Honor, again, we defer to your

3   judgment on this, but we think since he said he is

4   concerned about being impartial and specifically

5   mentions having done business with AseraCare or with

6   Beverly, that that concerned us.

7          THE COURT:  He's skeptical.  Generally, I think

8   being skeptical isn't so bad, but I think we will ask

9   questions of him.  He doesn't say I definitely cannot.

10  And that was what number?

11         MS. TAPIE:  Number sixteen.

12         MS. WOODKE:  The only other one --

13         THE COURT:  Just a minute.  And he is with

14  which bank?  I'm sorry.  Regions?

15         MR. LEMBKE:  He's a former Regions or AmSouth

16  -- I think it was AmSouth he mentions on Page 7.

17         THE COURT:  Okay.

18         MR. LEMBKE:  He's retired from there, I

19  believe.

20         THE COURT:  Okay.

21         MR. LEMBKE:  And is now an investor he said.

22         THE COURT:  Okay.  Next.

23         MS. WOODKE:  I just want to bring it to the

24  court's attention, juror number seven, apparently was

25  making sure that you were aware that she had noted that

--

      THE COURT:  Is that the mother of the pole vaulter?

      MS. WOODKE:  Yes, that's her.  And I was just saying to them, my daughter pole vaults.  And there's a very small community of pole vaulters and you get to know all the parents.  And I just want to make sure the Court was aware of that.

      THE COURT:  And she put that down where?  Oh, on number fifty-eight.  Okay.

      MS. WOODKE:  I don't think it probably matters, but I just wanted to bring that --

      THE COURT:  Joseph called that to my attention yesterday when he saw her.  One thing that I always ask during voir dire is whether the jurors know me or any of the members of my courtroom staff and I introduce them and would that make any difference.  But I want to make sure in terms of full disclosure to everybody, I'm asking if they know any of y'all that I will let you know if they know us as well.  And if you want to strike him because of that, that's just fine.  So whatever.

      Any others?

      MS. TAPIE:  I don't think we have any others specifically, Your Honor.  But I was going to ask if the plan is to bring in thirty, just the first thirty-five,

1   that most of our questions that we've raised are within

2   that number, so I don't know if that means it should be

3   bumped up to thirty-seven or should we add a few more or

4   --

5           THE COURT:  I will need to kind of look at that

6   and see and defer to my expert over here.  Let her look

7   at that and see.

8           While she's doing that, my thought would be

9   tomorrow that we would kind of begin with the general

10  voir dire, have them give us the information on

11  Frankie's revised list of categories.

12          Frankie, have you given them that?

13          THE CLERK:  Yes, ma'am, I will.

14          THE COURT:  We cut out the things that were

15  covered in your questionnaire like jury duty and

16  employment and stuff like that.  Frankie and Michelle

17  noticed, I think, that y'all did not -- you asked about

18  the employment of their spouse or adult in the household

19  but didn't ask about the name of spouse.  I don't know

20  that that makes any difference to anybody.  It may not

21  to the DOJ people but it might to some of our local

22  attorneys.

23          So we included that in there.  And, of course,

24  the fun things about their hobbies and stuff like that.

25          So, again, to give you an opportunity to

1  observe them individually and hear them tell you a

2  little bit about themselves, even if the information

3  itself isn't particularly revealing, I think it gives

4  you a chance to kind of size them up, are they

5  talkative, are they engaged, are they just not too happy

6  about being there, does the stutter affect them so much

7  that they can't get anything out or what.

8         Then afterwards, I will give you a chance to

9  ask follow-up questions.  As to these that you've got

10  specific questions concerning their ability to be

11  impartial, I would suggest that we call them up one at a

12  time.  What we may do is get some of the general stuff

13  out and if there's some other questions that y'all want

14  to ask, we will go for a while.

15         I will kind of watch the clock.  And when it's

16  time for a break for the jurors, then we may have some

17  of them remain while the others take a break and come up

18  or something.

19         We will kind of play that by hear, if that's

20  okay with y'all.  And if we want to go back asking

21  additional follow-up general questions to people, I'm

22  just kind of giving you -- that's a little out of time,

23  but sometimes the jurors need breaks and we may need a

24  break as well but we break faster.

25         I will see.  I don't know how much there's

1    going to be in terms of general follow-up of the others.

2          But the way it will work will be that the first

3    twelve that are not struck would be our jury.  So I

4    would encourage you to focus on the initial twenty-four

5    or so or however --

6          MS. TAPIE:  Is the striking order this order we

7    have now?

8          THE COURT:  There is no order.  You will fill

9    out a form that lists your strikes.  They will fill out

10   a form that lists their strikes.  If you both strike the

11   same person, that's wonderful, you don't get a juror

12   that neither side wants.  And it's the first twelve that

13   are not struck.

14          So we don't -- if I were you, I wouldn't strike

15   the last one on the list, because in all likelihood you

16   won't be getting to that person.  But it's not like one

17   strikes, the other one does -- no strike backs and all

18   that kind of --

19          MS. MARTIN:  We will exchange the list

20   simultaneously?

21          THE COURT:  Yes.

22          MS. TAPIE:  I have a clarification question,

23   Your Honor, when you're talking about calling up someone

24   away for individual questioning, is that outside the

25   hearing of the rest of the jury?

1          THE COURT:  Yes.  It will be up at the bench at
2     sidebar so the rest of the jury wouldn't hear.  That's
3     why we're saying we might release them to have a break
4     or something.  So I will do that.  Depending upon how
5     the time is running.
6          MR. LEMBKE:  Your Honor, I have a couple of
7     questions.
8          First of all, I understand that the Court is
9     going to start by asking them -- are you going to ask
10    them any general questions other than have them go down
11    this list?
12         THE COURT:  Yes.  We gave you -- didn't we or
13    we haven't yet?
14         MS. WALES:  We just gave them the list of the
15    witnesses.  We didn't give them that.
16         THE COURT:  Do you have copies?  I can quickly
17    run over the questions I'm going to ask.
18         I've already told them some of the things
19    about, you know, purpose of voir dire.  So I may skim
20    over that.  We talked about that some yesterday.  I may
21    -- I don't know.  I will introduce the attorneys, ask
22    them about if you know the attorneys, if you've ever had
23    any dealings with the U.S. Attorney's office.
24         I will introduce the defendants.  And we've got
25    company reps for AseraCare that we will introduce.  We

1  will introduce the if you or a close friend has ever

2  been employed by the defendants.  I think the

3  questionnaire asks whether you individually but not

4  relatives or close friends.

5          Then, do you know any of these attorneys, there

6  are not very many of them, so we'll see.

7          And I will list the relators there.  I need to

8  clarify who some folks are.  Charles Jackson and

9  Jackeline Rosero.

10          MR. WERTKIN:  Your Honor, they are our trial

11  software folks, the IT people.

12          THE COURT:  So they're like legal assistants,

13  is that an appropriate term to call them?

14          MS. TAPIE:  One is a paralegal and one is an IT

15  assistant.

16          THE COURT:  Would they be offended if we just

17  lumped them in as legal assistants?

18          MR. WERTKIN:  I don't think so, Your Honor.

19          THE COURT:  Okay.  And then for the defendants,

20  Nick Danella?

21          MR. CHRISTIE:  He's with our firm.

22          THE COURT:  Aaron Chastain, Fritz Spainhour,

23  Virginia Reeves and Erin Sullivan, they're not attorneys

24  -- and Brad Campbell and Terry Kelley.

25          MR. CHRISTIE:  Brad Campbell and Terry Kelley

1  are legal assistants.  They will be handing the

2  software, the same as the two government has.

3      The others are lawyers that may be in the

4  courtroom, but they're not going to be asking witnesses

5  any questions or speaking.

6      THE COURT:  Okay.  So they just may be --

7      MR. LEMBKE:  In and out.

8      THE COURT:  In and out, assisting with whatever

9  assistance y'all need, but not doing anything --

10      MR. LEMBKE:  They may be sitting at the table

11  at points, so that's why we listed them.  But I don't

12  think the jury will hear from them.

13      THE COURT:  And they are all with your firm?

14      MR. CHRISTIE:  Yes.

15      MR. LEMBKE:  Yes, Your Honor.

16      THE COURT:  I will introduce them as other

17  attorneys who you may see at counsel table from time to

18  time, do you know any of them.

19      MR. LEMBKE:  Your Honor, in our list of legal

20  assistants, there's probably a third name that needs to

21  be on there in addition to Terry Kelley and Brad

22  Campbell.  Kim Ferguson.  I'm sorry, we did not have her

23  down.

24      THE COURT:  Okay.  So I will ask them if they

25  know any of those.  That may take us about an hour to do

1    that.

2           Have you ever been represented by any of these

3    attorneys; do you know or are you related by blood or

4    marriage to any of the members of the jury panel; do you

5    know me, Joseph, everybody knows Joseph, Frankie,

6    Teresa, Michelle who will be in and out of the

7    courtroom.

8           Then I will ask them about the list of

9    witnesses that we will give them before we start and ask

10   them to review and ask them if they know or think they

11   may know any of the witnesses on that list.  That will

12   save us a good hour not having to read out that list.

13          Is there anyone who believes for whatever

14   reason you would be unable to be fair and impartial to

15   both sides?  Can you think of anything else you ought to

16   call to our attention and then I will turn it over to

17   y'all for additional questions.

18          Again, those questions need to either be follow

19   up to the questions that I ask in the morning, general

20   sort of things, or follow up to questions that they were

21   asked in the questionnaire.

22          You don't get to do any, do any of you think

23   kind of questions.

24          MR. LEMBKE:  So, Your Honor, do I understand

25   correctly that any follow up that either side's counsel

1   does should be directed to a particular juror?

2         THE COURT:  Generally, yeah.  Now, there may be

3   -- if there are a general category that was covered here

4   that you need some clarification from a group of folks

5   on, if you run it by me first and we can see about that,

6   but it needs to touch on something that's in the

7   questionnaires.

8         MR. LEMBKE:  Your Honor, I suspect much of the

9   individual follow up, based on the questionnaire at

10  least, will likely relate to strong views one way or the

11  other on the government and strong views one way or the

12  other on hospice care.  None of which I suspect either

13  side is particularly interested in having the whole

14  panel hear someone go off on a diatribe against either

15  the government or hospice care.

16        So I would ask that questions like that, which

17  are going to be the bulk of what we're going to have to

18  follow up on, I think, in addition to questions about

19  their personal health and things like that, would be

20  done outside the hearing of the rest of the jurors.

21        THE COURT:  We will work on that.  I need to go

22  make this phone call real quickly.  I hope I won't be

23  long.

24              (Brief recess)

25        THE COURT:  Are there some others that we

 1   haven't talked about that we should consider having to

 2   come in early?

 3          MS. TAPIE:  Number twelve, Your Honor.  We

 4   discussed him but didn't raise him with you.  We just

 5   thought -- we were wanting to follow up on his answers

 6   to questions fifty-seven and fifty-nine where he's just

 7   not into the juror thing.

 8          THE COURT:  We may need to talk to Mr. Greg

 9   Parker.  Okay.

10          MS. TAPIE:  We also thought number eighteen,

11   she said in response to number fifty-seven that she had

12   concerns about the ability to be fair and impartial

13   because of her present opinion of our U.S. government

14   being too liberal.

15          THE COURT:  I also am not interested in serving

16   as a juror presently due to the timing of being

17   summoned; though, I will serve if I have to.  All right.

18   And that's number eighteen.

19          Y'all should have heard the patriotic speech I

20   gave on them yesterday about how important it is for

21   jury service, but anyway.  I couldn't get some of these

22   excited about it.

23          Any others?

24          MS. TAPIE:  On number twenty-four, Your Honor,

25   it was a little unclear, this person responded to number

```
 1  fifty-nine, he just said, I have to work for a living.
 2  And he's in pharmaceutical sales.  And so we thought we
 3  would need to do some follow-up questions to find out,
 4  does that mean you're totally without income for these
 5  three months or not.  So we thought we needed some
 6  follow-up questioning.
 7           MS. MARTIN:  On number twenty-four?
 8           MS. TAPIE:  Yes.
 9           MS. MARTIN:  Is he in pharmaceutical sales or
10  is that his spouse?
11           MS. TAPIE:  Thank you, Kim, you're right.
12           THE COURT:  Senior estimator for SPECON
13  Systems, whatever that is.
14           MS. MARTIN:  You may still want to follow up
15  with him, but --
16           MS. TAPIE:  It was really just his answer to
17  that question.
18           THE COURT:  Well, we all have to work for a
19  living.  I don't see any need for specific things on
20  number twenty-four.
21           MR. LEMBKE:  Your Honor, thirty-one answered
22  the question --
23           THE COURT:  Wait a minute.  Wait a minute.
24  Which question?
25           MR. LEMBKE:  Forty-four, he has a mostly
```

1  negative opinion of hospice because my father was taken

2  to the ER after hospice transferred him home with hours

3  to live.

4         I think that's one we're going to have to talk

5  about.  And I really would like to do that outside the

6  presence of the other jurors.

7         THE COURT:  I think so, too.  That's number

8  thirty-one?

9         MS. WOODKE:  This is one I brought up to them

10 and this may be in a general, number thirty-four was a

11 legal secretary at Johnston, Barton, Don Long.

12        THE COURT:  Number thirty-four?

13        MS. WOODKE:  Yes, ma'am.  We may just ask some

14 questions about it.

15        THE COURT:  And Don worked there?

16        MR. LEMBKE:  Your Honor, we said that is not of

17 any particular concern to us.

18        THE COURT:  I think you can probably ask follow

19 ups about that.  That wouldn't be --

20        MS. WOODKE:  Personal, but --

21        THE COURT:  That would be easy to do in front

22 of everybody unless she spouts out something about how

23 absolutely horrible Don is, but that won't happen

24 because he's not.

25        MS. TAPIE:  Your Honor, number thirty-two, for

1   reasons we've already talked about this, but there's an

2   indication in the answer number fifty-nine that this

3   person has work travel scheduled in Canada.

4           THE COURT:  Which one?

5           MS. TAPIE:  It's potential juror number

6   thirty-two and it's question number fifty-nine on Page

7   9.

8           THE COURT:  He did not bring it to my

9   attention, but can we --

10          MR. LEMBKE:  That doesn't seem particularly

11  personal.

12          MS. TAPIE:  And I agree.  We can ask -- I

13  thought I would let you know if there were people we

14  thought we needed to follow up with question-wise.  This

15  doesn't seem to be needing to be outside the hearing,

16  but if it's for purposes of looking at the numbers, he's

17  somebody we may question.

18          THE COURT:  All right.  Anyone else?

19          MS. TAPIE:  Have we already talked about

20  thirty-seven?

21          THE COURT:  I don't have a mark by it, but that

22  doesn't mean anything.

23          MS. TAPIE:  He said --

24          THE COURT:  What page?

25          MS. TAPIE:  In the very last page, Page 9, he

1    answered yes to question fifty-seven about concerns

2    about ability to be fair and impartial.  And then he

3    also said yes in response to fifty-nine about his work

4    obligations.

5         So I don't know if based on his beliefs in

6    expressing fifty-seven or based on what Matt said

7    earlier he's got such strong feelings we would not want

8    him to start spouting off in front of the entire pool.

9         THE COURT:  Okay.  He's got some concern about

10   whistleblowers, trustworthiness, too, but also believes

11   the government should prosecute to the fullest extent of

12   the law.

13        Do y'all want to talk to this person privately

14   or --

15        MR. LEMBKE:  We don't have a problem with that,

16   Your Honor.

17        THE COURT:  He's even thinking about filing a

18   claim against the government if it continues to impose

19   its will by violating the constitution.

20        MR. LEMBKE:  Your Honor, there are -- I will

21   wait.

22        THE COURT:  Okay.  So bring Mr. Griggs in,

23   number thirty-seven.

24        Anyone else?

25        MR. LEMBKE:  Your Honor, there are two:  Number

 1  five is one, who, in questions thirty-nine and forty,

 2  puts very favorable for CMS and the Department of

 3  Justice.  And they are sort of general explanations the

 4  person gives.

 5        And I have -- if we probe more deeply, which I

 6  think we will want to, we have no idea what's going to

 7  come out of her mouth about those things.

 8        So, that's one where we prefer, since we don't

 9  really have a really good sense of the basis of those

10  comments, to ask her without the whole panel hearing.

11        THE COURT:  She also says that she's very

12  familiar and mostly positive views of hospice.  So I

13  think she likes everybody.

14        I don't see that as being something that we

15  need to talk to her about outside the presence of the

16  others.

17        MR. LEMBKE:  The other one along those lines,

18  Your Honor, that I was going to bring to the Court's

19  attention is number twenty-three.

20        THE COURT:  What page?

21        MR. LEMBKE:  Six.  Again, questions

22  thirty-eight through forty, very favorable down the line

23  with no explanation on thirty-eight and forty at all.

24  That sort of puts us in a difficult spot to ask the

25  question, when we literally have no idea what the basis

1  is.

2         THE COURT:  He's a former Social Security

3  Administration employee; right?  Number thirty-five?

4  His answer to question number thirty-five where he says

5  he was a claims adjustor for Social Security

6  Administration.  So that --

7         MR. LEMBKE:  True.

8         THE COURT:  So that would probably explain why

9  he's very favorably inclined towards the federal

10 government.

11        MR. LEMBKE:  But, as I read, I think on Page 2,

12 I think that says he's been a vice principal, it looks

13 like '92, it might be '02 but for a long time.  It must

14 be -- he says fifteen years, which doesn't quite match

15 either '02 or '92.

16        THE COURT:  Okay.  Mr. Scott asked to be

17 excused because he is a vice principal at -- do you

18 remember the name of the school?

19        MS. KIMBRELL:  It was a middle school here in

20 Birmingham.  I don't remember the name of it.

21        THE COURT:  Vice-president of a middle school

22 in Birmingham somewhere.  He asked to be excused because

23 school was starting and all that kind of stuff and he's

24 the only male person in the administration.  He felt

25 like he needed to be there.  But that doesn't fall

1 within one of those regular basis for excuse.  I mean,

2 his pay would not be affected and there are those there

3 that could do the things.  And I did note that in answer

4 to number fifty-nine, he marks no, that it wouldn't be a

5 greater inconvenience for him.  But I just want you to

6 know that he had requested an excuse based upon that

7 position.

8          It does seem to me that we might want to

9 clarify when he was a claims adjustor for Social

10 Security in relation to his work as vice principal.  But

11 I don't know.  I don't see that that needs to be done

12 outside the presence of the other jurors.

13          MR. LEMBKE:  The only thing I'm worried about

14 is -- most worried about is the very favorable on the

15 Department of Justice.

16          MS. WOODKE:  Worried about the very

17 unfavorable.

18          MR. LEMBKE:  With please explain and nothing.

19 Virtually everyone else gives you something, but he

20 gives us nothing.  And if we ask the question, we have

21 no idea what's coming.

22          THE COURT:  Well, that's often the way it works

23 with these voir dire questions in general.  So I don't

24 see any need to ask him privately.  At least with these

25 people we have some idea of what they might respond.

1    Generally when we ask those questions in open court of

2    everyone, we don't know how -- what they might blurt

3    out.

4            Got any others --

5            MR. LEMBKE:  I don't think so, Your Honor.

6            THE COURT:  -- that you want to try?  Okay.

7            MS. TAPIE:  Y'all are the experts, I know, as

8    far as numbers, I'm wondering if in all those questions

9    we would --

10           THE COURT:  That's what I'm going to ask the

11   expert over here.  What we may need to do is impose like

12   maybe a five minute time for these specific questions to

13   these individuals that we're concerned about in terms of

14   indicating some kind of bias.

15           And you can then ask them other questions you

16   may have for them with everybody else.

17           MS. KIMBRELL:  You've got ten people you're

18   going to take additional questions from in the morning,

19   so with that panel of thirty-five, I think you're still

20   good.

21           THE COURT:  Okay.

22           MR. LEMBKE:  And just so we're clear, can we

23   run through the ten so we know for sure?

24           THE COURT:  Yeah.

25           MR. LEMBKE:  Thank you.

1          MS. KIMBRELL:  If you don't mind, Judge, can I
2     run through my whole list so I can make sure I'm getting
3     the right information to give to the jurors?
4          THE COURT:  Sure.  You or me?
5          MS. KIMBRELL:  Either way.
6          THE COURT:  And we can make sure we've got the
7     same list.
8          I've got number eight, number twelve, number
9     fourteen, number sixteen, eighteen, nineteen,
10    twenty-six, twenty-nine, thirty-one, and thirty-seven.
11         MS. KIMBRELL:  That's what I've got.
12         THE COURT:  Cindy and I agree on that.  So
13    those ten we will have come in at 9:00 in the morning
14    and the others we will have come in at 10:00.  I do
15    think I will limit you to five minutes per juror.  I
16    will be a tad flexible on that.  There may be some we
17    don't need a full five minutes on but we will at least
18    try to keep it moving that way.
19         We will do that in the jury room adjacent to
20    the courtroom so that the other jurors can be
21    congregating in the courtroom.  And Frankie will be in
22    charge of putting them in some kind of line up and
23    order, maybe based upon who gets there first or
24    whatever.
25         THE CLERK:  Okay.

 1          THE COURT:  You can then let some know that it

 2  will be at least ten, twenty minutes, whatever before

 3  they come in, if they want to go get some coffee or

 4  whatever.

 5          Does that sound like a plan?

 6          MR. LEMBKE:  Yes, Your Honor.

 7          MS. TAPIE:  For strikes for cause, will those

 8  happen as we go or --

 9          THE COURT:  Probably.  We'll -- the way it

10  generally works is we pretty well know.  And we'll

11  usually say, you know, up or down in terms of cause as

12  we go.  But we depending upon how fast we get going, we

13  may have to come back and look at another -- take

14  another look at one or two or something.  So we will

15  see.

16          Any other questions?

17          MR. LEMBKE:  How many are going to be on each

18  bench, do you know?

19          THE CLERK:  We have three benches across.

20          THE COURT:  That are different sizes.

21          THE CLERK:  That are different sizes.  And I

22  had a seating thing this morning with some of my

23  co-workers, so we're going to start on the second bench,

24  not the front one because there's not enough leg room.

25  We're going to do six on the left, five in the middle.

1      THE COURT:  We're not going to be on the front

2  row?

3      THE CLERK:  No, ma'am, because there's not

4  enough leg room.  There's not enough leg room for them.

5  If they're going to be sitting there for several hours,

6  there's just not enough leg room.  If they're very tall,

7  there's no leg room.

8      THE COURT:  There is a pole that's a problem

9  and we'll do our best to work around it, which is what

10  we have to do everyday in there now.

11      THE CLERK:  We will start with whatever number,

12  number two, we will start number two and go all the way

13  across to the end, and then we will start with the next

14  number.

15      THE COURT:  We're going to go left, middle,

16  right, and then second row?

17      THE CLERK:  Yes.

18      THE COURT:  Or third row.

19      MR. LEMBKE:  So when you get to the third row

20  on which jurors are seated, you will go number two and

21  say number twenty was the last one down there, will you

22  then go back over to the left side and then go across

23  like that?

24      THE CLERK:  Yes, that is correct.

25      MR. CHRISTIE:  I hate to be difficult, but six,

1  five and six, six, five and six is thirty-four.

2          THE CLERK:  Then what number do we go through,

3  thirty-five?  There will be one extra sitting --

4          THE COURT:  Before we put those in there, we're

5  going to have strikes for cause.

6          THE COURT:  We won't have thirty-five in all

7  likelihood out there because doing it this way, I don't

8  see any need to make the ones that we know that are

9  going to be excused sit through the whole thing.

10         MR. WERTKIN:  I have two questions.

11         THE COURT:  Okay.

12         MR. WERTKIN:  One is about admitting evidence

13  before or at the beginning of trial.  Chris and I were

14  talking earlier, there are some exhibits for which

15  there's no objections, like the medical records.  And I

16  know some courts have a very strict that you cannot put

17  anything up on the screen unless it's been -- unless

18  it's been admitted into evidence.

19         THE COURT:  I am that way, too.  I mean, are

20  you talking about after we go through opening statements

21  or are you talking about using it in opening statements?

22         MR. WERTKIN:  Both, Your Honor.  Both.  So that

23  if -- what we can do is if we can agree that at the

24  beginning of trial, even before the jury is in, we just

25  admit into evidence all of the exhibits for which there

1    are no objections, then we could use them freely.

2         THE COURT:  Well, all of the exhibits for which

3    there were no objections, there may be objections as to

4    the relevance of it.  The objections were to

5    authenticity and foundation, I mean, other kinds of

6    things.  So just because they didn't object doesn't mean

7    that they agree --

8         MR. WERTKIN:  Right.

9         THE COURT:  -- it comes in.

10        MR. WERTKIN:  I understand that.

11        THE COURT:  Let me short circuit that to say, I

12   have said several times in our pretrial conferences that

13   if y'all can agree on certain exhibits that are

14   admissible, you can preadmit them with Frankie.

15        MR. WERTKIN:  That makes a lot sense, Your

16   Honor.  And I think for our purposes, because I don't

17   want to object during openings, certainly not, but to

18   the extent there are any exhibits that you want to show

19   and put up on the screen to the jury that has not been

20   -- where there's been an agreement with the party, that

21   may be a problem.  I just want to highlight that.

22        THE COURT:  Okay.  I've also said several times

23   at pretrials when we've talked about opening statements

24   that if either side plans on using any exhibits or any

25   demonstrative things, you have to show it to each other

1  and get permission to do so.  So I've said that before.

2  I will say it again.

3       So y'all need to talk and work out those kinds

4  of things, if you want to do it.  And just remember

5  what's good for the goose is good for the gander.  And I

6  don't know which side is which, but y'all work those

7  things out.  That's not something that I'm here to

8  babysit.  Y'all are grown lawyers and you ought to be

9  able to work those things out.

10       MR. CHRISTIE:  Just to be clear.  We are

11  planning on exchanging tomorrow evening what we are

12  planning on using during opening and letting the other

13  side and have a discussion about whether there are

14  objections.

15       Part of what I hear you saying is that if one

16  party thinks the other side is being unreasonable,

17  you're not going to referee that, we need to agree; is

18  that fair?

19       THE COURT:  Yes.

20       MR. CHRISTIE:  That's what I thought you were

21  saying and that's what I was operating under.  And Jeff

22  and I both think we have that understanding.

23       THE COURT:  But I would encourage y'all to talk

24  about exhibits that you both recognize will be admitted,

25  should be admitted, can be admitted and get with Frankie

1   and do that in advance and that will streamline things

2   as we go.  But just because there were no objections

3   doesn't mean that the evidence comes in.  There may be

4   -- or comes in with a witness unless y'all agree on

5   that.  All right.

6           MR. WERTKIN:  And I do not want to launch into

7   anything that would take a long time.  But when we have

8   a chance to have a break, Your Honor, we did take a look

9   at your preliminary instructions on Page 8 and I just

10  had one clarifying question.  Again, we do not want to

11  have any argument, but in the second --

12          THE COURT:  Give me just a minute to get to it,

13  please, sir.

14          MR. WERTKIN:  Sure.

15          THE COURT:  Page what?

16          MR. WERTKIN:  On Page 8.

17          THE COURT:  Okay.

18          MR. WERTKIN:  It's the second full paragraph,

19  it starts with, you may also consider.  And then the

20  last clause of the sentence is, whether AseraCare

21  intended the doctor to rely upon false information when

22  certifying a patient -- just as a clarifying matter, the

23  word "intended" sets off for us some thoughts about

24  scienter and knowledge.  We were just trying to get a

25  sense from you what you meant by that and whether this

1  expands in any way --

2          THE COURT:  No, it does not expand in any way

3  phase one.  But we went through a whole lot of motions

4  in limine this past week where y'all have been telling

5  me that you've got time and place connection to indicate

6  that the COTI is not reliable because of efforts to

7  undermine the information that the doctor had.

8          And I thought you were going to that kind of

9  information, that it's presented for the purpose of the

10  doctor to falsely certify the patient.

11          MR. WERTKIN:  Thank you, Your Honor.

12          THE COURT:  So, no, that's not opening it up

13  anymore into scienter or knowledge or intent.

14          I shouldn't have said the word "intended" but I

15  was trying to figure out how to get through what y'all

16  are telling me is tied time and place to undermine the

17  reliability of the COTIs.  And again, this is dealing

18  with whether the certification was false.

19          MR. WERTKIN:  Thank you, Your Honor.

20          THE COURT:  If y'all have a better way for me

21  to clarify that, I will certainly be glad to do that.

22          MR. LEMBKE:  Your Honor, I think we're

23  perfectly fine with striking everything after the comma

24  and whether, that last phrase.  We're fine with that

25  coming out.

1          THE COURT:  And if the government has concerns

2    about it as well, then it sounds like that might be a

3    good thing to do.  So I will take out that last part.

4          MS. TAPIE:  Your Honor, actually, can we get

5    back to, I think with your -- we may have some different

6    suggested language maybe.  But I mean, with your

7    clarification, I think that's helpful for us to

8    understand what you were meaning.  And I think it is an

9    important concept to include in a preliminary

10   instruction.

11         So I don't think that that concept should be

12   removed but maybe, like you said, the "intent" word is

13   problematic, we could come up with a better suggestion.

14         THE COURT:  I think the two things included in

15   there probably are really sufficient, whether any

16   information the doctor had when certifying the patient

17   was false and whether AseraCare provided false

18   information to or withheld relevant information from.

19         I think that really covers what I was trying to

20   relate to the jury without getting into this idea of

21   actually relying on it or intent to do so.  I think

22   that's probably a better approach.

23         Anything else that y'all saw in there that you

24   had any questions with?  Because I did change it from

25   what I had sent y'all earlier, again, in trying to mesh

53

1  the different suggestions that y'all had given me in

2  your view of it.

3        MR. LEMBKE:  Your Honor, we have not had a

4  chance to really study it.  And we would ask that

5  perhaps at the close of tomorrow's proceeding we take up

6  any issue that we may have.

7        THE COURT:  Yeah.  That's why I was trying to

8  get it to you today so you would have time to look at

9  it.

10        MR. WERTKIN:  We can discuss it tomorrow.

11        THE COURT:  Okay.  Anything else we need to

12  take up today?

13        I do hope that we will be able to have a jury

14  shortly afternoon tomorrow.  The jurors will be fed

15  lunch tomorrow so they will be happy, we hope, courtesy

16  of your Bar Admission Fund.  So that will be a good

17  thing for them.  But I really don't see it taking

18  forever tomorrow.  And I don't think we need to have any

19  jurors on back-up either.  I think we will be good.

20        So we will go with these thirty-five.  We will

21  get our jury from that and the rest will be happy that

22  they don't have to be here.

23        MR. LEMBKE:  Thank you, Judge.

24        MS. TAPIE:  So 9:00 a.m. tomorrow?

25        THE COURT:  9:00 a.m. in the morning.  And we

1    will move through those ten --

2             MS. WOODKE:  Do you want us to go directly to

3    the jury room?

4             THE COURT:  Yes.  Off the record.

5                  (Off the record discussion.)

1

2                        C E R T I F I C A T E

3

4          I hereby certify that the foregoing is a

5     correct transcript from the record of proceedings in the

6     above-referenced matter.

7

8     _____

9     Teresa Roberson, RPR, RMR
      Julie Martin, RPR, RMR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25