UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


UNITED STATES OF AMERICA,
EX REL., ET AL.,                    CV-12-KOB-245-S


                 Plaintiffs,     August 6, 2015

     vs.                         Birmingham, Alabama

ASERACARE, INC., ET AL.,

                 Defendants.

* * * * * * * * * * * * * * * * * * * * * * *


           REPORTER'S OFFICIAL TRANSCRIPT OF
                      JURY TRIAL
                     VOLUME III

        BEFORE THE HONORABLE KARON O. BOWDRE
         UNITED STATES DISTRICT CHIEF JUDGE


COURT REPORTER:
Teresa Roberson, RMR
Julie Martin, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
 1                    * * * * *

 2              A P P E A R A N C E S

 3                    * * * * *

 4   FOR THE PLAINTIFF:

 5   Jeff Wertkin
     Carolyn Tapie
 6   William Olson
     U.S. Department of Justice
 7   Civil Division
     P.O. Box 261 Ben Franklin Station
 8   Washington, DC  20044

 9

10   Lane Woodke
     Don Long
11   U.S. Attorney's Office
     1801 4th Avenue North
12   Birmingham, Alabama  35203

13

14

15   FOR THE DEFENDANT:

16   James Sturgeon Christie, Jr.
     Matt Lembke
17   Bradley, Arant, Boult & Cummings
     1819 Fifth Avenue North
18   Birmingham, Alabama  35203

19

20   ALSO PRESENT:

21   David Cannon
     Andy Sheldon
22   Rick Fuentes
     Angie Hollis
23

24

25
```

```
1                        * * * * *

2                  P R O C E E D I N G S

3                        * * * * *

4           (Proceedings held in the jury room.)

5           THE COURT:  Let's get started.  I think it's

6   juror number eighteen, she called Cindy Kimbrell last

7   night and said that she really needed to be excused

8   because the only other person that does what she does

9   is going out on maternity leave or something, so I

10  suggested that we might want to start with her.

11          THE CLERK:  This is juror eighteen.

12          THE COURT:  Is this Ms. Wise?

13          PROSPECTIVE JUROR WISE:  Correct.

14          THE COURT:  We appreciate you coming in this

15  morning early.  I understand that you called

16  Ms. Kimbrell yesterday --

17          PROSPECTIVE JUROR WISE:  Yes, ma'am, I did.

18          THE COURT:  -- about a conflict at work.

19  Would you tell us about that.

20          PROSPECTIVE JUROR WISE:  Well, I found out

21  after work yesterday, the job I do where I work, I

22  don't have anybody else presently available to do the

23  work that I do.  My counterpart, who could back me

24  up, had her baby on Tuesday, and she's going to be

25  out six or eight weeks.
```

1          So that kind of puts me in a pinch where I'm

2     at.  And so I wanted to make y'all aware of that to

3     see if possibly I could be excused because of the

4     bind I'm going to be in.

5          THE COURT:  And as I recall, you -- tell me

6     what you do.

7          PROSPECTIVE JUROR WISE:  I work as a nuclear

8     training specialist at Southern Nuclear.  Primarily

9     what I do is I support the fleet engineering group at

10    Southern Nuclear.  It's about one hundred fifty

11    engineers and the managers and directors.

12         So what I do on a daily basis, unfortunately

13    I'm the only one there right now, and I manage two of

14    the software databases there for a learning

15    management system and for intel which is a lot of

16    work because there's only one other lead

17    administrator there right now besides me and there's

18    nobody in my department that can do the software

19    administration for the learning management system,

20    plus process all the records and make sure

21    qualifications are kept current and so forth.

22         It's a lot of the management of software

23    stuff and records.

24         THE COURT:  Okay.  And is that the kind of

25    thing that you actually have to be physically present

1    there to do?

2           PROSPECTIVE JUROR WISE:  When it comes to

3    the records processing part, yeah, because it's paper

4    and it has to be processed.  I mean, if I could work

5    from home, I would.  But I also do a lot of customer

6    service stuff with, you know, issues.  Plus, I have a

7    role in a couple of meetings, committee meetings that

8    deal with training there.  I have to be present to do

9    that, unfortunately.

10          So right now, personally, if my counterpart

11   was available, I wouldn't be bringing this up.  I

12   would be doing my civic duty.  But it's just a

13   stressful time right now with her being out and me

14   being called to do this.  It just puts me in a bind.

15   It's stressing me out.

16          THE COURT:  Yeah.

17          PROSPECTIVE JUROR WISE:  More so than my

18   boss, unfortunately.

19          THE COURT:  Tell us what Southern Nuclear

20   does.

21          PROSPECTIVE JUROR WISE:  Southern Nuclear is

22   an operating company in Southern Company.  And they

23   manage the three nuclear plants, the one here in

24   Alabama, the two over in Georgia.  So that's our

25   primary role.  And I work at the corporate office.

1          So we deal with a lot of the governance and

2     oversight with the nuclear sites that we have.

3          THE COURT:  This is not apropos to much of

4     anything, but I notice you were with the Air Force a

5     while?

6          PROSPECTIVE JUROR WISE:  Civil service

7     actually.

8          THE COURT:  All right.  Having had a son in

9     the Air Force, I get excited when I see other Air

10    Force people.

11         Does anybody have any questions for

12    Ms. Wise?

13         MR. LEMBKE:  I do, Your Honor.  But --

14         MS. TAPIE:  You're welcome to start, Matt,

15    that's fine.

16         MR. LEMBKE:  Ms. Wise, I'm Matt Lembke and

17    I'm one of the lawyers for the defendant AseraCare in

18    this case and we appreciate you being here.

19         PROSPECTIVE JUROR WISE:  Thank you.  Nice to

20    meet you.

21         MR. LEMBKE:  I have just a couple of

22    questions.  You said a second ago that your boss was

23    not as stressed out about that as you are.  Tell me

24    about that.

25         PROSPECTIVE JUROR WISE:  Well, my boss -- in

1    the group I'm part of, we're kind of a hodge-podge

2    group of people.  We have some financial people, we

3    have training people, and we have an engineer, we

4    have a database person that creates databases.

5            He's a financial person.  He doesn't really

6    know everything that I do.  He knows some of it but

7    he doesn't know all of it.  And because he doesn't

8    know what it really takes to do my job, he just

9    thinks that it's not a big deal.

10           And I have talked to him personally about

11   having to come here just the other day, you know,

12   with my counterpart being out and he's not as

13   concerned.

14           And I just feel like it's because he really

15   doesn't understand everything that I do on a daily

16   basis and how that's going to impact my job and my

17   role in supporting the engineering department.  So

18   that's why I said that.

19           MR. LEMBKE:  I see.  And obviously, as I

20   understand it, Southern Nuclear is part of the

21   Southern Company; correct?

22           PROSPECTIVE JUROR WISE:  Yes.

23           MR. LEMBKE:  For the computer aspect of your

24   job, software support and things like that, do you

25   imagine if you're gone that Southern Company would be

1  able to send someone in to at least take up that part

2  of your job?

3          PROSPECTIVE JUROR WISE:  Well, Southern

4  Nuclear is a part of Southern Company, but they don't

5  actually manage it.  You know, they're the parent

6  company.  We're a subsidy, whatever you want to call

7  us, we kind of run on our own.

8          I guess somebody could -- they could get

9  someone to do it.  But I know one of the individuals

10 that doesn't work in my department, who is also an

11 administrator, she's overwhelmed right now anyway.

12         So we had a lot of the rog two years ago and

13 there's not a lot of people with the experience and

14 knowledge I have that can just step up and do

15 everything.

16         I'm sure, you know, maybe they could, you

17 know, spread things out, but it's just going to

18 become a mess.

19         MR. LEMBKE:  And I think the Judge has told

20 you that the jury trial is only going to occur over

21 four days every week, Monday through Thursday.

22         PROSPECTIVE JUROR WISE:  Right.

23         MR. LEMBKE:  Does the fact that you can work

24 on Fridays, does that alleviate some of the problem?

25         PROSPECTIVE JUROR WISE:  Some of it but it's

1  going to pile up.

2          MS. TAPIE:  Ms. Wise, I have a couple of

3  questions for you.  My name is Carolyn Tapie I'm one

4  of the Department of Justice attorneys representing

5  the United States in this case.

6          And I noticed on your survey that you had

7  some concerns about your ability to be fair and

8  impartial in the trial because of your opinion of the

9  government being too liberal.

10          PROSPECTIVE JUROR WISE:  Yes.

11          MS. TAPIE:  Can you elaborate on that for

12  us?

13          PROSPECTIVE JUROR WISE:  Well, to be honest,

14  I don't like the way the government is presently.  I

15  don't think the leadership is up to par.  I didn't

16  vote for Obama for either terms.  I personally think

17  that it's too liberal.  I don't agree with a lot of

18  the present state of, you know, government --

19  governing that's going on.  I don't like the way

20  foreign policy has been going.

21          I stay up to speed a lot with, you know,

22  what's going on with the government because it

23  affects me, it affects my children.

24          So presently, and I'm not talking about

25  overall, but presently, with the folks that are in

1   positions now, I'm not very happy with it and I don't

2   have a good opinion because of that.

3           MS. TAPIE:  And I appreciate your honesty.

4   Do you think those views could potentially hinder

5   your ability to serve as an impartial or fair juror

6   in this case considering it's brought by the United

7   States Government and United States Government is

8   represented by the Department of Justice attorneys?

9           PROSPECTIVE JUROR WISE:  To be honest with

10  you, I don't -- I don't know, because I don't know

11  enough about what this is all about.  I guess I don't

12  really -- I don't have a strong opinion one way or

13  the other about it.

14          I mean, you know, anything that I do, I try

15  to do it honestly.  I try to listen to -- I try to be

16  fair.  That's just the way I am.

17          But you know, I guess I could be unbiased if

18  I really had to, but, you know, I really -- I can't

19  say -- I can't guarantee an answer one way or the

20  other.

21          MR. LEMBKE:  May I ask one more question?

22          THE COURT:  Sure.

23          MR. LEMBKE:  Ms. Wise, if you're selected to

24  be a juror in the case, and at the end of the case

25  the Court -- and everyone brings in world views,

1   obviously, and their own opinions.

2          PROSPECTIVE JUROR WISE:  Sure.

3          MR. LEMBKE:  But at the end of the case, the

4   Judge instructs the jury that the case is to be

5   decided solely on the evidence presented in court and

6   the instructions given on the law by the court, do

7   you think you could follow that direction from the

8   Court and issue a fair and impartial verdict just on

9   that?

10         PROSPECTIVE JUROR WISE:  I guess I have to

11  say no or it depends because, I mean, personally if I

12  don't agree with the charge or the law charge, I may

13  not -- I may not be able to agree to that.

14         THE COURT:  All right.  Let me see if I can

15  get to something.  The government in this case claims

16  that AseraCare is a provider of hospice benefits

17  presented false claims for Medicare reimbursement and

18  that's kind of the center heart of the government's

19  claim.

20         You will be asked to determine whether

21  AseraCare, in fact, knowingly presented false claims

22  to the government for payment.

23         My job, as judge, is to tell the jury what

24  the law is so that the jury can make a determination

25  of whether AseraCare, in fact, violated the law.

1    That's going to be the jury's job.

2            Are you saying that if you disagree with the

3    law as I explain it to you, that you could not render

4    a fair verdict?

5            PROSPECTIVE JUROR WISE:  Well, to be part of

6    a jury, is it not like I have to listen -- I have to

7    listen to both sides and I have to decide from the

8    facts presented and everything whether guilty or

9    innocent, is that kind of the gist of it, though?

10           THE COURT:  Sort of, but this is not a

11   criminal case, even though the government is bringing

12   it.

13           PROSPECTIVE JUROR WISE:  Right.

14           THE COURT:  It's a civil case.  So it's

15   whether the person or whether the company is liable

16   for violating the law or not liable, so it's

17   different.  It's a different terminology.

18           PROSPECTIVE JUROR WISE:  Sure.

19           THE COURT:  But that would be the

20   responsibility of the jury, yes, to look at both

21   sides and determine, based upon the evidence that's

22   presented, whether the government has shown that

23   AseraCare violated the law by presenting false

24   claims, claims for people who were not eligible for

25   hospice benefits.

1      PROSPECTIVE JUROR WISE:  Well, I think I

2  could go with that.  I think I could, you know,

3  looking at it in a simple way, yeah.

4      THE COURT:  And it doesn't have anything to

5  do with President Obama or Congress or --

6      PROSPECTIVE JUROR WISE:  I could keep it

7  separate.

8      THE COURT:  Okay.  Any other questions for

9  Ms. Wise?

10      MS. TAPIE:  I have just another follow up

11  because you mentioned you were feeling stressed about

12  the potential work conflict issues about your

13  colleague being out of the office while you're here.

14      PROSPECTIVE JUROR WISE:  Yes.

15      MS. TAPIE:  Do you foresee that interfering

16  with your ability to concentrate during the trial?

17      PROSPECTIVE JUROR WISE:  To be honest, yeah.

18  I've been stressing last night, I couldn't sleep the

19  whole night.  I got up at 4:00 this morning.

20      Well, of course, worried about, you know,

21  what I'm going to experience here, but also, you

22  know, about my job responsibilities and my work load

23  and that sort of thing.  But I can be a worry wart

24  sometimes, but, yeah, it's stressing me.

25      MS. TAPIE:  Do you think it could hinder

1    your ability to hear?

2            PROSPECTIVE JUROR WISE:  It may, because my

3    mind may float off to what's piling up at work and

4    what I am going to have to do when I go to work on

5    Fridays and, you know, if I'm going to have to work

6    on the weekend.

7            You know, I'm the type of person that, you

8    know, I do my work, but I try to get it done during

9    the week so I don't have to do work on the weekend

10   because my family is important to me.  I have to work

11   to earn money, but that's not my top priority.

12           But when I have a job to do, you know, I

13   make sure it gets done.

14           MS. TAPIE:  And do you have concerns about

15   how your absence would impact the functioning of the

16   nuclear plant at all?

17           PROSPECTIVE JUROR WISE:  Well, what I do,

18   because I work at the corporate office, what I do

19   stays up -- the job I do affects what I do at the

20   corporate office for the department I work in.

21   That's not going to -- what I do is not going to

22   affect the plant.  It's separate.

23           THE COURT:  Any other questions?

24           MR. LEMBKE:  If you get assigned the job of

25   a juror, you'll take the job seriously and do your

1  best, won't you?

2          PROSPECTIVE JUROR WISE:  Yeah, I'll try to,

3  yes, sir.

4          MR. LEMBKE:  Thank you.

5          THE COURT:  Anything else?

6          MS. TAPIE:  No, Your Honor.

7          THE COURT:  Thank you, Ms. Wise.

8          PROSPECTIVE JUROR WISE:  Okay.

9                      (Juror excused).

10          THE COURT:  I don't think a challenge for

11  cause with the questions really -- Frankie, if you'll

12  wait just a second.

13          I think the question is excuse for job

14  concerns.

15          MR. LEMBKE:  Your Honor, she said her boss

16  isn't nearly as concerned.

17          THE COURT:  But he doesn't know what she

18  does.

19          MR. LEMBKE:  Then he said, I guess they

20  could get someone to do it.  And obviously, she's a

21  very responsible person and she described herself as

22  a worry wart.

23          But I don't think -- this is not really a

24  personal hardship.  She's really concerned more about

25  her employer and I don't think this rises to the

1    level of a hardship warranting an excuse.

2          MS. TAPIE:  Your Honor, frankly, we have

3    some concerns about her reticence to agree that she

4    could be impartial.

5          I mean, even when you presented it as, look,

6    this has nothing to do with Obama, it seems that your

7    concerns are separate from what this case is about,

8    she says, I think I could go with that.

9          THE COURT:  And then she said she could keep

10   it separate.

11         MS. WOODKE:  I think on the hardship aspect,

12   though, I think my paralegal would tell you that if

13   she was out for two months, I have no idea what she

14   does and she's probably correct and how it might fall

15   apart.

16         I do think that's a concern that should be

17   taken into account for the hardship.

18         I do think that she spends her life with

19   engineers for a nuclear plant is probably a very

20   stressful job.

21         THE COURT:  If this were presented to me

22   without y'all present, as these excuses often are, I

23   would excuse her.

24         So I am going to excuse her.

25         Frankie, if you could bring the next person

1  in and then just kind of subtly let Ms. Wise know

2  she's excused and send her back down, to go back down

3  and see Cindy.

4            THE CLERK:  This is juror number eight.

5            THE COURT:  Good morning.

6            PROSPECTIVE JUROR CADENHEAD:  Yes.

7            THE COURT:  Ms. Cadenhead?

8            PROSPECTIVE JUROR CADENHEAD:  Yes.

9            THE COURT:  We had a few questions that we

10 wanted to ask you about and particularly you told us

11 that your blind brother lives with you?

12           PROSPECTIVE JUROR CADENHEAD:  He does.

13           THE COURT:  And that he leaves from the --

14 is it the Alabama School for the Deaf and Blind at

15 4:30?

16           PROSPECTIVE JUROR CADENHEAD:  No, no.  He

17 has to be there at 8:00, so the bus kind of gets him

18 whenever they're ready.  They've been late all week.

19           THE COURT:  Is that going to be a problem

20 for you?

21           PROSPECTIVE JUROR CADENHEAD:  Possibly

22 because it's just he and I.

23           THE COURT:  And you have to basically be his

24 eyes to get him on the bus?

25           PROSPECTIVE JUROR CADENHEAD:  Well, he

1  maneuvers well getting to the bus.  I have to get him

2  breakfast and, you know, get him off.

3          THE COURT:  And what time does he get home?

4          PROSPECTIVE JUROR CADENHEAD:  Usually, 5:00,

5  5:30.  Just depends on how the bus is running.

6          THE COURT:  So if you had to be here from

7  8:30 to 5:30, would that be a problem for your

8  brother?

9          PROSPECTIVE JUROR CADENHEAD:  Sometimes

10 because, like I say, when it's cold, they don't have

11 a set schedule.  I have to -- I've called every

12 morning this week, they should be there at 8:00.

13 They might show up at 10:00.  They had a bus to break

14 down or the drivers were late.  It's like -- he's

15 paying to ride so he should be on time.  It's just

16 kind of weird.

17         THE COURT:  Okay.  Well, I think you should

18 be excused so you can take care of your brother.

19         PROSPECTIVE JUROR CADENHEAD:  I appreciate

20 it.

21         THE COURT:  Because we don't want you

22 sitting in here with us and then worrying about oh,

23 my goodness, you know, has he gotten home now, what's

24 he doing.

25         So we're going to excuse you so you can take

1   care of him.

2           PROSPECTIVE JUROR CADENHEAD:  Thank you so

3   much.

4           THE COURT:  And thank you so much for coming

5   and for at least being willing to see if you could

6   make it work.

7           PROSPECTIVE JUROR CADENHEAD:  All right.

8           THE COURT:  Thank you.

9           PROSPECTIVE JUROR CADENHEAD:  Have a good

10  day.

11                  (Juror excused).

12          THE COURT:  That was a good catch by y'all

13  about her, so I appreciate that.

14          MS. TAPIE:  She didn't say it was a

15  conflict.  She didn't check her box that it would

16  interfere.

17          THE COURT:  Right, but I'm glad y'all found

18  that.  The next one is Mr. Parker, he's not into the

19  jury thing.

20          THE CLERK:  Number twelve, Mr. Parker.

21          THE COURT:  Good morning, how are you doing,

22  Mr. Parker?

23          PROSPECTIVE JUROR PARKER:  Good morning.

24          THE COURT:  We wanted to ask you about a

25  couple of things and I'll just get kind of right to

1  the point.  You stated that you would not like to

2  serve in this case as a juror.  I don't know that

3  there are many people who would really want to

4  anyway.

5          So wanting to is not that big a deal or not

6  wanting to.  But then you went on to say that you're

7  not into the juror thing.

8          Would you explain that to me, please, sir?

9          PROSPECTIVE JUROR PARKER:  What I meant by

10  that is, I'm not into the jury thing because I know

11  if I sit in a jury, I would have to get up every

12  forty-five minutes to go to the restroom, because I

13  am a diabetic and I just can't sit still very long.

14          THE COURT:  Okay.  Mr. Parker, did you tell

15  me that on Tuesday?

16          PROSPECTIVE JUROR PARKER:  I did.

17          THE COURT:  And I overlooked that.  I am so

18  sorry.  I should have excused you then.  I just

19  missed that.  I apologize.  I missed it when we were

20  going through all of those.  So that's my fault that

21  you had to come back.

22          PROSPECTIVE JUROR PARKER:  That's okay.

23          THE COURT:  Will you forgive me?

24          PROSPECTIVE JUROR PARKER:  Yes, ma'am.

25          THE COURT:  So I am going to let you go now.

1    Thank you.

2           PROSPECTIVE JUROR PARKER:  You're welcome.

3    Y'all have a good day.

4           THE COURT:  You, too.

5                  (Juror excused).

6           THE CLERK:  Number fourteen, Mr. Kelly.

7           THE COURT:  Good morning, Mr. Kelly, how are

8    you?

9           PROSPECTIVE JUROR KELLY:  Doing well.  How

10   are you?

11          THE COURT:  I'm doing well.  We had a

12   question for you and I am trying to remember what

13   that was.

14          MR. LEMBKE:  Questions fifty-eight and

15   fifty-nine.

16          THE COURT:  Tell us about your job as

17   project manager for the new Trinity Hospital.

18          PROSPECTIVE JUROR KELLY:  I work for Rast

19   Construction Company.  I'm the project manager for

20   the front lot mass grading project.

21          THE COURT:  For the what?

22          PROSPECTIVE JUROR KELLY:  It's the front lot

23   mass grading project.  If you're familiar with

24   Highway 280, it's not the job between the Cahaba

25   River and 459 where the lanes are widening, although

1   that's part of it, that's Veterans Construction doing

2   that road work.  Rast Construction is doing the site

3   work in front of Trinity Hospital.  Brasfield is

4   doing the hospital.  Rast is doing the site

5   excavation.  Veterans is doing the highway.

6          We're under a pretty tight time line to get

7   the hospital and the staffing and the training.  I'm

8   project manager for Rast Construction's portion of

9   that project.

10         THE COURT:  If you are not there, who steps

11   into your shoes as project manager?

12         PROSPECTIVE JUROR KELLY:  I honestly don't

13   know.  That would have to be something, you know,

14   that would be discussed with the whole project team.

15   I guess it's not like jurors, we don't have just a

16   spare, you know, in the background or whatever.  So

17   I'm not sure.

18         We're pretty busy with other work at this

19   time, I'm not sure how they would handle that.

20         I'm also the only professional engineer on

21   staff for Rast Construction.  We have some excavation

22   design and that sort of thing which is greater than

23   twenty feet, which requires a PE stamp.  So I'm not

24   sure how to handle that.

25         I guess they could outsource it -- I'm not

1  sure what kind of financial impact.

2          THE COURT:  When you say PE, you're

3  referring to professional engineer stamp on that?

4          PROSPECTIVE JUROR KELLY:  Yes.

5          THE COURT:  Any questions for Mr. Kelly?

6          MS. WOODKE:  I had a question.  On the jury

7  questionnaire, you answered you had read some online

8  news articles about this case.  I just didn't know if

9  you recalled anything.

10         PROSPECTIVE JUROR KELLY:  It's been some

11 time.  I try to stay up and current on news and that

12 sort of thing.  And I recognize the company name.  I

13 know it's -- and I'm thinking more back to things I

14 heard Tuesday now but hospice company being sued by

15 the federal government.  No specifics.

16         MS. WOODKE:  Another question, you answered

17 that you had been investigated during the case with

18 Rast Construction.  Does that impact your views of

19 the department or the government?

20         PROSPECTIVE JUROR KELLY:  Honestly, I'm not

21 a big fan of how that was handled.  You know, I had

22 an FBI agent show up at my house one evening right at

23 the time that I should have been home, if I weren't

24 picking up the cat from the vet that evening, and

25 basically had my wife in tears with my new born son

1    in her arms, you know, trying to understand why the

2    FBI was here looking for her husband.

3         And they were pretty emphatic about meeting

4    with me that night, you know, waiting outside my

5    house and that sort of thing.

6         So, no, I was not a big fan of how the

7    government handled that situation.

8         MS. WOODKE:  This case is being brought by

9    the United States and the Department of Justice.  Do

10   you think that would impact your ability to be

11   impartial in the deliberation of this case?

12        PROSPECTIVE JUROR KELLY:  I would hope not.

13   But, you know, your frame of reference is your frame

14   of reference.  And you can't change what experiences

15   you've had.

16        MS. WOODKE:  Just to go back to your project

17   manager position, do you think that your absence from

18   the job would affect the time of completion of that

19   job or the quality of the project?

20        PROSPECTIVE JUROR KELLY:  I would hope not,

21   but I'm known as the detail guy and there's, you

22   know, I would hope that everybody would pick up all

23   the details and it wouldn't adversely affect

24   anything.  But I would have concerns that that would

25   not be the case, me being the only engineer on the

1    site.

2         MR. LEMBKE:  Mr. Kelly, I think, as Judge

3    Bowdre told you the other day, this trial is only

4    going to be conducted on Monday through Thursday and

5    every Friday the jury will have off.

6         Having Friday off, will that make you

7    available to provide the PE stamps that are needed on

8    the job?  Would that take care of that issue?

9         PROSPECTIVE JUROR KELLY:  I hasten to say it

10   would take care of that issue.  I have a hard time

11   getting my job tasks done in five to six days a week.

12   So to say that yes, I can handle everything on

13   Friday, there's no way I could possibly do what I've

14   been doing.

15        But as far as reviewing things and trying to

16   stamp things and do designs on Friday, I mean, it's

17   possible.  But it would certainly be a hardship.

18        MR. LEMBKE:  When do you anticipate Rast's

19   portion of the job being done?

20        PROSPECTIVE JUROR KELLY:  We have to be done

21   by October 1st.

22        MR. LEMBKE:  Are you ahead of schedule?

23        PROSPECTIVE JUROR KELLY:  We are on

24   schedule.

25        MR. LEMBKE:  The schedule of completion is

1   October 1st?

2           PROSPECTIVE JUROR KELLY:  It's October 1st

3   for us.

4           MR. LEMBKE:  You said a minute ago that

5   every juror brings his or her own life experiences to

6   the jury room.  But if you're selected as a juror and

7   at the end of the case the Judge tells you to decide

8   the case only on the basis of evidence presented in

9   court and the instructions on the law given by the

10  Judge, do you think you can follow that and render a

11  fair and impartial verdict?

12          PROSPECTIVE JUROR KELLY:  I do.

13          MR. LEMBKE:  I don't have anything further,

14  Your Honor.

15          THE COURT:  Anything else?

16          MS. TAPIE:  No, Your Honor.

17          THE COURT:  Thank you, Mr. Kelly.

18          PROSPECTIVE JUROR KELLY:  All right.  Thank

19  you.

20                  (Juror excused).

21          THE COURT:  That would be a tough one on the

22  job excuse.  And I don't think that what he said

23  rises to the level of challenge for cause because he

24  did say he could put that aside and be fair.

25          I don't know if you want him, but I think,

```
 1   you know --
 2          MS. WOODKE:  We would disagree about him
 3   being impartial and fair.  I think that the answer
 4   with the FBI showing up at his house would probably
 5   affect him.
 6          My concern about his hardship was that he's
 7   the only professional engineer on staff at Rast and
 8   they have to be done by October 3rd and they would
 9   have to outsource the professional engineering
10   position out.
11          THE COURT:  Yeah, but he did say he could
12   probably handle that part on Fridays.  So I'm
13   inclined to keep him at this point.
14          THE CLERK:  He stays?
15          THE COURT:  He stays.
16          THE CLERK:  Number sixteen, Mr. Gaffney.
17          THE COURT:  How are you doing, Mr. Gaffney?
18   We appreciate you coming in.
19          We had a few questions that we wanted to ask
20   you about some of your answers.  And I think these
21   come primarily from the attorneys, so which one of
22   you wants to start?
23          MS. TAPIE:  Thank you.  My name is Carolyn
24   Tapie and I'm an attorney with the Department of
25   Justice and I am bringing the case on behalf of the
```

 1   United States.

 2          I wanted to follow up on a couple of your

 3   responses in your questionnaire.

 4          You indicated that you did have some

 5   concerns about your ability to be fair and impartial

 6   during the trial because you're skeptical of federal

 7   prosecution.

 8          So that's the first part of your answer.  So

 9   I was hoping you could elaborate a little bit on

10   that.

11          PROSPECTIVE JUROR GAFFNEY:  Well, generally,

12   I've been in the banking business for thirty years.

13   I have been through just many, many roles of federal

14   regulators in thirty --

15          THE REPORTER:  Could you speak up a little?

16          THE COURT:  What were you saying?

17          PROSPECTIVE JUROR GAFFNEY:  I was saying I

18   was in the banking business for thirty years and I

19   had to deal with the OCC and federal regulators.  It

20   was a rather trying experience at many times because

21   of some of the circumstances.  And as a result,

22   perhaps I'm a little jaded and I cast a wide net for

23   those who have the federal hat.

24          MS. TAPIE:  And you did express concerns

25   about that impacting your ability to be unbiased or

1   impartial?

2           PROSPECTIVE JUROR GAFFNEY:  It could.

3           MS. TAPIE:  I also wanted to ask, in the

4   same answer you said, I know a little bit about the

5   defendant, I believe, we did some business with

6   Beverly.  Can you elaborate on that as well?

7           PROSPECTIVE JUROR GAFFNEY:  I was with

8   AmSouth Bank for thirty years, technically

9   twenty-nine, the last year was Regions was a combined

10  company.

11          One of the units I managed was a healthcare

12  banking group, and I think we might have done some

13  business with Beverly.  I'm not sure.  Just wanted to

14  be completely transparent on that.

15          MS. TAPIE:  What's your understanding of the

16  connection between Beverly and AseraCare?

17          PROSPECTIVE JUROR GAFFNEY:  Well, I don't

18  know.  I haven't researched it, obviously.  But I

19  think it's the parent -- it's the name of -- the

20  previous name of the parent company, I believe.

21          MS. TAPIE:  Also following up, this is in a

22  separate part of your questionnaire where you stated

23  that you have a very unfavorable opinion of the

24  federal government and a very unfavorable opinion of

25  Medicare and CMS.

1          Specifically, with regard to Medicare and

2   CMS, your comment that it's politically motivated and

3   uncontrolled.

4          I mean, this is a case, and I think the

5   Judge has told you, it's about Medicare, it's about

6   the United States bringing a case related to the

7   Medicare program.

8          Do you think it could be difficult for you

9   to find in favor of the United States based on your

10   views, your unfavorable views about the federal

11   government and the Medicare program?

12          PROSPECTIVE JUROR GAFFNEY:  It could.

13          MS. TAPIE:  And you think that it could

14   hinder your ability to be impartial if you were

15   selected as a juror in this case?

16          PROSPECTIVE JUROR GAFFNEY:  It could.

17          MS. TAPIE:  Would it be difficult for you to

18   follow the Judge's instructions, if the Judge were to

19   instruct you to only consider the evidence presented?

20   Would that be difficult for you based on your strong

21   feelings?

22          PROSPECTIVE JUROR GAFFNEY:  No.  I followed

23   the rules for thirty years as a banker.  I can follow

24   rules.

25          MS. TAPIE:  Do you have an opinion of

1  Beverly or AseraCare based on your prior dealing with

2  them?

3       PROSPECTIVE JUROR GAFFNEY:  No.

4       MS. TAPIE:  And you stated that you could

5  follow the rules.  Do you think that at the outset

6  you're starting out a little bit behind or a little

7  bit biased against the United States?

8       PROSPECTIVE JUROR GAFFNEY:  Skeptical would

9  be a better word.

10       MS. TAPIE:  I don't think I have anything

11  further.

12       MR. LEMBKE:  Mr. Gaffney, I'm Matt Lembke

13  and I'm one of the lawyers for the defendant.

14       This is a case where the United States is

15  claiming that my client, which provides hospice

16  services, AseraCare submitted claims for people that

17  were ineligible.

18       So the question that the jury has got to

19  decide is whether false claims were submitted.

20       If you're selected as a juror, at the end of

21  the case, if the Judge says, you know, everyone has

22  life experiences, but to decide this case, you must

23  limit it to the evidence presented in court and the

24  instructions on the law given by the judge, do you

25  think you could render a fair and impartial verdict

1  following those instructions?

2          PROSPECTIVE JUROR GAFFNEY:  Yes.

3          THE COURT:  Anything further?

4          MS. TAPIE:  Just one more, Your Honor.

5  Given your skepticism, would you say that at this

6  point both sides are on a level playing field, if you

7  were to start as a juror today?

8          PROSPECTIVE JUROR GAFFNEY:  Yes.

9          THE COURT:  Anything else?

10         MR. LEMBKE:  Nothing else, Your Honor.

11         THE COURT:  Thank you, Mr. Gaffney.  I

12 appreciate you coming in.

13                 (Juror excused).

14         MS. TAPIE:  That was a long pause.

15         THE COURT:  And for the record, she was

16 referring to between her question and Mr. Gaffney's

17 answer.

18         MS. TAPIE:  Yes.  Your Honor, we have some

19 concerns about that juror.  We think that he's

20 expressed enough or at least complied bias even if

21 he's not willing to ultimately express it, yes, I

22 will follow the Court's rules.

23         THE COURT:  Well, he answered the questions

24 correctly that are determinative of whether I should

25 strike him for cause.  He did say that he would

1  follow the rules and he had followed the rules for

2  thirty years, and he did say that he could be fair,

3  and that there's a level playing field.

4        So, in terms of those answers, I don't think

5  he qualifies to be struck for cause.  But I certainly

6  can understand the government's concerns.

7        Our next one.

8        THE CLERK:  Number nineteen, Mr. Mason.

9        THE COURT:  Good morning, Mr. Mason.

10       PROSPECTIVE JUROR MASON:  How are you doing?

11       THE COURT:  I'm doing well.  And you?

12       PROSPECTIVE JUROR MASON:  I'm just glad to

13 be here.

14       THE COURT:  Good.  We wanted to ask you a

15 little bit more about your work and your job with

16 Cadence.  And I was a little confused whether you are

17 a separate software developer and you have a contract

18 with Cadence or whether you're working with Cadence.

19 Explain it to me.

20       PROSPECTIVE JUROR MASON:  I have been the

21 owner of Shelby Systems for the last thirty years.  I

22 do -- my niche has become mortgage banking software.

23       Cadence hired me full time last year to help

24 them install this new origination system which is

25 necessary for Dodd-Frank which was due this month.

1    They have now pushed the date to October the 3rd.  So

2    in sixty days, we've got to have that up and online.

3    And I'm one of four doing that.

4            And if I'm here ninety days, when it's over

5    -- I know what you said about not being able to fire

6    people because it's a federal offense, but there will

7    be no job for me.

8            THE COURT:  Okay.  Because the work will be

9    completed?

10           PROSPECTIVE JUROR MASON:  Presumably it will

11   be completed.  They will have to hire somebody else

12   and get somebody else.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR MASON:  Maybe y'all will

15   hire me.

16           THE COURT:  Would being off on Fridays help?

17           PROSPECTIVE JUROR MASON:  Well, we are

18   constantly having conference calls with the vendor,

19   the main vendor, which is the conference call to

20   central mortgage Cadence which is in Colorado.  We're

21   constantly on conference with them.  There's another

22   employee training meeting that we go to probably two

23   times a week.  We don't go, obviously, it's online.

24           Plus, we're configuring the software we

25   already have and trying to blend it to the system.  I

1   have written most of their recording systems for the

2   old database and I have the new database and I have

3   got to connect the two of those, the two separate

4   systems together to generate the recording.  We're in

5   the throes of that.

6           In fact, Cadence had a duck when they found

7   out I wasn't going to be here on the first day of the

8   month.

9           THE COURT:  Any questions?

10          MR. LEMBKE:  I have a question.  Mr. Mason,

11  I'm Matt Lembke and I'm one of the lawyers for

12  AseraCare who is the defendant in the case.  And we

13  appreciate you being here and appreciate your candid

14  answers to the questionnaire.

15          You mentioned a minute ago you have three

16  other professionals working with you.  Who are they

17  and what are their backgrounds?

18          PROSPECTIVE JUROR MASON:  One of them is the

19  senior vice-president who is kind of overseeing the

20  whole project.

21          Another one is also a senior vice-president

22  who is doing -- who has been a sales manager, but he

23  knows more about the mortgage business in Alabama

24  probably than anybody.  He teaches the MBA courses.

25  He trains all the people.  He's looking at the

1  interface.  You may or may not know, but it's

2  completely different.  They change from the till and

3  the UFA estimate to use the consumer -- combine the

4  forms into one and he knows his stuff.  I mean, I'm

5  just a software guy.

6       And the third guy is a younger guy who's

7  very smart, probably the smartest guy there, and

8  knows all the regulations and stuff.

9       MR. LEMBKE:  Is there a software guy in

10  addition to you?

11       PROSPECTIVE JUROR MASON:  Not specifically.

12  He's more of an interface guy.

13       THE COURT:  So you're the only software

14  developer?

15       PROSPECTIVE JUROR MASON:  I'm the only

16  software developer that's connecting the old data and

17  the new data into -- the legacy data to the new data

18  and we've got -- this new data probably has six

19  thousand fields that we're trying to translate into a

20  field, process the dates and all.

21       Plus, what we don't understand now is how

22  much know-before-you-owe is going to change all that.

23       THE COURT:  How much what?

24       PROSPECTIVE JUROR MASON:  The know before

25  you owe concept.  That's the word they are using.

1    And it's due to the Dodd-Frank bill, and it's for the

2    consumers, to protect the consumers.  Now, the bank

3    has to do all the work to protect the consumers.

4              THE COURT:  Any questions?

5              MS. TAPIE:  You mentioned that you think

6    that you will lose this job or you won't be --

7              PROSPECTIVE JUROR MASON:  If I'm not there

8    to implement it, to help implement it, they will get

9    somebody else.  But we're already -- I mean, we're

10   short staffed.  Compass has two hundred people doing

11   this job.

12             MS. TAPIE:  Mr. Mason, I wanted to ask you,

13   actually, about a separate part of your questionnaire

14   related to your answer where you said you had

15   concerns about your ability to be fair and impartial

16   if you served as a juror.

17             Actually, I'm Carolyn Tapie.  I'm with the

18   Department of Justice and I am representing the

19   United States in this case.

20             And you said but the federal government has

21   shut down two of --

22             PROSPECTIVE JUROR MASON:  Yes, ma'am, they

23   have.  In 2009, the FDIC shut down three banks.  One

24   of them was New South Bank and that was the one I was

25   working for in a similar capacity, development

1  software.  And they shut it down, five hundred people

2  out of jobs.  And the group of people that I was

3  working with of about thirty, the mortgage part of

4  that was actually making a profit.  And the federal

5  government would not let them -- that group as a

6  whole set up another business or go to another bank.

7          And we're just -- it took me a year and a

8  half to get back where I could exist.

9          And then, and then, I go to work at Superior

10  Bank and they do the same thing.

11          And what's fascinating to me about the whole

12  thing is there was never -- it seemed so arbitrary to

13  me, because by the end of 2009, there was no more

14  money to shut banks down, so they just quit.

15          So where is the justice, if you will, in

16  that?

17          MS. TAPIE:  So given those strong feelings

18  that -- and we appreciate your honesty in expressing

19  them.

20          Do you have concerns about being impartial

21  in this trial and the federal government as --

22          PROSPECTIVE JUROR MASON:  Yes.  When I was

23  with the Air Force, the government was my best

24  friend.  But they've been trying to put me out of

25  business for the last thirty years, at least that's

1    the way it looks like to me.

2         How else can I look at it?  They've not been

3    supportive.  They've never helped us.  They're always

4    -- excuse me.  I won't say something.  I was angry

5    when I left after filling out the form.

6         MS. TAPIE:  So you think that's likely to

7    happen if you're selected as a juror knowing that

8    it's government attorneys, Department of Justice

9    attorneys representing the United States, do you

10   think it would be even possible for you to put aside

11   your feelings about the federal government?

12        PROSPECTIVE JUROR MASON:  Those are my

13   personal experiences with it.  When I consider just

14   some recent fast and furious deal the justice

15   department put together and the guns got out and

16   killed a federal officer and now, they've traced the

17   gun to the woman killed by the immigrant in San

18   Francisco.

19        I mean, I'm just a small guy.  I was in the

20   government in the Air Force for four years.  But now

21   it looks like -- I can't see that -- I would be

22   fired, if I put -- if I worked like that, I would be

23   fired.

24        MS. TAPIE:  Do you think that it would be

25   difficult for you to render judgment in favor of the

1    government?

2           PROSPECTIVE JUROR MASON:  Yes, ma'am, I do.

3           MR. LEMBKE:  Your Honor, may I ask a follow

4    up?

5           THE COURT:  You sure may.

6           MR. LEMBKE:  Mr. Mason, this case, my

7    client, AseraCare, is a hospice company.  And they

8    have a number of patients that they provide services

9    to that are on Medicare.  And the allegation made by

10   the government in the case is that AseraCare

11   submitted claims for payment for people who weren't

12   eligible.  So one of the questions to be decided in

13   the case, were there false claims submitted.

14          If you're selected as a juror and the Court

15   instructs you that your decision in this case has to

16   be based only on the evidence that's presented in

17   court and the instructions on the law that the Judge

18   gives, do you think you could follow that and render

19   a fair and impartial verdict based just on that in

20   this case?

21          PROSPECTIVE JUROR MASON:  That's a tough

22   question.  I'm bringing a lot of baggage to this

23   whole discussion.  And I'm not sure I could, frankly.

24   I would -- as a small business -- how big is your

25   business?  How big is AseraCare?

1          MR. LEMBKE:  Well, I'm not allowed to answer
2    that question.
3          PROSPECTIVE JUROR MASON:  I couldn't answer
4    that question without knowing more about it.
5          THE COURT:  All right.  Anything else?
6          MS. TAPIE:  No, Your Honor.
7          THE COURT:  All right.  Thank you very much,
8    Mr. Mason.
9          PROSPECTIVE JUROR MASON:  Thank you.
10                   (Juror excused.)
11          THE COURT:  Is there a motion?
12          MS. TAPIE:  I would like to ask that he be
13   excused for cause, Your Honor.
14          THE COURT:  I think you lost that one.
15          MR. LEMBKE:  Your Honor, I don't think I'm
16   going to put up a fight on that one.
17          THE COURT:  All right.  He's excused for
18   cause.
19          THE CLERK:  Before I call the next one,
20   Judge --
21          THE COURT:  He's excused for cause.
22          THE CLERK:  Yes, ma'am.  Before I call the
23   next one, number thirty-two neglected to tell us that
24   they have a vacation set for August and September to
25   Minnesota and some other places and Cindy has sent

1    him up, if you want to talk to him.

2            THE COURT:  That's Mr. Self.

3            THE CLERK:  Yes, ma'am.

4            THE COURT:  He did mention that he had

5    travel plans for work, but did not say anything --

6            THE CLERK:  Let me look again.

7            THE COURT:  He didn't say anything about

8    vacation.

9            THE CLERK:  Prepaid travel to Canada,

10   Minnesota and Connecticut in August and September is

11   what he said.

12           THE COURT:  Okay.

13           MS. WOODKE:  He said travel, but we didn't

14   know what it was for.

15           MR. LEMBKE:  For at least some of it, he

16   said he had some travel for work, but it wasn't

17   entirely clear --

18           MS. WOODKE:  If that's just to Canada or if

19   that's the other.

20           THE COURT:  Have her send him up and we will

21   take him after we finish --

22           THE CLERK:  I asked her to send him up

23   because I wanted you to know you had an extra one.

24           THE COURT:  Number twenty-six has the

25   migraine issues.

1          THE CLERK:  Number twenty-six, Ms. Kolar.

2          THE COURT:  Good morning, Ms. Kolar, how are

3    you doing?

4          PROSPECTIVE JUROR KOLAR:  Fine.

5          THE COURT:  We wanted to ask you about your

6    migraines and how frequent they are.

7          As a migraine sufferer myself, I know that

8    they can be a real problem.  So I want to know more,

9    if you don't mind, about yours and how frequent they

10   may be.

11         PROSPECTIVE JUROR KOLAR:  I used to have,

12   you know, real migraines quite often.  These are

13   occular, or something like that, migraines.  And very

14   bright lights take up the whole vision field along

15   with floaters and the headache, that's happened twice

16   this summer.

17         And when the vision field is taken up with

18   the bright lights and stuff, you can't see anything.

19         And the last time I was at the computer and

20   I sat there for like half an hour and it wouldn't go

21   away.  And eventually --

22         THE COURT:  That was half an hour when you

23   couldn't see?

24         PROSPECTIVE JUROR KOLAR:  Yeah.  I mean,

25   first it was one eye, then it was both eyes and I

1   really couldn't do anything, because it was just the

2   whole vision field was taken up.  And you just feel

3   so lousy that you want to lay down to get over it.

4           THE COURT:  You said that you've had them

5   twice this summer?

6           PROSPECTIVE JUROR KOLAR:  Uh-huh.

7           THE COURT:  Can you tell me within how many

8   months?  I guess I'm struggling with what the

9   definition of summer is anymore.  Are we talking

10  about --

11          PROSPECTIVE JUROR KOLAR:  Since June.

12          THE COURT:  Twice since June.

13          PROSPECTIVE JUROR KOLAR:  Uh-huh.

14          THE COURT:  Any other questions?

15          MR. LEMBKE:  Ms. Kolar, I'm Matt Lembke, and

16  I'm one of the lawyers for AseraCare which is the

17  defendant in this case.  And we appreciate you being

18  here and we appreciate you bringing these issues up

19  so we can talk about them.

20          You also mentioned you had some

21  gastrointestinal issues.  Are they connected with the

22  migraines or are they something else?

23          PROSPECTIVE JUROR KOLAR:  I don't know what

24  causes them.  Already this morning, I've been to the

25  bathroom three times, you know, I'm getting old.

1          MR. LEMBKE:  I understand.  Is this

2   something that could make it difficult over the

3   course of the ninety-day trial for you to sit there

4   without a break for an hour and a half or two hours

5   at a time?

6          PROSPECTIVE JUROR KOLAR:  It's hard to say

7   because the diarrhea, you know.

8          MR. LEMBKE:  Yes, ma'am, yes, ma'am.  How

9   frequently does this occur?

10          PROSPECTIVE JUROR KOLAR:  Probably about

11   once every week and a half or so.

12          THE COURT:  Ms. Kolar, it seems to me like

13   we probably need to excuse you and let you take care

14   of those health issues.  We would love to have you

15   with us, otherwise, but we want you to be

16   comfortable.  So you may be excused.

17          PROSPECTIVE JUROR KOLAR:  Thank you.

18                    (Juror excused).

19          THE COURT:  Mr. Mahaffey, he's the

20   stutterer.

21          Good morning, Mr. Mahaffey, how are you?

22          PROSPECTIVE JUROR MAHAFFEY:  All right.

23          THE COURT:  We had a couple of things that

24   we wanted to ask you about and noted that you had

25   mentioned your stutter.

95

1              PROSPECTIVE JUROR MAHAFFEY:  Yeah.

2              THE COURT:  So we really thought it would be

3    better to talk to you here where you're up close and

4    personal with all these lawyers, but not with all the

5    other jurors present as well.

6              And one question I had, Mr. Mahaffey, is

7    whether your stutter would prevent you from really

8    participating in jury deliberations.

9              PROSPECTIVE JUROR MAHAFFEY:  Almost

10   definitely.

11             THE COURT:  Do you feel uncomfortable

12   expressing your opinion in front of eleven other

13   people?

14             PROSPECTIVE JUROR MAHAFFEY:  Yes, ma'am.

15             THE COURT:  Would that affect, do you think,

16   your ability to reach a fair verdict if you don't

17   express to the other members of the panel your view?

18             PROSPECTIVE JUROR MAHAFFEY:  No.

19             THE COURT:  All right.  You also mentioned

20   that you had a close family friend who has worked for

21   hospice.

22             PROSPECTIVE JUROR MAHAFFEY:  Yes.

23             THE COURT:  Do you know which hospice

24   company that friend worked for?

25             PROSPECTIVE JUROR MAHAFFEY:  No, ma'am.

1          THE COURT:  Where was it city-wise?

2          PROSPECTIVE JUROR MAHAFFEY:  It was here in

3   Birmingham.

4          THE COURT:  Any other questions for

5   Mr. Mahaffey while he is in here with us?

6          MR. LEMBKE:  Yes, Your Honor.  Mr. Mahaffey,

7   I'm Matt Lembke and I am one of the lawyers for the

8   defendant in the case, which is AseraCare, the

9   hospice company.

10         I see you work at the Vestridge Animal

11   Clinic.  Is that the one behind Dollar General or the

12   dollar store on 31 or where is that?

13         PROSPECTIVE JUROR MAHAFFEY:  The -- the--

14   the Milo's, right there near that.

15         THE COURT:  Everybody knows where Milo's is.

16         MR. LEMBKE:  Exactly.  I know exactly where

17   you're talking about.

18         Mr. Mahaffey, you said in response to your

19   written questionnaire when you were asked how

20   difficult is it for a doctor to determine how long

21   someone with a terminal illness would live and you

22   said easy.

23         And then when asked to explain, you said

24   years of experience.

25         PROSPECTIVE JUROR MAHAFFEY:  Yes.

1          MR. LEMBKE:  Can you tell me more what you

2     mean by that?

3          PROSPECTIVE JUROR MAHAFFEY:  Years of

4     experience, like having seen it a lot and that's just

5     what they do, I suppose.  I think that's all I got.

6          MR. LEMBKE:  Okay.

7          THE COURT:  So were you referring to the

8     doctor's years of experience that would make it easy?

9          PROSPECTIVE JUROR MAHAFFEY:  Yes.

10          THE COURT:  That would make it easy for the

11     doctor to determine how long somebody would live

12     people?

13          PROSPECTIVE JUROR MAHAFFEY:  Yes, ma'am.

14          MR. LEMBKE:  In response to another question

15     about what is your opinion of companies that provide

16     hospice or palliative care, you said mostly neutral.

17          And then you said, I've heard a lot of bad

18     stories about it but it does some good.

19          Can you tell me about the bad stories you've

20     heard?

21          PROSPECTIVE JUROR MAHAFFEY:  Yeah.  Like

22     abuse and like with -- like, you know, all that kind

23     of stuff.  That's pretty much it.

24          MR. LEMBKE:  Is that focused on nursing

25     homes in general or hospice in particular?

1    PROSPECTIVE JUROR MAHAFFEY:  No, nursing

2  homes, I guess, yeah.

3    MR. LEMBKE:  Okay.  And we really do

4  appreciate your candor in answering the questions and

5  allowing us to follow up, Mr. Mahaffey.

6    And I want to ask you with regard to, you

7  said that you may not participate as much in

8  deliberations as a result of your stutter.

9    Do you think if you had something you

10  thought needed to be said in the deliberations, would

11  you be reluctant to say it because of your stutter?

12    PROSPECTIVE JUROR MAHAFFEY:  Probably.

13    MR. LEMBKE:  I don't have any further

14  questions, Your Honor.

15    MS. TAPIE:  Just a follow up.  Mr. Mahaffey,

16  I'm Carolyn Tapie and I'm with the Department of

17  Justice.

18    And I wanted to ask if you thought that your

19  stutter that you told us about would in any way

20  impact your ability to understand the evidence, to be

21  fair and impartial and to render a just verdict in

22  this case.

23    PROSPECTIVE JUROR MAHAFFEY:  It wouldn't,

24  you know, it's just the, like, the anxiety of it all

25  is, like, I would, you know, this whole thing.  But

1   inward is fine, you know, I could sit and make my own

2   opinions and stuff like that.

3           MS. TAPIE:  Would you be able to write down,

4   if you found yourself in a position where it was

5   difficult to speak, would you be able to write down a

6   note to another juror to make your opinions known?

7           PROSPECTIVE JUROR MAHAFFEY:  Sure.

8           MS. TAPIE:  No further questions.

9           THE COURT:  Anything else?

10          MR. LEMBKE:  I don't think so, Your Honor.

11          THE COURT:  Okay.  Thank you so much,

12  Mr. Mahaffey.  And I tell you what, one of the first

13  things that we're going to ask the jurors to do is

14  stand up and tell us some things about each

15  individual.  Why don't we do that now with

16  Mr. Mahaffey so he won't have to do it with the

17  others.  Do you have --

18          MR. LEMBKE:  I have the list, Your Honor.

19          THE COURT:  Okay.  Wonderful.  If you would

20  pass that to Mr. Mahaffey.  Thank you.  Would you

21  mind telling us that information?

22          PROSPECTIVE JUROR MAHAFFEY:  Sure.  I'm

23  Chase Mahaffey.  I don't have a spouse.  I don't have

24  any law experience.

25          THE COURT:  Okay.

1      PROSPECTIVE JUROR MAHAFFEY:  I like animals

2  and computers.

3      THE COURT:  What's your favorite animal?

4      PROSPECTIVE JUROR MAHAFFEY:  Probably a dog,

5  you know.  Bumper sticker, I don't have any on my

6  car.  I have a Facebook and a Twitter and an

7  Instagram account.

8      I don't read any blogs.  My source of news

9  is probably Reuters, which is like online.

10      And the last book I read was maybe -- it's

11  been a while since I've read a book, to be honest.

12      Magazine, I like People sometimes, but not a

13  lot.  That's it, I guess.

14      THE COURT:  Any other questions?  I think

15  the only other major questions we're going to be

16  asking out there will be whether you know any of the

17  attorneys.  These are not all of them.  We have even

18  more.  And also we will be giving you a list of

19  potential witnesses, and if you know any of those, if

20  you would let Ms. Calahan know after you look over

21  that list and you can just tell her and we can do it

22  that way because we don't want to put you in a

23  difficult and embarrassing situation.

24      PROSPECTIVE JUROR MAHAFFEY:  Yeah, I

25  understand.

1          THE COURT:  So I appreciate you coming here

2     for this.

3                    (Juror excused).

4          MR. LEMBKE:  Your Honor, he's obviously a

5     very likable guy, but he says he would be reluctant

6     to express his views.  And it seems like a critical

7     part of deliberations is the need to express your

8     views.  And the fact that we're concerned he would be

9     embarrassed saying in front of the jury the list of

10    questions, and he said, I think would it impact his

11    ability to participate, almost definitely or whatever

12    he said.

13         I just think he needs to be excused based on

14    that.

15         THE COURT:  He did express a lot of anxiety.

16    Even though he said that he could write something

17    down for someone to read, I feel concerned for him.

18         MS. TAPIE:  Your Honor, this is possibly a

19    three month trial, I think this position right here

20    might be the most stressful with all the attorneys

21    bearing down on him, but he's going to be with these

22    jurors, he's going to get more comfortable with them

23    and more comfortable writing notes.  And I think it

24    would be tough to say you can't come because

25    occasionally you have trouble speaking when he's able

1    to write and he said it would not hinder his ability

2    to consider the evidence and render a fair verdict

3    and also make his opinions known.

4          So it seems to me he's still participating

5    in the discussions if he's able to write notes.

6          In any event, I think, getting more

7    comfortable with his fellow jurors, rather than all

8    of us, more intimidating lawyers in a room with him.

9          MR. LEMBKE:  Your Honor, I think it wasn't a

10   mild thing.  We all saw that.

11         And I think the concept of deliberation is

12   to discuss and exchanges views, not write down a

13   thought on a piece of paper.  And I think it's going

14   to be very difficult to engage in a robust

15   deliberation if you are impeded in your ability to

16   speak.

17         MS. TAPIE:  That seems to be a mild

18   disability that he has.  And I just think it's

19   difficult for us to say you can't serve as a juror

20   because you're not able to speak as quickly as other

21   people.

22         MR. LEMBKE:  Your Honor, he's the one who

23   said it would affect his ability to deliberate.

24         THE COURT:  To participate.

25         MR. LEMBKE:  To participate in the

```
 1   deliberations.
 2          THE COURT:  Yeah.  This one is extremely
 3   close, but I'm going to go with my gut and excuse him
 4   because I really think it could be a very stressful
 5   experience for him and increase the anxiety that he
 6   expressed feeling about the whole process.
 7          MS. TAPIE:  And just to be clear, are you
 8   excusing him based on his hardship?  It's not based
 9   on cause?
10          THE COURT:  Yes, yes.
11                      (Brief pause)
12          THE COURT:  The next is Mr. Peete.
13          MR. LEMBKE:  This is the ER, the hospice
14   person.
15          THE COURT:  Good morning, Mr. Peete.  How
16   are you?
17          PROSPECTIVE JUROR PEETE:  I'm fine.  How are
18   you?
19          THE COURT:  All right.  We appreciate you
20   coming in this morning.
21          I think we have some questions we want to
22   ask you about some of your answers.  And I want to
23   first express appreciation to you for filling out
24   those answers or answering the questions honestly and
25   candidly.  So I think Mr. Lembke has some questions.
```

1          MR. LEMBKE:  Good morning, Mr. Peete.  I'm

2    Matt Lembke and I'm one of the lawyers for AseraCare

3    which is the defendant and a hospice company in this

4    case.  And I do have a couple of questions.  And we

5    do appreciate your answering them candidly.  As I'm

6    sure the Judge said at the beginning before you ever

7    filled it out, there are no right answers.

8          And one of the reasons we ask these kinds of

9    questions is to find out if, based on experiences

10   you've had in your life, this case might cut a little

11   too close to home for you.

12         I noticed in answering the question, what is

13   your opinion of companies that provide hospice or

14   palliative care.  You answered mostly negative.

15         PROSPECTIVE JUROR PEETE:  Yes.

16         MR. LEMBKE:  You said, my father was taken

17   to ER after in hospice.  Hospice tried to transport

18   him home with hours to live.

19         We're a hospice company.  So in light of

20   that experience, do you think this case, which is

21   about a hospice company being accused of submitting

22   claims for ineligible people, do you think this one

23   hits a little too close to home for you?

24         PROSPECTIVE JUROR PEETE:  I think personally

25   it does.  I would like to think I could be objective.

1  But I think in the back of my mind it would probably

2  cloud my judgment.

3         MR. LEMBKE:  Thank you.

4         MS. TAPIE:  Just a follow up, Mr. Peete.

5  I'm Carolyn Tapie and I'm one of the attorneys with

6  the Department of Justice.

7         Was the negative experience that you had

8  with hospice with AseraCare?

9         PROSPECTIVE JUROR PEETE:  No, it was not

10  with AseraCare.

11         THE COURT:  Which company was it with?

12         PROSPECTIVE JUROR PEETE:  I believe it was a

13  group with Alacare.  But it was not AseraCare that I

14  know of.

15         MS. TAPIE:  If the judge instructed you that

16  you are only to base your decision on the evidence

17  that's presented at trial, do you think that you

18  would be able to put aside the bad experience you had

19  with that separate hospice and decide this case based

20  only on the evidence that's presented at trial?

21         PROSPECTIVE JUROR PEETE:  I would like to

22  think I could, but again, it would -- I would

23  certainly try.

24         MS. TAPIE:  Do you think you could be fair

25  and impartial, if instructed by the Court to only

1  consider the evidence that's presented relating to

2  AseraCare hospice, do you think you could put out of

3  your mind the prior experience?

4          PROSPECTIVE JUROR PEETE:  Yes, ma'am.

5          THE COURT:  Let me also tell you this,

6  Mr. Peete.  This case is not about the quality of

7  care that patients receive, but is focused on whether

8  the company presented claims for Medicare payment for

9  patients who were not eligible for hospice care.

10         So would that distinction between quality of

11  care and eligibility for care help you in being

12  impartial and fair?

13         PROSPECTIVE JUROR PEETE:  I think it would.

14  But I also think dealing with Medicare or Medicaid,

15  whatever the case may be, having worked for Baptist

16  Health in the past and seeing how the rules change, I

17  don't know that I would be -- I would attempt to be

18  fair and honest.

19         THE COURT:  Explain to me that statement

20  about having worked with Baptist --

21         PROSPECTIVE JUROR PEETE:  I worked with

22  Baptist Health for years.  Every year the rules

23  changed, sometimes midyear, sometimes leading to

24  drastic staff cuts, sometimes leading to expansion.

25  They seem to be quite capricious sometimes as to what

1  changed.

2         Sometimes it would even be which billing

3  unit you were assigned to bill to as opposed to a

4  group in South Carolina, a group in Washington, DC,

5  as to what the standards were for what was allowed to

6  be billed.

7         THE COURT:  All right.  So that would kind

8  of cut against the government in this case?

9         PROSPECTIVE JUROR PEETE:  Yes.

10        THE COURT:  And your other comment would

11 kind of cut against AseraCare.  Do you think they

12 would balance each other out so that you could

13 evaluate the evidence as it's presented and be fair

14 to both sides?

15        PROSPECTIVE JUROR PEETE:  Yes, ma'am.

16        MR. LEMBKE:  Mr. Peete, would you say you're

17 still affected by the situation your father had with

18 hospice?

19        PROSPECTIVE JUROR PEETE:  It's been many

20 years.  It's been several years ago now.  My mother

21 has kind of come to terms with it.  So, of course,

22 the rest of the name has kind of let it go at that

23 point.

24        MR. LEMBKE:  You've indicated that you think

25 you could put it aside.  Can you assure us that that

1    experience wouldn't get in the way of your rendering

2    a fair and impartial verdict in this case?

3            PROSPECTIVE JUROR PEETE:  No, sir.  I would

4    do my best, but I cannot assure you.  It's the death

5    of a role model and my father.

6            MR. LEMBKE:  Thank you.

7            THE COURT:  Anything further?  Thank you,

8    Mr. Peete.

9                    (Juror excused.)

10           MR. LEMBKE:  Your Honor, we would move to

11   strike him for cause.

12           THE COURT:  Why don't these people be

13   consistent in what they say.

14           MS. WOODKE:  I'm not so entirely clear that

15   he's different from Mr. Kelly in the fact that

16   although Mr. Kelly said in the end after saying four

17   times he couldn't be impartial and then he said he

18   thought he could.  I'm not sure he's any different

19   than Mr. Kelly in this situation of animosity towards

20   one side or the other.

21           MR. LEMBKE:  I think he is different in that

22   he was hesitant every time he was asked and he said

23   he would try to put it out of his mind, but now we

24   find out that it's his role model and at the end of

25   the day he says he can't assure us that he can put it

1    aside and that, we think, requires him to be struck

2    for cause.

3         THE COURT:  He did say he could be fair to

4    both sides in this case and has issues really with

5    both the government and hospice.  So I am not going

6    to strike him for cause.

7         MR. WERTKIN:  Before we go on to the next

8    juror, can I say one thing?  We're talking about this

9    is not a quality of care case and we're not coming in

10   and this is not an elder abuse case or something like

11   that.

12        So, to the extent that AseraCare was

13   providing only palliative care to folks who would

14   normally be there for curative care, there are

15   quality issues that come through.  And I just want to

16   make Your Honor aware of that.

17        THE COURT:  Are you joining in the defense

18   motion to exclude this guy for cause?

19        MR. WERTKIN:  No.  I was saying when you

20   were saying this is not a quality of care case, I

21   wanted to make sure it was being clear that -- it's

22   not, you know, there are cases that we call elder

23   abuse cases and that's one thing and that's not what

24   this is.  But there are quality of care issues that

25   run through this case.  And I just wanted to make

1   Your Honor aware of that.  It's not related to this

2   juror necessarily.

3           MR. LEMBKE:  If they're now going to say

4   it's about the quality of care in some way, I think

5   it does implicate that juror.

6           THE COURT:  I think it implicates the way we

7   have been preparing this case for trial.  I mean,

8   that's the first time I've heard anything about any

9   implications of quality of care in this case.

10          MS. WOODKE:  I don't think it's quality of

11  care, I think it's quality of life.  Quality of care,

12  yes, but in the sense that people that were placed on

13  hospice did not receive medications that they would

14  have otherwise if they were not on hospice.

15          MR. WERTKIN:  That's right.

16          MS. WOODKE:  Not an abusive situation, not

17  that they have bed sores, not that type of situation.

18          MR. WERTKIN:  And quality of care -- there's

19  really nothing wrong with Your Honor's introduction

20  of the case, but I just wanted to make clear because

21  I think it's important, like you said, that everybody

22  understands that in order to elect hospice you have

23  to elect to give up curative care.

24          THE COURT:  Right.

25          MR. WERTKIN:  So that means that you're not

1   getting curative care anymore.  So to the extent you

2   have someone who has elected to give up curative

3   care, that implicates that choice and implicates the

4   care that they get.

5          So it's not -- quality of care cases are one

6   thing, but when you make that choice to give up

7   curative care, that affects the care you get.

8          I just wanted there to be no confusion that

9   those issues will come up, the fact that these

10  patients had elected to give up curative care where

11  curative care could have been appropriate.

12         THE COURT:  But if they make that choice,

13  isn't it their choice?  I don't see how that comes

14  into quality of care issues.

15         MR. LEMBKE:  As I understand what

16  Mr. Wertkin is now saying, which isn't in the

17  complaint and isn't in the pretrial order, as I

18  understand those two documents, that what they want

19  to do is argue to the jury that because these people

20  were put on hospice, they were deprived of curative

21  care that might have saved or prolonged their life,

22  which is a pretty significant argument to make.

23         And as to this juror, given that this juror

24  said he apparently blames hospice for his father's

25  death, that kind of argument directly implicates

1  that.

2          MS. WOODKE:  I don't think that's what he

3  said.

4          MR. WERTKIN:  I think it would be helpful to

5  separate, if there's an issue with the juror about

6  whether he could be fair and impartial, which I think

7  has been ruled on, but with regard to what we intend

8  to argue to the jury, yes, the fact is that patients

9  gave up curative care.  That's a fact.  And the fact

10  is that that means that they could have been given up

11  curative care that could have cured them.  That's a

12  fact of the case.

13          It's in -- that's just a basic fact of the

14  case.  So you're right to that extent, yes.

15          MR. LEMBKE:  But then are you going to

16  argue, beyond that, it harmed them.  It sounds like

17  that's what you're suggesting is you're not just

18  going to say they chose palliative care which means

19  no more curative.  You're then going to argue that

20  somehow these people were harmed by not receiving

21  curative care if they were ineligible; is that what

22  you're saying?

23          MR. WERTKIN:  No.  It's a fact that they

24  gave up curative care.  And it's a fact that -- in

25  fact, I will say that there were patients that were

1    treatable.  Those are two facts.

2            So I just wanted to raise that as an issue,

3    because I was just concerned about how we were

4    framing this case for prospective jurors.

5            THE COURT:  Are you planning on arguing that

6    because a patient made a choice to give up any

7    curative care that they might have been able to have

8    that there was a false claim?

9            MS. TAPIE:  No, Your Honor.  We're not.  And

10   that's -- I think that's where the disconnect is.

11   That is certainly not the basis of our case.

12           But Dr. Liao that reviewed the entire

13   patient files, he's going to describe what he saw in

14   those files.  And if he has an opinion that the

15   patient was treatable and did not receive treatment

16   that they would have received had they not elected

17   hospice, if it's clear in the files, he would testify

18   to that.  But you're right, that's not a question

19   that the jury will be asked to consider regarding

20   whether the patients were appropriate for hospice and

21   had a terminal prognosis.

22           THE COURT:  Are you planning on arguing to

23   the jury that because those patients gave up curative

24   care that might have been available to them that the

25   jury should punish AseraCare?

1      MR. WERTKIN:  No, no.

2      THE COURT:  Okay.  All right.

3      MR. LEMBKE:  They're just going to poison

4   the well and make the argument to the jury that

5   people were put on hospice apparently and had

6   treatable illnesses and they weren't provided

7   treatment because of this.

8      I mean, this is where it's going, even

9   though they say that's really not relevant to the

10  question of whether the patient was eligible or not,

11  they want to argue something that is not relevant,

12  that is inflammatory and has never been pleaded.

13     THE COURT:  Well, we will take that issue up

14  later.  Let's move on.

15     MR. LEMBKE:  In response to Ms. Tapie's

16  comment, Mr. Peete, in answer to number forty-five

17  said, my father's care was substandard at best and

18  added no quality of life that the family could see.

19     So, I mean, I think he has very strong views

20  about the care that was received by hospice -- from

21  the hospice provider.

22     THE COURT:  I have to look at the fact that

23  he said that he could be fair to both sides, so I

24  doubt if he will end up on our jury, but I'm not

25  going to excuse him for cause.

1          MR. LEMBKE:  Thank you, Your Honor.

2          THE CLERK:  Mr. Self, thirty-two.

3          THE COURT:  Mr. Self, how are you?

4          PROSPECTIVE JUROR SELF:  Good.  How are

5    y'all?

6          THE COURT:  All right.  We've got some

7    questions we want to ask you about.  But the first

8    one I want to ask is, I notice that you attend

9    Dawson.

10         PROSPECTIVE JUROR SELF:  Uh-huh.

11         THE COURT:  That's where my husband and I

12   also go to church.  I'm not sure if we have run into

13   each other there before or not, but I wanted to ask

14   if you knew me or recognize me.

15         PROSPECTIVE JUROR SELF:  You looked familiar

16   when you first came in but I'm not sure.

17         THE COURT:  Dawson is not a little church.

18         PROSPECTIVE JUROR SELF:  It's seven thousand

19   active members.

20         THE COURT:  Four different services on

21   Sunday, I wanted to cover that first.

22         Now, you had mentioned in your responses

23   that you had travel plans to Connecticut, Montana --

24         PROSPECTIVE JUROR:  Minnesota and Canada.

25         THE COURT:  Sorry, for work.  And now I

1    understand from Ms. Kimbrell that you've got some

2    prepaid vacation time or something.  Explain to me

3    what we're talking about.

4            PROSPECTIVE JUROR SELF:  It is all for work.

5    My job requires me to travel week in and week out.

6            I'm booked out at certain weeks already

7    through October.  And these are flights that I don't

8    even book.  People just book them, hey, you're going.

9            So when I wake up on Sunday morning, I'm

10   usually checking my phone, where am I going Monday.

11   Those were ones that just jumped out as these are

12   already booked right now.

13           THE COURT:  You are the director of sales

14   for Fastenal?

15           PROSPECTIVE JUROR SELF:  Fastenal.

16           THE COURT:  Tell me about that company.

17           PROSPECTIVE JUROR SELF:  We are a large

18   corporation, we sell industrial supplies, nuts and

19   bolts.  That was mainly what we started in 1967

20   doing, but we've grown into selling fifteen different

21   lines of products.

22           I'm the director of sales for metal working

23   and our custom manufacturing division.

24           So twenty-three guys report to me and, you

25   know, it's -- we do in sales four billion a year top

1  line as a company.  And I'm responsible for about $20

2  million a month of that.  Twenty-three guys recording

3  and, like I said, my territory is technically Canada,

4  Eastern United States over to Texas and Mexico.  I

5  don't ever travel to Mexico, though.

6       THE COURT:  Okay.  If you're selected for

7  this jury and would not be able to make these trips

8  for work, is there anyone else that could cover that?

9  Or what would happen?

10       PROSPECTIVE JUROR SELF:  I don't know what

11  would happen.  I mean, we would have to cancel the

12  flights, obviously, and I would miss the meetings.

13  But I mean, I've missed four meetings just today,

14  just being here today.

15       I don't -- I mean, federally, they can't do

16  anything to me.  But I don't -- I mean, Fastenal is

17  not going to be very pleased with that.  I mean,

18  that's just being as honest as I can be.

19       THE COURT:  Any other questions?

20       MS. TAPIE:  This may go to what the Judge

21  just asked you.

22       Do you have a replacement?  Can somebody

23  replace you?

24       PROSPECTIVE JUROR SELF:  Anybody can be

25  replaced, I feel.  But I don't want to be replaced.

1  This position I'm in is one that is probably middle

2  management.  And they could probably find out they

3  don't technically have to have that person.  But what

4  I feel like I bring to the table in a lot of these

5  meetings, I don't feel like anybody can replace me,

6  per se.  But there is a person that probably could

7  show up in my place, yes.

8          THE COURT:  If you were selected on this

9  jury to serve approximately three months, would you

10 be worried about whether they decided that they

11 didn't need your position or that there was someone

12 else --

13         PROSPECTIVE JUROR SELF:  I'm worried about

14 that, yes.

15         THE COURT:  Would that distract you from

16 your ability to concentrate and pay attention to the

17 evidence?

18         PROSPECTIVE JUROR SELF:  It's a distraction

19 right now, yes.  I feel like it would distract and

20 take away from that.  If this was a normal week long

21 trial, I would be all for it.

22         I mean, I'm in law school on Saturdays and

23 the reason on Saturday because my schedule is week

24 in, week out, out of town, out of state travel.

25         Yeah, it would definitely be a distraction

1    for me.

2           THE COURT:  Would the fact that we're in

3    court four days and not on Friday help in any way?

4           PROSPECTIVE JUROR SELF:  I think that would

5    possibly help to be able to do conference calls and

6    stuff on Fridays, like I normally do, but honestly, I

7    would almost rather, if I did have to be on it, go

8    Monday through Friday and get done in four weeks or

9    five weeks.

10          THE COURT:  We wouldn't be able to get done

11   in four or five weeks.  We have considered all kind

12   of options.  I assure you --

13          PROSPECTIVE JUROR SELF:  I'm sure you have.

14          THE COURT:  -- Mr. Self, to figure out how

15   to move this.

16          PROSPECTIVE JUROR SELF:  I would love to do

17   it, but it mortifies me to think about having to be

18   on a jury ninety straight days.  That's just --

19          MS. WOODKE:  Because of your job?

20          PROSPECTIVE JUROR SELF:  Yes.  If it wasn't

21   for the job, I would probably be trying to answer the

22   questions to get on the jury.  It is interesting to

23   me.  I don't want to be a civil lawyer, but I am

24   interested in the facts of cases and how procedural

25   things go and whatnot, but this one is a severe

1   hardship based on what I already have scheduled in

2   travel plans, not to mention that my job actually

3   requires me to be out of town week in and week out.

4           MR. LEMBKE:  May I ask a follow up?

5           THE COURT:  Yes.

6           MR. LEMBKE:  I'm one of the lawyers for the

7   defendant, AseraCare.  Would you agree in terms of

8   hardship, it's going to be more of a hardship to

9   Fastenal than to you yourself?  Wouldn't you agree?

10          PROSPECTIVE JUROR SELF:  If I lose my job

11  long term over it, it would be more of a hardship to

12  me, but you're probably right.

13          MR. LEMBKE:  If you're selected -- AND no

14  one at Fastenal has suggested in any way your job

15  would be in peril if you're on this jury?

16          PROSPECTIVE JUROR SELF:  No.

17          MR. LEMBKE:  If you're selected, you're

18  going to try to do a good job as a juror and be fair

19  and impartial and render a just verdict; correct?

20          PROSPECTIVE JUROR SELF:  I would, yes.

21          THE COURT:  Any other questions?

22          MS. TAPIE:  Just whether the stress -- you

23  mentioned missing four meetings today.  The stress of

24  missing work and being concerned about your job could

25  potentially distract you in such a way that you

1  wouldn't be able to fairly consider the evidence

2  that's presented, is that a possibility?

3           PROSPECTIVE JUROR SELF:  That is a

4  possibility.  I would try not to let it be, but that

5  is -- I mean, when you're asking me this question

6  right now, I'm actually thinking about other stuff,

7  even right now.  And this is a large panel, you know.

8  I'm taking it very seriously, but I am distracted

9  right now.

10          MS. TAPIE:  You can't assure us that you

11 would be able to put it all out of your mind such

12 that it wouldn't distract you?

13          PROSPECTIVE JUROR SELF:  I would do my best.

14          THE COURT:  Okay.  Anything else?  Let me

15 ask you this:  On the distraction scale of one being

16 minimal and ten being you really wouldn't be tuned in

17 as a juror, where do you think the distraction that

18 you're dealing with having or you anticipate dealing

19 with would be?

20          PROSPECTIVE JUROR SELF:  I can't put a

21 number on it like this, but my everyday life is such

22 that I work 50 to 60 hours a week and on Sundays, and

23 I also go to law school.  I am -- I have a million

24 things going on right now.  I have finals on

25 Saturday.

1              It's a lot to manage without a complicated

2     civil litigation where the U.S. Government is suing a

3     healthcare provider.  It's -- I do good just to keep

4     it between the lines on a normal week, week in and

5     week out, because of the two things that I do right

6     now.

7              With that being in there, I don't know.  I

8     wouldn't be able to put a number on the level of

9     distraction.  I mean, I am a pretty focused guy, but

10    it will be a distraction.  I'm just being honest.

11             MR. LEMBKE:  Your Honor, may I follow up?

12             THE COURT:  Yes.

13             MR. LEMBKE:  Mr. Self, if you're selected,

14    once you're selected and it's clear that you're going

15    to serve, won't it be less of a distraction at that

16    point?

17             PROSPECTIVE JUROR SELF:  I don't know.

18             MR. LEMBKE:  But you'll do your best to be a

19    serious juror and render a fair and impartial

20    verdict; correct?

21             PROSPECTIVE JUROR SELF:  Yes.  Can I ask you

22    a question?

23             MR. LEMBKE:  That's against the rules.

24             THE COURT:  Throw it out there.

25             PROSPECTIVE JUROR SELF:  Did you read my

1   responses?

2          THE COURT:  Yes, they did.

3          PROSPECTIVE JUROR SELF:  You know, I wasn't

4   answering this trying to get out of it.  I was just

5   trying to be as honest as I could be, and I really

6   don't understand why the government would want me on

7   this jury or why AseraCare would want me on this

8   jury.  And that's just honest.  It's more of a

9   comment than it is a question, I guess.

10          THE COURT:  Well, I will assure you that

11  they read every one of your answers, and they are

12  taking it into account, but the question right now

13  really is whether you should be excused because of

14  hardship.

15          PROSPECTIVE JUROR SELF:  Yes.

16          THE COURT:  Not whether they want you on the

17  jury.

18          PROSPECTIVE JUROR SELF:  I got it.

19          THE COURT:  So that's where we are now.

20          PROSPECTIVE JUROR SELF:  And I think I

21  should be excused for a hardship.  There is a number

22  of people in there that will do a really good job on

23  this jury and be fair and an unbiased verdict.

24          MS. TAPIE:  I have a follow up, Your Honor.

25          THE COURT:  Okay.

1       MS. TAPIE:  And this is going back to one of

2   your answer previously.  You used the word mortified

3   and I was wondering if you could explain.

4       PROSPECTIVE JUROR SELF:  Just this morning,

5   I had a high level meeting at Hubbell in leads, and

6   then I am slated to be in Oxford this afternoon for

7   three other meetings that are going on today.

8       I wasn't honestly expecting to be called

9   back after the questionnaire.  But when I saw that I

10  did, I said, okay, there is a possibility that in

11  itself is a -- I don't show up late for anything.  I

12  get a lot done in a day's time.  And when I have to

13  cancel four things that are already scheduled, that

14  is almost to me as bad as, you know, looking at the

15  next 90 days saying, okay, you're going to be doing

16  this for 90 days.  I have 25 other things already in

17  my calendar for the next 90 days, including a

18  directors meeting in October that, you know, this may

19  or may not go that distance.  I think it's October

20  24th.

21      But, you know, these are things that were

22  already scheduled, and they don't really ask you.

23  They just email out we're doing this then.  That is

24  what I mean by mortified.  It's daunting to think

25  about clearing you're schedule for the next three

 1  months.

 2         THE COURT:  Anything else?  Thank you,

 3  Mr. Self.

 4         PROSPECTIVE JUROR SELF:  You're not in the

 5  choir, Your Honor?

 6         THE COURT:  No.  I can't carry a tune in a

 7  bucket.

 8         THE REPORTER:  We need a break, Judge.

 9                  (Brief recess)

10         THE COURT:  Mr. Self obviously just doesn't

11  want to be here.

12         MR. LEMBKE:  Your Honor, he said someone

13  could show up in my place, having Fridays open would

14  help.  And he certainly is a busy guy.  But I don't

15  think -- and he acknowledged it's really more of a

16  hardship for his company than for himself.  And I

17  don't think busy people are excused just because they

18  have busy jobs.  And it seems like this could be

19  managed by him.

20         MS. WOODKE:  I don't think it can be

21  managed.

22         THE COURT:  He said it would be a severe

23  hardship, mentioned distraction many times, that he

24  was mortified about how it would affect, that they

25  may find that his position is not needed if he's not

1    there, worried about keeping his job.

2            MR. LEMBKE:  But, Your Honor, I think when

3    he was asked, you know, he didn't give you a number

4    on the scale.  And he said he would do his best.  And

5    as I recall, he said he thought he could render a

6    fair and impartial verdict.  And certainly he can't

7    be fired for being on jury duty.  And he will be

8    there one day a week.  And he said he also works

9    Sundays as it is, so it sounds like he will be there

10   two days a week.

11           MS. WOODKE:  I think a hardship for a

12   traveling salesperson is being in his office on

13   Fridays is not the same as being in his job in

14   Minnesota, or his job in Connecticut or his job in

15   Canada to cover the territory for the $20 million

16   that he's responsible for every month.

17           I just think a traveling salesperson, it's a

18   very different position.

19           THE COURT:  He's the director.

20           MR. LEMBKE:  He said someone could show up

21   in my place.

22           THE COURT:  He's the director, not the sales

23   person.

24           MR. LEMBKE:  Had twenty something people

25   working for him.

1    THE COURT:  Twenty-three guys that report to

2    him.  He's not going to be an engaged juror.  He's

3    told us that.  I'm going to excuse him.  We're also

4    going to make sure he gets called again soon to see

5    if he's really serious about being a juror.

6    Okay.  Mr. Griggs is our next one.  I don't

7    think we want to start off with someone who is

8    mortified about being here with us.

9    THE COURT:  Good morning, Mr. Griggs, how

10   are you?

11   PROSPECTIVE JUROR GRIGGS:  Good.  How are

12   you?

13   THE COURT:  I want to thank you for coming

14   today and also for filling out the questionnaire the

15   other day and sharing your views with us, which is

16   what we really, really want you to do.

17   But I think we have some questions about

18   your work and then also some of your answers.

19   You're the contract manager with Southern

20   Nuclear.

21   PROSPECTIVE JUROR GRIGGS:  Yes.

22   THE COURT:  Is that the same job as --

23   MR. LEMBKE:  Ms. Wise.

24   THE COURT:  Do you know Ms. Wise?

25   PROSPECTIVE JUROR GRIGGS:  No.

1           THE COURT:  Teresa Wise.  She's a nuclear

2    training specialist with Southern Nuclear.  Tell me

3    about your job and the expression of concern that you

4    raised about the need for you right now at work.

5           PROSPECTIVE JUROR GRIGGS:  I'm the corporate

6    manager of sourcing.  My group is responsible for

7    procuring all of the contracts and labor for services

8    and materials that we use to refuel our outages.

9           And September the 14th, we have a unit going

10   into an outage which is a typically a thirty day

11   refueling outage.

12          And my supervisors and my buyers are

13   expected to work shift work and we typically

14   volunteer from the corporate office to send our

15   corporate folks to the site to work those outages.

16          During those refueling outages, the public

17   is more at risk because we don't have all of our

18   safety systems in place.  So we pull a lot of

19   resources from various different contractors, as well

20   as our corporate employees for specialty expertise

21   down to operate valves to make sure that the public

22   safety is well maintained.

23          THE COURT:  Okay.  Which unit?

24          PROSPECTIVE JUROR GRIGGS:  Vogle unit two.

25          THE COURT:  Vogle?

1          PROSPECTIVE JUROR GRIGGS:  It's in Augusta,

2    Georgia.

3          THE COURT:  That's why I don't recognize the

4    name.  If you are here with us instead of there,

5    would there be someone to do your job?

6          PROSPECTIVE JUROR GRIGGS:  No.  There's no

7    one.  I do have cooperate supervisors that report to

8    me.

9          THE COURT:  Would there be enough people

10   from Southern Nuclear to take care of that refueling

11   outage?

12         PROSPECTIVE JUROR GRIGGS:  I'm sure there

13   probably would be.

14         THE COURT:  I think there may be some other

15   questions for Mr. Griggs as well.  Who wants to start

16   with that?

17         MR. LEMBKE:  Mr. Griggs, I'm Matt Lembke and

18   I'm one of the lawyers for AseraCare which is the

19   hospice company that's a defendant in this case.  And

20   I appreciate your candor in answering these

21   questions.  I just want to follow up with one or two

22   in particular.

23         You were asked on the written questionnaire,

24   based on what you know about the case so far, would

25   you have concerns about your ability to be fair and

1  impartial if you served as a juror in this case.  And

2  you answered yes, and if said yes, please explain.

3  And then you explained, I believe that the government

4  should prosecute to the fullest extent of the law.  I

5  work hard for my money and they should work equally

6  as hard to keep my taxes for me or my family.

7        Can you tell us what you mean by that?

8        PROSPECTIVE JUROR GRIGGS:  I mean exactly

9  what it says.  I think if the government feels like

10  there's any person or company that's defrauding the

11  process and trying to cheat the system, then I think

12  they're within their legal right to prosecute.

13        MR. LEMBKE:  In this case, the government

14  has brought a claim against AseraCare that they

15  submitted claims for payment for people who are not

16  eligible for hospice.

17        If you're selected as a juror and the Court

18  instructs you that you are to decide the case solely

19  based on the evidence presented in court and the

20  instructions on the law as given to you by the Judge,

21  do you think you can do that and render a fair and

22  impartial verdict?

23        PROSPECTIVE JUROR GRIGGS:  I don't know.  It

24  would depend on what's presented.  I think in my

25  ability, yeah, I think I can be fair and impartial

1   based on facts.  But I am an electrical engineer and

2   I'm very technical.  And I will find the details and

3   I don't always just side with the team.

4          MR. LEMBKE:  You'll listen to the evidence

5   and do what you think is right?

6          PROSPECTIVE JUROR GRIGGS:  I will swear to

7   that oath, right.

8          MS. TAPIE:  No questions.

9          MR. LEMBKE:  May i ask one more question,

10  Your Honor?

11         THE COURT:  Yes.

12         MR. LEMBKE:  Do you think in any way you

13  would be starting out with the government sort of

14  ahead in your mind in the case?

15         PROSPECTIVE JUROR GRIGGS:  I don't really

16  know how to answer your question, so I will just

17  express it the best I can.

18         They typically, typically win those cases,

19  big government, little people.  So I don't know.  I

20  may be slighted to think that -- they've got a

21  competitive advantage.

22         MR. LEMBKE:  By the mere fact that the

23  government has brought the case and this is a civil,

24  not a criminal case meaning the question is not

25  criminal liability, the question is whether there's

1  civil liability.  But do you think just because the

2  government has brought the case there must be

3  something to it?

4          PROSPECTIVE JUROR GRIGGS:  I would think so,

5  yes.

6          MR. LEMBKE:  And do you think that would

7  influence your ability to consider the case as a

8  juror?

9          PROSPECTIVE JUROR GRIGGS:  I think I would

10 be fair and impartial in terms of the evidence.  But

11 I don't think that -- I would hope that there's some

12 merit to their claim.

13         MR. LEMBKE:  But you're going to judge the

14 case, if you're a juror, solely on what's presented

15 in court; is that right?

16         PROSPECTIVE JUROR GRIGGS:  That's what

17 she'll instruct me to do; right?

18         THE COURT:  Right.  And will you do that is

19 what he's asking.

20         PROSPECTIVE JUROR GRIGGS:  Absolutely.

21         MS. WOODKE:  Let me ask a follow up in

22 relation to that.

23         SEARCH you answered a question that you were

24 unfavorable to Medicare because hearing from your

25 wife's work, her work is twice as hard each day

1    because the lack of paying fair market, checkchckfor

2    procedures, does that impact your ability to be fair

3    and impartial in this Medicare case?

4              PROSPECTIVE JUROR GRIGGS:  I don't think it

5    would impact my ability to be objective, no.

6              THE COURT:  Anything else?

7              MS. WOODKE:  How difficult is it for

8    Southern Nuclear to get someone to take your position

9    during the plant shut down and refueling?

10             PROSPECTIVE JUROR GRIGGS:  I'm not sure.

11   I've never seen this go that long without a person

12   there or having people dependent in our organization.

13             MS. WOODKE:  Are you the person that

14   generally goes for the refueling for the nuclear

15   plant?

16             PROSPECTIVE JUROR GRIGGS:  I've been each of

17   the last four years, I have been, yes, ma'am.

18             THE COURT:  Is that because of your

19   background and training as an engineer?

20             PROSPECTIVE JUROR GRIGGS:  Yes.  I am a

21   little more technical on the commercial side than a

22   lot of our team that's made up in its current

23   capacity.

24             But at corporate, I've got currently a young

25   team and not a lot of tenure, so we are trying to get

1  our corporate team more up to speed with the

2  expectations and functions and operations of those

3  plants.

4       I'm not saying it can't be done, but there's

5  some concern, if you're gone for three months, do you

6  really need that corporate overhead.

7       THE COURT:  I want to ask you a question in

8  response to one of the questions you were asked

9  whether you had filed or in the future might file

10 individual claim or complaint against the government.

11 You indicated yes.  That if the government continues

12 to impose its will by violating the constitution.

13 What you mean by that?

14       PROSPECTIVE JUROR GRIGGS:  I'm a huge

15 supporter of the Bill of Rights and specifically to

16 the topic of gun control.  And if things continue to

17 grow momentum towards confiscating my persona

18 handguns or rifles, you know, I will consider seeking

19 injunctions or legal recourse with regards to

20 protecting those rights.

21       THE COURT:  Any other questions?

22       MR. LEMBKE:  No, Your Honor.

23       THE COURT:  Thank you very much, Mr. Griggs.

24            (Juror excused).

25       MR. LEMBKE:  Your Honor, we don't think

1    there's a basis for a hardship excuse there.

2           MS. WOODKE:  I don't like the fact that he's

3    not going to be at the nuclear refueling.  But as

4    hardship, I don't think he gave us that either.  I

5    personally would prefer someone with experience

6    there, but --

7           THE COURT:  Okay.  So he's still with us.

8    All right.  So we need to see who we --

9           THE CLERK:  We have twenty-seven.

10          THE COURT:  Okay.  To strike from.

11          THE CLERK:  Yes, ma'am.

12          THE COURT:  All right.  Good.

13          THE CLERK:  Do you want to go over the list?

14          THE COURT:  I do.

15          THE CLERK:  Number two, four, five, six,

16   seven, eleven, thirteen, fourteen, fifteen, sixteen,

17   seventeen, twenty, twenty-one, twenty-two,

18   twenty-three, twenty-four, twenty-five, twenty-seven,

19   twenty-eight, thirty, thirty-one, thirty-three,

20   thirty-four, thirty-five --

21          MS. WOODKE:  I thought thirty-one was out.

22          THE COURT:  Thirty-one, no, he's in.

23          THE CLERK:  Thirty-one, thirty-three,

24   thirty-four, thirty-five, thirty-six, thirty-seven,

25   thirty-nine, forty.

1          THE COURT:  All right.  We will take a brief

2    recess.

3          THE CLERK:  Give me a few minutes to get the

4    charts together and make the copies.

5          THE COURT:  All right.  And then we will be

6    ready to go.

7                    (Brief recess).

8        (Open court.  Prospective jurors present.)

9          THE COURT:  Ladies and gentlemen, I want to

10   welcome you to this courtroom for a very important

11   day.  This is the first time this court has

12   officially been used for a jury trial.  And I think

13   Ms. Calahan said this is the first time she's had to

14   seat people out there and it's a little different

15   arrangement from my other courtrooms.

16         But we worked long and hard on this

17   courtroom to completely redo it.  It used to face,

18   the bench was over there and the gallery was out

19   there (indicating) and so we've expanded it so that

20   we have more room for large trials, and also so that

21   we can have naturalization ceremonies in here when

22   people become citizens and other important things.

23         But I'm very excited because this is the

24   first time we've used it for a trial.

25         But I'm also a little apprehensive.  I'm

1  concerned that there may be some little glitches

2  along the way in the way things operate.

3          For example, we don't have the hardware on

4  our door back there so that it can open from the

5  outside, but we're working on those little things.

6          A week ago we did not have chairs for

7  jurors, and I was getting a little worried.  But if

8  there's some things that happen today or during the

9  course of the trial that we have to address because

10 of the fact it's not been done in here before, please

11 bear with us.

12         I hope you like our new courtroom, I hope I

13 do, as we get to use it a little bit more in the next

14 few weeks.

15         But as I said on Tuesday, we very much

16 appreciate each one of you jurors being here and your

17 willingness to make the sacrifices that are necessary

18 so that we can have the best justice system in the

19 world.  One where the jury trial is very much at its

20 heart.

21         We are here today on the case of United

22 States of America, ex rel Debora Paradies, London

23 Lewis, Roberta Manley and United States of America

24 vs. GGNSC Administrative Services, LLC and others.

25         Is the plaintiff ready?

1          MS. TAPIE:  Yes, Your Honor.

2          THE COURT:  Is the defense ready?

3          MR. LEMBKE:  Defense is ready, Your Honor.

4          THE COURT:  Ladies and gentlemen, we are

5   about to select a jury for the trial of this case

6   that has been announced ready.  And to assist the

7   court and the attorneys in that selection process,

8   we're going to begin with what is called voir dire

9   examination.

10          Now, I explained to you on Tuesday before

11   you completed your interrogatories -- excuse me --

12   your questionnaire that voir dire means loosely to

13   speak the truth.  And we are asking you again this

14   morning to speak the truth in response to my

15   questions and the questions that the attorneys may

16   have for you.

17          As I said on Tuesday also, the purpose of

18   voir dire is to give the attorneys an opportunity to

19   find out some things about you so that they can

20   properly represent their clients in selecting a fair

21   and impartial jury for this trial.

22          No one wishes to probe unnecessarily into

23   your private affairs, but the parties have a right to

24   know some information about you.  I want to say at

25   the outset if any of the questions that are requested

1    of you are particularly personal in nature and you

2    don't want to discuss them in front of everybody,

3    just let me know, tell me that and we will have you

4    come up to the side of the bench at a later time to

5    give us that information that is particularly

6    personal for you, because we do not want to embarrass

7    anybody in this process.

8           But as I said, the lawyers need to know and

9    the parties are entitled to know some things about

10   you.

11          You stayed a good bit of time on Tuesday

12   answering the questions on the written questionnaire

13   and we very much appreciate it.  And I think all the

14   attorneys, I know I have looked over those answers.

15   The questions we're going to ask today are meant to

16   supplement those questions and not to repeat them.

17          So please answer each question today as

18   fully and accurately as you possibly can.

19          We need you to give your best, honest and

20   sincere effort to answer each question honestly and

21   truthfully.

22          If you are not sure whether the question

23   calls for any information that you have, tell us what

24   you think.  In other words, give us more information

25   than less.  If we don't need it, we will disregard

 1   it.  But if it's something that the lawyers need to

 2   know, we don't want you to withhold that.

 3           I am now going to request that Ms. Calahan

 4   call the role of jurors who have been summoned to

 5   this courthouse for a term of jury service through a

 6   random selection process and who have been selected

 7   through a similar random selection process to come

 8   into this courtroom as possible jury venire and who

 9   are seated in the order in which that random

10   selection process put you.

11           Now, as she calls your name, we want you to

12   stand up and, using that microphone, tell us in a

13   loud voice your name and the information requested on

14   the sheet of paper that you each have.

15           THE CLERK:  Sarah Kathleen Hyde.

16           PROSPECTIVE JUROR HYDE:  My name is Sarah

17   Kathleen Hyde.  I have no spouse.  I'm not married.

18   Never had any experience as a witness in a lawsuit.

19           My hobbies and interests include movies,

20   playing with my animals.  I have three dogs and three

21   cats.  And yard work.  I help my grandfather a lot

22   and things that he needs to get done.

23           I do not have a bumper sticker on my car.  I

24   do not have Facebook or Tweeter, I don't do any kind

25   of social networking.  I don't read blogs.

```
1              My main source of news and information is

2    Fox 6 app on my phone.

3              And I am currently rereading Kirk

4    (inaudible).

5              THE CLERK:  Celestial Hodges.

6              PROSPECTIVE JUROR HODGES:  My name is

7    Celestial Hodges.  I have no spouse.  I have --

8              THE COURT:  Ms. Hodges, can you speak up a

9    little bit louder?

10                        (Brief pause)

11             PROSPECTIVE JUROR HODGES:  Celestial Hodges.

12   I have no spouse.  I have no experience as a witness

13   in a lawsuit.

14             My hobbies are antiques and movies.  I don't

15   have a bumper sticker on my car.  I do have a

16   Facebook account.  I do not read any blogs.

17             My main source of news information is

18   probably Headline News.  I think the last book I read

19   was an autobiography on Elizabeth Taylor.

20             THE COURT:  Thank you, Ms. Hodges.

21             THE CLERK:  Janet Upshaw.

22             PROSPECTIVE JUROR UPSHAW:  Good morning.  My

23   name is Janet Cummings Upshaw.  I am divorced.  My

24   ex-spouse's name is Samuel.  No experience as a

25   witness in a lawsuit.
```

1          My hobbies are bowling and reading.  I don't
2   have a bumper sticker.  I have a Facebook page.  I
3   don't read blogs.  My main source of news is Fox 6.
4   The last book I read was something from Joy Lindsey.
5          THE COURT:  Thank you, Ms. Upshaw.
6          THE CLERK:  Vionna Cade.
7          PROSPECTIVE JUROR CADE:  I'm Vionna Cade I
8   do have an ex-spouse.  His name is Joe Nathan Hill,
9   Jr.  I do not have experience as a witness in a
10  lawsuit.
11         My hobbies are my four children and
12  interests.  I do have a bumper sticker on my car.  It
13  says Bull Dogs for Mississippi State University.
14         I do have a Facebook and Instagram.  I don't
15  regularly read blogs.  My main source of news is
16  al.com.  And the last book that I read is God Still
17  Don't Like Ugly.
18         THE COURT:  What was the name of the book?
19         PROSPECTIVE JUROR CADE:  God Still Don't
20  Like Ugly.
21         THE COURT:  Okay.
22         THE CLERK:  Pamela Passen.
23         PROSPECTIVE JUROR PASSEN:  My name is Pamela
24  Passen.  My spouse's name is Daniel Passen.  I have
25  testified in a lawsuit against a day care that my

1  children attended.

2          My hobbies are high school track and college

3  track.  The bumper sticker on my car says KBM and the

4  number 18.

5          THE COURT:  What does that stand four?

6          PROSPECTIVE JUROR PASSEN:  KBM stands for

7  Kyle Burks Motor Sports.  I'm a redneck, I like

8  racing.

9          THE COURT:  All right.

10          PROSPECTIVE JUROR PASSEN:  And 18 is his car

11  number.  And there's stickers because I don't like

12  stickers, so they are clings, technically.

13          I do have a Tweeter and Instagram account.

14  I mostly read blogs on the internet for news like Fox

15  6 news, the national one.

16          My main source of news is Breaking News on

17  my cell phone or Fox 6 news and then we watch Channel

18  13 at home.

19          I work for a magazine, so Progressive

20  Farmers is the last magazine that I read.  And I read

21  my Bible daily.  And I am currently reading a book

22  called Lethal Attraction.

23          THE COURT:  Called Lethal Attraction?

24          PROSPECTIVE JUROR PASSEN:  Yes, ma'am.

25          THE CLERK:  Cleve Park.

1          PROSPECTIVE JUROR PARK:  My name is Cleve

2    Park.  My spouse's name is Dixie.  I've never had any

3    experience as a witness or participant in any way in

4    a lawsuit.

5          My hobbies and interests include I'm a

6    golfer and I have a beautiful little German short

7    hair dog.  No bumper stickers.  Facebook that I look

8    at about once every two or three weeks.  I don't have

9    any blogs.

10          Main source of news information is I

11    subscribe to the Wall Street Journal and use the TV

12    news.

13          Book or magazine --

14          THE COURT:  Mr. Parkman, any particular news

15    station?

16          PROSPECTIVE JUROR PARK:  Fox 6.

17          THE COURT:  Okay.

18          PROSPECTIVE JUROR PARK:  The book I'm

19    currently reading is the Book of Revelation in the

20    Bible and that's basically getting to be Greek to me.

21          The last book or magazine, Golf Digest.

22          THE COURT:  Thank you, Mr. Park.

23          THE CLERK:  Ms. Houston.

24          PROSPECTIVE JUROR HOUSTON:  My name is

25    Taimaikiol Houston.  My husband is Eugene Horn.  I've

1  never experienced any lawsuit or witness in a

2  lawsuit.  My hobbies are skating.

3          I do not have any bumper stickers on my car.

4  I do have a Twitter and Facebook and an Instagram

5  account.  I don't read blogs.

6          My main source of news is Fox 6.  And the

7  last book I read was Heaven is for Real and I'm not

8  currently reading anything right now.

9          THE COURT:  Thank you, Ms. Houston.

10         THE CLERK:  Kyle Kelly.

11         PROSPECTIVE JUROR KELLY:  I'm Kyle Kelly.

12  My spouse's name is Susie Joe.  My experience with

13  lawsuits, I've been interviewed and questioned in a

14  lawsuit.  I guess not a witness specifically.

15         Hobbies and interests would be hunting and

16  fishing.  I have the Browning buck mark.

17         THE COURT:  The case in which you were

18  questioned, is that the one you told us about earlier

19  this morning?

20         PROSPECTIVE JUROR KELLY:  It was the federal

21  government against Rast Construction.

22         THE COURT:  That we talked about this

23  morning?  Not another one?

24         PROSPECTIVE JUROR KELLY:  No, it's that one.

25         THE COURT:  Okay.  Thank you.

1          PROSPECTIVE JUROR KELLY:  I do not frequent

2    Facebook or Twitter.  I do not read blogs.  Fox news

3    is my main news information.

4          Books or magazines, last book I read was

5    Lone Survivor and the Bible.

6          THE COURT:  Thank you, Mr. Kelly.

7          THE CLERK:  Michael Bibb.

8          PROSPECTIVE JUROR BIBB:  My name is Michael

9    Bibb.  My wife's name is Shellie Bibb.  I've never

10   been a witness in a lawsuit.

11         My hobbies include, I have one son and an

12   eighteen year old nephew and I do things with my

13   family mostly.  I don't have a bumper sticker.

14         I don't have a Facebook account.  I don't

15   read blogs.  My main source of news is Fox 6.

16         And I usually don't read books, but the last

17   magazine I read was Men's Health.

18         THE COURT:  Thank you, Mr. Bibb.

19         THE CLERK:  John Gaffney.

20         PROSPECTIVE JUROR GAFFNEY:  My name is John

21   Gaffney.  My spouse's name is Linda.  I have not been

22   a witness, although I have given several depositions.

23   My hobbies are golf --

24         THE COURT:  Mr. Gaffney, the depositions

25   that you've given, were they related to your work at

1   AmSouth?

2           PROSPECTIVE JUROR GAFFNEY:  Yes.

3           THE COURT:  Okay.

4           PROSPECTIVE JUROR GAFFNEY:  I've got plenty

5   of hobbies, may not have enough time, golf, hunting

6   and fishing.  I do have a bumper sticker that says

7   Vanderbilt Commodores, long suffering fan.

8           I have a Facebook page.  I do not read

9   blogs.  My main source of information is the Wall

10  Street Journal and Fox news.  And the last book I

11  read was Red Notice.

12          THE COURT:  Was what?

13          PROSPECTIVE JUROR GAFFNEY:  Red notice.

14          THE COURT:  Okay.  Thank you.

15          THE CLERK:  Jonathan Courington.

16          PROSPECTIVE JUROR COURINGTON:  My name is

17  Jonathan Courington.  My wife's name is Rosemary.

18  I've never been a witness, any type of witness in a

19  lawsuit.

20          My hobbies are hunting and fishing.  I don't

21  have a Facebook account, social media -- I don't have

22  any bumper sticker on my car.  And I'm not a blogger.

23  I don't do blogs.  And I do watch Fox 6 news, though.

24  The last magazine I read was People magazine.

25          THE COURT:  Thank you, Mr. Courington.

1         THE CLERK:  Carolyn Williams.

2         PROSPECTIVE JUROR WILLIAMS:  I'm Carolyn

3  Williams.  My husband's name is Carl.  I have no --

4  never been a witness in any kind of lawsuit.

5         The only interest I do is just take care of

6  my girls.  No bumper stickers on my car.

7         I do have a Facebook account, but I haven't

8  been on it in over four years.  I don't read blogs.

9  My main source of news and information is from Fox 6.

10  And right now, the only book I read is the Bible.

11         THE COURT:  Thank you, Ms. Williams.

12         THE CLERK:  Sandra Howard.

13         PROSPECTIVE JUROR HOWARD:  My name is Sandra

14  Howard.  My ex-husband is Charles Howard.  I have

15  never been a witness in a lawsuit.  My hobbies are

16  volunteering at church, going to the movies and

17  gardening.

18         I do not have a bumper sticker on my car.  I

19  have -- I do not have a Facebook, Twitter or social

20  network page.  I do not read blogs.  My main source

21  of news is CNN and Channel 13.

22         The last book/magazine I read was Southern

23  Living and Time Magazine.

24         THE COURT:  Thank you, Ms. Howard.

25         THE CLERK:  Mary Rains.

1          PROSPECTIVE JUROR RAINS:  My name is Mary

2     Rains.  My spouse's name is Fred.  I have been a

3     witness in a lawsuit.

4          THE COURT:  What kind of case was that?

5          PROSPECTIVE JUROR RAINS:  I'm not sure.  It

6     was fiduciary duty.  Does that -- my friend was

7     opening a clinic in Shelby County that I ended up

8     working at, but she -- she was being sued by her

9     other partners of another clinic -- wait, I only did

10    testimony for that.

11         THE COURT:  With them?

12         PROSPECTIVE JUROR RAINS:  This is when she

13    was sued by the City of Saginaw or Shelby County or

14    they didn't like the location she chose.  But she got

15    -- she ended up winning because it was all of Shelby

16    County, she could go anywhere, they just didn't like

17    the spot she picked or something.

18         THE COURT:  Okay.

19         PROSPECTIVE JUROR RAINS:  My hobbies or

20    interests, I like camping and reading.  I do not have

21    a bumper sticker on my car.  I do have Facebook and

22    Twitter.  I do not blog.

23         My main source of news and information is

24    Channel 13.  And I need to convert all you Fox 6

25    watches because I work at Channel 13.  I'm currently

1   reading the Luckiest Girl Alive.

2          THE COURT:  Thank you.  Is that you,

3   Ms. Rains?  The luckiest girl alive?

4          PROSPECTIVE JUROR RAINS:  I hope so.

5          THE COURT:  Okay.

6          THE CLERK:  Michael Scott.

7          PROSPECTIVE JUROR SCOTT:  Good morning.  My

8   name is Michael Scott.  My spouse's name is Cynthia

9   Scott.  I've never been a witness in a lawsuit.

10         My hobbies are yard work and watching

11  movies.  I do not have any bumper stickers on my

12  vehicle.  I do have a Facebook account.  I do not

13  read blogs.

14         My main source of news is basically Fox 6

15  and all of the news channels pretty much.

16         One book I'm currently reading is called

17  Good to Great by Jim Collins.  And the most recent

18  book that I read was a book called Mindsets by

19  Carolyn Drake.

20         THE COURT:  Thank you, Mr. Scott.

21         THE CLERK:  Gregg Smith.

22         PROSPECTIVE JUROR GREGG SMITH:  My name is

23  Gregg Smith.  My wife's name is Dana Lou Smith.  I

24  need a question answered.  Is attempted murder a

25  lawsuit?

1              THE COURT:  If it was prosecuted.

2              PROSPECTIVE JUROR GREGG SMITH:  I was in it.

3   I was the one that -- somebody shot me.

4              THE COURT:  Did you give testimony in court?

5              PROSPECTIVE JUROR GREGG SMITH:  I gave

6   testimony for three separate times.  But then they

7   asked if I would dismiss it because they had three

8   other murders that they wanted to get, so I guess

9   mine was the lowest on the totem pole because I was

10  alive.

11             THE COURT:  Did you testify in court on

12  that?

13             PROSPECTIVE JUROR GREGG SMITH:  Three times.

14  Because I was the person that was shot.

15             THE COURT:  Yeah, right.

16             PROSPECTIVE JUROR GREGG SMITH:  I'm a

17  golfer.

18             THE COURT:  Mr. Smith, let me say, we're

19  glad you're still here and that it wasn't a murder.

20             PROSPECTIVE JUROR GREGG SMITH:  Thank you.

21  Yeah, so am I.

22             THE COURT:  Okay.

23             PROSPECTIVE JUROR GREGG SMITH:  All right.

24  I'm a golfer.  I have twenty hole in ones.  I guess

25  I'm a golfer.

1          I don't have a bumper sticker on my vehicle.

2     I don't have a Facebook, Twitter or social network,

3     nothing like that.  And I don't do blogs.

4          My main source of information is the

5     newspaper, Birmingham News.  And I'm not a reader.

6     So the last thing I did was read the Birmingham News.

7          THE COURT:  Okay.  Thank you, Mr. Smith.

8          THE CLERK:  Debora Canada.

9          PROSPECTIVE JUROR CANADA:  My name is Debora

10    Canada.  I have an ex-spouse, his name is Phillip.

11    I've never been a witness in a lawsuit.  My hobbies

12    and interests include remodeling my home, spending

13    time with my children and my grandchildren.

14          I have a Facebook page that I use when my

15    children were teenagers to monitor them, but I

16    haven't logged onto it in years.  I do not read

17    blogs.

18          My main source of news and information is

19    al.com and the Birmingham News.  I haven't had time

20    in a long team to sit down and read a book.  And I

21    don't remember the last book that I read.

22          THE COURT:  Okay.  Thank you, Ms. Canada.

23          THE CLERK:  Ms. Beese.

24          PROSPECTIVE JUROR BEESE:  My name is Diane

25    Beese.  I've never been a witness in a lawsuit.  My

1  hobbies are riding my Harley, fixing my house and

2  stained glass.

3          I've got two bumper stickers.  One says

4  Never Forget 911 and the other is Father Son Equals

5  Holy Spirit.

6          I have a Facebook account, no blog.  News is

7  any local channel I feel like watching and magazine

8  is People.

9          THE CLERK:  Natalie Smith.

10         PROSPECTIVE JUROR NATALIE SMITH:  My name is

11  Natalie Smith.  My spouse is Clay.  I have never been

12  a witness in a lawsuit.  I'm an oil painter and yoga

13  and going to the lake.

14         No bumper stickers on my car.  I have a

15  Facebook page, Twitter and Instagram.

16         The only blogs I read are the ones my

17  friends have about their kids.  I really don't watch

18  a whole lot of news but if I do, I watch Fox 6.  And

19  I am reading Tiny Things.

20         THE CLERK:  Philip Smith.

21         PROSPECTIVE JUROR PHILIP SMITH:  My name is

22  Philip Smith.  My wife's name is Nina.  I've never

23  been a witness in a lawsuit.

24         My hobbies are reading.  I do not have a

25  bumper sticker on my car.  I do not have any Facebook

1  or social media accounts.  I don't read any blogs.

2       My main source of news and information is

3  Fox News.  And I'm currently reading the book Zero

4  Hours.

5            THE CLERK:  Mr. Peete.

6            PROSPECTIVE JUROR PEETE:  Benjamin Peete.

7  My spouse's name is Teresa.  I've never been a

8  witness in a lawsuit.  For hobbies, I enjoy

9  woodworking and kayaking.  I do have a bumper sticker

10  that says Marching Southern Sound and that's the name

11  of the high school band my son is in.

12            THE COURT:  Which high school?

13            PROSPECTIVE JUROR PEETE:  Thompson.

14            THE COURT:  Okay.

15            PROSPECTIVE JUROR PEETE:  Because I have

16  teenagers, I have Facebook, Twitter, Instagram, all

17  of them trying to keep up with them.

18       As far as reading blogs, mine are technical

19  in nature.  Threats on security and corporal

20  security.

21       My main source of news information, I'm a

22  news junkie, so it's going to be hard to narrow down.

23  Locally ABC, 33/40; al.com.  Nationally it would be

24  Washington Post, New York Times, Bloomberg.

25            The book I'm currently reading is Quiet:

1  The Power of Introverts in a World that Won't Stop

2  Talking.

3          THE COURT:  Sounds interesting.

4          PROSPECTIVE JUROR PEETE:  It is.

5          THE CLERK:  Christopher Lambert.

6          PROSPECTIVE JUROR LAMBERT:  Christopher

7  Lambert.  My wife's name is Kim.  I have never been a

8  witness in a lawsuit.  My interests are movies, I

9  like playing golf and watching sports.

10          I do not have a bumper sticker on my car.  I

11  have a Facebook account and an Instagram account.

12          I do not regularly read blogs.  My main

13  source of news would be al.com.  And the last book I

14  read was the Bible.

15          THE COURT:  Thank you.

16          THE CLERK:  Jamie Thomas.

17          PROSPECTIVE JUROR THOMAS:  My name is Jamie

18  Thomas.  My husband is Eric Thomas.  I have never

19  been a witness in a lawsuit.  My interest is my

20  family.

21          I do not have bumper stickers on my car.  I

22  do have a Facebook and Instagram.  I do not read any

23  blogs.

24          My main source of news is Fox 6.  And I do

25  not have time to sit down and read.

1          THE COURT:  Okay.  Thank you, Ms. Thomas.

2          THE CLERK:  Sherri Hackney.

3          PROSPECTIVE JUROR HACKNEY:  My name is

4   Sherri Hackney.  My spouse's name is Kevin.  I've

5   never been a witness in a lawsuit.

6          Hobbies are painting, reading and movies.  I

7   don't have any bumper stickers on my car.  I have a

8   Facebook account.  I don't read any blogs.  And my

9   main source of news information is Fox 6.  And I'm

10  reading the Bible right now.

11         THE COURT:  Thank you, Ms. Hackney.

12         THE CLERK:  Marlon Light.

13         PROSPECTIVE JUROR LIGHT:  Marlon Light.  My

14  wife's name is Amanda.  I do not have any experience

15  as a witness.

16         My hobbies and interests are anything to do

17  with my family, coaching youth, band boosters,

18  hunting and fishing.

19         I do not have a bumper sticker on my car.  I

20  do have a Facebook account.  I do not read blogs.

21         My main source of news is Fox News.  And I

22  read my daily Bible and I look at Field and Stream

23  Magazine.

24         THE COURT:  Thank you, Mr. Light.

25         THE CLERK:  Donald Griggs.

157

```
 1              PROSPECTIVE JUROR GRIGGS:  Good afternoon,
 2   I'm Donald Griggs.  My wife's name is Trina Lanay.  I
 3   do have experience as a witness in corporate contract
 4   disputes.
 5              THE COURT:  Is that for your employer?
 6              PROSPECTIVE JUROR GRIGGS:  Yes, ma'am.
 7              THE COURT:  Okay.
 8              PROSPECTIVE JUROR GRIGGS:  My hobbies
 9   include riding a street bike and mountain biking.  My
10   interests are in gardening.  I do not have a bumper
11   sticker on any of my vehicles.  I do have a Facebook,
12   Twitter, YAMMER and Instagram account.
13              I do read regularly two internal Southern
14   Company blogs.
15              My main source of news is Fox News Channel
16   and/or al.com for the local news.  I'm currently
17   reading a book entitled the Oz Principle, Creating
18   Organization Accountability.
19              And the last book that I've read is the
20   Bible.  And the last magazine I read was Forbes
21   Magazine.
22              THE COURT:  Thank you, Mr. Griggs.
23              THE CLERK:  Darlene Jones.
24              PROSPECTIVE JUROR JONES:  My name is Darlene
25   Jones.  My husband's name is Arlondo Jones.  I've
```

1  never experienced as a witness in a lawsuit.

2          My hobbies are bowling and gardening.  My

3  bumper stickers are Go Army, Army stickers and Texas

4  Aggies.

5          I do have Facebook page.  I don't regularly

6  read blogs.  My main source of information is Fox 6

7  News.

8          My last magazine that I'm currently reading

9  now is HGTV and AARP.  And that's it.

10          THE COURT:  Thank you very much, Ms. Jones.

11          THE CLERK:  Jeremy Pennington.

12          PROSPECTIVE JUROR PENNINGTON:  My name is

13  Jeremy Pennington.  I have no spouse.  I have no

14  experience as a witness in lawsuit.  My hobby is

15  gaming.  I have no --

16          THE COURT:  Wait.  I'm sorry.  I couldn't

17  hear you, your hobby is what?

18          PROSPECTIVE JUROR PENNINGTON:  Gaming.

19  I have no bumper stickers on my car.  I have a

20  Facebook account.  I do not read blogs.  My main

21  source of information is Fox 6.  And the last

22  magazine I read was Game Informer.

23          THE COURT:  Thank you, Mr. Pennington.

24          All right.  As I indicated a few minutes

25  ago, we're beginning the trial of the case of United

1  States of America vs. GGNSC Administrative Services.

2  And we actually refer to that as AseraCare.

3         So I think that's the last time I'm going to

4  say the case name that way.  We're just going to

5  refer to it as AseraCare.

6         The United States brings this case against a

7  group of companies known collectively as AseraCare.

8  This case is a civil case.  That means it has no

9  criminal charges involved in it.  The question is not

10  whether the defendant is innocent or guilty, in other

11  words.

12         The United States contends in this case that

13  AseraCare submitted claims for payments from Medicare

14  that it was not entitled to receive.  And the United

15  States brought this case to recover payments that it

16  made to AseraCare on these claims.

17         AseraCare is a hospice care provider.  The

18  Medicare hospice benefit is for terminally ill

19  Medicare patients who choose to receive palliative

20  care focused on relieving pain, symptoms or the

21  stress of terminal illness rather than curative care

22  that would be focused on curing the illness.

23         For the purpose of the Medicare hospice

24  benefit, a patient is terminally ill if the patient

25  has a medical prognosis that his or her life

1   expectancy is six months or less, if the patient's

2   illness runs its normal course.

3           Hospice care includes medical, social,

4   psychological, emotional and spiritual services with

5   the goal of making the terminally ill patient as

6   physically and emotionally comfortable as possible

7   while remaining primarily in the home environment,

8   which may be a private residence, a nursing home or

9   other healthcare facility.

10          As a provider of hospice services to

11  Medicare patients, AseraCare submits claims to the

12  United States for reimbursement of that care.

13          In this lawsuit, the United States alleges

14  that AseraCare violated the False Claims Act by

15  billing Medicare for hospice services even though the

16  United States contends the company knew or should

17  have known that the patients were not terminally ill

18  and did not need hospice care.

19          The United States seeks to recover those

20  payments it made to AseraCare that the United States

21  contends AseraCare was not entitled to receive.

22          AseraCare contends that the Medicare

23  patients were, in fact, terminally ill as certified

24  by a physician and, thus, it was properly paid for

25  those claims.

1    AseraCare also contends that the government

2    cannot prove that AseraCare submitted false claims or

3    that AseraCare presented claims knowing that it was a

4    false claim.

5          Now, ladies and gentlemen, as I indicated

6    earlier, I'm going to ask you some questions.  And

7    after that, I am going to allow the attorneys to ask

8    you some questions if they so desire.

9          Please answer these questions completely and

10   truthfully.  If the answer to any question is yes,

11   raise your hand and either tell me your name or give

12   me a second to find your name on the seating chart.

13         First, I want us to meet the people that are

14   involved in this case.

15         The government will not have a client

16   representative, as such, here at trial.  However,

17   there are several people who have a financial

18   interest in the outcome of this case and who also may

19   be called as witnesses in the case.

20         So my question will be whether you know any

21   of these people whose names I'm about to read.

22   Debora Paradies from Milwaukee, Wisconsin.  Is she

23   here with us?

24         Are any of the relators here?

25         MR. WERTKIN:  No.

1          THE COURT:  Robert Manley from Milwaukee.

2     Marsha Brown Farmer from Rainsville, Alabama.   Dawn

3     Richardson from Foley, Alabama and Dr. Joseph Micca

4     from Atlanta, Georgia.

5          Do any of you know or think you may know any

6     of those people?

7          Have you, your employer or family members

8     ever had any dealings with the United States

9     Attorney's office?  It's currently headed by

10    Ms. Joyce Vance.

11         Yes, Mr. Kelly.  We have discussed that;

12    right?

13         PROSPECTIVE JUROR KELLY:  (Witness nods head

14    affirmatively.)

15         THE COURT:  Anybody else?  I want to

16    introduce to you now the attorneys who are here on

17    behalf of the government.  And as I call your name,

18    if you would please stand.

19         Some of the attorneys may not be in the

20    courtroom now, but may be coming in and going at

21    other times, so I want to make sure to find out

22    whether you know any of these people.

23         Jeffrey Wertkin, William Olson -- if you

24    would stand and remain standing, please.  Carolyn

25    Tapie, Holly Snow, Renee Brooker, and Eva Gunasekera.

1          These are all attorneys with the United

2    States Department of Justice from Washington.

3    Anybody know or think you may know those attorneys?

4          Thank you.  You may be seated.

5          From the United States Attorney's office

6    here in Birmingham, we have Lane Woodke and Don Long,

7    III.

8          Do any of you know or think you may know

9    either of these attorneys?  Is that Ms. Thomas?

10          PROSPECTIVE JUROR THOMAS:  Yes.

11          THE COURT:  Will you please stand and tell

12    me who you know and how you know that person.

13          PROSPECTIVE JUROR THOMAS:  Don Long.  We

14    worked together at Johnston, Barton.

15          THE COURT:  And you were a legal secretary

16    there; is that correct?

17          PROSPECTIVE JUROR THOMAS:  Yes.

18          THE COURT:  Did you work directly with

19    Mr. Long?

20          PROSPECTIVE JUROR THOMAS:  No.

21          THE COURT:  How well do you know Mr. Long,

22    let's put it that way?

23          PROSPECTIVE JUROR THOMAS:  Not too well.

24    Just co-workers.

25          THE COURT:  All right.  Thank you.  Anyone

164

1  else?

2          We also have some people who are not

3  attorneys but who are assisting with different things

4  during the trial on behalf of the government.

5          Charles Jackson and Jackeline Rosero, are

6  they here?  Okay.  They're behind you.  Anyone know

7  or think you may know them?

8          We also have Andy Sheldon and David Cannon

9  from Atlanta.  Anybody know or think you may know

10  them?  Thank you.

11          As I mentioned earlier, the defendants in

12  this case are a group of entities that are

13  collectively known as AseraCare.  But to make sure

14  that you are not aware of any of those companies, I

15  am going to mention them one more time.  GGNSC

16  Administrative Services, LLC, Hospice Preferred

17  Choice, Inc., and Hospice of Eastern Carolina and

18  again AseraCare.

19          Have any of you had any dealings with any of

20  those entities?

21          The company representatives for AseraCare

22  are Angie Hollis Sells, she's president of AseraCare,

23  Dallas, Texas, and David Beck who is executive

24  vice-president of AseraCare, Dallas, Texas.

25          Do any of you know either of these people or

1    think you may?  Thank you.

2          Have any of you or any of your relatives or

3    close friends ever been employed by any of the

4    defendant entities as far as you know?

5          Now the attorneys for the defendant.  We

6    have Kim Bessiere Martin, Tiffany deGruy, Jack

7    Selden, Matt Lembke, Chris Christie, Jr.  These

8    attorneys are all with Bradley, Arant, Boult and

9    Cummings.  Most are from here in Birmingham, but

10   Ms. Martin is located in Huntsville.

11         Do any of you know or think you may know any

12   of those attorneys?  Mr. Gaffney.

13         PROSPECTIVE JUROR GAFFNEY:  I know

14   Mr. Selden and I know Mr. Lembke.

15         THE COURT:  And how do you them?

16         PROSPECTIVE JUROR GAFFNEY:  Mr. Selden and

17   I, we're in the same supper club and we socialize

18   from time to time.

19         I've met Mr. Lembke from time to time and

20   we're members of the same social club.

21         I know this firm and I know a lot of

22   partners in the firm as well.

23         THE COURT:  When you were with -- is it

24   AmSouth that you were with?

25         PROSPECTIVE JUROR GAFFNEY:  Yes.

1          THE COURT:  Did AmSouth use Bradley, Arant?

2          PROSPECTIVE JUROR GAFFNEY:  Occasionally,

3    they were not the primary firm.

4          THE COURT:  Would the fact that you know

5    these two gentlemen and socialize with them on

6    occasion affect your ability to be fair and impartial

7    to both sides in this case?

8          PROSPECTIVE JUROR GAFFNEY:  I think so,

9    Judge, candidly.

10          THE COURT:  Thank you.  The attorneys may be

11    seated.  We will move on to the next group of people.

12          Actually, I think some of these may also be

13    with Bradley.  I've lost track of who's on what

14    today.

15          Nick Danella, Aaron Chastain, Fritz

16    Spainhour, Virginia Reeves and Erin Sullivan, are

17    those with Bradley also?

18          MR. LEMBKE:  Yes, ma'am.

19          THE COURT:  And they may be in and out of

20    the courtroom some.

21          Do any of you know any of those names I just

22    listed?

23          We also have representing the defendants,

24    Andrew Jones and Chris Bohl.  This is Mr. Jones.

25    These two attorneys are with the Milwaukee firm of

1  White, Hirschboeck.

2        Does anyone know or think you may know any

3  attorneys from that firm or these two?

4        We also may have from time to time other

5  people assisting the defense, Brad Campbell, Terry

6  Kelley, Kim Ferguson -- are any of them in the

7  courtroom now?  They may be coming in and out doing

8  different things.

9        Anybody know or think you may know those

10  individuals?

11        And also at the defense table now is Rick

12  Fuentes from Orange Beach.  Any of you think you may

13  know Mr. Fuentes?

14        As far as you know, have you or any members

15  of your family or close friends ever been represented

16  by any of these attorneys I've introduced to you?

17        How about each other, before you came to the

18  court on Tuesday, did any of you know any of the

19  other potential jurors that are seated with you

20  today?  Is this Ms. Houston?

21        PROSPECTIVE JUROR HOUSTON:  Yes, ma'am.

22        THE COURT:  Who do you know?

23        PROSPECTIVE JUROR HOUSTON:  I don't know him

24  personally but we worked at Brookwood Hospital

25  together.  And I just saw him in passing.  I don't

168

1   know his name personally.

2           THE COURT:  Who is he?

3           PROSPECTIVE JUROR HOUSTON:  Marlon Light.

4           THE COURT:  Mr. Light, do you also work

5   there?

6           PROSPECTIVE JUROR LIGHT:  I used to, I work

7   at Cullman now.

8           THE COURT:  So would the fact that y'all

9   kind of recognize each other have any bearing on your

10  ability to reach your own independent decision in

11  this case?

12          PROSPECTIVE JUROR HOUSTON:  No.

13          PROSPECTIVE JUROR LIGHT:  No, ma'am.

14          THE COURT:  Does anybody else know anyone

15  else in here?  Okay.  Great.  It will give you an

16  opportunity to make some new acquaintances and

17  perhaps some new friends.

18          I would also like to introduce to you our

19  courtroom staff.  Not all of them are here right now,

20  but we'll see what we can do.

21          First, my name is Karen Owen Bowdre.  I grew

22  up in Montgomery and now I live in Vestavia.

23          Do any of you know or think you may know me?

24          The other members of my courtroom staff,

25  you've already met Frankie Calahan.  She lives in the

1   Cullman area.  And up here we have Teresa Roberson

2   from Hoover --

3           MS. ROBERSON:  Shelby County.

4           THE COURT:  Shelby County.  And Julie

5   Martin, who is typing away here.  She's over there.

6   Okay.  You move and I lose you.  That's okay.  Julie

7   and Teresa are our court reporting team and Julie

8   lives in Pinson.

9           Also with me is Joseph Callaway who is one

10  of my law clerks.  He lives in Leeds.

11          And also Michelle Wales who lives in

12  Homewood may be in and out of the courtroom some.

13  Any of you know or think you may know any of my

14  courtroom staff?

15          Is that Ms. Passen?

16          PROSPECTIVE JUROR PASSEN:  Yes, ma'am.

17          THE COURT:  Who do you know?

18          PROSPECTIVE JUROR PASSEN:  I know Joseph.

19          THE COURT:  You do?  That's from the pole

20  vaulting team.

21          PROSPECTIVE JUROR PASSEN:  He pole vaulted

22  with and against my son.  They pole vaulted against

23  each other during the school season and in the summer

24  they competed on the same team.  He would drive them

25  to Hoover because he loved the pole vaulting team so

1   much.

2          THE COURT:  Would the fact that you know

3   Joseph in any way affect your ability to be fair and

4   impartial to both sides in the case?

5          PROSPECTIVE JUROR PASSEN:  I don't think so

6   because he's not doing anything.  Does that make

7   sense?  I mean, he's not going to be testifying.

8          THE COURT:  Right.

9          PROSPECTIVE JUROR PASSEN:  Sorry, Joseph.

10          THE COURT:  He's totally impartial in this

11   case.  Anybody else?  Thank you.

12          Now, the possible witnesses.  You were given

13   earlier today a lengthy list of people who would

14   possibly be witnesses.

15          Have you all had a chance to review that?

16          PROSPECTIVE JUROR:  We weren't given that.

17          THE COURT:  Okay.  We've got a problem.  All

18   right.  Listen very carefully and I am going to read

19   quite a few names.  If you think you may know any of

20   these people, please raise your hand.

21          Sherry Adams from Louisville, Kentucky;

22   Ellis Allen from Foley, Alabama; James Avery from

23   Charlottesville, Virginia; Amy Barker from

24   Indianapolis; Kenny Barrett from Costa Rica; Michelle

25   Bass from Fort Meade, Florida; Jeffrey Bowling from

1   Austin, Texas; Robert Brooks from Pittsburgh,

2   Pennsylvania; Cindy Cieplik from Kansas City,

3   Missouri; Lauretta Dietrich from Augusta, Maine;

4   Robert Donovan from Chicago, Illinois; Peggy Durkin

5   from Scranton, Pennsylvania; Malena Dvwonkowski from

6   DePere, Wisconsin; Betty Eden from Newburgh, Indiana;

7   Jacquelyn Fehd from Evansville, Indiana; Henry

8   Feliciano from Columbia, South Carolina; Barbara

9   Ferguson from Little Rock, Arkansas; Scott Finger

10  from Highland Ranch, Colorado; John Finn from

11  Brighton, Michigan; Susan Gerhart from Lancaster,

12  Pennsylvania; Lisa Gober from Fort Worth, Texas;

13  Margie Greer from Henderson, Kentucky; Stephen Grubbs

14  from Tullahoma, Tennessee; Danielle Gruber from

15  Tullahoma, Tennessee; Terry Hadley from Dexter,

16  Missouri; Patricia Haas from Valparaiso, Indiana;

17  Diane Halderman from Germantown, Tennessee; Lori

18  Harris from Southhaven, Mississippi; Marie Infante

19  from Whitefish, Montana; Mark Jones from Lexington,

20  Nebraska; Denize Jordan from Leander, Texas; Kara

21  Kaiser from Evansville, Indiana; Deborah Lasater from

22  Fort Worth, Texas; Brad Landtroop from Nashville,

23  Tennessee; Dr. Solomon Liao from Orange County,

24  California; Katherine Lucas from Washington, DC;

25  Klaus Miescke from Indian Head Park, Illinois; Heidi

1  O'Connor from San Francisco, California; Sharon

2  Perryman from Westborough, Maine; LeeAnn Pringle from

3  Sideman, Pennsylvania; Kathleen Prechtel from Dallas,

4  Texas; Patricia Pruitt from Carey, North Carolina;

5  Rebekah Rivers from Birmingham, Alabama; she's with

6  the Department of Health and Human Services.

7           Anybody know Rebekah Rivers?

8           Matt Rucker from Fort Smith, Arkansas;

9  Rebecca Rugg-Fryman from Wichita, Kansas; Greg Ryan

10  from Sykesville, Maryland; Mary Jane Schultz from

11  Columbia, South Carolina; Mark Shepherd from Austin,

12  Texas; Tammy Spiegel from Norfolk, Nebraska; Phillip

13  States from Punxsutawney, Pennsylvania; Lori Strater

14  from Columbia, South Carolina; Vicki Stutts from

15  Hartselle, Alabama; Robert Sullivan from Altoona,

16  Pennsylvania; Angela Thornton from Chatom, Alabama;

17  Mary Walker from Cleveland, Tennessee; Vickie Porter

18  Valentine from Falmouth, Indiana; David

19  Brechtelsbauer from Souix Falls, South Dakota;

20  Kristen Bringhurst Lane from Memphis, Tennessee;

21  Cheryl Edmondson from Lawrenceville, Georgia; Carol

22  Eldrige from Sonoma, California; Janice Estey from

23  South San Francisco, California; John Evangelist from

24  Baltimore; Stephen Gershman from Las Vegas, Nevada;

25  Mark Hogle from Baltimore; Mariya Karimova from

1   Nashville; Glenn Pehl from Jamesville, Wisconsin;

2   Margaret Power from Columbia, South Carolina; Yvonne

3   Ruff from Columbia, South Carolina; Dr. Rocco Arcieri

4   from Dallastown, Pennsylvania; Brett Barlag from

5   Washington, DC; Pam Burford from Senatobia,

6   Mississippi; Dr. Jan Chua from Kenosha, Wisconsin;

7   Dr. Gail Cooney from West Palm Beach, Florida; Susan

8   Gerhart from Lancaster, Pennsylvania; Jason Harms

9   from Van Buren, Arkansas; Angie Hollis-Sells I've

10  already introduced to you from Dallas, Texas; Bo

11  Martin from Chicago, Illinois; Dr. Terry Melvin from

12  Chattanooga, Tennessee; Leslie Norwalk from McLean,

13  Virginia; Dr. Chester Palmer from Tallahassee,

14  Florida; Rebecca Smith from Fairhope, Alabama;

15  Dr. Martha Twaddle, Libertyville, Illinois;

16  Dr. Johnny Bates from Birmingham, Alabama.

17          Anybody know Dr. Johnny Bates?

18          Dr. John Crider from Arab, Alabama;

19  Dr. Eleanor Eller from Livingston, Alabama; Dr. Jared

20  Ellis from Tuscaloosa, Alabama; Dr. William Gibson

21  from Snead, Alabama; Dr. Robert Hargraves from Arab,

22  Alabama; Dr. Archie Hooper from Livingston, Alabama;

23  Dr. Travis Miller from Guin, Alabama; Dr. Dick Owens

24  from Haleyville, Alabama; Monica Pilkington from

25  Altoona, Alabama; Dr. Cesar Romero from Hamilton,

1   Alabama; Dr. Thomas Sahawnea from Oneonta, Alabama;

2   Dr. John Wagner from Cullman, Alabama.

3          Do any of you know or think you may know any

4   of those names that I just read?

5          Mr. Light.

6          PROSPECTIVE JUROR LIGHT:  Yes, ma'am.

7   Dr. Sahawnea was my mother's doctor in Oneonta.

8          THE COURT:  Mr. Light, what is your mother's

9   name?

10          PROSPECTIVE JUROR LIGHT:  Thelma Light.

11   She's deceased.

12          THE COURT:  Was he her attending physician

13   when she passed away?

14          PROSPECTIVE JUROR LIGHT:  I don't believe he

15   was.  I'm not sure because my sister ended up taking

16   medical care over.

17          THE COURT:  Do you know him personally?

18          PROSPECTIVE JUROR LIGHT:  I do not.

19          THE COURT:  Would you recognize him if he

20   walked in here?

21          PROSPECTIVE JUROR LIGHT:  I would not.

22          THE COURT:  Would the fact that Dr. Sahawnea

23   may testify in this case affect your ability to be

24   fair and impartial to both sides and weigh the

25   evidence fairly presented to you?

```
1            PROSPECTIVE JUROR LIGHT:  I do not believe
2   it will.
3            THE COURT:  Mr. Houston, was your hand up?
4            PROSPECTIVE JUROR HACKNEY:  Sherry Hackney.
5            THE COURT:  Who do you know or think you
6   know?
7            PROSPECTIVE JUROR HACKNEY:  Dr. Gibson, he's
8   my general physician.
9            THE COURT:  Dr. Who?
10           PROSPECTIVE JUROR HACKNEY:  Gibson.
11           THE COURT:  And he's your physician?
12           PROSPECTIVE JUROR HACKNEY:  Yes.
13           THE COURT:  If Dr. Gibson testified, would
14  you be able to weigh his testimony fairly or would
15  you be inclined to believe him more than you would
16  some other witness?
17           PROSPECTIVE JUROR HACKNEY:  Fairly.
18           THE COURT:  Pardon?
19           PROSPECTIVE JUROR HACKNEY:  I could be fair.
20           THE COURT:  All right.  Thank you.  Anyone
21  else think you may know any of those people we
22  listed?
23           On Tuesday morning I told you a little bit
24  about this case.  Other than me on Tuesday morning,
25  has anyone else talked with you about this case or
```

1    tried to talk with you about the case?  Or the fact

2    that you're a juror and it might be on the AseraCare

3    case, any of that kind of conversation?

4          Let me ask you this:  If anyone were to

5    approach you and try to talk to you about this case,

6    would you be the least bit hesitant to let me know

7    about that conversation or attempted conversation?

8          The reason I ask that is because if you're

9    selected to be on the jury, the jury is not supposed

10   to have any contact with anyone about this case

11   outside of this courtroom.  So if someone were to try

12   to talk to you about this case, I take it from the

13   silence that all of you would be willing to let me

14   know?

15         I see some heads nodding.  Would anyone have

16   a problem with that?

17         Is there any one of you who believes for

18   whatever reason, based upon what you know about this

19   case at this point, that you would be unable, if

20   chosen to serve on the jury in this case, to be fair

21   and impartial to both sides and to return a verdict

22   based solely on the facts as you determine them to be

23   from the evidence presented here in court and the law

24   that I instruct you applies to those facts?

25         Anyone have any question about your own

```
 1   ability to be fair and impartial in this case?

 2          Mr. Kelly, is that based on what we

 3   previously discussed?

 4          PROSPECTIVE JUROR KELLY:  It wasn't

 5   discussed.  It was of the same thing without getting

 6   into the specifics.

 7          THE COURT:  We'll talk again.  Anyone else?

 8   Mr. Gaffney, I was going to ask you that about this

 9   relationship.

10          PROSPECTIVE JUROR GAFFNEY:  I don't think I

11   can be completely -- I don't think I can put this

12   aside, Judge.

13          THE COURT:  Thank you.  Anyone else?  That's

14   Mr. Peete.  For the reasons we talked about earlier?

15          PROSPECTIVE JUROR PEETE:  Yes.

16          THE COURT:  Anyone else?

17          You were given an opportunity to answer this

18   question in your questionnaire, and I told you we

19   weren't going to be repeating questions.  But I am

20   going to invoke my privilege to do that.

21          We asked you at that time whether there was

22   anything else you thought that you should let us know

23   about yourself, some of you answered and gave us some

24   additional information.

25          You may have thought of some other things
```

1  since you filled out that questionnaire on Tuesday.

2          Is there anything else that any of you have

3  thought of that you think would be important for me

4  or the attorneys to know about you before the

5  attorneys make a decision about who will be jurors in

6  this case?  Ms. Passen.

7          PROSPECTIVE JUROR PASSEN:  I work for a

8  global company but our office is small and I know job

9  doesn't count, but my boss told me to say it anyway.

10  We don't have any backup.  So I would have to leave

11  here and still go to work and do certain things

12  because I do handle revenue and commissions as far as

13  sales staff.  And I work for a magazine.  So anything

14  to do with the advertising of the magazine, I handle.

15  I know that's not a reason, but he made me promise.

16          THE COURT:  Let me ask you this, Ms. Passen,

17  since you said that and we won't pass along anything

18  you say to your boss.

19          Would that be an undue hardship for you that

20  could distract from your ability to stay focused on

21  what went on in the courtroom?

22          PROSPECTIVE JUROR PASSEN:  I think possibly

23  because I would be worried about my emails.  Because

24  even if I can check my emails throughout the day

25  because the orders -- the advertising orders that

1    come in to our company come directly to me and I

2    distribute them to the staff.

3            Given that, you know, we're a small group of

4    a big entity, we don't have back up.  Even on

5    vacation we still have to check emails and stuff just

6    because we're a small group.

7            I'm the only accounting person in our group

8    in the Birmingham office.

9            THE COURT:  All right.  Thank you.  Anyone

10   else?

11           I've now asked all the questions I intend to

12   ask.  But I'm going to give the attorneys the

13   opportunity to ask any follow-up questions to the

14   written answers that you provided on Tuesday or

15   answers that you gave today.  And counsel may ask

16   those questions from the lectern.

17           Before we do that, I do want to let the

18   potential jurors know that I am aware of the time and

19   that we've got lunch that's going to be provided free

20   for you today.  So it will be the only time you get a

21   free lunch here.

22           Let me talk to the attorneys just a minute

23   before we do that.

24                 (Sidebar off the record.)

25           THE COURT:  Ladies and gentlemen, we are

```
 1   going to break in just a minute for lunch and then

 2   we'll come back and finish with some more voir dire.

 3            MR. WERTKIN:  Your Honor, I believe one of

 4   --

 5            THE CLERK:  One of our jurors stepped out.

 6            THE COURT:  Who is missing somebody next to

 7   you?  Okay.

 8            MR. CHRISTIE:  Your Honor, Mr. Scott.

 9            THE COURT:  We have to wait for Mr. Scott to

10   get back so I can tell you all at one time.

11            Actually, I guess while we're waiting for

12   him, Ms. Thomas and Mr. Kelly, I need to talk with

13   y'all if would you please come up here.

14                      (Sidebar)

15            THE COURT:  I understand that you have a

16   doctor's appointment.

17            PROSPECTIVE JUROR THOMAS:  At 1:30.

18            THE COURT:  Is there any way you can

19   reschedule and make it later for today?

20            PROSPECTIVE JUROR THOMAS:  I can try.

21            THE COURT:  You're health is important and I

22   want to make sure you take care of your health but if

23   there's any way you could move it until later, we

24   would very much appreciate you doing it.

25            Is this something that you could possibly
```

 1  even go tomorrow?

 2          PROSPECTIVE JUROR THOMAS:  If they've got an

 3  opening.  And I probably will need to do that before

 4  lunch.

 5          THE COURT:  Yes.  And if you'll just let

 6  Cindy in the jury room know.

 7          PROSPECTIVE JUROR THOMAS:  Let her know

 8  after I've done it?

 9          THE COURT:  Thank you.  But don't leave yet

10  because we've got -- you can leave here now.

11                    (Open court)

12          THE COURT:  I'm going to let the rest of you

13  go to lunch.  As I said, we have free lunch for you

14  down in the jury room.

15          I hope you enjoy it and don't let anybody

16  tell you that there's no such thing as a free lunch

17  because this one is free for you today.

18          We're going to try to take about a thirty

19  minute break.  So we will come back at 1:30.

20          Actually, we may ask a few of you to come up

21  separately from the rest of the gang so that we won't

22  have you just sitting out there talking among

23  yourselves.

24          I want to instruct you not to talk with

25  anyone about this case.  That means don't talk to

1    each other about anything that you've heard about

2    this case.  That's going to be a standing instruction

3    for anyone who is selected to be a juror on the case,

4    but it also applies to everyone right now.

5            Y'all have heard about each other's hobbies

6    and things, so I think you've got some things that

7    you can talk with each other about in that regard.

8            But you may go now down to the first floor

9    to the jury assembly room and I hope you enjoy your

10   lunch.

11           Ms. Calahan will come and get you when we

12   need you.

13                    (Sidebar)

14       THE COURT:  Mr. Kelly, you raised your hand

15   about a question about being fair and said there was

16   something you needed to tell us.  And you said it was

17   something that you had not told us about earlier.

18       PROSPECTIVE JUROR KELLY:  Well, just in the

19   questions we had this morning, I answered what I was

20   asked.  I just didn't elaborate on anything, but I am

21   employed with Rast Construction, and I write a check

22   to the federal government every month for penalties

23   from the case, which I mean, I'm not happy about.

24   And I don't like that the outcome of that, which was

25   a whole separate issue, but we're going to be doing

1    that for probably the next five and a half or six

2    years.

3           So the more I sit in this setting and see

4    the federal government, I'm just -- it seems I am

5    much less impartial.

6           THE COURT:  So more things are kind of

7    coming to the surface.

8           PROSPECTIVE JUROR KELLY:  It had kind of

9    been in the past, and I haven't really thought about

10   it, but the more I sit in this environment, you know,

11   I just -- again, it's a different case, but I didn't

12   like the outcome of that and the federal government,

13   the prosecution in the case, and that sort of thing,

14   so -- and I don't like writing that check every

15   month.

16          THE COURT:  So do you think that

17   experience -- and writing the check to the

18   government, is this for fines?

19          PROSPECTIVE JUROR KELLY:  It's part of the

20   restitution on the convictions.

21          THE COURT:  Okay.  So you think that would

22   affect your ability to be impartial in this case?

23          PROSPECTIVE JUROR KELLY:  I would hope not,

24   and I had thought not, but the more I sit in the

25   environment and look at the legal team and all that,

1    I just think it's a possibility that it could, you

2    know, weigh on me more.

3              THE COURT:  Okay.  Do y'all have any

4    questions?

5              MS. TAPIE:  I don't have any further

6    questions.

7              MR. LEMBKE:  I guess I will ask you again

8    what I asked this morning, Mr. Kelly, which is if

9    you're selected to be a juror -- and, obviously,

10   everyone has a background they bring to the case --

11   but if the judge instructs you that you are to

12   consider only the evidence and the facts and what she

13   instructs you on the law, do you think you could be

14   fair and impartial in following that instruction?

15             PROSPECTIVE JUROR KELLY:  I would answer

16   that, yes, I would certainly hope so, and I would

17   make an effort to.  But as I say, with my children, I

18   try to be fair and impartial with them, although I'm

19   obviously very biased as a parent.  So I would draw a

20   simulation in that reference.

21             But, again, just sitting in the courtroom,

22   there's just more things that keep coming up in my

23   mind from the previous frame of reference we talked

24   about earlier.

25             MR. LEMBKE:  And you understand this is a

1   civil case as opposed to a criminal case?

2           PROSPECTIVE JUROR KELLY:  I do.

3           THE COURT:  Everybody besides me may know

4   this answer, so I am going to ask it.  Do you recall

5   what the charges were against Rast?

6           PROSPECTIVE JUROR KELLY:  Not all of them

7   certainly.  There was a long list.  It was just

8   related to the Jefferson County sewer case.  Rast

9   Construction was one of the contractors.  It was

10  involved in that.  And there were different charges

11  for different members.  Like the two primary owners

12  of Rast Construction went to jail in Montgomery.

13          So, I mean, I went down and visited them

14  while they were in jail and they were both good men.

15  And my feeling is that bribery was never proven of

16  the elected officials but that wasn't the outcome of

17  the verdict, and the company as well.

18          THE COURT:  Bribery claims against the

19  company?

20          MR. LEMBKE:  I can't remember the specific

21  charges.

22          PROSPECTIVE JUROR KELLY:  There were mail

23  fraud and all sorts of different penalties that were

24  imposed.  But, yes, the company owes financial

25  restitution to the federal government.

1          MR. LEMBKE:  If I may?

2          THE COURT:  Yes.

3          MR. LEMBKE:  Was that the result of a jury

4  verdict or a guilty plea?

5          PROSPECTIVE JUROR KELLY:  It was a result of

6  a verdict.  It was not a plea.

7          MR. LEMBKE:  Okay.  And am I correct that

8  effectively all rose out of the allegations of

9  payoffs to county employees or officials, isn't that

10  basically what that was?

11          PROSPECTIVE JUROR KELLY:  The federal

12  government initially tried to prove a big collusion

13  because there was a limited number of contractors

14  that were players in Jefferson County and that was

15  not -- they weren't able to state that case and they

16  started looking at other -- as far as the net that

17  was cast out, they started looking at other issues.

18  And if anybody had given anybody a gift card for

19  Christmas or -- it went all the way down the line.

20          It became very expansive and involved a lot

21  of people and contractors and engineers and that sort

22  of thing.

23          MR. LEMBKE:  All right.

24          MS. TAPIE:  I do have a follow-up question,

25  if that's okay.

1          THE COURT:  Okay.

2          MS. TAPIE:  Your feelings that you are now

3    experiencing in the courtroom with the government

4    counsel team, do you feel you can assure us sitting

5    in here Monday through Thursday, 8:30 to 5:30 as a

6    juror, that you would be able to completely put those

7    feelings out of your mind and weigh the evidence?

8          PROSPECTIVE JUROR KELLY:  That's well

9    phrased and, you know, I wouldn't say that.  I can't

10   say that I can put it totally out of my mind, because

11   I didn't really think they were going to rise up.

12   But even this morning, just, you know, it keeps going

13   through my mind real heavy.

14         So I'm not trying to certainly get out of

15   serving.  I've served on juries before in the past.

16   I just don't feel -- hopefully, you have jurors that

17   can be completely impartial.  I just feel like that I

18   am slightly biased.

19         THE COURT:  Do you feel that the government

20   was overreaching in its --

21         PROSPECTIVE JUROR KELLY:  In that other

22   case?

23         THE COURT:  Yes.

24         PROSPECTIVE JUROR KELLY:  I do.  And I can

25   go into that, if you want me to.

1          THE COURT:  Okay.

2          MR. LEMBKE:  Mr. Kelly, obviously, everyone

3   who comes into the courtroom as a juror has life

4   experiences that may affect the way they view the

5   world.  But when it comes time to serving as a juror

6   and the judge says can you consider only the evidence

7   and follow the law as instructed by the court, do you

8   intend to do that if you're on the jury?

9          PROSPECTIVE JUROR KELLY:  I would certainly

10  try.

11         THE COURT:  Anything else?

12         MS. TAPIE:  No.

13         MR. LEMBKE:  No, Your Honor.

14         THE COURT:  Thank you, Mr. Kelly.  And I

15  very much appreciate your candor with us.  You can go

16  and enjoy your lunch.

17         MS. TAPIE:  We would renew our motion for

18  cause, Your Honor.  It's concerning.  We believe he

19  can't put his bias aside.

20         MR. LEMBKE:  Your Honor, this reminds me a

21  lot of the ones you kept on.  When we asked him a

22  question, do you intend to follow the instructions

23  and limit your verdict to the law and the facts, and

24  he said, yes, that's what he intends to do.

25         MS. TAPIE:  He said he would try.

1           THE COURT:  He said he would try.  I'm

2    concerned about this juror.  I really am.  So I am

3    going to excuse him for cause at this time.  I think

4    he was much less confident of his ability to put that

5    aside.

6           We were talking earlier off the record about

7    Mr. Gaffney, and I think Mr. Lembke said he couldn't

8    do much to rehabilitate Mr. Gaffney.

9           MS. TAPIE:  I was surprised that Mr. Gaffney

10   personally knows Mr. Lembke and Mr. Selden, and that

11   was not brought to our attention.  I'm just saying

12   that.  That came as a surprise to us.

13          MR. LEMBKE:  Well, Ms. Tapie said the court

14   was going to ask if anyone knew the lawyers, and I'm

15   not sure that there was an occasion to raise that.

16          THE COURT:  Well, the government did point

17   out to us when they saw the list that Ms. Thomas

18   knows Ms. Woodke or Don Long, but it's no big deal.

19          MR. LEMBKE:  I will say for the record, so

20   it's clear, until John Gaffney walked in the jury

21   room this morning, if I had seen him on the street, I

22   would not have known that was John Gaffney, but he

23   knows Jack Selden better.

24          THE COURT:  Are y'all in the same social

25   club?

1      MR. LEMBKE:  We were members of Mountain

2  Brook Club.

3      THE COURT:  We will get Mr. Peete --

4      MR. LEMBKE:  I think we may need to ask him

5  a question.

6      MS. TAPIE:  What number is that?

7      THE COURT:  Thirty-one.  He's the one whose

8  father was in hospice and had a very unfavorable

9  opinion.  He said he could be fair while we were in

10 there, but he raised his hand in response to the

11 question about his ability to be fair.

12      Do you want to bring him back up for some

13 more questions?

14      MR. LEMBKE:  Your Honor, we would defer to

15 the Court's judgment on that.

16      THE COURT:  I think if we let him go, then

17 y'all will each have four strikes that you can

18 exercise peremptorily without any concerns, I hope,

19 about the fairness of the jurors at this point.

20      MS. TAPIE:  There are a couple -- I think

21 Mr. Lembke has said there are a couple more we did

22 want to question privately either up here at sidebar

23 or based on their answers that could rise to cause

24 motions, but it's hard to know without knowing the

25 answers.

```
 1              THE COURT:  We have twenty-eight now?
 2              THE CLERK:  Yes.
 3              THE COURT:  We need twenty to seat the case
 4    from.  So if we get rid of those three, that would
 5    still leave -- I think that's seven -- off the
 6    record.
 7                         (Off the record)
 8              THE COURT:  I think the fact that he
 9    repeatedly questioned his ability to be fair is a
10    reason to strike him for cause.
11              If you will give me a list of the people you
12    want to hear from, we will start with them at 1:30 or
13    maybe a little before then.
14              MS. TAPIE:  I do want to ask Ms. Passen some
15    questions.  She's juror number seven.  And it
16    probably needs to be at sidebar.
17              Mr. Park, number eleven.
18              THE COURT:  Start with the numbers, if you
19    wouldn't mind.
20              MS. TAPIE:  Number eleven, Mr. Park also at
21    sidebar.  And number twenty-five, Ms. Canada, that's
22    also at sidebar.  And number thirty, Mr. Smith, also
23    at sidebar.
24              THE COURT:  And for the defense?
25              MR. LEMBKE:  Five, number fifteen, and
```

1    number twenty-two.

2           MS. TAPIE:  And number fifteen, Your Honor,

3    again, it might be someone that could have a business

4    relationship --

5           MR. LEMBKE:  He's coming up for me.

6           MS. TAPIE:  We are just highlighting that.

7           THE COURT:  Thank you.  And that's about a

8    business relationship.

9           MS. TAPIE:  It's when you were asking about

10   business relationships, I think.

11          THE COURT:  When would --

12          MS. TAPIE:  I don't remember.

13          THE COURT:  Okay.  We can go off the record.

14               (Off the record discussion)

15                    (Brief recess)

16          (Sidebar individual juror questioning.)

17          THE COURT:  Ms. Canada, the lawyers have

18   some questions that they want to ask you.

19          MS. TAPIE:  You said you got your news from

20   Al.com.  Have you seen any articles related to this

21   case?

22          PROSPECTIVE JUROR CANADA:  No, ma'am, I have

23   not.

24          MS. TAPIE:  I also want to ask you about a

25   response on the questionnaire.  You said you have an

1  unfavorable view for the federal government, Medicare

2  and Department of Justice.

3        Do you think that could impact your ability

4  to be impartial in the case that the United States is

5  bringing, the case represented by lawyers from the

6  Department of Justice and that the case involves

7  Medicare?

8        PROSPECTIVE JUROR CANADA:  I don't think

9  because I also have unfavorable views for hospice

10 care.  My daughter is a nurse.

11       THE COURT:  I'm sorry, I can't hear you.

12       PROSPECTIVE JUROR CANADA:  I also have

13 unfavorable views regarding, I guess, not Medicare,

14 but in addition to the government, Medicare, hospice,

15 nursing homes in general.

16       My daughter was a nurse.  Part of her

17 training was working in the nursing home doing what

18 she calls her clinicals.  And she was not impressed

19 with anything she saw.  I have that information from

20 her.  I have no firsthand experience, however.

21       THE COURT:  But that was her experience in

22 the nursing home?

23       PROSPECTIVE JUROR CANADA:  Yes, ma'am.

24       THE COURT:  Did she have any firsthand

25 experience with hospice care?

1          PROSPECTIVE JUROR CANADA:  She did home

2     health as one of her clinicals, and it was with the

3     hospice patients.

4          THE COURT:  Home health with hospice

5     patients?

6          PROSPECTIVE JUROR CANADA:  Yes, ma'am.  She

7     had two that passed away during her clinicals.

8          THE COURT:  And what about that experience

9     did she share with you that caused you to have these

10    feelings?

11         PROSPECTIVE JUROR CANADA:  There's all so

12    much bureaucracy involved.  The family may or may not

13    want a particular type of care and having trouble

14    getting it or not being able to get what they wanted

15    in some instances.

16         And the duties of the people that were

17    involved in the hospice care, she didn't feel like

18    the lady she was with truly cared about her patients.

19    She was doing a job.  And, of course, my daughter is

20    brand new.  She's having her eyes opened to a lot of

21    things.  But we rode together back and forth to and

22    from work, so we had time to talk.

23         MS. TAPIE:  I don't have anything further.

24         MR. LEMBKE:  Ms. Canada, I'm Matt Lembke,

25    and I'm one of the lawyers for the defendant

1    AseraCare, which is a hospice company.

2             Do you have any idea if your daughter was

3    working -- the company, the hospice company she was

4    --

5             PROSPECTIVE JUROR CANADA:  She was with

6    Alacare.  Her clinicals were with Alacare Care.

7             MR. LEMBKE:  And if you're selected to be a

8    juror in this case, the Judge is going to instruct

9    the jury that you are to consider only the facts in

10   this case and the law as instructed by the Court and

11   render a fair and impartial verdict based on that.

12            Do you have any doubt that you can do that?

13            PROSPECTIVE JUROR CANADA:  No.  I have to be

14   impartial in my job.  I do revenue analysis, data

15   analysis, sales commission, sales goals, I can't let

16   that be -- I can't let the fact that I know somebody

17   or am friends out of the home office with people be a

18   reason I set a goal or any consideration to that.

19            THE COURT:  Thank you very much.

20            THE CLERK:  Ms. Upshaw.

21            THE COURT:  Hi, Ms. Upshaw.  The lawyers

22   have some questions they want to ask you about some

23   of your answers.

24            MR. LEMBKE:  Ms. Upshaw, I am Matt Lembke.

25   I am one of the lawyers for AseraCare which is the

1   defendant in the case, and I wanted to follow up on

2   one of the questions in your questionnaire that I

3   pulled out to show you.

4          Number forty-four, the question was, what is

5   your opinion of companies that provide hospice or

6   palliative care.  And you answered, mostly positive.

7   And then in explaining you said, in general, it's a

8   great service that's needed when there is a true

9   need.

10          And I'm wondering when you said when there's

11   a true need, can you explain what you meant by that?

12          PROSPECTIVE JUROR UPSHAW:  Well, I've been

13   in healthcare for several years.  But I've been

14   oncology for the last twenty-six years.  And, for the

15   most part, the patients that we have or the companies

16   that we have are good.

17          But just in general, in passing, I've had

18   people that received care saying, you know, you can

19   put them on hospice and I'm like why, if they don't

20   need it.  Just in general.  But like no particular

21   instance, but I'm just saying if there's a need, it's

22   a good service.

23          MR. LEMBKE:  When you say that people were

24   putting them on hospice, what do you recall about

25   that?  When you just said the different --

1          PROSPECTIVE JUROR UPSHAW:  In general?

2          MR. LEMBKE:  Yes, ma'am.  What you just told

3    me.  In the sense of you said there were some

4    patients who you thought didn't belong on hospice.

5          PROSPECTIVE JUROR UPSHAW:  No.  I've never

6    run across anybody that didn't need it.  For

7    instance, I have a brother that has MS, and his

8    ex-wife was saying, well, if you put him on hospice,

9    you can get all these free services.  I'm like, well,

10   he don't need hospice, you know, so --

11         MR. LEMBKE:  I see.

12         PROSPECTIVE JUROR UPSHAW:  That was the

13   instance.

14         MR. LEMBKE:  And given that you work in the

15   oncology field, I would imagine a number of patients

16   you treat end up going on hospice.

17         PROSPECTIVE JUROR UPSHAW:  Yes.

18         MR. LEMBKE:  What is your overall view of

19   hospice companies?

20         PROSPECTIVE JUROR UPSHAW:  I think it's a

21   great service.  It's needed.

22         MR. LEMBKE:  Have you ever had any dealings

23   with AseraCare at all that you can recall?

24         PROSPECTIVE JUROR UPSHAW:  I've never heard

25   of them.

```
 1           MR. LEMBKE:  I don't think I have anything
 2   further.
 3           MS. TAPIE:  No questions.
 4           PROSPECTIVE JUROR UPSHAW:  Are y'all sure?
 5   I don't want to come back.  I'm just teasing.
 6           THE COURT:  I've got a question for you.
 7   You indicated that your stepsister had worked for the
 8   federal government.
 9           PROSPECTIVE JUROR UPSHAW:  She's a marshal.
10   Is it a marshal?  I don't know.  I asked her the
11   other day.  What's your term?  Because I said that,
12   and she said, no, she's not.  She's in security.
13           THE COURT:  Where?
14           PROSPECTIVE JUROR UPSHAW:  Here in security.
15           THE COURT:  What's her name?
16           PROSPECTIVE JUROR UPSHAW:  Juateria
17   Montgomery.
18           THE COURT:  Do you know her?
19           THE CLERK:  I think so.
20           PROSPECTIVE JUROR UPSHAW:  She's been here
21   three months.
22           THE COURT:  She's a court security officer?
23   Does she wear a navy blazer?
24           PROSPECTIVE JUROR UPSHAW:  Yes.  I didn't
25   know what she was.
```

1        THE COURT:  How close are you to her?

2        PROSPECTIVE JUROR UPSHAW:  I mean, we're

3  sisters.  We don't chat everyday or every week, you

4  know, but --

5        THE COURT:  Would her involvement here with

6  the court in any way affect your ability to be fair

7  and impartial in this case?

8        PROSPECTIVE JUROR UPSHAW:  Huh-uh.

9        THE COURT:  If you're selected to serve as a

10  juror, I would instruct you repeatedly that you're

11  not to talk with anybody about the case and that

12  would include even your sister.  Do you understand

13  that?

14        PROSPECTIVE JUROR UPSHAW:  Well, I work in

15  the hospital.  It's all about HIPPA, so I'm well

16  aware of that.  So, I mean, I wouldn't do it anyway.

17        THE COURT:  All right.  Good.  And I wanted

18  to make sure that I understood what you said.  Was it

19  your brother who someone suggested should be placed

20  on hospice?

21        PROSPECTIVE JUROR UPSHAW:  Uh-huh.

22        THE COURT:  You need to answer yes or no.

23        PROSPECTIVE JUROR UPSHAW:  I'm sorry.  Yes.

24        THE COURT:  And you said that he didn't need

25  it?

1      PROSPECTIVE JUROR UPSHAW:  No, he doesn't.

2      THE COURT:  And that was based on what?

3      PROSPECTIVE JUROR UPSHAW:  I think because

4  I'm his primary caregiver.  He lives with me.  I

5  think she was really trying to be helpful, as far as

6  like a lot of things like medical needs that he may

7  have or someone to come in and like give me relief or

8  something like that.  I think she meant it for the

9  good, but it was just, you know --

10      THE COURT:  Okay.  I guess what I'm trying

11  to get to is why do you -- why did you decide that he

12  didn't need hospice?  What was your --

13      PROSPECTIVE JUROR UPSHAW:  He's not at the

14  end of care, end of life needs.  He's well, other

15  than his disability.

16      THE COURT:  Which is what?

17      PROSPECTIVE JUROR UPSHAW:  Multiple

18  sclerosis.

19      THE COURT:  Is he still able to get around?

20      PROSPECTIVE JUROR UPSHAW:  He can do lateral

21  transfers, but he's completely wheelchair bound.

22      MR. LEMBKE:  And who was it that suggested

23  maybe hospice was an option for him?

24      PROSPECTIVE JUROR UPSHAW:  An ex-wife.

25      MR. LEMBKE:  An ex-wife.  Okay.  And where

1   does she work?

2          PROSPECTIVE JUROR UPSHAW:  She doesn't.

3          MR. LEMBKE:  Okay.  I think that's all.

4          THE COURT:  Thank you.

5          THE CLERK:  Ms. Passen.

6          THE COURT:  Ms. Passen.  I think the lawyers

7   have some questions for you.

8          MS. WOODKE:  I noticed on question 26 that

9   you stated that your stepmother owned a caregiver

10  company?

11         PROSPECTIVE JUROR PASSEN:  Yes, ma'am.

12         MS. WOODKE:  What kind of company is that?

13         PROSPECTIVE JUROR PASSEN:  She was in the

14  Rocky Ridge assisted living home, and she owned a

15  company that would -- she doesn't own it now -- but

16  she would do things for people in the home and then

17  she also went to people's homes and helped take care

18  of people.

19         MS. WOODKE:  Was it in a hospice capacity?

20  Do you know?

21         PROSPECTIVE JUROR PASSEN:  I'm not a hundred

22  percent sure.  I know several people who knew that

23  they had said they helped their parents, but I don't

24  think she -- she couldn't administer drugs and that

25  kind of stuff, she was just helping to care and bathe

1   and, you know, that kind of stuff.

2          MS. WOODKE:  You said she didn't own it

3   anymore.  Do you think what happened to the ownership

4   of that company?

5          PROSPECTIVE JUROR PASSEN:  After my mother

6   passed away and my dad met her, then she wanted to

7   spend more time with him.  Before she had been alone,

8   so she was real good taking care of other people.

9   She takes very good care of my dad.  She's like 12

10  years younger than my dad.

11         MS. WOODKE:  Do you know who she sold it to?

12         PROSPECTIVE JUROR PASSEN:  I don't, I do

13  not.

14         MS. WOODKE:  Do you know anything else about

15  her experience with that?  Has she given you any

16  stories about her experience --

17         PROSPECTIVE JUROR PASSEN:  She doesn't share

18  a lot of stuff.

19         MS. WOODKE:  She hasn't told you anything

20  that would make that make you not be fair and

21  impartial?

22         PROSPECTIVE JUROR PASSEN:  No.  She takes

23  care of great care of my dad.  He's 85.

24         MS. WOODKE:  You said that you participated

25  in a lawsuit with a children's daycare.

1           PROSPECTIVE JUROR PASSEN:  I testified.  I

2    testified, yes.  They were being charged with abuse,

3    and one of my children was one of the children who

4    had been abused.  Fortunately, for me, he was young

5    enough he did not remember it.  So I had to testify

6    and was threatened by their lawyer, too.

7           MS. WOODKE:  Was it a criminal case?

8           PROSPECTIVE JUROR PASSEN:  I don't really

9    know because my kids are 27 and 30, and that is when

10   they were little.

11          MS. WOODKE:  Did you bring the suit?

12          PROSPECTIVE JUROR PASSEN:  No, I did not

13   bring the suit.  I want to say Hoover was pressing

14   charges against them.  The City of Hoover was

15   pressing charges against them for things they were

16   doing to the kids, locking them outside and that kind

17   of stuff.

18          THE COURT:  Did you say that you were

19   threatened by a lawyer in that case or did I just

20   totally mishear that?

21          PROSPECTIVE JUROR PASSEN:  She wrote me a

22   letter saying I couldn't say the things I was saying.

23   And I wrote a letter back to her because I was told I

24   could say -- she told me I couldn't tell people about

25   what happened at the day care.  And I said if

1  somebody asks me did this happen to my child, because

2  it wasn't part of the case, it was like before the

3  case.

4         And she sent me a threatening letter

5  threatening to sue me because I was spreading bad

6  rumors about her client.  And I checked with a friend

7  of ours that was a lawyer, and she said she couldn't

8  do that.  I could stand on this person's property and

9  say the things I was saying.  And so I just wrote a

10  letter back.

11         In fact, when I testified, it was brought to

12  her attention that I was the person that she had

13  written a letter to, and she kind of weakened up on

14  her questioning of me.  Does that make sense?

15         THE COURT:  Yes.  Do you remember the

16  lawyer's name?

17         PROSPECTIVE JUROR PASSEN:  If you hadn't

18  asked me, I could have told you.  She's now changed

19  from being for the defendant.  Now she's prosecuting.

20  So she's kind of flipped sides now.  Again, my kids

21  are 27 and 30.  And, you know, this is when they were

22  five and six, so this is 20 plus years ago.

23         THE COURT:  Okay.

24         PROSPECTIVE JUROR PASSEN:  I considered it a

25  threatening letter.  She's telling me to be quite.

 1              THE COURT:  Okay.  Ms. Passen, let me ask

 2    you this:  When I tell you to be quiet about this

 3    case and not talk to anybody about it outside of

 4    this --

 5              PROSPECTIVE JUROR PASSEN:  I thought about

 6    that one, too.

 7              THE COURT:  Is that going to be hard for you

 8    to do?

 9              PROSPECTIVE JUROR PASSEN:  Yeah.  You can

10    tell I'm kind of a talkative person.  I will try my

11    best, yes, ma'am.

12              THE COURT:  Okay.

13              PROSPECTIVE JUROR PASSEN:  It's hard.

14              MS. WOODKE:  I have one more question for

15    you.  You answered the question what is your opinion

16    of the federal government, and you said somewhat

17    unfavorable because it wanted too much control of my

18    personal life.

19              What did you mean by that?

20              PROSPECTIVE JUROR PASSEN:  I will just that

21    they're trying to get involved on decisions that

22    should be mine, the cost of raising my parents.  Even

23    sitting here, I'm counting up how many lawyers on

24    both sides are costing everybody, and I have no idea

25    how much the money is in this case.  But, you know,

1  is it worth the amount of money that's being spent to

2  defend and, you know, prosecute the case for the

3  amount of money that needs to be refunded.  I don't

4  know how much money is involved here, but, you know.

5           MS. WOODKE:  What do you mean cost of

6  raising your parents.  It said -- particle size you

7  said raising your parents?

8           PROSPECTIVE JUROR PASSEN:  I meant my

9  children.  My parents are already raised.  Just

10  telling a person how they should or shouldn't behave.

11  What I want to teach my children about religion, what

12  immaterial to teach my children about sex or

13  marriage, that should be my choice.  It shouldn't be

14  something that the school system or the government is

15  saying that this is right and this is wrong.  Those

16  are moral questions.  And just because it's legal

17  doesn't mean it's right, you know.

18           MS. TAPIE:  Do you have any concerns based

19  on the fact that this is a case brought by the

20  federal government against a hospice company related

21  to Medicare?  Do you have concerns that those

22  feelings that you just expressed could impact your

23  ability to be fair and impartial?

24           PROSPECTIVE JUROR PASSEN:  I don't think so.

25  I've never been on a jury.  The only jury I've ever

1    been on is the Grand Jury.  It's kind of a totally

2    different because, in that case, you're only looking

3    at the evidence to see if there's enough evidence to

4    prosecute somebody.  So I've never sat on a jury, you

5    know.  I've thought more of how can I go to the

6    restroom, can I bring my fan in because I have hot

7    flashes, you know.

8            THE COURT:  You can bring your fan,

9    Ms. Passen.

10           PROSPECTIVE JUROR PASSEN:  I have one with

11   me right now.

12           THE COURT:  Anything else?

13           MS. WOODKE:  I don't think so.

14           MR. LEMBKE:  No questions.

15           THE COURT:  Thank you, Ms. Passen.

16           MR. LEMBKE:  Your Honor, I don't mean to be

17   a stickler, but I would ask we stick to one lawyer

18   per witness, so we don't have a tag team here.

19           THE COURT:  Can we do that, just one lawyer

20   questioning one juror?

21           MS. TAPIE:  Oh, yeah, sorry.

22           THE CLERK:  Number 11.  Mr. Park.

23           THE COURT:  Good afternoon, Mr. Park.  How

24   are you doing?

25           PROSPECTIVE JUROR PARK:  So far so good.

1          THE COURT:  I think these attorneys have

2     some questions for you.

3          MS. TAPIE:  I'm Carolyn Tapie with the

4     Department of Justice.  I want to ask you about a

5     question that you answered on your survey where you

6     said that you have an unfavorable view of the

7     Department of Justice because too selective in cases

8     investigated by Eric Holder, Justice Department.  I

9     was hoping you could elaborate on that.

10         PROSPECTIVE JUROR PARK:  I think he's been a

11    little bit lax, from my unprofessional experience, in

12    handling what should be done, like with Mrs. Clinton

13    and that whole experience.  I'm just not, you know --

14    I think it's not anything that I can't get over or

15    can't overlook, but it sticks in my craw.

16         MS. TAPIE:  That's really my next question.

17    Knowing that this case is being brought by the United

18    States and that the attorneys are from the Department

19    of Justice, do you think that could impact your

20    ability to be unbiased and impartial?

21         PROSPECTIVE JUROR PARK:  No, not at all.

22         MS. TAPIE:  Okay.  I don't have any further

23    questions.

24         MR. LEMBKE:  I don't have anything.

25         THE COURT:  Thank you very much, Mr. Park.

1          THE CLERK:  Number 15, Mr. Bibb.

2   How are you doing?

3          PROSPECTIVE JUROR BIBB:  Good.

4          THE COURT:  After we broke for lunch, one of

5   the lawyers brought to my attention that they thought

6   they saw your hand halfway go up.

7          PROSPECTIVE JUROR BIBB:  I was trying to get

8   your attention that we didn't hear.

9          THE COURT:  You're having trouble hearing?

10          PROSPECTIVE JUROR BIBB:  I didn't have a

11   problem hearing.  I was just trying to answer the

12   question that we didn't or -- I forget what the

13   question was.  I wasn't trying to raise my hand.

14          THE COURT:  I think it had something to do

15   with having any kind of business association or

16   anything with any of the parties in this case.

17          PROSPECTIVE JUROR BIBB:  I didn't raise my

18   hand.

19          THE COURT:  All right.  Good.  Because I

20   didn't see it, but I can't see everything.  All

21   right.  And then I think there's some questions.

22          MR. LEMBKE:  I did have a question.  I'm

23   Matt Lembke.  I'm one of the lawyers for AseraCare,

24   which is the defendant in this case and we're the

25   hospice company, as you've heard.

1        In looking at your written questionnaire, we
2   asked what are your general feelings about hospice or
3   palliative care, care that is focused on the
4   patient's comfort toward the end of his or her life,
5   and you circled somewhat up favorable.
6        PROSPECTIVE JUROR BIBB:  What are the
7   general feelings about hospice and palliative care
8   that is focused on the patient's comfort toward the
9   end of life.  Somewhat unfavorable.
10        MR. LEMBKE:  Did you mean to say that or --
11        PROSPECTIVE JUROR BIBB:  Let me see that.  I
12   just -- I mean, what I meant by it, I know it's a
13   tough process, because when me and my wife first
14   started dating, her grandmother was sick, but her
15   aunt took care of her, and there wasn't no hospice
16   because she was a nurse, and they talked about how
17   tough it was because she had cancer and the pain she
18   was going through.  That's what I was relating to.  I
19   know it's a really tough industry and dealing with
20   hospice.
21        MR. LEMBKE:  So you don't have any negative
22   feelings toward companies that provide hospice care?
23        PROSPECTIVE JUROR BIBB:  No.  Because I also
24   wrote down that I've never really had no dealings
25   with them because none of my families members have

1   ever been through it, so I'm kind of neutral about it

2   because I wasn't ever around it.

3            MR. LEMBKE:  Mr. Bibb, thank you.  That's

4   all I have.

5            PROSPECTIVE JUROR BIBB:  Okay.  Thank you.

6            THE CLERK:  22.

7            THE COURT:  Ms. Rains.  Ms. Rains, the

8   lawyers have some questions for you.

9            MR. LEMBKE:  Ms. Rains, I'm Matt Lembke, and

10  I am the lawyer for AseraCare, which is the defendant

11  in the case and, as you heard here, the hospice

12  company.  And in your written questionnaire, one of

13  the questions you were asked is what are your

14  feelings, general feelings about hospice or

15  palliative care that is focused on a patient's

16  comfort toward the end of his or her life, and you

17  circled very unfavorable.  Is that what you mean to

18  say?

19           PROSPECTIVE JUROR RAINS.  No, I meant very

20  favorable.  I'm sorry.  I had them backwards.

21  Because I think it's something you need.

22           MR. LEMBKE:  Okay.  Thank you.  I don't have

23  anything further, Your Honor.

24           MS. TAPIE:  Nothing here.

25           MR. LEMBKE:  Thank you, Ms. Rains.

```
 1              THE COURT:  The next one.
 2              THE CLERK:  24, Gregg Smith.  How are you
 3   doing?
 4              PROSPECTIVE JUROR GREGG SMITH:  Fine.
 5              THE COURT:  I think we wanted to ask you
 6   some questions about that attempt on your life and
 7   the prosecution of it.
 8              PROSPECTIVE JUROR GREGG SMITH:  Okay.
 9              THE COURT:  You mentioned that you had to
10   testify in three trials.
11              PROSPECTIVE JUROR GREGG SMITH:  No, it's the
12   same trial.
13              THE COURT:  I'm sorry, I misunderstood.
14              PROSPECTIVE JUROR GREGG SMITH:  Yeah, I got
15   shot.
16              THE COURT:  I understand that part.
17              PROSPECTIVE JUROR GREGG SMITH:  Two people
18   were invading my house, and I got up and confronted
19   them, so we exchanged fire.  So the trial was on me
20   against -- you know, I was trying -- they were trying
21   to convict them.  But, see, it was attempted murder,
22   but the next day, one of the guys went down the
23   street to a Circle K type thing, and the woman behind
24   the counter they had her lay down, and they shot her
25   in the back.  So that was one murder.  And then there
```

1   was two more.

2          So after three rounds of me testifying,

3   yeah, this is what happened, explaining as I am

4   explaining right now, they said, okay.  Finally, they

5   said, hey, do you mind dropping your, whatever your

6   case is, do you mind dropping it?

7          THE COURT:  Attempted murder?

8          PROSPECTIVE JUROR GREGG SMITH:  Because they

9   had three murders already, so that's what they did.

10         THE COURT:  Okay.  So was it one trial that

11  accused these people of attempted murder on you, and

12  then the other three murders in one case?

13         PROSPECTIVE JUROR GREGG SMITH:  No, it was

14  just me.  And, I mean, they had me come back three

15  times.  I said exactly the same thing in front of the

16  jury.

17         THE COURT:  And the other three -- in the

18  three murder cases?

19         PROSPECTIVE JUROR GREGG SMITH:  No, I wasn't

20  involved with the murder.  It was just my case.

21         THE COURT:  All right.

22         PROSPECTIVE JUROR GREGG SMITH:  In my case,

23  they made me come back three times for my case.

24         THE COURT:  Okay.

25         MR. LEMBKE:  In court?

1    PROSPECTIVE JUROR GREGG SMITH:  They had me
2  sitting like this.
3    MS. TAPIE:  And it was the same jury?
4    PROSPECTIVE JUROR GREGG SMITH:  I don't
5  recall the faces.  I don't know if it was the same
6  jury.  I assume it was.  So they asked me some
7  questions.  I'm assuming they wanted to ask me more
8  questions.  And I thought all right.  So I had to
9  come back three times.  I got shot here and here
10  (indicating.)
11    MR. LEMBKE:  How long ago was this,
12  Mr. Smith?
13    PROSPECTIVE JUROR GREGG SMITH:  '85.  It was
14  a long time ago.  So the point is they wanted to put
15  these guys in jail.  And I was standing in their way
16  is what they told me.  In other words, I was down
17  here, and they had three murder cases ahead of me.
18  Does that answer your questions?
19    THE COURT:  Would anything about that
20  experience with the prosecution team affect you?
21    PROSPECTIVE JUROR GREGG SMITH:  No.  The
22  only reason, it came up as a question, and I just
23  wanted to make sure I didn't lie.
24    THE COURT:  Well, we don't want anybody to
25  lie.  Was there any other questions?

1              MS. TAPIE:  Just a few.  If you have any

2    concerns, since you have that experience with the

3    prosecution, this is not a criminal case as the judge

4    has said, but the fact that it is the government and

5    the Department of Justice on one side --

6              PROSPECTIVE JUROR GREGG SMITH:  It has

7    nothing to do with that.

8              MS. TAPIE:  So you don't think it makes you

9    more biased or --

10             PROSPECTIVE JUROR GREGG SMITH:  No.  This is

11   personal.  I mean, that deal was personal.  This is

12   not personal.

13             THE COURT:  All right.  Was that prosecuted

14   by the county, district attorney?

15             PROSPECTIVE JUROR GREGG SMITH:  It happened

16   in Shelby County, and that was so long ago, and I'm

17   trying to forget it.

18             THE COURT:  But it was the not the United

19   States Government?

20             PROSPECTIVE JUROR GREGG SMITH:  No, ma'am.

21   I'm pretty sure it wasn't, but I can go back and

22   look.

23             THE COURT:  Was it in Shelby County?

24             PROSPECTIVE JUROR GREGG SMITH:  It was

25   downtown here.

1          THE COURT:  But not in this building?

2          PROSPECTIVE JUROR GREGG SMITH:  No.

3          THE COURT:  Well, it wouldn't have been in

4   this courtroom because it's brand new.

5          PROSPECTIVE JUROR GREGG SMITH:  I know.  My

6   construction company did this.

7          THE COURT:  Which construction company is

8   that?

9          PROSPECTIVE JUROR GREGG SMITH:  I'm the one

10  that did the dry wall.

11         THE COURT:  Okay.  Well, good.  Thank you.

12  The dry wall is good.  That doesn't have anything to

13  do with the trial.  Thank you very much.

14         THE CLERK:  Philip Smith.

15         THE COURT:  Mr. Philip Smith.  How are you

16  doing, Mr. Smith?  The attorneys have some questions

17  for you.

18         MS. TAPIE:  Mr. Smith, I'm Carolyn Tapie.

19  I'm with the Department of Justice.  I just have a

20  couple of questions for you.  First, what's involved

21  with your work with the social security?

22         PROSPECTIVE JUROR PHILIP SMITH:  I took

23  initial claims, and I then processed them.

24  Basically, I was on the phone interviewing people.  I

25  I would fill out an application for them.

1    Originally, we would send them out to sign and return

2    and then trigger it for payment, and then later we

3    needed a signature.  So I just asked routine

4    questions.

5         MS. TAPIE:  All social security claims?

6         THE COURT:  You need to answer out loud,

7    please, sir.

8         PROSPECTIVE JUROR PHILIP SMITH:  I was

9    answering.  Do you want me to speak louder?

10        THE COURT:  I just saw you nod your head.

11   I'm sorry.

12        MS. TAPIE:  I wanted to ask you about your

13   response about your opinion of United States

14   Department of Justice, and you said it's very

15   unfavorable, and it is currently too political.

16        PROSPECTIVE JUROR PHILIP SMITH:  I think

17   it's really political in the way they do things.

18   I've seen things that happened with the Black

19   Panthers and the voting booth in Philadelphia, and I

20   felt that was totally racial.  And the Department of

21   Justice, the president is black, and the people

22   intimidating the voters were black.  And I feel

23   personally if it had been a white person doing the

24   same thing, that it would have been prosecuted.  So I

25   feel like that it's all political.

1    MS. TAPIE:  I appreciate your candor about

2    it.  Those feelings that you have, the fact that this

3    case is being brought by the United States and all

4    the attorneys on this side of the government are

5    employed by the Department of Justice, do you think

6    that's likely to cause you to lean one way or the

7    other as a juror?

8          PROSPECTIVE JUROR PHILIP SMITH:  No.

9          MS. TAPIE:  So you're not concerned that it

10   would?

11         PROSPECTIVE JUROR PHILIP SMITH:  No, ma'am.

12         MS. TAPIE:  Maybe biased in any way?

13         PROSPECTIVE JUROR PHILIP SMITH:  No, ma'am.

14         MS. TAPIE:  Why is that?

15         PROSPECTIVE JUROR PHILIP SMITH:  I don't

16   know how to answer that other than I consider myself

17   to be a logical, fair-minded person.  And if the case

18   is proven against the defendants, then I will vote

19   that way.  If it's proven for the defendant, I will

20   vote that way.  It's just a matter of logic, not

21   emotion or anything else as far as I'm Concerned.

22         THE COURT:  You don't feel at this point

23   that you're leaning towards one side or --

24         PROSPECTIVE JUROR PHILIP SMITH:  I have no

25   idea what the case is, so I can't lean one way or the

other.  Other than what the judge said, I've never

heard of the defendant.  I don't watch local news,

and so I don't have any idea what's going on other

than what's been presented to us by the judge.  I

can't say I know enough to make a decision one way or

the other.

MS. TAPIE:  Nothing further.  Thank you.

MR. LEMBKE:  I'm Matt Lembke.  I'm one of

the lawyers for the defendant AseraCare.  As I

understand it, the bottom line is you think you can

be fair and impartial and base your decision on the

evidence that's presented in the court and the

instructions that the judge gives you at the end of

the case?

PROSPECTIVE JUROR PHILIP SMITH:  I believe I

can.

MR. LEMBKE:  Thank you.

THE COURT:  Thank you very much, Mr. Smith.

And that's it.

THE CLERK:  That's it.

(Open court.)

THE COURT:  Ladies and gentlemen, like

I said, this is our first time to try a case in this

courtroom.  And I want to check, when we were talking

with people privately up here, could you hear

```
 1   anything that was said up here?
 2                    (Responding no)
 3             THE COURT:  Good.  So our system is working
 4   on that.
 5             One thing that's not working on the system
 6   is I overlooked introducing someone to you and I
 7   apologize profusely.
 8             We have some additional attorneys on the
 9   government's side representing the relators and we
10   will explain who those are and what those are later.
11             First we have Mr. Jim Barger and Elliott
12   Walthall, is Elliott in here?  And Henry Frohsin.
13   They're with the Birmingham law firm of Frohsin and
14   Barger.
15             Do any of you know or think you may know any
16   of these people?
17             Thank you.  And I apologize again for not
18   introducing y'all.
19             Nola Hitchcock Cross, we may see her from
20   time to time.  Is she here?  I haven't seen her.  And
21   Mary Flanner and they're with the Cross Law Firm in
22   Milwaukee, Wisconsin.
23             Do any of you know or think you may know
24   those women?
25             Also, earlier this morning, I mentioned some
```

1   names of people from the Bradley, Arant firm who

2   might be in and out.  And I actually mentioned this

3   name but he wasn't here then, now Nick Danella is

4   here.

5          Would you get a look at him and see if you

6   know or think you may know him now that you can see

7   him.  Thank you.

8          Does the government have any additional

9   questions of any of the jurors?

10          MS. TAPIE:  We do, Your Honor.  We have a

11   few follow-up questions.

12          THE COURT:  You may do that.  And I would

13   suggest you stand at the lectern so that they can

14   hear you.

15          MS. TAPIE:  This is for number four,

16   Ms. Hodges.

17          THE COURT:  You have to call them by name.

18          MS. TAPIE:  Ms. Hodges, can you tell us

19   about your job at Blue Cross Blue Shield?

20          PROSPECTIVE JUROR HODGES:  I am the

21   assistant to our internal auditing and compliance.

22          MS. TAPIE:  What's involved with that

23   department?

24          PROSPECTIVE JUROR HODGES:  I assist in the

25   day-to-day duties of the department.

1          MS. TAPIE:  Are you familiar with what types

2    of audits are conducted?

3          PROSPECTIVE JUROR HODGES:  In a general

4    sense, yes.  I'm familiar with some audits they do

5    internally and with some of the audits they have that

6    come from inside the customer.

7          MS. TAPIE:  What types of customers are you

8    referring to?

9          PROSPECTIVE JUROR HODGES:  Customers who

10   have Blue Cross and Blue Shield as their insurance.

11         MS. TAPIE:  Individuals?

12         PROSPECTIVE JUROR HODGES:  No, companies.

13         MS. TAPIE:  Thank you.  That's all the

14   questions I have.  Your Honor, I think you may have

15   covered everything else.

16         THE COURT:  All right.  Does defense have

17   any further questions you would like to ask?

18         MR. LEMBKE:  Yes, Your Honor.  I have just

19   few.  I've already spoken with a number of you this

20   morning.  But for those that I have not spoken with,

21   my name is Matt Lembke and I am one of the lawyers

22   for the defendant AseraCare, which is a hospice

23   company.

24         And you have been very helpful in answering

25   your questionnaires and some of the other ones that

1   have been questioned this morning, so I don't have

2   many.  So if I don't ask a specific one of you a

3   question, please don't be offended by that.

4           Ms. Cade, you said you got a Mississippi

5   State sticker on your car.  Is that where you did

6   your master's work?

7           PROSPECTIVE JUROR CADE:  No.  Actually, my

8   sister's baby is a football player and he brought

9   them home and we came outside and they were on our

10  cars.

11          MR. LEMBKE:  Where did you do your master's

12  work?

13          PROSPECTIVE JUROR CADE:  University of

14  Phoenix.

15          MR. LEMBKE:  I noticed on your questionnaire

16  you said you lived in Green Acres.  And you're too

17  young to remember the Green Acres show.

18          Is the Green Acres neighborhood sort of past

19  the fairgrounds out toward Wenonah High School and

20  Western Hills Mall?

21          PROSPECTIVE JUROR CADE:  It's in the middle

22  of that.

23          MR. LEMBKE:  Thank you.  Ms. Passen, I've

24  got to ask you, you said you're reading the book

25  Lethal Attraction.  What is that about?

1          PROSPECTIVE JUROR PASSEN:  It's a western

2     romance.

3          MR. LEMBKE:  I noticed on your questionnaire

4     that your son works for Kyle Busch Motor Sports.

5          Is he on the pit crew or what does he do?

6          PROSPECTIVE JUROR PASSEN:  He works for Kyle

7     Busch Motorsports, not Kyle Busch Racing, which is

8     totally different.  Kyle Busch owns his company.  And

9     he is on the pit crew for the number four truck team.

10    And he does the underneath of the truck.  He's

11    responsible for all kind of stuff under the truck.

12         MR. LEMBKE:  When the race is going on, is

13    he one of the guys who raises out there to do the

14    stuff --

15         PROSPECTIVE JUROR PASSEN:  No.  If he goes

16    over the wall, you usually bring in a professional

17    team to go over the wall in that level, and he would

18    just go over and service the driver is all he does.

19    Go give him water or give him check--

20         MR. LEMBKE:  Thank you.  Ms. Houston.

21         MS. TAPIE:  Your Honor, may we approach?

22         THE COURT:  All right.

23              (Sidebar off the record)

24                   (Open court)

25         MR. LEMBKE:  Mr. Scott, how are you?

1          PROSPECTIVE JUROR SCOTT:  I'm doing fine.

2          MR. LEMBKE:  I noticed on your written

3  questionnaire response that at one point you were a

4  Social Security adjustor.

5          PROSPECTIVE JUROR SCOTT:  Yes.  Training.

6          MR. LEMBKE:  When was that?

7          PROSPECTIVE JUROR SCOTT:  That was 1998.

8          MR. LEMBKE:  And how long did you serve in

9  that capacity?

10          PROSPECTIVE JUROR SCOTT:  I started as an

11  intern when I was a junior in college and it lasted

12  until I graduated.

13          MR. LEMBKE:  What sorts of things did you do

14  in that job?

15          PROSPECTIVE JUROR SCOTT:  Well, during the

16  time that I interned, I did several different jobs.

17  Started out as a records analysis clerk.  Then

18  I dealt with what was called Hipp Smith Health

19  Insurance.  And then I did direct actions examiner, I

20  was school benefits.

21          And then after graduation, we moved into the

22  claims position where we basically investigated

23  claims for people that applied for Social Security

24  benefits.

25          MR. LEMBKE:  And I see you're currently a

1  vice principal; is that right?

2           PROSPECTIVE JUROR SCOTT:  Yes.

3           THE COURT:  What level:  Elementary, middle

4  or high school?

5           PROSPECTIVE JUROR SCOTT:  High school.

6           MR. LEMBKE:  Which high school?

7           PROSPECTIVE JUROR SCOTT:  Wenonah.

8           MR. LEMBKE:  What's the hardest part of

9  being a vice-principal?

10          PROSPECTIVE JUROR SCOTT:  Actually, for me

11 it's not hard at all.  I work real well with the

12 kids.  Probably the most difficult part is dealing

13 with the parents.

14          MR. LEMBKE:  As a parent of a high school

15 student, I can understand that.  Mr. Scott, thank you

16 very much.

17          Ms. Beese, I heard you say you're a Harley

18 rider.  Where do you ride your Harley?

19          PROSPECTIVE JUROR BEESE:  Any back road in

20 Alabama, Georgia and Mississippi.

21          MR. LEMBKE:  How long have you been doing

22 that?

23          PROSPECTIVE JUROR BEESE:  Off and on for

24 thirty years.

25          MR. LEMBKE:  Thank you.  Ms. Houston, I'm

1   just curious.  You said your hobby is skating.

2

3          PROSPECTIVE JUROR HOUSTON:  Skating, roller

4   skating.

5          MR. LINTON:  I was going to ask if it was

6   ice or roller skating.

7          Where do you do that?

8          PROSPECTIVE JUROR HOUSTON:  Most of the time

9   Fultondale.

10          MR. LEMBKE:  Is there any kind of team or do

11   it on your own?

12          PROSPECTIVE JUROR HOUSTON:  I just do it on

13   my own.  I used to go with people, but now I just do

14   it by myself.

15          MR. LEMBKE:  Thank you very much.  I think

16   that's all the questions I have.

17          THE COURT:  Ms. Thomas, did you take care of

18   that issue?

19          PROSPECTIVE JUROR THOMAS:  Yes.

20          THE COURT:  Thank you.  Ladies and

21   gentlemen, if you would be still for just one more

22   minute, I need to talk to the lawyers about something

23   real quick and then we will see what is next.

24                    (Sidebar)

25          THE COURT:  Anymore strikes for cause?

1    MR. LEMBKE:  No.

2    THE COURT:  How long do you think you need?

3    MR. LEMBKE:  Your Honor, I think I would

4   like thirty minutes.

5    MS. TAPIE:  I was going to say ten.

6    THE COURT:  I'm going to let them recess

7   until 2:45.  And as soon as you can get your stuff to

8   Frankie, the sooner we can get done.

9    MR. LEMBKE:  And it's four per side, four

10   strikes?

11    THE COURT:  Yes.

12    MR. LEMBKE:  Thank you, Your Honor.

13             (Open court).

14    THE COURT:  Ladies and gentlemen, we were

15   almost at that point where we answer the question

16   that has been burning in everyone's mind, who gets to

17   be a juror.

18       We need a little bit more time for the

19   attorneys to think about it and make their

20   selections.  I am going to release you until 2:45.

21       During this break, as during all others, do

22   not talk with anyone about this case, don't talk

23   among yourselves about anything you heard about this

24   case thus far today.

25       Frankie, do you want them to wait for you

229

1  downstairs?

2          THE CLERK:  Yes, please.

3          THE COURT:  If you will wait downstairs in

4  the jury assembly room, we will call for you when

5  we're ready for you to come up, but it will be around

6  2:45.  Thank you so much.

7              (Prospective jurors excused)

8          THE COURT:  I want to make sure we all know

9  who is on the list for being seated.

10          Ms. Calahan, do you have that?

11          THE CLERK:  Yes, ma'am.  The last five will

12  --

13          THE COURT:  Let's start and go down to make

14  sure that they know who is still under consideration

15  because we've had a lot of strikes and things.

16          THE CLERK:  Number two, number four, number

17  five, number six, number seven, number eleven, number

18  thirteen, fifteen, seventeen, twenty, twenty-one,

19  twenty-two, twenty-three, twenty-four, twenty-five,

20  twenty-seven, twenty-eight, thirty, thirty-three, and

21  thirty-four.

22          THE COURT:  And we won't reach the rest of

23  them.

24          THE CLERK:  That is correct.

25          THE COURT:  Is that correct?

```
1              THE CLERK:  That is correct.
2              THE COURT:  So you should use your four
3    strikes somewhere between number two and number
4    thirty-four as identifying being the ones before you.
5              Any questions about the process?
6              MS. TAPIE:  I think it was mentioned that if
7    both sides were to strike the same that it does not
8    count as a strike against both sides; is that
9    correct?
10             THE COURT:  It does.
11             MS. TAPIE:  Oh, it does.  You don't get an
12   extra strike.  Okay.
13             THE COURT:  You're just happy that person is
14   not on the jury.
15             MS. TAPIE:  That was my question.
16             THE COURT:  The first twelve who are not
17   struck will be our jury.  Okay.
18                     (Brief recess)
19       (Outside the presence of the prospective jurors.)
20             THE COURT:  All right.  I understand that we
21   have a jury; is that correct?
22             THE CLERK:  Yes, ma'am.
23             THE COURT:  All right.  Will you please give
24   me the number and name of jurors.
25             THE CLERK:  Number two, Sarah Hyde; number
```

231

```
1   four, Celestial Hodges; number six, Vionna Cade;
2   number fifteen, Michael Bibb; number seventeen,
3   Jonathan Courington; number twenty, Carolyn Williams;
4   number twenty-two, Mary Rains; number twenty-four,
5   Gregg Smith; number twenty-five, Debora Canada;
6   number twenty-seven, Diane Beese; number
7   twenty-eight, Natalie Smith; number thirty-three,
8   Christopher Lambert.
9           THE COURT:  Is the government satisfied with
10  the jury selection process and the jury that's been
11  selected?
12          MS. TAPIE:  Yes, ma'am, Your Honor.
13          THE COURT:  Any challenges to the
14  defendant's peremptory strikes?
15          MS. TAPIE:  No, Your Honor.
16          THE COURT:  Is the defendant satisfied with
17  the jury selection process and the jury selected?
18          MR. LEMBKE:  Yes, Your Honor.
19          THE COURT:  Any challenges to the
20  government's strikes?
21          MR. LEMBKE:  No, Your Honor.
22          THE COURT:  What we will do now is bring the
23  jurors in.  We'll have the ones that have been
24  selected take their seats in the box.  I will release
25  the others and I will give the selected jurors their
```

1    instructions.

2            I will ask you again, in the presence of the

3    jury, are you satisfied with the jury selection

4    process.  And I will instruct them not to read

5    anything or do any internet search or any of that

6    kind of stuff.

7            MR. WERTKIN:  I knew you would, Your Honor.

8            THE CLERK:  And we are going to wait until

9    Monday to swear them in.

10           THE COURT:  Yes.  We're waiting until Monday

11   to swear them in.

12                       (Brief pause.)

13                       (Open court.)

14           THE COURT:  Ladies and gentlemen, you have

15   been very patient with us today and we appreciate

16   that very, very much.

17           As I explained Tuesday, jury selection is a

18   very important part of our justice system.  And we

19   very much appreciate not only your willingness to

20   make the sacrifice when called upon, but also the

21   patience you've demonstrated to us today.

22           How was lunch?  We're at that point now

23   where we answer the question that's been burning on

24   everybody's mind which is who gets to be a juror.

25           I am going to ask Ms. Calahan to read the

```
 1   names of the people who have been selected to serve
 2   on this jury.
 3          As she calls the names, if she calls your
 4   name, please raise your hand and keep your hand
 5   raised.
 6          THE CLERK:  Sarah Hyde, Celestial Hodges,
 7   Vionna Cade, Michael Bibb, Jonathan Courington,
 8   Carolyn Williams, Mary Rains, Gregg Smith, Debora
 9   Canada, Diane Beese, Natalie Smith, Christopher
10   Lambert.
11          THE COURT:  So those of you who have your
12   hands raised, if you would please carefully make your
13   way out of the rows and come up and take your seat in
14   the jury box.
15          (Brief pause.)
16          THE COURT:  To make sure we do have
17   everybody everyone captured that we need to, I will
18   ask Ms. Calahan to call the roll.  As she calls your
19   name, please raise your hand and keep your hand
20   raised.
21          THE CLERK:  Sarah Hyde, Celestial Hodges,
22   Vionna Cade, Michael Bibb, Jonathan Courington,
23   Carolyn Williams, Mary Rains, Gregg Smith, Debora
24   Canada, Diane Beese, Natalie Smith, Christopher
25   Lambert.
```

1          THE COURT:  Okay.  I think that looks like

2    we got everybody we were supposed to get.  Ladies and

3    gentlemen, those of you who were not selected, again,

4    we very much appreciate your participation in this

5    process.  It was very important for us in terms of

6    allowing the parties to select the jurors that they

7    have for this case.  You are dismissed.  You are no

8    longer required to hang around here.

9          You are welcome to come back and observe

10   this court proceeding if you are terribly, terribly

11   interested in it.  We will actually begin the

12   presentation of evidence and opening statements on

13   Monday.  So if you would like to come back, you're

14   welcome to do that.  Thank you again, and you're now

15   excused from jury duty.

16         Wait a minute.  Before you leave, I forgot

17   to ask, I need to ask each side.  Government, are you

18   satisfied with the jury selection process and the

19   jury that we've selected?

20         MS. TAPIE:  Yes, Your Honor.

21         THE COURT:  And, defense, are you satisfied

22   with the jury selection process and the jury we have

23   selected?

24         MR. LEMBKE:  Yes, Your Honor.

25         THE COURT:  Okay.  Thank you.  Now, y'all

1   may leave.

2          Ladies and gentlemen, I have a few

3   instructions for you about what we're going to be

4   doing from here on.  We are going to let you go this

5   afternoon, and you can take care of notifying your

6   employers, your family that you have been selected to

7   serve on a jury, and that it's going to take a while.

8          Do not tell them anything about the case.

9   Do not tell them anything about the parties involved

10  in the case.  You can only tell them that you've been

11  selected to serve on this jury, and that it will

12  probably take approximately three months to try.  You

13  can let them know that you'll be in court Monday

14  through Thursday, 8:30 to 5:30 roughly, as I told you

15  on Tuesday and that we won't be in court on Friday.

16         We are hoping that having Fridays off from

17  court will help you to take care of your personal and

18  business things on that day.  Believe me, I know how

19  hard that will be, because I've got a lot of other

20  things going on here as well as this trial.  So I

21  will be in that same boat in trying to get so much

22  done on Friday we won't have time to get it done.

23         I want to let you know that on Monday, when

24  you come, Ms. Calahan will show you how to get into

25  the jury room which is where -- that will be your

 1   home away from home.  There will be coffee in there

 2   and water for you, and you are free to bring whatever

 3   else you want to have in there as long as it's not

 4   illegal or alcoholic beverages.

 5          Also we will have available for you at trial

 6   a juror notebook that will have tabs with the names

 7   of each patient that the government claims was not

 8   eligible for hospice benefits.  We will have blank

 9   pages in there so you can write notes about that

10   patient when there's testimony about that individual.

11          We also will have little flip notepads for

12   you to take any other notes that you might want.  And

13   we have an option that's available for the first time

14   in this trial, and that is, rather than writing by

15   hand your notes, if any of you would prefer to use an

16   Ipad to take notes, we have those available, but I

17   need to know how many of you would like to have an

18   Ipad.

19          And I will tell you, there will not be any

20   games on it.  There will not be internet access to

21   it.  It will just basically be a wiped clean kind of

22   Ipad that will have capacity for you to type notes on

23   it should you want to.

24          So if you would let Ms. Calahan know before

25   you leave today how many of you would like to have

1  the iPads, we'll have those available for you on

2  Monday.

3         We will also give you a calendar on Monday

4  that will contain dates when we will not be in court.

5  For example, there's some federal holidays.  I don't

6  think everybody gets Columbus Day, but we do in the

7  federal system, so you will have Columbus Day as a

8  holiday as well.

9         There are a few days that I have prior

10  commitments that I have to honor that we won't be in

11  trial, but all of those dates will be clearly on that

12  calendar, so you will know ahead of time when you can

13  plan things that you need to do in your own personal

14  life.

15         Any questions about any of those kinds of

16  things?  Yes, Mr. Smith.

17         JUROR SMITH:  Saturday and Sunday?

18         THE COURT:  We're off on Saturday and

19  Sunday.

20         JUROR SMITH:  Friday, Saturday and Sunday?

21         THE COURT:  Yes.

22         JUROR SMITH:  Sweet.

23         THE COURT:  I'm glad you appreciate that.

24  We will begin Monday morning at 8:30.  I will give

25  you some preliminary instructions, a little more

1    information about the case, and I will set out for

2    you the basic nutshell kind of law that you're going

3    to be looking at in this case and give you some

4    instructions about your conduct.

5            The attorneys will then make opening

6    statements to kind of paint a picture for you as to

7    what they expect the evidence to show as its comes

8    in, and then we will begin with testimony on Monday

9    as well.

10           I need to instruct you very, very seriously

11   between now and Monday and for your entire service as

12   jurors on this case, do not do any outside research

13   about the False Claims Act or about AseraCare or

14   about hospice or anything else that could be possibly

15   related to any questions you may have about this

16   case.

17           Everything that you need to decide this case

18   will be presented to you in this courtroom from the

19   witness stand and from documents and other things

20   that are admitted into evidence.  And that will be

21   all that you can consider and rely on in making your

22   decision.

23           We've spent a lot of time this week

24   selecting a group of jurors that the attorneys all

25   believe will be fair and impartial in this case and

1   render a fair verdict.  We do not want you to now go
2   and explore things that may give you an opinion about
3   anything that's related to this case.
4        In the same vein, as I said, you can tell
5   your employer, your family that you've been selected
6   for this case, but don't tell them anything about it.
7   Don't tell them who the parties are because somebody
8   might say something about one of the parties that
9   might inadvertently subconsciously affect your
10  ability to be fair and impartial.  Don't tell them
11  what kind of case it is, because otherwise somebody
12  might just spout off something that, again, may
13  subconsciously affect your ability to be fair and
14  impartial.
15       So those will always be my instructions to
16  you.  When you're not here in this courtroom, you're
17  not to talk with anybody at all about it.  And,
18  actually, you're not to talk among yourselves about
19  the case either, because we want you to wait until
20  you have heard all of the evidence in this case
21  before reaching a decision.  And it requires that
22  kind of fairness to both sides, which is why we
23  require that you don't talk about it.
24       Do you understand?
25              (Jury affirms.)

1              THE COURT:  Okay.  That can be kind of hard.

2   But believe me, after a few days, y'all will know

3   some things about each other that you're interested

4   in, and you can have all kinds of conversations about

5   anything else that you want to.

6              I've been in several trials where the jurors

7   have been together for a considerable amount of time,

8   and there have been some good friendships that have

9   formed, and they occasionally even get together after

10  the trial is over because they've gotten so used to

11  being with each other, I guess.

12             So I hope you will look on this as an

13  opportunity to make some new friends and also to

14  learn more about our justice system and how the jury

15  system works.

16             Any questions I might be able to answer for

17  you now?  Yes, sir, Mr. Bibb?

18             JUROR BIBB:  How do you -- how does it work

19  with payment?  Does your employer, do they get the 40

20  dollars a day and take it out?  How does that work?

21             THE COURT:  Ms. Kimbrell downstairs is the

22  expert on that.  I don't want to hazard to guess and

23  be wrong.  So you can ask her about that, and she

24  will explain it to you.

25             JUROR BIBB:  All right.

1      THE COURT:  Any other questions?  All right.

2  Ms. Calahan is going to show you into the jury room.

3  Like I said, it will be your home away from home.

4  Feel free to spruce it up however you want.  You will

5  be the first jurors to use the new jury room.

6      Let me warn you now, we talked about the

7  pole in here.  There's a pole in there right as you

8  walk in.  Be careful, watch where you're going,

9  please don't run into that pole.  Okay.  But just

10  remember it's there to keep the ninth floor from

11  falling in on us.

12      Thank you so much.  We will see you Monday

13  at 8:30.

14                  (Jury excused.)

15      THE COURT:  Okay.  A couple of hours later

16  than I had hoped, but we got it done before the day

17  was over.

18      Anything we need to take up before Monday?

19      MR. LEMBKE:  Yes, Your Honor.  We have a

20  couple of issues with regard to the preliminary

21  instructions that we want to take up with the Court.

22      THE COURT:  Do you want to do that in the

23  conference room or in chambers or somewhere where we

24  can loosen our ties?

25      MR. LEMBKE:  Whatever the Court prefers.

1          THE COURT:  Why don't we do that.  Adjourn

2    and reconvene in the conference room.

3                    (Brief recess.)

4          (Proceedings held in the conference room.)

5          THE COURT:  I understand, Mr. Lembke, you've

6    got some issues with the preliminary charges.

7          MR. LEMBKE:  Yes, Your Honor.  There are

8    three issues we want to raise.  The first is on Page

9    8.

10         THE COURT:  All right.

11         MR. LEMBKE:  In the carryover paragraph at

12   the top of the page, the second full sentence on the

13   page that begins, a patient is terminally ill if the

14   patient, and I believe the Court's previous iteration

15   of the preliminary charge had tracked the statutory

16   language.

17         THE COURT:  Of the individual?

18         MR. LEMBKE:  An individual is considered to

19   be terminally ill.  And we would like the -- I mean,

20   we don't mind a patient, but is considered to be is

21   the statutory language.

22         THE COURT:  Wonderful.  I don't think I

23   intended to change that from the statute, so I

24   appreciate you pointing that out.

25         MR. LEMBKE:  Your Honor, the second --

1          THE COURT:  I will say this:  I did make

2    some modifications to the statutory or regulatory

3    language where I thought it was needed to help

4    clarify things for the jury.  And again, I thought

5    using "patient" instead of "individual" would help in

6    that regard.  I may have gotten carried away.

7          MR. WERTKIN:  We have one that's similar, if

8    you don't mind.

9          MR. LEMBKE:  I don't mind at all.

10          MR. WERTKIN:  This would be on page -- it's

11    actually on the same page.

12          THE COURT:  Okay.

13          MR. WERTKIN:  To qualify for payment, the

14    provider must submit a certification.  And it goes,

15    in the last sentence, clinical information and other

16    documentation should support the medical prognosis.

17          The regulation, which I think that comes

18    from, says must as opposed to should.  I brought it

19    with me, Your Honor, if you want to take a look at

20    it.

21          THE COURT:  That's fine if that's what it

22    said.  Which regulation are you referring to?

23          MR. WERTKIN:  This would be at 42 CFR

24    418.22.  And I can give this to Joseph.

25          THE COURT:  Okay.

1          MR. WERTKIN:  You can take a look at it.

2          MR. CHRISTIE:  I'm sorry, I just --

3          MR. LEMBKE:  Is it 418.22(b)(2)?

4          MR. CHRISTIE:  Yes, it is.

5          MR. LEMBKE:  Is that what we're looking at?

6          THE COURT:  Does it say "must" instead of

7   "should"?

8          MR. LEMBKE:  The clinical information and

9   other documentation that support the medical

10  prognosis must accompany the certification and must

11  be filed in the medical record.  And then it goes on

12  --

13         THE COURT:  So it says it must be filed but

14  it doesn't say must support.

15         MR. CHRISTIE:  That's correct.  It says must

16  accompany, must be filed.

17         MR. WERTKIN:  We would be fine with the

18  language must accompany, must be filed, but that

19  seems a little bit more awkward.  But we're okay with

20  that language as well.

21         THE COURT:  I was trying to present it in a

22  way that was less cumbersome for the jury than that

23  regulation.  And we've talked before about how the

24  regulation does not require that the documentation

25  must establish the qualification.  And I think we had

1   a good bit of discussion about that earlier.

2           I will look at a way that I might be able to

3   restate that closer to this language.  But I think it

4   would be an erroneous statement of law to say that

5   the documentation must support the medical prognosis.

6           MR. WERTKIN:  Just so Your Honor is aware,

7   there will be testimony that we expect to be

8   submitted saying that the law is that it must support

9   -- that the medical records must support --

10          THE COURT:  You'll have to give me some law

11  to that effect before they just testify as to what

12  the law is.  And that's the Court's responsibility.

13          MR. WERTKIN:  Yes, Your Honor.  And in our

14  proposed jury instructions, there are numerous

15  citations to the Federal Register that include that

16  language.

17          THE COURT:  The language you're citing to me

18  here?

19          MR. WERTKIN:  That the medical records must

20  support the medical diagnosis, yes.

21          MR. SELDEN:  Judge, we would disagree with

22  that description of the law.  Certainly the statute

23  does not require it.  There's nothing in the

24  regulations that requires it other than the language

25  you just looked at at 418.22(b)(2) and there's

1   various language published by Medicare and the

2   Federal Register that doesn't state exactly what

3   Mr. Wertkin just represented.

4          THE COURT:  It says that -- and I will just

5   read it right out for the record:  Clinical

6   information and other documentation that support the

7   medical prognosis must accompany the certification

8   and must be filed in the medical record with the

9   written certification as set forth in Paragraph d(2)

10  of this section.

11         It does say initially that the clinical

12  information may be provided verbally and must be

13  documented in the medical record and included as part

14  of the hospice eligibility assessment.

15         I think that deals with what must be filed

16  or included in the record and not that it must

17  support the prognosis but that it -- the

18  documentation supporting it has to be submitted.

19         We may be dealing with semantics, but I

20  think it's an important semantic.  And I will be glad

21  to look at anything the government wants to give me.

22  But I think we went over that, didn't we, at summary

23  judgment that the regs don't say that the

24  documentation must support or must prove the

25  prognosis?

1          MR. WERTKIN:  I'm just learning, Your Honor,

2     for example, when AseraCare submits -- when AseraCare

3     is being reviewed by a Medicare contractor, like

4     Palmetto, and I think we are going to have a couple

5     of Palmetto people testify in this case, what -- what

6     they're doing is they're looking to see if the

7     medical record support the diagnosis.  And if they're

8     not, they say this claim is not payable, so that's

9     Palmetto.

10          Then there's another process afterwards by

11    Advance Med.  They're doing the same thing.  Look,

12    there could be a signed COTI but that's not the end

13    of the inquiry.

14          THE COURT:  Right.

15          MR. WERTKIN:  So they look and they say, oh,

16    does the medical record support the prognosis and if

17    it does, the claim is payable; and if it doesn't,

18    it's not.

19          I'm just Alerting Your Honor that testimony

20    will be elicited at trial.

21          THE COURT:  But there's a difference and

22    this is what we took up a lot at summary judgment,

23    there's a difference between medical records that

24    support the prognosis and medical records that prove

25    or establish the prognosis.

1          The regulations don't say that the medical

2    records have to prove it or establish it but just to

3    support it.  And we had a lot of discussion about

4    that being a different standard.  And I think there

5    was a lot of discussion about Dr. Liao's testimony

6    and whether he was, in fact, using a different

7    standard than the regs required, if I recall

8    correctly.

9          MR. WERTKIN:  I think Your Honor has that

10   exactly right.  If you didn't have a doctor -- if you

11   didn't have a signed COTI, whatever the records say,

12   it wouldn't be enough either.  So I think that's

13   consistent with what Your Honor is saying.

14         THE COURT:  Well, I will look at that and

15   see if I can make it more convoluted if I have to.

16         Anything else on Page 8 while we're there?

17         MR. LEMBKE:  Your Honor --

18         THE COURT:  I did take out that last phrase

19   in the second full paragraph that we discussed the

20   other day.

21         MR. LEMBKE:  That's what I was going to ask.

22         THE COURT:  That's out.

23         MR. LEMBKE:  The next thing we have is on

24   Page 11, which is simply that it says 124 instead of

25   123 in the second line at the top.

1       THE COURT:  I had questioned that and saw it

2   somewhere else.  So I appreciate you keeping me

3   straight.  I thought it was 123, so I don't know

4   where that came from.

5       MR. WERTKIN:  It was not your fault, Your

6   Honor, the number did change over the last six months

7   or so.

8       MR. CHRISTIE:  The government dropped a

9   number of claims that it's making, 124, 123 when they

10  filed the damages designation.

11      MR. WERTKIN:  There was one patient that

12  fell outside the date range.  It's not really that

13  important.

14      THE COURT:  Well, I have been living with

15  123, and then I saw it in here and I thought it could

16  come out of the proposal that y'all had submitted for

17  preliminary instructions.

18      So that's why it stayed in there because I

19  assumed y'all knew better than I did.  And as y'all

20  well know, I am not a numbers person.  I will make

21  sure that it's always 123.

22      Anything else, Matt?

23      MR. LEMBKE:  My next thing is on Page 16 at

24  the very bottom, which relates to what the jury is

25  going to be told about phase two.

250

1                And I know Your Honor said when we last took

2    this up that you're not going to do anything to

3    mislead the jury about phase two; and although we're

4    not suggesting Your Honor is intending to mislead the

5    jury, we think this could be a little misleading

6    because, as Your Honor said the last time we took

7    this up, if we were to prevail on all 123, there

8    really would be nothing left of the unjust enrichment

9    and payment by mistake, at least it's our position.

10               And we had suggested in the proposed charge

11   that the jury just be told, following completion of

12   the first phase of the trial, I will give you

13   additional instructions about what will happen in the

14   second phase.  And that's pretty innocuous.

15               THE COURT:  Yeah.

16               MR. LEMBKE:  And we would ask the Court to

17   consider giving something like that.

18               THE COURT:  And the government wants me to

19   tell the jury that regardless of what you do in phase

20   one, you will be back for phase two, which I don't

21   think is accurate.

22               MR. LEMBKE:  And in case Joseph is looking

23   for it, that is at Page 24 in document 309, that

24   language that we had suggested.

25               THE COURT:  Okay.  I think basically it

1    would be just taking out the last two sentences in

2    that paragraph, the government has some additional

3    causes to consider in phase two and when we reach, I

4    will give you preliminary instructions on that.

5                MR. LEMBKE:  Yes.

6                MR. WERTKIN:  May I say one thing?

7                THE COURT:  Yes.

8                MR. WERTKIN:  I do not want to get into it

9    right now, but it is the government's position at

10   this time, we haven't seen the final jury

11   instructions, that actually the jury -- what the jury

12   is asked to do could impact whether the unjust

13   enrichment and common law claims are in or out.

14            I just wanted to lay that out on the table

15   so you knew it was out there.

16            THE COURT:  I know that.  I think that's

17   what Matt was saying.  If what the jury does in phase

18   one will affect what we do, if anything, in phase

19   two.

20            MR. WERTKIN:  I will be a little more clear,

21   I'm sorry, Your Honor.

22            It's the government's position that

23   depending on what the jury is instructed to do that

24   the unjust enrichment claims, the common law claims

25   would not be determined in phase one.

1          THE COURT:  So, let's just say assuming the

2    jury found that there were absolutely no false claims

3    whatsoever, the government would still have an unjust

4    enrichment claim?

5          MR. WERTKIN:  Your Honor, and this dovetails

6    into what we were just talking about.  Palmetto --

7    the Medicare contractor is going to review -- when

8    they review these claims, they look at the medical

9    records and they decide do the medical records

10   support the diagnosis and that's what they're looking

11   at.  If the medical records don't support, then it's

12   not a payable claim.

13         If the jury is instructed, you know, jury,

14   you must determine whether or not the medical records

15   support these claims, and we would agree at that

16   stage that our common law claims are probably out.

17         However, if the jury is not instructed on

18   that and it's something different, then what we would

19   argue is that Palmetto would review these claims and

20   not pay them, they're not payable claims and,

21   therefore, common law claims would still be alive.

22         Does that make sense?

23         THE COURT:  In a very contorted way.

24         MR. WERTKIN:  Okay.

25         THE COURT:  We will deal with that when we

1    have to face it, if we do.  I never like to cross

2    bridges that I might not have to cross.

3            Any other issues with the preliminary jury

4    instructions?

5            MR. WERTKIN:  We have two small ones, Your

6    Honor.  If it would be possible, plaintiff in this

7    case would like to be preferred to as United States

8    instead of the government.

9            THE COURT:  I'm sorry.

10           MR. WERTKIN:  That's okay.  I'm sorry.

11           THE COURT:  It's a habit.

12           MR. WERTKIN:  It's not a big deal.  Fair

13   enough.

14           And then the only other --

15           THE COURT:  The government is one word, the

16   United States is two.  I try to keep them at a

17   minimum.  But that will be Joseph's responsibility to

18   go through and change it throughout.

19           MR. WERTKIN:  Thank you, Judge.  The other

20   one is on Page 7, and this is a little smaller --

21           THE COURT:  And I will not promise that I

22   will always refer to you that way.

23           MR. WERTKIN:  Yes, Your Honor.

24           THE COURT:  I will do my best.

25           MR. WERTKIN:  Thank you, Your Honor.  It

1   says in phase one --

2         THE COURT:  Where?  At the top of the page,

3   in phase one, you will be asked only to decide

4   whether any of the claims AseraCare presented to the

5   -- can I say to Medicare?

6         MR. WERTKIN:  No, no.  In phase one, your

7   duty will be to provide -- to decide whether -- I'm

8   sorry.  I should have --

9         MR. LEMBKE:  At the bottom.

10        MR. WERTKIN:  Your duty will be to decide

11  whether the government proves.  We are just --

12        THE COURT:  Where are you talking about?

13        MR. WERTKIN:  This is right after three.  In

14  phase one, your duty will be to decide whether the

15  government proves -- we would just ask you say proves

16  by a preponderance of the evidence.  That's all the

17  changes we have.

18        THE COURT:  On that page at the top, when

19  we're talking about whether AseraCare presented to

20  the government, do I need to say to the United

21  States?  To Medicare?  I mean, that's just kind of

22  awkward to say.

23        MR. WERTKIN:  I totally understand, Your

24  Honor, I'm sorry for interrupting.

25        The government is fine.  We're not going to

1   be sticklers about it and certainly understand that

2   where it makes much more sense, we'll be happy to

3   stick with it.  So present it to the government is

4   fine.  I believe that's actually what's in the

5   statute.

6            MR. CHRISTIE:  The statute uses government.

7            MS. TAPIE:  Your Honor, on that question,

8   also a small clarification.  It would probably be

9   more accurate for phase one, you will be asked only

10  to decide whether 123 of the claims AseraCare

11  presented to the government were false, rather than

12  any.

13           THE COURT:  Any of the 123 claims.

14           MR. OLSON:  It would be patients, Your

15  Honor.  It's not --

16           MS. TAPIE:  Thank you.

17           MR. OLSON:  It's not claims.  There are more

18  claims at issue in this case than 123.  It's claims

19  for 123 patients.  I know that makes it more

20  complicated but to be accurate.

21           MR. WERTKIN:  Nothing like twelve people in

22  a room wordsmithing.

23           THE COURT:  In phase one you will be asked

24  only to decide whether any of the claims of the 123

25  patients AseraCare presented to the government were

1   false.

2          It seems like at some point I need to

3   explain to the jury that there were more than 123

4   claims submitted to Medicare by AseraCare but we're

5   only looking at 123 of them or something.

6          I mean, 123 patients or just let y'all do

7   that in opening?

8          MR. WERTKIN:  You mean -- well, that the

9   experts were asked to review 233 and that or --

10         THE COURT:  Well, I mean, it's just whether

11  any of 123 patients AseraCare presented to the

12  government were false.  Sounds to me like AseraCare

13  only presented 123 patients.

14         MR. LEMBKE:  Maybe, Your Honor --

15         THE COURT:  Maybe 123 patients at issue that

16  AseraCare presented?

17         MR. LEMBKE:  Or maybe something like, you

18  will be asked only to decide whether any of the

19  claims pertaining to 123 specific patients or

20  something like that.

21         MR. CHRISTIE:  Specific patients at issue.

22         THE COURT:  What if I say whether any of the

23  claims the government challenges that AseraCare

24  presented.  I will work on that.

25         MR. WERTKIN:  I don't think the jury will

1  think AseraCare has only submitted 123 claims in the

2  world.

3          MR. LEMBKE:  I do think, though, that the

4  Court has a good point in that 123 sort of comes out

5  of nowhere at this point.  I don't think it's

6  discussed previously.

7          THE COURT:  I think back where we explain

8  what this case is about and what the government

9  contends.

10         At the bottom of Page 5, where it says

11 United States seeks to recover payments it made to

12 AseraCare that the United States contends AseraCare

13 was not entitled to receive.

14         What if we add there, made to AseraCare for

15 123 specific patients that the United States contends

16 AseraCare was not entitled to receive.

17         MR. OLSON:  Your Honor, I have a concern

18 about that in the overview of the case because to the

19 extent that overview applies to both phases -- the

20 causes of action in this case are not limited to 123

21 patients.

22         THE COURT:  We're talking about phase one

23 right now, though, right?  I'm talking generally

24 about the False Claim Act.  I'm not talking about any

25 of your other claims that you're asserting in phase

1  two.

2          MR. OLSON:  With respect to our overall

3  cause of action, even under the False Claims Act in

4  this case, is broader than 123 patients.  Your

5  Honor's suggestion that if you put the qualifier in

6  phase one, I believe that's accurate.  But to extend

7  it referring to the entire case, our cause of action

8  under the False Claims Act is broader.

9          We're relying on the extrapolation from the

10  statistical sample to allege damages beyond 123

11  patients.

12          THE COURT:  I don't think inserting that

13  right there is going to be so confusing to the jury

14  when weeks or so later, we get to that other part, if

15  we do, I can refer back to in phase one you were

16  asked to do this.  Now we're asking you to

17  extrapolate from what you found or whatever to these

18  other patients.

19          Does that make sense?

20          MS. TAPIE:  One issue with that, Your Honor,

21  because of the language, seeks to recover payment.

22  That is really talking about issues that will come up

23  in phase two when we're calculating the damages and

24  when we're talking about recovering damages.

25          At the end of phase one, it's a simple, do

259

1    we have a false claim or not for these 123.

2              THE COURT:  Well, I think that this came

3    almost verbatim from what y'all had submitted to me

4    earlier that you wanted to use in there.  But --

5              MS. TAPIE:  Right.  And the issue is if we

6    limit that one sentence to the 123, it's not really

7    an accurate statement of what the United States is

8    seeking to recover in the case.  That's a pretty

9    broad statement really encompassing both statements.

10   And if we limit it to the 123, it's sounding like

11   we're just looking to recover payments for those 123,

12   which is not correct.

13             THE COURT:  You think they're going to

14   remember that several weeks down the road?

15             MS. TAPIE:  I guess I just want to make sure

16   it's correct.

17             THE COURT:  Well, do y'all want to make a

18   suggestion as to where I can explain to the jury that

19   all of a sudden they're looking at 123 claims?

20             MR. LEMBKE:  Your Honor, maybe at the top of

21   Page 7, before the, you will be asked to decide,

22   maybe say something like, in phase one, the case will

23   be focusing on -- I'm just sort of making this up as

24   I go -- but the case will be focusing on the claims

25   submitted by AseraCare with respect to 123 specific

1    patients, period.

2            In this phase, you will be asked to decide

3    whether any of the claims of the 123 patients

4    AseraCare presented to the government were false.

5    Something like that.  Just to sort of set the stage

6    for what is -- the 123 are in phase one and then you

7    will be asked to decide sort of along the lines of

8    what you have.

9            THE COURT:  All right.

10           MR. WERTKIN:  We agree.

11           THE COURT:  Will that work?  Any other

12   issues?

13           Have y'all also looked at the PowerPoint

14   that will go along with the -- assuming everything

15   works?

16           MR. LEE:  Yes, Your Honor, and the defense

17   has no issue with it.

18           THE COURT:  Okay.

19           MR. WERTKIN:  We have no issue, Your Honor.

20           THE COURT:  Good.  I'm just looking at the

21   language on the slide that is entitled False Claims

22   Act.  There's a lot of language on there and not much

23   white space.

24           Would y'all have any trouble if I said, the

25   United States must prove the following elements by a

1    preponderance of the evidence, and then that

2    AseraCare presented, maybe dot, dot, dot to the

3    government for payment or approval.

4              I will read the whole thing, but just in

5    terms of getting it out there in kind of bullet

6    points; is that acceptable?

7              MR. LEMBKE:  No problem for us, Your Honor.

8              THE COURT:  I'm just trying to make it as

9    simple as I can on this thing so they can actually

10   read them.

11             And to that extent, we may divide the

12   conduct of the jury two slides into three.  I keep

13   adding to the instructions and things that they're

14   not supposed to do.  So if you see that divided into

15   three instead of two, that's why.

16             Anything else we need to take up today?  Any

17   issues we're going to have before we start on Monday

18   at 8:30 with these preliminary instructions followed

19   by thirty minute opening statements?

20             MR. WERTKIN:  Well, we have, by mutual

21   agreement, agreed to send over demonstratives and

22   exhibits on the Thursday before.  We may take up some

23   -- if there are any issues with those, perhaps we

24   could take them up Monday morning.  We haven't

25   exchanged them yet.  Just thinking ahead.

262

1          THE COURT:  I thought I said I wasn't going

2    to referee that.

3          MR. WERTKIN:  This was for the opening.

4    We're going to turn over all our exhibits.  I just

5    assumed that -- for the following week, if there are

6    any -- I don't know how you want to handle it, Your

7    Honor, if you want to do it as the witness is on the

8    stand.

9          THE COURT:  No.  I've told you that

10   repeatedly.  If there are going to be issues with

11   evidence with a witness on the stand, we're going to

12   take it up before the witness gets on the stand,

13   during a break while the jury is not waiting on us.

14         MR. WERTKIN:  In that case, Your Honor,

15   maybe it makes more sense to do it, presumably there

16   will be a break after openings but before the first

17   witness, maybe that's the best time to handle these

18   issues.

19         MS. MARTIN:  And there's been some

20   discussion, when we get the exhibits from the

21   government on Thursday, being able to sort of discuss

22   and see if perhaps we can reach agreement.  We've

23   exchanged some emails back and forth about ones that

24   we had questions and there are probably some room for

25   agreement there.

1          But we anticipate that there will be some

2      that we need to bring to your attention.  And we

3      recognize in your pretrial order it said to do it

4      outside of the presence of the jury and before the

5      witness gets on the stand.

6          So we were just wondering, we didn't know if

7      you wanted to do it on a break, if you wanted to set

8      aside a specific time.  If we're doing it on

9      Thursday, so if you wanted to -- do it on Friday

10     mornings or if there were particular times that you

11     wanted to do it to address it before the witness got

12     on the stand but breaks are fine as well.

13         THE COURT:  Fridays are going to be jam

14     packed full for me and taking guilty pleas,

15     sentencing people, dealing with administrative

16     things, having hearings on cases that have got to be

17     heard.  Trying to carve out time on Friday morning is

18     going to be very, very difficult.

19         MS. MARTIN:  Breaks will be fine.

20         THE COURT:  What we could more easily do is

21     if y'all could send me an email on Friday alerting me

22     to evidentiary issues you anticipate coming up with

23     certain witnesses and when you anticipate those

24     witnesses coming on for testimony, then maybe we

25     should plan on meeting every Monday at 8:00 o'clock

1    or 7:30 to address those that may be coming on early

2    on Monday.

3          I encourage you all to consider bringing

4    your lunches because we may be working through lunch

5    a lot of times, if we've got evidentiary issues we

6    need to take up.

7          What I will do at the end of every day is

8    ask you before I let you leave here if there are

9    issues you anticipate having with any evidence or

10   witnesses the next morning.  And we may be staying

11   here at night working on those.

12         It's going to be key that y'all work

13   together to figure out what's coming up when and to

14   see if there's a resolution that can be reached on

15   those evidentiary issues.

16         And it may -- I don't know what kind of

17   things you're talking about, but it may be redacting

18   a portion of a document so that the objection goes

19   away and it can come in or something of that nature

20   that I hope y'all will be able to work out among

21   yourselves.

22         So I take it from what you said you haven't

23   -- you haven't disclosed the evidence you anticipate

24   using for next week; is that what you were saying?

25              MR. WERTKIN:  Tonight we will exchange them.

1   Well, I guess it's our case, so we would send it

2   over.

3          THE COURT:  I was going to say I wasn't sure

4   there would be a whole lot coming from the other

5   direction.

6          MR. WERTKIN:  We expect to get

7   demonstratives, to the extent they use that.  But

8   beyond that, yes.

9          THE COURT:  I may have some time tomorrow if

10  some issues come up.  I've been so focused on what we

11  were doing here with this case, I really haven't

12  looked at what's on the schedule for tomorrow.  Off

13  the record.

14                 (Off the record)

15         THE COURT:  If there are some issues that

16  y'all see and anticipate coming up on Monday that we

17  need to take up before Monday, we can either meet

18  Monday morning, 7:30 or 8:00 o'clock or we can maybe

19  meet some time tomorrow.  But --

20         MR. WERTKIN:  Your Honor, for our travel

21  schedule, Monday would be better and --

22         THE COURT:  You were the one who was raising

23  it and wanted to know if we were going to meet about

24  it before Monday.  At least that was the way I

25  understood you were asking me.

1          MR. WERTKIN:  No, not necessarily, Your

2     Honor.  I think your plan about doing it either

3     before Monday or at the break, there will be a break

4     after the openings, that might be an opportunity to

5     do it.

6          THE COURT:  It may depend upon how much

7     there is.

8          MR. WERTKIN:  Okay.

9          THE COURT:  So I will rely on y'all to let

10    me know whether we need to meet before 8:30 on any of

11    those issues.

12         MR. LEMBKE:  Sort of a big picture

13    significant issue is the 404(b) issue on which the

14    Court is likely aware we have exchanged briefing this

15    week.

16         THE COURT:  And I have not had time to

17    thoroughly review that.

18         MR. LEMBKE:  And that is an issue that I

19    feel certain is going to rear up very early in the

20    government's case.

21         So, to the extent the Court wants to have

22    argument on that, that will be ripe for argument very

23    early.

24         THE COURT:  Who is the government's first

25    witness going to be?

1          MR. WERTKIN:  At this stage, our first

2   witness is going to be Dawn Zaragoza, formerly Dawn

3   Richardson.

4          THE COURT:  Who is she?

5          MR. WERTKIN:  She is one of the relators

6   from Alabama whose claims were dismissed.

7          THE COURT:  She's from where in Alabama?  Or

8   where did she work?

9          MR. WERTKIN:  She currently lives in

10  Florida.  She worked at both the Monroeville and the

11  Foley offices.

12         THE COURT:  Do you anticipate 404(b) issues

13  with her?

14         MS. MARTIN:  Yes, Your Honor, yes.

15         THE COURT:  I need to know specifically what

16  it is with her or with any exhibits that are

17  anticipated to be used with her.  And if y'all could

18  shoot that to me tomorrow to let me know.

19         Because, I mean, the briefing talks about

20  404(b) issues in kind of a vacuum.  I will say this,

21  I think the Citizens United case took care of the

22  question of whether a corporation is a person.

23         The government is arguing that 404(b)

24  doesn't apply to corporations because they're not

25  persons.  So I'm not really sure that I buy that.

 1          Of course, the defense has cited to some

 2    cases where 404(b) was held to apply in cases

 3    involving corporations.

 4          I've also seen a few completely different

 5    ones as well.

 6          So I don't buy that argument that it can't

 7    apply because the defendant is a corporation.  So I

 8    will let you know right up that I'm not buying that

 9    argument as to why it doesn't apply.  But if y'all

10    will let me know more specifically --

11          MR. LEMBKE:  Once we get the witness and the

12    exhibits, Your Honor, we will target it and identify

13    specifically what the issues we anticipate being.

14          MR. WERTKIN:  But just to put it on your

15    radar screen, the way that we read the brief, I

16    believe that the defendants are looking to exclude

17    all of Ms. Zaragoza's testimony and it would all be

18    encompassed into 404(b) and I don't know if that's an

19    accurate statement but that's how I read it.

20          If the Court is going to make rulings on

21    that, that would change in a major way the dynamic of

22    the trial.

23          THE COURT:  We will meet at 7:30 on Monday

24    and see what we need to tackle.

25          MR. LEMBKE:  Thank you, Your Honor.

1          THE COURT:  Okay.

2                    (Court in recess.)

3

4

5

6

7

8

9

10

11

12              C E R T I F I C A T E

13

14     I hereby certify that the foregoing is a

15 correct transcript from the record of proceedings in

16 the above-referenced matter.

17

18     _____

19 Teresa Roberson, RPR, RMR
   Julie Martin, RPR, RMR

20

21

22

23

24

25