951
FILED
2016 Jun-08  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ALABAMA
2          SOUTHERN DIVISION

3

4

5  UNITED STATES OF AMERICA,
   EX REL., ET AL.,          CV-12-KOB-245-S
6

7          Plaintiffs,   August 12, 2015

8    vs.                  Birmingham, Alabama

9  ASERACARE, INC., ET AL.,

10         Defendants.

11  * * * * * * * * * * * * * * * * * * * * * * * * *

12

         REPORTER'S OFFICIAL TRANSCRIPT OF
13               JURY TRIAL
                 VOLUME VI
14

15    BEFORE THE HONORABLE KARON O. BOWDRE
       UNITED STATES DISTRICT CHIEF JUDGE
16

17

18

19

20

21

22

   COURT REPORTER:
23  Teresa Roberson, RMR
    Julie Martin, RMR
24  Federal Official Court Reporter
    1729 Fifth Avenue North
25  Birmingham, Alabama  35203

```
 1                    *  *  *  *  *

 2              A P P E A R A N C E S

 3                    *  *  *  *  *

 4   FOR THE PLAINTIFF:

 5   Jeff Wertkin
     Carolyn Tapie
 6   Holly Snow
     Eva Gunasekera
 7   U.S. Department of Justice
     Civil Division
 8   P.O. Box 261 Ben Franklin Station
     Washington, DC  20044

 9

10   Lane H. Woodke
     Don Long
11   U.S. Attorney's Office
     1801 4th Avenue South
12   Birmingham, Alabama  35203

13   James F. Barger, Jr.
     J. Elliott Walthall
14   FROSHIN & BARGER
     3430 Independence Drive
15   Birmingham, Alabama  35209

16   Nola J. Hitchcock Cross
     CROSS LAW FIRM
17   345 North 11th Street
     Milwaukee, Wisconsin  53233

18

19

20

21

22

23

24

25
```

953

1              A P P E A R A N C E S  (continued)

2    FOR THE DEFENDANT:

3    James Sturgeon Christie, Jr.
     Jack Wright Selden
4    Matt Lembke
     Tiffany deGruy
5    BRADLEY, ARANT, BOULT & CUMMINGS
     1819 Fifth Avenue North
6    Birmingham, Alabama  35203

7
     Kimberly Martin
8    BRADLEY, ARANT, BOULT & CUMMINGS
     200 Clinton Avenue
9    Huntsville, Alabama  35801
     Charles H. Bohl
10   WHYTE, HIRSCHBOECK, DUDEK
     555 East Weels Street, Suite 1900
11   Milwaukee, Wisconsin  53202

12

13

14

15

16

17

18

19

20

21

22

23

24

25

954

```
1                   I N D E X
2  GOVERNMENT'S WITNESS:     D      C      RD      RC     FRD
3  Sherry Adams            991    1007   1009    1009
4  Margie Greer           1013    1027   1029
5  Debora Paradies        1063    1079   1097
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                      * * * * *

 2              P R O C E E D I N G S

 3                      * * * * *

 4   (The following proceedings outside the presence of

 5   the jury.)

 6           THE COURT:  Did we find any connection for

 7   Dr. Micca to Ms. Anne K.?

 8           MR. WERTKIN:  Yes, Your Honor.

 9           THE COURT:  May I see it?

10           MR. WERTKIN:  This is an index list of the

11   AseraCare employees, the documents I mentioned

12   yesterday.  Here are the medical records of Ms. Anne

13   K.  I have copies of the medical records.

14           Ms. Anne K. was admitted in January of 2007.

15   We have Sally Whitley, who was the patient care

16   coordinator who signed these.  The care was January

17   5th, 2007.  And --

18           THE COURT:  Did he mention Sally Whitley

19   yesterday?

20           MR. WERTKIN:  Yes, Your Honor.

21           THE COURT:  Can you show me that in the

22   transcript?

23           Do we have any people in here that are out

24   attorneys or associated with the teams?

25           MR. CHRISTIE:  Your Honor, we do have one
```

 1   parent.

 2          (Brief pause)

 3          MR. WERTKIN:  Your Honor, we are getting an

 4   electronic copy of the transcript that we need to

 5   publish for Your Honor.

 6          THE COURT:  Thank you.  This appears on Page

 7   926.

 8          MR. LEMBKE:  We would note on 926, Line 8

 9   where it talks about actually the people who came to

10   his facility where he was actually working were --

11   the only one he names is Belle Wright Goodman.

12          THE COURT:  Uh-huh.  He mentions that Sally

13   Whitley was a patient care coordinator.  I assume

14   that means when he worked for AseraCare and continued

15   to work there.  Okay.

16      His basis to believe that the practices were

17   going on and continued in January, February and March

18   of 2007 based upon his direct observation of what

19   they were doing with my own patients, not only in

20   efforts to admit patients that did not meet criteria,

21   but also to resist discharge of patients who, when

22   stabilized, no longer met criteria.  He had direct

23   observation at the nursing home where he was working;

24   right?

25          MR. WERTKIN:  I believe Your Honor is

1  correct.  The IDT meetings where you would talk about

2  the patients would also be a part of that.

3          MR. LEMBKE:  He wasn't participating in the

4  IDT meetings any longer after August of '07.

5          THE COURT:  August of '06.

6          MR. LEMBKE:  '06.

7          MS. TAPIE:  Your Honor, he did testify

8  yesterday that he would see sheets that came from IDT

9  meetings, whether or not he attended those IDT

10  meetings, and they were for his own patients.  He

11  would see the record from the IDT meeting and see

12  what was discussed about that patient.

13          THE COURT:  So, you're talking about things

14  that he saw after he left in August of 2006 on his

15  patients' charts at Northside Nursing Home, is that

16  the name of it?

17          MR. WERTKIN:  Yes, Your Honor.

18          THE COURT:  I want to make sure I keep

19  things straight.

20          MR. LEMBKE:  That's correct, Your Honor.

21          THE COURT:  And Ms. Anne K. was where?  She

22  was not at Northside, right?

23          MR. WERTKIN:  Correct, Your Honor.

24          THE COURT:  She was where?

25          MR. WERTKIN:  If I may take a look at the

1   medical records.

2          MR. LEMBKE:  She was at Medical Arts, Your

3   Honor.

4          THE COURT:  Which was in Rome, Georgia, I

5   think is what I heard yesterday?

6          MR. LEMBKE:  It's somewhere in North Georgia

7   but --

8          THE COURT:  And Northside was where?

9          MR. LEMBKE:  It's in metro Atlanta.

10         THE COURT:  Which encompasses a large

11  territory in and of itself.

12         MR. LEMBKE:  Medical Arts is in

13  Lawrenceville.

14         THE COURT:  Okay.

15         MR. LEMBKE:  I believe it's substantially

16  north of Atlanta, if I'm not mistaken.

17         MS. MARTIN:  It's north and west up towards

18  Rome.

19         THE COURT:  Because Sally Whitley was with

20  AseraCare when Dr. Micca was there before he left in

21  2006, you're saying he should be able to testify

22  about anything and everything?

23         MR. WERTKIN:  Well, Your Honor, there are

24  four different reasons why Dr. Micca has reasonable

25  knowledge to testify about AseraCare's general

1    practices.

2              One is obviously that he was the AseraCare

3    medical director for a time period preceding that.

4    We would submit that it is close in proximity.

5              Also, he had continuing patients that were

6    treated by AseraCare where he was the primary doctor.

7    He also had regular interaction with the AseraCare

8    staff at Golden Living Northside where he was the

9    attending doctor.

10             THE COURT:  He didn't say that he had any

11   continuing association with Sally Whitley after he

12   left there.  He only said that she was a patient

13   coordinator when he was there and apparently

14   continued to work in the January, February, March

15   2007 time frame for AseraCare.

16             He didn't mention he had any dealings with

17   her after then, after he left.

18             MR. WERTKIN:  And, Your Honor, let me be

19   clear when I say interactions, these actually could

20   be paperwork interactions, but the same people that

21   were treating the Golden Living Northside AseraCare

22   Hospice folks were the same people that he had dealt

23   with when he was an employee there.

24             That's really what we brought to Your

25   Honor's attention this morning, which is not just

1  Sally Whitley, but also Margo Marcus and Cheryl

2  Edmundson, who was the executive director of the

3  Atlanta facility, appears in the medical records for

4  this patient Anne K.

5         THE COURT:  Okay.  He said that the

6  executive director of the facility was Jeanine

7  Brotten.

8         MS. TAPIE:  He did mention Cheryl Edmundson.

9         THE COURT:  Okay.  Cheryl Edumndson was the

10 executive director.  All right.

11        Then we have another person who was

12 executive director also?

13        MR. LEMBKE:  I think the latter executive

14 director you're mentioning, Your Honor, is the

15 executive director of the nursing home from whom I

16 think he was suggesting he was getting information,

17 which, of course, in our view would be hearsay.

18        THE COURT:  Okay.  You're right.  That would

19 be hearsay, and I don't think that would be

20 admissible because it has nothing to do with -- it's

21 not something that any of the AseraCare people told

22 him, so it wouldn't come in that way.

23        Is there another way that that information

24 would come in?

25        MR. WERTKIN:  I don't believe we would

1    intend to elicit that, Your Honor.

2          THE COURT:  I'm not sure you were intending

3    to elicit it yesterday but it came out.

4          Okay.  He mentioned Margo Marcus as a

5    clinical service supervisor.

6          Okay.  Who were the AseraCare medical

7    doctors who signed off on any of these?

8          MR. WERTKIN:  I have that information on a

9    spreadsheet, Your Honor.

10         MS. MARTIN:  It's Dr. Bush, I believe.

11   Dr. Bernard Bush is a medical director for all of

12   those patients, I believe.  Dr. Bush was the medical

13   director for Anne K.  And the attending physicians

14   were various different doctors for each patient, but

15   not Dr. Micca.

16         THE COURT:  Is he going to testify

17   specifically about his interaction with Sally Whitley

18   and Margo Marcus?

19         MR. WERTKIN:  Your Honor, we're contending

20   that is general practices evidence.  And,

21   specifically, the testimony that we expect him to say

22   is that when he wanted to get patients off Medicare,

23   his medical clinical judgment was not being

24   respected.  He would want to do something both as the

25   medical director -- when he was the medical director

1  at AseraCare and then after, that his medical

2  judgment was not being respected.

3        THE COURT:  I didn't get my way.

4        MR. LEMBKE:  Your Honor, part of that goes

5  to what I was talking about yesterday which is as to

6  when he says this so-called general practice of when

7  I was no longer at AseraCare but I was a regular

8  doctor, I wanted to get patients off and they didn't

9  get off I think maybe as quickly as he thought they

10  should.

11        But when we asked to give us specifics so we

12  could go behind him, it was absolutely anecdotal.  He

13  gave us one name.

14        THE COURT:  Mary Ray.

15        MR. LEMBKE:  Mary Ray, and then he gave us a

16  description of another.  Now, yesterday he comes in

17  and says, well, I think there were, what, six or

18  eight, some number like that.  And we think that is

19  just a back door way to bring in anecdotal evidence.

20  It's not really a general practice.  He's just, you

21  know, relaying things that are absolutely anecdotal.

22        And I think especially given that, you know,

23  he's now going from one specific and maybe one

24  unnamed to now I say there are six or eight, I mean,

25  that just puts us at a tremendous disadvantage, and

1  we think that is anecdotal, not general practice

2  evidence that shouldn't come in.

3        The other thing we talked about yesterday,

4  which is -- and I don't know whether they intend to

5  elicit this or not, but he made this very vague

6  assertion in his deposition, well, I felt like the

7  nurses weren't giving me accurate information.

8        But when we asked him, he couldn't give us a

9  specific patient or a specific nurse.  He just did

10  this general thing.

11        And, Your Honor, I don't think it is

12  appropriate for him to get up now in trial and say,

13  well, there was a general practice of giving me

14  inadequate information when we asked him in his

15  deposition, and he couldn't tell us anything.

16        MS. MARTIN:  And, Your Honor, I would just

17  add one other point.  To the extent they are offering

18  Dr. Micca's testimony as an attending for patients

19  outside of the sample, in addition to this anecdotal

20  issue that we have here, under the Medicare

21  regulations, the decision to discharge a patient is

22  the medical director's decision and hospice's

23  decision, not the attending physician's decision.

24        So, we submit that there's a relevancy issue

25  there as well as to whether he felt like they were

1    improving and should be discharged is not -- that's

2    not the question.  The regulation is that it is the

3    medical director and hospice's decision.

4         THE COURT:  I do not see any relevance to

5    whether these seven people have been identified by

6    Dr. Liao as having been ineligible for hospice from

7    around the Atlanta area and Dr. Micca's testimony

8    about what he observed at the nursing home where he

9    was after he left AseraCare.

10        MR. WERTKIN:  May I address that, Your

11   Honor?

12        THE COURT:  Is there any connection between

13   what his patients in Northside and Anne K. other than

14   the names on those sheets?

15        MR. WERTKIN:  Well, other than the people

16   who cared -- they all -- the same people cared for

17   both people.  Hospice could be that they're all there

18   or at 25 different homes.

19        THE COURT:  No.  You haven't shown me that

20   Sally Whitley and Margo Marcus cared for the people

21   that were at his facility.  The only one he mentioned

22   coming there was Belle Wright Goodman.

23        He says, also the people that came to the

24   facility, the one that was coming to my particular

25   facility was Belle Wright Goodman.  She was the same

1   person when I was the director as well.

2          MR. WERTKIN:  I believe that the medical

3   records do contain --

4          MR. OLSON:  Your Honor, with respect --

5   you're making a comment that makes sense of a

6   hands-on nurse, but the individuals on the medical

7   records for Ms. Anne K., Sally Whitley, Margo Marcus,

8   they are at the management level, and they attended

9   IDTs.

10          The records represent their attendance and

11   participation at IDT discussions about patients, plan

12   of care, discussing about whether a patient should

13   remain on service.  That position would be the same

14   over the entire agency, that that's the role of that

15   position.

16          So, yes, Your Honor is correct that we

17   haven't shown that the hands-on nurse is the same one

18   at Northside, but we have shown that the individuals

19   that are involved with the oversight and the

20   discussion at the IDT level about Ms. Anne K. would

21   also be, by nature of their role at the AseraCare

22   Atlanta agency, but also cover patients at the

23   Northside agency because of the nature -- because of

24   the nature of their role, the patient care

25   coordinator and director of clinical services role.

1    That's our position of the connection is because of

2    the level of those employees.

3          And I would like to add that those two

4    individuals were in the same role when Dr. Micca was

5    medical director, and he has direct interaction with

6    those individuals when they were on IDT, and they're

7    serving in the same role with respect to Ms. Anne K.

8    with a different medical director, but his knowledge

9    from July 2006 is how they act in IDT.

10         And then he --

11         THE COURT:  But how they were acting in IDT

12   in January of 2007, which assumes that it continued

13   the entire time.  That's what I'm trying to figure

14   out, what is the connection.  And he said that the

15   person that came to his facility was not anyone whose

16   names appeared in what you've given me.

17         Do the names of Sally Whitley and Margo

18   Marcus appear in any of the charts of any of the

19   patients that he was dealing with after he left

20   AseraCare but was still at the nursing home in

21   Northside?

22         MR. OLSON:  I cannot answer that question.

23   Your Honor, we just cannot answer that question.

24         THE COURT:  I think I previously had ruled

25   that efforts to obtain testimony from people or from

 1  documents that were further out than like a year from

 2  the admission of a patient would not be admissible.

 3        And Caron K. was the second ineligible

 4  patient in the Atlanta Area, and she was admitted

 5  July 27th of 2007, almost a year from the time that

 6  he left AseraCare.

 7        So the only patient that would fall within

 8  that list is one of seven, Anne K.

 9        MR. WERTKIN:  Your Honor, we only included

10  those just to show that it's the same people that

11  Dr. Micca mentioned.  It was just for your

12  information purposes, Your Honor.

13        THE COURT:  Okay.  The point that I'm trying

14  to make, though, is if we did not have Anne K. I

15  would be able to clearly rule that his testimony

16  would be outside of that time frame I've been using

17  to determine whether it could be admissible in phase

18  one dealing with any connection to the ineligible

19  patients.

20        And here we only have one, one seventh of

21  the patients that have been identified from the

22  Atlanta area.  Maybe I could allow one seventh of his

23  testimony, if we could figure out how to do that.

24        Really, that's the problem I'm having,

25  trying to figure out what could he say that would

1   shed light on whether Anne K. was ineligible, because

2   that's what we're here about, whether he can -- I

3   don't know when we're going to get to it -- but we're

4   here about whether any of the 123 patients identified

5   by Dr. Liao were not eligible and that claims were

6   false.

7        We're not here about all these other

8   anecdotal instances that your witnesses keep wanting

9   to tell us about.  Anecdotal may go to how widespread

10  it was, but that's phase two.  It's not phase one.

11       You have listed for me one IDT or IDG plan

12  signed by Sally Whitley, January 5th, 2007, which I

13  have seen with the admission paperwork for Anne K.

14  And you keep listing IDT plans of care.

15       Who completed the evaluations of these

16  patients?  Wasn't that the nurse on site, or is that

17  the patient care manager?  Wasn't that what they

18  called the nurses who actually went out and took care

19  of people?

20       MR. WERTKIN:  That is our understanding of

21  how the practice worked in AseraCare generally, and

22  that would be correct, Your Honor.

23       Dr. Micca is here, and he said he can shed

24  any additional light on this.  I just want to let you

25  know.

1          THE COURT:  I think we have --

2          MR. LEMBKE:  I can answer your questions,

3    Judge.  Here is the nursing assessment, and it was

4    signed by a nurse named Ann Chatham on January 5th,

5    2007.  It's not one of the names he listed yesterday.

6          THE COURT:  May I see this?

7          MR. LEMBKE:  Yes, Your Honor.

8          MR. WERTKIN:  May I take that folder back,

9    please?  The one with the medical records in it?

10         THE COURT:  I don't have a folder with

11   medical records.  The only thing you gave me was this

12   list.  All right.

13         We've just heard a lot of talk about the

14   head-to-toe assessments.  I wanted to see what it

15   looked like.

16         MR. WERTKIN:  This is the IDT we were

17   referring to.  You can see that Ann Chatham's name

18   appears directly below Sally Whitley's name.  So this

19   would be consistent with the idea that when this

20   patient -- and I will just make it clear for the

21   record that I haven't discussed this with Dr. Micca,

22   but just from the testimony we've heard today, we

23   would anticipate that Ann Chatham would have, for the

24   first time, interacted with the medical director and

25   presented her case at that IDT meeting.

1          Like I said, this is just based on my

2    general understanding.

3          MR. LEMBKE:  Part of the problem here is

4    that, in his testimony, the only nurse that he said

5    he observed was Belle Wright.

6          And so now, you know, he's going to get up

7    and testify about things he observed in the nursing

8    home based on what he observed with Belle Wright and

9    then try to link it back to, well, then it must be

10   that Ann Chatham.  That's the inference that they

11   want to draw.

12         And we're already in a gray zone with the

13   timing.

14         THE COURT:  Uh-huh.  The government is

15   wanting Dr. Micca's testimony to cast doubts on the

16   reliability of the COTIs and medical evidence and

17   records for at least these seven patients in the

18   Atlanta area.

19         Yet, the only one that falls within that

20   time frame for allowing that testimony would be just

21   one, Anne K.

22         So would allowing his testimony be

23   sufficiently probative as to all seven of those when

24   the last one, Barbara N., was admitted in January of

25   2010 and left there in '06, three and a half years

1    prior.

2         MR. WERTKIN:  That's right.  We agree --

3    this goes to the weight of his testimony for certain,

4    and we would anticipate that defendants will make it

5    very clear about his time frame and ask him about all

6    those things.  But we think, Your Honor, these

7    questions go to the weight of his testimony.

8         THE COURT:  I think it also goes to the

9    probative value of it.  How far away -- and that's

10   what we were talking about the other day.  The

11   further away, the more tangential it becomes to

12   whether it actually is probative of the point that

13   you want to offer it for, that all these patients

14   were ineligible.

15        MR. WERTKIN:  Yes, Your Honor.  And as Your

16   Honor saw the defendant's had a slide in opening that

17   Dr. Liao disagrees with 233 doctors or something like

18   that.  And by putting that at issue, this testimony

19   really goes to that, because it assumes that all the

20   attending doctors or the primary doctors are in

21   agreement with the COTIs that are signed by the

22   AseraCare doctors.

23        So that's really the point that we're trying

24   to make is to address that, in fact, Dr. Micca will

25   say that the signatures of the attending or the

1   primary or the medical director doesn't show

2   agreement, and that's what he's going to testify to.

3          MS. MARTIN:  Your Honor, that statement in

4   opening was about the actual doctors for these

5   patients, the 123.  And Dr. Micca wasn't a doctor for

6   the 123.

7          So that does not add anything to how his

8   testimony is probative.

9          MR. WERTKIN:  Our position is it goes to the

10  general practice that the primary physicians,

11  attending physicians, were not being listened to and

12  that would include the 123, that it was the general

13  practice.

14         THE COURT:  Well, the attending

15  physicians -- what he said yesterday was that he, as

16  an attending physician, tried to get a patient off of

17  hospice and couldn't do it.

18         MR. WERTKIN:  As a primary physician.

19         THE COURT:  Right, right.  The attending

20  physician; right?  Primary, okay, but not the

21  AseraCare Hospice doctor.

22         MR. WERTKIN:  The distinction is actually

23  kind of important, an attending versus a primary

24  doctor.  Your primary doctor continues to be your

25  doctor on hospice.  So he was also the primary doctor

1   for a patient on AseraCare Hospice.  And so this

2   would be his primary doctor, someone he would see

3   over and over and over again.

4          And I think that we would agree that that

5   person's input into the care of the patient was

6   important.

7          THE COURT:  But it was represented to me

8   earlier that it is the hospice medical director's

9   decision whether to keep a patient on hospice, not

10  the primary care doctor's decision; right?

11         MR. WERTKIN:  Well, in terms of billing

12  Medicare, correct, you need to have -- the medical

13  director's decision needs to be -- you need only the

14  medical director's signature to submit the claim,

15  yes.

16         THE COURT:  And you have to have the

17  attending or primary care doctor's signature at the

18  beginning to admit the patient.

19         MR. WERTKIN:  That's right.

20         THE COURT:  But you don't have to have the

21  attending or the primary physician's signature any

22  other time during the process; right?

23         MR. WERTKIN:  During the process, that's

24  correct.

25         THE COURT:  And the attending/primary care

1  physician is not the one who has the regulatory

2  responsibility to decide whether to take a patient

3  off of hospice; right?

4          MR. WERTKIN:  Do the regulations even

5  address that?

6          MS. TAPIE:  They do, Your Honor, that's

7  correct.  And we would submit that that certainly

8  goes to the weight of Dr. Micca's testimony, the

9  regulation requirements and which physician is

10  actually making the decision about certification.

11          But, again, when they're talking about

12  Dr. Liao's opinion being different than this huge

13  group of physicians, which does include the attending

14  physician, then we think we should be able to offer

15  evidence that shows that the attending physicians

16  were not being considered clearly at the

17  recertification stages.

18          THE COURT:  There's no requirement for them

19  to be considered at the recertification stage.  So if

20  you raise that and bring that in and suggest it to

21  the jury through Dr. Micca's testimony, you're

22  suggesting something to the jury that is not correct.

23          MS. TAPIE:  Yes, Your Honor.  And that's not

24  what we would intend to do.

25          What I was meaning to say is that when they

1   are suggesting to the jury that these 200 something

2   physicians have agreed with AseraCare's physicians to

3   admit and recertify these patients, that we should be

4   able to offer up Dr. Micca's testimony to explain

5   that.

6           MR. WERTKIN:  We're getting a little further

7   afield.

8           THE COURT:  We are, because you're not

9   offering him as an attending physician for any of the

10  123 patients that you're claiming were ineligible.

11          MS. TAPIE:  That's right.

12          MR. WERTKIN:  We intend he would testify

13  primarily about his experience at AseraCare.

14          THE COURT:  As the medical director.

15          MR. WERTKIN:  Right.

16          THE COURT:  Not as an attending physician.

17          MS. MARTIN:  Which was the end of July to

18  August of 2006 and before.

19          THE COURT:  Yes.

20          MR. WERTKIN:  Actually, in terms of the

21  scope of his testimony, we're talking about a lot

22  about what happened afterwards.  That's just a way of

23  showing the nexus and showing how, you know, the

24  reasons we believe that this continued but we would

25  be focusing on his firsthand experience.  And if Your

1    Honor so limits it, we would stop it.

2            MR. LEMBKE:  Your Honor, there's sort of

3    been an evolution in the position of the government

4    since we started this morning, because I thought I

5    heard Mr. Wertkin say the primary reason they were

6    offering Dr. Micca was to say that attending

7    physicians were ignored when they suggested

8    discharge.  And, of course, I made the point that

9    there's -- you know, he had anecdotal evidence on

10   that.

11           And so I thought that's where we started,

12   that the primary reason to get him was to talk about

13   regular doctors being ignored, not anything he did as

14   a medical director.

15           MR. WERTKIN:  I'm not sure what the record

16   says.  My note says what Dr. Micca would basically

17   testify about is AseraCare's general practices.  So

18   --

19           MR. LEMBKE:  The general practice you

20   identified to the Court was the practice of ignoring

21   --

22           THE COURT:  Attending physicians.

23           MR. LEMBKE:  -- attending physicians based

24   on his anecdotal experience with Mary R., I think it

25   was, and that he talked about yesterday.

1          MR. WERTKIN:  But clearly he can't talk

2    about what happened -- well, he can't talk about his

3    experience as a medical director past August 2006.

4    And maybe we're just -- it's hard because it's a

5    difficult concept.

6          And I'm sorry if I am confusing it, but

7    we're focusing today or this morning or last night,

8    you know, how can he know that these general

9    practices continued, and that's what we've been

10   talking about here.  And that's what we've been

11   trying to show and focusing on.

12         We recognize that he couldn't testify about

13   his experience as the medical director, that he can

14   testify --

15         THE COURT:  Prior to August of 2006.

16         MR. WERTKIN:  There's no dispute about that.

17         THE COURT:  I don't want the jury to apply

18   those experiences all the way forward to Barbara N.

19   who wasn't admitted until three and a half years

20   later.

21         MR. WERTKIN:  Your Honor, again, we're

22   offering it for -- the weight that the jury gives to

23   it for the remaining patients, you know, that's up to

24   them.

25         THE COURT:  We're still dealing with its

probative value, which is a decision for me, not for

the jury.

MR. WERTKIN:  Yes, Your Honor.

THE COURT:  It's not a question of weight.

It's a question of how probative is it to the point

that you want the jury to draw from his testimony.

And then whether that probative value, which we

discussed before, it's lower and lower and lower, and

the further away you get from the patient that you're

trying to ask the jury to find was ineligible when

admitted.

So, certainly, I wouldn't allow it as to

Barbara N. or Virginia E. or Georgia M. or Alice

D. or Julia H. or Caron K. because it's so far out

that its probative value becomes diminished where the

prejudice, undue prejudice, to the defendant

increases.

And I also think it increases on the scale

of would it be confusing to the jury who is being

asked to look at or I assume eventually will be asked

to look at these seven people in the Atlanta area.

If there was some way to limit the relevance

of his testimony to that one Anne K., but I don't see

how we can do that with the jury, particularly when

the government has yet to mention to the jury any

1   connection to the 123.

2           I don't know how you can with the witnesses

3   you've been putting on.  But do you understand my

4   problem with it, Jeff?

5           MR. WERTKIN:  I think so, Your Honor.  I

6   think that this is -- I do understand your concern,

7   and I do think that I would anticipate that the o

8   there side would establish that he was only there for

9   a certain time period and argue to the jury that none

10  of those other patients, they shouldn't consider it

11  because it's not relevant, and the Court can even so

12  instruct if you so desire, to exclude his testimony.

13          I think it clearly has some probative weight

14  to one of the patients in the sample.

15          MR. LEMBKE:  Your Honor, it is a balance.

16  And we think, given the particular circumstances and

17  the time period involved and the number of patients

18  that it's not relevant to and has no probative value

19  for, we think the balance tips where the undue

20  prejudice substantially outweighs the very limited

21  probative value in these circumstances.

22          THE COURT:  I'm trying to think through all

23  the options.  I really am.

24          Jeff, you've talked about cross-examination

25  and what they can do in cross-examination, but thus

1  far, they haven't asked any questions about any of

2  the specific patients because the government hasn't

3  raised any of that.

4       I am trying to think whether it would be

5  appropriate to allow the defense to cross-examine

6  Dr. Micca about whether he had any experience with

7  any of these patients.

8       MR. WERTKIN:  We would be open to that.

9       THE COURT:  And I think that --

10      MR. LEMBKE:  Your Honor, here's the problem

11  with that, I really don't think that cures the

12  prejudice to us.

13      They have not identified and are not going

14  to identify and cannot identify because of what they

15  didn't do in discovery.  They can't get Dr. Micca to

16  link anything he says to any of the 123.

17      And it really isn't, I think, a fair

18  solution to us that we have to say, open your book of

19  123 and write down Anne K. next to this, because they

20  haven't -- they haven't made that link.

21      THE COURT:  No.

22      MR. LEMBKE:  And cannot make that link, at

23  least with Dr. Micca.  And I don't think it's a fair

24  solution to force us to do that.

25      MR. WERTKIN:  May I, Your Honor?  I believe

1   that the medical director, and you know better than

2   me, the medical director is on your witness list;

3   correct?

4           MS. MARTIN:  She is, yes.

5           MR. WERTKIN:  That would be another option

6   to call her.  That's another way of doing it.

7   Because if Dr. Micca is going to testify about the

8   general practices that he observed and it has

9   probative value to, number one, it seems to me the

10  best thing to do is call the one who was there and

11  then the jury can weigh it.

12          MS. MARTIN:  So you get to rebut our

13  testimony before we ever put it on?

14          I'm sorry, Your Honor, I don't think that

15  cures any prejudice that comes from this.  And, I

16  mean, we would just submit that the probative value

17  to Anne K. is so limited.

18          On what he said yesterday, it is

19  observations of -- the only person he mentioned was

20  Belle Wright Goodman that was in his facility.  Ms. K

21  was not even --

22          THE COURT:  Anne K.

23          MS. MARTIN:  Anne was not even in that

24  facility, and the rest of what he said yesterday was

25  things people told me and so --

982

1          THE COURT:  Which would not be admissible.

2          MS. MARTIN:  Correct, it's hearsay.  And so

3   we would just submit that there is no probative value

4   to his testimony about what was happening prior to

5   August of 2006.  And that's what he's talking about,

6   things that happened prior to August of 2006.

7          So, we're getting six months, seven months,

8   eight months from this Anne K. being on service.  So

9   the probative value of that is nil, in our opinion.

10  And to the extent there is any, the risk of prejudice

11  substantially outweighs --

12         THE COURT:  I think the defense is right on

13  this one.  I'm struggling with it a lot because I

14  would like to hear from Dr. Micca more than what we

15  heard yesterday, but I'm really concerned that that

16  testimony coming from a doctor that involved his

17  experiences six months or more prior to the first

18  patient and three and a half years prior to the last

19  one really is too tangential, not probative for the

20  issue that's before the Court, which is whether any

21  of these seven were ineligible at the time they were

22  admitted.

23         MR. WERTKIN:  Your Honor, I understand.  We

24  actually sat in the conference room after Your

25  Honor's order came out, and we went through this same

1  exercise with different -- there's a lot of evidence

2  that we didn't include, because it was a year out or

3  nine months out or more than a year out.  We did the

4  same analysis on our little conference room.

5      Our view is that -- and as Mr. Lembke

6  pointed out, it's here, and as Your Honor knows it's

7  here.  Our concern is that this is --

8      THE COURT:  When you said it's here for the

9  demonstrative purpose, for the record, is about

10 equally balanced.  And I don't think it's that

11 equally balanced when you look at how far out his

12 experience was from the last patient.  And we're only

13 looking at one that's within that time frame of six

14 to eight months or so.

15     MR. WERTKIN:  And I would say, Your Honor,

16 as you pointed out with your -- and for the record,

17 I'm slowly dropping my right hand and raising my left

18 hand.  It goes that way as you get further out.

19     Our view is that this is important

20 information for the jury to hear.  My concern is that

21 the defendant is not going to call the medical

22 director at the time, and the jury is not going to

23 hear this at all.

24     I mean, if it's so close and there's an

25 ability to clear up the issue in this trial, let's

1  put him on and let him testify and then let the jury

2  decide in the end.

3      THE COURT:  Well, you also have an

4  opportunity perhaps for rebuttal, you know.

5      MR. WERTKIN:  If he gets called.

6      THE COURT:  Well, I guess you didn't put

7  those people on your subpoena list or did you list

8  everybody that the defense listed on its list as

9  being part of my list, too, so that if they don't

10 call them, I can call them?

11     MS. TAPIE:  That's what we did, yes.  All

12 witnesses that are on the defendant's list.

13     THE COURT:  That's usually what I see, the

14 incorporation by reference.  So, I mean, that's --

15     MR. WERTKIN:  Can we rebut our own

16 witnesses?  Is that a solution, Your Honor, if we

17 called --

18     MR. LEMBKE:  Your Honor, if they're

19 concerned about what we're going to do in our case,

20 they have --

21     THE COURT:  We will wait to see --

22     MR. LEMBKE:  -- have an ability to rebut --

23 first, so the record is clear, I never, in any hand

24 gesture, suggested it was even close to equally

25 balanced.  So I just want --

 1          THE COURT:  The record should reflect.

 2          MR. LEMBKE:  I want the record to be clear

 3   that I think the balance is substantially, as I said

 4   with my words, substantially outweighed by any

 5   probative value.

 6          Your Honor, there's one other separate issue

 7   we want to raise.

 8          THE COURT:  All right.  I'm through on that.

 9          MR. WERTKIN:  So Your Honor's ruling is that

10   Dr. Micca is excluded?

11          THE COURT:  Yes, at this point.  Now,

12   whether you bring him back in rebuttal, we can

13   certainly talk about that later.

14          I definitely think he would be admissible in

15   phase two.  But for the purpose of what we're looking

16   at now, I think the probative value drastically

17   outweighs the prejudice.

18          MR. WERTKIN:  Under 403.  I wanted to

19   clarify that it's 403?

20          THE COURT:  Yes, coupled with phase one.

21          MR. LEMBKE:  Your Honor, late last night, or

22   last night, not late last night, consistent with our

23   agreement, we got the list of witnesses from the

24   government for today.  And there are four nurses from

25   the Evansville facility who are substantially

1   overlapping.

2          And, of course, none of them are being

3   called to talk about any of the 123.  And we're just

4   wondering when we're having general practices

5   evidence --

6          THE COURT:  How many do we need.

7          MR. LEMBKE:  How many do we need.  We

8   suggested four would be cumulative.

9          MS. MARTIN:  And one of those witnesses,

10  Your Honor, is Ms. Jackie Fehd who left the agency in

11  December of 2008, and the first person came on

12  service, allegedly an ineligible patient according to

13  Dr. Liao, in April of 2009.  So one of the four is

14  not connected in time to the sample.

15         The other three witnesses all overlap in

16  time.  Two of them -- one is from May of '09 to March

17  of 2010; one is from October of '08 to March of 2010;

18  one is from December of 2009 to August of 2010.

19         So one is outside the time frame, and the

20  other three substantially overlap in the time frame

21  that we anticipate they will be testifying about

22  today.

23         THE COURT:  How are they going to be any

24  different?

25         MR. WERTKIN:  We brought Jackie Fehd for

1  voir dire consistent with the Court's ruling, and we

2  wouldn't call her until that happens.

3       You know, they all -- they do tell the

4  story, tell a consistent story, that's true.

5       My big concern, frankly, Your Honor, is we

6  could put -- we could just put one or two of them up,

7  but we would need, you know -- of course, we would

8  need to have a recess because we don't have enough

9  people -- if we eliminated witnesses at this time, we

10  don't have -- we have been planning it out.  So we

11  can put people up in the day or earlier --

12       THE COURT:  That would be great.  The jury,

13  I think, will rather have a little extra time to

14  themselves than hearing the same story over and over,

15  the same questions over and over.

16       MR. WERTKIN:  That is correct.  I have the

17  same questions, Your Honor, of these witnesses.

18       THE COURT:  And we don't start with,

19  introduce yourself to the jury.

20       MR. WERTKIN:  Yes.

21       THE COURT:  We start with questions for the

22  witnesses.

23       MR. WERTKIN:  I understand that.  Can we go

24  off the record for one second?

25            (Off the record)

1          MR. LEMBKE:  Your Honor, I would say it

2     seems like the jury is getting a pretty good

3     understanding of what is hospice.  And we wonder is

4     it really necessary with every witness to ask what is

5     hospice.

6          MR. WERTKIN:  That's fine.  I actually

7     wasn't going to do that with the witnesses today,

8     Your Honor.

9          THE COURT:  Good.  Okay.

10          MR. LONG:  Your Honor, there was one

11     evidentiary issue that was not resolved at that time

12     that we -- there was an evidentiary issue that was

13     taken up Monday but not resolved as to exhibits that

14     we identified or that are assessments of AseraCare

15     facilities that are patient medical audits of charts.

16          And so there are both assessments of the

17     facilities.  And the witness today, Lori Harris,

18     performed those assessments.  They're all facilities

19     at the time they were ineligible patients.

20          THE COURT:  Is this going to be your first

21     witness?

22          MR. LONG:  No, Your Honor.

23          THE COURT:  Can we get the jury in and take

24     it up?  It's 9:00 now, so I'm thinking maybe at the

25     lunch break because I would also like to see what the

1   exhibits are that you're talking about.

2            MR. LONG:  Yes.

3            THE COURT:  So that I will be able to make

4   an informed decisions and not one in a vacuum.

5            MR. LONG:  I will let her know.

6            MS. MARTIN:  Thank you, Judge.

7            MR. LEMBKE:  May we have two minutes to run

8   to the restroom?

9            THE COURT:  Yes, yes.

10                      (Brief recess.)

11           (Open court.  Jury not present.)

12           THE COURT:  I gave you a homework assignment

13  last night.  Do you remember what it was?

14           MR. WERTKIN:  Yes, Your Honor.

15           THE COURT:  About Dr. Micca, but what?

16           MR. LEMBKE:  Reread the thing from Monday.

17           MS. TAPIE:  Reread from Monday.

18           MR. WERTKIN:  Yes, Your Honor.

19           THE COURT:  Did y'all do that?

20           MS. TAPIE:  Yes, we did.

21           THE COURT:  Do you have a better

22  understanding of my ruling?

23           MR. WERTKIN:  Yes, Your Honor.

24           THE COURT:  Did you read it, Mr. Wertkin?

25           MR. WERTKIN:  I did and Carolyn, we

1   discussed it last night.

2         THE COURT:  So you've got a better

3   understanding?

4         MR. WERTKIN:  Yes, Your Honor.

5         THE COURT:  So we won't have to have as many

6   objections today, right?

7         MS. TAPIE:  We also instructed the witnesses

8   to wait for the objections so we don't have to speak

9   over them.

10         MR. WERTKIN:  And I was there when Carolyn

11   advised the witnesses and she did it in a very strong

12   way.

13         THE COURT:  Okay.  One thing you learn as

14   you do more trials and work with witnesses and you

15   know that they are never going to do what we tell

16   them to do when they get on the stand anyway but

17   you've got to try.

18         (Open court.  Jury present.)

19         THE COURT:  Ladies and gentlemen, I want to

20   apologize for being late this morning.  But as

21   frequently is the case when you're not in here with

22   us, we are working out some issues that I think will

23   kind of move things along for y'all a little bit

24   more.  And I think it will -- you may not realize it,

25   but I think it's going to be worth the time that we

1    took this morning in the end for y'all.

2            So we are glad you're here and ready to

3    begin.

4            The United States may call your first

5    witness.

6            MR. WERTKIN:  Thank you, Your Honor.  The

7    United States calls Ms. Sherry Adams.

8             SHERRY ADAMS, GOVERNMENT'S WITNESS, SWORN.

9            THE CLERK:  State your name and spell your

10   first and last name for the court.

11           THE WITNESS:  Sherry Adams.  S-H-E-R-R-Y

12   A-D-A-M-S.

13           THE CLERK:  Thank you.

14                   **DIRECT EXAMINATION**

15   **BY MR. WERTKIN:**

16   Q.   Good morning, Ms. Adams.

17   A.   Good morning.

18   Q.   Ms. Adams, where do you currently reside?

19   A.   In Louisville, Kentucky.

20   Q.   What's your current profession?

21   A.   Nurse.

22   Q.   Have you ever heard of AseraCare Hospice?

23   A.   Yes.

24   Q.   How have you heard of AseraCare Hospice?

25   A.   I used to work for them.

1   Q.   In what capacity?

2   A.   As an RN case manager.

3   Q.   I would like to ask a few questions about your

4   background, if I may.

5   A.   Sure.

6   Q.   Where did you grow up?

7   A.   I grew up in Evansville, Indiana.

8   Q.   Where did you go to high school?

9   A.   Central High School.

10  Q.   Did you go to college, Ms. Adams?

11  A.   Yes.

12  Q.   Where did you go?

13  A.   University of Southern Indiana.

14  Q.   Did you graduate?

15  A.   Yes.

16  Q.   And what did you graduate with a degree in?

17  A.   Degree in science and nursing.

18  Q.   And after you got your degree, did you take the

19  licensing exam?

20  A.   Yes.

21  Q.   Did you pass that exam?

22  A.   Yes.

23  Q.   And after you passed that exam, what

24  professional license did you hold?

25  A.   A registered nurse.

1    Q.   What was your first job as a registered nurse?

2    A.   I was working at the hospital in Evansville,

3    St. Mary's.

4    Q.   What was your position there?

5    A.   Floor nurse.

6    Q.   What does a floor nurse do?

7    A.   That's the nurse that gives -- passes your

8    medicine when you're in the hospital.

9    Q.   And --

10   A.   And treatments.

11          THE COURT:  Tell me approximately what year

12   that was that you went to work at St. Mary's?

13          THE WITNESS:  1991.

14          THE COURT:  Is that the year you graduated?

15          THE WITNESS:  Uh-huh.

16          THE COURT:  And got your RN?

17          THE WITNESS:  Uh-huh.

18          THE COURT:  Thank you.

19   Q.   (By Mr. Wertkin)  How long did you work at

20   St. Mary's in Evansville?

21   A.   Two years.

22   Q.   What was your next job?

23   A.   The next job was Care Tenders.

24   Q.   What is Care Tenders?

25   A.   Care Tenders is a home care agency.  I was the

1    Kentucky Medicaid Waiver Supervisor.

2    Q.   About how long did you have that job?

3    A.   About two years as well.

4    Q.   Where did you work next?

5    A.   HealthSouth.

6    Q.   What is HealthSouth?

7    A.   It's a rehabilitation center.

8    Q.   What was your position at HealthSouth?

9    A.   It was a weekend supervisor.

10   Q.   And after you left HealthSouth, where did you

11   go?

12   A.   After that, I went to Outlook Point.

13   Q.   What is Outlook Point?

14   A.   It's an assisted living.

15   Q.   What's your position at Outlook Point?

16   A.   I was the director of health professions, which

17   that basically means I was the director of nursing, I

18   guess.

19   Q.   Thank you.  And after Outlook Point, where did

20   you work next?

21   A.   At AseraCare.

22   Q.   When did you start at AseraCare?

23   A.   May 27th, 2009.

24   Q.   You remember the precise day?

25   A.   It was my birthday, so that's why I remember.

1    Q.   And when did you stop working at AseraCare?

2    A.   It was approximately six months later.

3         THE COURT:  Which facility did you work at

4    for AseraCare?

5         THE WITNESS:  We had several different ones,

6    one of the main ones was Golden Living.

7         THE COURT:  I'm trying to at least figure

8    out a time and city and state.

9         THE WITNESS:  In Evansville, Indiana.

10   Q.   (By Mr. Wertkin)  And you said six months, so is

11   that May 27th -- six months would be November 27th,

12   2009, is that around that time that you stopped

13   working?

14   A.   Yes.

15   Q.   And you worked -- which AseraCare agency did you

16   work at?

17   A.   It was the one in Newburgh, Indiana.

18   Q.   Is Newburgh next to Evansville?

19   A.   Yes.

20   Q.   Did people refer to it as the Newburgh agency or

21   the Evansville agency or both or neither?

22   A.   There wasn't one in Evansville.

23   Q.   So it was in Newburgh?

24   A.   Newburgh, yeah.

25   Q.   What was your position at the Newburgh facility

1    in the May to November 2009 time frame?

2    A.   I was the -- an RN case manager.

3    Q.   What does an RN case manager do in Newburgh

4    during that time period?

5    A.   We have a -- we had to admit patients, discharge

6    patients or make visits, care for them.

7    Q.   Did you attend any clinical meetings when you

8    were an RN case manager in Newburgh in this time

9    period?

10   A.   Yeah.  We had a meeting every week, IDT

11   meetings.

12   Q.   Any other meetings that you attended?

13   A.   Yes, we did stand-up every morning.

14   Q.   What is a stand-up?

15   A.   It's a quick five to ten minutes where everybody

16   gets together and we have a plan for the day.

17   Q.   And who did you report to at the Newburgh

18   facility in the 2009 time frame?

19   A.   Deborah Hoffman was my immediate supervisor.

20   Q.   What position did Deborah Hoffman have?

21   A.   She was the director of nursing.

22   Q.   Who was the head of the office at the time?

23   A.   Debbie Waters.

24   Q.   You mentioned that you do -- you did admissions

25   as an RN case manager.  May I ask you some questions

 1   about that?

 2   A.   Sure.

 3   Q.   During this 2009 time frame in Newburgh, what

 4   was the first step in the admissions process?

 5   A.   We would get a referral.

 6   Q.   And if you got a referral without an order, what

 7   did you do?

 8   A.   We waited until we could get an order.

 9   Q.   Would you participate in procuring that order?

10   A.   I could, yes.

11   Q.   When you would do that, what would be the

12   process for getting that order?

13   A.   Just calling the physician's office.

14   Q.   Would you talk to the physician?

15   A.   No, the physician's nurse.

16   Q.   What would you ask the nurse to provide to you?

17   A.   If it was all right for us to go out and

18   evaluate and then to admit the patient under hospice.

19   Q.   Did you try to get a written order or was it a

20   verbal or something else?

21   A.   It could be either.

22   Q.   If it was written, what would the order

23   generally say?

24   A.   May admit to hospice, evaluate and admit.

25   Q.   Did it say anything else beside evaluate and

```
 1  admit?
 2  A.   Not at that point, no.
 3  Q.   And --
 4          THE COURT:  Evaluate and admit?
 5          THE WITNESS:  Uh-huh.
 6          THE COURT:  Is that all it said?
 7          THE WITNESS:  Yeah, to hospice.
 8  Q.   (By Mr. Wertkin)  There wasn't any kind of
 9  clause after that, evaluate and admit?
10  A.   No, if appropriate.
11  Q.   Was that what they would generally say?
12  A.   Yes, that's what the doctor would say, yes.
13  Q.   It's been a long time since you've seen an order
14  like that?
15  A.   It's been a little bit.
16  Q.   When you got an order to evaluate and admit, if
17  appropriate, what would be the first thing that you
18  would do?
19  A.   It would be to set up an arrangement to go see
20  the patient.
21  Q.   And when you went to see the patient, what was
22  the point of that meeting?
23  A.   To gather information to determine if they were
24  appropriate for hospice or not.
25  Q.   And what's involved in that process?
```

```
 1   A.   If they are a home patient, it's talking with
 2   the family and the patient.  If they are in a
 3   facility, it's also talking with the patient, the
 4   family, and the nursing staff that's there.
 5   Q.   And at the end of that evaluation process, if
 6   you found the patient was eligible for hospice, what
 7   would you do?
 8   A.   We would admit them.
 9   Q.   Would you consult anybody after you did your
10   evaluation but before you did your admission?
11   A.   No, huh-uh.
12   Q.   You wouldn't contact a doctor at all?
13   A.   No.
14   Q.   Why not?
15   A.   Because we already had the order to admit.
16   Q.   And who would decide the diagnosis in those
17   cases?
18   A.   The nurse.
19             THE COURT:  Can you say that again?
20             MR. WERTKIN:  The diagnosis of the patient.
21   A.   The nurse would.
22   Q.   What would you base that decision on?
23             MS. MARTIN:  Your Honor, we would just
24   object on our motion in limine on the 401, the 404(b)
25   and outside the statistical sampling and ask for a
```

1   continuing objection on that.

2           THE COURT:  Of course.  Overruled.

3           MS. MARTIN:  Thank you.

4   Q.  (By Mr. Wertkin)  What would you base your

5   diagnosis decision on generally?

6   A.  The lab work is a lot of it, their diagnoses

7   that they have there.

8   Q.  Okay.

9           THE COURT:  So you would already have a

10  diagnosis sometimes?

11          THE WITNESS:  Not beforehand, not before we

12  went out to evaluate them.

13          THE COURT:  Okay.  I thought you said

14  something about --

15          MR. WERTKIN:  Maybe I can --

16          THE COURT:  -- something on hand.

17          MR. WERTKIN:  Maybe I can clarify.

18  Q.  As part of your evaluation, you said you looked

19  at the medical records; is that right?

20  A.  Yes, in the facility.

21  Q.  Did the medical records have information on it

22  about their condition?

23  A.  Yes.

24  Q.  What kind of things would appear in a medical

25  record when you were looking and doing evaluation?

1   A.   Doctor's orders, lab work, nurse's notes, CNA
2   notes.
3   Q.   As part of the admissions process, did you need
4   to decide on what the terminal diagnosis was for the
5   purpose of the admission?
6   A.   Yes.
7   Q.   Who would decide the terminal diagnosis?
8   A.   We would.
9   Q.   Would you rely on the information in the medical
10  record to make that decision?
11  A.   Yes, yes.
12  Q.   If you did an analysis and you thought the
13  patient was not eligible, what would you do next?
14  A.   In the stand-up meetings in the morning, say,
15  well, I went out to admit this patient, this is what
16  I found.  I couldn't find anything that really fits
17  the -- fits the hospice criteria.
18  Q.   And when you -- who would attend these stand-up
19  meetings?
20  A.   It was all of us:  Debbie Waters, Debbie
21  Hoffman, all the nurses and the CNAs.
22  Q.   What, if anything, would Debbie Hoffman or
23  Debbie Waters say to you when you would report back
24  with that information?
25  A.   They would say that, you know, oh, well, we can

1  find -- we can put anybody on hospice for one cert

2  period, then we can look and see during that cert

3  period if there's anything else that we can --

4  another diagnosis we could put them under.

5  Q.  After you received those instructions at a

6  stand-up meeting, what would you do next?

7         Let me ask you a different way.  What did

8  you understand that to mean that we can put only one

9  -- we can put a person on -- any person on hospice?

10  A.  That everybody qualifies, basically.

11  Q.  Did they give you specific instructions about

12  patients you had found ineligible?

13  A.  They say adult failure to thrive.

14  Q.  They would suggest diagnosis to you?

15         MS. MARTIN:  I am going to object to the

16  leading.

17         THE COURT:  I'll give a little bit of leeway

18  here.

19  Q.  (By Mr. Wertkin)  I'm sorry.  So they would

20  suggest diagnosis to you?

21  A.  Yes.

22  Q.  What type of diagnosis would they suggest to

23  you?

24  A.  Adult failure to thrive, that is a big one.  It

25  goes under a very general category.

1003

1   Q.   And after you received this information, what

2   would you do about the patient that you had found

3   ineligible?

4   A.   I went ahead and admitted them.

5   Q.   Thank you.   I would like to switch gears a

6   little bit.

7   A.   Okay.

8   Q.   Actually, I'm sorry.   Had your opinion of the

9   patient changed between the time that you thought the

10  patient was not eligible and the time that you

11  admitted them?

12  A.   No.

13  Q.   Thank you.   I would like to switch gears and ask

14  you about the IDT meetings that you said that you

15  attended.

16  A.   Sure.

17  Q.   How often did you attend IDT meetings?

18  A.   Every Wednesday, once a week.

19  Q.   And did you call them IDT meetings or IDG

20  meetings?

21  A.   IDT.

22  Q.   Thank you.   What does IDT stand for?

23  A.   Interdepartmental team.

24  Q.   Okay.   Thank you.

25  A.   Discipline.

1    Q.   And who were the medical directors in the

2    Evansville agency from the May to November 2009 time

3    period?

4    A.   Dr. Sash was when I first hired on.  And Dr. --

5         THE COURT:  S-A-S-H?

6         THE WITNESS:  S-A-S-H.  And then it was

7    Dr. Mallick after that.

8    Q.   Did you have a chance to observe Dr. Sash at IDT

9    meetings?

10   A.   No.

11   Q.   Why not?

12   A.   He never came.

13   Q.   Do you know how the business of IDT got done

14   without Dr. Sash present?

15   A.   What we would do is we would write on our IDT

16   form our conclusions or summaries, and then they

17   would take those papers over to Dr. Sash's office for

18   him to sign.

19   Q.   And who was the medical director after Dr. Sash?

20   A.   Dr. Mallick.

21   Q.   Did you have an opportunity to observe

22   Dr. Mallick at IDT meetings?

23   A.   Yes.

24   Q.   And how involved, if at all, was Dr. Mallick in

25   IDT meetings?

1   A.   He sat at the head of the table.   He was

2   involved.   He signed them.

3   Q.   Who sat next to Dr. Mallick at the IDT meetings?

4   A.   Debbie Waters.

5   Q.   Did you have an occasion to observe the

6   interactions between Dr. Mallick and Debbie Waters at

7   these meetings?

8   A.   Yes.

9   Q.   What did you observe?

10  A.   I observed Debbie Waters kind of leading

11  Dr. Mallick where he needed to go so that we could

12  keep the patient.   Also, had heard them arguing --

13        MS. MARTIN:   Your Honor, we just object to

14  this anecdotal testimony.

15        THE COURT:   I will overrule this.

16  Q.   (By Mr. Wertkin)  Did you have an occasion to

17  observe any disagreements between Mr. Mallick and

18  Debbie Waters?

19  A.   Yes.

20  Q.   And did these disagreements take place in

21  IDT meetings?

22  A.   Sometimes.   Most of the time it was behind

23  closed doors.

24  Q.   When it occurred in IDT meetings, did you

25  observe -- do you know how those disagreements tended

1   to get resolved?

2   A.   We'll talk about it later in my office is what

3   Debbie Waters would say.

4   Q.   Did you have an occasion to observe them talking

5   about it in her office?

6   A.   I heard them because her office is right off --

7            MS. MARTIN:   We would just object to this --

8            THE COURT:   Sustained.

9   Q.   (By Mr. Wertkin)   I would like to ask you a few

10  questions about your documentation processes at the

11  Newburgh, Evansville, facility from the time period

12  of May to November 2009.

13           Did you see any instructions during that

14  time period about how to document your nurse's notes?

15  A.   Sure.

16  Q.   And who provided you with these instructions?

17  A.   Deborah Hoffman and Debbie Waters both.

18  Q.   And what were those instructions?

19  A.   That you always focus on the negative of the

20  visit.

21  Q.   What does that mean?

22  A.   Even though, let's say they walked 100 feet, you

23  don't necessarily put that down because that shows

24  improvement.  You want to just focus on the negative

25  things, needing assistance with bathing or not eating

1  or those type of things.

2          MR. WERTKIN:  Thank you, Ms. Adams.  I have

3  no further questions.

4          THE COURT:  Cross-examination.

5                    **CROSS-EXAMINATION**

6  **BY MS. MARTIN:**

7  Q.  Ms. Adams, I'm Kim Martin.  I represent

8  AseraCare.

9          I just wanted to ask you, you had said that

10 you left the Evansville agency in November of 2009,

11 but in looking at some of your records, would it be

12 more accurate that it was in March of 2010?

13          Does that sound right to you?

14 A.  It very well could have been instead of

15 approximately, I don't have the exact dates.

16 Q.  So about May of 2009 to March of 2010 is when

17 you would have been in Evansville; correct?

18 A.  Yes, that could -- yes, that could have been.  I

19 don't know the exact date I stopped.

20 Q.  But it wasn't much longer than that?

21 A.  No.

22 Q.  And you've offered some testimony here today,

23 and my question to you is, you're not here testifying

24 that every patient on service in the Evansville

25 agency during your tenure there was not appropriate

1   for hospice service, are you?

2   A.   I'm sorry, would you repeat that question?

3   Q.   Sure.  I just want to -- during your tenure,

4   you're not testifying that during your tenure in the

5   Evansville agency during your time to be employed

6   there, that all the patients who are on service were

7   not appropriate for hospice care; correct?

8   A.   Correct.  I mean yes.

9   Q.   So you would agree with me that there were many,

10  many eligible or appropriate patients on service

11  during your time in the Evansville agency?

12  A.   Yes, but I would like to explain.

13  Q.   Well, you just answered my question there.

14         So you would agree with me that there were

15  eligible or patients on service who were appropriate

16  for hospice care; correct?

17  A.   Yes.

18  Q.   And to make an assessment about whether a

19  patient is appropriate for hospice care or not, you

20  have to look at each individual patient; correct?

21  A.   Correct.

22  Q.   And you have to judge them on their own

23  individual circumstances; correct?

24  A.   Right.

25         MS. MARTIN:  Thank you, that's all I have.

1      THE COURT:  Any redirect?

2      MR. WERTKIN:  Yes, thank you.

3                **REDIRECT EXAMINATION**

4  **BY MR. WERTKIN:**

5  Q.  Ms. Adams (sic) asked you about whether there

6  were some patients that were appropriate and you

7  wanted to explain.

8       Do you want to go ahead and do that?

9  A.  Yes.  The average time you need to be on hospice

10  is three weeks prior.  We had a lot of patients that

11  were on service for years.

12  Q.  Thank you.

13       Ms. Adams, do you have a financial interest

14  in this litigation?

15      MS. MARTIN:  Your Honor, it's beyond the

16  scope of cross.

17      THE COURT:  Sustained.

18      MR. WERTKIN:  Thank you.  Those are the only

19  questions, Your Honor.

20      THE COURT:  Recross?

21      MS. MARTIN:  Can I have one second, Your

22  Honor?

23      THE COURT:  You may.

24          (Brief pause)

25              **RECROSS-EXAMINATION**

1  **BY MS. MARTIN:**

2  Q.  Ms. adams, just one follow-up question to your

3  testimony.

4        Is your testimony that the appropriate

5  amount of time for a patient to be on hospice is

6  three weeks prior to their death?

7  A.  Yes.

8        MS. MARTIN:  Thank you.  That's all I have.

9        MR. WERTKIN:  I'm sorry.  May I clarify that

10  testimony, please, Your Honor?

11        THE COURT:  You can try.  Redirect is

12  limited to --

13        MR. WERTKIN:  Yes, Your Honor.

14                REDIRECT EXAMINATION

15  By MR. WERTKIN:

16  Q.  Ms. Adams, can you explain what you mean when

17  you say that the -- can you explain what you mean the

18  appropriate amount of time for someone to be on

19  hospice?

20        MS. MARTIN:  Your Honor, we object to that

21  question.  It's asked and answered.

22  Q.  (By Mr. Wertkin)  Ms. Martin asked you, I

23  believe, what you think the average amount of time

24  that someone should be on hospice.

25        MS. MARTIN:  Your Honor, we object to that

1   restatement of the question.

2          MR. WERTKIN:  Can we read your last question

3   back?

4                    (Record read).

5   Q.  When you're evaluating a patient and you're

6   deciding whether they're eligible for hospice, are

7   you looking to see only if they're going to die in

8   the next three weeks?

9          MS. MARTIN:  Your Honor, we object, beyond

10  the scope.

11         THE COURT:  Sustained.

12  Q.  (By Mr. Wertkin)  Who is hospice for?

13         MS. MARTIN:  Your Honor, we object.  This

14  question is beyond the scope.

15         THE COURT:  Sustained.

16  Q.  (By Mr. Wertkin)  Can you explain what you meant

17  by your answer, please, Ms. Adams?

18  A.  The ideal time to admit a patient for hospice is

19  three to four weeks before they're dying.  That is

20  hard sometimes to predict.  But it doesn't -- it's

21  not meant for people to be on hospice for years.

22         MS. MARTIN:  Your Honor, we would object and

23  move to strike that last portion of her testimony.

24         THE COURT:  Sustained.  You are to disregard

25  that last statement.

1       MR. WERTKIN:  Thank you, Ms. Adams.

2       THE WITNESS:  You're welcome.

3       MS. MARTIN:  We have nothing else, Your

4  Honor.

5       THE COURT:  All right.  Thank you,

6  Ms. Adams, you may be excused.

7       And the United States may call your next

8  witness.

9       MR. WERTKIN:  The United States calls

10  Ms. Marsha Greer.

11       MS. MARTIN:  Your Honor, may we approach?

12       THE COURT:  All right.

13            (SIDEBAR)

14       MS. MARTIN:  Your Honor, this next witness,

15  Ms. Greer, is also from Evansville and she overlaps

16  in time with Ms. Adams and Ms. Adams was May of 2009

17  to March of 2010.  Ms. Greer is December 2009 to

18  August of 2010.  So we would just raise cumulative.

19       MR. WERTKIN:  She's another nurse.

20       MS. MARTIN:  She's another nurse from

21  Evansville.

22       THE COURT:  I will let them do that but I

23  don't know how much more than that.

24       MR. WERTKIN:  That's what I was going to do.

25       THE COURT:  She said she was at Newburgh and

1    not --

2         MS. MARTIN:  It's like Hoover, you know, and

3    so everyone in the documents and any sort of

4    reference to it is Evansville, but its physical

5    location is in Newburgh.

6         THE COURT:  All right.

7         MS. MARTIN:  And she's not represented.

8         MR. WERTKIN:  I was real surprised about

9    that as well.

10        THE COURT:  You probably need a second nurse

11   from Evansville.

12             (Open court.  Jury present.)

13        MARGIE GREER, GOVERNMENT'S WITNESS, SWORN.

14        THE CLERK:  State and spell your first and

15   last name for the court.

16        THE WITNESS:  Margie Greer.

17        THE CLERK:  Can you spell it, please.

18        THE WITNESS:  M-A-R-G-I-E, last name Greer,

19   G-R-E-E-R.

20        THE CLERK:  Thank you.

21                    **DIRECT EXAMINATION**

22   **BY MR. WERTKIN:**

23   Q.  Good morning, Ms. Greer.

24   A.  Good morning.

25   Q.  Where do you currently live?

1014

```
 1  A.   Currently I live in Henderson, Kentucky.

 2  Q.   Are you currently employed?

 3  A.   Part time.

 4  Q.   Are you part-time retired?

 5  A.   Yes.

 6  Q.   Have you ever heard of the defendant in this

 7  case, AseraCare Hospice?

 8  A.   I'm sorry?

 9  Q.   Have you ever heard of the defendant in this

10  case, AseraCare Hospice?

11  A.   Yes.

12  Q.   How are you familiar with AseraCare Hospice?

13  A.   I worked there for a short time.

14  Q.   What position did you have when you worked

15  there?

16  A.   I was a case manager.

17  Q.   Before we get into that, I would like to ask you

18  a few questions about your background.  Is that okay?

19  A.   Okay.

20  Q.   Where were you born?

21  A.   In Southern Illinois.

22  Q.   Where did you go to high school?

23  A.   In Grayville, Illinois.

24  Q.   Did you go to college after that?

25  A.   At Wabush Valley College in Mt. Carmel.
```

1   Q.   Did you get a degree?

2   A.   In nursing.

3   Q.   Did you take a licensing exam after you got your

4   degree?

5   A.   Yes.

6   Q.   Did you pass the exam?

7   A.   Yes.

8   Q.   After you passed the exam, what title did you

9   have?  What license do you hold?

10   A.   Nursing, associate's degree in nursing.

11   Q.   And after you passed your licensing exam, did

12   you hold -- did you get a license?

13   A.   Yes.

14   Q.   What was your license in?

15   A.   As a registered nurse.

16   Q.   Thank you.  What was your first job as a

17   registered nurse?

18   A.   My first job was in Carmel, Illinois, at a

19   skilled care unit.

20   Q.   What position did you hold there?

21   A.   When I started, I was the second shift charge

22   nurse.

23   Q.   And what does a second shift charge nurse do?

24   A.   Well, it was a 98 bed facility, and I was in

25   charge of the facility and all the other OPNs, RNs

1  and CNAs.

2  Q.   Around when was that?

3  A.   In 1986 to 1990.

4  Q.   And what was your next job?

5  A.   I went to work for Evansville State Hospital in

6  Evansville, Indiana.

7  Q.   In what capacity?

8  A.   Just as a staff nurse.

9  Q.   And what does a staff nurse do?

10  A.   That is a mental health hospital.  It was a very

11  large facility.  So you might have 20 to 40 patients

12  that you're responsible for.  As an RN you supervise

13  LPNs, QNAs and CNAs.

14  Q.   Have you had a long career as a nurse?

15  A.   Yeah.

16  Q.   You've had many different jobs?

17  A.   Uh-huh.

18  Q.   Will you tell the jury how many years you've

19  worked as a registered nurse.

20  A.   Approximately 30 years.

21  Q.   Around when did you start working for AseraCare?

22  A.   In December of '09.

23  Q.   And how long did you work for AseraCare?

24  A.   I think I left there in August of -- the

25  following August of '10.

1017

```
 1  Q.   You believed you worked there from December '09
 2  to August 2010?
 3  A.   Uh-huh.
 4  Q.   What position did you hold at AseraCare during
 5  that time period?
 6  A.   I was a case manager.
 7  Q.   And what does a case manager do?
 8  A.   For every patient you have, you have a team that
 9  consists of a physician and social worker, chaplain,
10  nurse, CNA, and I helped coordinate the care of that
11  patient and all of the other disciplines that was
12  needed for that care.
13  Q.   Did you have any other clinical responsibilities
14  as an RN case manager?
15  A.   Taking care of the patient.
16  Q.   Did you have an occasion to ever do any
17  admissions?
18  A.   Yes.
19  Q.   Did you attend any clinical meetings while you
20  were there?
21  A.   IDT meetings, yes.
22  Q.   Is there any other responsibilities that you had
23  besides taking care of patients, going to
24  IDT meetings and doing admissions?
25  A.   Yeah, on call.
```

1   Q.   What does on call mean?

2   A.   From the time the office closes until either the

3   next morning or on Friday evening until Monday

4   morning, you are on call.

5   Q.   If you get a call, what do you need to do?

6   A.   You have to go out.  You have to take care of

7   that patient.  And it may not be your patient.  It

8   may be a patient you're not even familiar with.

9   Q.   Thank you.  I would like to -- who did you

10  report to?

11  A.   Directly?

12  Q.   Yes, ma'am.

13  A.   Deb Hustus first.

14  Q.   What position did Deb Hustus have?

15  A.   She was my PCC.

16  Q.   What does PCC stand for?

17  A.   I knew you would ask me that.

18  Q.   Does it mean patient care coordinator?

19  A.   Yes.

20  Q.   And you said --

21          THE COURT:  Just a minute.  I forgot to

22  notify the jury.  We have our glossary over there

23  that I promised you last week we would have.

24          You also, I think, were provided a handout

25  with the glossary on it.  So probably before the end

1   of this trial, you will have these terms down pat.

2   We're teaching you medical terms and legal terms and

3   all kind of terms while you're here.

4          So at least your jury experience will be a

5   learning experience, expand your vocabulary.  But

6   there will not be a test.

7          Thank you.  You may proceed.

8          MR. WERTKIN:  Thank you, Your Honor.

9   Q.   You said that at first it was Deb Hustus.  Who

10  was it next?

11  A.   Well, she was my initial -- my first line

12  supervisor.  Then after her was Deb Hoffman.  She was

13  the middle manager, you might say.

14  Q.   Do you recall her title or position?

15  A.   I cannot recall her direct title.  I just know

16  she was a middle management.

17  Q.   Who is the head of the office, if you know?

18  A.   Deb Waters.

19          THE COURT:  Did you have to be a Deborah to

20  work there?

21          THE WITNESS:  Not everybody.

22  Q.   (By Mr. Wertkin) I would like to ask you a few

23  questions about the general admissions practices

24  during that December 2009 to August of 2010 time

25  period; is that okay?

1    A.    Okay.

2    Q.    What was the first step in the admissions

3    process in the Evansville facility at that time?

4    A.    They would come to one of the nurses.  We all

5    had a territory, a county or a town or a facility.

6    And if that was in your facility or your territory,

7    they would come to you and say we have had a referral

8    for a patient and they would want us to go out and

9    assess that patient, evaluate and admit, if they were

10   appropriate for hospice.

11   Q.    Thank you.  Did I ask you which AseraCare

12   location you worked at?  Which AseraCare location did

13   you work at?

14   A.    It was out of Newburgh, Indiana.

15   Q.    Thank you.  When you got -- when a referral came

16   in, did you get an order to evaluate and admit, if

17   appropriate?

18   A.    An order usually came with the referral.

19   Q.    And if you had an order to evaluate and admit,

20   if appropriate, what would you do?  What was your

21   next step?

22   A.    You went and evaluated the patient physically.

23   You would assess them head-to-toe, their alertness,

24   their level of ability to interact and tell you how

25   they feel.  You listen to heart and lung sounds and

1    bell sounds, took vital signs.  And then if they were

2    in a facility and had a chart, you would examine that

3    chart and go back and look at labs, compare how

4    they've changed over a period of time and doctor's

5    notes.

6    Q.   If you found -- if you believed that the patient

7    was hospice eligible, who would decide on the

8    terminal diagnosis?

9    A.   Usually a doctor would do that.  I mean --

10   Q.   After you do your evaluation, did you call --

11   but before you did the admission, did you usually

12   call --

13   A.   Well, it was pretty obvious.  If they had cancer

14   then it's going to be in the notes, or it's going to

15   be on the referral.

16          If they had, you know, any disease process

17   is going to be rather obvious, like I said, like

18   cancer, that kind of thing.

19   Q.   Was it your general practice after you did your

20   evaluation to admit the patient or call somebody or

21   do something else?

22   A.   If we had the order to evaluate and admit, if

23   appropriate, I would go -- we would go ahead and

24   admit them.

25   Q.   If you went out and did your evaluation and you

1  found that the patient was not eligible, what would

2  you do next?

3  A.   Then I didn't admit.  I would go back the next

4  meeting that we had, I would let them know at the

5  meeting that this patient, I couldn't find just cause

6  to admit them to hospice.

7  Q.   When you say the next meeting that you had, what

8  meeting would that be?

9  A.   If it was time for an IDT meeting, then the

10  doctor would be there, everybody would be there.

11  That would be the meeting.  If it was just your

12  general morning meeting that we had every morning, it

13  would be on that one.

14  Q.   That general meeting, did you call that

15  something?  Did that have a name?

16        MS. MARTIN:  Your Honor, could we renew our

17  continuing objection to this line of testimony?

18        THE COURT:  Yes.

19        MS. MARTIN:  Thank you.

20  Q.   (By Mr. Wertkin) The morning meetings, did you

21  refer to the morning meetings in some particular way?

22  A.   I think they typically called them stand-up

23  meetings.

24  Q.   And at these meetings, whether it be the

25  stand-up meetings or the IDT, if those were coming

1   up, what would be discussed about the patient that

2   you decided was not eligible?

3   A.   They would always want to know what we found out

4   about any patient they send us out to assess.   And if

5   I couldn't find just cause, I would tell them I

6   didn't find reason to admit them to hospice.

7   Q.   And what was the general reaction when you would

8   share that information?

9   A.   I usually was told to go back and dig deeper and

10  look harder.

11  Q.   And what did you understand those instructions

12  to mean?

13  A.   I understood them to mean that I was to find a

14  reason to admit them to hospice.

15  Q.   When you say "find a reason," what do you mean

16  by that?

17  A.   Create a reason because there was none there.

18  Q.   I would like to shift gears a little bit and

19  talk to you about those IDT meetings that you

20  mentioned.

21  A.   Uh-huh.

22  Q.   Did you attend IDT meetings?

23  A.   Yes.

24  Q.   And when you attended IDT meetings, did you

25  typically participate in the conversation?

1   A.   When it was my turn.

2   Q.   Did you discuss patients that you thought were

3   ineligible?

4   A.   Yes.

5   Q.   And what did you discuss when you would talk

6   about patients that were ineligible?

7   A.   Well, just like I told you about the stand-up

8   meetings, I would tell them, remind them who it was

9   they sent me out to assess and explain to them that I

10   could not find just cause for them to be admitted.

11   Q.   What about for patients that had already been

12   admitted and you were talking about recertifications,

13   did you discuss eligibility in terms of those

14   patients?

15   A.   I did.  When I hired on there, there had been

16   other nurses who had left already.  And I inherited

17   those patients.  And they had maybe been on service

18   for quite a while when I got them and I was not

19   seeing a decline.  I was not seeing a reason.  I

20   brought that up and --

21   Q.   It was your practice to raise concerns about

22   patients that were not eligible?

23   A.   Yeah, if they weren't eligible for hospice.

24   Q.   How were those concerns received?

25   A.   Not any better than the ones that I didn't want

```
 1  to admit when they didn't have cause to be on hospice
 2  care.
 3  Q.   Thank you.  Ms. Greer, do you have a financial
 4  interest in the outcome of this litigation?
 5  A.   No.
 6         MR. WERTKIN:  No further questions.  I'm
 7  sorry.  I should have checked with my counsel.
 8  Q.   Do you know what would happen to the patients
 9  after the disagreements during these IDT meetings?
10  A.   What do you mean what would happen?
11  Q.   Let me ask again.
12         Going back to your answer about you would
13  raise concerns about certain patients, do you know
14  what would happen to the patients that you raised
15  concern about after the IDT meetings?
16  A.   I just know that if I didn't find cause to admit
17  them, I didn't admit them.  I can't answer if they
18  sent out anyone else.  I don't know that.
19  Q.   Okay.
20  A.   I know that we argued that quite a bit.
21  Q.   The location of the AseraCare facility was in
22  Newburgh; is that right?
23  A.   Yes.
24  Q.   Did people refer to the AseraCare agency in
25  Newburgh as the Evansville agency?
```

1    A.   They did.

2    Q.   Why did you refer to it as Newburgh?

3    A.   I lived in Evansville and they kind of run

4    together but it's still Newburgh.

5    Q.   But in general, it's referred to as what?

6    A.   It's considered the Evansville office, even

7    though it's in Newburgh.

8    Q.   Okay.

9    A.   It's my own little hangout.

10        MR. WERTKIN:  Thank you for clarifying.

11        THE COURT:  Is Newburgh like a suburb of

12   Evansville?

13        THE WITNESS:  No, it's its own little town

14   but just smaller.  You just drive down the road and

15   you've driven out of Evansville and into Newburgh.

16        THE COURT:  Okay.  Unless you see a sign,

17   you wouldn't know the difference?

18        THE WITNESS:  You wouldn't.

19        THE COURT:  Okay.  We've got some of those

20   little towns around here, too, so we can understand

21   that.  Thank you.

22   Q.   (By Mr. Wertkin)  Do you know whether or not

23   patients would be discharged after you raised

24   concerns about them?

25   A.   There is one --

1    MS. MARTIN:  We just object to the anecdotal

2  evidence.

3    MR. WERTKIN:  I withdraw the question.

4  Thank you, Your Honor.

5    THE COURT:  Any cross?

6    MS. MARTIN:  Yes, Your Honor.

7  **CROSS-EXAMINATION**

8  **BY MS. MARTIN:**

9  Q.  Ms. Greer, I'm Kim Martin.  I represent

10  AseraCare.  I just have a couple of questions for

11  you.

12    You talk about -- you talked about

13  evaluating patients under hospice criteria.  What

14  criteria would you use in evaluating hospice patients

15  when you were at AseraCare?

16    What was the standard that you would use?

17  A.  Typically, when you got a referral with an

18  order, it would state, like I said, that they have,

19  you know, possible cancer or they've been declining

20  in weight or what reason that they were sending you

21  out to check that patient.

22  Q.  And we heard some testimony here about something

23  called local coverage determinations.  Are you

24  familiar with that term?

25  A.  No.

1    Q.   Okay.  And so when you would assess a patient

2    for whether they were appropriate for hospice

3    service, would you be considering any sort of

4    specific criteria or checklist of information?

5    A.   You know, that's been quite a while ago.  We did

6    have a packet of forms that we used when we went out

7    to fill out for all admissions.

8    Q.   And -- okay.  So in terms of the Evansville

9    agency when you were there, my understanding that was

10   from December of 2009 to August of 2010; is that

11   correct?

12   A.   Yes.

13   Q.   And you're not saying that every patient who was

14   on service in Evansville during that time frame was

15   not appropriate for hospice care?

16   A.   No.

17   Q.   And, in fact, you would agree with me that there

18   were many hospice or patients on service who were

19   appropriate for hospice care; correct?

20   A.   Yes.

21   Q.   And the only way to assess whether a patient is

22   appropriate for hospice care or not is to look at

23   that patient individually; correct?

24   A.   Right.

25   Q.   And you have to look at every patient

1  circumstances individually; correct?

2  A.  Yes.

3       MS. MARTIN:  Can I just have one second,

4  Judge?

5                    (Brief pause)

6       MS. MARTIN:  That's all I have.  Thank you.

7       THE COURT:  Any redirect?

8       MR. WERTKIN:  Just one question, Your Honor.

9                **REDIRECT EXAMINATION**

10 **BY MR. WERTKIN:**

11 Q.  Ms. Martin asked you about patients who were

12 appropriate in Evansville.  Are you saying that there

13 were some patients on service who were inappropriate?

14 A.  I felt there was, yes.

15 Q.  Thank you.

16 A.  Absolutely.

17      MR. WERTKIN:  Thank you.  No more questions.

18      MS. MARTIN:  We have no further questions,

19 Judge.

20      THE COURT:  Thank you, Ms. Greer.  You may

21 step down.

22      The United States may call your next

23 witness.

24      MR. WERTKIN:  Your Honor, may we have a

25 second to confer?

1    THE COURT:  Yes.

2         (Brief pause)

3    MR. WERTKIN:  May we approach?

4    THE COURT:  All right.

5              (SIDEBAR)

6    MR. WERTKIN:  Your Honor, we intend to call

7  the Davenport people this morning.  We have an issue

8  with the audits.  We have Lorri Harris here, who made

9  the assessments, and I think we would want to do

10  them, but Your Honor asked to look at the exhibits

11  and do that at lunch.  I didn't know what you wanted

12  to do.

13    THE COURT:  She's your next witness?

14    MS. TAPIE:  Yes.

15    THE COURT:  Then we will take a break.  Does

16  Mr. Long have those exhibits for me to see?

17    MR. WERTKIN:  I believe so.

18    THE COURT:  All right.

19    (Open court.  Jury present.)

20    THE COURT:  Ladies and gentlemen, I need to

21  look at some questions about some evidence and it's

22  going to take me more than a couple of minutes to

23  look at that.  So we're going to have another break.

24  I'm guessing probably about 20 minutes or so.  So

25  roughly 10:35 maybe.

1    You know the drill, you're not to discuss

2    anything about the case, anything you've heard, don't

3    let anybody come up and bend your ear about it

4    either.  We will see you back in a little bit.  Thank

5    you.

6                    (Jury excused)

7               (Outside the presence of the jury.)

8         THE COURT:  Okay.  Have you got something

9    for me to see, Mr. Long?

10        MR. LONG:  Yes.

11        THE COURT:  Were these audits part of any of

12   the motion in limine things that I may have reserved

13   ruling on?  If so, which one, if anybody can help me.

14        MS. MARTIN:  Yes, Your Honor.  These are

15   part of the audit -- I don't think they were on

16   motions in limine because there were a couple of

17   different issues.  I think one is non-physician

18   opinions about eligibility.

19        The other is sort of just general relevant

20   nexus and 404(b) issues.

21        THE COURT:  First of all, tell me what

22   facility these involve.

23        MR. LONG:  They involve Foley, Decatur,

24   Demopolis -- there are six total.

25        THE COURT:  Right.

 1          MS. MARTIN:  I'm sorry.  What number?  Can

 2   we just make sure I've got it?

 3          THE COURT:  We haven't heard anything about

 4   Demopolis, right?  What's the number?

 5          MR. LONG:  Government's Exhibit 53,

 6   Government's Exhibit 70-A; Government's Exhibit 77;

 7   Government's Exhibit 48; Government's Exhibit 87 and

 8   Government's Exhibit 142.  I have copies for the

 9   Court.

10          MS. MARTIN:  These are internal audits by an

11   AseraCare regional clinical person named Lorri Harris

12   and she had responsibility for these agencies at

13   various time frames and performed these internal

14   audits as a part of her -- as part of her duties to

15   do the review of patient charts.

16          So it's a review by a nurse of patient

17   charts for an assessment of various factors like what

18   forms were in the chart, forms that are in the chart

19   and different things that those --

20          THE COURT:  So this would be like the one

21   that Ms. Perryman had done?

22          MS. MARTIN:  Correct, yes, Your Honor.  We

23   talked about this --

24          MR. LEMBKE:  Your Honor, there are two times

25   in the transcript when Your Honor has discussed this.

1    THE COURT:  Well, that's why I was asking

2  which motion in limine it is related to.

3    MR. LONG:  We spoke about it on Monday.

4    MS. MARTIN:  It begins at Page 371 and

5  continues through --

6    MR. LEMBKE:  Your Honor, you also on July

7  29th at Page 72 of the transcript, there was a brief

8  reference to it.

9    MR. LONG:  Just so the record is clear,

10  there are six total documents here and three of them

11  have an audit of one of the patients, so one patient

12  was audited at different facilities in three of the

13  documents, that would be in Demopolis and in Foley

14  and in Mobile.

15    And then the Decatur ones do not have

16  patients at the sample but the audit of the other

17  documentation was done while there was an ineligible

18  patient on service.

19    MS. MARTIN:  The discussion on Monday was a

20  focus on these audits not being information that is

21  communicated to the physician, not information that's

22  shown to the physician.

23    So that was part of the discussion.  And you

24  indicated on Monday that you were not inclined to let

25  these in for that reason.

1    We also submit that to the extent that they

2  intend to offer these with regard to a specific

3  patient in the sample that is contrary to their

4  representations that only -- we wouldn't hear the

5  patient's name until we got to Dr. Liao.

6    MR. LONG:  Your Honor, the audits generally

7  are relevant evidence of the information that was

8  contained in the medical files at these facilities.

9    This information, as I understand, you've

10  instructed the jury they can consider as part of

11  their deliberations.

12    THE COURT:  So we have to have time and

13  place and related to information provided to the

14  physicians.  How does this relate to that?

15    MR. LONG:  So, for instance, Your Honor, if

16  I can --

17    THE COURT:  I think it may be wise to take

18  one of these at a time so I know where it was, what

19  the time frame was of the audit, and can compare it

20  to the time frames of when patients were there.

21    And also you indicated that some involved

22  patients that were actually identified by Dr. Liao.

23    MR. LONG:  Some are patients in the sample.

24    THE COURT:  I would like to know which ones.

25  So let's take them one at a time.

1    MR. LONG:  Government's Exhibit 53, this is

2  for Foley in August of 2007.  And this one has

3  Margaret W.  It is one of the patients audited.  This

4  is an audit of every chart in the Foley agency at

5  that time.

6            THE COURT:  Okay.  It was done by whom?

7            MR. LONG:  Lorri Harris.

8            THE COURT:  What was her position?

9            MR. LONG:  She was the clinical services

10  regional manager.  She was over -- she oversaw

11  auditing in various agencies in her region, that was

12  part of her responsibility.

13            THE COURT:  Did she actually do this audit?

14            MR. LONG:  Yes, Your Honor.

15            THE COURT:  May I see it?  Okay.  That kind

16  of digs with the defense in terms of pointing out

17  problems that need to be addressed and discharged, if

18  they're not appropriate.

19            MR. LONG:  In the summary of findings

20  section, Your Honor, she has conclusions about

21  documentation.  It's on Page 4 of the exhibit.

22            THE COURT:  Where?

23            MR. LONG:  In the admission trends noted,

24  FTT, lacking documentation.

25            On the next page, other trends, Page 5.

1    Alzheimer's and dementia, extremely weak supporting

2    documentation.

3         THE COURT:  Right.  And in her cover letter

4    she says you need to look at these patients again to

5    determine eligibility.

6         I mean, that's indicating to me, she says,

7    you've got some problems here you need to take care

8    of.  And if it includes discharging, then you need to

9    discharge; right?

10        MR. LONG:  Yes, Your Honor, she recommends

11   discharge for multiple patients that she audited.

12        THE COURT:  Okay.

13        MR. LONG:  So that's one of the tools that

14   she used to do the audit and that's a tool used to

15   audit patients with the Alzheimer's disease

16   diagnosis, and then the numbers refer to individual

17   patients.

18        THE COURT:  Where do you say that Margaret

19   W. --

20        MR. LONG:  She appears on Page 32 of the

21   exhibit, Your Honor.

22        THE COURT:  Can you give me the Bates

23   number?  Because I have one of three, one of four --

24        MR. LONG:  One of four, Your Honor.

25        THE COURT:  That's why I was asking for the

1    Bates number.

2              MR. LONG:  I'm sorry.

3              THE COURT:  She had cardiovascular disease,

4    that was her diagnosis.  It says reassess, referring

5    to Margaret W.  M.D. visit is required if team does

6    not agree with DC, I assume that means discharge?

7              MR. LONG:  I believe it does, Your Honor.

8              THE COURT:  Recommend discharge.  But are

9    you going to ask Ms. Harris about any of the specific

10   patients for the charts that were reviewed in this?

11             MR. LONG:  I was planning to go through the

12   audit tools and ask her about the notes and her

13   findings in the boxes regarding what documentation

14   appeared in the file.

15             THE COURT:  All of these?

16             MR. LONG:  Not all of them, Your Honor.

17             MR. LEMBKE:  Your Honor, here are two

18   problems:  Number one, and Kim, I know, will have

19   other problems, but the first two problems.

20             Problem number one, to the extent they're

21   wanting to put this forward about a patient in the

22   sample, they represented to the Court repeatedly that

23   they would not be putting in any evidence about the

24   123 through these people, and to the extent this is

25   direct evidence on one of the 123, it was not

1    disclosed in the interrogatory response where it

2    should have been disclosed.

3         So, based on the representations they made

4    to the Court, we just don't think they can do that.

5         Now, as to the additional patient, this is

6    the classic anecdotal evidence where they've reviewed

7    one chart or they reviewed various charts of various

8    patients, but it is propensity evidence that they're

9    putting forward because the only reason to put it

10   forward is to say, well, because this patient's chart

11   was incomplete, you should suggest that another

12   patient's chart was incomplete.

13        And I think that is a significant problem

14   with it.

15        MR. LONG:  Your Honor, if I can respond as

16   to the other patients.  Mr. Lembke has previously

17   argued that one of the issues with anecdotal evidence

18   is that, for instance, people couldn't remember the

19   names or they just remembered that something happened

20   as to one person.

21        Here, there's complete information in the

22   file with medical records.  These are AseraCare

23   documents prepared by AseraCare employees.

24        MR. LEMBKE:  That doesn't solve the 404(b)

25   problem.  Part of the anecdotal problem, Your Honor,

1  was when they couldn't even identify the patient.

2  But our argument was not limited nor did we think the

3  Court's ruling on that was related to unidentified

4  people.

5       THE COURT:  How does this information,

6  setting aside Margaret W. because I think that's a

7  different story, and we will talk about it in a

8  minute.  But how does this information about the

9  review of what paperwork was in the specific files go

10 to whether any of the 123 patients identified by your

11 expert were not eligible for hospice?

12      MR. LONG:  It's relevant evidence of the

13 practices of the facilities at the time regarding

14 their documentation.  It's evidence of what their

15 documentation looked like at the time, evidence

16 regarding what was in the files of the patients at

17 the time, at the same time there were ineligible

18 patients on service.

19      They have repeatedly argued or they have

20 argued in opening and in their line of questioning

21 has suggested that arguing that the clinical judgment

22 of the medical directors, indeed the medical

23 directors evaluated these patients and made a

24 clinical judgment regarding their appropriateness.

25 These audits indicate what documentation was in the

1  medical records available to those medical directors

2  and cast doubt on the ability of the medical

3  directors to fully exercise their clinical judgment.

4       MS. MARTIN:  That's not what that shows.

5  There are some parts of the review that are a review

6  of whether particular AseraCare forms are in the

7  chart.

8       But that does not mean that there is no

9  document -- if you don't have the AseraCare form in

10  the chart, that doesn't mean that there's no

11  documentation behind that.

12       So what they're trying to do is say, you

13  don't have the LCD checklist form in there so,

14  therefore, that means there was no documentation in

15  the chart to support the medical director's clinical

16  judgment.

17       But that's not an accurate representation of

18  what these audits are showing because there could be

19  many pages of medical records in the chart and that

20  one particular form not be in the chart.

21       So the information that goes into -- that is

22  used to check off on that form is in the chart.

23       It's just that the particular AseraCare

24  created checklist form is not there.

25       But in addition, the various items that are

1   on the checklist are not -- many times they are not

2   tied to factors that are relevant to the eligibility

3   or appropriateness of the patient.  They may be

4   things like home health aide frequencies not being

5   met or volunteer coordinator frequencies not being

6   met.

7          And there are many factors that are looked

8   at in those audits that don't relate to the issue of

9   whether a patient is eligible or not.

10          I also would state that for the time frame

11   that audit was completed in Foley, you know, the only

12   patient that we're talking about from the sample is

13   Ms. Wilkinson -- I'm sorry, Ms. Margaret W.  -- y'all

14   can just beat me about the head and shoulder if I

15   continue to do that, Ms. Margaret W.  And she has --

16   her diagnosis is congestive heart failure.  So they

17   want to bring in this audit to talk about adult

18   failure to thrive and Alzheimer's and other diagnoses

19   that aren't even relevant to the time frame that the

20   patient is on service, that there is an allegedly

21   ineligible patient on service.

22          THE COURT:  I missed you on the time frame

23   there.

24          MS. MARTIN:  The time frame of when that

25   audit was conducted in Foley was, I believe, in June

1    or July of 2007.

2              THE COURT:  August 2007 is when it was sent.

3              MS. MARTIN:  Correct.  And the only patient

4    from the sample that -- the sample time frame for

5    Foley is a longer sample, I mean, a longer time

6    frame.

7              This audit is a review of a snapshot in time

8    of what things looked like in August of 2007.

9              And the only patient that was from the

10   sample who was on service in that time frame was

11   Ms. Margaret W. from April of 2007 to May of 2008,

12   but she was the only one that falls in that time

13   frame and her diagnosis was congestive heart failure.

14   So they would be wanting to offer these audits from a

15   snapshot in August of 2007 for patients who came much

16   later in the sample period or later in the sample

17   period and sort of extrapolate that forward, that

18   these problems from August of 2007 --

19             THE COURT:  Continued on.

20             MS. MARTIN:  -- continued on.

21             THE COURT:  To the patient that was

22   discharged October 2011.

23             MS. MARTIN:  Correct.  Yes, ma'am.

24             MR. LEMBKE:  And again --

25             MS. MARTIN:  And that's getting into --

1    MR. LEMBKE:  These are anecdotal accounts of

2  specific patients that -- it seems like it is plainly

3  on the anecdotal side of the line because it is a

4  review of individual files one by one.  And the only

5  possible reason to have it is to say well, because

6  this was incomplete in someone in the sample, the

7  chart must have been incomplete.

8    THE COURT:  Even if, in the 123, some of the

9  documents identified in these audits were not in

10  their charts, would that alone indicate that the

11  claim that was made for those 123 was false?

12    MR. LONG:  I think it would go to the

13  ability of the medical director to exercise his

14  clinical judgment to his determining the eligibility

15  or certifying those patients as eligible.

16    THE COURT:  Right.  Well, I thought that

17  Dr. Liao had testified that you could tell just by

18  looking at the records that were in the file whether

19  that particular patient was eligible or not.  That's

20  what he did and that's what I've heard was the basis

21  for the government's contention that those 123 were

22  false and that's --

23    MS. MARTIN:  That's correct.

24    THE COURT:  And that's how you were going to

25  prove that those were false.

1    MS. TAPIE:  That's correct, Your Honor.  And

2    that's from the review of the entire patient file.

3    So, as Mr. Long has said, this is a particular time

4    and what was in the file at a particular time that

5    the medical director may or may not have had all of

6    the information.

7    MR. LEMBKE:  If a specific form is missing

8    in a specific patient's file, it doesn't mean that

9    it's missing in the file of any one in the 123.

10    MR. LONG:  Your Honor, it's not just as to

11    form.  For instance, in this, we're looking at

12    Margaret M. page and notes in the audit that the

13    patient -- was the patient optimally treated with

14    diuretics and vasodilators on admission.

15    And that's a relevant factor to consider

16    whether or not a patient who has heart disease is

17    terminal and -- well, it is marked no.  That wasn't

18    noted.  So that's a factor to consider.  It's not

19    just we failed to have a form.

20    THE COURT:  So the fact that in this audit

21    one patient is noted as not having been optimally

22    treated with diuretics, then you want the jury to

23    assume that there were others similarly situated

24    based upon this one example?

25    MR. LONG:  I want the jury to be able to

1  evaluate the argument that the medical director had

2  complete information and made a decision about

3  eligibility and these audits indicate that the record

4  or the information that was relevant to there was not

5  in there or may not have been in there.

6        THE COURT:  For this one patient that's on

7  the list of 123.

8        MR. LONG:  As to that patient and then also

9  generally as to the other patients identified in the

10  audit, it goes to show the processes of the record

11  keeping and their documentation of the information.

12        THE COURT:  I don't see how many were

13  actually audited total.  But the government is not

14  contending that any of those other patients were not

15  eligible for hospice benefits even if their files

16  lacked more documentation than Ms. Margaret W.

17        MR. LONG:  No, Your Honor, we are not

18  asserting that any of the other patients in there are

19  in the sample of the 123 that Dr. Liao found to be

20  ineligible.

21        MR. OLSON:  Your Honor, I think --

22        THE COURT:  So the issue in phase one is not

23  whether any of these other patients were ineligible

24  for hospice; correct?  In phase one.

25        MR. LONG:  The issue is not whether or not

1    they were ineligible.

2          But as I stated, Your Honor, the document

3    goes to show -- the audits go to show what kind of

4    documentation was kept in the files or what

5    information was recorded when patients were on

6    service at agencies that had ineligible patients in

7    the sample.

8          MR. LEMBKE:  Out of the medical records

9    themselves for the 123 patients are coming in

10   evidence and you're going to have experts on both

11   sides reviewing just those medical records, stating

12   whether the records support or do not support the

13   various doctor's judgments.

14         THE COURT:  But you're not putting up Lorri

15   Harris to testify to anything about Margaret W.

16         MR. LONG:  No.  I don't know that she was

17   questioned about Margaret W. at her deposition and I

18   imagine she will not specifically remember the

19   patient.

20         THE COURT:  I imagine she will not speak one

21   word about Margaret W. and being one of the files

22   that had been identified as being ineligible.

23         MR. LONG:  Yes, of course.  I apologize,

24   Your Honor.

25         THE COURT:  Because that has been the

1    government's trial position from day one.  We're

2    going to adhere to that.

3         Had that not been the case, then I think

4    this might be appropriate, at least as far as showing

5    that in August of 2000 someone associated with

6    AseraCare pointed out that there were problems with

7    the documentation in her file and she remained on

8    service for a while longer.

9         But you're not offering this document to

10   show that.  And I really am not trying to doubt the

11   government's case.  I just think there were some real

12   problems with the way the case originated and the way

13   it was represented to the Court and to defense

14   counsel as to what we were going to be looking at to

15   show falsity.  I know, Don, you weren't there at the

16   beginning.

17        So let's focus on whether these 123 were

18   false.  Can y'all do that?

19        And I don't think that this does.  It may

20   show that the records were in disarray on August the

21   7th, but it doesn't show whether Marsha Brown and

22   Dawn Richardson did anything in response to this to

23   clean up the medical records prior to the admission

24   of any of these other patients.

25        I'm struggling with it.  I just am -- I'm

1   having a lot of trouble with what the government is

2   wanting to present to show that these 123 are false.

3        Is this your best one?

4        MR. LONG:  Yes, Your Honor.  If that one is

5   not admitted -- just so the record is clear, the

6   exhibits that we discussed on the record are due to

7   be excluded?

8        THE COURT:  Yes.  And that would be -- go on

9   and identify for me each of those and what facility

10  and the date of it.

11       MR. LONG:  Of course, Your Honor.

12       THE COURT:  And this was 53.

13       MR. LONG:  Yes, Your Honor.

14       THE COURT:  Involving Foley.  And it was

15  done in August or at least the email is dated August

16  of 2007.

17       MR. LONG:  This is one with the sample

18  patient in it.

19       And the next one, Your Honor, is

20  Government's Exhibit 70-A and it was from --

21       THE COURT:  Were these all done by Lorri

22  Harris?

23       MR. LONG:  Yes, Your Honor.  It was from

24  June 2008 and it involved Foley and Monroeville but

25  we were only seeking to introduce it as to Foley.

1    THE COURT:  Okay.  That's why it's an A?

2    MR. LONG:  Yes, Your Honor.  And there are

3  no sample patients in that one.

4    THE COURT:  Okay.

5    MR. LONG:  The next one is Government's

6  Exhibit 77.

7    THE COURT:  Okay.

8    MR. LONG:  And that is from September of

9  2008 and that's for the Decatur facility.  And there

10  were no sample patients in that one.

11    And the next is Government's Exhibit 48.

12  This is a reassessment in an email that Lorri Harris

13  did of the Decatur facility, September 6th, 2007.

14  Sorry, I got them out of order.

15    Exhibit 48 is from September 6th, 2007.

16    THE COURT:  And it's just an email, it's not

17  an audit, per se?

18    MR. LONG:  It is a reassessment.  It is

19  based on an audit of medical records that she

20  performed.

21    THE COURT:  Based on the audit which was

22  done when?

23    MR. LONG:  I believe it was around the same

24  time period, August or September of 2007.

25    THE COURT:  This is Decatur?

1      MR. LONG:  Yes, Your Honor.

2      THE COURT:  Okay.

3      MR. LONG:  The next one, Your Honor, is

4  Government's Exhibit 87.

5      THE COURT:  Uh-huh.

6      MR. LONG:  That is from Demopolis, January

7  of 2009.  This one has a sample patient.

8      THE COURT:  Who is the sample patient?

9      MR. LONG:  Lucille P.

10      THE COURT:  Okay.

11      MR. LONG:  And the final one, Your Honor, is

12  from Mobile, June 2009, and this one also has a

13  sample patient.

14      THE COURT:  Who is that sample patient?

15      MR. LONG:  Wilson B., Your Honor.  Okay.

16      THE COURT:  Do you want to make any kind of

17  showing regarding Lucille and Wilson?

18      MR. LONG:  If I might start with

19  Government's Exhibit 87.

20      THE COURT:  All right.

21      MR. LONG:  That's Lucille P.  The comments

22  that Ms. Harris prepared regarding Lucille P. state

23  eligibility concerns:  9-7-07, albumin was 4.4,

24  nutritional deficit is less than 2.5.  And then it

25  goes on -- yeah, that is what is in that one.

```
 1            THE COURT:  All right.  So that was not
 2   documenting absence of documentation.  Is that a
 3   different kind of audit?
 4            MR. LONG:  It's the same kind of audit.
 5   This audit found that, as to Lucille P., there was a
 6   section documentation supports appropriateness of
 7   continuing hospice and plan of care and that was
 8   marked no.
 9            MS. MARTIN:  In answer to your question,
10   Judge, this audit shows no missing documentation and
11   it has yeses for all of the documentation and all of
12   that.  There is the line about where -- that Mr. Long
13   read and that is marked no -- I'm sorry, the two home
14   health aide components were marked as a no.
15            THE COURT:  Okay.  In that one, have you
16   redacted information about other patients; is that
17   it?
18            MR. LONG:  Your Honor --
19            THE COURT:  I am seeing a lot of black.
20            MS. MARTIN:  They have created 87-A that has
21   deleted information.
22            MR. LONG:  Because we weren't sure whether
23   -- what your ruling would be on this issue, and you
24   suggested on Monday that audits as to patients not in
25   the sample, you were leaning towards excluding them.
```

1052

1   We were prepared to offer the whole audit into

2   evidence or we also gave some redacted versions just

3   as the sample patients to counsel yesterday, because

4   we didn't know how the Court was going to rule.

5          THE COURT:  The one you're talking about is

6   the original 87 that has reports on the --

7          MR. LONG:  Ten patient --

8          THE COURT:  Ten patient files.  And then 142

9   for Wilson B.

10          MR. LONG:  Yes, Your Honor.

11          THE COURT:  For Mobile, 2009.

12          MR. LONG:  Your Honor, Ms. Harris marked in

13   the box, appropriate LCD for terminal diagnosis

14   completed with supporting criteria and documentation

15   present, dates of certification periods, signed and

16   dated.  She marked no.

17          THE COURT:  Okay.

18          MR. LONG:  She also in the box, reassessment

19   for ongoing eligibility completed prior to the end of

20   her certification period, she also marked no.

21          THE COURT:  Okay.

22          MR. LONG:  And then in the comment she

23   wrote, heart disease:  Nurse's documentation does not

24   give details of how a patient continues to meet

25   eligibility.  None of the areas checked on the LCD

1    were documented in the notes.  Vital signs are

2    stable, 02 used, 50 percent.

3           THE COURT:  If I let you use these audits as

4    to all the patients, we would be back at the 404(b)

5    argument.  And I'm really having a hard time seeing

6    where it would not be trying to show that because

7    there were absence of documents and some of these

8    other patient files that may or may not have had

9    anything to do with whether they were eligible, then

10   the jury should assume that documents were missing

11   from the 123 Dr. Liao has identified as being

12   ineligible.  I think that's a bit of a stretch.

13           Then if I were to allow you to use the

14   redacted versions just as to those that have been

15   identified, that would be contrary to the

16   representations that the government has made to

17   defense counsel and to the Court as to what evidence

18   you are going to be offering to show that those

19   documents were false.

20           So, I can't figure out which way I can let

21   it in and not be an abuse of discretion.

22           I'm sure the government will argue that by

23   excluding it that's an abuse of discretion.

24           I do think it would be relevant in phase two

25   when we're talking about knowledge.  It clearly would

1  come in then.  Lorri Harris as regional --

2         MR. LONG:  Clinical services regional

3  manager.

4         THE COURT:  Clinical services regional

5  manager was aware and notified your two star

6  witnesses thus far and then known as Brown and

7  Richardson that there were problems with their files

8  that needed to be addressed and not just with

9  documentation but with patient's eligibility she

10  questioned and suggested discharging.

11         Who knows, the defense may want to bring it

12  in in part two, I don't know.

13         But in phase one, I just -- I don't see how

14  it can come in.

15         MR. LEMBKE:  Your Honor, I have one other

16  issue to raise with the Court.

17         THE COURT:  Okay.

18         MR. LEMBKE:  And that's that I notice that

19  the third juror from the left, who I think is

20  Ms. Rains, has her cell phone out and has been

21  emailing or texting or doing something during the

22  trial this morning.  And I don't know how the Court

23  wants to address that.

24         THE COURT:  I think we will first have

25  Ms. Calahan just tell them they should not have their

1  cell phones out in the courtroom.

2          THE CLERK:  I will tell them.

3          THE COURT:  Sometimes we can't get jurors to

4  obey our orders anymore than lawyers can get

5  witnesses to obey their orders.  We will try that.

6          Also, we have gotten several questions from

7  time to time from Ms. Beese.  Many of them didn't --

8  weren't complete thoughts or sentences and they also

9  encompassed things that I thought eventually we would

10 be getting to, and she started after opening

11 statements.

12         But this is one that she has asked.  And I

13 will share it with you because -- all of you because

14 it seems that it may be something that's of concern

15 to you and y'all should know it.

16         What if the family agree with the nurse not

17 to admit, did the family have any say in the matter.

18         So I don't know if that's something that

19 y'all want to address.  And I think it would also go

20 to discharge as well, did the family have any say

21 there.

22         MR. OLSON:  Your Honor, just one follow up

23 to your order with respect to the argument on the

24 audits.  My understanding is that order covers any

25 audit of the type that we were just discussing, if

1   there are additional ones.

2           THE COURT:  I think probably so.  Unless

3   there's some distinguishing factor --

4           MR. OLSON:  Your Honor, we do not believe

5   so.  Would it be appropriate at a later time for us

6   to make an offer of proof with respect to those

7   exhibits?

8           THE COURT:  I think that would be fine.

9           MS. TAPIE:  Your Honor, I actually just have

10  one administrative presentation issue, but I did want

11  to raise it because of timing, particularly with

12  regard to witnesses.

13          We spoke previously, I think with Frankie,

14  Charles spoke with Frankie and then with you about

15  the use of a screen for demonstratives.

16          We're at the point where we either have to

17  use the screens or print out hundreds of poster

18  boards to bring in.  So our idea is it would be more

19  smoothly to have the demonstrative up on a separate

20  screen while the exhibits are on the screens for the

21  jurors.

22          THE COURT:  Have you talked with defense

23  counsel about that?

24          MS. TAPIE:  We have, Your Honor, but they

25  object to it.  But I'm really not understanding their

1   objection.  That is why I'm asking you to resolve

2   this.

3          THE COURT:  Is the objection to the use of

4   any demonstratives?

5          MR. CHRISTIE:  No.  There's a whole series

6   of demonstratives that we've agreed.  They've got a

7   demonstrative for every patient.  And we've agreed

8   that every patient by patient demonstrative may be

9   used.

10         They have other demonstratives, which I'm

11  not sure what they are, and for these isolated

12  demonstratives they need to put them up on the

13  regular screen and the Court allows them to do that,

14  they can do that.

15         But I'm not going to stipulate to

16  demonstrates I have not seen or demonstratives the

17  Court has not already agreed to and that's the basis

18  for the objection.

19         THE COURT:  What are the demonstratives that

20  you're wanting to use on the big screen?

21         MS. TAPIE:  Yes, Your Honor.  First off,

22  just to clarify, we had discussed with Mr. Christie

23  demonstratives for each individual 123 patients, a

24  demonstrative that could go up before Liao actually

25  starts testifying about that patient.

1    So those were the ones that we previously

2 agreed to, it's information about the patients.

3        THE COURT:  All right.  So are those the

4 ones that you're wanting to put up on the big screen?

5        MS. TAPIE:  Those are included in the ones

6 we want to put up on the big screen, but we're

7 talking about all the demonstratives that will be

8 used during Dr. Liao's testimony.

9        The ones we previously discussed with

10 AseraCare's counsel is the one that can go up before

11 he speaks about the patient.

12        THE COURT:  Have you shown all of those to

13 defense counsel?

14        MS. TAPIE:  We will, Your Honor, the

15 agreement between the parties is that those documents

16 are disclosed the Thursday before the week of

17 testimony.  So that would be the substance --

18        THE COURT:  Well, if you are wanting

19 preapproval by using, by the Court, demonstratives

20 that you've not shown to defense counsel, I'm not

21 going to go there.

22        MS. TAPIE:  Yes, Your Honor.  And that's not

23 what I'm asking.  I should clarify.  We are only

24 asking about the means by which demonstratives,

25 again, end up being objected to or not, are published

1    to the jury.  It's either a poster board or it's the

2    screen.

3            So the substance of the demonstrative is not

4    at all what we're asking the Court to agree to and

5    also not what we're asking counsel to agree on,

6    certainly without seeing it.  It's simply an issue of

7    the method by which the demonstrative is shown to the

8    jury.  And the substantive objections will --

9    obviously, counsel is entitled to make those once we

10   disclose --

11           THE COURT:  I basically said that if y'all

12   can work out and agree on demonstratives, then fine.

13   But I'm not going to referee demonstratives and

14   whether you use them or not.

15           Mr. Christie, do you have an objection to

16   the use of screen instead of poster board in showing

17   demonstratives that you have already agreed would be

18   appropriate?

19           MR. CHRISTIE:  For the ones that are patient

20   by patient, we've agreed they could use those with

21   the understanding that we already have our poster

22   boards ready.  They're not put together, but we have

23   them printed.  But we throw those away and probably

24   will use the same screen depending on how it works.

25           The problem with the other demonstratives is

1  it's sort of an issue by issue demonstrative and, if

2  they want to put that -- if they get permission from

3  the Court to put that up on the regular screen, then

4  that's another issue.

5          They're talk about putting something up

6  that's going to be sitting there the entire time.

7  And we're not going --

8          THE COURT:  As I said, if y'all can't agree

9  on demonstratives, I'm not going to referee that.

10 Because those are not evidence, they don't need to be

11 considered as evidence.  It's just to help you

12 present your case.

13         If y'all can't agree on them, they won't go.

14 But just remember what's good for the goose is good

15 for the gander and work those things out.

16         But in terms of actually using the screen,

17 I'm not hearing an objection to that method; is that

18 correct?

19         MR. CHRISTIE:  We told the government we

20 would agree to a screen for the things, the patient

21 by patient ones that we've already talked about, yes.

22         THE COURT:  And then perhaps any others

23 y'all might agree about down the road.

24         MR. CHRISTIE:  I'm not saying that we're not

25 going to agree to any others, but --

1     THE COURT:  I'm not asking for a

2  precommitment before you see them, just like I didn't

3  want to rule on the evidence before I could see it

4  either.

5     MS. TAPIE:  Frankly, if they're electronic

6  and defendants do have an objection to them, it's

7  much quicker and more streamlined to take something

8  out or change it, than if it's already on big

9  posters, a hard copy.

10     THE COURT:  Which is why it would be wise to

11  show it to them before you put it on a big poster

12  board.

13     Now, my instruction was if there was no

14  objections from counsel, and I don't know if you want

15  to talk to Frankie on this, that I want our IT people

16  consulted before additional IT stuff is brought in

17  here.

18     MS. TAPIE:  Yes, Your Honor.

19     THE COURT:  So you have to work with Ted or

20  --

21     MR. CHRISTIE:  I'm a little concerned about

22  the wires that's going to go across between counsel

23  table and possibly being a hazard.  Just to be frank

24  with the Court --

25     THE COURT:  This courtroom is wired

1  extensively, but for specific things that we normally

2  use.  We do have a big screen here, that's the size

3  of that whole wall.

4        MS. TAPIE:  Can that screen be separated

5  from the screen --

6        THE COURT:  I don't know.

7        THE CLERK:  No.

8        THE COURT:  I'm just saying what we've got.

9  I mean, you know, we thought when we did it we had

10  plenty of options.

11        MS. BROOKER:  Mr. Jackson and our tech guy

12  will consult with your IT people for sure.

13        THE COURT:  Anything else we need to do?

14  Have we got a witness to put on?

15        MR. WERTKIN:  Yes, Your Honor.

16        MS. BROOKER:  I will step out and grab the

17  witness.

18        MR. LEMBKE:  Can we have five minutes?

19        THE COURT:  We will take five and then we

20  will get the jury in and get going.

21                  (Brief recess.)

22              (Open court.  Jury present.)

23        THE COURT:  The United States can call your

24  next witness.

25        MR. WERTKIN:  The United States calls Debora

1    Paradies.

2        DEBORA PARADIES, GOVERNMENT'S WITNESS, SWORN.

3            THE CLERK:  Say and spell your first and

4    last name for the record.

5            THE WITNESS:  My name is Debora Therese

6    Paradies.  D-E-B-O-R-A, Therese, T-H-E-R-E-S-E,

7    Paradies, P-A-R-A-D-I-E-S.

8                    **DIRECT EXAMINATION**

9    **BY MR. WERTKIN:**

10   Q.   Where do you live?

11   A.   I live in Hartford, Wisconsin.

12   Q.   And what is your current profession?

13   A.   I'm a registered nurse.

14   Q.   Have you ever heard -- are you familiar with the

15   defendant in this case, AseraCare Hospice?

16   A.   Yes, I am.

17   Q.   How are you familiar with them?

18   A.   I was employed by them.

19   Q.   Ms. Paradies, where did you grow up?

20   A.   Hartford, Wisconsin.

21   Q.   Where did you go to high school?

22   A.   Hartford Union High School.

23   Q.   Did you go to college right after high school?

24   A.   Shortly thereafter, yes.

25   Q.   Where did you go?

1064

1   A.   I went to Moraine Park Technical College.

2   Q.   Did you get a degree?

3   A.   Yes, I did.

4   Q.   What was that degree?

5   A.   An associate degree in nursing.

6   Q.   And did you graduate?

7   A.   Yes, I did.

8   Q.   Did you take a licensing exam after you

9   graduated?

10  A.   Yes, I did.

11  Q.   What licensing exam did you take?

12  A.   PRN licensure.

13  Q.   Did you pass?

14  A.   Yes.

15  Q.   Did you become a licensed RN?

16  A.   Yes, I did.

17  Q.   What was your first job as an RN?

18  A.   I was hired at the Aurora Medical Center in

19  Hartford as a staff medical surgical nurse.

20  Q.   What year was that in?

21  A.   In 1999.

22  Q.   And have you worked as a registered nurse

23  continuously since -- from 1999 up until the time you

24  worked for AseraCare?

25  A.   Yes.

1  Q.   And when did you start working for AseraCare?

2  A.   I started working for AseraCare in early spring,

3  between March and May.

4  Q.   And do you recall when you stopped working at

5  AseraCare?

6  A.   February 20th, 2008.

7          THE COURT:  What year did you start work at

8  AseraCare?

9          THE WITNESS:  In 2007.

10          THE COURT:  Thank you.

11  Q.   So from the period of -- you said in the spring,

12  March, April, something like that, in the spring of

13  2007 until February 2008.  Which AseraCare location

14  did you work?

15  A.   The West Allis location.

16  Q.   Where is --

17  A.   Milwaukee.

18  Q.   How far outside of Milwaukee is West Allis?

19  A.   Not far.  It's probably within a five mile

20  radius.

21  Q.   What position did you hold at AseraCare

22  West Allis facility in the spring of '07 through

23  February of '08?

24  A.   I was hired as the admissions nurse.

25  Q.   What responsibilities did you have as an

1  admissions nurse?

2  A.   To admit patients into AseraCare Hospice.

3  Q.   Did you have any other clinical

4  responsibilities?

5  A.   Eventually, I did work in the office as --

6  helping out in the patient care coordinator office

7  and executive backup.

8  Q.   What's executive backup mean?

9  A.   That is where I would take a block -- a week

10  block answering the phones for nurses out in the

11  field.  If they ran into a problem, I would try to

12  help them, assist them get through it, give them

13  suggestions, answer the phones.  Assist with the

14  visit, if need be.

15  Q.   Your primarily responsibility was admissions?

16  A.   Yes.

17  Q.   Did you receive any training about how to do

18  admissions when you arrived at AseraCare in the

19  spring of 2007?

20  A.   Yes.

21  Q.   And who provided this training to you?

22  A.   I was paired up with Corene, one of the nurses

23  that worked for AseraCare.

24  Q.   And what was Corene's last name?

25  A.   I don't recall.

1   Q.   And what position did Corene hold?

2   A.   She was a nurse that also did -- she did

3   teaching, training.  She did also field work, going

4   out and seeing patients.

5   Q.   What kind of training did you receive from

6   Corene?  Did she show you videos or sit you down in a

7   conference room or something else?

8   A.   We didn't do videos.  What we did was, she took

9   me into one of the conference rooms and she had the

10  admissions packet and she explained the contents of

11  the admissions packet, what's to be used on all

12  admissions.  We went through each individual document

13  that was in there.  And she said I would know more as

14  we went out and did the admit.  She would see how the

15  paperwork was to be filled out, but she wanted me to

16  familiarize myself with it before we went actually

17  out.

18  Q.   Thank you, Ms. Paradies.  What was in that

19  packet?

20  A.   We have the plan of care.  We have the

21  medication orders.  We had the comfort pack

22  medication orders and certification for terminal

23  illness form.

24  Q.   Did you receive any specific instructions about

25  how to fill out the certification of terminal

1    illness?

2    A.   Yes.

3    Q.   And what instructions did she give you?

4    A.   She told me to put the patient's name on the

5    form, the date, the start of care date, the

6    certification date, and the diagnosis in an area on

7    the form.

8    Q.   Did she give any specific instructions to you

9    regarding the diagnosis line?

10   A.   She told me to use two diagnosis, either

11   debility or adult failure to thrive.

12   Q.   And did she explain why you were only permitted

13   to use two diagnoses?

14   A.   She did.  I asked why are we only using these

15   two diagnoses.  And I was -- she told me that that's

16   what she was trained to use and that's what I am

17   being trained to use.

18   Q.   Did you think that was strange?

19   A.   Yes.

20   Q.   Did you tell her you thought it was strange?

21   A.   I did.

22   Q.   What did she say?

23   A.   She told me that she only knew of these two to

24   be used and so I can't validate for any other

25   diagnoses there are.

1   Q.   And you received training as an RN nurse; is

2   that right?

3   A.   Yes.

4   Q.   You knew there were other diagnoses that were

5   out there?

6   A.   I knew there were diagnoses.  I did, however,

7   because this is my first time working for AseraCare

8   and if these were the two that I was told to use, I

9   didn't know if they had any other diagnoses for me to

10  use.

11  Q.   And for how long was it your understanding that

12  these were the only two diagnoses that you could use?

13  A.   Can you say that again?

14  Q.   For how long -- for what period of time after

15  you started in the spring of 2007 did you think that

16  you could only use one of those two diagnoses?

17  A.   I used those for approximately three to four

18  months.  And after we did the initial training --

19  Q.   As a general practice in that three or four

20  month period, did you always admit patients based on

21  one of these two diagnoses?

22  A.   Yes.

23  Q.   Did you ever admit a patient for a different

24  diagnoses?

25  A.   Not at the initial time, no.

1  Q.  What was your understanding in those first three

2  or four months about what your job was as an

3  admissions nurse?

4  A.  To go out to admit patients into AseraCare.

5  Q.  Was it your understanding that you had

6  discretion about whether to admit a patient or not?

7  A.  No.

8  Q.  Did you understand my question?  Do you know

9  what discretion means?

10  A.  It was up to me to decide whether they were

11  coming into hospice service.

12  Q.  Did you think you had discretion to decide

13  whether a patient was eligible at that time?

14  A.  No.

15  Q.  Did you understand that you were supposed to

16  exercise your clinical judgment at that time period?

17  A.  I was instructed to admit.

18  Q.  Did you think that was strange?

19  A.  Yes.

20  Q.  Did you raise those concerns with anybody?

21  A.  No.

22  Q.  And would you go out and see the patient during

23  the admission process?

24  A.  Yes.

25  Q.  And how would you choose which one of those two

1   diagnoses to use?

2   A.   She explained debility and adult failure to

3   thrive to me, that they were interchangeable, so it

4   didn't matter which one I used.  I should just pick

5   one and so I picked one.  I picked one differently

6   each time I went out.  I didn't know any difference.

7   I went to admit the patient.

8   Q.   And you said you did this for a period of how

9   long?

10  A.   Three to four months.

11  Q.   And what happened after three or four months

12  that your practice changed, if anything?

13  A.   I came into work and was instructed by the

14  patient care coordinator office to start using a form

15  called an LCD.

16  Q.   And what is an LCD?

17  A.   Local criteria coverage determination.  It was

18  specific diagnoses with criteria on each one that was

19  a guideline to be met for eligibility into AseraCare

20  Hospice.

21  Q.   Do you recall about when you were given the

22  LCDs?

23  A.   Somewhere between three and four months into my

24  employment.

25  Q.   Have you ever heard of an LCD before that time?

1   A.   No, I hadn't.

2   Q.   And when you got the LCD, what instruction were you

3   given with regard to the LCDs?

4   A.   I was instructed how to use them, what criteria is

5   specific to that diagnoses, to utilize the chart, the

6   patient's chart to go along with finding this

7   information that is listed on these LCDs.

8   Q.   What did you think when you were presented with the

9   LCDs for the first time?

10  A.   It almost blew my mind.

11  Q.   Why?

12  A.   Because what I was instructed to do and told to do

13  prior to that was not the information given to me that

14  would have helped me do my job effectively in making the

15  right choices.  I wasn't making the right choices.

16  Q.   And after you received the LCDs, how did your

17  practice change, if at all?

18       MR. BOHL:  We object to this line of testimony

19  being outside the scope of phase one and Your Honor's

20  order.

21       THE COURT:  Overrule.  How did your practice

22  change after you received the LCDs.

23       THE WITNESS:  I had information now to make an

24  accurate determination of an evaluation and the

25  treatment into hospice services.

1   Q.   Is it your understanding at that point that you were

2   supposed to exercise your clinical judgment?

3        MR. BOHL:  Objection, leading.

4        THE COURT:  Sustained.

5   Q.   (By Mr. Wertkin)  Did you have an understanding

6   about what how your role as an admission nurse had

7   changed after you got the LCD?

8   A.   Yes.

9   Q.   What was that understanding?

10  A.   That my expectation was still to admit the patients

11  but now I had information that was very vital and key

12  into making the correct decision to bring forward into

13  hospice.

14  Q.   And did you exercise your clinical judgment going

15  forward?

16  A.   No.

17  Q.   Why not?

18  A.   I was using the forms and I was told to continue to

19  admit.

20  Q.   Who told you that?

21  A.   Mary Reynolds.

22  Q.   Who is Mary Reynolds?

23  A.   She was the patient care coordinator in the patient

24  care office.

25  Q.   At which facility?

1   A.   The West Allis office.

2   Q.   And did you comply with her instructions for the

3   rest -- for the remainder of the time you were at

4   AseraCare Hospice?

5   A.   I did up until the very end.

6   Q.   What, if anything, did you change in your practices?

7   A.   I couldn't admit somebody that didn't have the

8   criteria.  And I felt by admitting them, to just admit,

9   was not the practice I wanted to continue.

10  Q.   Is the West Allis office known by another name?

11  A.   Not that I'm aware of.  AseraCare.

12  Q.   That's right.  I was actually referring to, is it

13  known from a different location, perhaps?

14  A.   Not that I'm aware of.

15  Q.   You never refer to it as the Milwaukee office?

16  A.   Yeah, yes.

17          THE COURT:  I'm not sure that I've gotten the

18  name of this town.  West what?

19          THE WITNESS:  West Allis.

20          MR. WERTKIN:  Can you spell it?

21          THE WITNESS:  W-E-S-T --

22          THE COURT:  That part I get.

23          THE WITNESS:  A-L-L-I-S.

24          THE COURT:  Sometimes I was hearing Dallas and

25  I was, wait a minute.  I thought we were in Wisconsin.

1   Q.   (By Mr. Wertkin)   Is West Allis very close to

2   Milwaukee?

3   A.   Yes.

4           MR. WERTKIN:   Can I have a second, Your Honor,

5   to consult with counsel?

6           THE COURT:   Yes.

7               (Brief pause).

8   Q.   Ms. Paradies, I just have a few more questions.

9           Your Honor, may we publish Defendant's Exhibit

10  226, please?

11          THE COURT:   I assume --

12          MR. WERTKIN:   It's been admitted already.

13          THE COURT:   Okay.

14  Q.   Ms. Paradies, are you familiar with this agreement

15  that appeared on your screen?

16  A.   I'm familiar with it.

17  Q.   Who are London Lewis and Roberta Manley?

18  A.   We are the relators in this claim.

19  Q.   How do you know London Lewis?

20  A.   They're former co-workers of mine when I worked for

21  AseraCare.

22  Q.   And Roberta Manley?

23  A.   Yes.

24  Q.   And who are Dawn Richardson and Marsha Brown?

25  A.   I know of those two through counsel, that they are

1   the other parties involved in Birmingham here.

2   Q.   Have you ever met them?

3   A.   Never.

4   Q.   Who is Dr. Joseph Micca?

5   A.   He was another person that was involved in this case

6   and I've never met the man myself either.

7   Q.   Do you have a financial interest in the outcome of

8   this litigation?

9   A.   Yes.

10  Q.   Do you know what it is?

11  A.   My understanding is that should there be any

12  findings to this case, that we would receive a part of

13  that.

14  Q.   Can we go down to Page 4, please?  I'm sorry, Page

15  3.

16        Ms. Paradies, I would like to direct your

17  attention to Paragraph 5.

18        Have you, in the context of this case, ever

19  performed any legal research?

20  A.   Say that question again.

21  Q.   Have you ever performed any legal research in the

22  context of this case?

23  A.   No, I have not.

24  Q.   Have you ever prepared any pleadings for this case?

25  A.   No, I have not.

1  Q.   Have you ever prepared any briefs?

2  A.   No, I have not.

3  Q.   Position papers?

4  A.   I have not.

5  Q.   Have you ever participated in meetings?

6  A.   Every once in a while at the office in Milwaukee

7  with Nola, to review where we are.

8  Q.   Who is Nola?

9  A.   Nola Cross is my attorney.

10  Q.   Do you participate in conference calls?

11  A.   Yes.

12  Q.   Hearings?

13  A.   No.

14  Q.   Pretrial conferences?

15  A.   Just when we came here.

16  Q.   Do you know what discovery is?

17  A.   Discovery is the presentations of the parties of

18  what the case is all about.

19  Q.   Okay.

20  A.   I really don't know.

21  Q.   Did you review documents?

22  A.   Just what was given to us through our attorney

23  periodically.

24  Q.   What's your understanding of your obligations under

25  this paragraph?

1  A.   I really don't have any obligations here.  This is,

2  to me, just the clerical things that the attorneys and

3  parties do to collect their information, to insure that

4  they're getting the information to the best and accuracy

5  that they can.

6  Q.   Did you sign this document?

7  A.   I did.

8  Q.   Can we go to the signature page, Charles?  Actually,

9  the next one, please.

10        Did you see your signature on this page?

11  A.   Yes.

12  Q.   And who signed underneath you?

13  A.   Ms. Nola J. Hitchcock Cross.

14  Q.   Who is that?

15  A.   She is my attorney.

16  Q.   Do you understand this document to impact your

17  ability to tell the truth today?

18  A.   Yes, I understand it.

19  Q.   Do you have -- let me ask it a different way.

20        Does this document affect your ability to tell

21  the truth today?

22        MR. BOHL:  Objection, asked and answered.

23        THE COURT:  Overrule.

24        MR. WERTKIN:  I'm sorry, let me ask it again.

25  Q.   Does this document affect your ability to tell the

1  truth today?

2  A.   No.

3  Q.   Have you told the truth today?

4  A.   Yes, I have.

5       MR. WERTKIN:  I have nothing further, Your

6  Honor.

7                    **CROSS-EXAMINATION**

8  **BY MR. BOHL:**

9  Q.   Good morning, Ms. Paradies.  How are you?

10 A.   I'm good.

11 Q.   My name is Charlie Bohl and I represent AseraCare.

12 And we met back when we took your deposition in

13 Milwaukee, Wisconsin; correct?

14 A.   Yes.

15 Q.   Have you read your deposition, the one you gave in

16 Milwaukee, Wisconsin?

17 A.   Way back when, yes, a long time ago.

18 Q.   You were asked the things that you were required to

19 do under this relators's agreement and you didn't

20 mention your deposition.

21      One of the things you were required to do was

22 go to a deposition and answer questions under oath.  Do

23 you remember that?

24 A.   Yes, I do.

25 Q.   And you did that?

1   A.   Yes.

2   Q.   Have you read the depositions of any other parties

3   or witnesses in this case?

4   A.   No.  Just my own.

5   Q.   Have you reviewed any documents to prepare yourself

6   to testify here today?

7   A.   Just what was brought up in the deposition that you

8   presented that I had presented.

9   Q.   When did you review those documents?

10   A.   Pardon me?

11   Q.   When did you review those documents?

12   A.   During the time of our deposition.

13   Q.   You haven't looked at them since?

14   A.   No.

15   Q.   Now, you were represented by counsel here today.

16   A.   Yes.

17   Q.   Now, when I say you were represented by counsel,

18   it's not these fine people from the government here at

19   the first two tables; right?

20   A.   They are the counsel.

21   Q.   Well, you have a private lawyer; right?

22   A.   Yes.

23   Q.   A private lawyer from Milwaukee, Wisconsin?

24   A.   Yes.

25   Q.   And your private lawyer is in the courtroom here?

1    A.   Yes.

2    Q.   What's the name of your private lawyer?

3    A.   Nola J. Hitchcock Cross.

4    Q.   I'm sure you've met with Ms. Hitchcock Cross to

5    prepare yourself for this deposition; right, this trial

6    testimony?

7    A.   Yes.

8    Q.   Now, you were shown the relator's agreement, Exhibit

9    226, and maybe we could put that up on the screen again.

10        Now, we saw your signature -- you signed this

11   document; right?

12   A.   Yes.

13   Q.   And Ms. Manley signed the document?

14   A.   Yes.

15   Q.   And Ms. Lewis signed the document?

16   A.   Yes.

17   Q.   By the way, where is London Lewis these days?

18   A.   I believe she lives in Arizona.

19   Q.   When was the last time you talked to London Lewis?

20   A.   At least six years or more ago.

21   Q.   Six years?

22   A.   Yes.

23   Q.   Now, you understand that you are what is known as a

24   relator as a result of this agreement; right?

25   A.   Yes.

1  Q.  And you filed a complaint in federal court in

2  Milwaukee along with others; right?

3  A.  Yes.

4  Q.  Now, as a relator, you are entitled to recover part

5  of the proceeds of the plaintiff should the plaintiff

6  recover; isn't that true?

7  A.  Yes.

8  Q.  Excuse me?

9  A.  Yes.

10  Q.  And you understand that your recovery isn't a flat

11  rate, it's not a sum certain.  Your recovery would be a

12  percentage of what the plaintiffs recover; right?

13  A.  I believe that's -- yes.

14  Q.  What percentage do you understand all of the

15  relators together are entitled to recover?  Do you know?

16  A.  I have no idea.

17  Q.  You just have no idea?

18  A.  (Witness shakes head negatively.)

19  Q.  You haven't asked anybody?

20  A.  No.

21  Q.  What percentage do you think you, as one of the

22  first relators, are entitled to recover should the

23  plaintiffs in this case recover?

24  A.  I don't know.  We never talked about it.  It was a

25  percentage that -- I have no idea if there is any

1  recovery what the amounts would be.  There is no

2  determination of that.

3  Q.  Well, Ms. Paradies, let me back up because I'm not

4  sure I understand.

5          You understand that if the plaintiffs recover

6  money, you get a percentage of it; right?

7  A.  Yes.

8  Q.  But you don't know what the percentage is?

9  A.  No.

10  Q.  And you understand that the relators, as a group,

11  they get a percentage, too, but you don't know what that

12  percentage is either?

13  A.  Right.

14  Q.  And you don't know what your percentage is of what

15  the relators are going to recover; right?

16  A.  That is true, yes.

17  Q.  And you've never asked anybody any of these

18  percentages?

19  A.  I wouldn't have asked because I don't know what an

20  amount would be.  It was never determined.  There is no

21  amount at this point.

22  Q.  Well, you know what a percentage is, don't you?

23  A.  Yes.

24  Q.  But you just have absolutely no idea what percentage

25  you will recover should the plaintiffs in this case

1  recover?

2  A.   No.

3  Q.   Well, how much money do you think -- let me ask you

4  a hypothetical question.

5         You know what a hypothetical question is, don't

6  you?

7  A.   Yes.

8  Q.   Let me ask you to assume, hypothetically, that the

9  plaintiffs over here get everything they want, this

10  trial goes perfectly for them.  They win.  How much do

11  you think you're going to get?

12  A.   It's not up to -- it's up to them whether or not I

13  am awarded any kind of amount.

14  Q.   Well, my question is, assuming the trial goes

15  perfectly for the plaintiffs, what is your belief as to

16  how much you're going to get?

17  A.   I'm not sure.

18  Q.   Ms. Paradies, one of the witnesses that have

19  testified at this trial has said that that amount might

20  be millions of dollars.  Is that true?

21         MR. WERTKIN:  Objection.

22         THE COURT:  Overruled.

23  A.   Possibly.

24  Q.   What do you think that number is?

25         MR. WERTKIN:  Objection, asked and answered.

1    THE COURT:  Sustained.  You can move on,

2  Mr. Bohl.

3  Q.   Now, if these plaintiffs over here recover zero,

4  what are you going to get?

5  A.   Zero.

6  Q.   So the range is zero on one hand and some other

7  number on the other hand; right?

8  A.   Possibly, yes.

9  Q.   Now, can we look at Page 1 of the agreement.

10    Now, the jury has already seen this quite a few

11  times, so I am not going to go over it in detail.  But

12  the first page has seven paragraphs that begin with

13  "whereas"; right?

14  A.   Yes.

15  Q.   Then it ends with "now therefore"?

16  A.   Yes.

17  Q.   Right?

18  A.   Yes.

19  Q.   Kind of looks like a lawyer might have wrote this?

20  A.   Yes.

21  Q.   Can we look at Page 2?  Page 2, we've got a

22  paragraph that talks about some employment counts and

23  claims; right?

24  A.   Yes.

25  Q.   And then we've got a paragraph that talks about

1   expenses, fees and costs; right?

2   A.   Yes.

3   Q.   And then we've got -- we turn the page.  We've got

4   other paragraph that talks about tax considerations;

5   right?

6   A.   Yes.

7   Q.   And turn the page.  And the last page, we've got

8   three more paragraphs, alternate dispute resolution,

9   agreement binding, amendment to counterparts?

10  A.   Yes.

11  Q.   So whoever wrote this agreement was trying to cover

12  all the bases, that's how it looks; right?

13  A.   Bases for?

14  Q.   Have a complete agreement that would cover all

15  eventualities.

16  A.   Yes.

17  Q.   Now, the agreement says that the people who signed

18  the agreement will have an unlimited amount of time to

19  review it.

20       Was that true in your case?  Did you have time

21  to review this before you signed it?

22  A.   I don't recall.

23  Q.   You don't recall reviewing it before you signed it?

24  A.   I recall the document.  I don't recall how long we

25  stayed with reviewing it.  This is -- this is the first

1    time I'm seeing it in a while.

2    Q.   Did you review it with your lawyer?

3    A.   Back when we received it, yes.

4    Q.   Now, let's go to page, the page that has Paragraph

5    5.

6    A.   Paragraph 5?

7    Q.   It starts with, all reasonable efforts.

8    A.   Okay.

9    Q.   That starts out -- and I will read it and you tell

10   me if I am reading it correctly.  Each relator and his

11   or her counsel agree to cooperate in making all

12   reasonable efforts to maximize the aggregate relator's

13   share of the proceeds in the action and then it goes on.

14           Did I read that correctly?

15   A.   I believe you did.

16   Q.   You are a relator?

17   A.   Yes.

18   Q.   And we would agree that this agreement is a

19   contract?

20   A.   I would agree, yes.

21   Q.   Isn't it true that you have a duty under this

22   contract to come here to court and to do whatever you

23   have to do to maximize your recovery?

24   A.   Yes.

25   Q.   That's what it says; right?

1   A.   Yes.

2   Q.   And that's what you're doing; right?

3   A.   Yes.

4   Q.   Now, if we go beyond the part of the paragraph that

5   I just read, it lists a whole long list of things that

6   you have to do to maximize your recovery.  Do you see

7   that?

8   A.   Yes.

9   Q.   Let me just go through some of them.  Perform legal

10  research; right?

11  A.   I see it listed, yes.

12  Q.   Preparing pleadings?

13  A.   I see that listed.

14  Q.   Briefs?

15  A.   I see that as well.

16  Q.   Position papers?

17  A.   I see that.

18  Q.   Participate in meetings.  It's there; right?

19  A.   I see all of the information.

20  Q.   Conference calls; right?

21  A.   I see all the information.

22  Q.   Hearings?

23  A.   Yes.

24  Q.   Pretrial conferences?

25  A.   Yes.

1089

1  Q.   Discovery?

2  A.   Yes.

3  Q.   Reviewing pleadings?

4       THE COURT:  I don't think that's what it says.

5  A.   Reviewing documents.

6  Q.   Thank you very much.

7       And if necessary participating in discovery and

8  litigation of relator's share; right?

9  A.   That's what it says, yes.

10 Q.   Now, where in this document does it say that it's

11 part of your contractual obligation to come here and

12 tell the truth?

13 A.   I'm not understanding this area.

14 Q.   Excuse me?

15 A.   I'm not understanding this area, can you give me a

16 different question or --

17 Q.   Let me just cut to the chase here, Ms. Paradies.  I

18 don't see anything in this agreement that obligates you

19 to come here and be honest or to tell the truth.  And my

20 question to you is, am I missing something?

21 A.   No, you're not missing anything.

22 Q.   It's not in there, is it?

23 A.   I don't see it.

24 Q.   And the agreement talks about such things as tax

25 consequences and alternate dispute resolution, but

1    nobody thought to put in there that you were obliged to

2    be honest or to tell the truth; isn't that correct?

3    A.   I am telling the truth.

4    Q.   Let me change the subject.  We are here in this

5    trial -- let me represent to you that we are concerned

6    with 123 specific patients.  I was listening to your

7    direct examination, and I don't recall that you

8    mentioned the name of a single patient.  Did I miss

9    something?

10   A.   No, you did not.

11   Q.   You haven't provided testimony about a single

12   patient; correct?

13   A.   Correct.

14   Q.   Now, when you were an admissions nurse at the

15   Milwaukee agency, you saw lots of patients; right?

16   A.   Yes.

17   Q.   And did some of them have a cancer diagnosis?

18   A.   Initially, no.

19   Q.   Would you agree that some of those patients were

20   completely eligible to receive hospice?

21   A.   We're talking cancer patients or any --

22   Q.   Any patient.  Any patients you saw, were any of them

23   eligible to receive hospice?

24   A.   Yes.

25   Q.   You're not saying that every patient you saw was

1  ineligible, are you?

2  A.   No.

3  Q.   Now, you would agree, wouldn't you, that in

4  determining the eligibility of a patient for hospice,

5  you have to look at the individual patient?

6  A.   Yes.

7  Q.   No two patients are alike; right?

8  A.   Right.

9  Q.   Even if they -- even if we have two patients with

10 the same diagnoses, one of those patients might have

11 comorbid conditions and other health problems and

12 spiritual problems and support network issues that the

13 other doesn't have; right?

14 A.   Right.

15 Q.   And when considering whether that patient is

16 eligible for hospice, it's not enough just to look at

17 that diagnoses, you have to look at all those things;

18 right?

19 A.   I would agree, yes.

20 Q.   Now, at some point in time, when you were at an

21 AseraCare, you used, I believe, you called them LCDs?

22 A.   Yes.

23 Q.   And they were like a checklist; right?

24 A.   It was a guideline into making determinations of

25 specific categories of diagnoses.

1   Q.   And if all of the boxes were checked on the

2   guideline, then a person automatically qualified; right?

3   A.   Not necessarily.

4   Q.   Well, explain that to me.

5   A.   There were certain criteria that must have been met

6   in the LCD and there was a portion that said several of

7   the items listed should be met -- if there was three --

8   there should be three out of five in a portion, so those

9   were guidelines.  There were other things that I used.

10  I could use a fast seven.  I could use the CAP rules and

11  determine whether or not a person was eligible for

12  hospice.

13  Q.   Was it possible for a patient to not meet every

14  single box on the LCD and still be eligible because of

15  comorbid conditions or secondary diagnoses or other

16  problems?

17          MR. WERTKIN:  Objection, lack of foundation.

18          THE COURT:  Overruled.

19  A.   Can you say the question one more time?

20  Q.   Sure.

21          If a patient didn't comply with all of the

22  boxes on the LCD, was it possible that they might

23  nonetheless be eligible as a result of secondary

24  diagnoses or comorbid conditions or psychological

25  factors or other factors that might affect their health

1   or longevity?

2   A.   That would be possible.

3   Q.   As a matter of fact, you probably had patients like

4   that, didn't you?

5   A.   Initially, I only knew of one way to admit the

6   patient and that was to admit the patient.  I did have

7   the tools later on to utilize and make that decision.

8   Q.   I was going to ask you about that, Ms. Paradies.  If

9   we go back and we look at all the patients you admitted

10  for the first three months when you were in the

11  Milwaukee agency, are you telling us they're all going

12  to have just those two diagnoses?

13          MR. WERTKIN:  Objection, lack of foundation.

14          THE COURT:  Let me see counsel, please.

15                      (SIDEBAR)

16          THE COURT:  Mr. Bohl, I'm concerned that we're

17  getting into areas where defense counsel has not wanted

18  plaintiff's counsel to go.

19          MR. BOHL:  I'm sorry.  I certainly did not

20  intend to do that.

21          THE COURT:  I think you may be opening the door

22  for some stuff.

23          MR. BOHL:  Well, I will retreat.

24          THE COURT:  Specifically, I've ruled we are not

25  getting into anecdotal evidence and you are asking her

1   for that.

2          MR. BOHL:  This is cross-examination, Your

3   Honor.  I didn't think this was anecdotal.  I thought

4   that was direct impeachment.

5          MS. MARTIN:  We will move on, Your Honor.

6          (Open court.  Jury present.)

7   Q.  (By Mr. Bohl)  You remember being asked questions at

8   your deposition; correct?

9   A.  Yes.

10  Q.  Do you remember being asked whether you would

11  falsify any documentation or signed any documentation

12  that wasn't true?

13  A.  Yes.

14  Q.  Do you remember being asked on Page 245, Line 1,

15  well, have you ever knowingly falsified any -- answer,

16  no.  Question -- patient information?  Answer, no.

17         MR. WERTKIN:  Objection, can we show the

18  witness the deposition transcript?

19         THE COURT:  Let her see the page numbers,

20  please.

21         MR. BOHL:  245, Line 1.

22         THE COURT:  Does she have her deposition to

23  see?  Now, wait a minute.  This doesn't go up to the

24  jury.  If you want to show it to the witness, you can do

25  that.

1  Q.   (By Mr. Bohl)  Do you recall giving those answers to

2  those questions?

3  A.   I don't have it on my screen here, sir.

4       MR. WERTKIN:  Your Honor, we move to strike

5  that last question and the display, please.

6       THE COURT:  Let's get our act together on the

7  deposition so you can ask her about it properly.

8       MR. BOHL:  Your Honor, would you like me to

9  show her her deposition or put it on the screen?

10      THE COURT:  If you put it on the screen, it's

11  only for the witness, not for the jury.  We need to make

12  sure that there's that distinction.

13      If we can't do that, you will need to show her

14  a hard copy.

15                  (Brief pause)

16      THE COURT:  We may have a technical glitch with

17  our new courtroom.  We need to figure out how to do

18  that.

19                  (Brief pause)

20      MR. BOHL:  Your Honor, I would be happy to do

21  it the old fashioned way.

22      THE COURT:  That's fine.  Why don't we do it

23  the old fashion way so we can move on.

24      MR. WERTKIN:  Your Honor, this is the second

25  time --

1     THE COURT:  Take it down.

2     MR. WERTKIN:  We move to strike the use of this

3 deposition testimony.

4     THE CLERK:  It's my fault.

5     THE COURT:  Like I said, we're trying to get

6 the glitches out of our courtroom.

7     THE CLERK:  That was me.

8     THE COURT:  We will work on that later.

9 Mr. Bohl, if you want to approach the witness and show

10 her the depo, you may do.

11     MR. WERTKIN:  May we have a copy of that, too?

12     THE COURT:  Do you not have a copy of her

13 deposition?

14     MR. WERTKIN:  I do electronically, Your Honor,

15 but it will take a second to call it up.

16     THE COURT:  It's generally appropriate for

17 counsel to have depositions of their own witnesses and

18 not be provided it by the other side.

19     MR. WERTKIN:  Yes, Your Honor, we've got it.

20     THE COURT:  Okay.  Good.

21 Q.  (By Mr. Bohl)  Are you ready?

22 A.  Sure, yes.

23 Q.  All I want to know is, did you give those answers to

24 those questions?

25 A.  Yes.

1          MR. BOHL:  Thank you very much.  That's all I

2   have.

3          THE COURT:  Okay.  Any redirect?

4          MR. WERTKIN:  One question.

5                    **REDIRECT EXAMINATION**

6   **BY MR. WERTKIN:**

7   Q.   Ms. Paradies, do you understand there's a difference

8   between the percentage that the relators are entitled to

9   recover under the False Claim Act and then the

10  percentage of that percentage is reflected in this

11  agreement?

12  A.   I guess there is, yes.

13  Q.   Do you understand that?

14  A.   To some degree, yes.

15         MR. WERTKIN:  Thank you.  No further questions,

16  Your Honor.

17         THE COURT:  Anything further on recross?

18         MR. BOHL:  No, Your Honor.

19         THE COURT:  Thank you.  Ms. Paradies, you may

20  step down.  We appreciate you being here today.

21         We've had a lot of breaks today but are y'all

22  ready for lunch break?

23         We'll have a lunch break and we will come back

24  around 1:00.  During this break, what do we do?  No

25  talking about the trial, don't talk about anything

1    related to the trial and don't allow anyone to talk to

2    you.  We will see you back at 1:00.

3                    (Jury excused.  Lunch recess.)

4                              (SIDEBAR)

5         MR. WERTKIN:  So, Your Honor, we've had a

6    chance to talk about it and we're starting to see that

7    there's some diminishing returns on having the witnesses

8    come in and saying the same thing.

9         We only have one more witness that -- we could

10   call one witness today.  But this is what our proposal

11   would be, would be to recess now and reconvene on Monday

12   morning.

13        And the reason is because Dr. Liao, his

14   schedule is such that we can get him here on Tuesday

15   morning, but not any earlier.  So what we would propose

16   to do is recess now, call the rest of our witnesses on

17   Monday, and then he will testify starting first thing on

18   Tuesday morning.

19        THE COURT:  So that's earlier than he was

20   previously available.

21        MR. WERTKIN:  We were able to get him to change

22   his plans, but he cannot come any earlier than Tuesday,

23   Your Honor.

24        MS. TAPIE:  And with one light verification,

25   because Katy Lucas will not be available until Thursday,

1    so we will have to move her testimony until after

2    Dr. Liao.

3            THE COURT:  Okay.

4            MR. LEMBKE:  Whatever the Court wants to do,

5    Your Honor.

6            THE COURT:  I think I could definitely enjoy

7    not being here tomorrow and get a lot of other stuff

8    done.

9            I will tell the jury, if it's all right with

10   y'all, that we've just run into some issues with

11   availability of witnesses and that we will recess until

12   Monday.

13           MR. WERTKIN:  We do want to raise one issue

14   that's related to a specific piece of evidence.  I don't

15   know when you want to do that.  We can do that on Friday

16   or on Monday.

17           We have a specific piece of evidence that we --

18           THE COURT:  I'm not planning on meeting with

19   you on Friday.

20           MR. WERTKIN:  Perhaps letting the Court know.

21           THE COURT:  Can we let our jury go and then we

22   will take that up?

23           MR. WERTKIN:  Yes.

24                (Open court.  Jury present.)

25           THE COURT:  Ladies and gentlemen, I have the

1   proverbial good news and bad news.  The bad news is that

2   we have run into a scheduling snafu with our next

3   witnesses.  The good news is we're going to recess

4   early.  We're also going to let you have tomorrow off

5   and we will come back on Monday.

6          So that's the bad news but the good news, I

7   think, outweighs the bad news for y'all; right?

8          I want to make sure that you remember the

9   special instructions that you're not to do any research

10  about any of these things that you've heard about, you

11  don't need to learn anymore about LCDs or -- I can't

12  remember all those acronyms.  No research, no

13  conversation with anyone.  Don't read any newspaper

14  articles that might show up about the case.  Don't let

15  anybody talk to you.  Don't email each other.  Y'all

16  can't get together and have a party tomorrow, at least

17  not without me.  We might do that after everything is

18  over.  But no emails to each other or phone calls with

19  each other, no conversations at all about this case.

20  And we'll see you Monday morning.  And we will start

21  bright and early at 8:30 and get it rolling again.

22                      (Jury excused)

23                       (SIDEBAR)

24          MR. WERTKIN:  Your Honor, we have an issue

25  that's come up about a specific piece of evidence that

 1    was the subject of a motion in limine.

 2              THE COURT:  Which one?

 3         MR. WERTKIN:  The one -- it was actually -- we

 4    had an omnibus and ours was about a settlement agreement

 5    that was entered into between the University of

 6    California Irvine.

 7              THE COURT:  And Dr. Liao's employer and the

 8    government.

 9         MR. WERTKIN:  And the Department of Justice;

10    that's right.  In response to the motion in limine,

11    there was some argument that was made by the defendants.

12         We have a lot of concerns about that, about the

13    argument that was made.  We tried -- we've reached out

14    and we've had some communications about it, just the

15    parties.  We have tried to talk about it just in person,

16    not just over email.  And we're -- we're afraid that

17    we're not going to be able to work that out.

18         There's some issues both from our side and

19    their side.  What we would request is the ability to

20    file something under seal so that Your Honor can -- we

21    can present the issue better, if it is filed under seal,

22    and we will take it up on Monday.

23              THE COURT:  All right.  You wouldn't need to

24    take it up before you put on another witness on Monday.

25         MR. WERTKIN:  No, before Dr. Liao.

1    THE COURT:  Okay.

2    MR. LEMBKE:  That's fine.  I will say this,

3    Your Honor, if what's coming under seal is a

4    declaration, then the witness better be available to be

5    cross-examined here or we don't think it should be

6    considered.

7    MR. WERTKIN:  Okay.  Noted.  If we got it to

8    Your Honor by Friday morning, would that be okay?

9    THE COURT:  Yes.  I think Friday morning will

10   be fine.

11   MR. WERTKIN:  We want to give them a chance as

12   well.

13   THE COURT:  By Friday noon.

14   MR. WERTKIN:  Thank you, Your Honor.

15   MR. LEMBKE:  That's fine, Your Honor.

16   THE COURT:  If the hypothetical declarant isn't

17   going to be on this side of the country, would there be

18   a way to do a phone conference?

19   MR. WERTKIN:  It's not going to be Dr. Liao.

20   THE COURT:  You understand what I'm saying?

21   MR. WERTKIN:  I see, so he doesn't have to be

22   personally here but be available to the court.

23   THE COURT:  By video conference.

24   MR. WERTKIN:  Yes, Your Honor.

25   THE COURT:  I just know the government has

1   already spent a lot of our taxpayer dollars getting

2   witnesses from --

3           MR. WERTKIN:  Actually, I'm sorry.

4           MR. LEMBKE:  And, Your Honor, if the submission

5   of a declaration may well open the need for other

6   witnesses, we'll just have to see.  We don't know what's

7   in it.

8           THE COURT:  We shall see.

9           MR. WERTKIN:  Actually the taxpayer dollars,

10  brings up one more issue, which is the issue of the

11  screen, so we are going to -- when we present Dr. Liao

12  --

13          THE COURT:  Have you talked to our IT people?

14          MR. WERTKIN:  Yes, yes.  So we anticipate that

15  the screens that the jurors have and that we have is

16  going to show the actual medical record.  We have

17  another demonstrative we want to show at the same time.

18          THE COURT:  On the big screen.

19          MR. WERTKIN:  On the big screen.  So what we

20  could do is we have hundreds of them.  We could print

21  hundreds of them out.  It would cost a lot of money and

22  just stack them up maybe somewhere over here.

23          The other alternative is this is a big screen

24  and we just flip them through and it's electronic --

25          THE COURT:  I'm not sure you were in here when

1  we had this another conversation earlier.  I said

2  anything that y'all can agree on in terms of

3  demonstratives, you can put on the screen.  And

4  Mr. Christie had no problem with using the screen for

5  the demonstratives that he has agreed to, but I also

6  said I'm not going to do playground monitoring on

7  whether y'all can use demonstratives.  If you agree on

8  it, you can show it however you want.

9         But I also said your IT had to talk with my IT

10  about any issues before bringing any additional stuff in

11  here.

12         MR. WERTKIN:  So --

13         MS. TAPIE:  It was when you were gone.  We did

14  have a discussion with her earlier today.

15         MR. WERTKIN:  I'm sorry.  I was not told.  So

16  it's all been worked?

17         MS. TAPIE:  We are working on it.

18         MR. WERTKIN:  I am sorry for wasting your time.

19  I was not aware.

20         THE COURT:  That's okay.  There's been a few

21  things going on.  All right.  So we're looking at who on

22  Monday?

23         MR. WERTKIN:  So, it would be Roberta Manley

24  and then Mary Schultz.  Maybe Henry Feliciano.

25         THE COURT:  These would be other nurses?

1    MR. WERTKIN:  No, no.  Mary Jane Schultz

2    THE COURT:  Off the record.

3         (Off the record discussion)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3        I hereby certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-referenced matter.

6

7

8  Teresa Roberson, RPR, RMR
     Julie Martin, RPR, RMR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25