FILED
5956
2016 Jun-10  PM 12:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


UNITED STATES OF AMERICA,
EX REL., ET AL.,                    CV-12-KOB-245-S


          Plaintiffs,     September 24, 2015

     vs.                  Birmingham, Alabama

ASERACARE, INC., ET AL.,

          Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * *


          REPORTER'S OFFICIAL TRANSCRIPT OF
                  JURY TRIAL
                  VOLUME XXVIII


     BEFORE THE HONORABLE KARON O. BOWDRE
        UNITED STATES DISTRICT CHIEF JUDGE


COURT REPORTER:
Teresa Roberson, RMR
Julie Martin, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
 1                    * * * * *

 2              A P P E A R A N C E S

 3                    * * * * *

 4   FOR THE PLAINTIFF:

 5   Jeff Wertkin
     Carolyn Tapie
 6   Holly Snow
     Eva Gunasekera
 7   Renee Brooker
     William Olson
 8   U.S. Department of Justice
     Civil Division
 9   P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
10

11   Lane H. Woodke
     Don Long
12   U.S. Attorney's Office
     1801 4th Avenue South
13   Birmingham, Alabama  35203

14   James F. Barger, Jr.
     J. Elliott Walthall
15   FROSHIN & BARGER
     3430 Independence Drive
16   Birmingham, Alabama  35209

17   Nola J. Hitchcock Cross
     CROSS LAW FIRM
18   345 North 11th Street
     Milwaukee, Wisconsin  53233
19

20

21

22

23

24

25
```

5938

1          A P P E A R A N C E S  (continued)

2    FOR THE DEFENDANT:

3    James Sturgeon Christie, Jr.
     Jack Wright Selden
4    Matt Lembke
     Tiffany deGruy
5    BRADLEY, ARANT, BOULT & CUMMINGS
     1819 Fifth Avenue North
6    Birmingham, Alabama  35203

7

8    Kimberly Martin
     BRADLEY, ARANT, BOULT & CUMMINGS
9    200 Clinton Avenue
     Huntsville, Alabama  35801
10

11   Charles H. Bohl
     WHYTE, HIRSCHBOECK, DUDEK
12   555 East Weels Street, Suite 1900
     Milwaukee, Wisconsin  53202
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2   WITNESS              D      C      RD     RC

3   Dr. Terry Melvin     5940

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    * * * * *
2              P R O C E E D I N G S
3                    * * * * *
4         (Open court.  Jury present.)
5         THE COURT:  Good morning, ladies and
6  gentlemen.  I'm glad you were all able to negotiate
7  traffic and to make it here and hope you had a little
8  sweet bite to get you through the morning; right?
9         Mr. Christie, you may proceed.
10        THE CLERK:  Dr. Melvin, I want to remind you
11 you're still under oath.
12             DIRECT EXAMINATION (continued)
13 BY MR. CHRISTIE:
14 Q.  Good morning, Dr. Melvin.
15 A.  Good morning.
16 Q.  Dr. Melvin, did you have an opportunity to
17 review the medical records for Kathryn H.?
18 A.  Yes, I have.
19        MR. CHRISTIE:  Kathryn H.'s medical records
20 are at Tab 61.  Her medical records have been
21 pre-admitted as Defendant's Exhibit 550, 550-A and
22 550-B.
23 Q.  Dr. Melvin, what was Kathryn H.'s age at the
24 time she was admitted?
25 A.  Ms. Kathryn was 96 years old.
```

1    Q.   When was she admitted?

2    A.   May the 29th of '09.

3    Q.   And Ms. Kathryn H. received hospice services

4    until what date?

5    A.   March the 24th of '12.

6    Q.   Have you reached a conclusion whether Kathryn

7    H., at the time of the admission, had a prognosis of

8    six months or less, if her illness ran its normal

9    course?

10   A.   Yes, I have.  I felt that Ms. Kathryn was

11   eligible for hospice services at the time of her

12   admission.

13   Q.   And why did you reach that conclusion?

14   A.   Ms. Kathryn came on with a diagnosis of COPD.

15   She also had a history of heart failure with some

16   confusions as a result of her dementia and

17   hyperprofusion.

18        She had peripheral edema.  She was

19   incontinent of bowel and bladder and had

20   symptom burden related to her hospice diagnosis, and

21   those are the reasons that Ms. Kathryn was eligible

22   for hospice services.

23   Q.   Have you reached a conclusion as to whether or

24   not Kathryn H., throughout the time she received

25   hospice services, had a prognosis of six months or

1  less, if her illness ran its normal course?

2  A.   Yes, I have.  And I felt that Ms. Kathryn was

3  eligible throughout her stay with hospice.

4  Q.   Why did you reach that opinion?

5  A.   Given Ms. Kathryn's increase in shortness of

6  breath with confusion, her recurrent lung infections,

7  her low albumin.  As a result of her receiving

8  antibiotics for her infection, she developed

9  infection of C-diff.  She became hypoxic on room air,

10  had some pleural effusion, had an increase in needing

11  assistance with her activities of daily living, more

12  edema, increased confusion.

13        Her weight fluctuated as a result of her

14  fluids that she accumulated.  Her need for more

15  oxygen to keep her oxygen saturation up, those were

16  the reasons that I felt Ms. Kathryn continued to be

17  eligible for hospice care.

18  Q.   What was the reason hospice services for

19  Ms. Kathryn ended?

20  A.   Ms. Kathryn died on 3/24 of 2012.

21  Q.   Dr. Melvin, if you could look at Page 3780 of

22  Defendant's Exhibit 550-A.

23        What's the date at the bottom of this

24  document?

25  A.   It's May the 29th of '09.

1    Q.    And what type of document is it?

2    A.    It's a nursing assessment.

3    Q.    And does this document say under history of

4    illness?

5    A.    96 year old female with a diagnosis of COPD.

6    Q.    If you go to Page 5 of that document, which

7    would be Page 3784 of Defendant's Exhibit 550-A.

8             What does this document say under physical

9    assessment?

10   A.    The patient was total care for all ADLs.  Bed

11   activity, she was unable to do.  She was unable to

12   transfer.  She was unable to ambulate.  She was

13   unable to go to the bathroom by herself.  Bathing and

14   personal care, she was unable to do alone.  Dressing,

15   she was unable to do.  Feeding required assistant.

16   Meal preparation, laundry, house management,

17   shopping, using the telephone, handling money and

18   driving, she was all unable to do.

19   Q.    If you could read what this document says under

20   summary/problems/intervention in the middle of the

21   page.

22   A.    Diagnosis of COPD, PPS is 30.  Patient is alert

23   but drowsy during the visit.  Lungs have scattered

24   crackles.  Oxygen was on 3.5 liters, nasal cannula

25   continuous, with an oxygen saturation of 94 percent.

1    Respiratory rate was even and unlabored at

2    20 breaths a minute.  Patient does become short of

3    breath with talking and moving around in bed.

4        Three plus edema was noted in the right

5    lower extremity and one plus edema noted in the left

6    lower extremity.

7        She denied any pain at present.  Patient has

8    slow decline over the past few weeks since recent

9    bronchitis, has a moist non-productive cough.

10       Her temperature is 99.  She had no

11   improvement with the use of antibiotics in recent

12   weeks.  Has become increasing confused.

13       Patient is total care of all ADLs.  Limited

14   use of bilateral lower extremity, requires the use of

15   a Hoyer lift to get out of bed to the wheelchair.

16       Needs fed by staff.  Appetite is poor at

17   about 25 percent of a regular diet.  Spoke with the

18   power of attorney, Barbara Long, wishes to be updated

19   Q two weeks or if problems.

20   Q.  Based on this nursing assessment, what, if

21   anything, did the facts highlighted in this document

22   tell you about the overall picture of Ms. Kathryn H.

23   at the time she was admitted to hospice?

24   A.  That at 96 years old, a patient with an

25   underlying diagnosis of lung disease, has developed a

1   pneumonia.  And despite receiving antibiotics, she

2   didn't recover and has developed increasing weakness

3   and was hospice eligible at the time of her

4   admission.

5   Q.   Dr. Melvin, if you could look with me to Page

6   3539 at Defendant's Exhibit 550-A and tell me the

7   date of this document up at the top.

8   A.   It looks like it's March the 23rd at the top.

9   I'm not really sure about the year.  I'm sorry.

10   Q.   If we could go to Page 3541, the third page of

11   this same document.

12          If you'll look at the bottom of the

13   document, can you read those dates?

14   A.   3/23 of '10.

15   Q.   If we could go back to the first page of this

16   document.

17          What type of document is this up at the top?

18   A.   It's a nursing clinical note.

19   Q.   And what does this document say under weight

20   history?

21   A.   Six months ago the patient was 153 pounds.

22   Three months ago, 157 pounds.  And then her most

23   recent weight is 166.6 pounds.

24          So she's had a weight gain, which is

25   probably from her edema.

 1  Q.   All right.  If we could go to Page 35 --
 2           MS. TAPIE:  For completeness, if the witness
 3  could read the cardiopulmonary in the systems
 4  screening and then also the BMI on the weight.
 5           THE COURT:  Okay.
 6           THE WITNESS:  So the BMI is 29.5 which will
 7  reflect the weight.
 8  Q.   (By Mr. Christie)  And what does this document
 9  say under cardiopulmonary?
10  A.   That the patient was having some mild shortness
11  of breath and she was not having any cardiac-related
12  pain.
13  Q.   All right.  If we could go to Page 3541 of
14  Defendant's Exhibit 550-A.
15           On the third page of this same document, if
16  you could read what it says under the nursing
17  narrative.
18  A.   Routine visit.  Chart reviewed.  No new orders
19  noted.  Nurses notes reveal no changes.  Patient
20  lying in bed with head of bed elevated.  Alert and
21  verbal.  Denies pain.  Oxygen in place, two liters
22  via nasal cannula.
23           Shortness of breath with minimal exertion --
24  shortness of breath with minimal exertion such as
25  turning and repositioning ADL.  Edema continues to

1   both feet, receiving Lasix once a day.

2           HFN, which is nebulizer treatments, two

3   times a day.  Routinely post ox drops in the 80s.

4           Total care with ADLs.  Feeds self after

5   staff sets up.  Transfer via lift when she gets out

6   of the bed.  Incontinent of bowel and bladder.

7   Barbara Long, I'm not sure what AAA is, updated every

8   other week.  Last update was 3/16.

9   Q.  Why would the head of her bed be elevated?

10  A.  When a patient -- so, the lungs and the heart

11  works together, and if I develop an infection in my

12  lungs and I have a history of heart failure,

13  frequently patients go into heart failure.  And so if

14  I lay my head of my bed down, patients feel like they

15  can't get enough air.  If you elevate the head, they

16  are a lot more comfortable.

17          We saw in the previous document that there

18  was an increase in the weight and here she's

19  accumulating fluid.  That's the pedal edema in her

20  lower extremities.

21          If she has that edema in the lower

22  extremities, she's going to have some in her

23  thoracic, in her chest cavity, which is affecting her

24  breathing.  Hence the low oxygen saturation to 80

25  percent.  And that's on oxygen.

1   Q.   If we could look Page 0972 of Defendant's

2   Exhibit 550-A.

3            What is the date at the bottom of this

4   document?

5   A.   January 13th of 2011.

6   Q.   What is the title of this document?

7   A.   It's a recertification of terminal illness.

8   Q.   And what does this document say under physician

9   narrative?

10   A.   See attached physician progress note.

11   Q.   If we could look at the next page, which is 0973

12   of Defendant's Exhibit 550-A.

13            What does this document say at the top?

14   A.   It's a physician's progress note addendum to

15   enhance the physician narrative.

16   Q.   If you could read the narrative.

17   A.   Diagnosis:  COPD.  Past medical history:

18   Congestive heart failure, hypertension, anxiety,

19   depression.  Neoplasm of the colon.

20            PPS is 30.  02 4.5 liters via nasal cannula

21   at 89 percent pulse ox.

22            Becomes short of breath with minimal

23   exertion, care, turning and repositioning.

24            Three plus edema bilateral low extremity,

25   edema left hand has revolved.  Receives Lasix daily.

1          Nebulize treatment two times a day routinely

2    and every four hours as needed.

3          Total care of ADLs.  Feeds self after staff

4    sets up.  Incontinent of bowel and bladder.  Spends

5    most of day in bed.  Transfer with lift when out of

6    bed.

7          On 12/3, patient was placed on GIP for

8    increasing respiratory.  Hands and fingers were

9    cyanotic.

10         Recommendations made for Albuterol and

11   Atrovent and nebulizer every four hours.  Orders were

12   received.  Also used Roxanol PRN as needed.

13         12/14, cyanosis around the lips.  Pulse ox

14   was 68 to 70.  Received nebulized treatment and

15   Roxanol.  Oxygen sat was then 78 to 80.

16         On 12/5, post ox 89 to 93.  She continues to

17   use the Roxanol and nebulizers.

18         On 12/7, the pulse ox is 83 to 88 percent.

19         On 12/8, pulse ox is decreased again to 70.

20   Patient is anxious, nebulized treatments are given.

21   Sat was up 95 percent.  Patient calm.

22         12/12, respiratory rate is 36.  Normal being

23   ten to 12.  With repositioning, it took her -- so she

24   didn't move on her own, somebody had to move her.  It

25   took her ten minutes to recover.

1           Her weight is down by 2.5 pounds in a month.

2   She returned to routine care on 12/20.

3           On 12/26, the skill nurse visit was

4   increased to three times a week to monitor her edema

5   of the hand, which was two plus, and then a pulse ox

6   was 89 percent on the nasal cannula.

7           So this patient is having an exacerbation of

8   her underlying lung disease.  She's not able to

9   breathe.  And they're having to give her Roxanol,

10  which is a concentrated Morphine, to help with her

11  shortness of breath and to help her relieve the

12  cyanosis.  She's very sick.  I wouldn't be surprised

13  if she doesn't survive this.

14  Q.   What does GIP mean?

15  A.   It's general inpatient.  There are four levels

16  of care with hospice.  There is routine home care,

17  and that can be done in the home, in the assisted

18  living or in a nursing home.

19          There is respite care, which is usually five

20  days and it helps the family to get a break.  Nine

21  times out of ten the families are with the patient

22  during respite care, though.

23          THE COURT:  With the respite care, where is

24  the patient?

25          THE WITNESS:  The patient is usually taken

1   out of the home or the assisted living and then the

2   hospice had contracted facilities, so it could be a

3   hospital or a nursing, home or it could be an

4   inpatient hospice house.

5           THE COURT:  So that's for just a short term

6   --

7           THE WITNESS:  Just five days to --

8           THE COURT:  To relieve the family.

9           THE WITNESS:  Just to relieve the

10  caregiver's stress.

11          Then the general inpatient is where a

12  patient becomes so sick that otherwise they would go

13  into a hospital, they need a higher level of care,

14  they need more care than just maybe the routine

15  coming and checking you once a day or every other day

16  or every shift.

17          And so we can see that, in this particular

18  case, this lady had so much distress that people were

19  in there on a regular basis trying to get her

20  symptoms controlled.

21          And then the fourth level of care is called

22  crisis care or continuous care.  And it's when a

23  patient becomes sick like this at home and they said,

24  I don't want to go anywhere.  I want to stay here at

25  home.  And the staff provides care around the clock

1  at the bedside.

2  Q.   The narrative that you read said on December

3  14th that her pulse ox was 68 to 70.  Tell me what

4  that means.

5  A.   Normal pulse ox is above 90.  So if we check all

6  of your pulse ox right now just sort of at rest,

7  you're probably going to be over 94.

8       And to have a pulse ox in the 60s, she is

9  not profusing her extremities --

10      THE COURT:  What do you mean profusing

11  extremities?

12      THE WITNESS:  She's not getting oxygen

13  throughout the body.  She's not getting it even to

14  her fingertips.  And if she's not getting it there,

15  then she's probably -- there's a decreased supply of

16  oxygen to the brain, so patients will have a change

17  in their level of consciousness, their ability to

18  focus and understand what's going on.

19  Q.   (By Mr. Christie)  What does the term pulse ox

20  mean?

21  A.   It measures, indirectly, sort of a snapshot in

22  time what your oxygen delivery system through the

23  body is.  It's a little small machine that just clips

24  on the finger and that can vary.  68 to 70 is

25  extremely low.  Someone with a pulse ox this low, we

1  would have them in the intensive care unit, if they

2  were not on hospice, or they had not made their needs

3  known in terms of advanced directives for their code

4  status.

5  Q.   Dr. Melvin, I would like for you to look, if you

6  would, to Page 2995 of Defendant's Exhibit 550-A.

7          Up in the right-hand top of this document,

8  what is the date?

9  A.   October 12 of '11.

10  Q.   What type of document is this?

11  A.   A nursing assessment update.

12  Q.   If you could go to Page 7 of this document,

13  which is 3001 of Defendant's Exhibit 550-A.

14          If you could read what it says under patient

15  response to intervention and new complaints.

16  A.   Patient is achy all over and she can't catch her

17  breath.

18  Q.   And if you could read what it says under nursing

19  narrative on that same page.

20  A.   Today's visit PRN due to not feeling well.  So

21  the visit was not scheduled.  So this nurse has had

22  to make an extra visit.  Shortness of breath --

23          MS. TAPIE:  Lack of foundation.

24          THE COURT:  Dr. Melvin, you were explaining

25  what visit PRN means?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  Thank you.

3    A.   Shortness of breath.  Patient yesterday was

4    complaining of increasing shortness of breath.  But

5    MD ordered chest x-ray and today patient in bed

6    looking tired, weak and pale.  States, quote, I can't

7    catch my breathe, close quotes.  Respiratory rate is

8    at 32 -- again, normal is ten to 12.

9          Afebrile.  Pulse is 84.  Her blood pressure

10   is 112/74.  Patient was -- has no breath sounds on

11   the left.  The right is diminished.  Oxygen on 3.5

12   liters, nasal cannula is 93 percent.

13         She has two plus pedal edema bilateral

14   knees.  I'm not sure what that's saying.  Asked staff

15   to give patient Roxanol for shortness of breath.

16   Patient agreed to take to get relief with her

17   respirations.

18         Patient placed on GIP with the goal of the

19   respirations to be less than or equal to 24 times 72

20   hours or cease to breathe.

21         Kelly Carden, the power of attorney, or the

22   POA, I'm sorry, unable to update.  She is out of the

23   office until August 16th.  No voicemail available.

24   Q.   What did you understand the phrase "cease to

25   breathe" to be referring to?

1   A.   An unintended consequence of treating patients

2   with terminal illnesses, we give medicine to help

3   their symptoms.   The intent is to relieve the

4   symptoms.   It's to relieve the suffering.   The intent

5   is not to stop them from breathing.   However, that is

6   a side effect, and so that is what she's saying from

7   this, to get her respiratory rate, which is obviously

8   from distress, from 32 to probably in the 20s is the

9   goal.

10   Q.   Dr. Melvin, if you could look at Page 0795 of

11   Defendant's Exhibit 550.

12          What is the date at the top right-hand

13   corner of this document?

14   A.   It's March the 24th of 2012.

15   Q.   What's the title of this document?

16   A.   It's a death note, summary and disposal of

17   controlled drugs.

18   Q.   What does this document say under cause of

19   death, terminal diagnosis?

20   A.   COPD.

21   Q.   What, if anything, have the facts we have

22   highlighted, looking at these documents, tell you

23   about the overall picture about Kathryn H.'s

24   eligibility for hospice during the time she received

25   hospice services?

1  A.   Ms. Kathryn was hospice eligible at the time she

2  was admitted.  And Ms. Kathryn was eligible for

3  hospice until her death as evidenced by, despite her

4  receiving antibiotics, the patient continued to be

5  symptomatic.  She got weaker, had a decrease in her

6  appetite, increase in swelling, despite them giving

7  her diuretics to get rid of the fluid, and she was

8  unable to keep her oxygen level up to maintain

9  herself.

10 Q.   In reaching your opinions, did you rely only on

11 the medical records that we've reviewed here in

12 court?

13 A.   No.

14 Q.   What else did you rely upon?

15 A.   I looked at all of Ms. Kathryn's records.

16 Q.   And were her other medical records overall

17 consistent with the opinions you have given here

18 today?

19 A.   Yes, they were.

20 Q.   Dr. Melvin, did you have the opportunity to

21 review the medical records of Ms. Lennie D.?

22 A.   Yes, I did.

23       MR. CHRISTIE:   Lennie D. is Tab 66.  Her

24 medical records have been pre-admitted as Defendant's

25 Exhibit 528, 528-A and 528-B.

1  Q.  Dr. Melvin, if I could get you to look at Page

2  5208 of Defendant's Exhibit 528-A.

3          What's the date at the top right-hand of

4  this document?

5  A.  It's September the 1st of 2010.

6  Q.  And what is the start of care date for this

7  document?

8  A.  It is September the 1st of 2010.

9  Q.  What's the title of the document?

10  A.  It's the initial and comprehensive nursing

11  assessment.

12  Q.  What was Ms. Lennie D.'s age at the time she was

13  admitted to hospice?

14  A.  Ms. Lennie was 83 years old.

15  Q.  What was her diagnosis?

16  A.  Heart failure.

17  Q.  Until what date was Lennie D. provided hospice

18  services?

19  A.  September the 26th of 2011.

20  Q.  Have you reached a conclusion as to whether or

21  not Ms. Lennie D., at the time of hospice admission,

22  had a prognosis of six months or less, if her illness

23  ran its normal course?

24  A.  I did.  And I did feel that Ms. Lennie was

25  hospice eligible at the time of her admission.

1    Q.   And why did you reach that conclusion?

2    A.   Ms. Lennie was having increasing shortness of

3    breath.  She was unable to swallow her food.  She was

4    actually holding the food in her mouth.  She was

5    developing a change in her mental status, so being

6    able to focus.  She had increasing pain and

7    restlessness along with her comorbid conditions.  She

8    had had a history of a stroke and had ongoing TIAs or

9    mini stroke.  Had coronary artery disease.  She had

10   diabetes that was insulin-dependent are the reasons

11   that Ms. Lennie was hospice eligible at the time of

12   her admission.

13   Q.   Have you reached a conclusion as to whether or

14   not Ms. Lennie, throughout the time she received

15   hospice services, had a prognosis of six months or

16   less, if her illness ran its normal course?

17   A.   Yes.  I felt that Ms. Lennie continued to be

18   hospice eligible throughout her stay with hospice.

19   Q.   And why did you reach that opinion?

20   A.   Ms. Lennie continued to have a large symptom

21   burden as it related to her heart failure.  And as a

22   result of her stroke and history of mini stroke, had

23   difficulty in handling food.  And that is why

24   Ms. Lennie continued to be eligible for hospice until

25   her death.

1  Q.  And what was the reason hospice services for

2  Ms. Lennie D. ended?

3  A.  She died on 9/26/2011 at 9:00 a.m.

4  Q.  If you could, I would like to ask you to go back

5  to Page 5208 of Defendant's Exhibit 528-A.  If you

6  could read what this says under illness trajectory

7  and reason for hospice admission.

8  A.  Patient has been having an increase in the

9  number of episodes of chest pain, shortness of

10  breath.  Patient was discharged from hospice today

11  and was admitted to the hospital with an exacerbation

12  and stroke.

13  Q.  If you could read what it says under subjective

14  data.

15  A.  The primary caregiver reports that the patient's

16  ejection fraction was still 16 percent due to

17  hospital testing, and that the patient also is having

18  more slurred speech with episodes of chest pain and

19  shortness of breath.

20  Q.  If you could explain what is the significance of

21  an ejection fraction of 16 percent?

22  A.  It's a way to measure when the heart contracts,

23  how much blood goes out.  And at 83, with her

24  diagnosis of the hypertension and her atherosclerotic

25  disease, so she has hardening of the arteries, we

1   would expect for her to have more diastolic

2   dysfunction, so that her EF, her ejection fraction,

3   would be high, would be sort of in the 50s to 60s.

4          Hers is low because of previous heart damage

5   that she's had, so the same that she's had a stroke,

6   so she had decreased blood supply to the brain, and

7   then she's had these little mini strokes, so it's

8   like having a stroke but you don't have any deficit,

9   you may get a little bit confused, you may get a

10  little dizzy and then it sort of passes.

11         Just like she had decreased blood flow

12  there, she had some decreased flood flow to her

13  heart, so that her heart wasn't all contracting.

14  Some of it was damaged like you would have a heart

15  attack.  So it wasn't all working together which

16  meant that her blood flow was decreased every time

17  her heart contracted.

18  Q.   Could you read, on the same page, what it says

19  under objective data?

20  A.   Patient is spending the majority of her time in

21  a recliner and is having increased difficulty moving

22  throughout the house.  She is taking sublingual

23  Nitroglycerine more often and now has a Catapres

24  patch to help control her blood pressure.

25  Q.   What does it say under primary complaints?

1  A.   Increased episodes of chest pain and shortness

2  of breath accompanied by slurred speech and weakness.

3  Q.   If we go to Page 5 --

4       MS. TAPIE:  For completeness, if the witness

5  could also read the desired outcomes section.

6  Q.   (By Mr. Christie)  Dr. Melvin, would you read

7  what it says under desired outcomes?

8  A.   Patient will take medications as directed and

9  will experience fewer exacerbations and will be able

10 to manage episodes with medicine.

11 Q.   All right.  If we go to Page 5 of this

12 eight-page initial and comprehensive nursing

13 assessment.

14       And on the bottom -- so, in the middle of

15 the document, bottom half of the document, what does

16 it say under --

17       THE COURT:  Excuse me, Mr. Christie, what is

18 the Bates page number for the record?

19       MR. CHRISTIE:  Page 5212 of Defendant's

20 Exhibit 528-A.

21       THE COURT:  Thank you.

22 Q.   (By Mr. Christie)  What does this document say

23 under cardiac-related pain?

24 A.   Patient has episodes of chest pain and shortness

25 of breath.  Blood pressure medicines and sublingual

1   Nitroglycerine, one administered to control episodes.

2   Q.   Then what does it say under edema location?

3   A.   She has two plus edema to bilateral lower

4   extremities.

5   Q.   And if we could go to Page 8 of this same

6   initial and comprehensive nursing assessment, which

7   is Page 5215 of Defendant's Exhibit 528-A.

8        If you could read what it says under the

9   nursing narrative.

10       MS. TAPIE:  Excuse me, I'm sorry, that page

11  must be missing from our copy.

12       MR. CHRISTIE:  Page 5215 of Defendant's

13  Exhibit 528-A.  It's Page 8 of an eight-page

14  document.

15       MS. TAPIE:  Thank you.  I'm sorry.

16  A.   Primary caregiver reports that patient did have

17  an exacerbation and suffered from a stroke upon

18  entering the hospital.

19       Patient still is having episodes of chest

20  pain and shortness of breath.  Patient is doing

21  better but is weak, and it has become harder for her

22  to ambulate throughout the house due to weakness and

23  shortness of breath with exertion.

24       Patient is sitting in a recliner in the

25  living room.  Patient has oxygen applied by nasal

1  cannula.  Patient is weak and gets short of breath

2  while trying to sit up in the chair.

3          Breath sounds are decreased in the bases

4  bilaterally.  Patient certainly -- currently has room

5  air saturation at 94 percent.  Patient does have two

6  plus edema to the bilateral lower extremity.  Patient

7  is weaker after her last episodes of chest pain

8  accompanied by a stroke.

9          Patient has no skin breakdown at this time.

10  Patient has no complaints of pain.  Patient does have

11  to rest frequently while moving throughout the house

12  to catch her breath.

13          Her ejection fraction was estimated at 16

14  percent per the hospital records.

15          Will continue to consult with the primary

16  caregiver to manage plan of care.

17  Q.  What does this initial and comprehensive nursing

18  assessment tell you, if anything, about the condition

19  and the overall picture of Lennie D. at the time she

20  was admitted to hospice?

21  A.  We can't just look at one organ.  We have to

22  look at the whole system.

23          And in looking at the whole system, when she

24  develops chest pain and when she gets short of

25  breath, so she's having a decrease in her cardiac

1   output, which has actually affected her brain, so

2   she's had a stroke as a result.

3         So, on the previous, we saw that when she

4   had her chest pain and shortness of breath, she would

5   get slurred speech.

6         Having all of this on her, I'm not sure that

7   we have the luxury of time for her to recover from

8   this last event.  This is how sick she is.

9   Q.   All right.  Dr. Melvin, if you could look at

10  Page 6066 of Defendant's Exhibit 528-A.

11         Tell us what the date of this document is up

12  on the upper right.

13  A.   11/22/10.

14  Q.   What type of document is this?

15  A.   A nursing clinical note.

16  Q.   If we could go to Page 3 of this nursing

17  clinical note, which is Bates Page 6068 in

18  Defendant's Exhibit 528-A.

19         If you could read what it says under nursing

20  narrative.

21  A.   Primary caregiver reports the patient had an

22  episode of shortness of breath and chest pain.  The

23  primary caregiver administered sublingual

24  Nitroglycerine times three.

25         Patient is sitting in a chair at the table.

1  Vital signs are stable.  Patient has no complaint of
2  shortness of breath or chest pain at this time.
3       Patient states this had all been alleviated
4  with the sublingual Nitroglycerine.  Patient is still
5  anxious at times.  Breath sounds are decreased in the
6  bases bilaterally.
7       Patient has two plus edema to the bilateral
8  lower extremities and decreased circulation to the
9  bilateral lower extremities.
10      Patient has decreased appetite due to
11  swelling in her mouth and also pain in her mouth due
12  to thrush.
13  Q.   What is thrush?
14  A.   Thrush is a yeast infection, fungal infection,
15  in the mouth.  If someone becomes immunocompromised,
16  their immune system is low, or if they have had
17  antibiotics.
18      Patient takes frequent rests every five to
19  ten words and every five to seven steps to catch her
20  breath.  Patient requires assist device for
21  ambulation.  Patient was instructed to take 50
22  milligrams of Benadryl orally every six hours to help
23  alleviate the swelling to the mouth and Nystatin was
24  called into the pharmacy to treat the thrush.
25      Primary caregiver verbalizes understanding

1   of how to administer medicine and will continue to

2   consult with the primary caregiver to manage the plan

3   of care.

4   Q.   Dr. Melvin, if you could look at Page 5877 of

5   Defendant's Exhibit 528-A.

6         What is the date in the upper right-hand

7   corner?

8   A.   May 4, 2011.

9   Q.   What type of document is this?

10  A.   Nursing clinical note.

11        MS. TAPIE:  From that page, can the witness

12  read what's next to cardiopulmonary and assistance

13  screening on that first page?

14        THE COURT:  On this page?

15        MS. TAPIE:  Yes, Your Honor.

16  Q.  (By Mr. Christie)  Could you read, please, what

17  it says under cardiopulmonary, two-thirds of the way

18  down the page?

19  A.   Cardiac-related pain on this visit, there was

20  none.

21        MS. TAPIE:  And the shortness of breath as

22  well.

23  Q.  (By Mr. Christie)  What does it say under

24  dyspnea?

25  A.   Shortness of breath was none.

1   Q.   If we could go to Page 3 of this clinical

2   nursing note, Page 5879 of Defendant's Exhibit 528-A.

3          If you could read the nursing narrative.

4   A.   Caregiver reports patient complains of right

5   shoulder pain on and off radiating down back and leg.

6   At present, patient rates pain at a two.  Patient

7   ambulates from the bathroom, has to rest after six to

8   eight steps.

9          Respiratory rate increases to 24 for five to

10  ten minutes and patient is unable to speak due to

11  shortness of breath for five minutes.

12         Lungs are clear to auscultation.  02 sat is

13  96 percent on room air.

14         Caregiver also reports patient had a crying

15  spell Monday and two shortness of breath/anxiety

16  spells on Tuesday requiring Xanax and oxygen for five

17  to six hours before recovering from it.

18         Continue to discuss disease process,

19  increasing shortness of breath episode.

20  Q.   Dr. Melvin, I would like for you to look at Page

21  4908 of Defendant's Exhibit 528-B.

22         It's Bates Page 4908 of Defendant's Exhibit

23  528-B.

24         What is the date under -- next to where it

25  says, effective date of change or status reported

1  below?

2  A.   It's August the 13th of 2011.

3  Q.   What does this document say under -- next to

4  hospitalized for non-related diagnosis?

5  A.   Possible CVA.  The hospital or the facility is a

6  non-contracted facility.

7  Q.   What difference does it make if it's a

8  contracted or non-contracted hospital from the

9  hospice's perspective and the patient's perspective?

10         MS. TAPIE:  Objection to relevance.

11         THE COURT:  Overruled.

12  A.   So, one of the -- of many guidelines with

13  hospice is that we have a contract with any facility

14  that our patients will receive services for.  We have

15  to have a contract with physical therapy.  We have to

16  have a contract with occupational therapy when they

17  come into the home.  If a patient goes into the

18  hospital, in order for us to continue to follow that

19  patient, we have to have a contract with that

20  facility.

21  Q.   There's a check box on the bottom, towards the

22  bottom two-thirds of the page, what is under patient

23  revoked hospice benefit due to -- what box is checked

24  there?

25  A.   A non-contracted facility.

1    Q.   Again, what is the date at the bottom of this

2    document?

3            THE COURT:  Dr. Melvin, if AseraCare had had

4    a contract with this hospital where Ms. Lennie went,

5    what would have been different, if anything?

6            THE WITNESS:  I can tell you how Hospice of

7    Chattanooga handles it.  We would have continued to

8    follow that patient within that facility and worked

9    with the admitting physician, making sure that that

10   plan of care that had been started was carried

11   through and updated.

12           THE COURT:  Would the patient then have been

13   removed from hospice during that hospice stay?

14           THE WITNESS:  If that organization had a

15   contract with that hospital, no.

16           THE COURT:  So, going to the hospital for

17   some -- would it be acute issue?

18           THE WITNESS:  Uh-huh.

19           THE COURT:  Would not mean that the patient

20   had to automatically be removed from hospice.

21           THE WITNESS:  No, no.  Can I?  So then

22   Medicare says, is this related to the terminal

23   illness or is it not related.  It makes it a little

24   bit more confusing from a billing standpoint.

25           THE COURT:  I don't think we want to get

1    into all that billing stuff.

2            THE WITNESS:  That's fine.  Yeah, we would

3    follow.

4    Q.   (By Mr. Christie)  Who makes the choice whether

5    to go to a contracted hospital or a non-contracted

6    hospital?

7    A.   When we're taking care of patients and they get

8    sick or something happens that's out of the ordinary,

9    they will usually go back to kind of where they've

10   been before, and it may not necessarily be a facility

11   that's related -- I mean, that they have a contract

12   with.

13           Ideally, you would like them to go to a

14   facility that you have a contract with, but in the

15   heat of the moment, patients and families will react.

16   And depending upon where you were -- where the

17   services are provided, you know, if you're located

18   with your central office here and they live over

19   there, they're going to go to their community.

20           THE COURT:  So, Doctor, who chooses which

21   hospital the patient goes to?

22           THE WITNESS:  The patient does, it's the

23   patient and family's choice.

24   Q.   (By Mr. Christie)  Dr. Melvin, if you could look

25   at Page 4927 of Defendant's Exhibit 528-A.

1           What is the date at the top of this

2   document?

3   A.   It's September the 26th of 2011.

4   Q.   And what's the title of the document?

5   A.   It's a discharge summary.

6   Q.   What does the document say toward the top on the

7   left-hand side about reason for discharge?

8   A.   Death and the patient was able to die at home.

9   Q.   If you could, please, read what it says under

10  summary of care.

11  A.   Patient had a stroke, then readmitted on 8/22/11

12  and was bedbound for two to three days, then became

13  alert and oriented to name and the caregiver -- to

14  name.

15          Caregiver got patient up to the wheelchair,

16  patient began to eat and take PO meds again.

17          Then patient became responsive after several

18  weeks requiring liquid meds due to difficulty

19  swallowing.

20          Patient became extremely anxious as the

21  patient began to become alert again and was up and

22  down for one week, then the patient expired on

23  9/29/11 with the granddaughter present when the CNA

24  arrived for her visit.

25  Q.   What, if anything, did the facts that we have

1   highlighted in the documents reviewed tell you about

2   the overall picture of Lennie D.'s hospice

3   eligibility during the time she received hospice

4   services?

5   A.   Ms. Lennie was hospice eligible at the time of

6   admission and Ms. Lennie continued to be hospice

7   eligible until her death.

8           Given her weakened heart, her ongoing chest

9   pain, with shortness of breath, her difficulty in

10  swallowing, development of the thrush were the

11  reasons that she continued to be hospice eligible.

12  Q.   In reaching your opinions about Ms. Lennie D.,

13  did you rely only on the medical records that we've

14  reviewed here today?

15  A.   No.

16  Q.   What else did you rely on?

17  A.   I looked at all of Ms. Lennie's records.

18  Q.   And were the other medical records overall

19  consistent with the opinions you've given here today?

20  A.   Yes, they were.

21  Q.   Dr. Melvin, did you have an opportunity to

22  review the medical records for Robert G.?

23  A.   Yes, I did.

24  Q.   What was Robert G.'s age at the time that he was

25  admitted to hospice?

5973

1   A.   Mr. Robert was 81 years old.

2          MR. CHRISTIE:   Robert G. is Tab 102.   And

3   his medical records have been pre-admitted

4   Defendant's Exhibit 541, 541-A and 541-B.

5          When was Mr. Robert G. admitted to hospice?

6   A.   April the 26th of 2010.

7   Q.   And until what date did he receive hospice

8   services?

9   A.   October the 22nd of 2011.

10  Q.   Have you reached a conclusion as to whether or

11  not Mr. Robert G., at the time of hospice admission,

12  had a prognosis of six months or less, if his illness

13  followed its normal course?

14  A.   I do.  I felt Mr. Robert was hospice eligible at

15  the time of his admission.

16  Q.   And why did you reach that opinion?

17  A.   Mr. Robert was admitted with a diagnosis of

18  congestive heart failure.  He had coronary artery

19  disease, dementia, hypertension.  He was requiring

20  more activities for his functional status.  He would

21  have periods of confusion with agitation, increasing

22  upper and lower extremity edema and became more

23  symptomatic as a result of his disease.  And these

24  were the reasons that Mr. Robert was hospice

25  eligible.

1   Q.   Have you reached a conclusion as to whether or

2   not Mr. Robert G., throughout the time he received

3   hospice services, had a prognosis of six months or

4   less, if his illness ran its normal course?

5   A.   Yes, I do.   And I feel that Mr. Robert continued

6   to be hospice eligible.

7   Q.   Why did you reach that opinion?

8   A.   Because his symptoms continued with his

9   shortness of breath, swelling, he became incontinent

10  of bowel and bladder, increasing fatigue with

11  confusion, falls, despite getting the medicine to get

12  rid of extra fluid were the reasons that Mr. Robert

13  continued to be hospice eligible.

14  Q.   And what was the reason hospice services for

15  Mr. Robert G. ended?

16  A.   I believe he died.

17  Q.   If you could look at Page 8506 of Defendant's

18  Exhibit 541-A.

19          What is the date of this document at the top

20  right?

21  A.   It's April 26th of 2010.

22  Q.   What is the title of this document?

23  A.   It's an initial and comprehensive nursing

24  assessment.

25  Q.   What is Mr. Robert G.'s age?

5975

1   A.   He's 81 years old.

2   Q.   And what is the diagnosis?

3   A.   Congestive heart failure.

4   Q.   What does this document say under illness

5   trajectory and reason for hospice admission?

6   A.   81 year old male with congestive heart failure,

7   comorbids of hypertension, pacemaker, coronary artery

8   disease, dementia, increased need for assistance with

9   activities of daily living, increased confusion at

10  times.

11  Q.   And what does it say there under subjective

12  data?

13  A.   Patient requires assistance with ADLs, patient

14  is confused with increasing periods of agitation.

15  Q.   And what does it say under objective data?

16  A.   One plus edema bilateral upper and lower

17  extremities.  Continent of bowel and bladder.  Bed to

18  chair.  Patient anxious.  Shortness of breath with

19  exertion.

20  Q.   What does this say under desired outcomes in the

21  middle of the page?

22  A.   Palliative care for end of life.

23  Q.   If we could go to Page 4 of this initial

24  assessment, which would be Bates Page 8509 of

25  Defendant's Exhibit 541-A.

1          Could you read the initial nursing narrative

2    that is on this page?

3    A.   Admitted to the services of AseraCare Hospice is

4    an 81 year old man with congestive heart failure

5    under the orders of Dr. Kurtts.  Patient complains,

6    alert and oriented with periods of confusion.

7          Patient reports shortness of breath five out

8    of ten, but refuses often -- offer of supplemental

9    oxygen.

10          One plus edema noted to bilateral upper and

11   lower extremities.  Patient with yeast infection in

12   the groin.  Lungs are diminished.  Trace edema to the

13   face.  Ectopia eyelid to the left eye.  Excoriation

14   skin to the left eye, cheek area.

15          Patient reports periods of insomnia.

16   History of skin cancer to the face.  Poor skin

17   turgor.

18          Patient requires increased assistance with

19   ADLs.  Patient is bed to chair.  Can assist with

20   transfer.  Patient is continent of bowel and bladder.

21   Has increasing shortness of breath with exertion.

22   Unable to perform physical activities or self ADL.

23          Continue edema despite diuretic therapy.

24   Patient complains of tightness in the chest daily and

25   periods of exacerbation with edema to the

1   extremities.

2           Medication for cardiac-related needs include

3   aspirin, Coreg, Sular, Imdur, Catapres, hydralazine

4   or hydrochlorothiazide.

5           Patient is controlled with current regime.

6   Immediate needs identified.  Noted to admit orders.

7   IDG notified of admit.  Collaborated with hospice MD,

8   attending MD, long-term care staff and IDG to the

9   plan of care.  Disciplines to follow with assessment

10  for further needs.

11  Q.  What do the facts highlighted in this initial

12  comprehensive nursing assessment tell you about

13  Mr. Robert G.'s hospice eligibility at the time he

14  was admitted to hospice?

15  A.  He was eligible.  Mr. Robert was symptomatic

16  with any movement --

17          THE COURT:  What do you mean symptomatic

18  with movement?

19          THE WITNESS:  He was having shortness of

20  breath when he got up to move.  When you look at this

21  and he has the yeast, although he's continent of

22  bowel and bladder, because he gets so short of breath

23  to get up and move, may be the reasons that he has

24  the yeast there in the groin.

25          He is needing more assistance with his just

1  physical activity.  He's having symptoms of chest

2  pain, shortness of breath.

3  Q.  Dr. Melvin, if you could look at Page 8448 of

4  Defendant's Exhibit 541-A.

5       What is the date at the upper right-hand

6  corner of this document?

7  A.  It's June 22nd, 2010.

8  Q.  What's the title of this document?

9  A.  It's a nursing clinical note.

10  Q.  And what does this document say under vital

11  signs?

12  A.  He has a low grade temp, 99.3.  Pulse is 94.

13  His respiratory rate is 33, which is high.  His sat

14  is 92.  Blood pressure is 130/80.  Although the lung

15  sounds are clear, he has diminished in the left lower

16  lobe.

17  Q.  If we go to Page 3 --

18       MS. TAPIE:  For completeness, could the

19  witness read the cardiopulmonary section in the

20  symptom screening on that same page?

21  Q.  (By Mr. Christie)  If you could read what boxes

22  are checked next to cardiopulmonary, please.

23  A.  Dyspnea, shortness of breath, is checked as

24  none.  And then cardiac-related pain is checked as

25  none.

1   Q.   And if we could go to Page 3, which is Bates

2   Page 8450 of Defendant's Exhibit 541-A.

3          If you could read the nursing clinical note,

4   please.

5   A.   Received a call from GL staff reporting patient

6   had been hard to arouse, unresponsive, shaking and

7   uncooperative around 7:00 p.m.  Staff reports patient

8   not responding as usual.

9          8:56 p.m., patient is up in a wheelchair

10  alert to self.  Denies any pain.  Respirations even

11  and unlabored.  Patient complains of being cold.

12  Staff reports this is normal for him.

13         Patient pants wet, smells like urine.  Staff

14  reported patient incontinent of bowel and bladder

15  times one around 7:00 p.m. this shift.

16         Staff reported this is unusual for the

17  patient.  Patient not following commands

18  appropriately.  Instructed patient that he should get

19  into bed for rest.  Patient responded okay but then

20  looked down at the floor unable to complete the

21  command.

22         His pupils were equally round and reactive

23  to light bilaterally.  Grips bilaterally were weak

24  but equal.  Patient appeared anxious.

25         Staff gave a PRN Valium but held other

1    psychotropic drugs tonight, due to the patient's

2    increased lethargy earlier in the shift.

3            Notified Dr. Kurtts of patient's condition.

4    9:50 p.m.  Received new orders.  Notified the primary

5    caregiver, Cindy, of the patient's condition and MD

6    orders.

7            Cindy expressed she did not feel comfortable

8    making a decision concerning patient's health status.

9            THE COURT:  Who is Cindy?

10           THE WITNESS:  I would have to go back

11   through the records and look.

12   Q.   (By Mr. Christie)  Actually, if you look up

13   above, it says notified PCG Cindy.

14   A.   That's the primary caregiver.

15           THE COURT:  Okay.  Thank you.  I'm sorry I

16   just missed that.

17   Q.   (By Mr. Christie)  There where it says i.e.

18   sending --

19   A.   Sending patient to ER.  Informed the primary

20   caregiver on the MD orders.  Linda, primary

21   caregiver, reported let's do that and if any changes,

22   please let me know.

23           10:20 p.m., patient resting quietly with

24   eyes closed in the wheelchair.  Informed staff to

25   notify hospice of any changes.  Expressed

1  understanding.  Will continue to monitor and report

2  to the team in the a.m.

3          No distress noted at the time of departure.

4  Q.  How would you describe the situation that's

5  being discussed here in this nursing narrative?

6  A.  The patient, on the previous note we saw, had a

7  low grade temp and is having an episode of a change

8  in his mental status.  He has decreased breath sounds

9  in the left lower lung.  And I would expect he either

10 has an infection -- that he has an infection.

11 Q.  If we could go to Page 8217 of Defendant's

12 Exhibit 541-A.

13         If you could tell us what is the date at the

14 top of this document?

15 A.  It's January the 18th of 2011.

16 Q.  And what type of document is this?

17 A.  Nursing clinical note.

18 Q.  And if we could go to Page 3 of this document,

19 which is Bates Page 8219 of Defendant's Exhibit

20 541-A.

21         If you could read what this says in the

22 nursing narrative.

23 A.  Patient is up in the wheelchair oriented times

24 two with periods of confusion.  Patient denies pain.

25 Vital signs are stable with no signs and symptoms of

1  acute distress.  Sutures noted on the right earlobe
2  from biopsy on 1/17/11.
3       Patient continent of bowel and bladder, bed
4  to chair, transfers self, requires no assistance --
5  requires increasing assistance with ADLs.
6       Consumes 50 to 75 percent of meals.  Patient
7  with a 7.8 pound weight loss in a month.  Shortness
8  of breath at rest.  Lungs are diminished.  One place
9  edema to bilateral lower extremities.  NP cough.
10  Q.  Might that be non-productive?
11  A.  Non-productive cough.  Patient educated to
12  infection control principles, requires
13  re-enforcement, collaborated with long-term care
14  facility to the plan of care.
15  Q.  All right.  Dr. Melvin, if you could, please,
16  look at Page 7667 of Defendant's Exhibit 541-A.
17       What is the date of this document up at the
18  top right hand?
19  A.  It's October the 22nd of 2011.
20  Q.  What type of document is this?
21  A.  It's a discharge summary.
22  Q.  And what does it state under reasons for
23  discharge?
24  A.  Patient died in the nursing home.
25  Q.  What does this state under terminal diagnosis in

1  the middle of the page?

2  A.   Congestive heart failure.

3  Q.   What does this document say under summary of

4  care?

5  A.   Patient admitted with congestive heart failure,

6  comorbids of hypertension, diabetes.  Patient bed to

7  chairbound.  KPS 40.  Shortness of breath at rest and

8  with exertion.  02 at two liters per nasal cannula.

9  General decline in condition with increasing

10  shortness of breath and facial swelling.  Decrease in

11  appetite.  Increase in weakness.

12        On 10/21/11, decrease level of

13  consciousness.  Respiratory congestion, lung with

14  rales and rhonchi.  15 second periods of apnea.

15  Comfort measures initiated.

16        Roxanol and Atropine.  KPS is ten percent.

17  On 10/22, patient expired peacefully at GLC.

18        Pronounced at 6:45 a.m. per Dr. Kurtts.

19  Charles arrived at facility and coping appropriately

20  and very appreciative of services.

21  Q.   Dr. Melvin, what, if anything, did the facts

22  highlighted in the documents reviewed here tell you

23  about the overall picture of Mr. Robert G.'s hospice

24  eligibility at the time that he was receiving hospice

25  services?

1   A.   Mr. Robert was hospice eligible at admission and

2   he continued to be hospice eligible as we see he had

3   a progressive decline in his condition with his

4   shortness of breath, his increasing swelling, his

5   weight loss and those symptoms made Mr. Robert

6   eligible until his death, where it sounds like he

7   developed an infection.

8   Q.   Dr. Melvin, have you had the opportunity to read

9   the medical records of Ms. Nellie C.?

10  A.   I have.

11          MR. CHRISTIE:   I have several questions I

12  overlooked.

13          THE COURT:   Wait a minute.   I think we may

14  need a break.

15          MR. CHRISTIE:   Can I ask the wrap up

16  questions for Mr. Robert G.?

17          THE COURT:   Yes.

18  Q.   (By Mr. Christie)   In reaching your opinions as

19  to Mr. Robert G., did you rely only on the medical

20  records that we've looked at here today?

21  A.   No, I did not.

22  Q.   What else did you rely on?

23  A.   I looked at all of Mr. Robert's medical records.

24  Q.   Were the other medical records that you reviewed

25  consistent with the opinions that you've given here

1  today?

2  A.  Yes, it was.

3          MR. CHRISTIE:  Thank you.

4          THE COURT:  Now we will take a break.  We

5  will come back at 10:50.

6          During that break, as during all others, no

7  conversation about the case and don't let anybody

8  talk to you about it.  Thanks.

9                      (Jury excused).

10          THE COURT:  It looks like we've got another

11  love note.

12                      (Off the record.)

13                      (Break taken.)

14              (Open court.  Jury present.)

15          THE COURT:  Mr. Christie, you may proceed.

16  Q.  (By Mr. Christie)  Dr. Melvin, have you reviewed

17  the medical records of Ms. Nellie C.?

18  A.  Yes, I have.

19          MR. CHRISTIE:  Nellie C. is Tab 93 and

20  Defendant's Exhibit 519 has been pre-admitted as well

21  as Defendant's Exhibit 519-A and Defendant's Exhibit

22  519-B.

23  Q.  What was Nellie C.'s age at the time she was

24  admitted to hospice?

25  A.  Ms. Nellie was 74 years old.

1  Q.   And what date was she admitted?

2  A.   October the 10th of '07.

3  Q.   Until what date did Ms. Nellie C. receive

4  hospice services?

5  A.   April 1st of '09.

6  Q.   Have you reached a conclusion as to whether or

7  not Nellie C., at the time of hospice admission, had

8  a prognosis of six months or less, if her illness ran

9  its normal course?

10 A.   Yes.  I felt that Ms. Nellie was hospice

11 eligible at the time of admission.

12 Q.   Why did you reach that opinion?

13 A.   Ms. Nellie had heart disease, diabetes,

14 nephropathy, hypertension and Ms. Nellie was having

15 shortness of breath on exertion, unsteady gait.  She

16 refused to take Nitroglycerine and continued to have

17 edema in her lower extremities were the reasons that

18 I felt she was eligible at the time of admission.

19 Q.   Dr. Melvin, have you reached a conclusion as to

20 whether or not Ms. Nellie C., throughout the time she

21 received hospice services, had a prognosis of six

22 months or less, if her illness ran its normal course?

23 A.   Yes.  I felt that Ms. Nellie was hospice

24 eligible throughout her stay with hospice.

25 Q.   And why did you reach that opinion?

5987

1  A.   Based on her ongoing episodes of chest pain and

2  shortness of breath, her fatigue.  Because her

3  symptoms became so much for her, she finally agreed

4  for oxygen.  Her lower extremity edema, chest pain

5  along with her comorbids are the reasons Ms. Nellie

6  continued to be hospice eligible throughout her stay.

7  Q.   What was the reason hospice services for

8  Ms. Nellie C. ended?

9  A.   Extended prognosis.

10  Q.   If you could look at Page 5046 of Defendant's

11  Exhibit 519-A.

12          What's the date of this document?

13  A.   October 10th of '07.

14  Q.   What is the title of this document?

15  A.   It's an initial nursing assessment.

16  Q.   And what's the age that is shown there?

17  A.   74.

18  Q.   What's the diagnosis?

19  A.   Heart disease.

20  Q.   If you could go to the fifth page of this

21  initial nursing assessment, which is Bates Page 5050

22  of Defendant's Exhibit 519-A.

23          Could you read the initial nursing

24  assessment summary of terminal condition that's on

25  that page?

A.   Admitted 74 year old white with diagnosis of
heart disease with comorbids of type II diabetes with
nephropathy and neuropathy.   Hyperlipidemia including
significant hypertriglyceridemia.   Hypertension.
History of peptic ulcer disease with an upper GI
bleed in the past.

        History of an AV block with a PR interval of
310 milliseconds.   B12 deficiency.   Mild
hypercalcemia.

        Upon initial assessment, patient was noted
to have generalized edema, two plus bilateral lower
extremity edema.   Also noted hand edema.   Gait was
unsteady, noted while ambulating.

        Patient complained of feeling tired and
weak.   Patient stated that she takes a lot of
medicine, but not sure about the names of them.

        Patient's husband who has a diagnosis of
dementia has been filling her med planner.

        Blood pressure was slightly elevated.
Assessment and patient states that patient does not
know if she has had her medications in the last two
days.

        Patient's granddaughter was present during
the assessment and encouraged her to help monitor
medications.   Skill nurse will set up the medications

1    on a weekly basis for safety.

2    Q.   What is neuropathy?

3    A.   It's when you have a decrease in sensation to

4    the extremities.  So, it feels kind of numb, tingly

5    and would be a side effect of decreased blood flow or

6    abnormal blood sugars that can cause that.  It can

7    also cause the heart disease as well.

8    Q.   What is nephropathy?

9    A.   The nephropathy is renal or kidney failure as it

10   relates to -- it's kidney failure.

11            And in this particular case, given her heart

12   disease, her history of hypertension with the

13   increased lipids and the diabetes, all of those can

14   cause her kidneys to fail.

15   Q.   And you mentioned increased lipids.  Is that

16   what hyperlipidemia or what is hyperlipidemia?

17   A.   So hyperlipidemia and the hypertriglyceridemia

18   is when your cholesterols are elevated.  So your

19   cholesterol, your LDL, HDL, triglycerides and that's

20   bad fat that can make plaque form within the arteries

21   of the heart, the kidneys and the lower extremities

22   that contribute to the renal and the nerve damage.

23   Q.   What, if anything, did the facts reviewed in

24   these documents told you about the overall picture of

25   Ms. Nellie C.'s hospice eligibility at the time she

1  was admitted to hospice?

2  A.  Ms. Nellie with a diagnosis of heart disease

3  with symptoms of edema and comorbids was hospice

4  eligible.

5  Q.  If you could, look at Page 5073 of Defendant's

6  Exhibit 519-A.

7        Tell me what is the date that is at the top

8  of this document.

9  A.  October --

10 Q.  On the right-hand side.

11 A.  June the 4th of '08.

12 Q.  And what type of document is this?

13 A.  It's a scheduled IDT conference and review

14 update of the plan of care.

15 Q.  Could you read what it says under IDT members

16 goals, focus or update of POC -- what is PCO?

17 A.  The plan of care.

18 Q.  Can you tell me what it says there next to RN?

19 A.  Can you move the -- thank you.

20        Patient is a 75 year old with heart disease.

21 Home health aide is three times a week.  RN two times

22 a week.  Patient is short of breath at rest.  Worsens

23 with activity.  Patient complains of being tired.

24 Hip hurts, pressure in chest.

25 Q.  And below that summary, it says, summary of

1  patient appropriateness, could you read what that

2  says?

3  A.   Patient with heart disease, patient short of

4  breath at rest, made worth with ambulation or

5  activities.  Patient uses oxygen at night to sleep.

6  Refuses pain meds or nitrates.

7  Q.   If you could look at Page 4999 for Defendant's

8  Exhibit 519-A.

9           At the bottom of the document, what is the

10 date of this document?

11 A.   December the 15th of '08.

12 Q.   And what type of document is this?

13 A.   It's a reassessment for ongoing eligibility.

14 Q.   If we could go to the fifth page of this

15 reassessment document.

16          MS. TAPIE:  For completeness, can the

17 witness read the circulatory status and respiratory

18 status on that first page?

19          THE COURT:  All right.

20          THE WITNESS:  So, patient is -- breath

21 sounds are clear.  She requires two liters -- she's

22 on two liters of oxygen as needed.  She becomes short

23 of breath walking and talking.  Her respiratory rate

24 is labored and she has purse lipped breathing.

25 Q.   (By Mr. Christie)  Can you read also what it

1   says under the circulatory status, please?

2   A.   Her heart is irregular.   She has edema of the

3   left lower extremity.   She gets short of breath on

4   walking and talking.

5   Q.   If you could go to the fifth page of this

6   document, which is Page 5003 of Defendant's Exhibit

7   519-A.

8        If you could read the summary of terminal

9   condition that's on that page, please.

10  A.   Patient admitted with heart disease.   Has

11  decreased endurance.   Fatigue just talking.   Has

12  shortness of breath at rest.   Increases slightly with

13  exertion.   Lung sounds are clear bilaterally.

14  Respiratory rate is 24 and labored.

15       Patient encouraged to use PRN oxygen for

16  shortness of breath.   Patient's heart rate is

17  irregular.   She has trace edema in the left lower

18  extremity.

19       Patient reports having occasional chest

20  pain.   States it only lasts a few minutes.   Refuses

21  to take Nitro.

22       Reports having increasing pain in the right

23  shoulder.   Takes Tylenol PRN.   Refuses strong pain

24  medicine.   Requires assistance with ADLs.   Secondary

25  shortness of breath.   She requires assistance with

1  her ADL because of shortness of breath and fatigue.

2  Q.   Dr. Melvin, if you could look at Page 4979 of

3  Defendant's Exhibit 519-A.

4         And at the bottom of the document, could you

5  tell me what the date of this document is?

6  A.   It's February the 16th of '09.

7  Q.   And what is the title of this document?

8  A.   It's a reassessment for ongoing eligibility.

9  Q.   And if we could go to Page 5 of this document

10  which is Page 4983 of Defendant's Exhibit 519-A.

11         If you could read the summary that's on that

12  page, please.

13  A.   Patient admitted with heart disease, continues

14  with shortness of breath with minimal exertion.

15  Reports being unable to carry on conversations

16  secondary to shortness of breath.  Using oxygen at

17  night and as needed during the day.  Has episodes of

18  chest pain two times a week.  Refuses to take

19  Nitroglycerine.  Has frequent pain in the right

20  shoulder with movement of the right arm.  No pain at

21  rest.

22         Patient continues with physical therapy

23  three times a week.  Hydrotherapy.  Refuses pain

24  medicine.

25         Respiratory rate is 30 which is down and

1  it's non-labored.  Heart rate 74 and irregular.

2  Trace edema to the bilateral lower extremities.

3  Lungs are clear.

4  Q.   What, if anything, have the documents reviewed

5  tell you about the overall picture of Nellie C.'s

6  hospice eligibility during the time she received

7  hospice services?

8  A.   Ms. Nellie was hospice eligible on admission and

9  she continued to be hospice eligible.  With hospice,

10  the plan of care is going to include what those

11  things a patient wants and doesn't want.  We respect

12  their autonomy.

13        So, in this lady's case, she did not want

14  oxygen and she did not want pain medicine and she did

15  not want Nitro.

16        She continued to be more symptomatic.  Her

17  symptoms were initially shortness of breath with

18  activity.  It became more that she had shortness of

19  breath at rest, with conversation, with activity that

20  impaired her ability to just do her daily activities

21  of daily living.

22        Her heart rate became irregular.  The purse

23  lipped breathing is patients that will put

24  (indicating) this extra blowing out that increases

25  the thoracic pressure so they can get a good breath

5995

1  in and to get that air out.  You see that with

2  patients that get real short of breath are reasons

3  why I think Ms. Nellie continued to be eligible

4  throughout her stay with us.

5  Q.   In reaching your opinions about Ms. Nellie C.,

6  did you rely only on the medical records that we've

7  reviewed here in court?

8  A.   No.

9  Q.   What else did you rely on?

10  A.   I looked at all of Ms. Nellie's medical records.

11  Q.   Were the other medical records overall

12  consistent with the opinions that you've given today?

13  A.   Yes.

14  Q.   Dr. Melvin, did you have an opportunity to

15  review the medical records of Michael B.?

16  A.   Yes.

17       MR. CHRISTIE:  Michael B. is Tab 88 and his

18  medical records were pre-admitted as Defendant's

19  Exhibit 516, 516-A and 516-B.

20  Q.   What was Michael B.'s age at the time that he

21  was admitted to hospice?

22  A.   Mr. Michael was 86 years old.

23  Q.   And when was Michael B. admitted to hospice?

24  A.   October the 26th of '07.

25  Q.   Until when did Mr. Michael B. receive hospice

1   services?

2   A.   April the 14th of '09.

3   Q.   Have you reached a conclusion as to whether or

4   not Mr. Michael B., at the time of the hospice

5   admission, had a prognosis of six months or less, if

6   his illness ran its normal course?

7   A.   Yes.  I did believe that Mr. Michael was hospice

8   eligible at the time of admission.

9   Q.   And why did you reach that opinion?

10  A.   Mr. Michael was admitted with coronary artery

11  disease.  He had experienced left-sided heart

12  failure, urinary tract infections, a pressure ulcer

13  in his mid spine.  He required oxygen because of his

14  shortness of breath and had an infection that

15  required antibiotics, in addition to his comorbids of

16  his COPD, his cardiac arrhythmia, his hyperlipidemia,

17  his dementia and his Parkinson's disease were reasons

18  that Mr. Michael was hospice eligible at the time of

19  his admission.

20  Q.   Dr. Melvin, have you reached a conclusion as to

21  whether or not Mr. Michael B., throughout the time he

22  was receiving hospice services, had a prognosis of

23  six months or less, if his illness ran its normal

24  course?

25  A.   Yes.  I did feel that Mr. Michael continued to

1  be hospice eligible throughout his hospice stay.

2  Q.   Why did you reach that opinion?

3  A.   The patient required adjustments in his fluid

4  medicine because of peripheral edema, became --

5           THE COURT:  What is that fluid medicine that

6  you're referring to?

7           THE WITNESS:  So, the fluid medicine or the

8  diuretic is Lasix.

9           THE COURT:  Thank you.

10          THE WITNESS:  You're welcome.

11          He would get increasing shortness of breath

12  and he started having symptoms with his lung disease,

13  the COPD, with some exacerbation.  Periods of

14  confusion.  He developed a pressure ulcer on his

15  bottom or a bed sore.

16          Increasing coughing, wheezing and fatigue.

17  The patient has episodes where hospitalization was

18  indicated, but the patient refused to go.  He became

19  more dependent in his activities of daily living.

20          He required more oxygen, became incontinent

21  of bladder, developed more infections were the

22  reasons that Mr. Michael continued to be eligible

23  throughout his stay.

24  Q.   What was the reason that Mr. Michael B.'s

25  hospice services ended?

1   A.   Extended prognosis.

2   Q.   If you could look at Page 6490 of Defendant's

3   Exhibit 516-A and to get a date for this, I'm going

4   to go to the second page.

5        Bates Page 6491 of Defendant's Exhibit

6   516-A.  What is the date at the bottom of this

7   document?

8   A.   October 26 of '07.

9   Q.   And at the bottom of this document under

10  supporting documentation, would you read what it

11  says?

12  A.   Patient is alert and verbal, oriented with

13  occasional confusion, extensive assist with ADLs.

14  Feeds self.  Appetite varies.  Continent of bowel and

15  bladder.  Ambulates with a walker and with one

16  assist.

17        Lung sounds are clear.  No edema.  Patient

18  also has diagnosis of congestive heart failure, COPD,

19  atrial fibrillation, ventricular ectomy, diabetes,

20  Parkinson's disease, advanced dementia, had quadruple

21  bypass in May of 2000.  Per family, patient's heart

22  stopped during kidney stone operation.  Shortness of

23  breath with exertion.

24  Q.   Based on your view of this document, what does

25  it tell you about the overall picture of

1    Mr. Michael's hospice eligibility at the time of

2    admission?

3    A.    That Mr. Michael was hospice eligible with a

4    number of comorbid conditions.

5    Q.    Dr. Melvin, if you could look at Page 6914 of

6    Defendant's Exhibit 516-A.

7             What is the date of this document?

8    A.    March 4th, '08.

9    Q.    What type of document is it?

10   A.    It's a nursing clinical note.

11   Q.    Could you please read the text under

12   problem/intervention/treatment?

13   A.    Diagnosis is coronary artery disease.  Patient

14   went to Percy Hospital, admitted with COPD.  Awake.

15   Disoriented to time and occurrences.  Verbal.  Came

16   to hospital with increasing shortness of breath and

17   coughing.  Increasing tremors of the hand and arms

18   noted that shakes the bed.

19             Patient eating lunch.  Short of breath with

20   exertion.  Lung sounds are coarse with rhonchi

21   wheezing, moist cough, abdomen soft, positive bowel

22   sounds.  Continent of bowel and bladder.  Positive

23   pedal pulses.  No edema.  Jobst stocking on.

24             Chart reviewed.  Patient on Levaquin 500

25   milligrams a day, IV and Solumedrol 600 milligrams

1  every eight hours.

2          Chest x-ray, early interstitial pulmonary

3  edema.

4  Q.   Can you tell us what interstitial pulmonary

5  edema is?

6  A.   It is where there's an accumulation of fluid

7  within the tissue of the lung.

8          We can see this with a patient going into

9  heart failure or you can see this when a patient is

10  having an exacerbation of their lung disease.

11          And it's hard sometimes to differentiate the

12  two.  Since they're so close together, they work

13  together.

14  Q.   And what does it say under progress towards goal

15  and outcomes?

16  A.   Monitor cardiopulmonary status, skin integrity,

17  nutritional status and emotional support.

18  Q.   Again, what's the date at the bottom of this

19  document?

20  A.   March 4th of '08.

21  Q.   If you could look at what is Page 6913 of

22  Defendant's Exhibit 516-A.

23          What's the date at the top of this document?

24  I'm sorry.  The date is at the bottom.  I'm sorry.

25  A.   It's March the 7th of '08.

1    Q.   And what type of document is this?

2    A.   It's a nursing clinical note.

3    Q.   And what does this document say under mobility?

4    A.   Out of bed to Geri chair with two assists.  So

5    it takes two people to get this man up.

6    Q.   What does this document say under

7    problem/intervention in the middle of the page?

8    A.   Diagnosis is coronary artery disease.  Patient

9    very agitated and restless.  States he has not slept

10   for four days.  Very upset with the daughter.

11            Patient flushed.  Tremors of upper

12   extremities.  Shortness of breath with agitation.

13            Instructing patient to breathe through nose

14   and out through mouth and to calm down.  Lung sounds,

15   wheezing with more cough, shortness of breath, 02 via

16   nasal cannula at two liters.  Abdomen is soft with

17   positive bowel sounds.

18            Appetite is fair.  Continent of bowel and

19   bladder.  Positive pedal pulses.  No edema.  Jobst

20   stockings on.  Something total care with ADL.  Feeds

21   self.  Able to make needs known.  Chart reviewed,

22   test results reviewed.

23   Q.   Positive pedal pulses, can you tell us what that

24   means, please?

25   A.   When you feel the pulses in the lower

1   extremities, that he had good blood flow.

2   Q.   If you can look at Page 6910 of Defendant's

3   Exhibit 516-A.

4          Can you tell us what is the date of this

5   document at the bottom?

6   A.   This is March 13, '08.

7   Q.   What type of note is this?

8   A.   This is a nursing clinical note.

9   Q.   What does this document say under wound

10  assessment?

11  A.   Area behind ear is healing.  Area middle of back

12  is healing.

13  Q.   And what does it say under

14  problem/intervention/treatment in this nursing

15  clinical note?

16  A.   Diagnosis is COPD.  Patient returns home from

17  the hospital last evening awake and verbal.  Numerous

18  bruises noted on the arm from blood draws and IV

19  site.

20         Discontinue or discharge instructions

21  reviewed, home health aide present.  Walked with

22  patient.  Gait steady with a walker.  No tremor

23  noted.  Lung sounds are diminished.  Moist cough.

24         Oxygen via nasal cannula at two liters.

25  Positive pedal pulse.  Slight edema or slight pedal

1   edema.  The Jobst stockings are on.  Area middle of

2   back is healing.

3             Calazime lotion applied.  Padding around ear

4   tubing to keep from rubbing ear.

5             THE COURT:  Is that padding around oxygen

6   tubing?

7             THE WITNESS:  Yes, ma'am.

8             The ears also healing.  Minimum shortness of

9   breath noted with ambulation or ambulating.

10  Q.  (By Mr. Christie)  If you could go to Page 6641

11  of Defendant's Exhibit 516-A.

12            What is the date at the bottom of this

13  document?

14            THE COURT:  Just a minute.  Can we go back

15  to that page just a second?  I wanted to clarify one

16  thing.

17            MR. CHRISTIE:  Page 6910 of Defendant's

18  Exhibit 516-A?

19            THE COURT:  Right.  Doctor, you read about

20  discharge instructions reviewed.

21            THE WITNESS:  Yes.

22            THE COURT:  Whose discharge instructions or

23  from where did the discharge instructions come that

24  are mentioned there?

25            THE WITNESS:  So, this patient's a veteran

1    and he developed some symptoms and went to the

2    hospital, so these are discharge summaries or

3    discharge instructions from the hospital back to the

4    hospice.

5            THE COURT:  I just wanted to be clear we

6    weren't talking about hospice discharge instructions.

7            THE WITNESS:  No.  The patient had some

8    symptoms, went to the VA hospital and now he's

9    returning back home.

10           THE COURT:  Okay.  And did he remain on

11   hospice care while he was at the VA hospital?

12           THE WITNESS:  Yes.

13           THE COURT:  Those are those notes that we

14   just were looking at prior to this?  Like a day or

15   two before?

16           THE WITNESS:  All of those are notes from

17   hospice.

18           THE COURT:  But was it hospice visits to him

19   while he was in the hospital?

20           THE WITNESS:  Yes, yes.

21           THE COURT:  I just wanted to clarify that.

22   Thank you.

23   Q.  (By Mr. Christie)  Just to be -- the document

24   we're looking at right now, what is the date of this

25   document?  The document that is Page 6910 of

1    Defendant's Exhibit 516-A.

2    A.   It's March the 13th of '08.

3    Q.   And we looked at an earlier document which was

4    Page 6914 of Defendant's Exhibit 516-A.

5         What is the date of this document?

6    A.   This was March the 4th of '08.

7    Q.   Just to make clear, what does this say in the

8    first line under problem/intervention/treatment?

9    A.   That he had gone into the hospital and he was

10   admitted with COPD.

11   Q.   If we could go now to Page 6641 of Defendant's

12   Exhibit 516-A.

13        What is the date of this document?

14   A.   This is August the 15th of '08.

15   Q.   And what's the title of the document?

16   A.   It's a nursing assessment.

17   Q.   And what does this document say under past

18   medical history?

19   A.   History of congestive heart failure, COPD,

20   hyperlipidemia, Parkinson's, diabetes and advanced

21   dementia.

22   Q.   What does this document say under others in

23   home?

24   A.   The patient has private caregivers in the home.

25   Q.   What does RTC tell you?

1  A.   It's around the clock.  So he's not being left

2  by himself in addition to having the hospice to come

3  in.

4  Q.   If we could go to the fifth page of this nursing

5  assessment, Page 6645 of Defendant's Exhibit 516-A.

6         What does this document say under

7  summary/problems/intervention?

8  A.   He has a diagnosis of coronary artery disease.

9  His PPS is 40.  Acuity med.  Patient is alert and

10  confused to time.  He is very weak.  He requires

11  complete care with ADLs and feeding.  His tremors

12  have increased to the upper extremities.

13         Has had increased shortness of breath having

14  to use 02 more often, more than 75 percent of the

15  time, at two to three liters nasal cannula.

16         Patient says his shortness of breath is

17  constant, even at rest.  When he transfers to chair

18  or ambulates ten feet, his respirations increase to

19  28 to 32 per minute and it takes him ten minutes to

20  recover.

21         On 8/12/08, he was taken via ambulance to

22  the hospital due to chest pain and shortness of

23  breath.  He was sent home after treatment because the

24  patient refused admission.

25         He was started on Prednisone 40 a day.  His

1   nebulized treatments were increased up to six a day.

2   His heart rate is weak and irregular, and he has two

3   plus edema to the right foot.

4           He continues -- he often has crackles to the

5   lung field.  He states that he has constant pain.

6   See pain assessment sheet.  He received oral Tylenol

7   PRN.

8           The RN caregiver is instructed to offer it

9   routinely when it's due.

10          So he's had a second emergency room visit

11  because of his symptoms of shortness of breath and

12  this time he refused to go in.

13  Q.  What are crackles?

14  A.  If you take your hair and you rub your hair

15  together over your ear is what crackles sound like

16  and it indicates fluid in the lung within the tissues

17  of the lung.

18  Q.  If we could go to Page 6602 of Defense Exhibit

19  516-A.

20          On the bottom of the document, can you tell

21  us what the date of this document is?

22  A.  This is December the 8th of '08.

23  Q.  And under others in home, what does this

24  document indicate?

25  A.  That the patient has 24-hour around the clock

1  caregivers.

2  Q.   If we could go to the fifth page of this

3  document, Page 6606 of Defendant's Exhibit 516-A.

4       If you could, read what it says under

5  summary/problems/intervention.

6  A.   Coronary artery disease, PPS is 40.   Acuity

7  meds.   Patient went to hospital on 11/28 due to low

8  grade temp.   Cough, increased shortness of breath and

9  decreased appetite.

10       He was found to have a UTI and was started

11  on Macrobid.

12       Then on 12/3, a PRN visit was made because

13  the patient was still not feeling well and had

14  increasing cough and shortness of breath.   Assessment

15  on that visit revealed lung sounds very coarse with

16  wheezing and the patient had a moist cough and

17  complained of feeling achy all over.

18       MD was notified and he was started on a

19  Z-pack.   Patient finished that on 12/7.

20       Visit was made to follow up with Z-pack and

21  check in on patient on 12/6 and that visit revealed

22  lung sounds decreased.   Pulse ox is 97 percent on

23  three liters and a good appetite.

24       Regular scheduled visit 12/8, patient had

25  good appetite.   Still had cough productive of

1  greenish sputum but lung sounds are not as coarse, no

2  wheezing, patient is on oxygen at three liters nasal

3  cannula.  Appetite is good at 100 percent.

4          Patient received PRN cough syrup and PRN

5  Tylenol.  Complete care with ADL.  Generalized

6  weakness.  Sleeping often, increased 50 percent of

7  the time.

8          Needs assistance with walker to ambulate.

9  Gate slow, shuffled-like and weak.

10          Continues continent and incontinent of bowel

11  and bladder.  Very confused at times, confused to

12  situations at times.  Hand tremor.  Needs assistance

13  with eating.

14          So he's had looks like four, five episodes

15  of an infection in a really short period of time.  As

16  a result, he's gotten weaker.  He's needing more help

17  with his care.

18  Q.  What, if anything, have the facts reviewed here

19  tell you about the overall picture of Mr. Michael

20  B.'s hospice eligibility while he received hospice

21  services?

22  A.   Mr. Michael was hospice eligible at the time of

23  admission.  He continued to be hospice eligible.  He

24  had both heart and lung disease.  He had progression

25  of both, as his functional status declined, had

1   urinary tract infections, his Parkinson's disease got

2   worse, that's the tremors.  He would go into some

3   failure, that's the crackles.  Actually went into the

4   hospital once, refused to go once, and then was

5   treated two other times at home.  And he continued to

6   be eligible through his stay.

7   Q.   In reaching your opinions, did you rely only on

8   the medical records that we reviewed today?

9   A.   No.

10   Q.   What else did you rely on?

11   A.   I looked at all of Mr. Michael's medical

12   records.

13   Q.   Were the other records for Mr. Michael B.

14   consistent with the opinions you've given today?

15   A.   Yes, they have.

16   Q.   Dr. Melvin, did you have the opportunity to

17   review the medical records of Ms. Agnes B.?

18   A.   Yes, I did.

19          MR. CHRISTIE:  Ms. Agnes B. is Tab 1 and her

20   medical records have been pre-admitted as Defendant's

21   Exhibit 514, 514-A and 514-B.

22          Dr. Melvin, what was Agnes B.'s age at the

23   time she was admitted to hospice?

24   A.   Ms. Agnes was 92 years old.

25   Q.   And on what date was she admitted?

6011

1   A.   March the 22nd of '07.

2   Q.   And until when was she provided hospice

3   services?

4   A.   April the 27th of '09.

5   Q.   Have you reached a conclusion as to whether or

6   not Ms. Agnes B., at the time of hospice admission,

7   had a prognosis of six months or less, if her illness

8   ran its normal course?

9   A.   Yes.  I felt that Ms. Agnes was hospice eligible

10  at the time of admission.

11  Q.   And why did you reach that opinion?

12  A.   Ms. Agnes was admitted with coronary artery

13  disease.  She had had comorbids of chronic heart

14  ischemia, so ongoing chest pain.  She had six

15  coronary arteries that were blocked and wasn't

16  treatable.  She had peripheral vascular disease,

17  history of GI bleed, hypertension.  She had episodes

18  of shortness of breath with chest pain and peripheral

19  edema were the basis that Ms. Agnes was hospice

20  eligible at the time of admission.

21  Q.   Dr. Melvin, have you reached a conclusion as to

22  whether or not Ms. Agnes B., throughout the time she

23  received hospice services, had a prognosis of six

24  months or less, if her illness followed its normal

25  course?

1   A.   Yes.  I did feel that Ms. Agnes continued to be

2   hospice eligible throughout her stay with hospice.

3   Q.   And why did you reach that opinion?

4   A.   It was based on the fact that she had some

5   pathology within the six vessels that could not be

6   corrected and she continued to have symptoms of chest

7   pain, shortness of breath, required more oxygen and a

8   decline in her functional status were the reasons for

9   her continuing to be hospice eligible throughout her

10  stay.

11  Q.   And what was the reason the hospice services for

12  Agnes B. ended?

13  A.   Extended prognosis.

14  Q.   Dr. Melvin, if you could look at Page 6756 of

15  Defendant's Exhibit 514-A.

16          What is the date at the bottom of that

17  document?

18  A.   March the 22nd of '07.

19  Q.   What type of document is this?

20  A.   It's a nursing assessment.

21  Q.   And what does this document say under history of

22  illness?

23  A.   Chronic ischemic heart disease, six coronary

24  blockages untreatable.  Coronary artery disease.

25  Q.   What does this document say under past medical

1    history?

2    A.    Peripheral vascular disease, uterine fibroid,

3    hypothyroidism -- thyroidectomy, fractured wrist,

4    hypertension, GI bleed as a result of about

5    anti-calculation, chronic renal insufficiency, anemia

6    and osteoporosis.

7    Q.    If you could, let's go to Page 5 of --

8           THE COURT:  Before we leave that, Doctor,

9    could you explain to me about the six coronary

10   blockages that were untreatable, what that means?  I

11   think we oftentimes hear about blockages, but I'm not

12   sure I fully understand what that means.

13          THE WITNESS:  So with the heart, in order

14   for the heart to survive, it has to have blood flow.

15   And the coronary arteries are pipes that are going to

16   feed and give nourishment to the heart.

17          This little lady had six of her pipes

18   blocked.  So the treatment normally would be to go in

19   and do a bypass so that she could have better supply

20   for her pump.  But in her case, she has the blockages

21   and she could not -- or it was not treatable.

22          And so that means that she's still going to

23   get up and work and she's still going to do her

24   thing, but as her demand for her heart, as she's

25   moving, is needed, her heart is not going to be able

1  to meet that need and she'll have pain in her chest

2  that will make her short of breath, that will make

3  her have more edema, and then gets a little confused

4  and then she has more weakness and then it becomes a

5  cycle.

6          THE COURT:  Thank you.

7  Q.  (By Mr. Christie)  Dr. Melvin, if you could look

8  at the fifth page of this nursing assessment, Page

9  6760 of Defendant's Exhibit 514-A.

10          If you could read what it says under

11  summary/problems/intervention.

12  A.  92 year old white Catholic female with ischemic

13  heart disease, peripheral vascular disease, six

14  coronary artery blockages unable to be treated.

15  History of chronic renal insufficiency, anemia,

16  hypertension, uterine fibroid, thyroidectomy, GI

17  bleed related to anti-coagulation, hypertension,

18  anemia, osteoporosis.  Lives alone.  Ambulates with

19  minimal assistance.

20          Family concerns for safety.  Increased

21  shortness of breath with any exertion.  Shortness of

22  breath at rest.

23          Nail beds are dusky.  Lungs are clear.

24  Grunts when exhaling.

25          Two plus pitting edema to the ankle.

1    Occasional discomfort to the left shoulder/chest with
2    exertion.
3    Q.   These six coronary artery blockages, does that
4    lead to damage to the heart?
5    A.   People die from that.  People have -- they will
6    have a heart attack.  Yes.
7    Q.   Based on --
8         MS. TAPIE:  For completeness, for that last
9    page, could the witness read the physical assessment
10   at the top and then also the care coordination at the
11   bottom?
12        THE WITNESS:  So the care coordination at
13   the bottom, diagnosis is coronary artery disease.
14   PPS of 60.  Acuity low.  Home health aide assigned
15   and complete.  DME, assess for bathtub assistance.
16   Q.   (By Mr. Christie)  And at the top of the page,
17   would you tell us what it indicates under physical
18   assessment?
19   A.   Uh-huh.  So, at 92, she is independent for her
20   bed activity, her transfer, her ambulation, her
21   toiletry, her bedding and personal, dressing, eating
22   and feeding, meal prep, laundry, house management.
23   She does require some assistance to shop.
24        Independent, using a phone, handling her
25   money, and she's unable to drive.

1   Q.   Dr. Melvin, if you would look at Page 6842 of

2   Defendant's Exhibit 514-A.

3            What is the date at the bottom of this

4   document?

5   A.   This is June the 6th, '07.

6   Q.   What type of document is this?

7   A.   It's a nursing assessment.

8   Q.   And if we could go to the fifth page of this

9   document, which is Page 66 -- I'm sorry, 6846 of

10  Defendant's Exhibit 514-A.

11           If you could read what this document says

12  under summary/problems/intervention.

13  A.   Patient is a 92 year old female with a diagnosis

14  of coronary artery disease and a history of

15  hypertension, hypokalemia, chronic renal

16  insufficiency, anemia and angina, that's chest pain,

17  congestive heart failure, dyspnea, shortness of

18  breath, hypercholesterolemia, patient has six

19  blockages from a year ago and refuses surgery.

20           Alert and oriented times three.  Lung sounds

21  are decreased at the bases.  She's increasing

22  shortness of breath with activity.  Nail bed dusky.

23  02 is now at three liters.  Uses it at bedtime and

24  occasionally during the day.

25           Patient using oxygen more often.  Skin

1  turgor is within normal limits.  Appetite is 100

2  percent.  Feeds self.  Limited assist with laundry.

3        The weight is 139 pounds which is a nine

4  pound increase -- which is nine pounds up since

5  3/26/07.  Patient was weighed at the MD's office.

6        Positive radial and pedal pulses.  Heart

7  rates low at 50 to 60.  She's asymptomatic.

8        No lethargy.  Abdomen is soft, non-tender.

9  Bowel sounds in all four quadrants.  She has two plus

10  non-pitting edema bilateral lower extremity and left

11  calf edema 14 to 15.  Left ankle from 10.5 to 11.5.

12  Right calf 14.  Ankle 11 to 11.5 measurements on

13  3/31/07 and 6/6/07.

14        Bilateral hose worn, bilateral feet

15  increased.  Patient complains of right thigh pain at

16  a number three on a one to five scale.  Increased

17  pain with ambulation.  Tylenol is effective.

18        On 5/30/07, Dr. Sullivan assessed patient

19  right thigh.  Negative for DVT.  Possible torn

20  muscle.

21        THE COURT:  Negative for what?

22        THE WITNESS:  A DVT or a clot in that leg.

23        THE COURT:  Okay.  Is that the deep vein --

24        THE WITNESS:  Thrombosis.

25        THE COURT:  Okay.  Thank you.

1          THE WITNESS:  Uh-huh.

2          Ambulation was independent without any

3    equipment and now patient ambulates on 5/25/07 to

4    present is unsteady with a walker.  Moist heat is

5    going to be used to the right thigh as needed.  Left

6    forearm, there's a one-by-one skin tear, scab

7    healing.  Patient refuses to wear oxygen

8    continuously.

9    Q.   What do all these measurements about the ankle

10   tell you that they're trying to keep up with for

11   Ms. Agnes B.?

12   A.   Ms. Agnes, it's following her swelling as it

13   relates to edema.  This heart rate of 50 to 60 is

14   abnormal.

15          Because of the blockages around her heart,

16   she's having some ongoing ischemia which is going to

17   slow her heart rate down.  She developed the edema.

18   She will have the increased shortness of breath on

19   exertion and, at 92 years old, she's doing it the way

20   she wants to do it.  She wants to be independent,

21   although it's not safe.

22   Q.   What does the edema have to do with the nine

23   pound weight gain?

24   A.   It's probably part of why it's nine pounds up

25   from the fluid in the lower extremities.

1          So, with patients with heart failure,

2    frequently we will have them weigh themselves every

3    morning so that they get an idea what their baseline

4    dry weight is --

5          MS. TAPIE:  Objection, non-responsive to the

6    question.

7          THE COURT:  Sustained.

8    Q.   (By Mr. Christie)  Dr. Melvin, if you could look

9    at Page 6823 of Defendant's Exhibit 514-A.

10         What is the date at the bottom of this

11   document?

12   A.   It's January the 8th of '08.

13   Q.   And what is the title of the document?

14   A.   It's a nursing assessment.

15   Q.   And if we could go to Page 5 of this document,

16   bates Page 6827 of Defendant's Exhibit 514-A.

17         If you could read what it says under

18   environmental safety next to safety concerns.

19   A.   Patient is a high risk for falls and now has a

20   Lifeline.

21   Q.   What does this document say under

22   summary/problems/intervention?

23         THE COURT:  Just a minute.  What do we mean

24   about Lifeline?  Is that the I've fallen and I can't

25   get up?

1          THE WITNESS:  Yes.  So it's a button to

2   alert someone when a patient is in some distress,

3   because she's going to live home alone.

4   Q.   (By Mr. Christie)  Could you tell us what this

5   nursing assessment says under

6   summary/problems/intervention?

7   A.   Patient is alert and oriented times three.  She

8   is pleasant and converse, delightful.  But she on

9   occasion repeats herself.  She is hard of hearing.

10  She's able to make needs known and follows demands.

11  She requires assistance with bathing; otherwise is

12  self care.

13          She's able to do very minor, light, cooking

14  and feeding herself.  She is continent of bowel and

15  bladder.  She tries very -- she tires very easily and

16  becomes short of breath after only a few yards of

17  ambulating.

18          She uses oxygen nasal cannula PRN shortness

19  of breath during the day and continues at night.

20          She reports an increase of shortness of

21  breath at night.  She uses two to three liters of

22  nasal cannula.

23          She has a bradycardic abnormal heart rhythm

24  and so now it's dropped down to the 40s and she has

25  plus three to plus four lower extremity edema.

1           Measurements are the following:  Her left
2   calf is 12 and a half.  Left ankle is ten.  Left foot
3   is eight and a half around.
4           Right calf is 13.  Right ankle is 11.  And
5   right foot is eight and a half around.
6           She wears compression stockings PRN.
7   Refuses them continuously.  Her weight is 137 on
8   1/3/08 and 139 on 1/8/08.
9           We have been encouraging her to rest and
10  elevate her legs.  She is compliant with that.
11          Bilateral lower extremity edema has
12  increased from one plus to two plus on 3/22/07 of
13  admission to two plus to three plus at present.
14          Three pound weight loss from 126 to 123.
15          On admission, patient ambulate
16  independently, now uses a cane.
17  Q.   Dr. Melvin, if you could look at Page 6624 of
18  Defendant's Exhibit 514-A.  If we could go to the
19  second page of that document for the date.  Actually,
20  it's the fourth page of the document for the date.
21          What's the date this document is signed and
22  who signed it at the bottom?
23  A.   The physician signs it on 3/5/09.
24  Q.   And what's the date of the other signature?
25  A.   It's 2/24 of '09.

1   Q.   What type of document is this document?

2   A.   It says hospice local coverage determination of

3   cardiopulmonary.

4   Q.   If you could, read what it says under medical

5   director's summary of patient's hospice eligibility

6   and medical necessity on Page 6627 of Defendant's

7   Exhibit 514-A.

8   A.   Agnes is alert and oriented times three but

9   becoming more confused.  She repeats herself more

10  often with poor stamina over the past month or so.

11  She tires easily and reports that she goes to bed

12  earlier now, over past several months, and must rest

13  every two hours after an afternoon nap.

14       Her heart rate is weak, irregular and

15  bradycardic and her nail beds are cyanotic.  She has

16  shortness of breath with wheezing with talking more

17  than six to eight words and becomes short of breath

18  with wheezing and pursed lip breathing.  And her

19  respiratory rate increases 24 to 28 after walking ten

20  to 20 feet.

21       It takes her ten minutes to recover.  She

22  uses a cane most of the time now.  She uses oxygen

23  PRN during the day and continuously at night.

24       For this time, she goes to bed -- from the

25  time she goes to bed till she wakes up in the morning

1  that she uses the oxygen continuously.

2       She has chronic three plus to four plus

3  bilateral lower extremity pitting edema.  Right calf

4  15 and a half.  Right ankle 11 and a half.  Left foot

5  nine and a half.  Left calf is 15.  Left ankle 11.

6  Left foot nine and a half.  Report that her legs feel

7  heavy at times.

8  Q.  Dr. Melvin, what, if anything, have the medical

9  records that we have reviewed here tell you about the

10  overall picture of Ms. Agnes B.'s hospice eligibility

11  at the time she was receiving hospice services?

12  A.   Ms. Agnes was hospice eligible at the time of

13  admission and she continued to be hospice eligible

14  throughout her stay.

15       She continued to have symptoms of shortness

16  of breath, swelling, requiring more oxygen, as well

17  as a decrease in her heart rate with irregularity of

18  her heart rate and became more symptomatic.

19  Q.  In reaching your opinions about Ms. Agnes B.,

20  did you rely only on the medical records that we've

21  reviewed today?

22  A.   No.

23  Q.  What else did you rely on?

24  A.   I looked at all of Ms. Agnes' medical records.

25  Q.  Were the other medical records overall

1  consistent with the opinions that you've given today?

2  A.   Yes.

3        MS. TAPIE:  Your Honor, we have a foundation

4  objection.  May we approach?

5        THE COURT:  All right.

6                     (SIDEBAR)

7        MS. TAPIE:  Your Honor, Dr. Melvin testified

8  that this patient, Ms. Agnes B., wanted to be

9  independent but that it wasn't safe.  And there was

10  simply no foundation for that in any of the documents

11  we were shown nor in her report.

12        In fact, this was a patient who was living

13  alone who, was extremely independent with multiple

14  activities of daily living for the two years that she

15  was on hospice.  So we would ask that that statement

16  be struck because it's simply not supported.

17        THE COURT:  She was shown and read from a

18  document about living at home but a high risk for

19  falls.

20        MS. TAPIE:  And, Your Honor, it's the

21  statement of the patient wanting to be independent,

22  which was not -- her opining on what the patient

23  wanted when it's not stated in the record.

24        THE COURT:  Okay.

25        MR. CHRISTIE:  She talks about how

1  independent the patient was.  Dr. Melvin made the
2  reasonable inference that someone with her health
3  conditions who remained independent at that time and
4  wanted to be independent.  I mean, that's a natural
5  inference.
6         THE COURT:  I don't think it's that hard of
7  an inference, but see if you can clear that up, okay?
8         MS. GUNASEKERA:  And, Your Honor, related to
9  that, the notion that she wanted to be independent
10 but it was not safe, it was notated that she was a
11 fall risk, but there wasn't documentation she -- that
12 actually there were any unsafe issues that weren't
13 presented in the records that we saw for the two
14 years that she was on hospice.
15        THE COURT:  Okay.  There was discussion
16 about the unsteady gait and needing to use a cane,
17 that she had not needed to use before.
18        MS. GUNASEKERA:  There was no documentation
19 of an actual fall, Your Honor.  So the notion that it
20 was unsafe for her, even that opinion has no
21 foundation based on the records that were shown to
22 the jury.
23        MR. LEMBKE:  Your Honor, I think the
24 government is willing to put Dr. Melvin to a very
25 different standard than Dr. Liao was put to in terms

 1  of foundation for statements.  There's absolutely a

 2  basis in the records that have been shown to draw the

 3  inference, and I would suggest if they want to go

 4  into that on cross-examination, they can, but the a

 5  notion that you can't conclude from a fall risk and

 6  needing to stop and rest and the family concerns for

 7  safety in the document you show.

 8          MR. CHRISTIE:  It was also in addition to

 9  the things I mentioned earlier, Dr. Melvin read about

10  the family concern for safety.  When you put that

11  together with the other things --

12          THE COURT:  Why don't we see if we can

13  clarify that for the jury a little bit, okay?

14              (Open court.  Jury present.)

15  Q.  (By Mr. Christie)  Dr. Melvin, if you could, I

16  would like for you to go to Page 6760 of Defendant's

17  Exhibit 514-A.

18          If you look at the bottom of this document,

19  what is the date of the document?

20  A.  March 22nd, '07.

21  Q.  How does that date compare with the date that

22  Ms. Agnes B. was admitted to hospice?

23  A.  She was admitted on March the 22nd of '07.

24  Q.  And if you will look under the summary/problems

25  on that page, and I'm really looking on the fifth

1   line down where it starts, lives alone.  Would you

2   read that line for us, please?

3   A.   Lives alone, ambulates with minimal assistance,

4   family concerns -- concerned with safety.  Increase

5   in dyspnea with any exertion, dyspnea at rest.  Nail

6   beds dusky.  Lungs clear.  Grunts when exhaling.  Two

7   plus pedal edema to the ankle.  Occasional discomfort

8   to the left shoulder and chest area, which is where

9   we see someone that has chest pains from heart.

10  Starts at the left shoulder and will go down the back

11  and chest.

12  Q.   Dr. Melvin, what do you remember about a

13  Lifeline for Ms. Agnes B.?

14  A.   A Lifeline was put in because Ms. Agnes was

15  living alone and her family was concerned for her

16  safety.

17  Q.   When you testified earlier that Ms. Agnes wanted

18  to be independent, what did you base that testimony

19  on?

20  A.   The fact that she was living alone and was very

21  frail and what had -- and had symptoms.  She has

22  pathology.  She had real disease in her heart.  She

23  was having symptoms from it.  She had a family and,

24  yet, she decided to stay at home.

25          MR. CHRISTIE:  Your Honor, would you like to

6028

1   do one more patient?

2          THE COURT:  One more since we got started a

3   little late?  Can we do it?  All right.  Let's go.

4   Q.  (By Mr. Christie)  Dr. Melvin, did you have the

5   opportunity to review the medical records of Norman

6   K.?

7   A.  I did.

8          MR. CHRISTIE:  Norman K. is Tab 94 and his

9   medical records have been pre-admitted as Defendant's

10  Exhibit 561 and 561-A.

11  Q.  What was Norman K.'s age at the time that he was

12  admitted to hospice?

13  A.  He was 71.

14  Q.  When was Norman K. admitted to hospice?

15  A.  March the 30th of '09.

16  Q.  And until when was Mr. Norman K. provided

17  hospice services?

18  A.  September the 8th of 2010.

19  Q.  Have you reached a conclusion as to whether or

20  not Norman K., at the time of hospice admission, had

21  a prognosis of six months or less, if his illness ran

22  its normal course?

23  A.   Mr. Norman was very ill.  He had a number of

24  medical problems.  I have not seen enough

25  documentation that would allow me to agree or

1  disagree that this patient was appropriate and

2  eligible for hospice services.

3  Q.   Have you reached a conclusion as to whether or

4  not Norman K., throughout his time receiving hospice

5  services, had a prognosis of six months or less, if

6  his illness ran its normal course?

7  A.   I could not -- I can't agree or disagree that

8  this patient was appropriate and eligible for hospice

9  services throughout his stay.

10  Q.   What was the reason Mr. Norman K. had his

11  hospice services end?

12  A.   He was admitted for heart failure.  He was very

13  sick.  He had some urinary incontinence, COPD,

14  diabetes, insulin dependent.  He was wheelchair

15  bound.  He had recurrent cellulitis in his lower

16  extremities.  He had diabetes, peripheral neuropathy.

17  History of an MI with hyperlipidemia.  Chronic back

18  pain were the reasons that he was admitted.

19  Q.   And what were the reasons his hospice services

20  ended?

21  A.   Extended prognosis.

22  Q.   Dr. Melvin, if I could get you to look at Page

23  81 -- I'm sorry -- Page 7133 of Defendant's Exhibit

24  561-A.

25          And what's the date at the bottom of this

1  document?

2  A.   April the 30th of '09.

3  Q.   What does this document say at the top?

4  A.   It's an initial nursing assessment.

5  Q.   Based on this initial nursing assessment, what

6  would be the date that Mr. Norman K. was admitted to

7  hospice?

8  A.   April the 30th of '09.

9  Q.   In the middle of this document, do you see where

10  it talks about his weight?

11  A.   Yes, he was 315 pounds.

12  Q.   If we could go to Page 5 of this document which

13  is Page 7137 of Defendant's Exhibit 561-A.

14        If you could read the initial assessment

15  summary.

16  A.   71 year old male with end stage cardiac disease

17  evaluated for hospice admission per Dr. Collins.

18        Patient with a history of COPD, congestive

19  heart failure, depression, anxiety, diabetes,

20  constipation, hypertension, muscle spasm,

21  hypercholesterolemia, venous like -- venous like

22  right leg.  Patient alert and oriented times three.

23  Complains of dizziness, headaches, right-sided

24  weakness and numbness.  Two plus edema to the legs

25  and feet.  Shortness of breath with exertion.

1   Productive cough.  Shallow breath sounds.  02 at two

2   liters nasal cannula.  Breathing treatments four

3   times a day.  Patient complains of incontinence,

4   constipation, unable to perform four out of six of

5   his ADLs.

6            He has stage three wound on the right leg.

7   Pain was nine of ten on the right side of the body.

8            Patient not taking prescription medicine as

9   prescribed and reinstructed on pain management.

10           Patient lives alone with two small dogs.

11  DME ordered.  Patient evaluated for hospice per

12  Dr. Collins.  Patient found to be hospice appropriate

13  with six months or less life expectancy.

14           Vital signs:  Heart rate 60.  Respiratory

15  rate is 16.  Blood pressure is 104/60.  Patient

16  admitted.

17  Q.   Dr. Melvin, if you could look at Page 6260 of

18  Defendant's Exhibit 561-A.

19           What is the date at the bottom of this

20  document?

21  A.   It's September the 4th of '09.

22  Q.   What's the title at the top of the document?

23  A.   It's a nurse visit note.

24  Q.   And if we could go to the second page of the

25  document, which is Page 6261 of Defendant's Exhibit

 1   561-A.

 2          If you could read what it says under summary

 3   of terminal condition and intervention.

 4   A.   Patient is a 71 year old white male, World War

 5   II Veteran, with heart failure, COPD, degenerative

 6   disk disease and depression.

 7          He is oxygen-dependent 100 percent of the

 8   time and uses nebulized treatments with Albuterol and

 9   Atrovent four times a day, two to four times a day.

10          He is incontinent of bowel and bladder and

11   has occasional diarrhea.  He is wheelchair

12   bound/chairbound 90 percent of the day and spends

13   most of his time laying back in his chair watching

14   TV.

15          His bilateral lower extremities are

16   edematous with one and a half plus pitting edema and

17   a rubor especially down the right -- down the midline

18   of the shin.

19          Continuing to treat with -- something

20   cleanser.  Curasol, Aquacell and Mepilex dressing,

21   covered by compression stocking.  Patient tolerating

22   treatment.

23   Q.   The reference to rubor especially down the

24   midline of the shin, can you tell us what that means?

25   A.   It is when a person has had chronic swelling

6033

1  with decreased blood flow, it's kind of a leathery

2  chronic change that we can see in the extremities.

3        We see it commonly when patients have

4  decreased peripheral vascular disease or peripheral

5  artery disease so they have blockages in blood

6  getting down or blockage in blood return and has

7  problems with the nerve ending.

8        It looks kind of leathery.  There's no hair.

9  It's easy to open and it has a tendency to get

10 infected.

11 Q.  Dr. Melvin, if you could look at Page 6771 of

12 Defendant's Exhibit 561-A.

13        Can you tell us what this document appears

14 to be?

15 A.  It looks like a medical record, Providence

16 Hospital discharge.  It's a coversheet that went from

17 the hospital to the hospice in Mobile.

18 Q.  If you could look at Page 6773 of --

19        THE COURT:  Before we do that, can we get

20 the date?

21        THE WITNESS:  It's July the 23rd, 2010.

22        THE COURT:  Thank you.

23        THE WITNESS:  Did I do that right?  So this

24 says July 27th, '10 that it was sent, but I think the

25 hospital was the 23rd.

1           THE COURT:  Okay.  Thank you.

2    Q.   (By Mr. Christie)  If we could go to Page 6773

3    of Defendant's Exhibit 561-A, which is the third page

4    of this document.

5           What does it say under admit date/time at

6    the top?

7    A.   7/23/10 at 11:07.

8    Q.   What does this document say in terms of chief

9    complaint?

10   A.   That Mr. K. is a 72 year old white male with

11   past medical history of chronic systolic, congestive

12   heart failure, chronic obstructive pulmonary disease,

13   diabetes mellitus type II, dementia.

14          He presents to the hospital due to altered

15   mental status and confusion today.  He also has

16   redness and erythema of the leg.

17          The patient is on hospice care due to

18   advanced chronic obstructive pulmonary disease and

19   congestive heart failure disease as well as dementia.

20          He is followed by AseraCare for hospice.  He

21   is seen by the Mobile VA outpatient clinic for his

22   primary care.

23          The patient was brought in to the emergency

24   room and was given IV fluids.  He was given IV

25   antibiotics for cellulitis in the leg and his mental

1   status improved dramatically.

2           He is now back to his baseline mental

3   status.  He is awake, alert and oriented times three.

4   He is being admitted for further IV antibiotics for

5   his cellulitis.

6   Q.   What is cellulitis?

7   A.   Cellulitis is an inflammation in the tissue.

8   And in this particular guy, with his lower

9   extremities that we were talking about, it becomes --

10  develop frequent infections in that area of his lower

11  extremities.

12  Q.   Under medications, there's a list of medications

13  that goes over to the next page.  Just looking

14  through those, could you identify the ones that are

15  related to his COPD, diabetes and other conditions

16  we've been talking about?

17  A.   Yes.  They're all related.  The first one is an

18  inhaler for his lung disease, the aspirin would be

19  for his heart disease.  The Buspar, which is number

20  four, would be given for some anxiety related to his

21  shortness of breath.

22          The Lisinopril is for his heart control.

23  Lasix would be for the heart control.  The Gabapentin

24  is for the peripheral neuropathy as it relates to his

25  diabetes.

1             Lortab is for pain.  His Metroprolol is for

2    his hypertension, that's 14.  MS Contin is for his

3    pain.  His immediate release Morphine is for the

4    pain.

5             His insulin NPH and he's on two doses is for

6    his diabetes.

7             Senokot is for the bowels as it relates to

8    the opioid.

9             Zocor is his cholesterol medicine.  Ambien

10   is just a sleep medicine and number 21 is a muscle

11   relaxant, Zanaflex.

12             MS. TAPIE:  Object for lack of foundation.

13   Go back for completeness on the list.

14   Q.   (By Ms. Christie)  If you could go back to the

15   prior page, please.

16             And is he taking Benadryl?

17   A.   So the Benadryl is just probably for itching.

18   Number five is going to be an antifungal cream.  The

19   Lexapro is an anti-depressant.

20             And then the Finasteride is for BPH.  And

21   then there's a steroid nose spray or it says -- so

22   there's a nose sprays.  I don't know what it is.

23   It's blank.

24   Q.   You mentioned number seven was for what again?

25   A.   A large prostate.

1   Q.   Okay.  If we could -- if we could go --

2          THE COURT:  I think there's one on the next

3   page that was skipped as well.

4          THE WITNESS:  The hydrocortisone cream is a

5   cream that's given to help probably with the

6   inflammation.

7   Q.   (By Mr. Christie)  Dr. Melvin, if you could go

8   to the bottom and read the assessment and plan?

9   A.   This is a 72 year old white male who presents

10  with:

11         One, altered mental status, likely metabolic

12  encephalopathy due to infection and dehydration.

13  The patient's mental status is back to his normal

14  baseline.

15         Two, bilateral lower extremity cellulitis.

16  Patient will be on Rocephin IV.

17         Three, chronic obstructive pulmonary

18  disease, continue his DuoMeds.

19         Four, chronic systolic congestive heart

20  failure.  Hold the Lasix.

21         Five, dementia which is stable.

22         Six, acute on chronic kidney disease.  Will

23  give general IV hydration.  Recheck the labs in the

24  morning and then deep venous thrombosis prophylaxis,

25  patient will be on Lovenox.

1   Q.   And continuing to the next page.

2   A.   And this was dictated by Dr. Baxter.

3   Q.   What do the facts we've reviewed here tell you

4   about Mr. Norman K.'s condition at the time when he

5   was receiving hospice services?

6   A.   There is enough documentation within the records

7   for this patient's eligibility.  But in my

8   professional judgment, I would have liked to have

9   seen more documentation; therefore, I cannot agree or

10   disagree that this patient was appropriate or

11   eligible for hospice services.

12   Q.   In reaching your opinions for Mr. Norman K., did

13   you rely only on the medical records that we've

14   reviewed here today?

15   A.   No.

16   Q.   What else did you rely on?

17   A.   I looked at all of Mr. Norman's records.

18   Q.   And were the other records overall consistent

19   with the opinions that you've given?

20   A.   Yes.

21        THE COURT:  Okay.  Perfect timing for lunch.

22   I have a 12:30 conference, so that works out well.

23        Ladies and gentlemen, we will see you back

24   at 1:30.  I tell you what, let's make it 1:40 because

25   I've got a few things I have to take care of.

1          So we will see you at 1:40.

2                  (Jury excused).

3          THE COURT:  We've got another love note.

4          (Off the record.  Lunch recess.)

5              (Open court.  Jury present.)

6          THE COURT:  Mr. Christie, you may continue.

7          MR. CHRISTIE:  Thank you.

8   Q.   Good afternoon.  Good afternoon, Dr. Melvin.

9   A.   Good afternoon.

10  Q.   I would like to show you one more document for

11  Norman K., Tab 94, Defendant's Exhibit 561-B which

12  has been pre-admitted.

13          THE COURT:  Is that B as in boy?

14          MR. CHRISTIE:  B as in boy; yes, ma'am.

15  Q.   What has been marked as Page 7700 in 561-B.

16          If you could tell us -- if you could go to

17  the bottom of the document, what is the dates of the

18  signatures at the bottom of the document?

19  A.   It's April the 30th of '09.

20  Q.   And who has signed the document at the bottom?

21  A.   Mr. Norman.

22  Q.   And then there's another signature?

23  A.   It was the hospice representative's signature.

24  Q.   From the top of the document, could you read us

25  what the title of this document is, please?

6040

1   A.   It's a special agreement, patient without a

2   primary caregiver.

3   Q.   Then going down to the paragraph that starts

4   with "I," could you read that for us, please?

5   A.   I, Norman K., request hospice services.  I do

6   not have a consistent caregiver but wish to remain in

7   my home at whatever the drive is as long as possible.

8        I acknowledge and agree to the following:

9   One, the hospice team will evaluate my situation on a

10  week-to-week basis to determine the safety of my

11  living alone.

12       Two, the hospice team and my attending

13  physician will determine when it is no longer safe

14  for me to live alone and at that time I will put in

15  for VA facility.

16  Q.   Are you familiar, Doctor, with a VA system to

17  have a judgment as to what the reference to VA

18  facility means?

19  A.   Yes, I am.

20  Q.   What would the reference to VA facility be?

21  A.   He would be put into the nursing facility at the

22  VA, long-term care nursing home.

23  Q.   Dr. Melvin, did you have the opportunity to

24  review the medical records of Ann S.?

25  A.   I have.

1          MR. CHRISTIE:  Ann S. is Tab 7 and her

2    medical records have been pre-admitted as Defendant's

3    Exhibit 601, 601-A and 601-B.

4    Q.   Dr. Melvin, what was Ann S.'s age at the time

5    she was admitted to hospice?

6    A.   Ms. Ann was 92 years old.

7    Q.   When was Ms. Ann S. admitted to hospice?

8    A.   March the 13th of '07.

9    Q.   And until when was Ms. Ann provided hospice

10   services?

11   A.   April the 12th of '08.

12   Q.   Have you reached a conclusion as to whether or

13   not Ms. Ann S., at the time of hospice admission, had

14   a prognosis of six months or less, if her illness ran

15   its normal course?

16   A.   Yes.  Ms. Ann was hospice eligible at the time

17   of her admission.

18   Q.   And why did you reach that opinion?

19   A.   Given her diagnosis of debility, her anorexia

20   with weight loss and the number of comorbidities that

21   she had -- pulmonary hypertension, cardiopulmonary,

22   congestive heart failure, rheumatoid arthritis,

23   hyperlipidemia, her cognitive impairment made Ann

24   hospice eligible at the time of her admission.

25   Q.   Dr. Melvin, have you reached a conclusion as to

6042

1   whether or not Ms. Ann S., throughout the time she

2   was receiving hospice services, had a prognosis of

3   six months or less, if her illness ran its normal

4   course?

5   A.   I do.   I felt Ann was -- she continued to be

6   hospice eligible throughout her stay with hospice.

7   Q.   Why did you reach that opinion?

8   A.   It was based on, again, her comorbids along with

9   her ongoing weight loss, her slurred speech, her

10  weakness, her fatigue, the development of

11  hypotension, infections were the basis of Ann being

12  -- Ann continuing to be hospice eligible throughout

13  her stay with hospice.

14  Q.   What was the reason Ms. Ann S.'s hospice

15  services ended?

16  A.   Ms. Ann died on April the 12th of '08.

17  Q.   Dr. Melvin, if I could get you to look at Page

18  4467 of Defendant's Exhibit 601-A.

19           If you could tell me the date at the bottom

20  of this document.

21  A.   It's March the 13th of '07.

22  Q.   And what's the relationship between that day and

23  when Ms. Ann S. was admitted to hospice?

24  A.   It is the date of her admission.

25  Q.   And what type of document is this based on the

1  title at the top?

2  A.   A nursing assessment.

3  Q.   Could you read the history of illness, please?

4  A.   Patient is a 92 year old female with debility

5  secondary to cardiomyopathy -- cardiopulmonary and

6  vascular disease.  She is consistently losing weight

7  over the past six months resulting in skin breakdown

8  and decline in her ADL performance.

9  Q.   Could you read what it says under past medical

10 history?

11 A.   Cardiomyopathy, dysphasia, a left BKA,

12 hypertension, pulmonary hypertension, rheumatoid

13 arthritis, hyperlipidemia, anemia, gastroesophageal

14 reflux disease, depression, endomyocardial fibrosis.

15 Q.   Could you tell us what cardiomyopathy is?

16 A.   Cardiomyopathy is an enlargement of the heart

17 due to -- it can be due to a number of things, but

18 it's where the heart muscle thickens and the

19 ventricles, the chambers within the heart, enlarges,

20 making it not very effective pump system.

21 Q.   What is dysphasia?

22 A.   Having difficulty in swallowing.

23 Q.   If we could go to Page 5 of this nursing

24 assessment, which is Page 4471 of Defendant's Exhibit

25 601-A.

6044

 1          If you could read what it says up at the top
 2   in the text under describe measure comments.
 3   A.   Dependent for all care.  Non-ambulatory,
 4   secondary to right BKA, blow the knee amputation.
 5   Staff lifts to transfer.  Mobile in wheelchair.
 6   Feeds self with self setup and supervision.
 7   Q.   If you could read what this document says under
 8   summary/problems/intervention?
 9   A.   Female patient with extensive history of tobacco
10   use resulting in pulmonary disease, cardiac disease
11   and vascular insufficiency.
12          Patient underwent a right BKA in 2002
13   resulting from osteomyelitis of the right foot.  She
14   had a fall in 2004 with multiple fractures.
15          She is now wheelchair bound, non-ambulatory
16   and dependent for all care.  She is confused at times
17   with short-term memory loss.  Discussions --
18   decisions are poor and unsafe.
19          Liquids are thickened due to dysphasia and
20   her diet is adjusted for this.  Bilateral lungs are
21   diminished with occasional moist cough.  Weight is
22   consistently declining over time.  She appears frail
23   with muscle wasting.  She receives high calorie
24   supplements daily.  She has four stage II ulcers on
25   bilateral buttocks, secondary to incontinence and

 1    immobility.

 2    Q.   Could you explain why she had to have part of

 3    her leg amputated in 2002?

 4    A.   So, this is a lady with advanced arthrosclerotic

 5    disease, so hardening within her vessels.  They're

 6    not just hardening within the heart, they're all

 7    over.

 8          She developed an infection in her foot.  The

 9    effects went from the soft tissue in the foot to the

10    bone and she developed the osteomyelitis, resulting

11    in her having to have her right leg amputated below

12    the knee.

13    Q.   If we could go to Page 4469 which is the third

14    page of this same document.

15          And could you tell us what it says under

16    nutritional status, if you would describe what this

17    is telling us on this page, please.

18    A.   Yes.  So she's underweight.  She has lost

19    weight.  Her weight is down by six pounds in six

20    months and her current weight is at 84.7 pounds.

21          She's having difficulty in swallowing, so

22    her diet has been changed to what they call a

23    dysphasia diet where it's nectar liquids, no straws,

24    small portions, they use house supplements, a noisy

25    cup with wide mouth glass, it's like a sipper seal

1   cup that the kids use, you can just tip it

2   upside-down and it controls how much fluids are

3   coming out.

4         NRP for swallowing.  She naps throughout the

5   day and she's a sound sleeper.

6   Q.   Dr. Melvin, what does this nursing assessment

7   tell you about the overall --

8         THE COURT:  Can I interrupt?

9         MR. CHRISTIE:  Yes, ma'am.

10        THE COURT:  This is one of those things I

11  have to ask because I'm just dadgum curious.

12        Why no straws for people or for this

13  patient?

14        THE WITNESS:  Patients that have dysphasia,

15  when you pull up through the straw, you have to use

16  the muscles in your mouth, your tongue, and then

17  gauge how much you can pull up to have an adequate

18  amount in before you swallow.

19        If you have dysphasia and you have cognitive

20  impairment, like this lady does, you will pull up and

21  you'll get too much in and really will get choked.

22        So, we take away the straw and then we limit

23  how much fluid that they can get in.

24        THE COURT:  So is it a combination of

25  dysphasia plus dementia that results in the no straw

1   orders generally?

2          THE WITNESS:  It's the dysphasia, but then

3   it's the cognitive impairment that's causing the

4   dysphasia.

5          THE COURT:  All right.  Got you.

6   Q.  (By Mr. Christie)  Dr. Melvin, what do the

7   documents we've reviewed so far tell you about

8   Ms. Ann S.'s hospice eligibility at the time she was

9   admitted to hospice?

10  A.  Ms. Ann was hospice eligible.  She had extensive

11  atherosclerotic disease involving her heart,

12  affecting her thinking.  She had dysphasia.  And she

13  was having unintentional weight loss at the time of

14  admission.

15  Q.  Dr. Melvin, if I could get you to look at Page

16  4632 of Defendant's Exhibit 601-A.

17         From the bottom of the document, can you

18  tell us what the date of this document is?

19  A.  June the 4th of '07.

20  Q.  And what is this type of document?

21  A.  It's a nursing clinical note.

22  Q.  Could you tell us what this says under

23  problem/intervention/treatment?

24  A.  Assist to propel wheelchair in hall -- from the

25  hall to the room.  Attempting to move about without

1   assistance.  Feet only moves several inches before

2   having to rest.

3          Respirations are rapid and shallow.  No

4   congestion noted.  She's tachycardic.  She's

5   hypotensive.  Denies any pain.  Transfer to bed by

6   total lift.  Does not bear weight on the left leg.

7          Quickly falls to sleep after being put in

8   bed.  Remains dependent in all ADLs.

9   Q.  What does tachycardic mean?

10  A.  It is measuring the heart rate and here is a

11  lady whose blood pressure is low, so she's

12  hypotensive.  Her heart rate is fast.  That tells me

13  that her heart rate is having to work overtime just

14  to keep up the blood pressure which is already low.

15  Q.  If we could look at Page 4628 of Defendant's

16  Exhibit 601-A.

17         If you could tell me, what is the date at

18  the bottom of this document?

19  A.  This is June the 19th of '07.

20  Q.  And what is -- what is the title of this

21  document?

22  A.  It's a nursing clinical note.

23  Q.  If you could read what this note says under

24  problem/intervention/treatment.

25  A.  Patient present in wheelchair.  Seated on a gel

1   cushion.  Drank nectar thick liquids with occasional

2   cough.

3          Becomes tearful, believes her father just

4   died and she has to go to his funeral.  Difficult to

5   redirect.  Remains dependent in all of her ADLs.

6          This coughing, see these thickened liquids

7   and coughing says that even with the thickened

8   liquid, so nectar is a thicken liquid, she's having

9   trouble handling the fluids.

10  Q.   Why would she have a gel cushion in her

11  wheelchair?

12  A.   I think earlier we saw that she was getting some

13  bedsores or skin breakdown.  The gel cushion is to

14  help relieve the pressures points on the bottom to

15  prevent any further breakdown.

16  Q.   Dr. Melvin, if you could look at Page 4432 of

17  Defendant's Exhibit 601-A.

18          What is the date at the bottom of this

19  document?

20  A.   February 22nd of '08.

21  Q.   And what is the type of the document based on

22  the title at the top?

23  A.   It's a nursing assessment.

24  Q.   And what does this document say under history of

25  illness?

1   A.   Diagnosis is adult failure to thrive, 93 year

2   old frail, weak.

3   Q.   Could you read what it says under past medical

4   history?

5   A.   I didn't -- ongoing weight loss, despite

6   supplements.  She has reflux, dysphasia,

7   endomyocardial fibrosis, a right BKA, below the knee

8   amputation, hypertension, pulmonary hypertension and

9   rheumatoid arthritis.

10   Q.   What is reflux?

11   A.   It's like having bad heartburn.  Your esophageal

12   gastric, at the end of your esophagus, your stomach

13   doesn't close all the way tight, it kind of relaxes

14   and then you'll have burning in your chest.

15   Q.   If you could, let's go to the third page of this

16   nursing assessment, Page 4434 of Defendant's Exhibit

17   601-A.

18        What does this document tell us up at the

19   top about her weight and what else does it say under

20   nutritional status?

21   A.   She continues to be underweight.  She continues

22   to lose weight.  Her weight is 80.9 pounds.  She's on

23   her dysphasia diet.  Nectar thickened.  She is on --

24   it looks like Reglan to help with her swallowing and

25   her BMI is 17.9.

1    And she's also receiving fortified foods

2    twice a day, so high calorie intake in addition to

3    her regular meal.

4    Q.   All right.  If we could go to Page 5 of this

5    nursing assessment, Page 4436 of Defendant's Exhibit

6    601-A.

7         If you could read what this says under

8    summary/problems/intervention.

9    A.   93 year old female AKA with maximum with ADLs.

10   PPS is 30.  Frail, thin.  Skin with frequent tears

11   and pressure ulcers.

12        Recent healed stage II ulcer on her

13   buttocks.  Ongoing weight loss and something with

14   dysphasia diet, supplements and fortified foods twice

15   day.

16   Q.   Dr. Melvin, if you could read for us part of

17   Page 4391 of Defendant's Exhibit 601-A and at the

18   bottom, could you tell us what the date of this

19   document is?

20   A.   This is April the 12th of '08.

21   Q.   What type of document is this?

22   A.   This is a patient's death checklist.

23   Q.   What does this document indicate is the date of

24   death?

25   A.   April the 12th of '08.

1    Q.   What does this document indicate under comments?

2    At the top of the page about a fourth of the way

3    down.

4    A.   FH signs and symptoms per skilled nursing

5    facility RN.  No family present.  Skilled nursing

6    facility staff is okay.  Writer contacted patient's

7    grandson.

8            THE COURT:  Could FH be funeral home

9    enroute?

10           THE WITNESS:  Yes, ma'am, it could be.  I

11   think that's what it is actually.  Funeral home

12   enroute per the skilled nursing facility RN.

13   Q.   (By Mr. Christie)  Dr. Melvin, what, if

14   anything, did the facts that we've reviewed in these

15   documents tell you about the overall picture of

16   Ms. Ann S. at the time she was receiving hospice

17   services?

18   A.   That Ms. Ann was hospice eligible at the time of

19   her admission and she continued to be hospice

20   eligible until her death as evidenced by her advanced

21   atherosclerotic disease, her pulmonary hypertension,

22   her ongoing weight loss, pressure ulcer, her

23   inability to handle even thickened liquids.

24   Q.   In reaching your opinions, did you rely only on

25   the medical records that we've reviewed here today?

1    A.   No.

2    Q.   What else did you rely on?

3    A.   I looked at all of Ms. Ann's records.

4    Q.   Were the other medical records that you reviewed

5    overall consistent with the opinions you've given

6    today?

7    A.   Yes, they are.

8    Q.   Dr. Melvin, did you have the opportunity to

9    review the medical records of Marilla B.?

10   A.   Yes.

11            MR. CHRISTIE:   Marilla B. is Tab 78.  And

12   her medical records have been pre-admitted as

13   Defendant's Exhibit 508, 508-A and 508-B.

14   Q.   What was Ms. Marilla's age at the time she was

15   admitted to hospice?

16   A.   Ms. Marilla was 101 years old.

17   Q.   And when was she admitted?

18   A.   August the 21st of '07.

19   Q.   And until when was she provided hospice

20   services?

21   A.   March the 4th of '09.

22   Q.   And did she have a second admission?

23   A.   Yes, on 6/14 of '09 to 6/19 of '09.

24   Q.   Have you reached a conclusion as to whether or

25   not Ms. Marilla B. was eligible for hospice services

1   at the time of her first admission?

2   A.   Yes.   I felt Ms. Marilla was hospice eligible at

3   the time of her first admission.

4   Q.   Why did you reach that opinion?

5   A.   101 year old with coronary artery disease, she

6   was having urinary tract infections with

7   unintentional weight loss made Ms. Marilla hospice

8   eligible.

9   Q.   Have you reached a conclusion as to whether or

10  not Ms. Marilla B. remained eligible for hospice

11  services throughout the time she was receiving

12  hospice services?

13  A.   Yes.   Ms. Marilla was felt to continue to be

14  hospice eligible throughout her stay.

15  Q.   Why did you reach that opinion?

16  A.   Again, the patient became increasingly weak,

17  requiring more assistance with her activities of

18  daily living, developing bradycardia, developing

19  focal weakness, weight loss were the reasons that

20  Ms. Marilla continued to be hospice eligible

21  throughout her stay.

22  Q.   All right.   What was the reason Ms. Marilla B.'s

23  hospice services ended the first time on March 2009?

24  A.   Extended prognosis.

25  Q.   And what was the reason Ms. Marilla's hospice

1  services ended in June of 2009?

2  A.   The patient died.

3  Q.   If you could please look at Page 9189 of

4  Defendant's Exhibit 508-A.  Brad, could you pull up

5  Page 9189 for me, please.

6        What is the date at the bottom of Page 9189

7  of Defendant's Exhibit 508-A?

8  A.   August the 21st of '07.

9  Q.   What type of document is this?

10  A.   A nursing assessment.

11  Q.   What does this document say under history of

12  illness?

13  A.   Diagnosis, adult failure to thrive, secondary of

14  dementia.

15  Q.   And what does this document say under past

16  medical history?

17  A.   History of corneal implant, coronary artery

18  disease, hypertension and chronic obstructive

19  pulmonary disease.

20  Q.   If we could go to the -- well, if we could go to

21  the fifth page of this document, Page 9193.  Brad, if

22  you could pull up Page 402 for me, please.

23        Page 9193 of Defendant's Exhibit 508-A,

24  could you read what this says under

25  summary/problems/intervention?

A.    101 year old female with a diagnosis of adult

failure to thrive.  Has lost approximately 32 pounds

since March of '07.  Current weight is 88 pounds.

Receives supplements three times a day but patient

refuses frequently.

          Has comorbids of dementia and occasional

demonstrates aggressive behavior.  May receive Ativan

as needed for increased agitation.  Patient verbal

but unorganized thought process.  Sometimes answers

simple questions appropriately.

          Dependent in all ADLs.  Unable to ambulate,

although able to propel wheelchair short distances.

          Occasional incontinent of bladder and wears

a brief.  No skin integrity issues.  No bruising

issues.  Bruising to the left hand that is healing.

APP mattress for bed as protective.

          Patient has no signs and symptoms of pain

and appears comfortable at this time.

Q.   And if you could, if you could look at Page 9042

of Defendant's Exhibit 508-A.  Brad, could you pull

up for me Page 271.

          What's the date at the very bottom?  Let me

make sure I get the page number right.  Page 9062 of

Defendant's Exhibit 508-A.

          And if you could tell me what's the meeting

1  date at the bottom of this page.

2  A.   It's August 29th, '07.

3  Q.   What type of document is this?

4  A.   That is hospice IDT plan of care update.

5  Q.   And if we could look at the bottom part, could

6  you describe the people who signed this document for

7  us?

8  A.   It was the attending physician, the medical

9  director, the nurse, social worker, spiritual

10  coordinator, an RN, an RN, and other members of the

11  team.

12  Q.   All right.  If you could, look up where it says

13  no changes, sort of in the middle of the document.

14  Do you see where I am?

15  A.   Yes.

16  Q.   Read what it says there.

17  A.   101 year old female with a diagnosis of adult

18  failure to thrive, dementia.

19  Q.   If you could, read what it says under changes to

20  --

21  A.   I'm sorry.  I didn't finish.  Dementia with

22  occasional demonstrations of aggressive behavior.

23  Weight is 88.6.  Height is 59.  And her BMI is 17.8.

24  I'm sorry.

25  Q.   No, no, that was my fault.

1              If you could read what it says in the box on

2    the left-hand side, it says changes to POC.

3    A.   Alteration in nutrition, has supplements three

4    times a day, refuse often, has regular diet.

5              Alterations in mental neurologic status,

6    patient verbal but unorganized thought process.  Has

7    Ativan cream .5 to wrist three times a day as needed.

8              Alterations in comfort.  Has Ativan PRN for

9    increased agitation.  Dependent for all ADLs.

10   Occasional incontinence of bladder.  Wears a brief.

11   APP mattress to the bed.  Pressure-relieving cushion

12   to the chair.

13             Patient unable to rate pain due to mental

14   status.  Tylenol as needed.

15             The APP mattress to the bed and the pressure

16   relief for the cushion kind of, given her weight,

17   talks to the facility really working to prevent any

18   skin breakdown, because she is so frail.

19   Q.   All right.  Dr. Melvin, what, if anything, have

20   the facts reviewed in those documents tell you about

21   the overall picture of Marilla's hospice eligibility

22   at the time she was admitted to hospice services?

23   A.   That Ms. Marilla was hospice eligible at the

24   time of admission.

25   Q.   If we could look at Page 9133 of Defendant's

1  Exhibit 508-A.

2          Could you tell us what the date at the

3  bottom of this document is?

4  A.   This is August the 5th of '08.

5  Q.   What is the type of document based on the top?

6  A.   It's a nursing assessment.

7  Q.   If you could read what it says under history of

8  illness.

9  A.   102 year old female with adult failure to

10 thrive.  Refuses all snacks at meals passes.  Fed by

11 staff.  Continues to lose weight.  Average bites.

12 Occasional 25 percent of the meal.

13 Q.   What does it say under past medical history?

14 A.   She had pneumonia in 2006, a history of coronary

15 artery disease, hypertension, frequent UTIs and

16 glaucoma.

17 Q.   If we could go to Page 5 of this nursing

18 assessment, which is Page 9137 of Defendant's Exhibit

19 508-A.

20          If you could read what it says under

21 summary/problems/intervention.

22 A.   102 year old female with adult failure to

23 thrive, has dementia, continues to lose weight.  Has

24 lost another nine pounds in six months.  BMI is 16.

25 Is fed by staff.  Recent diet changed to pureed diet.

1    Patient continues to lose weight.  Eats bites to

2    occasional 25 percent.  Refuses all snacks at med

3    pass.

4         Does not talk anymore.  Just answers a few

5    questions.  Is more withdrawn.  Sleeping frequently.

6    Does ask to be laid down after meals.  Does not

7    propel self in wheelchair, is stationary, incontinent

8    of bowel and bladder, can become uncooperative at

9    times.

10   Q.   Dr. Melvin, if you could review Page 8947 of

11   Defendant's Exhibit 508-A.

12        Could you tell us what the date is on the

13   bottom of the document.

14   A.   This is February the 24th of '09.

15   Q.   And what does the document say at the top?

16   A.   It's a hospice medical director note.

17   Q.   And what is your understanding what the S there

18   means?

19   A.   Subjective.

20   Q.   Could you read what that part says, please?

21   A.   Patient seen and examined and chart reviewed.

22   Marilla is 103.  Admitted to hospice 8/07 for adult

23   failure to thrive.  BMI 17 with a nine pound weight

24   loss since 11/07 with 100 percent intake of breakfast

25   daily and 90 cc's intake of supplements three times a

1   day.

2          Her weight fluctuates and overall she has

3   had no weight loss since 10/08.

4          She demonstrates severe Alzheimer's dementia

5   concerning cognition, but remains communicative --

6   community -- remains communicable, though fragmented,

7   able to eat, still smiles and is interactive.

8          She remains feisty and often is

9   uncooperative with care.

10  Q.   The O there, what does that stand for?

11  A.   Objective.

12  Q.   What does it say there?

13  A.   Blood pressure is 102/60.  Pulse rate 60.

14  Respiratory rate is 18.  She's in the wheelchair

15  sitting up on own.  Constantly moving and reaching

16  out to caregivers.  Constant tangential speech, not

17  able to follow instructions.  Heart, lung, abdomen

18  exam unremarkable.  There's no obvious skin

19  breakdown.  No recent labs or radiology data.

20  Q.   And A/P, what does that stand for?

21  A.   Assessment and plan.

22  Q.   Could you read that for us, please?

23  A.   Marilla is 103 old admitted to hospice 8/07 for

24  adult failure to thrive with only comorbids being

25  Alzheimer's and with recurrent disease demonstrating

6062

1   cognitive decline alone.  She has had overall stable

2   weight at 78 pounds since 10/08.  Due to the

3   consistent intake of breakfast and three times a day

4   supplements and has no current evidence of

5   progressive weight loss.

6           She is constantly on the move, interactive

7   with staff and often uncooperative due to ongoing

8   personality trait of cantankerousness.

9           She has had no recent infections or skin

10  breakdown and currently does not meet criteria for

11  ongoing hospice care.

12          Should she demonstrate recurrence of

13  progressive weight loss, significant decline in oral

14  intake or responsiveness or contact an infection

15  leading to terminal state, please contact us and we

16  would be grateful for the opportunity to recert her

17  for hospice.

18  Q.   All right.  Dr. Melvin, if you could, I would

19  like for you to see Page 8919 of Defendant's Exhibit

20  508-A.

21          Could you tell me what the date is at the

22  bottom of this document?

23  A.   This is June the 19th of '09.

24  Q.   And what does this document say at the top?

25  A.   It is a patient's death checklist.

1   Q.   And what does this document reflect as the date

2   of death?

3   A.   June the 19th of '09.

4   Q.   Dr. Melvin, what, if anything, have the facts

5   that we've reviewed for these documents told you

6   about the overall picture of Ms. Marilla B.'s health

7   during the time that she received hospice services?

8   A.   Ms. Marilla was hospice eligible at the time of

9   her admission and continued to be hospice eligible

10  through her stay.

11          She was also hospice eligible at her

12  readmission until her death on June the 19th of '09.

13  Q.   In reaching your opinions, did you rely only on

14  the medical records that we've reviewed here today?

15  A.   No, I did not.

16  Q.   What else did you rely on?

17  A.   I looked at all of Ms. Marilla's medical

18  records.

19  Q.   Were the other medical records overall

20  consistent with the opinions that you've given here

21  today?

22  A.   Yes, they have.

23  Q.   Dr. Melvin, have you had the opportunity to

24  review the medical records of Ms. Laura H.?

25  A.   Yes.

6064

1          MR. CHRISTIE:  Ms. Laura H. is at Tab 63.

2     The medical records for Laura H. have been

3     pre-admitted as Defendant's Exhibit 551, 551-A and

4     551-B.

5     Q.   Dr. Melvin, what was Laura H.'s age at the time

6     she was admitted to hospice?

7     A.   Ms. Laura was 94 years old.

8     Q.   And when was she admitted?

9     A.   December the 22nd of '10.

10    Q.   And until when did Ms. Laura H. receive hospice

11    services?

12    A.   March the 28th of 2012.

13    Q.   Have you reached a conclusion as to whether or

14    not Laura H., at the time of hospice admission, had a

15    prognosis of six months or less, if her illness ran

16    its normal course?

17    A.   I did.  I did feel that Ms. Laura was hospice

18    eligible at the time of her admission.

19    Q.   And why did you reach that opinion?

20    A.   Ms. Laura was admitted with debility.  She had

21    had increasing confusion, anxiety, difficulty

22    ambulating.  She was needing more assistance with her

23    functional care, peripheral edema, in addition to her

24    comorbid conditions of hypertension, diabetes, upper

25    respiratory infection, urinary tract infections were

6065

1   the grounds that Laura was eligible for hospice on

2   admission.

3   Q.   Dr. Melvin, have you reached a conclusion as to

4   whether or not Ms. Laura H., throughout the time she

5   received hospice services, had a prognosis of six

6   months or less, if her illness ran its normal course?

7   A.   I did feel that Ms. Laura was hospice eligible

8   throughout her hospice stay.

9   Q.   And why did you reach that opinion?

10  A.   With her ongoing, in addition to what was

11  mentioned earlier, cognitive decline, poor appetite,

12  needing assistance with her activities of daily

13  living, falls, increased confusion, development of

14  pressure ulcers or bedsores, infections were the

15  reason Ms. Laura continued to be hospice eligible

16  throughout her stay.

17  Q.   And what was the reason hospice services for

18  Ms. Laura H. ended?

19  A.   Ms. Laura died on 3/28 of 2012 at 3:15 p.m.

20  Q.   Dr. Melvin, if I could get you, if you would,

21  please, to look at Page 0548 of Defendant's Exhibit

22  551-A.

23        What is the date at the top right hand of

24  this document?

25  A.   It's December 22nd of '10.

1  Q.  And what's the title of this document?

2  A.  It's an initial and comprehensive nursing

3  assessment.

4  Q.  What's Ms. Laura's age?

5  A.  94.

6  Q.  What does this show as her diagnosis?

7  A.  Debility.

8  Q.  If you could, please, read what it says under

9  illness trajectory and reason for hospice admission.

10  A.  Patient in recent decline with increased

11  confusion, increased dependence on ADLs, increased

12  edema of the lower extremity, increased shortness of

13  breath on activity.

14  Q.  What does this say under subjective data?

15  A.  Patient increased sleeping during the day,

16  increased confusion, incontinent, more incontinent of

17  bladder.

18      Increased difficulty ambulating with walker.

19  Becoming shortness of breath after walking short

20  distances.

21  Q.  What does this say under subjective data?

22  A.  Patient sitting in recliner, I'm not sure what

23  that is, meals and to get up from chair.  Legs

24  bilateral edema, pitting, weeping, slight reddened

25  scratches on skin.

1   Q.   What does legs weeping mean?

2   A.   The patient has accumulated so much fluid in her

3   lower extremity that the fluid will literally weep

4   out from the skin.

5   Q.   If we could go to Page 8 of this initial

6   comprehensive nursing assessment, Page 0555 of

7   Defendant's Exhibit 501-A.

8          If you could tell us what this -- the date

9   of this document also again at the bottom is?

10  A.   Admission of 12/22/10.

11  Q.   All right.  What does this document say under

12  nursing narrative?

13  A.   94 year old female admitted routine with a

14  diagnosis of debility.  Patient has comorbids of

15  coronary artery disease, hypertension, questionable

16  congestive heart failure, high cholesterol.

17         Patient history of left hip fracture with an

18  ORIF three years ago.  Family notes recent increase

19  in bilateral lower extremity edema, three plus to

20  four plus.  Mild redness from the toes to the mid

21  shin calf.

22         Sitting, weeping, patient denies pain.

23  Multiple scratches on skin.  Family also notes

24  shortness of breath.  Patient denies, however.

25         Respiratory -- patient denies.  However, the

1    respiratory was between 18 and increased to 24 after

2    ambulating with the walker of about 20 feet.

3              Daughter states respiratory rate increases

4    with speech as well.  Family notes increased

5    confusion for two months.  Patient unable to

6    recognize family at times.  Unaware of where she

7    lives.  Is out of conflict --

8    Q.   Might that be context?

9    A.   Is out of context, frequently verbalize but

10   confused.  Has mild cough non-productive for a month.

11             Chest x-ray showed something at the lung

12   base.  The daughter recommended -- was recommended to

13   the daughter to get a CT scan.  The family opted not

14   to pursue the workup.  Patient more dependent in her

15   ADLs for two months but can perform moderate

16   assist -- I'm not sure what this is.

17   Q.   Just skip it.

18   A.   Eats good breakfast, zero to 100, lunch, dinner

19   very small portions.  Family educated regarding

20   hospice.  Call to the MD related to the edema.

21   Q.   All right.  There's a question been raised about

22   how far she was walking.

23   A.   Uh-huh.

24   Q.   Can you read the number right before the feet?

25   A.   50 feet.  50 feet.

1  Q.  All right.  Dr. Melvin, what, if anything, did

2  the facts that have been highlighted in this document

3  tell you about the overall picture for Ms. Laura H.

4  at the time that she was admitted to hospice?

5  A.  That Ms. Laura had already had a decline in her

6  condition prior to coming onto hospice.  She was

7  becoming more confused, was needing more assistance

8  with her ADLs, becoming more short of breath and

9  there appeared to be something on the chest x-ray

10  that the family just opted not to even address.

11  Q.  All right.  Dr. Melvin, if I could get you to

12  look at Page 9938 of Defendant's Exhibit 551-A.

13          What is the date at the bottom of this

14  document?

15  A.  It's June the 8th of '11.

16  Q.  What type of document is this?

17  A.  It's a hospice certification of terminal

18  illness.

19  Q.  And what does this document say under narrative

20  composed by hospice physician?

21  A.  Primary:  Debility.  Secondary diagnosis is

22  hypertension, diabetes, coronary artery disease,

23  congestive heart failure, recent fall, first time.

24  Increasing shortness of breath with walking.

25  Resolved buttock ulcer.  Urinary incontinent.

1   Appetite is down.  Confusion is increased.  Recent

2   increase in diuretics, secondary to the edema.

3            Goals is safety and nutrition.

4   Q.   If we could get you to go to Page 0080 of

5   Defendant's Exhibit 551-A.

6            What's the date at the top of this document?

7   A.   This is March the 23rd of '12.

8   Q.   And what type of document is this?

9   A.   It's a nursing clinical note.

10  Q.   And if we could, would you go to Page 3 of this

11  document which is 0082 of Defendant's Exhibit 551-A.

12           If you could read what this says under

13  nursing narrative.

14  A.   Significant change since yesterday.  Decreased

15  level of consciousness.  Respirations are shallow.

16  Lungs are diminished.  Hard to hear breath sounds.

17           Decreased level of consciousness.  Sleeps

18  unless awakened with verbal or tactile stimuli.

19           Weak, unable to reposition self or help with

20  repositioning.  Increased congestion with deep

21  productive cough of thick brownish mucus.  Only

22  taking sips of fluid and bites of food.

23           PPS changes to 20 percent.  Blood sugar is

24  153.  Caregiver reported patient cooperative with the

25  Albuterol treatments but complains it was hard to

 1   breathe.

 2          Placed in bed with an LAL mattress for

 3   comfort and ease of repositioning.  Mottling of both

 4   feet is noted.

 5          Discussed the dying process with the

 6   daughter and the two sons who verbalized

 7   understanding.  No new orders.  Daughter instructed

 8   to call hospice of any changes in patient's

 9   condition.  Hospice nurse will visit tomorrow.

10   Q.   What is mottling?

11   A.   Mottling is when there is no blood flow to the

12   extremity and it becomes extremely cool and purplish

13   color and it looks like -- if you've ever looked at a

14   lace cloth, so you know you have the outlines and

15   then it's clear in the center, so where the vessels

16   are in the outside tracing is a little purple with

17   centers of being really pale.

18          So there's just no blood flow to those

19   extremities or to that foot in this case.

20   Q.   Again, what's the date at the bottom of this

21   document?

22   A.   Can you move it up, please?  It's 3/23 of 2012.

23   Q.   If you could look at Page 9905 of Defendant's

24   Exhibit 551-A.

25          Can you tell us what the date of this

1   document is up at the top?

2   A.   It's March the 28th of 2012.

3   Q.   And what is the title of this document?

4   A.   It is a discharge summary.

5   Q.   So towards the top on the right, what does this

6   document say under reason for discharge?

7   A.   Patient died at home.

8   Q.   And could you read what this document says under

9   summary of care?

10   A.   Show decline until past month when decline

11   increased.   Past two weeks significant decline with

12   decreased intake, productive cough, increasing

13   shortness of breath, no improvement with continuous

14   oxygen, nebulizer treatment, antibiotic.

15          Entered dying process on 3/24, actively

16   dying process started on 3/26.   Treated with comfort

17   measures of Roxanol, Atropine, CB 3/28/12 with the

18   family in attendance.   Comfort maintained during the

19   dying process.

20   Q.   What, if anything, did the facts that have been

21   reviewed in the documents here told you about the

22   overall picture of Laura H.'s health during the time

23   she received hospice services?

24   A.   Ms. Laura's condition continued to decline.   She

25   became weaker, needing more assistance with her care,

1   just to get through the day, had increasing

2   difficulty with swallowing, and then developed an

3   infection that she could not really recover from.

4   Q.   Can you tell me whether or not Ms. Laura H.

5   remained hospice eligible during the time she

6   received hospice services?

7   A.   Yes.  Laura did continue to be hospice eligible

8   throughout her stay.

9   Q.   In reaching your opinions, did you rely only on

10   those medical records that we've reviewed here today?

11   A.   No.

12   Q.   What else did you rely on?

13   A.   I reviewed all of Ms. Laura's records.

14   Q.   Were the other records overall consistent with

15   the opinions you've given today?

16   A.   Yes, they were.

17   Q.   Dr. Melvin, did you have the opportunity to

18   review the medical records for Ms. Catherine F.?

19   A.   Yes.

20        MR. CHRISTIE:  Catherine F. is Tab 20 and

21   her medical records have been pre-admitted

22   Defendant's Exhibit 534, 534-A and 534-B.

23   Q.   What was Catherine F.'s age at her first hospice

24   admission?

25   A.   She was 89 years old.

1  Q.   What was the date of her first hospice

2  admission?

3  A.   January the 5th of '09.

4  Q.   And she received hospice services until what

5  date for her first hospice admission?

6  A.   July the 3rd of '09.

7  Q.   What was the date of Catherine F.'s second

8  hospice admission?

9  A.   11/13 of '09.

10  Q.   Until when did Catherine F. receive hospice

11  services for her second admission?

12  A.   May the 21st of '11.

13  Q.   Have you reached a conclusion as to whether or

14  not Catherine F., at the time of her first hospice

15  admission, had a prognosis of six months or less, if

16  her illness ran its normal course?

17  A.   I did find Ms. Catherine to be hospice eligible

18  at the time of her admission.

19  Q.   Why did you reach that opinion?

20  A.   She was admitted with adult failure to thrive

21  with ongoing unintentional weight loss.  She had a

22  history of hypertension, peripheral vascular disease

23  with mini strokes or the TIA.  Her oral take had

24  decreased.  She had developed a bed sore and pain

25  were reasons that Catherine was eligible for hospice.

6075

1  Q.   Have you reached a conclusion as to whether or

2  not Catherine F., throughout the time she was

3  receiving hospice services, during her first

4  admission, had a prognosis of six months or less, if

5  her illness ran its normal course?

6  A.   I did feel that Ms. Catherine continued to be

7  hospice appropriate through her first hospice course.

8  Q.   Why did you reach that opinion?

9  A.   Patient became more dependent in her functional

10  status, began to have more confusion and not be able

11  to communicate to make her needs known.  Her weight

12  loss were reasons that Catherine continued to be

13  hospice eligible.

14  Q.   What was the reason hospice services for

15  Catherine F. ended for her first admission?

16  A.   An extended prognosis.

17  Q.   For Catherine F.'s second hospice admission,

18  have you reached a conclusion as to whether or not,

19  at the time of hospice admission, had a prognosis of

20  six months or less, if her illness ran its normal

21  course?

22  A.   Yes.  Ms. Catherine was felt to be hospice

23  eligible during her second admission.

24  Q.   And why did you reach that conclusion?

25  A.   Her weight that she was discharged with from her

1  first admission, the patient was unable to maintain

2  that weight and had a significant weight loss was the

3  reason that Catherine was felt to be hospice

4  eligible.

5  Q.   Catherine's second hospice admission, have you

6  reached a conclusion as to whether or not, throughout

7  the time she received hospice services, had a

8  terminal illness?

9  A.   Yes.  Catherine continued to be hospice eligible

10  throughout her hospice stay.

11  Q.   And why did you reach that opinion?

12  A.   Ongoing weight loss, infection, becoming more

13  frail until her death.

14  Q.   And what was the reason her hospice services

15  ended for her second admission?

16  A.   She died on 5/21/11.

17  Q.   Dr. Melvin, if I could get you to please look at

18  Page 5957 of Defendant's Exhibit 534-A.

19        And if you could tell me what the date of

20  this document is at the bottom.

21  A.   January the 5th of '09.

22  Q.   If you could tell me, looking at the top, what

23  type of document is it?

24  A.   It's an initial nursing assessment.

25  Q.   What is Catherine F.'s age?

6077

1   A.   89.

2   Q.   And what is her diagnosis?

3   A.   Adult failure to thrive.

4   Q.   If you'll look in the box below there where it

5   says nutritional status, will you tell us what is

6   marked there under nutritional status on this page?

7   A.   The patient had had a 13 pound weight loss the

8   six months prior.  Her current weight was 94 pounds

9   with a BMI of 17.2.

10  Q.   If we could go to the fifth page of this

11  document, which is Page 5961.  Brad, if you can pull

12  up Page 66 of Defendant's Exhibit 534-A, please.

13          Could you read what this initial assessment

14  summary says, please?

15  A.   89 year old white female admitted to hospice per

16  orders from Dr. Shirley.  Admission diagnosis is

17  adult failure to thrive.  Comorbidities include

18  hypertension and anemia.

19          Patient lost -- weight loss of 12 percent in

20  six months.  BMI is 17.2.  Patient is dependent in

21  six of six ADLs with limited ability to make needs

22  known.

23          Patient resides in the Montgomery Care and

24  Rehab in Room 107.  She is alert, confused and

25  disoriented with garbled speech.

6078

1  Q.   What does this initial assessment summary tell

2  you, if anything, about the overall picture of

3  Catherine's hospice admission and her eligibility at

4  that time?

5  A.   That Ms. Catherine had an unintentional weight

6  loss.  She was more dependent in her ADLs and could

7  not always make her needs known, which made her

8  hospice eligible at the time of admission.

9  Q.   All right.  If you would, please, look at Page

10  7060 of Defendant's Exhibit 534-A.

11        And if you'll look at the date at the top of

12  that document.  What date does that seem to have?

13  A.   November 13 of '07.

14  Q.   If you'll look at the start of care date, what

15  does that look like to you?

16  A.   It's 11/13/09.  I'm sorry.  So it's 11/13/09.

17  Q.   If we could look at the second page of this

18  document, Page 7061.

19        What does this document say under notes?

20  A.   It's determining -- 90 year old with stage six

21  dementia.  Previously on hospice for adult failure to

22  thrive, diagnosed with weight -- discharged for

23  weight gain and extended prognosis.

24        Has experienced a ten pound weight loss from

25  8/09 to 10/09 from 116.6 pounds to 106.2 pounds

1   within three months.

2           Patient reportedly eats 25 percent.  BMI is

3   18.17.  PPS is 30 percent.

4   Q.   What does this document indicate is her PPS

5   score up under disability?

6   A.   Can you scroll?  30 percent.

7   Q.   If you could go to Page 6839 in Defendant's

8   Exhibit 534-A.

9           What's the date at the top of this document?

10  A.   June the 30th of '10.

11  Q.   And if we go to Page 7 of this document, which

12  is Page 6845, of Defendant's Exhibit 534-A.

13          If you could read what this says under

14  nursing narrative.

15  A.   Possible decrease appetite -- okay.  90 year old

16  female with a diagnosis of adult failure to thrive.

17  Nine pound weight gain in six months.  BMI is now 19.

18  Megace stopped three weeks ago per facility

19  regulations.  Plan to watch weight and appetite.

20          THE COURT:  What is Megace?

21          THE WITNESS:  Megace is a hormone that is

22  indicated for the treatment of head and neck cancer

23  and lung cancer.  When people are receiving chemo and

24  radiation treatments to maintain their weight is what

25  it's been approved for.

1  Q.   (By Mr. Christie)  When you say approved, who

2  would be doing the approving?

3  A.   The FDA.

4  Q.   And the FDA is?

5  A.   The Federal Drug -- I'm sorry.

6  Q.   Administration?

7  A.   Yes.

8  Q.   Why would there be facility regulations that

9  would make Catherine F. unable to continue to take

10 Megace?

11 A.   For one particular facility, I don't know why,

12 but Megace is not without side effects.

13          MS. TAPIE:  Object to the lack of foundation

14 or speculation.

15          THE COURT:  Sustained.  But you may rephrase

16 the question.

17 Q.   (By Mr. Christie)  In your hospice practice, are

18 you familiar with what side effects Megace may have

19 on the elderly?

20 A.   Yes.

21 Q.   Is Megace FDA approved for use in the elderly?

22          MS. TAPIE:  Objection, leading.

23          THE COURT:  Overruled.

24 A.   It's commonly used for weight gain.  The weight

25 gain that -- the weight that's put on is more central

1   adipose tissue, like in the belly.

2          The side effects that it can have peripheral

3   edema or swelling.  It can also cause vaginal

4   bleeding, because it is a hormone that is being used

5   for the side effects of the weight gain.

6   Q.   You used the term adipose tissue.  What is

7   adipose tissue?

8   A.   Fat.  So the patients will put fat on in their

9   belly, so not muscle mass.

10  Q.   Do you understand what the term "off label use"

11  means?

12  A.   Yes.

13  Q.   Would you explain to what an off label use is?

14         MS. TAPIE:  Objection to relevance.

15         THE COURT:  Overruled.

16  A.   An off label use of a medicine is a medicine

17  being used and it's not the reason it's been approved

18  to be used.  And it may be used for its side effect,

19  good or bad, usually good but it's not --

20         MS. TAPIE:  Object as nonresponsive.

21         THE COURT:  Sustained as to the last comment

22  about good or bad but the rest of it is all right.

23  A.   Okay.

24  Q.   (By Mr. Christie)  Dr. Melvin, why is it

25  significant that Megace puts on belly fat rather than

 1  other types of weight?

 2  A.   That's just -- that's just how it works.  It is

 3  going to -- it's not going to be a muscle mass, it's

 4  not going to -- and the weight that it puts on is not

 5  sustained.

 6  Q.   If I can get you to look at Page 6451 of

 7  Defendant's Exhibit 534-A.

 8          What is the date at the top of this

 9  document?

10  A.   July the 19th of '01.

11  Q.   What is the title of the document?

12  A.   It's a physician progress note.

13  Q.   And what does this document say under

14  examination, findings/note?

15  A.   Patient is a 90 year old admitted on 11/09 to

16  hospice for adult failure to thrive with 13 pound

17  weight loss over six months.  Weight on 12/09 was 100

18  pounds, BMI 18.

19          Comorbids include an iron deficiency anemia,

20  dementia and a history of TIAs.  Patient admitted --

21  patient admitted in 2007 with a weight of 114.8.

22  Facility no longer able to dispense Megace.  Stopped

23  6/10/10.

24          Now 112.8 pounds on 7/10.  104 pounds three

25  months ago.  98.2 pounds six months ago.

1          Patient has a history of significant weight

2     loss after Megace, attending MD stated nothing else

3     works for this patient.

4          Exam patient in the TV room in the

5     wheelchair.  Sleeping, arouses easily.  No acute

6     distress.  One word responses.  Falls asleep again

7     during assessment.

8     Q.   If you would read the next page, Page 6452 of

9     Defendant's Exhibit 534-A.

10    A.   Lungs are clear to auscultation.  Respiratory

11    rates between ten and 12.  Cardiac is regular rate

12    and rhythm.  On MCR appreciated.  Extremities have no

13    edema.

14         Assessment and plan:  90 year old under

15    hospice care for adult failure to thrive.  This

16    patient has a history significant weight loss with

17    Megace DC.  Facility states it will no longer be able

18    to dispense Megace.

19         Patient has been off meds approximately a

20    month according to the facility nurse.  Patient's

21    weight loss has historically occurred several months

22    after the treatment.

23         Would recommend recertification for hospice

24    at this time in anticipation of the above.

25    Q.   Megace DC, what does that mean?

6084

1   A.   That it was stopped.  I'm sorry.

2   Q.   If you could look at Page 6278 of Defendant's

3   Exhibit 534-A.

4           What is the date at the top right of the

5   document?

6   A.   March 1st, '11.

7   Q.   What is the title of this document?

8   A.   Can you scroll to the top, please?  Practitioner

9   progress note.

10  Q.   What is the reason for visit and read that in

11  the box under it, please.

12  A.   90 year old under hospice care for adult failure

13  to thrive.  Weight has declined from 110.4 pounds

14  8/20 to 85.4 pounds 2/11.

15          This is a decrease of 9.7 percent total body

16  weight in three months and 22.6 percent of the total

17  body weight in six months.

18          She is fed by staff at the assisted table in

19  the large dining room.  They report poor, continued

20  poor appetite.

21  Q.   What does this document say under past history

22  problem list?

23  A.   History of dementia, renal disease, transient

24  ischemic attacks, hypertension, iron deficiency

25  anemia, hypercholesterolemia, diverticulitis,

1  admitted to hospice 11/9 after 13 pound weight loss

2  over six months.

3            Weight 12/09 was 100.  BMI 18.  Patient

4  regained weight to 112.8 pounds after starting Megace

5  but this medicine has been stopped 6/10 and has again

6  lost weight.

7  Q.   All right.  If we could go to Page 3 of this

8  document, Page 6280 of Defendant's Exhibit 534-A.

9            If you could tell me what this says under

10  labs and data and what that means?

11  A.   It's 11/10, 4/10, the creatinine is 1.5 which is

12  elevated.  Protein is 5.9 which is low.  Albumin is

13  2. -- looks like six to me, which is low.  Hemoglobin

14  and hematocrit is 9.7 and 31.5 which is low.

15  Q.   What do those lab values tell you?

16  A.   She has a history of iron deficiency anemia, so

17  this reflects -- we see this with her low hematocrit

18  and hemoglobin.

19            The protein and the albumin level being low

20  really reflects her nutritional status.  The

21  creatinine could reflect the fact that she's volume

22  contracted.

23            It could also be tied in with her

24  nutritional status.  So muscle mass, when you lose

25  muscle mass, sometimes the creatinine will increase.

6086

1   Q.   And what does this document say next to

2   prognosis?

3   A.   Due to the patient's advanced age, continued

4   weight decline, BMI and hypoalbuminemia and advanced

5   dementia, I believe her life expectancy remains six

6   months or less.

7   Q.   If we could look at the next page, Page 6281 of

8   Defendant's Exhibit 534-A.

9          Who signed this document and what date?

10  A.   It is the physician and it's signed on 3/1/11.

11  Q.   All right.  If you could, I would like to go

12  back to the prior page.  And what does this say in

13  her psychosocial/cultural?

14  A.   Social worker provides emotional support and

15  socialization due to social isolation.  Family

16  desires that patient remain in the skill nursing

17  facility and avoid hospitalization, with continued

18  focus on comfort care.  They do not desire feeding

19  tubes or aggressive treatment.

20  Q.   Dr. Melvin, if I could ask you to please look at

21  Page 6395 of Defendant's Exhibit 534-A.

22          And what's the date at the top of this

23  document?

24  A.   5/21/11.

25  Q.   What's the title of the document?

1   A.   It's a discharge summary.

2   Q.   What's the reason for discharge?

3   A.   Patient died in the nursing home.

4   Q.   And if you could read what it says under summary

5   of care, please.

6   A.   91 year old female with a diagnosis of adult

7   failure to thrive admitted on 11/13/09.  Had a steady

8   weight loss and poor appetite.  Was surrounded by

9   family the last days of her life and passed away

10  peacefully on 5/21/11 at 3:15 a.m.

11  Q.   Dr. Melvin, what, if anything, did the facts

12  that we have reviewed in these documents tell you

13  about the overall picture of Catherine F.'s

14  eligibility for hospice during the time that she

15  received hospice services?

16  A.   That Ms. Catherine was hospice eligible at the

17  time of admission and she continued to be hospice

18  eligible until her death as evidenced by her ongoing

19  weight loss and decreasing or increasing dependence

20  on those that were around her.

21  Q.   In reaching your opinions, did you rely only on

22  the medical records that we've reviewed here today?

23  A.   No.

24  Q.   What else did you rely on?

25  A.   I looked at all of Ms. Catherine's medical

1   records.

2   Q.   Were the other medical records overall

3   consistent with the opinions that you've given today?

4   A.   Yes.

5           THE COURT:  Are y'all ready for a break?  We

6   will come back at 3:45.

7           During this break, as during all others, no

8   conversation about the case.  See you then.

9           (Jury excused.  Break taken.)

10          (Open court.  Jury present.)

11          THE COURT:  Mr. Christie, you may continue.

12          MR. CHRISTIE:  Thank you, Your Honor.

13  Q.   Dr. Melvin, did you have the opportunity to

14  review the medical records of Ms. Marian F.?

15  A.   Yes.

16          MR. CHRISTIE:  Marian F. is Tab 77.  And her

17  medical records have been pre-admitted as Defendant's

18  Exhibit 531, 531-A and 531-B.

19  Q.   Dr. Melvin, what was Ms. Marian F.'s age when

20  she was admitted to hospice?

21  A.   She was 89 years old.

22  Q.   And when was she admitted to hospice?

23  A.   December the 28th of '07.

24  Q.   Until when did Ms. Marian receive hospice

25  services?

1  A.    December the 17th of '09.

2  Q.    Have you reached a conclusion as to whether or

3  not Ms. Marian F., at the time of hospice admission,

4  had a prognosis of six months or less, if her illness

5  ran its normal course?

6  A.    I did -- I do.  Ms. Marian was hospice eligible

7  at the time of her admission.

8  Q.    Why did you reach that opinion?

9  A.    She was admitted with adult failure to thrive

10  had a BMI of 14.  She was dependent in all of her

11  ADLs and had a pressure ulcer or bedsore on her right

12  hip are the reasons that Marian was eligible for

13  hospice care.

14  Q.    Have you reached a conclusion as to whether or

15  not Marian F., throughout the time she received

16  hospice services, had a prognosis of six months or

17  less, if her illness ran its normal course?

18  A.    I felt that Ms. Marian continued to be hospice

19  eligible throughout her hospice stay.

20  Q.    Why did you reach that opinion?

21  A.    She continued a decline in her functional state

22  with weight loss, sleeping up to 20 hours a day, a

23  decrease in her oral intake, at times refusing to eat

24  and had a steady decline is why Ms. Marian was felt

25  to continue to be hospice eligible.

1  Q.   What was the reason hospice services for

2  Ms. Marian F. ended?

3  A.   Extended prognosis.

4  Q.   If you would look at Page 5779 of Defendant's

5  Exhibit 531, and what's the date at the top of this

6  document?

7  A.   December the 5th of '07.

8  Q.   How does that date compare to the admission date

9  of Ms. Marian F. to hospice services?

10  A.   It was 23 days before she was admitted.

11  Q.   If you could read -- what type of medical record

12  is this?

13  A.   It looks like a progress note.

14  Q.   If you could read what this record says under

15  review of systems.

16  A.   Geriatric syndrome, weight loss, expected weight

17  loss due to end of life process, no change in,

18  functional status, health status, mental status.

19  Appetite, 26 to 50 percent.  Negative for falls,

20  constipation.  Positive for weight loss, weight

21  change is expected.

22  Q.   What does this document say under

23  constitutional?

24  A.   Alert, member is cooperative with exam lying in

25  bed in no distress.  Member does recline in fetal

6091

1  position, mildly contracted, when up in a chair.

2  Needs to be watched as to not tumble forward from the

3  chair.  Has arm guards in place.  Her HEENT vision is

4  good enough to perceive a person in the room.

5          Member's dementia has progressed to the

6  point where her verbal interactions are limited and

7  she could answer only yes/no questions.

8          Hearing is adequate for exam.  However

9  member is unable to follow commands and take a deep

10  breath for lung sound.

11          Cardiac, regular rate and rhythm, no murmur,

12  no chest pain, palpitations or dyspnea.

13          Respiratory, lungs are clear to auscultation

14  bilaterally.  No coughing, no wheezing.

15          Psychiatric, negative for agitation,

16  positive for anxiety or anxious.

17  Q.  What does this document say under clinical

18  indicators?

19  A.  She is dependent in bathing, dressing,

20  toileting, transferring and eating, five out of six

21  of her ADLs.

22          Mobility, she's wheeled by others.  She uses

23  the assist of a wheelchair.

24  Q.  What does this document say under assessment and

25  plan?

1  A.   The diagnosis, senile dementia with depressive

2  features.

3       Medicine:  Ativan injection syringe two

4  milligrams ml.

5       Treatment plan:  Continue with current

6  treatment.  Member is on comfort care.  Medications

7  will be adjusted with this in mind as well as

8  interventions and lab work.

9       Will provide a safe environment to protect

10  her from injury and provide comfort and pain control.

11       The next diagnosis is chronic kidney disease

12  stage three.  Due to family's request, no blood draw

13  labs, request not to draw labs, will not monitor

14  renal function and since member is taking no PO meds,

15  no need to adjust dose.

16       Next diagnosis, slow transient constipation.

17  Medications are Magnesium hydroxide.

18       Plan, will monitor bowel habits and work to

19  keep member regard -- regular to avoid constipation.

20  Encourage fluids and intake as tolerated.

21       The next diagnosis is mixed incontinence

22  urge and stress.  Member wears protective garment.

23  Will keep skin clean and dry.  Will use moisture

24  barrier as needed to help protect the skin.

25       The next is paralysis agitans.  Medicines

6093

1  are acetaminophen two tablets orally every four as

2  needed, max of four grams a day.

3  Q.   Could you tell us what paralysis agitans is,

4  please?

5  A.   Someone that ICD 9, paralysis agitans comes up

6  under this ICD code to represent Parkinson's disease.

7  I think in this setting, it just -- it's speaking to

8  her rigidity.

9       So she has the contractures and it's just

10 speaking to how rigid she is.

11 Q.   Could you tell us what the ICD 9 codes are,

12 please?

13 A.   They are codes to -- they're used for

14 description of diseases for billing purposes.

15 Q.   Are there examples of ICD 9 codes towards the

16 bottom here on Page 5779 of Defendant's Exhibit

17 531-A?

18 A.   These are all codes that are being used and this

19 is a V code which just talks about the palliative

20 care component.

21 Q.   If we could look at the next page, Page 5778 of

22 Defendant's Exhibit 531-A.

23      Could you tell us what the treatment plan

24 for Ms. Marian F. at this time is?

25 A.   Medications have been discontinued.  Will

6094

1   provide pain control for comfort and other

2   interventions.

3          Lab draw, ABT et cetera will be done with

4   comfort in mind.

5   Q.   And could you tell us what it says under family

6   communication?

7   A.   Phil and Sandy, son, there's a number, discussed

8   medication discontinuation, are in favor of the plan

9   as long as Marian is comfortable.

10          Discussed current condition, change in plan

11   of care, family issues/concerns, keep her

12   comfortable.  Pain medicine, if needed.

13   Q.   If we could look at Page 5390 of Defendant's

14   Exhibit 531-A.

15          If you could tell me, from the bottom of the

16   document, what is the date of this document?

17   A.   This is December the 28th of '07.

18   Q.   How does that date compare to the date of Marian

19   F.'s admission to hospice?

20   A.   This is her hospice admission date.

21   Q.   What is the title of this document up at the

22   top?

23   A.   It's a nursing assessment.

24   Q.   And what is there under history of illness?

25   A.   Adult failure to thrive.

1   Q.   Towards the bottom of this document under

2   emotional status behavior, what does this document

3   say?

4   A.   Has crying spells at times.  Has Ativan as

5   needed.  Patient on routine PO meds -- patient not on

6   routine PO meds as long as history -- long history of

7   refusing.

8   Q.   If we could go to Page 5 of this nursing

9   assessment, Page 5394 of Defendant's Exhibit 531-A.

10         If you could tell us what this document says

11  under summary/problems/intervention.

12  A.   88 year old female with recent five and a half

13  pound weight loss in a month.  Patient with very poor

14  PO intake.  Takes bites only.

15         Patient with a history of dementia.

16  Currently not on any routine PO meds and patient has

17  long history of refusing meds.

18         Patient with a new pressure ulcer to the

19  left hip on 12/26/07.  Patient's family only wants

20  comfort measures at this time.

21         Patient with a history of crying spells with

22  Ativan as needed.  No pain.  Patient slow to respond.

23  Q.   What do the documents we've reviewed thus far

24  for Ms. Marian F. tell us about her eligibility for

25  hospice at the time of admission?

1  A.   Ms. Marian was declining before her admission to

2  hospice as evidenced by her weight loss.  She was

3  refusing medicine, the family respected her wishes,

4  and a lot of the medicines were stopped, all of the

5  medicines were stopped with the exception of the

6  Ativan.

7       She had poor PO intake, was developing some

8  contractures and had developed a bedsore on her hip

9  and was hospice eligible at the time of her

10  admission.

11  Q.   If we could go to Page 5324 of Defendant's

12  Exhibit 531-A.

13       If you could tell us, what is the date at

14  the bottom of this document?

15  A.   August the 24th of '08.

16  Q.   What is the title of the document up at the top?

17  A.   It's a nursing assessment.

18  Q.   And what does it say under history of illness?

19  A.   Adult failure to thrive.

20  Q.   And what does it say under past medical history?

21  A.   Chronic kidney disease, contract -- constipation

22  and hypothyroidism.

23  Q.   If we could go to Page 5 of this document which

24  is Page 5328 of 531-A.

25       If you could read under

1  summary/problems/intervention.

2  A.   Patient total care with all ADLs.  Wheelchair

3  bound.  Patient sleep in bed in a fetal position.

4  Sleeping 18 to 20 hours a day.  Patient PO intake is

5  less than 25 percent at meals.

6            Patient is cachectic in appearance.  Patient

7  has non-sensical speech.

8            89 year old lady in a fetal position --

9            MS. TAPIE:  Objection, there's no question

10  pending.

11            THE COURT:  Sustained.  Dr. Melvin, you just

12  need to wait for Mr. Christie to ask you a question.

13            THE WITNESS:  Okay.

14            THE COURT:  Thank you.

15  Q.   How does the record that you've read so far

16  about a woman of this age with the contractures that

17  she has and the other problems that she has -- what

18  does that tell you?

19  A.   That this patient is very sick.  It's taking her

20  to sleep 18 to 20 hours just to get through a day to

21  take in less than 25 percent of a meal.

22            When we talk about in the fetal position,

23  the patient is literally contracted and not straight

24  at all but just sort of the hunkered down.

25  Q.   If we could look at Page 5250 of Defendant's

1   Exhibit 531-A.

2           What is the date at the bottom of this

3   document?

4   A.   April 21st, '09.

5   Q.   What is the title of the document up at the top?

6   A.   Reassessment for ongoing eligibility.

7   Q.   And what does this document tell us under

8   nutritional status?

9   A.   She's anorexic.  She's having difficulty

10  chewing.  She has temporal wasting.  She has

11  difficulty swallowing.  Her diet has been changed to

12  pureed.

13          She has lost four pounds in six months with

14  her current weight being 85 pounds and she has a BMI

15  of 14.4.

16          Patient prefers chips at happy hour, bread

17  and jelly, otherwise she only eats bites, fun food.

18  Q.   If we could go to Page 5 of this reassessment

19  for ongoing eligibility.  If you could tell us what

20  it says on Page 5254 on Defendant's Exhibit 531-A

21  under summary, identify problems and intervention

22  over the last 14 days.

23  A.   Reviewed chart and MAR.  No new orders or

24  changes.  Collaborate with staff on any new issues or

25  concerns.  None voiced.

1          Patient sitting in dining room with the home
2   health aide Amber feeding a few bites of her lunch.
3   She is calm at this time.  Smiles at me and mumbles
4   words or two I can't understand.
5          She has no signs and symptoms of pain at
6   this time.  Looking at possible discharge --
7   discontinuation of hospice services at this point.
8          Patient's weight has been stable for the
9   last few months.  Her pre-albumin level was 25.
10  Patient has been on service for two years.
11         Will continue to meet with the son Phil, the
12  power of attorney, notified of update.  No other
13  problems identified at this time.
14  Q.  If we could look at Page 5167 of Defendant's
15  Exhibit 531-A.
16         What is the date at the bottom of this
17  document?
18  A.  December the 3rd of '09.
19  Q.  What is the title of the document?
20  A.  Reassessment for ongoing eligibility.
21  Q.  And what does this document tell us under
22  nutritional status?
23  A.  Anorexic, dehydration, dry mouth, temporal
24  wasting, cachexia.
25         She's had a 1.2 pound weight loss in a

1   month.  Her weight now is 83.1 pounds.  And her BMI

2   is 14.3.  Patient thin and temporal wasting.

3   Q.  What, if anything, did the facts that we've

4   reviewed in these documents tell you about the

5   overall picture of Ms. Marian F.'s hospice

6   eligibility during the time she received hospice

7   services?

8   A.  Ms. Marian was hospice eligible at the time of

9   admission and she continued to be hospice eligible

10  through her stay with hospice as evidenced by her

11  ongoing unintentional weight loss and frailty.

12  Q.  Dr. Melvin, did you have the opportunity to

13  review the medical records of Mary H.?

14          I'm sorry, I have several questions.  Let me

15  go back to Ms. Marian F.

16          In reaching your opinions about Marian F.,

17  Tab 78 -- I mean, sorry, Tab 77, did you rely only on

18  the medical records that we reviewed here today?

19  A.  No.

20  Q.  What else did you rely on?

21  A.  I looked at all of Ms. Marian's medical records.

22  Q.  Were the other medical records overall

23  consistent with the opinions you've given here today?

24  A.  Yes.

25  Q.  Dr. Melvin, did you have the opportunity to

1  review the medical records for Mary H.?

2  A.   Yes.

3         MR. CHRISTIE:   Mary H. is found at Tab 84,

4  her medical records are pre-admitted as Defendant's

5  Exhibit 546, 546-A and 546-B.

6  Q.   Dr. Melvin, what was Mary's age at the time she

7  was admitted to hospice?

8  A.   79.

9  Q.   And on what date was she admitted to hospice

10  services?

11  A.   January the 22nd of '09.

12  Q.   Until what date did Mary H. receive hospice

13  services?

14  A.   On March the 17th of '10.

15  Q.   Have you reached a conclusion as to whether or

16  not Mary H., at the time of hospice admission, had a

17  prognosis of six months or less, if her illness ran

18  its normal course?

19  A.   I do.  I felt Ms. Mary was hospice eligible at

20  the time of her admission.

21  Q.   And why did you reach that opinion?

22  A.   Ms. Mary was admitted with adult failure to

23  thrive, she had had a number of falls prior to

24  admission.  She had unintentional weight loss with

25  difficulty in chewing despite her diet being changed.

1              With her comorbid conditions of her

2    dementia, her chronic anxiety and hypertension were

3    the basis for Ms. Mary being hospice eligible.

4    Q.   Have you reached a conclusion as to whether Mary

5    H., throughout the time she received hospice

6    services, had a prognosis of six months or less, if

7    her illness ran its normal course?

8    A.   Yes.  Ms. Mary continued to be hospice eligible

9    throughout her stay.

10   Q.   And why did you reach that opinion?

11   A.   Her condition progressed to the point she was

12   dependent in all of her ADLs.  She developed pressure

13   ulcers of her hip, right and left.

14              She had increase in pain, required pain

15   medicine to help control her symptoms.  She became

16   more confused were the reasons that Ms. Mary

17   continued to be hospice eligible throughout her stay.

18   Q.   What was the reason that hospice services for

19   Mary H. ended?

20   A.   Extended prognosis.

21   Q.   If you'll look at your -- the end of one of the

22   paragraphs in your opinion --

23              MS. TAPIE:  Was that a question?

24   Q.   (By Mr. Christie)  Dr. Melvin, let me ask again,

25   can you tell us what the reason was that her hospice

1   services were discontinued referring to the notes

2   that you have two-thirds of the way down the page?

3           MS. TAPIE:  Objection, leading.

4   A.   Actually --

5           MS. TAPIE:  Objection, leading.

6           THE COURT:  Overruled.

7   A.   The patient's daughter signed revocation papers

8   and hospice service was discontinued on March 17th of

9   '10.

10  Q.   Dr. Melvin, if you could look -- if you could

11  look at Page 9441 of Defendant's Exhibit 546-A.

12          Could you tell us what the date is at the

13  top of that document?

14  A.   This is January the 13th of '09.

15  Q.   And how does this date relate to when she first

16  started hospice services?

17  A.   Probably nine days or so before she was

18  admitted.

19  Q.   What type of document is this?

20  A.   It's a history and physical.

21  Q.   What does this document say under where it says

22  patient name?

23  A.   The chief complaint, very agitated, wandering in

24  wheelchair, trying to stand frequently in spite of

25  safety belt.

1          Advanced dementia with behavior, severe

2    anxiety, hypertension.

3          Medications, Seroquel dose was increased.

4    Q.   What does this say as her weight under physical

5    exam?

6    A.   101.7 pounds.

7    Q.   Whose signature is at the bottom of this

8    document?

9    A.   It's a doctor, Brunelle.

10   Q.   If I could get you to look at Page 9664 of

11   Defendant's Exhibit 546-A.

12          What's the date at the bottom of this

13   document?

14   A.   This is February 24th of '09.

15   Q.   What type of document is this?

16   A.   It's a hospice interdisciplinary plan of care.

17   Q.   What does this document say under changes in the

18   middle of the page?

19   A.   Comfort:  Positioning when asleep in the

20   wheelchair.  High-back reclining wheelchair

21   furnished.  Comfort maintained.

22   Q.   And what does this document tell us in the box

23   below what you just read?

24   A.   Sorry.  Adult failure to thrive, February the

25   weight was 96.4, BMI was 17.  PPS was 40.  100 ADL

1   dependent.  Increase risk of injuries.

2          Weight loss is 5.3 pounds in a month.  She's

3   on a mechanical soft diet.  She needs supplements

4   three times a day.  Fortified breakfast cereal.

5          Encouragement and assistance with meals.

6   There is a left outer portion of the buttocks stage

7   two, superficial, pink, it's not infected and

8   Xenaderm is applied.

9   Q.   Who signed this document?

10  A.   The physician.

11  Q.   What physician is that that's the one -- the

12  first one signing?

13  A.   So the attending or the regular physician, the

14  medical director, the nurse, social worker, spiritual

15  coordinator and then other staff.

16  Q.   What does this document tell you about Ms. Mary

17  H.'s health at the time that she was admitted to

18  hospice?

19  A.   That she had unintentional weight loss.  She was

20  more frail.  She had to have her diet changed from a

21  regular diet to something softer and, in addition to

22  that, was having high calorie supplements.  So

23  fortified breakfast cereal is going to be a cereal

24  with a lot of calories in it.

25          In addition, they're giving her three times

6106

1   a day supplements.  And despite that, she has lost

2   this weight.

3   Q.   If we could look at Page 9364 of Defendant's

4   Exhibit 546-A.

5          Sort of in the middle of the page, could you

6   tell us the date that this document was signed?

7   A.   It's September the 9th of '09.

8   Q.   And what is the title of the document?

9   A.   It's a narrative summary of prognosis

10  documentation.

11  Q.   And what does this document indicate is the

12  diagnosis for Ms. Mary H.?

13  A.   Adult failure to thrive.

14  Q.   And what are the comorbid conditions listed

15  there?

16  A.   Alzheimer's, anxiety, psychosis, esophageal

17  reflux and hypertension.

18  Q.   If you could, read the text under history and

19  progress of the terminal illness.

20  A.   February weight was 96.4.  August weight was 99

21  to 90.5 which was a 5.9 pound weight loss in six

22  months.  8.5 pound loss in two week time.  Patient is

23  on fortified diet, snacks, supplements fed by staff.

24  Fairly good appetite.

25          Stage two wound recurrent to the left hip.

6107

1   Pinpoint size of pink surrounding tissue.  Twice a

2   day dressing.  Wound care.  100 percent in ADL

3   dependent.  PPS is 40.

4          Alternates with periods of hyperactivity and

5   lethargy.  She's frail.  She's confused.  She's had

6   multiple falls.  One with an injury of rib fractures.

7          Has a PSA floor mat.  She's on a low bed.

8   She has a lap tray, a safety belt has been ordered.

9          All needs are anticipated.  Pain controlled

10  with a Fentanyl patch, which is a pain patch, and she

11  remains hospice appropriate.

12  Q.  For a person in Mary's condition, what kind of

13  risks are there with falls?

14  A.  Rib fractures, hip fractures.  As a result of

15  the rib fractures, patients can get pneumonia.

16  Patients can die from falls.

17  Q.  If we could look at Page 9498 of Defendant's

18  Exhibit 546-A.

19          What's the date at the bottom of this

20  document?

21  A.  February the 1st of '10.

22  Q.  What's the age that's shown up at the top of the

23  document?

24  A.  80.

25  Q.  If you could read under nutritional status what

1  that says in the middle of this document.

2  A.   She has difficulty chewing.  She's on a

3  mechanical soft diet.  It says she has good intake.

4         In June, she had a weight of 99 with a BMI

5  of 17.5.

6         And then as of this date, the patient had

7  not been weighed.  It's still pending.

8  Q.   If we could look at Page 5 of this document,

9  Page 9502 of Defendant's Exhibit 546-A.

10        If you could read what it says under RN

11  supervision of LPN.

12  A.   No new orders, no new issues documented.

13  Remains on hospice for adult failure to thrive.

14        Most recent weight was 99 with a BMI of

15  17.5.  February weight pending.

16        Patient alert, confused, disoriented,

17  forgetful.  Up in high-back reclining wheelchair.

18  Fully dressed.  No signs and symptoms of discomfort.

19  Has blanket which she is folding and unfolding while

20  in a chair.

21        Lungs with diminished air exchange.  No

22  respiratory distress noted.  Skin is warm, pale,

23  acyanotic.  Abdomen is flat.  Patient not on the list

24  for bowel movements.

25        Continues with a good appetite.  Continues

1   with safety belt with risk of falls and injury risk.
2   Continues to randomly self propel.
3          Purposeful movement.  Mobility requires a
4   staff.  Has bilateral foam boots to the leg.  Has one
5   plus pitting edema to the bilateral lower
6   extremities, has a stage two wound to the left hip
7   that's recurrent and now appears non-healing.
8          Receives Granuflex to bilateral heels, a
9   skin protector.  Patient has good appetite.  Is fed
10  by staff.  Takes snacks well.  Family and facility
11  encouraged to call for needs.
12  Q.  If we could look at Page 9485 of Defendant's
13  Exhibit 546-A.
14          If you could read what it says under pain
15  assessment.
16          What's the date of this document?  I'm
17  sorry.  At the bottom of the document, could you tell
18  us what the date of this document is?
19  A.  February the 10th of '10.
20  Q.  Could you read that date again, please?
21  A.  I'm sorry.  March the 10th of '10.
22  Q.  And what is the title of the document?
23  A.  It's a nursing clinical note.
24  Q.  And under pain assessment, can you tell us what
25  that says?

6110

A.   No frowns, grimaces, moaning.  Roxanol five

milligrams sublingual PRN every two hours for

moderate to severe pain.

Q.   What does it say under wound assessment?

A.   The left hip area is healed.  Bilateral heels

resolved.

Q.   What does it say under

problem/intervention/treatment?

A.   The daughter to sign revocation paperwork.  To

be off AseraCare Hospice services on 3/17.  Granuflex

stopped to heels.  Area closed.  Still has foam boots

weekly.

        Fell on 2/25/10 with no injury.  Has PSA low

bed mattress.  Propelling self about in an up-back

wheelchair.

        Smiling.  Speaks non-sensical.  Social

worker here to present paperwork.  Told patient it

was her birthday.  Patient smiled, not really

understanding.

        Again, non-sensical speech.  Dependent in

all of her ADLs for care and transfer.

        Has MS Contin, long-acting Morphine, with

Roxanol as needed in between.  Periods of extreme

anxiety.  Klonopin, Seroquel, Depakote sprinkles.

Meds are crushed.  Poor turgor.  Fragile, thin skin.

1    Has pressure-reducing mattress.  Periods of lethargy

2    with increasing sleeping.  Often this happens because

3    patient is wandering up all night -- wandering up all

4    night.

5              Needs and wants are met per staff.  On call

6    with any concerns or changes in conditions.

7    Q.   What, if anything, have the facts that we've

8    reviewed in these documents told you about the

9    overall picture of Mary H.'s hospice eligibility at

10   the time she received hospice services?

11   A.   Ms. Mary was hospice eligible.  She continued to

12   be hospice eligible throughout her stay.  Needing

13   more care, continuing to fall, becoming more

14   confused, not being able to have her needs expressed,

15   requiring to be fed, the development of pressure

16   ulcers are some of the -- and her pain are evidence

17   that Ms. Mary continued to be hospice eligible.

18   Q.   In reaching your opinions about Mary H., did you

19   rely only on the medical records that we've reviewed

20   here today?

21   A.   No.

22   Q.   And what else did you rely on?

23   A.   All of her medical records.

24   Q.   And were the other medical records overall

25   consistent with those -- with your opinion?

6112

```
 1   A.   Yes.
 2   Q.   Dr. Melvin, did you have the opportunity to
 3   review the medical records of Lena S.?
 4   A.   Yes.
 5        MR. CHRISTIE:   Lena S. is Tab 65 and her
 6   medical records have been pre-admitted as Defendant's
 7   Exhibit 595, 595-A, and 595-B.
 8   Q.   Dr. Melvin, how old was Lena S. when she was
 9   admitted to hospice?
10   A.   Ms. Lena was 80 years old.
11   Q.   On what date was Lena S. admitted?
12   A.   On May the 1st of '09.
13   Q.   And until what date did Lena S. receive hospice
14   services?
15   A.   November the 29th of '10.
16   Q.   Have you reached a conclusion as to whether Lena
17   S., at the time of hospice admission, had a terminal
18   prognosis?
19   A.   I did feel that Ms. Lena was hospice eligible at
20   the time of her admission.
21   Q.   Why did you reach that opinion?
22   A.   She was really sick when she was admitted.  She
23   had a gallbladder that could not be operated on.  She
24   was admitted with a diagnosis of debility and had
25   problems with swallowing, infections, methicillin
```

1  resistant staph, UTI, are the reasons that Ms. Lena
2  was felt -- was hospice eligible.
3  Q.   Have you reached a conclusion as to whether Lena
4  S., throughout the time she received hospice
5  services, had a terminal prognosis?
6  A.   Yes.  Ms. Lena continued to be hospice eligible
7  throughout her stay.
8  Q.   Why did you reach that opinion?
9  A.   In addition to what was previously mentioned,
10 the development of her pressure ulcers, becoming more
11 dependent in her ADLs, confusion, are the reasons
12 that Ms. Lena was felt to have ongoing -- to be
13 eligible ongoing with her hospice stay.
14 Q.   What was the reason hospice services for Lena
15 were ended?
16 A.   It was extended prognosis.
17 Q.   Dr. Melvin, if you could look at Page 0235 of
18 Defendant's Exhibit 595-A.
19         If you could look at the top of the document
20 where it says date of admission, what is the date?
21 A.   Looks like it's 4/23/09.
22 Q.   And how does that compare to the date of her
23 hospice admission?
24 A.   She was admitted on 5/1, so we're looking at a
25 few weeks before she was admitted.

1  Q.   What type of document is this?

2  A.   This is an H&P from the hospital.

3  Q.   And what does that first --

4        THE COURT:  What is H&P?

5        THE WITNESS:  A history and physical that

6  the doctor dictates when the patient comes in.

7        THE COURT:  Thank you.

8  Q.   (By Mr. Christie)  If you could read just the

9  first paragraph there.

10 A.   Patient is an 80 year old white female who

11 presents from nursing home with complaints of

12 right-sided abdominal pain.  Patient has had a

13 history of dementia, previous stroke with a

14 left-sided hemiplegia but complains of right-sided

15 abdominal pain throughout the day today.

16        She has had several episodes of vomiting, no

17 fever, no diarrhea.  She seems to be a little bit

18 more confused in her baseline, according to the

19 records.

20        Patient, due to her dementia, is really not

21 able to rely -- qualify the pain or really describe

22 to me any exacerbating or alleviating factors.

23 Q.   If we could go to the next page of this

24 document, Page 0235.

25        If you could read what the clinical

1   impressions are there.  The next page, please.  What

2   is the clinical impression?

3   A.   The patient had cholecystitis which is an

4   infection in the gallbladder and she had a urinary

5   tract infection.

6   Q.   And who is the doctor that dictated this note?

7   A.   Dr. Brooks.

8   Q.   All right.  If we could look at Page 0241.

9         Up at the top of the document, what is the

10  admission date that's on this document?

11  A.   April the 23rd of '09.

12  Q.   And what do the lab results that are on this

13  page tell you?

14  A.   To start off with the blood sugars, they're all

15  elevated.  And in this lady's case, it's probably

16  secondary to her infection.

17        Her BUN and creatinine are elevated so that

18  it affects her kidney function, so she had some

19  kidney insufficiency, some dehydration.

20        Her albumin level, which is her protein

21  level, is low at 2.5 along with her total protein and

22  her electrolytes or carbon dioxide is low and her

23  calcium level is low.

24        This -- the SGOTO, the AST is a liver enzyme

25  that is bumped a little bit and this is because of

6116

1   the gallbladder.

2   Q.  If we could look at Page 0254 of Defendant's

3   Exhibit 595.

4          If you could tell us what the date of the

5   exam is on this document.

6   A.  It's the following day.  It's the 24th '09.

7   Q.  What's the name of the entity at the top of this

8   document?

9   A.  It's an ultrasound biopsy aspirate --

10  Q.  I'm sorry.  What's the --

11  A.  The hospital is St. Mary's Medical Center

12  Imaging Service Department.

13  Q.  All right.  And in the paragraph under -- why

14  don't you read the title to the paragraph under the

15  date of exam and then read that paragraph for us,

16  please.

17         THE COURT:  You don't want to try to say

18  that, Mr. Christie?

19         MR. CHRISTIE:  I can embarrass myself in

20  other ways, if that's all right.

21         THE COURT:  We will leave that to the

22  professional.

23  A.  This was a percutaneous cholecystostomy.  It was

24  performed without complications under fluoroscope and

25  ultrasound guided, following explanation of the risk

1    of the procedures and obtaining informed consent.

2             Following the installation of a local

3    anesthetic, a 22 gauge needle was placed within the

4    gallbladder under ultrasound guidance.

5             Following this, an 8 french pigtail catheter

6    was placed under fluoro guidance using the -- a

7    seldinger technique.

8             Approximately 200 cc's of viscous blackish

9    fluid was aspirated from the gallbladder.  The

10   catheter was anchored to the skin.  The patient

11   tolerated the procedure well and left the department

12   in good condition.

13            The catheter will be hooked up to a bulb

14   suction for normal -- with normal saline 5 cc flushes

15   but not out every shift -- but not out every shift.

16            Uneventful, successful procedure.

17            So the lady came in --

18            MS. TAPIE:  There's no question pending.

19            THE COURT:  Sustained.

20   Q.   (By Mr. Christie)  What does this document tell

21   you?

22   A.   This patient came in with left-sided weakness

23   from an old stroke but was complaining of right-sided

24   abdominal pain and actually had an acute gallbladder

25   or acute cholecystectomy.  Because of her age and

1  frailty, the treatment was antibiotics and then to

2  drain it.

3       And so this catheter is inserted from the

4  skin under fluoro into the gallbladder and then the

5  catheter is left on the outside to continue to drain

6  the gallbladder, to give her some symptomatic relief.

7  Q.   If we could look at Page 0952 of Defendant's

8  Exhibit 595-A.

9       What is the date at the bottom of this

10 document?

11 A.   May the 1st of '09.

12 Q.   How does that compare to admission to hospice

13 date?

14 A.   This is her hospice admission date.

15 Q.   What does this document say under history of

16 illness?

17 A.   Dementia, general debility, gallbladder disease,

18 inoperable.  Insulin-dependent diabetes and a urinary

19 tract infection.

20 Q.   What does this document say under past medical

21 history?

22 A.   Insulin-dependent diabetes, hypertension,

23 coronary artery disease, an old stroke,

24 gastroesophageal reflux disease and hypothyroidism.

25 Q.   If we could go to Page 5 of this document which

1 is Bates 0956.

2       If you could read what this document says

3 under summary/problems/intervention.

4 A.  80 year old white female patient of Dr. Boss

5 admitted to hospice on 5/1/09 with a diagnosis of

6 general debility.

7       Patient was admitted to SMMC on 4/23 and

8 discharged on 5/1/09.  Patient had been nauseated and

9 vomiting at the nursing facility.  Diagnosed with

10 gallbladder disease at the hospital.  But patient's

11 health and condition was too poor for surgery.

12       A JP drain in place to drain the bile.

13 Abdomen is large and distended and some firm.

14       Patient is alert but lethargic.  Attempt to

15 answer questions but speech somewhat thick and hard

16 to understand.

17       This is a decline since admission to

18 hospice.  Patient no longer eating and drinking well,

19 taking sips and a few bites.

20       Total ADLs now.  Complains of abdominal pain

21 and pain in legs.

22       Division in buttocks is very red and

23 excoriated with a small one millimeter area opened

24 with Tegaderm covering it.

25       Bilateral groin are very red and excoriated.

1    Foley catheter is in place.  Oxygen is at 1.5 liters

2    per nasal cannula.

3              Edema noted in bilateral hands.  Right lung

4    is clear.  Left lung basal rales.

5    Q.  All right.  Dr. Melvin, if you can read -- it's

6    sort of in the middle of the sentence, do you see

7    where the word understand starts a line?

8    A.  Yes.

9    Q.  Then the sentence is, this is a decline since

10   admission to HOSP, based on the prior records, would

11   HOSP be hospice or would it be hospital?

12   A.  It's the hospital.  I'm sorry.

13   Q.  Based on the records we have reviewed, do you

14   have an opinion about the overall picture of Ms. Lena

15   S. at the time she was admitted for hospice services?

16   A.  Ms. Lena S., 80 year old, in the nursing home,

17   developed an acute gallbladder.  She's too sick to

18   have surgery on it.  She returns from the hospital

19   and is in a weakened state, completely different from

20   what her baseline was and was appropriate for hospice

21   services.

22             I was surprised that she actually made it

23   out of the hospital.  That's how sick she was.

24   Q.  If we could look at Page 0834 of Defendant's

25   Exhibit 595-A.

```
 1              The date is not on -- the date is up at the
 2   top right of this document.  Can you tell us what
 3   that date is?
 4   A.   December the 17th of '09.
 5   Q.   And what is the title of this document?
 6   A.   General medical guidelines for determining
 7   prognosis.
 8   Q.   If you would, look at the second page of this
 9   document, Page 0835 of Defendant's Exhibit 595-A.
10              And do you see the date there at the bottom
11   of the document?
12   A.   Yes.
13   Q.   What's that date?
14   A.   12/17/09.
15   Q.   And what is the handwriting that's slanted above
16   the date?
17   A.   It said, see attached dictation.
18   Q.   All right.  If we could look at Page 0836 of
19   Defendant's Exhibit 595.
20              Could you tell us what the date of that
21   document is towards the bottom?
22   A.   It's 1221/09.
23   Q.   What is the date 12/21/09?
24   A.   It is -- I guess the date that the physician
25   signed and may have seen the patient.
```

6122

Q.   If you could read up above -- if you could read
the dictation that the physician has given for his
physician narrative, please.

A.   Ms. Lena is an 81 year old female is being
certified for general debility with comorbid
conditions of depression, dysphasia, diabetes,
constipation, hypertension and hypothyroidism.

Patient continues to lose weight.  Current
at 147 pounds, which is an over ten percent in 180
days.  Weight loss continues with intervention of
patient being fed by staff and supplements.  She is
currently on a pureed diet.

Her PPS is 30 and she is dependent for all 6
ADLs.

Patient is sleeping more.  Decreased awake
time.  Has recurrent UTI.  Is confused.  Requires
Title, T-i-t-l-e space chair, unable to support head.

Condition continues to decline.  Prognosis
is poor.

I hereby certify that the reasonable
medically predicted life expectancy of this patient
is six months or less, if the disease runs its normal
course.

By signing this form, I confirm that I have
composed the narrative above based on my review of

1  the patient's medical records.

2  Q.  All right.  Dr. Melvin, if you could go to Page

3  0686 of Defendant's Exhibit 595.

4      What is the date in the top right-hand

5  corner of this document?

6  A.  April the 13th of 2010.

7  Q.  What does this document say under additional

8  signs of disease progression?

9  A.  Decreased cognitive function, increased

10  sleeping, less alert and less responsive.

11      Weight loss of 13 pounds over the past six

12  months.

13  Q.  And what does this document say under, have

14  there been changes to patient/family preference since

15  last update?

16  A.  Okay.  Family wants patient comfortable.  They

17  do not want IVs, CPR or hospitalizations.

18  Q.  If we can go to Page 7 of this document.

19      MS. TAPIE:  For completeness, can the

20  witness please read the weight history and the BMI at

21  the bottom of the page.

22  Q.  (By Mr. Christie)  Dr. Melvin, would you please

23  read the weight history that's towards the bottom of

24  that page.

25  A.  The patient has lost 13 pounds in six months.

1   She's gone from 153.6 to 146 and then her most recent

2   weight is 140.6 pounds.

3   Q.   What is her BMI at this time?

4   A.   The BMI is recorded at 24.7 percent.

5   Q.   If we could go to Page 7 of this nursing

6   assessment update, which is Page 0692 of Defendant's

7   Exhibit 595-A.

8          If you could read what it says under nursing

9   narrative.

10  A.   Patient sleeping most of the time.  Does arouse

11  with touch and when name is called, but verbally

12  interaction is much less and difficult to understand.

13  Goes back to sleep abruptly.  Stage two on coccyx.

14  No other skin issues.  Bed/chair bound.

15         Total care, six of six of ADLs.  Decreased

16  cognitive function.  13 pound weight loss over six

17  months.

18         Signs and symptoms of approaching death

19  reviewed with the family per phone conversation.

20  Q.   Dr. Melvin, if we could read and see Page 0474

21  of Defendant's Exhibit 595-A.

22         What is the date at the top of this

23  document?

24  A.   This is October the 13th of 2010.

25  Q.   And if we could go to Page 7 of this document,

6125

1   if you could read the nursing narrative that's on

2   this page.

3   A.   Chair to bedbound, very drowsy and sluggish to

4   stay awake at all during the morning hours of the

5   day.  Naps on and off all day long.  Tires easily --

6   I'm not sure what that is.

7          THE COURT:  Could that be choked?

8   A.   Chocks easily and tries to eat quickly.

9   Requires multiple something to swallow.

10   Q.   Could it be cues?

11   A.   Cues to swallow and to slow down with eating.

12          Patient decreased sleeping after the

13   Depakote was stopped.  Hemoglobin A1C was 7.1.  PPS

14   is 30.  And it says 7C, 7D FAST.  Incontinent of

15   bowel and bladder.

16   Q.   What, if anything, did the facts of the

17   documents that we reviewed tell you about the overall

18   picture of Lena S. at the time that she was receiving

19   hospice services?

20   A.   That Ms. Lena was appropriate and eligible for

21   hospice services on admission and she continued to be

22   hospice eligible as evidenced by the fact that she

23   went into the hospital.

24          In my personal experience, I'm surprised

25   that she survived the hospital.  She comes out of the

1  hospital back to the facility, she continues to have

2  some weight loss.  She continues to fail in her

3  physical condition, needing more care to the point

4  that she can't even hold up her head when they have

5  in the chair, they had to order a special chair.

6         She developed a urinary tract infection and

7  confusion and now she's choking easily just with her

8  meals.

9  Q.  In reaching your opinions, did you rely only on

10  the medical records that we've reviewed here today?

11  A.  No.

12  Q.  What else did you rely on?

13  A.  I looked at all of Ms. Lena's medical records.

14  Q.  Were the other medical records for Lena S.

15  overall consistent with the opinions that you've

16  given today?

17  A.  Yes.

18  Q.  Dr. Melvin, did you have the opportunity to

19  review the medical records for Margaret S.?

20  A.  I did.

21         MR. CHRISTIE:  Margaret S. is Tab 74 and her

22  medical records were pre-admitted as Defendant's

23  Exhibit 605, 605-A and 605-B.

24  Q.  What was Margaret S.'s age at the time she was

25  admitted to hospice?

1   A.   Ms. Margaret was 81 years old.

2   Q.   And when Ms. Margaret S. was admitted to

3   hospice, what was the date?

4   A.   June the 2nd of 2010.

5   Q.   And until what day was she provided hospice

6   services?

7   A.   September the 19th of 2011.

8   Q.   Have you reached a conclusion as to whether

9   Ms. Margaret S., at the time of her hospice

10  admission, had a terminal prognosis?

11  A.   Yes.   Margaret S. was hospice eligible.

12  Q.   And why did you reach that opinion?

13  A.   She was admitted with adult failure to thrive.

14  She had unintentional weight loss.   It was the desire

15  of the family that the patient have no feeding tube

16  or CPR.

17         She was becoming more dependent in her ADLs

18  are the reason that Ms. Margaret was hospice

19  eligible.

20  Q.   Have you reached a conclusion as to whether

21  Ms. Margaret S., throughout the time she received

22  hospice services, had a terminal prognosis?

23  A.   Margaret S. continued to be hospice eligible

24  throughout her stay.

25  Q.   And why did you reach that opinion?

6128

1   A.   Ms. Margaret S. continued to lose weight,

2   despite being placed on medicine to stimulate her

3   appetite and supplements.

4        She developed increasing confusion with

5   anxiety, pain are the reasons that Ms. Margaret S.

6   continued to be hospice eligible.

7   Q.   And what was the reason hospice services for

8   Margaret S. ended?

9   A.   Extended prognosis.

10  Q.   If you could look, please, at Page 1572 at

11  Defendant's Exhibit 605-A.

12        What's the date at the upper left of this

13  document?

14  A.   April the 5th of '10.

15  Q.   How does this compare to when Margaret S. was

16  admitted to hospice services?

17  A.   It was before her admission in June.

18  Q.   What type document is this?

19  A.   It's a physician's progress note.

20  Q.   If you could, read the first several lines of

21  this document, first six lines, really.

22  A.   So, failure to thrive, weight loss.  Per nurse,

23  the patient has lost weight since admission.  Weight

24  117 pounds January of 2010; was 105.4 pounds this

25  month.  Nurse report she does not eat, won't open her

1   mouth.

2   Q.   All right.   From reading this document, is this

3   a nursing home progress note or is this a hospice

4   progress note?

5   A.   This is a nursing home progress note.

6   Q.   All right.   If we could, let's go to the next

7   page, the next document, Page 1690 of Defendant's

8   Exhibit 605-A.

9           What is the date at the top of this

10  document?

11  A.   June the 2nd of 2010.

12  Q.   And what is the age of Ms. Margaret on this

13  document?

14  A.   81.

15  Q.   What's the diagnosis?

16  A.   Adult failure to thrive.

17  Q.   If you could read what this document says under

18  illness trajectory and reason for hospice admission.

19  A.   Patient has had a 16.5 pound weight loss since

20  1/11/10.

21          Admission to GLC, Lexington East, greater

22  than five percent meals, regular, fortified shakes,

23  on Megace, has two episodes of vaginal bleeding this

24  past month.   Family do not want to investigate.

25  Q.   If we could, let's go to the second page --

1          MS. TAPIE:  For completeness, can the

2     witness read the PPS score, please?

3          THE COURT:  All right.

4          THE WITNESS:  PPS is 60.

5     Q.  (By Mr. Christie)  All right.  If we could go to

6     the next page of this initial and comprehensive

7     nursing assessment, Page 1691 of Defendant's Exhibit

8     605.

9          What does this tell us about the weight

10    history?

11    A.  I think this is a date.  1/11/10, looks like

12    she's 120.4 pounds.

13          Then on 2/5, she was 116; and then on 5/1,

14    she was 103.9 with a BMI of 19.

15    Q.  All right.  If we could go to the fourth page of

16    this eight-page document, Page 1693 of Defendant's

17    Exhibit 605-A.

18          If you could read what it says under initial

19    nursing narrative.

20    A.  Margaret was up in the dining room early dinner.

21    Per staff, she is often difficult to get her into the

22    dining room.  I'm not sure what that is.

23          She will eat usually greater -- 75 percent

24    of most meals.  Confused, difficult to redirect,

25    pleasant, makes eye contact, smiles.

1          Has had 16.5 pound weight loss since

2     admission to Lexington.  Has been on Megace since

3     April.  Has house diet with fortified food, whole

4     milk, house frappe three times a week.

5          Had episode of vaginal bleeding times two in

6     the past month.  Family wishes not to work up, wishes

7     DNR.  Will consider no IVs, no labs and will be

8     readdressed at a later time.

9     Q.   All right.  What do the documents that we've

10    reviewed so far tell you about the overall picture of

11    Margaret S. at the time that she was admitted to

12    hospice?

13    A.   That Ms. Margaret was -- had unintentional

14    weight loss, was getting weaker, more confused and

15    this was on medicine to try to help stimulate her

16    appetite.  The vaginal bleeding was also -- that's

17    okay.

18    Q.   If you could look at Page 1492 of Defendant's

19    Exhibit 605-A.

20          What is the date at the bottom of this

21    document?

22    A.   August the 25th of '10.

23    Q.   What does this document say under physician

24    narrative?

25    A.   Patient with adult failure to thrive continues

1   to decline, both functionally and nutritionally.

2          Functionally, she has no longer engaged in

3   conversation and has become mostly bedbound.  Showing

4   intermittent delirium.  Has had a 24.4 pound weight

5   loss in the past six months.

6          BMI has gone from 19 to 17.75 in August.

7   Patient's prognosis is less than six months.

8   Q.   If we could look at Page 1904 in Defendant's

9   Exhibit 605-A.

10          And up on the right-hand corner, could you

11   tell us what the date of this document is?

12   A.   May the 23rd of '11.

13   Q.   And what does this document describe in the

14   middle of the page under change in functional status?

15   A.   Continues to decline eating less than 25 percent

16   of meals.  Sleeping during the day.  Totally

17   intelligible speech, decreased weakness, ambulatory

18   status.

19   Q.   What does this document tell us about the weight

20   at the bottom, the weight history?

21   A.   Six months ago, the patient weighed 96.8 pounds;

22   three months ago, she was 90.6 pounds; and the weight

23   at the time of this documentation was 90.1 pounds

24   with a BMI of 16.5 percent.

25   Q.   If we could go to Page 7 of this nursing

1    assessment update, Page 1910 of Defendant's Exhibit

2    605-A.  Brad, if you can, please, pull up PDF Page

3    446.

4         If you could read what this document says

5    under patient response to interventions and progress.

6    A.   Patient continues to gradually decline

7    clinically, socially.  No longer speaks with purpose

8    or understanding.  Continues to meet hospice criteria

9    for adult failure to thrive.  Continue to provide

10   comfort, palliative care.

11   Q.   Under nursing narrative, could you just read

12   what that says?

13   A.   Margaret spends most of her days sleeping.  Is

14   often agitated when she is disturbed for nursing

15   care.  Her PO intake continues to decline.  Eating

16   less than 20 percent most meals.

17         She is anorexic and cachectic.  Her PO fluid

18   intake is also worsened and ranges from fair to poor.

19         She now has mild to moderate skin integrity

20   consistent with dehydration.

21         She is totally dependent on the long-term

22   care staff for all of her ADLs and mobility.

23         Plan is to monitor progression towards

24   transition and provide palliative care.

25   Q.   If we could go to Page 1863 of Defendant's

6134

1   Exhibit 605-A.

2          What is the date at the top right-hand?

3   A.   It's September the 6th of 2011.

4   Q.   And what type of document is this?

5   A.   Nursing clinical note.

6   Q.   And what is the most recent weight shown there?

7   A.   99.4 pounds.

8   Q.   If we could go to Page 1865 of Defendant's

9   Exhibit 401.  If you could read that nursing

10  narrative.

11  A.   Patient continues with decreased appetite but

12  weight is stable.  Generalized weakness continues.

13  Contemplation of changing diagnosis to dementia at

14  the next IDT.

15  Q.   All right.  If we could go to Page 1467 of

16  Defendant's Exhibit 605.

17          What is the date of this document up at the

18  top?

19  A.   It is September the 19th of 2011.

20  Q.   And what is the title of this document?

21  A.   It's a discharge summary.

22  Q.   And why was this patient discharged?

23  A.   Eligibility.

24  Q.   And could you read what it says under summary of

25  care?

1   A.   Patient was admitted to hospice services on

2   6/2/10 for adult failure to thrive.  Patient also has

3   Alzheimer's that currently does not appear to be end

4   stage.

5            Patient has also hypertension,

6   hypothyroidism and a history of left breast cancer.

7            Patient's weight at time of start of

8   services was 89.5 pounds.  Over the course of the

9   first year of hospice services, patient's weight rose

10  to 92.5 pounds on 4/25/2011.  Over the course of the

11  past most recent six months, patient's appetite

12  dramatically increased with 100 percent intake of all

13  meals.

14           Weight prior to discharge on 9/11/11 was

15  101.4 for a 9 pound increase over the past six months

16  and a 12 pound increase since her start of service.

17           Patient discharged due to significant and

18  consistent weight gain.

19  Q.   What, if anything, did the facts that we've

20  reviewed in these documents tell you about the

21  overall picture of Margaret S.'s eligibility for

22  hospice services during the time that she received

23  the services?

24  A.   Ms. Margaret was hospice eligible and continued

25  to be hospice eligible throughout her stay with

1   hospice as evidenced by she had a history of

2   hypertension and became hypotensive.  She had weight

3   loss.  She became less engaged.

4           And despite the nutritional supplement, she

5   initially put no weight on until the end.

6   Q.   In reaching your opinions about Ms. Margaret S.,

7   did you rely only on the medical records that we've

8   reviewed here today?

9   A.   No, I did not.

10  Q.   What else did you rely on?

11  A.   I looked at all of Ms. Margaret's records.

12  Q.   Were the other medical records overall

13  consistent with the opinion that you've given today?

14  A.   Yes.

15          THE COURT:  Do you want to try one more?

16  No.  Okay.

17          MS. TAPIE:  Your Honor, we actually do have

18  a foundation objection, if we can approach.

19          THE COURT:  All right.  Y'all hang on just a

20  second.

21                      (SIDEBAR)

22          MS. TAPIE:  Your Honor, Dr. Melvin testified

23  both at the beginning of her narrative about patient

24  Margaret S. and at the end that what supported her

25  opinion is that the patient had a continued weight

1   loss throughout the course of her hospice stay.

2          I waited to see that the documents

3   completely did not support that.  In fact, the last

4   document that was reviewed that went over what

5   happened over the course of this patient's stay, that

6   her weight increased during the first year, increased

7   again during the next six months.  And so her

8   statement that the patient was losing weight while

9   she was on hospice, despite receiving additional

10  nutritional supplements, is not supported in the

11  record, and we would ask that it be struck.

12          THE COURT:  I thought the testimony and the

13  records supported that the first year she did lose

14  weight and then it increased during the second and

15  that was why she was discharged.

16          MR. LEMBKE:  And, Your Honor, I would note,

17  contrary to what Ms. Tapie said a moment ago,

18  Dr. Melvin did not say there at the end that there

19  was a decline in weight throughout.  She said it was

20  a decline in weight until the end, which was

21  consistent with the document we just read saying

22  that, you know, it had gone down, and then it started

23  back up, which led to the discharge.  I don't think

24  there's anything inconsistent.

25          MS. TAPIE:  Your Honor, we would disagree.

1   And the document we just looked at, the 1467, the

2   discharge summary, it says, the patient's weight at

3   time of start of care was 89.5 pounds.  Over the

4   course of the first year of hospice services,

5   patient's weight rose to 92.5 pounds.  On April 25th,

6   2011, over the course of the past most current six

7   months, patient's appetite dramatically increased,

8   100 percent intake of all meals.

9           So, again, it showed a pattern of weight

10  gain through the first year and then also in the past

11  six months, so we would disagree with counsel's

12  interpretation.  I think that her opinion is

13  contradicted by the records.

14          THE COURT:  You can take that up on

15  cross-examination.

16          MS. TAPIE:  Yes, Your Honor.

17          THE COURT:  Anything else before we let the

18  jury go?

19          MR. LEMBKE:  No, Your Honor.

20          THE COURT:  Thank you.

21          (Open court.  Jury present.)

22          THE COURT:  Ladies and gentlemen, we will

23  see you back in the morning at 8:30.  We will see you

24  back Monday at 8:30.

25          During this break, I know you're so tempted

1  to do research on all these new medical terms you're

2  using so you can get that medical degree, but none of

3  that now.

4           We will see you Monday morning and don't

5  attempt to diagnosis anybody over the weekend.

6                    (Jury excused).

7               (Court in recess for the day.)

1

2

C E R T I F I C A T E

4

5          I hereby certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-referenced matter.

8

9

10  _____
    Teresa Roberson, RPR, RMR
    Julie Martin, RPR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25