6399

FILED
2016 Jun-10  PM 01:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

1           UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF ALABAMA
                SOUTHERN DIVISION
3

4

5  UNITED STATES OF AMERICA,
   EX REL., ET AL.,              CV-12-KOB-245-S
6

7           Plaintiffs,      September 29, 2015

8      vs.                    Birmingham, Alabama

9  ASERACARE, INC., ET AL.,

10          Defendants.

11  * * * * * * * * * * * * * * * * * * * * * * * *

12

13        REPORTER'S OFFICIAL TRANSCRIPT OF
                 JURY TRIAL
14               VOLUME XXX

15      BEFORE THE HONORABLE KARON O. BOWDRE
          UNITED STATES DISTRICT CHIEF JUDGE
16

17

18

19

20

21

22

23  COURT REPORTER:
    Teresa Roberson, RMR
    Julie Martin, RMR
24  Federal Official Court Reporter
    1729 Fifth Avenue North
25  Birmingham, Alabama  35203

1                      * * * * *

2               A P P E A R A N C E S

3                      * * * * *

4   FOR THE PLAINTIFF:

5   Jeff Wertkin
    Carolyn Tapie
6   Holly Snow
    Eva Gunasekera
7   Renee Brooker
    William Olson
8   U.S. Department of Justice
    Civil Division
9   P.O. Box 261 Ben Franklin Station
    Washington, DC  20044
10

11  Lane H. Woodke
    Don Long
12  U.S. Attorney's Office
    1801 4th Avenue South
13  Birmingham, Alabama  35203

14  James F. Barger, Jr.
    J. Elliott Walthall
15  FROSHIN & BARGER
    3430 Independence Drive
16  Birmingham, Alabama  35209

17  Nola J. Hitchcock Cross
    CROSS LAW FIRM
18  345 North 11th Street
    Milwaukee, Wisconsin  53233

19

20

21

22

23

24

25

```
 1            A P P E A R A N C E S  (continued)

 2    FOR THE DEFENDANT:

 3    James Sturgeon Christie, Jr.
      Jack Wright Selden
 4    Matt Lembke
      Tiffany deGruy
 5    BRADLEY, ARANT, BOULT & CUMMINGS
      1819 Fifth Avenue North
 6    Birmingham, Alabama  35203

 7

 8    Kimberly Martin
      BRADLEY, ARANT, BOULT & CUMMINGS
 9    200 Clinton Avenue
      Huntsville, Alabama  35801
10

11    Charles H. Bohl
      WHYTE, HIRSCHBOECK, DUDEK
12    555 East Weels Street, Suite 1900
      Milwaukee, Wisconsin  53202
13

14

15

16

17

18

19

20

21

22

23

24

25
```

6402

1                          I N D E X

2    WITNESS                 D      C      RD

3    Phyllis McNicholas    6432

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6403

```
1                      * * * * *

2             P R O C E E D I N G S

3                      * * * * *

4          (Open court.  Jury not present.)

5          THE COURT:  Good morning.  I understand we

6    have a few things to take up.

7          MR. WERTKIN:  Yes, Your Honor.

8          THE COURT:  First of all, I have something I

9    want to talk about.

10         I told you I would let you know this morning

11   what I decided about the verdict form.  I cannot put

12   on a verdict form with dates that were not presented

13   in evidence or pled in a pleading.

14         So, if the government really needs those

15   dates, then I'm going to ask the jury to put them in.

16         So the form will say the name of the

17   patient, yes, and then blank for the date, period to

18   be filled in, or no.

19         I mean, the language for the intro from both

20   sides is pretty much the same, so I will pull that.

21   But I can't put a date on a verdict form that's not

22   presented in evidence.

23         MR. WERTKIN:  Can we talk for one minute,

24   Your Honor?

25         THE COURT:  I don't have to have it right
```

1  now, but I just wanted you to know that it's either

2  yes or no or it's yes, dates and no.

3          MR. WERTKIN:  We have -- would it be proper,

4  Your Honor, we have a witness, our case agent in the

5  case, who can testify about the dates that we're

6  alleging, to put him on in rebuttal so that we can

7  put that into evidence about the dates we're

8  alleging.

9          THE COURT:  That's not rebuttal.

10         MR. WERTKIN:  I understand that normally it

11 would not be rebuttal, but would the Court allow --

12 would the Court allow us to do that, allow us to put

13 into evidence the dates that we're alleging from the

14 agent who has been working on the case since 2008?

15         THE COURT:  Again, that would be your case

16 in chief.  That would not be rebuttal.  And I don't

17 think it would be appropriate to present it at this

18 time.

19         MR. WERTKIN:  At this point, on the record,

20 can we make an oral motion to allow us -- I would

21 like to make sure the record is clear, we would like

22 to move to allow our case agent to discuss the dates

23 that were listed on the proposed jury verdict form.

24         THE COURT:  No.

25         MR. WERTKIN:  Okay.

1          THE COURT:  Again, as we discussed last

2    night, it doesn't appear anywhere in the government's

3    pleadings, so there's no record in terms of the

4    government's allegations that those are the dates as

5    to any of these patients that are at issue, and the

6    only evidence, the only information about those dates

7    come from Dr. Liao and they differ from the dates

8    that you're asking now.

9          Certainly, I would anticipate that if the

10   jury finds in the government's favor on, say, Agnes

11   B. and the date that the jury finds Agnes B. to not

12   be eligible is greater than the time period that the

13   government's got it at issue, all you have to do is

14   hack it off to figure out what we do in phase two.

15         MR. WERTKIN:  Your Honor, if we can just

16   have at least the morning to discuss this --

17         THE COURT:  We're not going to be giving the

18   jury a verdict form in the next 30 minutes anyway,

19   but I had told you I would let you know my decision

20   on that, so that's it.

21         I can't put something on the verdict form

22   that's not in evidence.

23         MR. WERTKIN:  If we were to use the

24   defendant's proposed verdict form, the Court would be

25   okay to bring back Dr. Liao in phase two for

1  testimony, if we needed to, for potentially several

2  more weeks.

3       THE COURT:  That would be -- I don't know

4  how or why, but we will cross that bridge whenever we

5  get to phase two.

6       MR. WERTKIN:  I just wanted to make sure the

7  Court understood that.

8       THE COURT:  Again, I'm not making a

9  precommitment on that because I don't understand why

10  and how that would be relevant or appropriate.  But

11  you've got the right to try to educate me about why

12  that should be, but I'm not making a precommitment

13  either way on that.  So that's the verdict.

14       MR. LEMBKE:  Form.

15       THE COURT:  The verdict form, yes, that's

16  the verdict on the verdict form.

17       And then we've got the issue of the

18  alternative -- the dueling redactions for the two

19  exhibits.

20       MR. LEMBKE:  Your Honor, on the exhibit, the

21  email, there's a threshold issue about the 803(6)

22  custodian and whether they can get around 803(6) --

23       THE COURT:  Right.

24       MR. LEMBKE:  -- and we actually think that

25  we would like to be able to take that up on voir dire

1   outside the presence of the jury or they ought to

2   establish it outside the presence of the jury before

3   we get into anything about that.

4          THE COURT:  Okay.

5          MR. WERTKIN:  Your Honor, there are two

6   evidentiary issues that need to be raised -- that the

7   government would like to raise at this time.

8          The first is about proposed Government's

9   Exhibit 494.

10          The government is proposing to use an

11   unredacted version of 494 which is titled AseraCare

12   Hospice Audit Project Guidelines.

13          THE COURT:  Right.  And I reviewed that and

14   we discussed it last night.  I've looked at it.  And

15   I've looked at the revisions that the defendant has

16   requested.

17          MR. WERTKIN:  Our position -- I believe they

18   are making a 403 argument, that's there is a

19   prejudice and that's the purpose of the redaction; is

20   that right?

21          MR. CHRISTIE:  There is more than one

22   argument.  It's a prejudice argument, there's

23   privileged information that's on here, and there's

24   some of it that is just inaccurate, you know, from a

25   legal prospective, I guess that's part of 403, but

1   there may be relevance also.

2          MR. LEMBKE:  And for all the other reasons

3   stated on the record yesterday during our conference

4   with the Court.

5          MR. WERTKIN:  What were those?

6          MR. LEMBKE:  I'm just incorporating any

7   others that we made on the record.

8          MR. WERTKIN:  I was just trying to figure

9   out what needs to be addressed, Your Honor.

10         So, in terms of 403 prejudice, Your Honor,

11  the guidelines here are actually what Excelas used as

12  their guidelines to do this project.

13         To the extent that they are wrong --

14         THE COURT:  Well, I mean, there still is the

15  threshold relevance issue that I believe was one of

16  the things that the defense asserted yesterday as

17  well.

18         MR. WERTKIN:  Your Honor, we think that 402,

19  402 argument, it's a low bar normally, and in this

20  case is very, very easily met.  We have demonstrated

21  that for at least two, and probably more, claims the

22  expert relied on summaries created by Excelas.  These

23  guidelines go to how Excelas created the summaries

24  that the defendant experts relied on.

25         So 402, we think, is relatively a straight

1   forward question.

2          THE COURT:  Then if it goes to how it was

3   created, I don't think that the first redaction

4   should be at issue, redacting Golden Living.

5          MR. WERTKIN:  Okay.  We agree with that.

6          THE COURT:  And then in terms of how it was

7   created, those three bullet points, I understand

8   there's some discussion as to whether that's what

9   they were instructed to do or whether it is even

10  accurate; is that correct, Chris?

11         MR. CHRISTIE:  Well, it's inaccurate in

12  terms of -- the first and the third bullet point are

13  clearly not consistent with what the jury has been

14  told about what the Medicare hospice benefit is

15  during this time period.

16         I don't know what they were told or not told

17  to do because this document is not something that was

18  available to us until the deposition -- until right

19  before the deposition.

20         MR. LEMBKE:  I think the overarching point,

21  Your Honor, is this really doesn't go to how they did

22  the summaries.  This is just some background

23  information they gave.  And for the reasons we stated

24  yesterday on the record, we don't think it's

25  relevant.  And to the extent it's relevant, it goes

1    to 403 because it misstates the law, as the Court is

2    going to charge the jury.

3              THE COURT:  Let's come back to the rest of

4    the stuff on Page 1 later.

5              On Page 2, it seems to me that the first two

6    paragraphs that the defense has requested be redacted

7    would seem to be appropriate.

8              MR. WERTKIN:  Your Honor, we don't plan on

9    making any -- necessarily making any points on this

10   with regard -- so I'm not really sure if it would be

11   relevance or prejudice.  But the idea that the

12   records were forwarded to Excelas and they were the

13   same as those produced by the government, that is --

14   I mean, that's something that the jury -- that's the

15   paragraph you're talking about, right?

16             THE COURT:  No, no.

17             MR. WERTKIN:  I'm sorry.

18             THE COURT:  The first paragraph that they've

19   requested to be redacted.  I don't think we have any

20   issues with paragraphs that they're not seeking or --

21             MR. WERTKIN:  I'm sorry, I misunderstood

22   what -- yeah, the second and the third paragraphs, we

23   agree.

24             The only issue that will be noted that the

25   document on the S drive, the S drive could come up,

1   Your Honor, because that's where they stored all of

2   their materials for this case, we understand, in

3   reference to the S drive --

4          THE COURT:  Yeah, but you don't need this

5   document to establish that.

6          MR. WERTKIN:  I hope not, Your Honor, I'm

7   not sure what the witness will --

8          THE COURT:  Well, if your witness doesn't

9   say S drive, then we'll get something for that.

10          MR. CHRISTIE:  The next paragraph --

11          THE COURT:  Wait a minute.  We've got three

12   things that we've agreed about.  The next paragraph.

13          MR. CHRISTIE:  The sentence that starts that

14   there's urgency, the items that are listed there in

15   that sentence are the same ones, basically, as the

16   bullet point that's on Page 1 on the first paragraph.

17          So, if the bullet points on Page 1 come out,

18   then that third paragraph ought to come out also.

19          MS. GUNASEKERA:  Your Honor, we would submit

20   that, in fact, it's the third paragraph that

21   establishes that those three bullets are the basis

22   upon which Excelas informed its personnel how to

23   prepare these summaries, so that they actually

24   support the government's position that those three

25   bullets are relevant to how Excelas -- how Excelas

```
 1   was intending to -- expected their clinicians to
 2   prepare these summaries.
 3           THE COURT:  Before I forget, did either side
 4   prepare a proposed limiting instruction for me to
 5   give the jury on this?
 6           MR. WERTKIN:  No.  We don't believe -- we
 7   are open to the idea of a limiting instruction.  We
 8   did not prepare one.  We don't think that --
 9           THE COURT:  I thought I told you last night
10   that I would allow it but only with a limiting
11   instruction.
12           So if we're not going to have a limiting
13   instruction, we need to go back to whether this
14   testimony comes in at all.
15           MR. WERTKIN:  Yes, Your Honor.  We would
16   propose that the jury be instructed to limit their
17   consideration of evidence as to how the --
18           MS. GUNASEKERA:  To what Dr. Cooney and
19   Dr. Melvin testified that they relied upon or that
20   they used.
21           THE COURT:  Which would be the two patients
22   from yesterday.
23           MS. GUNASEKERA:  We would submit, Your
24   Honor, respectfully, that they have been taking notes
25   and they have heard the testimony, and so as long as
```

1    the instruction is just limited to what they heard

2    --

3         THE COURT:  We're going back then to whether

4    this comes in.  Because I thought I indicated last

5    night that it only comes in as to those two patients.

6    And if you're wanting it for something broader, we're

7    starting over at scratch as to whether it comes in at

8    all.

9         MR. WERTKIN:  For the record, our position

10   is that the expert's testimony is not credible as to

11   how many patients that they relied on.  If the Court

12   has found -- has weighed that and decided that we can

13   only talk about in terms of those two patients, then

14   we would agree in those circumstances to a limiting

15   instruction with regard to those two.

16        THE COURT:  I want to make absolutely clear

17   I'm not weighing or making credibility

18   determinations.  But I'm dealing with what the

19   evidence that was presented showed in terms of the

20   patients that are at issue.

21        Now, whether Dr. Melvin relied on or used

22   any of the AseraCare stuff, goes to the two patients

23   that she reported on.  Whether she used it for the

24   ones that her opinion wasn't presented to this jury

25   is not relevant, even to her credibility or to the

1  reliability of her reports.

2          MR. WERTKIN:  Your Honor, just to explain --

3          THE COURT:  I know you disagree.

4          MR. WERTKIN:  We think that we could argue

5  in proposing that Dr. Melvin says that she relied on

6  a handful, we don't know how many that is, we think

7  it's a matter for the jury to figure out how many

8  patients -- now, we did only put on evidence that she

9  copied explicitly for two patients, that is not in

10  dispute.

11          And if the Court decides that that's how it

12  should be limited, then that's how it should be

13  limited.

14          THE COURT:  That's how I ruled last night

15  that that's how it's to be limited and that's how

16  it's going to be limited or it's not going to be

17  used.

18          MR. WERTKIN:  Okay, Your Honor, so we would

19  propose the jury be instructed to limit their

20  consideration of evidence to the patients that

21  Dr. Melvin copied the summaries and, you know, in her

22  expert report.

23          THE COURT:  I will work on that before we

24  get to it.

25          MR. LEMBKE:  I'm not sure we would agree

1  with the word "copy" as you might imagine.

2           Your Honor, the two patients are Agnes B.

3  and Laura H.  They are Number 1 and --

4           THE COURT:  Okay.

5           MS. MARTIN:  63, Your Honor, for Laura H.

6           THE COURT:  All right.  Let's move on to

7  Page 2 and see if we can agree with any others.

8           The paragraph dealing with time keeping, can

9  we agree that that paragraph should be redacted?

10          MR. WERTKIN:  Your Honor, we are looking to

11 get into the amount of money that Bradley or Excelas

12 got for preparing these.  If we can get a stipulation

13 as to the amount paid to the company, we would be

14 fine to take that out.

15          THE COURT:  I don't know why that has to

16 stay in, even if you get into how much did --

17          MR. WERTKIN:  Your Honor --

18          THE COURT:  -- Excelas bill.

19          MR. WERTKIN:  Your Honor, it's our

20 understanding the witness is not going to be

21 forthcoming in terms of that information, so we may

22 need to establish that it was billed by the hour and

23 then kind of back into a number using the number of

24 hours and number of employees.  And if she is not

25 willing to say they billed by the -- how they do --

1          THE COURT:  This doesn't even say billed by

2     the hour.  It just says they are to be billed to

3     Bradley, Arant.

4          MR. WERTKIN:  That's right.  The cases are

5     to be billed.

6          Now, the cases in that case are referring to

7     the individual client.  The way we understand is that

8     Excelas billed for everything --

9          THE COURT:  That's coming out because that

10    doesn't have -- that doesn't go to how they actually

11    kept it or anything, only that it's to be billed to

12    Bradley, Arant.  And I don't think that needs to be

13    in there.

14          MR. LEMBKE:  Let me just note, I have never

15    talked to Ms. McNicholas in my life, wouldn't know

16    her if she walked in here and stood next to me.

17          But the suggestion that was just made that

18    she's not going to be forthcoming is a pretty serious

19    assertion to be made by the government.

20          MR. WERTKIN:  And I believe what the record

21    says is that we don't know how forthcoming she is

22    going to be.  And I think I said that many times last

23    night and today.

24          I do not know how forthcoming the witness is

25    going to be because she is a witness that's

 1  identified as an adverse party and that's why we have

 2  not been able to --

 3          THE COURT:  And we've already covered that

 4  last night, that you're going to have to establish it

 5  today.

 6          I'm going to agree to the redaction on Page

 7  4.

 8          So, that leaves at issue the redactions on

 9  Page 1, other than the Golden Living that Jeff

10  graciously agreed to redact.

11          MR. WERTKIN:  Can I ask a point of

12  clarification, Your Honor?

13          What was just said to be redacted, did that

14  include the words, if you need to dig further

15  regarding a Dr. Liao issue?

16          THE COURT:  Yes.

17          MR. WERTKIN:  Your Honor, we think that's a

18  very important line in this document and one -- some

19  of the testimony we're going to try to elicit is that

20  they were instructed not to do an objective report

21  but to respond specifically to Dr. Liao, so this

22  sentence talks about having to dig deeper regarding a

23  Dr. Liao issue, and I would like to ask her, well,

24  what's a Dr. Liao issue, what does it mean to dig

25  deeper, so we feel that is a very important line in

6418

1   this document, Your Honor.

2         MR. CHRISTIE:  Your Honor, that line

3   actually relates to the big block that is deleted

4   from the first page and the comments template there.

5         So, historically, what happened is that they

6   were intending to do something that was going to be

7   an analysis and comments, they were asked not to do

8   that.

9         And they said, we've already got that kind

10  of information, what do you do with it, put it in a

11  separate document.

12        So the instructions here about the comments

13  is a privileged comment that they provided and the

14  government has never challenged the privilege of

15  those issues.  So this big block starting with

16  however, the third line in the format, all the way

17  down all has to do with the comments section.

18        THE COURT:  And that is something that you

19  instructed them not to do or that you didn't want or

20  that was not --

21        MR. CHRISTIE:  I let them do it.  I

22  discussed it with them, so they put it in a separate

23  document that was privileged, the government has

24  never challenged the privileged nature of them having

25  those comments that are separate from the neutral

1   summary that they did.

2          MR. LEMBKE:  But Dr. Cooney and Dr. Melvin

3   never had any access to those comments.

4          MR. CHRISTIE:  Correct.

5          MR. LEMBKE:  That was a totally different

6   part of what Excelas did.  And I think what Chris is

7   saying is that this line from Page 4 is dealing with

8   that type -- that separate analysis that Cooney and

9   Melvin did not have access to.

10         There are other places in this document that

11  talk about what Eva is getting at which is looking

12  into what Dr. Liao said in his report.

13         MR. WERTKIN:  Your Honor, if I may, so we've

14  heard, I think, from the defendants that they were

15  not involved in creating this document and haven't

16  had a chance to talk to the witness.  So I'm not sure

17  where that analysis -- that interpretation is coming

18  from.  But if you look at that first line on

19  Paragraph 1, it says --

20         THE COURT:  On Page 4?

21         MR. WERTKIN:  Page 4, Paragraph 1, when

22  beginning to write the case summary, and that's what

23  we think we're talking about here, not some other

24  types of things, comments or whatever, when you're

25  beginning to write the case summary, do not try to

1   keep track of any -- once you get all the pertinent

2   information for it, then you can easily see if

3   anything is missing or if you need to dig further

4   regarding a Dr. Liao issue.  This seems to us to be

5   referring directly to the case summary.  And to the

6   extent that defense counsel wasn't involved in

7   creating this and hasn't talked to the witness, this

8   is very proper to explore in examination.

9           MR. CHRISTIE:  Your Honor, when it's

10  referring to the report, that would be the case

11  summary.

12          So when you finish the case summary, then if

13  you need to dig further regarding a Dr. Liao issue is

14  the way -- is the way the language naturally reads.

15  So it's what you do in addition to the case summary,

16  in addition to the report.

17          MS. GUNASEKERA:  Your Honor, we would submit

18  that to the extent counsel wants to explore an issue

19  with Ms. McNicholas and try to make a distinction in

20  that paragraph, they can certainly do that.  But as

21  Mr. Lembke already noted, throughout this document,

22  the case summary specifically references responding

23  to Dr. Liao.  And so this is just an additional

24  instruction about how to do that.

25          THE COURT:  This is what I'm going to do,

1  I'm going to take out -- I'm going to go with the

2  redaction on the first page, all three, the one

3  that's agreed to and the other two.

4        MS. GUNASEKERA:  I'm sorry, Your Honor, all

5  three paragraphs?

6        THE COURT:  On Page 1, yes.  On Page 2 --

7        MR. WERTKIN:  So the bullets are coming out?

8        THE COURT:  Yes.

9        MS. GUNASEKERA:  Do you have an extra copy

10  of the redaction?

11        THE COURT:  I will give you mine in just a

12  minute.

13        MR. WERTKIN:  I have -- we have it here.

14        THE COURT:  On Page 2, the paragraph that

15  starts, some of the cases, that one is out.

16        The next paragraph, the wrong patient

17  document, that one is out.

18        The next paragraph I'm going to let the

19  government keep in with the exception of the last

20  three lines that begin, so only those issues.

21        MS. GUNASEKERA:  I'm sorry, Your Honor, only

22  those issues?

23        THE COURT:  Yes.  Got that?  The time

24  keeping paragraph is coming out.  But I will let the

25  government keep in the, or if you need to dig further

1  regarding the Dr. Liao issue, on Page 4 under helpful

2  hints because I think that that refers to the case

3  summary.

4          Chris, I understand your different

5  interpretation of it, but I think that that is

6  appropriate to keep it in there.

7          So, here are the redactions (indicating).

8          MR. WERTKIN:  Your Honor, just for the

9  record, these redactions are under 403?

10          THE COURT:  And relevance.

11          MR. WERTKIN:  402?

12          THE COURT:  What other reasons do I want to

13  give?  Confusion, because it states a standard other

14  than what the jury has been told.

15          You can ask her what they were looking for

16  or what they were applying, but in terms of having

17  the document in writing, I think that goes too far

18  into confusion as well as unduly prejudicial.

19          MR. WERTKIN:  Thank you, Your Honor.  That

20  raises an issue, if I ask her what they were asked to

21  look at, and she says -- the answer is different from

22  the information on this page, can I impeach her with

23  an unredacted version of the document?

24          THE COURT:  You can approach me beforehand

25  and we'll see.

1          MR. WERTKIN:  Your Honor, in order to

2    evaluate whether we can still call this witness, if

3    the Court can just give a sense of where it's

4    leaning, that would be helpful because, like I said,

5    we don't know what she's going to say.

6          THE COURT:  I don't either.  You talked to

7    her at least once.  I've never even met the woman.

8    So I have no idea.

9          MR. WERTKIN:  I know the Court doesn't like

10   to use hypotheticals, but to the extent she gives a

11   different answer than what's on this page, if she

12   says, you know, what did you look at, what were the

13   three factors that you were asked to look at, and she

14   says something that's not any of these three bullets,

15   would I be able to impeach her with the unredacted

16   version of this document?

17         THE COURT:  I don't know.  I don't know who

18   created that document.  I don't know if she's ever

19   seen it before.  There are just too many unknowns,

20   Jeff.

21         MR. WERTKIN:  Assuming I can lay the

22   foundation for both of those?

23         THE COURT:  We'll see.

24         MR. WERTKIN:  And the Court understands that

25   we are not trying to introduce this to somehow prove

6424

1  that these three bullets are correct but actually to

2  undermine --

3          THE COURT:  I understand.  I understand.

4          MR. WERTKIN:  I just wanted to make sure

5  that we're just using this to undermine the project

6  that they did and not bolster it.

7          THE COURT:  Right.  As to two patients out

8  of 121.

9          And then the issue on the emails.

10          MR. LEMBKE:  That, of course, our redaction,

11  as I said, Your Honor, is subject to our threshold

12  Rule 803(6).

13          THE COURT:  That the whole thing is not --

14          MR. LEMBKE:  We don't know if they can

15  establish the requirements to get it in as a business

16  record.

17          THE COURT:  As an exception to just outright

18  blatant hearsay.

19          MR. LEMBKE:  Bingo.

20          THE COURT:  Uh-huh.  The purpose of these is

21  to look at what the nurses were told in terms of what

22  they should include and should not include and to

23  show that they were not all inclusive; correct?

24          MR. WERTKIN:  Your Honor, there's actually

25  many different purposes that this email could be used

1  for.

2         One, just piggy-backing on what we were just

3  talking about, for impeachment purposes, Your Honor.

4         If we were to ask whether the case medical

5  legal analysts were told to approach this in an

6  objective manner, it could be used to impeach that

7  statement by a witness.

8         We also --

9         THE COURT:  With a document that the witness

10 didn't author?  And again, we've got issues there.

11        MR. WERTKIN:  The hearsay, you know, just --

12 maybe you can clarify --

13        THE COURT:  I have a question.  Off the

14 record.

15             (Off the record discussion)

16        THE COURT:  All right.

17        MR. WERTKIN:  And that goes to the

18 overarching question, Your Honor, and this is really

19 more to the review but this company Excelas was not

20 doing an objective review.  They had in mind a

21 purpose.  And we think that, you know, there are

22 several purposes we think that they had.

23        Number one is to keep their client happy;

24 another purpose was to attack Dr. Liao's report; and

25 the other purpose was to show that there was decline.

1          I'm not sure where we are in the redactions

2     right now, but we would like to be able to establish,

3     through the witness, through testimony, that they

4     were told to find decline, lack of decline is bad and

5     if they didn't find decline, it would be bad for

6     their client and that colored their review and their

7     summaries.

8          THE COURT:  I think with one exception,

9     which was your statement of lack of decline equals

10    bad, that the defendant's redacted version would

11    allow you to do all of those things that you have

12    indicated you want to do.

13         So, if you can establish that this meets the

14    business document exception to hearsay -- and let me

15    establish this:  Just because a document may pass the

16    business document exception to hearsay does not mean

17    that every line and every sentence in the document is

18    not hearsay.

19         So, I think that these comments that the

20    defense has asked to be excised from the document

21    would be the hearsay within the hearsay that wouldn't

22    come in under the business record exception because

23    they're general comments that don't advance the

24    business purpose of the document.

25         MR. LEMBKE:  And, Your Honor, as we noted,

1    we also object to those comments on relevance and

2    under 403 grounds.

3              THE COURT:  Okay.

4              MR. WERTKIN:  Your Honor, the last line of

5    the redaction where it says, I don't have the nursing

6    assessments for eligibility used, so I am trying to

7    pull info from the notes to describe any decline, you

8    said that's out?

9              THE COURT:  No.  It starts there, he seemed

10   to have.  Of course, that's just gratuitous comments.

11             MR. LEMBKE:  Of course, Your Honor, the "he"

12   means we're not talking about Ms. Agnes or Ms. Laura.

13             THE COURT:  Unless they're similarly

14   confused as to the sex of the people they are

15   reviewing as Dr. Liao was with Mr. Lennie,

16   Ms. Lennie, whichever way it ultimately went.

17             MR. WERTKIN:  Your Honor, may we have five

18   minutes to caucus?  In light of the Court's

19   redactions, we need to make a decision about whether

20   we are going to call Ms. McNicholas.

21             THE COURT:  I didn't say you couldn't

22   question her about the very things you say you want

23   to question her about.

24             MR. WERTKIN:  Thank you, Your Honor.

25             THE COURT:  The extent of their assignment,

1   the extent of their review, whether they were looking

2   for an objective evaluation or whatever, you can

3   question her about those things.  But these documents

4   don't go to the jury unredacted.

5           MR. WERTKIN:  Thank you, Your Honor.

6           MR. LEMBKE:  Your Honor, we would note, you

7   know, looking down the road, if they are able to get

8   this in as a business record, which we think is a big

9   if, but if they are, the notion that -- we think

10  there's going to be a serious question as to whether

11  this is a prior inconsistent statement of

12  Ms. McNicholas that would be appropriate for

13  impeachment, if they start trying to do that.

14          We will have to see how it, obviously, comes

15  in, but we just wanted to note that issue as one that

16  may well arise.

17          THE COURT:  And it may well be that

18  Ms. McNicholas is an adverse witness to everybody in

19  here today and is led all over the place by a ring in

20  her nose.  We'll see.

21          MR. LEMBKE:  What is the Court's plan for

22  how you want to deal with the threshold 803(6) issue?

23          Are we going to take that up outside the

24  presence of the jury or in the presence of the jury?

25  How does the Court want to proceed?

1          THE COURT:  We can do it either way.

2          MR. WERTKIN:  Well, Your Honor --

3          THE COURT:  Either she can establish that

4    foundation -- I don't even know if Jeff is going to

5    need to get to that, depending upon how cooperative

6    or uncooperative the witness is and that kind of

7    stuff.

8          You know me, I don't necessarily like to

9    cross bridges before I have to.  But if we need to

10   and it appears appropriate at that time to do it

11   outside the presence of the jury, we can have a

12   recess and do so.

13         I wouldn't anticipate it would be the first

14   thing that Jeff would start with with this witness,

15   but Jeff has surprised me before, so I don't know.

16         MR. WERTKIN:  It would probably be on the

17   early side, Your Honor, but it wouldn't be the first

18   question I asked her.

19         THE COURT:  We don't have a business record

20   problem with this one; right?  Now that it's

21   redacted.  Okay.

22         MR. WERTKIN:  Do you want to try to preadmit

23   the redacted version?  Can we do that?

24         Why don't we get it -- that might be a good

25   idea only because we are now in the process of doing

1    the redactions and that way the other side can look

2    at them and make sure they agree.

3           MR. LEMBKE:  We're going to put a relevance

4    objection on the record, so we can't agree to

5    preadmission because we have to preserve our

6    objection.

7           THE COURT:  All right.  And I'll overrule it

8    as to those two.  All right.  I will work on a

9    limiting instruction.

10          MR. LEMBKE:  Your Honor, here's just a

11   suggestion that someone from our team has written

12   down a potential start for a limiting instruction.

13          MR. WERTKIN:  Your Honor, we think that this

14   instruction is too limiting but we do not have

15   another suggestion at this time.

16          THE COURT:  Okay.  Then I will go with this

17   one.

18                         (Break taken.)

19          MR. WERTKIN:  Your Honor, while we're

20   waiting, may we approach?

21          THE COURT:  Okay.

22                           (SIDEBAR)

23              (Discussion off the record)

24          THE COURT:  Now, do you want this on the

25   record?

1        MR. WERTKIN:  Yes.  We anticipate just

2    walking the witness through the LCD records so that

3    they can say how Excelas medical analysts were

4    instructed, we're going to use Government Exhibit 310

5    and Page 33691, but that will be redacted, when we

6    show it to the witness and the jury.

7        THE COURT:  Thank you.

8                  (Brief recess.)

9             (Open court.  Jury present.)

10        THE COURT:  Ladies and gentlemen, because

11    the United States, as the plaintiff in this case, has

12    the burden of persuasion or the burden of proof, it

13    is allowed to make a rebuttal presentation of

14    evidence.  And at this time, I understand the

15    government does have a witness to call in rebuttal;

16    is that correct, Mr. Wertkin?

17        MR. WERTKIN:  Yes, Your Honor, thank you.

18    The government calls Phyllis McNicholas to the stand.

19    PHYLLIS MCNICHOLAS, GOVERNMENT'S WITNESS, SWORN.

20        THE CLERK:  Say and spell your first and

21    last name for the Court and try to speak in the

22    microphone, if you can.

23        THE WITNESS:  My name is Phyllis,

24    P-H-Y-L-L-I-S, McNicholas, M-C-N-I-C-H-O-L-A-S.

25

6432

```
 1                  DIRECT EXAMINATION
 2   BY MR. WERTKIN:
 3   Q.  Good morning, Ms. McNicholas.  Who is your --
 4            MR. CHRISTIE:  Your Honor, there was an
 5   instruction that we agreed on.
 6            THE COURT:  Do you want it now?
 7            MR. CHRISTIE:  Yes, Your Honor.
 8            THE COURT:  Okay.  Ladies and gentlemen, I
 9   do need to instruct you that as to Ms. McNicholas'
10   testimony and any exhibits admitted in relation to
11   her testimony, you may consider the testimony and
12   exhibits only with respect to Dr. Terry Melvin's
13   testimony regarding her opinions as to patients Agnes
14   B., who is Number 1 in your jury notebook, and Laura
15   H., who is Number 63.
16            You may not consider this testimony or
17   exhibits as to any other patients or for any other
18   purposes.
19            This is what we call a limiting instruction.
20   And I will give you more instruction about that
21   later.
22            MR. WERTKIN:  Thank you, Your Honor.
23   Q.  Who is your employer?
24   A.  Excelas.
25   Q.  And in the 2013 time frame, did you work for
```

1  Excelas?

2  A.   I did.

3  Q.   And what is Excelas' business?

4  A.   We summarize medical records in mostly the

5  defense of lawsuits.

6  Q.   When you say mostly in the defense of lawsuits,

7  what do you mean?

8  A.   I mean, we're legal support for the defense side

9  of litigation.

10  Q.   So, you represent mostly defendants in lawsuits;

11  is that right?

12  A.   Correct.

13  Q.   Does Excelas ever prepare summaries for

14  plaintiffs in court cases?

15  A.   I don't recall that we've ever done that.

16  Q.   In 2013, did Excelas do a project for AseraCare?

17  A.   Yes.

18  Q.   In 2013, did AseraCare hire Excelas to do work

19  in connection with this lawsuit?

20  A.   Yes.

21  Q.   And what was Excelas hired to do in connection

22  with this lawsuit?

23  A.   To create from the medical records unbiased

24  reports that reflected what happened in the medical

25  records and to tell, basically, the story of the

1  medical records.

2  Q.  Excelas, how many patient medical record

3  summaries did Excelas prepare in 2013 for AseraCare?

4  A.  124.

5  Q.  And sitting here today, you understand that the

6  124 records include the medical records for the

7  patients at issue in this case?

8          MR. CHRISTIE:  Objection.

9          THE COURT:  Sustained as to foundation.

10 Q.  (By Mr. Wertkin)  Do you know how those 124

11 summaries were used?

12 A.  No.

13 Q.  You don't know whether those 124 patients were

14 the 124 patients in this case; that's your testimony?

15         THE COURT:  That was not your question.

16         MR. WERTKIN:  Let me rephrase.

17 Q.  Ms. McNicholas, do you know whether the 124

18 summaries that Excelas prepared are for the patients

19 at issue in this lawsuit?

20 A.  I don't know that.  I assume that that would be

21 why we prepared the summaries.

22 Q.  So you assume that they are, but you don't know

23 for sure?

24 A.  Correct.

25 Q.  Who prepared the summaries for the AseraCare

1  project in 2013?

2  A.   Various medical legal analysts in our company.

3  Q.   And medical legal analysts, who are those

4  people?

5  A.   Basically, they're all almost all registered

6  nurses who summarize medical records with a variety

7  of experience.

8  Q.   So they're nurses; is that right?

9  A.   Correct.

10  Q.   What is their title at Excelas?

11  A.   Medical legal analysts.

12  Q.   Before we get too far along, I would like to ask

13  you a few questions about your background if that's

14  okay?

15  A.   Sure.

16  Q.   You started working at Excelas in what year?

17  A.   2006.

18  Q.   When you were hired, what was your position?

19  A.   Medical legal analyst.

20  Q.   Is that the same position as the nurses who were

21  providing the summaries that we're discussing today?

22  A.   Yes.

23  Q.   And as part of your responsibilities as a

24  medical legal analyst for Excelas, what did you do in

25  that time frame?

1   A.   Summarized medical charts.

2   Q.   And prior to working for Excelas, what company

3   did you work for?

4   A.   Litigation Management.

5   Q.   What does the firm Litigation Management do?

6   A.   Basically the same thing for a different type of

7   case.  They did mostly class action and

8   pharmaceutical work.

9   Q.   So your job with Litigation Management was also

10  to summarize medical records?

11  A.   That's correct.

12  Q.   And after joining Excelas in 2006, for how long

13  did you remain a medical legal analyst?

14  A.   I think it was like four or five years, and then

15  I was promoted.

16  Q.   What position were you promoted to?

17  A.   Manager.

18  Q.   And what was your new title?

19  A.   Manager medical division.

20       THE COURT:  Does Excelas have more than one

21  division?

22       THE WITNESS:  Not really.  I mean, we just

23  have different facets to our company where we have an

24  organization department that's more like a department

25  but we just titled it division.

6437

1    Q.   (By Mr. Wertkin)   Have you worked as the manager

2    since -- I'm sorry, when were you promoted?

3    A.   I believe in 2010 or 2011.

4    Q.   And have you held that position at Excelas since

5    that time?

6    A.   No.   I left briefly for -- I left for one year.

7    Q.   And when you came back, what was your position?

8    A.   Medical legal analyst.

9    Q.   So you went back down --

10   A.   I did.

11   Q.   And then did you get promoted again?

12   A.   I did.

13   Q.   And what was -- was it the same role or did you

14   have a different role when you got promoted again?

15   A.   It was the same role.

16   Q.   I would like to ask you a few questions about

17   what's involved in being a manager analyst at

18   Excelas.

19         In the 2013 time frame, did you manage a

20   team of people or just one person?

21   A.   I managed a team.

22   Q.   And how many people were on your team?

23   A.   I believe ten.

24   Q.   And the ten people were medical legal analysts?

25   A.   Correct.

1    Q.   And what's involved in managing a team of ten

2    medical legal analysts?

3    A.   I assigned work to each of the analysts and I

4    managed the work flow and was a liaison and a

5    resource person to each of my analysts.

6    Q.   When you say you assigned work, are you

7    specifically referring to patient medical records?

8    A.   Yes.

9    Q.   And what kind of -- in a typical situation, how

10   would the work flow proceed?  What would be your

11   process?

12   A.   When an analyst is available, they let me know,

13   meaning that they have finished their previous case,

14   and I would send them an email with a name and the

15   name of the client and how many pages the case was,

16   and then they would proceed with the analysis.

17   Q.   And about how long does it take for a medical

18   legal analyst to review and summarize medical records

19   for a particular patient?

20   A.   It's variable and really you cannot define how

21   long it's going to take because much like a book, we

22   never know what the pages are going to hold.  So we

23   -- sometimes you can have a 300 page record that

24   takes a short time but sometimes it could take a long

25   time depending on what issues the patient had.

1   Q.   So there's no average amount of time that it

2   takes a medical legal analyst to review and summarize

3   medical records?

4   A.   I would not say that there is, no.

5   Q.   And so -- and sometimes you could figure one out

6   in a very short amount of time; is that right?

7   A.   I mean, there are certain things that you have

8   to get from every case or the information that you're

9   looking for or providing in our summaries, so

10  there's, you know, a base amount of time that every

11  case is going to take.  And then in addition to those

12  constant, any information that's specific to that

13  patient would be included.

14  Q.   And as a medical legal analyst, if you find that

15  information quickly, you then move on to the next

16  record?

17  A.   After you're sure that you've done, you know, a

18  good look at the medical records and you still have

19  to read every page, because medical records aren't

20  always in the exact order that they should be or

21  people write on pages that they shouldn't, so,

22  basically, you have to read every page.

23  Q.   And did you have team meetings with your team of

24  medical legal analysts?

25  A.   We have like a monthly all-staff meeting.  And

1  that's it.

2  Q.   You don't have project specific meetings?

3  A.   Not really.  My work force is remote.

4  Q.   And when you mean remote, everybody works at

5  their house or is there some other --

6  A.   Most -- yes, everybody works at home.

7  Q.   And it's mostly done over just computers and

8  servers and email, most of the work?

9  A.   Correct.

10  Q.   And if a medical legal analyst has a question

11  about a project, is it their regular practice to

12  email that supervisor about that question?

13  A.   That would be what they should do.

14  Q.   And at Excelas in 2013, was it the manager or

15  supervisor's regular practice to respond to those

16  emails from the medical legal analyst?

17  A.   Yes.

18  Q.   So, during this time period, it was the regular

19  practice for team members and managers to use email

20  to communicate about review projects; is that right?

21  A.   Email --

22        MR. CHRISTIE:  Objection, leading.

23        THE COURT:  Sustained as to leading.

24  Q.   (By Mr. Wertkin)  And if the emails are sent

25  from an Excelas email account, they would be kept on

1    an Excelas email system; is that right?

2              MR. CHRISTIE:  Objection, leading.

3              THE COURT:  Sustained.

4    Q.  (By Mr. Wertkin)  If the emails were sent from

5    an Excelas email account, where would they be stored?

6    A.  In our server.

7    Q.  How does Excelas get its business from clients?

8    Is it a project-by-project basis or some other way?

9              MR. CHRISTIE:  Objection, relevance.

10             THE COURT:  Overruled.

11   A.  Will you restate the question?

12   Q.  (By Mr. Wertkin)  In terms of Excelas' business,

13   does it tend to work on a project-by-project basis or

14   some other way?

15   A.  Yes.

16   Q.  And how -- do you know how much Excelas charges

17   its clients for the review of medical records by

18   medical legal analysts?

19   A.  I have no idea.

20   Q.  Do you know if it's -- do you have any idea if

21   it's a flat rate or they charge by the hour?

22   A.  I don't know.

23   Q.  You're not aware of whether they charge by the

24   hour at all?

25   A.  I'm not.

1  Q.   Do you know if your time is billed by the hour

2  or not?

3  A.   I'm paid by the hour or our analysts are paid by

4  the hour, but I don't know how they bill it.

5  Q.   Do you keep track of your time when you're doing

6  a project on a piece of paper and then submit it to

7  somebody?

8  A.   Yes.

9  Q.   And what are the increments of time that you

10  keep track of it?  Do you have to keep track of every

11  five minutes, 15 minutes, 30 minutes, hour?

12  A.   15.

13  Q.   15 minutes.  So, if you work on a project for 15

14  minutes, you need to write it down and submit it to

15  somebody; is that right?

16  A.   I'm sorry.  We keep track of our time and then,

17  you know, at the end of the day, put in how many

18  hours we worked on that project for that day on that

19  case.

20  Q.   Do you say -- let's say that you come in and you

21  work for 15 minutes, and then you get distracted by

22  another project and you don't work at all, do you

23  bill zero time, did you bill an hour, do you bill 15

24  minutes, how does that work?

25  A.   If I work 15 minutes, I would bill 15 minutes.

1   Q.   And if you work 23 minutes, would you bill 23

2   minutes?

3   A.   I would probably bill 15.

4   Q.   Okay.  So that's really what I'm trying to get

5   at is you bill on 15 minute increments or something

6   else?  Is it the exact time or is it increments is

7   really what I'm trying to get at.

8          MR. CHRISTIE:  Objection, vague and --

9          THE COURT:  Sustained.

10  Q.   (By Mr. Wertkin)  Ms. McNicholas, when you are

11  keeping track of your time, how do you do it?

12  A.   I look at the clock when I start and I look at

13  the clock when I've stopped or finished for the day.

14  Q.   And you put the exact amount of time that you

15  worked?

16  A.   Yes.

17  Q.   And do you know how that information -- who do

18  you give that information to once you mark it down on

19  a piece of paper or on an email?

20  A.   We submit it on our timesheets.

21  Q.   And do you know how that information is used on

22  your timesheets?

23  A.   No.

24  Q.   You don't know whether or not the bills are

25  generated from those timesheets or not?

1    A.   I don't.

2            THE COURT:  Are you paid from those

3    timesheets?

4            THE WITNESS:  I'm on salary.

5            THE COURT:  Okay.  And the analysts, are

6    they paid based on those timesheets?

7            THE WITNESS:  Yes.

8    Q.   (By Mr. Wertkin)  So you receive an annual

9    salary; is that right?

10   A.   I do.

11   Q.   And you don't know how Excelas uses the

12   timesheets that you keep for your time?

13   A.   No, I don't.

14   Q.   You mentioned earlier that Excelas gets hired on

15   a project-by-project basis.

16           Are there standard guidelines that are used

17   for every project or do you do guidelines on a

18   project-by-project basis?

19   A.   We have standard guidelines.

20   Q.   Do you also generate project-specific guidelines

21   for certain projects?

22   A.   Sometimes.

23   Q.   So if you get a project that you've done before,

24   would you use standard guidelines?

25   A.   Likely.

1    Q.   And if you got a project that was new or somehow

2    different from something you had done before, would

3    you create project-specific guidelines?

4    A.   We have done that in the past.

5    Q.   Now, when Excelas did the work for AseraCare in

6    2013, how -- had it done this type of work for any

7    other hospice company besides AseraCare?

8    A.   No.

9    Q.   Ms. McNicholas, are you a registered nurse?

10   A.   I am.

11   Q.   Have you ever worked for a hospice company?

12   A.   No.

13   Q.   Have you ever referred a patient to hospice?

14   A.   No.

15   Q.   Have you ever evaluated a patient for

16   eligibility for the Medicare hospice benefit?

17   A.   No.

18   Q.   Have you ever received training in hospice or

19   palliative medicine?

20   A.   No.

21   Q.   Do you have any certifications in hospice or

22   palliative medicine?

23   A.   No.

24   Q.   Have you ever prepared clinical notes for a

25   hospice patient in a clinical setting?

1  A.  No.

2  Q.  You personally wrote -- let me ask it a

3  different way.

4        Did you write any of the summaries for the

5  AseraCare patient records in the 2013 project for

6  AseraCare?

7  A.  Yes.

8  Q.  And how many summaries did you personally write?

9  A.  I don't recall, but I think three or four.

10  Q.  In 2013, who was your supervisor?

11  A.  Cheryl Streicher.

12  Q.  What was her position?

13  A.  She was the medical director.

14  Q.  Do you know whether Ms. Streicher also prepared

15  summaries for the AseraCare project in 2013?

16  A.  One or two, I believe.

17  Q.  Was the AseraCare project that you did in 2013,

18  was that an instance where you were able to use your

19  standard guidelines or your project-specific

20  guidelines?

21  A.  Project-specific guidelines.

22  Q.  Who prepared the project-specific guidelines for

23  this particular project for AseraCare in 2013?

24  A.  Cheryl Streicher.

25  Q.  Cheryl Streicher was your supervisor; is that

1  right?

2  A.   Correct.

3  Q.   And were these instructions provided to the

4  medical legal analysts who did this project?

5  A.   Yes.

6  Q.   Did these guidelines indicate what was to be

7  expected of the Excelas medical legal analysts on the

8  2013 AseraCare project?

9  A.   They were basically a -- just a guide for them

10  to look at and to use in this project because we

11  hadn't done one before on hospice.

12  Q.   And are you familiar with the instructions that

13  were prepared by Ms. Streicher for the AseraCare

14  project and provided to your team for review?

15  A.   I've seen them.

16  Q.   And these instructions were called AseraCare or,

17  excuse me, what were these instructions called?

18  A.   I don't recall.

19  Q.   If you -- if I -- if you saw a copy of them,

20  would that help refresh your recollection?

21  A.   It would.

22         MR. WERTKIN:  Your Honor, may I approach the

23  witness?

24         THE COURT:  Yes, you may.

25  Q.   (By Mr. Wertkin)  Ms. Streicher (sic) does this

1    document help refresh your recollection about what

2    these guidelines were called?

3    A.   AseraCare Hospice Audit Project Guidelines.

4    Q.   And were these instructions stored by Excelas on

5    their company's server?

6    A.   Yes.

7    Q.   And do you remember where they were served?  Was

8    it A drive, C drive, something like that?

9    A.   S drive.

10   Q.   And the S drive is a shared drive on Excelas'

11   computer system; is that right?

12   A.   That's correct.

13           MR. CHRISTIE:  Objection, leading.

14           THE COURT:  Sustained.

15   Q.   (By Mr. Wertkin)  What is the S drive?

16   A.   It's where we put information that's accessible

17   to everyone in the company.

18   Q.   And in addition to this document, were there

19   other documents stored on the S drive that related to

20   the Excelas 2013 project?

21   A.   I believe so.

22   Q.   Do you recall what those documents were?

23   A.   I think there were certain sample pages.

24   Q.   Sample pages of what?

25   A.   Hospice records.

1  Q.   And were you working in the office when these

2  guidelines were sent out to your team?

3  A.   Actually, I was on vacation.

4  Q.   So, typically, would the project manager send

5  out guidelines for a project?

6  A.   Yes.

7  Q.   But in this case, did you send these guidelines

8  out?

9  A.   I did not.

10  Q.   Is that because you were on vacation at the

11  time?

12  A.   I was.  But it was Cheryl Streicher's job to

13  create the guidelines.

14  Q.   So it wouldn't be uncommon for her to send them

15  out?

16  A.   Correct.

17  Q.   And for -- were you on vacation for the entire

18  time that the Excelas project was done or for just a

19  limited time?

20  A.   Limited time.

21  Q.   And how long were you on vacation for when these

22  went out?

23  A.   From February, I think it was, the 19th until

24  the 24th.

25  Q.   So is that just one week?

6450

1    A.   Yeah, less than a week.

2    Q.   While you were on vacation, who were the medical

3    legal analysts instructed to contact if they had any

4    questions?

5    A.   Cheryl Streicher.

6    Q.   And when you returned from your vacation, did

7    you review these guidelines, the hospice audit

8    project guidelines for AseraCare?

9    A.   I don't recall.

10   Q.   You don't recall whether you reviewed them when

11   you got back from vacation at all from February 24th

12   forward?

13   A.   You know, I can't recall that I exactly did it.

14   I would assume that I did.

15   Q.   As the project manager, you typically are

16   familiar with the project-specific guidelines that go

17   to your medical legal analysts; is that right?

18        MR. CHRISTIE:  Objection, leading.

19        THE COURT:  Sustained.

20        MR. WERTKIN:  If I could just have a little

21   leeway, Your Honor, with this witness.

22        THE COURT:  Sustained.

23   Q.   (By Mr. Wertkin)  Ms. McNicholas, was it common

24   practice, as a manager, to be familiar with the

25   guidelines that was used for a project you were

1   managing?

2   A.   Yes.

3   Q.   Do you have any reason here today to think you

4   did not review these guidelines when you returned

5   from your vacation?

6   A.   No.

7   Q.   What guidance were the medical legal analysts

8   given with regard to what a patient needed to show to

9   be receiving hospice services?

10          MR. CHRISTIE:  Objection, foundation.

11          THE COURT:  Overruled.

12   A.   Can you restate the question?

13   Q.   (By Mr. Wertkin)  Yes.

14          What instructions were the medical legal

15   analysts given with regard to whether a patient is

16   eligible to continue receiving hospice services?

17          MR. CHRISTIE:  Objection, assumes facts not

18   in evidence.

19          THE COURT:  Sustained.

20   Q.   (By Mr. Wertkin)  Ms. McNicholas, did the

21   eligibility -- I'm sorry -- did the project

22   guidelines that we were just talking about, did they

23   include any instructions or guidelines to the medical

24   legal analysts regarding hospice and hospice

25   eligibility?

1   A.   Just what --

2           MR. CHRISTIE:  Objection, leading.

3           THE COURT:  Overruled.

4   Q.   (By Mr. Wertkin)  Did the hospice -- did the

5   AseraCare Hospice Audit Project Guidelines, did they

6   include information for the medical legal analysts

7   relating to hospice eligibility?

8   A.   Just what it says in the guidelines.

9   Q.   Can you remember -- can you recall what those --

10  what that information was that was provided to the

11  medical legal analysts?

12  A.   Just the guidelines and the sample sheets.

13  Q.   Was there any reference to local coverage

14  determinations that you can recall, any information

15  or instructions about local coverage determinations

16  provided to the medical legal analysts?

17          MR. CHRISTIE:  Objection, leading.

18          THE COURT:  Overruled.

19  A.   I believe there were LCDs as part of the

20  guideline.

21  Q.   And what were the instructions, as you recall

22  them, that relate to the LCDs?

23  A.   I don't know of any specific instructions

24  regarding the LCDs.  Basically, we give the

25  guidelines to our analysts.  They read them; if they

1  have questions, they ask.

2  Q.   And you do not recall whether or not the

3  guidelines said anything about LCDs?

4  A.   I know they mentioned LCDs.

5  Q.   Do you recall what they say about the LCDs?

6  A.   No.

7  Q.   Would it refresh your recollection to read the

8  guidelines and to help you remember whether or not

9  the guidelines said anything about LCDs?

10  A.   Yes.

11  Q.   Why don't I give you a second and when you're

12  ready --

13  A.   (Witness complies).

14  Q.   Did this document help refresh your recollection

15  about whether the guidelines that were -- I'm talking

16  about, to be clear, these are the AseraCare Hospice

17  Audit Project Guidelines that were prepared by your

18  boss for the project that Excelas did for AseraCare

19  in 2013.

20         Did those instructions say anything about

21  LCDs?

22  A.   Yes.

23  Q.   And --

24         MR. CHRISTIE:  Your Honor, may we approach,

25  please?

1          THE COURT:  All right.

2                  (SIDEBAR)

3          MR. LEMBKE:  Your Honor, I think, although

4    I'm not sure, but I think she has the unredacted copy

5    that she's reading from.  And I don't know what the

6    Court's intent was in that regard, but it seems to me

7    that refreshing her recollection with an unredacted

8    copy is -- that was not our understanding of what the

9    Court had in mind.

10         MR. WERTKIN:  I thought the Court ruled that

11   we can talk about these issues.  It's just that they

12   couldn't be shown to the jury.

13         MR. LEMBKE:  But I guess what I would say on

14   that, Your Honor, is trying to refresh her

15   recollection with matters in the document that the

16   Court has redacted is sort of a back door way to get

17   in the very things the Court said shouldn't come in.

18         I thought we were going to start with what

19   did she remember about things.  I mean, she said

20   there are LCDs referenced and things like that.  I'm

21   not sure -- what they're really trying to get at now

22   is the specifics of what's in the blacked out

23   portion.  So that's our concern.

24         MR. WERTKIN:  Your Honor, the subject matter

25   of the guidelines and the email, that you wouldn't

1   want it shown to the jury.

2          THE COURT:  Well, I don't want precise

3   testimony about the things that I've excluded from

4   there.

5          MR. WERTKIN:  So, Your Honor, when we had

6   this discussion, I was talking about I was going to

7   ask her did the documents say anything about LCDs,

8   and I anticipate that she was going to waffle on

9   this.  And that's why I was like, well, Your Honor,

10  can I use it for impeachment purposes.  And you said

11  that we could talk about it.

12         I'm not doing that now, but my understanding

13  is that we could cover -- this is what Excelas was

14  instructed to do -- and then cover that.  So to the

15  extent -- as I mentioned Your Honor, this is a

16  hostile witness and --

17         THE COURT:  You have not established that.

18         MR. WERTKIN:  Okay.

19         THE COURT:  Right now she is directly

20  answering every question you ask her, and there has

21  been no --

22         MR. WERTKIN:  Fair enough.

23         THE COURT:  There has been no evidence of a

24  hostile witness.

25         MR. WERTKIN:  Fair enough, Your Honor.  I

1    think as long as I can continue on the examination as

2    it goes, I don't see a problem with how we're doing

3    it.  So we didn't understand the basis of the

4    objection.

5            THE COURT:  You're not the one that brought

6    us up here.  The other side is the one that brought

7    us up here.

8            MR. LEMBKE:  Your Honor, we thought where we

9    were on it is she's going to be asked questions.  And

10   then before there's any effort made to show her

11   anything about what was behind the blacked in

12   portions, we were going to talk about it.  And it

13   appears as though she's now just been given that from

14   the outset, which, again -- our thought would be the

15   appropriate thing would be to give her the redacted

16   version, see what they get and then if they need

17   more, get more, but this is really a back door

18   effort.

19           THE COURT:  Well, she's got it now, and

20   she's been reviewing it.  But before you ask her

21   about any of the things that are in the blacked out

22   portion, I thought I made that clear that you would

23   approach.

24           MR. WERTKIN:  And, Your Honor, just to be

25   clear, my understanding is that the LCDs are not just

1    in that bullet.  They are mentioned in the bullet for

2    sure but the LCDs appear in the LCD forms and

3    everything like that, so I'm just trying to --

4            THE COURT:  Right, right.  This is

5    prophylactic effort here.

6            MR. LEMBKE:  And that, to some extent,

7    proves our point, which is there's a lot in there

8    about LCDs, but refreshing her one of the first

9    things she's sees is the bullets, I think, is going

10   to put focus on that.  The court's understands our

11   position and concern.

12           THE COURT:  Okay.

13           MR. LEMBKE:  Thank you, Your Honor.

14               (Open court.  Jury present.)

15   Q.  (By Mr. Wertkin)  Ms. McNicholas, we were

16   talking about guidance that the medical legal

17   analysts were given about LCDs.

18           Do you recall what guidance the medical

19   legal analysts were given with regard to local

20   coverage determinations in connection with the

21   AseraCare project?

22   A.   No.

23   Q.   You don't have any recollection about that?

24   A.   (Witness shakes head negatively.)

25           MR. WERTKIN:  Your Honor, may I approach the

1    witness?

2              THE COURT:  You may.

3              MR. WERTKIN:  I am handing you --

4              THE COURT:  What are you handing her?

5              MR. WERTKIN:  This is the guideline, the

6    redacted version of the guideline.

7              THE COURT:  Okay.  I thought -- all right.

8              MR. WERTKIN:  I'm handing what's been

9    previously identified as 494-C.

10   Q.  Ms. McNicholas, do you recognize this document?

11   A.  I do.

12   Q.  And what is this document?

13   A.  It's titled AseraCare Hospice Audit Project

14   Guidelines.

15   Q.  And are these the guidelines that were sent to

16   the AseraCare medical legal analysts in 2013?

17   A.  Yes.

18             MR. WERTKIN:  Your Honor, we would move to

19   admit this document into evidence.

20             MR. CHRISTIE:  Objection, relevance, 403,

21   hearsay.

22             THE COURT:  I overrule the objection and

23   will admit the redacted version of the Exhibit 494-C.

24             MR. CHRISTIE:  Your Honor, may AseraCare

25   have a continuing objection?

1          THE COURT:  You absolutely may.

2          MR. WERTKIN:  Your Honor, may we publish for

3     the jury the admitted exhibit?

4          THE COURT:  494-C?

5          MR. WERTKIN:  Yes.

6          THE COURT:  Yes, you may.

7          MR. WERTKIN:  Mr. Jackson, if we can go to

8     Page 1711, please.

9     Q.   Ms. McNicholas, can you read into the record

10    what it says about "course of hospice stay" on the

11    third page of this document?

12    A.   The report is -- "course of hospice stay:  The

13    report is broken out by hospice benefit period.  Each

14    hospice benefit period should contain the following

15    information:  A bolded heading noting the hospice

16    LCD, the LCD diagnosis, the number of the benefit

17    period, and the date range of the benefit period."

18    Q.   And if you could read also the second paragraph

19    into the record, please.

20    A.   The first paragraph contains the information

21    from the LCD regarding the hospice medical criteria

22    met at the time of the certification.  The client

23    requested we begin our statement with form reflects.

24    Note all criteria that applies.  You do not need to

25    note the criteria not met.  Note comorbidity and

1    secondary conditions.  Reference all page numbers of

2    the LCD, even if no information was taken from them.

3    It is of no concern to the client the date the LCD

4    was signed or if an ICD-9 code was not chosen, so if

5    it is omitted, it does not need to be document.

6            It is at the end of the paragraph where you

7    would note physician certified by medical --

8    brackets, by Medical Director J. Smith, MD, end of

9    bracket, as hospice eligible.

10   Q.  Ms. McNicholas, do you see the part where it

11   says "note all criteria that applies"?

12   A.  Yes.

13   Q.  "You do not need to note the criteria not met".

14   What does that mean?

15   A.  The form had boxes that -- some that were

16   checked and some that were not checked.  We

17   instructed the analysts to note the criteria that was

18   checked.

19   Q.  And if the criteria was not met, what did you

20   tell the medical legal analysts?

21   A.  That it was not necessary to capture it.

22   Q.  And so you personally reviewed, you said, about

23   three or four?

24   A.  Correct.

25   Q.  And you wrote three or four summaries; is that

1  right?

2  A.   I believe so.

3  Q.   And you used the local coverage determination

4  forms when you were doing your review; is that right?

5  A.   If they were included in the medical records.

6  Q.   So if you saw them, you would consider them in

7  writing your summaries?

8  A.   Correct.

9  Q.   Why did you do that?

10  A.   Because they were important concerning

11  eligibility and that was what the project was about.

12  Q.   I would like -- when you were reviewing the

13  instructions for this project, did you also -- did

14  those instructions on the S drive, did those also

15  contain examples of LCD forms that could be reviewed

16  by the medical legal analysts and yourself?

17  A.   I believe there were some.

18  Q.   And what does hospice LCD mean?

19  A.   It's a local coverage determination is what LCD

20  stands for.  I believe it's guidelines for

21  eligibility -- for determining eligibility and

22  possibly -- I mean, to give an idea of what

23  documentation needs to be present.

24  Q.   And in the number one, you see there's a

25  reference to LCD diagnosis.  What does LCD diagnosis

1   mean?

2   A.   There's a diagnosis or a condition that is

3   included with the LCD.

4   Q.   And why did you have to note the applicable LCD

5   based on a diagnosis?

6   A.   I don't know.

7            MR. WERTKIN:  I would like to publish for

8   the jury, Your Honor, an example -- an LCD form, if

9   that would be permitted.

10            THE COURT:  All right.

11            MR. WERTKIN:  Mr. Jackson, if we can put up

12   a -- the LCD form where it says local coverage

13   determination.  Thank you.  If you would blow up that

14   box, please, the entire -- everything that's boxed,

15   please.  Actually, we don't need the narrative in

16   this particular case, if you want to just do the box.

17   Thank you.

18   Q.   Ms. McNicholas, do you recognize this document?

19   Not necessarily this particular document, but are you

20   familiar with documents like these?

21   A.   Yes.

22   Q.   And what is your understanding of this document?

23   A.   It's a checklist.

24   Q.   And we were talking a minute ago about the

25   guidelines that were given to the medical legal

1   analysts and they were talking about when to note

2   criteria met and not met; is that right?

3   A.   Correct.

4   Q.   Now, can -- I would like to take you through and

5   you can explain what that instruction means in light

6   of this form; is that all right?

7   A.   In this form, the information that would have

8   been included in the summary would be the criteria

9   that was met, so that --

10   Q.   So the medical legal analysts were instructed to

11   put in their summaries when a criteria were met; is

12   that right?

13   A.   Yes.

14   Q.   So, in this case, we've got six check marks; is

15   that right?

16   A.   Correct.

17   Q.   Three check marks for criteria met and three

18   check marks for criteria not met; is that right?

19   A.   Correct.

20   Q.   So, let's just take this first line where it

21   says 7A.  Do you see where it says 7A?

22   A.   Yes.

23   Q.   Ability to speak is limited to one to five words

24   a day.

25          And can you just, for the record, say

1  whether the criteria is met or not met?

2  A.  Criteria not met.

3  Q.  So, in that particular case, you would not note

4  that the ability to speak is more than one to five

5  words a day when you're preparing your summaries for

6  AseraCare in 2013; is that right?

7       MR. CHRISTIE:  Objection, leading.

8       THE COURT:  Sustained as to leading.

9  Q.  (By Mr. Wertkin)  Would you note,

10  Ms. McNicholas, when doing your summaries for

11  AseraCare in 2013, whether there was an ability to

12  speak more than one to five words a day based upon

13  this chart and this check mark?

14  A.  No.

15  Q.  Let's go down one to all intelligible vocabulary

16  lost.

17       In preparing your summaries and in the

18  summaries that were prepared by the medical legal

19  analysts, would you note that not all intelligible

20  vocabulary was lost when preparing the summaries for

21  the AseraCare project in 2013?

22  A.  No.

23  Q.  Let's go down one more to non-ambulatory.  Would

24  you note that the patient was non-ambulatory in your

25  summaries?

1   A.   Yes.

2   Q.   And would you note that the patient was unable

3   to sit up independently in your summaries?

4   A.   Yes.

5   Q.   And if we go down to unable to smile, would you

6   note, in your summary, that the patient was able to

7   smile in your summaries?

8   A.   No.

9   Q.   And would you note for the 7F, unable to hold

10  head up, whether the patient was unable to hold head

11  up in your summary?

12  A.   Yes.

13  Q.   So, Ms. McNicholas, based on this form, your

14  summary would include that the patient was

15  non-ambulatory, that the patient was unable to sit up

16  independently, and the patient was unable to hold

17  head up; correct?

18  A.   Correct, based on this form.

19  Q.   But your summary would not indicate that the

20  patient was able to speak more than five words a day,

21  would not indicate that the patient had a vocabulary,

22  and would not indicate that the patient was able to

23  smile; is that right?

24  A.   On this page.

25  Q.   Ms. McNicholas, were the medical legal analysts

1  given any instructions, when preparing these

2  summaries for AseraCare, about decline?

3  A.   They were told to include decline and to include

4  improvement.

5  Q.   And if the patient had remained stable, their

6  condition had not changed, is that something that the

7  medical legal analysts would note on their summary?

8  A.   It all depends on the medical record, if it --

9  but it's our usual customary action, if the patient

10  remained the same, not to indicate that, only to

11  indicate up or down movement in their condition.

12  Q.   So, if the patient remained the same, if their

13  conditions did not change over a three-month period,

14  a four-month period, a five-month period, that would

15  not necessarily be noted in the summaries that were

16  created by the medical legal analysts for AseraCare;

17  is that right?

18  A.   It could be noted and it could not be noted.

19  Q.   In terms of what the guidelines asked, did the

20  guidelines suggest that that kind of thing should not

21  be noted or does not need to be noted?

22  A.   Not to my understanding.

23  Q.   If I could call your attention back to 494-C, if

24  we can publish that back up, please.  It's Page 3 or

25  it's the page that we were -- sorry, Page -- okay.

1      So, is it your testimony today that the
2  guidelines did not include any information about the
3  importance of showing decline?
4  A.   Correct.
5          MR. WERTKIN:  Your Honor, may we approach?
6          THE COURT:  All right.
7                    (SIDEBAR)
8          MR. WERTKIN:  So, Your Honor, the issue is
9  that, from the unredacted version, it says that only
10  those issues related to the LCD physician
11  certification and patient decline are relevant.  Now,
12  that has been redacted out of the redacted version.
13          She has testified that the guidelines did
14  not say anything about decline.  And I would like the
15  opportunity to impeach her with that statement
16  because it's not true, and I can't do it in front of
17  the jury with the redacted version.
18          MR. CHRISTIE:  Your Honor, the question was
19  does the guidelines talk about the importance of
20  decline.  It did not say they are not -- a decline
21  was mentioned.  The question --
22          THE COURT:  You need to rephrase your
23  question to get where you want to go, Jeff.
24          MR. WERTKIN:  Okay.
25          THE COURT:  If you do that --

1          MR. CHRISTIE:  I will say that paragraph
2    three at the top of Page 4 is unredacted.
3          MR. WERTKIN:  Okay.  Thank you, Your Honor.
4               (Open court.  Jury present.)
5    Q.  (By Mr. Wertkin)  Ms. McNicholas, before the
6    conference, I had asked a question about decline.  I
7    would like to ask it in a slightly different way.
8          Did the audit project guidelines stress the
9    importance of showing decline?
10          MR. CHRISTIE:  Objection.
11          THE COURT:  Overruled.
12   A.  I don't know.
13   Q.  (By Mr. Wertkin)  Okay.  I would like to turn
14   your attention to Page 4 or Page 1712 of Government's
15   Exhibit 494-C.  And if we could get that Paragraph 3
16   blown up, please.
17          Ms. McNicholas, can you read that into the
18   record?
19   A.  Number three, the second paragraph contains
20   information obtained from the actual medical records
21   describing the patient's condition.  A good source
22   for this is the routine nursing assessment document
23   or the nursing assessment for ongoing eligibility
24   document.
25          Be certain to capture anything that would

1  indicate decline in condition.  If a specific time

2  period or date is referenced by Dr. Liao, you may

3  need to go into the general skilled nurses notes, but

4  that would be an exception.  You do not need to note

5  documentation errors/omissions, unless it directly

6  addresses eligibility.

7  Q.  What is "be certain to capture anything that

8  would indicate decline in condition" mean?

9  A.  If the patient's condition declined, for

10 example, if they got an infection, you should be sure

11 to include it in the summary.

12 Q.  And the instructions don't say anything -- it

13 doesn't talk about being certain to capture anything

14 that would indicate improvement, does it?

15 A.  It's our normal procedure.

16 Q.  It doesn't say to be sure to capture anything

17 that would indicate stability, does it?

18 A.  It doesn't.

19 Q.  So, the AseraCare Hospice Audit Project

20 Guidelines did provide explicit instructions to look

21 for decline in doing the summaries; is that right?

22        MR. CHRISTIE:  Objection, leading.

23        THE COURT:  Sustained.

24 Q.  (By Mr. Wertkin)  I will ask you to go back to

25 my original question, Ms. McNicholas.

1          Did the guidelines talk about or stress for

2    the medical legal analysts decline and looking for

3    decline?

4    A.   I just read the sentence that said that.

5    Q.   And you would agree that that's what that --

6    that's how you interpret that sentence?

7          MR. CHRISTIE:   Objection, confusing, vague.

8          THE COURT:   Overruled.

9    A.   It says to capture anything that would indicate

10   decline.

11   Q.   (By Mr. Wertkin)   When AseraCare -- when Excelas

12   was -- let me ask you a different way.

13          Are you aware that the medical legal

14   analysts on your team for the AseraCare project

15   emailed questions to Cheryl Streicher about this

16   project?

17   A.   Yes.

18   Q.   And do you know what questions -- what those

19   questions were?

20   A.   No.

21   Q.   Do you know what informal guidance Ms. Streicher

22   gave to the medical legal analysts?

23   A.   No.

24   Q.   You were the project manager on the case; is

25   that right?

1    A.    Correct.

2    Q.    But you don't know what instructions were given

3    to your team members about this project?

4    A.    Not in my absence.

5    Q.    Ms. McNicholas, were the medical legal analysts

6    provided with Dr. Liao's opinion at the time that

7    they were doing their summaries and review?

8    A.    I believe so.

9    Q.    And how were the medical legal analysts

10   instructed to use Dr. Liao's report and conclusions

11   --

12   A.    I don't remember.

13   Q.    -- in their review?

14   A.    I don't know.

15   Q.    If we can look to the first page of Government's

16   Exhibit 494-C and blow up the paragraph that starts

17   "each case."

18          Ms. McNicholas, if you could read that into

19   the record, please.

20   A.    Each case should also have been received with a

21   brief written statement by the government's expert

22   witness, Dr. Liao.  The client will be forwarding

23   those statements to us and can be used as a roadmap

24   for us to see the ineligibility claim for each case.

25   Q.    So, when you and your medical legal analyst team

6472

```
 1  were doing your review, you had a roadmap for you to
 2  see ineligibility; is that right?
 3  A.   I didn't write this.  I don't know what
 4  Ms. Streicher was referring to with that.
 5  Q.   Did you use -- did you follow the instructions
 6  in the guidelines that were written up for this
 7  project when you were doing your review?
 8  A.   I reviewed the guidelines and then did my
 9  review.  I can't recall if I specifically followed
10  each guideline.
11  Q.   Did you follow this guideline?  Did you refer to
12  Dr. Liao's conclusions when you were doing your
13  review?
14  A.   I don't know that it was a conclusion.  I -- if
15  there was a comment by Dr. Liao, which there weren't
16  for every case, and if there was one on my case, I
17  looked at it.
18  Q.   And Dr. Liao was identified in these guidelines
19  as the -- or excuse me.
20           How was Dr. Liao identified in these
21  guidelines?
22  A.   I just read that he was identified as an expert
23  witness.
24  Q.   And you were hired by AseraCare; is that right?
25  A.   Yes.
```

1   Q.   So, you understood that Dr. Liao -- did you

2   understand that Dr. Liao was on the other side of

3   your client when you were preparing these summaries?

4   A.   I understood he was a government's expert

5   witness.

6   Q.   When you were preparing these summaries, is one

7   of the things you were doing responding to Dr. Liao?

8          MR. CHRISTIE:  Objection, leading.

9          THE COURT:  Sustained.

10  Q.   (By Mr. Wertkin)  How did you consider

11  Dr. Liao's opinion when you were preparing your

12  summaries and your -- when you were doing your review

13  and preparing your summaries?

14  A.   Not at all because we were looking at the

15  medical records and summarizing them.

16  Q.   So you were not following the guidelines here to

17  use Dr. Liao's statements as a roadmap when you were

18  doing that, were you?

19         MR. CHRISTIE:  Objection, leading.

20         THE COURT:  Sustained.

21  Q.   (By Mr. Wertkin)  If I could turn your attention

22  to Page 4 or also 1712 of this same document.

23         If you can read what's marked under number

24  one for helpful hints and just read that into the

25  record, please.

1  A.   When beginning to write the case summary, do not

2  try to keep track of any potential missing documents

3  or addressing the specific issues raised in

4  Dr. Liao's statement as you are going along.  Once

5  you get all the pertinent information in the report,

6  you can easily see if anything is missing or if you

7  need to dig further regarding a Dr. Liao issue.

8  Q.   So, at the beginning of your review, did you use

9  Dr. Liao's statement to guide your review?

10  A.   I don't recall.

11  Q.   And at the end of your review, after you have

12  put all the pertinent information in your report, did

13  you then consider Dr. Liao's statement and go back

14  into the medical record?

15  A.   I don't recall to be exact, but I would assume

16  that I would have looked at it.

17  Q.   When you were writing up your summaries, you

18  already had Dr. Liao's statement in front of you; is

19  that right?

20       MR. CHRISTIE:  Objection, leading.

21       THE COURT:  Sustained.

22  Q.   (By Mr. Wertkin)  Did you follow these helpful

23  hints, Ms. McNicholas, when you were doing your

24  summaries?

25  A.   I don't recall.

1   Q.   And do you know if your -- well, let me ask you

2   this:  How many team members did you have on your

3   Excelas team, how many medical legal analysts did you

4   have on your team?

5   A.   I had ten.

6   Q.   Were there only ten medical legal analysts doing

7   this project or are there others?

8   A.   There were two teams, and I had members from

9   both teams that were working on this project.  And I

10  don't know exactly how many.

11  Q.   So is it possible that up to 20 medical legal

12  analysts were working on this project for AseraCare?

13  A.   Definitely not.

14  Q.   Definitely not.  Would it be between ten and 20?

15  A.   I have no recollection.

16  Q.   And all of these -- do you know whether -- do

17  you know whether between ten and 20 medical legal

18  analysts were using these helpful hints as they were

19  preparing their summaries?

20  A.   I don't know.

21          MR. WERTKIN:  Ms. McNicholas, I have no

22  further questions.  Oh, I'm sorry.  Your Honor, if I

23  can just have one second to consult.

24          THE COURT:  All right.

25              (Brief pause)

1          MR. WERTKIN:  Your Honor, I would like to go

2    into an issue that we were discussing previously.  I

3    don't know if we would like to --

4          THE COURT:  All right.

5          MR. WERTKIN:  -- approach.

6                    (SIDEBAR)

7          THE COURT:  I assume about the email?

8          MR. WERTKIN:  Yeah.  We are just going to go

9    into the emails and I didn't know -- actually, I just

10   want to be careful.

11         THE COURT:  Okay.  You haven't established

12   the threshold requirements --

13         MR. WERTKIN:  Right now, I'm -- yes, ma'am,

14   not now.  I'm about to get into it.  So I don't know

15   -- I kind of need to show -- I may need to show her

16   the document so that I can --

17         THE COURT:  No, not before you establish the

18   parameters of it.

19         MR. WERTKIN:  Okay.

20         MR. LEMBKE:  Your Honor, we would ask that

21   this be done outside the presence of the jury.

22         THE COURT:  Okay.

23         MR. WERTKIN:  Your Honor, we don't oppose

24   that, Your Honor.

25         THE COURT:  All right.

1              (Open court.  Jury present.)

2         THE COURT:  Ladies and gentlemen, we're

3    going to take what I hope will be a short break and

4    come back at 10:45.  During this break, as during all

5    others -- I tell you what, let's make it 10:50 and I

6    hope to get you in here by 10:50.

7                   (Jury excused)

8         THE COURT:  All right.

9         MR. WERTKIN:  Your Honor, if I may ask some

10   questions regarding -- okay.

11   Q.   Ms. McNicholas, you testified earlier about it

12   was the regular practice to email your supervisor and

13   your manager, if you had questions, and you were a

14   medical legal analysts; is that right?

15        MR. CHRISTIE:  Objection, leading.

16        THE COURT:  Sustained.

17        MR. WERTKIN:  I believe that's established.

18        MR. CHRISTIE:  Your Honor, I object to the

19   comment, even though the jury is not here.

20        THE COURT:  Sustained.

21   Q.   (By Mr. Wertkin)  Do you know whether -- did you

22   personally receive emails from your medical legal

23   analysts that included questions about the projects

24   -- the AseraCare projects we've been discussing here

25   today?

1          MR. CHRISTIE:  Objection, leading.

2          THE COURT:  Overruled.

3   A.   I would assume so.

4   Q.   (By Mr. Wertkin)  How long were you on vacation

5   for when you were -- when this project got started?

6   A.   Less than a week.

7   Q.   Who was the person who stepped into your place

8   while you were on vacation?

9   A.   Cheryl Streicher.

10  Q.   And were the medical legal analysts told to

11  contact -- who were the medical legal analysts told

12  to contact while you were on vacation?

13  A.   I don't know.

14  Q.   You don't know?

15  A.   (Indicating.)

16          MR. WERTKIN:  Your Honor, may I lead the

17  witness?

18          THE COURT:  I think you need to establish

19  your foundation, and I don't know that there's

20  anything you need to lead her about to do that.  Just

21  ask your questions.

22  Q.   (By Mr. Wertkin)  Isn't it true that Cheryl

23  Streicher, who was asked to step in to your place,

24  was leading the team in your absence?

25          MR. CHRISTIE:  Objection, leading.

1          THE COURT:  Overruled.  I think we've

2     already had some testimony about that.

3          Let's get to the things that are at issue,

4     please.

5     A.  Cheryl Streicher was taking my place.

6     Q.  (By Mr. Wertkin)  And if the medical legal

7     analysts had a question, they would email Cheryl

8     Streicher in your absence; right?

9     A.  I don't know.

10    Q.  You have no knowledge of whether or not a

11    medical legal analyst emailed Cheryl Streicher while

12    you were on vacation about questions?

13    A.  I would assume that they did.

14    Q.  Are you --

15         MR. WERTKIN:  Your Honor, may I approach the

16    witness and show the witness this document?

17         THE COURT:  No, not until you establish the

18    foundation for it.

19    Q.  (By Mr. Wertkin)  If an email had been sent from

20    a medical legal analyst during the time that you are

21    on vacation that had a question in it, who would it

22    got to?

23    A.  I don't know.  I assume Cheryl Streicher.

24    Q.  And do most -- do most of the questions that

25    medical legal analysts ask occur in the beginning of

6480

1  the project, the middle of the project or the end of

2  the project?

3  A.  I don't really feel that there's any specific

4  time that's more likely to get a question.  When a

5  question comes, it comes.

6  Q.  Do medical legal analysts often or sometimes

7  have questions when a project first gets going?

8  A.  They could.

9  Q.  And Excelas had never done work for a different

10 hospice company than AseraCare at this time; isn't

11 that right?

12 A.  Correct.

13 Q.  And so -- and there were special, maybe not

14 special, but there were project-specific guidelines

15 that were created just for this AseraCare project;

16 isn't that right?

17         MR. CHRISTIE:  Objection, leading, asked and

18 answered.

19         THE COURT:  Sustained.

20 Q.  (By Mr. Wertkin)  And were there more questions

21 than normal at this time because it was a new

22 project?

23 A.  I don't know.

24         MR. WERTKIN:  Your Honor, may we approach?

25         THE COURT:  All right.

1                        (SIDEBAR)

2              MR. WERTKIN:  Your Honor, in order to

3    satisfy Rule 803(6)(a), I need to establish the

4    record was created at or near the time of the

5    AseraCare project.  I would like to show her this

6    document, so I can ask her if it was created at or

7    near the time of the project outside the presence of

8    the jury.

9              THE COURT:  I don't think that's your

10   biggest issue.

11             MR. WERTKIN:  It may not be, but I'm going

12   (a) through --

13             THE COURT:  It's dated during that time

14   period, is it not?

15             MR. WERTKIN:  Yes, Your Honor.

16             THE COURT:  Okay.  Then let's move on to the

17   other things you have to establish.

18             MR. WERTKIN:  Okay.  And that's fine, but I

19   was going to lump (a) -- I was starting at (a) and

20   going through (e).  And I was confused, Your Honor,

21   about how I was going to establish that it was

22   created at or near the time in evidence without being

23   able to show her the record.  That was why I wanted

24   to show her the record, Your Honor.  So I can skip

25   (a) and come back to it.

1          THE COURT:  Well, I'm not sure that you've

2    established everything else prior to (a).  At or near

3    the time is only one as aspect of it.

4          MR. WERTKIN:  Right.  Well, again, I would

5    have to ask her who Joanne Daugirdas is.

6          THE COURT:  Yes, yes.

7               (Open court.  Jury present.)

8    Q.  (By Mr. Wertkin)  Ms. McNicholas, who is Joann,

9    last named spelled D-A-U-G-I-R-D-A-S?

10   A.  At the time, she was a medical legal analyst.

11   Q.  And did she work on the AseraCare project in

12   2013?

13   A.  I believe so.

14   Q.  Was she tasked with reviewing and summarizing

15   medical records?

16   A.  I believe so.

17   Q.  Have you seen emails from medical analysts to

18   Cheryl Streicher?

19   A.  I saw them at the deposition.

20   Q.  And do you recall your testimony about emails on

21   a server?

22          MR. CHRISTIE:  Objection, improper use of

23   the deposition.

24          MR. WERTKIN:  I'm not using the deposition,

25   Your Honor.

1           THE COURT:  Rephrase your question.

2    Q.   (By Mr. Wertkin) Do you recall your testimony at

3    trial today about emails that were sent to an Excelas

4    account to another Excelas account?

5    A.   I think my answer was the server.

6    Q.   Right.  And so those emails would be kept on the

7    server; is that right?

8    A.   I believe so.

9    Q.   And it would be kept in the server in the

10   regular conducted business of Excelas; is that right?

11   A.   I mean, I would assume so.

12           MR. WERTKIN:  Your Honor, we would move to

13   or at this time we would move to admit Government's

14   Exhibit 495-D.

15           MR. CHRISTIE:  Objection.  803(6).

16           THE COURT:  Specifically?

17           MR. CHRISTIE:  They haven't established that

18   the -- that this woman is a custodian.  They've also

19   not established this is regularly conducted activity

20   or that they kept this, she said she assumed so.  She

21   did not say she knew one way or the other.

22           Again, there's no evidence that she's a

23   custodian of these emails.

24           MR. WERTKIN:  Your Honor, as the manager of

25   the project, we would contend that she's another

1   qualified witness.

2         And we would also like to point out, Your

3   Honor, there was no authenticity objection raised by

4   the defendant at the time that the parties agreed

5   pursuant to the pretrial order.

6         MR. CHRISTIE:  Your Honor, the objection is

7   based on hearsay, not authenticity.

8         THE COURT:  Can you establish 6-C?

9         MR. WERTKIN:  Well, Your Honor, I think we

10  already heard testimony that -- okay.

11  Q.   Ms. McNicholas, the medical legal analysts, did

12  they work in the office or did they work off site?

13  A.   Off site.

14  Q.   And when you were -- when you're a manager --

15  how long have you been a manager for at Excelas?

16  A.   Since either 2010 or '11.  Except for the year

17  that I was gone.

18  Q.   So that's about four years.  And how many

19  projects do you do a year?

20  A.   Well, it's really hard.  We do a lot of

21  individual cases, so I can't really tell you.

22  Q.   Would you say that it's maybe five or six

23  projects a year?

24  A.   I don't think it's -- I mean, in our normal

25  course of work, we do individual cases, so if you

1    want -- you call that one project, then it would be a
2    lot of projects, so I can't really answer your
3    question.
4    Q.   Okay.   And Excelas -- that's all Excelas does is
5    review these medical records or do they do other
6    types of business?
7    A.   We organize records, you know, and scan and
8    digitize them, too.   So sometimes we only do that
9    portion.   For --
10   Q.   And in terms of the percentage of your work, how
11   much of the work that Excelas does is relating to
12   medical legal analysts and using medical legal
13   analysts?
14   A.   I don't know that exact number because, like I
15   said, some of our clients just want us to take the
16   medical records and organize them and scan them.
17   Q.   And is that all you do, manage medical legal
18   analysts or do you do other things?
19   A.   I only manage the medical legal analysts, but I
20   certainly interface with the other departments.
21   Q.   And when you are -- and because you have all of
22   your medical legal analysts off site, do you rely
23   heavily on email communications to communicate with
24   your analysts?
25   A.   Email and phone.   We do speak a lot on the

 1  phone.

 2  Q.   And would you say that, in the course of a given

 3  project, you send at least one email out to a medical

 4  legal analysts in a day?

 5  A.   One to one?  I mean, one to each or one to --

 6  no, I send out at least one email a day to a medical

 7  analyst, that's true.

 8  Q.   Do you send out dozens of emails a day to

 9  medical analysts?

10  A.   Not necessarily.

11  Q.   Okay.  In the heat of a project, do you send out

12  dozens of emails out to medical legal analysts?

13  A.   You know, it all depends because it depends on

14  who's working on the project.  It's really --

15  Q.   But you would say it's a regular practice to

16  email medical legal analysts to communicate with

17  them?

18          MR. CHRISTIE:  Objection, leading.

19          THE COURT:  Sustained.

20  Q.   (By Mr. Wertkin)  But you do use email to

21  communicate with -- do you use email to communicate

22  with your medical legal analysts about projects that

23  you're doing for clients?

24  A.   Email and phone conversations.

25  Q.   Okay.  And when you were working on the

1  AseraCare project, you would -- you also used emails

2  to communicate with your medical legal analysts about

3  the project?

4          MR. CHRISTIE:  Objection, leading.

5          THE COURT:  It's leading but I will allow

6  the question so we can get through this.

7  A.   Emails and phone conversations.

8  Q.   (By Mr. Wertkin)  So, it was regular practice

9  for this project to email medical legal analysts;

10  isn't that right?

11  A.   I wouldn't say it was a regular practice because

12  it could have been as easily a phone call.

13  Q.   You do phone calls and emails; is that right?

14  A.   Correct.

15  Q.   Okay.  So, it would be a regular practice to

16  pick up the phone or accept a phone call; is that

17  right?

18  A.   If the phone rang, I would pick it up.

19  Q.   And if you had an email come up, you would

20  respond; is that right?

21  A.   I would read it, yes.

22  Q.   You would read it and you would respond; right?

23  A.   If it warranted a response.

24  Q.   Thank you.

25          MR. WERTKIN:  Your Honor, we move to admit

1    Government's Exhibit 495-D.

2            MR. CHRISTIE:  Objection, Your Honor,

3    hearsay, he hasn't satisfied the requirements of

4    803(6) and may we approach?

5            THE COURT:  All right.

6                    (SIDEBAR)

7            MR. LEMBKE:  Your Honor, number one, I don't

8    think they come close to satisfying the custodian

9    prong.

10           Number two, all this talk about emails that

11   are sort of done in the same way as telephone calls,

12   that leads into the plain case law that we identified

13   for you in our motion in limine that that sort of

14   communication does not qualify for the regular

15   conduct prong.

16           MR. WERTKIN:  Your Honor, in this particular

17   case in the nature of the business, as everyone is

18   off site, we would contend that emailing your manager

19   is a regular practice of this business.  It is unlike

20   the case law cited by defendants.

21           THE COURT:  I don't know how you get around

22   that it's a substitute for phone calls.

23           Now, I think it would be different in terms

24   of emailing the whole team information, which she

25   said was done, like the guidelines would have been

1    emailed.  That, I think, would establish it.

2         But these emails back and forth where

3    they're just kind of chatting about this stuff, I

4    think that is more in line with the telephone calls.

5         I'm not saying that all communications by

6    email within this company would not satisfy the

7    business documents, but the individual ones, I think,

8    are in essence a substitute for the telephone calls.

9         MR. WERTKIN:  For your consideration, Your

10   Honor, the email we do not think it falls into the

11   category of chitchat.  This is -- she testified that

12   as the manager, if they had a question, they would

13   email her.  This email that we're trying to admit

14   contains a specific instruction that relates

15   specifically to the AseraCare project, and that's

16   what we think makes it different.

17        THE COURT:  Okay.  Again, if it were

18   something that were emailed -- that was emailed for

19   emailed for the whole team, I think it would be fall

20   within a regular business document.

21        MR. WERTKIN:  May I ask her if -- I think

22   what she said is that these documents about the

23   guidelines and everything gets stored on a S drive as

24   opposed to email to the whole team.  So I'm not so

25   certain there are even emails that go out to the

1   whole team necessarily, because all these documents

2   that need to go out are stored on the S drive.  Maybe

3   that would influence how the Court considers this

4   question.

5           MR. LEMBKE:  Isn't their exhibit an email

6   that went out --

7           MR. WERTKIN:  Just to one person.

8           MR. CHRISTIE:  Exhibit 494 reflects the type

9   of guidelines that he's talking about.  It's the

10  first page of that.

11          MR. WERTKIN:  The email says go to the S

12  drive.  That's where this stuff is it.  I mean, we

13  didn't pull it, but something like that.

14          THE COURT:  Either way, these emails, I

15  believe, are more in line with telephone calls and

16  general hearsay conversations as opposed to a

17  business document.

18          MR. LEMBKE:  Thank you, Your Honor.

19                  (Brief recess.)

20              (Open court.  Jury present.)

21          THE COURT:  Mr. Wertkin, your may continue.

22          MR. WERTKIN:  Thank you.

23  Q.  Ms. McNicholas, do you recall what month in 2013

24  Excelas started working on its project to complete

25  124 summaries for AseraCare?

6491

1    A.    February.

2    Q.    And do you know when that work was completed?

3    A.    Mid March or late March, I'm not sure.

4    Q.    And do you know how many different people at

5    Excelas worked on that project?

6    A.    I don't.

7    Q.    And was the project completed -- did the medical

8    legal analysts review all 124 records and do

9    summaries in that six to seven week period?

10   A.    I believe so.

11   Q.    And how much was Excelas paid for this project?

12             MR. CHRISTIE:  Objection, relevance.

13             THE COURT:  Overruled.

14   A.    I have no idea.

15             MR. WERTKIN:  Thank you, Your Honor, no

16   further questions at this time.

17             THE COURT:  Okay.  Any cross-examination?

18             MR. CHRISTIE:  Your Honor, AseraCare does

19   not have any questions.

20             THE COURT:  Thank you, Ms. McNicholas, you

21   may step down.

22             Does the government have anything else in

23   rebuttal?

24             MR. WERTKIN:  Your Honor, the government has

25   no more witnesses to call in rebuttal and we rest.

1          THE COURT:  Ladies and gentlemen, do you

2     know what that means, it means we're through with

3     evidence in phase one.  And that means that the next

4     thing that we will do will be to provide you with the

5     complete instructions of the law that you are to use

6     in reaching your decision and then the government

7     will make closing argument, the defense will make

8     closing argument, the government will get again a

9     chance to rebut, and then I will give you final

10    instructions on what to do.

11          But we're going to wait until tomorrow to

12    start all that, if you don't mind having an extra

13    half day to do whatever you may need to do.  I think

14    Ms. Calahan has told you that when you start the

15    deliberations, which is what you will be doing after

16    the final instructions tomorrow and not before, that

17    you will then kind of be the masters of your destiny.

18    You will get to choose when you are here, what time

19    you take breaks, that kind of stuff, and when you

20    come back.  And I think she's talked with you about

21    whether you want to work on Fridays, that's totally

22    up to.  You control that issue.  You just need to let

23    me, through Ms. Calahan, know when you're going to be

24    here and for how long.

25          Also, once we start deliberations, we will

1   have lunch available for you, just a little extra

2   perk and a little extra way to say thank you for your

3   service.  And Ms. Calahan will explain that to you.

4       I am not sure whether we will have it

5   tomorrow -- we will?  Okay.  So we'll have lunch

6   available for you tomorrow and she will give you

7   information on that.

8       I'm just telling you this now so that if you

9   have things going on in your personal life or your

10  business life, you will know what to expect when you

11  come back tomorrow.

12      It's very, very important now that you've

13  heard all the evidence that you keep it in your mind

14  and you can certainly be thinking about it, but do

15  not talk about it with anyone.  If there are

16  unanswered questions at this point, just chalk them

17  up as unanswered questions.  You cannot do any

18  outside research.  You will have all of these

19  exhibits available to you, if you want to explore

20  them, to answer any unanswered questions.

21      But do not do any independent research,

22  don't do a Google search on anything.  As I've told

23  you before, your decision about this case will be

24  based only on the testimony that you have heard in

25  court and the documents that have been admitted into

6494

1  evidence.  And it's very important that you don't go

2  outside the testimony and the documents in making

3  your decision.

4          I will tell you how important that is:  If

5  that happens, we have to start all over on this case

6  with a new jury and how much waste would that be for

7  everybody involved, so it's very important that y'all

8  don't do that.

9          It's also important that you don't email

10  each other or talk to each other outside of that jury

11  room about the case.  So make sure that when you do

12  start deliberations, that's the only place that you

13  talk with each other.

14          We will see you back in the morning at 8:30

15  and we will be ready to rock and roll.

16          Let me explain one other thing about

17  tomorrow.  We will be taking more frequent breaks

18  because you will be sitting -- first, you will have

19  to listen to me rattle off what the law is.

20          Then we will take a short break and the

21  government will make its argument and we'll take

22  another short break -- I want you to be alert for

23  everything that the lawyers say and for everything

24  that I say, so we will be taking more frequent breaks

25  but they will be shorter breaks.  But you will get

1   lunch tomorrow.

2          So we will see you tomorrow.

3                  (Jury excused).

4          THE COURT:  Do y'all want to take a little

5   break and then I assume you've got --

6          MR. LEMBKE:  We have a motion, Your Honor.

7          THE COURT:  Another motion.

8          MR. LEMBKE:  Yes.

9          THE COURT:  All right.  Let's take a little

10  break because I do have a couple of questions I want

11  to ask regarding that, and I think those are on my

12  desk.  And you guys had a break and I didn't.

13         Also, Jeff, if y'all could talk and let me

14  know what your view is on the jury verdict form

15  because that may take a little while to get it done,

16  particularly when we've got other things going --

17  other things like PowerPoint and stuff.

18                  (Brief recess.)

19                  (Open court.)

20         THE COURT:  Have y'all decided which thing

21  we're going to take up first?

22         MR. LEMBKE:  Well, Your Honor --

23         THE COURT:  I guess you want to make your

24  motion.

25         MR. LINTON:  We're prepared to make our

1  motion, but whatever the Court's preference is, we

2  will, obviously, abide by it in terms of the order.

3           THE COURT:  I had forgotten until we went

4  back in there that the government had filed two

5  motions in limine this morning, and I was reading

6  those before coming back in.

7           So let's take up, then, the defendant's

8  motion.

9           MR. LEMBKE:  Your Honor, just a few minutes

10 ago on Pacer, AseraCare filed its motion for judgment

11 as a matter of law at the close of all the evidence

12 in phase one.

13          We adopt the arguments we've previously made

14 in connection with our two prior judgments for

15 motions as a matter of law without, of course,

16 waiving any of the grounds in the motion.

17          As the Court will recall, we previously

18 argued that there were 14 -- we focused on, at the

19 close of the plaintiff's case, 14 specific

20 individuals in connection with the JML at that time,

21 two of which the Court granted, the rest the Court

22 reserved ruling on.

23          And then there was the subsequent motion to

24 strike certain testimony from the government's

25 physician expert, Dr. Solomon Liao, which was

1   document 421 on Pacer and that involves a number of

2   additional patients and those arguments are

3   incorporated into our JML that we're now filing at

4   the close of all the evidence.

5           So, Your Honor, we're happy to address

6   whatever issues the Court wishes us to focus on.

7           THE COURT:  Okay.  I was looking over those

8   submissions last night and have some particular

9   questions I would like to ask to see if I can get a

10  clarification as to what's at issue.

11          And quite frankly, I'm torn between this

12  question of whether I am evaluating Dr. Liao's

13  methodologies under Daubert, or whether I am really

14  looking more at his credibility, which is not what I

15  am supposed to be doing now.

16          And it seems to me there's kind of a fine

17  line there, and I want to make sure I don't err on

18  either side of it.

19          I am trying to get all the evidence pulled

20  together in terms of -- well, let's just take the

21  Alzheimer's patients first and his testimony about

22  the patients who were not eligible for hospice

23  because with a diagnosis of dementia, they were not a

24  FAST 7.  And you've outlined in your motion to

25  strike, that's incorporated into your JML motion,

1   several patients that he testified weren't eligible

2   because they were not a FAST 7.

3           MR. LEMBKE:  Yes, Your Honor --

4           THE COURT:  And you've pointed out his

5   contradictory testimony regarding patient Vera W. who

6   is Number 114.  And you've also pointed out how --

7   and I'm just trying to summarize this to my

8   understanding for the record.

9           MR. LEMBKE:  Yes, Your Honor.

10          THE COURT:  You pointed out how he testified

11  repeatedly that the patient was not eligible because

12  the patient did not meet that one benchmark or

13  criteria, or whatever term we want to use,

14  specifically as to a FAST 7.

15          And you've also pointed to his testimony

16  that no, there wasn't a specific clinical benchmark,

17  although he has applied that FAST 7 in a method, in a

18  fashion that appeared to establish it as a hard FAST

19  benchmark requirement to be eligible.

20          Did I --

21          MR. LEMBKE:  Your Honor, I think that's

22  exactly it, through the number of patients and, as

23  you noted, we noted several, it's Thomas S., Number

24  113; Faye A., Number 36; Irene L., Number 48; Mary

25  S., Number 86; Sue S., Number 111; Patricia D.,

1    Number 97; and Ralph S., Number 101.

2           During his testimony, he testified to the

3    jury that those patients were not eligible for the

4    Medicare hospice benefit because the only reason he

5    gave was because they were not a FAST 7.

6           And then later -- much later in his

7    testimony, as the Court noted with regard to Vera W.,

8    and then on cross-examination, he said you did not

9    have to be a FAST 7 in order to be eligible.

10          And I think in terms of the line between

11   credibility and inconsistent methodology, this is

12   plainly on the inconsistent methodology side of the

13   line.

14          And we cited you some cases in our reply we

15   submitted in support of our motion to strike, which

16   was defense or Pacer document 431, and it's really

17   the whole Kumho Tire line of cases beginning with the

18   United States Supreme Court decision in Kumho Tire

19   and then there was some, as I recall, some District

20   Court -- another judge in this District went along

21   that line, Judge Blackburn had a case, and I think

22   there was a case from one of the other districts in

23   the circuit, which said that it is appropriate in the

24   role of the -- in the Court's role as gatekeeper when

25   an expert is applying a patently inconsistent

1   methodology, that falls under the gatekeeper

2   function.

3        And we think there is no way to look at what

4   Dr. Liao did other than an inconsistent methodology.

5        So, on that group of FAST 7 patients, that's

6   how -- that's where we think there's a basis for the

7   Court to strike the testimony.  And then if that

8   testimony is struck, enter judgment as a matter of

9   law.

10       THE COURT:  Well, I agree with your analysis

11  of Kumho Tire, and I think it was U.S. Can, maybe,

12  from the Middle district of Alabama or whatever, but

13  --

14       MR. LEMBKE:  Yes, Your Honor.

15       THE COURT:  But I'm also trying to figure

16  out in terms of the LCDs that Dr. Liao used for these

17  patients.  And at one time, I was hearing from

18  AseraCare that he was using the wrong LCD, either for

19  dementia patients, was using an Alzheimer's LCD or

20  for Alzheimer's was using a dementia LCD, or

21  something of that nature.  And I was trying to find

22  that last night and to figure out which LCD was

23  which.

24       MR. LEMBKE:  There's --

25       THE COURT:  And I didn't have easy access to

1  them at the time.  But I did note that for many or

2  most of the patients he was using LCD 16343 and for

3  others he was using LCD 31539 and for some patients

4  he was using both.

5          And is there a difference -- is it a time

6  frame difference or is it a standard difference?

7          MR. LEMBKE:  Your Honor, I will tell you, I

8  don't have the numbers committed to memory.

9          THE COURT:  You don't?

10         MR. LEMBKE:  On that I do not.

11         THE COURT:  It's not like they're very many

12  numbers in this case to commit to memory.

13         MR. LEMBKE:  But there is no separate LCD

14  for any one period of time for Alzheimer's dementia

15  and other dementia.  There's -- the title is

16  something like, Alzheimer's and related disorders.

17         THE COURT:  Diseases.

18         MR. LEMBKE:  Something like that.  There was

19  a dispute, and it came up in connection with that

20  Reisberg article about the FAST scale, about whether

21  the FAST scale really should apply to a

22  non-Alzheimer's dementia patient.  And that may be

23  part of what the Court is focused on.

24          So there's a question if an LCD that is

25  focused on Alzheimer's is based on the FAST scale

1  should it really e applied to non-Alzheimer's

2  dementia.

3          But I don't -- for purposes of this motion,

4  I'm not sure that gets in the way because Dr. Liao is

5  applying the FAST scale to all of these patients I

6  listed --

7          THE COURT:  To all dementia.

8          MR. LEMBKE:  To whatever kind of dementia

9  they had in that case, Alzheimer's or not.  And the

10  key is, for that initial group I listed, the reason

11  he gave for ineligibility is they're not a FAST 7.

12  And the problem with the inconsistent methodology is

13  then, as you said with Vera W. and then on cross, he

14  insisted he had not applied it only -- he had not

15  determined that someone was ineligible only on the

16  basis of FAST 7.

17          And that goes to the heart of the

18  methodology that he was using for these dementia

19  patients of whatever variety the dementia.

20          THE COURT:  Now, I did go back and review

21  the Reisberg article last night as well.  It doesn't

22  say that it's not appropriate for any and all types

23  of dementia, but it does emphasize the unique

24  advantages it has as a diagnostic measure for

25  dementia of the Alzheimer's type and the

1  identification of excess disability.

2         But then said that it was also useful in

3  studies that seek to compare cognition in dementias

4  of varying etiologies.

5         MR. LEMBKE:  I think, Your Honor, that one

6  of the real issues, and you heard some testimony on

7  this, I believe, from Dr. Cooney and perhaps others,

8  is the ordinality of the progression through the FAST

9  stages.

10         I think the suggestion was calling someone a

11  FAST 7C will tell clinicians non-ambulatory, the

12  issue for the use of the FAST scale is, does the

13  progression hold for non-Alzheimer's dementias and

14  you heard some testimony that it does not, that the

15  research suggests that it's the ordinality that has

16  been established for the FAST scale in Alzheimer's

17  patients.

18         But, again --

19         THE COURT:  And also I think there was some

20  testimony that if the patient wasn't following that

21  ordinal progression, then perhaps they had --

22         MR. LEMBKE:  A different form.

23         THE COURT:  -- dementia other than

24  Alzheimer's dementia.

25         MR. LEMBKE:  Yes, Your Honor.

 1            THE COURT:  Which raises for me some real

 2    questions about his application of the FAST 7

 3    across-the-board to all patients.

 4            That's not your inconsistent methodology

 5    argument, but it seems to me to raise a question as

 6    to whether that methodology is appropriate at all

 7    except with clearly -- with patients who clearly have

 8    Alzheimer's.

 9            MR. LEMBKE:  I think that is, in fact, an

10    additional issue above and beyond the inconsistent

11    methodology issue.

12            THE COURT:  All right.  Let me ask you about

13    the New York Heart Association patients.

14            MR. LEMBKE:  Yes, Your Honor.

15            THE COURT:  Which are like the second group

16    that you had a motion to strike.  And I have to

17    confess that I am not as well versed with all the

18    issues around the New York Heart Association Class IV

19    as I am around the FAST 7 and the dementia patients.

20    But he did testify frequently, as you have listed on

21    Page 4, that patients were not eligible simply

22    because they did not meet the New York Heart

23    Association Class IV classification.

24            Again, holding to a benchmark or an ultimate

25    requirement or whatever you want to characterize it,

1  then, yet, testifying that, no, that was not a

2  requirement to be eligible for someone with heart

3  disease.

4        But with the heart disease patients, I don't

5  think he contradicted himself in the analysis of the

6  patient as he did with Vera W. in dementia.

7        MR. LEMBKE:  That is correct, Your Honor.

8  The statement came in cross-examination, which was at

9  Exhibit 16 to our motion, the excerpt from the

10 transcript, where, after having gone through -- and

11 for the record, it was with Mr. Edward O., Number 28,

12 Argentina P., Number 9, Jenny S., Number 53, Rubye

13 Y., Number 105, Agnes B., Number 1 and John G.,

14 Number 55 -- giving as the reason they were not

15 eligible that they were not a New York Heart

16 Association Class IV, he then testified on cross, you

17 didn't have to be a New York Heart Association Class

18 IV in order to eligible.

19        So, again, having to testify to the jury

20 based on a methodology of the New York Heart

21 Association Class IV is controlling, he then said it

22 wasn't controlling, which, again, we think raises

23 serious issues for you as gatekeeper as to whether

24 that should be -- the jury should be allowed to

25 consider it in light of that inconsistent testimony

1   and methodology.

2          THE COURT:  I will say, as to your other

3   grounds for striking his testimony as to certain

4   patients, like whether they could speak five words or

5   more or the garbled speech and things of that nature,

6   I really think those go more to credibility and they

7   kind of raise some significant credibility issues for

8   me but I don't think those cross the line or come as

9   close to crossing the line as being methodology

10  issues.

11         So, as to those grounds -- and I'm looking

12  at your motion that was filed -- this is the original

13  motion to strike, document 421.

14         MR. LEMBKE:  Yes, Your Honor.

15         THE COURT:  But it would to items three

16  beginning on Page 5 of that motion, four on Page 7,

17  five on Page 7 -- those are the ones dealing with the

18  number of words to qualify for a FAST 7.

19         So, as to those grounds, I am going to deny

20  your motion.

21         The same as to ground six dealing with the

22  relevance of the PPS score.  The BMI for

23  malnutrition, to me also seems to get awfully close

24  to that, is it a methodology or is it credibility

25  more so than those others, so if you have any light

1  or additional argument you would like to make as to

2  ground number seven.

3       MR. LEMBKE:  Yes, Your Honor.  And that

4  pertained to what we viewed as inconsistent

5  methodology being applied to Caron K., Number 19 and

6  Mabel B., Number 71 on the one hand, as opposed to

7  Dorothy V., Number 25, Naomi M., Number 92 and

8  Catherine F., Number 20 on the other hand.

9       With regard to the first two, Dr. Liao's

10 testimony was that they met the LCD criteria for

11 malnutrition only because they had a BMI of less than

12 22.  But then with regard to the other three, he said

13 that a BMI less than 22 did not necessarily meet the

14 LCD criteria for malnutrition.

15      So, we think when the Court is looking at

16 that line between credibility and inconsistent

17 methodology, this seems to us to again be on the

18 inconsistent methodology side of the line.

19      THE COURT:  I will specifically say that I

20 think your argument is strongest as to Naomi M. who

21 had a BMI of 17.4, both Caron K. and Mabel B. were

22 found eligible by Dr. Liao for a period of time

23 because of their BMIs of 17.

24      MR. LEMBKE:  Yes, Your Honor.

25      THE COURT:  So, the other two patients that

1   you mentioned, Dorothy V. and Catherine F., which are

2   Number 25 and 20 respectively, had BMIs of 19.3.

3   and he specifically pointed to the improvement over

4   her BMI of 17.2 and I think that at least as to

5   Catherine F., had he not found her eligible for a

6   portion of time and this was the time period that she

7   was not eligible for; is that correct?

8           MR. LEMBKE:  Your Honor, I would have to get

9   out my list.  I'm told that that is correct.

10          THE COURT:  So his declaration that she was

11  no longer eligible was based upon an improvement, not

12  just that one score.

13          So, as to Catherine F., I would deny the

14  motion.

15          And I think that was also the case with

16  Dorothy V.

17          MR. LEMBKE:  Number 25.

18          THE COURT:  Yes.  He had found that she was

19  initially ineligible but, again, it was based on the

20  trend or direction, not just the BMI of 19.

21          So, as to Dorothy V., I would overrule.

22  But, again, I'm struggling with is this an

23  inconsistent application of a methodology that I

24  should serve as gatekeeper for or is it credibility

25  as to Naomi M.

1          MR. LEMBKE:  Your Honor, we think, in light

2    of the way he was doing it in terms of LCD criteria

3    for malnutrition, we think it is on the inconsistent

4    methodology side of the line akin to what we looked

5    at in the two initial categories in sections one and

6    two of the motion.

7          THE COURT:  Let me hear from the government

8    in response.  And specifically, Mr. Wertkin, I would

9    like your help, if I can find my note, in

10   distinguishing the Kumho Tire standard that the

11   Supreme Court established for the court as gatekeeper

12   from this situation involving the methodologies.

13         MR. WERTKIN:  Thank you, Your Honor.  So, I

14   think what may be worth stating is that we have to be

15   careful not to confuse Rule 702 and the analysis that

16   the Court needs to do under Kumho Tire under Rule 702

17   and Rule 50 under Federal Rules of Civil Procedure.

18         Now, I think what's happening is those two

19   things are getting conflated.

20         So, for Rule 702 methodology, the Court

21   should be looking at a lot of things, including his

22   expert report, Dr. Liao's expert report, the findings

23   he made in his expert report, including --

24         THE COURT:  Which for most patients were

25   about a paragraph.

1          MR. WERTKIN:  And the notes, Your Honor, as

2     well and everything connected to the report, as well

3     as his deposition testimony, in order to get a full

4     picture under Rule 702 of whether he applied the

5     methodology.

6          What the defendants are --

7          THE COURT:  But the key that I'm focusing on

8     now is what methodology did he apply in his testimony

9     here at trial.

10         MR. WERTKIN:  Well, Your Honor, we would

11    submit that his methodology has been the same.

12    There's no inconsistency that can be demonstrated.

13         He -- what's in his report, what's at trial,

14    he has consistently maintained that he reviewed the

15    medical records, applied the general medical

16    principles behind the LCDs, as well as the LCDs, and

17    took into account other considerations.

18         There's no argument that that methodology is

19    improper.

20         What the defendants are trying to do is

21    limit your consideration under Rule 702 to just what

22    he testified at trial.  And that's improper.

23         We've heard several times that Dr. Liao

24    found a patient ineligible only because of a certain

25    FAST score or only because of a certain nutritional

1    component, that misstates his opinions in his report;
2    that misstates his direct testimony in which he said
3    he didn't treat the LCDs as mandatory; he testified
4    in cross that he didn't treat the LCDs as mandatory;
5    he testified that other than the 123 patients or 124
6    patients, he found patients in the sample eligible,
7    even though they didn't meet the LCDs.
8            So, from the very beginning, Your Honor, he
9    has always consistently maintained they're not
10   mandatory criteria and he was not finding a patient
11   was ineligible only because.
12           Now, what --
13           THE COURT:  Let's take, for example, his
14   report on Ms. Sue S., which I think is one of the
15   ones that the defense is challenging.  Yes, Number
16   111.  She appears at A-2 in Dr. Liao's report.
17           And he states, as late as October 2008, a
18   hospice staff documented that she did not meet the
19   criteria for FAST A or FAST B.  And he found that she
20   was not eligible until July 2008.  I may be reading
21   that one backwards.  Yeah.  She's one of the ones
22   where he found she was eligible for part of the time
23   but not the rest of the time.  Let's see.  I was
24   looking at some of these last night.  Okay.
25           As to Mr. Thomas S., under A-3, it's talking

1    about how many words he was able to speak at a time

2    placing him in a FAST 6, in other words, he did not

3    meet the LCD criteria of FAST 7 until he had that

4    seizure in February.

5         So that indicates he's relying upon the FAST

6    score for Dr. Thomas -- I mean, Mr. Thomas in his

7    report.

8         So, I'm not looking just at his testimony

9    here, but whether he has consistently looked to see

10   whether someone was able -- was eligible based upon a

11   FAST score.

12        Another example, Ms. Faye A. on B-1 of his

13   report, she was ineligible for LCD L16343 because her

14   FAST score was never a 7 during her entire hospice

15   care.

16        MR. WERTKIN:  Your Honor, maybe we could

17   take them one by one.  Do you want to go back -- and

18   if I can defer to my colleague Eva, Ms. Gunasekera,

19   to talk about the specific patients.  But perhaps if

20   you started with Sue S. and we've got his notes up

21   and we can refer to his notes and all the different

22   factors that he did consider when reviewing the

23   medical records.

24        THE COURT:  I'm talking about the reason

25   that he gives for the patients not being eligible.

1          MS. GUNASEKERA:  Understood, Your Honor.

2          THE COURT:  The reasons that he gave at

3   trial and the reasons that he gave in his report.

4          MS. GUNASEKERA:  Understood, Your Honor.

5          THE COURT:  For example, Mary S. at B-3.

6   She was admitted for Alzheimer's at the time of

7   admission, she was not a FAST 7A or B, and as late as

8   August, she was not a FAST 7A or B.

9          I mean, that's the way he makes his

10  determination in his report on just about every one

11  of these patients that I've looked at.

12         MS. GUNASEKERA:  Your Honor, I do believe

13  that you really do have to read his report in

14  conjunction with his notes and the testimony that he

15  provided at trial.

16         When he was talking about dementia and

17  Alzheimer's patients and his evaluation of whether

18  those patients had a six month or less prognosis, he

19  was talking holistically about how that patient was

20  functioning.  And specifically, Your Honor, he

21  testified that you need to be evaluating what that

22  patient is incapable of doing neurologically but also

23  functional in other ways.

24         So, for instance, for Mr. Thomas S., Your

25  Honor, his evaluation included whether Mr. Thomas S.

1  could feed himself, whether he was able to be mobile,

2  and so his evaluation was not just limited to the

3  patient's speech or intelligent conversation.  It did

4  include a much more -- a thorough comprehensive

5  evaluation of the patient's clinical condition.  And

6  his notes are really a good exemplar of everything

7  that he considered, including weight, mobility,

8  functionality -- any kind of clinical evaluation or

9  tests that were taken by the patient, in addition to

10  the patient's verbal capability.

11        THE COURT:  I'm not talking about just

12  verbal.  I'm talking about any of the things that are

13  reflected on the FAST score.

14        MS. GUNASEKERA:  Okay.

15        THE COURT:  And it seems that his

16  conclusions, both in his report and in his testimony,

17  at least as far as these patients listed in the

18  defense motion, his ultimate conclusion was based

19  upon whether the patient did or did not meet the FAST

20  7 scale at some point in the hospice stay.

21        MS. GUNASEKERA:  If we could take a few

22  examples, Your Honor.  For instance, Dr. Liao's

23  testimony of Ms. Irene L. during trial included not

24  only an evaluation of her dementia, which he

25  testified did not appear of enough significance, but

1   also of her Parkinson's disease, and that the

2   Parkinson's disease was not progressing as one would

3   expect with a patient of six months or less

4   prognosis.

5           Also with regard to Ms. Faye A., Your Honor,

6   Dr. Liao specifically testified about what Ms. Faye

7   A. was able to comprehend and understand when she was

8   engaging in conversation.

9           It also includes an evaluation of the

10  patient's orientation.  If Your Honor remembers, the

11  patient can be oriented by three things, and I'm not

12  specifically remembering, I think it's time, place --

13          THE COURT:  And person.

14          MS. GUNASEKERA:  And person.  Thank you,

15  Your Honor.

16          So Dr. Liao is evaluating the patient's

17  ability both in orientation, functionality, their

18  nutrition, in addition to the FAST score

19  specifically.

20          In addition, Your Honor, I think it's

21  important to note that with regard to the specific

22  purported inconsistency that counsel was referring to

23  during the cross-examination of Dr. Liao, Dr. Liao

24  was asked whether a patient must be a FAST 7 in order

25  to be eligible for the Medicare hospice benefit.  And

1     his answer was no.

2          And then upon redirect, Your Honor -- and

3     actually, during his direct testimony, he explained

4     that not every dementia and Alzheimer's patient must

5     be a FAST 7.  There are exceptions.  There are

6     instances where a patient may go from a FAST 6 and

7     then, within six months, pass away.  But those are

8     the exceptions to the rule.

9          In a majority of instances, and as the

10    science and medical principles that he relies upon

11    and that the FAST scale and the LCDs are based on

12    have demonstrated in a majority of the cases, a

13    non-Alzheimer's -- in an Alzheimer's patient who is

14    not a FAST 7 is not going to -- is not expected to

15    pass within six months of that prognosis

16    determination.

17         And that's why he anticipated -- so,

18    actually, that's not an inconsistency at all.  It's

19    Dr. Liao being very precise and saying, no, not every

20    patient must be a FAST 7 but in the majority of the

21    instances, they're going to be a FAST 7.  That is

22    just that clinical progression of both the patient's

23    inability to function, including their activities of

24    daily living, and an evaluation of how that patient's

25    cognitive capabilities are declining.

1              So, I think in those instances, Your Honor,

2    I mean, it's kind of a multi-faceted response.   In

3    the first instance, Dr. Liao absolutely looked at the

4    comprehensive condition of the patient and his notes,

5    his report, his testimony support that.

6              In the second instance, it's also taking

7    this admission or purported admission from him that

8    every patient has to be a FAST 7 and really taking it

9    out of context.  He explained not every patient

10   necessarily has to be a FAST 7 in order to be

11   eligible, but most of them are, and that's what the

12   science and the clinical principles support.

13             And so really, I think you have to stick --

14             THE COURT:  So a FAST 7 is the determining

15   factor.

16             MS. GUNASEKERA:  No.  In the first instance,

17   Your Honor, Dr. Liao looked at a comprehensive

18   evaluation of the patient.  He was looking at

19   weights.  He was looking at mobility.  He was looking

20   at the patient's, not only cognitive ability, their

21   ability to feed themselves, their ability to go to

22   the bathroom on their own, their activities of daily

23   living.  So he was looking at the full picture of the

24   patient.

25             But -- and that is supported in his report

1   and in his notes and in both his deposition testimony

2   and his trial testimony.

3        THE COURT:  Well, I started by asking

4   counsel to provide me with some way to distinguish

5   the instructions from the Kumho Tire case, and I have

6   not heard those yet, where the Court basically said

7   that the District Court had not erred in excluding

8   the testimony of an expert when the testimony

9   demonstrated several inconsistencies between the

10  specific theory or approach that he testified to and

11  then the way he went about examining the alleged

12  defective tire that was inconsistent with how he

13  testified he would do.

14       How do you distinguish that case from this

15  one, please.

16       MS. GUNASEKERA:  Your Honor, that was the

17  point I was making about the purported

18  inconsistencies that AseraCare is arguing Dr. Liao

19  made, both with the FAST 7 testimony and the New York

20  Heart Association Class IV testimony.

21       The question that was posed to Dr. Liao was,

22  must a patient be a FAST 7 or alternatively a New

23  York Heart Association Class IV in order to be

24  eligible for that Medicare hospice benefit with that

25  diagnosis.  His response was no.

1          Upon redirect examination, and even during

2    his direct testimony, Your Honor, he explained, his

3    response was no because there are exceptions to the

4    rule.  There are patients who are New York Heart

5    Association Class III who still have a six month or

6    less prognosis.

7          There are patients who are FAST 6 who may

8    still have a six month or less prognosis but those

9    are exceptions to the rule.

10          So respectfully, Your Honor, we would submit

11    that's not an inconsistency at all.  In fact, that's

12    just the precision with which Dr. Liao was answering

13    that question which is to say that not every patient

14    must be a FAST 7 or a New York Heart Association

15    Class IV.  There are exceptions to that rule.  And so

16    he had to answer that question with a no.

17          But then he explained and said that there

18    are most -- in the majority of the instances and in

19    all the cases that he reviewed of the AseraCare

20    medical records, they had to be a FAST 7.  When you

21    look at their comprehensive picture, they otherwise

22    were not eligible.  They otherwise did not have a six

23    month or less prognosis.

24          So it's actually not --

25          THE COURT:  So they had to be a FAST 7 to

1  qualify or to be found eligible by Dr Liao.

2         MS. GUNASEKERA:  No, not necessarily, Your

3  Honor.  Based on the AseraCare medical record, when

4  looking at the comprehensive picture of the patient,

5  which included the fact that the patient was not a

6  FAST 7, the patient did not have a six month or less

7  prognosis.  But just to follow up, Your Honor, on

8  this inconsistency, there's actually no inconsistency

9  in Dr. Liao's testimony, and so under a Daubert

10  methodology or under a Daubert 702 argument, there's

11  no basis to exclude or strike any of these patients

12  based on the testimony that he's offered at trial.

13         MR. WERTKIN:  Your Honor, may I just make

14  one more point?

15         THE COURT:  All right.

16         MR. WERTKIN:  And I will be brief.  Your

17  Honor, just consistent with what Ms. Gunasekera said.

18  I think the Court's concern is that Dr. Liao was

19  using the LCDs, the FAST score, as a mandatory

20  requirement and as a checklist.

21         And we think that to the extent the

22  defendants are characterizing it that way, that

23  misstates it.

24         When you take that premise away, then there

25  is no inconsistency.

1        So, you know, that's not how -- Mary Jane

2   Schultz testified at trial and actually I believe

3   it's included in the Court's jury instructions to the

4   jury that these are not mandatory requirements.  And

5   Dr. Liao understood that.  He put that -- that's

6   reflected in his report.  It's in his testimony at

7   trial.  And he also testified that he applied the

8   medical principles behind the FAST 7A.

9        So, technically, he's not even saying, oh,

10  this person is not eligible because they're a 7A, but

11  as he testified at trial, the medical principles

12  behind the 7A, Dr. Liao did a review, as Chris

13  mentioned in 2010, that was just part of his cross.

14  And he found patients ineligible.  And I understand

15  that he didn't refer specifically to the Palmetto

16  LCDs.

17       Now, again, Dr. Liao, like every other

18  hospice doctor all over the country that's under the

19  coverage of Palmetto, is expected to use and refer to

20  the LCDs.  And that's what he did.

21       But the idea that he was using it as a

22  checklist, Your Honor, and that was the basis for his

23  opinion, that is incorrect.

24       And I think that's borne out in all of his

25  testimony, deposition testimony, his notes and his

1    record.

2          And that's why we think, Your Honor, that

3    there is no inconsistency and so, under Rule 702,

4    it's improper.

5          Now, to the extent that the Court is

6    considering his trial testimony by itself, we also

7    think that the defendants haven't met their burden

8    under Rule 50.

9          THE COURT:  Thank you.  Mr. Lembke.

10         MR. LEMBKE:  Your Honor, two points:  One,

11   of course, the issue under Rule 702 and Daubert is an

12   issue of reliability that the Court has to assess as

13   gatekeeper and was the methodology being reliably and

14   consistently applied.

15         I think that the counsel for the government,

16   you know, words matter.  And what Dr. Liao actually

17   said is quite different from the nuances that the

18   government counsel are trying to find in the

19   testimony.

20         I mean, as we recite in our motion at

21   document 421, Dr. Liao didn't have all that nuance.

22   It was not a FAST 7.  Why were they not eligible?

23   Not a FAST 7.

24         And then, yes, he did at another point say

25   that didn't matter, but that underscores the

1   inconsistency.

2          So, Your Honor, when you look at what

3   Dr. Liao has actually said, both in his expert report

4   and any suggestion that what he says at trial -- in

5   our view, in the role of gatekeeper, what is in the

6   record before the jury is what's most important at

7   this point.

8          So, we think these should be -- these as

9   indicated should be struck.

10          THE COURT:  I, too, agree that what's before

11   the jury is the most important aspect in terms of

12   evaluating the methodology used by Dr. Liao.

13          I've ruled on some.  As to the others, I am

14   reserving ruling to give it further thought.

15          MR. LEMBKE:  Thank you, Your Honor.

16          THE COURT:  All right.  And that goes to all

17   versions of the motion for judgment as a matter of

18   law.

19          We have two motions in limine that the

20   government filed this morning.

21          I assume, Mr. Lembke, that you and your team

22   have had some time to review those?

23          MR. LEMBKE:  We have reviewed those, Your

24   Honor, and we oppose both.

25          THE COURT:  Which one was filed first, I

1  guess -- well, let's take up 435 which deals with the

2  sampling.

3      Since I have -- do have the government's

4  motions and have read those, let me just go to a

5  response from the defense on these, and then if I

6  need anything further, I will get it.

7      What's the basis for objecting to the motion

8  to prohibit substantive arguments, and I understand

9  that's what it's directed to, concerning the way in

10  which the sampling universe was selected, the

11  characteristics of those patients, and how the United

12  States identified the 233 patients.

13      MR. LEMBKE:  Your Honor, our opposition to

14  this motion goes to, if the materials are in

15  evidence, then we should be able to talk about them,

16  what is in evidence.

17      And what is in evidence, without objection,

18  was that there are 48 to 52,000 patients from -- that

19  AseraCare treated during the time period in question;

20  and we're talking about 121, that they were drawn

21  from 233, you know, pulled from a group of 233 and

22  that was from a group -- the 233 were derived from

23  about 2100 who had been on service for over a year as

24  I recall the testimony.

25      Now, Your Honor, I don't know why we should

1   be prohibited from talking in closing argument about

2   matters that are in evidence.

3          And we've understood clearly that the Court

4   has said we're not to go beyond that into the

5   intricacies of sampling methodology and those sorts

6   of issues.  But if it's in evidence, I don't

7   understand why we should be precluded from talking

8   about what's in evidence.

9          THE COURT:  Mr. Lembke, the government says

10  that arguments, based on the larger universe, would

11  improperly confuse the central question the jury has

12  to answer as to whether the 121 were eligible.

13         MR. LEMBKE:  Well, Your Honor, I don't think

14  I'm giving much away to say this is not going to be

15  the central theme of the closing argument for

16  AseraCare.  But --

17         THE COURT:  I would hope not.

18         MR. LEMBKE:  Right.

19         THE COURT:  If it were, AseraCare would be

20  in pretty big trouble.

21         MR. LEMBKE:  I think that's right, Your

22  Honor.

23         But I think it is certainly not out of

24  bounds to talk about that over the course of time, of

25  the period at issue, we were dealing with about

1   50,000 patients that AseraCare treated and here in

2   this courtroom we're talking about 121.

3           And that, you know -- and beyond that, that

4   these 121 came from -- were pulled from this group of

5   about 2100 who are on service for more than a year.

6           THE COURT:  Mr. Lembke, what's so or

7   whoever, I'm sorry, I'm sorry, Mr. Wertkin, why is

8   that context objectionable?

9           MR. WERTKIN:  Your Honor, a couple of

10  factors.

11          Number one, if I can harken back to our

12  discussions before the trial started about propensity

13  evidence.  Your Honor, this is AseraCare -- and

14  whether it's a central theme of their closing or any

15  theme of their closing, it would be improper for

16  AseraCare to say, well, these 121 patients, they

17  aren't false because we treated hundred, tens of

18  thousands of patients and the government isn't

19  talking about those patients.

20          That is the argument, Your Honor, that we --

21  that they made in their opening statement and that we

22  think is improper.

23          THE COURT:  That these 121 are not false

24  because we treated a lot more patients.

25          MR. WERTKIN:  That's exactly what the

1   defendants argued in opening.  They said, the

2   government has essentially -- and I am paraphrasing,

3   of course, Your Honor, but the argument that we think

4   that they made in opening and that they intend to

5   make in closing is impugning the way that the

6   government went about selecting the 121 patients in

7   this case.

8          THE COURT:  All right.  I've not heard

9   anything about impugning the way they went about it.

10          I mean, that would not be proper because

11   that would get into the sampling methodology and all

12   that other stuff for which there is no evidence in

13   this phase.

14          MR. WERTKIN:  Well, Your Honor, we would

15   submit that the Court has been very clear and

16   consistent throughout -- especially in the beginning

17   part of the trial, about what evidence should be able

18   to come in.  The Court excluded all the audit

19   testimony, which shows that the company was

20   consistently finding that patients were not eligible

21   outside of the scope of the 123.

22          And the Court excluded a lot of other

23   evidence -- and we're not arguing that, Your Honor,

24   what we're saying is that AseraCare cannot now,

25   through the statement of the president of AseraCare,

1  that these were 2,100 patients selected all over a

2  year and argue that that is somehow relevant to the

3  eligibility question that the jury is being asked to

4  decide.

5       And there's no other reason to --

6       THE COURT:  Let me put it this way:  I will

7  not allow AseraCare to argue that because there are a

8  whole lot more patients that were not challenged here

9  or whatever, that then they should find that these

10  121 are not ineligible.

11      I'm not going to let them go that far with

12  them but I don't see why they can't comment that

13  you've heard testimony that AseraCare services 50,000

14  -- 50,000 patients during this time frame.

15      MR. WERTKIN:  Your Honor, I think we would

16  disagree.  But if Your Honor's -- we're specifically

17  talking about the testimony of Angie Hollis about the

18  2,100 patients here.

19      So, you know, we would disagree that the

20  total number of patients that they serve is relevant,

21  but that's not really part of this motion.

22      THE COURT:  We're talking context.  Okay.

23  And as your argument that Ms. Hollis testified that

24  the sampling universe was around 2100, when, in fact,

25  the size of the sampling universe was 2,181.

1          MR. WERTKIN:  The point is only that it's

2     incorrect, Your Honor.

3          THE COURT:  That seems to me like a big

4     distinction like between most and many.

5          A distinction that doesn't make any

6     difference.

7          MR. WERTKIN:  Really what I was drawing out,

8     Your Honor, is that Ms. Hollis had no personal

9     knowledge of how the universe was created but --

10          THE COURT:  And there was no testimony about

11     how it was created.  She talked about the numbers

12     that were pulled.

13          MR. WERTKIN:  But, Your Honor, she did

14     testify about the characteristics of the 2,100

15     patients.  She said that they were on for more than a

16     year.

17          THE COURT:  And wasn't that the standard

18     used?  Wasn't that the standard that's been

19     referenced to me forever?

20          MR. WERTKIN:  The jury did not have the

21     opportunity to hear from the government's expert

22     about how these -- how the sample was created and how

23     the sample was selected.  And it's improper.

24          This one quick line of testimony, and I

25     would submit that, Your Honor, if you knew that we

1   were going to be standing here today, that perhaps

2   the ruling on allowing that evidence would be

3   different because --

4        THE COURT:  I don't think so, because I had

5   indicated or had an understanding that there would be

6   some context presented to the jury about that number

7   as opposed to just, okay, we've got 123 patients here

8   that you've got to make a decision about.

9        MR. WERTKIN:  And what we're saying, Your

10   Honor, I think it's clear, if the defendants are

11   allowed to say we served 50,000 patients, the

12   government only chose 2,100 patients that were on for

13   over a year, and we're only talking about 122 of

14   them -- they're going to, by inference, just by

15   saying all three of those facts, they're arguing most

16   of AseraCare's patients were on for less than six

17   months.  That, Your Honor, is prejudicial and not

18   relevant to the discussion at issue.

19        The motions in limine were clear that phase

20   two issues should not be discussed in phase one.

21        The universe --

22        THE COURT:  They're not talking about the

23   methodology or the statistics.  We're talking merely

24   what will probably, at most, be one sentence setting

25   context for the jury and me thinks that doth protest

1   too much, Mr. Wertkin, about what I would perceive

2   would be a very teeny, tiny, tiny part of a 60 minute

3   argument.

4         I'm not going to let them argue that it goes

5   to the eligibility of any of the 121 patients that

6   are at issue.

7         But I don't think it would be proper for me

8   to preclude them from merely mentioning this

9   information that is in evidence.

10         So with that, I mean, I hope the defense

11   team understands my limit here, that we're not going

12   to be going on and on and on about how these numbers

13   show that none of the 121 were -- were whatever.

14         MR. LEMBKE:  Absolutely clear, Your Honor.

15         MR. WERTKIN:  And the last point is we would

16   just submit that if they mention it five times, they

17   shouldn't be able to mention it one time.  That's our

18   position.

19         THE COURT:  Well, I overrule that.  Okay.

20   Then you've also got the motion involving the

21   O'Connor settlement regarding Dr. Liao.  We've got

22   now his testimony.

23         So, how far does the defense think you would

24   be entitled to go in argument based upon his

25   testimony that he had no knowledge of any aspect of

1    that settlement?

2         MR. LEMBKE:  Your Honor, based on his

3    testimony at about Page 3418 of the transcript, which

4    was attached to the motion in limine, we certainly

5    think we can say that at the time Dr. Liao was hired

6    for this case, there was the False Claims Act case,

7    the O'Conner case pending against the University of

8    California-Irvine Medical School, that UC-Irvine

9    agreed to the $150 rate which the evidence showed was

10   less than half of what he had charged ten years

11   earlier for other similar work, and that his boss at

12   UC-Irvine approved him working on this matter.

13        We think that is plainly established in the

14   evidence that's been allowed in.

15        THE COURT:  He also testified that the $300

16   was charged to a non-government entity and that 150

17   is the government special rate.

18        MR. LEMBKE:  That's right.  And we will take

19   account of that, maybe not in those words, but we'll

20   take account of it.

21        THE COURT:  Yeah.  Again, this is one of

22   those issues where I think we have spent far more

23   time beating it up and down than the testimony's

24   ability to really make any points.

25        MR. LEMBKE:  Your Honor, I will say this:

1   First of all, we've had numerous arguments about

2   these issues leading up to the Court's decision to

3   allow into evidence what it allowed in.  We are not

4   going to go beyond what is in evidence.  We would

5   have liked to have had a lot more in evidence but

6   we're not going to get into what is not in evidence.

7   We're going to stick with what's in evidence.

8           THE COURT:  Then stick with what's in

9   evidence --

10          MR. WERTKIN:  May I be heard on this, Your

11  Honor?

12          THE COURT:  Okay.

13          MR. WERTKIN:  As the Court is considering

14  this question, I just ask the Court to consider what

15  is the purpose of arguing this point?  What is the

16  purpose that the defendants have to argue this point?

17          And I think that the answer is clear, the

18  purpose is that somehow the O'Conner suit is --

19  undermines or is connected in some way to the

20  opinions Dr. Liao reached.  That's false.  That is

21  not true.

22          The defendants have not established that and

23  it is false.  And there are not that many times that

24  an attorney can probably stand up and say something

25  like that to the Court, that this inference that the

1   defendants want to make, unequivocally, 100 percent

2   is false.  But we can do that in this case.

3        For that reason, the defendants shouldn't be

4   permitted to make any kind of connection between the

5   O'Connor case and Dr. Liao's opinion.

6        Furthermore, it is highly, highly

7   prejudicial.  The reason why there's been so much ink

8   spilled on this, Your Honor, and why there were

9   motions to keep things under seal is because of the

10  inflammatory nature of the accusations of impropriety

11  both on the part of the government generally and UCI

12  in particular.

13       And I know we're passed the government part

14  but in particular about what UCI was doing in

15  connection with a lawsuit that could or could not be

16  filed by the United States at some future point.

17       The suggestion of impropriety, not only is

18  false, but is also prejudicial.

19       Your Honor, we just spent a whole bunch of

20  time at the bench redacting emails out about smiley

21  faces and everything, and the Court appropriately is

22  considering inflammatory statements that -- what

23  should be made in front of the jury, and we submit

24  that this is far more prejudicial and far more

25  inflammatory than anything that the Court has heard

1   so far, and we ask the defendants be precluded from

2   mentioning the O'Conner suit or settlement in their

3   closing.

4          THE COURT:  Overruled in terms of any

5   mentioning.

6          I think the defense is well aware that if

7   they go too far, they will be called down in front of

8   the jury.  And I don't think they want that to

9   happen.

10         So I don't think we've got all those things

11   to worry about that you're worried about.

12         MR. WERTKIN:  Thank you, Your Honor.

13         THE COURT:  Anything else we need to take up

14   -- oh, yes, has the government given anymore thought

15   to the proposal that I made this morning in terms of

16   the verdict form?

17         MR. WERTKIN:  Your Honor, we are amenable

18   and agree that we will submit a revised verdict form

19   that indicates that the jury can write in the date

20   next to the patient's name.

21         THE COURT:  All right.  You're going to

22   submit it or that I can prepare it?

23         MR. WERTKIN:  Oh, you were going to prepare

24   it?  Yes.  Subject to seeing it, yes, Your Honor, we

25   would agree with that approach.

1          THE COURT:  Okay.

2          MR. LEMBKE:  Your Honor, that's fine.  I

3  think what we would think appropriate is somehow,

4  with regard to each one, yes/no, and then if yes,

5  period of ineligibility or something like that with a

6  blank.

7          THE COURT:  Yes.

8          MR. LEMBKE:  Then I think there will have to

9  be some revision or some explanation to the jury in

10  the charge as to what that's about.

11          THE COURT:  I would definitely do that.  And

12  normally, I don't write out those specific

13  instructions, but I will try to do that so that y'all

14  can see that in advance.

15          Basically, I will tell them just what you

16  said, Mr. Lembke, for each patient, you have to first

17  decide whether the government proved by a

18  preponderance of the evidence that any claims for

19  that patient's hospice stay were not reimbursable or

20  something to that effect and if you find yes, then

21  you need to state the time period that you found the

22  patient was ineligible or something to that effect.

23          If you find no, mark no.  That's my --

24          MR. LEMBKE:  If you find no, then you don't

25  have to answer that question for that patient.  You

1    can move on to the next patient.  Whatever.

2         THE COURT:  Or only if you find yes do you need

3    to answer that or something to that effect.  Because I

4    want to make sure that it doesn't convey to the jury,

5    oh, well, all we have to do is go back there and mark no

6    for everything and our job is over.  But I don't think

7    this jury is inclined to do that anyway, the way they

8    have paid such close attention throughout the whole case

9    with perhaps one exception, but that's pretty good, I

10   think, for a jury of 12 people.

11        So y'all did a good job in your jury selection.

12        MR. LEMBKE:  A minute ago you referred to 60

13   minutes, and I think that was, I hope, a slip in the

14   sense that it's 75.

15        THE COURT:  It was, it was.  I'm sorry, 75.

16   Maximum.

17        MR. WERTKIN:  Your Honor, we had communicated

18   by email with the other side about the idea of two

19   attorneys giving the presentation and the defendants

20   have indicated that they didn't have a problem, so even

21   in the first, let's say, let's just say we split it up

22   60/15 with Frankie, we're not committing to that yet, we

23   will send you an email about it, but two attorneys, we

24   just want to make sure that is okay with the Court.

25        THE COURT:  It's fine with me.

1         MR. WERTKIN:  And we may not do that ultimately

2    but thank you for the option.

3         THE COURT:  As I said, any demonstratives that

4    you're planning on using during closing that have not

5    previously been used, you need to work them out.

6         In terms of the ones that have already been

7    used and already been seen, the cat is out of the bag on

8    those but for anything that has been created --

9         MR. LEMBKE:  Your Honor, based on our

10   discussion the other day, we understand that if we show

11   an exhibit that's already in evidence and just have it

12   already pulled out with maybe a sentence highlighted, we

13   don't have to share that; correct?

14        THE COURT:  Exactly.  If it's already in

15   evidence, fair game.

16        MR. LEMBKE:  Thank you.

17        MR. WERTKIN:  We can talk about the scope of

18   that as well.  Because we don't want to burden the Court

19   with that.

20        THE COURT:  Again, if it's in the written jury

21   charge, we will have the final version to y'all this

22   afternoon, along with the PowerPoint presentation.  Any

23   objections you need to get -- well, you need to call

24   each other first, you need to get to me ASAP so that we

25   can have it ready to roll at 8:30 in the morning.

1        We're working on those even as we speak.

2        MR. LEMBKE:  I assume Your Honor's intention

3   will be to complete all the argument before lunch?

4        THE COURT:  I don't know if we can.  I would

5   love to do that.  And that's why I told them that we

6   would be having short little breaks.  And I'm planning

7   on having some snacks and things in there for them so

8   that we can roll as much as possible and then have

9   lunch.  But we will have to see where we are.  I mean,

10  it may be that we have to have rebuttal after.  It just

11  depends on how much time you actually take.

12       MR. WERTKIN:  If there are issues that come up

13  tomorrow, I'm not saying there will be, but if there

14  were to be issues, do you want us to come early tomorrow

15  in case that might -- because if we're going to be

16  communicating, if an issue does come up, do you want us

17  to come early or schedule the jury come later, how would

18  you like to do it?

19       THE COURT:  I'm not anticipating that y'all

20  aren't going to be able to work things out because I

21  hope you've learned by now that frequently, if you talk

22  to each other, things can be resolved without getting me

23  involved.

24       If there's an issue, shoot us an email and let

25  me know.  If it's something I can resolve by email,

6540

```
 1    I will or we can have a phone conference at 8:00 o'clock

 2    tonight or we can meet at 8:00 o'clock in the morning,

 3    depending upon what comes up.

 4              MR. WERTKIN:  Thank you, Your Honor.

 5              THE COURT:  In other words, I like to reserve

 6    my options until I find out what the issues are.

 7              Anything else?

 8              MR. LEMBKE:  No, Your Honor.  Thank you.

 9              THE COURT:  Okay.  Let's go work on verdict

10    forms and PowerPoints and final instructions.

11

12              (Court in recess for the day.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4                    C E R T I F I C A T E

5

6          I hereby certify that the foregoing is a

7   correct transcript from the record of proceedings in the

8   above-referenced matter.

9

10

11   Teresa Roberson, RPR, RMR
     Julie Martin, RPR, RMR
12

13

14

15

16

17

18

19

20

21

22

23

24

25