FILED
6542
2016 Jun-10  PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ALABAMA
2              SOUTHERN DIVISION

3

4

5  UNITED STATES OF AMERICA,
   EX REL., ET AL.,              CV-12-KOB-245-S
6

7            Plaintiffs,     September 30, 2015

8      vs.                    Birmingham, Alabama

9  ASERACARE, INC., ET AL.,

10           Defendants.

11  * * * * * * * * * * * * * * * * * * * * * * * * *

12

13          REPORTER'S OFFICIAL TRANSCRIPT OF
                    JURY TRIAL
                   VOLUME XXXI
14

15      BEFORE THE HONORABLE KARON O. BOWDRE
         UNITED STATES DISTRICT CHIEF JUDGE
16

17

18

19

20

21

22

23  COURT REPORTER:
    Teresa Roberson, RMR
    Julie Martin, RMR
24  Federal Official Court Reporter
    1729 Fifth Avenue North
25  Birmingham, Alabama  35203

```
 1                    * * * * *

 2               A P P E A R A N C E S

 3                    * * * * *

 4   FOR THE PLAINTIFF:

 5   Jeff Wertkin
     Carolyn Tapie
 6   Holly Snow
     Eva Gunasekera
 7   Renee Brooker
     William Olson
 8   U.S. Department of Justice
     Civil Division
 9   P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
10

11   Lane H. Woodke
     Don Long
12   U.S. Attorney's Office
     1801 4th Avenue South
13   Birmingham, Alabama  35203

14   James F. Barger, Jr.
     J. Elliott Walthall
15   FROSHIN & BARGER
     3430 Independence Drive
16   Birmingham, Alabama  35209

17   Nola J. Hitchcock Cross
     CROSS LAW FIRM
18   345 North 11th Street
     Milwaukee, Wisconsin  53233
19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S  (continued)

 2    FOR THE DEFENDANT:

 3    James Sturgeon Christie, Jr.
      Jack Wright Selden
 4    Matt Lembke
      Tiffany deGruy
 5    BRADLEY, ARANT, BOULT & CUMMINGS
      1819 Fifth Avenue North
 6    Birmingham, Alabama  35203

 7

 8    Kimberly Martin
      BRADLEY, ARANT, BOULT & CUMMINGS
 9    200 Clinton Avenue
      Huntsville, Alabama  35801
10

11    Charles H. Bohl
      WHYTE, HIRSCHBOECK, DUDEK
12    555 East Weels Street, Suite 1900
      Milwaukee, Wisconsin  53202
13

14

15

16

17

18

19

20

21

22

23

24

25
```

6545

1                              I N D E X

2                                PAGE

3    JURY CHARGE

4    GOVERNMENT'S CLOSING

5    ASERACARE'S CLOSING

6    GOVERNMENT'S REBUTTAL

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      *  *  *  *  *

2              P R O C E E D I N G S

3                      *  *  *  *  *

4            (Open court.  Jury not present.)

5            THE COURT:  We sent to y'all yesterday what

6   I thought might be the final, but should have known

7   it would be penultimate, jury charges and highlighted

8   with italics the changes that I made.

9            It never fails, when I'm going through

10  thinking in terms of how is this going to read more

11  than what does it say, that I find some things.  But

12  I understand that there's only one issue --

13            MR. LEMBKE:  One issue.

14            THE COURT:  -- with what we sent and that, I

15  think, is on Page 12.

16            Basically, what I did starting on Page 11

17  where we have the listing of the certification

18  requirements for that disputed requirement, it's

19  pretty much straight from the reg but I broke it into

20  two paragraphs just to make it easy for me as I read

21  it dealing initially with the initial certification

22  period, and then the recertification period after 90

23  days.

24            We originally had clinical information and

25  other documentation that support the medical
```

1  prognosis must accompany the certification -- et

2  cetera.

3        I added "for all certification periods"

4  because I think that's what the reg reflects but it

5  was not what we had before and it doesn't

6  specifically say that, but the reg, as I understand,

7  that refers to the content of the certification deals

8  with all of them, does it not?

9        MR. LEMBKE:  Yes, Your Honor.

10        THE COURT:  On the certification periods?

11        MR. LEMBKE:  For each certification.

12        THE COURT:  Is the problem that it should

13  say "for each certification" or that we have it in

14  there at all?

15        MR. LEMBKE:  Your Honor, we would prefer to

16  have it track the regulatory language exactly

17  because, as we said the other day, you never go wrong

18  when you stick to the statute and the regulation.

19        We would prefer just to have it as it was

20  previously "with clinical information," et cetera,

21  "must accompany the certification."

22        But if the Court is going to do anything, we

23  would prefer -- and we talked about this with the

24  government and they're not in agreement -- to take

25  out "for all certification periods" and just say

1  "must accompany each certification" instead.

2       THE COURT:  Okay.

3       MS. TAPIE:  Your Honor, our thought was,

4  when we read this, that it makes sense to add "for

5  all certification periods" because of the way we've

6  broken up the certification requirements about the

7  two that are undisputed and the one that is in

8  dispute and, because we have these separations in the

9  paragraphs, that it is consistent with what the law

10  requires that for all certification periods clinical

11  information and other documentation must support, and

12  so we think that it is helpful to the jury to have

13  that clarification since we've -- since the

14  instructions are currently worded the way they are.

15       MR. LEMBKE:  Your Honor, we note that in

16  this part of the regulations, at least 418.21 and

17  418.22, the term "certification periods" doesn't

18  really appear.

19       THE COURT: Doesn't appear.  You're right.

20  Okay.  I think the appropriate compromise would be to

21  take out the "for all certification periods" and say

22  information da, da, da must accompany each

23  certification.

24       And I think that carries out both the idea

25  of the regulations and makes it clear for the jury

1    that you don't just have to have it for the

2    recertification period, whatever.

3            So we will make that change on the final

4    charge and also on the PowerPoint that has that

5    instruction.

6            MR. LEMBKE:  Thank you, Your Honor.

7            THE COURT:  Any other issues with the

8    Court's instructions?

9            MR. LEMBKE:  None other than what we've

10   previously put on the record.

11           MS. TAPIE:  Same, Your Honor.

12           THE COURT:  And same as to the PowerPoint?

13           MR. LEMBKE:  No objection with the

14   correction that you're making.

15           MS. TAPIE:  Same for us, Your Honor.

16           THE CLERK:  Page 5, Judge.

17           THE COURT:  Actually, just leave it the way

18   it is here.

19           This is going back without the "for each,"

20   but -- I mean, for every certification or whatever

21   that initial introductory language was, but because

22   it's not a complete sentence, I don't know where to

23   say "each," so I'm just going to leave it as it was,

24   I think, originally to y'all.

25           MR. LEMBKE:  No objection.

1          MS. TAPIE:  Can we add "must accompany each

2     certification" to match the --

3          THE COURT:  Again, I'm trying to keep the

4     information on the PowerPoint as concise as possible.

5     They will not have the PowerPoint when they are

6     working.  They will have the jury charges when they

7     are working.

8          MS. TAPIE:  Yes, Your Honor.

9          THE COURT:  Okay.  And you have seen the

10    complete special interrogatories to the jury?

11         MR. LEMBKE:  AseraCare has no objection.

12         THE COURT:  Has everybody checked to make

13    sure we haven't omitted somebody that wasn't supposed

14    to be omitted or anything like that?

15         MR. CHRISTIE:  Yes, Your Honor.

16         THE COURT:  Again, I appreciate y'all's

17    indulgence with me in changing it from verdict form,

18    and we talked about verdict form, verdict form,

19    verdict form, but we're really not asking the jury

20    for a verdict at this point.  We're asking them to

21    tell us if the government has proved these are

22    ineligible or there are false claims, so I think this

23    reflects more what it is we want the jury to do.

24         Are we ready to go at 9:00 o'clock?

25         MR. LEMBKE:  Ready.

1           THE COURT:  What we will do, like I said

2    before, is I will go through my instructions, give

3    them a short break, and then we will start with the

4    government's and give them a short break, however

5    long it takes for a smoke break.  We want to find out

6    the minimum amount of time for a smoke break.

7           THE CLERK:  Five to ten minutes.  She said

8    five minutes, but you still have got to worry about

9    getting on the elevator.

10          THE COURT:  Yeah.  So I think 15 minutes

11   would probably be reasonable.  But we just need to

12   make sure that everybody comes back on time.  We want

13   to keep this moving.

14          We'll see you all at 9:00.

15                    (Break taken.)

16              (Open court.  Jury present.)

17          THE COURT:  Good morning, ladies and

18   gentlemen.

19                    JURY CHARGE

20          THE COURT:  Ladies and gentlemen, I will now

21   explain to you the rules of law that you must follow

22   and apply in deciding this case.

23          When I have finished with my instructions,

24   the lawyers will have the opportunity to make their

25   closing arguments.  Then you will go to the jury room

1   and begin your discussions -- what we call

2   deliberations.

3           A jury trial has, in effect, two lawyers --

4   excuse me -- two judges.  We have a whole lot more

5   than two lawyers in this case.  But we basically have

6   two judges.  I am one of the judges; the other judge

7   is the jury.

8           My duty during the trial is to preside over

9   the trial and to decide what evidence is proper for

10  your consideration.

11          My duty at this time is to explain to you

12  the rules of law that you must follow and apply in

13  arriving at your decision.

14          First, I will give you some general

15  instructions that apply in every civil case.  For

16  example, instructions about the burden of proof, how

17  to judge the believability of witnesses and other

18  things.

19          Then I will give you some specific rules of

20  law about this particular case.

21          And, finally, after the lawyers have made

22  their closing arguments, I will explain to you the

23  procedures that you should follow in your

24  deliberations.

25          Your duty in this phase of the trial will be

1   to decide whether the United States has proved by a

2   preponderance of the evidence the specific facts

3   necessary to find that AseraCare made a false

4   statement for reimbursement of hospice care for one

5   or more of the 121 patients during all or a portion

6   of their hospice admission at this issue in this

7   phase -- excuse me, at issue in this phase.

8          I will give you more instructions about the

9   specific law on this point in a moment.

10         You must make your decision only on the

11  basis of testimony and other evidence presented here

12  during the trial.  You, as jurors, are judges of the

13  facts.  You must not be influenced in any way by

14  either sympathy or prejudice, for or against either

15  party, but in determining what actually happened,

16  that is, in reaching your decision as to the facts,

17  your sworn duty is to follow all of the rules of the

18  law as I explain them to you.

19         You have no right to disregard or give

20  special attention to any one instruction or to

21  question the wisdom or correctness of any rule I may

22  state to you.

23         You must not substitute or follow your own

24  notion or opinion as to what the law is or ought to

25  be.  Your duty is to apply the law as I explain it to

1   you, regardless of whether you like the law or its

2   consequences.

3          Your duty also is to base your decision

4   solely upon the evidence, without prejudice or

5   sympathy for or against anyone.  You made that

6   promise and took that oath before being accepted by

7   the parties as jurors, and they have the right to

8   expect nothing less from you.

9          Remember that anything the lawyers say is

10  not evidence in the case.  Your own recollection and

11  interpretation of the evidence controls.  What the

12  lawyers say is not binding upon you.  Also, you

13  should not assume from anything I may have said that

14  I have any opinion concerning any of the issues in

15  this case, nor should you give any special attention

16  to the questions that I have asked.  Except for my

17  instructions to you on the law, you should disregard

18  anything I may have said during the trial in arriving

19  at your own decision concerning the facts.

20         As we told you several weeks ago when we

21  started this case, the United States brings this

22  lawsuit against a group of companies known as

23  AseraCare.  The fact that the United States

24  government and corporations are involved as parties

25  must not affect your decision in any way.  A

1    governmental entity, a corporation, and all other

2    persons stand as equal before the law and must be

3    dealt with as equals in a court of justice.

4         When a governmental entity or a corporation

5    is involved, of course, it may act only through

6    people as its employees; and, in general, a

7    governmental entity or a corporation is responsible

8    under the law for any of the acts and statements of

9    its employees that are made within the scope of their

10   duties as employees of the governmental entity or

11   company.

12        Now, in your deliberations, you should

13   consider only the evidence, that is, the testimony of

14   the witnesses and the exhibits I have admitted in the

15   record.

16        As you consider the evidence, both direct

17   and circumstantial, you may make deductions and reach

18   conclusions that reason and common sense lead you to

19   make.  In other words, you are permitted to draw such

20   reasonable inferences from the testimony and exhibits

21   as you feel are justified in the light of your common

22   experience.

23        I have disallowed certain evidence and

24   ordered you to disregard or ignore it -- this is

25   called striking the evidence.  That means that you

1  must not consider that evidence when you are deciding

2  this case because it is not properly before you.  You

3  should also not speculate as to why I struck the

4  evidence or allow that decision to influence your

5  decisions.

6      I also allowed some evidence for a limited

7  purpose -- specifically the testimony yesterday from

8  Ms. McNicholas about the Excelas summaries.  I

9  instructed you at that time that I allowed her

10 testimony and an exhibit for a limited purpose, and

11 you must consider it only for that limited purpose

12 and no other.

13     You should not be concerned about whether

14 the evidence is direct or circumstantial.  As we

15 discussed at the beginning, direct evidence is the

16 testimony of one who asserts actual knowledge of a

17 fact, such as an eye witness.

18     Circumstantial evidence is proof of a chain

19 of facts and circumstances tending to prove or

20 disprove any fact in dispute.  The law makes no

21 distinction between the weight you may give to either

22 direct or circumstantial evidence, or to the

23 reasonable inferences you draw from direct or

24 circumstantial evidence.

25     Now, in saying that you must consider all of

1   the evidence, I do not mean that you must accept all

2   of the evidence as true or accurate.  You should

3   decide whether you believe what each witness had to

4   say and how important that testimony was.

5           In making that decision, you may believe or

6   disbelieve any witness, in whole or in part.  Also,

7   the number of witnesses testifying concerning any

8   particular dispute is not controlling.

9           In deciding whether you believe or do not

10  believe any witness, I suggest that you ask yourself

11  a few questions:  Did the witness impress you as one

12  who was telling the truth?  Did the witness have any

13  particular reason not to tell the truth?  Did the

14  witness have a personal interest in the outcome of

15  this case or a related case?  Did the witness seem to

16  have a good memory?  Did the witness have the

17  opportunity and ability to observe accurately the

18  things about which he or she testified?  Did the

19  witness appear to understand the questions clearly

20  and answer them directly?  Did the witness' testimony

21  differ from other testimony or other evidence?

22          You should also ask yourself whether

23  evidence was offered tending to prove that a witness

24  testified falsely concerning some important fact; or,

25  whether evidence was offered that at some other time

1   a witness said or did something, or failed to say or

2   do something, that was different from the testimony

3   the witness gave before you during trial.

4          You should keep in mind, of course, that a

5   simple mistake by a witness does not necessarily mean

6   that the witness was not telling the truth as he or

7   she remembers it because people naturally tend to

8   forget some things or remember other things

9   inaccurately.

10          So, if a witness has made a misstatement,

11   you need to consider whether it was simply an

12   innocent lapse of memory, an innocent mistake, or an

13   intentional falsehood; and the significance of that

14   consideration may depend on whether the misstatement

15   relates to an important fact or only an unimportant

16   detail.

17          When a witness is questioned about an

18   earlier statement he or she may have made, or earlier

19   testimony he or she may have given, such questioning

20   is permitted to aid you in evaluating the truth or

21   accuracy of the witness' testimony here at this

22   trial.

23          Earlier statements made by a witness or

24   earlier testimony given by a witness are not

25   ordinarily offered or received as evidence of the

1    truth or accuracy of those prior statements, but are

2    referred to for the purpose of giving you a

3    comparison and aiding you in making your decision as

4    to whether you believe or disbelieve the witness'

5    testimony that you hear at trial.

6            However, if the prior inconsistent statement

7    of the witness was made under oath, such as in a

8    deposition, you may also consider it as evidence, if

9    you so choose.

10           Whether such prior statements of a witness

11   are, in fact, consistent or inconsistent with his or

12   her trial testimony is entirely for you to decide.

13           You can also decide whether to believe the

14   earlier testimony given under oath, or the testimony

15   given here at trial, or you can disregard both.  You

16   are the sole judges of the credibility of the

17   witnesses.

18           Now, in this case, we have heard testimony

19   from some witnesses --

20           A JUROR:  Are you going to give us a copy of

21   this?

22           THE COURT:  I am.

23           A JUROR:  Okay.  Thanks.

24           THE COURT:  But if I give it to you now, you

25   would be reading it and not listening.

1          A JUROR:  I didn't know if I should take

2     notes.

3          THE COURT:  Okay.  You will have these

4     written instructions with you when you do your

5     deliberations, but pay attention while I'm reading it

6     now.

7          A JUROR:  Yes, ma'am.

8          THE COURT:  All right.  In this case, we

9     have heard the testimony of some witnesses by video

10    deposition.  When a person is unavailable to testify

11    at trial, the deposition of that person may be used.

12    A deposition is the sworn testimony of a witness

13    taken before trial.  The witness is placed under oath

14    to tell the truth and lawyers for each party may ask

15    questions.  The questions and answers are then

16    recorded.

17         Deposition testimony is entitled to the same

18    consideration and is to be judged by you, insofar as

19    possible, in the same way as if the witness had been

20    present to testify.  You should treat deposition

21    testimony the same as any other testimony presented

22    in court.

23         You have heard testimony in this case from

24    expert witnesses about their opinions.  When

25    knowledge of a technical subject might be helpful to

1    the jury, a person having special training or

2    experience in that technical field is permitted to

3    state an opinion concerning those technical matters.

4         Merely because such a witness has been

5    designated as an expert and expressed an opinion,

6    however, does not mean that you must accept that

7    opinion.  The same as with any other witnesses, you

8    decide whether to rely upon the testimony.

9         Payment to expert witnesses for their time

10   and expenses is a regular and accepted practice.

11   However, when a witness is being paid for reviewing

12   and testifying concerning the evidence, you may

13   consider the possibility of bias by that witness in

14   favor of the party making the payments.

15        The plaintiff United States in this case

16   bears what we call the burden of proof.

17        In phase one of this case, that means the

18   United States has the responsibility to prove false

19   claims for the 121 patients at issue by a

20   preponderance of the evidence.  This requirement is

21   sometimes called the burden of proof or the burden of

22   persuasion.

23        A preponderance of the evidence simply means

24   an amount of evidence that is enough to persuade you

25   that a contention is more likely true than not true.

In deciding whether the United States has proved any contention by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and of all of the exhibits received in evidence, regardless of who may have produced them.

If the United States fails to establish by a preponderance of the evidence that AseraCare made false claims for any of the 121 patients at issue, you should find against the United States as to that patient.  Conversely, if the United States establishes by a preponderance of the evidence that AseraCare made false claims for any of the 121 patients at issue, you should find in favor of the United States as to that patient.

In this case, the parties' presentation of the evidence and your decision making is broken into two phases.

In phase one, you are asked only to decide whether the United States proved by a preponderance of the evidence that AseraCare made false claims to Medicare for hospice services for any of the 121 patients at issue now, and if so, the time period of those false claims.

The False Claims Act is a federal law that

1   authorizes the United States to recover money when

2   false claims are submitted to the United States with

3   knowledge of the falsity and paid by the United

4   States.

5       A claim under the False Claims Act is a

6   request or demand for payment of money from the

7   United States.  The parties in this case do not

8   dispute that AseraCare made claims to Medicare for

9   payment for hospice services for the 121 patients at

10  issue.

11      To find in favor of the United States in

12  phase one, you must find that the United States

13  proved, by a preponderance of the evidence, that

14  AseraCare made false claims to Medicare for hospice

15  services for one or more of the 121 patients for all

16  or a portion of their hospice admission.

17      To establish that AseraCare violated the

18  False Claims Act, the United States must prove that a

19  claim was false.  A claim is false if it is an

20  assertion that is untrue when made or used.

21      Claims to Medicare may be false if the

22  provider seeks payment or reimbursement for

23  healthcare that is not reimbursable.

24      For a hospice provider's claims to Medicare

25  to be reimbursable, the patient must be eligible for

1    the Medicare hospice benefit.

2            You have heard testimony that before being

3    admitted to hospice care, three requirements must be

4    met:  The first two are not in dispute, that the

5    patient elected or chose hospice care, and that the

6    patient is entitled to Medicare Part A.

7            As I said, the parties do not dispute these

8    two requirements as to the 121 patients at issue.

9            They do dispute the third requirement, that

10   the patients were properly certified as terminally

11   ill.

12           For hospice, a patient is considered to be

13   terminally ill when the patient has a medical

14   prognosis that the patient's life expectancy is six

15   months or less, if the illness runs its normal

16   course.

17           For a hospice provider to meet the disputed

18   certification requirement, for the initial benefit

19   period, the patient's attending physician, if the

20   patient has one, and the hospice program's medical

21   director each must certify that the patient is

22   considered to be terminally ill based on the doctor's

23   clinical judgment regarding the normal course of the

24   patient's illness.

25           After the initial 90 day period, for

1  recertification for the Medicare hospice benefit, the

2  hospice program's medical director must certify that

3  the patient is considered to be terminally ill based

4  on the doctor's clinical judgment regarding the

5  normal course of the patient's illness.

6           Clinical information and other documentation

7  that support the medical prognosis must accompany

8  each certification and must be filed in the medical

9  record.

10          Can I see counsel real quickly?  I think one

11  from each side will be sufficient for this.

12                    (SIDEBAR)

13          THE COURT:  I just realized that it sounds

14  almost like we're disputing that a certification was

15  presented.  Can I clarify that we are not disputing

16  that the doctors submitted certifications but that

17  they were not properly certified as terminally ill?

18          MR. LEMBKE:  No objection.

19          MR. WERTKIN:  I --

20          THE COURT:  I just don't want them to spend

21  forever looking for COTIs when the issue is whether

22  they were --

23          MR. WERTKIN:  I mean, can you just say that

24  you don't need to look for COTIs in the record, the

25  issues are the ones I presented to you?

 1              THE COURT:  No, because I don't think --

 2              MR. WERTKIN:  Just the presented the

 3    certifications, I don't want to them --

 4              THE COURT:  That they filed --

 5              MR. WERTKIN:  That the COTIs appear in the

 6    record or appear in the file?  I mean, part of what

 7    we're trying to do is underline the --

 8              MR. LEMBKE:  It seems like what the Court is

 9    getting at is there's no dispute that there were

10    certifications filed.  The question is whether the

11    certifications were proper.

12              MR. WERTKIN:  Yeah.

13              THE COURT:  Is that okay?

14              MR. WERTKIN:  Yes.

15              THE COURT:  All right.

16              (Open court.  Jury present.)

17              THE COURT:  Ladies and gentlemen, I also

18    want to clarify to you that there's no dispute that

19    there was certifications or that the doctors

20    certified the patients.  The question is whether

21    those certifications were proper in that what -- in

22    certifying those patients as terminally ill.

23              In reviewing the clinical information that a

24    patient's life expectancy is six months or less, if

25    the illness runs its normal course, the medical

director must consider the following:

One, the primary terminal condition;

Two, related diagnoses, if any;

Three, current subjective and objective medical findings;

Four, current medication and treatment orders; and

Five, information about the medical management of any of the patient's conditions unrelated to the terminal illness.

In considering whether any claim was false when made, you may consider each patient and the evidence related to that patient separately.  You may consider all the admitted evidence and testimony, including the medical record and any information the doctor had when certifying the patient.

You may also consider whether information the doctor had when certifying the patient was false and whether AseraCare provided false information to or withheld relevant information from the certifying doctor.

You may already consider the relevant local coverage determinations or LCDs issued by Palmetto. Palmetto refers to Medicare patients as beneficiaries.

1    In considering the relevant LCDs, you should

2    keep in mind that the LCDs, which contain criteria or

3    factors, are provided as eligibility guidelines.

4    As Palmetto advised:  The beneficiary may

5    not meet the criteria, yet still be appropriate for

6    hospice care because of other comorbidities or

7    structural/functional impairment.  Coverage for these

8    beneficiaries may be approved on an individually

9    considered basis.

10    Please do not consider these to be the exact

11    criteria used for determining terminality.  These are

12    suggested guidelines to help the clinical staff

13    understand the type of information that should be

14    assessed and documented to paint clear picture of the

15    beneficiary's medical condition.

16    There are many other factors which may need

17    to be considered when determining the beneficiary's

18    terminal condition.

19    Of course, the whole picture of the

20    beneficiary's condition should be considered when

21    determining the beneficiary's hospice

22    appropriateness.

23    Practices that may be improper, standing

24    alone, are insufficient to show falsity without proof

25    that specific claims were in fact false when

1    submitted to Medicare.

2          Again, your only responsibility for phase

3    one is to answer a single question for the 121

4    patients about whom you have heard testimony and

5    received other evidence:  Whether the United States

6    has proven by a preponderance of the evidence that

7    one or more of the claims for one or more of the 121

8    patients are false claims, and if so, the time period

9    of the false claim or claims.

10          You will not and should not consider any

11    other question during phase one.

12          You must consider each patient and the

13    evidence relating to the patient separately.

14          If you are reasonably satisfied of the

15    United States' proof that AseraCare made false claims

16    to Medicare for hospice services as to any patient

17    during all or a portion of the hospice admission,

18    your answer as to that patient should be yes.

19          As to each patient you answer "yes," you

20    then will need to state the time period for which you

21    find AseraCare made a false claim.

22          If you are not reasonably satisfied of the

23    United States' proof that AseraCare made false claims

24    to Medicare for hospice services as to a patient,

25    your answer as to that patient should be no.

1          We will hear summations or closing arguments

2     from the attorneys in just a moment.  Remember that

3     what the lawyers say is not the evidence in this

4     case.

5          I encourage you to test what the lawyers say

6     against your own memory of the evidence.  And

7     remember, you are the judges of the facts, not the

8     lawyers.  You are the judges of the credibility.

9          We are going to take a short break before

10    the government begins its closing argument and then

11    we will take another short break after that so that

12    we can have breaks and be fresh for each part of

13    these arguments.

14          How promptly we are able to move through

15    these arguments and how promptly we're going to be

16    able to get to your free lunch is going to depend to

17    some extent on how promptly you're returning to the

18    jury room so that we can bring you back into court.

19          We are going to break until 10:00 o'clock,

20    and at 10:00 o'clock, the government will begin with

21    its closing argument.

22          So we will see you back at 10:00.

23                    (Jury excused.)

24                      (SIDEBAR)

25          THE COURT:  I just talked to Ms. Beese.  She

1  was more than a little teary.  Her mother has been in

2  the hospital since Sunday, but she saw her right

3  before the trial.

4       She said that she has heart failure, and

5  that she's being kept posted by relatives, and her

6  niece is supposed to call her this afternoon to let

7  her know how things are.

8       What she would like to do, what she's hoping

9  to be able to do is make it through today and through

10 tomorrow's deliberation, then go to Virginia for a

11 long weekend.  I told her that we all understood,

12 that her first concern needs to be her mother and, if

13 she needs to leave, that she can do so without it

14 capsizing the trial.

15      And I told her also that if she gets to

16 Virginia and decides that she needs to stay, we will

17 work that out.  I don't know if that would mean we

18 would have to recharge the jury and restart

19 deliberations, which I think it may mean, but that

20 would be minor in my opinion compared to her doing

21 what she needs to do with her mother, but she wants

22 to try to stay and participate.

23      MR. LEMBKE:  Your Honor, the concern that

24 AseraCare has is the idea that we may go through a

25 day and a half of deliberations and then have to

1  start over, and it's very difficult we think to

2  really start over.

3         And then, secondly, there is sort of, in a

4  case about hospice and death and dying, this sort of

5  introduces a wild card into the deck, and we have

6  someone whose own mother is in the midst of the dying

7  proceed, and I have no way which way that cuts, but

8  --

9         THE COURT:  She did say it had been kind of

10  hard listening to some of the testimony about the

11  conditions that her mother has had.

12         MR. WERTKIN:  Well, we defer to the court in

13  how it wants to handle it.  We can understand the

14  juror wants to participate.  We just leave it for the

15  court.

16         THE COURT:  I mean, there's also an

17  authority that says that a juror has the right to

18  participate, too.  So I think it may be best just to

19  let it rock along right now and see where it goes and

20  what happens see.

21         MR. LEMBKE:  Your Honor, for the record, in

22  light of this new set of circumstances, AseraCare

23  moves to excuse her for cause.

24         THE COURT:  Okay.  Let's do this:  Let's

25  finish oral arguments, and we will take it up before

1  the jury begins deliberation.  And I will have her

2  come in.  I don't want an army of lawyers, we can

3  have one from each side, to talk with her and explore

4  with her what effect this may or may not be having on

5  her ability to deliberate.  So we will further your

6  motion, but --

7          MR. LEMBKE:  I understand, although it's

8  awkward having lawyers after closing argument asking

9  questions like that.

10          MR. WERTKIN:  Well, I kind of agree.  I

11  think maybe just the Court can ask the questions and

12  we can --

13          MR. LEMBKE:  Sit in the room.

14          THE COURT:  That's what I'm saying, be in

15  the room.  I will ask the questions, but y'all need

16  to be present for that determination.

17          MR. LEMBKE:  We understand.  Thank you, Your

18  Honor.

19          MR. WERTKIN:  Do you want to talk about

20  this?

21          THE COURT:  With what?

22          MR. WERTKIN:  There was just this line that

23  was just added, so AseraCare actually doesn't submit

24  the certifications.  They have to maintain them in

25  their files, so it's minor but --

1          THE COURT:  We can work with it before.

2    Give me your suggested change.  I was trying to just

3    cover it briefly.  And I was reading, and I said, oh

4    me goodness, we've told them that these two aren't at

5    issues, but then we say certification is at issue,

6    but it's not having the certification, it's whether

7    they're proper.

8          MR. WERTKIN:  This is what we kind of came

9    up with, appear in the medical record.

10          THE COURT:  We will do it before the final

11    goes back.

12          MS. TAPIE:  Your Honor, not the same

13    question, but in light of that, we actually are

14    planning to pull up part of the page of this during

15    closing arguments.  Is it all right to use the page

16    without that line in it?

17          THE COURT:  Sure.  Particularly, if it's

18    clear that you're not saying there aren't

19    certifications.

20          MR. WERTKIN:  Right.

21          THE COURT:  And that never has been an

22    issue.  Okay.  Thank you.

23              (Open court.  Jury present.)

24          THE COURT:  Is the government ready for

25    closing argument?

 1          MR. WERTKIN:  Yes, Your Honor.

 2          THE COURT:  You may proceed, Mr. Wertkin.

 3          GOVERNMENT'S CLOSING ARGUMENT

 4          MR. WERTKIN:  Good morning, ladies and

 5   gentlemen.

 6          When you go back into that jury room to

 7   begin your deliberations, you'll be deciding, is it

 8   more likely than not that AseraCare submitted false

 9   claims to Medicare.

10          And while you're making that determination,

11   I would ask you to consider the following question:

12          Was AseraCare providing the right care at

13   the right time.

14          What I hope you will remember is that just

15   because someone is elderly or frail, but not

16   terminally ill, does not make them eligible for the

17   hospice benefit.

18          If someone is elderly or frail, Medicare

19   still pays for their medical care.  When a Medicare

20   patient needs curative care, like heart medication to

21   ease their symptoms of heart disease, they are

22   entitled to that care under regular Medicare.  That

23   would be the right care at the right team.

24          And if someone wants palliative care, but is

25   not terminally ill, they can get palliative care

outside of hospice.  They can get the right care at
the right time.

Now, you heard from Katy Lucas, and this was
the witness who came from -- representing the
Medicare hospice program, and she testified that
hospice is a very specific benefit.  It's only for
people at the end of their lives.

Hospice is not a chronic care program.  It's
not for people who are chronic but not terminal.

Hospice is not for people who are improving.
Hospice is not for people who have treatable
conditions.  Hospice care is specialized and it's for
specific patients.

In this case, we saw examples of elderly,
frail and sick people living in nursing homes.  Some
of us have visited a loved one in a nursing home and
we know what it's like.  The residents are elderly.
The residents are frail.  Some are sick.  They are
facing different challenges, but all of them are in
need of some assistance in caring for themselves.

We've heard some heart-breaking stories,
some heart-breaking testimony about the condition of
some of the Alzheimer's patients living in nursing
homes in this case.

But just because someone has Alzheimer's and

1    is dependent on others for their care while living in

2    a nursing home does not mean they're terminally ill

3    and eligible for the hospice benefit.

4              Just because someone is elderly and fail

5    does not mean that hospice is the right care at the

6    right time.  And that's why Congress passed a federal

7    law that says, we will not pay hospice companies,

8    like AseraCare, for providing hospice to elderly and

9    frail people if those people are not terminally ill.

10   Because AseraCare submitted claims to Medicare that

11   should not have been paid, AseraCare's claims were

12   false.

13             Now, during this trial, you've learned a lot

14   about hospice care.  A lot.  You've learned about why

15   it's unique.  You've learned about why it's

16   important.

17             Dr. Ellis Allen was the first witness that

18   AseraCare called in its case.  Dr. Allen testified

19   that only terminally ill patients should be placed on

20   hospice because there is a significant expense to

21   hospice care.

22             And I asked him, what's your understanding

23   of the significant expense to hospice care?  And he

24   explained, hospice care is expensive, not necessarily

25   for the patient, but to the Medicare system.

1          You also heard from Dr. Twaddle, who was

2   another AseraCare witness in this case, and she

3   testified that Medicare is the primary payer of

4   hospice care in the United States.  And AseraCare's

5   president, Ms. Angie Hollis-Sells, also testified

6   that 95 to 96 percent of their revenues, so that

7   means 95 to 96 percent of all the money that

8   AseraCare makes, comes from Medicare each year.

9          Protecting hospice means protecting the

10  Medicare hospice benefit.  A benefit that Americans

11  who are actually at the end of their lives

12  desperately need and deserve.

13         You also heard from Mary Jane Schultz, the

14  head of the medical review department at Palmetto,

15  who testified about Palmetto's medical review

16  process.

17         And Palmetto reviews medical records to

18  determine whether a patient is terminally ill.  As

19  Ms. Schultz testified, this process is to make sure

20  that the program is being protected.  That is their

21  responsibility and that's a responsibility that you

22  share.

23         False claims take money out of an essential

24  healthcare system and jeopardize its availability to

25  those who really need it.

1          Let me say that again:  False claims take

2     money out of an essential healthcare benefit and

3     jeopardize its availability for people who really

4     need it.  And that is why it's critical that only

5     terminally ill patients be put onto hospice and that

6     all patients, whether they are terminally ill or not,

7     are provided with the right care at the right time.

8          When you go back into that jury room, I

9     would also like you to consider, do the most

10    vulnerable among us, elderly Americans who cannot

11    fully take care of themselves, do they deserve care

12    that has been carefully considered and recommended by

13    a physician.

14          It's not just our parts and our guts that

15    say yes.  The healthcare system and the legal system

16    also say yes.

17          Consider whether AseraCare's doctors

18    carefully considered and recommended hospice for the

19    patients at issue in this trial.  The facts say no.

20          I would like to take you back to that first

21    week of testimony.

22          Former AseraCare employees from all over the

23    country came in to tell their stories about what they

24    saw and they experienced at AseraCare.  Four of those

25    witnesses were whistleblowers, but the rest were

1   simply smart, dedicated and caring nurses and

2   managers who got caught up with the wrong company.

3         Although these witnesses worked in offices

4   as far apart as Concord, California and Boston,

5   Massachusetts, you heard the same types of stories

6   over and over and over again.  Doctors not showing up

7   to IDT meetings, nurses being instructed to admit

8   ineligible patients to hospice.  Look harder.  Dig

9   deeper.  Find a reason to get them on hospice when

10  their medical training and the LCDs told them that

11  hospice was not the right care at the right time.

12        The instructions that Judge Bowdre is going

13  to give to you talk about how in reviewing -- in

14  reviewing the clinical information to certify that a

15  patient's life expectancy is six months or less, the

16  medical doctor has certain things that they're

17  supposed to do.  And you can see them right there.

18  And that page will go back with you into the jury

19  room.

20        The testimony that you heard from

21  AseraCare's practices that first week of trial make

22  it absolutely clear that the doctors were not

23  considering the factors that are on this page.

24        Let's talk about the testimony that shows

25  that AseraCare's doctors were not exercising their

1  clinical judgment.

2          You heard witnesses, multiple witnesses from

3  AseraCare, that doctors regularly skipped

4  IDT meetings, interdisciplinary team meetings.  And

5  when these doctors did show up, they signed whatever

6  forms were put in front of them.

7          For example, you heard that AseraCare

8  doctors in Foley, Alabama, attended IDT meetings only

9  about 50 percent of the time.

10          This is Dawn Zaragoza, she was the former

11  director of clinical services at AseraCare.  She

12  testified that when the doctors did attend the

13  meetings, she would put little sign-here sticky notes

14  showing where the doctors should sign.  And when I

15  asked her, about how much time did Dr. Haggerty, one

16  of the medical records in Foley, spend on each form,

17  Ms. Zaragoza testified, it was just enough to make

18  his little signature.

19          Now, we've seen a lot of medical records in

20  this case.  I don't know if some of you noticed, but

21  those little stickies were popping up every so often

22  on the medical records.  Little sign-here stickies

23  that show the doctor where they're supposed to sign.

24          This form is from Laura H. from Pittsburgh,

25  Pennsylvania, but this is not an isolated incident.

1  You go back into the medical records, you can see

2  that these stickies appear on forms from Nashville,

3  Tennessee, Houston, Texas, Altoona, Pennsylvania,

4  Atlanta, Georgia, and others.

5       You also heard from Roberta Manley that

6  AseraCare's medical director in Milwaukee, Wisconsin,

7  Dr. Mateo, who spent IDT meetings making elaborate

8  drawings with his pen and his pad, and signing the

9  forms without looking at medical records.

10       And when he could not attend, he would

11  simply presign blank certifications of terminal

12  illness and leave them for the nurses to fill out.

13       Ask yourself, how could a doctor be

14  exercising their clinical judgment, fulfilling their

15  obligations that are on that page that you're going

16  to get in the jury room, if he's signing a blank

17  form.

18       You saw evidence that it was the regular

19  practice of AseraCare nurses to admit patients

20  without physician input.  Many of the AseraCare

21  witnesses in this case talked about the evaluation --

22  the orders to evaluate and admit, if appropriate.

23  This form right here (indicating).

24       You heard from Deb Paradies, from Milwaukee,

25  Wisconsin, who testified she made admission decisions

on her own and was instructed to choose between one
or two diagnosis.

I know it was a long time ago, but two
diagnosis she said were either debility or adult
failure to thrive.  And these are the diagnosis we
saw over and over and over for the patients in this
case.

You also heard from Sharon Perryman from
Boston, Massachusetts, who testified that when she
arrived on the scene in Boston, the AseraCare doctor
was not even being notified of admissions, much less
exercising his clinical judgment upon admission.

You heard evidence that it was AseraCare's
general practices to instruct their employees to find
a reason to put patients on hospice.

Margie Greer, a nurse from Evansville,
Indiana, testified that she was told to look harder
and find a reason to admit patients.  And she
understood that instruction to mean, create a reason
because there is none.

Marsha Farmer, a former executive director
from Monroeville, described the rule in her agency
that if a patient wasn't admitted, they would have to
call the director of operations for AseraCare and
they were told to dig deeper, look further and to

send another nurse.

Ms. Farmer testified that she understood the instruction to dig deeper to mean get the patient on services.

Sherry Adams, a nurse from Evansville, Indiana, testified that she was told, we can put anyone on hospice for one cert period, then we can look to see, during that cert period, if there's anything else, another diagnosis we can put them under.

We also saw evidence that nurses admitted patients that they did not believe were eligible for hospice.

Dawn Zaragoza, who is one of the whistleblowers in this case, was asked if she did an admissions assessment, if she determined that the patient was not eligible, she said that she would admit the patient anyway.

You also heard the same story from Sherry Adams, a nurse from Evansville, who is not a whistleblower in this case and has no financial interest in the outcome of this litigation. And Ms. Adams testified that when she went and found someone who is not eligible for hospice, she would come back to the office and participate in the

stand-up meeting that they would have in the morning.
And she testified that her supervisors would suggest
a diagnosis to her.  She said, adult failure to
thrive, that is a big one, it goes under a very
general category.

And after that, Ms. Adams would go back and
admit the patient, even though she did not think the
patient was terminally ill.

You heard evidence that AseraCare employees
were instructed by their supervisors to create false
medical records.

Lauretta Dietrich, a nurse from California,
testified that her supervisor instructed her to score
higher on a particular form so that this patient,
when they were brought up at interdisciplinary team
meetings, it would look like the patient had declined
when actually he or she had not.

Sherry Adams testified that she was always
-- said she was told always to focus on the negative
of the visit.  She testified that if she observed the
patient walk 100 feet, she didn't necessarily put
that down because it shows improvement.

She was told, focus on the negative things,
needing assistance with bathing or not eating, those
types of things.

1          You heard evidence that AseraCare made it

2    very difficult for their nurses to discharge

3    patients.

4          When Vickie Stutts from Decatur would

5    determine a patient is not appropriate for hospice,

6    she would tell her executive director, Ms. Susan

7    Helms, and Ms. Helms would instruct her to go back to

8    the chart and just find whatever I needed to admit

9    the patient.

10         And you heard similar testimony from

11   Lauretta Dietrich, the nurse from California, that

12   said she would give opinions that the patients were

13   not eligible and her recommendations were not

14   followed.

15         Finally, I would like to talk about the

16   testimony of Sharon Perryman.  Ms. Perryman was the

17   executive director from Boston, who has more than 20

18   years of experience, and is working toward her

19   doctorate.

20         When Ms. Perryman was hired as the executive

21   director in Boston, she came into a situation where

22   patients were automatically being admitted to hospice

23   without an assessment.

24         The medical directors were not even being

25   notified of the admissions and the documentation was

1   coming in late and incomplete, which meant at

2   IDT meetings, when they were supposed to be talking

3   about the patient and figuring out if the patient was

4   still eligible for hospice, they didn't have the

5   adequate documentation to determine whether the

6   patient was eligible.

7           Ms. Perryman testified that she tried to

8   make changes in Boston, but she faced pushback and

9   could not get full support.

10          She testified that the staff believed and

11  stated to me that I was -- that I had created the

12  Medicare regulations, because they did not have to

13  follow this stuff before.

14          Ms. Perryman said she did not get the

15  support she requested from human resources and did

16  not get the support she needed from her supervisor,

17  Gay Rogers.

18          In the end, she was not able to get to do

19  the general changes in the agency she wanted to make.

20          The evidence in this case shows not only

21  that AseraCare wasn't meeting its requirements under

22  the law, but also explains how AseraCare went about

23  admitting ineligible patients to hospice and

24  submitting false claims to Medicare.

25          You should consider this evidence when

1  determining whether AseraCare submitted false claims

2  to hospice.

3          Now, in light of all this testimony, ask

4  yourself, were AseraCare's doctors carefully

5  considering and recommending hospice.  You didn't

6  hear a single witness from AseraCare that doctors

7  were exercising their clinical judgements based on

8  complete and accurate medical records.

9          You didn't hear a single witness from

10  AseraCare, a single AseraCare employee, who testified

11  that AseraCare's medical directors were carefully

12  considering and recommending hospice.

13          And you didn't hear a single witness testify

14  that AseraCare's doctors were involved in every

15  admissions decision.  Not from a single AseraCare

16  doctor.  Not from a single AseraCare nurse.  Not from

17  a single AseraCare manager.  And not even from

18  AseraCare's president, Ms. Angie Hollis-Sells.

19          The legal term for this is unrebutted

20  evidence and that's what most people call the truth.

21          As you're deliberating, I also ask that you

22  consider, should AseraCare be given a blank check to

23  engage in whatever practices they want and submit

24  false claims.

25          Medicare puts a lot of trust in hospice

1    companies.  Medicare does not make AseraCare submit

2    medical records to go along with their claims and

3    prove that they are entitled to payment.

4         Medicare doesn't ask for records but trusts

5    that AseraCare has done the necessary assessments and

6    found that the patient was terminally ill.

7         As Judge Bowdre instructed you, claims may

8    be false if a provider seeks payment or reimbursement

9    for healthcare that is not reimbursable or a provider

10   who seeks payment or reimbursement for healthcare

11   that is not reimbursable may be false.  And you've

12   heard testimony that a hospice claim is not payable

13   or reimbursable if the hospice does not have clinical

14   information and other documentation that supports a

15   terminal prognosis.

16        Medicare does not require AseraCare to

17   provide the medical records to prove that they exist

18   but trusts the hospice company.

19        Katie Lucas, from the hospice program,

20   testified that they could not ask hospices to submit

21   all this information because they processed four

22   million claims just last year, and it would grind

23   them to a halt, if they did.

24        But she said the main reason is that when a

25   hospice company files a claim, they are basically

1    saying we are agreeing with and complying with all of

2    your regulations and requirements in submitting this

3    claim for payment.

4          Katie Lucas said, so it's a trust issue

5    really.  We are trusting that they're following the

6    law.

7          Medicare also trusts hospice companies, like

8    AseraCare, to properly evaluate whether a patient's

9    -- whether a patient is terminally ill and gives them

10   some flexibility in making those determinations.

11         So remember, to get Medicare money,

12   AseraCare has to show that the patient is terminally

13   ill and they are the ones making the decision.

14         That is a lot of trust that Medicare and the

15   public is putting in the hands of AseraCare.

16         We are here today because that trust was

17   broken.  Medicare's contractors puts out local

18   coverage determinations or LCDs.  You've heard a lot

19   about LCDs.  LCDs are guidelines.  They are based on

20   sound, medical principles and they are designed to

21   help clinicians make decisions about terminal

22   illness.

23         After listening to eight weeks of testimony,

24   there should be no doubt in your mind of the

25   importance of applying the LCDs when evaluating

1    terminal illness.

2         You heard testimony that Palmetto, the

3    Medicare administrative contractor, who Dr. Twaddle

4    called the voice of Medicare, uses the LCDs.  The

5    voice of Medicare expects that hospice providers will

6    apply the LCDs and the sound scientific medical

7    principles behind the LCDs to guide their

8    determinations about whether an elderly patient is

9    sick or whether an elderly patient is terminally ill.

10        The LCDs are there to help the doctors tell

11   the difference between being sick and being

12   terminally ill.  And doctors, who are doing their job

13   properly and truly evaluating a patient's condition,

14   can make this distinction.

15        Despite this very reasonable expectation

16   that AseraCare used the LCDs to evaluate terminal

17   illness, AseraCare now wants you to ignore the LCDs

18   and give them a blank check.

19        AseraCare wants you to believe that any

20   elderly patient is terminally ill so long as they can

21   get one of their doctors to sign a certification

22   form, even if the doctor never looked at a medical

23   record, and never examined the patient.

24        AseraCare wants you to believe that the LCD

25   criteria either do not exist or are meaningless.

1          AseraCare wants you to believe that any

2     claim is valid so long as their well paid experts say

3     that a patient is terminally ill.

4          Let me tell you something, Medicare does not

5     give out blank checks, not to AseraCare and not to

6     any hospice provider.

7          When considering the facts in this case,

8     please do not give AseraCare the blank check that

9     they are asking for.

10          They have violated the trust of Medicare at

11     the expense of patients who are truly in need of

12     hospice care.

13          Instead, hold them accountable, hold them

14     accountable for abusing the trust that Medicare has

15     placed in their hands.

16          Now, another question that I would like you

17     to consider is were the patients eligible for some or

18     all of their time on hospice.

19          And to help you answer that question, I am

20     going to cede the floor to my colleague Eva.  Thank

21     you for your time.

22          MS. GUNASEKERA:  Good morning, members of

23     the jury.  Let's talk about Dr. Liao.  You heard his

24     testimony over the course of three weeks.  And as you

25     heard, Dr. Liao is a hospice and palliative medicine

1   specialist and a geriatrician.

2          Dr. Liao has spent the last 18 years, and as

3   you heard him testify, almost his entire life

4   spending time with and caring for older and elderly

5   people.

6          Dr. Liao cares for elderly people everyday.

7   He has experience treating older patients who have

8   chronic illnesses like dementia, heart disease and

9   lung disease and patients who are so frail that they

10  are unable to care for themselves and have to rely on

11  others to assist them with their activities of daily

12  living.

13         Patients like Ms. Ruth S., who is Tab 106 in

14  your notebooks, but you don't need to flip to that

15  tab today, I'm just providing you with a number, if

16  you want to jot it down.

17         Ms. Ruth S. had dementia, was completely

18  dependent on others for all of her care and had to be

19  transferred with a Hoyer lift from her bed to a Broda

20  chair.

21         Although Ms. Ruth's condition was fragile,

22  based on his experience, Dr. Liao recognized that

23  Ms. Ruth was not terminally ill during the one year

24  and four months that AseraCare kept her on hospice.

25         And even AseraCare discharged her with an

1  extended prognosis, meaning that Ms. Ruth was

2  expected to live more than six months, but AseraCare

3  did not discharge Ms. Ruth until they had billed

4  Medicare for a year and four months.

5           Dr. Liao has also treated elderly patients

6  with depression and mental health problems who are

7  able to improve once those problems were treated.

8           He has seen patients like Ms. Alice M. at

9  Tab 3, Ms. Alice P. at Tab 4, and Rosalyn H. at Tab

10  103 who had treatable psychiatric conditions and who

11  Dr. Liao concluded were not terminally ill and should

12  not have been on hospice.

13           Dr. Liao knows from experience, in caring

14  for thousands of patients, that not every elderly

15  person who has a serious illness has a terminal

16  prognosis.

17           Now, keep in mind, Dr. Liao reviewed the

18  medical records for 233 patients, not just the 121 he

19  found ineligible.  He was asked to determine the

20  eligibility of each of the 233 patients.  And did

21  Dr. Liao find that every one of those patients were

22  ineligible?  No, he did not.

23           You can consider that fact in determining

24  whether his review of these medical records was fair

25  and unbiased.

1      Dr. Liao found almost half of the patients

2 he reviewed eligible for the Medicare hospice benefit

3 for the entire time they were on hospice.

4      Drs. Cooney and Melvin, the AseraCare

5 experts, only reviewed those patient medical records

6 that Dr. Liao found ineligible, and they found that

7 all of the patients were eligible except for one

8 patient each.

9      Ask yourself if their conclusions are really

10 credible.  You heard testimony that prognostication

11 decisions are not easy, but even though they may not

12 be an exact science, as even Dr. Melvin testified,

13 they are a science.  And there are a number of

14 research-based tools that help physicians to make

15 prognosis decisions.

16      Remember, these are decisions that hospice

17 physicians make every single day.  And Medicare

18 requires and expects hospices to ensure that there is

19 a sound basis for those prognosis decisions.

20      As Judge Bowdre instructed you, the law

21 requires there to be supporting documentation in the

22 records before a hospice can submit a claim to

23 Medicare for payment.  That is the law.  AseraCare is

24 required to comply with the law as is every other

25 hospice provider who submits claims to Medicare.

1          The judge has instructed you to answer the

2    following questions in this phase of the case:   The

3    first part of this instruction, preponderance of the

4    evidence, means that you need to find it is more

5    likely than not that claims that AseraCare submitted

6    to Medicare for these 121 patients were false.

7          The second part of this instruction states

8    that if you find that any of these 121 patients were

9    not eligible for hospice for any of the time that

10   AseraCare kept them on hospice, then you will check

11   "yes" on the jury form and write the specific dates

12   for the time period for those false claims.

13         For many patients, Drs. Cooney and Melvin

14   spent most of their time testifying about periods of

15   time in which Dr. Liao found the patient eligible for

16   hospice.

17         It was a needless and confusing exercise for

18   AseraCare to have their physician experts spend so

19   much time talking about time periods that are not in

20   dispute and are not at issue in this case.

21         During your deliberations, please remember

22   that there are periods of time when all the physician

23   experts agree that some of the patients were

24   eligible.

25         Why should you believe Dr. Liao and find

1    that it is more likely than not that AseraCare

2    submitted false claims for these 121 patients?

3              There are three reasons:  First, Dr. Liao

4    applied sound medical principles contained within the

5    Palmetto LCD;

6              Second, Dr. Liao identified patterns that

7    explained why these patients were not terminally ill;

8    and

9              Third, because Drs. Cooney and Melvin are

10   not credible.

11             First, Dr. Liao applied sound and accepted

12   medical principles which are contained in the

13   Palmetto LCDs when he reviewed the AseraCare medical

14   records.

15             Dr. Liao evaluated and determined whether

16   the 233 AseraCare patients he reviewed were eligible

17   for the Medicare hospice benefit.

18             As you have heard, time and time again, the

19   law defines eligibility for the Medicare hospice

20   benefit as patients who have a prognosis of six

21   months or less, if the illness runs its normal

22   course.  He came to this conclusion by following the

23   Medicare rules.

24             Judge Bowdre has instructed you on the

25   Medicare rules shown here that a hospice provider

1   such as AseraCare must follow.

2          Dr. Liao followed those exact same rules in

3   reviewing the AseraCare medical records in arriving

4   at his expert opinions in this case.  Drs. Cooney and

5   Melvin did not.  And you just heard from Mr. Wertkin

6   that even AseraCare's own physician did not do this.

7          Consistent with the law and the Court's

8   instruction, first, Dr. Liao began by evaluating the

9   patient based on the primary terminal condition

10  diagnosed by AseraCare.

11         Dr. Cooney did not testify about the

12  patient's admission diagnosis and often ignored the

13  primary diagnosis AseraCare made for patients when

14  admitting and recertifying those patients for

15  hospice.

16         For instance, for Mr. John S. at Tab 56,

17  Dr. Cooney never told you that AseraCare changed his

18  diagnosis three times while he was on hospice.

19         The defense may stand-up here and tell you

20  it doesn't matter what the hospice diagnosed the

21  patient with if there is some other reason that its

22  medical experts found the patient eligible.  That is

23  wrong.  AseraCare isn't allowed to make up a primary

24  diagnosis for the patient just to get them onto

25  hospice.

1          The primary diagnosis of the patient governs

2     the care the patient is receiving while at AseraCare.

3     Dr. Cooney agreed that the primary diagnosis for a

4     patient is the one that best explains the patient's

5     eligibility at that time and yet her opinion on

6     patient's hospice eligibility was rarely based on

7     AseraCare's primary admission diagnosis for each of

8     these patients.

9          Consistent with the law and the Court's

10     instructions, second, you heard how Dr. Liao

11     considered and testified about each patient's related

12     diagnoses and how those related diagnoses affected

13     the patient's terminal prognosis.

14          Consistent with the law and the Court's

15     instruction, third, you heard how Dr. Liao considered

16     the current objective medical findings of a patient,

17     reflected in the patient's medical record, meaning

18     measurable information about a patient's condition

19     and subjective findings, meaning observations by

20     people about the patient's condition.

21          Consistent with the law and the Court's

22     instruction, fourth, you heard how Dr. Liao

23     considered the patient's current medication and

24     treatment orders.

25          When evaluating whether patients were being

adequately or optimally treated for their diagnosis,
Dr. Liao testified about the specific medications or
treatments patients were on, the dosage of those
medications and how the patient was responding.

Consistent with the law and the Court's
instruction, fifth, you heard how Dr. Liao considered
information related to the medical management of the
patient's conditions unrelated to their terminal
illness.

Dr. Liao described these conditions as
comorbidity that, if significant, could make a
patient's condition terminal.

Unlike Drs. Cooney and Melvin, Dr. Liao
followed the Medicare rules.  Dr. Liao has testified
that the Palmetto local coverage determinations or
the LCDs are no different than the medical principles
for a specific disease.  There's not a body of
medicine over here on the one side called medical
principles for heart disease and a body of medicine
over here called LCDs.  They are not separate or
different standards.  The LCDs are a consolidation of
the medical literature on a particular disease.

So when you hear the defense say, Dr. Liao
applied the LCDs instead of determining whether a
patient had a prognosis of six months or less, that

1   is not accurate and it doesn't make any sense.

2           The LCDs are based on the medical principles

3   for that disease.  Both Drs. Cooney and Melvin

4   recognize that the LCDs are intended to help evaluate

5   if a patient is terminally ill.

6           Why did Dr. Liao use the LCDs in this

7   review?  For three reasons:  One, the LCDs simply

8   embody the medical principles for a particular

9   disease;

10          Two, the Palmetto LCDs are generally

11  accepted criteria that hospice physicians, including

12  Drs. Cooney and Melvin, use to determine when a

13  patient becomes terminal; and

14          Three, AseraCare used the Palmetto LCDs to

15  determine when a patient was terminally ill.

16          Dr. Cooney was asked 97 times at trial for

17  the basis of her opinion that the 97 patients were

18  eligible for the Medicare hospice benefit.  She never

19  once testified that the patients were eligible

20  because they met the LCDs.  Not once.  It was as if

21  the LCDs didn't exist, even though both Drs. Cooney

22  and Melvin used the Palmetto LCDs in their own

23  practices.

24          Drs. Cooney and Melvin did not mention the

25  LCDs in their testimony specific to the AseraCare

1  patients they reviewed because, as shown by

2  Dr. Liao's testimony, the patients would not have met

3  the LCD because the patients were not terminal.

4       You will recall that Drs. Cooney and

5  Melvin's approach at trial was to point out medical

6  records that showed a patient was very ill, never

7  mentioned the LCD, and conclude by testifying to the

8  effect that this is a very sick woman, and I believe

9  she has a prognosis of six months or less.

10      As Dr. Liao testified, most patients who

11 have a prognosis of six months or less will exhibit

12 signs, symptoms or medical indicators that meet the

13 LCD.  That is the entire purpose of the LCDs, to

14 determine whether a patient is terminal.  That is why

15 Dr. Cooney uses -- hospice uses the LCDs.  That is

16 why Dr. Melvin's hospice uses the LCDs, and that is

17 why AseraCare used those worksheets that you kept

18 seeing in the patient's medical records about the

19 LCDs, because the LCDs are created to help hospices

20 evaluate a patient's prognosis.

21      Dr. Liao used the medical principles

22 embodied in the LCDs to differentiate when a patient,

23 who was chronic or appeared very sick, was, in fact,

24 terminal.

25      Dr. Liao testified that the LCDs are

1  criteria that a hospice provider can use to

2  distinguish chronically ill patients from terminally

3  ill patients.

4      But Dr. Liao also did not apply the LCDs or

5  even the clinical tools like the FAST or the New York

6  Heart Association classifications rigidly.  In fact,

7  he testified that he found some patients were

8  eligible even though they did not meet the LCDs.

9  That is where a doctor's clinical judgment comes into

10  play.  It is not, however, an exercise of clinical

11  judgment to say that no medical principles, no

12  guidelines, no criteria apply.

13      A doctor or an expert is not exercising

14  their clinical judgment where they are using no

15  medical principles, no guidelines and no criteria.

16  No one practices good medicine that way.

17      The second reason that you should believe

18  Dr. Liao and find that it is more likely than not

19  that AseraCare submitted false claims to the Medicare

20  program is because Dr. Liao identified patterns that

21  explain why these patients were not terminally ill.

22      Dr. Liao explained that in his review of the

23  AseraCare medical records, he saw the same four

24  patterns in those records.  These patterns help

25  explain why these patients should not have been on

hospice.  These four patterns included AseraCare

patients who were chronic but not terminal.

AseraCare patients who were improving.  AseraCare

patients who were inaccurately evaluated.  And

AseraCare patients who were treatable.

For at least the first week of Dr. Liao's

testimony, you heard about a number of patients who

had chronic, but not terminal, health conditions.

Many of these AseraCare patients had chronic

conditions that elderly patients can live with for a

long time, sometimes for years and decades.

For instance, all the expert physicians

acknowledge that Alzheimer's patients can and do live

with the disease for many years, possibly as many as

12 years.

You heard Drs. Cooney and Melvin testify

about Mr. William T. and Mr. Norman K.  They

testified that both of these gentlemen had over a

dozen chronic conditions, including dementia,

diabetes, edema, shortness of breath, depression,

anemia, hypertension -- among numerous other

conditions.

You heard both Drs. Cooney and Melvin

testify that despite documentation of all those

chronic conditions, they could not conclude that

1  Mr. William T. or Mr. Norman K. had a six month or

2  less prognosis.

3        Curiously, Drs. Cooney and Melvin both found

4  every single patient eligible for hospice except for

5  one, just one.  Why?  Because they admitted that

6  those conditions, no matter how numerous or

7  progressive, were not significantly contributing to

8  the patient's terminal condition, but for every one

9  of the other 119 patients that Dr. Cooney and Melvin

10 testified about, who had similar conditions and were

11 sometimes in even better health, Drs. Cooney and

12 Melvin inexplicitly found that those patients had a

13 six month or less prognosis.

14        Why?  Because they felt that those patients

15 were eligible, because they believed that those

16 patients were eligible, because they would expect

17 that those patients to be eligible.  Neither Drs.

18 Cooney nor Melvin testified that their conclusions

19 were based on any standards or criteria.

20        Contrast that with what you heard from

21 Dr. Liao.  Dr. Liao explained to you that based on

22 scientific and research-based principles, having one

23 or even ten of these other conditions, does not mean

24 that the patient is terminally ill.

25        Instead, those other conditions must be

1  significantly contributing to the patient's terminal

2  condition.

3       So simply listing how many other health

4  concerns these elderly patients had is not a reason

5  to find them terminally ill.

6       In fact, many of these patients remain

7  stable, improved, or responded to treatment while

8  AseraCare billed Medicare for them for months or even

9  years.

10       There is no dispute that hospice was not the

11  right care at the right time for Mr. William T. or

12  Norman K.

13       But AseraCare did not discharge either of

14  them until after AseraCare kept each of them on

15  hospice for approximately a year and a half.

16       On the jury form, you should check "yes"

17  when finding that Mr. William T. was ineligible for

18  hospice from September 10th, 2007 to May 12th, 2009,

19  because AseraCare should not have billed Medicare for

20  those time periods.

21       On the jury form, you should check "yes"

22  when finding that Mr. Norman K. was ineligible for

23  hospice from April 30th, 2009 to September 8th, 2010

24  because AseraCare should not have billed Medicare for

25  those time periods.

1          You should also find patients with similar

2     chronic conditions to Mr. William T. and Mr. Norman

3     K. ineligible for hospice as Dr. Liao testified.

4          While many of these patients were sick and

5     frail, the patients remained relatively stable during

6     the entire time that AseraCare kept them on hospice.

7          For instance, and just to reiterate, members

8     of the jury, these are the periods of time that you

9     should find Mr. William T. and Mr. Norman

10    K. ineligible for hospice.

11         You heard about Ms. Sarah C. who, upon

12    admission, was 100 percent bedbound, dependent in all

13    ADLs, and unable to make needs known.

14         When AseraCare discharged her with an

15    extended prognosis, meaning that AseraCare found that

16    Ms. Sarah C. had more than a six month or less

17    prognosis, Ms. Sarah C. remained 100 percent

18    bedbound, dependent in all ADLs, and unable to make

19    needs known.

20         Those clinical characteristics that

21    Dr. Cooney testified about in support of her opinion

22    that Ms. Sarah only had six months to live were the

23    same upon admission and upon discharge.

24         Make no mistake, Ms. Sarah C.'s condition as

25    a 92 year old Alzheimer's patient is both sad and

1  serious.

2          Ms. Sarah continued to need care and

3  assistance for her fragile state, but not hospice

4  care, because Ms. Sarah was not terminally ill.

5          Dr. Liao initially found Ms. Sarah eligible

6  for approximately her first six months on hospice.

7  Once she began to gain weight in July 2007, Dr. Liao

8  found that she was expected to live more than six

9  months.

10          Instead of discharging her on or around July

11  2007, AseraCare billed Medicare for Ms. Sarah for

12  almost another full year.

13          After July 2007, hospice was not the right

14  care at the right time for Ms. Sarah.

15          On the jury form, you should check "yes"

16  when finding that Ms. Sarah was ineligible for

17  hospice from August 1st, 2007 to June 12th, 2008 and

18  you should find that other chronic and improving

19  patients like Ms. Sarah were not eligible for hospice

20  as Dr. Liao testified.

21          Now, you have heard a lot of dates during

22  this trial.  Let me provide you with some clarity

23  about which dates you should focus on as you begin to

24  evaluate a patient's eligibility for hospice for

25  specific time periods.

1          Ms. Sarah C. was on hospice from January

2     2007 through June 2008.  Dr. Liao found Ms. Sarah

3     ineligible for hospice from August 2007 through June

4     2008.

5          The jury form that you will be given

6     includes a space where you need to notate for what

7     period of time you find the patient ineligible for

8     hospice.

9          If you find that the patient was ineligible

10    for the entire time that the patient was on hospice,

11    like Mr. Norman and Mr. William, then you would

12    include the admission date and the discharge date on

13    the jury form after you check "yes."

14         If you find that a patient like Ms. Sarah

15    was ineligible for the time that she was on hospice,

16    consistent with Dr. Liao's opinion, you would check

17    "yes" and write for what time period she was

18    ineligible from August 1st, 2007 to June 12th, 2008.

19         The second person that Dr. Liao saw in his

20    review of the AseraCare medical records was patients

21    who were improving while on hospice.  These are

22    patients who are not just having one good day but

23    were able to show a sustained overall and consistent

24    pattern of improvement.

25         For instance, Dr. Liao testified about

Ms. Dorothy V. who Dr. Liao found eligible upon
admission to hospice with an adult failure to thrive
diagnosis.

By October 2009, Dr. Liao noted that
Ms. Dorothy had begun to gain weight and that
AseraCare hospice physician was evaluating
Ms. Dorothy for discharge, again in November and then
again in December 2009, and AseraCare Hospice
physician indicated that Ms. Dorothy should be
evaluated or planned for discharge.

Contrary to its own hospice physician's
recommendation after an evaluation of the patient and
contrary to Dr. Allen, Ms. Dorothy's attending
physician observed, and Ms. Dorothy's mobility,
AseraCare kept billing Medicare for Ms. Dorothy with
an extended prognosis until over a year later in
November 2010, even though hospice was not the right
care at the right time for Ms. Dorothy after October
2009.

On the jury form, you should check "yes"
when finding that Ms. Dorothy was ineligible for
hospice from October 1st, 2009 to November 19th, 2010
and you should find other improving patients like
Ms. Dorothy not eligible for hospice as Dr. Liao
testified.

1          The third pattern that Dr. Liao testified

2    about were patients who were inaccurately evaluated.

3          You heard from Dr. Liao and saw the records

4    where physicians, who did not work for AseraCare,

5    voiced concerns about whether a patient did, in fact,

6    have a terminal prognosis.

7          You heard about Mr. Samuel T. whose

8    non-AseraCare physician commented that she did not

9    feel he met hospice criteria and should be

10   discharged.

11         How did AseraCare respond?  The AseraCare

12   Hospice physician and Drs. Cooney and Melvin ignored

13   those written opinions and continued to find

14   Mr. Samuel T. terminal for over two years until his

15   own family revoked him from hospice.

16         On the jury form, you should check "yes"

17   when finding that Mr. Samuel T. was ineligible for

18   his entire stay on hospice from March 30th, 2010 to

19   April 29th, 2012 because AseraCare should not have

20   billed Medicare for those time periods.  And you

21   should find that other inaccurately evaluated

22   patients like him were not eligible for hospice as

23   Dr. Liao testified.

24         Dr. Liao testified about Ms. Betty H. who

25   was diagnosed with debility while she was living

1    independently in her own home, going shopping with

2    her son, and otherwise taking care of herself.

3    Ms. Betty was doing well.

4              How did AseraCare respond?  The AseraCare

5    Hospice physicians and Drs. Cooney and Melvin ignored

6    those nursing narratives and continued to find

7    Ms. Betty terminally ill for at least a year and a

8    half and continued to bill Medicare for that time.

9              This is the period of ineligibility for

10   Mr. Samuel T.

11             On the jury form, you should check "yes"

12   when finding that Ms. Betty was ineligible for the

13   entire time that AseraCare kept her on hospice from

14   June -- from January 20th, 2011 to at least August

15   1st, 2012 and AseraCare should not have billed

16   Medicare for those time periods.  And you should find

17   that other inaccurately evaluated patients like her

18   were not eligible for hospice as Dr. Liao testified.

19             You also heard from Drs. Liao and Cooney

20   that there were inaccuracies and inconsistencies like

21   what Mr. Wertkin spoke about from the former

22   AseraCare nurses.

23             In the AseraCare medical records, you heard

24   that those inaccuracies and inconsistencies involved

25   clinical information that a physician may have relied

1   upon when certifying a patient with a six month or

2   less prognosis.

3       The defense tried to minimize the

4   significance of those inaccuracies.  That is

5   troubling.  If someone's medical record that a

6   physician is relying on to diagnose and assess their

7   health had inaccuracies or inconsistencies, how could

8   they feel confident that the physician was making the

9   right decision regarding their health?

10      The fourth pattern Dr. Liao observed were

11  patients with treatable conditions.

12      Dr. Liao explained that some of the

13  AseraCare patients had treatable conditions that were

14  not contributing to the patient's terminal prognosis.

15  These are patients who had conditions that could be

16  treated and, in some instances, did respond to

17  treatment.  Those conditions that responded to

18  treatment were reversible.  These patients did not

19  need hospice but simply needed appropriate care to

20  help control their conditions.

21      You heard from Dr. Liao about Ms. Caron

22  K. who, upon admission to hospice, was losing weight,

23  had episodes of crying, was hostile to staff and had

24  a documented history of depression, anxiety and

25  psychosis.  Dr. Liao found Ms. Caron eligible for

1  hospice upon admission because, as he testified, it

2  was unclear what was causing her decline.

3        But once Ms. Caron received medication to

4  treat her mental conditions, she began to gain weight

5  and became more active.

6        Ms. Caron went from not wanting to get out

7  of bed to playing wheelchair volleyball.  Ms. Caron

8  was doing better and ultimately AseraCare discharged

9  Ms. Caron from hospice but not until AseraCare had

10  kept her on hospice for over a year.

11        In the jury form, you should check "yes"

12  when finding Ms. Caron was ineligible from December

13  1st, 2007 to August 19th, 2008.

14        During that time, hospice was not the right

15  care at the right time for Ms. Caron.

16        You should find that other treatable

17  patients like Ms. Caron were not eligible for hospice

18  as Dr. Liao testified.

19        Finally, the third reason that you should

20  believe Dr. Liao and find that it is more likely than

21  not that AseraCare submitted false claims to Medicare

22  is that Drs. Cooney and Melvin were not credible.

23        Dr. Liao offered at trial his expert opinion

24  that 110 patients were eligible for their hospice

25  stay and that 121 of the patients were not eligible

1   for part or all of their time on hospice at

2   AseraCare.

3           Drs. Cooney and Melvin, on the other hand,

4   found that every single patient that they reviewed,

5   except for one each, was eligible for the Medicare

6   hospice benefit.  That's unbelievable.

7           And you heard Dr. Cooney testify that any

8   diagnosis can be a hospice diagnosis.  That's

9   astonishing testimony to consider as you assess

10  whether Dr. Cooney is applying sound medical judgment

11  in this case.

12          Dr. Cooney also could not explain

13  AseraCare's decision to discharge 58 of the 121

14  patients for extended prognosis.

15          She repeatedly testified that patients who

16  were extremely sick and had a terminal prognosis were

17  discharged by AseraCare for an extended prognosis,

18  meaning that the patient was expected to live longer

19  than six months.

20          But Dr. Cooney was not able to explain why

21  AseraCare, after keeping patients on hospice for nine

22  months, 12 months, 15 months, 18 months -- reached a

23  different conclusion than she did.  Often, she merely

24  described her views as beliefs.

25          By contrast, Dr. Liao's opinion did not

1    change simply because the patient eventually died
2    while on hospice.  And she explained to you why.
3           Medicare requires that hospice patients have
4    an expected prognosis of six months or less.
5    Terminally ill patients may live longer than six
6    months and still remain eligible, just as people who
7    were not eligible for hospice may die unexpectedly.
8           Keep in mind, all of the patients whom
9    Dr. Liao found to be eligible for hospice were on
10   hospice for more than a year.  Dr. Liao looked at all
11   the records and assessed the patient's prognoses at
12   that time that AseraCare physicians were assessing
13   those patient's prognoses.
14          Dr. Cooney has an enormous incentive to
15   provide testimony favorable to the defense.  She made
16   close to $200,000 working on just this case alone.
17   You should consider whether those payments have made
18   her biased, even just a little or a lot.
19          And when you are considering the credibility
20   of Dr. Melvin, you should think about a number of
21   things.  Dr. Melvin testified that for some of the
22   patients she reviewed, including Ms. Agnes B. and
23   Ms. Laura H., she actually copied the exact same
24   language, including entire paragraphs, from the
25   Excelas summaries directly into her expert report.

1          Now, you heard testimony yesterday about the
2     summaries that Excelas made for the AseraCare
3     patients in this case.  You know from that testimony
4     that these were not unbiased objective summaries.
5     These were summaries that left out critical
6     information about the patient's medical conditions
7     and that were designed to help AseraCare's experts
8     respond to Dr. Liao's opinions.
9          THE CLERK:  60 minutes, counselor.
10          MS. GUNASEKERA:  Dr. Melvin, who is not
11     certified in either hospice or geriatrics, has also
12     given contradictory testimony during this case.  She
13     testified to you here in court that she did not rely
14     on the Excelas summaries when she created her report,
15     but then she admitted that she had previously
16     testified under oath that she had relied on the
17     Excelas summaries.
18          It is up to you to decide whether she was
19     telling the truth during her deposition or here in
20     court.
21          Dr. Melvin also destroyed or recycled the
22     notes that she made when she was reviewing the
23     medical records and the Excelas summaries, even
24     though she knew she might be testifying in court
25     about her work and her opinions in this case.  You

should consider these inconsistencies when evaluating
the credibility of Dr. Melvin's testimony.

In another instance, Dr. Melvin had to
correct her sworn testimony at trial regarding
Ms. Caron K.  When she initially testified that
Ms. Caron K. was losing weight, but then later had to
correct her testimony and state that Ms. Caron was,
in fact, gaining weight.

The Department of Justice team wants to
thank each of you for listening so attentively,
taking careful notes, and being respectful of each
witness and counsel on both sides of the case.

You are now being asked to determine whether
it is more likely than not that AseraCare submitted
false claims to Medicare.

Medicare has given hospices some flexibility
in determining whether a patient has a prognosis of
six months or less; however, despite what AseraCare
will have you believe, that does not mean that there
are no rules or criteria for no guidelines that
AseraCare had to meet.

AseraCare should not be seeking Medicare
money for patients who are not terminally ill and who
do not need expensive hospice care.

AseraCare wants a blank check from the

1   Medicare hospice program.  I ask that you not give it

2   to them.  I ask that you hold AseraCare accountable.

3   Thank you.

4            THE COURT:  Thank you.

5            MR. LEMBKE:  Your Honor, may we approach?

6            THE COURT:  All right.

7                    (SIDEBAR)

8            MR. LEMBKE:  Your Honor, AseraCare objects

9   to the portion of Mr. Wertkin's argument when he

10  talked about what Ms. Hollis-Sells did not rebut,

11  because, as the Court knows, you put limits on the

12  scope of what Ms. Hollis-Sells could talk to.

13           And his argument, we think, clearly crossed

14  the line into suggesting that evidence we were not

15  permitted to put on was improperly kept from the

16  jury.

17           MR. WERTKIN:  Your Honor, his objection --

18  I'm not familiar with that instruction.

19           THE COURT:  The government objected to her

20  testifying at all; right?

21           MR. WERTKIN:  Right.

22           THE COURT:  And I limited her testimony to

23  context only, nothing as to any of the individual

24  patients; right?

25           MR. LEMBKE:  And Your Honor said she would

1  not be coming in to talk about general policies of

2  the company.  And we think the impression he's given

3  is that we didn't rebut these policies that were

4  nationwide in our case when we couldn't come in with

5  general policy testimony from Ms. Hollis.

6          THE COURT:  Okay.  We're going to check and

7  see exactly what the ruling was.  And if you crossed

8  it, I will instruct the jury when we come back after

9  this.

10          MR. LEMBKE:  Thank you, Your Honor.

11          (Open court.  Jury present.)

12          THE COURT:  All right.  Ladies and

13  gentlemen, we're going to take a break before we hear

14  the defense rebuttal.

15          We will come back at 11:30, which is 16

16  minutes, I think.  So if y'all will be prompt, I will

17  do my best to keep us prompt in here, barring any

18  technical difficulties.  Thank you.

19                      (Jury excused.)

20                      (Brief recess)

21                        (SIDEBAR)

22              (Discussion off the record)

23          THE COURT:  As I understand, there was a

24  motion in limine concerning Ms. Hollis-Sells'

25  testimony, and the government objected, from what I

1    can tell from the transcript, this general practice
2    testimony that doesn't relate in time and location to
3    the 123 patients.  I said okay.  And, again, the
4    defense said they're presenting her for basic context
5    and to respond to specific testimony from the
6    government, which was whoever's testimony about what
7    she had said or not said.  I said all right.  Are we
8    good?
9         So apparently, I was staining the
10   government's objection to her testimony of any
11   general practice that didn't relate in time or
12   location to the 123 patients.
13        MR. WERTKIN:  That's right -- well, Your
14   Honor, I'm not sure that it was ruled -- I mean, if
15   the Court thinks it was ruled upon, it was ruled
16   upon, but we agree that that was what our position
17   was, yes.
18        THE COURT:  And I said the defense is
19   presenting her for basic context and to respond to --
20        MR. WERTKIN:  Rebut what the defendant said.
21        THE COURT:  Right.  I said all right.  Are
22   we good?
23        MR. WERTKIN:  Right.
24        THE COURT:  And there was no response that
25   that was not an appropriate understanding, that there

1  would not be testimony of general practices that

2  didn't relate -- in other words, I had barred the

3  government from testifying about general practices

4  that didn't relate to time and place.  And, of

5  course, that was kind of mushy at times in terms of

6  whether it did or didn't.  So she was not presented

7  to rebut or testify as to general practices.

8       MR. WERTKIN:  Well, Your Honor, our

9  objection was just goose-gander, that we had been

10  limited in our witnesses.

11       THE COURT:  Right, right.

12       MR. WERTKIN:  And Ms. Hollis-Sells

13  provided testimony, general practice testimony, that

14  did relate in time and location to the 123 patients.

15  In fact, she did do that.  She rebutted specific

16  testimony.  The defendants --

17       THE COURT:  One specifically?

18       MR. LEMBKE:  That is --

19       MR. WERTKIN:  If I may, the defendants, Your

20  Honor, were not limited.  They placed that limitation

21  on themselves.  That was what -- that was what our

22  point was.  If Ms. Hollis-Sells wanted to testify

23  about general practices at the facilities that she

24  over saw, she could have done so, Your Honor, under

25  the Court's ruling.

1          MR. LEMBKE:  Your Honor, this is now getting

2     grossly distorted because it goes back to what the

3     Court indicated that, in order for the testimony to

4     come in in phase one, it needed to have that time and

5     place nexus with regard to policies.  And Ms. Hollis

6     is up at the corporate level.  The one thing she

7     responded to was someone said Angie said on a phone

8     call, but now to suggest that the corporate president

9     didn't come in and rebut this, the only way she could

10    have come in and done it is with general practices.

11    She's not down at every location.

12          THE COURT:  Right.

13          MR. LEMBKE:  We couldn't come in under the

14    court's ruling and talk about this was the general

15    practice of company.  That's what the Court had made

16    clear we could not do.

17          MR. WERTKIN:  Actually, the court made clear

18    that if the defendants opened the door to that

19    testimony.  The Court did not rule, Your Honor -- I

20    don't want to -- Your Honor, our position is very

21    solid.  Ms. Hollis-Sells was involved in the specific

22    operations at the facilities.  They're say that

23    they're rebutting a specific piece of evidence.

24          THE COURT:  Which was that somebody said she

25    had said something.

1          MR. WERTKIN:  Exactly.  Someone said it was

2     the general practice that Ms. Hollis-Sells would make

3     phone calls and give instructions on this topic.

4     Ms. Farmer's testimony came in as general practice

5     testimony.  That's what it was.

6          THE COURT:  No.

7          MR. LEMBKE:  No.  It came in -- ms. Farmer

8     was testifying about the training she got at that

9     location.  And when the testimony was elicited as to

10    what the training was, she talked about Angie said

11    document to the LCDs.

12         MR. WERTKIN:  Regularly said, that was her

13    general practice that she would give those trainings.

14         THE COURT:  And she rebutted that particular

15    thing.

16         MR. WERTKIN:  Yes.

17         THE COURT:  But she was not involved, as I

18    understand it, in the decisions that were made at the

19    local entities that are at issue in this --

20         MR. WERTKIN:  Your Honor, she was.  We

21    contend she was.  In fact, we have emails in phase

22    two, Your Honor, you will see how --

23         THE COURT:  All right.  That's phase two.

24         MR. WERTKIN:  But --

25         THE COURT:  Phase two.

6625

1          MR. WERTKIN:  Which demonstrates her

2     involvement on the day-to-day level.  That's the

3     question.  We didn't try to use --

4          THE COURT:  She was presented for a very

5     limited purpose.  And you said in your closing that

6     she didn't demonstrate that the doctors were actually

7     involved and all this kind of stuff.  She's not down

8     in Foley to be able to testify about that.

9          MR. WERTKIN:  Your Honor, that's not in

10     evidence.  She is involved on a local level.

11          THE COURT:  Exactly what --

12          MR. LEMBKE:  You're asking for an inference

13     to be drawn from our failure to call her to testify

14     to something that she wasn't permitted to testify to

15     in this trial because all she could have done was

16     general practices, which she couldn't say.

17          THE COURT:  At the corporate level, but not

18     at the specific location and in the specific time for

19     these 123 patients that were at issue.

20          MR. WERTKIN:  We disagree, Your Honor.  She

21     could have talked about general practices at these

22     facilities.

23          THE COURT:  No.  General practice

24     corporately, okay, across the board.

25          MR. WERTKIN:  Right.

6626

```
1          THE COURT:  And you said that she didn't
2   rebut that these doctors who were making these
3   decisions were not involved.
4          MR. WERTKIN:  Right.
5          THE COURT:  And besides, I've yet to see
6   anything where the doctors that were identified by
7   any of your people were involved in any of these
8   decisions, but the testimony is closed on that.
9          MR. WERTKIN:  Your Honor, the defense --
10  this is -- our position is the defendants could have
11  offered general practice testimony that related in
12  time and location to the 123 patients from
13  Ms. Hollis-Sells.  They could have done so.
14         They chose not to do so.  That's what we
15  were pointing out in the closing argument.  They
16  could have done so.
17         THE COURT:  That's an improper statement,
18  and I will so direct the jury.
19         MS. MARTIN:  Thank you, Judge.
20                   (Brief recess.)
21      (Open court.  Jury not present.)
22      MR. WERTKIN:  Your Honor, may we approach?
23      THE COURT:  Okay.
24                   (SIDEBAR)
25      MR. WERTKIN:  Your Honor, we believe that it
```

1   is clear from the evidence that's available to the

2   court in this case that Ms. Hollis-Sells was involved

3   in eligibility documentation questions at the local

4   level in the following agencies but not exclusively:

5   Birmingham, Clanton, Clarksville, Decatur, Hamilton

6   --

7           MS. MARTIN:  Many of those are not involved.

8           MR. WERTKIN:  They are from Clarksville.

9   They are from Decatur.  Ms. Hollis-Sells was involved

10  in eligibility and documentation questions in

11  Decatur, Alabama.

12          THE COURT:  There's no evidence of that

13  other than the testimony of the woman down in Foley

14  that Ms. Hollis-Sells was going to rebut.

15          MR. WERTKIN:  Well, Your Honor, we

16  understand the basis of your -- the basis of your

17  ruling on the closing statement to be that

18  Ms. Hollis-Sells could not have provided general

19  practice testimony that rebutted the evidence that

20  was presented in this case.

21          Ms. Stutts, for example, was a nurse in

22  Decatur.  She went in and talked about how things

23  worked in Decatur.  Ms. Hollis-Sells was involved in

24  the eligibility and documentation issues at Decatur

25  during the same time period that was at issue in this

```
 1   case.  She could have offered testimony to rebut
 2   that.
 3           THE COURT:  Okay.  But you're statement was
 4   you didn't hear a single witness testify that
 5   Aseracare doctors were involved in every admissions
 6   decision.
 7           MR. WERTKIN:  Right.
 8           THE COURT:  How the heck could Angie
 9   Hollis-Sells testify that AseraCare doctors were
10   involved in every admissions decision when she was
11   not present when those doctors were making the
12   admission decisions or when certifications were being
13   done?
14           MR. WERTKIN:  Because Ms. Hollis-Sells was
15   on --
16           THE COURT:  If that had come up, I would not
17   have allowed her to testify to that unless she was
18   present when those decisions were made, and there is
19   no evidence that she was ever present in any of those
20   locations for any interdisciplinary group meetings or
21   for any decision about admissions.
22           MR. WERTKIN:  Your Honor, we talked about
23   her attendance, we talked about her knowledge of
24   audits and emails that she's on.  Your Honor, this
25   witness could have rebutted this testimony, and it
```

1   would have been permitted under the Court's rulings.

2          THE COURT:  You specifically requested that

3   she not be able to testify to those general

4   practices.

5          MR. WERTKIN:  No, Your Honor, that's not

6   right.  We just --

7          THE COURT:  Okay.  I've made my ruling, and

8   I'm going to instruct them that they should disregard

9   your comment about what Ms. Angie Hollis-Sells did

10  not testify about, because I have placed limitations

11  on what evidence and testimony could be presented in

12  phase one.

13         MR. LEMBKE:  Thank you.

14         MR. WERTKIN:  Your Honor, what is the rule?

15         THE COURT:  The rule deals with my control

16  of the evidence that was presented in phase one, and

17  that's all I need.

18         MR. WERTKIN:  Thank you, Your Honor.

19         THE COURT:  You keep pushing, Jeff.

20         MR. WERTKIN:  I'm sorry, Your Honor.

21         THE COURT:  You keep pushing, and I will

22  tell them to disregard your entire closing argument.

23         MR. WERTKIN:  I'm sorry, Your Honor.  I'm

24  sorry.  I should control --

25         THE COURT:  I know, but I am the one who has

1   to control the evidence that comes in and what the

2   jury hears.

3        MR. WERTKIN:  I know, Your Honor.  I'm

4   sorry.

5        THE COURT:  And it was your request to limit

6   her that got us to where we are.

7        MR. WERTKIN:  Thank you, Your Honor.

8              (Jury present.)

9        THE COURT:  Ladies and gentlemen, you

10  remember I told you that part of my role during trial

11  is to decide what evidence is proper for you to

12  consider.

13       Because we have limited phase one to just

14  the question of whether there were any false claims,

15  I've had to make rulings outside of your presence as

16  to what various witnesses could testify about in

17  phase one and what documents could come in in phase

18  one.

19       Because of rulings that I made limiting

20  testimony, specifically limiting the testimony of

21  Ms. Angie Hollis-Sells, I now instruct you to

22  disregard Mr. Wertkin's statement as to the testimony

23  or evidence that you did not hear from

24  Ms. Hollis-Sells and that is because I have made

25  limitations on that testimony prior to her taking the

 1    stand.

 2          So you should disregard that comment by

 3    Mr. Wertkin.

 4                ASERACARE CLOSING ARGUMENT

 5          MR. LEMBKE:  May it please the Court, good

 6    morning, ladies and gentlemen.  I'm sure it's not

 7    going to come as a big surprise to you that there's

 8    not a lot that the government lawyers said in this

 9    case that I agree with.

10          But there is one thing I agree with, and it

11    was the very first thing the government lawyer said

12    in his opening statement, now nearly two months ago.

13    I don't know if you remember it.  He said, this is a

14    case about trust.  And with that, I can completely

15    agree.

16          Now, when he said it, he meant the

17    government has to be able to trust companies like

18    AseraCare not to submit false claims and, of course,

19    that is true.

20          But trust is a two-way street.  And elderly

21    Americans on Medicare and the companies like

22    AseraCare that provide healthcare benefits to them

23    have to be able to trust the government, our

24    government, to stick to the laws and stick to the

25    rules that actually apply.

1         One of the big issues in this case is this:

2   Is the government sticking to the law and to the

3   rules or are the rules being changed after the fact.

4         Everyone learns in elementary school, the

5   first words of the Constitution of the United States

6   are, "we the people of United States of America" and

7   it was "we the people" acting through our elected

8   representatives in Congress that put in place the

9   Medicare hospice benefit.  And it was an act to help

10  some of the least of those in our society, those who

11  are dead and dying, it's never easy to talk about the

12  process of dying, but how society takes care of the

13  dying helps to define us as a society.

14        Now, "we the people" could have decided

15  we're going to make this benefit available to those

16  who are actively or imminently dying, and we heard

17  that that means someone who has just a few days,

18  maybe a few weeks, to live and it's relatively easy

19  to identify with certainty who those people are.

20        But in a balance between helping more people

21  who need it at the end of their lives and certainty

22  "we the people" acting through Congress opted to

23  strike the balance in favor of helping more people

24  who really need it.

25        So that's how we ended up with the Medicare

1   hospice benefit.

2          As we heard, it's a lot more certain to

3   predict actively dying versus people who have a six

4   month prognosis, but "we the people" chose to provide

5   more help.

6          Now, I want to talk first about what is the

7   law, what are the rules.

8          And let me go back to the screen so we can

9   look at some of what Judge Bowdre told you this

10  morning and she gave all the lawyers a copy of what

11  she was going to say.

12         And as she has instructed you, and this is

13  the law, remember she said you have to follow the law

14  as she gives it to you in this case.

15         What we heard is what we've heard throughout

16  the trial, remember this comes right out of Defense

17  Exhibit 234, which is the statute that "we the

18  people" acting through Congress passed, that there

19  has to be the certification from the medical director

20  and the regular physician at the outset that the

21  patient is considered to be terminally ill based on

22  the doctor's clinical judgment regarding the normal

23  course of the patient's illness and that's the

24  critical language -- clinical judgment.

25         That's the standard that "we the people" set

1   for how we were going to determine who was eligible

2   for the Medicare hospice benefit, the doctors closest

3   to the patient's being cared for.  We didn't choose a

4   tool.  We didn't choose a FAST score.  We didn't

5   choose an LCD.  "We the people" didn't choose a PPS.

6           What we chose to base eligibility on is the

7   clinical judgment of the doctors closest to the

8   people.  That is the standard of eligibility.

9           Thus -- and remember, the Medicare benefit,

10  hospice benefit, is always a choice for the patients

11  and the patient's family.  Always a choice.

12          So, "we the people" left the decision about

13  what was the right care at the right time to the

14  doctor's clinical judgment about the terminal

15  prognosis and to the patient's choice.

16          Then Judge Bowdre also told you, what we

17  heard and we saw in Defense Exhibit 235 during trial,

18  another statute passed by Congress, to be considered

19  terminally ill, that means the patient has a medical

20  prognosis that the patient's life expectancy is six

21  months or less, if the illness runs its normal

22  course.

23          Now, the two critical words there, prognosis

24  ties back to clinical judgment.  It's a prediction.

25  It's a prediction made by the doctor.  And then, runs

1   its normal course, that language is what "we the

2   people" knew when we made that decision, help more

3   people and have less certainty, running the normal

4   course takes account of the fact that we can't be

5   certain that everyone will be dead within six months.

6   We realize some won't be.  That's where that comes

7   into play.

8          And you remember, we heard Ms. Lucas who

9   came and testified, called by the government, the

10  lady who was the Ph.D. from Medicare who talked about

11  the statutes and talked about the regulations, talked

12  about the Federal Register provisions, she confirmed

13  that under the law patients can have unlimited

14  benefit periods.  Unlimited periods.  It's not six

15  months and that's it.

16         It's unlimited, so long as at every

17  certification period, the medical director looks at

18  the patient from that point forward and says, from

19  this point, it's a six month or less prognosis.

20         Now, Judge Bowdre gave you another critical

21  instruction that I want to look at, and the

22  government showed it to you already, and these are

23  the various factors that have to be considered in

24  making that prognosis based on clinical judgment.

25         And when you look at them all together,

1   these group of factors really amount to this:  It's

2   not just the primary diagnosis, the doctor has to

3   look at the whole picture of the patient, both the

4   primary terminal condition and then in number five

5   conditions unrelated to the terminal illness and

6   everything inbetween.

7          You've got to assess the prognosis based on

8   the whole picture.

9          Then there was critical testimony -- now,

10  these were in the instructions.  Then we heard

11  testimony, during the case, about what the law is and

12  what the rules are.

13         And I'm a big football fan.  And I've heard

14  a lot of coaches say, a football game is 60 minutes

15  long, but in any game, there are six or seven key

16  plays, six or seven big moments that go a long way

17  toward determining the outcome of the game.

18         Well, in a lot of ways, a trial is a lot

19  like that, in that we've been here for two months

20  listening to evidence and listening to testimony.

21  But there have been, I'm going to talk about, six big

22  moments that we've heard in this courtroom that I

23  think will go a long way toward how you should decide

24  this case.

25         And I want to talk right now about big

1    moment number one.

2           Mr. Wertkin referred a few minutes ago to

3    the testimony of Ms. Schultz.  She was the lady from

4    Palmetto who came and testified.  And she offered

5    this critical, critical testimony, the first big

6    moment.  Two doctors using their clinical judgment

7    can look at the same medical records, come to

8    different conclusions about prognosis, and neither

9    one be wrong -- two doctors using their clinical

10   judgment can look at the same medical records, come

11   to a different conclusion about prognosis and neither

12   one be wrong.

13          Ms. Schultz also gave us big moment number

14   two.  And what was big moment number two?

15          It was her testimony when she said, the LCDs

16   that we've heard so much about are not mandatory

17   guidelines.  We do not have a check box approach to

18   whether someone is eligible.  That's not what "we the

19   people" chose.

20          Now, that should not have been any surprise

21   when she said that because Medicare, as we looked in

22   the Federal Register several times, that exhibit that

23   said, there are no clinical benchmarks, meaning you

24   don't have to check certain boxes in order to decide

25   who is eligible and who's not.

1          We saw in the Palmetto manual, and that was

2     Defense Exhibit 4023, that yes, LCDs are a tool to be

3     used.  But remember Dr. Cooney read through all those

4     other criteria in addition to the LCDs and it said,

5     you consider all of this and you consider even things

6     beyond this.  You consider the whole picture.

7          And, in fact, Judge Bowdre has already made

8     clear in her instructions to you about the LCDs, they

9     are eligibility guidelines but, as she said, a

10    beneficiary may not meet the criteria, yet still be

11    appropriate for hospice care.

12         Big moment number two, we don't have a check

13    box approach to eligibility determinations.  That's

14    not the law.  The LCDs are not mandatory.

15         Here's another critical part of the law that

16    Judge Bowdre told you about and you heard this is a

17    False Claims Act case.  And in order for a claim to

18    be false, it has to be an assertion that is untrue

19    when made or used.  Untrue when made.  And we're

20    going to talk some more about that in just a minute.

21         During your deliberations, in everything you

22    do, I hope you will keep coming back to what these

23    critical parts of the law is, what the rules are.

24    Clinical judgment, prognosis of six months or less

25    based on the normal course, look at the whole

1  patient, it's not a checklist approach, unlimited

2  benefit periods, and the claim must be untrue when

3  made.

4         As we talk in the next few minutes about the

5  government's evidence in this case and all the

6  evidence in this case, I think you will see, despite

7  what the government may be saying, the government's

8  case is based on different rules than those that

9  actually are in effect.

10        And this talk about the best way to protect

11  the integrity of the Medicare system, the best way to

12  protect the integrity of the Medicare system is to

13  follow the law that "we the people" set.

14        Now, ladies and gentlemen, I want to shift

15  gears for a minute and I want to talk about who are

16  these 121 people that you're going to be talking

17  about back in the jury room.

18        I know if you heard it once, you must have

19  heard it 3,000 times over the last two months, the

20  question is whether a patient has the prognosis of

21  six months or less, if the illness runs its normal

22  course.

23        And Dr. Twaddle, you may remember, she was

24  the tall gray-haired lady from Chicago who was

25  AseraCare's national medical advisor and remember she

6640

1 was one of the people, along with president Ronald

2 Reagan and Dr. Gail Cooney, who have been recognized

3 a couple of years ago as one of the 30 visionaries,

4 the 30 most important people in the field of hospice

5 in the last 30 years.  And I thought Dr. Twaddle

6 explained really well what that whole normal course

7 means.

8         You may remember she testified that it

9 starts with looking at what she called populations of

10 people, meaning large groups of people with a

11 particular illness, and what is the way more people

12 than others have that illness play out.  And she

13 said, her term was the most common trajectory of the

14 illness is the norm but she said -- and that's how

15 you get normal course, the most common trajectory of

16 the illness.

17         But she said there are people who don't

18 follow the normal course.  And she said, when you get

19 down to that individual level, I really like the way

20 she talked about, for the individual, she said, each

21 person writes their own story.  Each person writes

22 their own story.

23         And she explained that many people, in

24 writing their own story, don't follow that common

25 trajectory, don't follow the normal course.

1        And why is that?  People are not robots.

2    That's not what we are.  And we've all seen, I

3    suspect, in our lives someone who was very near the

4    end of life, who hung on longer than anyone really

5    thought would happen.  Why that person and not

6    someone else?  We don't know.

7            Now, there's also been a great deal of talk

8    in this courtroom about patterns.  This pattern, that

9    pattern, straining and striving, in our view, to come

10   up with a pattern.

11           Ladies and gentlemen, you don't have to

12   stretch and you don't have to strain to see the

13   pattern.

14           What is the real pattern for these 121

15   people?  The real pattern is they are plain and

16   simply the patients whose illnesses do not follow the

17   normal course.  That's who they are.

18           You heard in this five year period of issue,

19   AseraCare took care of about 50,000 patients.  And

20   these are 121 of them out of 50,000 whose illness did

21   not follow the normal course.

22           When I think about patients not following

23   the normal course out of these 121, one who comes to

24   mind for me is Ms. Donna W.  Remember Ms. Donna W.

25   was the lady who was in the hospital, she had had a

1    severe heart attack, she had COPD, she had pneumonia,

2    she had a lot of other things wrong with her and she

3    was on the ventilator and she wanted to get off that

4    ventilator.  And the doctor told her, if we take you

5    off, it is very likely you're going to die.  And

6    remember, she wrote him a note, take me off.

7          And so that's what happened.  And after she

8    was taken off the ventilator, she and her family

9    chose to go on hospice.  And I suspect no one in the

10   world believed it would be a very long stay on

11   hospice.  But even though she wasn't expected to

12   survive more than a few days, she lived a lot longer

13   than six months.  And she lived longer than six

14   months, even though we heard her weight ultimately

15   fell to 63 pounds and a BMI of 11.

16         Now, we heard a lot of BMIs.  But I don't

17   ever remember one lower than 11 in all the ones we

18   saw.

19         She was the lady who had the severe air

20   hunger.  Remember Dr. Cooney talked about that was

21   constant gasping for breath and she needed that

22   concentrated Morphine, Roxanol, four or five times a

23   day to just calm her down so she could be

24   comfortable.  That was her.  She was extremely

25   cyanotic, blue.  She had -- it was so bad that she

1   had to pause between bites when she was eating to

2   catch her breath.

3            Now, when her doctors were making the

4   determination that she had a terminal prognosis, they

5   weren't saying something that was untrue when they

6   said it.

7            Why did she hang on for so long with all of

8   that wrong with her?  I submit that no one on earth

9   can answer that question.

10           Now, with hindsight, we now know, looking

11  back, we see it that for Donna W. and these 120 other

12  patients, they didn't follow the normal course but

13  there was no way, at the time that terminal prognosis

14  was being made, that the doctors doing it could have

15  known this was the patient who's not going to be on

16  the common trajectory.  So when the doctors were

17  making the decisions, they weren't saying anything

18  untrue.  They were just making their prognosis,

19  according to the law, based on their clinical

20  judgment that "we the people" said was the standard

21  for eligibility.

22           And these 121, they're the very people "we

23  the people" knew were out there when we set a benefit

24  with unlimited benefit periods based upon the normal

25  course.

1          The trade off between certainty and helping

2     more people who needed it at the end of their lives,

3     giving them the choice to receive that help.

4          Now, you know that all of these patients,

5     everyone of them decided -- you heard Judge Bowdre

6     say, it's not disputed, every single one of them

7     chose and a lot of times it wasn't the patient

8     because they were no longer able to choose, it was

9     the patient or the patient's family chose hospice.

10    And you saw many examples where the family said, we

11    don't want anymore blood draws, we don't want anymore

12    diagnostic tests, we don't want anymore getting them

13    out of bed to put them on a scale for a weight, the

14    choice that had been made was for comfort and

15    dignity, and that's the choice that "we the people"

16    gave to our citizens on Medicare and that's the

17    choice that AseraCare respected.

18         Now, you heard Dr. Cooney and Dr. Melvin

19    paint the entire picture of what was wrong with these

20    patients.  And Dr. Cooney and Dr. Melvin were asked

21    what is the correct question under the law; and that

22    is, in their clinical judgment, did these patients

23    have a terminal prognosis, if the illness ran its

24    normal course.  And you heard that they looked at the

25    whole picture of the patient based upon their review

of the medical records.

Now, why is it so important to look at the whole patient when making these eligibility determinations?

Well, first of all, it's important because that's the law as Judge Bowdre has already indicated. That's the law.  You've got to look at everything.

But we also heard Dr. Cooney describe when someone has -- these patients, these 121, they all had a lot wrong with them.  We heard that.

And Dr. Cooney gave -- said that when you bring these multiple illnesses together, it adds to the problems.  I think she gave the example of if you have an end stage dementia patient who is also end stage Parkinson's, that creates more problems.  The Parkinson's patient, in the end stages, becomes unsteady, has difficulty swallowing, so they've got to remember you can't try to get up out of bed without help.  You've got to remember exactly how to eat your food or your pureed diet, and those present significant challenges to that patient.

But remember, when you then add on the dementia that they can't remember not to get out of bed and they can't remember exactly how to handle their food, the combination of the end stage diseases

1  means one plus one doesn't equal two, one plus one

2  equals three, and in the case of many of these

3  patients, it wasn't one plus one equals three.  It

4  was one plus one plus one plus one plus one equals

5  ten.  All of these things came together.  And you

6  heard Dr. Cooney and Dr. Melvin explain those

7  combinations for these patients looking at the whole

8  picture.

9          Now, you also heard that Dr. Cooney and

10  Dr. Melvin both have spent more than 20 years of

11  their careers in the hospice setting.  Between them,

12  they have certified or recertified tens of thousands

13  of people and they have reviewed the certifications

14  by other doctors of tens of thousands more.

15          So when they would testify to you that, in

16  my experience, looking at this patient with these

17  symptoms, if the illness ran its normal course, they

18  would be dead in six months or less.

19          They weren't talking out of theory.  They

20  were talking about a professional career worth of

21  experience of seeing how this played out with tens of

22  thousands of people.

23          Now, I heard the statement a little while

24  ago that Dr. Cooney and Dr. Melvin didn't use the

25  LCDs.  Untrue.

1            You heard Dr. Cooney and Dr. Melvin say the

2    LCDs are a tool.  They are a tool to consider along

3    with the PPS and the FAST and all the other tools and

4    they said they took it into account.  And I don't

5    know how many times we showed Dr. Cooney and

6    Dr. Melvin those LCD worksheets and talked about them

7    in their connection with their testimony.

8            And also the idea that, well, there were no

9    criteria applied.  Well, the criteria they applied is

10   the legal requirement that you look at the whole

11   patient and, again, you remember Dr. Cooney talked

12   about all those criteria that Palmetto sets out and

13   she said, I consider the whole patient.  That's what

14   we're supposed to do.

15           So, ladies and gentlemen, I want to say one

16   more thing in response to what the government said

17   about Dr. Cooney, the government brought this case,

18   brought in an expert witness to testify about

19   eligibility, and then it's our job to come back and

20   respond with an expert witness.

21           To criticize us for hiring a witness who

22   gets paid for her time, I mean, that's sort of

23   twisted logic.  AseraCare needed to be able to

24   respond to the charges and Dr. Cooney was a highly

25   qualified person to do it.  And the suggestion about

6648

1  Dr. Melvin destroying her notes -- remember what she
2  said, I gave the handwritten notes to my secretary.
3  She typed them up.  I made sure they were accurate.
4  And then I used the typewritten notes and recycled
5  the handwritten notes.  That's what really happened.
6          Now, ladies and gentlemen, we heard there
7  were multiple ways that people will die on hospice --
8  excuse me -- leave hospice.  One of which is that
9  people die, which is expected in many cases.
10         We also heard that some people decide to
11  revoke.  And again, that whole idea of choice, you
12  get to choose coming in and at any point during your
13  time on hospice you want to come out, you're out.
14  You can revoke.  You can seek other treatment.  And
15  AseraCare always respected that.
16         Now, the government, in its opening
17  statement in this case, talked about someone, in
18  fact, it was the very first patient they talked about
19  as someone who had revoked their benefit.  That was
20  Ms. Elsin K.
21         And when I thought back to that discussion
22  of Elsin K. in the opening statement, it brought back
23  to mind to me a radio program I used to listen to
24  when I was a kid riding in the car that my mother
25  loved, and maybe some of you are old enough to

remember it, it's called the rest of the story by
Paul Harvey.  And it would be five minutes long.  And
for about the first three minutes, Paul Harvey, who
was a national radio guy, would tell you some facts.
He wouldn't tell you who or what he was talking
about.  But he would start telling you facts.  And he
would build it up for about the first three minutes
to where you got an impression of where you thought
the story was going, and then he would go to
commercial, of course, and he would come back from
the commercial, and he would then tell you the rest
of story which would be facts that took it in an
entirely different direction than the impression he
had left you with.  And then he would end with the
famous words "and now you know the rest of the
story."

         Well, in the government's opening statement
about Ms. Elsin K., the government suggested that
AseraCare had kept her on hospice because she had a
chronic problem with her hip and her knee and some
chronic pain and they said that went on for months
and months and months and said then Ms. Elsin took
herself off hospice.  And that's all they told you.

         So they wanted to leave you with the
impression that there really wasn't much wrong with

1    Ms. Elsin and she finally figured that out and she

2    was out the door.

3          Well, now let me tell you from what you

4    heard at trial what was the rest of the story.

5          Well, Ms. Elsin, as you, I'm sure, will

6    remember, was the lady who had those terrible wounds

7    on her hip and her knee with the MRSA infection and

8    it went from clear drainage and, you know, it was

9    hard to listen to, huge amounts of bloody pus

10   draining out of those.  She developed edema.  She

11   needed the Hoyer lift.  Her infection got so bad in

12   her right leg that her right leg was visibly

13   shrinking in size because the infection was eating

14   away her bone.  And it is true that Ms. Elsin did

15   revoke hospice on June 8th, 2008.  But remember why

16   she revoked?  She revoked because she got a massive

17   blood clot in her abdomen and she went to the

18   hospital to get that treated.

19         But then, eight days later, she made the

20   choice to come back on hospice.

21         Now, ladies and gentlemen, in a case that

22   the government says is all about trust, why in the

23   world would the first patient the government talked

24   about be discussed in a way that left you with such a

25   misimpression?

1          There's another way that people left hospice

2     and that was through discharge for extended prognosis

3     and the government has talked a lot about that.  You

4     heard talk about it today.

5          And, of course, the suggestion they want to

6     leave you with is oh, if you're discharged for

7     extended prognosis, that meant you were never

8     supposed to be on there to start with.  But that's

9     not true.

10          You heard Dr. Cooney say, that decision

11     about whether to discharge someone for extended

12     prognosis is one of the toughest calls to make

13     because remember the discussion about the saw-tooth

14     decline?  You've got to make sure that the up isn't

15     going to be followed by another down, and this isn't

16     part of just a general downward trend.

17          And remember, the law is, the claim has to

18     be untrue when made.  This is an important time when

19     that comes into play.  Because just because a doctor,

20     based on the information he or she had at one point,

21     said terminal prognosis, based on clinical judgment,

22     it doesn't mean the fact that after more information

23     became available to the doctor that a different

24     conclusion meant something was untrue the first time

25     around.

1     And, in fact, if you look, we looked at

2  Defendant's Exhibit 752-A at Page 0078 which was some

3  language out of the Federal Register which talked,

4  Medicare telling the world, what to say about what

5  about discharge.  And they say, if a patient improves

6  or stabilizes over time and they no longer have that

7  prognosis, the patient should be considered for

8  discharge from the Medicare hospice benefit.

9     But then they went on to say, remember,

10  however, conversely, patients in the terminal stage

11  of their illness who originally qualify for the

12  Medicare hospice benefit but stabilize or improve

13  while receiving hospice care, yet still have that

14  reasonable expectation of a terminal prognosis,

15  they're still eligible.

16     In other words, what Medicare was saying is,

17  you've got to keep considering it, but just because

18  there's improvement or decline, we are still

19  following the law that "we the people" set.  We're

20  basing it on the doctor's clinical judgment.

21     Now, one of the other patients -- before I

22  get to that, let me -- I want to remember to say

23  this:  When we talk about the discharge for extended

24  prognosis that AseraCare did, that doesn't show that

25  AseraCare was doing something wrong.  It shows that

1    AseraCare was doing exactly what Medicare told
2    AseraCare and the world to do, keep evaluating, look
3    for improvement or stability and have that doctor
4    continually reassess.
5            So the fact of an extended prognosis doesn't
6    mean there was anything wrong.
7            One of the other patients the government
8    talked about in opening statement was someone who had
9    been discharged with an extended prognosis, and they
10   talked about her again today, Ms. Dorothy V. from
11   down in south Alabama.
12           She was the patient that Dr. Allen came to
13   the courtroom to talk about.  And he said she had
14   that saw-tooth decline going on.
15           Now, what did the government tell us in
16   opening statement?  They said, it was wonderful that
17   Ms. Dorothy V.'s health was improving on hospice and
18   they said, you're going to hear that at her fifth
19   month on hospice and her six month on hospice, there
20   was discharge planning underway but, despite that
21   improvement, AseraCare continued to certify her.
22           So the impression that was left was she just
23   kept getting better, better, better, but they held
24   her on there.
25           Well, now -- and let me say, during the

1    trial, the government was talking to Dr. Cooney and

2    they talked about those notes about discharge

3    planning at the fifth and sixth month and said, isn't

4    it true that she wasn't ultimately discharged for

5    extended prognosis for nearly a year.  So that's the

6    impression that was left, that she was being held on

7    there improperly.  But, again, based on what occurred

8    at trial, we found out the rest of the story.  We saw

9    that, in fact, she didn't have a steady improvement.

10   She had a setback.  And one of the setbacks, we saw

11   some documents about a urinary tract infection, and

12   then we saw a note from March of 2010 from Dr. Morrar

13   saying, and he had been to see her, and he said,

14   compared to my last visit, much less responsive and

15   engaging.  Weight down.  Recent UTI may have knocked

16   her down more.  Need to monitor, if returns to

17   preinfection condition, and to evaluate only then for

18   discharge planning.  That's in Defense Exhibit 616-A,

19   Page 6710.

20        So here we've got AseraCare and the doctor

21   doing exactly what they're supposed to do, but again

22   you have to ask, in a case that the government said

23   is all about trust, why were you given a

24   misimpression about what really was going on with

25   Dorothy V.?

6655

1          The government, of course, has the burden of
2    proof in this case, so let's think back for a minute
3    about what the government has submitted in support of
4    their case.
5          As you heard Mr. Wertkin say earlier, the
6    government called some witnesses at the beginning,
7    the first week of trial, who had worked at some -- a
8    few AseraCare agencies around the country.  And
9    you'll remember several of these witnesses had a big
10   financial stake in the outcome of this case because
11   -- but remember, even here at the trial in their
12   testimony, they said oh, we've never given a moment's
13   thought to how much we could get out of this.
14   Really?
15         And then remember, we were asked, we asked
16   them about the agreement that each of them had signed
17   that said, they agreed to cooperate in making all
18   reasonable efforts to maximize the aggregate relator
19   share of the proceeds of the actions.  In other
20   words, maximize how much they got.  But every one of
21   them insisted, oh, I don't think that put any
22   obligation on me.  Well, that's not what the contract
23   says.
24         So you have to wonder, why wouldn't those
25   people fess up to the clear promise they made in that

1   contract?

2          Now, ladies and gentlemen, it's true that a

3   few of those people talked about problems that were

4   going on at a few AseraCare agencies, there was talk

5   for a limited time, there were doctors that didn't

6   come every time, there were IDT meetings where

7   someone was asleep -- and look, if those things were

8   really happening, that shouldn't have been happening,

9   and AseraCare would agree with that.  But whether or

10  not those problems existed, that doesn't establish

11  whether these 121 patients were eligible or not.

12         Judge Bowdre already instructed you earlier

13  today that practices that may be improper standing

14  alone are insufficient to show falsity without proof

15  that specific claims were, in fact, false when

16  submitted to Medicare.

17         So, you know, remember what we're talking

18  about in this case, these 121 and no one connected a

19  dot between that practice and any doctor involving

20  the 121.

21         There was also discussion today about

22  inaccurate and inconsistent facts in the medical

23  records.

24         Well, you heard testimony about why there

25  are inconsistencies in medical records because people

1   look different.  Sometimes at different points in the
2   same day.
3        And as for inaccurate records, look, we have
4   spent two months of our lives reading more medical
5   records than probably any of us ever dreamt we would
6   look at.  And did it seem to you like those records
7   weren't painting a complete picture?  And in
8   thousands of pages of records, if there were an
9   inaccuracy and Dr. Liao said he saw a few, that
10  didn't really impact the ability to look at the whole
11  patient and figure out the eligibility question.
12       Then we heard discussion this morning about,
13  well, there was some testimony that doctors really
14  weren't involved in making their clinical judgments.
15       Now, I ask you, when you heard the testimony
16  of Dr. Allen from south Alabama about Dorothy V. and
17  Dr. Chua about Yvonne R. and Dr. Arcieri about James
18  T., did they sound like they didn't know what was
19  going on with their patient and that they weren't
20  exercising their clinical judgment in saying that
21  those patients were eligible for hospice?  And you
22  heard Judge Bowdre say, there's no dispute that there
23  are signed certifications of terminal illness for all
24  these patients for all the time periods at issue.
25       And remember, we looked at I don't know how

1   many physician narratives that were written by

2   doctors, and we know they were written by doctors

3   because that handwriting was so hard to read.  We

4   must have spent hours trying to decipher it.  And it

5   always said, I certify this -- I've written it myself

6   and this is based on my evaluation.  And then we saw

7   all those face-to-face encounter reports after that

8   came into the law in 2011.  Those doctors went out

9   and looked at the patients and then wrote down the

10  basis of their clinical judgment.

11          Did it sound like those doctors weren't

12  applying their clinical judgment and weren't thinking

13  about these patients?

14          Now, there's something else that's very

15  important, but before I get to that about that

16  testimony, I want to also remind you, some of those

17  witnesses that the government put on the stand didn't

18  really know what the law was.  I mean, Ms. Zaragoza,

19  who was the very first witness, and Ms. Dietrich

20  testified that LCDs alone determined eligibility,

21  which we know is not the law.  And Ms. Adams, who

22  they talked about this morning about her views on

23  eligibility were being ignored, she testified under

24  oath that her view was hospice is appropriate only

25  for people who have three to four weeks to live.

That's not the law either.

Why in the world is the government putting on witnesses to talk about views on hospice that aren't consistent with the law?

This brings us to big moment number three in the case, and this is sort of a collective big moment.

Remember, we had that week's worth of testimony from those witnesses and every one of those witnesses, after telling whatever they wanted to say, were asked three questions:

Number one, you're not saying that every patient that you dealt with with AseraCare was ineligible, are you?  No.  Everyone of them said no, I'm not saying that.  And in fact, many of them were eligible.  Wouldn't you agree with that?  Yes, I agree with that.

And then they were asked the critical question, and isn't it true that in order to decide whether any particular patient is eligible or not, you have to look at the specific facts and circumstances for that patient?  And every single one of them said yes.

And yet, not a single one of those witnesses could tell you one fact or one circumstance about any

1   of the 121 patients at issue.

2          So, essentially, that week of testimony was

3   a distraction from what's really at issue in this

4   case.

5          So how did the government -- if those

6   patients couldn't tell you about the facts that are

7   really relevant, how did the government decide they

8   were going to try to meet their burden of proof in

9   this case?

10         Well, that was Dr. Liao.  And let me say one

11  more thing about those other witnesses.  You heard a

12  lot about, we didn't rebut those witnesses.  We

13  didn't put on evidence.  Of course, we don't have the

14  burden of proof.  But if they didn't have anything to

15  say about the 121, that's not really what's at issue

16  in this case.

17         Now let's talk about Dr. Liao and what he

18  had to say about the 121.  And I suspect, after you

19  heard Dr. Liao testifying for a couple of weeks, and

20  then you heard Dr. Cooney and Dr. Melvin get on the

21  stand, you must have thought you were in a rest of

22  story radio episode.  Because the patients that

23  Dr. Liao was talking about didn't sound anything like

24  the patients, the whole picture of the patients that

25  Dr. Cooney and Dr. Melvin were talking about.  And

1  Judge Bowdre told you on Monday, they all had the

2  same records available to them.  No one was at an

3  advantage or disadvantage with that.

4         But then, we found out that Dr. Liao

5  performed his analysis in a different way.  And there

6  were three significant analytical problems with his

7  analysis, and I suspect you have in mind what they're

8  going to be -- big moments four, five and six in this

9  trial.

10        Big moment four, Dr. Liao testified,

11 remember, he had done some analysis in 2010 and then

12 some in 2013.  He said, in 2013, the government

13 lawyers instructed him to redo his analysis by

14 applying the Palmetto LCDs.

15        And boy did he follow those instructions,

16 because Dr. Liao undertook a check box approach to

17 his analysis of eligibility.

18        If he could find any reason why the LCD was

19 not met, ineligible.

20        And we heard him for day after day after day

21 go through dozens and dozens and dozens of patients,

22 and I suspect your notes, if you took them, will

23 reflect it.

24        Dr. Liao, why was this patient ineligible?

25 Not a FAST 7.

6662

1          Next.  Dr. Liao, why was this patient

2    ineligible?  Not a New York Heart Association Class

3    IV.

4          Next.  Dr. Liao, why was this patient not

5    eligible?  Not a PPS or 40 or less.  Ineligible.

6          Next.  Not a BMI of under 22.

7          Next -- I mean, we heard it, over and over

8    and over.

9          A check box approach which, of course, is

10   not the law.  As Ms. Schultz testified, and as Judge

11   Bowdre has already instructed you, that sort of check

12   box approach is not the law.

13         Now, I know the government got up here today

14   and said, oh, he didn't do that.  And even if you

15   might remember, at the very end of his testimony,

16   Dr. Liao, I think it was on cross-examination, said,

17   oh, I looked at the whole patient and if I remember

18   looking over at the jury, there were several people

19   who looked about as surprised as I was at that

20   statement, because we all heard it.  You know, the

21   old line, if it looks like a duck and walks like a

22   duck and quack like a duck, it's a duck.

23         The process -- the explanation that Dr. Liao

24   gave for his conclusions was a check box approach to

25   determining eligibility.

1    And, of course, the check box approach
2  explains why he was able to spend so much less time
3  in his analysis.
4    If you remember, he said, if you looked at
5  his bill from 2013 and you took the 233 patients he
6  looked at and divided it by the time he spent for
7  reviewing records, it was 13 minutes, 13 minutes a
8  patient to review hundreds and hundreds and hundreds
9  of pages.
10    Now, if you give him the benefit of the
11  doubt, and you add up all the time he spent up until
12  the time he wrote his report, it still is less than
13  one hour per patient.
14    Dr. Cooney and Dr. Melvin said it took them
15  three or four hours just to review the records for
16  most patients.
17    But if you're just looking for an unchecked
18  box, it doesn't take as long.  If you're just looking
19  for an unchecked box, you can delegate most of your
20  note taking to some assistants you choose because
21  you're just looking for something that's unchecked.
22    Now, big moment number five, he didn't look
23  at the patient as a whole.  And how do we know that?
24  He was shown a document for patient Betty H. and if
25  you remember, it had two illnesses listed on the

1    diagnosis line:  Debility and ischemic heart disease.

2    And he was asked by the government's lawyer, what was

3    the relevance of the second diagnosis?

4         And he answered this way:  It's only the

5    first diagnosis that's used in evaluating for hospice

6    eligibility.  It's only the first diagnosis that's

7    used in evaluating for hospice eligibility?

8         Well, remember that jury instruction the

9    judge gave you this morning?  The list of things to

10   consider.  In fact, number one is the primary

11   terminal condition, which is the first diagnosis, but

12   you don't stop there.  That's not all you look at.

13        And yet, that's how Dr. Liao explained his

14   approach and that also explains why -- remember how

15   many times he said just because someone's primary

16   diagnosis switched, they went from being eligible to

17   ineligible to vice versa.

18        Now, that doesn't make a lot of sense

19   because the person didn't change.  Just because the

20   doctor decided that the illness that seemed most

21   contributing to death may have flipped, it doesn't

22   mean they were any better.  That's no basis to change

23   your conclusion, not if you're looking at the whole

24   patient.  But that's what Dr. Liao did over and over.

25        Big moment number six:  His best days

approach.  Remember that?  When asked about dementia

patients who also had depression or some other

psychiatric problem, he said oh, you can't look at

all of their days.  You only have -- you only should

look at their best days.

Remember what Dr. Twaddle said about that?

She said, the best days you consider as one data

point.  And she said, if the best day turns into a

trend, then you pay it more attention.  And she

illustrated that with the story of the wife of the

church organist.  Do you remember that?  Where she

talked about this lady who was, I think, a FAST 7D,

hadn't had any speech in a long time and yet one day

she was in the activity room at the nursing home and

all of a sudden she started singing harmony.

Dr. Twaddle said, it must have touched something deep

within her.  Dr. Twaddle was asked, did that mean you

needed to change her terminal prognosis?  And she

said no, it was merely a day to celebrate.

But it wasn't -- just because that was her

best day, that didn't change the overall picture.

And that was reflected, remember, I think it was

Plaintiff's Exhibit 277, the article about FAST, the

Reisberg article that we looked at, felt like a 150

times?  Remember it said, people can have lost speech

1  for months and yet all of a sudden briefly regain

2  some words.  Have a best day.

3        But it said, that doesn't mean your terminal

4  prognosis is different or you're going back up the

5  FAST scale.

6        Yet, Dr. Liao's approach was you only look

7  at the best days.  Wrong based on that article; wrong

8  based on the real world experience of Dr. Twaddle.

9        Let me tell you, Dr. Liao was a curious

10 choice to be the expert in this case.  If you were

11 going to instruct someone, apply the Palmetto LCDs,

12 wouldn't you think you would get someone like

13 Dr. Cooney or Dr. Melvin who applied Palmetto LCDs

14 everyday?  But Dr. Liao said he had never even looked

15 at them before.  And the government went all the way

16 to California to get a medical school professor and

17 they didn't choose just any medical school, they

18 chose the University of California-Irvine, which we

19 found out, at the time they hired Dr. Liao, they

20 happened to have a False Claims Act case pending

21 against that medical school.  And Dr. Liao said --

22 UC-Irvine had every reason to make the government

23 happy.  They had a special rate for the government

24 for experts and even though it was half of what

25 Dr. Liao had charged ten years earlier, that was

1   Dr. Liao's rate.  And Dr. Liao's boss said, you go

2   right ahead.

3           There are other reasons to question

4   Dr. Liao's credibility.  There were times, during his

5   testimony, when it seemed like he had crossed the

6   line from being an expert to being an advocate for

7   the government.

8           And remember, it seemed as though Dr. Liao

9   got to the point where he wasn't really calling it

10  straight on what the medical records said.  He

11  wouldn't yield either.  He insisted that they said

12  what he needed them to say to get to where he wanted

13  to go.  And frankly, some of his interpretations of

14  those records were ridiculous.

15          The first one that comes to mind was Ruth

16  S., who I think was talked about a few minutes ago.

17  Remember Ms. Ruth S., there was a box in the

18  dependence and activities of daily living section

19  that wasn't checked.  Ambulation to bathroom was not

20  checked.

21          And Dr. Liao said that means she was able to

22  ambulate to the bathroom.

23          But then, in that same document, it said,

24  well, she's incontinent of bowel and bladder, so it's

25  not clear what reason she had to be going to the

1  bathroom, especially since she was dependent for

2  bathing, she only got out of bed to a Broda chair via

3  a lift and she was unable to bear weight and is a

4  FAST scale 7C, which is, you may remember, means

5  non-ambulatory.

6          Now, how in the world can you take what's on

7  that page of the document and insist that that

8  unchecked box means able to ambulate?

9          But in the check box approach of Dr. Liao,

10 that's how he did it.

11         Then we had Edward O.  Remember Mr. Edward

12 O. was the man who had chest pain so bad that

13 Nitroglycerine wouldn't help.  And to give him

14 relief, they had to give him that concentrated liquid

15 Morphine, and it would usually take three doses every

16 15 minutes to get him relief.  And there was a

17 medical record -- and you will remember, and you can

18 look in the jury room, that was documented over and

19 over and over in the medical records and then there

20 was this record that said, patient does not respond

21 to Nitroglycerine during chest pain episode.

22 Roxanol, the concentrate Morphine, is given until

23 subsides.

24         Yet, when Dr. Liao was asked, isn't

25 Mr. Edward O. being given Morphine for chest pain, he

1   said, that's unclear.  Morphine is given for a lot of

2   reasons.

3           Come on.  You can't read that medical record

4   and come to that conclusion.

5           You also heard that Dr. Liao say that a

6   number of patients on the day of or the day or two

7   before their death, even then, they were not

8   eligible.  Even then, imminently dying, they did not

9   have a terminal prognosis.

10          We saw Ms. Mary A.  Remember?  Now here's a

11  check box that he didn't want to pay a lot of

12  intention to.  Imminently dying.  Respiration rate

13  44, when we heard normal was 12.

14          And then you saw, a page or two later in the

15  record, it had gone through all the signs of pending

16  death -- the mottling, skin, all of those things and

17  it said son Larry present for visit, he wished that I

18  show him the signs that I see confirming approaching

19  death.

20          And yet, even though all of that was in the

21  medical record, Dr. Liao insisted, even then, that

22  death -- the person did not have, Mary A., did not

23  have a terminal prognosis.  Not credible.

24          You saw it with your own eyes.  You heard it

25  with your own ears.  These are just a few of the

1  examples.  I could go on for a long, long time, and

2  I'm sure you remember a lot more than I do.

3       But you have to decide, did it get to the

4  point where you really have to ask yourself, has he

5  destroyed his own credibility by reaching so far and

6  straining the meaning of these records really beyond

7  the breaking point.

8       You know, at the end of the day, you don't

9  have to decide whether Dr. Liao was wrong, whether

10  because of any of the three big analytical errors, or

11  whether his testimony had gotten to the point where

12  he had destroyed his own credibility.  Why don't you

13  have to decide if he was wrong?

14       Big moment number one:  Mary Jane Schultz

15  saying, two doctors can look at the same medical

16  record, come to different conclusions based on

17  clinical judgment, and neither one be wrong.

18       Now, make no mistake, by basing their entire

19  case on Dr. Liao, the government is trying to change

20  the law and the rules that apply.  Notwithstanding

21  what they say, the only take away from their

22  approach, their check box approach, is that LCDs are,

23  in fact, controlling.

24       You heard them say well, you've got to have

25  criteria.  "We the people" set the criteria.  The

1  clinical judgment of the doctors closest to the

2  people.

3        The only way to take what Dr. Liao says is

4  the rule becomes you don't have to look at the whole

5  picture, oh, terminal prognosis is pretty much an

6  exact science, despite Medicare telling the world

7  it's not, and second guessing of doctors is just

8  fine.

9        Essentially what happens is Dr. Liao's view,

10  his clinical judgment, becomes the law.

11        Now, think about it.  Dr. Liao, obviously,

12  says he's right.  And he says -- he disagreed with

13  all those regular doctors -- Dr. Allen, Dr. Chua,

14  Dr. Arcieri and the dozens of other regular doctors

15  who certified their own patients as having a terminal

16  prognosis.  Dr. Liao went so far, you heard it over

17  and over, to question years after the fact in

18  hindsight, to question, I don't think the doctor was

19  prescribing the right medicine or I don't think they

20  were giving the right dose for a medicine.

21        Years later, he's questioning the clinical

22  judgment down to that level of those doctors.  He's

23  also questioning the clinical judgment of dozens and

24  dozens of hospice doctors.  He's basically saying

25  they're wrong, not just disagree, wrong.  The regular

6672

1   doctors are wrong.  The hospice doctors are wrong.

2   Dr. Cooney, wrong; Dr. Melvin, wrong.

3           Remember those handpicked doctors he helped

4   to prepare his notes?

5           Now, these were people he trained, who were

6   board certified hospice doctors, who he said were

7   engaged daily in certifying people for hospice, and

8   yet, whenever they disagreed with him, wrong.

9           And then we found out, of course, that

10  Dr. Liao even disagreed with himself.  And he was

11  asked -- remember, if you look in the evidence pile,

12  there's a piece of paper where he signed showing all

13  of the patients where his opinion changed between

14  2010 and 2013, even though it was the same patient

15  and the same medical records, and when he was asked

16  he said, oh, I was a different Dr. Liao in 2010 than

17  I was in 2013.

18          How in the world could AseraCare have known

19  that hospice eligibility would be determined by

20  Dr. Liao's personal clinical judgment alone?  It is

21  totally, completely arbitrary.  Dr. Liao becomes the

22  law.

23          And they say, oh, look at all these time

24  periods when Dr. Liao agreed with people.  Well,

25  that's fine.  But realize what they're saying is,

1  whenever Dr. Liao disagrees with anybody, Dr. Liao is
2  absolutely right and the others are absolutely wrong.
3       When they made a prognosis, it was untrue
4  when made.  That's not the law.  And there's no way
5  AseraCare could ever know what Dr. Liao would have
6  been thinking on any specific day.  He can second
7  guess anybody in his hindsight analysis and, if
8  that's the rule, then what "we the people" acting
9  through Congress made the law, which is we're basing
10 this benefit on the clinical judgment of doctors
11 closest to the scene, then that law is turned upside
12 down.
13      Now, the government now says, you heard it
14 today, they're not really second guessing the
15 doctors.  It's there's not records to support it.
16 That's semantics.  That's double talk.
17      What's really going on here, you saw
18 Dr. Cooney and Dr. Melvin and they would state their
19 reasons, and then they would go through medical
20 records, and they would be right there, all of the
21 bases they offered for their testimony.
22      There was support in those medical records
23 for their approach and their testimony.
24      It's not a question of the clinical judgment
25 not supporting it, what they're really saying with

1  that is, the documents don't support a check box

2  approach.

3          It's just another back door argument to get

4  to the same place which is, even though "we the

5  people" decided something else, we really think there

6  ought to be check boxes; we really think there have

7  got to be some criteria that absolutely apply and, if

8  you don't meet them, then your clinical judgment is

9  disregarded.  Not the law.

10         It has been a great privilege for me, and

11  for everyone on our AseraCare team, to speak on

12  behalf of Angie Hollis, AseraCare's president, and

13  all the hard-working caregivers who make up

14  AseraCare.  And like the government, we thank you.

15  This has been a long case.  It's required a lot of

16  attention.  And we appreciate the seriousness with

17  which you are taking your job.

18         Now, because the government has the burden

19  of proof, they get to go first today and they get to

20  go last.  Obviously, when they stand up, they know

21  whatever they say, I don't have a chance to respond.

22         So I'm going to count on you, as they're

23  making their argument, to think about how would

24  AseraCare answer that argument.

25         I told you we had six big moments in this

trial.  We're about to get to big moment number seven
and that's when you go back in that jury room and
make the decision in this case.

Now, we all hear a lot about abuse of
government programs, about healthcare providers who
bill for services that were never provided.  I heard
the other day about someone billing a government
agency $800 for a pencil holder.

If there are false claims in cases like
that, there need to be consequences.

But this situation is nothing like that.
AseraCare takes its obligations to its patients very
seriously, every single one.

And AseraCare followed the law in taking
care of these 121 patients.  When these 121 patients,
who were eligible, chose the hospice benefit, they
were entitled to services and medicine and equipment
and that's what -- and that's what AseraCare
provided, and AseraCare did that trusting that the
government was going to stick to the law and stick to
the rules.

Now, AseraCare believed then and believes
now that these 121 patients were eligible.  And
AseraCare disputes absolutely and emphatically that
it submitted a single false claim, and yes, that

1    includes William T. and Norman K. because even though

2    Dr. Liao and Dr. Cooney and Dr. Melvin had a

3    different clinical judgment, that's no reason to say

4    that the doctors who reached the clinical judgment

5    that they did on those patients were wrong.

6         And you saw, there's a lot of evidence,

7    there's a lot of back up in their medical records for

8    how sick those two gentlemen were.

9         Ladies and gentlemen, I submit to you that

10   there is no way the government can win this case, if

11   the law that is in place is applied, if the rules

12   that are in place are applied.  The checklist

13   approach that Dr. Liao's evidence is based on is not

14   the law.  The whole patient approach used by

15   Dr. Cooney and Dr. Melvin, that's the law.  Dr. Liao

16   does not have clinical judgment that rains supreme

17   over the rest of the world.  When he says something,

18   anyone who disagrees is wrong, and if someone files a

19   claim, based on that different clinical judgment,

20   it's that false claim, that is not the law.

21        For the life of me, I cannot figure out why

22   the government is wanting to change the rules, not

23   follow the law in place.  Why this check box

24   approach, which is underlying it, why it's going on

25   but then again, there's a lot of things the federal

1   government does that I don't understand.

2        Maybe there's someone in the administration

3   who thinks clinical judgment shouldn't be the

4   standard for eligibility.  I don't know.

5        But let me say this:  Some day, we the

6   people, may decide to change the basis for

7   eligibility for the hospice benefit.  But the way it

8   works in our system is that has to be done in the

9   halls of Congress in Washington, not in a courtroom

10  in Birmingham, Alabama.

11       Recognize that, during your deliberations,

12  compromising and finding even one claim to be false

13  would mean that the government can look in hindsight

14  and say that one or more of these 121 patients and

15  their families were not eligible for the benefits

16  under the hospice benefit simply because the patient

17  wrote his or her own story in a way that deviated

18  from the normal course.

19       A compromise even as to one patient would

20  mean that only Dr. Liao's judgment is right and the

21  clinical judgment of the doctors closest to the

22  patients are wrong.

23       When you get back to the jury room, if you

24  believe that the government's case is not based on

25  the actual law and the actual rules, then you have to

1  stand firm and say, no false claims.  Not a single

2  one.

3          When you get back in that jury room, when

4  you start on big moment seven, I want you to go back

5  to big moment number one, Mary January Schultz

6  testifying that two doctors can review the same

7  medical record using their clinical judgment, come to

8  different conclusions on prognosis, and neither one

9  be wrong.

10         In light of that, unless you believe that

11 the government has done the impossible and shown that

12 Dr. Liao's clinical judgment is the only one that can

13 be right, and the clinical judgment of the regular

14 doctors and the hospice doctors and Dr. Cooney and

15 Dr. Melvin, and even his reviewing doctors that he

16 chose, those cannot possible be right, the government

17 hasn't shown that.  And if they haven't shown that,

18 then you have to say no false claims.

19         The law that actually applies and the

20 evidence that you've heard in this courtroom lead to

21 only one conclusion:  There are no false claims.

22         Ladies and gentlemen, were there any false

23 claims in this case?  No.  121 times no.

24         THE COURT:  Thank you.  Ladies and

25 gentlemen, we'll have about 20 minutes of more -- I

6679

```
 1    think the government has about 12 minutes and I've
 2    got maybe about ten minutes or less to go over with
 3    you.  So I'm going to let y'all take a break right
 4    now and we'll come back, and then after that, you can
 5    have your lunch.  But I think there's some snacks in
 6    there maybe that will hold you over until then.
 7                  So let's come back at 1:00 o'clock.
 8                        (Jury excused.)
 9            MR. WERTKIN:  May we approach for one
10    second, please?
11            THE COURT:  All right.
12                        (SIDEBAR)
13            MR. WERTKIN:  Your Honor, during closing
14    argument, counsel for defendants said that we know
15    that the narratives were written by doctors because
16    of the handwriting.  We move that that testimony --
17    that the testimony defense counsel provided should be
18    stricken.
19            There's been no evidence about handwriting.
20    There's been no evidence that the narratives were
21    written by doctors.  If counsel had said perhaps you
22    can assume or some other qualifier, perhaps it would
23    be permissible.  But the way that that came out, we
24    know that the narratives were written by doctors
25    because of the handwriting, the jury should be
```

1   instructed that we do not know that the narratives

2   were written by doctors.

3        THE COURT:  That that's a reasonable

4   inference that they could draw from the type of

5   handwriting that was seen.

6        MR. WERTKIN:  If Your Honor would like to

7   limit that instruction in that way, that would be

8   fine, but we think the jury needs to be advised that

9   we do not know that the narratives were written by

10  doctors because of the handwriting.

11       MR. LEMBKE:  Your Honor, it is, in fact, a

12  fair inference.  I said we can tell from that

13  handwriting that so was so hard to read, it had to be

14  written by a doctor.  And, of course, the narratives

15  almost all said, I certify that I composed this

16  narrative.

17       So I don't think there's any basis at all

18  for an instruction.  This is a fair inference from

19  the evidence that the jury heard.

20       THE COURT:  If they weren't written by

21  doctors, they must have been written by chickens

22  scratching.

23       MR. WERTKIN:  So is that denied, Your Honor?

24       THE COURT:  That's denied.

25                    (Brief recess.)

1                    (Open court.  Jury not present.)

2            THE COURT:  Okay.  I understand you've got

3    -- Carolyn, are you the one that's got the issue?

4            MS. TAPIE:  Yes, Your Honor, but I don't

5    have the instruction.

6            THE COURT:  Submitted?

7            MS. TAPIE:  That's correct, Your Honor.

8            THE COURT:  All right.  The problem is with

9    this word submitted certifications.  The problem I

10   have with changing it is this language that says

11   documentation that support the medical prognosis must

12   accompany each certification, and I know it has to be

13   filed in that, but to me that sounds like accompany

14   it when it's submitted.

15           MR. LEMBKE:  What about obtained?

16           THE COURT:  Obtained certifications?  Would

17   that --

18           MS. GUNASEKERA:  Your Honor, our suggestion

19   I think at one point was the parties do not dispute

20   that certifications appeared in the medical record

21   for each patient.

22           THE COURT:  Okay.  They appeared magically

23   by some, you know, it was that AseraCare was required

24   to have them; right?

25           MS. GUNASEKERA:  That's correct, Your Honor.

```
 1            MS. TAPIE:  I think obtained, I think
 2   obtained works.
 3            THE COURT:  Obtained instead of submitted.
 4            MR. LEMBKE:  No objection.
 5            MS. TAPIE:  Yes, Your Honor.
 6            THE COURT:  I just was trying to do
 7   something quickly on the fly, and I apologize for
 8   that, but I do think it was needed to clarify to the
 9   jury that they have they don't to look through the
10   COTIs for everything.
11            MR. LEMBKE:  Yes, Your Honor.
12            THE COURT:  I will make that change.  I
13   understand y'all have 12 minutes left.
14            MS. GUNASEKERA:  Yes, Your Honor.  Thank
15   you.
16            THE COURT:  And I think we will talk to
17   Ms. Beese while we let the others go get lunch.  I
18   usually tell them that they can select their
19   foreperson before Frankie gets the exhibits back to
20   them and that way we can take up any issues that
21   we've got, but I'm going to tell them the first thing
22   they need to do is go to lunch.  And when they come
23   back, they can choose the foreperson and the exhibits
24   will be ready and no talking until they get back in
25   there.
```

```
 1                    (Brief recess.)

 2                    (Jury present.)

 3           THE COURT:  Mr. Wertkin, you may proceed.

 4           GOVERNMENT'S REBUTTAL ARGUMENT

 5           MR. WERTKIN:  Ladies and gentlemen, the

 6    standard to apply in this case is the preponderance

 7    of the evidence standard, which means is it more

 8    likely than not that AseraCare submitted false

 9    claims.

10           It's not beyond a reasonable doubt, it's

11    just, is it more likely than not.

12           Now, you heard defendant's arguments, and

13    you didn't hear defense counsel talk about testimony

14    from any of the -- any AseraCare doctors or medical

15    directors.

16           You didn't hear, in this case, a single

17    witness who testified that AseraCare doctors were

18    exercising their clinical judgment based on accurate

19    and complete medical records.

20           You didn't hear from a single AseraCare

21    employee who testified that AseraCare's medical

22    directors carefully considered and recommended

23    hospice.

24           You didn't hear from these people.  So, as a

25    result, the defendant's case that you just heard is
```

1   really more about confusion and confusing you.

2        We ask that when you go back into that jury

3   room that you try to cut right through that

4   confusion.  Because in this case, there is only one

5   right answer, and we hope that -- and I want to talk

6   a little bit about that right now.

7        You heard a lot about a big moment where

8   Palmetto's representative Mary Jane Schultz came and

9   testified and you must have heard at least six or

10  seven times that Mary Jane Schultz said that if two

11  doctors looked at a record, they can have different

12  conclusions.

13       Well, Mary Jane Schultz came to talk about

14  Palmetto's process.  She came to say that Palmetto

15  does a medical review process and they look at

16  medical records and if the medical records of the

17  clinical documentation doesn't support a

18  certification of terminal illness, then the claim is

19  not payable.

20       That's why Ms. Schultz was called as a

21  witness in this case, and I mentioned to you in my

22  statement that you now share that responsibility.

23       Well, I'm not really sure if Ms. Schultz

24  made some comment out of context but to be clear,

25  Judge Bowdre has instructed you that what the lawyers

1   say is not evidence.  And I ask you to consider Mary

2   Jane Schultz's testimony for what it was.

3         Mary Jane Schultz talked about Palmetto and

4   the LCDs and the medical review process.  And to

5   think for one second that Mary Jane Schultz came in

6   and said that somehow there could not be a false

7   claim because a doctor had signed a form, that

8   doesn't make any sense.  That's not consistent with

9   the rest of her testimony.

10        Her testimony is that the medical records

11   and other clinical documentation in the record must

12   support the terminal prognosis.  And that is

13   consistent with how the judge has instructed you in

14   this case.

15        So keep that in mind when you consider why

16   did Mary Jane Schultz come and testify in this case

17   and what does Palmetto require for a claim to be

18   reimbursable.

19        You also heard Dr. Liao's approach described

20   as a check box approach.  Do you remember that?  A

21   check box approach?

22        That's kind of an interesting argument.  You

23   saw a ton of medical records where there were boxes

24   and those boxes were checked; right?

25        Those were AseraCare forms.  Those were

1  AseraCare forms that said on the top of them, local

2  coverage determinations and criteria met or criteria

3  not met.

4         And how AseraCare nurses went about their

5  business in evaluating patients is checking those

6  boxes because that's what the forms were.  It would

7  be weird if none of those boxes were checked; right?

8         Dr. Liao went through and he used those

9  check boxes, yes or no, to get a sense of what the

10  patient was looking like, based on the nurse's

11  assessment.

12         To now hold Dr. Liao responsible for relying

13  on the check marks that the AseraCare nurses made on

14  the AseraCare forms, it just doesn't make any sense.

15         Dr. Liao testified that he relied on sound

16  scientific principles, and he applied the sound

17  scientific principles to underly the LCDs.  That is

18  what he did.

19         Did he use forms that AseraCare created and

20  AseraCare filled out to do his evaluation?  Of course

21  he did.  That's what's in the medical record.

22         But it doesn't make any sense to argue that

23  this is some kind of check box approach that's

24  different or changing the rules or something like

25  that.  It's just not credible.  And we ask that you

1    discount that argument.

2         If you take the idea that two doctors -- as

3    long as AseraCare can get a doctor to sign a form

4    there can never be a false claim, that's that blank

5    check that I was telling you about earlier.  That's

6    the blank check that AseraCare is asking you to give

7    them.  And that is not how Medicare works.  It's not.

8         We heard testimony about that from Katie

9    Lucas, the CMS representative, and from Mary Jane

10   Schultz, the Palmetto representative.  We are here

11   today because that's not how it works.

12        Clinical information and other documentation

13   in the record must support the terminal prognosis and

14   that's what you're here to decide, and it's

15   completely proper for you to do that.  That's what

16   you're being charged to do.

17        Now, I told you a minute ago that you didn't

18   hear about what AseraCare witnesses say because we

19   didn't hear from AseraCare medical directors and

20   nurses.  And instead, there was some confusion going

21   on.  And I know Eva talked about how she thought,

22   wasn't it confusing when AseraCare's experts were

23   testifying about periods that were not at issue in

24   the case?

25        Well, I don't have enough time to go through

1    all the patients that were raised by the defense

2    counsel, but the first one that he talked about was

3    Donna W. and he followed the same script.

4            First he told you that Donna W. was on a

5    ventilator and she wrote a note to take off the

6    ventilator.  Yes, that's true.

7            But he didn't tell you that Dr. Liao found

8    Donna W. eligible for the first two or three months

9    that she was on hospice.

10           It's true that she was on a ventilator, and

11   that's a sad fact about her condition, but it's

12   misleading because Dr. Liao agrees that this patient

13   was eligible during that time period.

14           Then counsel assumes that the medical

15   director who was caring for Donna W. in the

16   Clarksville, Tennessee office, had exercised her

17   clinical judgment.  There's no evidence of that.

18           In fact, if you go to the medical record,

19   Government Exhibit 331-B, you'll see that her medical

20   record shows that she was not being optimally treated

21   for her heart condition for years.  Ms. Donna W. was

22   on hospice a year -- a month shy of three years.

23           Again, the question is, who is telling the

24   whole story.

25           Donna W. was not eligible for hospice during

that time period because she was not terminally ill
with a prognosis of six months or less to live.

You also heard about choice.  You heard that
patients make a choice to enter hospice and that's
absolutely true.  Patients do make a choice to go on
hospice.  They make a choice to enter hospice, and
when they do that, they make a choice to give up
curative care.

Now, hospice companies should not be taking
advantage of vulnerable people faced with that
personal choice.  Dr. Melvin testified that when
telling someone that they are terminally ill, could
affect the choices that they make.

So, if a hospice nurse or hospice doctor
tells someone, I think you're terminally ill, isn't
it possible that that would affect the choices that
they make?

We also heard defense counsel talking about
the tens of thousands of claims that AseraCare serves
or submits.

In this phase of the case, you have only
heard about the 233 records that Dr. Liao reviewed
and the 121 claims that he found were false.

You have not heard any testimony or any
information about every -- all the other tens of

1    thousands of claims.

2          We don't know if those are valid claims or

3    not valid claims because we haven't heard any

4    evidence about it.  But given what you've heard about

5    AseraCare's general practices, the testimony that

6    those nurses gave, that I talked about earlier,

7    instructing nurses to admit ineligible patients,

8    pre-signing documents, the idea that AseraCare has

9    50,000 patients on, that's a scary thought.

10         This case is not about six big moments or

11   seven big moments.  This case is about 121 patients.

12   They are real people.  They are not just tabs in a

13   notebook.  They are real people with real families

14   and they have an absolute right to expect that they

15   would be provided with the right care at the right

16   time.  That's what they expected and that's what they

17   deserved.

18         THE CLERK:  Three minutes, counselor.

19         MR. WERTKIN:  I have three minutes left.

20   And I will leave you with this last point.  AseraCare

21   is asking you to find that a hospice provider could

22   never be found to submit false claims as long as they

23   get a physician to sign a certification of terminal

24   illness, to put their signature down on a page.

25         And what we're asking is to not -- that's

1   incorrect.  That's not the law.  That's not the

2   testimony that you've heard about, and that's not

3   reflected in the instructions that you were given.

4           And protecting the hospice benefit, in this

5   case, means finding that AseraCare needs to show that

6   there was clinical documentation in the record to

7   support the terminal illness.  And that means

8   checking "yes" and writing the dates that you find

9   that the patients were ineligible.

10          You have been empowered, in this case,

11  against an untrustworthy hospice company.  But your

12  verdict in this case will go well beyond the

13  corporate offices at AseraCare, because your verdict

14  will protect integrity, your verdict will protect

15  Medicare, and your verdict will protect patients.

16          Thank you.

17          MR. LEMBKE:  May we approach?

18          THE COURT:  Yes.

19                    (SIDEBAR)

20          MR. LEMBKE:  Your Honor, we have three

21  objections.  Objection number one is the last

22  statement about your verdict will protect Medicare.

23  That violates the clear 11th Circuit rule, golden

24  rule, that you can't appeal to the fact that the jury

25  may be a beneficiary.  And since all of those people

1  are future Medicare beneficiaries, they shouldn't be

2  saying that.

3       Number two, just before that, he said

4  AseraCare needs to show that there is evidence in the

5  record to support it.  That is not correct.  That is

6  not the burden, and the jury should be instructed

7  that is not the burden.

8       Lastly, he said, talking about the other

9  claims besides the 233, we don't know if those claims

10 are invalid or valid because there's no evidence

11 about those other claims.  This court prevented any

12 evidence about the other claims from being included

13 in evidence, and the jury should be told we had no

14 opportunity to do that.

15      MR. WERTKIN:  Your Honor, in regard to the

16 last one that was made, I thought it was -- I tried

17 to make it very clear to the jury that those were not

18 at issue in this case, and there was no evidence

19 about it.  That was what I talked about in terms of

20 -- it was responding to their point about they

21 mentioned 50,000 claims, and I was just sayings those

22 other claims are not in evidence.  There's no issue

23 about those other claims.  That's what the context of

24 that was.

25      And the second one -- can you tell me what

1   that context for the second one is?

2            MR. LEMBKE:  Well, Your Honor, on the first

3   one, you then went on to state, that's a scary

4   thought.

5            The second one was you said that AseraCare

6   needs to show that there's evidence in the medical

7   record to support this.  AseraCare has no obligation

8   in this courtroom to show anything.

9            THE COURT:  The burden of proof is on the

10  government to show that there's not --

11           MR. WERTKIN:  I was talking about in the

12  context of Palmetto, Palmetto regarding --

13           MR. LEMBKE:  No.

14           THE COURT:  That's not the way I heard it

15  either.

16           MS. GUNASEKERA:  I think what Mr. Wertkin

17  was intending to say was --

18           MR. LEMBKE:  It doesn't matter --

19           THE COURT:  It doesn't matter what he was

20  intending to say, Eva.  It's what he said.

21           MS. GUNASEKERA:  Understood, but it goes

22  back to the clinical documentation straight from Your

23  Honor's jury instructions that AseraCare did not have

24  the clinical documentation to support --

25           THE COURT:  But it's the government's burden

1   to show that, not AseraCare's.

2           MS. GUNASEKERA:  I understand, Your Honor.

3           MR. LEMBKE:  You're not going to be able to

4   read it, I'm afraid, Your Honor.  I could be a

5   doctor.

6           The other one, Your Honor, was that

7   Mr. Wertkin said AseraCare needs to show that there

8   is evidence in the medical record to support the

9   clinical judgment, I believe, is what he said.

10          MR. WERTKIN:  Not in the context of

11   Palmetto.

12          MS. GUNASEKERA:  I thought it was.

13          MR. LEMBKE:  And the government has the

14   burden.  AseraCare does not have the burden.

15          THE COURT:  All right.

16          MR. LEMBKE:  Then there was the discussion

17   about with regard to the claims other than the 233

18   that have been mentioned here in the courtroom, there

19   was talk about we don't know if they're valid or

20   invalid because there's no evidence about those other

21   claims.  And the Court's prior rulings restricted the

22   ability of the parties to put on evidence about

23   anything other than the 233 claims.

24          MR. WERTKIN:  Your Honor, if you're inclined

25   to give that instruction, may I be heard on it?

1          THE COURT:  All right.

2          MR. WERTKIN:  I clearly stated before that

3   that those claims were not at issue, and they're not

4   being asked to decide that.  And just out of, you

5   know, out of the court's deference, I would

6   appreciate pointing that out that, but I mentioned

7   that these claims were not at issue, and they're not

8   -- and to the extent that, you know, the Court wants

9   to give other instructions, but I think, you know,

10  the defense raised the issue of the 50,000 claims and

11  the government, you know, just picked a couple, and

12  there's lots of other claims, and I was just

13  responding to that and trying to do it in a way to

14  make it very clear that those are not an issue.

15         And I really do -- I really do think I did

16  that, Your Honor.

17         THE COURT:  Not when you went on to say, and

18  that's a scary thought.  That was insinuating that --

19         MR. LEMBKE:  All these others are bad.

20         THE COURT:  Right.  And then the third one?

21         MR. LEMBKE:  The third one was, at the very

22  end of his statement, he started talking about

23  protection of Medicare.  And the problem was he did

24  it in a way that extended it beyond this case, such

25  that, you know, since everyone in our society,

1  including those in the jury box, may end up on

2  Medicare, that's the old 11th Circuit golden rule

3  that you're not supposed to appeal to a fact that the

4  jury may be a tax payer or a beneficiary or whatever.

5          MR. WERTKIN:  Your Honor, the rule is

6  putting the jurors in the shoes of the party.  That's

7  what the rule is, and I clearly did not do that.

8          MR. LEMBKE:  The 11th Circuit goes beyond

9  that to tax payers.

10         THE COURT:  Yet, it's pretty --

11         MR. WERTKIN:  I didn't refer to tax payer at

12 all.

13         THE COURT:  You said Medicare beneficiaries

14 protect it.

15         MR. WERTKIN:  We've been talking about

16 patients.  Everyone on the jury is a prospective

17 Medicare patient.  That's true.  We've been talking

18 about patients for the entire case.  So the idea that

19 the Medicare benefit in this case is at issue, that

20 is what that statement -- I don't know how else to

21 say it.

22         MR. LEMBKE:  It's the very end.

23         THE COURT:  Can you read his last statement

24 to the jury, last couple of sentences?

25         MR. WERTKIN:  This is probably close if you

1  want to take a look at it.  I don't know if these are

2  the exact words.

3          THE COURT:  That's close to it.  It's this

4  part that really, I think, goes to our -- I thought

5  for a minute we were going to get the send a message

6  argument.

7          MR. LEMBKE:  I did, too, but I was on my

8  hair trigger for that one.

9                      (Brief pause)

10                     (Record read.)

11          (Open court.  Jury present.)

12          THE COURT:  Ladies and gentlemen, I need to

13  remind you, once again, that the arguments of counsel

14  are not evidence in this case.

15          And I want to particularly point out that

16  contrary to Mr. Wertkin's statement that AseraCare

17  needs to show evidence to support that the patients

18  were eligible -- in this case, the government is the

19  one who has the burden to show that the patients were

20  not eligible.

21          AseraCare does not have the burden of proof

22  as to any issue in this case.  It remains with the

23  government.

24          Also, Mr. Wertkin made reference to other

25  claims that have not been presented in this court and

1    not knowing whether those claims were valid or

2    invalid.

3         I think I've told you all along that this

4    phase of the case is limited to now just 121

5    patients.  And you should disregard his comment about

6    the others.

7         Then Mr. Wertkin, in essence, urged you to

8    protect patients.  Your job is not to protect

9    patients or any patient rights.  Your job is to

10   determine whether the government has proven by a

11   preponderance of the evidence that any of the claims

12   for the 121 patients at issue were false.

13        And, ladies and gentlemen, I need to give

14   you a few little instructions and then send you to

15   lunch.  I think I've heard some stomachs rumbling

16   from that direction, so we want to get you there.

17   But I do need to give you some instructions about how

18   you will conduct yourselves during deliberations.

19        Again, as I said, you should not consider

20   what the lawyers say to be evidence and should not

21   substitute what the lawyers say for your own

22   recollection.

23        Neither should you decide the case based

24   upon the eloquence of the lawyers and their

25   arguments.  You must decide the case based solely on

1   your view of the facts, as you find them to be from

2   the evidence, and then applying the law that I've

3   instructed you to those facts.

4           In this case, you've been permitted to take

5   notes during the course of the trial, and I think all

6   of you have been using those juror notebooks that

7   you've been given, and have taken advantage of the

8   opportunity to make notes.

9           You will have those notes available to you

10  during your deliberations, but I need to caution you

11  as to how you should use them.

12          You should make use of them only as an aid

13  to your memory.  In other words, you should not give

14  your notes any precedence over your independent

15  recollection of the evidence or the lack of evidence,

16  and neither should you be unduly influenced by the

17  notes of other jurors.

18          I emphasize that notes are not entitled to

19  any greater weight than the memory or impression of

20  each juror as to what the testimony may have been.

21          Your duty as jurors will be to discuss the

22  case with one another and consult with one another i

23  an effort to reach agreement, if you can do so.

24          Each of you must decide the case for

25  yourself but only after full and impartial

1   consideration of the evidence with the other members

2   of the jury.

3          While you are discussing the case, do not

4   hesitate to re-examine your own opinion and change

5   your mind if you become convinced that your initial

6   opinion was wrong.

7          But, do not give up your honest beliefs as

8   to the weight or affect of the evidence solely

9   because others think differently or merely to reach a

10  decision.

11         Remember, in a very real way, you are

12  judges, judges of the facts, and judges of the

13  credibility of the witness.  Your interest is to seek

14  the truth from the evidence in the case.

15         When you go to the jury room after lunch,

16  I'm going to insist that you go to lunch first, but

17  then when you're back in the jury room, you should

18  select one of your members to act as your foreperson.

19  That foreperson will guide your deliberations and

20  will speak for you in court.

21         As I've already told you, in phase one, you

22  have one question to answer:  Whether the United

23  States proved by a preponderance of the evidence that

24  AseraCare made false claims to Medicare for hospice

25  services for any of the 121 patients at issue now for

1    all or a portion of their hospice admission.

2            That one question, however, as you've

3    probably guessed, has 121 subparts.  You will need to

4    answer that question as to each of the 121 patients

5    at issue.

6            When you get back from lunch in the jury

7    room, you will have in there a document entitled

8    special interrogatories to the jury, phase one.

9    You've seen portions of this document demonstrated

10   for you.  It lists each of the 121 patients and has

11   their name and their number that you have in your

12   jury book and you answered either "yes" that

13   AseraCare's claims for that patient were false, and

14   if you answer "yes," then you come below and you fill

15   in that time period that you find the patient was not

16   eligible for hospice or that AseraCare made false

17   claims.

18           And as it's been demonstrated to you, it

19   could be for the entire period or it could be a

20   portion of the time that the person was in hospice.

21           So, if you find that there was a false claim

22   for one of the patients, you need to identify the

23   time period.

24           If you find, instead, that the government

25   did not prove by a preponderance of the evidence that

1   AseraCare made a false claim for any patient, you

2   would check "no" and then move on to the next

3   patient.

4           Now, just because these are listed in

5   numerical order does not mean you have to approach

6   them in that order.  You can choose which patients

7   you want to discuss and in what order.  This is just

8   listed numerically to help you find the patients that

9   you're discussing.

10          Every answer that you reach in the jury room

11  must be unanimous; that is, you must all agree on the

12  answer.

13          Your deliberations will be in secret and you

14  will never have to explain your answers to anyone.

15          When you have reached unanimous agreement on

16  all of the 121 patients, your foreperson will

17  complete the interrogatory form, date it and sign it,

18  and then y'all will return to the courtroom.

19          When you've reached your decision, knock on

20  the jury room door and -- it says tell the marshal,

21  but knowing Ms. Frankie, she'll probably be the one

22  in here waiting for you, just let her know that you

23  have reached a decision.

24          If you desire to communicate with me during

25  this time, please write down your message or your

1   question, have your foreperson sign it and then give

2   it to Ms. Frankie.  She will be the one around here.

3           I will then respond as promptly as possible,

4   either in writing or by having you return to the

5   courtroom so that I can address you orally.

6           It may take me a little while to get back

7   with you because I will have to consult with the

8   attorneys on all of those questions.

9           I caution you, however, in any message or

10  question that you send to me you should not tell me

11  any numerical division that you may be in at that

12  time.

13          As I indicated the other day, from this

14  point on, you will decide when to take your breaks

15  and when you want to stop for the day.  You will also

16  decide whether you want to come in on Fridays to

17  deliberate.  I understand y'all have decided not to

18  for this Friday, which is absolutely fine.  You just

19  need to let Ms. Calahan know what time you're going

20  to be here on what days, and then you can follow your

21  own schedule.

22          But I want to emphasize to you, you can only

23  discuss this case when all of you are together in the

24  sanctity of that jury room.  That is a very special

25  place.  It is the only place where jury deliberations

1    take place.

2         Also, as I said, you don't have to tell

3    anybody about any of your reasons -- and actually,

4    what is said among you in that jury room is secret

5    and should remain secret.  You can later tell people

6    what you think, but what goes on in that room is a

7    very sacred thing, and I ask you to recognize the

8    sanctity of that place and only discuss the case

9    there.

10        Again, I need to remind you not to post

11   anything about the case on Facebook or any other

12   social media, and don't email friends about it, don't

13   talk to friends outside of the courtroom or anybody

14   outside the courtroom about this case.  When you

15   finish, you'll be able to do that.  Don't do any

16   separate research.  I've told you before, if you want

17   to pursue your medical degree, you will need to do it

18   after you finish this case, no more research.

19        The only information you should use to

20   decide this case is what you've heard from the

21   witness stand and the exhibits that have been

22   introduced.

23        At this time, you get to go to lunch.  I

24   think it should be ready for you downstairs in the

25   jury room.

1          When you come back up, the special
2    interrogatories to the jury form will be in the jury
3    room, along with the exhibits, and you can then at that
4    time select your jury foreperson and begin your
5    deliberations.
6          We appreciate so much your attention today and
7    I hope that you now can go fill those grumbling bellies.
8          You will be back at your own time on your own
9    schedule.  Thank you very much.
10                        (Jury excused).
11    THE COURT:  Other than the previously stated,
12    any there any objections to the instructions I gave to
13    the jury?
14          MS. GUNASEKERA:  No objections, Your Honor.
15          MR. LEMBKE:  Nothing other than what has been
16    previously stated on the record from AseraCare, Your
17    Honor.
18          MS. GUNASEKERA:  And nothing other than stated
19    from the government, Your Honor.  Thank you.
20          THE COURT:  We're going to have a little
21    conversation in my office, one person from each side
22    only.
23                        (In chambers).
24                (Jury deliberations.  2:15 p.m.)
25              (Court in recess for the day.  4:00 p.m.)

1

2                          C E R T I F I C A T E

3

4          I hereby certify that the foregoing is a

5    correct transcript from the record of proceedings in the

6    above-referenced matter.

7

8    _____

9    Teresa Roberson, RPR, RMR
     Julie Martin, RPR, RMR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25