FILED
2016 Jun-13 AM 09:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

6809

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
EX REL., ET AL.,                    CV-12-KOB-245-S

           Plaintiffs,     October 19, 2015

    vs.                     Birmingham, Alabama

ASERACARE, INC., ET AL.,

           Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORTER'S OFFICIAL TRANSCRIPT OF
JURY TRIAL
VOLUME XXXIV

BEFORE THE HONORABLE KARON O. BOWDRE
UNITED STATES DISTRICT CHIEF JUDGE

COURT REPORTER:
Teresa Roberson, RMR
Julie Martin, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
1                      * * * * *

2              A P P E A R A N C E S

3                      * * * * *

4    FOR THE PLAINTIFF:

5    Jeff Wertkin
     Carolyn Tapie
6    Holly Snow
     Eva Gunasekera
7    Renee Brooker
     William Olson
8    U.S. Department of Justice
     Civil Division
9    P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
10

11   Lane H. Woodke
     Don Long
12   U.S. Attorney's Office
     1801 4th Avenue South
13   Birmingham, Alabama  35203

14   James F. Barger, Jr.
     J. Elliott Walthall
15   FROSHIN & BARGER
     3430 Independence Drive
16   Birmingham, Alabama  35209

17   Nola J. Hitchcock Cross
     CROSS LAW FIRM
18   345 North 11th Street
     Milwaukee, Wisconsin  53233

19

20

21

22

23

24

25
```

A P P E A R A N C E S (continued)

FOR THE DEFENDANT:

James Sturgeon Christie, Jr.
Jack Wright Selden
Matt Lembke
Tiffany deGruy
BRADLEY, ARANT, BOULT & CUMMINGS
1819 Fifth Avenue North
Birmingham, Alabama  35203


Kimberly Martin
BRADLEY, ARANT, BOULT & CUMMINGS
200 Clinton Avenue
Huntsville, Alabama  35801


Charles H. Bohl
WHYTE, HIRSCHBOECK, DUDEK
555 East Weels Street, Suite 1900
Milwaukee, Wisconsin  53202

```
1                    * * * * *

2              P R O C E E D I N G S

3                    * * * * *

4          (Judicial conference room).

5          THE COURT:  We need to talk about all this

6     stuff that y'all submitted to me on the request for

7     clarification from the jury of some of their time

8     frames.  And I've read everything you've submitted.

9          I've thought through it, as much as I can

10    possibly do, and I'm just going to let you know what

11    I've decided and why.

12         I disagree with the government that we don't

13    have to have some sort of medical expert testimony

14    because the statute does deal with a clinical

15    judgment of the physicians.

16         So, I think when you're challenging, in

17    essence, what it boils down to, the clinical judgment

18    of physicians as to whether someone is eligible, that

19    certainly logic supports, I think, law in terms of

20    medical-related cases support, and I also think that

21    the safer approach is to require that there be some

22    expert testimony to support a finding of a period of

23    ineligibility.  But I don't think that we can rely on

24    the mere fact that the experts for the defense

25    testified that the patient was on hospice for a
```

1  period of time, because that did not present evidence

2  of ineligibility.

3          However, I do agree with the government that

4  when we've got minor inconsistencies in dates that we

5  don't need to go back and get clarification.

6          And there may be some difference of views as

7  to what constitutes minor versus major deviation, but

8  that's the basis for my decisions on these particular

9  patients.  And we can walk through them, and I can

10 tell you what I have decided on each of these.

11          As to number 6, Ann K., I'm going to

12 overrule the -- I don't know if it's an objection,

13 but the request for clarification because Dr. Liao

14 did testify that she was not terminal from the

15 beginning to the end.  He testified that she was in

16 hospice until at least September of 2009.  The jury

17 found that she was ineligible to October 7th, 2009,

18 which I believe is the date of discharge.

19          Do I have that right?  I'm juggling a lot of

20 papers, so y'all may need to help me on that.  That's

21 my recollection.

22          MR. LEMBKE:  Your Honor, that is not the

23 date of her discharge.  She died in December 2009.

24          THE COURT:  Okay.  So the question then is,

25 where did the jury get the October 7th date?

1            MR. WERTKIN:  Your Honor, we have indicated

2    in our filing that Defense Exhibit 555-B at 1496

3    shows that Ann K.'s weight loss decline began on that

4    date, and so our -- we indicated that the jury could

5    infer from Dr. Liao's testimony and Dr. Cooney's

6    testimony and that exhibit that Ann K. was ineligible

7    until October 7th.

8            THE COURT:  Well, again, I'm not relying on

9    Dr. Cooney's testimony for anything that would

10   support a finding of ineligibility.

11           MR. LEMBKE:  Your Honor, may I respond

12   briefly to what Mr. Wertkin just said?

13           THE COURT:  Okay.

14           MR. LEMBKE:  The government argued in their

15   submission to you that that Exhibit 555-B at Pages

16   1496 to 1497, quote, shows that Ann K.'s weight loss

17   and functional decline began on October 7th, 2009,

18   end quote.  That's what the government said.

19           But that document did not show that Ann K.'s

20   weight loss and functional decline began on that date

21   and that indeed the document is dated October 7th,

22   2009 and states on Bates Page 4301, quote, resident

23   has had a slow progressive decline, end quote.

24           So on its face, the document says the

25   opposite of what the government represents it says.

6815

1 It shows that Ann K. was declining prior to October

2 7th, 2009, not beginning on October 7th, 2009.

3          And there were numerous indications in the

4 record that her weight loss had been going on for a

5 considerable period of time before that.

6          MR. WERTKIN:  We obviously disagree with

7 that characterization of that document, Your Honor.

8          MR. LEMBKE:  May I also note for the record

9 that the government argued in its submission to you

10 that October 7th, 2009, quote, is the date Dr. Cooney

11 testified Ann K. began experiencing the symptoms that

12 caused her death, end quote.  And Dr. Cooney never

13 testified to that.  In fact, she didn't testify at

14 all about that document.

15          THE COURT:  All right.  I withdraw my

16 overruling and that will go to the jury.

17          Elizabeth K., who is number 32.  This one

18 was close in terms of time frame.  The jury found

19 that Dr. Liao had testified that she was on hospice

20 as of 3/12/2011.  The evidence shows that she died

21 3/28/11, that's when the jury found that her period

22 of ineligibility ended.

23          However, Dr. Liao never testified concerning

24 her eligibility from the last date that he looked at

25 records, which was March 12th, 2011, until she died

1  3/28/11.

2         While that time period is short, the facts

3  there are potentially contrary to the jury's finding

4  of ineligibility.

5         So that one will go back to the jury for

6  clarification.

7         Number 46, Ingeborg D., the jury found that

8  she was ineligible from November 4th, 2010 to

9  September 10, 2012.

10         Dr. Liao testified that she was on hospice

11  in November 2010 to as late as August 2012.  He also

12  testified that she was not eligible the entire time

13  that she was on hospice.

14         So, I am inclined to overrule the request

15  for clarification as to her, because we're talking

16  about a period of days or weeks in having to

17  interpret Dr. Liao's testimony as late as August

18  2012.

19         MR. LEMBKE:  May I bring one fact to the

20  Court's attention, Your Honor?

21         THE COURT:  Okay.

22         MR. LEMBKE:  As shown at Page 2870 of the

23  transcript, Line 17 and 18, Dr. Liao's opinion was in

24  large part based on his conclusion that her PPS score

25  never dropped below a 50.

1          But Exhibit 523-B at Page 7175, which is the

2    September 10th, 2012 records cited by the government,

3    states that her PPS is 40 on that date.

4          THE COURT:  If I'm not mistaken, I don't

5    recall if this is one of the particular ones, but

6    Dr. Liao frequently disagreed with the PPS score that

7    was reflected in the documents based upon the

8    inability to get around.

9          MR. LEMBKE:  He never looked at this

10   document because it was after his August 2012 ending

11   date.

12         THE COURT:  Okay.

13         MR. LEMBKE:  I believe.

14         THE COURT:  I don't see any reference to it.

15         MR. LEMBKE:  His testimony was she was on

16   hospice as late as August 2012, which in my

17   understanding of what he was saying is he did not

18   know of anything after that date.

19         THE COURT:  And the document you were

20   referring to you said was Page 7175, what was the

21   date of that?

22         MR. LEMBKE:  It's Defense Exhibit 523-B,

23   7175 on September 12th, 2012.

24         THE COURT:  Which was the end date of the

25   jury's finding of ineligibility.

1          MR. LEMBKE:  Yes, Your Honor.

2          THE COURT:  So I am going to overrule the

3   request for clarification as to Ingeborg.

4          Number 54, Joan S., Dr. Liao testified that

5   she was admitted to hospice on November 2010 and that

6   she was on hospice at least until August 2012 and

7   that she was not eligible for hospice from the

8   beginning to the end.

9          The jury found that she was not eligible for

10  hospice from 11/13/2010 to 9/03/2012.

11         It seems reasonable that the jury could

12  infer from Dr. Liao's testimony that she was

13  ineligible for a few days or a few weeks past his

14  finding that she was on hospice at least until August

15  2012.

16         Is there another document or evidence I

17  should consider before making a decision on that?

18         MR. LEMBKE:  I don't think so, Your Honor.

19         THE COURT:  All right.  Then I overrule as

20  to Joan S.

21         Now, Katherine K., I really have a problem

22  with the jury's answer and Dr. Liao's testimony.  The

23  jury found that Katherine K was ineligible from

24  November 1st, 2011 to February 4th, 2012.  Then again

25  ineligible July 01, 2012 to September 01, 2012.

1          Dr. Liao spent as much, if not more, of his

2   time talking about the period for which he found she

3   was eligible.  He testified that she was admitted in

4   September of 2010 and was on hospice up to August of

5   2012.

6          Then he found that she was eligible upon

7   admission and that she was eligible until November of

8   2011.

9          So that would be consistent with the first

10  period at which the jury found she was ineligible.

11          Then he talked about why she was not

12  eligible as of November 2011.

13          Then the only other time that he mentioned

14  was discussion of a document, which is Government

15  Exhibit 367-A, Page 3648 and maybe some other pages

16  around there, but it's dated July 7th, 2012 and

17  talked about limited verbalization, but she was still

18  capable of answering questions; therefore, that would

19  mean she's not a FAST 7.

20          And on Page 2671 of the transcript, based

21  upon his review, he would score her FAST score as a

22  six and that he saw her as a lady who was capable of

23  improving and that was it.

24          There was no other testimony from him as to

25  her ineligibility during any of the time period after

1    November 2011 except for that date.

2            So the jury's finding of the second period

3    of ineligibility of July 01, 2012 to September 01,

4    2012, I'm concerned about a lack of evidentiary

5    foundation for that finding.

6            Why should I not be concerned about the lack

7    of evidentiary foundation for that when the only time

8    that Dr. Liao talked about was July 7th, 2012?

9            MR. WERTKIN:  Well -- go ahead.

10           MS. GUNASEKERA:  If I may, Dr. Liao

11   initially found was Katherine K. eligible based on

12   her weight and based on her functional capability in

13   terms of her weight and nutritional status, and then

14   found her ineligible based on, as you noted, Your

15   Honor, her FAST scale and her verbal capability.

16           So, part of the assumption there is that she

17   was always a FAST 6, so she was not -- there was no

18   reason to assume that she declined once he noted that

19   she was a FAST 6 in July.

20           So she became ineligible in July of 2011 or

21   2012 because she would have been a FAST 6.

22           So this isn't a fluctuating weight or

23   anything along those lines, it's more she was a FAST

24   6 at that point and had always been a FAST 6 as of

25   that time.

1          THE COURT:  The problem I have is both with

2     the fact that his only testimony during the period of

3     ineligibility after November 1st or November of 2011

4     was concerning a document dated July 7th, 2012.  He

5     testified that she was on hospice as late as up to

6     August of 2012.

7          MS. GUNASEKERA:  That's correct, Your Honor.

8          THE COURT:  So, he provided no opinion

9     concerning her ineligibility after -- I'm sorry, but

10    I read up to August of 2012 as like August 1st.

11         MS. GUNASEKERA:  I understand.

12         THE COURT:  To August.  All right.  So,

13    there's no testimony from him about her ineligibility

14    from August 1st through the whole entire month.

15         His only testimony was July the 7th.  And

16    the jury found that she was ineligible July 1 through

17    September 1.

18         And it just seems to me that there's only

19    that one little bit of testimony to support that

20    finding.

21         MS. GUNASEKERA:  And, Your Honor, he

22    actually used the words up to or through.

23         THE COURT:  Up to.  This is on Page 2666,

24    Line 15 and 16.  She was on hospice as late as, I'm

25    sorry, up to August of 2012.  So this is not just a

1  week or two.

2       In my opinion, it's at least six weeks for

3  which he gave no testimony about her being

4  ineligible.

5       MS. GUNASEKERA:  And, of course, I can't

6  speak for Dr. Liao but --

7       THE COURT:  Well, it doesn't matter speaking

8  for Dr. Liao, we have to speak based upon his

9  testimony.

10       MS. GUNASEKERA:  I guess my point, Your

11  Honor, that word choice, he had been consistently

12  saying through August of 2012.

13       THE COURT:  No, he had not.  No, he had not.

14  There were times when he said in a month; there were

15  times when he said as of a month; and there were

16  times when he said up to a month.

17       And that, in my opinion, was a major problem

18  throughout his testimony and it is the government's

19  burden to prove the time period for which you're

20  claiming ineligibility.

21       So, I am going to grant the defendant's

22  motion for judgment as a matter of law as to that

23  second period that the jury found Katherine K. was

24  ineligible, which was July 1st, 2012 through

25  September 1, 2012 because of lack of sufficient

1   evidentiary evidence for that.

2          So, we don't have to worry about taking

3   anything to the jury on Katherine K.

4          As to Lanny R., the jury found that Lanny R.

5   was ineligible from February 28th, 2008 to July 31st,

6   2009.

7          Now, as I understand, it's uncontested that

8   he was actually admitted in March of 2008 and

9   Dr. Liao -- I'm sorry, I'm sorry, no, not admitted, I

10  apologize.

11         That Dr. Liao testified that by March 2008

12  he was clearly ineligible.  He had actually been

13  admitted January 2007 and Dr. Liao found him eligible

14  initially but that by March 2008 he was clearly not

15  eligible for hospice.

16         MR. LEMBKE:  And, Your Honor --

17         THE COURT:  Just a minute.  Let me finish

18  what I want to put here.

19         He also found that Lanny R. was still on

20  hospice as of August 2009.  Yes.

21         MR. LEMBKE:  I was just going to note, you

22  asked him a clarifying question at Page 2719, Line

23  16, of exactly what he was saying about the period of

24  eligibility.  So you cleared up the by, and he said,

25  at Line 18, I found that he was eligible for hospice

1   from January of 2007 to March of 2008.

2        THE COURT:  And the jury found he was

3   ineligible beginning February 28th, 2008 and we had

4   some discussion on last Thursday as to whether that

5   was two days or what, depending upon leap year and

6   things of that nature.

7        While I agree that we need to have actual

8   testimony about -- to support a finding of

9   ineligibility, that Dr. Liao did testify that by

10  March of 2008 he actually had improved.

11       In fact, his improvement began as far as

12  back as November 2007 when his swelling improved and

13  his shortness of breath improved, so by March 28th,

14  he was not taking heart medications, et cetera.

15       So, while on Thursday I was pretty much

16  inclined to have the jury clarify that, after reading

17  the whole transcript there --

18       MR. LEMBKE:  May I bring one more fact to

19  the Court's attention?

20       THE COURT:  Yes, you may.

21       MR. LEMBKE:  He testified specifically that

22  Government Exhibit 370-A at Pages 2117 and 2118,

23  dated March 14th, 2008 supported his opinion of

24  ineligibility in March of 2008 because he said, it

25  stated, not taking any meds except pain meds.

1          According to Dr. Liao, because Lanny R. was

2     not taking any heart medications at this point, he is

3     not a terminal heart disease patient.

4          THE COURT:  Where in the transcript?

5          MR. LEMBKE:  I'm at 2716, Line through 17.

6     Then he further said, at this point, he is not

7     optimally treated and he actually does not appear to

8     need any heart medications at this time.

9          So, I think, Your Honor, he was tying his

10    March 2008 statement to this document on March 14th,

11    2008.

12         THE COURT:  The March 14th, 2008 document

13    which is at Government Exhibit 370-A, Page 2117 and

14    2118 and probably a few other pages.

15         MR. LEMBKE:  Yes, Your Honor.

16         MS. GUNASEKERA:  If I may, Your Honor,

17    Dr. Liao's opinion is not just specific to pain

18    medication but is also discussing that he had

19    shortness of breath with minimal exertion and

20    declining oxygen use.

21         So, ultimately, Mr. Lanny, in March of 2008,

22    was not in a New York Heart Association Class IV, so

23    it's not just specific to the heart medication

24    testimony, which, as Mr. Lembke pointed out, at this

25    point language is specific to the heart medication.

1   But there are other reasons for why Dr. Liao found

2   Mr. Lanny R. ineligible in March of 2008 that could

3   relate specifically to the heart medication

4   testimony.

5           THE COURT:  Okay.  But the jury found that

6   he was ineligible February 28th, 2008.

7           MR. LEMBKE:  Your Honor, I would direct the

8   Court's attention to Page 2714 of the transcript at

9   Line 19 and 20 and really through 23 where it says,

10  the shortness of breath improved to only

11  intermittently occurring but by March 2008 he was not

12  taking heart medications anymore, so at this point,

13  he clearly did not need hospice care.

14          MS. GUNASEKERA:  Your Honor, that testimony

15  is not tied to a specific date in March.

16          THE COURT:  I know.  And that was one of the

17  major problems with Dr. Liao's testimony and asking

18  the jury to find ineligibility periods for which the

19  government did not produce direct evidence as to time

20  periods.  So that's why I believe we're at this point

21  where we are now dealing with asking the jury to

22  clarify things.

23          So I will submit that one to the jury as

24  well.

25          Then Lidia S., I think we all agreed last

1   week that that needs to go back for clarification

2   because the only evidence as to the time period for

3   when she was admitted is that she was admitted April

4   15th, 2009 but the jury found she was ineligible

5   beginning April 1st, 2009.  So she needs to be

6   clarified.

7           And Lottie W., I think, also has got to go

8   back to the jury because this is one of those times

9   when Dr. Liao testified that she was not eligible for

10  hospice from November 2007 to January of 2009.  And,

11  again, I interpret to January 2009 to be like January

12  1st, 2009.

13          The jury found that she was ineligible to

14  February 19th, 2009.  So, there's no testimony that

15  she was ineligible after January 2009.

16          So I think the jury needs to clarify as to

17  Lottie W.

18          I already took care of number 75, Margaret

19  W.; Mary A., number 81, I overruled that one on

20  Thursday.

21          Number 94, Mr. Norman K., Dr. Liao -- the

22  jury found that Norman K. was ineligible for hospice

23  from March 30th, 2009 to September 8th, 2010.

24  Dr. Liao testified that Norman K. was admitted to

25  hospice in April of 2009.  Dr. Murray testified that

1   he was admitted to hospice April 30th --

2        MR. LEMBKE:  You mean Melvin.

3        THE COURT:  I'm sorry, what did I say?

4        MR. LEMBKE:  Murray.

5        THE COURT:  I don't know where I got Murray

6   from.  I have to admit, I have not gone back and

7   pulled the actual medical records, but I don't know

8   where the jury is basing the finding of admission or

9   ineligible a month before Norman K. may have been

10  admitted.

11       MR. WERTKIN:  I don't think this is one

12  we're necessarily arguing about, but Dr. Melvin

13  actually did testify March 30th, and then later

14  corrected herself, and it wasn't an immediate

15  correction, I understand, there was some time passed.

16       We don't really know what happened in the

17  jury room, but we could guess that the jurors put

18  down that first date, but then not the corrected

19  date, that happened some time later in the testimony.

20       THE COURT:  All right.  So we need to get a

21  clarification on Norman.

22       Then Sheila A., the jury found that she was

23  ineligible from September 17th, 2010 to September 05,

24  2012.

25       Dr. Liao testified that she was admitted in

1   September of 2011 and she was on hospice as of August

2   2012.

3           He also testified that she did not have a

4   six months or less prognosis from beginning to end,

5   so the entire hospice period.

6           Why is this not one where I can find that

7   there was a minor deviation from the evidence and

8   overrule your request for a clarification?

9           MR. LEMBKE:  Your Honor, first, I would just

10  note for the record you said Liao said she came on in

11  2011 and it was actually 2010.  I think the Court

12  just misspoke.

13          THE COURT:  Yeah.

14          MR. LEMBKE:  So I didn't want it to seem

15  like there was an error on the front end.

16          THE COURT:  Thank you.

17          MR. LEMBKE:  Your Honor, this is one where

18  we just think that because he only had reviewed the

19  records through August 2012, there's no testimony for

20  the additional days in September, but stand on that

21  argument.

22          THE COURT:  I'm going to overrule the

23  objection as to Sheila A. because I think it's one of

24  those minor deviations that we can live with and work

25  with.

1            Also, for the record, it's my understanding,

2    based upon our conversations last Thursday and other

3    times, that in terms of damage amounts, the

4    government is only going to be using the shorter of

5    the time periods; right?

6            MR. WERTKIN:  Yes, Your Honor.  As long as

7    the jury is focused on just these particular dates in

8    issue, we don't think it will affect anything with

9    regard to damages.

10            MS. GUNASEKERA:  With the one exception,

11    Your Honor, is Ms. Elizabeth K.  That's the only

12    exception.  And the only reason that's excepted is --

13    well, if the jury goes with a shorter date in March,

14    then it will drop down the damages calculation.  But

15    that's the only one that would affect.  And our

16    expert is actually going to prepare two separate

17    reports to indicate that.

18            THE COURT:  I'm not as concerned about what

19    your expert is doing but as to the representations

20    that were made earlier by the government as to the

21    time frames that y'all are actually seeking damages

22    for.  And it's my understanding that it's based upon

23    time periods Dr. Liao actually testified to which

24    would generally be shorter in these instances where

25    I'm overruling the request for clarification anyway.

1          MR. WERTKIN:  Yes.  Correct.  And that's the

2     same.

3          THE COURT:  If he says as of August 12th and

4     the jury found September, y'all are going to be

5     using, what, August 1st as the cut off?

6          MS. GUNASEKERA:  Actually July 31st.

7          THE COURT:  I just wanted to clarify that

8     for the record.

9          So, if I'm wrong on my rulings, it's a no

10    harm, no foul kind of situation.

11         So we will get clarification from the jury

12    on Ann K., Elizabeth K., Lanny R., Lidia S., Lottie

13    W., and Norman K.  I think six out of 121 isn't too

14    terribly bad.

15         Do you have -- of course, I've looked at

16    y'all's joint proposed supplement legal charge that

17    you submitted on October 18th timely.  I asked for

18    joint, and I think the only thing joint about it is

19    that y'all actually submitted it together on one

20    document.  But there wasn't much joint in terms of

21    the proposal.

22         I have to disagree with the government,

23    though, I don't think it's proper for me to comment

24    to the jury on the time periods.

25         In other words, that would, in essence, be

1  directing the jury to find those time periods, and

2  I'm uncomfortable with doing that.

3          It is the government's burden to prove those

4  times periods.  I don't think it's my responsibility

5  to instruct the jury to find the time periods.

6          MR. WERTKIN:  Your Honor, if I may, just

7  based on your last comment, we do think that if the

8  jury was focused on -- was directed to certain time

9  periods, that that will give them some direction as

10  far as what they're supposed to do.

11          If, in fact -- without that kind of

12  direction, if they go back in and go back into the

13  time periods that, you know, for which damages are at

14  issue, then we think that the harmless error piece of

15  that would be -- might go back into play.  I just

16  wanted to alert Your Honor to that fact.

17          THE COURT:  I'm aware of that.  But again,

18  it's the government's burden to prove these things.

19  And if the government hasn't proved those dates, then

20  it's not my job to instruct the jury to find them.

21          MR. WERTKIN:  No, no.  And, Your Honor, to

22  the extent that -- we were not suggesting in our

23  proposal that there be any instruction to findings

24  for the jury, just to alert them as to the periods

25  that are at issue that we've just been discussing.

1          And I would -- the idea that we had here is,

2     you know, that there's an issue with regard to the

3     time period and here are the time periods that are at

4     issue.

5          Just the same way that we would say to them,

6     okay, you know, generally, for all the patients, it

7     was from '07 to 2012, just identify to the jury the

8     periods at issue.  Because, you know, that seems to

9     be what we've just been discussing and what we would

10    want the jury to do.

11         THE COURT:  Well, I'm not going to do that.

12    And I have basically taken but modified the proposal

13    from the defense.

14         What I plan to tell the jury is as follows:

15    I tell you what, I'm not going to read it.  Y'all can

16    read it.  It will be on the record soon enough.

17         I did add the next to the last paragraph

18    that if you decide not to change your answer, your

19    foreperson should initial beside that answer so we

20    will know you, in fact, discussed it.  That way we

21    won't have to go back and say, you didn't change this

22    one, you know, whatever.

23         MR. WERTKIN:  Your Honor, we don't agree,

24    but I respect your rulings about letting them know

25    about the dates.

1           The line in here which is on Line 6 --

2    sorry, starts on Line 5, the time period during which

3    the claims were false are not consistent with the

4    evidence presented by the United States.

5           Now, not consistent with the evidence, we

6    think that that's an incorrect statement, Your Honor,

7    and we would object to that instruction going back.

8           The evidence that was -- we understand that

9    Your Honor wants -- is sending these back to the jury

10   because it doesn't match Dr. Liao's testimony, and

11   that's based on Your Honor's understanding and ruling

12   on the medical, you know, piece of this.

13          However, we would contend that the evidence

14   in this case, which includes the medical records,

15   does support and the jury could reasonably infer from

16   the medical records.

17          So what we had proposed, Your Honor, is to

18   say that the dates do not precisely track the dates

19   of ineligibility identified by Dr. Liao, the United

20   States' medical expert -- now, we still object --

21          THE COURT:  Where do you suggest that?

22          MR. WERTKIN:  Page 5.

23          THE COURT:  Okay.

24          MR. WERTKIN:  The dates you indicated do not

25   precisely track the dates of ineligibility that were

1   identified by Dr. Solomon Liao, the United States'

2   medical expert, and while we have a continuing

3   objection to this going back to the jury at all, we

4   do think that this language is more correct and

5   should be used in your instruction to the jury rather

6   than not consistent with the evidence.

7            MR. LEMBKE:  Your Honor, what is in your

8   proposed charge right now is consistent with the

9   evidence presented by the United States concerning

10  the dates of ineligibility.  That's accurate.

11           The only evidence about dates of

12  ineligibility they presented was from Dr. Liao.  But

13  I don't think, you know, it is by singling -- by

14  singling him out in your charge, I think it is

15  putting too much focus on specific evidence.  And I

16  think you just need to say, we would submit, the more

17  general statement about evidence presented by the

18  United States concerning dates of ineligibility.

19           THE COURT:  That's what I am going to go

20  with.  And you can have your standing objection to

21  it.

22           MR. WERTKIN:  If I just may say, evidence,

23  as we understand it and we think the jury understands

24  it, and I believe it was defined by the Court,

25  includes the exhibits, the documents and medical

1    records in evidence and that's why that term, we

2    believe, is too broad.

3           THE COURT:  But the medical records

4    themselves do not include any medical opinions about

5    ineligibility.  And I've ruled that it's my opinion

6    that when you're challenging the clinical judgment of

7    the physicians that there needs to be medical

8    testimony to support that challenge and the basis for

9    that.  And I understand you disagree.

10          MR. WERTKIN:  But if you follow that, Your

11   Honor, just to the logical, your know, the next step.

12   You don't have to single out Dr. Liao.  So we can say

13   is not consistent with expert medical testimony then.

14          If you don't want to mention Dr. Liao, but

15   you're -- I understand Your Honor's ruling and, you

16   know, we respectfully don't agree.

17          But okay, if your ruling is that the medical

18   expert, there has to be testimony from a medical

19   expert, and that's why the jury's findings go back,

20   then it makes sense to identify is not consistent

21   with the expert medical testimony that occurred.

22          But to go broader than that, because if I'm

23   a juror, if the juror is reading this, they don't --

24   they wouldn't understand that point because evidence,

25   as far as has been defined for them, includes the

1  medical records.

2          So, I think it would just make -- based on

3  how -- based on the reasoning that you're using, Your

4  Honor, it just makes more sense to say, not

5  consistent with the expert medical -- the expert

6  testimony in this case or the United States' expert's

7  testimony.

8          THE COURT:  All right.  Are not consistent

9  with the expert medical testimony presented by the

10  United States concerning the date of ineligibility.

11  That way they can't consider Dr. Cooney or

12  Dr. Melvin's testimony, because they did not testify

13  as to periods of ineligibility.

14          MR. LEMBKE:  Can you state it one more time?

15          THE COURT:  The date you indicated for the

16  period during which claims were false are not

17  consistent with the expert medical testimony

18  presented by the United States concerning the dates

19  of ineligibility.

20          MR. WERTKIN:  The only other suggestion that

21  we would say is that the words not consistent, we

22  would suggest do not precisely track --

23          THE COURT:  I'm not going there because the

24  standard is not whether they precisely track.  The

25  standard is whether the jury's finding is

1    inconsistent with the medical evidence.

2           MR. WERTKIN:  It's just that, I don't know

3    if Your Honor had a chance to review the Sixth

4    Circuit case, the Jewell case in the Sixth Circuit

5    case.

6           THE COURT:  I read through the highlights of

7    it.

8           MR. WERTKIN:  Because as you know, Your

9    Honor, what the -- the medical expert said -- the

10   issue was what happened in 1978.  And the expert

11   said, prior to 1980, and the jury said that's okay,

12   that's okay --

13          THE COURT:  But there was actual testimony

14   there, as the defense pointed out in their response,

15   about what happened in 1980.

16          Here, we don't have expert medical testimony

17   about what happened during these time periods that

18   are challenged because they're inconsistent with

19   Dr. Liao's testimony.

20          MR. WERTKIN:  The issue was actually 1978.

21   It was two years earlier.  And we would just submit

22   that more prior to that, which is the language the

23   Sixth Circuit focused on, is the same as when

24   Dr. Liao said at least or up until.

25          So that -- we just think that with regard to

1  the not consistent with, just as the Sixth Circuit

2  ruled in JEWELL, that all of the findings of the jury

3  could be considered consistent with Dr. Liao's

4  testimony.

5        It was just that there wasn't testimony

6  about those specific days, as Your Honor points out.

7  So that's why we think the language should reflect

8  that.  That's the basis for the Court's ruling.

9        THE COURT:  Does the Jewell case hold, does

10  not precisely track?

11        MR. WERTKIN:  Yes, Your Honor, that's what

12  we --

13        THE COURT:  It says precisely track in

14  Jewell?

15        MR. WERTKIN:  The Court reaches the opposite

16  conclusion, it says it does not need to precisely

17  track.  That would be the basis.

18        THE COURT:  Number one, Sixth Circuit does

19  not control what I do.

20        Number two, I think we're talking a whole

21  lot about a difference that doesn't make any

22  significant change.

23        MR. WERTKIN:  But it could, Your Honor,

24  that's the problem.

25        THE COURT:  Well, the government should have

6840

1  thought about that in preparing their witness for

2  testimony and for presenting that testimony.  You

3  knew all along you were going to have to prove the

4  time periods that you claim were ineligible and you

5  didn't do that very precisely.  Had you done that

6  precisely, I dare say we wouldn't be dealing with

7  this need for clarification.

8          MR. WERTKIN:  Your Honor, we respect that

9  with regard to the one, the week or two periods.

10  We're just asking that the jury be given some --

11  imagine you're the jury, they won't understand that

12  the issue is only these certain time periods.

13  They're going to go back and they're not going to

14  realize that.  And that's the concern that we have.

15          There's no way from this instruction for

16  them to understand really what they're supposed to be

17  doing and what they're supposed to focus on.

18          THE COURT:  Whose problem is that?  Again, I

19  think it falls back on the lack of precision in the

20  government's testimony from Dr. Liao.

21          We're dealing with only six.  And if the

22  jury has problems in understanding this instruction,

23  they know how to ask questions about it and we will

24  see what they do.

25          But this is as far as I'm going to go in

1  terms of directing them to particular dates.  I've

2  made my ruling on that.

3             MR. WERTKIN:  Thank you, Your Honor.

4             MR. LEMBKE:  For the record, we understand

5  the Court's ruling.  We except to the words, expert

6  medical testimony, as calling, as we've previously

7  argued, undue attention to a particular subset of

8  evidence for the record.  Thank you.

9             THE COURT:  Okay.  The jury will be back at

10  10:00 to deal with this.  We've got a few other

11  things to talk about and then we will probably

12  adjourn until the jury goes back.

13             Matt, Michelle brought me these two articles

14  that you said we need to discuss.

15             MR. LEMBKE:  Yes, Your Honor.  One of the

16  big issues involves the statement by Ms. Cross.

17  Ms. Cross is not here.  We alerted her that we would

18  be bringing this up and she asked to be included by

19  phone.

20             THE COURT:  Okay.

21             MR. LEMBKE:  Because she claims it's ex

22  parte.

23             THE COURT:  What about Mr. Barger?

24             MR. LEMBKE:  I kept thinking he was going to

25  be here so --

```
 1              THE COURT:  Do we need to take this up
 2    before anything goes to the jury?
 3              MR. LEMBKE:  I think it needs to be taken up
 4    before the jury leaves today.
 5              THE COURT:  I also think I may need to ask
 6    the jury whether any of them read any reports of this
 7    case.
 8              MR. LEMBKE:  That is what we are going to be
 9    asking for.  And we would like you to do it one by
10    one in chambers.
11              THE COURT:  Okay.
12              MR. WERTKIN:  Your Honor, our position on
13    this is that you've instructed the jury not to read
14    press articles.  Whether or not, you know, anybody
15    has been quoted in this or who is associated with
16    this case would not seem to matter with regard to
17    whether or not they've read any articles, if they
18    have or not.
19              Our position is that it's not necessary to
20    poll the jury and certainly not necessary to do it
21    one by one.
22              THE COURT:  Well, I cautioned them, when
23    they left on Thursday, not to read anything, but my
24    experience has been just because you caution them
25    doesn't mean they follow that instruction.
```

1           So, I think it probably would not be a bad

2   idea to poll them about whether they have read, so I

3   don't think it would be a bad idea just to poll them.

4   It's been a long time since we started this case.  So

5   I will do that.

6           We're not going to have a whole herd of

7   lawyers present when we do it.  I think one from each

8   side would be sufficient.  I don't want to put the

9   jurors any less at ease than they should be about

10  this.  So we will just do that.  I think we should do

11  it before they start deliberating on the

12  clarifications.

13          MR. LEMBKE:  Your Honor, it is not, in light

14  of what the Court is doing, it's not as immediate but

15  there's still an issue with regard to Ms. Cross'

16  statement about settlement in the Law 360 article.

17          THE COURT:  Okay.  We'll take care of that

18  then with her a little later.

19          After the jury gets these issues, then we'll

20  talk about some of the other issues that you mention

21  that we needed to address in the joint status report,

22  which actually seems to be somewhat joint in its

23  content, and I appreciate that.

24          And I think a good thing that was noted was

25  the Advanced Med issues, and I've got several

1   questions about these new people that may be coming

2   in to testify, so we'll hold that for a while.

3          The motion to quash subpoenas, I'm really

4   inclined to deny that, but I want to talk some more

5   with counsel about it.  I just wanted you to know

6   kind of where I'm leaning on that.

7          I think we've already drawn up an order

8   granting AseraCare's motion to amend the pretrial

9   order to add the two additional attorneys as trial

10  counsel.

11         Those were identified to the jury during

12  voir dire and Mr. Spainhour actually was a

13  demonstrative evidence participant earlier.  So they

14  have seen him.

15         Now, as to the government's motion, however,

16  to add Christina Davis and Mary Lester, they were not

17  identified as potential lawyers or attorneys or

18  participants at voir dire.  And to reopen it now to

19  find out whether any of the jurors may know these

20  attorneys, I think, would be impractical, improbable

21  and risky were my reasons for denying that.

22         So they can certainly help in the

23  background, but in terms of sitting as counsel and

24  questioning witness, I don't think we will do that.

25         I asked you on Thursday to let me know about

1  settlement prospects.  This tells me absolutely
2  totally nothing, quote, the parties have been in
3  contact with Judge Ott regarding settlement
4  discussions.
5        Does that mean that you just waved at him in
6  the hall or have there been any really serious
7  conversations?
8        As I mentioned Thursday, I really think it's
9  time, I don't think I put it in these terms, to fish
10  or cut bait.
11        If y'all are not serious about trying to get
12  this case resolved, quit wasting his time.
13        If you're serious about getting it resolved,
14  get serious about getting it resolved.
15        So that's all I'm going to say about that.
16  But I really think that it is in a posture now where
17  AseraCare has a good idea of risk that you face.
18        I'm still struggling, however, with whether
19  I was correct in the standard to apply in this case.
20  And so many of my decisions in this case have been,
21  in my opinion, wrongly based upon what I expected to
22  see from the government in terms direct evidence from
23  the relators and others in terms of what the doctors
24  actually did not have in front of them or false
25  information that was provided to them but was not

 1  presented in evidence here.

 2          But I also am looking back at the Amin

 3  Radiology case that was cited by the defense in the

 4  renewed motion for judgment as a matter of law and

 5  Judge Hodges' decision in the Middle District of

 6  Florida.

 7          What is the status of that case?  It was

 8  decided in January of 2015.  His opinion certainly

 9  indicates he expects an appeal.

10          MR. LEMBKE:  We will check that and get you

11  an answer right away.

12          THE COURT:  I would really like to know.

13  Anyway, anything else we need to take up before we

14  try to find Frankie?

15          MR. WERTKIN:  The only thing, we filed

16  earlier this morning a response to the supplement on

17  the Advanced Med.

18          THE COURT:  Yes.

19          MR. WERTKIN:  You already know --

20          THE COURT:  Yes, early this morning.

21          MR. LEMBKE:  Your Honor, one thing that

22  wasn't in the status report, but both parties have

23  now weighed in on, is what the jury is going to be

24  told as a preliminary legal instruction in phase two.

25  And I hope we can discuss that.

 1          THE COURT:  I have the proposal.

 2          MR. LEMBKE:  We can discuss that later today

 3   because that could have an influence on opening

 4   statement.

 5          THE COURT:  I am not going to recharge them

 6   on everything that they have already heard from my

 7   preliminary instructions and my final instructions in

 8   phase one as to what their duty is and the burden of

 9   proof and the evidence to be considered.  I ain't

10   going to do that.  Even if I had the stronger voice

11   than I have right now, I wouldn't be doing that.

12          So I will be looking more carefully as to

13   what each side has proposed on the specific

14   information.

15          MR. WERTKIN:  And just --

16          MR. LEMBKE:  We understand.

17          MR. WERTKIN:  Just to be clear, Your Honor

18   --

19          MR. LEMBKE:  I'm sorry, I thought it was

20   filed.

21          MR. WERTKIN:  At about --

22          THE COURT:  I saw something from the

23   government on that.

24          MR. WERTKIN:  No, Your Honor.  On Saturday

25   about 11:00 o'clock we got AseraCare's proposal.

1  We've already submitted jointly in June or July the

2  joint proposals, and then we actually don't think

3  it's even necessary or proper to revisit what we've

4  already submitted to the Court in July.

5        AseraCare, what they filed, we haven't had a

6  chance to review or look at yet.  So we sent them

7  last night, at around 11:00 p.m. or so, our red line

8  of their proposal and we haven't discussed that yet.

9        I just wanted to make sure -- that was

10  actually just a, you know, AseraCare filed that

11  without us having a chance to weigh in on what they

12  wanted the jury to hear in phase two.  Whatever.

13  It's not a joint proposal.  I just wanted to make

14  sure the Court understood that.

15        THE COURT:  I know it's not joint.

16        MR. WERTKIN:  And we haven't --

17        THE COURT:  I think the defense referred me

18  back to what the government had filed in July.

19        MR. WERTKIN:  No, that was joint, what

20  happened in July.  What we --

21        THE COURT:  Again, joint, I think, in name

22  only.

23        MR. WERTKIN:  Chris and I worked hard on

24  that.  There were conversations that I feel like

25  should be mentioned for the record.  And yeah, there

were times that we differed, but in that particular

case, I do think we made a real effort to do it as

jointly as possible.

THE COURT:  But I'm not going to reinstruct

them on everything they've already heard.  I will

merely say and remind them that my prior instructions

to them about burden of proof, weight of evidence,

credibility, all those other kind of things still

stand in phase two and go forward with that.

MR. WERTKIN:  I might suggest should we send

over our red line of what they sent over to us, and I

would suggest we have a chance to work it out before

the Court --

THE COURT:  Feel free to do it as long as

you don't ask me to tell them all those other things

again.

MR. WERTKIN:  Yes, Your Honor, understood.

THE COURT:  Am I clear on that part?  Okay.

Is there any way that perhaps someone from each side

could be talking about those things while someone

from each side sits in while I ask the jurors whether

they've read any of the news coverage on this?

That way we can divide and conquer and be

efficient.

(Brief pause)

1          THE COURT:  We've got a few jurors here.  So

2    if we want, we can start with the ones that are here

3    and work through them individually in my office.  But

4    I hope it will be a little less intimidating with one

5    lawyer and me and Frankie and a member of my staff.

6    Okay.

7          And then after we get the clarification to

8    the jury, we can start working through some other

9    things.

10          What do y'all think about giving the jurors

11    the list when we give them back the verdict form?  Do

12    you have the original verdict form?

13          THE CLERK:  We filed it.  The original I can

14    go downstairs and get it.

15          THE COURT:  Okay.

16          THE CLERK:  Do you want me to go get it now

17    or do you want me to wait until after you've talked

18    to the jury?

19          THE COURT:  Is there anybody else -- off the

20    record.

21               (Off the record)

22          MR. LEMBKE:  Your Honor, I had just sort of

23    assumed you were going to give them a copy of your

24    written charge which I guess would have the list in

25    it.

 1          THE COURT:  You're right, it would.

 2          MR. LEMBKE:  So they have would have no --

 3          THE COURT:  Good idea.  I'm glad somebody is

 4  thinking.  I may need help from all of you to think

 5  today.  So y'all keep me straight.  Okay.

 6          Who is going to be with me in chambers to

 7  talk to jurors?

 8          MS. GUNASEKERA:  I think I'm going to go for

 9  the government, Your Honor.

10          MS. MARTIN:  And I will go for the defense.

11          THE COURT:  All right.  Great.

12                    (Brief recess)

13                    (In chambers)

14          THE COURT:  Ms. Canada, if you would please

15  sit there.  I am letting you sit in my favorite

16  chair.  I hope you enjoy it.  We are just going to be

17  asking everybody and I ask when you go back in there

18  not to say anything to anyone else.

19          But there's been a fair amount of news

20  reports and things about this case since y'all

21  answered questions on Thursday.

22          And it's not uncommon, in long cases, for me

23  to do what I'm doing.  So I don't want you to think

24  I'm just picking on y'all.

25          I just need to know whether you have seen or

1   heard any of the news reports about this case either,

2   you know, intentionally or inadvertently.

3        JUROR CANADA:  I haven't seen anything.

4   I've seen one headline because I work at al.com.  My

5   home page is al.com because of where I work.  I've

6   seen the headline but I didn't read the article.

7        THE COURT:  Do you know Kent Falk?

8        JUROR CANADA:  Only because he had a

9   backpack on the first day we came to court.

10       THE COURT:  So you recognized him.

11       JUROR CANADA:  I recognized his backpack and

12   then I realized who he was.  I don't have any

13   personal interaction with him at all at work.

14       He's in content and I'm in sales.  And

15   there's not a lot of cross over.  I do database

16   analysis.  And he's a reporter.  So we don't have any

17   interaction at work.

18       THE COURT:  Okay.  Kent is one of my

19   favorites over there.

20       JUROR CANADA:  I don't really know him.

21       THE COURT:  You need to keep doing what

22   you're doing, not paying any attention and not

23   reading any of his reports or anybody else's reports.

24       JUROR CANADA:  Yeah.

25       THE COURT:  Anything from y'all?

1          MS. GUNASEKERA:  No, Your Honor.

2          MS. MARTIN:  Has anyone asked you about the

3  case there at al.com or just in general?

4          JUROR CANADA:  They all ask because I'm

5  away.  I'm only there one day a week.  They will ask

6  how it's going.  It's going good.  Do you find them

7  guilty?  It's like we can't talk about it.  That kind

8  of thing, just the usual banter when somebody is out

9  of the office for a long period of time but no

10  specifics.

11          THE COURT:  Not just at work, but anywhere,

12  have you had people asking you about the case?

13          JUROR CANADA:  No.  No.  I don't go many

14  places.  I'm usually at home.  My mom lives with me

15  and my daughter and my grandson live with me.  They

16  know it's off limits.  My son was home this weekend.

17  We played what's called phase ten card game and we

18  cooked out and that kind of stuff.  I'm not one that

19  gets out and about and socializes a whole lot.

20          THE COURT:  Okay.

21          MS. MARTIN:  Could I just ask one, do you

22  remember what the headline was that you saw?

23          JUROR CANADA:  I remember seeing the

24  numbers.  I'm a numbers person.  So it said like 104

25  of 121.  I saw the word AseraCare and I saw those

1   numbers.  I recognized what it was so I just skipped

2   over it.

3          MS. MARTIN:  Thank you.

4          THE COURT:  Again, as I said, just don't say

5   anything to anybody in there.  We're going to ask

6   everybody basically the same questions.

7          JUROR CANADA:  Not a problem.

8          THE COURT:  We appreciate it.

9          JUROR CANADA:  Okay.

10          THE COURT:  Thank you.

11          JUROR CANADA:  You're welcome.

12                 (Brief pause)

13          THE CLERK:  Ms. Smith.

14          THE COURT:  How are you doing, Ms. Smith?

15          JUROR NATALIE SMITH:  Fine.

16          THE COURT:  Ms. Smith, we are just asking

17   everybody these questions.  It's been a long time

18   since we started this case and it's not uncommon in

19   long trials to kind of do this.

20          After we reported on the jury's answers to

21   the special interrogatories, there was some press

22   reports about the case and online media and local and

23   we're just asking everybody whether you saw any of

24   that or you read any of it or --

25          JUROR NATALIE SMITH:  I haven't, no.

1           THE COURT:  Didn't see anything or hear any
2    reports?
3           JUROR NATALIE SMITH:  No, I don't know.
4           THE COURT:  All right.  Do you read the
5    Birmingham News regularly or al.com?
6           JUROR NATALIE SMITH:  No, I don't.
7           THE COURT:  Has anyone at work or at home or
8    socially said anything to you about the case since
9    the -- well, at all since the beginning of the case?
10           JUROR NATALIE SMITH:  No.  Nobody really
11    knows what it's about, so it hasn't really been
12    brought up.
13           THE COURT:  Remind me where it is you work.
14           JUROR NATALIE SMITH:  I say this all the
15    time.  Vision First Eye Center.  I worked at Alabama
16    Vision Center for five years.  I tend to say that
17    sometimes.
18           THE COURT:  So are you going in on Fridays?
19           JUROR NATALIE SMITH:  Yes, ma'am.
20           THE COURT:  And they don't say anything to
21    you about how when it's going to be over?
22           JUROR NATALIE SMITH:  They do ask when is it
23    going to be over.  I say, I don't know, I asked.
24    Everybody is ready for me to get back to work.
25           THE COURT:  Any questions from y'all?

1        MS. GUNASEKERA:  I don't, Your Honor.

2        MS. MARTIN:  Not just about the verdict, but

3   any media coverage at all maybe that you've seen

4   about the case?

5        JUROR NATALIE SMITH:  No.

6        MS. MARTIN:  Okay.  Thank you.

7        THE COURT:  Thank you, Ms. Smith.  And I ask

8   you, as I did Ms. Canada, when you go back just don't

9   say anything to anybody about our conversations but

10  we will be asking everyone the same questions.  Thank

11  you.

12       JUROR NATALIE SMITH:  Okay.

13            (Brief pause)

14       THE CLERK:  Michael Bibb.

15       THE COURT:  Please have a seat.  We are

16  asking everybody just a few questions.  It's not

17  uncommon to do this in large or long trials.  Just

18  kind of touch base and make sure we know where

19  everyone is.

20       JUROR BIBB:  All right.

21       THE COURT:  After the special

22  interrogatories were answered on Thursday, and also

23  some during the trial, there's been some press

24  coverage about the case.  And we're just checking to

25  see whether anyone saw that, read it, heard anything

1    about it.

2         JUROR BIBB:  I haven't saw or heard

3    anything.  I don't watch the news that much.  So I

4    haven't really seen anything at all.

5         THE COURT:  What about Birmingham News,

6    al.com?

7         JUROR BIBB:  I really don't read the

8    newspaper.

9         THE COURT:  All right.  Where do you work,

10   Mr. Bibb?

11        JUROR BIBB:  City of Hoover.

12        THE COURT:  What do you do at the city?

13        JUROR BIBB:  I'm an equipment operator, but

14   I run the grass crew, grass crew during the summer.

15        THE COURT:  Okay.  Has anyone there said

16   anything to you about the case, what's going on with

17   it?

18        JUROR BIBB:  They don't know what the case

19   is about because I haven't said nothing.  They don't

20   talk to me about it.  I just tell them I've been on

21   jury duty.  That's all they know.

22        THE COURT:  That you're going to be here for

23   a little while.

24        JUROR BIBB:  Yeah.

25        THE COURT:  Any questions, Eva?

1          MS. GUNASEKERA:  No, thank you.

2          MS. MARTIN:  You were asked about any press

3    coverage since the answers to the special

4    interrogatories, but anything that you had seen maybe

5    throughout the entire time of the case?

6          JUROR BIBB:  No, I haven't seen nothing.

7          MS. MARTIN:  Okay, thank you.

8          THE COURT:  Again, this is not picking on

9    y'all --

10         JUROR BIBB:  I understand, I understand.

11   It's a big case.

12         THE COURT:  It is.  So we appreciate your

13   attention to it.  And I've asked the two before you,

14   don't say anything to anybody or any conversation

15   when you go back.

16         JUROR BIBB:  They will know when they get in

17   here.

18         THE COURT:  We will be asking everyone the

19   same thing.  Thank you very much, Mr. Bibb.

20              (Brief pause)

21         THE CLERK:  Ms. Cade.

22         THE COURT:  We are asking everybody the same

23   questions and it's not uncommon to do this in a long

24   trial like this one particularly.

25              But after the special interrogatories were

1  announced on Thursday, there's been a fair amount of

2  press coverage about the case.  There was some before

3  then.  We want to know whether you have happened to

4  see any of the headlines or hear anything about it or

5  read anything?

6          JUROR CADE:  No, ma'am.

7          THE COURT:  Okay.  Do you generally read the

8  Birmingham News or al.com?

9          JUROR CADE:  It will maybe come up, somehow

10 or new feed, al.com, but I haven't seen anything

11 about the case.

12         THE COURT:  What is your news feed?

13         JUROR CADE:  On my Facebook.  My column or

14 whatever you call it.

15         THE COURT:  Has anyone said anything to you

16 about your jury service or about the case or asked

17 you what's happening or anything like that?

18         JUROR CADE:  No.  They don't even know what

19 type of case it is.

20         THE COURT:  Okay.  Where do you work?

21         JUROR CADE:  I work at Regions Bank.

22         THE COURT:  Okay.  Have they given you any

23 grief about being out?

24         JUROR CADE:  No, not yet.  I'm keeping all

25 my stuff with the dates on there and my manager has

1  been real good.  She kind of goes ahead and puts my

2  time in for jury duty, so not so far.

3          THE COURT:  Good, good, good.  Anything from

4  y'all?

5          MS. GUNASEKERA:  Nothing, Your Honor, no.

6          MS. MARTIN:  Over the course of the case,

7  any press coverage or anything like that that you may

8  have seen?

9          JUROR CADE:  No.  I have four kids and

10  honestly --

11          MS. MARTIN:  You don't have time.

12          JUROR CADE:  I really don't watch TV.

13          THE COURT:  What about any internet searches

14  or you said you mentioned Facebook?

15          JUROR CADE:  Just Facebook.

16          THE COURT:  Okay.  Nothing else?  No other

17  regular news sources, anything like that?

18          JUROR CADE:  No.

19          THE COURT:  We appreciate your service and

20  as we said we're just kind of checking with everybody

21  right now to make sure we're all still good.  Thank

22  you.

23          JUROR CADE:  Thank you.  Don't say anything

24  to anyone else about our conversation.

25                    (Brief pause)

1           THE CLERK:  Mr. Lambert.

2           THE COURT:  Mr. Lambert, how are you?

3           JUROR LAMBERT:  Wonderful.  How are you?

4           THE COURT:  I guess you're wonderful since

5    your team won a game last week.

6           JUROR LAMBERT:  Finally, yeah.

7           THE COURT:  Okay.  Mr. Lambert, we're just

8    checking with everybody, and this is not uncommon to

9    do in a long trial, but there's been some press

10   coverage about the case and some reports on internet

11   sources and things and we just want to check and see

12   if you have seen any of those.

13          JUROR LAMBERT:  I have not.

14          THE COURT:  Okay.  Do you look at al.com or

15   the Birmingham News or anything?

16          JUROR LAMBERT:  I usually do just like at

17   their sports stuff.

18          THE COURT:  For the important things.

19          JUROR LAMBERT:  Right, right.

20          THE COURT:  Okay.  Did you happen to see a

21   headline or anything about this case?

22          JUROR LAMBERT:  Huh-uh.

23          THE COURT:  You need to answer out.

24          JUROR LAMBERT:  Oh, no.  Sorry.

25          THE COURT:  And remind me where you work,

1   Mr. Lambert.

2          JUROR LAMBERT:  I work at York Risk Services

3   Group.

4          THE COURT:  Is that like -- tell me what it

5   is.

6          JUROR LAMBERT:  It's a third party

7   administrator for insurance companies.  Uh-huh.

8          THE COURT:  All right.  Has anyone there

9   asked you anything about the case or made comments to

10  you?

11         JUROR LAMBERT:  Just asked to see how long

12  we're going to be there and that kind stuff.

13         THE COURT:  Did you tell them about two or

14  three more years?

15         JUROR LAMBERT:  Who knows.

16         THE COURT:  Has anyone anywhere said

17  anything to you about the case, what it's about or

18  anything?

19         JUROR LAMBERT:  No.

20         THE COURT:  Any questions?

21         MS. GUNASEKERA:  Nothing from me, Your

22  Honor.

23         MS. MARTIN:  No media coverage at all that

24  you've seen?

25         JUROR LAMBERT:  Huh-uh.

1          MS. MARTIN:  Nothing on al.com or anything?

2          JUROR LAMBERT:  Huh-uh.

3          THE COURT:  If you should see headlines,

4     that's not uncommon, it's not something that you can

5     necessarily prevent from seeing.

6          JUROR LAMBERT:  Sure.

7          THE COURT:  But we do ask if you see any

8     headlines, don't read the article.  As I often tell

9     jurors, you know a whole lot more about the case than

10    any reporter that gets just a snippet of it.  Thank

11    you.  If you would not say anything to the other

12    jurors about this.  We're going to be asking

13    everybody the same questions and they will find out

14    when they get here.  Thank you.

15          JUROR LAMBER:  Absolutely.

16          THE COURT:  Thank you, Mr. Lambert.

17               (Brief pause)

18          THE CLERK:  Sarah Hyde.

19          THE COURT:  Ms. Hyde, we are asking

20    everybody these same questions and it's not uncommon

21    to do this in a long trial, particularly one where

22    there's been some media coverage and there has been

23    recently and also earlier on about this case.

24          We just want to know whether you have seen

25    any headlines or read anything about the case?

1          JUROR HYDE:  No.  I have heard that there's

2     stuff on al.com, but -- it was my dad telling me and

3     I said don't tell me about it.  But I haven't read

4     anything or seen it.

5          THE COURT:  Okay.  What else did your dad

6     say?

7          JUROR HYDE:  He just said that he was on

8     al.com and saw something about the case.  I said

9     don't tell me.

10          THE COURT:  All right.  How did he know

11     about the case and your connection?

12          JUROR HYDE:  He just knew I was in court.

13          THE COURT:  For a long time.

14          JUROR HYDE:  Yes.  I didn't ask him about,

15     you know, how did you know this was my case.

16          THE COURT:  It's --

17          JUROR HYDE:  I guess he just assumed it was.

18          THE COURT:  Okay.  What does your father do?

19          JUROR HYDE:  He is an engineer, I guess.  He

20     works for Utility Engineering Consultants out of -- I

21     think their office is in Tuscaloosa, but they do work

22     all over, like sewer lines and stuff like that,

23     surveying, he's a draft man and he draws up plans.

24          THE COURT:  Okay.  Do you generally read

25     Birmingham News or al.com?

1              JUROR HYDE:  Fox 6.

2              THE COURT:  I don't know if they had

3    anything on this.

4              JUROR HYDE:  I haven't seen anything.

5              THE COURT:  All right.  Has anybody else

6    said anything to you about this case or your jury

7    service?

8              JUROR HYDE:  Work, yeah, they want to know

9    when it's over but that's about it.

10             THE COURT:  Remind me where you work.

11             JUROR HYDE:  Publix.

12             THE COURT:  And do you work in one of the

13   stores?

14             JUROR HYDE:  Yes.

15             THE COURT:  Which one?

16             JUROR HYDE:  The one on 31.

17             THE COURT:  In Vestavia?

18             JUROR HYDE:  Hoover.

19             THE COURT:  There's two on 31.

20             JUROR HYDE:  Yes.

21             THE COURT:  So they just have asked when are

22   you going to be back and that kind of thing.

23             JUROR HYDE:  Yes.

24             THE COURT:  Has anyone asked anymore pointed

25   questions about what the case is about or anything --

1          JUROR HYDE:  Yeah, they want to know but I
2   said I can't talk about it.
3          THE COURT:  Wait until it's over and then
4   you will want me to quit talking about it.
5          JUROR HYDE:  Right.
6          THE COURT:  Any questions for Ms. Hyde?
7          MS. GUNASEKERA:  No, Your Honor.
8          MS. MARTIN:  I just want to mention, your
9   dad mentioned there was some coverage.  Did he say
10  anything about what was in the article?
11         JUROR HYDE:  No, he didn't.  He asked me,
12  you know, did you read anything and I said no, don't
13  tell me about it.
14         MS. MARTIN:  Okay.  And just when you said
15  people have asked you more details about the case at
16  work, is there anything in particular that they've
17  asked you about?
18         JUROR HYDE:  They just want to know what
19  it's about, why is it taking so long, because it's
20  not common you hear about this long a trial.
21         MS. MARTIN:  Right.  Okay.  Thank you.
22         THE COURT:  Thank you, Ms. Hyde.  When you
23  go back, don't say anything about our conversation
24  with anyone.  We're asking them all the same
25  questions and they will find out when they get here.

1    Thank you, Ms. Hyde.

2                      (Brief pause)

3            THE CLERK:  Carolyn Williams.

4            THE COURT:  Ms. Williams, how are you?

5            JUROR WILLIAMS:  I'm doing well.

6            THE COURT:  Good, good.  Ms. Williams, we

7    are asking everybody basically the same questions and

8    it's not uncommon to do this in a long trial.

9    There's been some publicity recently about this case

10   and also some earlier on.

11           Have you happened to see any headlines or

12   any articles or hear any reports about it?

13           JUROR WILLIAMS:  No, ma'am.

14           THE COURT:  Do you generally read al.com or

15   Birmingham News?

16           JUROR WILLIAMS:  No.  I read my bible.

17   That's it.

18           THE COURT:  Okay.  And remind me where you

19   work.

20           JUROR WILLIAMS:  I work at Brookwood.

21           THE COURT:  Brookwood Hospital?

22           JUROR WILLIAMS:  Uh-huh.

23           THE COURT:  Remind me what you do there.

24   I'm sorry, it's been a long time.

25           JUROR WILLIAMS:  I'm an access rep, in other

1    words, wait on the patients.

2          THE COURT:  All right.  Has anyone at work

3    said anything to you about the case or asked you

4    about it?

5          JUROR WILLIAMS:  All of them have asked me

6    about it.

7          THE COURT:  What do they ask you about?

8          JUROR WILLIAMS:  Basically, they just be

9    jealous because I'm here and they're not here.

10   People want to know what kind of case that is lasting

11   that long.  I said that's none of your business.

12         THE COURT:  Okay.  So just basically

13   questions about the length of the trial and stuff?

14         JUROR WILLIAMS:  Yes.

15         THE COURT:  Okay.  Has anyone there figured

16   out what the case is about, what case you're on?

17         JUROR WILLIAMS:  No, ma'am.  No, ma'am.

18         THE COURT:  Anyone anywhere said anything to

19   you about the kind of case you're involved in or

20   anything like that?

21         JUROR WILLIAMS:  No, ma'am.

22         THE COURT:  Any questions?

23         MS. GUNASEKERA:  None from me.

24         MS. MARTIN:  Just nobody, when asking about

25   the case, nobody has asked you about what's going on

1  or anything like that?

2        JUROR WILLIAMS:  No, ma'am.

3        MS. MARTIN:  All right.  Thank you.

4        THE COURT:  As I said, Ms. Williams, we're

5  asking everybody this and if you would just not

6  discuss it when you get back, they will find out when

7  they get here.

8        Thank you, Ms. Williams.

9              (Brief pause)

10        THE CLERK:  Hope Hodges.

11        THE COURT:  Ms. Hodges, we're asking

12  everybody some questions and it's not uncommon to do

13  this in lengthy trials like this.  But we wanted to

14  know whether you have seen any of the or heard any of

15  the press coverage about this case.

16        JUROR HODGES:  No.

17        THE COURT:  Do you generally read al.com or

18  Birmingham News?

19        JUROR HODGES:  No, huh-uh.  The only news I

20  watch is Headline News in the morning.

21        THE COURT:  Headline News, would that be CNN

22  or --

23        JUROR HODGES:  You know, I don't know what

24  it's on to tell you the truth.  I don't know who

25  they're affiliated with.  I just like Robin Meade in

1   the morning, so I watch her.

2        THE COURT:  So that's on TV.

3        JUROR HODGES:  Yes.

4        THE COURT:  Anything on there about this

5   case that you've seen?

6        JUROR HODGES:  No, I haven't seen anything.

7        THE COURT:  Okay.  And remind me,

8   Ms. Hodges, where you work.

9        JUROR HODGES:  Blue Cross and Blue Shield of

10  Alabama.

11       THE COURT:  And what is it that you do?

12       JUROR HODGES:  I assist the director of

13  internal audit and corporate compliance.

14       THE COURT:  Has anyone there asked you about

15  this case?

16       JUROR HODGES:  No.

17       THE COURT:  Other than how long you're going

18  to be gone?

19       JUROR HODGES:  Yes, the length has been an

20  issue, but other than that, no.

21       THE COURT:  Any comments about what kind of

22  case is taking so long or anything like that?

23       JUROR HODGES:  No.  They just keep asking

24  me, are you sure it's going to be 90 days or it's

25  going to be the end of October, and I don't know.

1  I'm hoping it's going to be the end of October, but I
2  don't know.
3       THE COURT:  Well, we all hope that, I'm not
4  so sure right now.
5       JUROR HODGES:  I told my boss right now it's
6  kind of like a week to week thing.  I'm just telling
7  you this week, this is the times that I will be here
8  and when I won't be here.
9       THE COURT:  Just a lot of things that we
10  don't have control over as we get into cases.
11       Anyway, these lawyers know I'm pushing them
12  hard to get through before the holidays get here;
13  right?
14       JUROR HODGES:  That has been a topic of
15  conversation in the jury room.  Are we going to be
16  here for Thanksgiving.  I'm like, I don't know.
17       THE COURT:  Marcus is doing a good job of
18  food, isn't he?
19       JUROR HODGES:  He is.  We're set.
20       THE COURT:  Any other questions for
21  Ms. Hodges?
22       MS. GUNASEKERA:  None from me, Your Honor.
23       MS. MARTIN:  Nobody has asked you any
24  details or anything like that?
25       JUROR HODGES:  No, no, they're real good

1    about that.  I told them on the onset I couldn't talk

2    about it.  They're like, are you sure it's going to

3    be 90 days.

4              THE COURT:  Yeah.  All right.  Well, we are

5    working hard, I promise you, to try to get it

6    finished as soon as possible.  Appreciate your

7    working with us on that.

8              JUROR HODGES:  You're welcome.

9              THE COURT:  When you go back, if you would

10   not have any conversation with anyone else about

11   this.  We're just talking to everybody about the same

12   thing, so they will figure it out when they get here.

13             Thank you so much, Ms. Hodges.

14             JUROR HODGES:  You're welcome.

15                       (Brief pause)

16             THE CLERK:  Ms. Rains.

17             THE COURT:  How are you?

18             JUROR RAINS:  I'm good.  How are you?

19             THE COURT:  All right.  We are asking

20   everybody basically the same questions and it's not

21   uncommon to do this in a long trial like we have.

22   And also there's been some recent publicity about the

23   case and there was some early on.  We just want to

24   know whether you've seen any of the headlines or

25   heard anything about the reports or anything.

1        JUROR RAINS:  No.  Even though I work at a

2  news station, I haven't watched no news, no internet.

3        THE COURT:  Has that been hard?

4        JUROR RAINS:  No, I don't watch a lot of TV.

5        THE COURT:  You get enough there already?

6        JUROR RAINS:  Yeah.  Well, you know, I have

7  so many kids, I don't have time to watch everything.

8        THE COURT:  How many kids do you have?

9        JUROR RAINS:  I had five but I lost one a

10  year ago.

11        THE COURT:  So sorry about that.  That's

12  tough.

13        JUROR RAINS:  Oh, yeah.  So I have four left

14  and two grand kids.

15        THE COURT:  Wow.  And they keep you busy,

16  huh?

17        JUROR RAINS:  Yeah.

18        THE COURT:  I'm jealous about the grand

19  kids.  I've got a grand puppy but that's the closest

20  I've got to grand kids.

21        Has anyone at work said anything to you

22  about the case?

23        JUROR RAINS:  No, only when am I coming back

24  to work.

25        THE COURT:  What do you tell them?

1      JUROR RAINS:  As soon as it's over.

2      THE COURT:  We're working on it, we're

3  working on it.  Okay.  Has anyone asked you about the

4  kind of case that's taking so long or anything in

5  that regard?

6      JUROR RAINS:  Not really.  I just tell them

7  I'm down here at this building, if they want to see

8  me, they can come over here.

9      THE COURT:  Okay.  All right.  Any

10  questions?

11      MS. GUNASEKERA:  Not from me, Your Honor.

12      MS. MARTIN:  Do you look at al.com or get

13  alerts from anywhere like that on your phone?

14      JUROR RAINS:  Oh, no.  I mean, I have our

15  app and they text me.  She puts out all these things

16  about what she's wearing today.

17      THE COURT:  What is that?

18      JUROR RAINS:  She's our traffic lady.  She's

19  hilarious.  She's always doing these little spoofs

20  with her and Stephanie, our weather girl.

21      THE COURT:  But that doesn't have anything

22  to do AseraCare and hospice stuff?

23      JUROR RAINS:  no.

24      THE COURT:  Well, Ms. Rains, we appreciate

25  very much and if you would, when you go back to the

1  jury room, don't have a conversation with anyone

2  about our conversation.  We're asking everyone

3  basically the same thing.

4        JUROR RAINS:  Okay.

5        THE COURT:  We appreciate it.

6        JUROR RAINS:  Okay.

7                   (Brief pause.)

8        THE CLERK:  John Courington.

9        THE COURT:  How are you?

10        JUROR COURINGTON:  This is exciting, isn't

11  it?

12        THE COURT:  I don't know, I don't know,

13  Mr. Courington.  We're just asking everyone some

14  questions and it's not uncommon to do this in a long

15  trial like we have.  And recently, there's been some

16  press coverage and some news reports around about the

17  case and we just want to know if you had seen any of

18  those, if anybody has said anything to you about the

19  case or anything like that.

20        JUROR COURINGTON:  No.

21        THE COURT:  Do you read Birmingham News or

22  al.com or any of those?

23        JUROR COURINGTON:  No.  I'm not a blogger.

24  It wasn't like TMZ?  I'm a big TMZ, but this ain't on

25  there.

1          THE COURT:  All right.  What is TMZ?

2          JUROR COURINGTON:  It's like hilarious.

3          THE COURT:  Okay.  I don't think we've got

4   --

5          JUROR COURINGTON:  It hasn't been on there.

6   It comes on TV late at night but no.  I'm a big Jimmy

7   Fallon guy.

8          THE COURT:  This hadn't quite made it to Jim

9   Fallon.  I guess that's probably good that it hadn't

10  been on there.

11         Remind me where you work?

12         JUROR COURINGTON:  State of Alabama.

13         THE COURT:  What do you do with the State of

14  Alabama?

15         JUROR COURINGTON:  I do unemployment claims.

16         THE COURT:  You do that where?

17         JUROR COURINGTON:  Crestwood Boulevard is

18  the location.  It's in Irondale.

19         THE COURT:  It's kind of like what?

20         JUROR COURINGTON:  It's kind of a rough

21  area, but it's in an old brick building.  We make

22  decisions, you know, people that file for State of

23  Alabama unemployment.  That only has to do with their

24  separation from their job, when they got separated.

25         THE COURT:  Okay.  Has anyone at work said

1  anything to you about this case or your service?

2          JUROR COURINGTON:  They ask about it but

3  it's kind of -- they ask about how much longer is it

4  going to be and I said I don't know.

5          THE COURT:  Which is my answer, too,

6  Mr. Courington.

7          JUROR COURINGTON:  I mean, you know, so but

8  that's, you know --

9          THE COURT:  Have they asked you anything

10  about the kind of case?

11          JUROR COURINGTON:  They try to, but I didn't

12  answer them.

13          THE COURT:  When they asked you, what did

14  you say to them?

15          JUROR COURINGTON:  We can't talk about that.

16  It's a federal offense or something like that.

17          THE COURT:  You don't want to get in

18  trouble.

19          JUROR COURINGTON:  They ask that question

20  and how much do you make.  You know, people are

21  inquisitive.  And I said, I don't know, because I

22  really don't know.

23          THE COURT:  Okay.

24          JUROR COURINGTON:  That's the only

25  questions.  But you know, I haven't talked to them

1  about the case.

2          THE COURT:  What about outside of the

3  workplace, has anybody asked you about the case or

4  any comments?

5          JUROR COURINGTON:  No one knows but my wife.

6          THE COURT:  No one knows what?

7          JUROR COURINGTON:  That I'm on jury duty.

8  We don't talk about it.

9          THE COURT:  She's not curious, so what are

10  you really doing all day, no questions --

11          JUROR COURINGTON:  Just jury duty.  She just

12  says that's got to get boring.  Do the jurors get on

13  your nerves and was like no, they're okay.  No, she

14  hasn't.

15          THE COURT:  Okay.  Any questions?

16          MS. GUNASEKERA:  Not from me, Your Honor.

17          THE COURT:  When she asks if it's boring,

18  what do you tell her?

19          JUROR COURINGTON:  I say it's interesting,

20  the jurors are interesting.  She will say, how are

21  the jurors, how do you get along with the jurors.  I

22  said they're interesting.

23          THE COURT:  Do you tell her you get good

24  lunches?

25          JUROR COURINGTON:  I told her about the

1  lunch.

2          THE COURT:  That's only during

3  deliberations.  Back in trial, you're on your own on

4  that.

5          JUROR COURINGTON:  I don't come into work

6  and talk about AseraCare or anything like that.  I

7  haven't talked about anything.

8          THE COURT:  All right.

9          MS. MARTIN:  Has anybody mentioned to you

10  that they saw maybe news articles about the case or

11  anything like that?

12          JUROR COURINGTON:  They have.

13          MS. MARTIN:  They have.

14          JUROR COURINGTON:  That's not good, is it?

15          THE COURT:  No, no.  You cannot control what

16  other people have said.

17          JUROR COURINGTON:  They have said that.

18          MS. MARTIN:  Did they tell you anything

19  about they read?

20          JUROR COURINGTON:  I'm not able to talk

21  about it, that's what I told them.

22          MS. MARTIN:  Did they tell you anything they

23  read in the articles or anything?

24          JUROR COURINGTON:  No.  I said I'm not at

25  liberty to talk about that.

1           THE COURT:  What did they say to you about

2     seeing articles or something?

3           JUROR COURINGTON:  The only thing that I had

4     happen to me is I had -- I didn't go to work on

5     Friday, this past Friday, because Mike was sick and I

6     got his cold.  The Friday before that, I came to work

7     and somebody had mentioned, the lady that's like over

8     us, she had mentioned AseraCare case.  And I said, I

9     don't know what you're talking about.  I can't talk

10    about that.  But she did mention it.

11          THE COURT:  What did she say?

12          JUROR COURINGTON:  The article on al.com,

13    she had printed it off.  And she brought it to me and

14    she said, is this the case you're on?

15          I'm like no, I can't talk about the case,

16    but no.  But she did print off the article and she

17    came over there and she brought it to me.  She said,

18    are you on this case.  I said no.  I can't talk about

19    that.

20          THE COURT:  Did you read what she had

21    printed out or you just --

22          JUROR COURINGTON:  I didn't even look at it.

23          THE COURT:  All right.

24          JUROR COURINGTON:  That's your honest

25    opinion.  That's what you wanted.  And that's what

1  she did.  Her name is Susan Beatty Pierce, if you

2  want her name.

3       THE COURT:  Well, you can't control what

4  other people do or say.  You can control how you

5  respond to it and you can also control whether you

6  actually pay attention to it or you read what your

7  eyes come across.  So that's what we are talking

8  about.

9       JUROR COURINGTON:  That's what happened.

10      THE COURT:  Okay.  Would any of that have

11  any effect on how you participate as a juror going

12  forward?

13      JUROR COURINGTON:  No, not at all.  Because

14  it's really not her business, you know.

15      THE COURT:  And, again, we're more concerned

16  about how anything she might say would affect you.

17      JUROR COURINGTON:  She didn't say nothing.

18  She just said, is this the case you're on.  I can't

19  talk about the case or nothing like that.  I said,

20  you can call the judge and ask her.  I got

21  Ms. Frankie's card and if she had any questions about

22  the case that I'm on and she just walked away.  You

23  wanted to know.

24      THE COURT:  I did, yeah.  And seriously,

25  that is what we want to know.

1          JUROR COURINGTON:  No, it wouldn't affect me

2    at all.  We don't talk about the case.  We're not

3    allowed to talk about anything.

4          MS. MARTIN:  Did you see the headline or

5    anything in the article?

6          JUROR COURINGTON:  It was turned over

7    backwards and then when she showed it to me, she

8    said, this is on AseraCare case, are you on this

9    case?  And I said no.  I said, that doesn't involve

10   me.  And she walked away with it.

11         MS. MARTIN:  And you didn't -- she didn't --

12         JUROR COURINGTON:  We didn't go into detail

13   about it.  We didn't talk about nothing.  She walked

14   away.  When I brought up the judge's name, she walked

15   away.  You get what I'm saying.  When you bring the

16   judge, they get kind of scared.  That's about it.

17         THE COURT:  All right.

18         MS. GUNASEKERA:  Nothing from me, Your

19   Honor.

20         THE COURT:  Thank you very much,

21   Mr. Courington.

22         When you go back, if you would, please don't

23   discuss anything about our conversation.  Thank you.

24                   (Brief pause)

25         THE CLERK:  Mr. Smith.

1            THE COURT:  Hello, Mr. Smith.  How are you?

2            JUROR GREGG SMITH:  What's going on?

3            THE COURT:  I think I may have that crud

4   that you had for a while.

5            JUROR SMITH:  I got it from oysters.

6            THE COURT:  Well, different kind of crud

7   then.  I haven't had oysters.

8            We are asking everybody basically the same

9   questions, Mr. Smith, and it's not uncommon to do

10  this in a lengthy trial.

11           There's been some publicity recently about

12  your answers to interrogatories and things of that

13  nature and you cannot control what other people may

14  say to you or what you may see casually.  But we want

15  to find out if anybody has said anything to you about

16  this case or if you have seen any of the news reports

17  about the case.

18           JUROR GREGG SMITH:  No.  I made it a point

19  not to see.

20           THE COURT:  How did you do that?

21           JUROR GREGG SMITH:  For one thing, I don't

22  watch TV much and I don't read the paper.  I don't do

23  Facebook and all that other crap.

24           THE COURT:  Al.com?

25           JUROR GREGG SMITH:  Uh-huh.  And I make it a

1  point to go --

2       THE COURT:  What about al.com, you said

3  uh-huh.  Do you lump that into that other crap that

4  you said you don't do or --

5       JUROR GREGG SMITH:  Yeah, I don't do that.

6  But I also make a segue, if you're talking to

7  somebody, I just say, I can't talk about this and

8  they know it.

9       But I mean, it's like my son, my wife and at

10  work, we only have two people, that's pretty much it,

11  and they all know not to say anything about it.

12       THE COURT:  Remind me where it is you work.

13       JUROR GREGG SMITH:  I work for Spec Con,

14  which is a specialty contractor, and it's right down

15  the street, Second Avenue North.

16       THE COURT:  What do you do there?

17       JUROR GREGG SMITH:  I'm the head estimator

18  but I'm the project manager.  And I'm a senior

19  estimator.  In other words, I'm a major cog and

20  they're missing me bad.  It was pretty bad at first,

21  they didn't talk to me but it's gotten better, not

22  much better, though.

23       THE COURT:  Are they putting any pressure on

24  you about the time that you're away?

25       JUROR GREGG SMITH:  Indirectly, of course.

1   But they're not, I mean, not talking to me, I guess,

2   that's one way to not say anything to me about it.

3   But nobody understands mainly because I've already

4   been through this once, but it wasn't for federal,

5   you know, I've already been through jury duty several

6   months ago.  And they're going, how can this happen

7   again, this is not right.  And I'm going

8   (indicating.)  What am I supposed to do about it?

9           We are going above and beyond our jury duty,

10  though.  We are.

11          THE COURT:  Y'all are working.

12          JUROR GREGG SMITH:  We should get the silver

13  star for this.  This is not our duty.  This is above

14  and beyond is the way I look at it.

15          THE COURT:  All right.  Any other questions?

16          MS. GUNASEKERA:  Not from me, Your Honor.

17          MS. MARTIN:  I was just wondering, has

18  anybody mentioned to you that they've seen press

19  coverage about the case?

20          JUROR GREGG SMITH:  Huh-uh.

21          THE COURT:  Or anything like that?

22          JUROR GREGG SMITH:  Has there been any?

23          MS. MARTIN:  Yes.  I think there has been

24  some in the paper.

25          JUROR GREGG SMITH:  I haven't seen it, but

1    I'm a home body.  And I don't get out much.

2          THE COURT:  Now that we've told you that

3    there's been some, there's been some on the internet,

4    don't go looking for it.

5          JUROR GREGG SMITH:  Yeah.  I don't get on

6    the internet.  Just job-related stuff.

7          THE COURT:  I am concerned, Mr. Smith, about

8    this indirect pressure at work.  Is that affecting

9    your ability to concentrate and participate in the

10   trial?

11         JUROR GREGG SMITH:  No, no, because I can do

12   that.  I can put things aside.  And I can look at the

13   situation as it is right now and deal with that one

14   thing at a time.

15         THE COURT:  All right.

16         JUROR GREGG SMITH:  So, no, it hasn't,

17   because I work at nights and I work Friday, Saturday

18   Sunday and I'm constantly working.  It sure would be

19   nice to have a break, but I know we're going to get a

20   break pretty soon; right?

21         THE COURT:  We're working towards it.  We're

22   working towards it.  We really are.

23         JUROR GREGG SMITH:  But, no.  And again, I

24   think that's just the way they deal with it is not

25   talking to me.  So -- so, yeah.

1          THE COURT:  Does that give you any concern

2     about your job security or anything like that?

3          JUROR GREGG SMITH:  No, because I'm the head

4     salesperson for three years in a row, so they're not

5     going to -- that's not it.  They're just frustrated

6     because I asked them straight up, and they're just

7     frustrated.

8          THE COURT:  That you're not there.

9          JUROR GREGG SMITH:  Because there's only

10    three of us.  And I'm getting jobs and I'm not there

11    to answer questions.  So it's big.

12          Have you ever heard of the Grand Bohemian in

13    Mountain Brook?  It's a hotel.

14          THE COURT:  That's being built.

15          JUROR GREGG SMITH:  It's about finished.

16    That's one of the projects I did.  I did AmSouth

17    here.  I did everything at Children's, Children

18    Harbor, the west tower, you name it at Children's.  I

19    was the project manager for Benjamin Russell, the

20    brand new hospital.  So if I'm not there, it's bad

21    news.

22          So I guess that's the reason why they're

23    frustrated.  So am I, in a way, but I'm just doing

24    the best I can.  Right?  That's what I'm supposed to

25    do.

 1          THE COURT:  Yes, yes.  And we appreciate

 2   your commitment.  I don't know if we can get a silver

 3   star, but we will see what we can do.

 4          JUROR GREGG SMITH:  I was playing with that.

 5   But this is a pretty intense time period.  It's a

 6   long time.

 7          THE COURT:  It is, it is for all of us.  But

 8   we appreciate it very much.

 9          Anything else?

10          MS. MARTIN:  Just this pressure, I guess,

11   from work and you're sure that you can sort of --

12   that's not affecting maybe your thoughts about the

13   case.

14          JUROR GREGG SMITH:  No.  It would affect me

15   if I didn't go to work and I just blew it off, then

16   it would affect me.  But I'm keeping up with

17   everything.  I'm doing what I'm supposed to do.  So,

18   no, that's, huh-uh.

19          MS. MARTIN:  Thank you.

20          THE COURT:  Okay.  We appreciate very much,

21   Mr. Smith, and we ask that when you get back in the

22   jury room that y'all not discuss our conversation in

23   here.

24          We've had basically the same conversation

25   with everyone, but we will be taking a short break,

1  and then we will be back in the courtroom to give you

2  instructions on what we do next.

3           JUROR GREGG SMITH:  Okay.  And just to

4  understand, we have a good group in there.  A very

5  good group.  And we just didn't flip coins.  And if

6  you ever -- I don't know if you're going to be able

7  to, but I'm going to keep my stuff up, but if you go

8  in our jury room, you can see what we did because

9  it's all over the walls.

10          THE COURT:  I hope you haven't been writing

11  on my new walls in there.

12          JUROR GREGG SMITH:  No.  But big stickies.

13  So we've done the best we could.  We didn't just flip

14  a coin.  That's the second time I said that, but it

15  was real easy to do that, but I made sure that didn't

16  happen.

17          THE COURT:  We appreciate that.  Okay.

18  We'll see you back in the courtroom in a few minutes.

19          JUROR GREGG SMITH:  Hey, you guys are doing

20  a good job, too, by the way.

21          THE COURT:  Thank you.

22                    (Brief pause)

23          MS. MARTIN:  Judge, as we sit here and just

24  thinking about the answers that we had, with

25  Ms. Canada, you know, she said that people had asked

1  if she had found AseraCare guilty and some questions

2  like that.  And we didn't really ask her at what time

3  frame, I know --

4          THE COURT:  Do you want to ask her to come

5  back in?

6          MS. MARTIN:  If we could have her come back

7  in because I'm not sure what time frame --

8          THE COURT:  I did feel like she was very

9  candid with us.

10          MS. MARTIN:  She was.  She was.  But I just,

11  as we went through and saw with the other jurors, I

12  realized we didn't establish that issue.

13          THE COURT:  I don't think we were quite as

14  prepared for that off the bat.

15                  (Brief pause)

16          THE CLERK:  Ms. Canada.

17          THE COURT:  Hello again, Ms. Canada.  We

18  asked you back because, after we talked to other

19  people, we decided we needed to ask you a few more

20  questions.

21          I very much appreciate your candid answers

22  about seeing and hearing about the headlines.  That

23  is so logical and so honest.  But we did want to ask

24  some questions in terms of timing of some questions.

25          I think you indicated that some people at

1  the office may have asked you about AseraCare.

2      JUROR CANADA:  No, not about AseraCare, but

3  about what case I was on.  I saw the headline that I

4  talked about when you asked me what headline I saw, I

5  saw the word AseraCare and I saw those two numbers

6  and knew what the article would have been about so I

7  just skipped over it.

8      But nobody knows what the case is.  They

9  just know I'm on a case and I've never been on a jury

10 before, but I've heard other people talk about it.

11     And when you tell them, they're like, just

12 tell them you're going to find them guilty so you can

13 get off the jury.  I said, well, it's not that kind

14 of case.  Just try to go on from there.  But nobody

15 ever used the word AseraCare.

16     THE COURT:  They were saying early on find

17 them guilty and move on.

18     JUROR CANADA:  Find them guilty and you'll

19 get kicked off.  That type of thing.

20     MS. MARTIN:  Just the comments that they

21 made, that was just in terms of you being on the jury

22 but not about how you would decide the case or

23 anything?

24     JUROR CANADA:  No, no, everybody has got

25 advice on how to get out of jury duty.  That's

1   basically what it is.  And when they find out it's
2   like 90 days, well, go back and tell them this -- go
3   back and tell them this.  That's all it is.
4        MS. MARTIN:  And the comments that people
5   have made to you about your jury service, has any of
6   those been about what the case is about or how the
7   results are going to come out --
8        JUROR CANADA:  No, ma'am.  They just asked
9   me when will I be back or when they will see me again
10  because right now it's just on Fridays or like this
11  past week or week before when we had Columbus Day, I
12  was there on Monday.  That's about it.
13       THE COURT:  Okay.
14       MS. MARTIN:  And I know we had -- I'm sorry,
15  because I may have asked you this when you were in
16  here.
17       JUROR CANADA:  That's okay.
18       MS. MARTIN:  You mentioned that one
19  headline, but any other prior coverage or anything
20  like that?
21       JUROR CANADA:  I had not heard of anything
22  before I got on this case.  I didn't know anything
23  about it.  I think I was asked then had I seen any
24  headlines and no, I hadn't.  If I had, they didn't
25  ring any bells when I heard the name of the case.  I

1   haven't seen any since.

2           I've seen Kent up here a couple of times.

3   Before the case started, I couldn't pick him out

4   because the picture I see online did not look like

5   the man I see in the courtroom.

6           The backpack is what made me notice him the

7   first time because we all have identical backpacks

8   and I was like who is this and that's when I realized

9   who he was.

10          MS. MARTIN:  Thank you.

11          THE COURT:  Okay.  So I think this is

12  correct, Kent had written an article about the

13  beginning of the case.  Did you see headlines on that

14  or anything?

15          JUROR CANADA:  I know he was there the first

16  day, so I assume he wrote an article when we started,

17  but I haven't seen it.

18          THE COURT:  All right.  And if you did, you

19  would treat it the same way you did this recent

20  headline, just --

21          JUROR CANADA:  Like I said, my home page is

22  al.com, but when I go online, I'm going to other

23  websites.  We have, I don't know what you call them,

24  but we have different things we have to go through to

25  do our online ordering, our databases.  We pull up

1  our internet and then I've got favorites buttons that

2  I push and I'm off those home pages in no time.  But

3  almost everybody that works there has al.com as their

4  home page.  And I don't remember ever seeing one

5  coming up as a headline because usually when it comes

6  up there's a picture box that comes up with a picture

7  that scrolls across and that's about the only thing

8  you see when you first get on.

9          THE COURT:  All right.  Anything else?

10         MS. MARTIN:  I don't believe so.

11         THE COURT:  We appreciate it.  We will see

12  you back in the courtroom in just a few minutes.

13                  (Brief pause)

14         THE COURT:  If that's it, we're okay.  I am

15  a tad concerned about Mr. Smith.

16         MS. MARTIN:  I'm concerned about Mr. Smith

17  and I'm a little -- I'm a little concerned about

18  Ms. Hyde, whose father saw the article, and then told

19  her it was on, and I know she said he just figured it

20  out, but it just strikes me that perhaps there's been

21  some conversation there.

22         THE COURT:  My experience in long cases is

23  that it's not hard for people, who are the least bit

24  news savvy, to figure out that if somebody is on a

25  long case at the federal court and the only thing

1    that's being reported as being long is such and such.

2           It happens, which is one reason you tell the

3    jurors if somebody, you know, approaches them about

4    the case, just don't talk about it.

5           MS. MARTIN:  Right.

6           THE COURT:  Did you want to ask her any

7    further questions on that?  I thought we were kind of

8    --

9           MS. GUNASEKERA:  I had the same thought,

10   Your Honor.

11          THE COURT:  And her father is an engineer.

12          MS. GUNASEKERA:  He's somebody who, it

13   sounds like, understands --

14          THE COURT:  Would be on top of things.

15          MS. GUNASEKERA:  Yes, yes.

16          MS. MARTIN:  I mean, I think it might be

17   worth asking her just if she's had any discussions

18   with him about the specifics of the case or how he

19   would have known that she was on that case.

20          THE COURT:  I thought we asked her that.

21          MS. GUNASEKERA:  I think we asked her that,

22   Your Honor, and she said no.

23          THE COURT:  Let's be back in the courtroom

24   at 11:15.

25          MS. MARTIN:  With regard to Mr. Smith,

1  Judge, you said there were concerns about --

2       THE COURT:  My concern is the pressure at

3  work, but he doesn't seem concerned about it, so --

4       MS. GUNASEKERA:  I would think he would be

5  honest.  You were asking him pretty directly, Your

6  Honor, are you concerned and he said no.

7       THE COURT:  He's too self important to be

8  worried about it.

9       MS. MARTIN:  The concern I had was in his

10  expressed statements that they are going above and

11  beyond their duty as jurors and that they deserve a

12  silver star.  And I would not dispute that they are

13  going above and beyond, but he seemed, in his

14  responses, to be expressing some, perhaps,

15  frustration and dissatisfaction with that.  And that

16  is just of concern because we are now looking at a

17  phase two that we know is going to go for several

18  weeks and it just -- he seems to have some definite

19  frustration about.

20       MS. GUNASEKERA:  But I think, as Your Honor

21  commented, I think that frustration can be all

22  around, frankly.  It's not specific to anything.

23  It's the time.  And I don't think any of us

24  anticipated that it was going to be as protracted as

25  it has been.

1          THE COURT:  That's why I started in August

2     instead of September.

3          MS. MARTIN:  I will just say to that point

4     that he did expressly state his frustration and that

5     they have been going above and beyond.  And it just

6     seems to me that he is expressing some pressure from

7     work or the service, that it is some dissatisfaction

8     with sitting on a jury, and that definitely could

9     have an impact in phase two.

10          MS. GUNASEKERA:  I guess I would just add I

11     had a little bit of a different take on it in that I

12     heard him, you know, talking about the work aspect of

13     it, but I felt like he was saying, we're going above

14     and beyond to communicate to us but I'm taking this

15     very seriously.

16          So I don't want you to think I'm just like,

17     I'm done with this, and I'm frustrated with the whole

18     process.  I just want to remind you, and I felt like

19     that's why he made the comment at the end, just to

20     say we're taking this very seriously.

21          THE COURT:  We're not flipping a coin, that

22     we're taking it very seriously.  And to me, it seemed

23     to be a point of pride with him.  Of course, there

24     were several points of pride with him.  But I felt

25     like he was expressing his pride in his leadership of

1    the juror to really pay attention and take it

2    seriously.

3         But I do think we may need to spot check,

4    depending upon how much longer things go, just to

5    make sure that he still feels very self confident

6    that he doesn't have any risk at the job.  So we will

7    see.

8                    (Brief recess.)

9              (Open court.  Jury not present.)

10                      (SIDEBAR)

11        MR. LEMBKE:  Your Honor, Ms. Martin has

12   informed the rest of the AseraCare team about the

13   comments made by Mr. Smith during the Court's

14   interview of him.

15        I will also tell the Court that during

16   Dr. Cooney's examination, at one point, I personally

17   observed Mr. Smith seeming frustrated and at one

18   point did the slash motion across his throat.  And it

19   seems to us like he is growing frustrated, especially

20   in light of the comments he's made, and it calls in

21   to question his ability to fairly consider the

22   evidence.  So we move to have him excused for cause.

23        MS. GUNASEKERA:  Your Honor, the government

24   would oppose that request.  We're not aware that he

25   made any kind of gesticulations during Dr. Cooney's

1   testimony.

2          And more to the point, during the

3   conversation that we just had with him, Your Honor,

4   he actually made a big point of the fact that he is

5   taking this case very seriously and has taken the

6   time and actually appears very proud of the fact that

7   they've taken the time to deliberate the phase one

8   jury decision that they came to and did not indicate

9   any concerns at the moment about continuing in his

10  role as a juror through this case.

11         THE COURT:  I overrule that motion at this

12  time.

13         MR. LEMBKE:  Thank you, Your Honor.

14                  (Jury present)

15         THE COURT:  Ladies and gentlemen, as I

16  mentioned before you left on Thursday, the parties

17  and I have some concerns about a few of the answers

18  that you gave.

19         And we've worked out some of those, but we

20  still have a few issues.  So, I'm going to give you

21  instructions now as to how we would like for you to

22  look at clarifying some of your answers.

23         The Court and the parties have reviewed the

24  answers you gave to the special interrogatories for

25  phase one.  In a few instances where you answered

1   "yes" as to a specific patient and identified a

2   period of time during which you found AseraCare's

3   claims for hospice services were false, the dates you

4   indicated for the period during which claims were

5   false are not consistent with the expert medical

6   testimony presented by the United States concerning

7   the dates of ineligibility.

8          I remind you that the United States bears

9   the burden of proof by a preponderance of the

10  evidence.

11         This issue exists regarding your answers for

12  the following patients:  number 6, Ann K.; number 32,

13  Elizabeth K.; number 62, Lanny R.; number 67, Lidia

14  S.; number 69, Lottie W.; and number 94, Norman K.

15         For these patients, you need to resume your

16  deliberations and reconsider your answers.

17         If you decide to change any of your answers,

18  you should mark through your prior answer and write

19  in your new answer on the original verdict form.

20         The foreperson should then initial any such

21  changes.  If you decide not to change your answer,

22  your foreperson should initial beside the answer so

23  we will know that you, in fact, discussed that

24  answer.

25         As with your initial deliberations, all of

1  your answers must be unanimous and you should follow

2  all of the other instructions that I have previously

3  given you concerning the legal standards you should

4  apply.

5          Also, make sure that you still have a copy

6  of the Court's original instructions and they will

7  apply, as well, to this deliberation.

8          If you have any questions, then you should

9  communicate the same way that you were instructed to

10  do so during your original deliberations and all

11  those other things apply as well.

12          You will have lunch today around noon.  We

13  appreciate your hard work.  And I really think that

14  it's pretty remarkable that out of 121 patients and

15  answers we're only asking you to clarify regarding

16  six, so we do appreciate your attention to those

17  details.

18          You will have a copy of my instructions, as

19  well as your original verdict form, and the original

20  instructions that I gave you for your deliberation.

21          You may now go to the jury room.  And as

22  soon as you get these documents, you may begin work

23  on this new assignment.

24                  (Jury excused).

25          THE COURT:  Any objections to the Court's

1    instructions to the jury other than those previously

2    made?

3            MR. LEMBKE:  None for the defense, Your

4    Honor, other than previously made.

5            MR. WERTKIN:  Except for the standing

6    objections we've previously made, Your Honor, no

7    further objections.

8            THE COURT:  All right.

9            (Brief recess.)

10           (In judicial conference room.)

11           THE COURT:  Do you want to take up the issue

12   about the attorney before we get to this other stuff?

13           MR. LEMBKE:  Yes, Your Honor.  As the Court

14   ruled already this morning, the motion to add

15   Ms. Lester and Ms. Davis as trial counsel were

16   disallowed.

17           And we certainly understand, you know, if

18   they want -- and the reason is they haven't been

19   qualified with the jury during voir dire.

20           Our concern is when we went in to court this

21   morning before the session with the jury, Ms. Lester

22   was sitting with one of the government's lawyers in

23   the front row directly behind the government's table

24   and with one of the lawyers who has been qualified

25   with the jury as -- or people, I don't know whether

1   she's a lawyer or not, but one of the government

2   people who have been there the whole time.  Someone

3   sitting there in that position with that group, it

4   would be pretty clear to anyone looking over she's

5   with the government.  And if someone on the jury

6   knows her, then it raises the potential of bias.

7           So, we ask, would it be better if she sat

8   back a couple of rows whenever she's in the

9   courtroom.  And the government's response to me was

10  that was ridiculous.  They said we need to raise it

11  with the Court and here we are.

12          MR. WERTKIN:  The government's official

13  position on this, Your Honor, is that it's

14  ridiculous, said with a smile.

15          Ms. Lester will sit in the gallery and if

16  Your Honor has any questions about that, I will be

17  happy to address them.

18          THE COURT:  I do have some concerns about it

19  because I felt like we took great strides during

20  initial voir dire to introduce to the jury anybody

21  who might possibly be affiliated with either side to

22  see if they knew anyone.

23          Now, I don't know where Ms. Lester and

24  Ms. Davis are from.  I don't think they're from the

25  Birmingham area.  It may be highly unlikely that

1    jurors may know either of them.  But that's a risk

2    that I am concerned about because we didn't have an

3    opportunity to question the jury about it.

4            MS. LESTER:  I'm from Luverne, Alabama.  I

5    have been in Birmingham for four years.

6            THE COURT:  Okay.

7            MS. LESTER:  Going on four years.

8            THE COURT:  Then that increases my concern.

9    Ms. Lester, would you have any problem with sitting

10   back away from the government lawyers?

11           MS. LESTER:  The second row, I mean, in all

12   fairness, too, I have been here the past -- since we

13   started trial, sitting on the front row with Lane and

14   I understand that it's, you know, I guess association

15   that you can tell now -- I guess I don't necessarily

16   understand why it's different now if I'm not -- I

17   haven't, you know, been considered counsel.

18           But yes, I'm happy to sit on the third row,

19   if that works.

20           THE COURT:  If you have been sitting in all

21   along, why were we not including you when we

22   questioned the jury about who they might know.  We

23   asked about Lane, and we asked about Don and

24   everybody else that I know who has been in and out of

25   the courtroom on behalf of the government.

1          MS. LESTER:  Right.  And that's a very fair

2     question, Your Honor.  I did not start at the U.S.

3     Attorney's office until August 10th.  I was not

4     around for voir dire.  But then since y'all started

5     trial, which was like August 10th, which was the day

6     I started, I've been coming in and out since then,

7     not everyday, all day everyday, but just popping my

8     head in, sitting and listening, but clearly on the

9     government's side.

10          But I'm happy to sit a couple of rows back.

11     That's fine.

12          MS. TAPIE:  Your Honor, just for the record,

13     there have been numerous individuals who I presumed

14     are Bradley, Arant secretaries who have sat on the

15     front row and the second row who have lined up behind

16     defense counsel in this case.

17          I don't have an understanding that all of

18     them were asked about during the juror's voir dire.

19     I don't think that this is an issue where the

20     government suddenly has someone new sitting behind

21     them when it hasn't also been happening on the other

22     side to individuals who weren't specifically raised

23     during voir dire.

24          THE COURT:  Have there been any attorneys

25     that have been in and out of the courtroom?

1      MR. LEMBKE:  Your Honor, I think all of the

2  attorneys from our side who have been in and out on a

3  regular basis, now, certainly, a couple came and

4  listened at the back to opening and closing, but it's

5  been, you know, we qualified the jury on Mr. Danella,

6  Mr. Spainhour, Ms. Sullivan, and Ms. Reeves --

7      MS. MARTIN:  Ms. deGruy.

8      MR. LEMBKE:  Ms. deGruy.  All of whom have

9  been in and out, and I don't know anyone who has been

10  in and out on a regular basis, as an attorney, who

11  has been in and out of the courtroom not qualified.

12      Anyone who has been in the courtroom on a

13  regular basis, any attorney on our side, was

14  qualified.

15      MR. WERTKIN:  Just to be clear, just for the

16  record, we're talking about the gallery.  Ms. Lester

17  has not been sitting in front of the bar.

18      MR. LEMBKE:  That's what I'm talking about.

19      THE COURT:  Right.  Where is Ms. Davis from?

20      MR. WERTKIN:  Ms. Davis is a trial attorney

21  in the civil division.  Her office is in Washington,

22  DC.  We believe she's originally from Chicago,

23  Illinois.

24      THE COURT:  Has she been sitting in the row

25  behind the government counsel?

1        MR. WERTKIN:  No, Your Honor.  I think --
2   actually, I'm not sure where she's been sitting.
3   She's never come ahead of the bar.  She's always sat
4   to the -- to the extent she's ever been in the
5   courtroom, it's been in the gallery, Your Honor.
6        THE COURT:  There's the gallery that's the
7   row or two behind counsel where lawyers who generally
8   have been identified to the jury but haven't been at
9   counsel table have been sitting regularly, and then
10  there's the gallery several rows back where just
11  ordinary spectators come in.  And I see a difference
12  in this case.  Because a lot of the lawyers
13  identified for both sides have been sitting in those
14  benches.
15       MR. WERTKIN:  Is there a demarcation?  I
16  haven't been back in the gallery.  It's just like the
17  first two rows generally tend to be the lawyers?
18       THE COURT:  Well, that's what I've observed,
19  that lawyers for both sides have generally come in
20  and sat in those rows and are clearly identified with
21  one side or the other.  But they are lawyers who have
22  generally been identified to the jury during voir
23  dire with the exception of Ms. Lester.
24       MR. OLSON:  To clarify, Ms. Davis only
25  attended the trial on one day, the jury verdict,

1  return of the special interrogatories.  She joined us

2  two weeks ago.  She was not here for the case.

3       THE COURT:  I see two possible scenarios

4  here:  One would preclude Ms. Lester from being

5  anywhere identified with the government.  The second

6  scenario would be to voir dire the jury now as to

7  whether they know this person who has been sitting in

8  the courtroom this whole time that has not been

9  brought to my attention as being a lawyer for the

10  government in this case.

11       MR. LEMBKE:  Your Honor, we think, first of

12  all, we think the notion of voir diring the jury at

13  this point is not workable.  Because if they say yes,

14  and they say well, we're not going to have Ms. Lester

15  be counsel, then they know she's counsel.

16       Now, I will tell you -- and I guess I just

17  wasn't observing -- I did not realize until today

18  that Ms. Lester, until she just said it, that

19  Ms. Lester has been a regular spectator in the first

20  two rows of the courtroom and, frankly, that's very

21  problematic to us.

22       MS. LESTER:  Can I clarify that?  I say

23  regular, I don't mean that I was there for eight

24  hours everyday.  There are weeks that I didn't come

25  in.  It was when, oh, they're doing the cross of so

1   and so, might be interesting for you to come watch.

2   I just started, so I didn't have a huge case load

3   right when I came on, so I would come over and watch.

4   It wasn't like I was a lawyer and hadn't been

5   identified.

6           I didn't really start doing anything for

7   this case until I filed my notice of appearance which

8   was, I think, two weeks ago.

9           MR. WERTKIN:  Your Honor, maybe it's

10  possible that I missed it in one of the Court's

11  orders, but did the Court order that certain people

12  cannot attend the court proceedings?

13          THE COURT:  No.  I have no problem with

14  people attending court proceedings.  But when it's

15  somebody who then is identified as an attorney for

16  one side or the other, that we haven't asked the jury

17  about, that can be problematic.

18          Don't you understand that?

19          MR. WERTKIN:  But in this particular case,

20  the Court has already ruled that Ms. Lester is not

21  going to be trial counsel in this case and that she's

22  -- and she's only going to sit in the gallery, so

23  we're not going to identify Ms. Lester as an attorney

24  for the government.

25          THE COURT:  All right.  But she's sitting

1    with counsel for the plaintiffs in the courtroom

2    right behind the bar where other people clearly

3    identified with the plaintiff's side are sitting and

4    someone who is local, who is from Alabama, who is,

5    you know, working across the street, that is where

6    the problem comes in.

7              Do you understand, Ms. Lester?

8              MS. LESTER:  Yes, ma'am.

9              THE COURT:  I don't know whether any of

10   those jurors grew up in your hometown and might know

11   your mamma.

12             MS. LESTER:  I would know, I think, if they

13   are from Luverne because it's about this big

14   (indicating).

15             THE COURT:  Right.  But you don't know those

16   folks that grew up and knew your mamma and moved up

17   here.

18             MS. LESTER:  I understand.

19             THE COURT:  That just opens a whole can of

20   worms for me and it really concerns me.

21             MR. WERTKIN:  Let's say that -- we don't

22   think that any of the jurors know Ms. Lester, but if

23   one of the jurors did know Ms. Lester, would the

24   right result be that she couldn't attend the

25   proceedings?

```
 1              THE COURT:  It would be grounds for possibly
 2    excusing the juror.  That's why you ask jurors, do
 3    any of you know any of these attorneys who are
 4    representing some of the parties.  And depending upon
 5    whether they know them or not, then they may be
 6    excused for cause, depending upon how close the
 7    relationship is, but the other side would also have a
 8    right to strike that juror as part of their
 9    preemptory challenges if they're concerned about that
10    relationship, Mr. Wertkin.  Don't you understand
11    that?
12              MR. WERTKIN:  I guess -- I don't mean to be
13    obtuse, Your Honor, I just -- the logical extension
14    of that is that Ms. Lester would be barred from the
15    courtroom.
16              MR. LEMBKE:  Your Honor, just for the
17    record, if a juror had said, I know Mr. Wertkin, I
18    grew up with him, but I haven't seen him in 15 years.
19    And you asked, well, can you be fair?  Oh, I can
20    still be fair.
21              We might very well strike that juror out of
22    concern as to whether they would be fair.  And we
23    went through all the lawyers who we said, I think
24    it's in the transcript, they will be in and out and
25    we went through them.
```

1              Now, Your Honor, I would hope the Court

2     would consider, so the record is clear, you asking

3     Ms. Lester to clarify her best estimate of the number

4     of days she's been in the courtroom during trial and

5     her best judgment as to where she has been sitting on

6     those days so we have a clear record of it.

7              THE COURT:  Ms. Lester.

8              MS. LESTER:  I can do that, maybe not right

9     off the top of my head.  I started August 10th, which

10    was when y'all started, I guess, opening statement.

11    I watched that.

12             I was in orientation actually pretty much

13    the entire first week.

14             The second -- I didn't see -- I watched

15    maybe opening statements.  And then the next time I

16    was there was when Dr. Liao was on his like fifth day

17    of testimony maybe.

18             So that maybe after -- maybe one more time

19    in August and maybe after Labor Day, I watched maybe

20    a day and a half of Dr. Liao's testimony, maybe

21    watched a little bit of the cross.  So that was maybe

22    a day and a half.

23             And then I watched closing, I think.  I

24    walked over with someone -- and sitting on the front,

25    I would say, maybe once, twice.  Other times it was

1   just, you know, pop in and sit in the back, in the
2   middle, wherever.
3           But I've had -- it's not like I have been on
4   trial team working this case.  I've had my own cases
5   back over there, so I've been over there filing
6   stuff, doing stuff, learning stuff, doing all of
7   that.
8           So it's not like -- when I say regular, I
9   didn't mean I was in here all day every day.  I would
10  pop in for an hour or two.  But I had my other
11  responsibilities at the U.S. Attorney's office that I
12  was doing.
13          MS. TAPIE:  Your Honor, if I may, I am
14  having a little trouble understanding.  I understand
15  what Mr. Lembke just said about what they've
16  intentionally might have done if one of the jurors
17  knew Ms. Lester.
18          What I said previously about secretaries
19  that are local who work at Bradley, Arant who have
20  been sitting in that first row, in that second row,
21  if the jurors had any question about them and had
22  said yes, I mean, we could have potentially done a
23  strike on them as well.
24          I guess, I'm having trouble understanding
25  when people are sitting directly behind counsel and

1    potentially your understanding that or the juror's
2    understanding that they're associated with that side
3    and not having been questioned about why the attorney
4    or the secretary makes a difference here, when there
5    are apparently people on both sides who are sitting
6    in that first row that the jury was not questioned
7    about.
8         THE COURT:  You don't see any difference
9    between a secretary who may come in from time to time
10   and a lawyer who has some kind of responsibility for
11   the case and the juror's knowledge or association of
12   such person?
13        MS. TAPIE:  I certainly understand the
14   difference between secretary and lawyer.  But not
15   knowing if there is a relationship or knowledge or,
16   you know, if I know that person, I think it's still a
17   close relationship of potentially someone that they
18   know that could cause bias, Your Honor.
19        THE COURT:  I've never been asked to ask
20   jurors do you know these secretaries -- we always
21   identify paralegals who are coming in and we did that
22   in this case for both sides.
23        MR. WERTKIN:  Also -- sorry, I didn't mean
24   to interrupt.  But to clarify also, Ms. Lester did
25   not have any responsibility in this case until she

1   filed her notice of appearance which was while the

2   jury was deliberating.  So while she was attending

3   court, she had no responsibility in this particular

4   case.

5          THE COURT:  But the thing is now she does.

6   And we don't know whether any jurors know her.  And

7   the defense has a right to know that because it could

8   affect whether they would have kept such a juror on

9   this case.

10          So I think the only thing that we can do,

11   Ms. Lester, is basically say you stay out of the

12   courtroom and you get daily copy.  You can read

13   whatever they want you to know.  I'm sorry.  I don't

14   think it's your fault in this situation, but I hope

15   you understand the concern about whether the defense

16   would have struck a juror if that juror knew

17   something, knew you or your parents or whatever.

18          MS. LESTER:  So I can't even sit like on the

19   back row?

20          THE COURT:  No, no.  I just think it needs

21   to be as disassociated as possible to preserve the

22   integrity of the jury that has been working for two

23   months or more on this case.

24          I don't know what else to do other than now

25   conduct a voir dire which we all think or some of us

 1   think would be very disruptive and impractical.

 2           MR. LEMBKE:  If we have different thoughts,

 3   we will let you know immediately after lunch, if

 4   that's all right.

 5           THE COURT:  That's fine.  This is not

 6   something that has ever come up before in my cases.

 7   So I'm treading new water, new ground.

 8           MR. WERTKIN:  We just respectfully request

 9   an opportunity to do some research into it.  And if

10   Your Honor would allow, to bring you some case law

11   about attending proceedings.

12           THE COURT:  If you can find that.

13           MR. WERTKIN:  Thank you.

14           MS. TAPIE:  Does this apply just to

15   Ms. Lester or also to Ms. Davis?

16           THE COURT:  Ms. Davis can sit in the back,

17   is that okay with y'all?

18           MR. LEMBKE:  I don't have any objection to

19   that.

20           THE COURT:  I do want you to ask her where

21   she grew up, if she has any contacts with Alabama,

22   that's not determinative, that there's no way anybody

23   on the jury could know her, but it's much less likely

24   or much less of a concern.

25           MR. WERTKIN:  We actually discussed it, Your

1  Honor, when the motion was posed.  And we can
2  represent that she has no connection, I believe it's
3  the first time that she's visited Alabama.
4       MS. LESTER:  She said I was the first person
5  she met from Alabama.
6       THE COURT:  Okay.
7       MR. LEMBKE:  I guess, Mr. Pehl, you know, is
8  in the courtroom and I think the jury knows he's the
9  investigator, the tall guy who I think, by this
10 point, is clearly identified with the government.
11      I would hope that she would not sit with him
12 in the courtroom on a regular basis to sort of give
13 the signal that she's part of the team, if she's
14 going to be there regularly.
15      THE COURT:  Can we do that and make sure
16 she's not with team members?  Okay.
17      I'm going to have to say that's it for now.
18 I've got a 12:30.
19      MR. LEMBKE:  And we've given Frankie the
20 number for Ms. Cross.
21      THE COURT:  So we will take that up at 2:00.
22      MR. LEMBKE:  We would like that --
23      THE COURT:  At 1:00.
24      MR. LEMBKE:  Given the subject matter of her
25 statement to the press, we would like that part of

1    the transcript to be under seal.

2         THE COURT:  We will meet in here for that.

3    I'm assuming we will have questions you can ask.

4         MR. LEMBKE:  Yes, Your Honor.

5         THE COURT:  Okay.  All right.  As I said,

6    I've got a 2:00 o'clock and then we will probably, at

7    that point, come back to the subpoenas and the

8    Advanced Med issues.  We will take those up

9    definitely before we leave today.  But I'm not sure

10   how long I can hang with y'all today.  I'm sorry.

11   But I want to be able to be with you for the rest of

12   the week.  Okay.

13                    (Brief recess.)

14              (Open court.  Jury present.)

15        THE COURT:  I understand, jurors, that you

16   have answers for us; is that right, Mr. Smith?

17        JUROR GREGG SMITH:  Yes (indicating).

18        THE COURT:  As to patient number 6, Ann K.,

19   the juror's answer as to the ineligible time period

20   is January '05, 2007 to September 8, 2009.

21        As to patient number 32, Elizabeth K., the

22   juror's time period is January 28th, 2010 to March

23   12, 2011.

24        As to patient number 62, Lanny R., the

25   juror's time period of ineligibility is March 14th,

1  2008 to August 27th, 2009.

2          And for patient number 67, Lidia S., the

3  juror's time period for ineligibility is April 15th,

4  2009 to October 1st, 2011.

5          As to patient number 69, Lottie W., the

6  period of ineligibility is November 23rd, 2007 to

7  January 22nd, 2009.

8          And for patient number 94, Norman K., the

9  period of ineligibility is April the 30th, 2009 to

10  September 8, 2010.

11          And those were all the ones that we asked

12  for clarification.

13          Mr. Smith, I did not ask you to do this, but

14  I am going to ask you, if you would, go back and

15  beside your initial, put today's date, if you

16  wouldn't mind doing that for me.

17          As I said, I forgot to ask you to do it.  It

18  shouldn't take you very long.

19          Ladies and gentlemen, you are released until

20  Wednesday morning at 8:30 when we resume testimony in

21  the trial of phase two of this case.

22          As you've previously been instructed, and as

23  you demonstrated to me this morning, you have all

24  complied with the instruction to not pay any

25  attention to any news coverage or information online

1  or in newspapers or anywhere else about this case and
2  we appreciate that.
3      You need to continue to ignore any outside
4  information about this case.  You are to continue to
5  not discuss it with anyone and no additional research
6  and all those other things I've told you not to do
7  all this time and we will see you back Wednesday
8  morning at 8:30.
9      If you would just put the date on there
10 before you leave, Mr. Smith, I would appreciate it.
11                    (Jury excused).
12     THE COURT:  I did not have my notes with me,
13 but from my recollection, it seemed to me that they
14 hit the dates that were at issue on the head.  But
15 I'm sure that defense will let me know if I'm wrong
16 on any of those.
17     MR. LEMBKE:  That's right, Your Honor.  And
18 at some point, and I'm not sure how the Court plans
19 to do it, but the jury will need to be advised as to
20 the patients for whom the Court entered judgment as a
21 matter of law on a couple of the time periods.
22     THE COURT:  I think we will take that up
23 probably when we get to the issue of damages.  So I
24 think that will be the appropriate time to address
25 that.

1          Frankie talked to Ms. Cross to let her know

2    that we would get back with her.  I don't know if

3    she's ready now, but when Frankie gets back, we will

4    see if we can catch Ms. Cross and take that issue up.

5          MR. LEMBKE:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7                    (Brief recess).

8          (In chambers conference under seal.)

9          THE COURT:  I've reviewed the defendant's

10   motion to quash subpoenas, which is document 442, the

11   government's response, which is document 443, and is

12   this one where we were got another response this

13   morning?

14         MR. LEMBKE:  Yes, Your Honor, 447.

15         THE COURT:  I reviewed that as well.  And,

16   of course, the Section 3731 of 31 United States Code

17   dealing with false claims procedures and Rule 45 of

18   the Federal Rules of Civil Procedure, and a couple of

19   cases that were cited and things of that nature.

20         As I understand the defendant's argument,

21   it's basically that Section 3731(a) provides national

22   service of subpoenas, but doesn't or is in

23   contradiction, I guess you would say, to Rule 45

24   which limits the compliance with such a subpoena for

25   trial purposes to 100 mile radius of home -- is that

1   basically it?

2          MR. LEMBKE:  Yes, Your Honor.

3          THE COURT:  I've looked at the various cases

4   cited dealing with that.  And it seems like the

5   majority of the cases take a different view and say

6   that if that were the view, then Section 3731(a)

7   would be toothless.

8          If you could just serve them anywhere but

9   they only had to appear for trial within 100 mile

10  radius, then there's no benefit to that rule.

11         So what's your response to that?

12         MR. LEMBKE:  Your Honor, we live in a plain

13  language circuit.  And the plain language of the

14  statute provides for service and the Rule 45

15  underscores that under the law and, of course,

16  Congress under the Rules Enabling Act allow Rule

17  45(c) to go into effect, there's a difference between

18  service and compliance.

19         And I think that under both the Supreme

20  Court and the circuit case law we've cited to you

21  about plain language, that's the plain language.

22         To the extent someone said -- now, there's a

23  benefit to not having to go to the District Court of

24  North Dakota to get a subpoena issued.  And Rule 45

25  has changed now from what it was when this statute

1    was enacted.

2         THE COURT:  Right.

3         MR. LEMBKE:  To allow this Court, for

4    example, to issue a subpoena that can go anywhere but

5    you still don't have compliance anywhere -- you don't

6    have national compliance obligations.

7         So clearly when rule enactors and statutory

8    drafters want to say service and compliance, they

9    know how to do it.

10        And in significant measure, you know, I

11   think the new Rule 45 underscores the distinction

12   between the two concepts.

13        THE COURT:  Mr. Lembke is correct in that

14   the majority of judges on the Eleventh Circuit are

15   plain language interpreters.

16        As a matter of fact, at least one I've heard

17   say that don't cite me legislative history because

18   that's not going to carry the day.  I've heard that

19   more than once.

20        Why does not this statute or why is not this

21   statute limited to service of subpoenas as opposed to

22   compliance?

23        MR. WERTKIN:  Your Honor, Statute 3731(a),

24   what it says in full is that the subpoena requiring

25   attendance of a witness at trial or hearing conducted

1  under the Section 3731 of this title may be served at

2  any place in the United States.

3          So, as Your Honor points out, the Eleventh

4  Circuit does talk about the rules of construction and

5  in Florida, Brotherhood of Locomotive Engineers and

6  Trainmen, that's kind of a long case cite at 522 F.3d

7  1190 said, to the extent possible, the rules of

8  statutory construction require courts to give meaning

9  to every word and clause in a statute.

10          And what we would suggest, Your Honor, is

11  that the idea of requiring the attendance of a

12  witness, in order for that phrase to have any

13  meaning, the statute would have to have some teeth,

14  so to speak.

15          And if it was read in the way that

16  defendants proposed, that would be reading out really

17  the plain language of statute.

18          And I think also, Your Honor, that while our

19  understanding of the Eleventh Circuit is they are

20  focused on plain language, the Court of Appeals will

21  look at Congressional intent in order to inform their

22  decision.

23          And in this particular case --

24          THE COURT:  It may depend on who's on the

25  panel.

1          MR. WERTKIN:  Yes, Your Honor, that's true.

2    We think that both the plain language and the clear

3    legislative history in this case from the House

4    Judiciary Report at -- sorry -- the House Judiciary

5    Committee Report which is HR Rept 95-1447 makes it

6    clear that the language was designed to permit

7    nationwide enforcement as the Court found in the

8    Siebert case that we cited to you.

9          THE COURT:  Does not this statute, even as

10   read by the defense, have teeth when it's dealing

11   with requiring the attendance of a witness at trial

12   or a hearing that's within 100 miles radius as

13   required by Rule 45?

14         MR. WERTKIN:  I think Your Honor was correct

15   in the way you introduced this topic, that, you know,

16   it wouldn't -- Section 3731, the nationwide process

17   of service, you know, the False Claims Act was

18   enacted by Congress to protect the taxpayers and

19   protect the United States from fraud.  And it was

20   written broadly to allow for nationwide process of

21   service.

22         And as Your Honor pointed out, it would

23   render that section meaningless or toothless.

24         THE COURT:  Does it completely supersede any

25   of the provisions in Rule 45 that are designed to

1   protect witnesses from undue burdens?

2           MR. WERTKIN:  Your Honor, just in terms of

3   what we're talking about in this particular case,

4   yes, we do believe that this statute, you know, would

5   -- it is not subject to Rule 45 in the sense that a

6   subpoena may be served and witnesses, you know, can

7   be compelled to attend a hearing beyond 100 miles.

8           THE COURT:  Does it overrule the provisions

9   in Rule 45(d)(3)(A) (C) concerning specifying

10  conditions as an alternative to quashing or modifying

11  a subpoena to ensure that the witness doesn't have to

12  deal with undue hardship?

13          Let me tell you what really bothers me about

14  this, these two witnesses have both already been

15  deposed; right?

16          MR. WERTKIN:  In discovery, Your Honor, but

17  trial depositions have not been taken.  It was in

18  discovery.

19          THE COURT:  But they've been deposed.  And

20  we often use discovery depositions at trial when a

21  witness is otherwise unavailable.

22          MR. WERTKIN:  My understanding of what this

23  motion is is whether or not Rule 45 in some way, you

24  know, supersedes or I believe that the argument is is

25  that the movants do not reside or regularly transact

1   business -- there's no argument regarding undue

2   burden that's made, at least my understanding in this

3   motion.

4         So to the extent that, you know, if we can

5   take that up and talk about it, but I understand that

6   the Court's inquiry for this motion is limited to

7   simply whether or not the Court must quash under

8   (d)(3)(A) because of the geographic situation.

9         THE COURT:  Okay.  Well, all of Rule 45(d)

10  includes 3(C), and I was asking you whether it was

11  your position that Section 3731(a) trumps all the

12  provisions of Rule 45 or whether, when facing a

13  motion to quash, the Court still has the authority to

14  specify conditions as an alternative.

15        MR. WERTKIN:  Your Honor, I'm sorry, I'm not

16  prepared to answer that on behalf of the Department

17  at this time.

18        As far as I know, that was not the issue

19  that was raised by the defendants in their motion, so

20  I can't say what the United States' position on that

21  matter is at this time.

22        MR. LEMBKE:  Now, of course, Your Honor,

23  you've sort of smoked out what is the logical

24  conclusion in the breath taking scope of what they're

25  arguing as to the absolute meaning of the statute

1  because there's no way it can be half a loaf.

2        I would say two things in addition:  One is

3  my legal writing professor was Ruth Buck.  And she

4  said you always have to breakdown the structure of a

5  sentence.  And the phrase, requiring the attendance

6  of a witness at a trial or hearing conducted under

7  Section 3730 of this title modifies the word

8  subpoena, not anything else;

9        Secondly, this does not, given what the

10  status of Rule 45 was at the time this statute was

11  enacted, interpreting it in the manner that the plain

12  language suggests does not render it meaningless or

13  toothless because it enabled a nationwide service of

14  process which before that was not available.

15        So, again, we submit under the plain

16  language instruction, which the Eleventh Circuit

17  generally follows, you can't get there from here

18  where the government is wanting to go.

19        And as the Court notes, both of these

20  witness have been deposed and, thus, their testimony

21  is available to the jury, if the government chooses

22  to present it.

23        THE COURT:  I am concerned about some of the

24  cases out of district courts in the Eleventh Circuit.

25  As far as I know and as far as I think y'all cited to

1    me, there has not yet been a decision by the Eleventh
2    Circuit on this issue.
3          So, it's another one of those where we are
4    guessing as to what the Eleventh Circuit might do.
5    Like the decision from my colleague Judge Proctor,
6    who you made reference to the ability to obtain or
7    compel attendance at trial under 31 Section
8    3730(a) and again dealing with not the actual trial
9    of a case but the question of venue and finding that
10   that was the neutral issue because the False Claim
11   Act provides for nationwide service of process.
12         So, that indicates to me that he would think
13   that the service of process was more than just you
14   can accept a subpoena but you might not be able to
15   get that person at trial to testify.
16         Then we also have a case from Judge
17   Albritton that was just decided last month, September
18   was last month, it just seems like a long time ago,
19   and he made reference, again, to the nationwide power
20   to subpoena witnesses in 31 U.S.C. Section 3731(a)
21   means that compulsory process is not a significant
22   factor in the analysis.
23         Again, neither of these decisions dealt with
24   an effort to compel, though, a witness who lives in
25   -- Chattanooga isn't that terribly far but the other

```
 1    one lives where?
 2             MR. LEMBKE:  Fort Smith, I believe.
 3             MS. MARTIN:  Oklahoma.
 4             MR. LEMBKE:  Across the border.
 5             THE COURT:  Which is pretty decent way.
 6             MR. WERTKIN:  Your Honor, may I suggest we
 7    just -- I think that the issue that was brought by
 8    these motions, as I understand it, is kind of a
 9    straight forward legal issue.
10             I do think that what would be helpful is if
11    we haven't heard anything about undue burden about
12    some of these witnesses, we don't know -- I'm not
13    familiar with where they live.  We don't know what
14    their situation is.
15             THE COURT:  You don't know where they live
16    when you sent subpoenas to them?
17             MR. WERTKIN:  Not off the top of my head.
18             MR. LEMBKE:  What we said on Page 2.
19             MR. WERTKIN:  My point is only, Your Honor,
20    I think it may be helpful to rule on this motion with
21    regard to the request under 45(d)(3)(A) about 100
22    miles.  And if the defendant wants to file a motion
23    claiming undue burden or under some other part of
24    Rule 45, at that time we can get the facts out and
25    deal with that issue.
```

1        I'm just concerned about blending those two

2   issues because there hasn't been any representations

3   about undue burden about these two witnesses beyond

4   just where they live, so that's my request, Your

5   Honor, if we could just separate out kind of what we

6   think is a relatively straight forward legal issue

7   and then there can be another motion to quash based

8   on other factors that are not discussed in this

9   motion.

10       THE COURT:  That's why I was asking you

11  about this idea under Rule 45 because I do think it's

12  relevant, and I do think it's a legal issue, and I do

13  think it was invoked, at least from the Court's

14  standpoint, in looking at what do I do when there's a

15  motion to quash.

16       And one of the things that this indicated I

17  should do is look at whether there's a substantial

18  need for the testimony that can be met without undue

19  hardship which would mean to me there could be a

20  deposition or ensures the subpoenaed person will be

21  reasonably compensated.

22       MR. WERTKIN:  I can represent that we are

23  not planning on calling these two witnesses within

24  the first week for certain and probably longer.  So

25  if the Court would dispose of this particular legal

1   issue and we can raise the other issues and I would

2   be able, Your Honor, to --

3          THE COURT:  Well, I'm not going to dispose

4   of an issue until I have the full understanding of

5   what that issue involves.

6          In other words, I'm not going to rule that

7   3731 completely guts Rule 45.

8          MR. WERTKIN:  I don't think we're asking --

9   I certainly -- and that's not the position that we're

10  asking you to take, Your Honor.  I think that it's

11  clear to us anyway that this motion is really -- that

12  the defendants have filed is based solely on the

13  Court's -- what they list as non-discretionary, you

14  know, issues and must quash under 45(d)(3)(A) for no

15  other reason, Your Honor, than the deponents -- that

16  the people live within 100 miles.

17         I think consistent with the majority of the

18  courts that have taken up this issue, we would

19  request that the Court deny on this ground and that

20  the defendants, if they so choose, move to file a

21  motion to quash under a different rule, if they so

22  choose, and at that time it would be ripe for the

23  Court and give us --

24         THE COURT:  I'm not going to do that because

25  when this rule is invoked, in my opinion, there are

1    also other factors that Rule 45 makes reference to.

2    And if we were dealing with this in some other

3    context, I certainly would have the discretion to

4    say, okay, there's a problem here, but let's see if

5    we can work out a solution.  And that's what I'm

6    trying to do.

7         I recognize that there's a problem here.

8    And I don't want to be put into any kind of situation

9    of saying, well, judge, you ruled such and such so,

10   therefore, you can't come back and do something

11   different.

12        I want to get the whole thing out there.

13   And if that means delaying ruling on this, then I

14   will delay ruling on this.  But I have these cases

15   making reference to the nationwide service of

16   subpoena, the compulsory service, under Section 3731

17   were not in the context of actually compelling a

18   witness to attend trial at a great distance.

19        As I said, Chattanooga may be a little bit

20   more than 100 miles, but it's not much more than 100

21   miles.

22        MR. LEMBKE:  It's about 150.

23        THE COURT:  But this Arkansas, Oklahoma

24   person, that is a long way to ask somebody to come to

25   trial.  And I don't want to be on the record of

1    saying that there's no circumstance under which the

2    Court can't consider any of these other factors in

3    Rule 45 when being asked to deal with a subpoena

4    under 3731(a).

5            MR. WERTKIN:  I totally understand, Your

6    Honor.  And just to be clear, we wouldn't be asking

7    you to do that.  We thought that the Siebert case

8    from the Northern District of California would be a

9    roadmap for the Court to use, if the Court so

10   desired, to deal with -- to dispose of this narrow

11   issue.

12           THE COURT:  You know that's Ninth Circuit.

13   You know how far away the Eleventh Circuit is from

14   the Ninth Circuit?  As far away as California is from

15   Georgia.

16           MR. WERTKIN:  Your Honor, logic knows no

17   boundaries.

18           THE COURT:  I don't know about that when you

19   talk about the Eleventh Circuit.

20           MR. LEMBKE:  I don't think the Eleventh

21   Circuit judges would agree with that.

22           For the record, according to Google, it's

23   146.9 miles.

24           THE COURT:  All right.  It's just not one of

25   those places that I think is far away.  And I'm

1   reminded I have a 2:00 o'clock.

2          Why don't we come back at 3:00 and we will

3   take up the Advanced Med issue.  I am going to

4   withhold my ruling on this.  I would encourage y'all

5   to look at it.

6          And one thing I'm going to want to know,

7   Mr. Wertkin, is how long are you asking these people

8   to testify when you want them to come cross country.

9          MR. WERTKIN:  Yes, Your Honor.

10          THE COURT:  All right.

11                    (Brief recess.)

12                    (Back on the record.)

13          THE COURT:  It took me longer, when I gave

14   you a five minute warning, because I forgot I didn't

15   read the government's submission that was filed at

16   7:00 this morning and I needed to do that.

17          And the government says that AseraCare's

18   motion regarding the Advanced Med information, that

19   it's moot.

20          MR. LEMBKE:  May I speak to that, Your

21   Honor?

22          THE COURT:  I want you to.

23          MR. LEMBKE:  Well, to set the stage, this

24   all goes to what the damages are and how they get to

25   the damages in a case where they're seeking, what we

1   expect to be, somewhere north of $150 million.

2          And in this case, as Your Honor knows, they

3   hired Dr. Liao, as the medical expert, to figure up

4   periods of ineligibility.

5          And they hired Dr. Miescke as the statistics

6   expert to take the damages for what is now the 104

7   and extrapolate them.  But in between those two

8   steps, while one might have expected a forensic

9   accountant as an expert, they didn't hire a forensic

10  accountant as an expert.

11         Instead, up to this point they had Advanced

12  Med calculate the numbers for the ineligible

13  patients.  And it was Mr. Barrett who was identified

14  in discovery as the guy who had information about the

15  calculation and the only one who was identified in

16  discovery.

17         And, obviously, the identity of the person

18  who is going to tell you about how damages are

19  calculated is a pretty big deal.

20         Now, Dr. Miescke was asked about did he know

21  about how the hundred -- did he calculate, you know,

22  what's now the 104, was then probably the 124, and

23  Dr. Miescke said no.  In fact, he said, he called

24  AseraCare the pricer -- excuse me, Advanced Med the

25  pricer.  And he said that he wasn't the one who

1  interpreted Dr. Liao's findings to determine the
2  price, what should have been paid and was lost.  He
3  said that was done by Advanced Med.

4       And he said he did not do anything to check
5  whether the pricer has actually put data into the
6  alleged loss column, et cetera, and he accepted the
7  pricer's alleged loss calculations on blind faith,
8  and he said, I don't have the expertise to calculate
9  the alleged losses.  It's not part of my expertise.

10       Now, for the government to come in today, in
11  light of that testimony, and say they're now going to
12  have Dr. Miescke do that calculation, I don't think
13  that's going to fly.

14       If they wanted Dr. Miescke to do that
15  calculation, they needed to put that in his original
16  expert report.  And it would be an absolute trial by
17  ambush to have us, on the eve of opening statements,
18  in the middle of a trial to say suddenly, oh, we've
19  changed course and now Dr. Miescke, who didn't have
20  the expertise to do it, now suddenly can do it.  I
21  don't think that's going to fly.

22       So, I don't think that motion -- there's no
23  way this motion is moot because you notice they say
24  as a fall back, they tried out these other names.
25  And if you want, I can go into what the problems are

1   with the other names, but I don't know if you want to

2   take up this Miescke issue first.

3          THE COURT:  I think we should, because if

4   Miescke can do what the government says he has now

5   done, it does raise for me a question of why the heck

6   did we have an Advanced Med calculation to begin

7   with.

8          MS. GUNASEKERA:  Your Honor, I think it

9   would be helpful to just provide a little bit of

10  context as to what we're talking about.

11         We actually brought some spreadsheets just

12  to give you a more specific idea of what both

13  Advanced Med and now Dr. Miescke has done or is

14  intending to do with the jury's decision.

15         So, it's not actually a calculation as the

16  defendants are describing.  It's really moving from

17  one column how much AseraCare was paid for a

18  particular patient for a particular claim to another

19  column that's entitled loss to the government based

20  on the dates during which the jury found that the

21  patient had ineligible claims.

22         So, at most, the calculation that's being

23  done is just an addition of the numbers in the loss

24  to the government column, but it's very simply moving

25  numbers based on the dates identified for that claim

1    for when the jury finds a patient has an ineligible

2    period of time on hospice and moving the amounts paid

3    to AseraCare for that time into a different column.

4          So, Your Honor --

5          THE COURT:  Who did this spreadsheet that

6    you have just provided to me for patient, we'll still

7    call her Agnes B.?

8          MS. GUNASEKERA:  Oh, yes.  I meant to redact

9    that.

10         THE COURT:  It certainly will be redacted

11   before -- if this goes to the jury, certainly before.

12         MS. GUNASEKERA:  Yes, yes, Your Honor.  This

13   is the original spreadsheet that was produced to

14   AseraCare and was marked as a government trial

15   exhibit, so this was originally done by Advanced Med.

16         THE COURT:  Kenny Barrett.

17         MS. GUNASEKERA:  And Kenny Barrett in

18   particular, that's correct, Your Honor.

19         So, what Mr. Barrett had done was

20   essentially had taken Dr. Liao's conclusions and

21   moved amounts paid to AseraCare to a loss to the

22   government based on when Dr. Liao found a patient was

23   ineligible for hospice.

24         What Dr. Miescke has done both for judicial

25   economy and because it is a simple moving of the

1    amounts paid between columns, he's taken the jury

2    decisions and he has now similarly applied the same

3    method.

4         So, when the jury found a patient ineligible

5    for a period of time, he has taken the amount paid

6    for that patient during that period of time and

7    simply moved it to this column that's now entitled

8    loss to the government.

9         THE COURT:  And where did he get the amount

10   paid to move to another column?

11        MS. GUNASEKERA:  So Dr. Miescke had the

12   original -- the spreadsheets that were originally --

13   the claims data, essentially, that Advanced Med had

14   been working with.

15        So, he had those spreadsheets from when he

16   had done his work previously.  And so he took those

17   -- that same --

18        THE COURT:  So he had spreadsheets like this

19   one that you have given me that Kenny Barrett

20   prepared?

21        MS. GUNASEKERA:  Without the columns that

22   Kenny had included.

23        MR. WERTKIN:  Kenny was not involved in the

24   preparation of the original claims data.  Kenny only

25   did the last piece.

1            THE COURT:  Who did?

2            MS. GUNASEKERA:  Who prepared the original

3    claims data?

4            THE COURT:  Yes.

5            MS. GUNASEKERA:  The original claims data

6    was generated by the national provider -- I forget

7    the acronym -- but the NPI database.  The NPI

8    database, which is a national database of all the CMS

9    claims, generates these spreadsheets, these massive

10   spreadsheets.

11           And those massive spreadsheets were then

12   marked as exhibits.  Those massive spreadsheets were

13   also given to Dr. Miescke.  And from those

14   spreadsheets, he's able to identify the amounts paid

15   for each patient by date.

16           MR. WERTKIN:  And we have witnesses who can

17   lay the foundation for that.  Those witnesses are not

18   Kenny Barrett.  That's not, I think, that's outside

19   the scope of what we're talking about today but we do

20   have witnesses that can talk about this, to the

21   creation of the big spreadsheet that she's talking

22   about.

23           MS. GUNASEKERA:  More specifically, Your

24   Honor, you have the NPI database, which is a national

25   database, and then the spreadsheets are actually

1   generated by the Medicare contractors.  And so in

2   this instance, it was Advanced Med, who then pulls

3   from that national database and they are able to

4   generate these claims data spreadsheets that the

5   government marked as exhibits.

6           MR. LEMBKE:  Your Honor, may I be heard on

7   this?

8           THE COURT:  Yes.

9           MR. LEMBKE:  Let's take a step back.  The

10  real spreadsheet that's in the national claims

11  database or whatever it's called doesn't have the

12  last two columns.

13          THE COURT:  Right.

14          MR. LEMBKE:  And the actual spreadsheet

15  would probably be as long as this table it's got so

16  many columns on it.  So this is something that, up

17  until the last two columns, is pulled out of that.

18  It's not the complete --

19          THE COURT:  A part of it.

20          MR. LEMBKE:  A part of it.

21          THE COURT:  A part plus more.

22          MR. LEMBKE:  Plus more.  And it's not even

23  -- Advanced Med didn't for one of the universes, it

24  was a prior contractor whose name is TriCenturion, so

25  they pulled all but the last two columns for their

1   universe, and then Barrett added the last two

2   columns.  And then Advanced Med pulled whatever

3   columns they wanted and Barrett added the last two

4   columns to it.

5         Then they sent it to Miescke.  Miescke

6   looked at what was in the last two columns.  And when

7   he was asked did he know how to calculate the amounts

8   owed, he said, it's not part of my expertise.  I

9   accept it on blind faith.  I don't have the expertise

10   to calculate alleged damages.

11         MR. CHRISTIE:  He specifically had

12   spreadsheets that looked just like these in front of

13   him when he gave that testimony.

14         MR. LEMBKE:  Now, Your Honor, it simply is

15   not permissible to have an expert witness say, I

16   disclaim any expertise in this, that's not my area,

17   and now they're going to come in at trial and say

18   surprise, now it is.

19         And we don't have any opportunity to

20   question him about that before trial.  That is -- if

21   that's how they wanted to do it and make him the

22   quasi forensic accountant, they should have disclosed

23   him as such.  But to come in now at the eleventh hour

24   and say we're changing our approach --

25         THE COURT:  Changes our horse in midstream.

1          MR. LEMBKE:  Changing our horses in

2    midstream and suddenly what he said was not part of

3    his expertise is, that cannot be permitted.

4          MS. GUNASEKERA:  If I may, Your Honor, the

5    comments and the testimony that Mr. Lembke is citing

6    to for Dr. Miescke is taken out of context.

7          Dr. Miescke was actually being asked whether

8    he could determine whether the pricer, in this case

9    Advanced Med, what they did was accurate.

10         And more specifically, whether or not

11   Advanced Med had made any mistakes.

12         In response to those specific questions,

13   Dr. Miescke responded, I couldn't tell you whether

14   the pricer made any mistakes.  That's not part of my

15   expertise.

16         So he was being asked whether the pricer,

17   what Advanced Med had done, was correct or accurate.

18   But that wasn't part of what he was asked to do in

19   the first go around.

20         So when he said that wasn't part of my

21   expertise, Dr. Miescke was saying, that wasn't part

22   of what I was asked to do sitting here today.  Not

23   that he can't do it.

24         THE COURT:  But now, after having been

25   disclosed as an expert on the statistical stuff and

1  whatever else, but not on computing the specific loss

2  amounts, the government is wanting to substitute him

3  for Kenny Barrett to testify about something that he

4  was not disclosed as being the witness who was going

5  to testify about it.

6         MS. GUNASEKERA:  That is accurate, Your

7  Honor.  And we would submit, Your Honor, that

8  AseraCare could have the opportunity to depose him as

9  to the work that he's done here.

10        I mean, in all frankness, Your Honor, part

11  of the reason Dr. Miescke performed this analysis was

12  to get the analysis done quickly and he is able to do

13  the work.

14        I mean, the work is not anything, frankly,

15  that requires expertise.  This was part of the United

16  States' response to the original motion in limine.

17  It is the moving of columns based on dates.

18        So long as he had --

19        THE COURT:  But for the columns to be

20  admissible, doesn't there have been to be some

21  testimony about the accuracy of the information

22  contained there?  And he doesn't know anything or so

23  he said in his deposition about the accuracy of the

24  data that he's extrapolating.

25        MS. GUNASEKERA:  This is a related issue,

1   Your Honor, of the defendants, and we've actually

2   tried to work this issue out in advance of trial

3   about the accuracy of the claims data overall.

4         So, the United States had wanted to

5   stipulate as to the accuracy of the claims data

6   because we maintain AseraCare knows what it was paid

7   by the Medicare program for these dates of service

8   and the United States knows what it paid Medicare or

9   what it paid AseraCare.  And so we had offered, as

10  late as really June of this year, before trial, that

11  we stipulate as to the accuracy of the claims data.

12        THE COURT:  Well, the defense doesn't have

13  to stipulate to accuracy of anything and it's the

14  government's responsibility to establish the

15  accuracy.

16        My question goes to how are you going to

17  establish the accuracy when Dr. Miescke says he

18  doesn't know where those numbers came from.

19        MR. WERTKIN:  Just to be clear, because I

20  don't want to blend the issues, we are going to have

21  other witnesses that establish the accuracy of the

22  data.

23        So, that's why I mentioned earlier, I said

24  we have other people.  Everything is kind of related,

25  but it is a little bit different.  That's not an

1  issue right now.

2       MS. GUNASEKERA:  In terms of the accuracy of

3  the loss amounts, Your Honor, the accuracy of that is

4  really simply looking at the dates.  And so, in order

5  to determine whether or not the loss amounts that

6  Dr. Miescke has now identified as loss amounts are

7  accurate, it's really simply looking at what the jury

8  decision states ineligibility were compared to the

9  spreadsheets that we intend to produce to the

10  defendants later today.

11       THE COURT:  And the government, sometimes

12  smaller dates of ineligibility, as you've told me

13  earlier you're going to be using.

14       MS. GUNASEKERA:  Yes, Your Honor, in fact,

15  that's explained in Dr. Miescke's -- that will be

16  explained in Dr. Miescke's supplemental report that

17  it's smaller dates.

18       THE COURT:  In his supplemental report.

19       MS. GUNASEKERA:  That he's going to be

20  producing now in response to the jury's decisions

21  after phase one.

22       THE COURT:  Okay.

23       MR. LEMBKE:  Your Honor, if Dr. Miescke can

24  really do this, there's no reason why the government

25  couldn't have him do this all along.  And for

1    whatever reason the government chose to take another

2    path.

3            And we had -- Dr. Miescke produced a report

4    and he started with the liability number, the damages

5    numbers for the sample, and then extrapolated from

6    there.

7            Now they want to take him back a step and

8    make him the expert for something else.

9            It is way too late to disclose a new expert.

10   It is way too late to have him supplement a report in

11   a manner that adds to his expertise.  And the notion

12   of, well, they're willing to let us take his

13   deposition.  You've got to be kidding.  We're 11 or

14   12 -- this is week 12 of this trial.  We have opening

15   statements on Wednesday.  And they say you can depose

16   him?

17           Your Honor, that is not the way it works.

18   And this is not some minor issue in the case.  This

19   is the damages where they're seeking $150 plus

20   million we expect.

21           So, I just don't think Dr. Miescke is an

22   option for them in light of how, you know, decisions

23   have consequences and they decided not to make him

24   their expert on this and it's too late to change

25   horses.

1          MS. GUNASEKERA:  Your Honor, if I may, the

2    use of the term expertise is inaccurate here.  It's

3    not that we're now offering Dr. Miescke as having new

4    expertise or that this requires a new expert

5    analysis.  It doesn't require that at all.

6          It's simply the computation or the

7    calculation or the addition of the specific loss

8    amounts by claim by date.

9          So, it really is a simple looking at the

10   dates that that patient was on service and then

11   taking the dates for which the jury found the patient

12   ineligible and adding up those claim amounts, that's

13   really it.

14         So, there's no expertise involved.  There's

15   nothing new and the data --

16         THE COURT:  Well, I may agree with you in

17   terms of no specific expertise involved in adding up

18   numbers, although there are days when I wonder about

19   that personally.  But in terms of nothing new, I tend

20   to disagree with you, Eva, because when he was

21   deposed, he specifically said, I didn't do any of

22   that.  I took the numbers that the pricer gave me and

23   then I used those to extrapolate.

24         So you're adding something to, in essence,

25   the testimony and the report and the scope of work

1    done by your expert.

2            Now, I think we all recognize or certainly I

3    recognize that after we had determinations from the

4    jury about periods of eligibility that there would

5    have to be modification to the damages estimate, so I

6    think we all understood that.  And I don't think the

7    defense can say oh, it's not fair now that we're

8    getting a modification of that.

9            But what I understand the defense saying is

10   not fair is that we've got somebody different now who

11   wants to testify about how we got to that

12   intermediate step between Dr. Liao's testimony and

13   now we will say the jury's findings and the

14   extrapolation that Dr. Miescke did earlier, that his

15   report was about and that his deposition was about.

16           MR. LEMBKE:  That is exactly it, Your Honor.

17           MS. GUNASEKERA:  Yes, you're absolutely

18   correct, Your Honor.  But the difference here, too,

19   or I guess I will just add to that, as you noted,

20   Your Honor, there were always -- there was always

21   going to be somebody who was going to have to create

22   new loss calculation worksheets.  I call it a

23   worksheet.

24           And so whether it was -- so what Mr. Barrett

25   had done previously, and what he had been deposed on

1 previously, the United States is not going to use

2 those worksheets anymore because --

3          THE COURT:  So what worksheets are you using

4 and who has created the worksheets that you're going

5 to use?

6          MS. GUNASEKERA:  The worksheets that we're

7 going to use are now going to be produced to the

8 defendants based on the jury's decision from this

9 morning and last Thursday.

10          THE COURT:  Who is producing them?

11          MS. GUNASEKERA:  Dr. Miescke has prepared

12 those worksheets.

13          MR. WERTKIN:  So we've also asked Advanced

14 Med to do the same task because we didn't know how

15 this was going to come out and theirs is going to be

16 ready sometime tomorrow, I think.

17          Miescke was able to work all weekend and do

18 the work himself.  But we didn't know how this -- the

19 defendants raised the issue and we didn't know how it

20 was going to come out, so we're having it redone,

21 both ways.

22          We fully anticipate that when Advanced Med

23 sends us their stuff, probably sometime tomorrow

24 midday or the end of the day, it's going to look

25 exactly the same thing as what Miescke did.

1           So that's why we did it this way, Your

2    Honor, just because we knew -- Advanced Med, we

3    couldn't make them work all weekend on it, and so

4    Advanced Med stuff is going to look exactly the same

5    as Miescke's stuff.

6           And I would also point out that there's no

7    -- there's no dispute, at least we have never heard

8    any dispute about these numbers -- about what these

9    numbers are anyway.

10          So all those things together, you are 100

11   right, he's being asked to do something that's more

12   than what we asked to do before.

13          THE COURT:  More than he was disclosed as

14   being -- as doing.

15          MR. WERTKIN:  Right.

16          THE COURT:  When the expert disclosures were

17   made.

18          MR. WERTKIN:  Right.  It wasn't in his

19   original report and he testified to that.  I took the

20   pricer stuff at his word.

21          So, we are making a change, Your Honor, and

22   we're just explaining why, time exigencies and the

23   fact that it's a simple calculation and all that

24   stuff.

25          So we leave it to Your Honor to decide what

1  to do.  If Your Honor says that we need to use

2  Advanced Med, it will take an additional day or two

3  days, at least two days, once Miescke gets the new

4  stuff from Advanced Med to generate his new report,

5  so I wanted to make Your Honor aware of the timing

6  situation.

7          MS. GUNASEKERA:  Compared to our capability,

8  Your Honor, to produce his supplement report later

9  today with the worksheets.

10          MR. LEMBKE:  I mean, that's not our problem.

11 So, Your Honor, part one of our argument is about

12 Miescke.  And we don't see any way that they can now

13 have an expert witness, who they didn't disclose as

14 being the expert on this topic, suddenly become the

15 expert and testify on this as well.  So I don't think

16 they can do that.

17          THE COURT:  If it really took an expert to

18 add up these numbers, like I said, sometimes I really

19 think it takes an expert to do any math --

20          MR. LEMBKE:  Your Honor, let me sort of go

21 into that issue.

22          This is something that, as I say, the

23 spreadsheet is as long as this table.  And if

24 Dr. Miescke just went to that spreadsheet, there's no

25 way he would have known what to do with it because it

was massive and, you know, and dozens, if not
hundreds, of lines per patient.

So, instead, they disclose the one and only
person with knowledge on that was Kenny Barrett.

Now, even though they say it's so easy,
Dr. Liao's dates of ineligibility never changed, but
the numbers that they gave to Dr. Miescke changed at
least four times.  That's how easy it is.  They
constantly were making revisions to it because of
mistakes that were made.

Now, let me tell you the problem we had with
Mr. Barrett's testimony.

When we had our opportunity to depose
Mr. Barrett -- now, realize, he's the one and only
person they put forth.  They decided not to get a
forensic accountant.  They decided to do it with an
inhouse guy at Advanced Med.

So we take his deposition and get him to
explain.  And we say, Mr. Barrett, there were
numerous changes made in this.  Why were they made?
I don't know.

Well, who told you to make them?  The
Department of Justice.

What did they tell you to do?  Privileged.

Now, Your Honor, that's not the way you get

1    to play this game.  They didn't want to have an

2    expert and an expert, obviously, would have had to

3    tell you how he calculated the numbers.

4           But the government decided, basically, it

5    sounds like to do it inhouse and try to launder it

6    through Mr. Barrett and hide what instructions were

7    given to Mr. Barrett.

8           So Mr. Barrett didn't have the adequate

9    knowledge to testify to these things.  And a lot of

10   these numbers aren't changing based on the jury's

11   result.  Only if it's a period different from what

12   had already been done and not all of them are

13   different.

14          So, we don't think Mr. Barrett had the

15   knowledge, the personal knowledge, to get those

16   exhibits into evidence and he said he didn't know why

17   the changes were made and, frankly, when the

18   government made the decision to invoke privilege and

19   not tell us how these calculations were done,

20   decisions have consequences.

21          So, Mr. Barrett should not be allowed to get

22   up on that stand now and explain what he said he

23   couldn't explain and they basically said he would not

24   be permitted to explain.  So --

25          THE COURT:  I would not allow him to testify

1  about any of those things either that were invoked as

2  being privileged and he was not allowed to testify

3  about at his deposition.

4        MR. LEMBKE:  That's basically the final

5  numbers on these spreadsheets which is the damages

6  calculation.  That's what they wouldn't let him tell

7  us how he got to those final numbers.  So it's a big

8  problem.

9        So, then, their last ditch effort was to

10 throw out the names of Karimova and Landtroop.

11       THE COURT:  Yeah, I don't know who they are.

12       MR. LEMBKE:  Well, let me tell you, neither

13 did we in discovery.  At no point were Karimova and

14 Landtroop disclosed as people with knowledge about

15 anything in this case during discovery.

16       Now, during discovery, there was a 30(b)(6)

17 deposition notice to the government about -- and part

18 of it related to some investigations of AseraCare

19 that aren't at issue under two chapters of program

20 integrity manual and Landtroop was put forth to

21 testify about that.  Nothing about the damages

22 calculations.

23       And then, on June the 23rd, we got a letter

24 from the government -- now, this is after the close

25 of discovery -- and they said that Mr. Landtroop was

1  the -- do you have that letter, Chris?  They called
2  Mr. Landtroop the -- Kenny Barrett was listed, but
3  they had Mr. Landtroop as the maintainer of Advanced
4  Med's national claims history.
5          Now, he had never been disclosed in
6  discovery as the maintainer of Advanced Med's
7  national claims history but they said Mr. Landtroop
8  wife was ill and was on hospice and he might not be
9  able to come to trial and if he couldn't come to
10 trial, Ms. Karimova would testify in his place as the
11 maintainer of Advanced Med's national claims history.
12         And here, if Your Honor wants it, is a copy
13 of that letter.
14         Now, Your Honor, the government, that does
15 not say that he's calculating or she's calculating
16 the damages.  That was always the only person they
17 ever disclosed for that is Mr. Barrett.
18         And it's way too late in the game, 12 weeks
19 into a trial, to suddenly say, now we've come up with
20 somebody different.
21         And it was during discovery -- what
22 Mr. Barrett was disclosed as, and this is quoted at
23 Page 3 of document 332, he had discoverable
24 information on the collection and contents of claims
25 data used by the United States statistical expert in

1   creating the statistically valid random samples of

2   AseraCare's hospice patients and extrapolating

3   damages.

4          So, basically, he's the guy who talks about

5   the adding up for what was then 124.  That's who was

6   disclosed for that.  And at no time, before last

7   Friday, did the government ever suggest anyone other

8   than Kenny Barrett would be doing it.

9          So, you've got the problem with Miescke

10  wasn't disclosed as an expert; Barrett wasn't allowed

11  to testify as to how these things -- why they were

12  changed and how the final number was reached, and

13  Karimova and Landtroop were never disclosed.

14         MR. WERTKIN:  Right.  And that's what we

15  were saying earlier.  So Miescke was identified as an

16  expert statistician, but we are saying that Miescke

17  is definitely going beyond what he had originally

18  done in his report, so we agree with that.

19         In this case, we -- just for the purposes of

20  being able to provide the report today -- we asked

21  him to do that and are willing to have him subject to

22  questioning at the defendant's convenience.  We

23  wouldn't have him called at least until two weeks on,

24  if there are any questions.

25         They've probably done the calculations -- I

1   don't know if they've done the calculations

2   themselves, but I would think that there should be no

3   dispute.

4        The issue for the jury is whether they

5   believe the claims should be extrapolated.  Everybody

6   -- there is no dispute over how much money AseraCare

7   got for the 104 patients during that time period.

8        So that's why a lot of this is, you know, we

9   don't really understand that much about why all of

10  this is going on.  But they're right that Miescke did

11  go beyond his original report over the weekend and if

12  he were to supplement his report today, it would be

13  beyond.

14       MR. LEMBKE:  Your Honor, let me tell you,

15  first of all, the data is not all totally undisputed.

16  In fact, Mr. Barrett couldn't even tell us why

17  certain changes were made.

18       But when you're seeking tens, if not

19  hundreds, of millions of dollars in damages, just

20  cavalierly walking in and saying, oh, well, you

21  shouldn't dispute that, there are three words to

22  answer that, burden of proof.  You don't get to hide

23  the ball.  You don't get to just assume everyone is

24  going to agree.

25       You've got to follow ordinary discovery and

1   let the defendant know who's going to calculate the

2   damages.  How they're calculating the damages.  And

3   they have fallen in the ditch on this.

4          MS. GUNASEKERA:  Your Honor, consistent with

5   our continuing discovery obligation, just as Your

6   Honor noted, we are intending to produce revised

7   worksheets to the defendants as soon as later today,

8   if Dr. Miescke's worksheets can be used, that they

9   can then go and check the accuracy of those numbers.

10         I mean, what Mr. Barrett did in his prior

11   worksheets are now not at issue because the jury has

12   rendered their own decision as to the period of

13   ineligibility.

14         So those worksheets --

15         THE COURT:  But the jury did nothing with

16   any amounts of money for any of those time periods.

17         MS. GUNASEKERA:  Correct, Your Honor, but

18   then those worksheets had to be recreated.  They

19   necessarily had to be recreated based on the jury's

20   decisions because the jury did have findings that

21   were different for certain patients than what

22   Dr. Liao had found as a period of ineligibility.

23         So Dr. Miescke took those -- took the jury

24   decision and essentially created a new worksheet that

25   reflected the loss amount per patient based on what

1   the jury found or when the jury found that patient

2   ineligible.

3          THE COURT:  Did he pull that information

4   from this national database himself?

5          MS. GUNASEKERA:  No.  He used the claims

6   data of Advanced Med and TriCenturion, which was the

7   Medicare contractor before Advanced Med created for

8   the different universes.

9          THE COURT:  So he used the spreadsheet that

10  Kenny Barrett created?

11         MS. GUNASEKERA:  No.  He used --

12         THE COURT:  Advanced Med and TriCenturion --

13         MR. WERTKIN:  It might be better to identity

14  it this way.  Getting the claims data, step one.

15  That's not really what we're talking about with

16  witnesses or anything.

17         Now you go to step two which is creating

18  that column that Kenny Barrett did.  Then there was

19  --

20         THE COURT:  The two columns Kenny Barrett

21  did.

22         MS. GUNASEKERA:  And in --

23         THE COURT:  And lesser columns or did the

24  first folks come up with the lesser columns?

25         MS. GUNASEKERA:  You mean --

1          THE COURT:  Because we talked about earlier

2     how the national database has a spreadsheet that's

3     much, much longer than what this one is.

4          MS. GUNASEKERA:  The spreadsheet Dr. Miescke

5     is working with, it's a claims data spreadsheet.

6          I should add, the very first step is

7     Dr. Miescke is the one who pulled the samples to

8     begin with from the universe.

9          So Dr. Miescke has always had all the claims

10    data, the thousands of lines of claims data from both

11    universes from the beginning of this case.  So he

12    took those -- that universe claims data and he has

13    had familiarity working with that claims data to then

14    pool the two samples.

15         THE COURT:  I'm not talking about samples of

16    patients.  I'm talking about dollar figures.

17         MS. GUNASEKERA:  Right.  Understood.  So

18    Dr. Miescke --

19         THE COURT:  Did he pull the dollar figures

20    from the big NPI --

21         MS. GUNASEKERA:  Yes.

22         MR. CHRISTIE:  No, he did not.  That's

23    inaccurate.

24         MR. WERTKIN:  This weekend you asked --

25         THE COURT:  That you're now wanting him to

1   testify about doing.

2           MR. WERTKIN:  This weekend.

3           MS. GUNASEKERA:  And I feel like we're using

4   these terms, so we begin with the big massive

5   spreadsheet that he --

6           THE COURT:  The NPI.

7           MS. GUNASEKERA:  The NPI sheet -- nobody

8   ever got anything from the NPI database.  That is

9   filtered through Advanced Med and TriCenturion, the

10  Medicare contractors.

11          So Advance Med and TriCenturion pulled from

12  the NPI database and then they generate the claims

13  data worksheet.

14          In the first instance, Dr. Miescke got those

15  claims data worksheets for the universe.  So --

16          THE COURT:  Do those claims data worksheets

17  have everything except the last two columns of this

18  worksheet that you just gave me?

19          MS. GUNASEKERA:  That is correct, yes.

20          THE COURT:  So that's what he had from the

21  very beginning.

22          MS. GUNASEKERA:  From the very beginning;

23  that's correct.

24          THE COURT:  For all patients.

25          MS. GUNASEKERA:  That's correct.

1          THE COURT:  But he testified in his

2    deposition that he didn't know whether any of this

3    data was accurate; right?  And that that was not --

4          MS. GUNASEKERA:  The testimony that counsel

5    cites in their motion, Your Honor, is specific to a

6    question he was asked about whether what Mr. Barrett

7    did was accurate.

8          And the response they quoted from him was, I

9    can't testify as to what Mr. Barrett did because I

10   wasn't reviewing that.  I wasn't involved in that

11   process.

12         So, I am not aware of other --

13         MR. WERTKIN:  He probably doesn't -- he

14   probably doesn't know all this.  If those -- that's

15   that -- so, there's actually more than -- he pulled

16   the sample, then there was a worksheet created, then

17   Kenny Barrett added the line, and then Dr. Miescke --

18   I keep bringing -- we have people who are going to

19   talk about the accuracy of this information.  So that

20   is -- that's not at issue, and we're okay on that.

21   We're talking --

22         MR. CHRISTIE:  No, that is at issue.

23         MS. GUNASEKERA:  It is at issue, but it's

24   not at issue.

25         MR. WERTKIN:  But not what this motion in

 1  limine is talking about.

 2          Miescke is not going to testify that the

 3  claims data is accurate, we're going to have other

 4  people do that.

 5          The question is is that middle step about

 6  those last two columns, we skipped that step this go

 7  around.  That's what's going on.  But in terms of the

 8  accuracy --

 9          MS. GUNASEKERA:  Yeah.  Miescke,

10  essentially, he did that step, so we condensed what

11  was a three-step process into a two-step process.

12          MR. LEMBKE:  Your Honor, on this discussion

13  about what they're doing now, what we understood from

14  the beginning was once the jury ruled, what had been

15  done to that point, might have to be tweaked on some

16  lines.  Most of it does not have to be tweaked in

17  terms of the loss calculation.

18          It's only if the -- because, presumably, the

19  government had them calculate from the beginning what

20  were the periods the government was claiming was

21  damages.

22          And then if the jury narrowed it on some of

23  them, which they did on some, but not most, then they

24  would have -- then there would have to be an update

25  of those.

1          It was never contemplated that we would

2     start over and they would have a new expert to come

3     in and redo stuff that didn't even change based on

4     the jury's verdict.

5          So, they're taking this, what was going to

6     be an update, oh, we always agreed we would start

7     over.  That was never what was contemplated and

8     that's what's inappropriate.

9          This is a complete shift by the government

10    in the middle of trial and with people who were not

11    disclosed for this and it's not appropriate and fair.

12         And there's a heck of a lot of money

13    involved in this and why the government didn't decide

14    upfront they were going to have Miescke do it or have

15    someone who could testify as to how it was done, one

16    or the other.  But they did neither of those.  And

17    now they're trying to get themselves out of a ditch

18    at the last minute under the cover of we have to

19    update it for the jury.

20         MS. GUNASEKERA:  Your Honor, if I could just

21    respond to one point there.

22         We recognize that the amounts may not have

23    changed as to some of the patients.  And counsel can

24    do their own QC work of the worksheets that we're

25    going to use, I QC'd the worksheets myself and the

1  amounts didn't change.  So it's not that we're

2  creating brand new calculations or brand new loss

3  figures.

4       But where the jury periods of ineligibility

5  that were consistent with what Dr. Liao found

6  previously, those amounts are going to be the same on

7  the worksheets.

8       THE COURT:  But who produced those

9  worksheets?

10      MS. GUNASEKERA:  So, Dr. Miescke prepared

11 those worksheets.  So, again this goes back to --

12      THE COURT:  Instead of Barrett who was the

13 one who testified about it and who was put up as the

14 one who was pulling those dollar figures.

15      MS. GUNASEKERA:  Your Honor, the fact that

16 it is the same numbers, that it didn't require any

17 expertise --

18      MR. WERTKIN:  And there's no surprise.

19      MS. GUNASEKERA:  There's no surprise.

20      MR. WERTKIN:  There can be no claim for

21 surprise.

22      THE COURT:  Wait a minute, wait a minute,

23 wait a minute.

24      When you disclose your expert witness and

25 his report and the scope of the work that he is doing

1    for the government and the scope of that work then

2    changes, it's ridiculous to say that there can't be

3    surprise.

4            MR. WERTKIN:  Can I, Your Honor --

5            THE COURT:  The end result and the data and

6    all that kind of stuff may be the same, but when

7    you're changing the scope of what your expert is

8    testifying that he did, yes, it does constitute

9    surprise to the other side when that has not been

10   disclosed previously.

11           MR. WERTKIN:  Your Honor, that's just -- as

12   we've been trying to say, and be completely upfront,

13   he did go beyond his original report.  That's all

14   we're saying.

15           Let's just say if the number for Alice P.

16   was 2,150 when Kenny Barrett did it and Alice P.

17   didn't change, the number is still going to be 2,150

18   when Dr. Miescke did it.

19           All I was saying is that that number -- that

20   number is not going to be new.  That number is not

21   going to be a surprise.  And I may have used the

22   wrong word.  I was trying to explain that that just

23   kind of goes to show that --

24           MS. GUNASEKERA:  We just wanted to respond

25   to Mr. Lembke's claim that this is brand new.

1          MR. LEMBKE:  It is brand new because they're

2    having Miescke do it from scratch.   That's brand new.

3          MS. GUNASEKERA:  That's a separate issue.

4    We are talking about the specific numbers in the

5    context you were speaking of, the specific numbers

6    for those patients where Dr. Liao's period of

7    ineligibility matches with the jury's decision is

8    going to be the same numbers; that's all.

9          MR. LEMBKE:  Maybe yes and maybe no.

10         MR. WERTKIN:  You'll see it --

11         MS. GUNASEKERA:  They can look at it.

12         MR. LEMBKE:  Your Honor, we shouldn't be put

13   to having a new expert in to say, oh, well -- and

14   they just say, oh, well, it's just all so simple and

15   easy and even though we had to revise it four times

16   to get it right the first time, it's perfectly

17   understandable that anyone in the world, including

18   Dr. Miescke, could look at it and figure it out -- I

19   mean, discovery is to get all this sorted out.

20         And I go back to the problem, Mr. Barrett

21   was not permitted to tell us how he calculated the

22   numbers.

23         MS. MARTIN:  But that's why the fact that

24   the numbers may not change for certain patients,

25   that's really not that -- that doesn't get around the

1  fact that the original numbers, the witness who was

2  put forth to testify about them, could not testify

3  about how they came to be.

4        So, that's not sort of a saving grace that

5  the numbers don't change.

6        THE COURT:  And that's something that really

7  concerned me about Mr. Barrett's testimony that when

8  there were changes in his numbers and reports that he

9  was not allowed to explain how those changes came

10 about.

11       MR. LEMBKE:  That's exactly right, Your

12 Honor.  And the question is how can it possibly be

13 privileged if this is the basis for his calculation.

14       But if the government wanted to play hide

15 the ball, they don't now get to come into court and

16 say, oh, now we've changed our mind, he can tell you.

17 It's too late.  They had their chance.

18       THE COURT:  Or we're going to change the

19 witness.

20       MR. LEMBKE:  Because that's a problem, we're

21 now going to get a different witness and surprise you

22 with that.  It's too late.

23       MS. GUNASEKERA:  Mr. Barrett, Your Honor, is

24 -- he has since left Advanced Med and so he's no

25 longer employed by them.  He cannot be working with

1    claims data.  So he cannot -- he is not in a position

2    -- he's on a mission trip in Costa Rica.  He's not in

3    a position where he can now take the jury's decisions

4    and revise the worksheets that he originally

5    prepared.

6         So, he was never going to be able to respond

7    to the jury's decisions.

8         THE COURT:  But he left, according to your

9    document that was filed this morning, he left

10   Advanced Med in July of 2014.

11        MS. GUNASEKERA:  He did, yes, Your Honor.

12        THE COURT:  More than a year before this

13   trial started and certainly with ample time for the

14   United States to find somebody else who would be

15   available to testify at trial about this and to

16   update that information to the defense.

17        MR. LEMBKE:  Your Honor, let me also note, I

18   am puzzled by what Ms. Gunasekera just said because

19   this morning, in document 462 at Page 4, they said to

20   the extent the Court has any concern about replacing

21   Mr. Barrett with either Mr. Landtroop or

22   Ms. Karimova, the United States is prepared to call

23   Kenneth Barrett to testify at trial.

24        Now, we think there are problems with

25   calling Mr. Barrett, as we've said, but which is it?

 1          MS. GUNASEKERA:  Mr. Lembke is

 2  mischaracterizing my statement, Your Honor.

 3          THE COURT:  I'm reading exactly what you

 4  said.

 5          MR. WERTKIN:  Not that.

 6          MS. GUNASEKERA:  My point is, he can come

 7  back -- we can call him to come back to testify about

 8  the work that he had done previously, but he can't

 9  now revise the loss calculations based on the jury

10  decision.

11          MR. LEMBKE:  Your Honor --

12          MS. GUNASEKERA:  He can't do that because

13  he's not employed by Advanced Med anymore, so he

14  can't be working with claims data and patient

15  information.

16          THE COURT:  Okay.  But again, that's

17  something that you've known since July of 2014.

18          MR. LEMBKE:  15 months without a

19  supplementation on the discovery, Your Honor.

20          MR. WERTKIN:  Your Honor, when we were

21  talking about bifurcation, we laid out the plan where

22  the jury would decide and then we would have -- we

23  would do the recalculation of damages.  So that was

24  only at the end of May.

25          THE COURT:  May.

1          MR. WERTKIN:  So, on June 23rd, we sent over

2     the list of people who would testify about these

3     kinds of things.

4          THE COURT:  Wait a minute.  Are you saying

5     that from July 2014 when Mr. Barrett left Advanced

6     Med until May of 2015, it never crossed your mind

7     that there might be some need to change or modify the

8     damage calculation?

9          How were you going to present the trial, the

10    case, you just were going to put all of them out

11    there together and say, jury, go accept our word that

12    all 124 or 123 or whatever the magic number happened

13    to be, that they were all invalid for the entire time

14    period regardless of the testimony of the experts

15    from the defense?

16          MR. LEMBKE:  Your Honor --

17          MS. GUNASEKERA:  Your Honor, the jury

18    wouldn't -- we wouldn't be in a place where the jury

19    would have been finding falsity of the claims and

20    then we would be revisiting the loss calculation.  We

21    would be putting on our whole case, including the

22    damages, and that would be consistent with Dr. Liao's

23    findings.  So if the jury, you know, didn't adopt

24    some of that, you know --

25          MR. WERTKIN:  No, we had no intention of

1   changing his calculations, Your Honor.

2          THE COURT:  Regardless of what the jury --

3   you were just expecting me to just give an up and

4   down, we find for the government and award $50

5   billion as opposed to finding whether any of the

6   claims were not false?

7          MR. WERTKIN:  We were not thinking this was

8   going to be -- we didn't know this was going to be a

9   phase case.  So we didn't anticipate that there would

10  be a need in the middle of trial or at any time to

11  update the calculations.  Right?  That would be --

12  this is more of the exception than what normally

13  would occur.

14         For example, I mean, in --

15         THE COURT:  Are you saying that normally a

16  judge would never ask the jury to determine whether

17  124 patients were not eligible?

18         MR. WERTKIN:  No.  I'm sorry, Your Honor.  I

19  may not be being clear.

20         I was just saying that we did not anticipate

21  that the Advanced Med spreadsheets would need to be

22  updated in trial.  We didn't anticipate that.

23         MS. GUNASEKERA:  It could have been gone in

24  a number of different ways, Your Honor, but I think

25  we envisioned our whole case would be presented,

1  including the damages piece of it, and then the jury

2  would be voting yay or nay on specific patients, not

3  necessarily finding periods of ineligibility and

4  having to go back and revise the calculation.

5           So, you're correct, Your Honor, we didn't

6  anticipate that.

7           THE COURT:  How would the jury be able to

8  ascertain damages?

9           I mean, I'm thinking now, had I not

10  bifurcated it in terms of we're first going to define

11  that there were false claims, I may well have said,

12  we don't get to damages until the jury determines how

13  many patients were ineligible.

14          I don't think that would be as farfetched as

15  y'all think what I did with the other stuff was.

16          MR. WERTKIN:  That's right.  And that would

17  probably --

18          MS. GUNASEKERA:  Yeah.  So, in that instance

19  --

20          MR. WERTKIN:  We would have, at that point,

21  anticipated doing --

22          MR. LEMBKE:  Your Honor, may I point one

23  thing out?

24          In their letter on June 23rd, it was clear

25  the case was bifurcated then.  In that letter, at the

1   bottom of Page 1, they still listed Kenny Barrett and

2   they did not say, if we have to update our numbers,

3   we've got somebody new to do it.

4           At no point, until last Friday, did they

5   ever suggest that anyone, other than Kenny Barrett,

6   was going to be the person to talk about the damages

7   for the ineligible patients in the sample upon which

8   the extrapolation would then be based.  They just

9   didn't do it.

10          As we say, there's a big problem with

11  Mr. Barrett even on the old data because they

12  wouldn't let him tell us how he calculated it.

13          MR. WERTKIN:  So, I guess, if we -- we know

14  that Kenny Barrett is on a mission trip in Costa

15  Rica.  We also know that everyone anticipated that

16  there would be a recalculation of the damages based

17  on what the jury found.

18          Now, you know, I think, is the argument --

19  because I'm still trying to get past -- we're finding

20  that Miescke can't do it, and if Miescke can't do it,

21  then we would go and have an Advanced Med person do

22  it and give it to him.  That work is going to be new

23  no matter what.  That work is always going to be new.

24          MR. LEMBKE:  No, no.

25          MR. WERTKIN:  How was it not going to be

1   new?

2           MR. LEMBKE:  It was only going to be new to

3   the extent there was a difference from the old.

4           MR. WERTKIN:  Right.

5           MR. LEMBKE:  It was going to be a tweak, not

6   a redo.

7           THE COURT:  By someone not previously

8   disclosed to do it.

9           MR. LEMBKE:  Correct.

10          MS. GUNASEKERA:  And that is accurate, Your

11  Honor.  But, again, Dr. Miescke has a lot of

12  familiarity with the claims data worksheets.

13          THE COURT:  So why not in June did you not

14  disclose that Dr. Miescke would be the one to testify

15  about the spreadsheet that he would be using to

16  calculate the damages as opposed to continue to list

17  Kenny Barrett, who you certainly knew by that time

18  was in Costa Rica and was no longer employed by

19  Advanced Med and, as you say, could not have updated

20  the data.

21          MS. GUNASEKERA:  I think in part, Your

22  Honor, that we didn't know how the jury form -- how

23  the jury was going to be making its decision.

24          So, for instance, and I'm speaking for

25  myself, although the other teammates should chime in,

1  in my mind, I'm thinking it's going to be yay or nay

2  as to individual patients, not necessarily defining

3  specific different time periods of ineligibility.

4       THE COURT:  If I'm not mistaken, it was the

5  government who suggested we needed to come up with a

6  time period, so that it would mesh with your measure

7  of damages, and you even wanted me to put the dates

8  on there for them.

9       MR. WERTKIN:  That would have been still yay

10  or nay of those dates.  And in that case, the

11  spreadsheet wouldn't have changed.  Because --

12       THE COURT:  But you didn't present that as

13  evidence to the jury.

14       MS. GUNASEKERA:  Understood --

15       MR. WERTKIN:  No, no, no --

16       MR. LEMBKE:  Your Honor, may I point one

17  thing out?

18       MS. GUNASEKERA:  This is why we didn't see

19  the need to disclose that Miescke would be doing

20  repricing, so to speak, if it's yay or nay as to the

21  specific dates that were already calculated, then

22  he's just carving those out of the spreadsheet.

23  There's no recalculation, there's no revised

24  spreadsheet.  It's the same spreadsheet, you're just

25  not just including that in the extrapolated loss.

1          Now we're in a totally different ball game

2    where we have different dates, we have actual

3    different dates for claims.  So, because of that, we

4    necessarily had to create new worksheets.

5          THE COURT:  Then the fact that the

6    government did not anticipate and did not present

7    your evidence to coincide with the dates that you

8    used in your spreadsheet, we're going to present

9    someone who was not disclosed to the defense as being

10   the one who extrapolates or calculates or makes the

11   worksheet or makes the changes and it's supposed to

12   be okay.

13          MS. GUNASEKERA:  Well, I mean --

14          MR. LEMBKE:  Your Honor, I would note, in

15   document 353 filed on July the 20th, in response to

16   our motion in limine, they never said Mr. Barrett was

17   unavailable or Mr. Barrett, you know, someone else

18   was going to do it.

19          It's a bait and switch now.  They're still

20   talking about oh, Mr. Barrett is fine as a witness.

21   There was no suggestion of Barrett's out, someone

22   else is going to have to come in.

23          MR. WERTKIN:  As we said, we can bring

24   Mr. Barrett back to the extent that it's necessary.

25          MR. LEMBKE:  But you just said he can't

1   update the information.

2          First of all, Barrett shouldn't be allowed,

3   Your Honor, because they wouldn't let Barrett tell us

4   how he did the calculation.  I mean, you don't get to

5   hide the ball.

6          MS. GUNASEKERA:  Your Honor --

7          MR. LEMBKE:  Decisions have consequences.

8   And on what theory in the world they thought they

9   could get their loss calculation damages expert to,

10  on an instruction of privilege, not tell us the

11  information?  That is one of the wildest things I've

12  ever seen.  But that's what they did.  So they've got

13  to live with it.

14         THE COURT:  Now they're saying that he can't

15  update the data anyway.

16         MR. LEMBKE:  Because he's not eligible to

17  look at it.

18         But they never updated their disclosures to

19  tell us who else had the information.  If someone

20  else had the information, presumably, they should

21  have disclosed it in discovery, if it was more than

22  Mr. Barrett.

23         THE COURT:  You know, quite frankly, when I

24  read through this material this weekend, before I got

25  the government's thing that was filed this morning,

1   wherever it is, it's in my file somewhere, and I saw

2   that he was a former employee, I wondered, doesn't

3   that create a problem in terms of updating it,

4   because he's no longer employed by the contractor

5   that deals with the spreadsheets and things.

6           And I don't understand why the government

7   didn't recognize that that was going to be a problem

8   in June -- July, at least, when the motion in limine

9   was filed.

10          I mean, if the government had said then, oh,

11  we're going to have a problem, it would have been

12  much easier to remedy then before trial started.  It

13  would have been hard because it would have been late,

14  but to do so now, after 12 weeks of testimony, in the

15  middle of it and --

16          MR. WERTKIN:  Your Honor, I understand.

17  We've all been trying to get our heads around it.

18  When we were putting together our initial jury

19  instructions and that was in the early part of July,

20  we were trading verdict forms, the verdict form that

21  we were trading, neither of those two, however they

22  would come out, would require, after phase one, a

23  recalculation.  And that's why we didn't anticipate

24  it.

25          Your Honor, we --

1          THE COURT:  We talked in May about the need

2    for a recalculation after the jury's verdict.

3          MR. WERTKIN:  No, sorry, of this

4    spreadsheet.  Of this particular spreadsheet.  So --

5    because of different dates.

6          Miescke -- if we had used -- if the jury

7    wasn't given an opportunity to find their dates --

8    and that was the right decision and we're not

9    challenging it.  I don't want to give the wrong idea.

10   But if the jury didn't have that option, we wouldn't

11   have had to regenerate these spreadsheets because all

12   Miescke would have had to do is just cross out lines

13   where the jury had found patients were in or out of

14   the sample.

15         That's what's going on here, Your Honor.

16   It's just -- and I would think that, you know, be

17   given, you know, I think this has been a really

18   complex trial and it's been, I've been, frankly, you

19   know, you know how we had some debates over how it

20   was being managed and we said we didn't agree, but I

21   think it turned out in terms of like how it's going

22   pretty good, I mean, I've been -- and I will eat my

23   hat on that one.  But, of course, there are certain

24   things as the playing field has shifted a little bit

25   and I think given the fact that really there's not

1  going to be a change -- there's not going to be a

2  change of the actual numbers, the person who is going

3  to be testifying about it, yes, that's going to

4  change.  We acknowledge that.

5        But the actual -- what the facts are is not

6  going to change.  And that's why we think that, you

7  know, we ask the Court for a little leeway.

8        THE COURT:  The ultimate fact, yes.  But the

9  underlying fact for which he calculates the damages

10  would not have changed.

11        MR. WERTKIN:  Right, the underlying

12  assumptions and the underlying numbers.

13        THE COURT:  He didn't testify about any

14  assumptions because he didn't make any.

15        MR. WERTKIN:  At the time, that's right.

16  But he's using the same assumptions that Kenny

17  Barrett used and --

18        THE COURT:  How do we know that when Kenny

19  Barrett was prohibited from testifying about how he

20  --

21        MR. LEMBKE:  Got to the final numbers.

22        MR. WERTKIN:  We know because the numbers

23  are the same.

24        MR. LEMBKE:  Think about how unfair it is to

25  us to allow now a substitute expert or layperson when

1  the first person who was put forward at the time

2  provided in the rules to tell us wouldn't tell us.

3  That's trial by ambush.

4          And the fact that, you know, the government

5  has, always has had, always will have the burden of

6  proof in this case.  And the fact that they said,

7  well, we just assumed it would be all or nothing on

8  Liao, that's what you get for assuming.

9          MS. GUNASEKERA:  And that's not entirely

10  accurate, Your Honor.  Mr. Barrett was deposed on how

11  he put together the worksheets.  And he provided

12  sworn testimony as to exactly how he did that.

13          In terms of why specific changes were made,

14  as to patients, had nothing to do with the way in

15  which he put the worksheet together.

16          It all had to do with -- why did you now,

17  for February 2009, count that as a loss as opposed to

18  as not a loss, something that should have been paid

19  to AseraCare.  That didn't have anything to do with

20  the underlying work that he did to prepare the

21  worksheets.  It was --

22          MR. WERTKIN:  If we gave --

23          MR. LEMBKE:  That's double talk, Your Honor.

24          MR. WERTKIN:  If we gave them the benefit of

25  the doubt, so -- can you give a specific example, if

 1   we gave them the benefit of the doubt and said, you

 2   know, do you have a specific example you can give?

 3          THE COURT:  I would like to see

 4   Mr. Barrett's deposition where this information was

 5   not disclosed.  I think it's in some motion.

 6          MS. GUNASEKERA:  Your Honor, in one

 7   instance, Mr. Barrett was being questioned about why

 8   particular changes were made based on certain

 9   observations by the defendants' expert.  And what he

10   wasn't allowed to answer was as to specifically --

11   what the lawyers specifically advised him about the

12   change.

13          MR. LEMBKE:  Your Honor, it starts around

14   Page 120 of Mr. Barrett's deposition.

15          THE COURT:  That is Exhibit 4 to document

16   332.  I don't know if it goes the full amount.

17          MR. LEMBKE:  I don't know if it does either.

18   And then it really goes through the end of the

19   deposition because there were numerous instances

20   where the government made clear that they weren't

21   going to allow investigation into, you know, you

22   start with questions like on 120 at Line 18, who made

23   the judgment?  Whose idea was it to initially make

24   that change?  I don't know.  I don't know whose idea

25   it was.

1        MS. GUNASEKERA:  Let me give you some

2   context, Your Honor, to that specific reference.

3        Mr. Barrett is being questioned about why

4   changes were made between the pilot sample that

5   Dr. Liao reviewed, the 2010 sample versus the 2013

6   sample.

7        As Your Honor now is aware, there were

8   changes in Dr. Liao's opinion as to certain patients'

9   period of ineligibility.

10       So Mr. Barrett was not made aware as to why

11   Dr. Liao made those changes.  So that's what he is

12   not answering here.  That has nothing to do with the

13   specific loss calculation or the underlying data from

14   which Mr. Barrett was assessing a loss.

15       It has to do with Dr. Liao's determination

16   about ineligibility.

17       MR. LEMBKE:  Read on, Judge.

18       MS. GUNASEKERA:  Well, that's one instance,

19   Your Honor.

20       MR. LEMBKE:  Ms. Gunasekera -- Your Honor,

21   you might ask, does the government dispute that they

22   claimed privilege and prevented him from explaining

23   how the final calculations were made as to a number

24   of patients on the spreadsheet that he was being

25   deposed about?

1          MS. GUNASEKERA:  Yes, I do.  As to how,

2     yeah, he was being told --

3          MR. LEMBKE:  No, no, I mean as to how the

4     final number was reached in the sense of what the

5     reason was for the change from the previous version

6     to the final number in the final version that was

7     before him at the time.

8          THE COURT:  Why don't y'all just give me a

9     few minutes to read this.

10          MR. LEMBKE:  And I have the exhibits, Your

11     Honor, if you want to see them.

12                         (Brief pause.)

13          THE COURT:  So one of the things that he did

14     was look at Palmer's report and recognize that

15     changes needed to be made.

16          MR. LEMBKE:  Someone, I think, told him that

17     changes needed to be made by virtue of that.

18          THE COURT:  Did you sit down and analyze

19     Palmer's report and based on Palmer's report

20     recognize that there were changes that needed to be

21     made or is that what happened?  Yes.  I analyzed his

22     reports, noted his -- noted his comments with respect

23     to some of the work that Advanced Med did and then

24     reviewed it and saw that changes, that oversights

25     needed to be changed.

1              It looks like the government invoked

2      privilege as to who may have told Mr. Barrett about

3      Dr. Palmer's report and the need to make changes; is

4      that --

5              MR. CHRISTIE:  Part of the issue.  There

6      were other issues besides just Mr. Palmer's report.

7              THE COURT:  All right.  That's one of them

8      where the government invoked privilege.

9              MR. LEMBKE:  Yes, Your Honor.

10             THE COURT:  Is there any dispute,

11     Ms. Gunasekera?

12             MS. GUNASEKERA:  That is correct, Your

13     Honor.  But it was Mr. Palmer's report that was the

14     explanation for why the changes were made.

15             So when you look to Dr. Palmer's report,

16     there are deviations as to specific patients, so as

17     Mr. Barrett explained in his deposition, that's why

18     certain changes were made.

19             So that was explained, Your Honor.  He made

20     those changes after his review of Dr. Palmer's

21     report.

22             THE COURT:  On the instruction of some

23     unknown --

24             MS. GUNASEKERA:  Yes.  The privilege was

25     invoked as to who gave him the report and provided

1   him with --

2           THE COURT:  And what instructions and what

3   emails may have gone with it in terms of what he was

4   directed to do.

5           MS. GUNASEKERA:  Exactly, right.  But the

6   changes were explained in response to Mr. Palmer's

7   report.

8           MR. LEMBKE:  I would note this, I've never

9   been in a situation where an expert witness is asked

10  to explain the instructions he was given and why he

11  made changes and they say sorry, you don't get to

12  know that.  Privilege.

13          MS. GUNASEKERA:  Mr. Barrett was not our

14  expert.

15          MR. LEMBKE:  A person who is being put

16  forward to offer a damages calculation in a case, if

17  they elect to use him for that, then they don't get

18  to hide the basis, the full basis for his

19  calculation, and that's what's going on here.

20          MS. GUNASEKERA:  There was no hiding, Your

21  Honor, it's in Dr. Palmer's report as to why changes

22  were made.  Deviations in the specific numbers that

23  then Mr. Barrett looked to Mr. Palmer's report and

24  corrected those deviations in his loss calculations,

25  every calculation.

1          MR. CHRISTIE:  Dr. Palmer's report was a

2    fraction of changes that were made.  And I was

3    prepared to ask questions on dozens of changes.

4    Because, as you will read, like on Page 169, not only

5    did they say the privilege, they made clear they were

6    not going to waive the privilege and privileges were

7    going to be asserted as to all the changes.

8          MR. LEMBKE:  Your Honor, for example, I

9    direct you to Page 135 -- excuse me, 155.

10          THE COURT:  Because I had read through 135.

11          MR. LEMBKE:  Beginning at Line 9, really on

12    154.

13          THE COURT:  Well, let me start at 153.

14          MS. GUNASEKERA:  Actually, Your Honor, I

15    think you should start at 152 or even 151.

16          THE COURT:  Y'all can take a nice little

17    recess while I read.

18          MR. LEMBKE:  Your Honor, I would just note a

19    couple other pages of importance for the Court to

20    look at.

21          THE COURT:  Just note that they're not

22    letting me read any of these pages until they keep

23    adding more to them.

24          MR. LEMBKE:  163 and 169, if it's all right,

25    I'm going to take a restroom break.

1     THE COURT:  Y'all go take whatever kind of

2  breaks you need.  I will be sitting here rocking and

3  reading.

4                    (Brief recess).

5     THE COURT:  Okay.  All right.  I have read

6  just about the last 50 pages or so of -- 40 pages or

7  so of Mr. Barrett's deposition.  And a lot of it was

8  taken up with discussion about invocation of

9  attorney/client privilege or work product privilege

10  concerning why Mr. Barrett made certain changes based

11  either on Dr. Palmer's report or on misunderstandings

12  of maybe Dr. Liao's report, but he never was allowed

13  to testify as to who instructed him to make those

14  changes and things of that nature.

15     But for the revised spreadsheets that

16  Dr. Miescke is presumably, or I hope it's completed

17  by now, there wouldn't be -- well, there would be a

18  lot of changes from prior versions --

19     MR. LEMBKE:  No, Your Honor.  Dr. Miescke,

20  they've said, is starting from scratch.

21     THE COURT:  Right.

22     MR. LEMBKE:  So he's not using anything

23  that's gone before in terms of the calculation.  They

24  represented -- he's doing an entirely new

25  calculation.  He's not using anything that Barrett

1   did in those last two columns.  He's doing that all

2   over.

3        THE COURT:  But they may be different from

4   any of Barrett's prior calculations.

5        MR. LEMBKE:  Some.

6        THE COURT:  Is he going to be allowed to

7   testify as to why they are different from the prior

8   spreadsheets that were provided to the defense during

9   discovery?  Because I can see that question coming.

10        MS. GUNASEKERA:  He can to the extent he has

11   knowledge of it.

12        MS. MARTIN:  Your Honor, he had those

13   spreadsheets, as I understand it, he had the original

14   spreadsheets from the very beginning.  And they never

15   put it in his expert report that he would be doing

16   this type of calculation.

17        MR. LEMBKE:  This is a case --

18        MS. MARTIN:  Go ahead, Matt.

19        MR. LEMBKE:  This is a case where the

20   government came in seeking at least $200 plus million

21   and they didn't disclose Dr. Miescke for this.  And

22   the notion that on the fly we're supposed to start

23   from scratch with Dr. Miescke on this, that is

24   totally contrary to the way the discovery process

25   works and the expert disclosure deadlines.  And

1    Dr. Miescke could have done this from day one and

2    they made the decision not to have him do it.  And he

3    said it's not my expertise.

4           And now they're coming in saying, oh, this

5    is so simple and straight forward, when you just read

6    40 pages of deposition suggesting it's not quite as

7    straight forward as they make it out to be.

8           THE COURT:  Or it wasn't at the time that

9    Mr. Barrett did his --

10          MR. LEMBKE:  But whether or not, Your Honor,

11   it's straight forward.  If they wanted Miescke to do

12   it, they could have had him do it from day one.

13          And it simply is improper, unfair, totally

14   contrary to the Court's expert disclosure orders,

15   totally contrary to the rules of discovery to let

16   them know now say we're changing.

17          THE COURT:  I think that's where I really

18   have my biggest problem, that it is different from

19   what had been disclosed to the defendant, not only

20   initially, but even as late as July of this year

21   after we knew that the case was going to be

22   bifurcated, after we had conversations about the

23   potential need to recalculate the damages after the

24   jury verdict on that, we had those conversations

25   early on after the bifurcation issue was decided that

1  before we had a jury verdict form that broke it out

2  into periods of ineligibility.

3       Sometimes it's really, really hard to follow

4  the rules of the court and, yet, try to be fair to

5  both sides in addressing issues like this.  Because I

6  understand the problems for the government with this,

7  but to throw to the defense 12 weeks into trial, a

8  couple of days before or barely more than 24 hours

9  before we start phase two, that your expert is going

10  to be talking about calculations or worksheets or

11  whatever you want to call it that he has now done,

12  that he had not done any of at the time that he was

13  deposed, and was actually represented as not being

14  the one who was doing it, it just creates a real

15  bugger bear for me to figure out and to try to figure

16  out the best way to address that problem at this

17  time.

18       This may be -- have we seen his report yet?

19  Has he finished his revised report?

20       MS. GUNASEKERA:  It is finished, Your Honor.

21  In fact, I think he was just calling me to let me

22  know whether he sent it to me, but he was -- I sent

23  him the form this morning and he was finishing it up

24  and he was expecting to send it to me by 5:00 today.

25       THE COURT:  Why don't we look at it and see

1  what it is and see what he says and see where we go.

2          MS. GUNASEKERA:  We can get this over to you

3  --

4          MR. LEMBKE:  Your Honor, nothing that he

5  says is going to change the fact that he wasn't

6  disclosed to us and that we did not have the

7  opportunity to ask him, before we even put forward

8  our expert witness, about how he did it and the like.

9          I mean, that just -- that's not the way it's

10  supposed to work.  If they -- they could have

11  selected him as the expert for this from day one and

12  decided not to.

13          THE COURT:  I understand, but it's like what

14  do we do now?

15          MR. LEMBKE:  It's their problem of proof.

16          THE COURT:  Provide them with the report.  I

17  will make a decision in the morning.  I am physically

18  drained and probably mentally as well and I just need

19  some time to rest.

20          MS. GUNASEKERA:  Would you like me to send a

21  copy of the report to you?

22          THE COURT:  Yes, I would.

23          MR. WERTKIN:  What is the best way, what's

24  the best way to transmit it to you?

25          MS. GUNASEKERA:  The report itself is an

1    email.  The worksheets, Your Honor, those are

2    probably too large to --

3              THE COURT:  I don't want to see them.

4              MS. GUNASEKERA:  So that would be burned on

5    a CD, so we'll just send you the report.

6              MR. WERTKIN:  We will bring a copy of the CD

7    in the morning just in case.

8              THE COURT:  I'm sorry, I just am exhausted.

9              MR. LEMBKE:  Let me just sort of quickly

10   alert the Court to what we've got to do before

11   opening statement.

12             In addition to this issue, there's the other

13   motions in limine that are outstanding that are noted

14   in our report.

15             There's the issue of what the preliminary

16   instruction on the law is going to be, which is a big

17   issue.

18             THE COURT:  Have we gotten anything from the

19   government on that yet or did y'all talk about that?

20             MR. LEMBKE:  We're waiting for an update

21   from the government but, realistically, I don't think

22   there's going to be a substantial amount of agreement

23   on some key aspects to it.  So there's going to be

24   some significant differences, I anticipate.

25             Then, Your Honor, the government disclosed

1   to us on Saturday night their witnesses and exhibits,

2   to the extent they listed both.  As was true in phase

3   one, you know, it seemed like the first week had a

4   ton of issues and then it went down from there.

5   There are going to be a ton of issues.  And as soon

6   as we get back to the office, we're going to be

7   completing our little report on it, sending it to the

8   government and we hope by late tonight or first thing

9   in the morning we will be able to submit it to the

10  Court, but there's going to be a substantial number

11  of evidentiary issues to take up with regard to that.

12          THE COURT:  With their first couple of

13  witnesses?

14          MR. LEMBKE:  Yes, Your Honor.

15          THE COURT:  And we also need to take up the

16  equitable stuff.

17          MR. LEMBKE:  Yes.

18          THE COURT:  That is one that I feel almost

19  competent to discuss or at least raise here.

20          Why aren't those claims equitable and why do

21  they go to the jury at all?

22          MR. OLSON:  To the extent they are

23  equitable, I think there's some case law that goes

24  both ways on whether they're classified as equitable

25  or legal.  We didn't address that point in our

1    pleading.  But assume they are equitable, our

2    position is that they are overlapping issues of fact

3    between the False Claims Act counts, that those

4    factual issues, regardless, go to the jury.

5           So, if the Court was to treat them as

6    equitable claims, the factual issues underlying --

7    the overlapping factual issues overlap -- underlying

8    those common law counts would go to the jury.

9           MR. LEMBKE:  And --

10          THE COURT:  Not for specific findings, but

11   as part of the other claims; right?

12          MR. OLSON:  I think that's right.  And

13   that's something that's discussed -- I believe how

14   the -- if there was a special interrogatory in the

15   verdict form, in connection with the verdict, it

16   could be structured in a way to make sure that the

17   Court had the factual determination it would need for

18   --

19          THE COURT:  Even with equitable claims, if

20   there are factual questions, that's for the Court.

21   It's not for the jury in equitable cases.

22          MR. OLSON:  Except where they overlap.

23   There is case law at the Supreme Court level and the

24   Fifth Circuit prior to the Eleventh -- the split that

25   recognized that.

1          MR. LEMBKE:  But, Your Honor, I think your

2     point is right in the sense that, you know, the jury

3     will decide these claims.  And if there's some facts

4     relevant to the False Claims Act claims, that the

5     government thinks there ought to be a special

6     interrogatory on, fine.

7          And then the Court takes what the jury has

8     decided and if there's overlap, there's overlap.  But

9     the Court still decides the equitable claim.

10          So I think, I mean, you certainly don't

11     submit to the Court any of the elements of the

12     equitable claims or any of the factual issues

13     targeted to the equitable claims because they are

14     ultimately for the Court's decision.  And while I

15     understand their argument about, well, if there are

16     overlapping factual issues, the Court can't -- in a

17     case, the Court can't decide something inconsistent

18     with the way it was done.  But if they want to ask a

19     special interrogatory about a factual issue that they

20     think may have a bearing on equitable claims, they

21     can propose it.

22          But, you know, our point is we don't think

23     the jury needs to be told at the outset of this case

24     that the equitable claims are being tried.

25          Now, of course, all the proof is put on in

1   the trial, it's just when it's over, the Judge gets

2   the verdict and then the Judge decides the equitable

3   claims.

4           THE COURT:  Why doesn't it work that way?

5           MR. OLSON:  I don't dispute that.  To the

6   extent these are equitable claims, that is correct.

7   We don't dispute that characterization that -- but

8   those factual findings would overlap and our position

9   is the central factual finding, a falsity finding for

10  False Claim Act purposes are central to the unjust

11  enrichment and paid by mistake counts, those factual

12  findings would have to be applied -- when the Court

13  determines the equitable -- ultimately makes the

14  equitable finding.  And the Tumi case that we cited

15  recognizes that, that that was the issue in the Tumi

16  case that that wasn't done.

17          THE COURT:  Okay.  You said to the extent

18  these are equitable claims.

19          Are you disputing that these claims in

20  addition to the false -- two False Claims Act counts

21  are equitable?

22          MR. OLSON:  There is mixed case law in

23  payment by mistake which we did not address in our

24  filing.

25          Sitting here today, our position is that we

1    don't -- we don't contest it for purposes of this

2    issue or at least we don't -- I guess for purposes of

3    what the jury -- we would like the opportunity to

4    look into it further, and we would not ask the Court,

5    in the preliminary instructions, to instruct on

6    payment of claims.  I don't think they will be

7    necessary to make a final determination.

8            THE COURT:  Or unjust enrichment.

9            MR. OLSON:  Unjust enrichment, I think

10   there's a stronger argument that it is equitable.

11           If you look at the elements itself --

12           THE COURT:  It's an equity claim.  It always

13   has been.

14           MR. OLSON:  It has a reference to that.

15   Payment by mistake, there is -- I think, as we looked

16   at it a little bit more after we filed this, the

17   Fourth Circuit case law we cited, the Fourth Circuit

18   does view it as an equitable claim.  There's case law

19   elsewhere --

20           THE COURT:  What does the Eleventh Circuit

21   say?

22           MR. OLSON:  I don't have an answer.  I don't

23   know what the Eleventh Circuit -- I don't have an

24   answer for you on that.  I cannot give you an answer.

25           MR. LEMBKE:  Your Honor, our issue on this

1    is this is their -- it's time to fish or cut bait.

2    We've got to know -- I think the notion of -- we're

3    not -- if this is really a legal claim and it's going

4    to be decided, the jury needs to be told that in the

5    preliminary instructions.

6            We think, based on the case law we submitted

7    to you, these are both equitable claims.  But if the

8    government is going to take the position that it's a

9    legal claim, we need to know it and get it resolved

10   before opening statement.

11           THE COURT:  Yes.  Because I need to know

12   what I'm going to have to tell the jury in the

13   preliminary instructions.

14           MR. OLSON:  Do we have permission to give

15   you the answer by the morning?

16           THE COURT:  Okay.  All right.  I've got a

17   lot to mull over, if I can get my head clear enough

18   to do it.

19           MR. LEMBKE:  I'm going to go ahead and say

20   it, I don't see how we can have opening statements on

21   Wednesday morning, Judge.

22           THE COURT:  I'm beginning to wonder that

23   myself.

24           MR. LEMBKE:  I would say from the lawyers'

25   perspective, it sounds like we've got a full day here

1   at the courthouse, and trying to get ready for

2   opening statements and witnesses after two full days

3   at the courthouse is very difficult.

4           THE COURT:  Let's see where we are tomorrow.

5   But I am tending to agree with you and we may be

6   pushing it to Thursday.

7           I just am very concerned about getting this

8   resolved before the holidays.  And I think we've

9   heard some concern from the jurors on that this

10  morning.

11          MR. LEMBKE:  It all depends on which holiday

12  we're talking about.

13          THE COURT:  Well, there's several, aren't

14  there?

15          MR. WERTKIN:  What time tomorrow?

16          THE COURT:  Let's say 9:00.

17          (Court in recess for the day.)

18

19

20

21

22

23

24

25

7004

1

2

3

4                        C E R T I F I C A T E

5

6          I hereby certify that the foregoing is a

7    correct transcript from the record of proceedings in

8    the above-referenced matter.

9

10
     _____
11   Teresa Roberson, RPR, RMR
     Julie Martin, RPR, RMR
12

13

14

15

16

17

18

19

20

21

22

23

24

25