563

FILED
2016 Jun-28 PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ALABAMA
              SOUTHERN DIVISION

3

4

5   UNITED STATES OF AMERICA,
    EX REL., ET AL.,              CV-12-KOB-245-S
6

7          Plaintiffs,      August 11, 2015

8      vs.                  Birmingham, Alabama

9   ASERACARE, INC., ET AL.,

10         Defendants.

11  * * * * * * * * * * * * * * * * * * * * * * * *

12

13       REPORTER'S OFFICIAL TRANSCRIPT OF
                JURY TRIAL
                VOLUME V

14

15     BEFORE THE HONORABLE KARON O. BOWDRE
        UNITED STATES DISTRICT CHIEF JUDGE

16

17

18

19

20

21

22

23  COURT REPORTER:
    Teresa Roberson, RMR
    Julie Martin, RMR
24  Federal Official Court Reporter
    1729 Fifth Avenue North
25  Birmingham, Alabama  35203

```
 1                    *  *  *  *  *

 2              A P P E A R A N C E S

 3                    *  *  *  *  *

 4   FOR THE PLAINTIFF:

 5   Jeff Wertkin
     Carolyn Tapie
 6   Holly Snow
     Eva Gunasekera
 7   U.S. Department of Justice
     Civil Division
 8   P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
 9

10   Lane H. Woodke
     Don Long
11   U.S. Attorney's Office
     1801 4th Avenue South
12   Birmingham, Alabama  35203

13   James F. Barger, Jr.
     J. Elliott Walthall
14   FROSHIN & BARGER
     3430 Independence Drive
15   Birmingham, Alabama  35209

16   Nola J. Hitchcock Cross
     CROSS LAW FIRM
17   345 North 11th Street
     Milwaukee, Wisconsin  53233
18

19

20

21

22

23

24

25
```

```
1              A P P E A R A N C E S  (continued)

2    FOR THE DEFENDANT:

3    James Sturgeon Christie, Jr.
     Jack Wright Selden
4    Matt Lembke
     Tiffany deGruy
5    BRADLEY, ARANT, BOULT & CUMMINGS
     1819 Fifth Avenue North
6    Birmingham, Alabama  35203

7
     Kimberly Martin
8    BRADLEY, ARANT, BOULT & CUMMINGS
     200 Clinton Avenue
9    Huntsville, Alabama  35801
     Charles H. Bohl
10   WHYTE, HIRSCHBOECK, DUDEK
     555 East Weels Street, Suite 1900
11   Milwaukee, Wisconsin  53202

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    * * * * *
2              P R O C E E D I N G S
3                    * * * * *
4          (Open court.  Jury present.)
5          THE COURT:  Good morning, ladies and
6   gentlemen.
7          The United States may call your next
8   witness.
9          MR. WERTKIN:  Yes, Your Honor.  The United
10  States calls Vickie Stutts.
11          VICKIE STUTTS, GOVERNMENT'S WITNESS, SWORN.
12          THE CLERK:  State and spell your first and
13  last name for the court, please.
14          THE WITNESS:  V-i-c-k-i-e, S-t-u-t-t-s.
15                  DIRECT EXAMINATION
16  BY MR. WERTKIN:
17  Q.  Good morning Ms. Stutts.
18  A.  Good morning.
19  Q.  Could you please introduce yourself to the jury.
20  A.  My name is Vickie Stutts.  I've been a nurse for
21  17 years.
22          MS. MARTIN:  Your Honor, we would object to
23  --
24          THE COURT:  Sustained.  Ask questions of
25  your witness, please, sir.
```

1   Q.   Ms. Stutts, where are you from?

2   A.   I'm from Danville.  I was born in Decatur,

3   Alabama.

4   Q.   Where do you live now?

5   A.   I still live in Danville.

6   Q.   And are you familiar with AseraCare Hospice?

7   A.   Yes, I worked there.

8   Q.   And are you a -- what's your profession?

9   A.   I'm a nurse, RN.

10   Q.   How long have you been a nurse for?

11   A.   17 years.

12   Q.   And how are you familiar with AseraCare Hospice?

13   A.   I worked there from June 2006 to July 2007.

14   Q.   And what was your position there?

15   A.   I started as a case manager, was a case manager

16   for a few weeks; and then was promoted to patient

17   clinical coordinator; and then was promoted to

18   director of clinical services.

19   Q.   Okay.  Do you know why you've been called as a

20   witness in this case?

21   A.   Yes, I do.

22   Q.   Why?

23   A.   Some questionable patients were admitted that

24   were inappropriate.

25   Q.   Okay.  Ms. Stutts, have you ever given testimony

1   in a courtroom before?

2   A.   No, this is my first time.

3   Q.   What did you do to prepare for today?

4   A.   A lot of prayer to get ready for this.

5   Q.   Are you a bit nervous?

6   A.   Definitely.

7   Q.   Before you talk about your time at AseraCare, I

8   would like to ask you a few questions about your

9   background.

10          Where did you go to high school?

11  A.   Danville.

12  Q.   And is that Danville, Alabama?

13  A.   Yes.

14  Q.   And after high school, what did you do?

15  A.   I went to nursing school at the University of

16  Alabama in Huntsville.

17  Q.   Did you get a degree from the University of

18  Alabama in Huntsville?

19  A.   Yes.  I got my bachelor's of science in nursing.

20  And then went back a year later and got my Master's

21  of science in nursing and nursing administration.

22  Q.   Did you do that one after the other or was there

23  a break?

24  A.   Yes.

25  Q.   What was your Master's degree in?

1  A.   In nursing with a specialty in nursing

2  administration.

3  Q.   And why did you choose nursing?

4  A.   I always wanted to help people.

5  Q.   And do you have any licenses from the State?

6  A.   Just my RN license.

7  Q.   What did you have to do to get your RN license?

8  A.   After finishing my nursing school, I had to take

9  a test with the State, and then I have to, every two

10  years, get continuing education hours with the State

11  to stay certified.

12  Q.   And what was your first job as a nurse?

13  A.   I was an oncology nurse in a hospital.

14  Q.   What's an oncology nurse do?

15  A.   I did chemotherapy.  I dealt with patients who

16  has cancer, single cell anemia.

17  Q.   Which hospital was that?

18  A.   Huntsville Hospital.

19  Q.   And how long did you work at Huntsville Hospital

20  as an oncology nurse?

21  A.   I was there for a little bit less than a year

22  and I moved closer to home to Decatur where I was an

23  ICU nurse for about three years.

24  Q.   And what hospital were you an ICU nurse at?

25  A.   Decatur Morgan Hospital.

1   Q.   How long were you an ICU nurse at Decatur Morgan

2   Hospital?

3   A.   Three years.

4   Q.   Where did you work after you were an ICU nurse?

5   A.   I stayed at the hospital.  I just received a

6   promotion to become an educator for the hospital.

7   Q.   What does an educator for a hospital do?

8   A.   I coordinated all the education as far as

9   advance cardiac support, basic cardiac support.

10  Organized all the nurse for the hospital as well.

11  Checkcheckthatanswer.

12  Q.   Your focus was teaching other nurses?

13  A.   Yes.

14  Q.   And what did you after that position?

15  A.   After that position, I was actually recruited to

16  go back to Huntsville Hospital to work in the

17  cardiovascular service line.

18          So, I actually did a lot of education there

19  for the nurses as well, that service line.  I was

20  there for about a year as well.

21  Q.   What did you do after that?

22  A.   Then I had some family issues, so I took a

23  baylorck position where I worked only weekends for my

24  family.  My mom was not doing well at the time.  So I

25  went to a post-op surgical unit at Cullman Regional

1   Medical Center and worked weekends.

2   Q.   For how long did you work weekends at that

3   center?

4   A.   For about a year.  And then she was better, so I

5   was able to go back to work Monday through Friday.

6   Q.   What did you do there?  What were your clinical

7   responsibilities, if any, in the baylorck position?

8   A.   I took care of residents or patients at the

9   time.  So, I did post-op care for knees, hips.  We

10  did a lot of IV therapy as well.

11  Q.   And you said you worked there for one year; is

12  that right?

13  A.   Yes.

14  Q.   What did you do after that?

15  A.   Then I went to AseraCare.

16  Q.   When did you apply to work for AseraCare?

17  A.   It was a little before June of 2006.  I actually

18  received a call from the executive director to ask if

19  I wanted to come work there.

20  Q.   What did you decide to do?

21  A.   It sounded great, so I went for it.

22  Q.   Why did you decide to do that?

23  A.   I wanted to try hospice.  My aunt, I lost her to

24  breast cancer, and she had hospice and I saw what

25  those nurses did, so I wanted to try that.

1  Q.   And which AseraCare agency did you apply to work

2  at?

3  A.   Decatur.

4  Q.   And that's Decatur, Alabama?

5  A.   Yes.

6  Q.   And what was your position in Decatur when you

7  started?

8  A.   The RN case manager.

9  Q.   What were your responsibilities as an RN case

10  manager in Decatur, Alabama?

11  A.   I managed a group of patients at that time.  So,

12  my job was to go into the house to assess the

13  patients.  There were times where I may have had to

14  do an admission as well, but my goal at the time was

15  just to be focused on caring for that patient and

16  that symptom management.

17  Q.   Did you have any other clinical responsibilities

18  when you were an RN case manager?

19  A.   I assessed them for -- continuing to make sure

20  they were still eligible to be on hospice, they still

21  met criteria.

22  Q.   Did you do admissions?

23  A.   A couple of admissions, yes.  I did a few

24  admissions as well.

25  Q.   And how about re-certifications?

```
 1   A.   Yes.
 2   Q.   Did you attend any clinical meetings while you
 3   were an RN case manager?
 4   A.   Yes, IDT meetings.
 5        MS. MARTIN:  Your Honor, we would just
 6   object.  My understanding is that Ms. Stutts was only
 7   an RN case manager for a short period of time in
 8   2006.
 9        THE COURT:  Clarify your time frame.
10        MR. WERTKIN:  Yes, Your Honor.
11   Q.   How long did you work as an RN case manager --
12   and if I could just have a little leeway, I'm just
13   establishing her work history up until the time that
14   we're going to focus on, Your Honor.
15        How long were you an RN case manager in the
16   Decatur facility?
17   A.   It was only for a few weeks before my promotion.
18   Q.   Okay.
19        THE COURT:  For a few weeks?
20        THE WITNESS:  Yes, ma'am.
21   Q.   What is an IDT meeting?
22   A.   Interdisciplinary team meeting.  That's where
23   the RN, the chaplain, the social worker and the
24   medical director actually get together and discuss
25   the patients.
```

1   Q.   Did you have any experience with hospice before

2   you started as RN case manager?

3   A.   No.

4   Q.   And who did you report to as RN case manager?

5   A.   To the patient care coordinator and the director

6   of clinical services.

7   Q.   You said that you only served for a few weeks;

8   is that right?

9   A.   Yes.

10   Q.   What happened after a few weeks?

11   A.   I was promoted to patient care coordinator.

12   Q.   And what was your responsibility as patient care

13   coordinator?

14   A.   ChckthisanwercheckI oversaw the nurses and the

15   C. NAs that worth there.  I also help them manage

16   symptom manage.  We looked at medication manage.

17   Action make sure they were getting the correct

18   equipment to that patient as well.  And also helped

19   with the IDT team as well.

20   Q.   How long did you serve as a patient care

21   coordinator in Decatur?

22   A.   I can't be exactly sure.  It was for a few

23   months though before I was promoted to director of

24   clinical services.  I don't remember the exact time

25   frame.

1  Q.   What is a director of clinical services?

2  A.   I was responsible for oversight of all of the

3  clinical issues that went on in the building, that

4  would be making sure all the recertifications were

5  ready, making sure all of RN case managers were doing

6  their jobs, taking care of their patients as well, as

7  well as doing audit, too.

8  Q.   And when you say the certifications were ready,

9  what does that mean?

10  A.   Making sure we were prepared for IDT and making

11  sure also when we were ready to bill, everything was

12  ready to go, everything was on the docket, the

13  medical record.

14  Q.   When you say ready to bill, can you explain

15  that?

16  A.   The certification of terminal illness was signed

17  and that there were actual documentation in the chart

18  to support that that patient was eligible.

19  Q.   Did you attend any clinical meetings when you

20  were the director of clinical services?

21  A.   I did.

22  Q.   What meetings were those?

23  A.   IDT.

24  Q.   And that's stand for?

25  A.   Interdisciplinary team.

1  Q.  What was your role at the IDT meetings when you

2  were a DOCS or director of clinical service at

3  Decatur?

4  A.  I would provide oversight of the meeting and

5  help the medical director, keep the meeting on task

6  and make sure we were covering all of the patients.

7  Q.  Who did you report to as the director of

8  clinical services in Decatur, Alabama?

9  A.  The executive director.

10  Q.  Who is that?

11  A.  Suzanne Helmsck.

12  Q.  I would like to ask you a few questions about

13  hospice itself.  What is hospice?

14  A.  It's a service that CMS also supports and what

15  we do is if the patient has a terminal illness and

16  it's six months or less, then that patient can

17  receive services.  The services are, of course,

18  medical services, but they're also chaplain services

19  and social services, services for that resident or

20  for that particular patient.

21  Q.  Who is hospice for?

22  A.  It's for any patient that has a diagnosis, a

23  terminal diagnosis.

24  Q.  And where do patients typically receive hospice

25  care?

1  A.   Typically in their home, but it's also in

2  nursing homes as well.  And there can be hospice in

3  hospital settings as well, but typically it is in the

4  home setting.

5  Q.   Do you have any knowledge of curative care?

6  A.   Yes.

7  Q.   And what is curative care?

8  A.   Curative care is when you're able to treat

9  whatever that patient has and that is cured.  That's

10  different than hospice in that they're never going to

11  get better.  It's a terminal illness.

12        Curative would be I go into the hospital for

13  surgery, I have surgery, and then I come home and I'm

14  fine.

15  Q.   Are you familiar or are you knowledgeable about

16  the palliative care?

17  A.   Yes.

18  Q.   What is palliative care?

19  A.   Palliative care is when we're treating their

20  symptoms.  It's more of a symptom management type of

21  thing as well.

22  Q.   And what's the difference between curative care

23  and palliative care, if you know?

24  A.   Curative, there is going to be an end.  Whereas

25  palliative, you're treating symptoms and there may

1  not be an end unless there is a death.

2  Q.   What type of care does hospice provide?

3  A.   Palliative.

4  Q.   Can you give me an example of type of curative

5  care that is not provided by hospice?

6  A.   I guess you would say if we were doing

7  chemotherapy and the chemotherapy would cure the

8  cancer.

9  Q.   Thank you.  I would like to ask you some

10  questions --

11            THE COURT:  Can I ask, you said chemotherapy

12  would cure the cancer, that doesn't always happen

13  with chemotherapy.

14            THE WITNESS:  Or go into remission, yes,

15  ma'am.

16            THE COURT:  But it would be designed to

17  cure, whether it did or not.

18            THE WITNESS:  Yes, ma'am.  Yes, ma'am.

19            MR. WERTKIN:  Thank you, Your Honor.

20  Q.   I would like to ask you some questions about the

21  time that you were working in Decatur, Alabama, near

22  the end of your time period in the May, June, July

23  2007 time frame.

24  A.   Okay.

25  Q.   Were you involved in the admissions process?

1   A.   Yes, I was.

2   Q.   About how many admissions did you do?  Make sure

3   that is 2007.

4   A.   It's hard to say a number.  I participated in

5   several admissions but I couldn't give you a number

6   from that far back.

7   Q.   At Decatur in that May 2007, July 2007 time

8   frame, what was the first step of process for

9   admitting a new patient to hospice?

10  A.   We receive the referral and the referral would

11  come --

12  Q.   Actually, I'm sorry to interrupt.  I'm not so

13  interested in where the referral is coming from at

14  this time.

15  A.   Okay.

16  Q.   But if you can just tell us what a referral is

17  and what it means.

18  A.   Okay.  A referral is from a physician that feels

19  like his patient may benefit from hospice or may be

20  appropriate for hospice.

21       So they would send a referral over for us to

22  evaluate that patient.

23  Q.   So would the referral have an order attached to

24  it or would --

25  A.   Yes, it would.

1   Q.   What was that order?

2   A.   It would say -- usually would say, admit or

3   evaluate and admit, if appropriate, for hospice

4   services.

5   Q.   What does an order to evaluate and admit, if

6   appropriate, mean?

7   A.   It means for the nurse to go --

8          MS. MARTIN:  We would object in terms of her

9   understanding of what that meant from the doctor.

10         THE COURT:  Okay.  Establish your

11  foundation.

12  Q.   (By Mr. Wertkin)  Do you have any knowledge

13  about orders to evaluate and admit, if appropriate?

14  A.   Yes.

15  Q.   What is the basis of that knowledge?

16  A.   That means for us to actually do an assessment

17  on that patient --

18         MS. MARTIN:  Your Honor --

19         THE COURT:  The question, Ms. Stutts, what's

20  the basis of your knowledge, where does your

21  information come from, not what is the result of the

22  --

23         THE WITNESS:  It's just experience with my

24  physicians.

25  Q.   And what can you tell us about orders to

581

1   evaluate and admit, if appropriate?

2   A.    How do you mean that?

3   Q.    What is your understanding of what an evaluate

4   and admit, if appropriate, means?

5   A.    My understanding is we actually would go to that

6   patient, we would evaluate the chart, we would

7   evaluate the patient as well.  And then we would take

8   that evaluation, base that upon the criteria that we

9   have, and then see if they're appropriate for

10  admission.

11  Q.    And what does an order to evaluate and admit, if

12  appropriate, look like?

13  A.    It's just a written note on a physician's order

14  sheet.

15  Q.    What is a physician's order sheet?

16  A.    It's just a piece of paper where the physician

17  or physician writes his orders.

18  Q.    What's your understanding of what evaluate means

19  in the context of evaluate and admit, if appropriate?

20  A.    It means to assess that patient based on the

21  skillset that we have as nurses, we evaluate the

22  patient.  We also evaluate the medical record to see

23  if there's documentation to support that diagnosis.

24  Q.    What is involved in an evaluation?

25  A.    It's a clinical assessment.  So we actually go

1    in and we listen to the heart, the lungs, we evaluate

2    the patient for any wounds they may have as well.

3    Q.   Did you have an occasion to do evaluations when

4    you were a nurse when you were a DOCS in Decatur?

5    A.   Yes.

6    Q.   And when you were doing that, what was the first

7    step that you would do when you would do an

8    evaluation?

9    A.   My first step was to review the medical record

10   first to see what the patient -- the diagnosis is,

11   what types of illnesses they've had in the past, what

12   their history was, see what their current health

13   status is.

14   Q.   What was the next step?

15   A.   Then it would be to actually assess the patient.

16   Q.   How would you do that?

17   A.   I would go to the patient and do an actual

18   physical exam on the patient.

19   Q.   What does that mean?

20   A.   That means looking the patient over, assessing,

21   getting my stethoscope, feeling of the patient,

22   looking at every area on their body and, of course,

23   listen to their heart, their lungs and if they had

24   wounds, assessing their wounds as well.

25   Q.   And when doing an evaluation, did you use any

1  paperwork at all to help?

2  A.   Yes.   We had paperwork that AseraCare provided

3  us to document on.

4  Q.   What was that paperwork?

5  A.   It was just an admission packet and like an

6  assessment form.

7  Q.   If you can recall, what was in that packet of

8  information that you had?

9  A.   I can't recall the exact things that were in

10 there, but there was an assessment form for us.

11 There was also a certification of terminal illness

12 that was also in there as well.

13 Q.   And when you do an evaluation or when you did

14 evaluations in this time frame and the end of May,

15 June, July 2007 in the Decatur agency, what exactly

16 are you evaluating?

17 A.   We are evaluating to see if they're actually

18 appropriate for hospice and they meet the criteria.

19 Q.   What does it mean for someone to be appropriate

20 for hospice?

21 A.   There is criteria that is set forth by -- we use

22 the Medicare criteria and that Medicare criteria is

23 very specific based on the diagnosis, what they

24 actually have.

25 Q.   What are the possible outcomes of your

1  evaluation?

2  A.   Either they meet the criteria or they do not

3  meet the criteria.

4  Q.   Going back to that order to evaluate and admit,

5  if appropriate, what does -- what's your

6  understanding of what admit, if appropriate, means?

7  A.   If they actually meet the criteria, then we

8  would go ahead and do an admission, so we would admit

9  the patients to our services and then we would call

10  the physician and let him know that we were admitting

11  his patient to our services.

12  Q.   In your experience in Decatur in the May, June,

13  July 2007 time frame, who would make that decision

14  about whether to admit, if appropriate, or not?

15  A.   The nurse would doing the assessment.

16  Q.   Would the nurse call anybody in the process of

17  making that decision?

18  A.   Typically, no.  We would call if there was a

19  question, if we were kind of concerned if they didn't

20  meet the criteria, but if they met, we would go ahead

21  and admit.

22  Q.   Who, if anyone, would decide the diagnosis for

23  the patient?

24  A.   Typically the physician, when he does the

25  referral, he will put, you know, to evaluate for

1  Alzheimer's or evaluate for cancer and then we would

2  look at it as well.

3          If they didn't meet for that, but they would

4  meet for a diagnosis, we would admit them under that

5  diagnosis.

6          MR. WERTKIN:  Your Honor, may we approach

7  for a second, please?

8          THE COURT:  All right.

9              (SIDEBAR)

10         MR. WERTKIN:  I just wanted to be clear

11  because Your Honor asked that we come forward.  She

12  was making a distinction between the calls that come

13  from doctors where there's sometimes there's a

14  diagnosis.

15         And I would like to draw that there's a

16  distinction that, when a referral that doesn't come

17  from a doctor, there's not a diagnosis attached, and

18  the nurses will then use the same diagnosis.

19         So that's what I would like to ask her

20  about.  I just want to be sure, because I don't want

21  to go into how the referrals were gotten, but just

22  that it didn't necessarily have to come from a

23  doctor.

24         THE COURT:  Okay.  And I think you can lead

25  her to get to that.  Just that sometimes you get a

1   referral that doesn't come from a doctor and what do

2   you do then.

3          MR. WERTKIN:  Okay.  Thank you, Your Honor.

4          MR. LEMBKE:  What do you do then?  If all he

5   wants to do is establish that if you get a referral

6   from someone other than a doctor, there's no

7   diagnosis.

8          Your Honor, if they say -- I think what he's

9   wanting to establish is that if they get it a

10  referral from someone other than a doctor, it doesn't

11  have the diagnosis.  I don't think he needs to go any

12  further than that.  The "what do you do" is sort of

13  open ended.  I think if he just asks if it doesn't

14  have a diagnosis, that ought to take care of his

15  point.

16         MR. WERTKIN:  I want to know who did the

17  diagnosis then.

18         THE COURT:  I think that's appropriate.

19         MR. WERTKIN:  I understand.  Okay.

20         (Open court.  Jury present.)

21  Q.  (By Mr. Wertkin)  I apologize, Ms. Stutts.

22         You testified that if the referral came from

23  a doctor, sometimes it would have a diagnosis.

24  A.  Yes.

25  Q.  But all referrals didn't come from doctors.

1    A.   No.

2    Q.   And if the referral did not come from a doctor,

3    who would decide the diagnosis?

4    A.   The nurse would doing the assessment.

5    Q.   Just in terms of regularity, about how often

6    would these referrals come from doctors versus

7    another source without a diagnosis attached?

8    A.   Majority --

9              MS. MARTIN:   Objection, Your Honor.

10             THE COURT:   Establish your foundation.

11   Q.   When you were working in the Decatur agency in

12   the time period of time May, June, July 2007, your

13   experience with that, how many referrals came from a

14   doctor versus came from another source without a

15   diagnosis?

16   A.   Most of them came without a diagnosis.

17   Q.   And in those cases, who would make the diagnosis

18   decision?

19   A.   The nurse doing the assessment.

20   Q.   In your experience in the Decatur agency in May,

21   June, July 2007 time frame, were there many occasions

22   where you would call if -- call somebody or were

23   there many occasions where you had questions about

24   eligibility when you were doing admissions?

25   A.   There were several, yes.

1   Q.   Who would you call if you had a question?

2   A.   Typically, I would call the physician back to

3   ask questions.  But if I didn't feel that they were

4   appropriate to admit, I would notify my executive

5   director, Suzanne.

6   Q.   When you say the physician, which physician are

7   we talking about?

8   A.   If it was more information from the admitting

9   physician or the decision from doing the referral, I

10  would call the referral physician for more

11  documentation.

12  Q.   Were there occasions in that 2007 time frame in

13  Decatur where you did not have questions about

14  eligibility?

15  A.   As far as it never occurred or we --

16  Q.   Where you did not call the doctor after you did

17  your evaluation.

18  A.   I would say I'm sure there was, yes.

19          THE COURT:  Let me see if we can clarify

20  what you're asking for there.

21          Were there times when you evaluated patients

22  and it was clear that that patient was eligible for

23  hospice and you didn't have to call anybody else?

24          THE WITNESS:  Yes, ma'am.  Yes, ma'am.

25          MR. WERTKIN:  Thank you, Your Honor.

1          THE COURT:  I had trouble following the
2   question.  I wasn't sure exactly where we were going.
3          MR. WERTKIN:  I will do my best to do
4   better, Your Honor.
5   Q.   What is a diagnosis?
6   A.   It's a condition the patient has, whether it is
7   heart disease, Alzheimer's disease, that's a
8   diagnosis of a patient, present symptoms that meet
9   that criteria for that diagnosis.
10  Q.   And do you have any knowledge about what a
11  prognosis is?
12  A.   Yes.
13  Q.   And what is a prognosis?
14  A.   It's a length of time that you would assign to
15  someone to see if, in our case, how long that person
16  is going to live.
17  Q.   When you're doing evaluations in this time
18  period in this Decatur agency, what's the difference
19  between a diagnosis and a prognosis?
20  A.   A diagnosis is the actual condition the patient
21  has.
22          A prognosis is the time frame that patient,
23  we think that patient is going to live.
24  Q.   When you do an admission, when you were doing
25  admissions in this time period, were you doing just

1   the diagnosis or just a prognosis or both?

2   A.   Both.  Because you're looking at what the

3   symptoms have for that diagnosis.

4   Q.   And if you thought that the answer was clear one

5   way or the other, would you contact anybody before

6   you did an admission?

7   A.   No, we just admitted the patient.

8   Q.   Why is that?

9   A.   Because they met the criteria and the physician

10  trusted us to go ahead and sign off on the

11  certificate of terminal illness.

12  Q.   After admissions, what forms, if any, did you

13  collect from the patient's primary doctor or

14  attending physician?

15  A.   The certificate of terminal illness.

16  Q.   What is a certificate of terminal illness?

17  A.   It's a document that actually states on there

18  that the patient's physician is verifying that

19  patient has a prognosis of six months or less, has a

20  terminal illness.

21  Q.   During a time period in Decatur we were talking

22  about, how did you go about getting the signatures on

23  the certificate of terminal illnesses?

24  A.   During the admission process or during --

25  Q.   Yes, ma'am.  During the admissions process.

```
 1   A.   We would --
 2            MS. MARTIN:  Your Honor, we would just
 3   object to this line of questioning on the grounds of
 4   our motion in limine under 401, 404(b) and under lack
 5   of consist assistant with the same checkcheck.
 6            THE COURT:  Are we talking about the time
 7   frame of May, June, July of 2007?
 8            MR. WERTKIN:  Yes, Your Honor.
 9            THE COURT:  All right.  You may proceed.
10            MS. MARTIN:  Your Honor, can we have a
11   continuing objection to this line of questioning?
12            THE COURT:  Yes.
13            MS. MARTIN:  Thank you.
14            THE COURT:  And I do want to make sure,
15   Ms. Stutts, that you understand we're only asking you
16   about the time period of May, June and July of 2007.
17            THE WITNESS:  Yes, ma'am.
18            THE COURT:  So make sure that your answers
19   deal with what you observed or did during that time
20   frame.
21            THE WITNESS:  Yes, ma'am.
22   Q.   (By Mr. Wertkin)  Thank you.  And just to be
23   clear, we're talking about the May, June, July 2007
24   time period in the Decatur AseraCare location.
25            You were a director of clinical services and
```

1  how would you go about getting signatures on

2  certifications of terminal illness?

3          THE COURT:  From whom?

4          MR. WERTKIN:  Well, I think the earlier

5  questions, who had signed the certificate of terminal

6  illness.

7  A.   The initial, it would be the attending physician

8  and our medical director would both sign.

9  Q.   Let's stick with the attending for now.

10  A.   Okay.

11  Q.   How would you go about getting a signature from

12  the attending physicians on these certifications of

13  terminal illness?

14  A.   After we did the admission, typically either the

15  nurse would go by his office and get him to sign it

16  or our marketing person would go by there and get him

17  to sign that.

18  Q.   Okay.  Did you have occasion to go and have the

19  doctor sign it in person?

20  A.   Yes.

21  Q.   When that happened, what would you tell the

22  doctors in those situations?

23  A.   That we were admitting his patient for whatever

24  diagnosis we admitted him for and he would just sign

25  it.

1  Q.   Did the doctor ask -- did you give the doctor

2  any clinical information at that time?

3  A.   During that time frame, I can't speak for sure.

4  Q.   Do you recall if the doctor asked you any

5  clinical questions about your decision?

6  A.   No, sir.

7          MS. MARTIN:   Your Honor, foundation.

8          THE COURT:   Sustained.

9  Q.   During the time period that we're talking about

10  in the Decatur agency when you're interacting with

11  the primary physician to get a certification of

12  terminal illness signed, do you recall instances

13  where the doctor would ask you clinical information?

14          MS. MARTIN:   Objection, Your Honor.

15          THE COURT:   Overruled.

16  A.   There were times when the physicians would ask

17  us questions to kind of clarify what we were

18  admitting them for.  Because typically when we

19  admitted them, the attending physicians would not

20  follow that patient anymore, our medical director

21  would.

22  Q.   In your -- based -- do you have any knowledge

23  about or any -- did you form any opinions about

24  whether the attending doctors or the primary doctors

25  that you would interact with during that July, June,

 1  May 2007 time period from Decatur had, were

 2  knowledgeable about hospice and the hospice

 3  eligibility requirements?

 4           MS. MARTIN:  Objection.

 5           THE COURT:  Overrule, but establish your

 6  foundation.

 7           MR. WERTKIN:  Okay.  Thank you, Your Honor.

 8  Q.  Did you observe attending or primary doctors in

 9  the May, June, July 2007 time frame from Decatur when

10  they were signing certifications of terminal illness

11  for patients?

12  A.  Yes.

13  Q.  And when you would observe these doctors during

14  that time period, did you form an opinion about

15  whether they were knowledgeable about hospice and the

16  Medicare hospice requirements?

17           MS. MARTIN:  Objection, foundation.

18           THE COURT:  Overruled.

19  A.  Yes, I did.

20  Q.  What were those opinions?

21  A.  That not -- majority of the physicians we dealt

22  with did not understand what hospice was at that

23  time.

24           THE COURT:  Ms. Stutts, what kind of

25  practices did these doctors generally have?

595

1          THE WITNESS:  Typically they were just

2    family practice, internal medical.  They typically

3    were not specialists.  They were just general

4    medicine physicians.

5          THE COURT:  Would you have any reason to

6    expect doctors in that kind of practice to have any

7    specific knowledge or understanding about Medicare,

8    hospice regulations?

9          THE WITNESS:  No, ma'am.

10         THE COURT:  Okay.

11         MR. WERTKIN:  Thank you, Your Honor.

12   Q.   I would like to switch gears to the other

13   physician who had to sign the certification of

14   terminal illness at the time of admission.

15         And during that time period that we've been

16   talking about -- May, June, July of 2007 in the

17   Decatur agency -- who was the other doctor who needed

18   to sign the certification of terminal illness?

19   A.   A medical director who was John Wagner.

20   Q.   And what is a medical director?

21   A.   He provides the medical oversight, so he

22   actually has the ultimate signature or the diagnosis,

23   this patient does meet criteria.

24         At that time, he was the, I guess you would

25   say, he was the final medical opinion.

1  Q.   And who did you say that was in that time
2  period?
3  A.   Dr. John Wagner.
4  Q.   After -- during this time period -- May, June,
5  July 2007 in Decatur, Alabama area when you were
6  doing an admission, what information, if any, did you
7  communicate to the AseraCare medical director after
8  your evaluation and before you did your admission?
9  A.   Nothing.
10  Q.   And during that same time period in that same
11  area, what steps, if any, would you take to procure
12  the signature on the certification of terminal
13  illness from the AseraCare medical director?
14  A.   He also worked at a nursing home.  So we would
15  take it to the nursing home that he worked and would
16  have him sign those after we got the attending
17  physician to sign.
18  Q.   And when you would go and bring those to him,
19  would you provide any clinical information at that
20  time?
21  A.   No.  Typically we just gave him, usually, a stack
22  of papers to sign, he just signed the papers.
23  Q.   I would like to take you back to the question
24  that I asked about the possible outcomes of your
25  evaluation.

1          Can you tell me again what the outcomes of

2    your evaluation could be?

3    A.   Either we admit them because they were

4    appropriate; or they were not appropriate, so they

5    would not be admitted.

6    Q.   When you were director of clinical services in

7    that May, June, July 2007 time frame, did you ever

8    have occasion to go and evaluate a patient and find

9    that the patient was not hospice appropriate?

10   A.   Yes.

11   Q.   And what would you do next?

12   A.   I would let my executive director Suzanne know

13   we were not going to admit the patient.

14   Q.   What, if anything, would Suzanne say in those

15   situations?

16   A.   She told me to go back to the chart and just

17   find whatever I needed to find to admit the patient.

18   Q.   And what was your understanding of what that

19   meant?

20   A.   To look to find whatever I needed to find to

21   admit that patient.

22   Q.   And did these conversations ever lead to a

23   disagreement between you and her?

24   A.   Yes.

25   Q.   And what was that disagreement over?

1   A.   Because I felt like the patient, there was not

2   enough clinical documentation to support that

3   patient's admission.   So I didn't feel like they

4   should be admitted.

5   Q.   And what was the outcome of those conversations?

6   A.   There were a couple of occasions that I can

7   remember when the patient would be admitted by

8   someone else.

9   Q.   I would like to switch gears a little bit and

10  ask you some questions about the IDT meetings.

11         In the May, June, July 2007 time period, did

12  you attend the IDT meetings in Decatur?

13  A.   Yes, I did.

14  Q.   What are the purposes -- what are one or more

15  purposes of an IDT meeting, interdisciplinary team

16  meeting?

17  A.   It's for us to sit, to be able to review the

18  medical condition of the patient.   If they were

19  declining, any symptom management.   It allowed the

20  social worker, the chaplain, as well as a nurse, and

21  the physicians to discuss that patient.

22  Q.   How often would the Decatur agency hold IDT

23  meetings?

24  A.   Every two weeks.

25  Q.   Why every two weeks?

1    A.   That would give us time to review that patient

2    and that was what our guideline was by AseraCare to,

3    every two weeks, review the patients.

4    Q.   Where were those meetings held?

5    A.   They were in a conference room at the agency.

6    Q.   And can you describe the type of room that was

7    in?

8    A.   It's just -- it was a small room with a large

9    table and chairs around it.

10   Q.   Who would typically attend an interdisciplianry

11   team meeting?

12   A.   The medical director, myself as DOCS, the

13   patient care coordinator, the case managers would

14   attend.  Usually the social worker and the chaplains

15   were always there.  And occasionally we would have

16   the CNAs, the home health aids would come in, if they

17   were available.

18   Q.   What is a home health aide?

19   A.   That's an unlicensed person that actually gives

20   personal care like bathing and that sort of thing to

21   the patient.

22   Q.   And you mentioned a medical director, is that

23   the same medical director that signs the

24   certification that you were talking about earlier?

25   A.   Yes.

1   Q.   Who was that in that time period in Decatur?

2   A.   Dr. John Wagner.

3   Q.   And who would run the IDT, the interdisciplinary

4   team meetings?

5   A.   Typically the DOCS would be myself or the PCC.

6   Q.   And how often did you run those meetings?

7   A.   I was there, always run the meetings.

8   Q.   What's involved in running an IDT meeting?

9   A.   We kept a large binder that had all the patients

10  in there, so we would go from patient to patient to

11  review it.  And as we reviewed the patient, we would

12  give the certification of terminal illness to

13  Dr. Wagner and he would sign off on it.

14  Q.   Where would you sit at these IDT meetings?

15  A.   Right next to him.

16  Q.   And who would sit next to you?

17  A.   Typically the PCC, patient care coordinator.

18  Q.   And what paperwork, if any, was signed by

19  Dr. Wagner at these interdisciplinary team meetings?

20  A.   The certification of terminal illness.

21  Q.   And what exactly is a certification of terminal

22  illness?

23  A.   It's just a form where the physician actually

24  attesting to Medicare or anyone else that looks at

25  that chart that that patient is appropriate for

1  hospice.

2  Q.   Do you have any knowledge about why a doctor

3  would sign a certification form?

4  A.   Because that's what --

5       MS. MARTIN:  Objection, Your Honor,

6  foundation.

7       THE COURT:  Sustained.

8  Q.   (By Mr. Wertkin)  Do you have any knowledge

9  about why AseraCare procured these types of forms in

10  the business of hospice in this time period in this

11  agency?

12       MS. MARTIN:  Objection, Your Honor.

13       THE COURT:  Sustained.  Rephrase your

14  question.

15       MR. WERTKIN:  Thank you, Your Honor.

16  Q.   In the May, June, July 2007 time period in

17  Decatur, Alabama, did the AseraCare Hospice location

18  in Decatur use certifications of terminal illness?

19  A.   Yes.

20  Q.   Did you receive any instructions about why those

21  would be used?

22  A.   Yes.

23  Q.   What was your understanding of those

24  instructions?

25  A.   We had to have that signed before we could

1  actually bill.

2  Q.   When an IDT meeting -- can you walk me through

3  an IDT meeting?  What's the first thing that happens

4  at a disciplinary team meeting?

5  A.   We just start by going through each patient.  So

6  the physician could come in and sit down and we would

7  begin the meeting as soon as he got there.  We would

8  just begin with the first patient that came up.

9  Q.   At that time, your -- can you just describe who

10  goes first or what happens and how the process works?

11  A.   It wasn't an order who went first.  It was just

12  -- if this case manager wanted to go ahead and get

13  her patients over with, she would start with her case

14  load first.  So we went by case managers.  They would

15  review their case load.

16  Q.   And you would go case by case through --

17  A.   Yes, yes.

18  Q.   And when you started that process, what was

19  Dr. Wagner doing?

20  A.   He would usually just sit there.  And then as we

21  would give him the form to sign, he would just sign

22  the form.

23  Q.   Do you recall, during this process, Dr. Wagner

24  asking questions of the nurses, unsolicited questions

25  about the information that he was being provided?

1    A.   No, I don't.

2    Q.   Do you recall any occasion where Dr. Wagner --

3    strike that.

4         When the case managers are presenting their

5    cases, would they make recommendations?

6    A.   Yes.

7    Q.   What kind of recommendations would they make?

8    A.   Whether to keep the patient on service.  The

9    patient was declining or they wanted to keep the

10   patient on service for the next certification period.

11   Q.   Do you recall any instances where Dr. Wagner

12   disagreed with those recommendations?

13   A.   No.

14   Q.   Do you have any knowledge about the accuracy of

15   the information that was being provided to

16   Dr. Wagner?

17   A.   Yes.

18   Q.   And what is that -- what is the basis of that

19   knowledge?

20   A.   From looking at the charts and knowing what was

21   going on in that facility.

22   Q.   And what can you tell us about the accuracy of

23   that information?

24         MS. MARTIN:   Objection, Your Honor, to this

25   anecdotal testimony.

1          MR. WERTKIN:  I will withdraw.

2    Q.   Who was the medical director in the time period,

3    May, June, July, 2007 in the Decatur, Alabama --

4    A.   Dr. John Wagner.

5    Q.   Who did Dr. Wagner report to?

6    A.   Assuming he reported to someone at corporate,

7    but he usually dealt with --

8          MS. MARTIN:  Your Honor --

9    A.    -- the medical director.

10         THE COURT:  Okay.  Don't make a --

11   A.   I don't know.

12   Q.   Who was the head of the Decatur office in the

13   May, June, July 2007 time frame?

14   A.   The executive director, Ms. Helms.

15   Q.   Did you have occasion to observe the

16   relationship between Ms. Helms and Dr. Wagner?

17   A.   Yes.

18   Q.   What was the relationship like?

19   A.   They were very good friends.

20   Q.   Did you observe or have any occasion to observe

21   Susan Helms and Dr. Wagner have any conversation

22   about clinical information?

23   A.   Yes.

24   Q.   What did you observe during that time period?

25         MS. MARTIN:  Objection, Your Honor, to the

1  anecdoctal evidence.

2        THE COURT:  Okay.

3  Q.  During the time period of time of May, June,

4  July 2007 in Decatur, were there instances -- I'm not

5  asking you specific instances, but just were there

6  instances where the nurses and Ms. Helms disagreed

7  about what should be done about a patient?

8        MS. MARTIN:  Objection, Your Honor.

9  Anecdoctal evidence.

10        THE COURT:  Overruled at this time.

11  A.  Yes.

12  Q.  And how would those situations, and again I'm

13  not asking you about a particular situation, how

14  would those situations be resolved?

15  A.  Suzanne would just take over --

16        MS. MARTIN:  We would make the same

17  objection, Your Honor.

18        THE COURT:  All right.  I'm not sure that I

19  understand what specific information you're asking

20  her about.  So if you would rephrase your question

21  and be more specific.

22  Q.  (By Mr. Wertkin)  During this time period we've

23  been discussing in Decatur when you indicated there

24  would be disagreements between the nurse and

25  executive director over eligibility, would the

1  executive director have gone out and done her own

2  anlaysis of the patient?

3          MS. MARTIN:  Objection, Your Honor.

4          THE COURT:  Overruled.

5  A.  No, she would not.

6  Q.  And would the executive director be involved in

7  the admissions process at that time even though she

8  hadn't done an evaluation?

9  A.  No, she's not involved in the admissions

10  process.

11  Q.  And when there was a disagreement between the

12  nurses who had done the evaluation and the executive

13  director about the eligibility of a patient, how

14  would that disagreement get resolved?

15  A.  She would would go to someone else who would

16  actually see her side and it would be resolved that

17  way.  She would not actually address the issue with

18  that person.

19  Q.  Did you ever have an occasion to observe where

20  Dr. Bolton disagreed --

21          MS. MARTIN:  Your Honor, we would object to

22  this.  I interrupted his question.

23          THE COURT:  Dr. Bolton?

24          MR. WERTKIN:  Did I say Dr. Bolton?  I

25  apologize.

1        THE COURT:  Yes.

2  Q.  During the time period of May, June, July 2007

3  in Decatur where Dr. Wagner was the AseraCare medical

4  director, did you have an occasion to observe any

5  disagreements between Dr. Wagner and the executive

6  director of the agency?

7  A.  No.

8  Q.  Were there any occasions where -- actually you

9  testified earlier that there were times you went on

10  and did an admission and you said your director

11  disagreed with your evaluation; is that right?

12  A.  Yes.

13  Q.  Then when that happened, you had testified that

14  she would send someone else out to do that; is that

15  right?

16  A.  Yes.

17        MS. MARTIN:  Objection to leading, Your

18  Honor.

19  Q.  And that's --

20        THE COURT:  All right for now.

21        MR. WERTKIN:  Thank you, Your Honor.

22  Q.  And in those situations that we have covered,

23  who had to sign the certification of terminal

24  illness?

25  A.  The physician, the medical director, Dr. Wagner.

1    Q.   And do you recall any situations where

2    Dr. Wagner did not sign those certifications in those

3    instances?

4    A.   No.

5    Q.   Do you recall any instance where Dr. Wagner did

6    not sign the certification of terminal illness?

7    A.   No.

8    Q.   I would like to shift gears a little bit and

9    talk about your role in billing.

10           Were you at all involved in the billing

11   process?

12   A.   I would make sure --

13           MS. MARTIN:  We would object to the

14   relevance of this, Your Honor.

15           THE COURT:  I'll give you a little leeway,

16   but I'm not seeing much relevance either.

17           MR. WERTKIN:  I am going to jump ahead a

18   little bit and I may come back.

19   Q.   What information needs to be transmitted to

20   Medicare or Medicare contractor, if you know?

21   A.   It's done electronically, so it's just an

22   electronic billing system.

23   Q.   Do medical records have to get transmitted to

24   Medicare?

25   A.   No.

1  Q.  Were you involved at all in the billing process

2  at the Decatur agency in the May, June, July 2007

3  time frame?

4  A.  Yes.

5  Q.  And what was your role?

6  A.  We had a checklist we had to go through to make

7  sure that the forms were signed.  We had case notes

8  in there, as well as the certificate of terminal

9  illness, so there was a little checklist that I would

10  do before I would hand that off to my executive

11  director.

12  Q.  What was on that checklist?

13  A.  Just to make sure the certification of terminal

14  illness was signed and that it was current and that

15  it was on the chart as well.  And also just to look

16  to make sure that the documentation was there from

17  the nurses as well.

18  Q.  And how would go about doing that?

19  A.  I would review the medical record.

20  Q.  And what would you do with that information?

21  A.  After we did that, we actually pulled the

22  certification of terminal illnesses and we kept it in

23  a binder and I would give that binder to my executive

24  director and he would review it and then bill.

25  Q.  Do you have any knowledge about what information

1  is provided to Medicare or the Medicare contractor

2  when you do a bill, when you're billing?

3  A.   Those dates of service that we put in, and then

4  we electronically submit that to Medicare.

5  Q.   Is there anything -- is there any other clinical

6  information besides dates of service that's

7  transmitted at that time?

8  A.   Not that I'm aware of.

9  Q.   I would like to ask you a few questions about

10  discharging patients.

11        What does it mean to discharge a patient?

12  A.   That would be when we would actually discharge

13  them from our service, so we would stop providing

14  service for that patient if they no longer met

15  criteria.

16  Q.   Are you familiar with the process at AseraCare

17  for discharging a patient at Decatur in the May,

18  June, July time period?

19  A.   Yes.

20  Q.   And what's the process?

21  A.   We would actually look to make sure the patient

22  was not declining.  And then we would review that.

23  And then we would do a 30 day discharge notice for

24  the patient.  We would communicate that to the

25  attending physician that we were picking services

1  back up for that patient, and then discharge.

2  Q.   Why would you give 30 days?

3  A.   For transition of service, to make sure the

4  patient wasn't just -- we didn't discharge them one

5  day and them not have any coverage.

6  Q.   During the time period of May, June, July 2015

7  at the Decatur agency, did you ever try to discharge

8  a patient?

9  A.   Yes.

10        MS. MARTIN:  Objection, Your Honor.

11        THE COURT:  Overruled.

12  Q.   And what was the result of that attempt to

13  discharge a patient?  In general, was there a general

14  practice at the agency during that time period when

15  nurses wish to discharge patients?

16  A.   Yes.

17  Q.   What was the general practice?

18  A.   We would discuss them in our IDT meetings and

19  then the case manager would make the recommendation

20  to discharge the patient.

21  Q.   Was that a common occurrence?

22  A.   We had some, yes.

23  Q.   Were there ever occasions where you personally

24  tried to discharge a patient and were not able to?

25        MS. MARTIN:  Objection to the anecdoctal

1    evidence, Your Honor.

2         THE COURT:  Sustained.

3    Q.  (By Mr. Wertkin)  Did you find, as a general

4    matter, it was easy or hard to discharge patients

5    that you were involved with?

6         MS. MARTIN:  Objection, Your Honor.

7         THE COURT:  Sustained.

8    Q.  In the Decatur agency in 2007, in the May, June,

9    July 2007 time frame, who was involved in making a

10   decision or making an initial recommendation to

11   discharge a patient?

12   A.  The case manager.

13   Q.  And if the case manager made a recommendation to

14   discharge, who needed to sign off on that?

15   A.  To sign off on that would be the medical

16   director who would make the ultimate decision to

17   discharge the patient.

18   Q.  Would the executive director be involved in that

19   decision?

20   A.  She would.  But it would not be in an official

21   capacity.  She would make recommendations as well.

22   Q.  What types of recommendations would she make in

23   her unofficial capacity?

24   A.  Do not discharge that patient.

25   Q.  When she would give you those instructions, what

1  would you do?

2  A.   We would have a disagreement about that for a

3  while.

4  Q.   How did the disagreement usually get resolved?

5  A.   Usually the patient would stay on service.  She

6  would say give them one more cert period,

7  certification period, a couple more months to see how

8  that goes.

9  Q.   Did you ever have occasion to review the medical

10  records of Decatur patients?

11  A.   Yes.

12  Q.   And what context did you review the medical

13  records?

14  A.   I reviewed them to make sure that they were

15  being completed timely, that everything was in the

16  chart.

17  Q.   Did you find generally that they were complete?

18  A.   Yes, yeah.

19  Q.   And when you were reviewing, did you have any

20  specific -- actually, I will ask you this:  Are you

21  familiar with the term additional document requests?

22  A.   Yes.

23  Q.   What is an additional document request?

24  A.   That is what we receive from Medicare when they

25  ask for more information.  They actually ask for

1  documentation, a medical record to support the bill

2  that we sent them.

3  Q.   Who sends an ADR?

4  A.   We get them from Medicare.

5  Q.   ADR is what?

6  A.   Additional document review.

7  Q.   And what are they looking for?

8  A.   They're looking for documentation to support the

9  diagnosis and to support the bill that we've

10 submitted.

11 Q.   And are you familiar with the process for

12 responding to additional document requests from

13 Medicare?

14 A.   Yes.

15 Q.   Are you familiar with that process at the

16 Decatur agency in the 2007, May, June, July time

17 period?

18 A.   Yes.

19 Q.   And what was that process?

20 A.   Those came to me and I would review the charts

21 and gather documentation to submit.

22 Q.   And who, if anyone, trained you on how to do

23 this?

24 A.   Suzanne did, the executive director.

25 Q.   What instructions, if any, did Ms. Helms give

1  you to respond to additional document requests from

2  Medicare?

3  A.   Just to get things out of the chart and then, if

4  I had to, as she would say call and get what I need

5  to do that from the physician.

6  Q.   And what does that mean, call and get what you

7  need?

8  A.   I took that to mean if I couldn't get it from

9  the medical record, I was to call the physician and

10 try to get any information that he had to make it

11 fit.

12 Q.   Did you do that?

13 A.   There were times where I called, yes.

14 Q.   And when Ms. Helms would -- would Ms. Helms

15 review your work when you put together these

16 additional document requests?

17 A.   Yes.

18 Q.   And what instruction, if any, did she give to

19 you?

20 A.   There would be times where she would say that I

21 need to add a few things here or add something to a

22 chart.

23 Q.   What kinds of things are we talking about?

24 A.   If there wasn't enough documentation to support

25 the diagnosis that we were billing Medicare for.

1   Q.   Did you follow those directions?

2   A.   No, I did not.

3   Q.   Why not?

4   A.   Because I could not find the documentation in

5   the medical record.

6   Q.   What would you do in those circumstances?

7   A.   I would tell her that this is what I had, this

8   is what I was going to submit to them but I did not

9   feel like it would be enough for us to support that.

10   Q.   And what was the outcome of that?

11   A.   She said just do -- a couple of times she told

12   me just to send what I had.  But --

13           MS. MARTIN:  We would just object, this is

14   very anecdotal.

15           THE COURT:  Sustained.

16   Q.   Was there a time during the May, June, July 2007

17   time period where you stopped being responsible for

18   additional document requests?

19   A.   Yes, there was.

20   Q.   Why?

21   A.   Because Suzanne felt like someone else could do

22   it, could get the documentation needed.

23   Q.   And can you explain what you mean by that?

24   A.   She just felt like that I wasn't able to get the

25   information to submit to Medicare.

1   Q.  Can you be a little bit more direct about what

2   you're testifying --

3           MS. MARTIN:  Your Honor, we would just

4   object.

5           THE COURT:  Sustained.

6   Q.  What's your understanding of why you were asked

7   to stop doing additional document requests?

8           MS. MARTIN:  Objection, Your Honor.

9           THE COURT:  Sustained.  It's been asked and

10  answered.

11  Q.  You testified earlier that you were instructed

12  to make it fit.  What did you mean by that?

13  A.  To call anyone to find anything I needed to find

14  to make that diagnosis or make that fit that

15  diagnosis.

16  Q.  And is there anything improper about that?

17  A.  Yes.

18  Q.  What's improper about that?

19  A.  Because I'm not going to make anything up.

20  Q.  And who took over the process for responding to

21  adjustors what you stopped doing them?

22  A.  I believe her name was Ann Smith.  She was a

23  case manager at the time.

24  Q.  Do you have any knowledge about why it's

25  important to respond to an ADR?

1    A.    Yes.

2    Q.    What's the basis of that knowledge?

3    A.    That's what Medicare is actually asking for a

4    medical record of proof, that they are actually

5    billing appropriately, that we were billing

6    appropriately.

7    Q.    You testified that medical records don't need to

8    be sent with the bills; is that right?

9    A.    Right.

10   Q.    So sometimes Medicare asks for more documents;

11   is that what your testimony is?

12   A.    Yes.

13   Q.    So why is it important to respond to an ADR?

14   A.    If you do not respond to it, then they will

15   actually -- they can fine you, but they also ask for

16   money back.

17   Q.    And in situations like you described where you

18   couldn't find the information that you needed, what

19   would that mean in terms of getting money from

20   Medicare?

21            MS. MARTIN:  Objection, Your Honor.

22            THE COURT:  Sustained.

23   Q.    You testified that Medicare could fine you and

24   not pay you.

25   A.    Uh-huh.

1  Q.  Why was that?

2         MS. MARTIN:  Objection, Your Honor.

3         THE COURT:  Sustained.  Foundation.

4  Q.  What is the basis of your knowledge that

5  Medicare would fine you and not pay you?

6  A.  We actually received -- we would have to pay

7  Medicare back, they can make you pay them back.

8  Q.  So, in your time period in --

9         MS. MARTIN:  Your Honor, we would just move

10 to strike that last answer.

11        THE COURT:  Sustained.

12        MR. WERTKIN:  May I have one second to

13 consult with my counsel, please?

14        THE COURT:  You may.

15             (Brief pause).

16 Q.  (By Mr. Wertkin)  We talked about discharging

17 patients earlier.  Do you recall that?  And during

18 that time period of May, June, July '07 in Decatur,

19 what would be the reasons for discharging a patient

20 from hospice?

21 A.  They no longer met the criteria, they weren't

22 declining.

23 Q.  How would you make that determination?

24 A.  Based on the symptoms.

25 Q.  And how would you know what their symptoms were?

620

1    A.   The nurse would assess the patient.

2    Q.   You mentioned that one of the first things you

3    did when you were doing your evaluation was to look

4    at the medical records; is that right?

5    A.   Yes.

6    Q.   And why would you look at the medical records as

7    part of your evaluation?

8    A.   To know the patient's history, to see what their

9    current situation is.

10   Q.   And why are the medical records important?

11   A.   Because we have to have proof of what we're

12   saying.  We have to prove that this really is there.

13   Q.   Do you rely upon the medical records when you're

14   doing evaluations in this time period in this agency

15   to find that a patient is terminally ill?

16   A.   Yes.

17   Q.   Why?

18   A.   Because, again, it's proof, it's documentation,

19   it's proof that what we're saying is there really is

20   there.

21   Q.   In your experience in this time period, May,

22   June, July '07 in Decatur, did you find that the

23   medical records were -- did you find that the medical

24   records were accurate and complete?

25        MS. MARTIN:  Objection, Your Honor.

```
 1              THE COURT:  What medical records are you
 2   referring to?
 3              MR. WERTKIN:  The ones that you were
 4   reviewing as you were doing your evaluation.
 5              MS. MARTIN:  Objection.
 6              THE COURT:  Sustained.
 7   Q.   We were talking about making it fit earlier.
 8   What does it mean to make symptoms fit a diagnosis?
 9   What does that mean?
10              MS. MARTIN:  Objection.
11              THE COURT:  Sustained.
12   Q.   When you said make it fit, can you give the
13   context of what you're talking about?
14              MS. MARTIN:  Objection, Your Honor.
15              THE COURT:  Overruled.
16   A.   If there was documentation that there were
17   symptoms and the symptomsor the criteria wasn't
18   there, she would say, she would ask me questions like
19   don't they have nausea and vomiting or aren't they
20   bed bound now or --
21              MS. MARTIN:  Your Honor, we object.
22              THE COURT:  Sustained.
23   Q.   In the May, June, July 2007 time period, did
24   Dr. Wagner attend every disciplinary team meeting?
25   A.   No.
```

1    Q.   During that May, 2007 to July 2007 time frame,

2    how would the business of IDT get done when

3    Dr. Wagner did not attend?

4    A.   In the instance, there was -- the binder that

5    contained all of the certifications of terminal

6    illness was pre-signed before the meeting.

7    Q.   What do you mean by pre-signed before the

8    meeting?

9    A.   He had signed all of them before we even had the

10   IDT meeting.

11   Q.   At the time that he pre-signed all the

12   certification forms, did you provide him with any

13   clinical information?

14   A.   No.

15   Q.   For any of the patients?  Are you aware if

16   anyone provided him with any clinical information?

17   A.   No, I'm not.

18   Q.   And did this concern you?

19   A.   Yes.

20   Q.   Why?

21   A.   Because I didn't feel it was appropriate,

22   because we had not discussed the patients.

23   Q.   Did you form an opinion about whether Dr. Wagner

24   exercised his clinical judgment at the time that he

25   pre-signed those certifications of terminal illness?

1    MS. MARTIN:  Objection.

2    THE COURT:  Overruled.

3  A.   Yes.

4  Q.   What was that opinion?

5  A.   That he was just signing the COTIs, he wasn't

6  even asking questions.

7  Q.   And you mentioned that concerned you.  Did you

8  report your concerns?

9  A.   I did.

10  Q.   Who did you report your concerns to?

11  A.   I called Dianne Halderman with our corporate

12  office and asked her to be present at the next day

13  for the IDT meeting and told her what had happened.

14  Q.   What happened?

15  A.   The next morning, when I arrived to work, my

16  patient care coordinator and I went to open the door

17  and the locks had been changed.

18    MS. MARTIN:  We object to this testimony.

19    THE COURT:  Sustained, sustained.

20  Q.   Did you ever raise your concerns directly with

21  Dr. Wagner about pre-signing the certifications of

22  terminal illness?

23  A.   No, I did not.

24  Q.   Did you have occasion to talk to anybody else

25  besides Dianne Halderman about this issue?

1    A.   The next day I did call Joy Golden.

2         MS. MARTIN:  Your Honor, we would just

3    object to this line of questioning.

4         THE COURT:  Sustained.

5         MS. MARTIN:  Your Honor, may we approach for

6    one second?

7         THE COURT:  All right.

8                   (SIDEBAR)

9         MS. MARTIN:  Your Honor, she testified about

10   this idea that Dr. Wagner was pre-signing the COTIs,

11   and it's not clear from her testimony exactly what

12   that is.  But we have an interrogatory answer, and we

13   asked them specifically about pre-signed forms, and

14   the only instance that they told us about was

15   Dr. Tate was alledged to have pre-signed forms by

16   Dr. Mateo, and it appears now that Ms. Stutts is

17   offering testimony that there was actually

18   pre-signing of forms by Dr. Wagner in Decatur.  And

19   that was not something that was disclosed to us.

20        The only thing that was disclosed was

21   Dr. Mateo's pre-signing of forms.

22        MR. WERTKIN:  I do not -- I would have to go

23   back and look at the disclosures.

24        MS. MARTIN:  That's the only thing is we

25   specifically asked about pre-signed forms and it was

1  Dr. Mateo was the only thing that was identified to

2  us.

3         THE COURT:  That's the only one I recall

4  having heard about as well when I asked for a listing

5  of what are we dealing with here.  I was trying to

6  find out if we had the classic phantom patient

7  situation for services not provided, et cetera, and

8  that was the only one that was mentioned.

9         MR. WERTKIN:  My understanding, Your Honor,

10  is that all these patients were not -- they are real

11  patients.

12         THE COURT:  That's not the issue.  The issue

13  is it wasn't disclosed that Dr. Wagner had signed

14  blank forms.

15         MS. TAPIE:  Your Honor, we do not have any

16  information that any of the 123 patients had a

17  pre-signed form.  It is what led to this the

18  witnesses departure from AseraCare.  It's part of why

19  she left the company.

20         THE COURT:  If it doesn't have to do with

21  any of the false claims, we don't need to get into

22  that and particularly when it wasn't disclosed

23  previously.

24         So is there a motion to strike?

25         MS. MARTIN:  Yes, there's a motion to

1   strike, Your Honor.

2           THE COURT:  I will grant it.

3           (Open court.  Jury present.)

4           THE COURT:  Ladies and gentlemen, based upon

5   evidentiary rulings that I have to make in this case,

6   I am instructing you to totally disregard Ms. Stutts'

7   testimony about Dr. Wagner and these allegedly blank

8   forms.  That's not part of phase one for you to

9   consider.  So disregard that.

10           You may proceed.

11   Q.  (By Mr. Wertkin)  Ms. Stutts, do you have a

12   financial interest in the outcome of this litigation?

13   A.  No, I do not.

14   Q.  Why are you here today?

15           MS. MARTIN:  Your Honor, we object.

16           THE COURT:  Sustained.

17   Q.  Did you receive a subpoena to appear in court

18   today?

19   A.  Yes.

20   Q.  Are you represented by counsel?

21   A.  No.

22   Q.  Do you have any personal interest in the outcome

23   of this litigation, financial or otherwise?

24   A.  No.

25           MR. WERTKIN:  Your Honor, I would like to

1   make an offer of proof at this time but before the

2   witness closes.

3            THE COURT:  All right.  Are you through with

4   this witness at this time?

5            MR. WERTKIN:  Yes, Your Honor.

6            THE COURT:  Okay.  Why don't we go ahead and

7   take a break.  We will come back at 10:00 o'clock.

8   During this break, what's your instruction?

9            A JUROR:  Don't talk about it.

10           THE COURT:  Don't talk about it to anybody

11  or let anyone talk to you.  Pretty soon you're going

12  to be telling me what your instructions are.

13                   (Jury excused)

14                    (SIDEBAR)

15           MR. WERTKIN:  Your Honor, we would like to

16  make an offer of proof of evidence that we believe

17  has been excluded in this case.

18           We would like to make an offer of proof on

19  the accuracy of the information that was provided to

20  Dr. Wagner and our conversations regarding clinical

21  information between Dr. Wagner and Susan Helms.

22           I would like to make an offer of proof on

23  Vickie Stutts being locked out of the building the

24  day after she reported to Dianne Halderman that

25  Dr. Wagner was signing COTIs.  And we would like to

1   make an offer of proof about Dr. Wagner pre-signing

2   COTIs.

3           THE COURT:  So what is your offer of proof?

4           MR. WERTKIN:  That with regard to the

5   information provided to Dr. Wagner, that it was not

6   complete.  With regard to conversations with been

7   between Dr. Wagner and Suzanne Helms, that Suzanne

8   Helms told Dr. Wagner to sign forms, and also that

9   Suzanne Helms bragged that she could get Dr. Wagner

10  to sign anything that she put in front of him.

11          Also, Ms. Stutts, after she reported the

12  pre-signed COTIs, she was locked out of the building,

13  and she was suspended.  And the next morning, she was

14  -- she had personal effects inside of the building.

15  And when she went to go retrieve them the next day,

16  there was a police officer escorting her.

17          We would also like to make an offer of proof

18  that Dr. Wagner pre-signed certificates of terminal

19  illness for patients that he had not seen and had no

20  clinical information on.

21          THE COURT:  Okay.  Well, if you wanted to do

22  that, you should have disclosed in it in response to

23  interrogatory answers.  So that one is no problem.

24          And what happened with her does not relate

25  to falsity of any of these 123 claims.

1        MR. LEMBKE:  Your Honor, may I raise just

2   one issue while we're on the break, and that is --

3   and this is really for future witnesses -- but when

4   they ask a non-physician what is your opinion about

5   other whether the doctor properly exercised his

6   clinical judgment, I think we covered that in the

7   motion in limine, and they're supposed to approach

8   before they do that, and he didn't do that and --

9        THE COURT:  I had forgotten about that.  I

10  apologize for that ruling, but they should not be

11  offering any opinion regarding the conduct of the

12  doctors and whether that met any kind of standard.

13        I think if you rephrase your question you

14  can get in similar information, but not through the

15  opinion of an RN as to whether a doctor was doing

16  what a doctor was supposed to do.

17        MR. WERTKIN:  I think I understand, Your

18  Honor.  Thank you.

19        MR. LEMBKE:  Let's me finish on that.  Your

20  Honor, I guess we would ask for to you instruct the

21  jury to disregard her testimony about her opinion on

22  whether the doctor had properly exercised his

23  clinical judgment.

24        THE COURT:  Okay.  I will do that.  And if I

25  forget it, you will remind me.

 1          MR. LEMBKE:  Thank you, Your Honor.

 2          MR. CHRISTIE:  Your Honor, are you changing

 3  topics?

 4          MR. LEMBKE:  I don't think so.

 5          MR. CHRISTIE:  Your Honor, there is no

 6  requirment that there be any connection between IDT

 7  meetings and signing the certificates of terminal

 8  illness.

 9          The certificates of terminal illness are

10  supposed to be signed whether it's at the end of

11  three month period or the end of the two month

12  period.  So the jury is going to be confused because

13  the testimony has led them to believe that they're

14  supposed to sign the certificates of terminal illness

15  at the IDT meetings, and that is incorrect.

16          They're supposed to sign them when the

17  certification period is over.  So it is very likely,

18  for example, that in between two IDT meetings, there

19  will be people whose certification period would end.

20  Therefore, the doctor would come in and sign the

21  certificates of terminal illness before the next

22  meeting.

23          And I'm very concerned that the testimony

24  that is solicited is inconsistent with the Medicare

25  regulations and is confusing to the jury.

1          THE COURT:  I think you can probably cover

2   some of that in cross-examination and show that she

3   doesn't know what those requirements were or whether

4   they were being met.

5          MR. WERTKIN:  Your Honor, if you are going

6   to strike her testimony about the doctor's clinical

7   judgment at the time of pre-signing forms, can we

8   have an opportunity first to examine her and rephrase

9   the question?

10          MS. MARTIN:  Say that again, I'm sorry.

11          MR. WERTKIN:  The motion to strike is now

12   after the close of the testimony, and I don't have an

13   opportunity --

14          THE COURT:  It's not after the close of

15   testimony.  It's time for cross-examination.

16          MR. WERTKIN:  Can I cover that on redirect,

17   Your Honor?

18          THE COURT:  If it's within the scope of

19   cross.

20          MR. WERTKIN:  That's why I asked.  If it is

21   not covered in the scope of cross --

22          THE COURT:  Then you can approach and ask.

23          MS. MARTIN:  Are you talking about the

24   pre-signing -- I thought you said it related to the

25   pre-signing of forms.

```
 1              MR. WERTKIN:  Well, the exercies of clinical
 2     judgment.
 3              MS. TAPIE:  I think it was an instruction
 4     that Your Honor was going to give.
 5              MS. MARTIN:  I thought you were talking
 6     about pre-signing forms.
 7              MR. WERTKIN:  I guess I need to hear the
 8     instruction maybe again.
 9              THE COURT:  To disregard Ms. Stutts'
10     testimony regarding her opinions about whether Dr.
11     what's his name?
12              MS. TAPIE:  Wagner.
13              THE COURT:  Exercised his clinical judgment,
14     and that was as far as I had gotten.
15              MR. LEMBKE:  Properly exercised his clinical
16     judgment.  And I would note, Your Honor, Mr. Wertkin
17     is in this mess because he did not adhere to the
18     ruling on the motion in limine, which was he was
19     supposed to approach before he asked any
20     non-physician witness their opinion on the doctors
21     exercising --
22              MR. WERTKIN:  Actually, I think that's not
23     how I recall the motion in limine.  We can get the
24     ruling to confirm, but I thought you were -- first,
25     nurses weren't supposed to say, you know, look at
```

1    records and say, this person is terminally ill.  That

2    was something that only doctors could do.  The basis

3    of the motion in limine, as I understood it --

4            THE COURT:  I remember discussing the

5    requirement under Alabama medical malpractice cases

6    that an RN is not qualified to testify as to whether

7    the doctor properly performed his duties.

8            MR. WERTKIN:  Your Honor, we will make sure

9    that we're consistent with your ruling.

10           MR. LEMBKE:  Thank you, Your Honor.

11                   (Break taken)

12              (Open court.  Jury present.)

13           THE COURT:  Ladies and gentlemen, remember I

14   told you I would have to rule on evidentiary and

15   legal issues.

16           I need to instruct you based upon a legal

17   requirement that you are to disregard Ms. Stutts'

18   testimony concerning her opinion about whether

19   Dr. Wagner properly exercised his clinical judgment.

20   That's not something that a nurse is allowed by law

21   to testify about.

22           So if you made a note about that, mark it

23   out.  And if it's in your mind, erase it from your

24   mind.  Thank you.

25           You may proceed, Ms. Martin.

1                    CROSS-EXAMINATION

2    **BY MS. MARTIN:**

3    Q.  Hi, Ms. Stutts.  I'm Kim Martin.  I represent

4    AseraCare.

5              And we've never met before; correct?

6    A.  Correct.

7    Q.  And you were employed in AseraCare's Decatur

8    agency; correct?

9    A.  Yes.

10   Q.  And you were -- from January of 2007 to July of

11   2007, you were the DOCS; right?

12   A.  Yes.

13   Q.  And you testified about patients meeting

14   criteria to be eligible for hospice.  And when you

15   talk about criteria, do you mean the criteria set out

16   in the local coverage determination?

17   A.  Yes.

18   Q.  And when you would be evaluating patients, would

19   you use the criteria, the guidelines, the local

20   coverage determinations as sort of a checklist for

21   evaluating eligibility?

22   A.  Yes.

23   Q.  And in your assessment of patients, if a patient

24   did not meet every one of the items on the LCD

25   guidelines, you would find that patient was not

1  appropriate for hospice care; correct?

2  A.   Correct.

3  Q.   You've told us a little bit about prognosis and

4  diagnosis.  You understand, don't you, that the

5  Medicare regulations look at the patient's prognosis

6  in determining whether they have a life expectancy of

7  six months or less?

8  A.   Yes.

9  Q.   And the diagnoses that a person may have, there

10  could be many of those?

11  A.   Yes, there can.

12  Q.   And those can all combine together to contribute

13  to what a patient's prognosis is; right?

14  A.   Yes.

15  Q.   And in your experience, physicians use their

16  training to make prognosis about a patient just in

17  their general care and treatment of patients;

18  correct?

19  A.   Yes.

20  Q.   And you would use your nursing training to do

21  that as well; correct?

22  A.   Yes.

23  Q.   You would agree with me that nurses and doctors

24  have different skill sets in terms of their medical

25  training and experience?

```
 1   A.   Yes.
 2   Q.   And under the Medicare statute, it is the
 3   physician's judgment about a patient's prognosis that
 4   is the deciding factor; correct?
 5   A.   Yes.
 6   Q.   And nurses can provide information, but
 7   ultimately it's the doctor's decision; correct?
 8   A.   Yes, it is.
 9   Q.   And the doctor, in your experience while you
10   were working at AseraCare, the doctor, regular doctor
11   would sign a certificate of terminal illness;
12   correct?
13   A.   Yes.
14   Q.   That certificate of terminal illness would state
15   that the patient had a prognosis of six months or
16   less if the illness ran its normal course?
17   A.   Yes.
18   Q.   And that would be the same for the medical
19   director as well?
20   A.   Yes.
21   Q.   And --
22           THE COURT:  I was going to ask a
23   clarification.  When you're referring to regular
24   doctor, are you referring to the attending physician?
25           THE WITNESS:  Yes.
```

1          THE COURT:  The doctor that the patient has

2     before coming into hospice?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.

5     Q.  (By Ms. Martin)  When you would get a referral

6     for a patient, you would get medical records from

7     time to time about the patient's history before they

8     got to you?

9     A.  Yes, ma'am.

10    Q.  And you would consider those as a part of your

11    assessment of the patient?

12    A.  Yes, I would.

13    Q.  You've testified about the admission process and

14    that after an assessment was made and a patient was

15    determined to meet -- to be appropriate for hospice

16    care that the nurse would admit the patient.

17    A.  Yes.

18    Q.  And you understand that that's appropriate under

19    the Medicare rules and regulations; correct?

20    A.  Yes.

21    Q.  And your requirement under the Medicare rules

22    and regulations is to get a verbal order from the

23    physician within two days; right?

24    A.  Yes.

25    Q.  And if you take that verbal order within two

1   days, then you just have to make sure that the

2   physician has signed the certificate of terminal

3   illness before the billing goes out; correct?

4   A.   Yes.

5   Q.   And you've talked about taking -- strike that.

6        You mentioned about additional -- I think

7   you called them additional document requests.  I know

8   them by the term additional development requests.

9   A.   Yes.

10  Q.   But that is when there is a request for more

11  information about a patient; correct?

12  A.   Yes.

13  Q.   And that comes from -- that comes from -- do you

14  understand that comes from Palmetto?

15  A.   Yes.

16  Q.   And that would be the contractor that Medicare

17  hires to administer the claim?

18  A.   Right.

19  Q.   And you --

20       MS. MARTIN:  May I approach the witness,

21  Your Honor?

22       THE COURT:  Yes, you may.

23  Q.   Let me show you what's been marked previously as

24  Defendant's Exhibit 402.3?

25       THE COURT:  What's the number?  I'm sorry.

1           MS. MARTIN:  4023.

2    Q.  (By Ms. Martin)  And if you could -- look at

3    this.  Are you familiar with training materials that

4    Palmetto would send out to hospices?

5    A.  When I worked in hospice, yes, I did use this.

6    Q.  So you've used this document?

7    A.  Yes.

8    Q.  And you mentioned in your testimony that

9    Ms. Helms would ask you to try to obtain additional

10   documentation to submit with the patient's record;

11   correct?

12   A.  Yes.

13   Q.  And she would ask you to call other -- to call

14   perhaps the regular doctor, the attending physician

15   to get records; correct?

16   A.  Correct.

17   Q.  And if I could get you to look at Page --

18   there's some numbers down at the bottom, that's sort

19   of a long string of numbers, it starts with AC.  Do

20   you see that?

21   A.  Yes.

22   Q.  And if I could get to you flip all the way over

23   to AC and then it's the 602-0006338.

24           THE COURT:  Ms. Martin, I think if we just

25   use the last four, that would probably be sufficient

1   to describe it.

2        MS. MARTIN:  I will just use those from now

3   on.

4        THE COURT:  So it's 63?

5        MS. MARTIN:  38.

6        THE COURT:  Thank you.

7   Q.  (By Ms. Martin)  Are you there?

8   A.  Yes, I am.

9   Q.  I'm trying to pull it up on the screen as well.

10  And do you see at the top there it says, responding

11  to a hospice ADR?

12  A.  Yes.

13  Q.  And when it says the enclosed list is provided

14  as a remainder of what to include when responding to

15  an ADR.

16  A.  Yes.

17  Q.  And then it goes below and there's a checklist.

18  A.  Uh-huh.  Yes.

19  Q.  Would you refer to this checklist in responding

20  to ADRs?

21  A.  Yes.

22  Q.  If you could look at number five on that list.

23  Do you see there where it says, please submit any

24  documentation that would support the beneficiary's

25  hospice Medicare benefit appropriateness and medical

1  necessity of level of care billed.  And it says, this

2  may include documentation outside the dates of

3  service under review.  Do you see that?

4  A.   Yes.

5  Q.   So that was instructions that came from Palmetto

6  to the hospice?

7  A.   Yes.

8  Q.   So if you could look over on the next page and

9  if you could look at number twelve.  Are you there?

10  A.   Yes, I am.

11  Q.   And number twelve says, if the documentation for

12  the dates of service in question does not paint a

13  clear picture of the beneficiary's hospice

14  appropriateness, you may also submit documentation

15  for the months prior to or subsequent to the dates of

16  service requested.  Do you see that?

17  A.   Yes, I do.

18  Q.   So that is also direction from Palmetto about

19  how to respond to an ADR?

20  A.   Yes.

21  Q.   And that would have been information that you

22  had at the time that you were working in Decatur and

23  responding to ADRs?

24  A.   Yes.

25  Q.   Now, Ms. Helms, that you've talked about, she

1  was also a nurse; correct?

2  A.   Yes, she was.

3  Q.   And you would agree that assessing a person's

4  prognosis is not an exact science; correct?

5  A.   Yes, I would.

6  Q.   And you would agree that reasonable people could

7  disagree about a person's prognosis?

8  A.   Yes.

9  Q.   And that there are many factors that go into

10  determining a person's prognosis; correct?

11  A.   Yes.

12  Q.   And you have to look at the whole picture of the

13  person to assess their prognosis; correct?

14  A.   Yes.

15  Q.   And that's just because every person is

16  different; right?

17  A.   Yes, they are.

18  Q.   Everybody's disease process is different?

19  A.   Yes.

20  Q.   And so you would agree that in making an

21  assessment of whether a patient is appropriate or not

22  for hospice care, you have to look at that patient

23  individually; correct?

24  A.   Yes.

25  Q.   You talked about the signing of forms by

1  Dr. Wagner.  And you said you would bring information

2  to him, and you said it would include the

3  certificates of terminal illness; correct?

4  A.   Yes.

5  Q.   Would it also include plans of care for the

6  patient?

7  A.   Yes, it would.

8  Q.   So the plan of care for the patient, would that

9  have documentation from the different disciplines

10  that are in the interdisciplinary team?

11  A.   Yes, it does.

12  Q.   So that would include information from the

13  nurse; right?

14  A.   Yes.

15  Q.   And the social worker?

16  A.   Yes.

17  Q.   And the chaplain?

18  A.   Yes.

19  Q.   And any others that I'm leaving out, that would

20  be on that plan of care?

21  A.   There's also a plan of care for the home health

22  aide.

23  Q.   So that would be information that the doctor

24  would have at the time that he was signing the forms

25  that you brought to him?

1   A.   Yes.

2   Q.   And you're not saying that every patient that

3   was on service in the Decatur agency during your time

4   there from January 2007 to July of 2007 was not

5   appropriate for hospice service, are you?

6   A.   No.

7   Q.   And, in fact, you would agree with me that there

8   were many patients on service who were appropriate

9   for hospice care?

10   A.   Yes, I would.

11   Q.   And you would agree that in determining whether

12   the patient was appropriate or not, you have to look

13   at them individually; correct?

14   A.   Yes.

15   Q.   You mentioned one thing about discharges and

16   there were times when patients were discharged;

17   correct?

18   A.   Yes, there was.

19   Q.   And you mentioned that you would put them on a

20   30 day plan?

21   A.   Yes.

22   Q.   And that's an Alabama state requirement;

23   correct?

24   A.   Yes, it is.

25   Q.   So, if there was a patient that you determined

1  needed to be discharged in Alabama, there's a 30 day

2  process before that can occur?

3  A.   Yes.

4        MS. MARTIN:  Judge, if I may have one

5  second?

6        THE COURT:  All right.

7            (Brief pause.)

8        MS. MARTIN:  That's all we have, Your Honor.

9        THE COURT:  Any redirect?

10        MR. WERTKIN:  Yes, Your Honor, thank you.

11              REDIRECT EXAMINATION

12  BY MR. WERTKIN:

13  Q.   Ms. Stutts, Ms. Martin asked you about nurses

14  and doctors have different skill sets.  Do you

15  remember that?

16  A.   Yes.

17  Q.   What skill sets does a hospice nurse have?

18  A.   The skill set of anyone else, all nurses have

19  the ability to assess patients and to make

20  recommendations to the physician.

21  Q.   Hospice nurses have different skill sets than

22  nurses that are not hospice nurses?

23  A.   Yes.  We're trained in more end of life, so we

24  do have more training for the end of life services

25  than the normal nurse would.

1   Q.   What kind of training do you get?

2   A.   We have the continuing education where we look

3   at symptom management just for one.  Also, we look at

4   criteria for determining the patient is appropriate.

5   Q.   And is there any other -- do you draw on your

6   experience day after day to help build your skill set

7   as well?

8   A.   Yes.

9   Q.   The Judge asked you in your earlier testimony

10  about attending doctors and what kind of practices

11  they have; do you remember that?

12  A.   Yes.

13  Q.   What kind of practices generally did the

14  attending doctors have?

15          MS. MARTIN:  We would object.  Beyond the

16  scope of cross.

17          THE COURT:  Sustained.

18  Q.   (By Mr. Wertkin) Going back to Ms. Martin's

19  questions about doctors having different skill sets.

20          In your experience, do doctors have

21  different skill sets?

22  A.   Yes, they do.

23  Q.   In your experience, are there some doctors that

24  have skill set experience regarding hospice and some

25  that don't?

1   A.   Yes.

2   Q.   Ms. Martin asked you about what Suzanne Helms

3   told you with regard to ADRs.

4   A.   Yes.

5        MS. MARTIN:   Objection, Your Honor, I don't

6   think I asked that.

7        THE COURT:   Sustained.

8   Q.   (By Mr. Wertkin)   Ms. Martin asked you about

9   your response to ADRs; is that right?

10  A.   Yes.

11  Q.   And she asked you about what records you look

12  for when doing your ADRs.

13  A.   Yes.

14  Q.   Did you receive any instructions about what

15  records to use when you do your ADRs?

16  A.   Which records specifically or -- what's your

17  question?

18  Q.   In general, what your instructions were about

19  finding records to respond to ADRs.

20  A.   I was just told to find whatever I could find.

21  Q.   And did you have concerns about that

22  instruction?

23        MS. MARTIN:   Your Honor, we object.

24        THE COURT:   Overruled.

25  A.   Yes, I did.

1   Q.   And what concerns did you have?

2   A.   Because I felt like once I had all the

3   recommendation, that there was nothing else to

4   gather.  And I felt like she was implying that I was

5   to make something fit.

6        MS. MARTIN:  Your Honor, we would object and

7   move to strike.

8        THE COURT:  Sustained.  Y'all disregard

9   those last comments.

10  Q.   (By Mr. Wertkin)  Ms. Martin asked you about

11  looking at each patient as an individual; do you

12  remember that?

13  A.   Yes.

14  Q.   And when you say looking at each patient, what

15  are you looking at?

16  A.   Looking at that patient, their diagnosis and the

17  symptoms that that patient is having.

18  Q.   Are you looking at their medical records?

19  A.   Yes.

20  Q.   Did you review medical records to help them make

21  determinations of eligibility?

22       MS. MARTIN:  Your Honor, beyond the scope of

23  cross.

24       THE COURT:  Sustained.

25  Q.   (By Mr. Wertkin)  When looking at each patient

1  as an individual, as Ms. Martin asked you, what would

2  you -- what would be involved in looking at each

3  patient as an individual for the purposes of just

4  evaluating them?

5  A.   We're looking at their chart, looking at their

6  symptoms they're having, their history, and how it

7  relates to their diagnosis and their symptoms at that

8  time.

9  Q.   And when doing that kind of evaluation, what do

10 the medical records need to show?

11 A.   That the patient --

12       MS. MARTIN:  We would object as to beyond

13 the scope of cross.

14       THE COURT:  Sustained.

15 Q.   (By Mr. Wertkin)  Ms. Martin asked you questions

16 about records sent to Palmetto; do you remember that?

17 A.   Yes.

18 Q.   And who would decide what records were sent to

19 Palmetto?

20 A.   The DOCS, a lot of the times I would.  And if I

21 had any questions, I would refer it to Suzanne.

22 Q.   Would the entire medical record be sent to

23 Palmetto?

24 A.   I would say not the entire medical record, but

25 any documentation that supported that diagnosis or

1  those symptoms would be sent.  So a lot of times it

2  was a lot of information.

3  Q.   And what if there was evidence in the medical

4  record that did not support the terminal illness,

5  would those records get sent?

6       MS. MARTIN:  Your Honor, we would object,

7  beyond the scope of cross.

8       THE COURT:  Sustained.

9       MR. WERTKIN:  Thank you, Your Honor.

10  Q.   When you were the DOCS and you were responding

11  to Palmetto record requests as you were being asked

12  before, how would you decide what records to send?

13  A.   I went by the checklist.

14       THE COURT:  Which checklist are you

15  referring to?  The one from --

16       THE WITNESS:  Palmetto.  We actually used

17  that as a guide for us to send it.

18  Q.   (By Mr. Wertkin)  And when you were doing this,

19  would you send documents that did not support a

20  diagnosis in responding to an ADR?

21  A.   If that's what I had, that's what I sent, yes.

22  Q.   Did you receive any instructions about that?

23       MS. MARTIN:  We object, beyond the scope of

24  cross.

25       THE COURT:  Sustained.

 1          MR. WERTKIN:  Thank you very much,

 2   Ms. Stutts.

 3          THE COURT:  Recross?

 4          MS. MARTIN:  I have no further questions,

 5   Your Honor.

 6          THE COURT:  Ms. Stutts, you may step down.

 7   The United States may call your next witness.

 8          MS. TAPIE:  Your Honor, we call Ms. Lauretta

 9   Dietrich.

10                    (Brief pause).

11   LAURETTA DIETRICH, GOVERNMENT'S WITNESS, SWORN.

12          THE CLERK:  State and spell your first and

13   last name for the court.

14          THE WITNESS:  First name is Lauretta,

15   L-A-U-R-E-T-T-A, Dietrich is spelled D-I-E-T-R-I-C-H.

16          THE CLERK:  Thank you.

17                  DIRECT EXAMINATION

18   **BY MS. TAPIE:**

19   Q.  Ms. Dietrich, can you please introduce yourself

20   to the jury?

21   A.  I can't hear.

22          MS. MARTIN:  Objection.

23   Q.  Can you not hear me?  Can you hear me now?

24   A.  (Witness nods head affirmatively.)

25          THE COURT:  I sustain the objection to that

```
 1  question.  Please ask your witness a question.
 2  Q.  (By Ms. Tapie)  What is your name?
 3  A.  Lauretta Dietrich.
 4  Q.  Where do you live?
 5  A.  Winthrope, Maine.
 6  Q.  Have you ever testified in court before?
 7  A.  No.
 8  Q.  I'm just going to ask a few questions first
 9  about your background.
10          Can you tell the jury what your occupation
11  is?
12  A.  I am a registered nurse.  I'm a hospice nurse.
13  I'm a certified hospice nurse.
14  Q.  And are you currently working as a hospice
15  nurse?
16  A.  No, I'm retired.
17  Q.  And how long have you been retired from hospice
18  nursing?
19  A.  About two years.
20  Q.  Do you have any special certifications with
21  regard to being a hospice nurse?
22  A.  I'm -- I have my CHPN which stands for certified
23  hospice palliative nurse.
24  Q.  How long have you been retired from hospice
25  nursing?
```

1    A.   About two years.

2    Q.   Do you currently have any involvement with

3    hospice at all?

4    A.   I'm a hospice volunteer.

5    Q.   What's involved in your hospice volunteer work?

6    A.   I -- what I like to do and what I am doing is

7    sitting with patients who are actively dying and

8    being present with them and just being there for

9    them.

10   Q.   How long have you been a nurse?

11   A.   Since '89.

12   Q.   How much of your nursing career since 1989 has

13   involved hospice?

14   A.   About 90 percent.

15   Q.   When did you have your first job as a hospice

16   nurse?

17   A.   In June of 1989.  Oh, as a hospice nurse?  As a

18   hospice nurse, it would be about '94.

19   Q.   Why did you choose to become a hospice nurse?

20   A.   Because I was doing med surge, medical surgical

21   nursing, and I was afraid that my patients were going

22   to die on me.  I was afraid of death.  So I thought I

23   would just run into hospice where everybody is

24   supposed to die.

25   Q.   And why did you stay a hospice nurse for so many

1  years?

2  A.   Because I found out that it was an honor and a

3  privilege and it is the last thing that I could do to

4  make a difference in someone's life.

5  Q.   You mentioned previously that your -- you've

6  worked as a hospice nurse since, I think you said,

7  1994.

8  A.   It was four years after I started, so I started

9  in '89.  Around '94, I guess.

10 Q.   Ms. Dietrich, can I ask you to move the

11 microphone closer to your mouth.  I want to make sure

12 the jury is able to hear what you're saying.

13 A.   (Witness complies.)

14 Q.   Did you work as a hospice nurse with AseraCare?

15 A.   Yes, I did.

16 Q.   When did you start working for AseraCare?

17 A.   At the end of '09 until -- it was 11 months,

18 until about the end of 2010.

19 Q.   Where did you have your job with AseraCare?

20 A.   San Francisco Bay area.

21 Q.   What was the name of the particular location?

22 A.   Concord.

23 Q.   You said that you started that in, I think you

24 said, December 2009.

25            So, at the time that you started working at

1  AseraCare's Concord location, how long had you been

2  working as a hospice nurse?

3  A.   Quite a few years.

4  Q.   You mentioned, I'm not great at math either, but

5  you mentioned that you started in 94, that was your

6  first hospice nurse job.

7       What I'm asking is from '94 to when you

8  started at AseraCare in 2009, have you been a hospice

9  nurse that entire time?

10  A.   Yes, yes.

11  Q.   Where was AseraCare's Concord office actually

12  located?

13  A.   In Concord, California.

14  Q.   Where specifically physically was the office

15  located?

16       MS. MARTIN:  Your Honor, we would just

17  object to relevance.

18       THE COURT:  Sustained.

19  Q.   (By Ms. Tapie)  Was the AseraCare office inside

20  a hospital?

21  A.   No.

22  Q.   Did any patients receive care at AseraCare's

23  hospice --

24  A.   No.

25  Q.   I mean, AseraCare's office location.

1   A.   No.

2   Q.   Why not?

3   A.   Because it was an office building.  It wasn't

4   where we would see patients.  It was the -- it's

5   where -- it's just the office, the office from where

6   we worked.

7   Q.   What was your position at AseraCare's Concord

8   agency?

9   A.   I began as a weekend nurse, and then for 16

10  hours and then I went up to 20 hours.

11  Q.   Then you went up to 20 hours?  And just -- I'm

12  just asking --

13           THE COURT:  If you would answer out loud.

14  Q.   Just speak into the microphone.

15           THE COURT:  You can't nod your head.

16  Q.   It's important for the court reporter to get

17  down your answers.

18  A.   Okay.

19  Q.   Why did you only work on weekends at AseraCare?

20  A.   Because I was a caregiver for an elderly woman

21  in Oakland and my time was -- that was my priority

22  job.  And so my time with AseraCare had to be -- had

23  to be coordinated with that time.

24  Q.   You mentioned that --

25           THE COURT:  Were you the primary caregiver

1  for this person during the week and then worked with

2  AseraCare on the weekend?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Thank you.

5          MS. TAPIE:  Thank you, Your Honor.

6  Q.  You mentioned that your job title was a weekend

7  nurse.

8  A.  Yes.

9  Q.  What were your job responsibilities as a weekend

10 nurse?

11 A.  To do revisits and also to do admissions.

12 Q.  What do you mean by "revisits"?

13 A.  The case managers would have a case load of

14 patients and anyone that they thought needed to be

15 seen over the weekend to assess their symptoms, just

16 follow up visit to see how they were doing.

17 Q.  So the revisits would be to patients who were

18 already on hospice care?

19 A.  Yes.

20 Q.  You mentioned that you would receive those

21 instructions from the RN case manager.

22 A.  Yes, yes.  Personally, I didn't receive it from

23 her.  But she would tell the DOCS and then they would

24 set up a weekend schedule.

25 Q.  What does DOCS stand for?

1  A.   Director of clinical services.

2  Q.   Back to your job responsibilities, you mentioned

3  that you did revisits and admissions.

4        I want to talk about each one.  But before I

5  do, were there any other job responsibilities that

6  you had as a weekend nurse?

7  A.   I had to do admissions.  And if admissions came,

8  if there was a referral for an admission, I would

9  have to take care of that.

10  Q.   You mentioned admissions, which I do want to

11  talk about, ask you about in more detail, as well as

12  patient visits.

13        Were there any meetings that you were

14  required to --

15  A.   Yes, the IDT meetings which are

16  interdisciplinary group meetings.

17  Q.   Were there any other meetings that you attended?

18  A.   There were stand-up meetings in the morning.

19  Q.   What was a stand-up meeting?

20  A.   It's when we all would get together in the

21  morning and listen to the night report and then get

22  our assignments from there.  We would know which

23  patients would need to be followed up on.  And then

24  we would discuss which patients were going to be

25  admitted and which patients needed to be discharged,

1  if there were any.

2  Q.   Let's back up a minute.  You're saying "we."

3  Who is "we" when you're talking about the stand-up

4  meeting?  Who would attend the stand-up meeting?

5  A.   It would be the ED.

6  Q.   What does that stand for?

7  A.   Executive director, ED.  And the DOCS, which is

8  the director of clinical services.  Case managers,

9  the marketer, the home health aides, maybe the

10  chaplain, and the social worker.

11  Q.   You mentioned that at these stand-up meetings

12  you would listen to the night report.  What was the

13  night report?

14  A.   The night nurse would -- we had a report line.

15  And so the night nurse would give her report on the

16  report line, and then we would all listen to the

17  report at stand-up to see what happened during the

18  night.

19  Q.   You also mentioned the IDG meeting.  Can you

20  explain to the jury what IDG means?

21  A.   IDG is the interdisciplinary group, so it's the

22  whole team with the different disciplines like

23  nursing, the medical director, social worker, home

24  health aides, chaplain, and all the members of the

25  team.

1          THE COURT:  Would they all be working during

2     the weekend when you were working?

3          THE WITNESS:  No.  There may be a social

4     worker working.  But during the week, I would go to

5     the meetings.

6          THE COURT:  All right.  I'm sorry.  I

7     understood you to only be working on weekends.  Okay.

8          MS. TAPIE:  Thank you for clearing that up,

9     Your Honor.  That's actually a good point.

10    Q.   Ms. Dietrich, were your patient visits mostly

11    occurring on the weekend?

12    A.   Yes, at the beginning.

13    Q.   And when you say "at the beginning," did that

14    change?

15    A.   Yes.  When I worked 20 hours a week, I did work

16    certain days or certain hours during the day in

17    addition to my caregiving position.

18    Q.   When you attended the stand-up meeting, did

19    those occur on the weekends or during the week?

20    A.   No, just during the week.

21    Q.   And what about the IDG meetings?

22    A.   That would be during the week.

23         THE COURT:  I didn't think all those people

24    were working on weekends.  Thank you for clearing

25    that up for me.

1   Q.   (By Ms. Tapie)  We're going to talk again about
2   those different jobs you had one at a time.
3            So first going back to the nursing visits.
4   What is involved in a nursing visit to a patient who
5   is already on hospice?
6   A.   The case manager would be totally in charge of
7   the patient's care from admission to death.  And if
8   the patient needed to be seen, say, three times a
9   week but there was something going on, he needed more
10  symptom management, then I would go out and evaluate
11  what's going on and make sure that he or she is
12  comfortable and make sure that they know how to get
13  in touch with us.
14  Q.   And you mentioned RN case manager.  How many RN
15  case managers were there in the Concord agency?
16  A.   I'm really not sure.  But at least three, two or
17  three.
18  Q.   Do you remember any of their names?
19  A.   I remember one name.
20  Q.   What is the name of the RN case manager that you
21  recall?
22  A.   Fidelia.
23  Q.   Do you remember Fidelia's last name?
24            MS. MARTIN:  We would just object to this
25  line of questioning.

```
 1          THE COURT:  Sustained.  Would you move on,
 2   please?
 3   Q.  (By Ms. Tapie)  Who did you report to at the
 4   Concord agency?
 5   A.   The executive director.
 6   Q.   What was his name?
 7   A.   Ralph Ramirez.
 8   Q.   Did you ever report to anyone else?
 9   A.   The director of clinical services.
10   Q.   You mentioned that part of your job
11   responsibilities involved doing admissions.
12   A.   Yes.
13   Q.   What did that involve?  If you can walk me
14   through -- walk me through the process from your
15   perspective and explain to the jury, please.
16   A.   I would go to the patient's home, wherever that
17   is.  Home could also be under a bridge.  And I would
18   speak with the patient and the caregivers and let
19   them know what hospice is all about.  And if they
20   wanted to go on hospice, they would sign the consent.
21   And then I would do a full assessment, head-to-toe
22   assessment and make sure that they got their comfort
23   kit and make sure that they understood how to give
24   the medications, how to draw up the medications, and
25   which medications for what, and make sure that they
```

1   know how to get ahold of us 24/7.

2   Q.   And backing up a little bit, Ms. Dietrich.   How

3   would you know what patient to visit, to assess, to

4   determine if that patient should be admitted?

5   A.   Because that would have been drawn up on Friday

6   evening and set on a table so when we would come in

7   on Saturday, there would be a list of patients to

8   admit and a list of patients to revisit.

9         MS. MARTIN:   Your Honor, I'm sorry.   I don't

10   mean to interrupt.   I'm having trouble hearing the

11   witness.

12         THE WITNESS:   I'm sorry.

13         MS. MARTIN:   I'm sorry, it's just a long

14   distance between us.   But also just object to the

15   relevance of this testimony.

16         THE COURT:   I will give you a little leeway,

17   Ms. Tapie.

18         MS. TAPIE:   I will try, Your Honor, yes.

19   Q.   Ms. Dietrich, do you know who would make the

20   list of names of patients that you were to assess for

21   admission?

22   A.   Either the ED or DOCS.

23   Q.   You mentioned that when you would visit the

24   patient to assess her admission, you mentioned a lot

25   of things that you would do.   What specifically would

1  you be assessing when you visited the patient?

2  A.   I wanted to make sure that they qualified for

3  the hospice Medicare benefit.

4  Q.   And how would you make that determination?

5        MS. MARTIN:  Your Honor, we would object on

6  the grounds of our motion in limine.

7        THE COURT:  There are only about 100 of

8  those.

9        MS. MARTIN:  I'm sorry.  On the nurse

10  assessment of eligibility.

11       THE COURT:  Overruled.

12  Q.   What would you be assessing when you were

13  visiting a patient for admission purposes?

14  A.   I would be looking for signs and symptoms of the

15  illness that qualified under the hospice Medicare

16  benefit.

17  Q.   What's involved in that clinical assessment that

18  you would perform?

19  A.   We had a -- we had a form, and at this moment I

20  can't remember the name of the form.  And on the form

21  were lists of all the diagnosis, and then under the

22  diagnosis, it's like a menu.  You have to have two of

23  these and one of these or you have to have this, this

24  and this.

25        So I would check the diagnosis and make sure

1  that they qualified under that form.

2  Q.   Where did you get those forms?

3  A.   It just comes.  You get it when you get

4  oriented.

5          THE COURT:  When you get what?

6          THE WITNESS:  Say that again.

7          THE COURT:  You said you get it when you get

8  something?

9          THE WITNESS:  When you start work at

10 AseraCare.  Everybody has their own forms.  It's like

11 a tool.

12 Q.   (By Ms. Tapie)  Did you say get oriented?

13 A.   Yes.

14 Q.   Is oriented the word you used?

15 A.   Yes.

16 Q.   What did you mean by that?

17 A.   Another nurse would take me around and show me

18 the ropes.

19 Q.   And the specific forms that you're referring to

20 that you would consult when you were assessing a

21 patient for eligibility for hospice, were those forms

22 AseraCare forms?

23 A.   It had AseraCare's name on it, but it wasn't

24 specific to AseraCare.  Every hospice has that form.

25 Q.   That's helpful.  When you were at AseraCare, the

666

1  forms that you were using to guide you in assessing

2  the patient had AseraCare's name on them?

3  A.   Yes.

4  Q.   Would you rely on what was contained in the

5  patient's medical record when you were conducting

6  that assessment at admission?

7  A.   Yes.  The medical records and also what the

8  patient and the family members were telling me and

9  what I was seeing, hearing and smelling.

10 Q.   Would you then also document your assessment of

11 a patient in that patient's medical record?

12 A.   Yes.

13 Q.   Is documentation important to your work as a

14 hospice nurse?

15 A.   Very definitely.

16 Q.   Why is that?

17 A.   Because everybody who works with a patient has

18 to know the patient's story, so to speak, know where

19 he's been, where he is and where he's going,

20 according to the disease, and what we may expect to

21 happen.

22       It's a plan that -- that says this is our

23 okay, we're doing this and then next visit check for

24 this that and the other thing.

25 Q.   You mentioned plan of care.  What do you mean by

1   that?

2   A.   Every patient has a plan of care or a care plan,

3   which directs us to whatever we're going to do for

4   the patient according to his medical diagnosis.

5   Q.   Going back to your description of when you would

6   be assessing a patient for possible admission to

7   hospice.

8         After assessing a patient, would you make a

9   decision about whether that patient should be

10  admitted to hospice or not?

11  A.   I would know whether the patient qualified or

12  not.  So yes.

13  Q.   What would you do if you determined that the

14  patient you were assessing was eligible for hospice

15  and did qualify?

16  A.   I would report it on the report line.

17  Q.   Would you report that -- just for the benefit of

18  the jury, Ms. Dietrich, if you would try not to use

19  the acronyms if at all possible, so when you say ED

20  and DOCS.

21        You said you would report that admission.

22  Would you report that before you admitted the

23  patient?

24  A.   Well, if I admitted the patient, I would, of

25  course, report it.  If the patient did not qualify --

1  Q.  Wait, I'm sorry.  Ms. Dietrich, I am only asking

2  you now about what happened when you determined a

3  patient did qualify.

4  A.  I would let the team know.

5  Q.  And when would you let the team know?

6  A.  Right away.

7  Q.  When you say "right away," was that before or

8  after you had admitted the patient?

9  A.  After.

10  Q.  And how -- again, this is on the weekends much

11  of the time.

12      How would you let the team know that you had

13  admitted the patient?

14  A.  On the report line and -- if there was no

15  problem, I would report it on the report line.

16  Q.  And what was involved with reporting something

17  on the report line?  If you could explain that to the

18  jury.

19  A.  So, we would say, today I admitted Sandy Jones.

20      THE COURT:  To whom would you say that and

21  how would that be communicated, I think is what she's

22  asking.

23  Q.  (By Ms. Tapie)  When you say report line, what

24  does that mean?  What would you do to put something

25  in the report line?

1    A.   I would say what happened on the admissions.

2    Q.   And you would say that to whom?

3    A.   The whole -- the whole team would hear the

4    report line.

5    Q.   How would they hear it?

6         THE COURT:  Physically, Ms. Dietrich, if you

7    would walk us through what you do.  Was the report

8    line a phone call that you called in or was this

9    something you emailed?  What did you do?  If you

10   would explain that to us, please, ma'am.

11   A.   It was a phone call.

12   Q.   And what would happen when you make the phone

13   call?

14   A.   It would go on the report line.

15   Q.   Would you be speaking to a live person or would

16   you be leaving a voice recording?

17   A.   Leaving a voice recording.

18   Q.   And when would those voice reports be heard by

19   anyone?

20   A.   During stand-up and during IDG.

21        THE COURT:  I'm sorry.  Ms. Dietrich, at the

22   same time or a different time?

23        THE WITNESS:  IDG or interdisciplinary group

24   would be a different time.  Stand-up is every

25   morning.

1          THE COURT:  So if you call in to the report

2     line, say, Saturday afternoon, that would be heard

3     the next morning at stand-up?

4          THE WITNESS:  Well, anyone could hear it at

5     any time who called the report line.  But we would

6     discuss it at stand-up on Monday.

7          THE COURT:  Who would be calling in to

8     listen to reports that were made on the report line?

9          THE WITNESS:  The case managers, the nurses,

10    the home health aides.

11         THE COURT:  Anybody who needed to know about

12    that patient?

13         THE WITNESS:  Right.

14    Q.   (By Ms. Tapie):  During the admissions process,

15    how would a patient actually be added to AseraCare's

16    census?

17    A.   As soon as the patient was admitted, they would

18    be added to the census by the executive director or a

19    director of clinical services.

20    Q.   Can you explain to the jury what "census" means?

21    A.   Census is just the amount of patients we have,

22    like our census is 20 or 50.  It's just the amount of

23    patients that we -- that are on our service.

24    Q.   Now, going back to assessing a patient for

25    qualification, you mentioned to determine whether

1    that patient should be admitted.  What would happen,

2    just generally, what would happen in the events that

3    you determined that the patient did not qualify for

4    hospice?

5              MS. MARTIN:  We would just object to the

6    time frame and scope.

7              THE COURT:  Sustained.

8    Q.  (By Ms. Tapie)  Ms. Dietrich, during your entire

9    employment with AseraCare, which I believe you

10   testified previously was December 2009 or about 11

11   months?

12   A.   Yeah.

13   Q.   So it was through November --

14   A.   Through November.

15   Q.   Of 2010?

16   A.   Yes.

17   Q.   During that entire time, what was the process

18   that you followed when you would assess a patient and

19   determine that that patient did not qualify for

20   hospice?

21   A.   I would get in touch with the executive director

22   or the director of clinical services and let them

23   know that the patient did not qualify.  Or when I

24   came back to the office, I would let them know that

25   the patient didn't qualify and why.

1  Q.   When you say "and why," what do you mean by

2  that?  What reasons would you provide?

3  A.   According to that form that I spoke about

4  earlier, if signs and symptoms did not fit on the

5  form, for instance, if they -- if they -- for certain

6  diagnosis, if you have to have lost ten percent of

7  your weight in the last six months and they didn't do

8  that, instead they gained weight, then because they

9  gained weight they would not be qualified.

10       MS. MARTIN:  Your Honor, we would just

11  object to that last and move to strike.

12       THE COURT:  I will let it stay right now,

13  but --

14       MS. TAPIE:  Yes.

15  Q.   Just generally, Ms. Dietrich, I'm asking you --

16  I appreciate you trying to explain to the jury.  But

17  generally, what type information would you provide to

18  the executive director and the director of clinical

19  services when you were explaining to them why you had

20  not admitted a patient to hospice?

21  A.   I would just tell them why they didn't -- can

22  you say that again, please?

23  Q.   Generally, what information would you provide to

24  the executive director and the director of clinical

25  services when you were explaining to them that you

1  had not admitted a patient to hospice?

2  A.   I would just go by the sheet that we used to

3  determine the diagnosis and let them know that they

4  didn't fit.

5  Q.   When you say "didn't fit", what do you mean?

6  A.   Didn't fit under any of the diagnosis, any of

7  the diagnosis -- I went blank.  For instance, if they

8  said that they had to gain or lose weight, then it

9  didn't fit under that.

10  Q.   And that example of a detail would be for a

11  particular diagnosis?

12  A.   Yes.

13  Q.   Can you explain to the jury generally again what

14  would happen during those discussions that you would

15  have about your determination that a patient was not

16  eligible for hospice and you had not admitted that

17  patient?

18       MS. MARTIN:  We would just object on 404(b)

19  as well as relevance.

20       THE COURT:  I sustain as to foundation.

21  Q.   (By Ms. Tapie)  Ms. Dietrich, did you have

22  discussions with the executive director or the

23  director of clinical services throughout your time at

24  AseraCare, did you have discussions with them about

25  patients that you had not admitted to hospice because

1   you had determined that those patients were not

2   qualified to receive hospice?

3   A.   Yes.

4         MS. MARTIN:  Your Honor, we would again

5   object under 401 and 404(b) and lack of consistency

6   with the sampling methodology.

7         THE COURT:  I'm going to overrule right now.

8         MS. MARTIN:  Can we have a continuing

9   objection?

10        THE COURT:  You may.

11        MS. MARTIN:   Thank you.

12  Q.   (By Ms. Tapie)  Ms. Dietrich, can you explain

13  generally -- again, this is covering the time period,

14  the whole time period that you worked at AseraCare,

15  what would happen during those discussions?

16        THE COURT:  Who were they with, please?

17        MS. TAPIE:  Those discussions with the

18  executive director or the director of clinical

19  services.

20        THE COURT:  The names.

21        MS. TAPIE:  With Ralph Ramirez, the

22  executive director, and can you say the name of the

23  director of clinical services?

24  A.   Ralph Ramirez would yell at me --

25  Q.   Wait, I'm sorry, Ms. Dietrich.

1          MS. MARTIN:  Your Honor, we would move to

2     strike that answer.

3          THE COURT:  Sustained.  Ladies and

4     gentlemen, you are to disregard that.  It has nothing

5     to do with the issue which you will be addressing.

6     Q.  (By Ms. Tapie)  Let me start first just talking

7     about your discussions with the executive director,

8     Ralph Ramirez.

9          Can you explain to the jury what those --

10    what those discussions would involve when you were

11    explaining to Mr. Ramirez why you had not admitted a

12    patient that you believed did not qualify for

13    hospice?

14         MS. MARTIN:  Your Honor, we object on

15    anecdotal evidence.

16         THE COURT:  Sustain on those grounds.

17    Q.  (By Ms. Tapie)  Did you have discussions with

18    executive director Ralph Ramirez during your time

19    working at AseraCare, during the entire time period,

20    did you have discussions with Mr. Ramirez about

21    patients that you did not admit to hospice because

22    you determined that they were not eligible for

23    hospice?

24    A.  Yes.

25    Q.  During those discussions, what would Mr. Ramirez

1  communicate to you?

2          MS. MARTIN:  Objection, Your Honor.

3          THE COURT:  Sustained.

4  Q.  During those discussions, what would you

5  communicate to Mr. Ramirez?

6          MS. MARTIN:  Same objection, Your Honor.

7          THE COURT:  Overruled as to that.

8  Q.  What would you communicate to Mr. Ramirez during

9  those discussions?

10  A.  Why the patient did not qualify for hospice.

11  Q.  Generally, can you explain how Mr. Ramirez would

12  respond?

13          MS. MARTIN:  Your Honor, we object.

14          THE COURT:  Approach, please.

15                      (SIDEBAR)

16          THE COURT:  It's indicated there were only

17  about 100 motions in limine.  I'm not sure I can

18  remember every single one.

19          MS. MARTIN:  Yes, Your Honor.

20          THE COURT:  And I'm not quite sure exactly

21  where you're going with your objections, so would you

22  please explain?

23          MS. MARTIN:  Yes, Your Honor.  This is

24  asking her for again anecdotal evidence and also on

25  the grounds of 404(b).  And also I'm very concerned

1  that she said Mr. Ramirez yelled at her, and I'm very

2  concerned about what is going to --

3        THE COURT:  Yeah.  That was something I

4  specifically said we were not going to be having.

5        MS. TAPIE:  Yes, Your Honor.  I am really

6  trying to not get into specifics because of the --

7        THE COURT:  No.  I'm going to make sure I'm

8  clear.  Y'all are to instruct every single one of

9  your witnesses that we are not getting into anybody

10  being ugly to me or yelling at me or any of those

11  kinds of things.

12        Do you understand?

13        MS. TAPIE:  Yes, Your Honor.

14        THE COURT:  And I want to make sure that you

15  make sure that all your witnesses understand that.

16        MS. TAPIE:  Yes, Your Honor.

17        MR. WERTKIN:  Maybe if you can lead the

18  witness a little bit and just say in terms of

19  clinical information, what clinical kind of

20  information did you typically relate to -- is that

21  what you're --

22        MS. MARTIN:  She's already asked that, and

23  it's been answered.

24        MS. TAPIE:  And I'm trying to explain what

25  the general practice was, how this information would

1  be handled in the Concord agency when it came to a

2  nurse like Ms. Dietrich.

3          Their objection to anecdotal testimony is

4  that I can't specifically say, tell me about this

5  patient, tell me about what happened with that

6  patient.  And so I'm asking as a general practice

7  what would occur when she did not admit a patient.

8          THE COURT:  Yes.

9          MS. MARTIN:  The answer is Mr. Ramirez

10  yelled at me.

11          THE COURT:  Yeah.

12          MS. TAPIE:  And you're excluding that, Your

13  Honor?

14          THE COURT:  You're dern right I am.  Did you

15  not hear me say that yesterday with regard to

16  Ms. Zaragoza?

17          MS. TAPIE:  Yes, Your Honor.

18          THE COURT:  And that applies to every one of

19  your witnesses.  They need to be instructed before

20  they take the stand that they are not to testify

21  about anything like that.  And if we keep having that

22  come in --

23          MR. WERTKIN:  If you lead, not tone, just

24  process wise, what happened process wise.

25          THE COURT:  We've already gotten past that.

1   So your objection is to the general discussion about

2   what in general what would happen?

3           MS. MARTIN:  That it is asking her about the

4   specific -- I mean, I know she's saying generally,

5   but it's asking about specific instances and it is

6   touching on this issue of Mr. Ramirez yelling at her.

7           MR. LEMBKE:  Once bitten, twice shy, Your

8   Honor.  She's blurted it out once.  She's asking

9   basically the same question again that led to her

10  blurting out.

11          This is the second of three witnesses who

12  has blurted out highly prejudicial information that

13  the Court instructed would not happen yesterday, and

14  now it's happened twice.

15          And we're very concerned that she's going to

16  ask the question, and it's going to get blurted out

17  again, which is completely improper.  And if she

18  starts getting into specific examples, that also is

19  not proper.

20          THE COURT:  Why don't we move on with this

21  witness to something else?  Thank you.

22          MS. TAPIE:  Yes, Your Honor.  And I would

23  just preserve the opportunity to make an offer of

24  proof.

25          THE COURT:  You can do offers of proof all

1    day long.

2              (Open court.  Jury present.)

3              THE COURT:  You may proceed.

4              MS. TAPIE:  Thank you, Your Honor.

5    Q.  Ms. Dietrich, when you would provide the

6    executive director, Mr. Ramirez, with information

7    that you had not admitted a patient because you had

8    determined that that patient was not eligible for

9    hospice, what would MR. Ramirez do with that

10   information?  And I'm not asking you specifically

11   what he -- what he said to you in those

12   conversations.  I'm asking if you know what he would

13   do with that information.

14             MS. MARTIN:  Your Honor, we would object.

15             THE COURT:  Sustained.  Do you remember my

16   instruction to move on?

17             MS. TAPIE:  Yes, yes, Your Honor.

18   Q.  Who was the medical director at the Concord

19   agency during the time that you worked there?

20   A.  Dr. Gary Miller.

21   Q.  And would Dr. Miller sign off on certifications

22   of terminal illness during IDG meetings that you

23   attended?

24   A.  As far as I know, I don't know exactly what he

25   signed.

1  Q.   I go I go?

2         THE COURT:  Can we move on?

3  A.   Yes, Your Honor.

4  Q.   Were you involved in the recertification process

5  at all for patients who were already on hospice at

6  AseraCare?

7  A.   I didn't have to do the recertifications;

8  however, I knew when the patient --

9         MS. MARTIN:  Your Honor --

10        THE COURT:  Sustained.  Ms. Dietrich, if you

11 would just answer the specific question that's asked

12 of you.  Okay?  If she wants additional information,

13 she will ask it.

14        THE WITNESS:  Okay.

15 Q.   A yes or no, were you involved at all in the

16 recertification process at AseraCare for patients who

17 were already on hospice?

18 A.   Yes.

19 Q.   How were you involved in that process?

20 A.   I would say why that patient did not qualify, if

21 that was the case.

22 Q.   When would you convey that information that a

23 patient did not qualify?

24 A.   At the interdisciplinary group.

25 Q.   And what would be the basis for your information

1  that the patient did not qualify for hospice?

2  A.   Because I knew what would qualify him or her for

3  hospice.

4  Q.   But how did you know?  Had you visited the

5  patient yourself?

6  A.   Yes.

7  Q.   Who would be present at the IDG meetings at

8  AseraCare's Concord office?

9  A.   The medical director, the director of clinical

10  services, the executive director, case managers, home

11  health aides, spiritual care director, volunteer

12  coordinator, marketer.  I think that's it.

13  Q.   What would occur at the IDG meetings?  What

14  generally was the purpose of the IDG meetings at the

15  Concord office?

16  A.   To let everybody know what's going on with each

17  patient and where we're going with that patient.

18  Q.   How would each patient be discussed?  Who would

19  discuss each patient at the IDG meeting?

20  A.   The executive director would bring up the

21  patient's name.  And then the case manager would give

22  her report on how the patient had done in the last

23  week or two weeks.

24  Q.   Would anyone else, other than the case manager,

25  provide information about a particular patient during

1  the IDG meeting?

2  A.   Social workers could.   Home health aides could.

3  Anyone at the meeting that knew anything about the

4  patient.

5  Q.   When patients were up for recertification, would

6  -- how -- what would be involved in those discussions

7  during the IDG meetings?  What was the purpose of

8  discussing those patients?

9  A.   The purpose was to determine whether they

10 continued to qualify for the Medicare hospice benefit

11 or if they did not and needed to be discharged.

12 Q.   Who would make the recommendations regarding

13 whether the patient should be recertified or

14 discharged?

15 A.   Dr. Miller.

16 Q.   Dr. Miller would make a recommendation?

17 A.   I believe so.

18 Q.   Would --

19 A.   I can't really remember that.

20 Q.   Would Dr. Miller ask questions regarding

21 particular patients when he was determining whether

22 those patients should be recertified for hospice?

23 A.   Not that I recall.

24 Q.   Would the RN case managers make specific

25 recommendations to Dr. Miller regarding whether

1  patients should be recertified?

2  A.   Not that I recall.

3  Q.   Did you ever speak up during an IDG meeting with

4  regard to any patients?

5  A.   Yes.

6  Q.   Did you ever speak up during an IDG meeting to

7  say that you had an opinion on whether a patient

8  should be recertified or not?

9  A.   Yes.

10  Q.   When you would speak up at an IDG meeting

11  regarding whether a patient should be recertified or

12  not, what type of information would you provide?

13  A.   The reasons why the patient didn't qualify,

14  specific reasons why the patient didn't qualify.

15  Q.   Would you make a recommendation regarding

16  whether a patient should be recertified?

17  A.   Yes.

18  Q.   Would your recommendations be followed if you

19  recommended that a patient should be discharged?

20  A.   No.

21  Q.   Do you know why?

22  A.   No, I don't.

23  Q.   Did you have any concerns while you were working

24  at AseraCare's Concord agency that there were

25  patients who did not qualify for hospice that were on

1   AseraCare's census?

2   A.   Yes.

3   Q.   Did you speak to anyone about those concerns

4   that you had?

5   A.   Yes.

6   Q.   Who did you speak to?

7   A.   Carrie Arp.

8   Q.   Who is Carrie Arp?

9   A.   Carrie is from the corporate office.

10  Q.   Did Carrie Arp work in the Concord office?

11  A.   No.  She was -- she worked out of the corporate

12  office, which right now I don't know where that was.

13  I can't remember where that was.  She was one of the

14  executives.

15  Q.   When did you have an opportunity to voice your

16  concerns to Ms. Arp?

17  A.   At one point when she was at the Concord office,

18  we had --

19           MS. MARTIN:  Your Honor, we would just

20  object to this anecdotal testimony.

21           THE COURT:  You may continue.

22  Q.   (By Ms. Tapie)  My question was when you had the

23  opportunity to voice your concerns to Ms. Arp.

24  A.   When she was looking at files and I went to her

25  and told her that this patient did not qualify --

1        MS. MARTIN:  Your Honor, we would object to

2   this anecdotal testimony.

3        THE COURT:  Okay.  Let's not discuss any

4   particular patient, please, ma'am.

5   A.   Well, I didn't think I was.

6   Q.   If you could not -- if you could generally say

7   what you expressed to Ms. Arp without going into any

8   details about a particular patient.

9   A.   Okay.  I told her that a patient would not

10  qualify -- did not qualify.

11  Q.   And what was Ms. Arp's response?

12  A.   She agreed with me.

13  Q.   What happened next?

14  A.   She went to the conference room where the IDG --

15       MS. MARTIN:  This is anecdotal evidence that

16  we would object.

17       THE COURT:  I sustain as to that objection.

18       MS. TAPIE:  Yes, Your Honor.

19  Q.   What, if anything, happened as a result of you

20  addressing your concerns to Ms. Arp?

21       MS. MARTIN:  Objection, Your Honor, on the

22  anecdotal evidence.

23       THE COURT:  Did the patient remain in

24  service?

25       THE WITNESS:  Yes.

1   Q.   (By Ms. Tapie)   During your visits to assess

2   patients that you spoke about previously, either for

3   admission purposes or visiting patients who are

4   already on service, would you fill out a complete

5   document that became part of that patient's medical

6   records?

7   A.   Can you repeat the question, please?

8   Q.   Yes.   When you would conduct nursing visits,

9   would you fill out documents that became part of that

10  particular patient's medical records?

11  A.   Yes.

12  Q.   Did you receive any instructions while you were

13  at AseraCare's Concord agency regarding how to

14  document information in patient's files?

15  A.   Yes.

16  Q.   When did you receive those instructions?

17  A.   During orientation.

18  Q.   And how long after you started working at

19  AseraCare did you have that orientation?

20  A.   Maybe a couple of days after.

21  Q.   Who gave you that orientation?

22  A.   Another nurse.

23  Q.   Do you remember her name?

24  A.   FIDELIA.

25  Q.   I think you testified earlier she was the RN

1  case manager?

2  A.   Yes.

3  Q.   What did FIDELIA instruct you to do, again,

4  generally, regarding patient documentation?

5  A.   She instructed me to score higher on a

6  particular form so that when this patient was brought

7  up at interdisciplinary group meetings, it would look

8  like the patient had declined, when actually he or

9  she had not.

10  Q.   Can you explain to the jury what you mean by

11  scoring, scoring a patient or when you said provide a

12  particular score, what type of score are you

13  referring to?

14  A.   We had a form, it was called --

15          THE COURT:  Please speak in the microphone.

16  I'm sorry.

17  A.   We had a form called the PPS form, which all

18  hospices have.  And on the top of that, the form went

19  from 100 to zero.  100 would mean that there's

20  nothing going on with a patient.  It would mean like

21  you and I, we can eat, drink, dress ourselves, take

22  care of ourselves.

23          As you go down the line, the patient becomes

24  more and more dependent.

25          At 50, we had to score below 50 where the

1    patient maybe is bed bound or can't ambulate anymore

2    or is incontinent and keep on going down the line

3    where zero would be that the patient had died.

4            So we would have to score below 50.

5    Q.   What do you mean when you say you would have to

6    score below 50?

7    A.   Above 50 meant that the patient was probably

8    still ambulatory and really not sick enough to come

9    onto hospice.  So below 50, it just showed their

10   ADLs, which is activities of daily living, were more

11   and more -- they needed more and more assistance.

12   Q.   So that scale you were just referring to that

13   you just explained, you testified that Fidelia

14   instructed you to score a patient higher on the scale

15   than they actually were?

16   A.   Yes.

17   Q.   Did she explain to you the reason that you were

18   to score patients that way?

19   A.   Yes.

20   Q.   What was the explanation that she gave you?

21   A.   So we could show a decline.

22   Q.   And show a decline when?

23   A.   At the IDG or, generally speaking, the patient

24   would show a decline.

25   Q.   Did she explain or did you understand why

```
 1   showing a decline was important or significant --
 2   scratch that.
 3           Did she explain to you why she wanted the
 4   patients to show a decline?
 5   A.   Yes.
 6           MS. MARTIN:  Objection.
 7           THE COURT:  Overruled.
 8   A.   Yes.
 9   Q.   And what was that explanation?
10   A.   So that the patient would automatically show a
11   decline.
12   Q.   And why -- did she say explain why she wanted
13   the patient to automatically show a decline?
14   A.   No.
15   Q.   Did you follow that instruction?
16   A.   No.
17   Q.   Why not?
18   A.   Because it was not true.
19   Q.   Did you speak to anyone else at AseraCare about
20   what have Fidelia had instructed you to do?
21   A.   I don't remember.
22   Q.   Did you speak to any other nurses at AseraCare
23   --
24           MS. MARTIN:  Objection.
25           THE COURT:  Sustained.  She's answered the
```

```
 1   question.
 2   Q.   You only worked at AseraCare for 11 months, you
 3   testified.
 4   A.   Yes.
 5   Q.   Why did you leave AseraCare?
 6          MS. MARTIN:  Your Honor, we object.
 7          THE COURT:  Sustained.
 8          MS. TAPIE:  Sorry.
 9   Q.   How did your employment with AseraCare come to
10   an end?
11          MS. MARTIN:  Your Honor, we object.
12          THE COURT:  Sustained.
13          MS. MARTIN:  Your Honor, can we approach?
14          THE COURT:  All right.
15                    (SIDEBAR)
16          MS. MARTIN:  Your Honor, this is precisely
17   what you instructed them not to do, and they're
18   trying to elicit testimony from her about why she
19   left the company and bring in this issue of people
20   yelling at herand pressure and all that.
21          MR. LEMBKE:  And, Your Honor, the other
22   problem is you've told them they're not to ask these
23   questions.  And yet, they're asking them and asking
24   them and making us object to leave an impression with
25   the jury.
```

1          And so now we're having questions that
2   you've put off limits being asked.  We've got
3   witnesses blurting it out.  And it is not fair, it is
4   not appropriate, that this is happening over and
5   over.

6          MS. TAPIE:  I don't understand how it's not
7   important for the jury to know why this lady stopped
8   working at AseraCare.

9          THE COURT:  What the heck does it have to do
10  with whether any of the 123 patients were ineligible?

11         MS. TAPIE:  It's because the general
12  practices at AseraCare were to falsely document what
13  went into the patient medical records that the doctor
14  relied upon.

15         THE COURT:  You've already had this witness
16  go beyond where I've instructed you to let them go.
17  I'm not going to let her get into the case of
18  horribles as to why she left.

19         MR. LEMBKE:  And, Your Honor --

20         THE COURT:  I can only assume from what she
21  has said that it's going to be precisely one of those
22  things that I said we're not going to get into in
23  this courtroom during phase one.

24         MS. TAPIE:  Your Honor, I expect that the
25  witness will testify that she was concerned about

1   losing her job and that she --

2           THE COURT:  Exactly what I have said we're

3   not getting into.

4           MR. LEMBKE:  Your Honor --

5           MS. MARTIN:  I'm sorry, go ahead.

6           MR. LEMBKE:  Your Honor, you asked Ms. Tapie

7   on the record on Monday, do you understand that you

8   are not to get into that and she answered yes, as I

9   recall.

10          And now she said knowing what the answer is

11  going to be, she intentionally asked the question,

12  knowing it was out of bound.

13          Now, Your Honor, this is so prejudicial to

14  us, we move that this witness' entire testimony be

15  stricken because of this.

16          THE COURT:  I'm not going to do that, but if

17  we keep going in these areas where -- you know what

18  your witnesses are going to testify about.  I don't,

19  but I have instructed you repeatedly that we are not

20  getting into the parade of horribles.

21          MS. TAPIE:  Yes, Your Honor.

22          THE COURT:  And that would include why she

23  quit.

24          MS. TAPIE:  Okay.  I understand that, Your

25  Honor.

```
 1              THE COURT:  Okay.  And also when I tell you
 2   to move on and go to something different, I don't
 3   expect you to go to that lectern and ask the precise
 4   question that I told you to leave.
 5              MS. TAPIE:  Yes, Your Honor.
 6              THE COURT:  Do we understand that?
 7              MS. TAPIE:  Yes.
 8              THE COURT:  So we're going on to something
 9   else?
10              MS. TAPIE:  I think I am almost done with
11   this witness, yes.
12              THE COURT:  But we're not going into why she
13   left.
14              MS. TAPIE:  That's correct, I'm actually not
15   going to ask her about that.
16              THE COURT:  Okay.  Good.
17              (Open court.  Jury present.)
18   Q.  (By Ms. Tapie)  Ms. Dietrich, do you have a
19   financial interest in the outcome of this cause?
20   A.  No.
21              MS. TAPIE:  I have nothing further at this
22   time, Your Honor.
23              THE COURT:  Cross-examination.
24              MS. MARTIN:  Yes, Your Honor.
25              THE COURT:  You may proceed.
```

```
 1                        CROSS-EXAMINATION
 2   BY MS. MARTIN:
 3   Q.   Hi, Ms. Dietrich.
 4   A.   Hi.
 5   Q.   I'm Kim Martin.  I represent AseraCare, and I
 6   just have a few questions for you.
 7             As you've told us, you work in the Concord
 8   agency; correct?
 9   A.   Uh-huh, yes.
10   Q.   So your time from there was December of 2009 to
11   November of 2010; correct?
12   A.   Correct.
13   Q.   And you said something about what you're doing
14   now is a hospice volunteer sitting with people who
15   are actively dying?
16   A.   Yes.
17   Q.   Can you explain that term for us?
18   A.   Actively dying?
19   Q.   Yes.
20   A.   It's patients who are reaching the last stage of
21   the dying process.  They may have a couple of days
22   left or maybe a couple of weeks left.  They're just
23   at the end stages.
24   Q.   And a patient, you would agree with me, can be
25   appropriate for hospice service well before their
```

1    actively dying phase?

2    A.   Yes.

3    Q.   And you understand that the criteria for a

4    patient being appropriate for hospice is whether they

5    have a terminal illness with a prognosis of six

6    months or less if the illness runs its normal course;

7    correct?

8    A.   Correct.

9    Q.   And you've talked a lot today about the criteria

10   for assessing whether a patient is eligible or

11   appropriate?

12   A.   Uh-huh.

13   Q.   When you're talking about criteria, you're

14   talking about those check boxes on the form, correct,

15   that you would have from AseraCare?

16   A.   Yes.

17   Q.   Let me just clarify that.  During the time frame

18   that you worked with AseraCare and you were assessing

19   patients for their appropriateness for hospice

20   service, you were going off of the guidelines that

21   are on those checklist forms; correct?

22   A.   Correct.

23   Q.   And in your view, when making an assessment of a

24   patient, if the patient did not meet every one of the

25   boxes on the checklist, then in your view they would

1   not be appropriate for hospice care; correct?

2   A.   No.

3   Q.   Okay.

4   A.   They did not have to check every box.  The

5   instructions would be they must have two of the

6   following, and there may be three or four.

7   Q.   Okay.  And thank you for that.  So you would go

8   by what was specified on the form; correct?  And if

9   they did not meet the guidelines that were on that

10  form then, in your view, they were not appropriate

11  for hospice service; correct?

12  A.   Correct.

13  Q.   And so you really applied that form as the

14  mandatory criteria for whether or not the patient

15  would be appropriate for hospice; correct?

16  A.   Correct.

17  Q.   And those forms that you would use, they would

18  -- there's not a form for every illness that a person

19  could have; correct?

20  A.   No.  This form had all the illnesses, the

21  different cancers, the kidney diseases, the dementia,

22  anything that --

23  Q.   You would have separate forms though for

24  individual diagnoses?

25  A.   No.

1  Q.   No, you had one form?

2  A.   Uh-huh.

3  Q.   You would agree with me that there are many

4  different illnesses that a person could have that

5  would make them be -- to have a terminal illness;

6  correct?

7  A.   Yes.

8  Q.   But in assessing whether a patient has a

9  terminal illness, you have to look at the whole

10 picture of the patient; correct?

11 A.   What was the first words you used there?

12 Q.   In assessing whether a patient has a terminal

13 illness, you have to look at the whole picture of the

14 patient; correct?

15 A.   Right.

16 Q.   And you understand that under the Medicare rules

17 and regulations that the decision about whether a

18 patient is terminal or not is the physician's

19 decision; correct?

20 A.   Correct.

21 Q.   And whether -- and you understand that the

22 physician is looking at whether the patient has a

23 prognosis of six months or less if the illness runs

24 its normal course; correct?

25 A.   Correct.

1  Q.   And so you know that a nurse's determination of
2  appropriateness for hospice care is not the deciding
3  factor; correct?
4  A.   It is part of the deciding factor.
5  Q.   Your assessment is something that can be
6  considered by the physician in making his
7  determination; correct?
8  A.   Correct.
9  Q.   And, in addition, the information from other
10 individuals, other disciplines, that see the patient,
11 that also goes into the physician's decision as well;
12 correct?
13 A.   Correct.  May I change that?  May I change my
14 answer?
15 Q.   Sure.
16 A.   It's not other disciplines.  Like it wouldn't
17 matter if the social workers or the spiritual care
18 coordinator or the home health aid had input, because
19 they didn't do -- that's not their discipline.  It's
20 if the nurse who admitted had the input.
21 Q.   And thank you.  That's helpful.  And so with
22 your time there at the AseraCare agency in Concord,
23 you've told us you were the weekend, nurse and so you
24 did not have a patient case load that you were
25 responsible for; is that correct?

1   A.   Correct.

2   Q.   So there would be an RN case manager that would

3   have responsibility for patients on a regular basis;

4   correct?

5   A.   Correct.

6   Q.   And you would see people on the weekend as it

7   was needed for them to be seen?

8   A.   Yes.

9   Q.   Just one more question about the forms I had

10   asked you about.  Did those correspond to what's

11   called local coverage determinations?

12   A.   Yes.  That's what it was.

13   Q.   Okay.  So those forms were the local coverage

14   determination forms?

15   A.   Yes.

16   Q.   So the information, the guidelines, on those

17   forms came from the local coverage decisions?

18   A.   Correct.

19   Q.   And those were issued by Palmetto, the Medicare

20   administrator; correct?

21   A.   I believe so.

22   Q.   And you're aware that Palmetto says those LCDs

23   are just guidelines, they're not mandatory?

24   A.   I don't know much about Palmetto.

25   Q.   You talked about doing admissions as the weekend

1   nurse and you are aware that under the Medicare rules

2   and regulations that it is appropriate for a nurse to

3   admit the patient to hospice; correct?

4   A.   Yes.

5   Q.   And that the requirement is that if you cannot

6   get the certification from the physician at the time

7   of admission that you just have to get a verbal order

8   from the physician within two days; is that correct?

9   A.   It sounds correct, but I don't clearly remember.

10  Q.   You've told us about reporting to the various

11  people that patients did not meet the LCD

12  requirements -- I'm sorry, that they did not meet

13  criteria for continue -- either for admission --

14  strike that.  Let me start over.  That was a bad

15  question.

16          You've told us about -- that you would

17  report that patients maybe -- on admission were not

18  meeting -- you said not meeting criteria.  And that

19  would be the criteria that are on those local

20  coverage determination forms; correct?

21  A.   Right.

22  Q.   And you said that you would report on occasion

23  in IDT that a patient that was being recertified were

24  not meeting criteria and would that, again, be those

25  criteria on the local coverage determination forms?

```
 1    A.   Yes and my assessment.
 2          THE COURT:  But was your assessment based on
 3    the LCDs?
 4          THE WITNESS:  Not totally.  Whatever I would
 5    see and then I would --
 6          THE COURT:  That was the answer to my
 7    question.
 8    Q.   (By Ms. Martin)  What you would see would go
 9    into marking off the checklist on the LCD form;
10    correct?
11    A.   Yes.
12    Q.   And you told us about the people who would be in
13    the IDT meeting and all of those -- you talked about
14    the RN case manager, the home health aide, the
15    spiritual care and the volunteer coordinator, would
16    those individuals report on patients during the IDT
17    meeting?
18    A.   Yes.
19    Q.   And you mentioned the instruction from this
20    nurse Fidelia, you did not follow that instruction;
21    correct?
22    A.   Correct.
23    Q.   And to the extent that you documented
24    information about a patient, it was always true and
25    accurate; correct?
```

1  A.   Correct.

2  Q.   And to the extent that a physician was relying

3  on information that you provided, they were relying

4  on correct and accurate information; correct?

5  A.   Correct.

6  Q.   And when you talk about the 50 percent on the

7  PPS scale, was that again something that came from

8  that number, that 50 percent, that came from these

9  LCD checklist forms; correct?

10 A.   I believe that was the PPS form.

11 Q.   I'm not being clear.  But the reason you were

12 looking at the PPS number was because it was on one

13 of the checklist forms; correct?

14 A.   I don't believe so.

15 Q.   Ms. Dietrich, you're not saying that every

16 single patient on service in the Concord agency when

17 you were there was not appropriate for hospice care,

18 are you?

19 A.   No.

20 Q.   And you're not saying that -- strike that.

21      You would agree with me that there were many

22 patients on service who were appropriate for hospice

23 care; correct?

24 A.   Yes.

25 Q.   And you would agree that in making an assessment

1  about whether a patient is appropriate or not for

2  hospice care that you have to look at each patient

3  individually; correct?

4  A.  Right.

5          MS. MARTIN:  Just one second.  Give me one

6  second, if I might confer.

7                      (Brief pause).

8          MS. MARTIN:  Thank you, Ms. Dietrich, that's

9  all I have.

10          THE COURT:  Any redirect?

11          MS. TAPIE:  No, Your Honor.

12          THE COURT:  All right.  Thank you.

13  Ms. Dietrich, you may step down.  We appreciate you

14  being here today.  We can either take an early lunch

15  or see if we can get a quick witness in.  Do you have

16  any idea how long your next witness might be?

17          MR. WERTKIN:  I think it would take some

18  time.

19          THE COURT:  Do y'all want to take an early

20  lunch then?

21          Are there so many snacks in there already,

22  you're not hungry?

23          Why don't we go on and break and we will

24  come back at 1:00.

25          During this recess, as during all others, do

1  not talk to anyone about the case, do not let anyone

2  talk about it in your presence, and don't go down to

3  some internet bar and go surfing on the web about

4  stuff.

5         We will see you back in the jury room at

6  1:00.

7                    (Jury excused).

8         THE COURT:  Is there anything we need to

9  take up during this break?

10        MS. TAPIE:  Your Honor, we want to make an

11  offer of proof on Ms. Dietrich.

12        THE COURT:  Okay.

13                    (SIDEBAR)

14        MS. TAPIE:  Your Honor, based on the Court's

15  ruling, we would just like to make this offer of

16  proof with regard to Ms. Dietrich's testimony.

17        We believe that she would have testified

18  that when she brought concerns about patients being

19  ineligible for hospice to the executive director,

20  Ralph Ramirez, or the director of clinical services,

21  Mary Ifel, that her concerns would be disregarded and

22  that Mr. Ramirez would, without providing any reason

23  for why he may have disagreed with her conclusion

24  that the patient was not eligible for hospice,

25  Mr. Ramirez would just send out a different nurse to

1  admit the patient for hospice.

2        We also believe that Ms. Dietrich would have

3  testified that at IDG meetings when she brought up

4  concerns about patients being ineligible for hospice,

5  that Mr. Ramirez would indicate to her that she

6  should stop speaking and that her concerns would be

7  disregarded by the team, and that at no point during

8  Ms. Dietrich's employment with AseraCare did

9  AseraCare tell her that she was misapplying the

10  guidelines or that she needed any further education

11  or information about the decision that she was making

12  with regard to a patient's eligibility.

13        We also believe that Ms. Dietrich would have

14  testified that she was written up by AseraCare for

15  fabricated reasons on two different occasions, she

16  believes, in retaliation for her refusal to admit and

17  recertify patients that were ineligible, and that it

18  was those writeups, as well as her concern about

19  losing her nursing license, that led to her decision

20  to resign from AseraCare.

21        And that concludes our offer of proof, Your

22  Honor.

23        THE COURT:  Cast of horribles that I said we

24  were not getting into in this case, in this part of

25  the case.

1          MR. LEMBKE:  Your Honor, I don't know when

2    Dr. Micca is going to be coming up, but Dr. Micca is

3    one of the witnesses in response to a motion in

4    limine that Your Honor indicated that there were some

5    issues to take up on voir dire before he would be

6    allowed to testify.  And I just wanted to remind Your

7    Honor of that ruling.  And we've been told that he

8    may be the last witness today.

9          MR. WERTKIN:  Yes.

10          THE COURT:  Is he here now?

11          MR. WERTKIN:  He is not here, Your Honor.

12   We have two witnesses that we want to put on before

13   him.

14          We do not think that he will be today, as I

15   indicated.  I think I said he'd be available at the

16   end if we needed him.  So we anticipated, Your Honor,

17   we would do a voir dire consistent with Your Honor's

18   order.

19          THE COURT:  Okay.  Would he be here for that

20   during our afternoon recess?

21          MR. WERTKIN:  I can have him.

22          THE COURT:  Are you planning on putting him

23   on today?

24          MR. WERTKIN:  I am not planning on putting

25   him on today, Your Honor.  But just because you never

1  know how long this will take, I disclosed him to the

2  defendants as kind of our safety valve witness.

3          THE COURT:  If he goes on, we will take it

4  up.

5          MR. WERTKIN:  And, Your Honor, we are very

6  mindful of the Court's ruling.

7          I think we have two exhibits that we are

8  going to use with one of the witnesses that will go

9  on right after lunch.  We can do it when we get back

10  or do it now.

11          THE COURT:  We will do it now.  That's what

12  we're here for, in addition to the offer of proof.

13          MR. WERTKIN:  Your Honor, this is -- I'm

14  sorry.  This is a presentation that --

15          THE COURT:  Does it have an exhibit number?

16          MR. WERTKIN:  Yes, Your Honor.  It's marked

17  for identification purposes as Government's Exhibit

18  Number 97.  And it is our understanding that

19  Ms. Perryman will testify that this is a training

20  document about instructing people generally how to do

21  things in the Boston office at the time.

22          We expect her to testify that she received

23  it, understood it to be a this is how you're supposed

24  to do things generally, but she did give it to her

25  staff or pass it along to her staff, as she said she

1  was instructed to do, and we will just have her talk

2  about it generally.

3          THE COURT:  The Boston office during the

4  time?

5          MR. WERTKIN:  Yes, Your Honor, during the

6  time of an ineligible patient.

7          MS. MARTIN:  Judge, this is not any

8  information that would have been given to the

9  physician, and this is not -- the testimony around

10 this document is that it actually was not a policy

11 and procedure from AseraCare, and that once someone

12 found out about this -- or not found about it, but

13 once it was made as a presentation, that they were

14 told don't follow this presentation.  And that's

15 testimony from Ms. Kiehl --

16         MR. WERTKIN:  I'm not familiar with that

17 testimony.

18         MR. OLSON:  There is testimony --

19         MS. MARTIN:  There's testimony from

20 Ms. Kiehl that once this -- once Ms. Rogers, who

21 authored this document, made it known that this was

22 her thoughts on admission, that the company said this

23 is not what we do.

24         But our main objection here is that this is

25 not something that was shown to physicians and it's

1    not a routine -- they've been getting in all this

2    because there's a routine -- not a routine practice,

3    but it's a practice within the agency at the time and

4    there's not really any evidence that this was a

5    practice that AseraCare engaged in.

6              THE COURT:  Okay.  Is this something that

7    AseraCare, in essence, had her withdraw?

8              MS. MARTIN:  Yes.

9              THE COURT:  And not do that anymore?  Do we

10   have that specific testimony?

11             MS. MARTIN:  It's testimony from Jen Kiehl

12   who was the CSRN who was at the meeting where

13   Ms. Rogers discussed this and said that clinical

14   services was on it and told them that's not how we do

15   things at AseraCare.  And that that -- I mean, we can

16   get you that testimony.

17             MR. WERTKIN:  Your Honor, Ms. Perryman, that

18   is not part of her testimony.  As far as Ms. Perryman

19   is concerned and what was going on at the Boston

20   agency at that time, this was given to her.  She was

21   -- she used it -- we expect her to testify that this

22   was given to her.  She understood that it was -- it's

23   from her boss, the director of operations, she gave

24   it to her staff.

25             To the extent there's other testimony out

1    there that it was withdrawn, that can be -- I'm not

2    -- that can be on cross or you can examine Ms. Kiehl

3    about it.

4           MS. MARTIN:  To the extent -- this is

5    hearsay, to the extent that it's not -- I mean, this

6    is not our -- it's not our business record and we

7    didn't tell her to create it.  She created it.  And

8    once it was created, the company said don't do this

9    and so -- don't use this.

10          To the extent that they are offering it,

11   this is not something that -- it is not something

12   that falls under the exception of hearsay.

13          MR. OLSON:  I would like to make a

14   clarification.  MS. KILL did testify as the

15   presentation, but there is no specific testimony to

16   that particular document.  There's no indication that

17   is -- Ms. Kiehl talked about a specific phone call.

18   That is an email instruction to the ED.  We don't

19   have --

20          MS. MARTIN:  It said, let me know if this is

21   consistent with --

22          THE COURT:  AseraCare -- let me know if the

23   AseraCare culture does not support these thoughts and

24   I will change it.

25          And what you're telling me, Ms. Martin, is

1    somebody told her it did not support --

2         MS. MARTIN:  And the testimony from Jen

3    Kiehl is that Gay Rogers gave a presentation on

4    managing the gray zone and that when it occurred,

5    that there was an immediate response to that and --

6    statement and this is not what we do at AseraCare.

7         MR. WERTKIN:  Your Honor, we respectfully

8    say that Ms. Martin is drawing the inference that she

9    would want to be drawn from Ms. Kiehl's testimony.

10        THE COURT:  You just told me you weren't

11   aware of Ms. Kiehl's testimony.

12        MR. WERTKIN:  I'm just listening to it right

13   now.

14        THE COURT:  You're giving me like double

15   hearsay from what he says her testimony is.  I want

16   to see the testimony myself.

17        MR. WERTKIN:  Okay.

18        MS. MARTIN:  We can get that.

19        THE COURT:  Then I will not draw inferences

20   that are not appropriate.  I will read that.  So let

21   me see that.  And nothing with this document until I

22   see that.

23        MR. WERTKIN:  Yes, Your Honor.

24        THE COURT:  Okay.

25        MR. WERTKIN:  There's one more exhibit, Your

1    Honor, if you want to take it up now or after lunch.

2         THE COURT:  Okay.

3         MR. WERTKIN:  This is what's been marked for

4    identification purposes as Government's Exhibit 89.

5    Here's a copy for you.

6         And what this is is Sharon Perryman was the

7    executive director of the Boston agency.  This is the

8    same one I was just talking about.  She took it upon

9    herself, when she was there, to regularly review

10   medical charts and she found that there were some

11   consistent patterns in what was being missing.

12        This is one particular time that she did it,

13   but if we can establish that this was a regular

14   practice and that she found something, there's no

15   patient's names listed on this chart.  It's just

16   generally like where -- how the medical record was

17   incomplete or, in some cases, I think -- did she say

18   inaccurate or is it just incomplete?

19        MS. MARTIN:  I don't think there is anything

20   --

21        MR. WERTKIN:  Just incomplete.  Her concern

22   in Boston, Your Honor, was that when she arrived, she

23   was finding that medical records were routinely

24   incomplete.  And she was trying to turn that around

25   and was doing these reviews and this is one of those

1    examples, Your Honor.

2          MS. MARTIN:  Your Honor, this is --

3          THE COURT:  Sorry.

4          MR. WERTKIN:  If I can call Your Honor's

5    attention --

6          THE COURT:  If you will just give me a

7    minute, I will read it.  Okay.

8               (Brief pause)

9          THE COURT:  Okay.  I've read it now.

10         MR. WERTKIN:  Thank you, Your Honor.  If I

11   can point your attention to the third page, 304.

12   There's a section that starts documentation,

13   documentation supports appropriateness of continuing

14   hospice and POCs, plan of care is missing in three

15   records.

16         So we're not -- these three records are not

17   identified, so we're not trying to say that this

18   particular patient or this specific sample.  But we

19   expect for her to testify that she did review these

20   charts, she routinely found or this was the general

21   practice on the incompleteness and this would be to

22   bolster that testimony, to provide, you know,

23   corroborate her testimony on that point.

24         MR. LEMBKE:  Your Honor, number one, this is

25   the very kind of anecdotal -- in terms of anecdotal

1    was identified and unidentified people.

2          So here she's talking about, well, I

3    reviewed a few charts and found that, you know, three

4    records out of, it looks like probably about seven,

5    something like that, three records out of seven are

6    not compliant.

7          And this is -- in addition, Your Honor, this

8    is some non-scientific sample that she's done.  It's

9    not the 123 that she reviewed.  This is just some

10   group of records that she's withdrawn or reviewed and

11   now is drawing these conclusions from them.

12         It's one thing to say, well, I would do

13   regular medical records reviews, but to give a report

14   and say, well, they were 57 percent compliant,

15   especially when there's no way for us to go behind it

16   and look and see what she's talking about.

17         MS. MARTIN:  And it's talking about the plan

18   of care being missing, not the -- a document being

19   missing, but not necessarily anything that's required

20   for eligibility under the Medicare hospice benefit

21   and doesn't go to the eligibility of -- I mean, this

22   is a document that does not go to the eligibility of

23   any particular patient in the 123.  And the jury is

24   being asked to infer from these acts that the same

25   type of issues were appearing with patients in the

1    123 from Boston.

2          THE COURT:  Do any of these findings go to

3    falsity of the records themselves?

4          MR. WERTKIN:  Well, it goes to the

5    completeness of the records, Your Honor.  So in your

6    preliminary instructions you say, you may consider

7    whether the doctor has -- I don't have it memorized

8    but I think it said something like accurate and

9    complete information.  So what this is showing --

10          THE COURT:  Whether any information was

11    withheld from the doctors.

12          MR. WERTKIN:  The plan of care that

13    Ms. Martin refers to.

14          Now, the plan of care is an important part

15    of the hospice record.  And I don't think AseraCare

16    is saying that the doctors should not consider the

17    plan of care that has been in existence for the

18    patient when deciding whether to recertify.

19          So I think with regard to the, you know --

20    this goes to the completeness of the record, whether

21    or not -- and remember, Your Honor, the medical

22    record is what's given to the doctor.  So if the plan

23    of care or other documentation is not in that -- in

24    the medical record, then the doctor is not receiving

25    complete information.

1      THE COURT:  But the plan of care is how

2  often we're going to go out and see this patient, who

3  is going to go see the patient, whether the patient

4  is asking for spiritual care and whether that's going

5  to be part of it.

6      It doesn't have to do with the assessment of

7  whether that patient is eligible for hospice.

8      MR. OLSON:  Your Honor, there's a few

9  categories here that are relevant to that process and

10  reliability of the COTIs.

11      Page 4 of the document -- I'm sorry, Page 3.

12  Page 3, the header documentation, the first line

13  under that reads, documentation supports the --

14      THE COURT:  That's exactly what they're

15  talking about.

16      MR. OLSON:  The first phrase of it is the

17  POC part, yes, it's plan of care.  The first phrase,

18  support the appropriateness of hospice, Ms. Perryman

19  will testify that that refers to whether

20  documentation in the medical records supports the

21  prognosis of six months or less.  That is a two part

22  category.

23      MR. LEMBKE:  Here we go with another --

24  she's not a doctor.  So, we've got Dr. Liao and

25  Dr. Cooney and Dr. Melvin coming to testify in this

1  case about whether, because they can say whether the

2  documents support a medical prognosis.

3          I don't believe this nurse is qualified to

4  give that opinion.

5          In addition, Your Honor, this is the

6  ultimate propensity evidence, because in the three

7  out of seven cases I reviewed, unnamed, there was in

8  my opinion as a nurse, there wasn't appropriate

9  medical records, you should then infer that it's true

10  for some of these 123.

11          THE COURT:  Well, the way it reads, is that

12  documentation supports appropriateness of continuing

13  hospice and three of the records have a POC missing.

14          MR. WERTKIN:  That's something that if -- I

15  mean, Sharon Perryman on the stand will explain what

16  that means, Your Honor, and they will have an

17  opportunity to cross.

18          Can I just -- if I may address two points on

19  what Mr. Lembke made?

20          The first is that I think there's a little

21  confliction of what's going on.  Your Honor ruled

22  that or -- under Medicare law that nurses can't

23  decide, can't reach -- sign a certificate of terminal

24  illness but nurses and non-doctors can look to see if

25  documentation supports the appropriateness of

1    continuing hospice.

2            Their own experts relied on non-doctors to

3    do that same thing.

4            THE COURT:  Yeah, nurses do that evaluation,

5    I don't think there's any question about that.  But

6    who is -- who is this woman, Ms. Perryman, what is

7    her job, what was her --

8            MR. WERTKIN:  She was the head of the office

9    and she has 25 years of clinical experience.  She's a

10   very accomplished clinician, Your Honor.

11           THE COURT:  But we don't know which files

12   she reviewed.  We don't know -- I guess if we did

13   some kind of mathematical calculation that Mr. Lembke

14   apparently can do and I can't to figure out how many

15   records would have had to have been reviewed for

16   three of them to have missing dietary consults to be

17   57 percent compliant.

18           I mean, there's a whole lot on here that

19   from what I know about the requirements of hospice

20   and I've been trying to read up on it and get

21   familiar with the regulations, but I haven't seen

22   anywhere in there that requires there be dietary

23   consults or else the eligibility is wrong, they're

24   not eligible.

25           MR. WERTKIN:  I don't think that we are

1  focused on that.

2       THE COURT:  Well, the thing is, you're

3  wanting to introduce this entire document --

4       MR. WERTKIN:  Yes, Your Honor.

5       THE COURT:  -- and there's a whole lot of

6  crap on there about things being missing from records

7  that have nothing to do with whether the records

8  actually support a diagnosis or prognosis of six

9  months to live.

10      MR. WERTKIN:  Well, Your Honor, the defense

11 has been arguing consistently all throughout the day

12 and for a long time that you have to look at the

13 whole picture.  You don't have to look at just what

14 Medicare requires.  We've heard that in

15 cross-examination three times.

16      THE COURT:  For determining whether the

17 patient is eligible.

18      MR. WERTKIN:  That's right, the whole

19 picture.  So if something in the dietary restrictions

20 says that she's eating better or not eating better,

21 that would be part of the whole picture that the

22 defense said the doctors were looking at.

23      THE COURT:  But if it's missing from the

24 medical record, it doesn't mean that the person is

25 not eligible.

1           MR. WERTKIN:  That's true, Your Honor,

2     that's true.  And I hope Your Honor has seen from our

3     opening statement and from how we've been using this

4     that we are not using this as propensity evidence.

5     That is not what we're doing.

6           We are showing that they had a general

7     practice of having incomplete medical records and

8     what that rebuts is the defense argument that these

9     medical doctors were exercising their clinical

10    judgment based on a complete medical record.

11          MR. LEMBKE:  That's a preposterous statement

12    when the witnesses have repeatedly testified you have

13    to look at each one and many of the people were

14    eligible.  So a general practice of incomplete

15    records, there is no way that anyone could get that

16    --

17          THE COURT:  Wait a minute.  I found a big

18    one right here.  Spiritual assessments were missing

19    in three records; therefore, those three records

20    would obviously not comport with Medicare and,

21    therefore, would show that the patient was not

22    eligible.

23          MR. WERTKIN:  Your Honor, we're not -- our

24    intention is to use this document to talk about

25    documentation and to the extent that -- you will have

1    to weigh, Your Honor, whether you think that the

2    undue prejudice of those other things, but I would

3    submit that the defendants can cross-examine

4    Ms. Perryman about those things and ask her and the

5    jury can be the one that weighs and decides whether

6    or not that is important or not.

7          We are not certainly going to be drawing

8    their attention to it.

9          THE COURT:  But you have had a four page

10   document that lists all kinds of those things that

11   don't go to whether a patient is eligible.  Yet, you

12   want to parade this in front of the jury to get the

13   jury to think that AseraCare had a practice of not

14   including important information in their medical

15   records when it may be that volunteer frequencies

16   were missing or were not applicable in six patient

17   records.  I mean, no.

18         MR. WERTKIN:  Okay.  Thank you, Your Honor.

19         THE COURT:  I think the undue prejudice of

20   this document certainly outweighs its probative value

21   to go to the question of whether any of the 123

22   patients in your study were ineligible.

23         MR. WERTKIN:  Okay.  Thank you, Your Honor.

24         THE COURT:  And whether the claims were

25   false.

```
 1                    (Lunch break.)
 2                (Open court.  Jury present.)
 3          MR. WERTKIN:  Your Honor, the United States
 4    calls Sharon Perryman.
 5       SHARON PERRYMAN, GOVERNMENT'S WITNESS, SWORN.
 6          THE CLERK:  Please say and spell your first
 7    and last name for the record.
 8          THE WITNESS:  Sharon, S-H-A-R-O-N, Perryman,
 9    P-E-R-R-Y-M-A-N.
10                    DIRECT EXAMINATION
11    BY MR. WERTKIN:
12    Q.   Good morning, Ms. Perryman.  Where do you
13    currently live?
14    A.   I live Westborough, Massachusetts.
15    Q.   Is that near Boston?
16    A.   Yes.
17    Q.   And what's your profession?
18    A.   I am licensed as a registered nurse.
19    Q.   And how long have you been a registered nurse
20    for?
21    A.   Since 1988, so 27 years.
22    Q.   Do you know why you've been called as a witness
23    in this case?
24    A.   I was called to give testimony about my
25    experience in Boston at the AseraCare office.
```

1  Q.   Have you ever given testimony in a courtroom

2  before?

3  A.   No.

4  Q.   Are you a bit nervous?

5  A.   A little bit.

6  Q.   What did you do to prepare for today?

7  A.   Really just try to remember what I had done,

8  what was reviewed, what I had talked about, the

9  different things that I recall doing when I was at

10  AseraCare.

11  Q.   Thank you.  Before we talk about your time at

12  AseraCare, I would like to ask you a few questions

13  about your background.

14        Where did you go to high school?

15  A.   High Park High School in High Mark, Maine.

16  Q.   After high school, what did you do?

17  A.   I went on to Boston University and I graduated

18  with a bachelor of science degree in nursing.

19  Q.   Did you get a job at that point or did you

20  continue your schooling?

21  A.   No, I got a job.  My first job was TouchStone

22  Medical Center, I worked as a staff nurse on a -- at

23  that time, it was a GYN oncology unit, so I worked

24  there for a couple of years and went to vascular

25  surgery.

1   Q.   What was your degree at Boston University in?

2   A.   A bachelor of science in nursing.

3   Q.   Did that make you a nurse at that point?

4   A.   No, I had to pass the licensure exam.  So I

5   graduated with a degree, but then I had to take the

6   Massachusetts license exam.

7   Q.   Did you pass that exam?

8   A.   Yes, I did.

9   Q.   As a result of passing the exam, what did you

10  become as recognized by the state?

11  A.   As a registered nurse in Massachusetts.

12  Q.   After your first job -- did you say it was --

13  A.   Touchstone Medical Center.

14  Q.   What was your next job after that?

15  A.   After that, I went into my first hospice job.

16  So in '92, I believe, I started working at that time

17  it was called Trinity Hospice.

18  Q.   And for how long did you remain at Trinity

19  Hospice?

20  A.   1988 -- 1992, I believe I left in 1994.

21  Q.   And where did you go in 1994?

22  A.   I went to Brigham Women's Hospital.

23  Q.   What is Brigham Women's Hospital?

24  A.   It's one of the largest tertiary care centers in

25  Massachusetts.  It's world renowned.  I worked there

1   as a staff nurse on the oncology unit.

2   Q.   What does tertiary care mean?

3   A.   They provide preventative services, as well as

4   interventional services to patients that are coming

5   in for oppressive or supportive treatment.

6   Q.   What unit did you work in?

7   A.   I was on the GYN -- I'm sorry. Medical oncology

8   unit.

9   Q.   What does that unit do?

10  A.   It's basically -- the medical oncology, I worked

11  in soft tissue tumors, I did med surge management.  I

12  gave chemotherapy on the unit.  I did training and

13  teaching while maintaining and taking care of

14  patients on the unit.

15  Q.   For how long did you work at Brigham Women's

16  Hospital?

17  A.   My career there was almost ten years at Brigham.

18  Q.   Did you have different positions at Brigham?

19  A.   Yes, I did.

20  Q.   What were they?

21  A.   I started out as a staff nurse -- sorry, a

22  charge nurse.  And then I became the assistant nurse

23  manager for diversity, and I became, at that point,

24  the nurse -- I stayed in that role and became the

25  assistant nurse manager on the orthopedic unit, and

1   then I went, from that point, I became the nurse

2   manager for the float pool; and then I became the

3   nursing supervisor; and then at that time I was still

4   the intermediary float pool nurse manager.

5   Q.   Did you work your way up the chain at Brigham

6   Woman's Hospital?

7   A.   Yes.

8   Q.   Where did you work after ten years at Brigham

9   Women's Hospital?

10  A.   I went across the street to Dana-Farber and was

11  hired there as the nurse executive diversity there.

12  Q.   What is Dana-Farber?

13  A.   Dana-Farber Cancer Institute.

14  Q.   What do they do there?

15  A.   They provided outpatient chemotherapy,

16  management of clinical patients doing clinical

17  trials.

18  Q.   And how long did you work at Dana-Farber?

19  A.   Three years.

20  Q.   And what was your next position?

21  A.   At that point, I essentially took a little bit

22  of time off and started pursuing my doctorate at that

23  time.  So I was doing some consulting work.

24  Q.   Did you get any other schooling after you got

25  your nursing degree from Boston University?

1   A.   Yes.  I got my Master's degree in health

2   administration from Suffolk University.

3   Q.   Where is Suffolk University?

4   A.   In Boston.

5   Q.   And then at the time you took your time off,

6   what degree were you pursuing?

7   A.   My doctorate in nursing.

8   Q.   And did you complete that degree?

9   A.   No, I did not.

10   Q.   No?

11   A.   No.

12   Q.   Are you still working on it?

13   A.   I hope to work on it.

14   Q.   After Dana-Farber, you said you took some time

15   off.  What was your next job?

16   A.   Well, I was -- as I was working on my doctorate,

17   I was doing some consulting work.  So I was hired by

18   Pfizer to do national speaking about medical -- I'm

19   sorry -- minority recruitment into clinical trials,

20   and I was also doing consulting education and

21   diversity education and training, so I was lecturing

22   across the country.

23   Q.   After you finished your consulting work, what

24   position did you hold?

25   A.   Then I became -- initially I was hired as a

1  patient care manager, I believe it was, that I was

2  initially hired for at Affinity Hospice and

3  circumstances changed within a month of my employment

4  and I was promoted to general manager.

5  Q.   How long did you work at Affinity Hospice?

6  A.   Just shy of a year.

7  Q.   What was your next position?

8  A.   Then I was recruited to AseraCare Hospice.

9  Q.   When was that?

10  A.   I was recruited in February.  I started in March

11  of 2008.

12  Q.   What was your role at AseraCare Hospice?

13  A.   I was executive director.

14  Q.   And which location were you the executive

15  director of?

16  A.   Boston.

17  Q.   What were your responsibilities as executive

18  director of Boston agency from March 2008 to November

19  of 2009?

20  A.   As executive director, I was responsible for the

21  financial and clinical oversight of that agency,

22  including and up to all regulatory and compliance

23  responsibilities.

24  Q.   And what clinical responsibilities did you have

25  as the executive director?

1    A.    In addition to overseeing that the clinical

2    process was going through appropriately and looking

3    at the eligibility of patients and showing that they

4    were coming on appropriately and insuring that the

5    admission process was well thought out and being done

6    properly and anything and up to direct line patient

7    care.

8    Q.    Did you have occasion to visit patients when you

9    were an executive director during the March 2008,

10   November 2009 time period?

11   A.    Yes.

12   Q.    Did you attend any clinical meetings during that

13   time period?

14   A.    Yes.

15   Q.    Which clinical meetings did you attend?

16   A.    IDT.

17   Q.    What is IDT?

18   A.    It's the interdisciplinary team meeting that was

19   run every two weeks to review all patients that are

20   currently on census.

21   Q.    And within the Boston agency in the March 2008,

22   2009 November time period, did you report to anyone

23   within the Boston agency?

24   A.    Yes.

25   Q.    Who did you report to?

1   A.   Initially, I reported to Peggy Durkin.

2   Q.   Where was Peggy Durkin located?

3   A.   Peggy, I believe she worked out of Philadelphia.

4   Q.   Were you the senior most person in the Boston

5   agency?

6   A.   Yes.

7   Q.   Do you know what position Peggy Durkin held?

8   A.   Peggy was the regional director, I believe.

9   Q.   Who reported to you?

10  A.   The office, the entire office staff and all the

11  clinical team, everybody in the office reported to

12  me.

13  Q.   About how many people was that?

14  A.   Anywhere from 45 to 50 people, that included

15  home health nurses, social workers, chaplain.

16  Q.   About how many people at any one given time were

17  enrolled in hospice at AseraCare's Boston agency in

18  the March 2008, 2009 time period?

19  A.   May I ask a clarifying question?  Do you mean

20  how many people we admitted during my time frame or

21  what my census was?

22  Q.   Census.

23  A.   Our ADC at that time was between 120 to 140 to

24  50, I believe.

25  Q.   What does ADC stand for?

1   A.   Average daily census.

2   Q.   I would like to ask you a few questions about

3   hospice itself, if that's okay.

4   A.   All right.

5   Q.   What is hospice?

6   A.   Well, hospice is a general term, to bring on

7   patients that are within six months or have a six

8   month expectancy of life.  We are to provide support

9   and training to that patient, that family to help

10  them do the transition to dying.

11  Q.   Who is hospice for?

12  A.   Hospice is for anyone, anyone that meets

13  criteria.

14  Q.   And where do patients typically receive hospice

15  care?

16  A.   It typically is whatever area they deem as home.

17  Q.   Can you give me some examples?

18  A.   So, it could be their private home.  It could be

19  a nursing home.  It could be assisted living.  It

20  could be anywhere where it is identified that the

21  patient has said this is home.

22  Q.   Are you familiar with the term curative care?

23  A.   Yes.

24  Q.   What does that mean to you?

25  A.   Curative care means to me that the medical --

1    the medical approach is to treatment or treatment of

2    their disease have not been exhausted and we're

3    looking to eradicate the disease.

4    Q.    Are you familiar with the term palliative care?

5    A.    Yes.

6    Q.    What does palliative care mean?

7    A.    Palliative care means the symptomatic management

8    of any issue that's related to their disease process

9    that's causing them problems or causing them to be

10   uncomfortable.

11   Q.    What does systematic management mean?

12   A.    In terms of palliative care?  So that could

13   mean, for example, if you have a patient that is

14   receiv -- that has an abdominal tumor that's

15   discreting fluid, symptomatic management of that

16   patient means that they may get tired of radiation

17   treatment or palliative chemotherapy and we will

18   clinically manage that patient on hospice while they

19   decided that they weren't going to try to get cured

20   from it.  We just want to feel comfortable.

21            So the systematic management means we would

22   look at all aspects of care to make that patient

23   comfortable and safe.

24   Q.    What's the difference between curative care and

25   palliative care?

A.   Curative care, we're basically saying we're not giving up and we're going to continue to fight and look at other options to assure that this patient's disease is halted, it's stopped.  Whereas palliative care, we're not trying to stop the disease in its tracks.  We're understanding that the disease process, if it continues along its projected trajectory, the patient will die.  So we're here to make the patient comfortable.

Q.   Which type of care does hospice provide?

A.   We provide palliative care and supportive care.

Q.   Can you give me an example of the type of curative care that is not provided by hospice?

A.   Any type of chemotherapy, that's the easiest thing I can say.

Q.   We already had someone say that.  Do you have a different answer?

A.   Besides chemo?  I mean, just if a patient says, I don't want to give up finding a treatment, any type of treatment and that could be under any type of situation.

     So even if a patient, just because their disease trajectory is such that death is imminent or death will come, if the patient and family decides that they don't want it, then hospice isn't going to

1  be appropriate for them because they have not

2  identified that they want that service.

3  Q.   And what types of palliative services did you

4  provide to patients?

5  A.   I think we've done or we did do, we did do some

6  palliative chemotherapy.

7         THE COURT:  I heard you say that a minute

8  ago, too, when you said with hospice you wouldn't do

9  chemotherapy as curative.

10         Can you explain the difference between what

11  you're talking about in terms of palliative

12  chemotherapy and curative chemotherapy because I

13  don't want the jury to be confused about that.

14         THE WITNESS:  Certainly.  So with curative

15  chemotherapy, curative chemotherapy states or is

16  identified as, we're going to try to stop the disease

17  in its tracks, we're trying to get rid of the tumor.

18  We're trying to alleviate death from coming and

19  extend your life.

20         Whereas, palliative chemotherapy would be

21  given to patients where the symptoms, because of

22  increase in fluid or there is something that's going

23  on, if we provided chemotherapy that would either

24  shrink the tumor or would cause the symptom to begin

25  to go down or change, that would make the patient

1  feel better.

2          So if it makes the patient feel better, it's

3  palliative, because in its nature it's not going to

4  stop the process of death occurring if it continues

5  on its natural progression.

6  Q.   Thank you.

7          On a routine visit, routine hospice visit,

8  what kind of services are provided to a patient?

9  A.   Certainly nursing services will be provided.

10  Q.   Like what?

11  A.   Nurses would go in, they would do medication

12  management.  They would be evaluating the patient

13  based on the LCD determining whether or not how they

14  continue to meet criteria for service.

15          The nurse would be looking at their overall

16  psychological pieces.  They would be looking at

17  opportunities to bring in other team members.  They

18  would be looking at talking to bereavement people,

19  bereavement folks about how are they getting their

20  information, are they prepared for what's going to

21  happen.  So the nurse was sort of like the hub.

22          He or she was the person that was

23  corroborating all of the care that happened for this

24  patient during this time period.

25  Q.   Thank you.

1           Do you have any knowledge about the

2    admissions process that was in place when you arrived

3    in the Boston agency in March 2008 and for the period

4    of time right after you arrived?

5    A.   Yes, I do have knowledge.

6    Q.   Thank you.  And what was the admissions process

7    when you first arrived at the Boston agency in March

8    2008?

9    A.   When I arrived there, the process was such, the

10   -- I'm going to call them the sales manager, but I

11   think they were called the PRMs.

12           MS. MARTIN:  Your Honor, we would object to

13   this question.

14           THE COURT:  Please direct your attention to

15   just the question of admission process.

16   Q.   (By Mr. Wertkin)  So you have knowledge about

17   the admissions process when you arrived at your new

18   job.

19   A.   Yes.

20   Q.   What state was the admissions process in at that

21   time?

22   A.   There wasn't one.

23   Q.   Can you explain what you mean by that?

24   A.   Well, there wasn't -- there wasn't any

25   organization around how the admission came in.

1              THE COURT:  I think what we want you to do

2      is address your attention to once a patient was

3      recognized or referred for consideration for hospice.

4      Q.   (By Mr. Wertkin)  So if you've got a name, what

5      would be the first thing that happened?

6      A.   That name would be given to the admissions

7      coordinator.  The admissions coordinator would then

8      contact the nurse and the admission would be

9      assigned.

10     Q.   And at what point did they do an evaluation of

11     the patient?  Did AseraCare's Boston agency at the

12     time that you started, did a nurse do an evaluation

13     of the patient before admitting them to hospice?

14     A.   I have to answer that every patient that was

15     admitted -- can I ask -- can I have it phrased

16     differently because I'm not quite sure I understand

17     what you're looking for.

18     Q.   Okay.  When a name would come in --

19     A.   Yep.

20     Q.   -- to AseraCare, first of all, it would be given

21     to an admissions coordinator.

22     A.   Correct.

23     Q.   And would someone go out and -- what would come

24     into the admissions coordinator?

25     A.   Well, the nurse would go out and see the

1  patient.  So the admission coordinator will call the

2  nurse.  The nurse will go out and go see the patient.

3  Q.   Then what would happen?

4  A.   Then the admission would have taken place and

5  the paperwork would come into the office.

6  Q.   Can you walk me through that process, please?

7  A.   So the --

8          THE COURT:  The nurse gets the name.  What

9  did the nurse do?

10         THE WITNESS:  The nurse gets the name.  It

11  is the nurse that would go out and assess the patient

12  and admit them to service.

13  Q.   (By Mr. Wertkin)  Would the nurse evaluate the

14  patient and decide, based on their evaluation,

15  whether to admit the patient?

16  A.   The patient was admitted.  An evaluation, if

17  you're looking for --

18         MR. WERTKIN:  May I approach, Your Honor?

19         THE COURT:  All right.

20                  (SIDEBAR)

21         MR. WERTKIN:  Here's what's going on:  When

22  she arrived at this facility, the PRMs were doing the

23  admissions.  That's what she's -- I think she's going

24  to testify about.

25         THE COURT:  What are PRMs?

1           MR. WERTKIN:  The marketing people.  The

2    marketing people would give a name, call the

3    admission, so we have an admission and that person

4    would be admitted.  That's the problem that she's

5    having.  I can't ask her about that, if I can't say,

6    so I say what is the first step and she started to

7    talk about PRMs and marketing.  She's going to say, I

8    think, I am anticipating her testimony is that the

9    PRM would say, I have an admission, the patient will

10   be admitted and just hand it over to a nurse.  But

11   the admission is done at that level before an

12   assessment.

13           And the problem that she's having is she

14   can't -- she's not allowed to talk about PRMs, she

15   can't explain the process that was in place in Boston

16   at the time.

17           MS. MARTIN:  She testified the nurse would

18   go out and do an assessment.  I think she said a

19   nurse would go out and do an assessment.

20           MR. WERTKIN:  I think we can all agree that

21   is not what she's talking about right now.

22           MR. LEMBKE:  I thought it was pretty clear

23   when you asked to approach, she seemed to be doing

24   just fine.  Your Honor, I certainly don't think --

25   the witness avoiding discussion about the marketing

1  --

2          THE COURT:  Uh-huh.

3          MR. LEMBKE:  -- and all those things, I

4  think that this is a backdoor suggestion that she can

5  get into those things.

6          THE COURT:  If the patient was automatically

7  admitted when the marketing people got a name, I

8  think that --

9          MR. LEMBKE:  But it's one thing to say every

10  patient is admitted.  It's another thing to say --

11          MR. WERTKIN:  I can lead her to say that.

12          MR. LEMBKE:  I did not think we are at a

13  point where leading this answer makes sense.  I mean,

14  she was explaining the process and it seems like it's

15  been short circuited because the answer wasn't coming

16  in the way they want it to come in.

17          THE COURT:  Ask her, the nurse did an

18  evaluation before the patient was admitted.  She can

19  say yes or no.  If the answer is no, then you can

20  lead her to keep her from talking about marketing.

21  Is that okay?

22          MR. LEMBKE:  Yes, Your Honor.

23          (Open court.  Jury present.)

24  Q.  (By Mr. Wertkin)  Did the nurse do an evaluation

25  for hospice appropriateness before a patient was

1  admitted?

2  A.   No.

3  Q.   Is it true that once the name came in, under the

4  process that was in place when you arrived, the

5  patient was automatically admitted?

6  A.   Yes.

7  Q.   Okay.  Once the patient was automatically

8  admitted, who would decide -- then what would happen?

9  A.   The patient at that point would be presented at

10  IDT.

11  Q.   And I think you had said that a nurse would then

12  go out after admission?

13  A.   The nurse would go -- the patient wasn't

14  considered admitted until the nurse went out and

15  admitted the patient to service.

16          THE COURT:  So a nurse did see the patient

17  before the patient was admitted?

18          THE WITNESS:  Yes.  The patient -- the

19  patient was seen.  The evaluation process -- may I

20  clarify?

21  Q.   Please.

22  A.   The evaluation process is different in that it

23  assumed that before a nurse -- before the nurse

24  admits the patient that the evaluation for

25  appropriateness was done.  That is the assumption, it

1   goes in line.  Whether or not that was --

2           THE COURT:  We will go back to asking

3   questions one at a time.

4           THE WITNESS:  Okay.

5   Q.   Did it concern you that patients were

6   automatically admitted to hospice without an

7   evaluation for appropriateness?

8   A.   Yes.

9   Q.   Why?

10  A.   Because it was -- when I came in to the agency,

11  there was several, what's called additional

12  documentation requests that the agency had.  The

13  documents that were coming into the agency and the

14  things that I saw led me to believe that the patients

15  were not screened effectively.  And it looked to me

16  that we needed to look at a different process to

17  admit those patients to service to make sure that an

18  appropriate evaluation was completed before the

19  actual patient was even seen, to determine if they've

20  met conditional criteria to be admitted to service.

21  Q.   And were there other specific problems that you

22  noticed in the March 2008 -- March, April, May time

23  frame regarding the admissions process?

24  A.   Yes.

25  Q.   What were they?

1   A.   The documentation was coming in late.   The

2   information was not always complete or it was

3   inaccurate.   It did not reflect the patient

4   disposition at time of admission.   Those are the

5   things that I saw.

6   Q.   Okay.   Let's talk about this admissions coming

7   in late.   What do you mean by that?

8   A.   So, the paperwork would come into the office,

9   sometimes weeks later.   And not being able to see

10  clinically what was going on with the patient, it was

11  hard to determine whether or not they met the

12  criteria for admission.

13  Q.   Where does this paperwork come from?

14       MS. MARTIN:   Your Honor, we would just

15  object to this line of questioning on the grounds of

16  our anecdotal motion in limine and 404(b) and also

17  401 and the statistical sampling.

18       THE COURT:   You can have a standing

19  objection.

20       MS. MARTIN:   Thank you.

21  Q.   (By Mr. Wertkin)   Where does this paperwork come

22  from that's coming in late?   Where is it coming from?

23  A.   It's coming from the nurses in the field.

24  Q.   Are the nurses in the field different from

25  AseraCare nurses?

1   A.   Those were our nurses.

2   Q.   And who does it come to?

3   A.   It would come to the office to the admissions

4   person to begin putting the chart together.

5   Q.   And what is considered to be timely submissions?

6   A.   Timely submissions are within 48 hours of

7   admission, paperwork is coming to the office.

8   Q.   And how long were you finding that it was taking

9   to get the paperwork in?

10   A.   It could be up to two weeks.

11   Q.   Why is that a problem?

12   A.   Because we had IDT every two weeks.  So

13   depending on when IDT fell, you could be doing your

14   documentation review at IDT, which really didn't give

15   the team a chance to sort of even look at the

16   admission paperwork, look at the clinical diagnoses,

17   look at the issues that were being brought to the

18   table about why this person was appropriate to be on.

19   Q.   Was this timeliness problem just for admissions?

20   A.   No.

21   Q.   What other areas did that affect?

22   A.   Just the normal standard operating procedures,

23   so just getting the charts in and getting things

24   submitted timely.  It also affected other aspects of

25   the business, just getting things billed and

1  processed, getting our documentation in line so that

2  we met the Massachusetts standard for having

3  documentation brought into the agency.

4  Q.   Are you familiar with the term recertification?

5  A.   Yes.

6  Q.   What does a recertification mean?

7  A.   Recertification means that the physician and the

8  team have identified that the client, the patient,

9  continues to meet eligibility criteria and should be

10  provided an additional 60 days, I believe it was, to

11  be on service.

12  Q.   And what does it mean when the patient is

13  recertified?

14  A.   It means that they are still eligible under the

15  hospice benefit to receive all the services provided.

16  Q.   And what is involved in determining whether a

17  patient should be recertified?

18  A.   There is a few things.  One is that there is

19  another assessment that is completed, that the

20  patient's primary care physician and the hospice

21  medical director have again both identified that yes,

22  the patient is appropriate.

23       The paperwork has been completed.  The LCD

24  has been identified with that particular patient

25  diagnosis and how they continue to meet criteria to

1   remain on hospice.

2   Q.   What's the different in terms of process and

3   what's being evaluated between recertification and

4   admission?

5   A.   On admission, the process is to -- really, to be

6   honest, there really isn't a difference because the

7   same process still is in line.  You still have to

8   meet eligibility criteria on admission and on recert.

9   And if you don't meet, then our job is to identify

10  either how they do meet or plan discharge for that

11  client to move them off service.

12  Q.   Was each recertification a new admission

13  essentially?

14  A.   It was not considered a new admission.  It was

15  considered an extenuation of the current admission.

16  Q.   For the evaluation purposes and the diagnostic

17  purposes, it's the same?

18  A.   It's the same.

19  Q.   Would information that came in late affect the

20  recertification process as well?

21  A.   It could.

22  Q.   How?

23  A.   In that if we were looking at labs or weights or

24  things of that nature that would help us to determine

25  if the patient continued to meet service.  If we

1  didn't get that information or it was inaccurate or

2  it was incomplete, then we might have been

3  recertifying a patient that may not have met

4  criteria.

5  Q.  And at the Boston agency in March 2008, March,

6  April, May time period, were you finding that

7  documentation was coming back, as you said,

8  incomplete and inaccurate?

9  A.  Yes.

10  Q.  Can you give me an example?

11  A.  The one thing that often came up is when the

12  patient was recertified, the process was to do an LCD

13  and complete the documentation to submit prior to the

14  recert.

15      Oftentimes, the information would come back

16  and it would not be filled in.  The LCD information

17  wouldn't be filled in Or the clinical assessment

18  pieces that identified the patient as being

19  appropriate wouldn't be complete and didn't give you

20  a full accurate picture of what's going on with that

21  patient.

22  Q.  Do you have any knowledge about why it would not

23  come back incomplete or why it would come back

24  incomplete?

25  A.  In talking with the staff, a lot of it was they

1   didn't think they had to do it.

2         MS. MARTIN:  Your Honor, we would object to

3   this anecdotal testimony.

4         THE COURT:  Sustained.

5         MR. WERTKIN:  Just for clarification, what

6   rule is that under exactly?  This objection?

7         MS. MARTIN:  Our --

8         THE COURT:  We're not going to argue about

9   it in front of the jury.

10        You may proceed.

11  Q.   (By Mr. Wertkin)  I asked you if you had formed

12  -- did you have any knowledge about why these

13  documents had come back incomplete.  And what was

14  your answer?

15  A.   In speaking with the staff --

16  Q.   I'm sorry, about your knowledge, yes or no.  Do

17  you have any knowledge?

18  A.   Yes, I have knowledge.

19        THE COURT:  Knowledge about what?

20  Q.   (By Mr. Wertkin)  How did you know that the

21  information was coming back incomplete or inaccurate?

22        MS. MARTIN:  We would object to that

23  question on the same grounds.

24        THE COURT:  Overrule that question.

25  A.   Because I had done chart audits and I reviewed

1   the documents.

2   Q.   And what's the problem with information that

3   comes back incomplete or when the forms are not

4   filled out completely or accurately?

5   A.   It could lead you to recertifying a client or

6   patient that was not appropriate to be recertified.

7   Q.   How?

8   A.   Because if you are admitting a patient or

9   recertifying the patient under a diagnoses and under

10  that diagnoses is the requirements for weight and,

11  you know, how they are tolerating their diet, if

12  there have been any major changes or if they are in

13  pain, if that stuff is not completed or is not added,

14  it does not give the full picture of how does the

15  patient continue to meet criteria to stay on hospice

16  service.

17  Q.   Why is it important to get the full picture?

18  A.   Because at any time when you're looking at

19  documentation, you want to be able to create a

20  picture of how and why the patient continues to be in

21  need of the hospice benefit.

22        Because as we -- as the person that was in

23  charge of the agency, I was responsible to make sure,

24  and I felt responsible, to make sure that everything

25  we were doing was in line with meeting the best needs

1  of that patient and that family and meeting the

2  organizational goals for the agency and company.

3  Q.  Did you think that incomplete and inaccurate

4  records was accomplishing or helping you accomplish

5  that goal?

6  A.  No, sir.

7  Q.  Why not?

8  A.  Because I was not able to, if anyone ever asked

9  me, why was a patient admitted and why they stayed on

10  service, I didn't have an answer.  I needed to find

11  the answer and I needed to have the documentation

12  complete to insure that we were doing the right

13  things.

14  Q.  Did you give, in this time frame, March 2008 for

15  a few months going forward, in that Boston agency,

16  did you raise your concerns about this to anybody?

17  A.  Yes.

18  Q.  Who did you raise those concerns to?

19  A.  I talked to Peggy Durkin.  I talked to the

20  quality people at that time.  I talked to the

21  regional director of clinical services about my

22  concerns.

23  Q.  What was the response?

24  A.  It was to --

25          THE COURT:  Excuse me just a minute.  I only

1   heard one name.  Peggy Durkin.

2          THE WITNESS:  Peggy Durkin.  Yes, ma'am.

3          THE COURT:  Who else did you talk to by

4   name?

5          THE WITNESS:  LeAnne Folk who was the

6   regional director of clinical services.

7          THE COURT:  What was her name?

8          THE WITNESS:  LeAnne Folk.  And please don't

9   ask me to spell her name, ma'am, I don't know how.

10          THE COURT:  Anyone else?

11          THE WITNESS:  Yes, ma'am.  I talked to -- I

12   did talk to human resources.  At that time, it was a

13   gentleman and I can't recall his name off the top of

14   my head but it was a man.

15          THE COURT:  All right.

16          THE WITNESS:  I spoke to another compliance

17   person.  Susan Gerhart who I believe was the -- she

18   oversaw compliance.  So I don't know what her title

19   was at that time.  I don't remember.

20          THE COURT:  All right.

21   Q.  (By Mr. Wertkin)  In addition to the evaluation

22   prior to admission and the incomplete and inaccurate

23   information and the non-timely submissions of

24   paperwork, were there any other specific problems

25   that you observed in the time period of March, April

 1   May 2008 in the Boston agency?

 2   A.   The care plan process I thought was problematic

 3   because we didn't have individualized care plans for

 4   our patients.   That was a problem for me.

 5   Q.   And did you raise your concerns or were there

 6   any concerns related to the medical director?

 7   A.   Yes.

 8   Q.   Who was the medical director during the March

 9   2008 time period that you started in Boston?

10   A.   Dr. Ramadurai.

11   Q.   Can you say that again?

12   A.   Murali Ramadurai.

13   Q.   And was Dr. Ramadurai involved in the admissions

14   process?

15          Well, can you explain -- do you have any

16   knowledge about Dr. Ramadurai role in the admissions

17   process when you first arrived in Boston in March

18   2008?

19   A.   The -- all the hospice medical directors were to

20   be notified of an admission.

21   Q.   Is that what was occurring at that time?

22   A.   No.

23   Q.   What was occurring?

24   A.   The patient was admitted to service based on the

25   order that was in the nursing home at that time and

1  that was how the patient was admitted.

2  Q.   Was there any communication with the medical

3  director at any time between when the name came in

4  and the patient was admitted?

5  A.   No.  At least not that I'm aware of, no.

6  Q.   And in the March 2008 going forward, March,

7  April, May in the Boston agency, was there -- are you

8  aware of Dr. Ramadurai getting involved with the

9  patient at any time before the first IDT meeting?

10 A.   No.

11 Q.   When would be the first time Dr. Ramadurai would

12 be presented with the patient?

13 A.   It would be at IDT.

14 Q.   I guess if a patient was admitted the day after

15 an IDT meeting, how long would it be until

16 Dr. Ramadurai got presented with the patient?

17 A.   It would be two weeks after that.  So if we just

18 had IDT, two weeks after that, another IDT would come

19 up and the patient would be presented.

20 Q.   You've talked about no evaluation prior to

21 admission and the incomplete and inaccurate

22 information, the communications with the medical

23 director, timely submissions of the plan of care, any

24 other problems that you recognized in terms of the

25 general practices of the Boston agency in the March

1 2008 to March, April, May 2008 time period in the
2 Boston agency?
3 A.   The nurses, when working with them, really
4 didn't have, in my estimation from reading the
5 documents, a full clinical understanding of disease
6 trajectory, which would make it very difficult to
7 sort of put together the picture on what's going on
8 with that client and that patient.
9 Q.   What do you base that conclusion on?
10 A.   In meeting with the staff and having staff
11 meetings and talking with them about disease
12 trajectory and hospice 101.
13 Q.   What did you learn from those conversations?
14 A.   I learned that the clinician or the nurses
15 really felt that their role --
16       MS. MARTIN:  We would just object to this as
17 anecdotal testimony.
18       THE COURT:  I am going to let it go a little
19 further.  We will see.
20 A.   In speaking with the nurses, talking to them
21 about disease trajectory, it really became clear to
22 me that their understanding of what was going on with
23 the patient was minimal, it was base line.
24       So it made it hard, I felt, to really have
25 the substantive conversation about then how do we

1   know the disease trajectory of this patient to keep

2   them on service.

3   Q.   Did you ever have occasion to or was it your

4   general practice to personally ask Dr. Ramadurai to

5   sign certifications of terminal illness, is that your

6   responsibility?

7   A.   It was not directly my responsibility, no.

8   Q.   Whose responsibility was it?

9   A.   At that time whoever was running the IDT.  We

10  would make sure that the documents were signed.  It

11  became my responsibility to insure that all the

12  documents had been signed.  And then, at that point,

13  if not, put the process in place to insure that the

14  documents were signed within a reasonable time

15  period.

16  Q.   You said ADC earlier, what does that stand for?

17  A.   Active daily census.

18  Q.   What was the average daily census at that time

19  period at the Boston agency?

20       MS. MARTIN:  We object to this on relevancy.

21       THE COURT:  No further.

22       MR. WERTKIN:  Yes, Your Honor.

23  A.   The ADC was, at that time, I believe it was 140,

24  I believe.

25  Q.   So when you had these IDT meetings, how many

1  patients would be presented?

2  A.   Can I clarify?  The team -- the agency was

3  broken up into three teams.  So we had a red team,

4  blue team and green team.  And each team had two

5  hours.

6          So at -- so on, I believe, we had one team

7  on Wednesday and another team on Thursday, so it

8  would be that same week.  Two teams would run one day

9  and one team on another day.

10  Q.   Did you attend all those IDT meetings?

11  A.   After a couple of months, I started going to all

12  of the IDT meetings.

13  Q.   So when you first arrived, did you attend IDT

14  meetings?

15  A.   No, I did not.

16  Q.   And when did you start to attend IDT meetings?

17  A.   A few months after I got there.  So I would say

18  June, June, something like that.

19  Q.   Why did you start attending IDT meetings?

20  A.   After observing that the admission process was

21  broken, I felt, that I thought it would be good if I

22  sat in on IDT to get a clear sense on what's going on

23  with the patient.  So I guess I put together a

24  process.

25  Q.   When you started to sit in on IDT meetings in

1  that June 2008 to -- did you continue to go to those

2  meetings until you stopped working?

3  A.   I went as often as I could, certainly, towards

4  the end.

5  Q.   And how were those meetings run in that June

6  2008 time period at that time?

7  A.   Initially, it was -- people just sort of sat

8  around the table and were just talking about the

9  patient is on service, we've got to recertify them,

10  and that was generally the extent of the

11  conversation.

12  Q.   And what did you think about that?

13  A.   I thought that we didn't get to the meat of why

14  the patient continued to meet service and continued

15  to need us.

16  Q.   Why is that?

17  A.   Because the question that I began asking was

18  what was going to kill them, what were they going to

19  die of.

20       And until that time, that was not a question

21  that was asked.

22  Q.   What were they talking about?

23  A.   They were talking about, you know, how the

24  patient was while they were on service.  So, you

25  know, were they eating, were they up, were they in

1   the chair, were they sleeping, how were the

2   medications.

3          But the question for me around eligibility

4   was, to insure eligibility was, when are they going

5   to die, when is that going to happen.  And what

6   symptoms are we seeing that's leading us to that so

7   we can continue to see the patient.

8   Q.   And who is running the IDT meetings at that

9   time?

10  A.   At that time, they were called patient care

11  coordinators because they each had a team, so they

12  each ran their particular team.

13  Q.   And did you have three patient care coordinators

14  at that time?

15  A.   I did.

16  Q.   What were their names?

17  A.   Linda Esanado, I can't pronounce her last name.

18  It's Esolani or something.  I had Lauren Chauncey and

19  then I had Virginia -- I can't remember her last

20  name.  I had Virginia.  So I had three.  And then I

21  had a director of clinical services.

22  Q.   And did you raise concerns with them about the

23  subject matter of the IDT meetings?

24  A.   I did.

25  Q.   And what did you say?

A.   I said, we just need to be talking more about
eligibility, how does the patient continue to meet
eligibility.

Q.   What was the response?

A.   They said okay.

Q.   And were there any other issues that you saw
when you started attending the IDT meetings in the
June 2008 time period in Boston?

A.   One of the things I wanted added from the
medical director perspective was teaching.  I wanted
them -- because my feeling at that time was
understanding disease trajectory was limited.  So I
wanted the medical director to focus more on what's
going on with the clinical management of the patient
and to really start doing some direct teaching around
diseases so that they can start picking up what the
changes were, how they were seeing them, how to
document them.  And then, again, talking about when
it is time to start looking at taking the patient off
service if they are no longer appropriate.

Q.   In your opinion, that was not occurring?

A.   Prior to that, that was not occurring.

Q.   What was occurring?

A.   Again, they were just having conversations about
the patient.

1  Q.   What was the participation of the medical

2  director?

3  A.   He was there.  There wasn't a whole lot of -- at

4  least not that I initially saw of him being pointed

5  around why this person is appropriate and why we need

6  to take them off.  I did not hear that initially.

7  Q.   In addition to not talking about why patients

8  were eligible and engagement of the medical director,

9  were there any other issues you observed at the IDT

10  meetings when you started attending in the June 2008

11  time period in Boston?

12  A.   Not that I can recall at this particular moment,

13  no.

14  Q.   And what, if anything, was your response to

15  these problems that you identified?

16  A.   I thought that we might be doing a disservice to

17  the agency, to the patients, by not addressing them.

18  And I wanted to start talking more about, you know,

19  the eligibility pieces and making sure that we were

20  falling more into line and we were being more

21  compliant.

22  Q.   And did you try to implement any changes?

23  A.   I did.

24  Q.   What changes did you try to implement?

25  A.   For the admission process, I moved that call to

1   the admissions coordinator to the nurse in the

2   office, so that way the nurse can start asking

3   diagnosis, what's wrong with the patient and start

4   getting a simple screen sort of put together.

5          I then --

6   Q.   May I stop for a second.  What is a simple

7   screen?

8   A.   Basically, you know, get the diagnosis, make

9   sure there's an order in place, make sure that we

10  understand like what actually brought them to

11  hospice, what forced the call.  So that with the

12  nurse, when we were arming her or him with the

13  information, they were starting to think about what

14  to look for when the patient was being admitted.

15  Q.   What's the order that you decided to implement?

16  A.   Evaluate and admit, if appropriate.

17  Q.   What did you understand this new requirement to

18  mean?

19  A.   I wanted the nurses to have some say, that if

20  the patient really did not meet criteria, meaning

21  that they looked at the LCD for that particular

22  disease process and they could not check all the

23  boxes, that if they did not admit, it was not a

24  failure to admit, it was because they did not meet

25  criteria.

1           The nurses at that time were instructed to

2    leave a note in the chart to contact the PCP and then

3    to let us know, the agency know, that yes, we did not

4    admit that patient and why we did not.

5    Q.   What is a PCP?

6    A.   The primary carry physician, the patient's

7    doctor.

8    Q.   In order to admit -- I'm sorry, evaluate and

9    admit, if appropriate, what does evaluate mean?

10   A.   Actually, do the screening.  So go in with the

11   LCD, go in with the clinical assumption on what's

12   going on with the patient, and determine do they meet

13   criteria based on the LCD.

14   Q.   When you arrived, that was not occurring?

15   A.   No.

16   Q.   And what does admit, if appropriate, mean?

17   A.   If they did meet criteria, then the nurse then

18   had permission to go ahead and admit that patient

19   because they met criteria and admit the patient to

20   service.

21   Q.   Who would give the order to evaluate and admit,

22   if appropriate?

23   A.   The physician, at the time, it's a nursing home,

24   so it would be the doctor in the nursing home, so the

25   medical director there would write the initial order.

1  That would then trigger us to go out.

2  Q.  And who decides if the admission is appropriate

3  under those circumstances?

4  A.  The nurse would be contacting the hospice

5  medical director and should be having a conversation

6  with them saying what their findings were and if she

7  and the hospice medical director both agreed that the

8  patient was not appropriate, then the admission did

9  not go forward.

10  Q.  Was that occurring when you arrived at the

11  Boston agency in March of 2008?

12  A.  No.

13  Q.  And this is a change that you implemented?

14  A.  Yes.

15  Q.  What was the specific change?

16  A.  The specific change was to call the medical

17  director prior to the admission and then put the

18  order in place.

19  Q.  And why did you make that specific change?

20  A.  Because I'm going to assure that we were

21  covered, that we had the appropriate and necessary

22  documentation to admit patients appropriately to

23  service.

24  Q.  Is there any other ways that you attempted to

25  fix the admissions process?

1   A.   In addition to doing chart reviews, I did those

2   and reported those results back to the staff and

3   tried to put processes into place to assure ongoing

4   documentation and improve documentation.

5   Q.   How would that improve processes?

6   A.   Because what it would do is if you are unaware

7   of what you're missing, you're less likely to do it.

8   When you become aware, it would be identified that

9   you would then do that thing.

10          So, if you were often missing your LCDs, it

11   would become now, if you tell somebody over and over

12   and over again, it would become now part of your

13   working everyday process to make sure I did an LCD to

14   submit my documentation.

15   Q.   It was your job to notify them?

16   A.   It was mine, it was the PCC, it was the director

17   of clinical services, so we sort of did it as a

18   combined effort to make sure all of us were on the

19   same page around eligibility, were we doing all of

20   this.

21   Q.   And how would you go about gathering that

22   information?

23   A.   In the morning, we had what's called morning

24   rounds.  And on morning rounds, we would check and

25   see what paperwork came in, what was in, when did it

1   come in.  And we had a clipboard.  And we would check

2   off everyday at every morning meeting what was done.

3   And people were each given an assignment to follow up

4   on the nurse or whoever didn't bring in the paperwork

5   to get on them to get the information into the

6   office.

7   Q.   And why did you implement that change?

8   A.   Because I wanted a better turn-around on our

9   paperwork.  I wanted to -- and then be able to sort

10  of see what was being submitted so we could catch it

11  early and let the clinicians know so that way they

12  weren't inadvertently missing information or, you

13  know, we were able to correct the chart in a timely

14  manner, so that way it was reflective of why this

15  patient was admitted to service.

16  Q.   Were you successful in doing that?  Were you

17  successful in identifying the problems?

18  A.   Yes.

19  Q.   Were there other changes that you attempted to

20  implement in Boston in the time period of, I guess

21  June 2008 to November 2009?

22  A.   Yes, I tried.

23  Q.   Like what?

24  A.   I began sitting in on IDT and that was one of

25  the processes that I tried to put in place where I

1  tried to change the dynamic in the team to begin

2  asking more questions about eligibility.

3          Another process I put in place was on

4  admission that the -- when the nurse went out, that

5  she didn't just go out with just the one admission

6  packet.  We put in different LCDs that fit criteria

7  for the particular patient they were going to admit.

8          So that way when the information came back,

9  it was more apt to be completed because the documents

10  were all together.  So we tried to do that.

11  Q.  Can you explain a little bit more about what

12  packets you would give, what was in those packets?

13  A.  So, we had two sets of packets.  We had a nurse

14  admission packet and we had a consent packet.  So the

15  consent packet were all of the documentation that

16  said that the person was allowing us to admit them to

17  service and to bill the Medicare benefit.  That was

18  the first packet.

19          The second packet was the admission packet.

20  It was the full clinical packet of why this patient

21  was admitted to service.

22          So, this clinical packet, in that I included

23  the things that we were often missing, the LCDs that

24  showed eligibility.

25  Q.  And what are LCDs?

1  A.   LCDs are the limited conditions of

2  determination.  And what it basically says for

3  Medicare, they give you a list on what types of

4  patients based on that diagnosis would fit the

5  criteria to admit them to hospice.

6          And I wanted to and I did at that time make

7  it mandatory that every admission and -- it was

8  mandated on every admission.  But not on every

9  recert.  So I mandated on every recert that was

10  completed and brought into the office so that we had

11  a complete packet of information to work with.

12  Q.   Any other things that you put in the packets for

13  the nurses?

14  A.   I mean, that's all I remember putting in.

15  Q.   You said that you started sitting in on IDT

16  meetings.

17  A.   Uh-huh.

18  Q.   What changes did you make or what changes, if

19  any, did you make to IDT meetings?

20  A.   It was more around the discussion.  It was more

21  around making sure that we were asking, you know, how

22  do they meet criteria questions and really using the

23  format of the LCD as the justification for continued

24  service.

25  Q.   And how did that impact what was going on at IDT

1  meetings?

2  A.  Well, the dynamic changed because it wasn't any

3  longer about, you know, we like the patient and

4  everything is going great and we can keep the patient

5  on service.  It became more substantive.  It became

6  more of a discussion around why this person was

7  hospice appropriate.

8  Q.  Are there any other changes that you suggested

9  in your, I guess the IDT meetings and the months

10  after you started attending?

11  A.  Again, I added more teaching.  So we had a

12  section that we started where we came like, for lack

13  of a better word, it was like the doctor's minute

14  where they would actually talk about a clinical

15  issue.  They would talk about what's going on with

16  the patient.  And it was -- I thought it was very

17  helpful.

18  Q.  What kind of teaching did you do?  What was the

19  context of it?  Where did it occur?  Who did it?

20  A.  It would occur -- ideally it was with the

21  medical director.  But a lot of times it would be

22  myself or even -- I encouraged even the team members

23  to begin that process so that they can start teaching

24  themselves and that was how I wanted the learning to

25  start to occur.

1  Q.   Any other things that you tried to do to change

2  the process during that time period?

3  A.   Those were the main things that I did.

4  Q.   And what was the reaction by the agency to your

5  changes?

6  A.   The staff -- there was a lot of pushback because

7  there was more requirements to assure that

8  documentation was completed.

9         There was a -- the staff believed and stated

10  to me that I was -- that I had created the Medicare

11  regulations because they did not have to follow this

12  stuff before.

13         It was very difficult trying to get the

14  staff on board to sort of understand that this was,

15  you know, how do we -- how do we make sure we are

16  justifying everything that was done and everything

17  we're doing.

18  Q.   Were you able to win over the staff?

19  A.   I think I won over some.  I don't think I won

20  over all.

21  Q.   Did you find that your fixes got implemented?

22  A.   While I was there, yes, the fixes were going in

23  and then some things went well and some things

24  didn't.

25  Q.   And what was the reaction by the staff who did

1  not appreciate your fixes?

2  A.   They would leave.

3         MS. MARTIN:  Your Honor, we would object to

4  that as anecdotal testimony.

5         THE COURT:  It's already been answered.  I

6  will overrule it at this point.  But that's as far as

7  we need to go on that, I think.

8  Q.   (By Mr. Wertkin)  Did you find as though -- that

9  the changes that you're attempting to make, were they

10 embraced by the staff?  Did they start to do those

11 things?

12        MS. MARTIN:  Asked and answered, Your Honor.

13        THE COURT:  Sustained.

14        MR. WERTKIN:  Can I read back from the

15 record what her answer to that question is, please?

16        THE COURT:  Her answer to your question was

17 that while she was there, yes, the fixes were going

18 in and some things went well and some things didn't.

19 Q.   (By Mr. Wertkin)  What do you think the impact

20 of your changes were to the patients?

21 A.   I think we -- I think we managed to have

22 patients on service for an appropriate period of

23 time.  We weren't getting them too early.  We weren't

24 getting them too late.  I think they had the

25 opportunity to benefit from the services that were

1   offered to them, so they were able to get the full
2   array.  They were able to get the bereavement
3   services, the full access to chaplain services, the
4   nursing service, the home health aide services.  And
5   then be able to bond with that family in a very
6   productive way, I felt.
7   Q.  How did you deal with the pushback that you
8   received from some of the staff?
9   A.  I sometimes talked to my leadership teams,
10  talked to them.  I tried to talk to the staff, we had
11  staff meetings, to explain why I was doing what I was
12  doing.  To give them a better sense that it was not
13  the Sharon rule.  These are Medicare rules.  These
14  are company policies.  These are things that we are
15  all trying to make sure that we do the right thing.
16  We want to follow policy.  We want to follow
17  practice.  And we want to follow the Medicare
18  regulations.  That's what we want to do.
19  Q.  Did you get the support from your leadership
20  team, your supervisors?
21  A.  Initially from Peggy, I did.  I did.  I got a
22  lot of support in terms of, you know, at least being
23  understanding of what I was going through and how I
24  was going through it.
25          The thing that I was requesting from

1   leadership, because the pushback was so severe, I had

2   requested to have HR come down and sort of back me up

3   that the Medicare information that I was providing to

4   the staff and handing to them was not coming from me,

5   it was coming from this is the practice.  I asked

6   them to support me on that.

7   Q.   Did you get that support?

8   A.   I did not get HR.  Peggy would come.  Peggy came

9   a couple of times.  And it was -- at that time it was

10  very much appreciated.  But in terms of the push of

11  what needed to happen, the agency needed much more.

12  It almost needed a, for lack of a better word, it

13  needed the full team to sort of say that this is not

14  about Sharon.  This is about the agency.  This is

15  about doing the care.  This is about what this is and

16  that didn't happen.

17  Q.   Who was your direct supervisor?

18  A.   Initially, it was Peggy Durkin.  And then when

19  Peggy got promoted, it was Gay Rogers.

20  Q.   Did Gay Rogers give you the backup to make the

21  changes you wanted to make?

22  A.   She did not.

23  Q.   And how do you know that?

24  A.   When Gay Rogers appeared on the scene, I did not

25  find that she was a support.  She had intimated to me

774

1    --

2            MS. MARTIN:  Your Honor, we would object to

3    --

4            THE COURT:  Sustained.

5    Q.   (By Mr. Wertkin)  I don't want you to tell us

6    necessarily about the specific conversations.  But in

7    terms of the ability of you to make the general

8    changes in this agency, can you talk a little bit

9    about how you were not able to do that?

10   A.   I didn't -- I just wasn't -- I didn't get to do

11   them.

12           THE COURT:  First of all, can we set the

13   time frame for when Gay Rogers came on?

14           MR. WERTKIN:  Thank you, Your Honor.

15   Q.   Do you recall when Gay Rogers came on the scene?

16   A.   Gay Rogers came on the scene, I believe she

17   retired in May of 2009.

18           THE COURT:  That was more than a year after

19   you began with AseraCare?

20           THE WITNESS:  Yes, ma'am.

21           THE COURT:  How long were you with AseraCare

22   in the Boston office?

23           THE WITNESS:  I was there until November of

24   2009, so May to May is 12.

25           THE COURT:  So until November of 2009?

```
 1              THE WITNESS:  2009.
 2              THE COURT:  Thank you.
 3              THE WITNESS:  Yes, ma'am.
 4   Q.  (By Mr. Wertkin)  And can you explain a little
 5   bit about how you were blocked from making these
 6   changes that you wanted to make?
 7              MS. MARTIN:  Your Honor, we object.  Assumes
 8   facts not in evidence.
 9              THE COURT:  I think we've covered enough on
10   that.  Let's move on.
11   Q.  (By Mr. Wertkin)  You said that you left in
12   November of 2009; is that right?
13   A.  Yes, sir.
14   Q.  Are you knowledgeable about certifications of
15   terminal illness?
16   A.  Yes.
17   Q.  How are you knowledgeable about that?
18   A.  I've been doing medical care for many years and
19   in hospice work in particular and really delving into
20   the regulations and the policies and procedures.  It
21   gave me a better sense of what needed to happen and
22   how it needed to happen.
23   Q.  Who signed the certification of terminal
24   illness?
25   A.  Initially, on admission, it's the patient's
```

1  primary care doctor, and then the hospice medical

2  director.

3  Q.   And when must they be signed?

4  A.   They must be signed, I believe it's within -- we

5  get a verbal order within 24 hours but it has to be

6  signed, I believe it's within a few days of

7  admission.

8  Q.   How are certifications of terminal illness used

9  by AseraCare in the Boston agency in the time period

10  you were there?

11  A.   It justified why we were continuing to provide

12  service to that patient.

13  Q.   What did you need it for?

14  A.   We needed it to bill for Medicare.

15  Q.   Do you have any experience -- did you have in

16  the Boston agency in the March 2008 to November 2009

17  time period have any experience getting the COTIs or

18  certifications of terminal illness signed by

19  attending physicians?

20  A.   Did I have experience -- yes, yes.

21  Q.   What was your experience?

22  A.   Physicians would sign them.

23  Q.   Can you describe the general practice of how you

24  would interact with an attending physician in order

25  to get a certification of terminal illness signed in

1   that time period in the Boston agency?

2          THE COURT:  How she would personally do

3   that?

4          MR. WERTKIN:  Yes, how you would personally

5   do that.

6   A.   If we were having difficulties getting it

7   signed, I may have called the doctor and explained

8   why they either need to sign the certificate of

9   terminal illness and provide a way to get that

10  information to the doctor, to get it signed and sent

11  back to the agency.

12  Q.   When you made those phone calls, did the doctor

13  ever disagree with you?

14  A.   Not that I recall, no.

15  Q.   But that wasn't your job primarily, you would

16  only get involved when there was a problem?

17  A.   I would get involved if there was a problem.  I

18  didn't necessarily deal with the day-to-day

19  paperwork.  I had staff that did that and they

20  brought it to me if there was a problem.

21  Q.   When there were problems, was that usually the

22  result of a disagreement about clinical judgment or

23  just because it was a paperwork issue?

24  A.   It could be a little bit of both.  The

25  physician, the patient's primary care doctor, could

1  have just decided they weren't going to sign it.  You

2  know, in my history, oftentimes doctors would sign

3  too many papers, I don't want to sign anymore.  I had

4  that.

5          Some wanted to understand why this person

6  was put on hospice and we would have to explain why

7  the person was put on hospice.  Sometimes that fell

8  to me to do and I did those.

9  Q.  Would you characterize that during the time

10  period that you were in Boston as rare or common or

11  very common?

12  A.  It wasn't common, no.  It was not common.

13  Q.  And based on your experiences at the Boston

14  agency between March 2008 and November 2009, did you

15  find it difficult or easy to get COTIs signed by the

16  AseraCare medical director?

17  A.  It was relatively easy to get them signed.

18  Q.  Why is that?

19  A.  Because the medical director came in during IDT,

20  that was part of his role was to sign the paperwork.

21  Q.  And the medical director's name at that time was

22  what?

23  A.  Ramadurai, Dr. Ramadurai.

24  Q.  What types of questions would Dr. Ramadurai

25  usually ask before signing the paperwork, if any?

1  A.   He may have asked, you know, what was the

2  diagnosis, what was going on with the patient.  If we

3  had just finished the IDT, he would just sit down and

4  go through and sign the documents.

5  Q.   Do you know what an LCD form is?

6  A.   Yes.

7  Q.   What is an LCD form?

8  A.   It is the Medicare criteria for admission to

9  hospice and it's based on, you know, a list of

10  diagnoses or problems or issues and things that we

11  have to complete to show how they meet criteria based

12  on these diagnoses.

13  Q.   And who uses an LCD form?

14  A.   The physician does, the nurses do.

15  Q.   And what is it used for?

16  A.   It is used for ongoing -- for admission and then

17  for recertification purposes.

18  Q.   And where does an LCD form appear?

19  A.   You can pull it down from the Medicare website.

20  And when I was at AseraCare, I believe we even had it

21  on a computer.  It was on one of the lists.  So we

22  can go in and you can pull up the LCDs and print them

23  all up and that's what we did.

24  Q.   Where would the LCD forms get filled out?

25  A.   The clinician -- the nurses could fill them out

780

1   at the time of admission, and as long as they were

2   completed in a timely matter after a review of the

3   documents and documentation and seeing the patient.

4   Q.   Where would they end up?

5   A.   They would wind up in the office and they would

6   be put in the patient's chart.

7   Q.   Is a patient's chart different from the

8   patient's medical record?

9   A.   No.  The chart and medical record are the same.

10   Q.   And why is the medical record important?

11   A.   It gives us an overview and history of why the

12   patient was admitted to service, what were the

13   comorbid conditions, what were the clinical

14   presentation at the time.  It tells us the whole

15   history, tells us the family history, the bereavement

16   history, it tells us a whole lot about what's going

17   on with that patient.

18   Q.   If something is not in the medical record, what

19   does that mean to you as a nurse?

20   A.   If you didn't write it down, it didn't happen.

21   Q.   In the Boston agency in the 2008, 2009 time

22   frame, did AseraCare rely on LCD forms?  Did they use

23   LCD forms?

24   A.   Yes.

25   Q.   How did they use LCD forms specifically?

1  A.  They were initially used on admission.  And then

2  we were using them again, as I said, in

3  recertification processes.

4  Q.  While you were at the Boston agency between

5  March 2008 and November 2009, did you form an opinion

6  as to whether nurses on your staff understood the LCD

7  forms?

8  A.  Yes.

9  Q.  What was that opinion?

10  A.  That they did not understand.

11  Q.  What was that based on?

12  A.  It was based on the clinical presentations of

13  the patients that were coming in and the lack of

14  completion of the documents at the time and not

15  really understanding disease trajectory and

16  understanding what diseases or issues were making the

17  patient appropriate for hospice at that time.

18  Q.  Why is that important?

19  A.  Because if you don't know those things, it's

20  hard to determine whether or not the patient is or is

21  not appropriate.

22  Q.  Why is that important for patients?

23  A.  Because if the patient is on the other end and

24  they're expecting to die within six months because

25  we've told them or if you don't know that the patient

1   or you have not told the patient that you expect them

2   to die within six months or less, the patient has

3   unrealistic expectations.  So it's a matter of how do

4   you have a conversation with the patient and the

5   family about what's going on with them.

6          If you don't know, if you can't explain or

7   you can't tell, it's hard to relieve the patient's

8   perceptions or understanding of what's going to

9   happen to them.

10  Q.   Why is the patient's perceptions important?

11  A.   Because I think, at any given time, we're all

12  human.  And as a patient, you may be thinking, we're

13  all hopeful at some point and nobody wants to die.

14  Hospice is a very difficult job to do.  Nobody wants

15  to hear I'm going to be dead in six months.

16         So, if you have a glimmer of hope and you

17  want to hope, it's not our job to dash that hope.

18  It's our job to encourage the hope, but encourage it

19  realistically.

20         What does it mean and what does hope mean to

21  you and how do we get you there.  Does hope mean that

22  you die comfortably?  Does hope mean you want to live

23  another 20 years?

24         It depends on what it is you want to do.  So

25  if your patient says, I want to live for 20 years,

 1   they don't belong on hospice.  If they say I want to

 2   die comfortably at home, I want to die without pain,

 3   then that is our job is to align our expectations and

 4   we should be able to understand why and how they will

 5   or will not experience whatever problem they're

 6   identifying in a way that will make it meaningful for

 7   them.

 8   Q.   And how --

 9         MS. MARTIN:  Let me just object to that last

10   line of testimony and move to strike.

11         THE COURT:  It goes beyond the question, but

12   I will allow it at this point.

13   Q.   (By Mr. Wertkin)  What type of paperwork is

14   necessary for you to align your understanding with

15   the patient's understanding?

16   A.   I think it begins on the admission process.  I

17   think on admission, if -- if the patient is made

18   aware that the expectation or your doctor's

19   expectation is that you will -- if your disease

20   continues along this normal trajectory, that you will

21   die within six months or this, if that statement is

22   not made, the patient already does not have the

23   appropriate expectation because they don't know.

24   Q.   I would like to shift gears a little bit.

25         Are you familiar with the term H&P form?

1   A.   Yeah.

2   Q.   What's an H&P form?

3   A.   It's a health and physical.

4   Q.   Who uses a health and physical form?

5   A.   Usually the physicians, they will use an H&P to

6   give an overall of the clinical presentation of the

7   patient.

8   Q.   How is an H&P form used?

9   A.   On admission or at any point during the

10  patient's stay on service, you could use an H&P to

11  give you a general overview of what's clinically

12  going on with that patient from a physician's

13  standpoint.  It helps you prepare your plan.

14  Q.   And why is that important?

15  A.   Because, as you know, in healthcare you can't do

16  anything without a physician.  You can't do anything

17  without their position, their name, you can't do

18  anything without their okay.

19        So, a physician overview is really what's

20  going to give you the diagnostic practice or phase of

21  what's going to happen with that patient and what you

22  do for them.

23  Q.   Did AseraCare in the March 2008 to November 2009

24  time frame in the Boston agency use H&P forms?

25  A.   We had -- there were some, yes, so there were

1  some.

2  Q.   What does that mean "there were some"?

3  A.   In some of our records, there were H&Ps on

4  admission and then in some there weren't.

5  Q.   Who fills that out, the H&P form?

6  A.   The physician would, the physician would.

7  Q.   Are you familiar with the term fast score?

8  A.   Yes.

9  Q.   What is a fast score?

10  A.   It's a scoring tool that's used on clients with

11  Alzheimer's disease.

12  Q.   Is that an acronym?  Does that stand for

13  something?

14  A.   Yes.  It's a functional -- I can't recall the

15  actual name.  It's a screening tool.

16  Q.   What does it measure?

17  A.   It measures levels of debility or changes or

18  decline in patients.

19  Q.   And how is it used?

20  A.   Usually, the nurse or clinician, anyone can go

21  in and look at the patient and based on the scoring

22  tool, they can say, based on the symptoms or clinical

23  presentation, what the patient looks like and then

24  they get a score.

25  Q.   Can you give me an example of how it's used?

1   A.   When you go and do an admission on the fast

2   score, I believe, on a hospice patient, I believe the

3   scoring goes to a seven.  It goes from zero to seven.

4   A patient with Alzheimer's has to be at a six, has to

5   be almost end stage in order to meet criteria for

6   hospice.

7            So if you're admitting an Alzheimer's

8   patient, you would take the fast score and you could

9   sort of really look at it because it gives you some

10  very objective points to look at.

11  Q.   Did AseraCare nurses, while you were there in

12  Boston in the March 2008 to November 2009 time frame,

13  use a fast score to evaluate patients?

14  A.   It was on the LCDs, so I am going to say yes.

15  Q.   Did you form an opinion as to whether nurses on

16  your staff understood the fast score system?

17  A.   I formed an opinion, yes.

18  Q.   What was that opinion?

19  A.   I think some did and I think some didn't.

20  Q.   If a nurse evaluated a patient inaccurately

21  using a fast score, what impact could that have for

22  the patient?

23  A.   If you downgrade the patient too much and the

24  patient is actually better, then the patient may not

25  fit criteria.  They may not meet that.

1           If you downgrade -- if you kind of upgraded

2      them, when they should have been downgraded, then

3      they would have been appropriate and you didn't admit

4      them.

5           So having an understanding of how to use the

6      tool was helpful.

7      Q.   So, either way you move, it could be harmful?

8      A.   It could be.

9      Q.   Specifically how would it be harmful?

10          MS. MARTIN:  I object to the statement as

11     being harmful, it's a summation.

12          THE COURT:  Rephrase your question.

13          MR. WERTKIN:  Yes, Your Honor.

14     Q.   And what affect would scoring someone too high

15     or too low in the fast score have, if any, on the

16     patient?

17     A.   It could be something as simple as you may need

18     to wait if we scored them too high because they

19     haven't quite reached that level six number.  You

20     need to wait a little bit.  Their swallowing may not

21     be there, their trunk control may not be there.  We

22     just have to watch them.

23          If we score them too high when they're

24     actually lower on the scale, then it's not so much

25     harm as it is, you know, are we accurately projecting

1  what's wrong with the patient based on an objective

2  tool.

3  Q.   Who does it need to be accurately projected to?

4  A.   I think anyone that has any discussion about the

5  patient or with the patient, so physicians, nurses,

6  colleagues, anyone that's working with that client.

7  Q.   As part of your changes, did you try to do

8  teaching on the fast score scale?

9  A.   Yes.

10  Q.   And were you able to do that training?

11  A.   Yes.

12  Q.   Can you describe what it is?  Is it a piece of

13  paper?  Is it a ruler?  What is a fast score,

14  exactly?

15  A.   AseraCare -- we, at one point, were able to

16  purchase these books.  They were called hospice

17  compliance -- hospice -- I can't remember what they

18  were called, but they were hospice compliance books.

19  And it listed every type of scoring tool or, you

20  know, how to use the LCDs.  It was a nice little

21  packet.

22         You could print off a fast score from the

23  computer.  You can print them up.  But through

24  AseraCare, we were able to buy these books.  We went

25  through the training on how to use the book.  We went

1   through, and I remember printing some out for staff

2   so that way they would have it, so that they would

3   get a better understanding of what they're looking at

4   when they're seeing the patient.

5   Q.   Did you form an opinion about whether they did

6   get a better understanding after you got those books?

7   A.   Yes.

8   Q.   What was that opinion?

9   A.   Some of them did and some of them didn't.

10  Q.   Who published that packet?

11  A.   I believe it was Corridor.

12  Q.   And I would like to change and switch gears to

13  -- I'm sorry, did you say Corridor?

14  A.   Corridor, I believe it was called Corridor.   It

15  was a book company.   It's called Corridor.

16  Q.   What is a PPS score?

17  A.   PPS scoring is, again, another functional

18  scoring that was used to determine patient's

19  functionability.

20  Q.   And do you know what PPS stands for?

21  A.   Performance -- something scale.   I can't

22  remember.

23  Q.   What does it measure?

24  A.   Again, it measures functionality of the patient.

25  And I believe it gives a score again from zero to, I

1  think it was 100, and I think there's like a 40, 50

2  percent where, on a hospice patient, you've got to

3  sort of be looking at, are they around that number.

4  And it sort of gives you, there again, very objective

5  data on what the patient should look like.  And it's

6  variable.  Some patients, based on what they see, you

7  know, the clinician sees, could be falling into one

8  area.  Another clinician may come in and see them at

9  a totally different level.

10        So it just depends.  And it's just getting a

11  variation on the score to understand what does it

12  mean and how to look at that patient.

13  Q.  What types of patients are PPS scores used for?

14  A.  You can use them pretty much for anybody.  Use

15  them for almost every patient, we get a PPS score.

16  Q.  Can you give me an example of how that might be

17  used?

18  A.  Sure.  Again, on admission or at any time during

19  a patient's case, if the patient begins to make a

20  decline, they will add a 70, 80 percent and they will

21  walkie-talkie, they were eating okay, they were doing

22  okay.  Something happened, they had a urinary tract

23  infection, they had a respiratory infection.  All of

24  a sudden, not wanting to eat, really having

25  difficulty walking, a lot of difficulties.  That may

1  change their PPS score from a 70 or 80 to maybe a 50,

2  which would be, for a hospice patient, a substantive

3  change because you can admit a patient on service

4  with a PPS of 70 because they have other clinical

5  issues that are going on that make them appropriate.

6  But when you see a change in a PPS, you might say to

7  yourself, okay, something really dramatic is

8  happening, something is really different and I need

9  to pay attention to this.

10  Q.   Are you knowledgeable about how doctors use PPS

11  scores when evaluating whether a patient is hospice

12  eligible?

13  A.   I'm not knowledgeable about that.

14  Q.   When you were at the Boston agency between March

15  2008 and November 2009, did you all use PPS scores to

16  evaluate patients?

17  A.   Yes.

18  Q.   And did you form an opinion as to whether nurses

19  on your staff understood PPS scores?

20  A.   Yes.

21  Q.   What was that opinion?

22  A.   That some of them did and some of them didn't.

23  Q.   For those who did not, what is the outcome when

24  PPS scores are not properly done?

25  A.   Well, you really didn't have to delve into

1   what's wrong with the patient again.  You've got to,

2   you know, go back and relook at information.  You've

3   got to maybe reassess the patient again.  You've got

4   to talk to other clinicians to see, you know, if what

5   was reported was just a fluke.  Did it happen just

6   this one time or is this a continuation and how does

7   that present.  So it requires you to do more.

8   Q.   What is a Karnofsky performance score?

9   A.   That's another Alzheimer's scoring tool.

10  Q.   You're familiar with this term?

11  A.   I don't use Karnofsky, so I'm not as familiar

12  with it as the other ones.

13  Q.   Do you know --

14          THE COURT:  Are you familiar with how it

15  might be spelled?

16          THE WITNESS:  Yes.  K-a-r-n-o-f-s-k-y.

17          THE COURT:  That's a scoring system to

18  evaluate Alzheimer's patients?

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  Thank you.

21          THE WITNESS:  You're welcome.

22          MR. WERTKIN:  Your Honor, it may be spelled

23  with a V.

24          THE COURT:  That's close enough.  That's

25  better than I could have done on my own.  Thank you.

1    Q.   (By Mr. Wertkin)  And what does it measure?   To

2    the extent that you know, what does it measure?

3             MS. MARTIN:   I object to the foundation.

4             THE COURT:   Sustained.

5    Q.   (By Mr. Wertkin)  Do you know what it measures,

6    what the Karnofsky performance score measures?

7    A.   It measures --

8    Q.   Just yes or no, do you know what it measures?

9    A.   Yes.

10   Q.   What does it measure?

11   A.   It measures Alzheimer's stages.

12   Q.   How is it used?

13   A.   It's used, again, as another tool to objectify

14   what's going on with the patient over time.

15   Q.   Do you have any experience applying the score to

16   patients?

17   A.   I do not know.

18   Q.   Are you familiar with the term plan of care?

19   A.   Yes.

20   Q.   What is plan of care?

21   A.   Plan of care gives the overall treatment,

22   supportive measures and family support that's

23   identified through physician orders, nursing plans

24   that's sent to physicians for signatures.

25   Q.   Who decides on a plan of care?

1   A.   Ideally it's the nurse, the patient, the family

2   and the patient's physician.

3   Q.   That's a lot of people.  Can you say it again?

4   A.   Yes.  The nurse, the patient, the family, and

5   the physician.

6   Q.   Is there anyone else who had input into the plan

7   of care?

8   A.   The team members.  So, yes, the bereavement

9   people would have a say, the chaplain people would

10  have a say.

11  Q.   How do they decide on a plan of care?

12  A.   Really, it's based on your clinical expertise

13  and knowledge base.

14          So, if your clinical knowledge is such that,

15  you know, if you are -- I'm a nurse.  So as a nurse,

16  I have a certain body of knowledge.  Based on what I

17  know about what happens in end stage respiratory

18  disease, I know I have to have a certain number of

19  criteria or plans or treatments or interventions that

20  would be appropriate to that disease state to help

21  that patient reach whatever goal they've identified

22  as theirs.

23  Q.   What information is used to make a plan of care?

24  A.   It could be any number of things.  I mean, it's

25  really an evidence based practice model.  You would

1   look at the most recent history, what's going on with

2   that patient.  You would confer with that doctor and

3   you would confer with the patient.

4            Sometimes the patient is probably your most

5   important person because they will tell you what they

6   want.  You have to be able to have a conversation and

7   identify how does that match with the medical piece

8   and give them a plan that works for them.

9   Q.   Would LCD forms be used to form a plan of care?

10  A.   It could be.

11  Q.   Would fast score results be used for a plan of

12  care?

13  A.   It could be.

14  Q.   Would PTS scores be used for plan of care?

15  A.   It could be.

16  Q.   Would Karnofsky scores be used for plan of care?

17  A.   It could be.

18  Q.   How important is it that all those scores are

19  accurate in making a plan of care?

20  A.   They are important as how much weight you put on

21  them is probably the most general way to say it.

22  Every patient is different.  Every patient's outcomes

23  are going to be different in terms of what they want

24  and how they want to get there.  These are tools.

25  These are tools.  They're guidelines.  They are to

1  help a clinician to formulate an opinion on what's

2  the next step.  It does not substitute for clinical

3  knowledge.

4  Q.  Is that what a plan of care does, tells you what

5  the next steps should be?

6  A.  It does.  It should be.

7  Q.  Why is that important?

8  A.  Because at any given time, any clinician,

9  anybody should be able to pick up the plan of care

10  and say, okay, this is what the family wants or this

11  is what I want to do this week or this is a goal that

12  the family has.

13          Every note, every interaction should read

14  back to that plan of care and the plan of care is a

15  living document.  It basically gives you the road map

16  on where the patient sees themselves at the end of

17  this journey and how do we get them there and the

18  plan of care should do that.

19  Q.  Are you familiar with the acronym CMS?

20  A.  Yes.

21  Q.  What is CMS?

22  A.  Center for Medicare and Medicaid Services.

23  Q.  And that's the acronym.  Do you know what it is?

24  A.  It's Medicare, yes.

25  Q.  Are you familiar with the term Palmetto?

1   A.   Yes.

2   Q.   What is Palmetto?

3   A.   Palmetto, at that time, was the fiduciary

4   intermediary for us in Massachusetts.

5   Q.   As the executive director in Boston from March

6   2008 to November 2009 time frame, who was responsible

7   for submitting bills to Medicare?

8   A.   Our biller was responsible.

9   Q.   Who did your biller report to?

10  A.   They reported to the VP and the regional

11  director.

12  Q.   Did you have anything to do with the billing in

13  that time period in March 2008 to November 2009 in

14  Boston?

15  A.   I'm making sure everything was ready.

16  Q.   What's involved with making sure everything is

17  ready?

18  A.   That we have the consent forms in the agency,

19  that the documentation is completed, that the COTIs

20  are signed and completed, that the initial process

21  has been done.

22  Q.   When you say the documentation is completed,

23  what do you mean by that?

24  A.   That means that it's not blank, it's completed,

25  that the physicians have signed it and dated it.

1   Q.   When you were doing that review in that time

2   period in Boston from March 2008 to November 2009,

3   did you form an opinion as to whether the medical

4   records needed to support a prognosis of terminal

5   illness in order to get paid by Medicare?

6   A.   Yes.

7   Q.   What was that opinion?

8           MS. MARTIN:  We would object to her

9   testimony on this subject under --

10          THE COURT:  Sustained.

11          MR. WERTKIN:  Your Honor, may I approach?

12          THE COURT:  All right.

13                    (SIDEBAR)

14          MR. WERTKIN:  I just want to understand that

15  she's the one who is ultimately responsible for

16  submitting the bills to Medicare, so she should be in

17  the best position to say what they thought they

18  needed to do to get paid.

19          MS. MARTIN:  I thought we dealt with this

20  with the witness prior about the questioning of

21  whether the documentation supported -- I mean, she's

22  a nurse and not the administrative person in the

23  office, and he's asking her to say whether the

24  documentation would support medical records.  Maybe I

25  misunderstood the question.

1          THE COURT:  I thought he was asking her

2     whether she had an opinion as to whether medical --

3     the medical records had to support the decision to

4     get paid.

5          MR. WERTKIN:  To get paid, right, not a

6     specific record.

7          THE COURT:  And I'm not sure that there's

8     been a foundation laid for her to do that.

9          MR. WERTKIN:  I can lay the foundation.

10          THE COURT:  I'm not sure what their

11     objection is.

12          MR. LEMBKE:  Your Honor, part of the problem

13     is, they're asking does she have an opinion on

14     whether you have to submit medical records to get

15     paid, isn't that an opinion on what the law is and

16     why is she testifying to that?

17          MR. WERTKIN:  Your Honor, I can phrase it a

18     different because she submits the bills.  And --

19          THE COURT:  No, she said she wasn't

20     responsible for submitting the bills.  She was

21     responsible for seeing that the documents were in

22     order but she didn't submit the bills is what I

23     understood her to say.

24          MR. WERTKIN:  I agree that that's a good

25     reading of what she said.  I don't think she was very

1    clear.  I think she is the one who checks it over

2    before the bills go out.  She's the executive

3    director, that's what they all seem to do.

4          THE COURT:  She said her billing person did

5    that.

6          MR. WERTKIN:  Yeah, but she checks it to

7    make sure it's all complete.  I think I know from

8    talking to other witnesses that it's called drop

9    billing.  It's like a term of art.  The medical

10   director -- the medical director -- the billing

11   person does all that stuff.  They give it to the

12   medical director, the medical director checks it out

13   and notifies corporate and they say you can now bill

14   for this stuff.

15          That's my understanding of how the whole

16   process works.  And I think that's consistent with

17   what she's going to testify to.

18          THE COURT:  That's not what she has

19   testified to.

20          MR. WERTKIN:  I can ask a clarifying

21   question.

22          THE COURT:  I'm not sure that she's here to

23   give an opinion as to what Medicare standards are.

24          MR. WERTKIN:  Well, I mean, Your Honor, I

25   apologize because I'm trying to think fast about how

1    to phrase this.  But this is the head of the

2    AseraCare office in Boston.  What do you think you

3    need to get paid by Medicare, I can say it that way.

4           THE COURT:  I think that's a little bit

5    different than asking her what her opinion is as to

6    what the law requires.  And certainly you are going

7    to have others, I would anticipate, that are actually

8    involved with AseraCare in making those decisions;

9    right?

10          MR. WERTKIN:  Yes.

11          MR. LEMBKE:  We just note our objection for

12   the record that we still think this is a pending on

13   legal issue, saying what do you think you need to get

14   paid, it's still --

15          THE COURT:  There's another way to ask it in

16   terms of what did you provide to Medicare for

17   payment.  I mean, that is more of a factual thing.

18          MR. LEMBKE:  That's all right.

19          MR. WERTKIN:  Okay.

20              (Open court.  Jury present.)

21   Q.  (By Mr. Wertkin)  What do you need to provide to

22   get paid by Medicare?

23          MS. MARTIN:  We object.

24          THE COURT:  Sustained.  That's not what we

25   discussed.

```
 1              MR. WERTKIN:  Give me one second, please.
 2                   (Brief pause)
 3  Q.  Do you know what needs to be submitted -- no?
 4              Were you involved at all in the billing
 5  process?
 6              MS. MARTIN:  Asked and answered.
 7              THE COURT:  Overrule.  We're trying to
 8  clarify that.
 9  Q.  (By Mr. Wertkin)  Were you involved at all in
10  the process for submitting bills to Medicare?
11              THE COURT:  Did you submit the bills to
12  Medicare or did somebody else submit them?
13              THE WITNESS:  Somebody else submitted the
14  bills.
15  Q.  (By Mr. Wertkin)  Did you have any role along
16  the way?
17  A.  Yes.
18  Q.  Okay.  Along the way, what was your role?
19  A.  To collect the document and make sure that I had
20  them.
21  Q.  Can you just actually talk me through the
22  process, like it's time to bill, what's the first
23  thing that happens, the second thing and third thing
24  and fourth thing?
25  A.  The first thing that happens for billing, you
```

1   must have signed COTIs; on admission, you must have

2   consent forms.  You must have the admission

3   documentation, the nursing admission completed and

4   ready to close.  That gets us going to get started on

5   the billing process.

6           On recert, you needed to have your signed --

7   I'm sorry -- an LCD.

8           On recert, you needed your COTIs signed by

9   your medical director.  You needed the signed -- all

10  the signed recertification paperwork to get that

11  patient ready to bill.

12  Q.  What was your role?

13  A.  My role was to make sure it was done.

14          THE COURT:  Make sure the documentation was

15  done?

16          THE WITNESS:  Make sure that when the biller

17  said we're ready to bill, to make sure that

18  everything that needed to be there to make sure she

19  could bill was there.

20  Q.  (By Mr. Wertkin)  Do you know whether or not the

21  patient's Medicare records, full medical records,

22  were sent to Medicare to bill?

23  A.  No.  I don't know that, no.

24  Q.  You don't know whether that's true or not or you

25  don't know if that happens?

1   A.   I don't know if that's true or not, if the whole

2   chart goes at one time, because of how -- because of

3   how the billing process goes.

4          THE COURT:  You just don't know that?

5          THE WITNESS:  I don't know that.

6   Q.   (By Mr. Wertkin)  Do you know what was needed to

7   be contained in the medical record before claims were

8   submitted?

9          MS. MARTIN:  We would object for the grounds

10  previously raised.

11         THE COURT:  Sustained.

12         MR. WERTKIN:  Thank you, Your Honor.  I have

13  the exhibit we were talking about earlier.  Can

14  I approach, Your Honor?

15         THE COURT:  Yes.  I tell you what, why don't

16  we go on and take a break.  We have been going for a

17  while and now may be a good time for that.  We will

18  come back around 3:00.  Okay.  Maybe a little bit

19  after that but not before 3:00.  Okay.  What are the

20  instructions?

21                 (Jury responds)

22         THE COURT:  No talking, don't let anybody

23  talk to you.  All right.  We will come back in just a

24  minute.

25         MR. WERTKIN:  You are still under oath.  Do

1   you want her to sit there or go back to the jury

2   room?

3            THE COURT:  After the jury leaves, we will

4   talk about that.  Okay?  We will wait for our jury to

5   go to their home away from home.

6                      (Jury excused)

7                       (SIDEBAR)

8            MS. MARTIN:  Judge, I realized that there

9   was a page that I intended to have that talked about

10  who was in that -- I don't guess I have to talk to

11  you in that way, but who was in that meeting at the

12  time.  And I'm trying to get it to come up on my

13  computer, and I am having a little difficulty.  It

14  was blacked out.  But it was the region one and

15  region two executive directors were at that meeting

16  and that's where Ms. Perryman had responsibility.

17           THE COURT:  I don't think I have a copy of

18  the exhibit.  I think I gave it back to you.

19           MR. WERTKIN:  Your Honor, I would request

20  the opportunity to lay a foundation for this

21  document.  And I anticipate that Ms. Perryman is

22  going to say she received this document, that she was

23  presented the presentation that's in this document

24  and that she gave and passed it out to her staff and

25  it was not withdrawn.

1        I also would like to bring to the Court's

2   attention to Government's Exhibit 182 which is an

3   email from the president of AseraCare that talks

4   about gray areas and shows that this concept was not

5   one that was withdrawn.

6        MS. MARTIN:  What's important on the

7   document it says, remember, this is not a black and

8   white business.  We have to deal with gray areas all

9   the time.  It doesn't talk about the gray patient or

10  managing patients in the gray zone.  It talks about

11  that this is not black and white business and it says

12  thus, make eligibility judgments possible -- doesn't

13  talk about any of the things that are contained in

14  that PowerPoint in terms --

15       THE COURT:  I want to find out where this

16  PowerPoint came from.  Because this deposition

17  excerpt from Ms. Kiehl refers to Gay Rogers; right?

18       MS. MARTIN:  Right.

19       THE COURT:  Who followed Ms. Durkin; is that

20  right?

21       MS. MARTIN:  Right.

22       MR. WERTKIN:  Yes, Your Honor.

23       THE COURT:  And I'm not sure I got the time

24  quite right.  So I would like to hear, out of the

25  presence of the jury, from this witness about this

1  document.

2          MR. WERTKIN:  Yes, Your Honor.

3          THE COURT:  But I'm inclined to exclude it

4  at this point.

5          MR. WERTKIN:  Thank you, Your Honor.  As

6  long as I have the opportunity to lay a foundation,

7  then I totally understand Your Honor and respect and

8  will abide by Your Honor's ruling.

9          THE COURT:  And I need a minute or two.

10                  (Brief recess).

11    (Open court.  Outside the presence of the jury.)

12          THE COURT:  Ms. Perryman, we need to ask you

13  some questions outside the presence of the jury.  If

14  you would answer them please, ma'am.

15          THE WITNESS:  Yes, ma'am.

16  Q.  (By Mr. Wertkin)  Who is Gay Rogers?

17  A.  Gay Rogers was the regional director of

18  operations, I believe, for the region I was in.

19  Q.  What region were you in?

20  A.  It was region two.

21  Q.  Was she your direct supervisor when she came on?

22  A.  When she came on yes, she was my direct

23  supervisor.

24  Q.  When did she come on?

25  A.  She came on in May, I believe, 2009.

1  Q.  As your direct supervisor, what was her title

2  again?

3  A.  I believe she was --

4         THE COURT:  Let's just get to the issue at

5  hand.  We've already covered a lot of that and I want

6  to find out about this document.

7         MR. WERTKIN:  Thank you, Your Honor.

8  Q.  If an email came in to AseraCare DOC's division,

9  would you have received that email?

10  A.  Yes.

11  Q.  Do you recall getting an email with a

12  presentation attached from Gay Rogers?

13  A.  Yes.

14  Q.  Do you recall what the presentation was about?

15  A.  It was something along the line of hospice, the

16  gray zone or understanding admitting patients in the

17  gray zone.

18  Q.  Do you recall -- what was your understanding of

19  when you got that email and you got that attachment,

20  what was your understanding of that?

21  A.  It was supposed to help us to understand how to

22  admit patients that weren't quite hospice eligible

23  but were hopefully going to be.

24  Q.  What did you do with that presentation?

25  A.  I was -- we were told, I believe it went to just

1  the ED, I think we were told to share that with the

2  staff, with the salespeople, I believe.

3  Q.  Did you?

4  A.  I did.

5  Q.  Was there ever any follow-up about the

6  presentation, any kind of follow-up that you

7  received?

8  A.  Not that I can recall, no.

9  Q.  Do you remember ever being told not to give a

10  presentation to your staff or --

11  A.  No.

12  Q.  That's my only question.

13  A.  I don't remember that.

14  Q.  Did you ever recall saying, hey, this was a

15  mistake, I don't want to -- you should just disregard

16  this?

17  A.  Well, no, I didn't say that.

18          THE COURT:  Do you recall when this email

19  was roughly?

20          THE WITNESS:  It couldn't have been much

21  later than when she started, so it had to be June or

22  July or something.

23          THE COURT:  Of?

24          THE WITNESS:  2009.

25          THE COURT:  You left there in November of

1  2009?

2          THE WITNESS:  Yes, ma'am.

3          MS. MARTIN:  Your Honor, I have just a

4  couple of questions, if I might.

5          THE COURT:  You may.

6  Q.  (By Ms. Martin)  Hi, I'm Kim Martin.

7  A.  Hi.

8  Q.  You would not have gotten an email to all the

9  DOs, would you?  You weren't a director of

10  operations; correct?

11  A.  No, I was an ED.

12  Q.  You were an ED.  So you wouldn't have been on

13  any email chain that was to directors of operation;

14  correct?

15  A.  No.  But I do remember getting that and I don't

16  know how I got it.

17  Q.  Okay.  And you said it was something to give to

18  the salespeople?

19  A.  That was my impression, that we were to use that

20  as a way to bring more patients on.

21  Q.  And you gave it to the salespeople in your

22  agency?

23  A.  I vaguely remember having a conversation with

24  them about this.

25  Q.  Thank you.  Are you sure you gave it to them or

1   you said you -- or do you just vaguely recall a

2   conversation?

3   A.   I remember I had a conversation.  I don't recall

4   definitively that yes, I sat down with them and we

5   had a meeting, but I remember we had a talk.  I

6   remember it coming to me.  We had some kind of

7   conversation about it.  And I was supposed to do

8   something with it.  And I believe that was to talk to

9   the salespeople about it.

10          MS. MARTIN:  Thank you.

11          THE WITNESS:  You're welcome.

12          THE COURT:  Do you recall what form the

13  information was in when you received it?

14          THE WITNESS:  I believe it was just an

15  email, it was just an email.  It was a PowerPoint.

16          THE COURT:  Email what?

17          THE WITNESS:  An email, it was a PowerPoint

18  that was in an email, ma'am.

19          THE COURT:  Any further question?

20          MS. MARTIN:  No, Your Honor.

21          MR. WERTKIN:  No.

22          THE COURT:  Was that anything that you used

23  or shared with the nurses or anyone who was doing an

24  evaluation as to whether any of the patients were

25  eligible for hospice care?

1          THE WITNESS:  I can't say definitively that

2     yes, I did that.  I know that I had a conversation

3     with --

4          THE COURT:  Salespeople.

5          THE WITNESS:  I know I talked -- I know I --

6     I apologize.  It was --

7          THE COURT:  I understand it was a long time

8     ago.  I can't remember sometimes what I did

9     yesterday.

10          THE WITNESS:  Yeah.

11          THE COURT:  But your recollection is you

12     shared it with your salespeople?

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  You don't have a recollection of

15     sharing it with people who were doing the evaluations

16     as to eligibility?

17          THE WITNESS:  Not as I -- not as I -- not as

18     I try --

19          THE COURT:  I sustain the objection.  Are we

20     ready for our jury now?

21          MR. WERTKIN:  Yes, ma'am.

22          THE COURT:  Okay.

23                    (Jury present)

24          THE COURT:  Mr. Wertkin, you may continue,

25     please.

1          MR. WERTKIN:  Thank you, Your Honor.

2    Q.   Ms. Perryman, how would you characterize the

3    general admissions practices and IDT practices when

4    you arrived at AseraCare in March of 2008?

5          MS. MARTIN:  Objection, asked and answered,

6    Your Honor.

7          THE COURT:  Sustained.

8    Q.   Did AseraCare support your efforts to change

9    those processes?

10         MS. MARTIN:  Objection, Your Honor, asked

11   and answered.

12         THE COURT:  Sustained.

13         MR. WERTKIN:  Your Honor --

14   Q.   At the end of your tenure at AseraCare in

15   November, October, November time period, did you find

16   that the general processes and IDT practices --

17   strike that.

18         MR. WERTKIN:  I'm done with my questions.

19   Thank you.

20         THE COURT:  Thank you.  Cross-examination.

21         MS. MARTIN:  Thank you, Judge.

22                   CROSS-EXAMINATION

23   **BY MS. MARTIN:**

24   Q.   I'm Kim Martin.  I introduced myself a few

25   minutes ago.  I represent AseraCare.

1          You are not saying that every patient in the

2     Boston agency during your tenure there was not

3     eligible for service, are you?

4     A.   No, I'm not.

5     Q.   And you would agree with me that there are many

6     -- there were many patients on service in Boston that

7     you would say were eligible; correct?

8     A.   Yes.

9     Q.   And you would agree with me that in assessing

10    eligibility of a patient, you have to look at the

11    patient individually; correct?

12    A.   Yes.

13          MS. MARTIN:  Just one second.

14               (Brief pause)

15          MS. MARTIN:  That's all I have.  Thank you.

16          THE WITNESS:  Thank you.

17          THE COURT:  Anything further?

18          MR. WERTKIN:  No, Your Honor.

19          THE COURT:  Ms. Perryman, you may step down

20    and be excused.  Thank you.

21          And the United States may call your next

22    witness.

23          MR. WERTKIN:  Your Honor, the United States

24    calls Marsha Brown Farmer.

25                    (SIDEBAR)

815

1    MR. WERTKIN:  Your Honor, I have a question

2    about her financial interest in this case.  Can I

3    simply call her back and ask that one question?

4         MR. LEMBKE:  That was not covered on cross.

5         THE COURT:  And she's gone.

6         (Open court.  Jury present.)

7         MS. MARTIN:  May we approach, Your Honor?

8         THE COURT:  Okay.

9                     (SIDEBAR)

10        MS. MARTIN:  Judge, I know that Ms. Brown

11   Farmer was in the Monroeville office for a period of

12   time and in the Foley office for -- was responsible

13   for the Foley office up until around December of

14   2008.

15        And so the -- the eligible -- the only

16   ineligible patient in this sample in Monroeville is

17   was not on service until, I believe, 2010 and the

18   time frame is different in Foley, and then the other

19   agency that she did have responsibilities for but I

20   don't -- what's the date?  I'm losing it.  She was no

21   longer the executive director in Mobile at that time.

22        So before we started, I wanted to make sure

23   the time surrounding Ms. Brown, I wanted to make sure

24   the times were kept and the agencies were kept within

25   the time frame.

1        MR. WERTKIN:  I will do my best to preface

2    any questions in this time frame.  I may need to ask,

3    there might be some dates when the doctors came on

4    but I will preface each question with the dates.

5        MS. MARTIN:  I just recognized that as a

6    potential issue with this witness because of time

7    frame of agencies.

8        MR. WERTKIN:  I can do a pretty decent job

9    of it.

10       THE COURT:  Sometimes.

11       MR. WERTKIN:  I try to.

12       THE COURT:  I do think it's important not to

13   go into why somebody left but establish pretty early

14   the framework during which they were at a particular

15   place.  Like with Ms. Perryman, I think I had to ask

16   to find out so I can keep up with what the relevant

17   time frame is for the testimony.

18       MR. WERTKIN:  Thank you, Your Honor.

19       MS. MARTIN:  Thank you.

20       (Open court.  Jury present.)

21    MARSHA BROWN FARMER, GOVERNMENT'S WITNESS, SWORN.

22       THE CLERK:  State and spell your first and

23   last name for the court.

24       THE WITNESS:  My first name is Marsha, last

25   name is Farmer.

 1            THE COURT:  Would you spell those, please?

 2            THE WITNESS:  M-A-R-S-H-A and last name is

 3   F-A-R-M-E-R.

 4            THE COURT:  Thank you.

 5            THE WITNESS:  Yes, ma'am.

 6                  DIRECT EXAMINATION

 7   BY MR. WERTKIN:

 8   Q.    Good afternoon, Ms. Farmer.  Where are you

 9   from, Ms. Farmer?

10   A.   I'm originally from Monroeville and I currently

11   live in Fort Payne.

12   Q.   You were born in Monroeville?

13   A.   Yes, sir.

14   Q.   And now you currently live in Fort Payne?

15   A.   Yes, sir.

16   Q.   And are you married?

17   A.   Yes, sir, I am.

18   Q.   Do you have children?

19   A.   Three.

20   Q.   Ms. Farmer, do you know why you've been called

21   as a witness in this case?

22            MS. MARTIN:  Your Honor, object.

23            THE COURT:  Sustained.

24   Q.   Ms. Farmer, have you ever worked for the

25   defendant in this case, AseraCare Hospice?

1   A.   Yes, sir, I did.

2   Q.   And in what position did you work for AseraCare

3   Hospice?

4   A.   I worked for them as an executive director which

5   is like an administrator role.

6   Q.   For how long did you work for them?

7   A.   From the time that they acquired Hospice South

8   which was 2004 until 2011.

9        THE COURT:  Could you give me approximate

10  months in those years, please, ma'am, Ms. Farmer?

11       THE WITNESS:  Yes, ma'am.  I believe they

12  acquired Hospice South in May of 2004 and I believe

13  it was February or March of 2011.

14       THE COURT:  February or March of 2011 when

15  you left?

16       THE WITNESS:  Yes, ma'am.

17       THE COURT:  Thank you.

18  Q.   (By Mr. Wertkin)  Ms. Farmer, I will get into

19  specifically your job and your responsibilities and

20  your time frame.

21       Have you filed a complaint in this case

22  against AseraCare?

23  A.   I did.

24  Q.   Do you know what happened to that complaint?

25  A.   Yes, sir.  We chose to combine complaints with

1   other relators and move forward.

2   Q.   Why did you file a complaint?

3   A.   Because I was there over a number of years and

4   had witnessed many things and participated in things

5   that I believe to be fraudulent.

6         MS. MARTIN:  Your Honor, we need to

7   approach, please.

8         THE COURT:  All right.

9               (SIDEBAR)

10        MR. LEMBKE:  In the motion in limine, there

11  were lots of ways to talk about this and he just

12  asked, what was in your complaint.

13        Now, I think it's pretty clear that Your

14  Honor said they weren't supposed to do that and here

15  we go again.

16        MR. WERTKIN:  That's not fair, Your Honor.

17  We know that we get to talk about it in terms of the

18  relator agreement and I wanted to just ask her why

19  are you here.  And I didn't -- and she reported

20  fraud.  That is not fair.  Come on.

21        THE COURT:  I would agree with Mr. Wertkin

22  on this one.  We're going to not go into details of

23  the complaint but she filed a complaint and she's a

24  whistleblower.  And you got to have that before you

25  can cross-examine her on the relator agreement.

1          MR. LEMBKE:  All right.

2          MS. MARTIN:  Thank you, Judge.

3          (Open court.  Jury present.)

4   Q.  (By Mr. Wertkin)  Why did you file a complaint

5   in this case?

6   A.  Because I, again, felt like some things were

7   being done that were not right and they were

8   fraudulent and I came forth with that information.

9   Q.  Ms. Farmer, have you ever given any testimony in

10  a courtroom before?

11  A.  No, sir.

12  Q.  And what did you do to prepare for today?

13  A.  I met with my attorneys and yourself and that's

14  it.

15  Q.  Are you nervous today?

16  A.  A lot nervous today.

17  Q.  Before we talk about your time at AseraCare, I

18  would like to ask you a few questions about your

19  background; is that okay?

20  A.  Sure.

21  Q.  Where did you go to high school?

22  A.  Monroeville County High School.

23  Q.  After high school, what did you do?

24  A.  Alabama Southern over a period of time and where

25  I received my associate's degree.

1   Q.   What kind of school is Alabama Southern?

2   A.   It's just a community college in Monroeville.

3   Q.   Did you receive your degree?

4   A.   My associate's, yes, sir, in arts.

5   Q.   How long did it take you to do that?

6   A.   I went there initially for about a year and then

7   I stopped and I returned later and completed it.

8   Q.   Why did you stop?

9   A.   I got married at a very young age and I quit

10  going.

11  Q.   What did you get your degree in?

12  A.   It was an associate's in arts.

13  Q.   Did you attend any other college or university

14  after Alabama Southern Community College?

15  A.   Yes, sir.  I went to AUM.  I did -- most of it

16  was online, distance education training, and some

17  weekend classes there.

18  Q.   Did you graduate from Auburn?

19  A.   I did not.

20  Q.   In Montgomery.  Do you have any formal medical

21  training?

22  A.   No, sir.

23  Q.   When did you start working in the hospice

24  industry?

25  A.   Initially it was 2002, January of 2002.

1  Q.   And what company did you start working for?

2  A.   Hospice South.

3  Q.   What did you do at Hospice South?

4  A.   I was a CE for the first year which was a

5  community educator.

6  Q.   And what does a community educator do?

7  A.   My role was to educate the community regarding

8  hospice services, what we did and what we provided.

9  Q.   And what responsibilities does a community

10  educator at Hospice South have?

11  A.   I specifically --

12          MS. MARTIN:  We would just object to the

13  relevancy of this testimony.

14          THE COURT:  Sustained.

15  Q.   (By Mr. Wertkin)  How long did you work in that

16  position at Hospice South?

17  A.   A year.

18  Q.   And what did you do next?  What was your next

19  job?

20  A.   I moved into the administrator role or executive

21  director role there at Hospice South.

22  Q.   Was that a promotion?

23  A.   Yes, sir.

24  Q.   And what years was that?

25  A.   That was in 2003.

1  Q.   How long did you work as an executive director

2  at Hospice South?

3  A.   Until the point that it was acquired by

4  AseraCare Hospice in 2004.

5  Q.   What location did you work at when you were an

6  executive director at Hospice South?

7  A.   That was the Monroeville location.

8  Q.   About what year was Hospice South acquired by

9  AseraCare, if you know?

10  A.   I believe that to be 2004, May of 2004.

11  Q.   What happened after the acquisition of Hospice

12  South by AseraCare?  What happened to your job?

13  A.   I remained in the same position and for the same

14  agency for a period of time.  And then we did a

15  startup agency in Foley, where I was also the

16  administrator.

17          And then later on, I also was an

18  administrator for the Mobile location.

19  Q.   Let's go and take them one by one.  I think this

20  is what we were talking about a little earlier.

21          From Monroeville --

22  A.   Yes, sir.

23  Q.   -- what was the time period that you were the

24  executive director at the Monroeville agency for

25  AseraCare?

824

1   A.   From the time they aquired in May of 2004 all

2   the way until I left in 2011.

3   Q.   And you mentioned that you were the --

4          THE COURT:   February or March of 2011?

5          THE WITNESS:   Yes, ma'am.

6   Q.   And you mentioned that you were also the

7   executive director of other AseraCare agencies?

8   A.   Yes, sir.

9   Q.   Which ones were those?

10  A.   Foley, Alabama and then Mobile, Alabama.

11  Q.   For how long were you the executive director in

12  Foley, Alabama?

13  A.   I'm not positive on the dates, but I'm thinking

14  it was 2005 until the end of 2008 for Foley.

15         THE COURT:   That would be starting when in

16  2005?

17         THE WITNESS:   It was a startup.   I'm

18  thinking that some time around the spring or summer,

19  but I'm not positive of the exact month.

20  Q.   (By Mr. Wertkin)  Do you have a recollection of

21  when you stopped being the executive director of the

22  Foley office in 2008, which month?

23  A.   I think it was around December.

24  Q.   Were you the executive director of another

25  AseraCare agency?

1   A.   Yes, sir.  Mobile, Alabama.

2   Q.   What was the time period that you were the

3   executive director of the Mobile, Alabama office?

4   A.   I believe the dates would be -- from around the

5   fall of 2006 until -- or maybe 2007.  I'm thinking --

6   I'm thinking the end of 2006, the fall of 2006, all

7   of 2007 until January of 2008.  I know I was still

8   there when I had my daughter and she was born in

9   January of '08.

10  Q.   Ms. Farmer, looking at these dates, it seems to

11  me you were the executive director of three agencies

12  all at the same time; is that right?

13  A.   Yes, sir.

14  Q.   Was that a lot of work?

15  A.   Yes, sir.  A great deal.

16  Q.   Did you ask for those jobs?

17  A.   No, sir.

18  Q.   How did you get them?

19  A.   You know, at this point, I don't know.  It was a

20  startup for Foley and they were placed under our

21  provider number.  And then Mobile belonged to another

22  agency, which was the Jackson, Alabama agency

23  initially.  And then they asked me if I would come to

24  Mobile, I think, in 2006.  They had done a level

25  three, which is an APA audit, which is an internal

1  audit.

2        MS. MARTIN:  Your Honor, we would object to

3  this line of testimony.

4        THE COURT:  Sustained.   Disregard that

5  comment, please.

6  Q.   (By Mr. Wertkin)  Did your responsibilities vary

7  depending on which agency or were they all the same

8  as an executive director of all three agencies?

9  A.   My responsibilities were the same, but depending

10 on which agency I was in and what needed the most

11 attention at the time.  I mean, you couldn't be in

12 all three agencies the same day.  I had to travel --

13 it was two hours at least between each agency.

14 Q.   What were your responsibilities as the executive

15 director of AseraCare's Monroeville and Foley

16 agencies?

17 A.   The responsibility was very vast.  It's

18 everything from hiring and terminating physicians,

19 hiring medical directors, ADRs, anything you can

20 think of, we were ultimately responsible for it.

21 Q.   Can you highlight the clinical responsibilities

22 that you had as the executive director of the

23 Monroeville --

24 A.   I didn't have clinical responsibilities exactly.

25 I mean, I would help write the ADRs which would be

1  more of a clinical type position, but I didn't see

2  patients.

3  Q.   Did you attend clinical meetings?

4  A.   IDGs, yes, sir.

5  Q.   What are IDGs?

6  A.   They are meetings with a team and the medical

7  director would get together to discuss the patients

8  that you need to review at that time period, as well

9  as certify or recertify patients for hospice service.

10  Q.   What are ADRs?

11  A.   Additional data requests.  They are sent from

12  Medicare and they are asking for more information on

13  a patient for a certain time period.

14  Q.   What was your responsibility with regard to

15  ADRs?

16  A.   I would write some of the responses and pull the

17  paperwork together to send back to Medicare.

18          MR. WERTKIN:  With the Court's indulgence,

19  if I can have a minute to check some dates, please.

20          THE COURT:  Okay.

21             (Brief pause.)

22          MR. WERTKIN:  Thank you, Your Honor.

23  Q.   Ms. Farmer, what is hospice?

24  A.   It's a service that's provided by Medicare to

25  help take care of patients who are terminally ill

1    that are actually dying at that point in time.

2    Q.   Who is hospice for?

3    A.   People who are dying.

4    Q.   Are you knowledgeable about the difference

5    between the care you get on hospice and other kinds

6    of care?

7    A.   As in --

8    Q.   I'm just asking you if you have any knowledge

9    about the difference between the kind of care that

10   you get in hospice and the kind of care that you

11   might get in a hospital.

12   A.   Sure.  Absolutely.

13   Q.   What's the difference?

14   A.   Well, it's focused on the patient, as well as

15   the family.  And it's definitely driven toward

16   keeping the patient from being in pain.  And it's a

17   hollistic approach to making that patient comfortable

18   at the end of life.

19   Q.   Are you familiar with the term palliative care?

20   A.   I am.

21   Q.   What does palliative care mean?

22   A.   It's not something that I know of that we

23   practiced, our agency.  And I'm not sure if I know

24   exactly what it means.  But my understanding would be

25   --

1    MS. MARTIN:  We would just object.

2    THE COURT:  Sustained.

3  Q.  (By Mr. Wertkin)  Ms. Farmer, did you attend IDG

4  meetings?

5  A.  Yes, sir.

6  Q.  Did you attend them when you were the ED in

7  Monroeville?

8  A.  Yes, sir.

9  Q.  Did you attend them when you were the ED in

10  Foley?

11  A.  Very few.

12  Q.  Did you attend them when you were the -- okay.

13  I will just ask you those two questions.

14    In the time period in Monroeville from

15  February 2010 to February 2011, you attended IDG

16  meetings in Monroeville?

17  A.  Yes, sir.

18  Q.  And I would like to ask you a few questions

19  about those meetings, if I may.

20  A.  Okay.

21  Q.  Where were these meetings held?

22  A.  They were held in the conference room in the

23  back of the building.

24  Q.  And who would attend those meetings?

25  A.  I would, our DOCS, our medical director, our

1   nurses, social workers, and chaplains and

2   occasionally a CNA would.

3   Q.   What was your role?

4   A.   I was there and was there with the medical

5   director to make sure he got some of the paperwork

6   and everything he needed to focus on for the day.

7   Q.   During that time period, who were the -- who was

8   the medical director in the Monroeville agency?

9   A.   Can you tell me the dates again?

10  Q.   February 2010 to February 2011.

11  A.   I believe during that time it was Sage Smith.

12          THE COURT:  I'm sorry, what was the name?

13          THE WITNESS:  Sage Smith.

14  Q.   And who hired Dr. Sage Smith?

15  A.   I did.

16  Q.   Why did you hire him?

17  A.   He was a great physician.  He was actually my

18  personal doctor as well.  He also had lots of

19  geriatric patients in the small town of Monroeville

20  and I hired him.

21  Q.   Did you attend IDG meetings when Dr. Smith was

22  the medical director?

23  A.   Yes, sir.

24  Q.   How often?

25  A.   Just about all.

1    Q.   Okay.

2    A.   A large percentage, just about all of them.

3    Q.   How long did those meetings typically last?

4    A.   An hour, sometimes an hour and a half with him.

5    Q.   How many patients would be discussed?

6    A.   Depending on what the census was at that time,

7    it could be anywhere from 55 to 65 patients.

8    Q.   And how long did you say it would last?

9    A.   An hour to an hour and a half.

10   Q.   Assuming that you had 55 patients in the office

11   and the meeting lasted an hour and a half, would each

12   patient be discussed for two minutes or less?

13        MS. MARTIN:  We object to foundation.

14        THE COURT:  Sustained.

15   Q.   How long would each patient be discussed for at

16   these meetings in Monroeville in February 2010 to

17   February 2011 time frame?

18   A.   If it was just --

19        MS. MARTIN:  We would again object,

20   foundation.

21        THE COURT:  Establish your foundation.

22   Q.   About how many patients were discussed -- what

23   was your average census in the Monroeville agency in

24   the February 2010 to February 2011 time period?

25   A.   I would say it was probably around the 50, 50 to

1   55 mark, around that time period.

2   Q.   Are patients discussed every week or are they

3   discussed every other week?  How does that work?

4   A.   They have to be discussed every 14 days.

5   Q.   Did you have two IDTs that met or just one?

6   A.   During that time period, we only had one.

7   Q.   And how long would those IDTs usually last?

8   A.   An hour to an hour and a half.

9   Q.   I'm sorry.  Is it IDT or is it IDG?

10  A.   It has been referred to as both before.  IDT

11  would be the interdisciplinary team meeting or IDG as

12  the interdisciplnary group meeting.  Either way, it

13  means the same thing.

14  Q.   Which do you use?

15           THE COURT:  Because we've heard it both ways

16  in the last two days as well.  So thank you for that

17  clarification.

18  Q.   Which do you use?

19  A.   IDT is presently the one that stuck the longest

20  with me.

21  Q.   I will try to use that one.  And at the IDG

22  meetings, or did we agree on IDT meetings, they would

23  last around 90 minutes where you would discuss

24  approximately 55 patients.  Approximately how long

25  would each patient be discussed for?

833

1  A.  If it was a quick review, it could be two

2  minutes or less.  And if it's, let's say, someone who

3  is up for certification or recertification, it could

4  take a little longer.

5  Q.  What's the first thing that happens when an IDT

6  meeting gets started?

7  A.  Everyone would be gathered around the table.

8  Our chaplain would always open with prayer, and then

9  our DOCS -- or I'm trying to get the title right, our

10 director of clinical services, would begin by saying

11 which patients we're going to review first, and then

12 the nurses, if they were assigned that patient, they

13 would begin speaking about that patient.

14 Q.  What would Dr. Smith be doing during this time?

15 A.  He would be signing the forms that he needed to

16 sign.

17 Q.  Can you describe that for me, please?

18 A.  Our medical records person would always get

19 together the required documentation that needed his

20 signatures and she would put them together, paperclip

21 them and put them at the head of the table for him

22 and he would come and just started flipping through

23 looking for the spots that had the place on here, the

24 arrows or highlights or whatever, and he would begin

25 signing as he's listening to the girls speak.

1  Q.   Who would put the "please sign here" flags or

2  highlight those documents for Dr. Smith?

3  A.   Our medical records person.  It would have been

4  Sandra Bishop at the time.

5  Q.   About how long did it take Dr. Smith at a

6  regular IDT meeting to sign all the paperwork?

7  A.   Not very long.  He could sign the stack within

8  five minutes.  It wouldn't take long.

9  Q.   What kind of paperwork was that?

10 A.   It could be anything from a benefit period form,

11 a certification form or a recert form to maybe a med

12 sheet.  It could be -- there's lots of different

13 types of forms, but they're all patients.

14 Q.   And did you say that one of the forms was a COTI

15 form?

16 A.   Yes, sir.

17 Q.   What is a COTI form?

18 A.   A certificate of terminal illness.

19 Q.   And what is a certificate of terminal illness

20 form, what is it used for?  Do you know?

21 A.   That form specifically is the one that you have

22 to have signed by the medical director as well as --

23 if it's a first time cert, I believe the attending

24 physician, both have to sign, and it states the

25 patient has a prognosis of six months or less on it.

1  Q.   Do you refer to it as a certificate of terminal

2  illness or a COTI?

3  A.   COTI.

4  Q.   Will you try to refer to it as the COTI?

5  A.   That's good.

6  Q.   Okay.  And who gave Dr. Smith the COTIs to sign?

7  A.   The medical records person.

8  Q.   The COTIs, did they have the names of patients

9  on them or were they blank forms or what was on the

10  COTIs?

11  A.   They would have the name of the patients at the

12  top.  And if I'm not mistaken, down toward the

13  bottom, there's a couple of lines, a couple of blank

14  lines where he would write in why the patient was

15  appropriate for hospice and needed to remain on

16  service.

17  Q.   So, how would he do that?  What was the process

18  for him writing that stuff down?

19  A.   The nurse would give him the information.  He

20  was trusting her to relay appropriate information to

21  him to put on the form.

22  Q.   As he was going through the papers, if he came

23  to a form that he needed to write something, would

24  the business of IDT stop or would it keep going?

25  A.   It would continue going.  What he would do when

1   we got to that patient that needed to be certified,

2   he would ask the nurse who had that patient, she

3   would tell him verbatim, she would say, we have a KPS

4   of whatever the score would be.  If it was a dementia

5   patient, she would list what the fast count score was

6   and he would jot down that information.

7   Q.   Do you know why that information needed to be on

8   the COTIs?

9   A.   Because those are guidelines from Medicare that

10  say that a patient meets criteria for hospice

11  services.

12  Q.   Were those always the guidelines?

13  A.   The ones that I just mentioned?

14  Q.   Even at the time that you began in Monroeville

15  in 2004 or when you came over to AseraCare in 2005?

16  A.   Yes, sir.  Yes, sir.  We always had to have --

17  you always had to write on there why the patient was

18  appropriate for hospice and needed to be recertified.

19  But the physician did not always write that in.  It

20  was toward the end when Sage Smith was there that it

21  was written in.  Prior to that, the nurses would fill

22  that in --

23        MS. MARTIN:  Your Honor, we would just

24  object to the narrative.

25        THE COURT:  Sustained.  If you would,

1   Ms. Farmer, listen just to the question and answer

2   just the question that's asked.

3            THE WITNESS:  Okay.  Yes, ma'am.

4            THE COURT:  Thank you.  I know that's kind

5   of hard to do but that's what we require in court.

6            THE WITNESS:  Okay.  Thank you.

7   Q.  So, as Dr. Smith is flipping through the pages

8   with the "sign here" forms, does he stop and ask for

9   someone to give him the information; is that how it

10  works?

11  A.  Yes, sir.

12           MS. MARTIN:  We would just object to that

13  question.  It's restating the witness' testimony.

14           MR. WERTKIN:  Let me rephrase.

15  Q.  Ms. Farmer, can you walk me through the process

16  from the first thing that happens at IDT and how

17  those forms get signed?

18  A.  We would begin discussing the patients first

19  that needed to be just discussed.  And after those --

20  for the 14 day requirement.

21           And once those patients were discussed, we

22  went on to talk about the patients who were up for

23  recertification.  Those patients take a little more

24  detail because they have more forms.  You have four

25  or five forms possibly that he would have to sign.

1           And in one section he would actually have to

2    write why the patient was hospice appropriate.

3           So he would look to the nurse so she could

4    give him the information needed to fill out that

5    section of the form and then he would sign that and

6    he would pass it on --

7    Q.    What kind of information would the nurse give?

8    A.    Any type of clinical information she would have

9    or if a patient was declining and those types of

10   things, scales, scores, things like that.

11   Q.    And would Dr. Smith at that time look at any

12   medical records as he was deciding whether to sign

13   the form?

14   A.    No, sir.  The medical records were in the

15   medical records room.

16   Q.    Would he look at any records at all?

17   A.    No, sir.

18   Q.    And what else besides the nurse's information

19   would Dr. Smith rely on when he signed the

20   certificate of terminal illness?

21   A.    Nothing.  He was completely relying on the

22   nurses to be telling him the truth.

23   Q.    How often, if ever, did nurses give their own

24   conclusions about whether a patient should be on

25   hospice?

1   A.   Often.   I mean, it was what their opinion was.

2   They would state what they thought.

3   Q.   How often, if ever, did Dr. Smith disagree with

4   the opinions of nurses?

5   A.   I don't recall --

6        MS. MARTIN:   We would just object to this

7   line of testimony.

8        THE COURT:   Overruled.

9        MS. MARTIN:   Thank you.

10  A.   Can you ask me the question again?   I'm sorry.

11  Q.   How often, if ever, did Dr. Smith disagree with

12  the opinions of the nurses at IDT meetings?

13  A.   I don't recall him disagreeing with the nurses.

14  Q.   Did Dr. Smith have available to him in that room

15  any information that would allow -- that would give

16  him a basis for disagreeing with the nurses?

17  A.   No, sir.   The only thing in the room was the

18  conference table, chairs, the people that we

19  mentioned earlier and the nurse giving the

20  information to him.   There was nothing else other

21  than paperwork he needed to sign.

22  Q.   Dr. Smith typically ask nurses questions?

23  A.   He did ask questions.   He was very good about

24  asking questions.   And on occasion he would -- I'm

25  sorry.   He would bring his book that had some of the

1    LCDs in it to the meeting.

2    Q.   Was Dr. Smith given accurate and complete

3    information by these nurses?

4    A.   Not at all times, no.

5    Q.   How do you know that?

6    A.   Because I have attended the meetings and I have

7    heard a nurse in there before actually give him --

8           MS. MARTIN:  We would object to this

9    anecdotal testimony.

10          THE COURT:  Sustained.

11   Q.   Without giving any specific examples --

12   A.   Okay.

13   Q.   -- how do you know that Dr. Smith was being

14   given incorrect or incomplete information by the

15   nurses at IDT meetings?

16          MS. MARTIN:  Same objection, Your Honor.

17          THE COURT:  How do you know?

18          THE WITNESS:  I was there.

19          THE COURT:  Did you do any patient

20   evaluations?

21          THE WITNESS:  I did not.  But I heard the

22   nurse tell -- I'm sorry.

23          MS. MARTIN:  I object.

24          THE COURT:  The question is, did you do any.

25          THE WITNESS:  No, ma'am.

1  Q.  How often, if ever, would Dr. Smith personally

2  examine the patients who were being discussed at IDT

3  meetings?

4  A.  The physician didn't see the patients until

5  after the face-to-face rule came into effect in the

6  agency.

7  Q.  Do you remember when that was?  Was it during

8  your time at Monroeville?

9  A.  Yes, sir.  Toward the end of my time there, I

10 believe, is when they began doing face-to-face

11 visits.

12 Q.  Did Dr. Smith ask a lot of questions at

13 IDT meetings?

14 A.  Yes, sir, he did.

15 Q.  What kind of instructions did Dr. Smith give to

16 you, if any, about who should be eligible for hospice

17 in the Monroeville agency?

18 A.  He didn't give me any instructions.  He was

19 there as an employee of AseraCare Hospice.

20 Q.  Did you ever disagree with him about --

21        MS. MARTIN:  Your Honor, we object on

22 foundation grounds.

23        THE COURT:  Sustained.

24 Q.  When you were at IDT meetings, did you ever have

25 a situation where Dr. Smith did not want to put

1  someone on hospice or did not want to recertify

2  someone for hospice?

3  A.   No, sir, not that I recall.

4  Q.   Never happened?

5  A.   I don't remember him arguing or disagreeing

6  about it.  Again, he was completely trusting the

7  nurse to give him the information, the correct

8  information.

9         MS. MARTIN:  Your Honor, we would just

10  object to the stated mental opinions of Dr. --

11         THE COURT:  Sustained.  Please just answer

12  the question that's asked, Ms. Farmer.

13         THE WITNESS:  I'm sorry.

14  Q.   Did you attend IDT meetings in Foley, Alabama?

15  A.   In the very beginning I attended a couple with

16  Dr. Bolton and she was a medical director, I believe,

17  right after the agency opened there.

18  Q.   So this would be in the January 2007 to December

19  2008 time frame?

20  A.   I'm thinking 2005 for Foley.

21         MS. MARTIN:  Your Honor, to the extent it's

22  2005, we would object as to nexus.

23  Q.   You told me you work -- I'm sorry.

24         THE COURT:  Her testimony was she was there

25  in 2005.

1          MR. WERTKIN:  Through December 2008.

2   A.   Yes, sir.

3   Q.   Let me focus your attention on the time period

4   between January 2007 and December 2008.

5   A.   Okay.

6   Q.   Did you attend IDT meetings during that time

7   period in Foley?

8   A.   I don't recall attending IDT meetings there.

9   Those were usually with Dawn.

10  Q.   For the three agencies for which you were

11  executive director, how many patients do you think

12  were admitted while you were in charge of all these

13  agencies?

14  A.   Thousands.

15          MS. MARTIN:  Your Honor, we would object to

16  any questions about Mobile.  There's a lack of nexus

17  to Mobile.

18          THE COURT:  Sustained.

19  Q.   For the Monroeville agency in February 2010 to

20  February 2011, what was the process, the first step

21  in the process for admitting a patient to hospice?

22  A.   After you receive the referral, what did we do

23  next; is that what you're asking me?

24  Q.   Yes.

25  A.   Depending on how you received it, if it was a

1  fax or a phone call from the office or if it was --

2  depending on the type of referral, we would contact

3  the physician's office and normally speak to the

4  nurse, asking for permission to evaluate and admit

5  the patient, if appropriate.

6  Q.   Is that something that you would do, would you

7  make those phone calls?

8  A.   I have made those calls, yes, sir.

9  Q.   Who would you call?

10 A.   I would call the clinic and speak with the

11 nurse.

12 Q.   And what would you ask the nurse for?

13 A.   I would explain the patient and what we had been

14 told and ask for permission to evaluate the patient

15 and admit, if appropriate.

16 Q.   You say what we had been told.  Who is telling

17 you -- is this from the referral source?

18 A.   Yes, sir.

19 Q.   And was that referral source always a doctor?

20 A.   No, sir.

21 Q.   And what would you get -- so what would you ask

22 the nurse for?

23 A.   If it was okay to do the evaluation and admit or

24 order, if appropriate.

25 Q.   What is an order to evaluate and admit, if

845

1   appropriate?

2   A.   If a nurse goes out and sees the patient and she

3   does her nursing examination and she feels that the

4   patient is appropriate for hospice, she would go

5   ahead and do the admission.  We were asking for

6   permission to do that.

7   Q.   And when you were in charge of the Monroeville

8   agency in February 2010 to February 2011, did that

9   agency have a policy that the nurse had to contact

10   the medical doctor after the evaluation but before

11   the admission?

12   A.   I don't recall if they had a policy, not one

13   that I remember being written that said they had to

14   contact someone.

15   Q.   Is it possibly that there wasn't such a policy?

16           MS. MARTIN:  Your Honor --

17           THE COURT:  Sustained.

18   Q.   Are you aware of any situation where -- strike

19   that.

20           And once the patient has been admitted to

21   hospice, what happens next?

22   A.   After they've been admitted?

23   Q.   Yes.

24   A.   The nurse would come back to the office, finish

25   up her paperwork and given the paperwork that was

1  required to the medical records person.

2  Q.   What paperwork was that?

3  A.   It was usually the benefit election form, the

4  beginning of like the COTIs, certificate of terminal

5  illness, and a couple of other pages, a med sheet,

6  the forms that required some signing.

7  Q.   You were the executive director of the

8  Monroeville agency from February 2010 to February

9  2011; is that right?

10  A.   Yes, sir.

11  Q.   If there was a policy to contact the medical

12  director, would you be familiar with THAT?

13        MS. MARTIN:  We would object to that

14  question, asked and answered, and it's leading.

15        THE COURT:  It's also --

16        MS. MARTIN:  And it lacks foundation.

17        THE COURT:  Foundation.

18        MR. WERTKIN:  May I approach for a second,

19  Your Honor?

20        THE COURT:  Can we move on, please?

21        MR. WERTKIN:  I'm sorry?

22        THE COURT:  Can we move on, please?

23        MR. WERTKIN:  Sure.

24  Q.   And once the medical records person got the

25  files, what would the medical records person do with

1  those papers that needed to be signed?

2  A.   She would then fax them to the medical director

3  for signature.

4  Q.   And the fax would be sent to who?

5  A.   She would fax it to the attending physician that

6  we had called earlier.

7  Q.   What would that fax look like?  What would that

8  fax contain?

9  A.   Just a face sheet and it would basically have on

10  there please sign where noted and she would have

11  marked the locations with like a black sharpie with

12  an X to sign.

13  Q.   How many pages would be faxed over?

14  A.   Just the ones that required the attending

15  physician signature and usually I believe that was

16  only like one, maybe two pages.

17  Q.   Would any clinical information be sent over to

18  the attending physician in these faxes?

19  A.   No.

20  Q.   What would the attending physician usually do?

21  A.   He would sign them and send them back, usually

22  rather quickly.

23  Q.   Do you ever recall a situation where the

24  attending physician refused to sign in the

25  Monroeville time period in the Monroeville agency

1  from February 2010 to February 2011?

2  A.   No, sir.  No, sir.  He gave the order for

3  evaluation to admit usually earlier.

4  Q.   What did you understand an order to evaluate and

5  admit, if appropriate, to mean?

6           MS. MARTIN:  Your Honor, asked and answered.

7           THE COURT:  Sustained.

8  Q.   If a nurse went out and did an evaluation during

9  the February 2010 to February 2011 time frame in

10  Monroeville and determined that the patient was not

11  eligible, what was the next step in the process then?

12  A.   Most of the time we would make a phone call to

13  let our regional director know and we would send out

14  another nurse.

15  Q.   Who is we?

16  A.   Any of the staff, either the DOCS or myself.

17  Q.   How would you get the information if the nurse

18  had decided the patient was not eligible?

19  A.   She would come back and tell us that she did not

20  feel the patient was appropriate.

21  Q.   And what would you do with that information?

22  A.   She would tell us and then we would make

23  arrangements for another nurse to go out.

24  Q.   Why would you do that?

25  A.   Because that's what was needed, that's what we

1   were asked to do.

2   Q.   And did you send another nurse out because you

3   didn't think that the first nurse had done a good job

4   evaluating the patient?

5           MS. MARTIN:  Objection, leading, Your Honor.

6           THE COURT:  Sustained.

7   Q.   So can you explain a little bit more about why

8   you sent another nurse out?

9   A.   Yes, sir.  There was a rule that we were

10  supposed to contact our director of ops if a patient

11  was not admitted to hospice services.

12          So when a nurse did not admit, we would make

13  the phone call and we would be told that they needed

14  to dig deeper, look further and send another nurse

15  out and that's what we would do.

16  Q.   Who was the director of ops at that time?

17  A.   Kay Brown.

18  Q.   What is director of ops?

19  A.   Director of operations.  She's over -- she would

20  have been over several different agencies in our

21  region at that time.

22  Q.   Was Ms. Brown related to you?

23  A.   No, sir.

24  Q.   And was Ms. Brown a nurse?

25  A.   I'm not sure.

1   Q.   And what information would you provide to

2   Ms. Brown when a nurse came back and told you that

3   the patient was ineligible?

4   A.   I would just let her know that we had gone out

5   to do an evaluation or to do an admission and that

6   the nurse said the patient was inappropriate.

7   Q.   What would her response usually be?

8            MS. MARTIN:  Your Honor, asked and answered.

9            THE COURT:  Sustained.

10  Q.   When Ms. Brown said dig deeper, what did you

11  understand that to mean?

12  A.   Get the patient on services.

13  Q.   When Ms. Brown said look harder, what did you

14  understand that to mean?

15  A.   Get the patient on services.

16  Q.   And what if the nurse had told you that the

17  patient was not eligible?

18  A.   It didn't matter.  It still meant get the

19  patient on services regardless if they're not

20  appropriate.

21  Q.   What would you do?

22  A.   I would send another nurse out and we would get

23  the patient admitted.

24  Q.   Did you have concerns about that?

25  A.   Sure.

1  Q.   What were your concerns?

2  A.   That it wasn't the right thing to be doing.

3  Q.   Did anyone else besides Kay Brown give you

4  instructions like look harder, look deeper?

5  A.   It was a common term.  Those were heard quite

6  often, yes.

7  Q.   Did you have to do any reports?

8  A.   Yes.

9  Q.   What kind of reports did you have to put

10  together?

11  A.   We had daily reports and weekly reports.

12  Everything was around, you know, how many patients

13  were on service at the time.

14        MS. MARTIN:  We would object to this line of

15  testimony in phase on relevance grounds.

16        THE COURT:  Sustained.

17        MR. WERTKIN:   Your Honor, may I approach?

18        THE COURT:  We've gone over these things

19  before.

20        MR. WERTKIN:  It will be short.

21        THE COURT:  All right.

22                    (SIDEBAR)

23        MR. WERTKIN:  I understand your prior orders

24  but I can't ask her why.  And she just explained that

25  she had told nurses to admit patients without and I

1  can't say why.  That's just what I'm trying to do is

2  establish the background situation.

3       I know she's not going to say census.  But

4  I'm trying to understand, trying to let the jury

5  understand that every time an ineligible patient came

6  through what the process was.

7       So I want her to talk about -- reports had

8  to go up.  I want her to talk about some of the

9  conversion, they had a conversion rate.  Every

10  referral that didn't turn into admission was a

11  non-conversion -- that was the thing that was talked

12  about.  It's not a census question.  It's about how

13  the practice was working.

14       MS. MARTIN:  Clearly what she said is not

15  accurate.  However, this is squarely within the type

16  of business practices evidence that the Court has

17  ruled is not coming in in phase one on numerous,

18  numerous occasions.

19       THE COURT:  My ruling stands.  We are not

20  going into any of these reports that had nothing to

21  do with admissions and had nothing to do with

22  eligibility of these patients and that are just

23  taking up a whole lot of time we don't need to be

24  dealing with.

25       MR. WERTKIN:  Thank you.

```
 1              (Open court.  Jury present.)
 2   Q.   I would like to shift gears a little bit and
 3   talk to you about training at the facility,
 4   specifically training involving nurses.
 5   A.   Okay.
 6   Q.   Were you involved at all in any kind of calls or
 7   training activities or anything like that?
 8   A.   Yes, sir.
 9   Q.   Can you tell me about how you were involved in
10   that?
11   A.   There would be different types of conference
12   calls and sometimes there would be actually people
13   that would come to our office that would do training
14   with the nursing staff.
15   Q.   And would you attend these trainings?
16   A.   Some of them, yes, sir.
17   Q.   Did you attend these trainings in the
18   Monroeville facility between February 2010 and
19   February 2011?
20   A.   I attended meetings in Monroeville, yes, sir.
21              THE COURT:  During that time period?
22              THE WITNESS:  Exact time period, I know
23   we've had training in that time period, and I believe
24   that they were in that agency, yes, sir.
25              THE COURT:  And you attended them?
```

1    THE WITNESS:  Yes, ma'am.

2  Q.   Did those trainings -- were they called

3  something?  Is there a common word or were they just

4  called trainings?

5  A.   There were different types.  There were

6  different types of training.  There was always

7  training on documentation.  There was training

8  regarding -- that was called ground rounds for a

9  while.

10  Q.   Called what?

11  A.   Ground rounds.  There were different types of

12  training that were out there.

13  Q.   Let's start with the conference calls.

14  A.   Okay.

15  Q.   What kind of conference calls involving clinical

16  issues would occur?

17    MS. MARTIN:  Your Honor, we would object to

18  foundation.

19    THE COURT:  Sustained.

20  Q.   At the Monroeville agency between February 2010

21  and February 2011, were there conference calls in

22  which there was training that was being provided?

23  A.   Yes, sir.

24  Q.   What type of training was being provided?

25  A.   There would be training regarding documentation.

1   Q.   And on these conference calls, what kind of

2   training was provided regarding documentation?

3   A.   How to document in your nurse's notes as well as

4   on your other forms.

5   Q.   What instructions were the folks from

6   Monroeville in the February 2010, February 2011 time

7   period given on these conference calls?

8   A.   They were being told they needed to document to

9   the LCDs.

10  Q.   What does that mean to document to the LCDs?

11  A.   They were being told that they needed --

12       MS. MARTIN:   I would object to the

13  foundation of that question.

14       THE COURT:   Sustained.

15  Q.   Do you know what they meant?   Did you form an

16  opinion or form an understanding of what was meant by

17  document to the LCDs?

18       MS. MARTIN:   We would object to that

19  question, Your Honor.

20       THE COURT:   Ms. Farmer, did you ever do any

21  documentation regarding LCDs?

22       THE WITNESS:   On ADRs, yes, ma'am, I did.

23       THE COURT:   Were you using LCDs to evaluate

24  eligibility of patients?

25       THE WITNESS:   The ADR would contain that

```
 1   information.
 2           THE COURT:  That's not my question.
 3           THE WITNESS:  Okay.
 4           THE COURT:  Were you evaluating patients
 5   using the LCDs?
 6           THE WITNESS:  No, ma'am.  I'm not a
 7   clinician, so no, ma'am.
 8   Q.  Ms. Farmer, were you responsible for insuring
 9   that the nurses abided by the training that they were
10   provided on these conference calls?
11   A.  Yes, sir.
12   Q.  So, if the nurses under you in the Monroeville
13   agency from February 2010 to February 2011 weren't
14   following the training, were you ultimately
15   responsible?
16   A.  Yes, sir.
17           MS. MARTIN:  We object to leading and
18   foundation.
19           THE COURT:  Overruled as to foundation.
20   Sustained as to leading.
21   Q.  As a person -- you were in charge of the
22   Monroeville agency from February 2010, 2011, did you
23   -- were you responsible for reinforcing messages that
24   came on conference calls to your staff?
25   A.  Yes, sir, I was.
```

1   Q.   Were you expected to understand what was being

2   said on those conference calls to your nurses?

3   A.   Yes, sir, I was.

4   Q.   Did you form an understanding as to what

5   document the LCDs meant on those conference calls?

6   A.   I did.

7   Q.   What was your understanding?

8   A.   That they needed to use the words that were

9   found on the LCD guidelines verbatim in their notes.

10  Q.   What if the words on the LCD guidelines did not

11  match what the patient's conditions were?

12  A.   It didn't matter.

13  Q.   Did you reinforce that message to your nurses?

14  A.   Yes, sir.

15  Q.   How did you do that?

16  A.   I continued to educate and do the same type of

17  talks at our stand-up meetings on Monday mornings.

18          MS. MARTIN:  Your Honor, we have a nexus

19  objection, I would like to approach, if I might,

20  please.

21                    (SIDEBAR)

22          MS. MARTIN:  This witness testified in her

23  deposition that after March of 2009 she no longer

24  told people to misrepresent documentation in the

25  agency and the time frame that we're talking about is

1    in 2010.  This is Monroeville, so it's 2010.  And so

2    this testimony about her reinforcing this training

3    based on her sworn testimony is outside of the time

4    frame of the ineligible patient in Monroeville.

5              THE COURT:  Let's clarify that.  And we need

6    to make sure in terms of time frames.

7              MR. WERTKIN:  Thank you, Your Honor.

8              (Open court.  Jury present.)

9              THE COURT:  Ladies and gentlemen, we need to

10   take another break.  This will be, I hope, the last

11   one before we go home for the day.

12             We will come back at 4:15.  Don't talk with

13   anybody or let them talk to you.

14             (Break taken.  Jury excused.)

15               (Open court.  Jury present.)

16             THE COURT:  Mr. Wertkin, you may continue.

17             MR. WERTKIN:  Thank you, Your Honor.

18   Q.   Ms. Farmer, were you the executive director of

19   the Foley office from January 2007 to December 2008?

20   A.   Yes, sir.

21   Q.   When we were discussing conference calls

22   earlier, would you participate in these conference

23   calls from January 2007 to December 2008 as well?

24   A.   Yes, sir.

25   Q.   And when I asked you earlier about the

1    conference calls with regard to documents of the

2    LCDs, did those conference calls occur in the time

3    period between January 2007, December 2008?

4    A.   There were always ongoing conference calls

5    regarding --

6    Q.   Ongoing conference calls.  When did you file

7    your complaint in this case?

8    A.   Early in 2009.

9    Q.   And once you filed your complaint, did you

10   change your behavior at the agency?

11   A.   Yes, sir.  We decided or Dawn and I decided at

12   the time that we just couldn't do it anymore and a

13   lot of the things --

14        MS. MARTIN:  We would object to the

15   narrative answer.

16        THE WITNESS:  I'm sorry.

17        THE COURT:  Sustained.  If you would, please

18   --

19        THE WITNESS:  Yes, ma'am.

20        THE COURT:  And let the lawyers ask you

21   questions on this.  Okay?

22        THE WITNESS:  Yes, ma'am.

23   Q.   And the question, I believe, was did you change

24   your behavior.

25   A.   Yes, sir.

1   Q.   And how did you change your behavior?

2   A.   Just got to the point where I would not push the

3   nurses for the admissions as much and just --

4   Q.   When I asked you earlier about how you would

5   instruct the nurses about documenting to the LCDs,

6   were you referring to when you were executive

7   director in Foley from January 2007 to December 2008

8   or Monroeville from February 2010 to February 2011?

9           MS. MARTIN:  Objection, leading, Your Honor.

10          THE COURT:  Overruled at this point.

11  A.   There were always conference calls regarding

12  documentation improvement in the charts from the

13  entire time that I remember being there.  So it was

14  ongoing all the way until 2011.

15  Q.   And in Foley --

16          THE COURT:  The question was not that.  Do

17  you want to clarify the question or do you want me

18  to?

19          MR. WERTKIN:  Your Honor can.

20          THE COURT:  Basically the question was, when

21  you were in Monroeville, which didn't start until

22  February -- excuse me, I am looking at the wrong one.

23  Okay.  After you filed your complaint in 2009, at the

24  Monroeville office, did you continue to instruct the

25  nurses as you had previously in terms of documenting

1  to the LCDs?

2          THE WITNESS:  I couldn't to tell them things

3  we heard on the conference calls to push that

4  information, yes, ma'am.

5          THE COURT:  That's after 2009?

6          THE WITNESS:  That I filed the complaint,

7  yes, ma'am.  It was February, I believe.

8  Q.  Let's talk about Foley from January 2007 to

9  December of 2008.

10  A.  Okay.

11  Q.  And you participated in those conference calls

12  during that time period?

13  A.  Yes, sir.

14  Q.  Who would be on those calls?

15  A.  All the clinicians would be on the calls in the

16  building.

17  Q.  And what are clinicians?

18  A.  The nurses and the social workers and chaplains

19  were required to be there as well.

20  Q.  Who would run the calls?

21  A.  DOCS would get everyone together and notify the

22  time that they needed to be in the agency for the

23  conference call.

24  Q.  Who was the DOCS in Foley from January 2007 to

25  December 2008?

1   A.   Dawn Richardson was.

2   Q.   And after Dawn gathered everybody, how would the

3   calls go?

4   A.   The phone would be in the middle of the table

5   and they would begin discussing what the requirements

6   were for the documentation that they wanted to see in

7   the charts.

8   Q.   Who would be on the other end of that phone

9   line?

10   A.   It could be anywhere from Lori Harris to Angie

11   Hollis.  It varied.

12   Q.   Who was Lori Harris?

13   A.   Our regional clinical service manager.

14   Q.   Who was Angie?

15   A.   Angie Hollis (indicating).

16   Q.   You're pointing?

17   A.   I'm sorry.  Yes.

18   Q.   Is Angie Hollis here in the courtroom?

19   A.   Yes, sir.

20   Q.   And what would Lori Harris and Angie Hollis say

21   on these calls?

22   A.   They would be giving information about how they

23   wanted to see the documentation in the charts.

24   Q.   And in the time period of January 2007 to

25   December 2008, what instructions would they give

1   about how to do the charts?

2   A.   Again, it would be documenting toward the LCDs.

3   Q.   It was your responsibility to push those

4   instructions down; is that right?

5   A.   Yes, sir.

6   Q.   And what is your understanding of what that

7   meant?

8   A.   Take the information on the LCDs and put it on

9   the patient notes and the patient file.

10   Q.   Do you recall during any of these calls or was

11   it a regular thing that people would ask questions

12   during these calls from the office, the clinicians?

13   A.   I remember a time that a nurse has asked a

14   question and the response was --

15           MS. MARTIN:   Your Honor, we object --

16           THE COURT:   Ask the question was it a

17   regular thing or not a regular thing.

18   Q.   Was it a regular thing or not a regular thing?

19   A.   It wasn't regular.

20   Q.   Did the clinicians ever ask you after the calls

21   were done any questions about what information was

22   being transmitted?

23   A.   Yes, sir.

24   Q.   And what types of questions would you generally

25   get after these calls were over?

1          MS. MARTIN:  We just object for lack of time

2    frame and scope.

3          THE COURT:  Okay.  Sustained as to that.

4    Q.   In the January 2007 to December 2008 time frame,

5    what kinds of -- just generally -- what kinds of

6    questions would you get following these calls?

7    A.   What type of information we are supposed to put

8    in our chart if they're not meeting the LCD.

9    Q.   And what responses would you give to those

10   questions?

11   A.   Well, you need to find some information on the

12   LCD and get it in the chart.  That's what they're

13   asking you to do.

14   Q.   And what message were you intending to convey

15   when you respond in that way?

16   A.   That the chart needed to make the patient look

17   appropriate for hospice.

18   Q.   And why would you convey that message?

19   A.   Because --

20          MS. MARTIN:  Your Honor, we object to that

21   question.

22          THE COURT:  Sustained, sustained.

23   Q.   You mentioned in addition to conference calls

24   there were other types of training.

25          Can you describe some of the other types of

 1  training?

 2  A.   Usually we would just --

 3       MS. MARTIN:  We would object to scope again.

 4  Q.   Other types of trainings in the Foley office in

 5  the 2007 to -- January 2007 to January 2008 time

 6  frame?

 7  A.   There would be meetings where the regional

 8  clinical directors or the regional -- the director of

 9  ops would come to the agent and actually continue

10  teaching the same thing that you would have heard on

11  the conference call.  It would be like a national

12  roll out and then the regionals would come to the

13  agencies and continue following through.

14  Q.   How often would that happen:  Weekly, monthly,

15  quarterly?

16  A.   It wasn't weekly or even monthly, but they would

17  come to your office at least quarterly.

18  Q.   During that time period, January 2007 to

19  December 2008, you would continue to convey those

20  messages to your staff?

21  A.   Yes, sir.

22  Q.   Did you convey that message because you were

23  following instructions?

24  A.   Yes, sir.

25  Q.   And whose instructions were you following?

```
1    A.   My supervisor's, Kay Brown.
2    Q.   Anybody else?
3    A.   That's what we had been told on the conference
4    calls, I'm just continuing to push it down.
5    Q.   And going back to the training in the office,
6    did that -- was that called something?  Was there --
7    did that have a name or anything like that?
8    A.   I don't remember a specific title.  It would
9    just be a training.  And it would be an inservice
10   sheet that would be done and signed by the
11   individuals that were present.
12   Q.   Who would do that training?
13   A.   If it was a clinical person that was regional,
14   she would lead the meeting.
15   Q.   And lead --
16   A.   That would be Lori Harris.  It was normally our
17   regional person that would come to our office and do
18   it which would be Lori Harris.
19   Q.   Was she the regional person that was over both
20   the Foley and the Monroeville office?
21   A.   Yes, sir.
22   Q.   During that time period, from January 2007 to
23   December 2008, and then again from February 2010 to
24   February 2011?
25   A.   She was during the Foley time period that you
```

1   mentioned there.  And at some point there was another

2   person in the Monroeville that was a regional

3   clinical person, and I believe her name was Jane, but

4   I'm not sure of the dates that she was present.

5   Q.   And what would those trainings involve?

6   A.   It would just be a continuation of the same

7   information that was coming across the conference

8   calls that was the initial roll out of making sure

9   that your documentation in your chart supports the

10   diagnosis of the patient that you've admitted to

11   services.

12   Q.   And at these trainings that happened you said

13   every month or two, was there a set of questions that

14   continually came up during these trainings?

15   A.   The nurses -- there would be questions to the

16   regional clinical manager that would be present,

17   specifically Lori Harris, and they would ask her

18   about the documentation and they would be told to --

19   that your LCD information needed to be in that chart

20   on your nurse's notes as well as on the other forms

21   in the chart.

22   Q.   Are you familiar with the term or the phrase

23   corps excellence calls?

24   A.   I remember the term.  I don't know if I recall

25   exactly what each one of those was, but I remember

1   the name.  I may be able, if I heard it with

2   something else, I may be able to tell you what it

3   was.  But I remember the name corps excellence, yes.

4   And I believe that's where we would compare the --

5              MS. MARTIN:  Your Honor, we just object to

6   the --

7              THE COURT:  Sustained.

8   Q.  I'm sorry, I can't understand your answer.  You

9   know -- are you familiar with the corps excellence

10  call or not?

11  A.  I remember the name corps excellence calls.  But

12  right this second, off the top of my head, I can't

13  tell you exactly what they were.

14  Q.  We talked about trainings and we talked about

15  conference calls.

16             Were there any other ways that -- where you

17  participated in training or instructions that were

18  given to the clinicians either in Foley or

19  Monroeville in the 2007, 2008 or 2010 to 2011 time

20  frame?

21  A.  That I would do personally?

22  Q.  Yeah, that you were involved with.

23  A.  Yes, sir.  I would continue, just like the

24  regionals did, I would continue to educate and so

25  would the DOCS to the nurses at stand-up meetings

1  that we needed to continue to do what we were asked

2  to do.

3  Q.  When you say educate, what do you mean by that?

4  A.  We would refresh and review the information that

5  was passed to us, a lot of times it would come with a

6  handout or a spreadsheet or some type of information.

7  It would be like a handout and it would have all of

8  the -- if it was a PowerPoint, it would have the

9  slides listed, so we would just review the slides at

10  meetings.

11  Q.  What kind of education was provided?

12  A.  It would just be the LCD documentation

13  throughout the chart, making it match.

14  Q.  And what does "making it match" mean?

15  A.  It means that you needed to make that patient

16  look like they were hospice appropriate.

17  Q.  Did those words appear in the training that you

18  had to make them look hospice appropriate even if

19  they were not?

20  A.  No, not those exact words, no, sir.

21  Q.  What words did appear on the training?

22  A.  It would tell you which words you could

23  sometimes use, which words you could not uses, things

24  such as that.

25  Q.  So what words were you not allowed to use?

1   A.   We couldn't use the word not declining, stable,

2   within normal limits.   And I'm sure there were more,

3   but those are the three that kind of come quickly to

4   me.

5   Q.   Why not?

6   A.   Because they instructed us not to.

7   Q.   What words could you use?

8   A.   That they were declining, and you know, just

9   painting the picture that they were becoming worse

10  over a period of time.

11  Q.   And why would -- why would you be -- did you

12  form an understanding about why you would be

13  instructed not to use certain words?   Did you form an

14  understanding?   Do you remember --

15  A.   Yes, sir.

16  Q.   What's that basis?

17  A.   Because I was present when they were telling us

18  these things.   It was -- they wanted the patient to

19  appear to be declining and that they were truly

20  hospice appropriate, so that's the reason we were not

21  allowed to use that terminology.

22  Q.   Did that concern you at all?

23  A.   Sure.

24  Q.   Did you raise your concerns to any supervisors?

25  A.   At that time, no, sir.

1  Q.  Why not?

2  A.  It wouldn't have mattered.  They knew --

3       MS. MARTIN:  We would just object.

4       THE COURT:  Sustained.  Disregard that

5  answer.

6  Q.  I want to switch gears a little bit and talk

7  about submitting bills.

8  A.  Okay.

9  Q.  Were you involved in the process of submitting

10  bills to Medicare for the Foley office from '07 --

11  January '07 to December '08, for Monroeville from

12  February 2010 to February 2011 or both?

13  A.  I was involved in the process of making sure

14  that the prebill process, which is the process of or

15  -- yes, submitting the claims.

16  Q.  During both time periods?

17  A.  Yes, sir.

18  Q.  What is a prebill period?

19  A.  A prebill process was a -- it was a spreadsheet

20  that was created that would list the patient's names

21  down one side of it and then across the top it would

22  have certain forms listed that would require

23  physician signatures, whether it be attending or

24  medical directors, and then we would go through and

25  check off and date whenever we had received that

1  paperwork back signed.

2          And once we had everything that was needed,

3  then we would release billing to Medicare.

4  Q.   What does that mean, release billing?

5  A.   We would sent the information from our office,

6  from our agency to corporate so they would release

7  and bill Medicare.

8  Q.   And what information was being transmitted from

9  your office to corporate?

10  A.   It was just usually a quick email saying you can

11  release these patients and it would list the names.

12  Q.   It was just an email?

13  A.   Yes, sir.

14  Q.   Is there any other information on the email

15  besides the patient's names?

16  A.   Not that I recall, no, sir.

17  Q.   To your knowledge, as the executive director in

18  the Foley and Monroeville offices, Foley from January

19  '07 to December '08 and then Monroeville from

20  February 2010 to February 2011, were the patients'

21  medical records sent over for billing Medicare?

22  A.   No, sir.

23  Q.   How do you know that?

24  A.   There would have been a ton of faxing going back

25  and forth in order for us to do that.  No, sir.

1  Q.   I would like to shift gears a little bit.

2          You mentioned eaerlier you were involved in

3  something called ADRs.

4  A.   Yes, sir.

5  Q.   What's ADRs?

6  A.   An additional data request from Medicare.

7  Q.   What does ADR or additional data request look

8  like?

9  A.   It's usually a one-page form that's dated at the

10  top and it's asking you for information regarding a

11  specific patient for a certain -- a specific time

12  period that that patient has been on hospice

13  services.

14  Q.   And what are they asking for exactly?

15  A.   Information to prove that patient's eligibility

16  for that specific time frame.

17  Q.   What kind of information?

18  A.   We would write a letter back to them --

19          MS. MARTIN:  Your Honor, we --

20          THE COURT:  Sustained.

21  Q.   So you said that they request information?

22  A.   Yes.

23  Q.   I was asking what kind -- what was the

24  information that they requested?  Do you understand

25  the question?

1   A.   Yes, sir.  They were just asking for additional

2   information other than -- they were asking for things

3   such as notes and so forth that would show why the

4   patient would be appropriate for hospice.

5   Q.   Notes from where?

6   A.   The patient's medical records, the ones the

7   nurses would fill out.

8   Q.   Is that where the information -- they wanted

9   information about what?

10  A.   The patient's diagnosis, showing that they were

11  appropriate.

12  Q.   Where would that information come from?

13  A.   The nurses would fill it out and it would be in

14  the patient's records.

15  Q.   Who would send these ADRs?

16  A.   To us or back to the --

17  Q.   Yes.  Who received the ADRs?  Were they sent to

18  the Monroeville office between February 2010 and

19  February 2011 or the Foley office between January

20  2007 and December 2008 or were they sent somewhere

21  else?

22  A.   I believe they were sent to the office.

23  Q.   Who would send them?

24  A.   CMS.

25  Q.   And when you received one, was there a general

1  process in either Foley during January '07 through

2  December oh at or February E 2010 or 2011 y'all fold

3  when you responded to these?

4  A.   Yes, sir.

5  Q.   What was that process?

6  A.   When it came in, we would log the patient's name

7  on a spreadsheet and we would also put the date that

8  it was due by on the spreadsheet because the

9  spreadsheet had all agencies and it kept a running

10 tab so you knew where you were with it, so that

11 information would go on there.  And then we would

12 have that time period inbetween to make sure that we

13 answered the additional data requests by submitting

14 what they asked for.

15 Q.   Once the names were logged into the spreadsheet,

16 what was the next step?

17 A.   To begin to write the letter or the response

18 back to CMS with the information.

19 Q.   What does the response look like?

20 A.   Usually it's a one-page letter from the hospice

21 agency that would describe why the patient was

22 hospice appropriate.

23 Q.   Were you involved in writing those responses?

24 A.   Yes, sir.

25 Q.   And how would you go about preparing the

1    responses, the one-page responses?

2    A.   We would pull the patient's medical records,

3    which would be the nurse's notes, chaplain's and

4    social worker notes and we would take that

5    information and put it into a note.

6    Q.   And you would take the information out of the

7    record and what would you do with it?

8    A.   We would type a letter that would give specific

9    dates and information from those notes within that

10   letter, we would highlight or bullet that information

11   out and send a letter back to CMS.

12   Q.   And for these ADR requests that came in, were

13   there signed COTIs in the patient's medical record?

14   A.   Yes, sir.

15   Q.   So, if there were signed COTIs in the patient's

16   medical record, what additional information was

17   Medicare asking for?

18   A.   They wanted to see if the patient met the

19   eligibility, their guidelines that were out there.

20   Q.   And what information would you use to show that

21   the patients did meet eligibility?

22   A.   The nurse's notes specifically.  We would use

23   that.

24   Q.   Where are the nurse's notes located?

25   A.   In the same medical record with the COTIs.

1  Q.   So once you've pulled the records in order to do

2  the response -- when we say records, are we talking

3  about medical records here?

4  A.   Yes, sir.

5  Q.   Once you pull the records, what was the -- did

6  you do this on your own or did you have help?

7  A.   I would create, in my agency, if it was

8  Monroeville, Teresa would sit on one side and she

9  would do hers and I would do mine at my desk.  And

10  then if it was in Foley, Dawn may do some.  I'm not

11  sure if she did or Teresa still may have done Foley's

12  as well, and I did some as well.

13  Q.   Who trained you or instructed you on how to

14  respond to ADRs?

15  A.   The training we received regarding ADRs would

16  have came from the RO department, Susan Gerhart.

17  Q.   And were there occasions where an ADR would come

18  in and you would find that there was evidence in the

19  medical record to support payment and put a letter

20  together?

21  A.   Sure.

22  Q.   So what would you do in those situations?

23  A.   We would --

24       MS. MARTIN:  Your Honor, we would object to

25  this as anecdotal testimony.

 1            THE COURT:  You're asking if there are

 2    situations in which she would find evidence in the

 3    medical record to support eligibility?

 4            MR. WERTKIN:  (Witness nods head

 5    affirmatively.)

 6            THE COURT:  Okay.

 7            MS. MARTIN:  We withdraw the objection, Your

 8    Honor.

 9            THE COURT:  Okay.

10    A.   Yes, sir, we would and we would take that

11    information and put it in the letter.

12    Q.   Were there occasions or was it a regular

13    practice in either the Foley agency in January 2007

14    to December 2008 or Monroeville from February 2010 to

15    February 2011 where you would go through the medical

16    records and not be able to find evidence to support a

17    terminal diagnosis?

18    A.   That has happened as well, yes.

19    Q.   In general, when that happened, what would do

20    you?

21    A.   I would go back to other sections of the medical

22    record like the benefit period prior to or the

23    benefit period after that they were requesting and

24    pull information from there if I could find

25    supporting data in those sections and add it to the

1   letter.

2   Q.   What, if anything, is wrong with that?

3   A.   It's not for the benefit period that the CMS

4   would be requesting for specifically on the ADR

5   requests.

6   Q.   And were you trained or instructed to do that?

7   A.   Yes, sir.

8   Q.   By whom?

9   A.   Susan Gerhart.

10  Q.   And what did Susan Gerhart train you or instruct

11  you to do with regard to responding to ADRs for the

12  patients who are not eligible?

13  A.   If there's not supporting data in the benefit

14  period that CMS has requested information for, look

15  in other areas, look in other benefit periods.

16  Q.   Did you indicate in your response letter to

17  Medicare that you were pulling from other benefit

18  periods?

19  A.   No, sir.

20  Q.   Why not?

21  A.   Because they were specifically asking for one

22  area.

23  Q.   Did you indicate the benefit period that you

24  were drawing from in those letters?

25  A.   No, sir.

1    Q.   Were you mindful of some instructions that you
2    were given before?
3    A.   Yes.
4    Q.   Why would you do that?
5              MS. MARTIN:   Your Honor, we would object to
6    the "why" question.
7              THE COURT:   Sustained.
8    Q.   When you engaged in that practice, were you
9    successful in getting claims paid?
10   A.   Yes, very successful.
11   Q.   What does it mean that you were successful?
12   A.   We had a very low percentage of claims that were
13   not paid from the ADRs.
14   Q.   Who's judging whether you're successful or not?
15   A.   The payment would come in and AR in the R&O
16   department would notify us if we were paid or not
17   paid for the ADR request that we had sent the
18   information in for.
19   Q.   What is R&O?
20   A.   Reimbursement and outcomes department.
21   Q.   What do they do?
22   A.   I couldn't tell you everything they do.  I know
23   that they were the ADRs specifically.
24   Q.   What information would they send to you about
25   the ADRs?

1  A.  How to write them and at a time I would even fax

2  them to them in the beginning so she could read them.

3  Q.  Did you ever get edits back?

4  A.  No.

5  Q.  You mentioned that you were given instructions

6  by Susan Gerhart.

7  A.  Yes, sir.

8  Q.  Is she part of that R&O and reimbursement and

9  outcomes department?

10  A.  I believe she's over that department or was.

11  Q.  She's over it?

12  A.  I believe that's correct.

13  Q.  And in charge of it?

14  A.  Yes, sir, I'm sorry.

15  Q.  I want to go back and make sure I did not miss

16  any training that may have happened in the Foley time

17  period in January 2007 and 2008.

18          Other than what you've already testified to

19  today, was there any other training exercises or

20  training that would occur in that time frame in that

21  agency?

22  A.  It's possible, yes, sir.  But I can't tell you

23  specifically what one would be right this moment.

24  Q.  Okay.  Thank you.

25          MR. WERTKIN:  Your Honor, request to publish

1    what's been previously admitted into evidence as

2    Defendant's Exhibit 226.

3              MS. MARTIN:  We have no objection, Your

4    Honor.

5              THE COURT:  All right.  You may do so.

6    Q.  I would like to call your attention -- actually,

7    before we go right into this document, are you

8    familiar with this document?

9    A.  Yes, sir.

10   Q.  What is this document?

11   A.  It's a relator agreement.

12   Q.  Are you a signatory of this document?

13   A.  Yes, sir, I am.

14   Q.  And who did you enter -- actually, let's go into

15   the document, if you don't mine.

16             Do you see the paragraph that starts,

17   whereas, relators Debora Paradies, London Lewis and

18   Roberta Manley collectively first relators filed a

19   false claim action against AseraCare, Inc. and GGNSC

20   Administrative Services doing business as Golden

21   Living, formerly known as Beverly Enterprises in the

22   Eastern District of Wisconsin, do you see that?

23   A.  Yes.

24   Q.  Who are Debora Paradies, London Lewis and

25   Roberta Manley?

1    A.    They are the first relators to file a claim

2    against AseraCare.

3    Q.    Have you ever met them?

4    A.    No, sir.

5    Q.    How do you know they're the first relators?

6    A.    Because my attorneys mentioned their names to

7    us.

8    Q.    I would like to go down one, please.

9          Do you see the second paragraph, whereas,

10   relators Dawn Richardson and Marsha Brown

11   collectively second relators filed a false claims

12   action against Golden Gate National Senior Care, LLC,

13   doing business as Golden Living, GGNSC Holding, LLC

14   and AseraCare, Inc. and Aegis Therapies, Inc., in the

15   Northern District of Alabama.  Do you see that?

16   A.    Yes, sir.

17   Q.    Who are Dawn Richardson and Marsha Brown?

18   A.    Marsha Brown is me and Dawn Richardson was the

19   DOCS for the Foley agency.

20   Q.    You changed your name?

21   A.    Yes, it's Farmer.

22   Q.    Did you get married?

23   A.    Yes, sir, I did.

24   Q.    Go down to the next one.

25             THE COURT:  Is Dawn Richardson Dawn

1  Zaragoza?

2          THE WITNESS:  Yes, ma'am.

3  Q.   This is a paragraph that starts, whereas relator

4  Dr. Joseph L. Micca, third relator, filed a false

5  claims action against GGNSC Administrative Services

6  doing business as Golden Horizons formerly known as

7  Beverly Enterprises, Inc., et al., in the Northern

8  District of Georgia.  Do you see that?

9  A.   Yes, sir.

10  Q.   Who is Dr. Joseph L. Micca?

11  A.   He was the third relator that filed a claim.

12  Q.   Have you ever met Dr. Micca?

13  A.   No, sir.

14  Q.   How do you know he's the third relator?

15  A.   Again, that information came from my attorneys.

16  Q.   Okay.  Thank you.

17          Can we go down to the bottom paragraph that

18  starts with percentage interests?

19  A.   Yes, sir.

20  Q.   Do you see the paragraph that starts, the first

21  relators, the second relators and the third relators

22  agree to assign and exchange between and among

23  themselves undivided interests in the substantive

24  claims and any recoveries thereon in each of the qui

25  tam actions and any related state actions and then

1  there's a parenthetical, in the following way, 55

2  percent shall belong to the first relators, 35

3  percent shall belong to the second relators and the

4  remaining ten percent shall belong to the third

5  relator?

6  A.   Yes, sir.

7  Q.   In this paragraph, which of this refers to you?

8  A.   The second set of percentages.

9  Q.   Does this mean that you have a -- what does this

10 paragraph mean to you?

11 A.   It states that I have a monetary award in this

12 claim here.

13 Q.   You have a financial interest in this

14 litigation?

15 A.   Yes, sir.

16 Q.   Why should we believe your testimony if you have

17 a financial interest in this litigation?

18       MS. MARTIN:   Your Honor, we object to that

19 question.

20       THE COURT:   Sustained as to the form.

21 Q.   Does this document or this agreement in any way

22 affect your ability to tell the truth today?

23 A.   No, sir.

24 Q.   Did you, in fact, tell the truth today?

25 A.   Yes, sir.

886

1   Q.   Can we go down to the -- it may be the next

2   page.

3          Do you see in paragraph five that says, each

4   relator and his or her counsel agree to cooperate in

5   making all reasonable efforts to maximize the

6   aggregate relator's share of the proceeds of the

7   actions, including, but not limited to, performing

8   legal research, preparing pleadings, briefs and

9   position papers, participating in meetings,

10  conference calls, hearings, pretrial conferences and

11  discovery, reviewing document and if necessary

12  participating in discovery and litigation of

13  relator's share issues in the district and appellate

14  courts?

15  A.   Yes, sir, I see that.

16  Q.   In your experience in this case, have you ever

17  performed any legal research?

18  A.   No, sir.

19  Q.   Ever prepared any pleadings?

20  A.   No, sir.

21  Q.   Briefs?

22  A.   No, sir.

23  Q.   Position papers?

24  A.   No, sir.

25  Q.   Did you participate in meetings?

```
 1   A.   Only the ones that I was required to by my
 2   attorney.
 3   Q.   Did you participates in conference calls?
 4   A.   No, sir.
 5   Q.   How about hearings?
 6   A.   No, sir.
 7   Q.   Pretrial conferences?
 8   A.   No, sir.
 9   Q.   Do you know what discovery is?
10   A.   Not exactly, no.
11   Q.   Did you review documents?
12   A.   No, sir.
13   Q.   Do you see the next paragraph, each party's
14   cooperation in maximizing the relator's share awarded
15   is a principal consideration for this agreement?
16   A.   Yes, sir, I see it.
17   Q.   What does this paragraph mean to you?
18   A.   To me, this entire paragraph means that it's all
19   about the lawyers and what the attorneys are to do.
20   Q.   Do you understand that this agreement binds you
21   in any way in terms of testimony that you give today?
22   A.   No, sir.  It doesn't say anything that I'm
23   obligated to do.
24          MR. WERTKIN:  May I have one moment, please,
25   Your Honor?
```

1          THE COURT:  You may.

2                (Brief pause.)

3   Q.   (By Mr. Wertkin)  Ms. Farmer, why did you decide

4   to contact an attorney in this case?

5          MS. MARTIN:  Your Honor, we object to that

6   question.

7          THE COURT:  Sustained.

8   Q.   Did you contact an attorney in this case?

9   A.   Yes, sir.

10         MR. WERTKIN:  Your Honor, may I understand

11  the basis for the objection and the ruling?

12         THE COURT:  Because of where similar

13  questions have gone when you've been instructed about

14  them previously.

15         MR. WERTKIN:  Okay.

16  Q.   Ms. Farmer, when did you decide to contact an

17  attorney in this case?

18  A.   It was in 2008, specifically.  And the reason I

19  know that is because that's the time --

20         MS. MARTIN:  Your Honor, that answer goes

21  beyond the scope --

22         THE WITNESS:  I'm sorry.

23         THE COURT:  Yes.  The question is just for

24  when.

25         THE WITNESS:  Yes, ma'am.

1    Q.   And what did you do after you decided to contact

2    an attorney in this case?

3    A.   After I made the decision to do so, then made

4    the phone call, set up a meeting and explained what

5    was going on and what we saw.

6    Q.   Was it an easy decision for you to decide to

7    come forward?

8    A.   Yes, sir.

9           MS. MARTIN:  Your Honor, we object to this

10   question.

11          THE COURT:  That would be a yes or no

12   answer.

13   A.   Yes, sir.

14   Q.   It was an easy decision?

15   A.   Yes, sir.

16   Q.   Why was it an easy decision?

17          MS. MARTIN:  Your Honor, we object to the

18   "why" question.

19          THE COURT:  Sustained.

20          MR. WERTKIN:  Ms. Farmer, thank you for your

21   answers.  I have no further questions at this time.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Cross-examination.

24          MS. MARTIN:  Yes, Your Honor.

25          THE COURT:  All right.

1                        CROSS-EXAMINATION

2    **BY MS. MARTIN:**

3    Q.   Ms. Farmer, I'm Kim Martin, I represent

4    AseraCare.  We've never met before; correct?

5    A.   Correct.

6    Q.   And you just said that you told the truth here

7    today; correct?  You said you told the truth; right?

8    A.   Yes, ma'am.

9    Q.   So you were the executive director in the Foley

10   -- over the Foley agency from January 2007 to

11   December of -- from 2007 into 2008; correct?

12   A.   Yes, ma'am.

13   Q.   And you were the executive director in

14   Monroeville during the 2010 to 2011 time frame;

15   correct?

16   A.   Until I left in '11, yes, ma'am.

17   Q.   And your testimony here today is that you

18   instructed individuals in the Monroeville agency to

19   continue the documentation practices that you've

20   discussed here today in terms of documenting to the

21   LCDs, that you told them to continue that while you

22   were the executive director in Monroeville; correct?

23            MR. WERTKIN:  Objection, the time frame is

24   not in the question.

25   Q.   In the 2010 to 2011 time frame, you told them --

1   you testified here today that you told them to

2   continue documenting to the LCDs; correct?

3   A.   I believe my testimony was, I continued to tell

4   them what we had overheard on the conference calls,

5   yes, ma'am.

6   Q.   And you continued to tell them, make the

7   information in the LCD appear in the medical record

8   even if it wasn't there; correct?  That's what you

9   told them?

10  A.   I told them that they needed to follow

11  instructions and match the LCDs, yes, ma'am.

12  Q.   You've had your deposition taken in this case,

13  haven't you?

14  A.   I have had my deposition --

15  Q.   It wasn't me, but it was somebody else right

16  down the street here in my office; correct?

17          And you were under oath just like you are

18  today in that deposition; correct?

19  A.   Yes, ma'am.

20  Q.   And your counsel was there; correct?

21  A.   Yes, ma'am.

22  Q.   And counsel for the government was there;

23  correct?

24  A.   Yes, ma'am.

25  Q.   And there was a court reporter there and a

1  videographer; correct?

2  A.   Yes, ma'am.

3  Q.   And there were lots of questions asked and your

4  testimony was taken down in a deposition; correct?

5  Or in a transcript; correct?

6  A.   Yes, ma'am.

7  Q.   And you've seen that transcript since that time;

8  right?

9  A.   Yes, ma'am.

10 Q.   And do you recall that you were asked in that

11 lawsuit, so if you filed the lawsuit in March 2009,

12 is that approximately when you started talking to

13 your clinical staff and your agencies about the right

14 way to do things?

15         And you said, it was around that time frame.

16 Do you recall that?

17 A.   I don't recall it specifically, but if you say

18 it's there, I believe you, yes, ma'am.

19 Q.   And you were asked, and once you started having

20 those conversations with your clinical staff, are

21 those conversations that you repeated as time went

22 on?

23         And you said yes.

24         And then you were asked, so was that a

25 message in terms of documenting accurately that you

1  conveyed to your clinical staff multiple times from

2  March of 2009 approximately forward?

3         And you say, I don't know how many times but

4  we had those conversations many times.

5         Now, do you remember giving that testimony

6  in your deposition?

7  A.   If you say it's there, I believe you.

8  Q.   And that's true and correct when you said it in

9  your deposition; correct?

10  A.   Yes, ma'am, if you say it's in there.

11  Q.   And what you're telling this jury here today is

12  different from what you said in your deposition;

13  correct?

14  A.   I believe I also said in my testimony a few

15  minutes ago that I had told them that we were not

16  pushing for patients that were not appropriate

17  anymore.

18  Q.   But you did --

19  A.   But to continue to do things we heard on the

20  conference call.

21  Q.   Well, you say in your deposition that a message

22  in terms of documenting accurately that you conveyed

23  to your clinical staff multiple times from March of

24  2009 approximately forward, and you say, I don't know

25  how many times we had those conversations.  I don't

1   know how many times but we had those conversations

2   many times.

3          And you don't dispute giving that testimony,

4   do you?

5   A.   I don't dispute it if you say --

6   Q.   You were under oath when you gave that

7   testimony; correct?

8   A.   Yes, ma'am.

9   Q.   Now, you've given some testimony here today

10  about Dr. Smith.  Do you recall that testimony?

11  A.   Yes, ma'am.

12  Q.   Dr. Smith was your actual doctor; correct?

13  A.   Yes, ma'am.

14  Q.   And you were asked some questions about him in

15  your deposition, weren't you?

16  A.   I believe so, yes, ma'am.

17  Q.   And you were asked, in your professional

18  dealings with Dr. Smith at AseraCare, did you find

19  him to be a competent physician?

20         And your answer was, he tried very hard to

21  ask the right questions at the IDG meetings and to

22  get the answers that he needed.

23         Was that the correct statement when you made

24  that statement?

25         MR. WERTKIN:  Your Honor, can we have the

1  page number that Ms. Martin --

2      MS. MARTIN:  I'm sorry, it's Page 78, Lines

3  1 through 6.

4  Q.  Was that accurate testimony about Dr. Smith when

5  you gave your deposition?

6  A.  Yes, ma'am.

7  Q.  So he tried very hard to ask the right questions

8  at the IDG meetings and to get the answers that he

9  needed?

10  A.  He did, yes.

11  Q.  And you also gave some testimony about providing

12  information in response to ADRs which are those

13  additional development requests.  Do you recall that

14  testimony?

15  A.  Yes, ma'am.

16  Q.  Let me show you what has previously been marked

17  as Defendant's Exhibit 4023.

18      Do you recognize this as the Palmetto

19  training manual?

20  A.  I do.

21  Q.  And would Palmetto be the agency that would be

22  sending you the ADR requests?

23  A.  I thoughts they came strictly from CMS, but I

24  could be mistaken.

25  Q.  If I could get you to look at Page --

1          THE COURT:  Ms. Farmer, can you tell us who

2   or what Palmetto GBA is?

3          THE WITNESS:  Palmetto is a -- they're a

4   regional contractual group that is an intermediary

5   between CMS and the hospices.

6          THE COURT:  They are an intermediary between

7   Medicare and hospice?

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  Thank you.

10          THE WITNESS:  Yes, ma'am.

11  Q.   And if I could get you to look at Page 6338.

12  There's -- actually, let me explain a little more.

13          There's some pages down in the bottom right

14  -- numbers in the bottom right-hand corner of the

15  pages.  So if you could go to 6338, please.

16  A.   Okay.

17  Q.   And you see at the top of that page there, it

18  said, responding to a hospice ADR.

19  A.   Yes, ma'am.

20  Q.   And was this a checklist of information or a

21  checklist that was provided to you by Palmetto for

22  responding to ADR requests?

23  A.   Was this document provided to me by Palmetto?

24  Q.   This document was in the Palmetto training

25  manual; correct?

1  A.  Yes.

2  Q.  And the Palmetto training manual was something

3  you used there in the agency in Monroeville and Foley

4  for reference; correct?

5  A.  It was in the agency, yes, ma'am.

6  Q.  Were you, in responding to hospice ADRs, did you

7  review this checklist?

8  A.  No.  There was a checklist from corporate that

9  they sent out for us to use.

10  Q.  In looking at this checklist from Palmetto in

11  terms of responding to ADRs, look at paragraph five

12  for me.

13  A.  Okay.

14  Q.  And if you see there, it says, please submit

15  any, in all caps, documentation that would support

16  the beneficiary's hospice Medicare benefit

17  appropriateness and medical necessity of level of

18  care billed.  This may include documentation outside

19  the dates of service under review.

20        Do you see that there?

21  A.  Yes, ma'am, I do.

22  Q.  So, that was information that Palmetto was

23  giving to hospice providers about what was

24  appropriate information to submit in a response to an

25  ADR; correct?

1    A.   Yes, ma'am, that's what they're asking for.

2              THE COURT:  Yes, ma'am, what?

3              THE WITNESS:  Yes, ma'am, that's -- I agree,

4    that's what they were asking for.

5    Q.   And if you would look over on the next page,

6    that's Page 6339, Paragraph 12, and it says, if the

7    documentation for the dates of service in question

8    does not paint a clear picture of the beneficiary's

9    hospice appropriateness, you may also submit

10   documentation for the months prior to or subsequent

11   to the dates of service requested.

12             Did I read that correctly?

13   A.   Yes, ma'am, you did.

14   Q.   So, again, this is information from Palmetto

15   about -- that they gave to hospice providers about

16   how to respond to ADRs; correct?

17   A.   Yes, ma'am.

18   Q.   So, Palmetto is telling hospice providers in

19   these two paragraphs that it's okay to submit

20   documentation outside of the dates of service;

21   correct?

22   A.   Yes, ma'am, that's what it says.

23   Q.   When you were asked about ADRs in your

24   deposition, you were asked and you mentioned that you

25   would include information from different cert

1  periods, and you were asked if you would send the

2  documentation that went along with that -- strike

3  that.

4         In your deposition, do you recall being

5  asked that when you would pull information from other

6  time periods, you would include copies of whatever

7  documentation you were pulling and you would include

8  that in what you sent to Palmetto?

9  A.  I'm sorry.  Can you reask that?  That was a long

10 question.  I'm sorry.

11 Q.  Do you recall being asked in your deposition if,

12 when you pulled information from other time periods,

13 whether you would include copies of that

14 documentation in what you sent to Palmetto?

15 A.  I don't remember it specifically, but if you say

16 it's in my deposition.

17 Q.  Do you recall that your answer to that question

18 in your deposition was yes, that you would include

19 copies of that documentation in what you sent to

20 Palmetto?

21 A.  Again, I haven't looked at my deposition in a

22 long time.

23 Q.  If that's what's in your deposition, you don't

24 dispute --

25 A.  I don't dispute it, no, ma'am.

1           THE COURT:  What page is that on, please?

2           MS. MARTIN:  I'm sorry, it's 138.

3           THE COURT:  Line?

4           MS. MARTIN:  18 through 22 of her

5    deposition.

6    Q.   So even if you included information from outside

7    the cert period, you would include the supporting

8    documentation that went along with that information

9    when you sent it to Palmetto; correct?

10   A.   We did send some of the paperwork, yes.

11   Q.   Well, you say in your deposition that you would

12   include the copies of whatever documentation you were

13   sending to Palmetto; correct?

14   A.   Yes, ma'am.  If you say it's there.

15   Q.   Now, Ms. Farmer, you are not -- you're not a

16   clinical -- you've told us you're not a clinical

17   person; right?

18   A.   No, ma'am.

19   Q.   And you don't have any clinical training or

20   background?

21   A.   No, ma'am.

22   Q.   And you would not have been involved in doing

23   any patient assessments; correct?

24   A.   No, ma'am.

25   Q.   And you would not have had patients that you

1  were responsible for caring -- providing the care

2  for; correct?

3  A.   No, ma'am, I would not.

4  Q.   And you did not make admission decisions;

5  correct?

6  A.   I did not make admission decisions.

7  Q.   And you did not make assessments of whether the

8  patient was appropriate for hospice care; correct?

9  A.   No, I did not.  I'm not -- huh-uh.

10 Q.   And you did not make decisions about

11 recertification; correct?

12 A.   No, ma'am, I did not.

13 Q.   And you would agree that not every patient that

14 was on service in the Foley agency during the time

15 that you were the executive director was not

16 appropriate for hospice service, you would agree with

17 that, wouldn't you?

18 A.   That every patient was not --

19 Q.   Appropriate.

20 A.   I would agree with that, yes, ma'am.

21 Q.   And there were many patients on service in Foley

22 that you agree were appropriate; correct?

23 A.   There were patients that were appropriate, yes.

24 Q.   And the same question with regard to when you

25 were the executive director in Monroeville, you are

1   not telling this jury that every single patient from

2   -- well, focusing on the February 2010 to February,

3   March 2011 time frame, you're not telling this jury

4   that every patient on service in Monroeville during

5   that time frame was not appropriate for hospice

6   service, are you?

7   A.   No, ma'am.

8   Q.   And you would agree that there were many, many

9   eligible patients on service in Monroeville during

10  that time frame; correct?

11  A.   I would agree there were many patients that were

12  on service at that time?

13  Q.   Who were appropriate for hospice care.

14  A.   Yes, ma'am, I agree.

15  Q.   Now, you were asked some questions about the

16  agreement that is Defendant's Exhibit 226 which is

17  the relator agreement.

18  A.   Yes, ma'am.

19  Q.   And as you testified, that agreement gives you a

20  financial interest in the outcome of this litigation,

21  doesn't it?

22  A.   Yes, ma'am.

23  Q.   And as Mr. Wertkin walked you through, you and

24  Ms. Richardson Zaragoza now, are the second relators

25  as defined in this agreement; correct?

1    A.   Yes, ma'am, that's correct.

2    Q.   If you look on Page 2 of this agreement, you and

3    Ms. Richardson Zaragoza are entitled to 35 percent of

4    any relator share that comes from -- if there's a

5    recovery in this case; correct?

6    A.   That's my understanding, yes, ma'am.

7    Q.   And how much money exactly do you expect that to

8    be?

9    A.   I don't have any expectations.

10   Q.   So, you've never thought about how much money

11   you may receive if there is a verdict in this case?

12   A.   No.

13   Q.   So it's never crossed your mind how much money

14   you may get?

15   A.   You would -- when we found out that there was --

16           MS. MARTIN:  Your Honor, I would ask her --

17           THE WITNESS:  I'm sorry.

18           THE COURT:  Answer the question.

19   A.   Can you ask that again, please?

20   Q.   It's never crossed your mind how much money you

21   may receive if there's a verdict in this case?

22   A.   No.

23   Q.   And you know it could be millions of dollars;

24   correct?

25   A.   That's what I've been told, yes, ma'am.

1  Q.  So you at least have contemplated that it could

2  be millions of dollars; correct?

3  A.  Yes.

4  Q.  And that's a pretty big financial interest,

5  isn't it?

6  A.  Yes, ma'am, it is.

7  Q.  And you were asked some questions about

8  paragraph five of this agreement.  It starts out,

9  it's titled all reasonable efforts.  Do you see that?

10  A.  Yes, ma'am, I do.

11  Q.  And as I understand your testimony is you think

12  this paragraph only relates to your attorneys?

13  A.  My understanding of this paragraph was that

14  because of the things that are listed in it, such as

15  participating in meetings, pretrial conferences,

16  preparing pleadings, that these are all attorney

17  efforts.

18  Q.  But the first line there is each relator;

19  correct?  Do you see that?

20  A.  I do.

21  Q.  And you are a relator; correct?

22  A.  Yes, ma'am.

23  Q.  And you have participated in some of these -- in

24  listings here; correct?  You sat for a deposition;

25  correct?

1   A.   Yes, ma'am.

2   Q.   You are testifying here today; correct?

3   A.   Yes, ma'am.

4   Q.   And you've had conferences and meetings with

5   counsel; correct?

6   A.   I've had some meetings, yes, ma'am.

7   Q.   And you understand that this agreement, here in

8   this agreement, you have agreed to cooperate in

9   making all reasonable efforts to maximize the

10  aggregate relator share of the proceeds of the

11  action; correct?

12  A.   That's not what that means to me.

13  Q.   Okay.  But that's the language of this agreement

14  that you have signed; correct?

15  A.   That's the language of the agreement, yes.

16  Q.   It also says, each party's cooperation in

17  maximizing the relator share awarded is a principal

18  consideration for this agreement.  Do you see that?

19  A.   Yes, ma'am.

20  Q.   And you are a party to this agreement; correct?

21  A.   I am.

22  Q.   And let me ask you -- go to Page 6 of that.

23        While we're trying to get that page up,

24  Ms. Brown -- Farmer, I'm sorry.

25  A.   That's okay.

1   Q.   Have you ever discussed with Ms. Zaragoza the

2   fact that you could receive millions of dollars in

3   this case?

4   A.   The only thing we've discussed is when we signed

5   -- when we received the document, the percentage

6   there, the 35 percent.

7   Q.   So you and Ms. Zaragoza have talked about that

8   percentage; correct?

9   A.   Yes.  We had to agree on it before we signed the

10  agreement.

11  Q.   And if you look here on Page 6 of the agreement,

12  that's your signature; correct?

13  A.   Yes, ma'am.

14  Q.   And so you're a party to this agreement;

15  correct?

16  A.   Yes, ma'am.

17  Q.   And so you're subject to the terms of it;

18  correct?

19  A.   Yes, ma'am.

20  Q.   So your testimony here today is a part of your

21  obligations under this agreement; correct?

22  A.   No, ma'am.

23  Q.   You would agree with me, though, that as a part

24  of this agreement, you have various obligations that

25  are put on you under this agreement; correct?

1   A.   This agreement is from beginning to end, the

2   only thing it talks about is the three parties coming

3   together and, again, my interpretation of this

4   Paragraph 5 was the attorneys.  And the only thing

5   that we did on this form that we understood was the

6   percentages there is what we were --

7   Q.   That Paragraph 5 does say that it applies to the

8   relators and you're one of the relators; correct?

9   A.   It does have that wording, yes, ma'am.

10         MS. MARTIN:  Judge, if I could have just a

11   minute.

12         THE COURT:  Okay.

13              (Brief pause).

14         MS. MARTIN:  Thank you, Ms. Farmer, that's

15   all I have.

16         THE COURT:  Any redirect?

17         MR. WERTKIN:  Yes, Your Honor, just a few

18   questions.

19                   REDIRECT EXAMINATION

20   **BY MR. WERTKIN:**

21   Q.   Ms. Farmer, Ms. Martin asked you a few questions

22   about your deposition testimony regarding Sage Smith;

23   do you remember that?

24   A.   Okay.

25   Q.   Do you also recall in your deposition on Page

1   266 Line 12 that Sage Smith would sign his -- would

2   sign his without reading them, but he -- the nurses

3   would give him an overview --

4          MS. MARTIN:  We object to this as beyond the

5   scope.  And also asked and answered on direct.

6          THE COURT:  I don't know because I don't

7   know what the testimony is that's coming, but it

8   sounds to me like it does relate to the questions you

9   asked, so I will allow it.  At least the question to

10  be asked.

11  Q.  Do you recall testifying during your deposition

12  Sage Smith would sign his without reading them, but

13  he -- the nurses would give him an overview, if you

14  will, during the team meeting, an update on the

15  patients and he trusted that what they were saying

16  was on the form in front of him?  Do you recall

17  testifying about that?

18  A.  If it's in my deposition, then, yes, sir, I did.

19  Q.  Is that consistent with your testimony about

20  Dr. Sage Smith that you gave today?

21  A.  Yes, sir.

22  Q.  Do you recall Ms. Martin asked you about a

23  Palmetto document?

24  A.  Yes, sir.

25         MR. WERTKIN:  May I have permission to

1    publish that document as the same one that was --

2             THE COURT:  You may.  What page are you

3    wanting?

4             MR. WERTKIN:  This is the right page, Page

5    6339.

6    Q.   This is the document that Ms. Martin showed you;

7    do you remember?

8    A.   Yes, sir.

9    Q.   Do you see paragraph 12 here?

10   A.   Yes, sir.

11   Q.   It says, if the documentation for the dates of

12   service in question does not paint a clear picture of

13   the beneficiary's hospice appropriateness, you may

14   also submit documentation for the months prior to or

15   subsequent to the dates of service requested.  Do you

16   see that?

17   A.   Yes, sir.

18   Q.   You testified earlier that you were pulling

19   information from other time periods; is that right?

20   A.   Yes, sir.

21   Q.   And when you were doing that, were you intending

22   to paint a clear picture of the beneficiary's hospice

23   appropriateness?

24             MS. MARTIN:  Your Honor, we object to

25   leading.

1          THE COURT:  Sustained.

2    Q.   Ms. Farmer, when you were pulling documents from

3    different time periods, what was your intention in

4    terms of providing information about the

5    beneficiary's hospice appropriateness?

6    A.   To make the patient look appropriate for

7    hospice.

8    Q.   In your view, was that following the requirement

9    in number 12?

10   A.   We didn't refer to the Palmetto Guideline to do

11   the ADRs.

12   Q.   Were you providing a clear picture when you were

13   doing that in your view?

14   A.   Yes, sir.

15   Q.   Providing a clear picture?

16   A.   No, we were painting a picture to make it look

17   like it was hospice appropriate.

18          MS. MARTIN:  We would object.

19          THE COURT:  Sustained.

20   Q.   Ms. Martin asked you if you knew whether there

21   were eligible patients on hospice in the time frames

22   that we were talking about; do you recall that

23   question?

24   A.   Yes, sir.

25   Q.   Do you recall your answer?

1   A.   Yes, sir.

2   Q.   What was it?

3   A.   That, yes, sir, there were some.

4   Q.   Were there ineligible patients on hospice during

5   that time --

6          MS. MARTIN:  Object, Your Honor, I don't

7   think I asked about eligibility.  I think I asked

8   about appropriateness.

9          THE COURT:  Okay.  Rephrase your question.

10  Q.   Ms. Martin asked you about appropriateness and

11  you testified -- do you recall your testimony about

12  whether there were patients that were appropriate in

13  hospice during that time frame?

14  A.   Yes.

15  Q.   What did you say?

16  A.   I said yes, sir, there were.

17  Q.   Were there patients who were not appropriate for

18  hospice during that same time frame?

19  A.   Yes, sir.

20         MR. WERTKIN:  Thank you.  No further

21  questions, Your Honor.

22         THE COURT:  Recross?

23         MS. MARTIN:  Yes, Your Honor.

24                  CROSS-EXAMINATION

25  **BY MS. MARTIN:**

1    Q.   You would agree that in assessing -- first of

2    all, as a non-clinician, your basis for assessing

3    appropriateness of a patient for hospice is limited;

4    correct?

5    A.   It's based on what I read in the LCDs, yes.

6    Q.   So you're looking at what is in the local

7    coverage determination from Palmetto; correct?

8    A.   Yes, ma'am.

9    Q.   And in your view, if a patient doesn't meet that

10   criteria or those guidelines, the patient is not

11   appropriate; correct?

12        MR. WERTKIN:  Your Honor, I'm going to

13   object to that question as beyond the scope of

14   redirect.

15        THE COURT:  It goes to her understanding of

16   what was appropriate.  Overruled.

17   A.   I know that from my understanding the LCDs were

18   guidelines and that they -- and also my understanding

19   is that the patient should meet the majority of the

20   check boxes or questions, if you will, on the LCD.

21   Q.   And that's your understanding as a

22   non-clinician; correct?

23   A.   Yes, ma'am.

24        MS. MARTIN:  Okay.  Thank you.  That's all I

25   have.

1    THE WITNESS:  Yes, ma'am.

2    MR. WERTKIN:  Nothing further, Your Honor.

3    THE COURT:  Thank you.  Ms. Farmer, you may

4  be excused.

5    And I think it's an appropriate time to

6  recess for the evening.  Again, I don't think we will

7  get someone in in ten minutes.

8    During the recess tonight, what is your

9  instructions?  Don't talk to anybody, don't let

10  anybody talk to you.  Don't do any independent

11  research.  Ignore any news reports that may be out

12  there.  Don't go fishing around to find information,

13  et cetera, et cetera.  Right?

14    We will see you back in the morning at 8:30.

15  Thank you very much.

16    (Jury excused).

17    (SIDEBAR)

18    MR. LEMBKE:  Again, we did not bring this up

19  because we didn't want to have to ask to approach

20  three times during the witness because we did object.

21    I don't think it could have been any clearer

22  yesterday that Your Honor said we're not getting into

23  why and yet the government continues to ask why and

24  sometimes witnesses blurt out answers before we're

25  able to object and Your Honor is able to instruct

1  them.

2           We had, why did you not raise that concern?

3  Why did you not submit from the other benefit

4  periods?  And why is it an easy decision?

5           Your Honor, you know, it's getting a little

6  old here that they continue to defy your order and

7  continue to ask the questions and it is a prejudice

8  on us and we submit that it needs to stop.

9           MR. WERTKIN:  Okay.

10          THE COURT:  Y'all are all getting daily

11  copy; right?

12          MR. WERTKIN:  Yes, Your Honor.

13          THE COURT:  So I suggest that you all go

14  back and read the instructions from Monday morning.

15          MR. WERTKIN:  Yes, Your Honor.  And may I

16  just say --

17          THE COURT:  And I'm going to do the same.

18          MR. WERTKIN:  That's fair, Your Honor.  And

19  our understanding was that not every single question

20  that starts with a why is inappropriate.

21          We have --

22          THE COURT:  I would agree.  But these are

23  all going to those kinds of things that we talked

24  about that weren't coming in.  Why they're upset with

25  AseraCare?  Why they don't -- why all those kind of

1   things.  And again, after you've asked those

2   questions and you've had witnesses blurt out

3   information that I told you we're not getting into, I

4   am particularly concerned about continuing to ask

5   those questions.

6          And the only thing I can do is sustain an

7   objection to them when we've seen those kinds of

8   things come out in response to this generic kind of

9   why questions.

10          MR. WERTKIN:  Yes, Your Honor.

11          THE COURT:  Do you understand where I am

12   coming from?

13          MR. WERTKIN:  I understand.  And we are

14   trying hard to comply with your order.  We have

15   instructed the witness, especially the relators, do

16   not say, do not talk about census, do not talk about

17   particular times when you felt pressure.  And to the

18   extent we're asking why questions, it's not meant to

19   elicit that testimony and in fact --

20          THE COURT:  And not that somebody yelled at

21   me, not that I felt pressured, not that, you know --

22          MR. WERTKIN:  But, in our view, that doesn't

23   eliminate all why questions, just certain ones that

24   elicit those kinds of responses.

25          MR. LEMBKE:  Your Honor, I just don't see

1  how anyone in good faith listening to what the Court

2  said yesterday could think, why did you not raise

3  this concern could possibly be within what the Court

4  has said was out of bounds.

5      It was plainly out of bounds and she

6  answered it.

7      And there comes a point at which objecting

8  and having Your Honor say disregard what you just

9  blurted out, I mean, it almost begins to be a pattern

10  where this is going on and it's prejudicial to us.

11      THE COURT:  My instructions to all the

12  lawyers and to myself and my trusted assistant, we're

13  going to go back and read tonight the transcript from

14  Monday.  And we're going to be careful not to elicit

15  any questions that would ask for a response that goes

16  into those emotional kinds of things I said were

17  we're not getting into here.

18      MR. WERTKIN:  Yes, absolutely.

19      THE COURT:  Which would include things like,

20  I feel pressure or I needed to keep my job because

21  I'm a single mom or any of those kind of things.

22      MR. WERTKIN:  Absolutely.

23      THE COURT:  Or somebody shouted at me when I

24  would ask.

25      MR. WERTKIN:  Absolutely, Your Honor.  And

1  also, if the response is because I didn't know

2  better, that would probably be okay, if the responses

3  are why didn't you do it.

4         THE COURT:  But how am I supposed to know

5  that's going to be the response when prior questions

6  have elicited those kinds of responses that I said

7  we're not getting into.

8         MR. WERTKIN:  Yes.

9         THE COURT:  So you understand the problem.

10         MR. WERTKIN:  I do.  And actually, I'm very

11  sensitive to it because we have witnesses coming

12  tomorrow who are not relators and, you know, we are

13  going to do our best to instruct them.  So I am very

14  sensitive to the types of the questions that we're

15  going to be asking, especially with these witnesses

16  tomorrow.

17         THE COURT:  Relators or not relators, it

18  doesn't matter.  They are witnesses that the

19  government is putting on and you're responsible for

20  making sure that they are prepped and they understand

21  some things.  And while we are talking about prepping

22  your witnesses, please explain to them that when

23  there is an objection, they are to stop and not

24  answer until the objection is ruled on.  Okay?

25         Because there have been several times when I

1  have had to raise my voice over a witness talking

2  when there's an objection that's been raised.

3         So if you will make sure they understand

4  that as well, I think it will make things go a lot

5  smoother for everyone else, too.

6         MR. WERTKIN:  I will, Your Honor.

7         THE COURT:  I don't like doing that.

8         MR. WERTKIN:  I understand.

9         THE COURT:  Anything else?

10         MR. LEMBKE:  Dr. Micca.

11         THE COURT:  We will take a short break

12  before we get to that, so we will do that in here.

13                    (Brief recess).

14              (Open court, jury not present.)

15         THE COURT:  All right.

16         MR. LEMBKE:  Yes, Your Honor.  We would note

17  that the relevant page of the transcript where Your

18  Honor made your ruling is Page 205 on July 22nd,

19  2015.

20         THE COURT:  Okay.

21         (Brief pause)

22         MR. WERTKIN:  Are we doing any production or

23  just swearing --

24         THE COURT:  I want to get right to the

25  pertinent issues concerning Dr. Micca's testimony in

```
 1  phase one.
 2          MR. WERTKIN:  And Your Honor's concerned
 3  mostly with the time connection; is that right?
 4          THE COURT:  And people.
 5          MR. WERTKIN:  And people.
 6                  DIRECT EXAMINATION
 7  BY MR. WERTKIN:
 8  Q.  Dr. Micca, did you file a complaint in case?
 9  A.  I did.
10  Q.  And when did you begin working at AseraCare?
11  A.  I was at AseraCare as medical director from
12  February of 2005 through August of 2006.
13  Q.  Dr. Micca, did you with AseraCare -- I'm sorry,
14  where did you work?
15  A.  The three points that I would like to make --
16  Q.  First, I'm just asking where you work, what
17  office?
18  A.  AseraCare.
19  Q.  Okay.  What connections, Dr. Micca, if any, did
20  you have to AseraCare's Atlanta office after you
21  stopped working in August 2006?
22          MR. LEMBKE:  Your Honor, we would just note
23  for the record that the first patient in the 123 from
24  Atlanta that went on service was January of 2007.
25          THE COURT:  Right.  I got that.
```

 1   Q.   What connections, Dr. Micca, if any did you have

 2   to AseraCare's Atlanta office after you stopped

 3   working in August 2006?

 4   A.   My clinical practice has been based in a nursing

 5   home that was owned by Golden Living from 1999 -- and

 6   I'm still attending there at the present -- from 1999

 7   through November of 2009.  I was also their medical

 8   director of subacute services.

 9   Q.   Whose medical director were you?

10   A.   Of the nursing home for Golden Living that used

11   exclusively AseraCare Hospice for their hospice

12   patients.

13          In that role, I was present in that building

14   in excess of 100 hours a month.  I was very aware of

15   the operations of AseraCare Hospice in that building

16   throughout that time period.  I also knew the staff

17   of the building very well.

18   Q.   What time period are you talking about?

19   A.   Between 1999 and even the present.

20   Q.   Okay.

21   A.   When I was at AseraCare, as I mentioned earlier

22   from February 2005 to August of '06, I was very aware

23   of the staff of AseraCare Hospice both in their

24   office and the front line people that would come to

25   the facility.  They essentially did not change after

1   I left the directorship position in August of 2006.

2   They continued for years after that.

3   Q.   So you interacted with AseraCare's staff in

4   Atlanta, the same ones you worked in August 2006 into

5   2007?

6   A.   That is correct.

7   Q.   What kind of interactions did you have with

8   them?

9   A.   Well, I had interactions of requests for

10   admissions into hospice, not only for my own patients

11   but, because of my leadership role within the

12   building, also patients that were with other

13   attendings that were being requested for AseraCare

14   admissions.

15   Q.   Did you have patients who were on hospice while

16   you were the will medical director at AseraCare in

17   August 2006 time period?

18   A.   I did.

19   Q.   Did they stay on -- did they remain your

20   patients after you left AseraCare?

21   A.   They did.

22   Q.   So they were being -- they were AseraCare

23   patients who were also your patients after 2006 and

24   into 2007?

25   A.   That is correct.

1  Q.   And so because of that, did you have direct

2  connections with AseraCare?

3  A.   I did.

4  Q.   Can you explain that?

5  A.   I had multiple patients that I had that were on

6  AseraCare Hospice that, after stabilization, I would

7  like to have them come off the hospice and have those

8  efforts resisted.  Very.

9       Specifically, I had a patient Mary R that

10 was active during this time period in question, who I

11 had admitted onto hospice when she did meet criteria.

12 She was admitted to a hospital first with an acute

13 heart attack and had pump failure where her heart

14 ejection fraction was 15 percent.  She had symptoms

15 at rest.  She had heart failure at rest.  She had

16 ongoing angina, was oxygen dependent.

17      All of that made her appropriate for

18 AseraCare Hospice to be placing her, and I was her

19 attending as well.  However, in following her

20 overtime, her symptoms resolved.  She was off oxygen.

21 She regained her normal weight.  She no longer had

22 heart failure at rest or with activity, had no

23 angina.  And I would formally would ask to have her

24 placed --

25 Q.   When did she get better, she got better after

1  you left AseraCare or while you were there?

2  A.   Yes.   And even throughout 2007, I continued

3  efforts to have her removed from AseraCare Hospice

4  and have them thwarted by the hospice.

5  Q.   So she was your patient while you were the

6  AseraCare medical director?

7  A.   Correct.

8  Q.   And then she continued to be your patient when

9  you left?

10  A.   Correct.

11  Q.   And she was being treated by the AseraCare

12  staff?

13  A.   Correct.

14  Q.   And you had interactions with those staff?

15  A.   I did.

16  Q.   And was it just that one patient or were there

17  other patients like that?

18  A.   There were other patients similar to that as

19  well.

20  Q.   Around how many?   Do you have any idea?

21  A.   I would say another eight or ten of my own

22  patients that I attempted to get off hospice.

23  Q.   So, in that context, were you able to observe

24  the general practices of AseraCare after 2006 into

25  2007?

1  A.   Yes.  And, again, not only with my patients but

2  with patients of other attendings.

3  Q.   What do you mean by that?

4  A.   Well, I would have other attendings -- when I

5  would get a call for a request for an AseraCare

6  evaluation to admit -- I'm sorry -- a consult for

7  AseraCare to evaluate and admit, I would answer that

8  call and say, well, can I just have an evaluation,

9  and was told that, no, I had to have an order that

10 said evaluate and admit is appropriate.

11         I would then ask the nurse --

12         THE COURT:  That was while you were with

13 AseraCare?

14         THE WITNESS:  No.  This is as an attending

15 physician following that into 2008, 2009, 2010.

16         THE COURT:  All right.

17 A.   Where I would get the call from the nursing

18 staff for such an order.  I would then ask the --

19 Q.   And the nursing staff of AseraCare we're talking

20 about?

21 A.   No.  This is the nursing staff of Golden Living,

22 which is the building where I was the attending that

23 exclusively contracted with AseraCare.

24 Q.   Okay.

25 A.   When I received that request, I would ask the

1    nurse why are you requesting for me to consult with

2    the hospice in a patient who is either stable and/or

3    wants curative care.

4          And they were telling me that members of the

5    AseraCare staff had come into the build and surveyed

6    the patients and provided a list to the nursing home

7    staff for them to call the respective attendings of

8    these patients to then get this consult.

9    Q.   Did those patients actually get on AseraCare

10   Hospice?

11   A.   For my patients, through my own self education

12   of hospice requirements where they were not meetings

13   those requirements, I would not allow that consult.

14   But for patients of other attendings, I was aware

15   that patients were getting those consults and were

16   being admitted.

17   Q.   Who were the staff that you worked with when you

18   were still at AseraCare and you continued to work

19   were in the January, February, March 2007 time frame?

20   A.   Cheryl Edmundson was the executive director of

21   AseraCare Atlanta, and she maintained that position

22   throughout, I believe, through 2010.

23         Margo Marcus was a clinical services

24   supervisor.  She was there while I was medical

25   director and continued to be in that position

1  throughout this time period.

2           Sally Whatley was a patient care

3  coordinator.  Melinda, I don't recall her last name

4  at this moment, was also a patient care coordinator.

5  These were the same people I worked with when I was

6  the medical director and continued their positions

7  throughout 2007 through 2010.

8           Also the people that came to the facility,

9  the one that was coming to my particular facility was

10  Belle Wright Goodman.  She was the same person when I

11  was the director as well as for a few years after

12  that in my building as well as the non-professional

13  staff, the chaplains and consultants that would come

14  to the building.

15  Q.   Do you have the reason to believe that practices

16  that were going on when you were at AseraCare in

17  June, July, August of 2006 time frame were still

18  going on in the January, February, March 2007 time

19  frame?

20  A.   I do.

21  Q.   And how do you have that opinion?

22  A.   I have direct observation of what they were

23  doing with my own patients, not only in efforts to

24  admit patients that did not meet criteria, but also

25  to resist discharge of patients who, when stabilized,

1   no longer met criteria.

2       I also had direct observation that that was

3   happening in other patients that I was not the

4   medical attending.  The nursing staff, when I would

5   refuse the order for the consultation, would tell me

6   that they wanted me to do it because they were being

7   pressured to increase AseraCare's census in that

8   facility.

9       The executive director of the facility,

10  Jeanine Brotten, who maintained the executive

11  director position through '08, also would tell me

12  frequently that she was being pressured by AseraCare

13  to increase the proportion of patients in the

14  building that were on AseraCare Hospice.

15  Q.   Is there anything else you want to tell the

16  judge that I didn't ask you about your connection?

17  A.   I think that covers most of the elements.

18       MR. WERTKIN:  That's all, Your Honor.

19       THE COURT:  All right.  Who wants to

20  question Dr. Micca?

21                  **CROSS-EXAMINATION**

22  **BY MS. DEGRUY:**

23  Q.   Dr. Micca, my name is Tiffany deGruy.  We met

24  when I took your deposition.

25       Now, you just told us that you were a

1    hospice doctor at AseraCare in the Atlanta agency; is

2    that right?

3    A.   I was the medical director of the Atlanta agency

4    from 2005 to 2006.

5    Q.   Right.  So you left that position in August of

6    2006; right?

7    A.   That's correct.

8    Q.   And after you left that position in August of

9    2006, you never again worked as a medical director

10   for the AseraCare Hospice?

11   A.   I did not.

12   Q.   And after you left your job in August of 2006

13   with AseraCare, you never again attended any

14   interdisciplinary group meeting at AseraCare Hospice;

15   is that right?

16   A.   Yeah.  In fact, my contract had a 60 day --

17   Q.   My question was, after you left in 2006, you

18   never again attended an IDG meeting at AseraCare

19   Hospice?

20           MR. WERTKIN:  Objection, Your Honor.  I

21   don't think this a cross-examination of the witness.

22   If the witness can give a more complete answer, I

23   believe he should be allowed to do so.

24           THE COURT:  I think I will make that

25   decision, and I think it's appropriate for me to

1  instruct the witness to answer just the question

2  you're asked, please, sir.  Okay.

3  Q.   Dr. Micca, after you left your job at AseraCare,

4  in August of August of 2006, you never again attended

5  an IDT meeting at AseraCare Hospice; is that correct?

6  A.   I did not.

7  Q.   And you didn't personally observe then what

8  happened in any of the these meetings after August of

9  2006; correct?

10  A.   Not by firsthand knowledge.

11  Q.   And so if one of your patients you were

12  attending physician for had been discussed in one of

13  these meetings after you left in August of 2006, you

14  would have no personal knowledge of what was

15  discussed in that meeting; correct?

16  A.   That is not true.

17  Q.   Well, you just told me you didn't attend any of

18  those meetings; correct?

19  A.   Correct, but the IDT meeting generated a form

20  that was then placed on the chart of the patient that

21  I did have access to and would review.

22        This particular patient that I'm speaking

23  of, I have that --

24  Q.   Sir, Dr. Micca, I'm not asking you about a

25  specific patient at this point.  I am asking you

1   about the meetings that you attended which, under

2   what you just testified to, ended in August of 2006.

3   Do you recall that?

4   A.   Yes.   I thought the question was did I have any

5   information about those meetings, and I was saying I

6   did because I had the paperwork from those meetings.

7   Q.   But other than the paperwork you that may have

8   received after the IDG meetings, you did not

9   personally observe any of the meetings after August

10  2006; correct?

11  A.   I did not have personal firsthand knowledge.

12  Q.   You weren't there?

13  A.   I was not there.

14  Q.   Now, Dr. Micca, you testified at your deposition

15  about certain information that you feel like may have

16  been inaccurately reported to you while you were

17  working as a medical director at AseraCare.   Do you

18  recall that?

19  A.   I do.

20  Q.   And in that deposition, you could not recall a

21  single instance where information was misrepresented

22  to you.   Isn't that true?

23  A.   I cannot recall a specific name of a patient.

24  Q.   And isn't it true that, when I asked you at your

25  deposition, who in fact was the one misrepresenting

1  the information to you, you did not give me a single

2  name; isn't that right?

3  A.   That is correct.  I stated it was -- I mentioned

4  it by the role of the person in the staff.  So, for

5  example, the nurses that were evaluating the patient

6  would give me information on things like the FAST

7  scale or a PPS scale --

8  Q.   Dr. Micca, isn't it true you do not recall a

9  specific patient for which any of this supposedly

10  inaccurate information was presented.

11  A.   I do not remember them by name at this date.

12  Q.   Now, you testified a few minutes ago that you

13  felt like, after you left your job at AseraCare, that

14  you had some patients who continued on service; is

15  that right?

16  A.   That is correct.

17  Q.   And one patient you named specifically, Ms. Mary

18  R; is that correct?

19  A.   Correct.

20  Q.   And you told us that you felt like AseraCare

21  resisted your efforts in getting her off of hospice;

22  is that right?

23  A.   That is correct.

24  Q.   And I think you told me at your deposition that

25  there was one other patient that you could recall who

1  was -- you couldn't remember her name but she lived

2  at the Kennestone facility; is that right?

3  A.  I know of a patient that I had at Kennestone,

4  yes.

5  Q.  And is it your allegations that the patient at

6  Kennestone was similar to Ms. R. and that AseraCare

7  resisted your efforts to discharge her?

8  A.  I don't believe -- I don't recall that part of

9  the deposition.  If you could refresh my memory of

10  that.

11  Q.  If your testimony is -- is your testimony today

12  then that Ms. Mary R. is the only specific patient

13  that you can recall who you felt like should be

14  discharged and you felt like AseraCare resisted that?

15  A.  That is the only patient I recall by name today.

16  Q.  And so other than that one anecdotal example,

17  you can't name any other specific patients; correct?

18  A.  That was -- by name, I cannot mention another

19  patient that is correct.  There was a particular

20  patient where there was a lot of communication back

21  and forth, which is why it sticks in my mind so much.

22  Q.  My question was whether you could name any

23  patient other than Mary R.?

24  A.  Not by name.

25          MS. DEGRUY:  No further questions, Your

1   Honor.

2          THE COURT:  All right.  Anything further?

3          MR. WERTKIN:  No, Your Honor.

4          THE COURT:  I would like to hear from

5   Dr. Micca if I may.  Since this will not be for the

6   jury, it's for my edification.  Doctor, you may or

7   may not be aware that the patients whose eligibility

8   is at issue have been identified only by their first

9   name and last initial.  Are you aware of that?

10          THE WITNESS:  I'm not.

11          THE COURT:  I'm not sure if I have gotten

12   these correctly, but there's one who has been

13   identified from Atlanta, Alice D., was she your

14   patient?

15          THE WITNESS:  I do not recall.

16          THE COURT:  Ann K.?

17          THE WITNESS:  Not by that name and the

18   initial.

19          THE COURT:  Barbara N.?

20          THE WITNESS:  Not by the name and initial.

21          THE COURT:  Caron K. and that's Caron with a

22   C-A-R-O-N, at least we got the "O" part correct.  Was

23   she your patient?

24          THE WITNESS:  What was her last initial?

25          THE COURT:  Caron K.

1      THE WITNESS:  I don't know her by that

2  initial.

3      THE COURT:  Georgia M.?

4      THE WITNESS:  I don't know her by that

5  initial.

6      THE COURT:  Julia H.?

7      THE WITNESS:  Not by that initial.

8      THE COURT:  Virginia E.?

9      THE WITNESS:  Not by that initial.

10      THE COURT:  I don't know if I got all of the

11  Atlanta patients or not.

12      MR. LEMBKE:  Your Honor, we would represent

13  to the court that, based on the review of AseraCare's

14  medical records, Dr. Micca was not a physician

15  associated with any of the 123 sample patients.

16      MS. MARTIN:  And, Your Honor, you did cover

17  all the Atlanta patients.

18      THE COURT:  I think before we have any

19  further discussion that Dr. Micca should be excused

20  from the courtroom.  I have a feeling we will see

21  each other in the morning.

22      THE WITNESS:  Thank you, Your Honor.  Thank

23  you.

24      THE COURT:  He mentioned a lot of names, and

25  I was not able to get them all down nor do I have

1   anyway of knowing whether any of those named people

2   were involved with any of the admissions of those

3   patients who are at issue.  So can somebody help me

4   connect those dots?

5           MR. WERTKIN:  Your Honor, the AseraCare

6   staff in Atlanta were the same people who have been

7   involved in all of the Atlanta patients, so Cheryl

8   Edmundson was in charge of office.  She was in charge

9   also when Dr. Micca was there.  She continued to be

10  in charge of the office in the January, February,

11  March 2007 time frame and so she would have

12  ultimately in charge of all the AseraCare people.

13          Dr. Micca listed off a few different nurses.

14  At this time, you know, I can represent to the court

15  that the Atlanta office would only have had like

16  somewhere between two and four nurses.  So it's

17  extremely likely -- and we could go into the medical

18  records, Your Honor, and we could pull those names.

19  We could not do that now.  That would take some time

20  to do, but we can represent to the court that these

21  people were being cared for by all the same people.

22          MS. MARTIN:  Your Honor, the Atlanta agency

23  was a fairly large agency given the size of Atlanta,

24  and they had more than the two to four nurses that

25  Mr. Wertkin represents.  And they are one of the

1  agencies that had two or three different IDT teams

2  and different case managers caring for the patients.

3         THE COURT:  All right.  Well, I believe that

4  I specifically indicated that I wanted to know if

5  there's any tie to the nurses that were involved at

6  the locations where the patients were actually being

7  treated and declared ineligible by Dr. Liao.  I

8  haven't heard that.

9         MR. WERTKIN:  Your Honor, we can pull those

10  records together for you.  And I would -- we can pull

11  those records together for you.  And if Your Honor

12  would allow, I have one additional point that I would

13  like to make.

14         THE COURT:  Okay.

15         MR. WERTKIN:  Which is, when we questioned

16  Dr. Micca, I thought it was pretty clear that he was

17  observing the general practices that were going on at

18  AseraCare in that January, February, March 2007 time

19  frame.  He had patients.  He was in the facility.  He

20  had interaction with the employees.

21         Now, they asked him a lot questions about

22  specific patients.  We're not talking about specific

23  patients in this case, and I would only be asking

24  about general practices anyway.

25         So for that reason, we can supplement with

1  the medical records, Your Honor, if you so require,

2  but I think we would ask that Dr. Micca be allowed to

3  testify.

4         THE COURT:  My request, I think, was pretty

5  clear that I wanted to know whether there was any tie

6  to the nurses involved at the locations where the

7  patients were actually being treated that were

8  declared ineligible by Dr. Liao, not just some

9  general, yeah, the staff was the same.

10        I mean, that was what I specifically

11  indicated I wanted to see before I made a ruling on

12  Dr. Micca's testimony.

13        MR. WERTKIN:  Yes, Your Honor.  We will pull

14  that tonight for you.

15        THE COURT:  Mr. Lembke.

16        MR. LEMBKE:  You gave that direction, if I

17  may, on July the 22nd.  And we were going to take him

18  on voir dire and resolve it.  We just did that.  They

19  didn't meet the standard that the court set down.

20        MR. WERTKIN:  Your Honor, we did have a few

21  things going on between that time and the time the

22  trial started.  And --

23        THE COURT:  We all did.

24        MR. WERTKIN:  I would say that when we

25  discussed this matter with -- we all did, yes, of

course.  When we discussed this matter with

Dr. Micca, we didn't understand that you wanted a

complete record review.  And now that we do

understand that, we will go ahead and do that.

THE COURT:  Okay.  I also am talking about

all the things that we had to do months and months

and months ago.  We discussed having a large blow up

for the jury for the terms that were going to be

thrown around.

Are we going to have that some time soon?

MR. WERTKIN:  The glossary, Your Honor?

THE COURT:  Yes.

MR. WERTKIN:  We brought the glossary in

today.

THE COURT:  So where is it?

MS. TAPIE:  I'm sorry, Your Honor, we must

have misunderstood.  I think we thought you had

decided you only wanted the jurors to have it in

front of them on a piece of paper and not on the

boards.

THE COURT:  I thought y'all were asking me

if that was all right.  I told you it was hard to

read, but if that's what we've got.  I had asked a

long time ago that we have that for the jury, and I

told them last week when I organized them that they

1  would, and I want to make sure we get that for them.

2          MS. TAPIE:  Yes, Your Honor.

3          THE COURT:  All right.  I want to see you in

4  the morning at 8:00 o'clock.  Whatever connection

5  there is between Dr. Micca and any of the patients

6  that Dr. Liao says were ineligible at the hospice

7  facility in Atlanta, and I also want to know the

8  names of any of the nursing staff that show up that

9  were involved with any of those patients.

10         Do you understand what I'm asking for?

11         MR. WERTKIN:  Yes, Your Honor.

12         THE COURT:  When you give me that

13  information, I want both of those things, okay?

14         MR. WERTKIN:  Okay.  Your Honor, just to

15  clarify, you want the names of the Atlanta staff that

16  appear in the records of the Atlanta patients.  And

17  what was the second thing.

18         THE COURT:  For the Atlanta patients that

19  Dr. Liao has identified as being ineligible.  And

20  then I'm going to go back through the transcript from

21  tonight to see if there's any connection to the names

22  that he gave appearing in any of those medical

23  records that Dr. Liao has identified as allegedly

24  being ineligible.

25         Do you understand what I'm asking for?

1          MR. WERTKIN:  You wanted the records, the

2     medical records, that refer to the Atlanta staff?

3          THE COURT:  If I have to go through the

4     medical records myself to find that, I guess that's

5     what I will do, but I will need it a whole lot

6     earlier than 8:00, if we're going to start with this

7     at 8:30.

8          I want to know whether any of the nurses'

9     names show up in any of those medical records for the

10    patients that Dr. Liao has declared in his opinion to

11    be ineligible.

12         MR. WERTKIN:  Okay.

13         THE COURT:  Then I want to be able to

14    compare the names of those nurses that show up there

15    from AseraCare with the list of names that he gave us

16    this afternoon of people that he knows that were

17    still there.

18         MR. WERTKIN:  Okay.

19         THE COURT:  That's one thing.  The first

20    thing is I want to know whether any of those patients

21    identified by Dr. Liao after Dr. Micca left being the

22    medical director for AseraCare were his patients at

23    the nursing home and if he was the attending

24    physician for any of those patients who have been

25    identified as being ineligible of the 123.

```
 1              MR. LEMBKE:  Your Honor, I can represent to
 2    the court that none of the patients identified by
 3    Dr. Liao from the Atlanta agency that are in the
 4    sample were at the Golden Living nursing home where
 5    Dr. Micca was, where he was doing his work after he
 6    left the job at AseraCare.
 7              THE COURT:  So they were not even at the
 8    same nursing home?
 9              MS. MARTIN:  No.
10              MR. LEMBKE:  They were not, Your Honor.
11              THE COURT:  Where he testified about today?
12              MS. MARTIN:  Correct.  They are all from
13    different nursing homes.
14              MR. WERTKIN:  We will have to take a look at
15    that, Your Honor.
16              MR. LEMBKE:  We've looked at it, Judge.
17              MS. MARTIN:  We've looked at it, and he was
18    the medical director from Golden Living Northside,
19    and none of these patients were on service at Golden
20    Living Northside.
21              MR. WERTKIN:  The same AseraCare nurses
22    would have gone to different nursing homes.
23              THE COURT:  If it was not even at the same
24    nursing home and the basis that I understood the
25    government telling me, when we looked at this a few
```

1  weeks ago that his testimony would be relevant, was

2  because it was the same facility where --

3          MR. WERTKIN:  There were a ton of patients

4  that were at his facilities who were also AseraCare.

5  It was Golden Living AseraCare.  They're the same.

6          MR. LEMBKE:  No, they're not the same.

7          MS. MARTIN:  They're not the same.

8          MR. WERTKIN:  They're the same company.

9          MR. LEMBKE:  No, they're not the same

10  company.

11          MS. MARTIN:  They are part of the same

12  corporate structure, but they are not

13          MR. WERTKIN:  They are part of the same

14  corporate structure, and there was a ton of nurses

15  from AseraCare Atlanta that worked in his facility.

16  I think that that's something that we should all be

17  able to agree on, and that's what we were saying.

18          THE COURT:  But if they're not the same

19  nurses who were involved in providing care for these

20  allegedly ineligible hospice patients who were at a

21  totally different nursing facility, then I don't

22  think there's the connection.  We don't have the time

23  and place kind of thing.

24          MR. WERTKIN:  We will pull those records for

25  you.  We will pull those records, so you can figure

1    that out, Your Honor.

2              THE COURT:  Okay.

3              MR. LEMBKE:  Your Honor, so as to save time

4    in the morning, in the event Dr. Micca is allowed to

5    testify at all, there are two points I want to raise

6    arising out of what he said.

7              THE COURT:  Okay.

8              MR. LEMBKE:  One is you notice that the

9    basis for some of his testimony or basically the

10   basis for his testimony about his claim that

11   attending physicians were ignored, he said he heard

12   about that from Golden Living nurses.  So that's

13   hearsay.  And I don't think he can base it on that.

14             And this whole notion of -- you know, we

15   asked him at his deposition tell us the patients, and

16   this was not a general practice.  He gave us two

17   names, and that's anecdotal evidence.  And so he

18   shouldn't be allowed now, after giving us just two

19   names, to manufacture a practice, a general practice.

20             The other thing, Your Honor, in a similar

21   vein is that, at his deposition, Dr. Micca was asked

22   or he suggested, well, he felt like he wasn't getting

23   complete information from the nurses on patients when

24   he was the medical director at AseraCare, but he was

25   not able to give us any information, specifics to

944

1    back that up.

2         And we don't think he should now be allowed

3    to get up and say there was a general practice of not

4    giving me complete information when, in discovery,

5    when we asked him to tell us anything he could to

6    back that up, he couldn't give us anything.

7         And we don't think that's appropriate for

8    him now, under the guise of the general practice, to

9    get up and announce something.  And, you know, he's

10   at the very edge of what Your Honor's sort of time

11   window is.  He's five months removed from the first

12   patient coming on service.

13        THE COURT:  Who was at a different facility

14   than the one where he was working as a --

15        MR. LEMBKE:  Nursing home doctor.

16        THE COURT:  Nursing home doctor.

17        MR. LEMBKE:  Yes, Your Honor.

18        MR. WERTKIN:  Your Honor, I think that

19   Mr. Lembke is using the wrong standard here.  He only

20   was able to provide two names.  He was clear today, I

21   only identified two people by name.  And if we were

22   doing that, if that's what we were doing here,

23   identifying them by name, then that might be the

24   right standard.

25        But he did testify -- we can pull the

```
1   transcript -- but Mr. Lembke said he didn't give us
2   any information.  That's not right.  He didn't give
3   specific patients' names.  That's what Ms. DeGruy was
4   talking about, did you give any specifics, do you
5   have any patients' names, but he said not by name.
6           He said that it was a general practice that
7   his decisions and his recommendations were being
8   ignored.  That's what we have, Your Honor, in this
9   case.
10          THE COURT:  Well, I would definitely want to
11  know what the basis of his general practice
12  conclusion is.  But I'm inclined right now not to
13  allow his testimony if it's based upon what he
14  observed at a different nursing home than the one
15  where these patients were.
16          And, you know, this has been with one of
17  those patterns where originally, when this came up, I
18  was told that he was the attending physician for
19  patients who were on hospice care in the same
20  facility as these who were declared ineligible.  And
21  we're not even getting that now.
22          MR. WERTKIN:  Not one of the 123, but he was
23  the attending physician.
24          Your Honor, I would also like to point out
25  that hospice is not always provided in a nursing
```

1   home.  So --

2           THE COURT:  I know.  I understand that.

3           MR. WERTKIN:  It would be the same if you

4   were living in one nursing home or another nursing

5   home or as opposed to different houses.

6           THE COURT:  But the reason you told me that

7   his testimony should be allowed and should be

8   considered was because he continued as a treating

9   physician for patients with AseraCare in the same

10  facility as the ones that were not eligible.

11          MR. WERTKIN:  No, as lots of other AseraCare

12  patients who have been treated by the same AseraCare

13  nurses.  And you know --

14          THE COURT:  And so we want to parade in his

15  view, not even of his own patients, but of some other

16  attending physician's patients at the Northside

17  facility as evidence that the patients admitted by

18  AseraCare at what other facility?

19          MS. MARTIN:  Well, it's important to note,

20  Judge, that it's not even all -- the patients were

21  not even all in the Golden Living facility.  So this

22  patient was at Ivy Hall at St. Ives, which is not a

23  Golden Living facility, and that's Alice D.  And the

24  same for Ms. Virginia E.  She was at Ivy Hall at

25  St. Ives, which is not Golden Living.

1            And then there was, of course, Julia H. at
2      Kennestone, Ann K. At Medical Arts, which is not
3      Golden Living.  Caron K. at Golden Living Rome.
4      Georgia M. At Cedar Valley I think it's Nursing and
5      Rehab, which is not Golden Living.  And then Barbara
6      N., who was at the Briarwood facility, which I think
7      may have been Golden Living.
8            MS. MARTIN:  The only one that's within --
9            MR. LEMBKE:  The five months.
10           MS. MARTIN:  The five month time frame of
11     his departure from AseraCare was not in a Golden
12     Living facility.
13           THE COURT:  And that was who?
14           MS. MARTIN:  Ann K.
15           THE COURT:  She's the only one within the
16     five months that we're talking about?
17           MR. LEMBKE:  Yes, Your Honor.
18           THE COURT:  She was not even in any Golden
19     Living facility, much less than the one where
20     Dr. Micca was?
21           MS. MARTIN:  Correct.
22           MR. CHRISTIE:  Your Honor, I'm going to have
23     to correct that.  Vanessa just tells me that Medical
24     Arts was a Golden Living facility.
25           MS. MARTIN:  That's not where Ann K. was.

1          THE COURT:  Medical Arts was who, which

2     patient?

3          MS. MARTIN:  No, that is Ann K.  I'm sorry,

4     Judge.

5          THE COURT:  Ann K. was in Medical Arts,

6     which is a --

7          MR. LEMBKE:  A different Golden Living

8     facility.

9          MS. MARTIN:  A different Golden Living

10    facility.

11         THE COURT:  All right.  Unless the

12    government can somehow tie -- we were only talking

13    about one that was in that five month period of time.

14    If you can tie Ann K. to Dr. Liao -- excuse me -- to

15    Dr. Micca, I will consider letting his testimony in.

16    Otherwise, it doesn't come in in phase one.  He can

17    just land blast AseraCare all day long that he wants

18    to in phase two.

19         MR. WERTKIN:  Thank you, Your Honor.  We

20    will pull his records.

21         THE COURT:  And let me also say on these

22    other people and other evidence that I've withheld

23    ruling and indicated that I want specific

24    information, please get me the specific information

25    before I have to decide, okay?

949

 1          MR. WERTKIN:  Yes, Your Honor.

 2          THE COURT:  All right.  Okay.  We will see

 3   you in the morning, I guess, at 8:00 o'clock.  If you

 4   don't have that information, if you'll let me know,

 5   okay?

 6          MS. TAPIE:  Yes, Your Honor.

 7          THE COURT:  All right.

 8                  (Court in recess.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4           I hereby certify that the foregoing is a

5   correct transcript from the record of proceedings in

6   the above-referenced matter.

7

8   _____

9   Teresa Roberson, RPR, RMR
    Julie Martin, RPR,RMR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25