FILED
2016 Jun-28 PM 01:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

5279

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
EX REL., ET AL.,                    CV-12-KOB-245-S


            Plaintiffs,      September 21, 2015

    vs.                      Birmingham, Alabama

ASERACARE, INC., ET AL.,

            Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * *


            REPORTER'S OFFICIAL TRANSCRIPT OF
                    JURY TRIAL
                    VOLUME XXV


        BEFORE THE HONORABLE KARON O. BOWDRE
         UNITED STATES DISTRICT CHIEF JUDGE


COURT REPORTER:
Teresa Roberson, RMR
Julie Martin, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
 1                        *  *  *  *  *

 2               A P P E A R A N C E S

 3                        *  *  *  *  *

 4   FOR THE PLAINTIFF:

 5   Jeff Wertkin
     Carolyn Tapie
 6   Holly Snow
     Eva Gunasekera
 7   Renee Brooker
     William Olson
 8   U.S. Department of Justice
     Civil Division
 9   P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
10

11   Lane H. Woodke
     Don Long
12   U.S. Attorney's Office
     1801 4th Avenue South
13   Birmingham, Alabama  35203

14   James F. Barger, Jr.
     J. Elliott Walthall
15   FROSHIN & BARGER
     3430 Independence Drive
16   Birmingham, Alabama  35209

17   Nola J. Hitchcock Cross
     CROSS LAW FIRM
18   345 North 11th Street
     Milwaukee, Wisconsin  53233
19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S  (continued)

 2    FOR THE DEFENDANT:

 3    James Sturgeon Christie, Jr.
      Jack Wright Selden
 4    Matt Lembke
      Tiffany deGruy
 5    BRADLEY, ARANT, BOULT & CUMMINGS
      1819 Fifth Avenue North
 6    Birmingham, Alabama  35203

 7

 8    Kimberly Martin
      BRADLEY, ARANT, BOULT & CUMMINGS
 9    200 Clinton Avenue
      Huntsville, Alabama  35801
10

11    Charles H. Bohl
      WHYTE, HIRSCHBOECK, DUDEK
12    555 East Weels Street, Suite 1900
      Milwaukee, Wisconsin  53202
13

14

15

16

17

18

19

20

21

22

23

24

25
```

5282



1                        I N D E X

2    WITNESS                 D      C     RD    RC

3    Dr. Cooney             5286

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      * * * * *

2              P R O C E E D I N G S

3                      * * * * *

4         THE COURT:  Okay.  Let's approach and take

5    up whatever it is you need to talk about.

6                     (SIDEBAR)

7         MR. LEMBKE:  Your Honor, this morning we

8    raised with the government whether they had any

9    objection to Defense Exhibits 234 and 235.  234 are

10   excerpts from Section 1395f of 42 U.S.C., and in

11   particular the second page of the exhibit has the

12   language about clinical judgment in the middle of the

13   page.

14        And then 235 is Section 3595x, excerpts from

15   it which are definitions.  And on the second page,

16   it's the definition of terminally ill.

17        As I understand the government's position, I

18   don't think they have an objection to these two

19   exhibits but they want a separate statute put into

20   evidence.

21        And my -- AseraCare's position is if they

22   want to put in another statute when they examine the

23   witness or, you know, in their case, they can.  But I

24   don't think AseraCare has an obligation to put in a

25   separate statute.
```

 1            THE COURT:  Are both of these the complete
 2   sections?
 3            MR. LEMBKE:  These are excerpts because
 4   they're lengthy.  But these are the -- you know, as I
 5   understand it, and I will let the government speak,
 6   they want to put in a separate -- we have 1395f and
 7   1395x and they want to put in 1395y.
 8            THE COURT:  All right.
 9            MR. WERTKIN:  All right.  So, our position
10   is that they want to draw excerpts from Subchapter 18
11   of Title -- Chapter 7 of Title 42 and our objection
12   is on completeness grounds, Your Honor, that we don't
13   want to put all of Y in because we understand that
14   it's volumunous, but 1395y is the part that takes you
15   want reasonable and necessary for the medical
16   services and we think that's important to get in for
17   completeness.
18            To the extent they can add that other part
19   of the subchapter, we wouldn't object.  But just
20   taking these excerpts without complete -- well, it
21   wouldn't be complete because it wouldn't be all of
22   1395 with that other subsection, we don't have an
23   objection.
24            THE COURT:  If your objection on
25   completeness grounds dealt with the way they were

5285

1   excerpting a subsection, I think that would be valid.

2   But you're asking them to put in excerpts of a

3   totally different subsection, so I don't think that

4   fits within the completeness doctrine.

5          You certainly have the right and opportunity

6   to present alternative sections or excerpts

7   thereof -- and, actually, it's sub-subsections,

8   I guess right -- but you can do that in cross or in

9   rebuttal or in some other --

10          MR. WERTKIN:  All right.

11          THE COURT:  Anything else we need to take

12  up?

13          MR. LEMBKE:  Subject to that, can they be

14  pre-admitted, or do you want to have me do it the old

15  fashioned way?

16          MR. WERTKIN:  Let's just -- maybe we should

17  just have her identify it.

18          MR. LEMBKE:  That's fine.

19          MR. LEMBKE:  Your Honor, since we are having

20  a short break for lunch, there's one other --

21          MS. GUNASEKERA:  We haven't had a chance --

22          MR. LEMBKE:  We will have another issue

23  today, but it will not come up before the first

24  break.

25          THE COURT:  Okay.  Are we ready?

1          (Open court.  Jury present.)

2          THE COURT:  Good morning, ladies and

3   gentlemen.  I trust you had a nice weekend, despite

4   the football games.

5          Mr. Lembke, you may proceed.

6          THE CLERK:  I remind you you're still under

7   oath.

8          THE WITNESS:  Thank you.

9          DIRECT EXAMINATION (continued)

10  BY MR. LEMBKE:

11  Q.   Dr. Cooney, I would like to show you what's been

12  previously marked as Defendant's Exhibit 234.

13          Dr. Cooney, what, if any, familiarity do you

14  have with the statutes passed by Congress that apply

15  to the Medicare hospice benefit?

16  A.   I'm familiar with the statutes.

17  Q.   Do you recognize Defendant's Exhibit 234?

18  A.   This is the Federal Statute on requirements of

19  requests and certifications.

20          THE COURT:  Dr. Cooney, I'm sorry.  The

21  question is whether you are familiar with it.

22          THE WITNESS:  Yes.

23  Q.   (By Mr. Lembke)  What is it?

24  A.   It is the Federal Statute on hospice

25  certification, requirement of requests and

1    certifications.

2           MR. LEMBKE:  Your Honor, AseraCare offers

3    Defendant's Exhibit 234.

4           MS. GUNASEKERA:  We have no objection, Your

5    Honor.

6           THE COURT:  It's received.

7    Q.  (By Mr. Lembke)  Now let me show you,

8    Dr. Cooney, what has been previously marked as

9    Defendant's Exhibit 235.

10          Do you recognize this document?

11   A.  Yes.

12   Q.  What is it?

13   A.  This is the Federal Statute with definitions of

14   certain medical terms.

15   Q.  What, if any, relation does it have to the

16   Medicare hospice benefit?

17   A.  It includes the definition of terminally ill.

18          MR. LEMBKE:  Your Honor, AseraCare offers

19   Defendant's Exhibit 235.

20          MS. GUNASEKERA:  No objection, Your Honor.

21          THE COURT:  It's received.

22          MR. LEMBKE:  Brad, would you pull up 234,

23   please.

24   Q.  Dr. Cooney, let me direct your attention now to

25   the second page of this exhibit.

1          MR. LEMBKE:  Your Honor, this is an excerpt,

2    so the second page at the top is Page 3 but it's

3    because it's an excerpt.

4          Let me direct your attention to Subsection

5    (7).  Do you see that?

6    A.   Yes.

7    Q.   Would you read Subsection (A) of Subsection (7).

8          THE COURT:  Excuse me.  Just for the record

9    and to be sure that it's clear, are we talking about

10   42 U.S. Code Section 1395f, Subsection (A)(7)?

11         MR. LEMBKE:  Yes, Your Honor.

12         MS. GUNASEKERA:  Your Honor, if we may

13   approach.  It appears that we don't have Page 2.

14         THE COURT:  Mr. Lembke, just stated that,

15   this is an excerpt of the section.

16         MS. GUNASEKERA:  But even within the

17   excerpt, Your Honor, it appears we don't have -- it

18   goes from one, two and then it jumps to six.

19         THE COURT:  Right.  That's the nature of an

20   excerpt.  You don't have the entire part of it.

21         MS. GUNASEKERA:  Okay.  Thank you, Your

22   Honor.

23   Q.   (By Mr. Lembke)  Dr. Cooney, here at Subsection

24   (7) on the second page of the exhibit, what is the --

25   would you read, first, the introductory phrase in

1  Subsection (7) says what?

2  A.   In the case of hospice care provided an

3  individual.

4  Q.   And then what does Subsection (A) under (7) say?

5  A.   (i) in the first 90-day period and (I) the

6  individual's attending physician (as defined in

7  Section 1395x(dd)(3)(B) of this title) (which for

8  purposes of this subparagraph does not include a

9  nurse practitioner), and (II) the medical director

10  (or physician member of the interdisciplinary group

11  described in Section 1395X(dd)(2)(B) of this title)

12  of the hospice program providing (or arranging for)

13  the care, each certify in writing at the beginning of

14  the period, that the individual is terminally ill,

15  (as defined in Section 1395x(dd)(3)(A) of this title)

16  based on the physician's or medical director's

17  clinical judgment regarding the normal course of the

18  individual's illness.

19  Q.   And then continue with Subsection romanette ii

20  of (A).

21  A.   (ii) in a subsequent 90 or 60-day period, the

22  medical director or physician described in clause

23  (i)(II) recertifies at the beginning of the period

24  that the individual is terminally ill based on such

25  clinical judgment.

1  Q.  Dr. Cooney, do you know if, during 2007 through

2  2012, this was the statutory language in effect as to

3  the certifications?

4          MS. GUNASEKERA:  Objection, lack of

5  foundation.

6          THE COURT:  He's trying to establish that.

7  Overruled.

8  Q.  (By Mr. Lembke)  Do you know?

9  A.  Yes.

10  Q.  And was it in effect in that time period?

11  A.  Yes, it was.

12  Q.  Now let me direct your attention down to

13  Subsection (D) at the bottom of that page.  And what

14  does the introductory language say there?

15  A.  On and after January 1st, 2011.

16  Q.  And then if we go to the next page at the top,

17  what does Subsection romanette (i) say?

18  A.  A hospice physician or nurse practitioner has a

19  face-to-face encounter with the individual to

20  determine continued eligibility of the individual for

21  hospice care prior to the 180th day recertification

22  and each subsequent recertification under

23  subparagraph (A)(ii) and attests that such visit took

24  place (in accordance with procedures established by

25  the secretary).

1  Q.   Dr. Cooney, do you know if Subsection (i) was in

2  effect from January 1, 2011 through the end of 2012?

3  A.   Yes.  This statute became effective January 1,

4  2011.

5  Q.   And --

6  A.   And remained in effect throughout 2012.

7  Q.   Let me direct your attention to Defense Exhibit

8  235, which I put in front of you earlier.  And I want

9  to get you to turn to the second page of the exhibit.

10         First, this is part of --

11         MR. LEMBKE:  Your Honor, for the record, 42

12  U.S. Code Section 1395x.

13         MS. GUNASEKERA:  Can we establish a date?

14         MR. LEMBKE:  Let me go to the second page

15  and I will lay the foundation, Your Honor.

16         THE COURT:  All right.

17  Q.   (By Mr. Lembke)  Dr. Cooney, I want to direct

18  your attention to the second page of the exhibit

19  which is numbered Page 42 at the top.  Do you see the

20  definition there next to (3)(A)?

21  A.   Yes.

22  Q.   Do you know if that definition was in effect

23  from 2007 to 2012?

24  A.   Yes, it was.

25  Q.   Was it in effect during that time period?

1  A.   Yes, it was in effect during that period.

2  Q.   And what does that definition state?

3  A.   An individual is considered to be terminally ill

4  if the individual has a medical prognosis that the

5  individual's life expectancy is six months or less.

6  Q.   Dr. Cooney, have you had occasion to review the

7  medical records of Eleanor S.?

8  A.   Yes, I've reviewed the medical records on

9  Eleanor S.

10       MR. LEMBKE:  Your Honor, Eleanor S. can be

11  found at Tab 30 of the juror notebook and the entire

12  record of Eleanor S. has been pre-admitted as Defense

13  Exhibit 596, with excerpts from the medical record

14  having been pre-admitted as Defense Exhibit 596-A and

15  596-B.

16  Q.   How old was Ms. Eleanor S. at the time of her

17  admission to hospice?

18  A.   Ms. Eleanor S. was 90 years old.

19  Q.   When was she admitted to hospice?

20  A.   She was admitted January 24th, 2007.

21  Q.   What was the last date on which Ms. Eleanor S.

22  was provided hospice services?

23  A.   January 25th, 2008.

24  Q.   Have you formed an opinion as to whether

25  Ms. Eleanor S., at the time of her admission to

1  hospice, had a terminal prognosis?

2  A.   Yes.  At the time of her hospice admission,

3  Ms. Eleanor S. was terminally ill with a prognosis of

4  six months or less.

5  Q.   Why did you reach that opinion?

6  A.   Ms. Eleanor had been very ill for a long time.

7  She had severe rheumatoid arthritis with joint

8  deformities that made it -- made her dependent in

9  care and primarily in bed.

10        But at the time of her hospice admission,

11  she had developed shortness of breath with any

12  activity and, you know, I think activity is a woman

13  who is primarily in bed, from her history of

14  congestive heart failure and chronic obstructive

15  pulmonary disease, COPD.

16        She also developed wounds that would not

17  heal on her left leg and her sacrum.

18        Her right leg had previously been amputated

19  above the knee back in 2001 because of non-healing

20  wounds.

21        Her nutritional status was poor.  On

22  admission, she weighed 72 pounds with a BMI of less

23  than 13.  She also had diabetes and a history of

24  stroke.

25        So, this was an already frail, elderly woman

1  with severe rheumatoid arthritis who develops

2  non-healing wounds and shortness of breath at rest.

3        She was terminally ill at the time of her

4  hospice admission.

5  Q.  Have you formed an opinion as to whether

6  Ms. Eleanor S., throughout the time she was receiving

7  hospice services, had a terminal prognosis?

8  A.  Yes.  Throughout the time she received care,

9  Ms. Eleanor S. remained terminally ill.

10  Q.  Why did you reach that opinion?

11  A.  Ms. Eleanor S. got steadily worse during the

12  time she received hospice care.  She developed

13  additional wounds on the stump of her right leg and

14  on her left heal.  They all did not heal with care.

15        She had pain, both from her wounds and from

16  her rheumatoid arthritis that was hard to manage

17  because any time she received personal care or was

18  moved that pain would dramatically worsen.

19        Her weight continued to fall despite

20  receiving supplements and assistance with feeding.

21        In January 2008, she weighed 62 pounds.  She

22  became steadily worse but her pain came under control

23  and she was able to die peacefully in her bed with

24  her family on her ninety-second birthday.

25  Q.  Dr. Cooney, let me direct your attention to

1   what's been pre-admitted as Defense Exhibit 596-A

2   and, in particular, to Page 9206.

3           What is the date of this document?

4   A.   January 24th, 2007, the date of her hospice

5   admission.

6   Q.   What is this document?

7   A.   This is a nursing assessment.

8   Q.   And what is indicated as the -- next to the

9   history of illness?

10  A.   Congestive heart failure.

11  Q.   And what is indicated with regard to past

12  medical history?

13  A.   Diabetes, rheumatoid arthritis, above-the-knee

14  amputation, COPD and CVA, stroke.

15  Q.   What is indicated under the mental status

16  section next to confused/disoriented?

17  A.   She's noted to be alert and confused.

18  Q.   And what is indicated in the comment section?

19  A.   At times.

20          MS. GUNASEKERA:  For completeness, could the

21  witness please read the line above that?

22  Q.   (By Mr. Lembke)  What is stated next to

23  alert/oriented?

24  A.   Yes.

25  Q.   What is circled by alert/oriented?

5296

1   A.   Alert.

2   Q.   What is the meaning of alert?

3   A.   Awake.

4   Q.   Let me direct your attention to Page 9208, which

5   is the third page of this five-page exhibit.

6           Next to genito/urinary, what is stated there

7   in the comment section?

8   A.   In the comment section, history of urinary tract

9   infections.

10  Q.   And then at the top of the page -- let me direct

11  you to Page 9209, which is the fourth page of this

12  five-page document.

13          And what is indicated in the center column

14  next to musculoskeletal?

15  A.   She's wheelchair bound.

16  Q.   What is indicated in the comment section there?

17  A.   Amputation of the right leg.

18  Q.   Now let me direct your attention to Page 9210,

19  which is the fifth page of this five-page document.

20          What is indicated with regard to her

21  dependence for activities of daily living at the top

22  of the page?

23  A.   She is completely dependent, except for eating

24  and feeding.  She's unable to turn herself in bed,

25  transfer, walk, use the toilet or bathe or dress.

1   Q.   What is stated in the summary section on this

2   page?

3   A.   91 year old white female admitted to AseraCare

4   Hospice with a diagnosis of congestive heart failure.

5   She has a history of strokes, COPD, diabetes and

6   above-the-knee amputation of the right leg, urinary

7   tract infections.

8            She is alert, verbal and somewhat oriented.

9   She is non-walking, transfers with the assist of two

10  to wheelchair.

11           She is incontinent of bowel and bladder.

12  She is dependent on staff for activities of daily

13  living, needs assistance with feeding due to

14  contractures of her hands and fingers from rheumatoid

15  arthritis.

16           She has bruising on her right arm.  She has

17  a decubitus ulcer one centimeter by two centimeters

18  by one centimeter deep with yellow, serosanguinous --

19  and that's kind of clear but bloody drainage with a

20  dry dressing.

21           Lung sounds clear in both bases.  Heart rate

22  has irregular rhythm.  Bowel sounds positive.  No

23  edema of the left foot.

24           She has episodes of abusive behaviors that

25  have been attributed to pain.

1    She rates her pain at a six but says it is

2   controlled with her pain medications.  Pain is

3   related to her arthritis.  Daughters are very

4   supportive, involved with her and visit regularly.

5   They require an update of status with changes only.

6   Q.  What, if anything, does this indicate with

7   regard to whether Ms. Eleanor S. is bedbound?

8   A.  This states that she is able to be up in a chair

9   with assistance and transfers -- let's see.

10  Transfers with the assistance of two to a wheelchair.

11       So, she is able to be up to a wheelchair at

12  the time of admission.

13  Q.  What, if anything, do the facts you've

14  highlighted in this document tell you about the

15  overall picture of Ms. Eleanor S. at the time of her

16  admission to hospice?

17  A.  These facts demonstrate the problems that she

18  was having that made her hospice eligible.  The

19  wounds, the debility, the pain.  So she was, at the

20  time of hospice admission, terminally ill.

21  Q.  Now let me direct your attention to Page 9261.

22  Actually, let me go to 9262 to get the date of this

23  document.

24       What is the date of this document?

25  A.  November 12, 2007.

1  Q.   What is this document?

2  A.   This is the worksheet for the hospice local

3  coverage determination heart disease.

4  Q.   Going back to 9261, what is indicated in the

5  supporting documentation section?

6  A.   Diabetes, rheumatoid arthritis, COPD, stroke and

7  peripheral vascular disease.  Oxygen at two liters

8  per minute by nasal cannula, short of breath with

9  minimal exertion.

10        Right gluteus, her buttocks, a stage three

11  with tunneling, left heal stage four with eschar

12  which is closed cover.  Coccyx area has open areas.

13        Eight pound weight loss since September 10,

14  2007.  Chronic pain from rheumatoid arthritis and

15  wounds.

16        Severe distortion of her hands from

17  rheumatoid arthritis.  Skin tear healing.  Fragile

18  skin condition.  Urinary tract infections times two

19  with antibiotic treatment, September 24th and October

20  22nd.

21  Q.   What is tunneling in regard to a stage three

22  pressure ulcer?

23  A.   Tunneling is where the area of usually infection

24  and skin breakdown kind of goes under the surface and

25  then extends below areas where the surface skin is

1  intact, so it's like it makes a tunnel.

2  Q.  Now let me direct your attention to Page 9250 in

3  Defendant's Exhibit 596-A.  I will go to 9251.

4       What is the date on this document?

5  A.  January 7th, 2008.

6  Q.  And back to 9250, what is this document?

7  A.  This is the worksheet for hospice local coverage

8  determination heart disease.

9  Q.  And would you please read what is written under

10  supporting documentation?

11  A.  Diabetes, rheumatoid arthritis with severe

12  distortion of both hands.  Chronic obstructive

13  pulmonary disease, stroke, peripheral vascular

14  disease, short of breath with minimal exertion,

15  oxygen at two liters by nasal cannula as needed.

16  Multiple non-healing wounds.  Stage two and stage

17  four with tunneling.

18       Weight loss of seven pounds November 26th to

19  62 pounds -- I'm sorry.  Weight loss from 67 pounds

20  November 26th to 62 pounds on December 28th.  Five

21  pounds over basically one month.

22       Above-the-knee amputation of the right leg.

23  Q.  Now let me direct your attention to Page 9326 in

24  Defendant's Exhibit 596-A.

25       What is the date of this document?

```
 1   A.   January 25th, 2008.

 2   Q.   What is this document?

 3   A.   This is a nursing clinical note.

 4   Q.   Would you please read the problem section?

 5   A.   Patient in a contracted -- return to the

 6   contracted bed at 10:20 a.m. 1/25/08.  Family with

 7   patient at time of death.  AseraCare noted after

 8   patient -- had continued to breathe, CTB seems to be

 9   continued to breathe.  This nurse comforted patient's

10   family.  Spoke about patient's life.  Patient passed

11   on her birthday.

12           Daughter stated, we are going to go home and

13   have a celebration for her birthday.  Do you think

14   that is all right?  Reaffirmed family that it would

15   be fine and appropriate.  Family coping well.  Will

16   continue to monitor family.

17   Q.   Might CTB be ceased to breathe?

18   A.   Yes.  Yes.

19   Q.   What, if anything --

20   A.   Ceased to breathe at 10:20 a.m., so that's when

21   she died.

22   Q.   What, if anything, did the facts you've

23   highlighted in the documents created after

24   Ms. Eleanor S.'s admission to hospice tell you about

25   her overall picture while she was receiving hospice
```

1   services?

2   A.   These documents describe a woman who is

3   continuing -- whose condition is continuing to worsen

4   over time until she dies an expected death with her

5   family at her bedside.

6            So, she continued to be terminally ill

7   throughout the time of her hospice care.

8   Q.   In reaching your opinions with regard to

9   Ms. Eleanor S., did you rely only on the medical

10  records that we've looked at here in the courtroom?

11  A.   No, I reviewed the entire medical record.

12  Q.   Was the entire medical record overall consistent

13  with your opinion?

14  A.   Yes, it was.

15  Q.   Have you had occasion to review the medical

16  records of Mr. B.J.C.?

17  A.   Yes, I reviewed the medical records on

18  Mr. B.J.C.

19            MR. LEMBKE:   Your Honor, Mr. B.J.C. can be

20  found at Tab 12 of the juror notebook.   The entire

21  medical record of Mr. B.J.C. has been pre-admitted as

22  Defense Exhibit 520, with excerpts from the medical

23  record having been pre-admitted as Defense Exhibit

24  520-A and 520-B.

25  Q.   How old was Mr. B.J.C. at the time of his

1   admission to hospice?

2   A.   Mr. B.J.C. was 78 years old.

3   Q.   When was he admitted to hospice?

4   A.   He was admitted to hospice on March 8th, 2007.

5   Q.   What was the last date he was provided hospice

6   services?

7   A.   March 19, 2008.

8   Q.   Have you formed an opinion as to whether

9   Mr. B.J.C., at the time of his admission to hospice,

10  had a terminal prognosis?

11  A.   Yes.  At the time of his hospice admission,

12  Mr. B.J.C. was terminally ill with a prognosis of six

13  months or less.

14  Q.   Why did you reach that opinion?

15  A.   Mr. B.J.C. had well-established coronary artery

16  disease.  He had had four heart attacks.  He had had

17  cardiac bypass grafting and he had stints placed as

18  well.  But had, according to the records, not been

19  having symptoms until just before the time he was

20  admitted to hospice.

21       What appears to have happened is that he had

22  a collapse of one of his vertebral bodies and was

23  admitted to the hospital for kyphoplasty which is a

24  surgical procedure that involves injection of a

25  cement-like material into the vertebral body to try

1  to stabilize it and control the pain.

2         So that was done the month before his

3  hospice admission.

4         After that, he went for rehabilitation.  But

5  when he returned home in March of 2007, he was

6  wheelchair bound.  He had to be transferred with

7  assistance.  And he was short of breath with

8  conversation.

9         He refused oxygen therapy.  His weight on

10 admission was 165 pounds, but this was a new and

11 dramatic decline that seemed to happen between the

12 time that he collapsed that vertebral body and a

13 month later when he's admitted to hospice care.

14        So he was terminally ill at the time of his

15 hospice admission.

16 Q.  Have you formed an opinion as to whether

17 Mr. B.J.C., throughout the time he was receiving

18 hospice services, had a terminal prognosis?

19 A.  Yes.  Throughout the time that Mr. B.J.C. was

20 receiving hospice services, he remained terminally

21 ill.

22 Q.  Why did you reach that opinion?

23 A.  He never showed any improvement.  He continued

24 to be confined to a wheelchair.  He continued to have

25 shortness of breath with any activity and he had

1  episodes of chest pain that would last up to ten

2  minutes.

3          So, during the time he was on hospice

4  services, he continued to be terminally ill.

5  Q.  What was the reason for his hospice services

6  ending?

7  A.  He was discharged on March 19th, 2008 with an

8  extended prognosis.

9  Q.  Let me direct your attention, Dr. Cooney, to

10  pre-admitted Defendant's Exhibit 520 and, in

11  particular, to Page 8699.

12          At the bottom, what is the date of this

13  document?

14  A.  March 8th, 2007.

15  Q.  What is this document?

16  A.  It's a nursing assessment done at the time of

17  his admission.

18  Q.  What is indicated as Mr. B.J.'s age in the top

19  right?

20  A.  He's 78 years old.

21  Q.  What is indicated as his diagnosis?

22  A.  End stage ischemic heart disease.

23  Q.  In the center of the page under circulatory

24  status, what is indicated with regard to his

25  shortness of breath?

1    A.   He's described as short of breath with walking

2    and talking and at rest.

3    Q.   Down into the nutritional status section, what

4    is indicated in the second column there?

5    A.   Dysphasia, difficulty swallowing.

6    Q.   What is indicated as his weight?

7    A.   165 pounds.

8    Q.   Let me get you to turn to the second page of

9    this five-page document, which is at Page 87 or 8700.

10          Under the self care deficit/functional

11   limitations section, what is indicated in the left

12   column under mobility?

13   A.   Transfers with assistance and wheelchair bound.

14   Q.   What is indicated with regard to his dependence

15   for activities of daily living?

16   A.   He is dependent in five of the six activities of

17   daily living.  He appears able to feed himself.

18   Q.   What is indicated under the next section with

19   regard to the skin breakdown risk factor score?

20   A.   There is a total score of 14.

21   Q.   What's the significance of a score of 14?

22   A.   It means that, because of these factors, limited

23   oral nutrition and fluid intake, being confined to a

24   chair, very limited activity and multiple comorbids,

25   incontinent of urine and bowel, that this is a

5307

1  gentleman who is at high risk for having his skin

2  breakdown because of immobility and because of poor

3  nutritional intake primarily.

4  Q.   Now let me direct your attention to the fifth

5  page of this five-page document which is at 8703.

6         What is stated under Mr. B.J.'s summary of

7  terminal conditions and interventions?

8  A.   78 year old white male admitted to hospice with

9  a terminal diagnosis of end stage chronic ischemic

10  heart disease.

11         History of myocardial infarction, heart

12  attacks, times four, cardiac stints, coronary artery

13  bypass grafts three.

14         Esophageal strictures, compression fractures

15  and hypertension.

16         Surgeries, kyphoplasty, cholecystectomy,

17  coronary artery bypass grafts.

18  Q.   Let me stop you and ask, what is a

19  cholecystectomy?

20  A.   Gallbladder removal.

21  Q.   What are esophageal strictures?

22  A.   It's a general term that applies to narrowing in

23  portions of the esophagus, making it more difficult

24  for food to pass through.

25  Q.   Would you please continue reading that summary?

1   A.   Patient in a hospital bed upon arrival but was

2   assisted to the wheelchair.  Alert and oriented.

3   Noted shortness of breath with talking but patient

4   denied shortness of breath, although after getting up

5   stated, let me catch my breath.

6           Oxygen at two liters ordered and present,

7   but patient states he didn't need it.

8           Ate two to three bites of cooked cabbage and

9   two bites of a Krystal hamburger.

10          Stated he lost his appetite in rehab.  Four

11  of five daughters present during admission.  Mary J.,

12  daughter, lives in the apartment with the

13  patient.

14          Due to past history of esophageal

15  strictures, patient requires medications to be

16  crushed and a soft diet with ground meat.

17          Was assisted back to bed after complaining

18  of back pain.

19          Upon physical exam, noted lungs clear to

20  auscultation, abdomen soft, legs dry and scaly and

21  dark in color.

22          Patient was undecided on a DNR, do not

23  resuscitate status.  But daughter discussed this

24  decision and informed nurse to document DNR.  Patient

25  stated he had never given it any thought.

1          Skin free of any open areas.  Noted four

2     puncture sites on upper middle back from surgery in

3     February 2007.  Areas healed.

4          Reviewed medications with family.  Discussed

5     hospice philosophy and disease process and on call

6     24/7.

7     Q.  What, if anything, did the facts you've

8     highlighted in this document tell you about

9     Mr. B.J.C.'s overall picture at the time of his

10    admission to hospice?

11    A.  This is a gentleman who is now having shortness

12    of breath at rest with conversation, even though he

13    says he doesn't have shortness of breath, he's

14    visibly short of breath with talking, when he gets up

15    to do something, he says, let me catch my breath.

16         This is happening in the setting of this

17    back pain and a pre-existing condition that has made

18    it difficult for him to swallow and maintain his

19    nutrition, and he is reported to have lost weight

20    while -- between the time the surgery was done and

21    the time he's admitted to hospice.

22         So, he has multiple risk factors that make

23    him terminally ill at the time of hospice admission.

24    Q.  What, if any, is the distinction between

25    shortness of breath at rest and shortness of breath

1   with talking?

2   A.   Most people do most of their talking during a

3   nursing assessment, while they are sitting or lying

4   down, and so I view shortness of breath with

5   conversation as shortness of breath at rest.  It's a

6   subtle distinction, but --

7   Q.   Let me direct your attention now to Page 8874 of

8   Defense Exhibit 520-A.

9            Down at the lower right, what is the date of

10  this document?

11  A.   August 21st, 2007.

12  Q.   What is this document?

13  A.   This is a nursing visit note.

14  Q.   And in the -- at the bottom of the page in the

15  second column, what is noted with regard to mobility?

16  A.   He's bedbound 75 percent of the day and in a

17  wheelchair 25 percent of the day.

18  Q.   Let me direct your attention to the next page of

19  the exhibit which is 8875.

20            And what is stated under the summary of

21  terminal condition and intervention here?

22  A.   Patient up in a wheelchair, sitting at the

23  kitchen table complaining of back pain.  He is about

24  to take his pain medication.

25            Alert and oriented times three, behavior

1  calm.  Voices concern regarding his need for hospice.

2  He states, quote, I don't know what I would do

3  without you nurses helping me.  Unquote.

4      Heart rate 82, regular.  Patient complains

5  of one episode of chest pain early this morning,

6  short duration, on left side of chest, not radiating,

7  no other symptoms.  Voice with the chest pain.

8  States no pain since.

9      Reviewed with patient to use Nitroglycerine

10  sublingually should chest pain return and to call the

11  hospice nurse.

12      Patient and caregiver voice understanding.

13  Respirations even and non-labored, shallow and

14  diminished.  Uses oxygen as needed, soft bowel sounds

15  active, incontinent of bowel and bladder.

16      Lower extremities discolored with scaly

17  skin.  Pedal pulse positive but weak.

18      Requires assistance with transfers and

19  activities of daily living.  Appetite is adequate.

20  Q.  Now let me direct your attention to Page 8689 of

21  Defendant's Exhibit 520-A.  What is the date of this

22  document in the bottom right?

23  A.  February 18th, 2008.

24  Q.  What is this document?

25  A.  A reassessment for ongoing eligibility.

1   Q.   And in the center of that first page, what is

2   indicated as Mr. B.J.'s weight at this point?

3   A.   His weight has decreased to 150 pounds.

4   Q.   What is the BMI indicated?

5   A.   23.  So it's low normal.

6          MS. GUNASEKERA:  For completeness, could we

7   have the witness read into the record the respiratory

8   status?

9   Q.   (By Mr. Lembke)  Just above that, Dr. Cooney,

10  what is indicated in the respiratory status section?

11  A.   He has no cough and he's using oxygen on an as

12  needed basis at two liters per minute.

13  Q.   What is indicated in the left column?

14  A.   His lung sounds are clear and his respirations

15  are regular.

16  Q.   Turning to Page 8690.  In the self care

17  deficit/functional limitations section in the left

18  column, what is indicated in that column?

19  A.   Wheelchair bound and sleeping 75 percent of the

20  day.

21  Q.   What is indicated with regard to his dependence

22  for activities of daily living?

23  A.   He's now dependent in four of the six activities

24  of daily living.  He appears able to feed himself and

25  remain continent.

1  Q.   Now let me direct you to Page 8693, which is the

2  fifth page of this five-page exhibit.

3          What is indicated in the summary section

4  here?

5  A.   Patient is wheelchair bound, has lower back pain

6  every morning, relieved with his pain medication.

7  Several chest pain episodes in the past few weeks

8  that does not radiate.  Patient states his -- has

9  lasted as long as ten minutes at a time.

10         No Nitro taken, although oxygen applied and

11  has eased the pain.

12  Q.   What, if anything, did the facts you've

13  highlighted in the documents created since the time

14  of Mr. B.J.C.'s admission tell you about his overall

15  picture while he was receiving hospice services?

16  A.   Mr. B.J.C. continues to be terminally ill.  He

17  continues to be confined to a wheelchair and develops

18  chest pain that contributes that is a symptom of his

19  heart disease.  So he remains terminally ill.

20  Q.   In reaching your opinions about Mr. B.J.C., did

21  you rely only on the medical records that we've

22  looked at here in the courtroom?

23  A.   No, I reviewed the entire medical record.

24  Q.   Was the entire medical record overall consistent

25  with your opinions?

1   A.   It was.

2         MS. GUNASEKERA:  Objection, Your Honor, lack

3   of foundation.  May we approach?

4         THE COURT:  All right.

5                    (SIDEBAR)

6         MS. GUNASEKERA:  Your Honor, during

7   Dr. Cooney's opening narrative, she testified that

8   Mr. B.J.C. remained dyspneatic at rest and with

9   excretion.  She then testified, based on the record

10  dated March 2008, that Mr. B.J.C. did not have any

11  dyspnea at rest or exertion, that in fact his

12  respirations were regular.

13        We would ask that her testimony be struck

14  because it's inconsistent with the medical record.

15  It's inconsistent with what she testified to during

16  her opening narrative, and it's misleading to the

17  jury.

18        THE COURT:  You can cover that on cross.

19        MS. GUNASEKERA:  I will just add, Your

20  Honor, unlike what occurred during Dr. Liao's direct

21  testimony where objections were made based on

22  foundations and inconsistencies in the medical

23  records, his testimony was actually struck at times.

24  We again just reiterate our objection.

25        MR. LEMBKE:  I would just note for the

1   record that Dr. Liao's testimony, as I recall, when

2   it was struck is when he said a document said

3   medication was stopped and that was the primary basis

4   for his opinion.  This is a very distinct situation

5   as to what she's talking about.

6          MS. GUNASEKERA:  In other instances, we had

7   to go back and lay the foundation for his opinion,

8   and here there's a clear inconsistency but we

9   understand Your Honor's ruling.  Thank you.

10         THE COURT:  I will add the plaintiff has the

11  burden of proof.

12         MS. GUNASEKERA:  I guess it's unclear to us

13  why the lack of foundation under the Federal Rules of

14  Evidence would be different for the plaintiff versus

15  the defendant, but we understand Your Honor.

16         THE COURT:  It still has to do with burden

17  of proof, and this is a relatively minor aspect of

18  her testimony.  You can cover it on cross.

19         MS. GUNASEKERA:  Thank you, Your Honor.

20         (Open court.  Jury present.)

21  Q.  (By Mr. Lembke)  Have you had occasion to review

22  the medical records of Ms. Argentina P.?

23  A.  Yes, I've reviewed the medical records of

24  Ms. Argentina P.

25         MR. LEMBKE:  Your Honor, Ms. Argentina P.

1   can be found at Tab 9 of the juror notebook.

2   Ms. Argentina P.'s entire medical record has been

3   pre-admitted as Defense Exhibit 583 and excerpts from

4   the medical record have been pre-admitted as Defense

5   Exhibits 583-A and 583-B.

6   Q.   How old was Ms. Argentina P. at the time of her

7   admission to hospice?

8   A.   Ms. Argentina P. was 89 years old.

9   Q.   And when was she admitted to hospice?

10   A.   She was admitted February 19th, 2010.

11   Q.   What was the last date on which she was provided

12   hospice services?

13   A.   April 15th, 2011.

14   Q.   Have you formed an opinion as to whether

15   Ms. Argentina P., at the time of her admission to

16   hospice, had a terminal prognosis?

17   A.   Yes.  At the time of her hospice admission,

18   Ms. Argentina P. was terminally ill with a prognosis

19   of six months or less.

20   Q.   Why did you reach that opinion?

21   A.   Shortly before her hospice admission,

22   Ms. Argentina P. had been hospitalized with an

23   episode of ischemic cardiomyopathy, so that is --

24   ischemic is poor blood flow to the heart muscles.  It

25   was difficult to manage.

1          She was noted to be allergic to ACE

2     inhibitors and to statins.

3          At the time of her discharge, because of her

4     advanced age, her frailty and her declining

5     functional status, she was referred to hospice.

6          At the time of admission, her left

7     ventricular ejection fraction was 25 to 30 percent

8     and she was a New York Heart Association Class III.

9     She had shortness of breath with activity and

10    persistent chest pain, angina, that was relieved with

11    Nitroglycerine.

12          Her age, her symptoms, her coronary disease

13    contributed to her poor prognosis.  Additionally, she

14    had moderately severe kidney disease, stage three out

15    of five stages, five being on dialysis.

16          And she had noted that she had undocumented

17    liver abnormalities, that they chose not to diagnose

18    because of her poor condition.

19          She was terminally ill at the time of her

20    hospice admission.

21    Q.   Have you formed an opinion as to whether

22    Ms. Argentina P., throughout the time she was

23    receiving hospice services, had a terminal prognosis?

24    A.   Yes.   Throughout the time that Ms. Argentina

25    received hospice services, she remained terminally

1    ill.

2    Q.   Why did you reach that opinion?

3    A.   Ms. Argentina had progressive symptoms and

4    progressive functional decline.  Her shortness of

5    breath increased.  She began using a wheelchair for

6    any activity outside the home.  She had an episode

7    with -- she had a heart attack in November 2010, so

8    another complication.

9           She then required oxygen around the clock.

10   Her cardiac medicines were increased.  She became

11   homebound and 911 was called in January because her

12   symptoms were so severe.

13          Her weakness and shortness of breath

14   worsened and worsened and then she died in her home

15   on April 15th, 2011 with her family.

16   Q.   Let me direct your attention to what's been

17   pre-admitted as Defense Exhibit 583-A and get you to

18   look, in particular, at Page 8771.

19          And up in the upper right, what is the date

20   on this document?

21   A.   I believe this document is from February 17th,

22   2010.  The fax date is February 18, 2010.

23   Q.   What is this document?

24   A.   This is a notation from Kaiser Permanente

25   Hospital and it's a listing of her medications taking

1  as of her hospitalization on February 15th.

2  Q.   Let me direct your attention to Page 8774, which

3  is the fourth page of this five-page document.

4         Do you see the section evaluation, chest

5  pain, 2/16/10?

6  A.   Yes.

7  Q.   Would you please read what is in that section?

8  A.   Patient is an 89 year old female presented with

9  left-sided chest pain.  She has known coronary artery

10  disease.  Heart attack ruled out, excluded.  Will

11  continue aspirin, nitrates, Coreg, Plendil.  Defer on

12  ACE inhibitor and statin due to allergy.

13         Her presentation is atypical for angina and

14  myocardial infarction has been ruled out.

15         Given her advanced age and other

16  comorbidities, will continue medical management.

17  Patient agrees with continuing medical therapy and

18  declines any invasive intervention.

19  Q.   What is stated next or next to anemia and the

20  date 5/8/2007?

21  A.   Says, this is a new problem.  Hemoglobin was

22  normal in 2009.  No evidence of gastrointestinal

23  bleeding.  I discussed workup for anemia and GI

24  bleeding with the patient.  She declines further

25  evaluation.  Hemoglobin and hematocrit are a little

1  better today.

2  Q.   If you look down two sections, what is the

3  heading on -- just after the gerd section?

4  A.   Abnormal findings on liver function.

5  Q.   Would you read what is stated under that?

6  A.   Etiology unclear.  Questionable drug reaction.

7  Keflex, which is an antibiotic, discontinued.  Liver

8  function tests have improved.  No significant

9  abnormalities seen in liver on CT scan of the

10  abdomen.

11  Q.   Then down at the bottom, what is stated next to

12  disposition?

13         MS. GUNASEKERA:  For completeness, could we

14  please have the witness read what is listed under

15  coronary artery disease and cardiomyopathy?

16  Q.   (By Mr. Lembke)  Dr. Cooney, what is stated

17  under the section coronary artery disease?

18  A.   Assessment:  Chronic.  Plan:  See above plans.

19  Q.   And what is stated under ischemic

20  cardiomyopathy?

21  A.   Chronic, continue outpatient medications.

22  Q.   Can a chronic illness become a terminal illness?

23  A.   Yes.

24  Q.   What is stated under abdominal pain?

25  A.   It's up here at the top.  Abdominal pain,

 1  assessment, no acute findings on abdominal or pelvic

 2  CT scan.

 3          Seems to be a migratory pattern.  Liver

 4  function tests are elevated but not tender in the

 5  right upper quadrant.  Her abdominal pain could be

 6  due to constipation.

 7          She declines colonoscopy and barium enema

 8  study.

 9  Q.  Down at the bottom of the page, what is

10  indicated under disposition?

11  A.  Home today.  Patient and family request

12  outpatient hospice referral due to gradual decline in

13  overall health and functional status.  E consult

14  sent.

15  Q.  What, if anything -- first of all, what is the

16  relationship between the date of this document and

17  Ms. Argentina P.'s admission to hospice?

18  A.  This is about two days before her hospice

19  admission.

20  Q.  What, if anything, did the facts you've

21  highlighted in this document tell you about her

22  overall picture at the time of her admission to

23  hospice?

24  A.  The overall picture of Ms. Argentina is one of a

25  decline in overall health and functional status.

1   She's had to be hospitalized and didn't have a

2   myocardial infarction but was having symptoms of

3   chest pain and has multiple medical problems that

4   contribute to her prognosis and she was terminally

5   ill at the time of her admission.

6   Q.   Now let me show you what is Page 8709 in Defense

7   Exhibit 583-A.

8           What is the date on this document?

9   A.   May 25, 2010, the physician signed it May 20th,

10  2010 is when the verbal order was obtained.

11  Q.   What is this document?

12  A.   This is the recertification of terminal illness.

13  Q.   What is indicated as her diagnosis?

14  A.   End stage heart disease.

15  Q.   What is indicated as a secondary complication?

16  A.   Ischemic cardiomyopathy.

17  Q.   What is indicated as comorbid conditions?

18  A.   High blood pressure, gerd, congestive heart

19  failure, coronary artery disease and degenerative

20  joint disease.

21  Q.   What is stated under the physician narrative?

22  A.   89 year old with ischemic cardiomyopathy.   Left

23  ventricular ejection fraction 25 to 30 percent.

24  Stage three chronic kidney disease.

25          Patient with chest pain relieved with

1   Nitroglycerine.  Patient now has shortness of breath

2   after less than one block.  Patient's goal is to die

3   at home and not alone.

4   Q.   Now let me direct your attention to Page 8706 in

5   Defendant's Exhibit 583-A.

6        What is the date of this document?

7   A.   December 14, 2011.

8   Q.   What is this document?

9   A.   This is a recertification of terminal illness by

10  the physician.

11  Q.   What is stated in the narrative section, the

12  physician narrative section?

13  A.   It begins with PPS 40 percent.  90 year old with

14  ischemic cardiomyopathy, ejection fraction 30

15  percent, history of heart attack, congestive heart

16  failure, TIA, stroke that clears, high blood pressure

17  and chronic kidney disease, stage three.

18        Admitted to acute hospital November 30th to

19  December 3rd due -- diagnosed with myocardial

20  infarction, heart attack, troponin levels elevated.

21  Troponins are enzymes released by the heart muscle

22  when it's damaged.  Positive AV block.  It's a

23  conduction problem with the electrical system in the

24  heart.

25        Now requires continuous oxygen,

1  Nitroglycerine more frequent, at least twice daily.

2          Increased anxiety, requiring Xanax, a

3  Valium-related drug.  Coreg, one of her heart

4  medicines, increased to twice daily because of

5  arrhythmias, rhythm abnormalities of the heart.  Had

6  increased Nitro patch, nitroglycerines to eight

7  milligrams, patient doesn't go out of the house.

8  Walks ten to 15 steps with shortness of breath with a

9  cane.  Anticipate patient's life expectancy is less

10  than six months.

11  Q.  Now let me direct you to Page 8673 of

12  Defendant's Exhibit 583-A.

13          In the upper right, what is the date of this

14  document?

15  A.  April 15, 2011.

16  Q.  What is this document?

17  A.  This is a death note summary and disposal of

18  controlled drugs.

19  Q.  What is stated in the narrative note section?

20  A.  91 year old female with a diagnosis of end stage

21  heart disease joined hospice services February 19,

22  2010.  Care delivered under AseraCare Hospice

23  Service.

24          Patient followed by Dr. Gary Miller and care

25  managed by case manager nurse.

1          Patient experienced fever, absence of bowel

2    activity, agonal respirations, long periods of apnea,

3    not breathing, cardiopulmonary arrest.  Patient

4    received symptomatic treatment, pain managed and

5    comfort care.

6          Patient died 4/15/2011 at 5:14 a.m.  Family

7    members were present.

8    Q.   What, if anything, did the facts you've

9    highlighted in the documents created after the time

10   of Ms. Argentina P.'s admission to hospice tell you

11   about her overall picture while she was receiving

12   hospice services?

13   A.   Ms. Argentina P. was admitted when her heart

14   disease began to significantly impact her function at

15   home.  She showed steadily worsening that became more

16   rapid after she had a heart attack in November of

17   2010.  Symptoms steadily worsened until she died in

18   her home on May 5th, 2011.

19          So, these documents support her continued

20   eligibility for hospice care.

21   Q.   In reaching your opinions with regard to

22   Ms. Argentina P., did you rely only on the medical

23   records that we looked at here in the courtroom?

24   A.   No, I reviewed the entire medical record.

25   Q.   Was the entire medical record overall consistent

1   with your opinion?

2   A.   Yes, it was.

3        THE COURT:   Mr. Lembke, I'm afraid I need to

4   take a break.

5        Ladies and gentlemen, I think Ms. Calahan

6   explained to you I've got some things going on with

7   the court today.   We may have to take more breaks

8   than usual.   We will come back at 10:05.   You know

9   the drill during those breaks.   Thank you.

10              (Jury excused.   Break taken.)

11              (Open court.   Jury present.)

12        THE COURT:   Mr. Lembke, you may continue.

13   Q.   (By Mr. Lembke)   Dr. Cooney, have you had

14   occasion to review the medical records of Mr. John

15   G.?

16   A.   Yes.   I reviewed the medical records on Mr. John

17   G.

18        MR. LEMBKE:   Your Honor, Mr. John G. can be

19   found at Tab 55 of the juror notebook.   Mr. John G.'s

20   entire medical record has been pre-admitted as

21   Defense Exhibit 535, with excerpts from his medical

22   records having been pre-admitted as Defense Exhibit

23   535-A and 535-B.

24   Q.   How old was Mr. John G. at the time of his

25   admission to hospice?

1   A.   He was 88 years old.

2   Q.   And when was he admitted?

3   A.   November 20th, 2009.

4   Q.   What was the last date on which he was provided

5   hospice services?

6   A.   November 20th, 2011.

7   Q.   Have you had formed an opinion as to whether

8   Mr. John G., at the time of his admission to hospice,

9   had a terminal prognosis?

10   A.   Yes.  At the time of his hospice admission,

11   Mr. John G. was terminally ill with a prognosis of

12   six months or less.

13   Q.   Why did you reach that opinion?

14   A.   Mr. John G. had two main cardiac problems.  One

15   was ischemic cardiomyopathy, so damage to the heart

16   muscle from poor blood flow.  And the second was

17   critical aortic stenosis.

18            The aorta is the valve where the blood has

19   to pass through in order to get out of the heart to

20   the rest of the body.

21            And so when that's narrowed, it's like

22   trying to push something through a very narrow hose,

23   like a kink in your garden hose almost.

24            And so what that does is it decreases the

25   amount of blood that can be pushed through at any one

1  time to the rest of the body, and then it backs up

2  and kind of stretches out and damages the heart

3  because of the ongoing pressure pushing against that

4  narrow opening.

5         So he had both problems with damage to the

6  muscle from blood flow and valve disease.  And he had

7  recently had multiple hospitalizations for congestive

8  heart failure before the time of his hospice

9  admission.

10        At the time of his hospice admission, his

11  left ventricular ejection fraction, that measure of

12  the function of the left ventricle was severely

13  impaired at ten to 15 percent.

14        At the time of admission, he was able to

15  walk short distances.  He was described as being able

16  to walk from his room to the dining room where he

17  lived but it made him very short of breath.

18        Walking within his room, his oxygen

19  saturation dropped down to 90 percent.  So he did

20  have shortness of breath with activity and measures

21  of low oxygen levels with that shortness of breath.

22        So, at the time of his admission, Mr. John

23  was terminally ill.

24  Q.  Have you formed an opinion as to whether

25  Mr. John G., throughout the time he was receiving

1 hospice services, had a terminal prognosis?

2 A.   Yes.   Throughout the time of hospice care,

3 Mr. John remained terminally ill.

4 Q.   Why did you reach that opinion?

5 A.   His symptoms continued to progress and he

6 continued to worsen.   He initially had some weight

7 gain.   And with patients with congestive heart

8 failure, most of the time, we've been talking that

9 weight gain is a sign of improvement.   In patients

10 with heart failure, it often means that they are

11 retaining fluid, and it's actually a sign of

12 problems.

13          So when his weight would go up, he would be

14 treated with Lasix, that water pill, to try and clear

15 out the water so his heart didn't have too much to

16 pump against.

17          So, he did start on oxygen at two liters per

18 minute every night all night and then as needed

19 during the day.

20          He still had these episodes of fluid

21 retention, shortness of breath, treated with the

22 diuretics and each one left him a little more

23 exhausted and frail.

24          He started sleeping in his recliner, which,

25 again, is common in people with end stage heart

1   disease.  He really restricted his activities because

2   he was so short of breath.  He became confined to his

3   room and, ultimately, pretty much bedbound, confined

4   to his bed.

5            He had to be started on opioids, narcotics,

6   around the clock to -- not for pain but to control

7   his shortness of breath because it was so profound.

8            So this is a picture of a man who continued

9   to worsen over time and who remained terminally ill

10  during the time he received hospice services.

11  Q.   What was the reason for hospice services coming

12  to an end for Mr. John G.?

13  A.   He was discharged with an extended prognosis on

14  November 20th, 2011.

15  Q.   Let me direct your attention to Defense Exhibit

16  535-A, which has been pre-admitted and, in

17  particular, to Page 6802.

18            What is the date of the signatures on this

19  document?

20  A.   November 20th, 2009.

21  Q.   And what is this document?

22  A.   This is a certification of terminal illness.

23  Q.   What is indicated as the hospice diagnosis?

24  A.   Congestive heart failure.

25  Q.   What is indicated as Mr. John G.'s age at the

```
 1   time?
 2   A.   He's 88.
 3   Q.   What are listed as secondary complications?
 4   A.   High blood pressure and aortic stenosis.
 5   Q.   What is indicated as comorbid conditions?
 6   A.   Non-insulin dependent diabetes and
 7   hypothyroidism.
 8   Q.   What is stated under the physician narrative?
 9   A.   Patient has end stage cardiac disease with
10   congestive heart failure and continued --
11   Q.   Might that be aortic stenosis?
12   A.   Oh, yes.  And critical aortic stenosis.
13   Ejection fraction ten percent.  Two hospitalizations
14   in the past two months.  Marked decrease in appetite.
15   Patient has extremely poor prognosis and qualifies
16   for hospice.
17   Q.   Now let me direct your attention to what has
18   been pre-admitted as Defense Exhibit 535-B.
19        Let me direct your attention to Page 6888 in
20   Defense Exhibit 535-B.
21        What is the date of this document?
22   A.   November 20th, 2009, the date of his hospice
23   admission.
24   Q.   What is the document?  And I will show you Page
25   1 is at 6885.  What is this document?
```

1    A.   This is the worksheet for the hospice local

2    coverage determination cardiopulmonary.

3    Q.   Going back to 6888, which is the fourth page of

4    four-page document, what is stated under medical

5    director's summary of patient's hospice eligibility

6    and medical necessity?

7    A.   Patient has multiple cardiac issues, including

8    left bundle branch block, aortic stenosis with

9    ejection fraction ten to 15 percent, cardiomyopathy,

10   angina benign hypertension, also non-insulin

11   dependent diabetes mellitus and hypothyroid.

12          Recovering from recent bout of bronchitis

13   and pneumonia.  So far he is able to ambulate to walk

14   alone.  Encouraged to use a cane or a walker as he is

15   having occasional bouts of dizziness.

16          Hard for him to walk to the dining room as

17   it is a long distance.

18          After a short walk around the apartment,

19   oxygen saturation was 90 percent.  We talked about

20   the possible need for oxygen soon.  He's been

21   hospitalized twice in the last two months with

22   exacerbations of congestive heart failure and

23   increased fluid retention.  Marked decrease in

24   appetite.

25   Q.   What, if anything, did the facts you've

1  highlighted in the documents created at the time of

2  Mr. John G.'s admission to hospice tell you about his

3  overall picture at that point?

4  A.   These documents describe a man with advanced

5  heart disease who is having increasing symptoms and

6  complications and who is terminally ill.

7  Q.   Let me direct your attention to Page 6890.  And

8  I am going to go to the fourth page of this document

9  to get the date.  Brad, would you pull up PDF,

10  please?  This is in 535-A.

11       What is the date on this document?

12  A.   It was signed by the nurse on February 4th,

13  2010; and by the physician on February 16th, 2010.

14  Q.   What is this document?

15  A.   This is a worksheet, hospital local coverage

16  determination cardiopulmonary.

17  Q.   What is indicated in the narrative summary

18  section?

19  A.   Patient was admitted with heart failure and

20  pneumonia.  Has had an exacerbation of congestive

21  heart failure in January 2010.

22       Dr. Weaver increased Lasix to 80 milligrams

23  twice daily for three days, which resulted in weight

24  loss from 192 back to 184.

25       Is now using oxygen at two liters per minute

1  and also sleeps with oxygen and uses portable when he

2  walks to and from the dining room.

3             Lung sounds remain diminished throughout but

4  clear.  No edema noted.

5  Q.   Now let me direct your attention to Page 6920 in

6  Defendant's Exhibit 535-A.  Let me again go to the

7  third page of this at 6922 to get the date.  Brad,

8  would you pull up PDF 199, please.

9             What is the date of this document?

10  A.   This document was signed by the nurse on June

11  30th, 2011; and by the physician on July 5th, 2011.

12  Q.   At the first page at 6920, what is this

13  document?

14  A.   This is the worksheet, the hospice local

15  coverage determination cardiopulmonary.

16  Q.   And on the second page at 6921, what is

17  indicated with regard to mobility?

18  A.   He's now noted as being bedbound.

19  Q.   And then back to 6922 -- Brad, if you would just

20  scroll down for me, please.

21             What is indicated in the clinician summary

22  section?

23  A.   Patient continues with ejection fraction of 15

24  to 20 percent, short of breath on exertion, oxygen at

25  three liters per minute, increase to four liters per

1  minute at times.  Bedbound now.

2  Q.   Now let me direct your attention to Page 6968 in

3  Defendant's Exhibit 535-A.

4         What is the date of this exhibit?

5  A.   August 31st, 2011.

6  Q.   What is this exhibit?

7  A.   This is a practitioner progress note.

8  Q.   What is stated as the reason for the visit?

9  A.   Face-to-face evaluation for continued hospice

10  eligibility.

11  Q.   All right.  Let me direct you to Page -- the

12  next page, 6969.  Brad, would you scroll down for me,

13  please?

14         What is stated next to extremities?

15  A.   Extreme leg weakness.

16  Q.   What about next to neurological?

17  A.   Awake, alert and oriented.

18  Q.   And what is indicated next to psychosocial and

19  spiritual well being?

20  A.   Depression, anxiety.

21  Q.   And what is indicated in the numeric

22  qualification next to shortness of breath?

23  A.   This is a zero to ten scale.  Shortness of

24  breath is documented as being a level seven.  Or it

25  might say seven to ten, but I believe it states seven

1  and they've crossed out ten.

2  Q.   Then what is stated next to fatigue?

3  A.   This is seven to ten.

4  Q.   And then what is indicated at the bottom next to

5  constitutional?

6  A.   Bedbound, pleasant.

7  Q.   What about next to HEDNT?

8  A.   He's on nasal oxygen.

9  Q.   Now let me direct your attention to the next

10  page, and again -- there we go, at 6970.

11          What is indicated in the bottom half of the

12  page next to impression?

13  A.   Heart failure, end stage cardiomyopathy, and

14  aortic stenosis.

15  Q.   In the left column, what is written and circled

16  next to prognosis?

17  A.   Poor.

18  Q.   And what are the five numbered points written in

19  the comment section there?

20  A.   Number one, patient continues to be appropriate

21  for hospice.

22          Number two, New York Heart Association Class

23  IV cardiac disease.

24          Number three, cardiac cachexia.

25  Q.   What does that mean?

1   A.   Some patients with end stage heart disease just

2   begin to waste away and lose weight and become

3   extremely drawn and gaunt.

4            Number four, shortness of breath at rest.

5            Number five, on 24/7 oxygen.

6   Q.   What is stated next to psychosocial, cultural,

7   spiritual and ethical legal?

8   A.   Patient continues to require support and he has

9   a do-not-resuscitate order.

10  Q.   What, if anything, did the facts you've

11  highlighted in the documents created since Mr. John

12  G.'s admission to hospice tell you about his overall

13  picture while he was receiving hospice services?

14  A.   These documents show that Mr. John G. continued

15  to be terminally ill.  His symptoms continued to

16  progress.  His functional impairments continued to

17  worsen and he remained terminally ill during the time

18  that he was in hospice care.

19  Q.   In reaching your opinions with regard to

20  Mr. John G., did you rely only on the medical records

21  that we looked at here in the courtroom?

22  A.   No, I reviewed the entire medical record.

23  Q.   Was the entire medical record overall consistent

24  with your opinion?

25  A.   Yes, it was.

5338

1  Q.  Have you had occasion to review the medical

2  records of Ms. Donna W.?

3  A.  Yes.  I've reviewed the medical records on

4  Ms. Donna W.

5         MR. LEMBKE:  Your Honor, Ms. Donna W. can be

6  found at Tab 23 in the juror notebook.  The entire

7  medical record for Ms. Donna W. has been pre-admitted

8  as Defense Exhibit 622, and excerpts from the medical

9  record have been pre-admitted as Defense Exhibit

10  622-A and 622-B.

11  Q.  How old was Ms. Donna W. at the time of her

12  admission to hospice?

13  A.  Ms. Donna was 66 years old.

14  Q.  On what date was she submitted to hospice?

15  A.  March 25th, 2007.

16  Q.  What was the date on which she no longer

17  received hospice services?

18  A.  February 16th, 2010.

19  Q.  Have you formed an opinion as to whether

20  Ms. Donna W., at the time of her admission to

21  hospice, had a terminal prognosis?

22  A.  Yes.  At the time of her hospice admission,

23  Ms. Donna W. was terminally ill with a prognosis of

24  six months or less.

25  Q.  Why did you reach that opinion?

A.   Just before hospice admission, Ms. Donna W. was

in the hospital.  She had advanced chronic

obstructive pulmonary disease and heart disease and

had experienced an acute myocardial infarction, a

heart attack.

Her difficulty breathing was so severe that

she had to be intubated, had to have a tube put down

her throat, and was on a respirator, a breathing

machine.

She had multiple complications including

kidney damage, liver impairment and pneumonia.  Her

ejection fraction was measured at 15 to 20 percent.

After a week on the ventilator, she

insisted, through written notes, on being removed

from the ventilator, despite being told by the

physician that she would likely die very rapidly if

she was removed from the ventilator.  But she was

very clear about it and --

MS. GUNASEKERA:  Objection, lack of

foundation.

MR. LEMBKE:  We will lay the foundation,

Your Honor.

THE COURT:  All right.

A.   She was removed from the ventilator and referred

to hospice.  When they saw her at home, she was

1  cyanotic, that sort of bluish, purplish color that

2  people are when oxygen isn't circulating, and her

3  breathing was very labored.

4          So, at the time of her hospice admission,

5  Ms. Donna was terminally ill.

6  Q.   Have you formed an opinion as to whether

7  Ms. Donna W., throughout the time she was receiving

8  hospice services, had a terminal prognosis?

9  A.   Yes.  Throughout the time that Ms. Donna

10 received hospice services, she remained terminally

11 ill.

12 Q.   Why did you reach that opinion?

13 A.   Ms. Donna survived, despite her physician's

14 expectations, but she remained extremely thin and

15 frail.  She had chest pain and shortness of breath at

16 rest.  And over time, she got worse.  She got

17 steadily worse.

18         She became so that she could only take a

19 couple of steps without having to stop and catch her

20 breath.  She was on oxygen continuously.  And she had

21 a poor appetite.  Her weight fell from her admission

22 weight of 79 pounds, first to 70 pounds and then down

23 to 63 pounds.

24         She began to need Morphine for air hunger

25 which is just, you know, gasping for breath.  She had

1    resting chest pain that responded to Nitroglycerine.

2            She had more anxiety.  That's really common

3    among people with breathing problems of this

4    severity.

5            In my experience, she became confined to

6    bed, her recliner.  She was homebound.  She was

7    dependent for all of her personal care.

8            As her symptoms worsened, she required more

9    and more assistance, and then died -- died at her

10   home on February 16th, 2010.

11           So, she showed a steady, continual

12   progression of her terminal illness.

13   Q.  Let me now direct your attention to pre-admitted

14   Defense Exhibit 622-A and Page 2062 of that document.

15           What is the date?

16   A.  This is dated March 24th, 2007.

17   Q.  Now I want to direct your attention to Page

18   2071.  And what is the date of the note at the top of

19   this page?

20   A.  March 23rd, 2007.

21   Q.  What does this -- first of all, what is this

22   document?

23   A.  This is a physician progress note.  It appears

24   to be from her hospital.

25   Q.  All right.  Would you read that note for us,

1  please?

2  A.   Medical and surgical ICU nurse practitioner

3  note.  Asked by nursing to come to the bedside.

4  Patient and family have discussed do not resuscitate

5  status.  Patient requests a DNR by handwritten note

6  in my presence.  I advised if she was indicating

7  removal of ventilator support.  She, Mrs. W., is

8  emphatic about removing the tube today.

9          I advised that she would likely not survive

10  if she removed ventilator support at this time.  I

11  advised that we could insert a tracheostomy, a hole

12  in the trachea through the skin to allow her to be

13  home with home ventilator.  She insisted that she

14  does not want this and understands that she will

15  likely not be able to survive long without

16  ventilatory support.

17          Husband and family at bedside and understand

18  her wishes.  Discussed with Dr. M. who is covering

19  for Dr. M.  Will honor Ms. W.'s request and pursue

20  comfort care.

21  Q.   And what does the second note indicate?

22  A.   Same date, 3/23/07, patient refusing

23  echocardiogram.

24  Q.   Now let me direct your attention to Page --

25          THE COURT:  Mr. Lembke, I missed the page

1   number for that document.  If you wouldn't mind

2   giving it to me, I would appreciate it.

3            MR. LEMBKE:  I'm sorry, Your Honor.  That is

4   Page 2071.

5            THE COURT:  Okay.  Thank you.  I'm sorry.

6   Q.  (By Mr. Lembke)  Now going back to Page 0669 in

7   Defense Exhibit 622-A.  In the upper right, what is

8   -- excuse me, in the lower right, what is the date of

9   this document?

10  A.  This is two days later, March 25th, 2007, the

11  date of her hospice admission.

12  Q.  And what is indicated as Ms. Donna W.'s age at

13  this point?

14  A.  She's 66 years old.

15  Q.  What is indicated as her hospice diagnosis?

16  A.  End stage heart disease.

17  Q.  What is -- next to vital signs, what is her

18  heart rate?

19  A.  It's increased 98 to 106 beats her minute.

20  Q.  And what about her breathing respirations?

21  A.  She's breathing rapidly, 26 times per minute.

22  Q.  Under circulatory status, what is indicated as

23  to history in the left column?

24  A.  She has a history of myocardial infarction,

25  heart attack.

1  Q.   In the center column, what is indicated with

2  regard to shortness of breath?

3  A.   She's short of breath at rest.

4  Q.   In the right column, what is indicated with

5  regard to oxygen usage?

6  A.   She's on oxygen three liters per minute 100

7  percent of the day.

8  Q.   Down in the nutritional status section, in the

9  left column, what boxes are checked?

10  A.   Anorexia, dehydration, dry mouth.

11  Q.   And what about in the next column?

12  A.   Cachexia, extreme weight loss, or visible.

13  Diet, regular, 15 percent.  Dentures, yes.

14  Q.   What is indicated as to her weight and BMI?

15  A.   Her weight is 79 pounds with a BMI of 14.

16  Q.   Now let me direct your attention to Page 0670.

17  In the section under self care deficit/functional

18  limitations, what is indicated with regard to her

19  dependence for activities of daily living?

20  A.   She's dependent in all of the activities of

21  daily living at the time of admission.

22  Q.   And in the section below that, what is indicated

23  as to her skin breakdown risk level?

24  A.   It's elevated, 15.

25  Q.   What is indicated below that as to wounds she

1  has?

2  A.   Can you scroll up just a little bit because

3  they're referring to the picture -- no, down, I

4  guess.   Yeah.

5       So a, looks like her forearms, she has heavy

6  bruising from the hospitalization.   And then B is her

7  sacral area, her buttocks, a small pink area that

8  blanches, which means you push on it and it kind of

9  turns white and stays white, the size of a dime.

10 Q.   Now let me direct your attention to Page 0673,

11 which is the fifth page of this five-page document.

12       What is stated in the initial assessment

13 summary?

14 A.   66 year old woman appearing much older than 66.

15 She is very alert and pleasant despite her poor

16 prognosis.

17       She is very accepting but spouse of 33 years

18 is having difficulty stating, it has been too many

19 ups and downs.   Patient is extremely cyanotic with

20 labored breathing.

21       Neighbor Eddie helps family a whole lot.

22 There are two sons, but neither live in town.

23 Q.   What, if anything, did the facts you've

24 highlighted in the documents created just before and

25 at the time of her admission to hospice tell you

1  about Ms. Donna W.'s overall picture at that point?

2  A.   These documents support her terminal prognosis

3  at the time of admission.

4  Q.   Now let me direct your attention to Page 0682.

5  I will actually go forward to 0685 to get the date.

6         What is the date of this document?

7  A.   April 1st, 2009.

8  Q.   What is this document?

9  A.   This is the worksheet for hospice local coverage

10 determination cardiopulmonary.

11 Q.   What is stated in the medical director's summary

12 of patient's hospice eligibility and medical

13 necessity?

14 A.   History of myocardial infarction, heart attack,

15 with resuscitation and ventilator two years ago.

16 Asked to be removed from ventilator and sent home.

17 MD gave her a prognosis of one week.

18        Patient is severely disabled and has

19 continuous air hunger.  She is on oxygen continuous

20 and her -- and has anxiety about her dyspnea.

21        Takes 0.25 MLs of Roxanol, that's liquid

22 Morphine, for air hunger and Ativan, the Valium-like

23 drug, for anxiety.

24        She has chest pain at rest.  And is on

25 Nitro-Bid five milligrams twice daily and NitroQuick

1    five units every five minutes up to three which

2    provides relief.

3            She is bed to chair and can walk five to six

4    steps to the bathroom at times and gets air hunger

5    which takes 15 to 20 minutes to recover.  Mainly uses

6    the bedside commode.

7            Eats 50 percent, weighs 63 pounds, BMI of

8    11.  Continues to lose weight.  Was 110 one year ago

9    and has to pause when eating to breathe.

10           Unable to clean, shop, cook, et cetera.

11   Patient under stress.  Caregiver husband diagnosed

12   with colon cancer and tried -- this past week her son

13   was diagnosed with bladder cancer and is having

14   surgery.

15           Patient not handling this well as she is

16   unable to be with him.

17   Q.   Now let me direct your attention to Page 0674.

18   I will go forward for the date to 0677.

19           What is the date of this document?

20   A.   Signed by the nurse August 3rd, 2009; and by the

21   physician, August 5th, 2009.

22   Q.   What is this document?

23   A.   Again, this is the hospice local coverage

24   determination for cardiopulmonary worksheet.

25   Q.   And what is stated under the medical director's

1  summary?

2  A.  Patient has been having episodes of air hunger,

3  two to three times per week, where her husband calls

4  for an as needed nursing visit.

5       Patient has stridor, sounds of a blocked

6  airway, gasping for air.  Usually relieved with 0.5

7  MLs of Roxanol and Ativan as needed.

8       Takes four to five doses of Roxanol, 0.25

9  MLs daily.  Severe dyspnea at rest.  Bed to recliner.

10  Can tolerate no activity.  Has to pause eating and

11  talking to get her breath.

12       House bound, unable to cook or do any

13  housework.  Has nausea symptoms with -- she has

14  nausea, treated with Phenergan as needed.

15       Ativan for anxiety.  Nitro-Bid and

16  NitroQuick for angina.

17       Cyanosis of her fingers, feet and lips.

18  Weight 63.  BMI 11.  Dependent in five of six

19  activities of daily living.

20  Q.  Now let me direct your attention to Page 6902,

21  what is the date of this document?

22  A.  December 30th, 2009.

23  Q.  What is this document?

24  A.  This is the recertification of terminal illness.

25  Q.  What is stated under the physician narrative?

1  A.   Dyspnea at rest.  More frequent exacerbations of

2  air hunger requiring increased Roxanol, 0.25 to 0.75

3  MLs for exacerbation.  Chair and bedbound, 100

4  percent of the time.  Continued decreased air

5  exchange and increased respiratory rate daily.

6  Q.   Why is morphine used to treat air hunger?

7  A.   Morphine has two -- two sites of action for air

8  hunger.  Part of it, it does dilate the heart vessels

9  so it is a routine treatment when somebody is having

10  prolonged angina or chest pain.

11         But for air hunger, such as Ms. Donna is

12  experiencing, it's primarily working in the brain.

13  And it decreases that sense that you can't get your

14  breath.  And it's very -- it's very effective.

15  Sometimes takes higher doses, such as she's been

16  getting, but it basically works in the brain, kind of

17  help making the brain perceive that you're not as

18  desperate for air as you are.

19  Q.   Now let me direct your attention to Page 6898 of

20  Defense Exhibit 622-A.

21         What is the date of this document?

22  A.   February 16th, 2010.

23  Q.   What is this document?

24  A.   A death note summary and disposal of controlled

25  drugs.

1  Q.   And what is stated under the narrative note?

2  A.   Patient supine in bed at home.  No signs of

3  trauma noted.  Hospice staff had been with the

4  patient from 10:00 a.m. to 7:30 p.m. on continuous

5  care as patient was showing signs and symptoms of end

6  of life.

7          Patient had fallen asleep peacefully and

8  ceased breathing.

9  Q.   What, if anything, did the facts you've

10  highlighted in Ms. Donna W.'s medical records since

11  the time of her hospice admission tell you about her

12  overall picture while she was receiving hospice

13  services?

14  A.   These documents show that Ms. Donna W. remained

15  terminally ill with advanced and progressive symptoms

16  of her heart and lung disease until she died quietly

17  in her home.

18  Q.   In reaching your opinions about Ms. Donna W.,

19  did you rely only on the medical records that we

20  looked at here in the courtroom?

21  A.   No, I reviewed the entire medical record.

22  Q.   Was the entire medical record overall consistent

23  with your opinions with regard to Ms. Donna W.?

24  A.   Yes, it was.

25  Q.   Have you had occasion to review the medical

1  records of Ms. Dollie K.?

2  A.   Yes, I've reviewed the medical records for

3  Ms. Dollie K.

4       MR. LEMBKE:  Your Honor, Ms. Dollie K. can

5  be found at Tab 22 of the juror notebook.  Ms. Dollie

6  K.'s entire medical records have been pre-admitted as

7  Defense Exhibit 558, with excerpts from her medical

8  records having been pre-admitted as Defense Exhibit

9  558-A and 558-B.

10 Q.   How old was Ms. Dollie K. at the time of her

11 admission to hospice?

12 A.   She was 98 years old.

13 Q.   What was the date on which she was admitted?

14 A.   February 22nd, 2010.

15 Q.   What was the last date on which she was provided

16 hospice services?

17 A.   July 7th, 2011.

18 Q.   Have you formed an opinion as to whether

19 Ms. Dollie K., at the time of her admission to

20 hospice, had a terminal prognosis?

21 A.   Yes.  At the time of her hospice admission,

22 Ms. Dollie K. was terminally ill with a prognosis of

23 six months or less.

24 Q.   Why did you reach that opinion?

25 A.   Ms. Dollie was living at home with her daughter

1   looking after her, and she had been declining.

2   Functionally, she began falling.  She was weaker.

3   She was more fatigued.

4          She was having spells of dizziness that came

5   before she would fall.  And she had persistent edema.

6          At the time of admission, she weighed 112

7   pounds and her edema was described as three plus,

8   that's three plus out of four.  She was breathless at

9   rest.  With walking, she could only take three to

10  four steps before she needed to stop and catch her

11  breath.

12         She needed assistance with all of her

13  activities of daily living, her personal care.

14         So, at the time of admission, Ms. Dollie was

15  terminally ill.

16  Q.   Have you formed an opinion as to whether

17  Ms. Dollie, throughout the time she was receiving

18  hospice services, had a terminal prognosis?

19  A.   Yet.   Throughout the time that Ms. Dollie

20  received hospice services, she remained terminally

21  ill.

22  Q.   Why did you reach that opinion?

23  A.   Ms. Dollie got steadily worse.  Her weight is

24  one measure that it's unsure what it's measuring

25  because of all this edema that she's got.  But her

1  weight was able to be maintained at about 97 to 99

2  pounds, but she was still very short of breath with

3  any activity.

4          She was started on oxygen at night.  She

5  steadily worsened.  She became unable to leave her

6  home and could never walk, you know, more than a few

7  feet without resting and taking a breath.

8          Her pedal edema, the edema in her lower

9  legs, would get worse throughout the day as she sat

10  up in her chair and she needed more and more help

11  with transferring and with walking.  She continued to

12  require total care with bathing and dressing.

13          But -- just a moment.  It appears, reading

14  the record, that her disease was slowly changing and

15  she was discharged on July 7th, 2011 with an extended

16  prognosis.

17  Q.   Let me show you what has been pre-admitted as

18  Defense Exhibit 558-A and, in particular, Page 7553.

19          What is the date of this document?

20  A.   February 22nd, 2010.

21  Q.   What is this document?

22  A.   This is a request for hospice evaluation.

23  Q.   In the middle of the page, what is stated under

24  summary of clinical findings?

25  A.   Daughter staying with patient providing total

1   care.  Patient has two plus edema of the lower

2   extremities and hands.  Periorbital edema causing

3   visual problems due to unable to open her eyes.

4          Increased weakness with multiple falls over

5   the last month.  Patient unable to transfer without

6   maximal assistance.  Takes three to four steps, then

7   rests.

8          Complains of left neck pain since emergency

9   room visit, vena puncture, blood draw, in the neck.

10  Q.  Now I want to direct your attention to what's

11  been previously admitted as Government Exhibit 330-C.

12         Brad, if you could pull up in PDF Page 594

13  in Government 330-C.

14         THE COURT:  Are you saying Government

15  Exhibit 330C?

16         MR. LEMBKE:  Yes, ma'am.

17         THE COURT:  Thank you.  And the page?

18         MR. LEMBKE:  It's 8085 is the page.

19         THE COURT:  Thank you.

20  Q.  (By Mr. Lembke)  There it is, thank you.  At the

21  top right, what is the date of this document?

22  A.  February 22nd, 2010, date of her hospice

23  admission.

24  Q.  What is this document?

25  A.  This is the initial and comprehensive nursing

1    assessment.

2    Q.   What is indicated as Ms. Dollie's age at this

3    point?

4    A.   Age 98.

5    Q.   And what is the diagnosis indicated to be?

6    A.   Heart failure.

7    Q.   In the primary complaints, what is stated there

8    in that left margin about halfway down the page?

9    A.   Caregiver concerned about increasing edema,

10   increased pain to the left side of the neck, holding

11   head to the left side since vena puncture at

12   emergency room.

13   Q.   Up above, what is stated under subjective data?

14   A.   Caregiver reports patient has fallen multiple

15   times over the past month.  States more swelling than

16   she has ever had.  Complaining of unable to keep

17   patient warm and too weak to walk now.

18   Q.   Now let me direct your attention to Page 8092,

19   Brad, that's PDF 601, which is the eighth page of

20   this eight-page document.

21          What is stated under the nursing narrative?

22   A.   Admit 98 year old female to hospice services.

23   Caregiver reports patient has progressively gotten

24   weaker over the past six months.  Began having

25   multiple falls.  Patient fell February 14, 2010 and

1   was unable to get up from the floor.

2          Patient was transferred to the emergency

3   room for evaluation.  Observed for 24 hours, then

4   advised to follow up with her physician for the

5   edema.

6          Patient seen by Dr. K. February 19th, 2010.

7   New prescription for Lasix due to edema.  Caregiver

8   reports patient normal weight is 102 pounds, patient

9   was 112 pounds at the emergency room.  109 at her

10  physician visit.

11         Caregiver reports more swelling on her

12  mother than she has ever seen.  Patient sits all day

13  with her feet down in a dependent position.

14         Two plus edema of the legs and hands.

15  Periorbital edema closing the patient eyelids.

16  Patient complaining of unable to see.

17         Patient has three centimeter blister on her

18  left leg, burned on a heater.  Patient sitting in

19  front of the kerosene heater, six layers of upper

20  clothing and three layers lower.  Temperature in room

21  warm enough to cause sweat at rest.  Odor of kerosene

22  very strong.

23         Caregiver educated to safety and encouraged

24  to obtain smoke alarm with a carbon dioxide monitor.

25         Patient very weak, unable to transfer

1   without assistance -- unable to transfer without

2   assistance to steady gait.

3        Caregiver requests a wheelchair to transfer

4   the patient.  Patient takes two to three steps,

5   rests, poor endurance.

6        Caregiver reports patient sleeps most of the

7   time, 20 out of 24 hours per day.  Appetite fair.

8   Encourage Ensure supplements.  Caregiver reports

9   patient drinks approximately one half can daily.

10       Daughter reports limited support.  Daughter

11  is the only child attempting to provide total care.

12  States patient no longer attempts to transfer without

13  her assistance.

14       Uses bedside mode.  Occasionally urinary

15  incontinence.  Wears pullups.  Daughter requests a

16  hospital bed.  Feels patient needs to stay in bed

17  more to decrease the edema.

18       Patient needs her feet elevated.  Limited

19  salt intake.

20  Q.  What, if anything, did the facts you've

21  highlighted in this document tell you about

22  Ms. Dollie's overall picture at the time of her

23  admission to hospice?

24  A.  These documents describe a frail woman, 98 years

25  old, who has worsening edema, symptomatic with

5358

1  shortness of breath, with only very limited activity.

2  And she is terminally ill at the time of admission.

3  Q.  Let me direct your attention to Page 7598 back

4  in Defense Exhibit 558-A.

5          What is the date of this document?

6  A.  This document is dated February 8th, 2010.

7  Q.  Is that February or December?

8  A.  December.  December 8th, 2010 -- is that a -- I

9  think that's a ten.

10 Q.  And what is the -- what is this document?

11 A.  This is the recertification of terminal illness.

12 Q.  What is indicated above as secondary

13 complications?

14 A.  Generalized weakness, shortness of breath.

15 Q.  What about comorbid conditions?

16 A.  Hypertension, heart disease, arthritis and

17 peripheral vascular disease.

18 Q.  What is stated under the physician narrative?

19 A.  99 year old woman with congestive heart failure

20 with weakness, shortness of breath and peripheral

21 vascular disease, hypertension, arthritis, some

22 bradycardia, slow heart rate, walks with her walk --

23 Q.  Might that say walker five feet only?

24 A.  Walks with her walker five feet only.  Heart

25 rate 80 to 40 at rest.  No chest pain noted.  Oxygen

1    dependence continues at night.  Uses nebulizer

2    therapies for wheezing.

3            She has leg pain and is on Lortab, which is

4    an opioid, a narcotic.  Weight down two pounds in two

5    months.  BMI 16.  KPS 40 percent.

6            Goal:  Prevent falls and fluid overload.

7    Q.   Let me now direct your attention to Page 7577 in

8    Defendant's Exhibit 558-A.

9            What is the date of this document?

10   A.   April 13, 2011.

11   Q.   What is this document?

12   A.   This is a recertification of terminal illness

13   attestation for hospice medical directors.

14   Q.   In the top part of the page, what is stated

15   under secondary conditions?

16   A.   Class IV, bed to chair with maximal assistance,

17   sleeping more, oxygen dependent.

18   Q.   Let me direct your attention now to Page 7578 in

19   this document.  What is stated in clinical summary?

20   A.   99 year old woman with Class IV congestive heart

21   failure and secondary weakness and shortness of

22   breath.  Also with pain from peripheral vascular

23   disease in both feet and hypertension, arthritis,

24   bradycardia, bladder incontinent, bed/chair, up only

25   with maximal assistance.

1          Five out of six activities of daily living

2     assist.  Weight the same.  Goal:  Fall prevention.

3     Adequate hydration.  Pain control.  KPS 30 percent.

4     Q.   Now let me get you to turn to the next page,

5     which is Page 7579 in Defendant's Exhibit 558-A.

6          What is stated in this enhancement to

7     physician narrative?

8     A.   99 year old African-American woman with heart

9     failure.  Oxygen dependent at night and as needed.

10    Up with walker six to eight feet.  Class IV.  Bed to

11    chair.  Sleeps a lot.  History of hypertension.

12    Incontinent of urine.  KPS 30 percent.  BMI 16.

13    Shortness of breath spells with choking at night.

14         Goals:  Maintain oxygenation.  Prevent

15    falls.  She has a do-not-resuscitate order.

16    Q.   What, if anything, did the facts you've

17    highlighted in the documents created after

18    Ms. Dollie's admission to hospice tell you about her

19    overall picture at the time of her admission?

20    A.   These documents show that she continues to be

21    terminally ill with worsening of her cardiac disease

22    and progressive functional decline.

23         So, she remains hospice eligible with a

24    prognosis of six months or less.

25    Q.   In reaching your opinions with regard to

1   Ms. Dollie, did you rely only on the medical records

2   that we looked at here in the courtroom?

3   A.   No, I reviewed the entire medical record.

4   Q.   And was the entire medical record overall

5   consistent with your opinion?

6   A.   Yes, it was.

7   Q.   Have you had occasion to review the medical

8   records of Ms. Birdie C.?

9   A.   Yes, I reviewed the medical records for

10  Ms. Birdie C.

11           MR. LEMBKE:   Ms. Birdie C. can be found at

12  Tab 17 of the juror notebook.  Ms. Birdie C.'s entire

13  medical record has been pre-admitted as Defense

14  Exhibit 518, and excerpts from her medical record

15  have been pre-admitted as Defense Exhibit 518-A and

16  518-B.

17  Q.   How old was Ms. Birdie C. at the time she was

18  admitted to hospice?

19  A.   Ms. Birdie was 69 years old.

20  Q.   And what was the date on which she was admitted?

21  A.   March 25th, 2008.

22  Q.   And what was the last date on which she was

23  provided hospice services?

24  A.   May 18, 2009.

25  Q.   Have you formed an opinion as to whether

 1  Ms. Birdie C., at the time of her admission to

 2  hospice, had a terminal prognosis?

 3  A.  Yes.  At the time of her hospice admission,

 4  Ms. Birdie C. was terminally ill with a prognosis of

 5  six months or less.

 6  Q.  Why did you reach that opinion?

 7  A.  Ms. Birdie was living at home.  She had both end

 8  stage COPD and ischemic heart disease and a history

 9  of stroke.  At the time of admission, she had

10  shortness of breath at rest.  She had an elevated

11  resting pulse, which is a measure of how hard she was

12  working to maintain her oxygenation and low oxygen

13  levels.

14          She was becoming more confused.  She needed

15  more assistance with bathing, dressing and with

16  walking.

17          So, at the time of admission, Ms. Birdie was

18  terminally ill.

19  Q.  Have you formed an opinion as to whether

20  Ms. Birdie, throughout the time she was receiving

21  hospice services, had a terminal prognosis?

22  A.  Yes.  Throughout the time of hospice care,

23  Ms. Birdie remained terminally ill.

24  Q.  Why did you reach that opinion?

25  A.  She was steadily worse.  She was more short of

1  breath.  More fatigued.  Had more edema, swelling.

2  She got to where after about seven -- about seven

3  months, she couldn't live on her own and had to be

4  admitted to a nursing home because she needed so much

5  support and care.  She had been living in her home,

6  had to be admitted to a nursing facility and even

7  with -- in the nursing facility, she was still short

8  of breath with talking, worse with anything, any

9  activity.  Her oxygen saturation stayed low.  Down to

10  87 percent on room air and she was on around the

11  clock oxygen.

12          But she had more support.  Her disease

13  progression, reviewing the clinical note, seems to go

14  more slowly and she was discharged with an extended

15  prognosis on May 18th, 2009.

16  Q.   Have you had -- excuse me.  Let me direct your

17  attention to Defense Exhibit 518-A, which has been

18  pre-admitted.

19          What is the date of this document which is

20  at Page 5215.

21  A.   March 25th, 2008.

22  Q.   What is this document?

23  A.   This is the initial nursing assessment on the

24  day of admission, hospice admission.

25  Q.   What is Ms. Birdie's age at this point?

1  A.   She's 69 years old.

2  Q.   What is the hospice diagnosis?

3  A.   End stage COPD.

4  Q.   What is her heart rate indicated to be in the

5  vital signs?

6  A.   Heart rate is 108.

7  Q.   What about her respiration rate, what is

8  indicated?

9  A.   Elevated, 24.

10  Q.   In the circulatory status section, what is

11  indicated as to her -- in the left column as to her

12  history?

13  A.   History of myocardial infarction, stroke, and

14  high blood pressure.

15  Q.   What is indicated in the center column with

16  regard to her shortness of breath?

17  A.   Shortness of breath on exertion with walking and

18  talking.  Shortness of breath at rest and PND, that's

19  shortness of breath at night when lying flat.

20  Q.   In the right column -- actually down in the

21  respiratory status section, what is indicated in the

22  right column with regard to oxygen usage?

23  A.   She's on two liters of oxygen 100 percent of the

24  day.

25  Q.   Let me get you to turn to Page 5306, which is

1  the fifth page of this five-page document.

2         What is stated in the summary section?

3  A.   Patient sitting up on the side of bed.  Patient

4  states a chest x-ray was done this morning because of

5  left-sided lung pain in --

6  Q.   Let me stop you, Dr. Cooney.  I jumped ahead in

7  time and that's not the right page.

8         Let me direct you to actually Page 5219,

9  which is the fifth page of the first document we were

10  looking at.

11        Brad, would you pull up PDF 252 in Defense

12  518-A, please.  Let me make sure I've got it right.

13        What is the date in the lower right of this?

14  A.   March 25th, 2008, this is the day of her

15  admission.

16  Q.   What is stated there for the initial assessment

17  summary?

18  A.   69 year old female with end stage COPD, history

19  of MI with bypass and stints.  History of stroke and

20  coronary artery disease.

21        Patient is maxed out on bronchodilators,

22  oxygen dependent, oxygen saturation 85 percent on

23  room air at rest.  Some confusion at times.  At this

24  point, wants to be resuscitated.  Will work with

25  patient as the daughter does not want her to be

 1  resuscitated and she has the power of attorney for

 2  durable healthcare.

 3          Patient currently has oxygen and nebulizers

 4  with -- provider will swap with their provider and

 5  get hospital bed, and an oxygen concentrator and

 6  nebulizer.

 7          Nursing visits twice weekly.  Home health

 8  aides three times weekly.  Social worker and

 9  spiritual care counselor to evaluate.

10  Q.   What, if anything, did the facts you've

11  highlighted in this document from the time of

12  admission tell you about Ms. Birdie's overall picture

13  at the time of her admission to hospice?

14  A.   These documents describe a woman with very

15  advanced shortness of breath with both COPD and heart

16  disease who is terminally ill.

17  Q.   Now let me direct your attention to Page 5504 in

18  Defense Exhibit 518-A.  And in the lower right, what

19  is the date of this document?

20  A.   This is November 19, 2008.

21  Q.   What is this document?

22  A.   This is a nursing visit note.

23  Q.   And in the left-hand column under respiratory,

24  what is stated with regard to shortness of breath?

25  A.   She has dyspnea, shortness of breath with

1  walking and with talking.  She has nocturnal dyspnea

2  and she has orthopnea, she can't lie flat without

3  becoming short of breath.

4  Q.  What is indicated just below that with regard to

5  edema?

6  A.  She has two plus edema in both legs.

7  Q.  At the bottom page, what is indicated with

8  regard to the summary?

9  A.  Patient moved from home to long-term care

10  facility today.  Accepting the change well.  No

11  distress.  Continue the plan of care.

12  Q.  Now let me direct your attention to Page 5302.

13  What is the date of this document?

14  A.  March 9th, 2009.

15  Q.  And what is this document?

16  A.  This is a reassessment for ongoing eligibility.

17  Q.  And what is indicated in this document with

18  regard to the circulatory status section with regard

19  to shortness of breath?

20  A.  She's noted as being short of breath with

21  walking and talking.

22  Q.  And in the respiratory status section, what is

23  indicated with regard to shortness of breath at rest?

24  A.  It's noted that she has shortness of breath at

25  rest at times.

1  Q.   What about -- what is indicated with regard to

2  her oxygen usage?

3  A.   She's on oxygen two liters per minute 100

4  percent of the day.

5  Q.   Now let me show you Page 5306, which is the

6  fifth page of this five-page document.

7        What is stated in the summary section?

8  A.   Patient sitting up on the side of the bed.

9  Patient states a chest x-ray was done this morning

10  due to left-side lung pain in the upper back.  Denies

11  pain at this time.  Vital signs stable.  Patient

12  extremely short of breath during conversation.

13  Oxygen at two liters by nasal cannula, 100 percent of

14  the day.  Oxygen saturation 94 percent on oxygen and

15  87 percent on room air.  Dependent in four of six

16  activities of daily living.  Ambulates with a

17  Rollator walker.  Denies other issues.

18  Q.   What, if anything, did the facts you've

19  highlighted in the documents created after the time

20  of Ms. Birdie's admission tell you about her overall

21  picture while she was receiving hospice services?

22  A.   These pictures -- these documents demonstrate

23  someone who continues to have shortness of breath at

24  rest and to be oxygen dependent and she remains

25  terminally ill.

1    Q.   In reaching your opinions with regard to

2    Ms. Birdie C., did you rely only on the documents

3    we've looked at here in the courtroom?

4    A.   No, I reviewed the entire medical record.

5    Q.   Was the entire medical record overall consistent

6    with your opinion?

7    A.   Yes, it was.

8           MS. GUNASEKERA:  Your Honor, objection, lack

9    of foundation.  May we approach?

10          THE COURT:  All right.

11                    (SIDEBAR)

12          MS. GUNASEKERA:  Your Honor, Dr. Cooney once

13   again offered an opinion at the outset about

14   Ms. Birdie's disease progression was slow, moving

15   more slowly, as a reason or justification for why

16   Ms. Birdie was discharged at that time, and there was

17   no foundation laid either in her opinion or the

18   medical records that there was any change in her

19   condition.  If anything, her condition remained the

20   same.

21          So her testimony trying to explain the

22   discharge justification or the reason for the

23   discharge slowly progressing, there hasn't been a

24   foundation laid for that opinion neither in the

25   records or her testimony.

1           So consistent with Dr. Liao being unable to

2    explain the reason for a patient's discharge is going

3    beyond the record.  She's going beyond her expert

4    report.  She's going beyond her opinions and offering

5    an opinion that is inconsistent, frankly, with what

6    the medical records reflect about Ms. Birdie's

7    medical condition.

8           MR. LEMBKE:  Your Honor, what Ms. Gunasekera

9    just said is not true.  Dr. Cooney stated in her

10   report because her disease was slowly progressing,

11   Ms. C. was discharged from hospice on this date.  And

12   she said in her initial report, looking over my

13   notes, I see that the disease was slowly progressing.

14          Now, in going through the medical records,

15   you see things showing up that weren't there before.

16   So I really don't understand the basis of the

17   foundation objection.

18          MS. GUNASEKERA:  Your Honor, we disagree.

19   There hasn't been any foundation laid, either the

20   records that were shown or the testimony offered,

21   that the patient's disease was slowly progressing and

22   a justification for the discharge.  And consistent

23   with Dr. Liao not being allowed to offer any

24   testimony about why AseraCare discharged a patient,

25   Dr. Cooney's testimony should be struck for that

1   reason, lack of foundation, inconsistency with the

2   medical records that were shown to the jury,

3   misleading and inconsistent with what Dr. Liao was

4   allowed to offer an opinion on.

5            THE COURT:  Okay.  Dr. Liao was not allowed

6   to offer an opinion as to what AseraCare was

7   thinking, why AseraCare did things because he

8   wouldn't have knowledge of why AseraCare did things.

9   She's saying, based on her review and her opinion,

10  why a patient was eligible for discharge.

11           MS. GUNASEKERA:  And, respectfully, Your

12  Honor, Dr. Liao was not able to offer an opinion as

13  to why he believed the discharge was appropriate or

14  the reasons or the justifications for the discharge,

15  not why AseraCare discharged the patient, but why in

16  his opinion the patient should have been discharged.

17           MR. LEMBKE:  Your Honor, I think the Court

18  is correct about the distinction.

19           THE COURT:  Okay.  Objection overruled.

20              (Open court.  Jury present.)

21  Q.  (By Mr. Lembke)  Dr. Cooney, have you had

22  occasion to review the medical records of

23  Ms. Patricia F.?

24  A.  Yes.  I've reviewed the medical records for

25  Ms. Patricia F.

1          MR. LEMBKE:  Your Honor, Ms. Patricia F. can

2    be found in the juror notebook at Tab 98.  Her entire

3    medical record has been pre-admitted as Defense

4    Exhibit 532, with excerpts of the medical record of

5    Ms. Patricia F. having been pre-admitted as Defense

6    Exhibit 532, A, 532-B, 532-C and 532-D.

7    Q.   How old was Ms. Patricia F. at the time of her

8    admission to hospice?

9    A.   Ms. Patricia F. was 71 years old.

10   Q.   When was she admitted?

11   A.   June 1st, 2010.

12   Q.   What was the last date on which she was provided

13   hospice services?

14   A.   July 25th, 2011.

15   Q.   Have you formed an opinion as to whether

16   Ms. Patricia D., at the time of her admission to

17   hospice, had a terminal prognosis?

18   A.   Yes.  At the time of her admission to hospice,

19   Ms. Patricia F. was terminally ill with a prognosis

20   of six months or less.

21   Q.   Why did you reach that opinion?

22   A.   Ms. Patricia had pulmonary fibrosis, which is a

23   scarring within the lung that makes it hard for the

24   oxygen to be transported from the lung into the

25   bloodstream.

1    She had had two hospitalizations over three

2  months just before her admission, one in March and

3  one in May of 2010.

4    She was dependent on oxygen and she was

5  dependent on steroids.  At rest, her heart rate was

6  rapid.  Her breathing rate was rapid and she didn't

7  always take her medications or use her oxygen in the

8  way that she was instructed.

9    She lived at home.  And all these factors

10  contributed to her terminal status at the time of

11  admission.

12  Q.  Have you formed an opinion as to whether

13  Ms. Patricia F., throughout the time she was

14  receiving hospice services, had a terminal prognosis?

15  A.  Yes.  Throughout the time that Ms. Patricia

16  received hospice services, she remained terminally

17  ill.

18  Q.  Why did you reach that opinion?

19  A.  She became more short of breath.  It became more

20  difficult for her to leave the home.  Her resting

21  pulse remained high, a measure of how hard her heart

22  was working.  She was short of breath with

23  conversation.  She had to stop after one or two

24  sentences to catch her breath.

25    She had to have more help with personal

1    care.  She's living at home.  She became unable even

2    to do simple housework.  Eventually, she became very

3    socially isolated, didn't leave her home and was

4    increasingly unable to care for herself.

5           The hospice felt she needed nursing facility

6    care because of her worsening functional abilities,

7    but she wanted to stay in her own home.

8           So, over time, Ms. Patricia got worse, never

9    better and remained terminally ill.

10   Q.  What was the reason for ending her hospice

11   services?

12   A.  She was discharged with an extended prognosis on

13   July 25th, 2011.

14   Q.  Let me direct your attention to what's been

15   pre-admitted as Defense Exhibit 532-A and, in

16   particular, to Page 5578.

17          Up in the upper part, what is the date of

18   this document?

19   A.  This is the history and physical done at the

20   time of her hospital admission on May 14, 2010.

21   Q.  And what is stated under history of present

22   illness?

23   A.  The patient is a pleasant 71 year old white

24   female that carries a diagnosis of pulmonary

25   fibrosis.  I had seen her in the office two days ago

1  in followup from her pulmonology appointment.  She

2  had been doing well at that time.  She had been on

3  six liters of oxygen at rest, eight liters of oxygen

4  with exertion.

5          She is also on Prednisone, ten milligrams

6  daily.  She has been non-compliant with her DuoMeds,

7  inhalers, and really non-compliant with her oxygen at

8  times, which exacerbates her symptoms.

9          She states that today is much worse because

10  she is having increased diarrhea, had multiple stools

11  this morning.  She feels like she has lost almost

12  seven pounds in the last couple of days.

13          She is complaining of being very weak and

14  having more pain today.  She also notes that she has

15  had increasing cough and more shortness of breath.

16          In addition, she had some trouble with

17  reflux and has a history of gastric ulcer and gerd.

18  She is supposed to be on Nexium twice per day, but

19  decreased that, secondary to its expense recently,

20  and has been taking this once a day.

21          She continues to have some difficulty with

22  swallowing and today tells me she sometimes gets food

23  stuck and has to vomit as she cannot get things to go

24  down.

25          She has a history of esophageal dilation in

1    the past.  She says she had a ring placed, but it was

2    removed because it had migrated into her small

3    intestine.

4           Since then, she had not had any esophageal

5    dilations and continues to have problems.

6           In regards to her diarrhea, this also has

7    been an ongoing problem for her.  She denies any

8    blood in the stools or black stools, but has loose

9    watery stools.  Lomotil generally takes care of this

10   but has not done so today.

11          In the past, she has refused EGD,

12   esophagogastroduodenoscopy.  Colonoscopy and lap work

13   for further evaluation for this.  The patient also

14   has some abdominal pain diffusely.

15   Q.  Before you move on, what is the significance of

16   six liters -- significance, if any, of six liters of

17   oxygen at rest and eight liters of oxygen with

18   exertion?

19   A.  Those are very high flow rates.  It's requiring

20   a lot of oxygen for her to get enough oxygen into her

21   system.

22   Q.  All right.  Would you go back down and read the

23   next paragraph of the history of present illness?

24   A.  The patient also complains of increased anxiety

25   and back pain.  She is followed by pain management,

by Dr. Edwards.  He has been giving her MS Contin and

some Vicodin for her pain.

Interestingly, after I leave the room of the

patient, the patient's niece does tell me that the

patient has been taking her pain medications more

frequently than she is supposed to and, by her

report, thought the patient might be out of her pain

medications about ten days earlier.

This corresponds roughly with today's date

and shed some interesting light on the situation --

her sense of urgency for admission today.

Q.  Would you -- let's go to the next page, which is

5579, and would you continue reading, please, the

history of present illness section.

A.  At any rate, the patient has not been able to

take care of herself while at home.  She has been

non-compliant with some treatments.

Home healthcare has been attempting to

follow with her but she oftentimes will not let them

into her apartment and refuses care.

In addition, she has been driving without

her oxygen and on her narcotic medications despite my

request for her not to do so, and also her niece's

request for her not to do so.

I had arranged for home healthcare to try to

1  set up hospice for her today, but because of her new

2  symptoms, she elected to be admitted instead of

3  having them visit her today.

4  Q.   Now let me direct your attention to the next

5  page which is 5580, the third page of this five-page

6  document.

7          What is indicated in the assessment and plan

8  section at the bottom half of the page?

9          Before we go there, under vital signs, what

10  is indicated with regard to her pulse?

11  A.   Her pulse is 101.

12  Q.   What about respirations?

13  A.   22, slightly elevated.

14          MS. GUNASEKERA:  If the witness could read

15  into the record what's listed by general.

16  Q.   (By Mr. Lembke)  Before we get there, what is

17  listed for oxygen saturation rate?

18  A.   90 percent on six liters of oxygen.

19  Q.   What is stated next to general?

20  A.   In general, the patient was alert and appeared

21  to be in no acute distress and in no respiratory

22  distress.

23  Q.   Then down under assessment and plan, what is

24  stated?

25  A.   This is a 71 year old white female with several

1   medical issues and really not doing well at home.

2          Number one, pulmonary fibrosis.  The patient

3   states that her prognosis by pulmonology was anywhere

4   from two to six months.  This likely would qualify

5   her for some hospice care.

6          We will continue her oxygen and steroids and

7   also have respiratory therapy do DuoMeds with her

8   this evening.  Will also check a chest x-ray.

9          In terms of her exam today, this was overall

10  one of the better days in terms of her pulmonary

11  fibrosis.

12         Number two, nausea and dysphasia.  I talked

13  with the patient about having the gastroenterologist

14  visit with her.  I suspect that she may need an EGD

15  for her dysphasia and possible dilation.  This would

16  be for comfort mainly.  Patient agrees.  Will also

17  increase her Nexium again.

18         Number three, mild thrush.  Will continue

19  her -- that's a candida infection with people who are

20  on steroids often get.  Will continue her magic

21  mouthwash and Mycelex.

22         Chronic pain, suspect that maybe she has

23  some seeking behavior based on the --

24  Q.  And going to 5581, would you please continue?

25  A.  Information from the nurse as above.  Will

5380

1  continue her pain medications only as prescribed by

2  Dr. Edwards at this point and no additional pain

3  medication.  She can continue her Ativan for her

4  anxiety.

5        Number five, diarrhea.  Will check an

6  abdominal x-ray and labs and continue on Lomotil.

7  This seems to have improved since noon today.

8        Number six, will also have social work work

9  on a better plan for home for her.  She may need

10  hospice care.  I do believe she qualifies.  I do not

11  think she is able to care for herself at home at this

12  point and has been refusing care.  I think placement

13  would be her best option, as well as someone to

14  manage her medications with her to make sure that she

15  is not a harm to herself.  I do not think that she

16  can drive at this point either and I have told her

17  so.

18        Number seven, the patient does have a

19  do-not-resuscitate order and advanced directives.

20  She has refused pulmonary biopsy and many procedures

21  in the past.  And I have been happy to comply with

22  that based on her request.

23        Will continue to monitor at this point and

24  hopefully have a better home situation for her at the

25  time of discharge.

1  Q.   And on the next page, 5582, who does it indicate

2  signed this note?

3  A.   Rebecca Lancaster, MD.

4  Q.   Now let me direct your attention to Page 5789 in

5  Defense Exhibit 532-A.

6         What is the date of this document in the

7  upper right?

8  A.   June 1st, 2010.

9  Q.   What is this document?

10 A.   This is the initial and comprehensive nursing

11 assessment.

12 Q.   What is indicated as Ms. Patricia's age at this

13 point?

14 A.   71.

15 Q.   And what is indicated as the diagnosis?

16 A.   Respiratory pulmonary fibrosis.

17 Q.   What is stated as to the illness trajectory and

18 reason for hospice admission?

19 A.   Recent hospitalization with oxygen saturations

20 in the 60s requiring nine liters of oxygen to get to

21 92 percent.  Placed on continuous oxygen, antibiotics

22 and steroids.

23        Findings of pulmonary fibrosis with

24 scattered breast calcifications.

25 Q.   What is stated under subjective data?

1   A.   Been extremely short of breath, had a cough and

2   suffers from chronic back pain.  She has diarrhea and

3   suffers from weight loss.

4   Q.   What is stated under objective data?

5   A.   Patient is able to get up more around the

6   apartment independently with oxygen by nasal cannula

7   on six liters while resting.

8           Patient presents walking, ambulation,

9   walking with a trunk and rib cage that is rounded and

10  hunched over a bit.  She scoots her feet and does not

11  pick them up.

12  Q.   Let me direct your attention --

13          MS. GUNASEKERA:  For completeness, could we

14  have the witness read what the PPS is?

15  Q.   (By Mr. Lembke)  What is indicated as

16  Ms. Patricia's PPS?

17  A.   Her PPS is 60.

18  Q.   Now let me direct your attention to the next

19  page, which is the second page of this eight-page

20  document.

21          In the PCG family section, what is indicated

22  with regard to pets?

23  A.   Her cousin gave her dog away, extremely sad.

24  Q.   In the vital sign section, what is indicated

25  with regard to her pulse?

5383

1   A.   Her pulse is 105.

2   Q.   What about her respiration rate?

3   A.   Her respiratory rate at rest is 30.

4   Q.   What, if anything, did the facts you've

5   highlighted in the documents from before and at the

6   time of Ms. Patricia F.'s hospice admission tell you

7   about her overall picture at that point?

8   A.   These documents describe a woman with end stage

9   lung disease caused by pulmonary fibrosis, dependent

10  on high flow rates of oxygen and with multiple signs

11  and symptoms of end stage disease.

12          She lives at home.  It's not a safe

13  situation for her and that contributes to her poor

14  prognosis at the time of admission.  She's terminally

15  ill.

16  Q.   Let me show you what -- or document 5546 in

17  Defense Exhibit 532-A.

18          What is the date of this document?

19  A.   December 29, 2010.

20  Q.   What is this document?

21  A.   This is the attestation of face-to-face

22  encounter for patients entering their third and

23  greater benefit periods.

24  Q.   At Page 5547, what is indicated in the HX

25  section?

5384

1    A.   HX, hypertension, anxiety, chronic back pain are

2    typed in and then handwritten 73 year old woman with

3    primary pulmonary fibrosis end stage who is oxygen

4    and Prednisone dependent.   Symptoms at rest.

5    Worsening endurance with independent activities of

6    daily living and increased assistance required.

7    Q.   And on the next page, which is 5548, what is

8    indicated next to cardiac in the comment section in

9    the bottom half of the page?

10   A.   Gait slow and unsteady after about ten feet of

11   ambulation, after one to two sentences talking,

12   becomes winded and must stop and catch her breath.

13   Respiratory rate 40 to 28.

14   Q.   And then what is indicated next to neuro?

15   A.   No edema, tachycardia.

16   Q.   And is tachycardia the fast or the slow heart

17   rate?

18   A.   That's the fast heart rate.

19   Q.   And then on Page 5549, which is the third page

20   of this particular document, what is stated next to

21   physical aspects of care?

22   A.   Refuses extra care, overly concerned when

23   medications are needed.   Volunteer shops for the

24   patient, increased weakness, gets tired easily.

25   Q.   I need to go back to 5548, which is the previous

1   page.  What is indicated at the very bottom next to

2   prognosis?

3   A.   Expected life expectancy, less than six month

4   prognosis.

5   Q.   Let me show you Page 5675 in Defendant's Exhibit

6   532-A.

7          In the upper right, what is the date of this

8   document?

9   A.   February 3rd, 2011.

10   Q.   What is this document?

11   A.   This is an IDG conference, interdisciplinary

12   group conference, and review and update of the plan

13   of care.

14   Q.   And in the summary section, what has been

15   written there?

16   A.   Extremely short of breath with exertion as well

17   as with no movement.  Respirations increase to 38 per

18   minute, oxygen at eight liters.  Lives alone, now has

19   a home health aide and a volunteer.

20   Q.   Now let me direct you to Defense Exhibit 532-D,

21   which has been previously admitted, and Page 5551.

22          What is the date of this exhibit?

23   A.   March 25th, 2011.

24   Q.   What is this document?

25   A.   This is the attestation of a face-to-face

1   encounter for patients entering their third and

2   greater benefit period.

3   Q.   Now let me direct your attention to Page 5552

4   and at the bottom, what is written in the comments

5   section beginning with lives alone?

6   A.   Lives alone in apartment.  Has hospice nursing

7   and bath aides visiting her.  Very much wants to be

8   as independent as possible.  Stooped over with

9   ambulation.  Occasionally incontinence.  Wears a

10  pullup.  Speech is clear.  Alert and oriented times

11  three.  Balance unsteady.  Has to sleep in a

12  recliner.  Shortness of breath all the time now.

13  Dyspnea on exertion all the time now.

14          Able to eat and drink.  Weight loss unknown,

15  doesn't want weights to be done.  States probably a

16  weight gain.

17  Q.   Let me direct your attention to Page 5553.  In

18  the upper half of the page, what is written next to

19  shortness of breath?

20  A.   In this section (indicating)?

21  Q.   Yes.

22  A.   Yes.

23  Q.   And what is written next to fatigue?

24  A.   Yes.

25  Q.   And at the bottom of the page, what is written

5387

1   next to prognosis?

2   A.   Continue with hospice services and plan of care.

3   Life expectancy less than six months.

4   Q.   Then on the next page, Page 5554, what is

5   written under the addendum section?

6   A.   Addendum, patient's independence is decreasing.

7   Less activities and increased assistance required.

8   Less dog care.  Wants to find a new owner.  Less

9   independent activities of daily living and activities

10  of daily living.  Falling -- talking of time to go to

11  the nursing home.

12       Increased pain meds because of increased

13  shortness of breath from her pulmonary fibrosis.

14  Q.   What, if anything, did the facts you've

15  highlighted in the documents created after --

16       MS. GUNASEKERA:  We have an objection, lack

17  of foundation.  May we approach?

18       THE COURT:  I think we should let him finish

19  the question first.  Okay.

20  Q.   (By Mr. Lembke)  What, if anything, did the

21  facts you've highlighted in the documents created

22  after Ms. Patricia F.'s admission to hospice tell you

23  about her overall picture while she was receiving

24  hospice services?

25  A.   This is a woman with severe end stage pulmonary

1    disease who continues to worsen over time, but who

2    very much wants to remain in her home, do things her

3    way.  She remains terminally ill.

4    Q.   In reaching your opinions with regard to

5    Ms. Patricia, did you rely only on the medical

6    records that we looked at here in the courtroom?

7    A.   No, I reviewed the entire medical record.

8    Q.   Was the entire medical record overall consistent

9    with your opinion?

10   A.   Yes, it was.

11           MS. GUNASEKERA:  Your Honor, if we could

12   renew our objection.

13           THE COURT:  All right.

14                   (SIDEBAR)

15           MS. GUNASEKERA:  Your Honor, Dr. Cooney

16   testified based on document Bates stamped 5552 dated

17   March 25th, 2011, that Ms. Patricia had dyspnea on

18   exertion.  All the time now is the specific language

19   that she testified to, at which time Mr. Lembke wrote

20   on the demonstrative, shortness of breath at all

21   times, which is inconsistent and frankly misleading.

22           Dyspnea on exertion is very different than

23   having shortness of breath all the time, on exertion

24   and at rest.  And so his notation of SOB all the time

25   infers that she's having shortness of breath all the

```
 1   time, upon exertion and at rest, when the record
 2   specifically states dyspnea on exertion all the time
 3   now.
 4           And so the demonstrative is inconsistent
 5   with the record and the testimony that Dr. Cooney
 6   offered.
 7           MR. LEMBKE:  I will fix that.
 8           THE COURT:  Okay.
 9           MR. LEMBKE:  I will just put what she said.
10           MS. GUNASEKERA:  We would ask that that be
11   corrected for the jury, that they understand why he's
12   fixing it.
13           THE COURT:  Okay.
14           MS. GUNASEKERA:  Thank you, Your Honor.
15           THE COURT:  Do you want to ask her --
16           MR. LEMBKE:  I'm going to bring the document
17   back up.
18           MS. GUNASEKERA:  Thank you, Your Honor.
19           (Open court.  Jury present.)
20   Q.  (By Mr. Lembke)  I want to go back because I
21   misheard something you said to document 5552 at the
22   bottom.
23           Do you see the line that begins, has to
24   sleep in recliner?
25   A.   Yes.
```

1   Q.   All right.  What is stated on that entire line?

2   A.   Has to sleep in recliner, DOE, dyspnea on

3   exertion, all the time now.

4   Q.   All right.  I'm going to mark through what I had

5   written.  And then you said it's shortness of breath

6   on exertion at all times?

7   A.   Yes.

8   Q.   Then I want to go to the next page, which we

9   looked at, which is 5553, and it indicates what as

10  whether she has shortness of breath?

11  A.   Yes.

12  Q.   Okay.

13       MR. LEMBKE:  Your Honor, we can go ahead or

14  if you want to stop for lunch, this is a good

15  stopping point.

16       THE COURT:  If you're through with that

17  patient, we're going to stop for lunch.  Ladies and

18  gentlemen, we're going to take a little shorter break

19  than usual today.  We're going to come back at 12:45.

20       During this break, as during all others, no

21  conversation about the case.  Thank you.

22                 (Jury excused).

23       MR. LEMBKE:  Your Honor, there's one issue

24  we need to bring up either now or at the end of our

25  lunch break about one of the patients to be covered

1  after lunch.  Whatever the Court prefers.

2        THE COURT:  Let's go ahead and take it up

3  now.

4                    (SIDEBAR)

5        MR. LEMBKE:  Your Honor, this pertains to

6  patient Arthur W.  And Arthur W. had two hospice

7  admissions.  And when -- and we approached the bench

8  and we had some conversation when it came up about

9  whether there was potential confusion to the jury as

10 to the earlier hospice admission which was from

11 considerably earlier which was not at issue.

12        And then at Page 3042 at a bench

13 conversation --

14        THE COURT:  And for the record --

15        MR. LEMBKE:  What's the date of this?  Do

16 you know?

17        MS. GUNASEKERA:  September 1st.

18        MR. LEMBKE:  So, at 3042, we were talking

19 and at Line 20, the Court said, at Line 9, this is

20 where the Court was expressing concern because he had

21 mentioned the December 2005 admission date and there

22 was concern on the Court's part that the jury would

23 be confused about the time period at issue.

24        Then the Court said, if there's for some

25 reason that he wants to go back and refer to

1    something prior, I will let him do that.  But that

2    will be actually totally clear to this jury that the

3    time frame that's at issue is November '07 through

4    three of '09 and not December '05.

5          And then the Court at Line 10 on 3043 said,

6    I will let you talk about it but you're going to

7    start with the time frame that's at issue so the jury

8    doesn't have any confusion.  If any of your questions

9    start confusing them about the 2005 admission being

10   in any way in play for their consideration of false

11   claim, I'm going to stop it.

12         And then we had some further discussion at

13   the bottom of Page 3043, and going over

14   Ms. Gunasekera said, it's relevant.  I was talking

15   about an extended prognosis discharge, which

16   Ms. Gunasekera said it was relevant insofar as that

17   means prostate cancer was not terminal and she went

18   on -- and then at Page 3047 at the bottom, the Court

19   said, Line 24, no, I don't mind going back and making

20   reference to it.  But I want it absolutely

21   established up front the time frame that's at issue,

22   and then the Court goes on and makes clear that there

23   will not be, then, that the second question going

24   back to the other one, you're going to establish the

25   time frame that he was ineligible, the Court says,

1    what he was admitted for on that diagnosis was not

2    prostate cancer, and then at Line 12, the Court again

3    said, and then if there's something from that prior

4    discharge that he needs to reference, I will let you

5    do it if it is clear what dates are at issue.

6           So that's sort of the backdrop.  What we

7    want to do is when we start looking at documents,

8    with regard to Mr. Arthur W., we will talk about the

9    hospice period at issue.  But we would like to go

10   back and at document 2570, which was the referral

11   intake from his initial hospice stay, it refers to

12   the fact that his prostate cancer had spread into his

13   bones.  And we just want to bring out that he had

14   metastatic prostate cancer because Dr. Cooney's

15   opinion refers to him having prostate cancer.  So

16   that's all we want to use it with.  And we think

17   that's consistent with what the Court said about use

18   of information from a prior hospice visit if it's

19   relevant to the opinion being offered.

20          THE COURT:  Have y'all discussed this?

21          MR. LEMBKE:  Yes.  I think they have a

22   problem.

23          MS. GUNASEKERA:  We have several concerns,

24   Your Honor.  First of all, the document that they're

25   going to use is dated December 2005, and it's a

5394

1    referral intake supporting the patient's hospice

2    admission, that first hospice admission.  And they're

3    looking to elicit that testimony that's specific to

4    the first hospice admission about why the prostate

5    cancer was terminal.  So it is, in fact, the whole

6    document is about whether or not the patient should

7    have been admitted to hospice with prostate cancer as

8    a terminal diagnosis, and they are looking to elicit

9    that fact.

10             THE COURT:  When the fact was metastatic --

11             MS. GUNASEKERA:  For the first admission,

12   Your Honor, but in support of Dr. Cooney's opinion

13   about the second admission, so we would contend, Your

14   Honor, that this is exactly what Your Honor was

15   trying to avoid when Your Honor was limiting

16   Dr. Liao's testimony about the same patient and the

17   same manner.

18             THE COURT:  I didn't preclude him from

19   testifying about anything involving medical records

20   and medical diagnosis in that first hospice, but only

21   that you had to first establish and make clear that

22   the time frame that was at issue in terms of whether

23   he was eligible was this subsequent hospice

24   admission.

25             MS. GUNASEKERA:  Understood, Your Honor.

1   But in further discussion, Your Honor even asked on

2   Page 3049 of the trial transcript, why do we even

3   need to get into the prostate cancer, if it's not

4   part of the reason why he was admitted the second

5   time.

6           So, Your Honor was getting to this very

7   issue of the prostate cancer was not relevant and, in

8   fact, the document that counsel wants to show is in

9   support of the first admission that the patient was

10  discharged from, with an extended prognosis.

11          So, it's not only irrelevant outside the

12  time frame but it's also misleading to the jury,

13  because this was in support of the first admission,

14  that the narrative that he wants Dr. Cooney to

15  testify is specific to supporting the first admission

16  but he's looking to introduce it to support

17  Dr. Cooney's opinion about the second admission.

18          But it's irrelevant, it's misleading and

19  it's not the time frame that's at issue.

20          THE COURT:  You are citing to a question

21  that I asked which was why do we need to get into the

22  prostate cancer, if it's not part of the reason why

23  he was admitted the second time.  And the answer was,

24  because it appears in the record.

25          MS. GUNASEKERA:  And so Dr. Liao was wanting

1    to discuss the patient's prostate cancer because he

2    wanted to testify that it was not a comorbid or

3    secondary condition, because the patient was

4    discharged from AseraCare and AseraCare made the

5    decision or made the observation that the prostate

6    cancer is no longer terminal, and so in support of

7    Dr. Liao's opinion about the second admission, he

8    wanted to offer -- he wanted to offer his testimony

9    that even AseraCare had discharged the patient with

10   prostate cancer because the prostate cancer was no

11   longer terminal.

12          So, thus, it wasn't a comorbid condition, it

13   wasn't a reason to justify the second hospice

14   admission and there was actually a specific record,

15   Your Honor, that we were talking about at the time

16   the objection was made where prostate cancer was

17   listed as the comorbid condition for the second

18   admission.

19          So that's where an objection was made by

20   Mr. Lembke that this is outside of the time period at

21   issue in this case.

22          Further, as we continued to the bench

23   conference, we ended up doing a proffer with Dr. Liao

24   because he wanted to explain why he needed -- why he

25   felt that that was an important fact to testify to,

1    and we ended up in its place where he actually didn't

2    testify about the prostate cancer from the first

3    admission after further conversation.

4         THE COURT:  Y'all have the advantage of

5    having read this transcript.  I haven't.  Let me read

6    it and we will take it up as soon as I can get back

7    before 12:45.  But I've got -- I have a half a dozen

8    judges that have called me and I haven't returned

9    their calls on.  And I will just have to see how

10   quickly I can get back to it.

11        MS. GUNASEKERA:  Thank you, Your Honor.

12        THE COURT:  Thanks for having this

13   transcript for me to review.

14                   (Lunch recess.)

15                    (SIDEBAR)

16        THE COURT:  I just want to say I haven't had

17   time to completely review all that I want to on the

18   issue, but I understand he's not going to be the

19   first going out.

20        MR. LEMBKE:  He would be fourth, which is

21   likely the last one for today, but I can make him the

22   first one tomorrow if the Court would rather have the

23   occasion tonight to look at it.

24        THE COURT:  Let's see how far we get.

25        MR. LEMBKE:  Okay.

```
 1              THE COURT:  And I will try to look at a
 2   couple of things that I want to, if y'all will just
 3   keep moving things nicely along, I don't have to pay
 4   110 percent attention.
 5              MR. LEMBKE:  Okay.
 6                  (Open court.  Jury present.)
 7              THE COURT:  You may proceed.
 8   Q.  (By Mr. Lembke)  Dr. Cooney, have you had the
 9   occasion to review the medical records of Ms. Marion
10   G.?
11   A.   Yes, I've reviewed the medical records on
12   Ms. Marion G.
13              MR. LEMBKE:  Your Honor, Ms. Marion G. can
14   be found at Tab 79 in the juror notebook.  The entire
15   medical records for Ms. Mary G. have been
16   pre-admitted Defense Exhibit 536, with excerpts from
17   her medical records having been pre-admitted as
18   Defense Exhibits 536-A and 536-B.
19   Q.   How old was Ms. Marion G. at the time of her
20   admission to hospice?
21   A.   She was 88 years old.
22   Q.   What was the date on which she was admitted?
23   A.   February 6th, 2007.
24   Q.   And what was the last date on which Ms. Marion
25   G. was provided hospice services?
```

```
 1  A.   March 29, 2008.
 2  Q.   Have you formed an opinion as to whether
 3  Ms. Marion G., at the time of her admission to
 4  hospice, had a terminal prognosis?
 5  A.   Yes.  At the time of her hospice admission,
 6  Ms. Marion G. was terminally ill.
 7  Q.   Why did you reach that opinion?
 8  A.   Ms. Marion G. had had both weight loss and a
 9  decline of function at the time of her hospice
10  admission.  Her physicians had repeatedly evaluated
11  her attempting to determine what was the cause of her
12  weight loss.
13          She had been seen by the nutritionist,
14  medications, dietary changes, but she kept losing
15  weight.
16          Before her hospice, she had been doing --
17  she had been doing pretty well, living at home until
18  November 2006, and then she took a fall in her
19  kitchen, a bad fall.  She had multiple facial
20  fractures.  She had more fracture of one of the
21  vertebral bodies and it was thought that she might
22  have had a heart attack as part of this.
23          She was discharged to a nursing facility for
24  rehabilitation and at that time she weighed 78
25  pounds.  This is all before she was admitted to
```

1   hospice.  This is the three months leading up.

2          In December, she was readmitted to the

3   hospital with bilateral pneumonia.  And by late

4   December, her weight was then 72 pounds, despite the

5   supplements.  And she was eating only 25 to 75

6   percent of her meals.

7          She was on Mirtazapine, Remeron, the

8   medication that helps both depression and appetite.

9   They adjusted her pain meds thinking that perhaps her

10  pain, after her fall, the side effects of the

11  medicine was affecting her appetite.

12          But at the time of hospice admission, her

13  weight had fallen to 67 pounds.  Her functional

14  status had also declined.  She was spending more of

15  her time in bed and was often lethargic.

16          So, at the time of her hospice admission,

17  she was terminally ill with weight loss and

18  functional decline.

19  Q.   Have you formed an opinion as to whether

20  Ms. Marion G., throughout the time she was receiving

21  hospice services, had a terminal prognosis?

22  A.   Yes.  Throughout the time that Ms. Marion G.

23  received hospice care, she remained terminally ill.

24  Q.   Why did you reach that opinion?

25  A.   She kept losing weight, you know.  Her

5401

1   medications were adjusted.  She kept losing weight.

2   She got down to -- the lowest weight that I have

3   noted is about 65 pounds.  She was spending almost

4   all her time in bed.  She developed pressure ulcers

5   that wouldn't heal, bedsores.

6          And then she started getting these little

7   dark-colored growths in her skin that started around

8   her breast, and then spread over her chest, and I

9   think shoulder area as well.  She had had a history

10  of malignant melanoma in the past.  It was never

11  defined.  It was just always noted in her past

12  medical history that she had a history of melanoma,

13  but with these multiple melanotic skin lesions that

14  had erupted and were spreading all over, the

15  diagnosis of recurrent malignant melanoma was made.

16         At that point her condition rapidly

17  declined.  Her pain medicines were titrated for

18  comfort.

19         And she died in the nursing facility on

20  March 29, 2008 with the hospice nurse at her bedside.

21  Q.   Dr. Cooney, let me direct your attention to

22  pre-admitted Defense Exhibit 536-B and Page 3571.

23         What is the date of this document?

24  A.   December 1st, 2006.

25  Q.   What is this document?

A.    This is a history and physical for

hospitalization admission.

Q.    And what is stated as the chief complaint?

A.    Bilateral pneumonia.

Q.    What is stated under the history of present

illness?

A.    Ms. G. is a very pleasant 87 year old female.

She was recently admitted after a fall with facial

trauma.  She was discharged to Beverly Manor.

       She has done reasonably well there.  She

began having pleuritic chest pain today, substernal

to the right.

       She is having a hard time telling me this

story now.  She's apparently not been having the pain

after the fall -- has not been having the pain after

the fall.  It was worse with deep breaths, worse with

moving.

       She felt a little bit short of breath.  No

fever, chills or night sweats, no nausea or vomiting.

       Given the pleuritic nature of her chest

pain, CT angiogram was done which showed bilateral

pneumonia.

Q.    What is indicated as to her past medical

history?

A.    Melanoma, vertebral fractures, gastroesophageal

1   reflux, limiting her ability to take Bisphosphonate,

2   pelvic fracture, osteoporosis, status post

3   appendectomy, status post cholecystectomy, recent

4   facial trauma with facial fractures.

5   Q.   Now let me direct your attention to Defense

6   Exhibit 536-A, which has been pre-admitted, and Page

7   3224.

8          In the lower right, what is the date of this

9   document?

10  A.   February 6th, 2007, the date of her hospice

11  admission.

12  Q.   What is this document?

13  A.   This is a nursing assessment.

14  Q.   What is stated under history of illness?

15  A.   89 year old female admitted to hospice with a

16  diagnosis of adult failure to thrive.  Patient with

17  progressive weight loss and functional decline.

18          Current BMI 14.  PPS 40 percent.  Status

19  post falls and pneumonia requiring antibiotic

20  therapy, in January of '07.  Patient complaining of

21  severe fatigue.

22  Q.   What is stated by past medical history?

23  A.   Status post fall with facial fractures,

24  vertebral fractures, osteoporosis, gerd, melanoma,

25  pelvic fractures.

5404

1   Q.   Now let me direct your attention to the second

2   page of this five-page document which is at 3225.

3   And at the bottom under respiratory status, what is

4   stated first with regard to, in the left column,

5   shortness of breath?

6   A.   She's described as short of breath on exertion.

7   Q.   What is noted in the comment section to the

8   respiratory status?

9   A.   It states limited capacity due to severe

10  kyphosis and kyphosis is that forward bending of the

11  spine.

12  Q.   All right.  Now let me show you what's been

13  marked or, excuse me, what is 3226, which is the

14  third page of this five-page document.

15          What is stated with regard to the comment

16  section next to sleep/rest at the top?

17  A.   Awake at night, walking with a rolling walker in

18  the corridors according to staff documentation.

19  Q.   What is her weight indicated to be?

20  A.   67 pounds.

21  Q.   And the BMI?

22  A.   14.

23  Q.   And what is indicated in the comments next to

24  the genito/urinary section?

25  A.   History of stress incontinence and urinary tract

1  infections, uses undergarment pads.

2  Q.   Then let me direct your attention to Page 3228,

3  which is the fifth page of this five-page document.

4        What is indicated at the top with regard to

5  her activities of daily living?

6  A.   She's noted as requiring assistance with all of

7  her activities of daily living.

8  Q.   And what is indicated in the summary section?

9  A.   Alteration in comfort related to pain.

10  Alteration in mental status related to lethargy.

11  Alteration in nutritional status.  Alteration in

12  function.  Potential for injury related to her

13  entries of falls.

14  Q.   What, if anything, did the facts you've

15  highlighted in this document and in the document

16  leading up to her admission tell you about Ms. Marion

17  G.'s overall picture at the time of her admission to

18  hospice?

19  A.   These describe a woman who has had a major

20  decline in function, first from trauma, then from

21  pneumonia, and has been unable to improve her

22  nutritional status and is terminally ill at the time

23  of admission.

24  Q.   Now let me direct your attention to Page 3210,

25  in Defense Exhibit 536-A.  Brad, would you pull that

5406

1   up for me, it's PDF 50, please.

2           What is the date of this document?

3   A.   July 25th, 2007.

4   Q.   What is this document?

5   A.   This is a nursing assessment.

6   Q.   Let me direct your attention to Page 3212, which

7   is the third page of this five-page document.

8           What is indicated in the comment section

9   with regard to weight?

10  A.   Weights are ranging 62 to 68 pounds.   BMI

11  remains less than 19.   Cachectic.

12  Q.   Let me direct your attention to Page 3194 in

13  Defense Exhibit 536-A.

14          What is the date of this document?

15  A.   January 31st, 2007.

16  Q.   I'm actually going to the next page.

17          What is the date shown at the bottom of that

18  page?

19  A.   January 31st, 2008.

20  Q.   The next page also has a date on it, what is the

21  date there?

22  A.   January 31st, 2008.

23  Q.   All right.   Going back to the first page of this

24  document, what is this document?

25  A.   This is a reassessment for ongoing eligibility.

1   Q.   In the nutritional status section, what boxes

2   are checked in the first two columns?

3   A.   Anorexia, dehydration, dry mouth, temporal

4   wasting and cachexia.

5   Q.   What is indicated as to her weight?

6   A.   Her weight is 65 pounds.

7   Q.   What is the BMI?

8   A.   13.

9   Q.   And just below that, what is the comment with

10  regard to -- that's been written in next to patient

11  eats fewer than two meals per day, that question?

12  It's number one.

13  A.   She needs to be fed.

14  Q.   Now let me direct your attention to Page 3195,

15  which is the second page of this five-page document,

16  under the self care deficit/functional limitation

17  section in the first column, what is indicated in the

18  mobility column?

19  A.   She's bedbound 90 to 100 percent of the day and

20  sleeping 50 to 75 percent of the day.

21  Q.   What is indicated with regard to her dependence

22  for activities of daily living?

23  A.   She's dependent in all six activities of daily

24  living.

25  Q.   In the section below, what is indicated with

1    regard to any wounds?

2    A.   She's noted to have a stage two wound on her

3    left ankle, open with scabbing and some

4    serosanguineous drainage, one centimeter by one

5    centimeter and a stage two on her left buttock open

6    with a pink surface, small amount of drainage, two

7    centimeters by 1.5 centimeters.

8    Q.   Now let me direct your attention to Page 3198,

9    which is the fifth page of this five-page document.

10        What is stated in the summary section?

11   A.   Patient with anorexia, malignant melanoma, adult

12   failure to thrive.  More tumors evident.  Visible on

13   the left neck under the right arm and two on abdomen

14   in the upper right and left quadrants.

15        Resident continues to decline.  Ad lib

16   weight, 65.1 pounds, down three pounds from last

17   certification period.

18        Increased functional weakness with increased

19   pain on movement.  Managed well on current medication

20   regimen when medicated with Roxanol, 0.25 MLs, five

21   milligrams, under the tongue 30 minutes before any

22   activity, such as her morning care or et cetera.

23        Bowel regimen in place and effective for

24   patient on opioids.  Bedbound 90 to 100 percent.  Out

25   of bed for the hair dresser once a week.  Weakness

1   present on her left side.

2          Noted occasional edema of her legs and her

3   feet result of positioning in bed.  She's on MS

4   Contin, long-acting Morphine, 30 milligrams at

5   bedtime, which continues to be effective.

6          Remains a do not resuscitate, do not

7   intubate, do not hospitalize.  BMI 13.  PPS 30

8   percent.

9   Q.   Let me direct your attention now to Page 3344 of

10  Defendant's Exhibit 536-A.

11         What is the date of this document?  Down at

12  the bottom.

13  A.   March 29th, 2008.

14  Q.   What is this document?

15  A.   This is a nursing clinical note.

16  Q.   At the top, what is indicated as the respiration

17  rate?

18  A.   She's breathing 42 to 44 breaths per minute.

19  That's very rapid.

20  Q.   What is indicated with regard to skin?

21  A.   Mottling.

22  Q.   What is stated in the problem section?

23  A.   Resident's respirations 30 to 32 at 1:00 p.m.,

24  had received Roxanol, the liquid Morphine, ten

25  milligrams at 12:30 p.m., at 12:45 p.m. resident's

1 respirations increased to 42 to 44.  Color around the

2 face blue to red.  Struggling to breathe.  Medicated

3 with Roxanol with good effect.  Respirations

4 decreased to 20 to 22.  Color in the face changed.

5 The bluing diminished.

6          Respirations not strained and relaxes.  At

7 2:30 p.m., resident's respirations ceased, no pulse

8 or blood pressure, pupils fixed, no response to

9 verbal or tactile stimuli.  Doctor notified.  RN

10 pronouncement.  And notified son, John, daughters.

11 Spent time with her daughter -- with her daughter

12 grieving appropriately.  Funeral home notified.

13 Family spent 3:00 p.m. to 4:45 with the resident and

14 this hospice nurse.  Pronouncement completed.

15 Q.  What, if anything, did the facts you've

16 highlighted in the documents created after the time

17 of Ms. Marion G.'s admission to hospice tell you

18 about her overall picture while she was receiving

19 hospice services?

20 A.  These documents support her ongoing terminal

21 condition, ultimately with the diagnosis -- clinical

22 diagnosis of malignant melanoma until the time of her

23 death.

24 Q.  In reaching your opinions with regard to

25 Ms. Marion G., did you rely only on the medical

1  records that we looked at here in the courtroom?

2  A.   No, I reviewed the entire medical record.

3  Q.   And was the entire medical record overall

4  consistent with your opinion?

5  A.   It was.

6          THE COURT:  Dr. Cooney, if I could ask just

7  one question.

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  I noted that you read from the

10  January 31st, 2008 record that she was out of bed

11  once a week for the hair dresser.

12          THE WITNESS:  Yes.

13          THE COURT:  What, if any, effect does that

14  have on a patient's terminal diagnosis?

15          THE WITNESS:  It doesn't affect her terminal

16  prognosis, but it just shows what was important to

17  her, even very near to the end of her life.

18          THE COURT:  Thank you.

19  Q.   (By Mr. Lembke)  Have you had occasion to review

20  the medical records of Geraldine H.?

21  A.   Yes, I reviewed the medical records on Geraldine

22  H.

23          MR. LEMBKE:  Your Honor, Geraldine H. can be

24  found at Tab 40 of the juror notebook.  The entire

25  medical records for Geraldine H. have been

1   pre-admitted as Defense Exhibit 544, with excerpts

2   from her medical records having been pre-admitted as

3   Defense Exhibit 544-A and 544-B.

4   Q.   How old was Ms. Geraldine H. at the time of her

5   admission to hospice?

6   A.   Ms. Geraldine H. was 72 years old.

7   Q.   And what was the date on which she was admitted

8   to hospice?

9   A.   She was admitted on April 20th, 2007.

10   Q.   And what was the last date on which she was

11   provided hospice service?

12   A.   August 11, 2008.

13   Q.   Have you formed an opinion as to whether

14   Ms. Geraldine H., at the time of her admission to

15   hospice, had a terminal prognosis?

16   A.   Yes.   At the time of her hospice admission,

17   Ms. Geraldine H. was terminally ill with a prognosis

18   of six months or less.

19   Q.   Why did you reach that opinion?

20   A.   At the time of her admission, Ms. Geraldine

21   H. had both weight loss and a functional decline.

22   She had been evaluated and no reversible causes for

23   her weight loss were found.

24        She did have a life-long history of mental

25   retardation and with dementia now, complicated by

1    depression.  And in addition to her weight loss from

2    113 pounds to 87 pounds with a BMI of 15.

3            She also had changes in her function and her

4    behavior.  She was refusing medications.  She had

5    increased behavioral outbursts when she would weep

6    and cry.  She was still able to walk by herself but

7    was requiring a lot of encouragement to eat and

8    sometimes choked on her food.  She was also noted to

9    fatigue more easily with activity.

10           So, in this setting, Ms. Geraldine H. was

11   terminally ill at the time of her admission.

12   Q.  Have you formed an opinion as to whether

13   Ms. Geraldine H., throughout the time she was

14   receiving hospice services, had a terminal prognosis?

15   A.  Yes.  Throughout the time that Ms. Geraldine H.

16   received hospice services, she remained terminally

17   ill.

18   Q.  Why did you reach that opinion?

19   A.  She had documented weight loss down to 82 pounds

20   with a BMI of 15.  And she was described as

21   cachectic, temporal wasting, thinning of the face and

22   bony protrusions.

23           She also had more behavioral outbursts.  Her

24   exercise tolerance decreased and she was now using a

25   wheelchair any time she had to go more than 25 feet.

1             Her appetite remained poor.  It actually got

2      worse.  She's now eating only ten to 25 percent of

3      her meals and has to actually be hand fed.  She's

4      sleeping much more during the day.

5             And then about a month -- in July of 2008,

6      she had some improvement in her appetite and

7      improvement in her weight up to 97.5 pounds.  She

8      seemed to be a little more social.  And when those

9      improvements were sustained, she was discharged on

10     August 11, 2008 with an extended prognosis.

11            So, she remained terminally ill until the

12     time of her discharge.

13     Q.   Let me direct your attention to pre-admitted

14     Defense Exhibit 544-A, Page 9859.

15            What is the date of this document?

16     A.   February 15th, 2007, so this is about two months

17     before she was admitted.

18     Q.   What is this document?

19     A.   This is a physician progress note.

20     Q.   And what is stated in the first paragraph of

21     that progress note?

22     A.   72 year old woman, frail, elderly, older than

23     stated age.  Alert but not oriented to time or

24     situation.  She has a history of dementia,

25     depression, mental retardation and recent weight loss

1    reported as 30 to 40 pounds since November of 2006.

2            She has had evaluation by hematology and

3    oncology and this is a second opinion on the etiology

4    of this weight loss.

5    Q.   And at the bottom of the page there are three

6    numbered items.  What do they say?

7    A.   Number one:  EGD, esophagogastroduodenoscopy,

8    colonoscopy and check with Dr. Ryan.

9    Q.   Let me direct your attention to Page 0051, which

10   is also in Defense Exhibit 544-A.

11           What is the date of this document?

12   A.   April 20th, 2007.

13   Q.   What is this document?

14   A.   This is a nursing assessment on the day of her

15   hospice admission.

16   Q.   What is stated in the history of illness

17   section?

18   A.   Increased weight loss.  Height of 64 inches,

19   weight 87.3 pounds.  BMI 15.4.  Patient refusing

20   meals and meds, in spite of dietary changes and

21   supplements.  Increased weeping and crying.  Refuses

22   medications and meals.  Anti-depressant, Zoloft,

23   refusing.  See something.  See assessments.

24   Q.   What is indicated next to the past medical

25   history?

1  A.   Osteoarthritis, glaucoma, depression, mental

2  retardation and dementia.

3  Q.   Under the mental status section in the middle of

4  the page, what is indicated in the comments section?

5  A.   Mental retardation.  At times will yell and

6  become aggressive, will throw items and attempt

7  scratch.

8  Q.   Now let me direct your attention to Page 0052,

9  which is the second page of this five-page document.

10        In the section mouth, nose and throat, what

11  is indicated in the comments section?

12  A.   Patient refusing meals and only sips of

13  supplements.  Patient use of puree related to choking

14  with mechanical soft diet.  Aspirations precautions

15  -- aspiration precautions, something.

16  Q.   What is indicated in the comments next to the

17  neurological section at the bottom?

18  A.   Increased lethargy and aggression.

19  Q.   What is indicated in the comment in the far

20  right-hand column under respiratory status?

21  A.   Short of breath with 25 feet of ambulation,

22  walking.

23  Q.   Now let me direct your attention to Page 0053,

24  which is the third page of this five-page document.

25        What is indicated as her weight at that

1  point?

2  A.   Her weight is 87.3 pounds.

3  Q.   What is the BMI?

4  A.   15.4.

5  Q.   Let me now direct your attention to Page 0055,

6  which is the fifth page of this five-page document.

7        What is indicated under the summary section?

8  A.   Admitted to hospice, 72 year old woman with

9  steady, weakness and weight loss.  Currently 87.3

10 pounds.  BMI less than 18.

11        Patient with mental retardation and

12 confusion.  Very thin, cachexia.  Nursing facility

13 has incorporated nutritional supplements, such as

14 Magic Cup and Med Pass, those are just kinds of

15 nutritional supplements, for patient in spite of --

16 in spite of dietary attempts, continued weight loss.

17        Sister had concepts faxed and explained the

18 policy, philosophy plan of care and journey process

19 and goals discussed.

20        I believe that's pharmacy notified call,

21 made aware of admission, plan of care.  She added as

22 needed from social work -- spiritual care for

23 occasional agitation.

24        Patient refusing meals and medications.

25 Only 50 percent of meds taken with applesauce, safety

```
 1   discussed and staff agreeable to above.  Seen with
 2   nursing assistant.
 3   Q.   What, if anything, did the facts you've
 4   highlighted in this document and in the previous
 5   document we looked at tell you about Ms. Geraldine
 6   H.'s overall picture at the time of her admission to
 7   hospice?
 8   A.   This is a woman who is already impaired with
 9   mental retardation and depression, in addition to --
10   and dementia, in addition to her depression.  And she
11   is declining.
12         Her weight is steadily declining, despite
13   having seen specialists for evaluation for a
14   reversible cause of the weight loss.
15         She's refusing to take her medications or
16   eat her meals.  She's having a lot of emotional
17   outbursts and is able to do less than she had
18   previously.  So she is terminally ill at the time of
19   the admission.
20   Q.   Let me direct your attention to Page 9617 in
21   Defense Exhibit 544-A.
22         What is the date of this document?
23   A.   July 16th, 2007.
24   Q.   What is this document?
25   A.   Nursing assessment.
```

1  Q.   What is stated in the history of illness

2  section?

3  A.   Adult failure to thrive.  Weight loss, 3.3

4  pounds in this recent visit.  Muscle wasting,

5  increased weakness, continues refusal of meds and

6  meals reported by staff at nursing facility.  Sister

7  aware.  BMI 14.5.

8  Q.   What is indicated in the comment section next to

9  mental status?

10  A.   Patient has limited understanding.  Reviewed in

11  simple words, recertification and disease process.

12  It has diagnosis of mental retardation there.

13          Occasionally not appropriate towards nursing

14  staff.

15  Q.   What is indicated in the comment section next to

16  hearing capacity?

17  A.   Speech sluggish and mumbling at times, gives

18  good eye contact.

19  Q.   Now let me --

20          MS. GUNASEKERA:  For completeness, if you

21  could go to the top of that page and have the patient

22  read the past medical history.

23  Q.   (By Mr. Lembke)  Dr. Cooney, what is indicated

24  in the past medical history section?

25  A.   See admit.  Depression continues, dementia.

1  Q.   Now, at Page 9618, which is the second page of

2  this five-page document.

3          What is indicated in the comment section

4  next to mouth, nose throat?

5  A.   Appetite varies, zero to 25 percent, according

6  to the staff.  Use of nutritional supplements

7  continue.  Added to coffee.  Patient in spite of

8  weight loss, weight down.  Occasional choking with

9  meals.  Pureed diet continues.

10  Q.   Next to the cardiovascular section, what is

11  written in the comments there?

12  A.   Bony prominence protruding, hips, facial bones,

13  ribs, knees, extremity -- skin care provided by

14  staff.

15  Q.   What is indicated next to the neurological

16  section as the comments?

17  A.   Lethargic at times, very weak, easily fatigued.

18  Q.   What is indicated in the respiratory status

19  comment section?

20  A.   Becomes short of breath within 20 feet of

21  walking with assistance, requires frequent rest

22  periods.

23  Q.   Now let me direct your attention to what's

24  previously been admitted as Government Exhibit 348-A.

25  And, Brad, would you pull up PDF 519 from that

5421

1   document.

2           THE COURT:  For the record, Mr. Lembke, what

3   is the Bates number for that?

4           MR. LEMBKE:  I'm sorry, it's 0073.

5           THE COURT:  Thank you.

6           MR. LEMBKE:  Here it is.  Thank you.

7   Q.  What are the dates, the first date in the upper

8   left on this document?

9   A.  April 29, 2008.

10  Q.  What is this document?

11  A.  These are nursing notes.

12  Q.  Would you please read the first nursing note,

13  the date and time?

14  A.  4/29/08, 1:33 a.m.

15  Q.  What does it say?

16  A.  Ms. Geraldine H., resident alert and resting in

17  bed comfortably.  Had two yelling episodes this

18  shift.  Administered Ativan one milligram at

19  6:30 p.m. on left hand, appetite 25 percent.  Offered

20  Med Pass supplement, zero percent.  Encouraged

21  fluids.

22  Q.  What is the date and time of the second note?

23  A.  4/29 -- April 29, 2008.  3:48 p.m.

24  Q.  What does the text of that note say?

25  A.  Ms. Geraldine H. received, resident in the bed

1   crying.  When asked if she has pain, she nodded yes.

2   Roxanol, the liquid Morphine, 0.25 milligrams given

3   and tolerated well.

4           After one hour, resident seemed more relaxed

5   and given a shower by staff and tolerated well.

6   Q.   The fourth note on that page from May 2nd, do

7   you see that?

8   A.   Yes.

9   Q.   And what is the date and time of that note?

10  A.   May 2nd, 2008, 3:55 p.m.

11  Q.   What is the text of that note?

12  A.   Resident in bed crying and grimacing when moving

13  right arm and shoulder.  Repositioned in the bed and

14  medicated with Roxanol 0.25 milligrams orally.  After

15  one hour, resident quiet.

16  Q.   If we can go to the next page, which is PDF 520,

17  Bates number 0074.

18          What is the date and time of the first entry

19  on that page, Dr. Cooney?

20  A.   May 11, 2008, 12:11 a.m.

21  Q.   What is the text of that note?

22  A.   Geraldine in bed this evening.  Screaming for

23  approximately one and one half hours.  One-to-one

24  ineffective.  Attempts to kick and push away with

25  fists.  Unable to verbalize reason for screaming.

1  Routine Ativan ineffective.  Room temperature

2  adjusted.  Snack and drink offered.

3         Roxanol given after continued screaming and

4  facial grimacing.  Effective approximately 45 minutes

5  later.

6  Q.  Let me go back to Defense Exhibit 544-A and

7  direct your attention to Page 9977.  And actually, at

8  9978, what is the date of this document?

9  A.  June 10, 2008.

10  Q.  What is this document?

11  A.  This is the worksheet hospice local coverage

12  determination adult failure to thrive.

13  Q.  And what is stated in the supporting

14  documentation section?

15  A.  Weight loss in 30 days, 87.8 to 87 pounds.  BMI

16  of 15.  Patient unable to ambulate, walk, greater

17  than ten feet.  Becomes shaky and weak.  Patient now

18  using wheelchair for transfers and sleeping -- for

19  transfers and sleeping and refusing to get out of

20  bed.

21         More lethargic, according to the nursing

22  facility staff, falls noted.  Physical therapy

23  provided by the nursing facility.  Ativan one

24  milligram continued.

25  Q.  What, if anything, did the facts you've

1   highlighted in the documents created after

2   Ms. Geraldine H.'s admission to hospice tell you

3   about her overall picture during the time that she

4   was receiving hospice services?

5   A.   These documents demonstrate a continued decline

6   with her weights very low, with poor appetite,

7   continued agitated behaviors, along with increased

8   functional decline and poor activity tolerance, so

9   she remained terminally ill throughout this time.

10  Q.   In reaching your opinions with regard to

11  Ms. Geraldine H., did you rely only on the medical

12  records that we've looked at here in the courtroom?

13  A.   No, I reviewed the entire medical record.

14  Q.   Was the entire medical record overall consistent

15  with your opinion?

16  A.   Yes, it was.

17  Q.   Dr. Cooney, have you had the occasion to review

18  the medical records of Ms. Elsin K.?

19  A.   Yes, I reviewed the medical records on Ms. Elsin

20  K.

21          MR. LEMBKE:  Your Honor, Ms. Elsin K. can be

22  found at Tab 33 of the juror notebook.  The entire

23  medical records of Ms. Elsin K. have been

24  pre-admitted Defense Exhibit 559, with excerpts from

25  her medical record having been pre-admitted as

1   Defense Exhibit 559-A and 559-B.

2   Q.   Dr. Cooney, how old was Ms. Elsin at the time of

3   her admission to hospice?

4   A.   Ms. Elsin K. was 80 years old.

5   Q.   And what was the date when she was first

6   admitted to hospice?

7   A.   January 15, 2007.

8   Q.   And what was the date when the provision of

9   hospice services for that admission ended?

10  A.   June 8th, 2008.

11  Q.   Was Ms. Elsin K. readmitted to hospice?

12  A.   Yes, she was.  She was readmitted on June 16th,

13  2008.

14  Q.   What was the last date on which hospice services

15  were provided to her for that admission?

16  A.   April 7th, 2009.

17  Q.   Was Ms. Elsin K. admitted again to hospice?

18  A.   Yes.  She was admitted on May 7th, 2009.

19  Q.   When did that admission to hospice end?

20  A.   September 17th, 2009.

21  Q.   Have you formed an opinion as to whether

22  Ms. Elsin K., at the time of her first admission to

23  hospice, had a terminal prognosis?

24  A.   Yes.  At the time of her first hospice

25  admission, Ms. Elsin K. was terminally ill with a

1   prognosis of six months or less.

2   Q.   Why did you reach that opinion?

3   A.   Ms. Elsin had been sick for a long time.  She

4   had infections in her hip and these had caused her a

5   lot of problems.  But two years ago, she had been

6   able to live at home and now she's in a nursing

7   facility.  And in addition, at the time she was

8   admitted to hospice, she had a more recent decline.

9   She had lost 31 pounds over the past year, 16 pounds

10  over the past six months to a weight of 159 pounds.

11          Her albumin, which is a nutritional marker,

12  was low at 2.8.

13          She required help with most of her

14  activities of daily living and she was in pain.

15          So, at the time of her hospice admission,

16  Ms. Elsin was terminally ill.

17  Q.   Have you formed an opinion as to whether

18  Ms. Elsin K., throughout her first admission on

19  hospice, had a terminal prognosis?

20  A.   Yes.   Throughout her first admission to hospice,

21  Ms. Elsin remained terminally ill.

22  Q.   Why did you reach that opinion?

23  A.   Ms. Elsin was treated with antibiotics for these

24  infections in her hip, she had x-rays that showed

25  that the bone beneath in her leg was actually

 1   destroyed.  She steadily -- she steadily worsened.

 2   She developed new wounds in her right knee and began

 3   having, you know, pussy drainage from both the knee

 4   and the hip.

 5          You know, she was depressed.  She was

 6   anxious.  She was in pain.  She was still able to

 7   wash her face and feed herself but she couldn't move

 8   her legs.  She both had pain and weakness and she was

 9   otherwise dependent on her care.

10          On June 8th, 2008, she had the sudden onset

11   of severe abdominal pain and she and her family chose

12   to revoke the hospice benefit and go to the hospital

13   for investigation of this problem.

14          So, throughout the time that she received

15   hospice services, Ms. Elsin was terminally ill.

16   Q.   Have you formed an opinion as to whether

17   Ms. Elsin, at the time she was admitted back to

18   hospice eight days later, had a terminal prognosis?

19   A.   Yes.  At the time of her second admission, on

20   June 16th, 2008, Ms. Elsin was terminally ill with a

21   prognosis of six months or less.

22   Q.   Why did you reach that opinion?

23   A.   What was found in the hospital, she was on

24   Coumadin, the Warfarin, a blood thinner because she

25   had blood clots in her legs in the past.  And she was

1  found to have a big blood clot inside her abdominal
2  wall that appeared to be causing her pain.
3          So they took her off of the blood thinners,
4  the Warfarin.
5          She also had some heart failure symptoms
6  while in the hospital.  When she got -- when she was
7  readmitted, she had new edema.  She has a sacral
8  pressure ulcer, pressure ulcer on her bottom, and was
9  still -- and was still having abdominal pain even
10 though they had stopped the blood thinners, so she
11 continued to be terminally ill at the time of her
12 readmission.
13 Q.   Have you formed an opinion as to whether
14 Ms. Elsin K., throughout her second hospice
15 admission, had a terminal prognosis?
16 A.   Yes.  Throughout her second hospice admission,
17 Ms. Elsin continued to be terminally ill.
18 Q.   Why did you reach that opinion?
19 A.   Her course was complicated by the kind of
20 step-wise problems that we see.  She has urinary
21 tract infections, treated, a little better.  She
22 started having episodes of unresponsiveness and
23 staring.  These were never -- they didn't do any
24 diagnostic studies but they placed her on a seizure
25 medication for them.  She was still -- she still

1    continued to have the staring episodes.

2         She had ongoing problems with her skin,

3    which were not healing.  And her condition continued

4    to deteriorate during her second hospice admission.

5    Q.   What was the reason that the provision of

6    hospice services to her ended for that second hospice

7    admission?

8    A.   It states that she was discharged with an

9    extended prognosis on April 7, 2009.

10   Q.   And have you formed an opinion as to whether

11   Ms. Elsin K., when a month later she was readmitted

12   to hospice for a third stay, had a terminal

13   prognosis?

14   A.   Yes.  At the time of her readmission on May 7th,

15   2009, she was terminally ill.

16   Q.   Why did you reach that opinion?

17   A.   She had experienced a significant weight loss in

18   that month.  She was down to 148 pounds on

19   readmission on May 7th.  In December of 2008, six

20   months earlier, she had weighed 167 pounds.

21         So, it's a significant loss of weight.  She

22   was much weaker.  She could no longer drink using a

23   straw.  She was coughing.  Her lungs were becoming

24   congested.  And she was continuing to have these

25   staring spells.

1          So, yes, she was terminally ill at the time

2    of her readmission.

3    Q.   What was the reason for the end of hospice

4    services for Ms. Elsin K. on the third admission?

5    A.   Her condition steadily worsened and she died an

6    expected death on September 17, 2009 with her

7    daughter at the bedside.

8    Q.   Let me direct your attention to pre-admitted

9    Defendant's Exhibit 559-A and Page 3087 of that

10   exhibit.

11         What is the date on that exhibit?

12   A.   January 15, 2007.

13   Q.   That was the date of the first admission?

14   A.   Yes.

15   Q.   What is this document?

16   A.   It is a nursing assessment.

17   Q.   What is indicated as to the history of illness?

18   A.   80 year old female with a diagnosis of debility.

19   Patient has a 15 year history of left hip revisions,

20   eight surgeries from a total hip replacement in 1981.

21   Current wound is open to drain and is positive for

22   methicillin-resistant staphylococcus aureus, MRSA.

23         She is rejecting her right knee prosthesis

24   and also has MRSA.

25         Patient has osteopenia, which is thinning of

1   the bones, osteoarthritis, dementia, dependent for

2   all care, mostly bedbound, incontinent of bowel and

3   bladder, increased confusion and increased anxiety

4   over the past two months.

5   Q.   What is indicated in her past medical history?

6   A.   Aortic stenosis, dementia, seizures in 1992,

7   increased forgetfulness at that time.  Incontinent of

8   bowel and bladder, dementia, chronic left hip

9   prosthesis, MRSA, left hip wound, right knee,

10  diverticular disease, osteoarthritis, osteopenia,

11  deep venous thrombophlebitis of her left lower -- of

12  her left leg in October 2006.  Osteomyelitis in 2006.

13  Aortic stenosis.

14  Q.   What is osteomyelitis?

15  A.   It's infection in the bone.

16  Q.   In the mental status section in the middle of

17  the page, what is indicated in the comment section?

18  A.   Confused at times, history of anxiety, very

19  demanding and/or tearful at times.  Depression,

20  dementia, signs and symptoms 1992.

21  Q.   Let me direct your attention to the third page

22  of this five-page document.

23          In the nutritional status section, what is

24  indicated about her weight history?

25  A.   It begins with appetite decreased, January 2006,

5432

1  190, which was a 31 pound weight loss over a year;

2  July 2006, 160, it's also a weight loss over six

3  months; October 2006, 175 pounds; November 2006, 165

4  pounds; December 2006, 158 pounds; January 2007, 159

5  pounds.  Albumin of 2.8 in December of 2006.

6  Q.   What is indicated in the comments section next

7  to genito/urinary?

8  A.   She had an urinary tract infection in January of

9  '07 and is or was on antibiotics.

10  Q.   Now let me direct your attention to Page 3090,

11  which is the fourth page of this five-page document.

12          In the musculoskeletal section at the top of

13  the page, in the left column, would you indicate

14  which items have a yes checked next to them.

15  A.   Spasticity or contracture, limited range of

16  motion, altered coordination, unsteady gait and

17  prosthesis.

18  Q.   In the center column, what is indicated there?

19  A.   It's the no column.  Paralysis, flaccidity is a

20  no, numbness, decreased sensation and amputation are

21  no.

22  Q.   In the next column over it has bedbound at the

23  top.  What is indicated in that column?

24  A.   She's wheelchair bound in a Geri chair.

25  Q.   What is noted in the comment section to the

5433

1   right of the word Geri chair?

2   A.   Transfers with the assistance of a Sara lift,

3   needs more assistance with feeding, related to

4   arthritic hands.  Mostly bedbound.  Left hip

5   replacement.  Right total knee replacement.  Fingers

6   contracting, severe deconditioning.

7   Q.   What, if anything, did the facts you've

8   highlighted in this document tell you about

9   Ms. Elsin's overall picture at the time of her first

10   admission?

11   A.   These documents demonstrate a woman with a

12   long-standing problem with infections in her left hip

13   but who has taken a recent and sudden decline with

14   persistent weight loss, declining function and

15   multiple other medical problems including her deep

16   venous thrombophlebitis would add to her poor

17   prognosis.

18   Q.   Let me now direct your attention to Page 2959 of

19   Defendant's Exhibit 559-A.

20        In the top right, what is the date of this

21   exhibit?

22   A.   February 27, 2008.

23   Q.   What is this document?

24   A.   The general medical guidelines for determining

25   prognosis.

5434

1  Q.  And in the assessment section, what is written?

2  A.  On admission, the right posterior knee was

3  reddened.  Now draining copious amounts.  Some thin

4  and serous, clear, serosanguineous, blood tinged or

5  purulent, pussy.

6       Anterior knee is now usually red,

7  occasionally warm, blister.  Comes and goes.

8       The left trochanter is not as large, was not

9  goal, decreased drainage, not -- oh, decreased

10  drainage, not necessarily good.

11  Q.  What is trochanter?

12  A.  Trochanter is in the hip -- in the hip joint.

13  Q.  Please continue reading that narrative.

14  A.  Has gross bilateral edema of the legs.  Had no

15  edema on admission.  She's been on Lasix, it was

16  increased to 40 milligrams twice daily, plus

17  Zirconium which is another diuretic, water pill, 2.5

18  milligrams six days a week.

19       Her left leg was slightly shorter than the

20  right on admission.  Now significantly.  Continues

21  with Keflex antibiotic five milligrams three times

22  daily indefinitely.

23       Now also on Sulfamoxole, which is a sulfa

24  antibiotic, 400-80 for recurrent urinary tract

25  infections.

5435

1              Has required multiple medication changes for

2   optimum pain control.

3   Q.   How does a leg become shorter?

4   A.   You know, the bone in the leg is being eroded by

5   the infection and shortening.

6   Q.   What is the PPS score that's indicated?

7   A.   Her PPS is 40 percent.

8   Q.   And what is indicated with regard to her

9   dependence for activities of daily living?

10  A.   She's dependent in bathing, dressing, able to

11  feed herself with a prepared tray, but she's

12  dependent in transfers, continence and is unable to

13  ambulate to the bathroom.

14  Q.   What is stated under the section, recent

15  impaired nutritional status?  What is the comment

16  there?

17  A.   8/8/07, 174 pounds.  2/5/08, 175 pounds.  Weight

18  fluctuates probably due to gross bilateral edema of

19  the legs.

20  Q.   Now let me direct your attention to the next

21  page which is 2960.  And in particular under clinical

22  findings what, if anything, is indicated as to how

23  Ms. Elsin K. gets out of bed?

24  A.   Requires total care, a Hoyer lift to get out of

25  bed.

1  Q.  What, if anything, did the facts you've

2  highlighted in this document tell you about Ms. Elsin

3  K.'s overall picture while she was receiving hospice

4  services during that first admission?

5  A.  She's continuing to worsen despite antibiotics.

6  Her areas of infection seem more.  She's developed

7  swelling in her legs, so she continues to be

8  terminally ill.

9  Q.  Let me now direct your attention to Government's

10  Exhibit 341-A, which has been admitted, and in

11  particular to Page 2933.

12          And what is the date of this document?

13  A.  June 8th, 2008.

14  Q.  What is this document?

15  A.  This is a revocation of hospice election.

16  Q.  What is given as the reason for the revocation?

17  A.  Patient developed right abdominal pain, elected

18  to go to the hospital for diagnosis and treatment.  I

19  think that's severe, but I'm not sure.

20  Q.  Now let me direct your attention to what has

21  been pre-admitted as Defense Exhibit 559-B, Page

22  3984.

23          MS. GUNASEKERA:  Objection, Your Honor,

24  outside the scope.  May we approach?

25          THE COURT:  All right.

1                        (SIDEBAR)

2            MS. GUNASEKERA:  Judge, if we could just ask

3    that there be a clarification given to the jury about

4    the first admission is the only admission at issue,

5    not the second or the third admissions and so --

6            THE COURT:  Based upon Dr. Liao's testimony?

7            MS. GUNASEKERA:  Yeah.  And based upon the

8    government's allegations.  As Your Honor knows,

9    there's specific time frames that are at issue.

10           THE COURT:  Okay.  Dr. Liao discussed

11   January of 2007 through April of 2009 in his

12   testimony and in his report and did not break it up

13   by admissions.

14           MS. GUNASEKERA:  Uh-huh.  And I guess we

15   would just ask that, at least as to the latter, the

16   last admission, that the jury understands that that

17   that's not a part of the relevant time frame.

18           MR. LEMBKE:  Your Honor, at Page 1435 of the

19   transcript.

20           MS. MARTIN:  August 18th.

21           MR. LEMBKE:  On August the 18th.  Page 1435

22   of transcript, Dr. Liao was asked:

23           Based on the record you reviewed, what was

24   the last date in the medical record that you reviewed

25   for Ms. Elsin while she was on hospice?

1        The last date that was available to me in
2    the medical records was April of 2009.  And at that
3    time she was still alive.
4        Well, lo and bold, there are medical records
5    that show her dying -- you know, they were in the
6    medical records, and he just didn't review them.  And
7    so I don't think there's anything inappropriate about
8    asking since he said he didn't know how it ended.
9        MS. GUNASEKERA:  And, Your Honor, we're not
10   indicating that the witness not testify as to that
11   admission.  We're simply asking that a clarification
12   be instructed to the jury that that admission is not
13   at issue.
14       THE COURT:  What was the date of the last
15   admission?
16       MR. LEMBKE:  The last admission, Your Honor,
17   was on May 7th, 2009.  So what Dr. Liao said was the
18   last record he had available, that was available to
19   him in the medical records, was 8/4/2009, but if he
20   had been, I guess, provided the complete medical
21   record, he would have seen that she was back a month
22   later and died thereafter.
23       MR. WERTKIN:  Your Honor, it's just a matter
24   of clarification, so we're not arguing that there are
25   false claims submitted after that date.  So just to

1    make it clear to the jury that that's not an issue,

2    if they want to elicit testimony after the date.

3    Just so the jury is not confused about what the dates

4    are in this case.  We're not alleging false claims

5    after April 2009.

6            MR. LEMBKE:  Your Honor, I would think that

7    if we thought -- I mean, we're the ones who are the

8    defendants, and we don't think we're being prejudiced

9    in any way by calling attention to this later

10   admission, so I'm not sure why there needs to be any

11   clarification.

12           And the record was clear that Dr. Liao

13   stopped his opinion in April of 2009 apparently

14   because no one bothered to give him the records to

15   show what really happened.  We don't see the need for

16   any kind of instruction at this point because it's

17   hard to see how the government is being prejudiced

18   here.

19           MR. WERTKIN:  Just to respond, you know, of

20   course, we are prejudiced if the jury is misled and

21   confused about the date.  Just to be absolutely

22   clear, we're not saying that -- we're not trying to

23   stop her from testifying about whatever it is that

24   Mr. Lembke wants to ask her about, just to clarify

25   that this admission is not -- we're not making

1  allegations of false claims during that last

2  admission.

3         MR. LEMBKE:  Part of the problem comes about

4  here because Dr. Liao has testified the last date

5  that was available to him in the medical records was

6  April of 2009, and so this is a problem of the

7  government's own making, because he either didn't

8  review them or wasn't provided the complete medical

9  record.

10         But, you know, if the Court is going to tell

11  them that they're not making a claim after that date,

12  then it would seem like the Court would need to say

13  Dr. Liao said he didn't have medical records

14  available to him after April of 2009.

15         THE COURT:  And that she was still alive.

16         MR. LEMBKE:  And that she was still alive.

17         MS. GUNASEKERA:  The testimony is, Your

18  Honor, that she passed away after that date, but the

19  issue is the confusion of whatever dates are at

20  issue.  That's all, Your Honor.

21         THE COURT:  I do think there can be some

22  confusion about that, and I am going to instruct the

23  jury.  You can elicit the testimony, but I am going

24  to instruct the jury that the last date for Dr. Liao

25  testifies she was ineligible was April the 7th, 2009.

1          MS. GUNASEKERA:  Thank you, Your Honor.

2          MR. LEMBKE:  Let me check one thing before.

3          THE COURT:  Sure.

4               (Brief pause)

5          MR. LEMBKE:  Okay.  He did say that she was

6     ineligible the entire time.  That's what I wanted to

7     check.

8          THE COURT:  Yeah.

9          MS. GUNASEKERA:  Okay.  Thank you, Your

10    Honor.

11              (Open court.  Jury present.)

12         THE COURT:  Ladies and gentlemen, just to

13    make sure there's no confusion, the last date that

14    Dr. Liao testified that in his opinion Ms. Elsin K.

15    was ineligible was in April of 2009.

16    Q.  (By Mr. Lembke)  Dr. Cooney, did the medical

17    records that you reviewed in this case extend beyond

18    April of 2009?

19    A.  Yes, they did.

20    Q.  I want to go back to, I'm not sure whether I

21    showed it or not, it's Defense Exhibit 559-B, which

22    has been pre-admitted -- there it is, Page 3984.

23              What is the date of this document?

24    A.  June 16, 2008.

25    Q.  What is this document?

1   A.   A general medical guideline for determining

2   prognosis.

3   Q.   And what is indicated under the section on the

4   first page, multiple ER visits, hospitalizations over

5   previous six months?

6   A.   June 8th, 2008, abdominal wall hematoma.

7   Q.   What is a hematoma?

8   A.   A hematoma is a collection of blood, like a big

9   blood clot.

10  Q.   How is that treated?

11  A.   Sometimes, depending on where they're located,

12  they could be removed surgically.  Usually, they are

13  just left alone.

14  Q.   Just above that notation about the recent

15  hospitalization is the assessment section.  What is

16  stated there?

17  A.   Alert and oriented times three, out of bed to

18  recliner with a Maxi lift.  Right leg wound, three

19  areas on her buttocks, stage one.  Deconditioned.

20  Q.   What does deconditioned mean?

21  A.   It's just -- it's lack of cardiovascular reserve

22  from inactivity.

23  Q.   Then at the bottom of the page, what is

24  indicated with regard to dependence for activities of

25  daily living?

1    A.   It's noted that she's dependent in all the

2    activities of daily living and not applicable is

3    written next to ambulation to bathroom because she

4    was not ambulatory.

5    Q.   Let me direct your attention to Page 3985, which

6    is the second page of this document.  What is stated

7    under -- first of all, what is the hospice diagnosis

8    for this second admission?

9    A.   Debility.

10   Q.   What is noted under the history and progression

11   of the terminal illness?

12   A.   Recent hospitalization for abdominal wall

13   hematoma.  History of deep venous thrombophlebitis in

14   her left leg.  A vena cava filter was placed.

15   Coumadin discontinued.

16        Patient received plasma and three units of

17   blood at the hospital, according to her daughter.

18   Being medicated for right flank pain.

19   Q.   What is a vena cava filter?

20   A.   When people are unable to take blood thinners or

21   sometimes when blood clots go up to the lung, despite

22   blood thinners, they will place a filter in the vena

23   cava which is the big vein that brings the blood back

24   to the heart to try and stop them from getting up

25   into the rest of the system.

1  Q.   What, if anything, do the facts you've

2  highlighted in this document from the time of her

3  second hospice admission tell you about Ms. Elsin

4  K.'s overall picture at that point?

5  A.   She is terminally ill at this point.  She's had

6  significant complications from her medications as

7  well as her ongoing disease process.  She is

8  terminally ill at this time.

9  Q.   Let me show you what is Page 6463 in Defendant's

10  Exhibit 559-A, and what is the last date shown on

11  this document?

12  A.   May 4th, 2009.

13  Q.   What is this document?

14  A.   This is a weight sheet.

15  Q.   And what is shown as her weight on August 20th,

16  2008?

17  A.   Her weight on August 20th, 2008 was 178 pounds.

18  Q.   And then what is shown as her weight on

19  September 30th, 2008?

20  A.   163 pounds.

21  Q.   What is shown as her weight on May 4th, 2009?

22  A.   148 pounds.

23  Q.   Is each weight on here less than the previous

24  one?

25  A.   No.  There's some variation.

1   Q.   But overall --

2   A.   Overall they're trending down and they're

3   steadily less from the first of the year.

4   Q.   How does the ending weight on May 4th, 2009

5   compare to the beginning weight?

6   A.   It's 30 pounds less.

7   Q.   Now let me direct your attention to Page 4136 in

8   Defense Exhibit 559-A.

9         What is the date of this document?

10  A.   September 22nd, 2008.

11  Q.   Let me go to the last page, which is 4140.

12        What is stated in this summary at this time?

13  A.   MRSA infection -- debility, MRSA infection of

14  joint replacement site.  Dementia, seizure disorder,

15  aortic stenosis, pulmonary hypertension,

16  osteoarthritis, history of osteomyelitis, decreased

17  frequency of cellulitis, history of deep venous

18  thrombosis.

19        In the intensive care unit in June for large

20  abdominal hematoma.  Taken off Coumadin, her PTINR,

21  which is the measure of how thin the blood is, had

22  been normal that week, to prevent a recurrence of

23  deep venous thrombophlebitis.

24        Urinary tract infection end of August,

25  treated with Tetracycline.  On Bactrim indefinitely

1   for suppression of MRSA.

2          Present left trochanter, right anterior

3   knee, right posterior knee, all draining copious

4   amounts of serosanguineous and purulent drainage.

5          Has been much more confused, forgetful and

6   emotionally labile since hospitalization.  Not able

7   to read as she did before.  Has emotional meltdowns

8   almost daily.

9          Is on Aricept, Ativan as needed and Zyprexa

10  1.25 milligrams at bedtime.

11         Daughters strongly feel that increased doses

12  or other medications cause an increased in her focal

13  seizures.

14         Patient will stare a second or look away.

15  Dr. unsure if seizures or not.  Is on Tegretol 200

16  milligrams three times daily.

17         Constipation is patient's main concern,

18  obsesses about it.  Always has, much worse now.

19         Daily supplements always effective.  Soft

20  stool, still obsesses.

21         Complaining of hemorrhoid pain, despite

22  Anusol suppositories.

23         Has had significant weight loss, 47 pounds

24  in three months, 12 pounds the last month due only in

25  part to decrease in edema.  No medication changes.

1   Still on Lasix 40 milligrams twice daily and

2   Zaroxolyn six days a week.

3           Still pitting entire length of leg.

4   Appetite decreased.  Pain still an issue.  Difficulty

5   to assess as the details change with confusion.

6   She's on MS Contin, which is long-acting Morphine,

7   100 milligrams every eight hours and Roxanol, oral

8   Morphine, 20 milligrams every two hours as needed.

9           Less use of Roxanol.  PPS 40 percent.

10  Q.  What, if anything, did the facts you've

11  highlighted in this document tell you about Ms. Elsin

12  K.'s overall picture while she was receiving hospice

13  services during that second admission?

14  A.  Ms. Elsin continues to worsen with worsening

15  infections, pain and -- these outbursts of agitation,

16  she's continuing to be terminally ill.

17  Q.  Let me now direct your attention to Page 6478.

18  What is the date of this document?

19  A.  May 7th, 2009.

20  Q.  And what is this document?

21  A.  It's a nursing assessment.

22  Q.  And what is indicated in the history of illness?

23  A.  83 year old woman in period of steep decline

24  from multiple infections, immobility, 21 pound weight

25  loss since February of 2009, foul drainage from her

1  wounds, inability to take sufficient food and fluids

2  to maintain her nutritional needs and assist with

3  wound healing and keep patient from becoming

4  dehydrated.   Now on oxygen at two liters by nasal

5  cannula.

6  Q.   Now let me direct your attention to Page 6378 in

7  Defendant's Exhibit 559-A.

8       What's the date of this document?

9  A.   September 17, 2009.

10 Q.   And what is this document?

11 A.   This is the patient death checklist.

12 Q.   In reaching your opinions about Ms. Elsin K.,

13 did you rely only on the medical records that we

14 looked at here in the courtroom?

15 A.   No.  I reviewed the entire medical record.

16 Q.   Was the entire medical record overall consistent

17 with your opinion?

18 A.   Yes, it was.

19       THE COURT:  Ladies and gentlemen, as

20 Ms. Calahan advised you earlier, we're going to take

21 an early break today.  I know you're very, very

22 disappointed in that, but we will see you back in the

23 morning at 8:30.  No additional research about any of

24 these wonderful medical terms.  You can work on your

25 medical degree later.

1    We will see you in the morning.  Thank you.

2                      (Jury excused).

3         THE COURT:  Let's meet a little earlier in the

4    morning and I will let you know about Mr. Arthur.

5         MR. LEMBKE:  8:15?

6         THE COURT:  I think that will be fine.  I

7    appreciate y'all working with me today.

8                 (Court in recess for the day.)

9

10

11

12

13

14

15              C E R T I F I C A T E

16

17        I hereby certify that the foregoing is a

18    correct transcript from the record of proceedings in the

19    above-referenced matter.

20

21

22   Teresa Roberson, RPR, RMR
     Julie Martin, RPR, RMR
23

24

25