7005
FILED
2016 Jun-28 PM 01:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
EX REL., ET AL.,                    CV-12-KOB-245-S

         Plaintiffs,      October 20, 2015

   vs.                       Birmingham, Alabama

ASERACARE, INC., ET AL.,

       Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S OFFICIAL TRANSCRIPT OF
JURY TRIAL
VOLUME XXXV

BEFORE THE HONORABLE KARON O. BOWDRE
UNITED STATES DISTRICT CHIEF JUDGE

COURT REPORTER:
Teresa Roberson, RMR
Julie Martin, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
1                        * * * * *

2                    A P P E A R A N C E S

3                        * * * * *

4    FOR THE PLAINTIFF:

5    Jeff Wertkin
     Carolyn Tapie
6    Holly Snow
     Eva Gunasekera
7    Renee Brooker
     William Olson
8    U.S. Department of Justice
     Civil Division
9    P.O. Box 261 Ben Franklin Station
     Washington, DC  20044
10

11   Lane H. Woodke
     Don Long
12   U.S. Attorney's Office
     1801 4th Avenue South
13   Birmingham, Alabama  35203

14   James F. Barger, Jr.
     J. Elliott Walthall
15   FROSHIN & BARGER
     3430 Independence Drive
16   Birmingham, Alabama  35209

17   Nola J. Hitchcock Cross
     CROSS LAW FIRM
18   345 North 11th Street
     Milwaukee, Wisconsin  53233
19

20

21

22

23

24

25
```

7007

```
1          A P P E A R A N C E S (continued)

2     FOR THE DEFENDANT:

3     James Sturgeon Christie, Jr.
      Jack Wright Selden
4     Matt Lembke
      Tiffany deGruy
5     BRADLEY, ARANT, BOULT & CUMMINGS
      1819 Fifth Avenue North
6     Birmingham, Alabama  35203

7

8     Kimberly Martin
      BRADLEY, ARANT, BOULT & CUMMINGS
9     200 Clinton Avenue
      Huntsville, Alabama  35801
10

11    Charles H. Bohl
      WHYTE, HIRSCHBOECK, DUDEK
12    555 East Weels Street, Suite 1900
      Milwaukee, Wisconsin  53202
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                          * * * * *

                     P R O C E E D I N G S

                          * * * * *

          (In judicial conference room.)

          THE COURT:  We've got several issues to

discuss this morning.  The first one I want to talk

about is the defendant's motion to quash subpoenas,

which is document 442.  We talked about that some

yesterday.

          The first thing I want to know is whether

y'all have had any discussions since then to see if

you can resolve the issue or come up with a

compromise on that.

          MR. WERTKIN:  No, Your Honor.

          THE COURT:  Jeff looks like a deer in the

headlights.

          MR. WERTKIN:  It wasn't on my radar screen.

We didn't talk about it.  We didn't not talk about

it.  It just didn't come up.

          MR. LEMBKE:  We were working on other issues

late into the night.

          THE COURT:  I know.  I saw a whole bunch of

that stuff come in early this morning.  So, I wasn't

accusing y'all of not working.  Just a question of

whether y'all were talking.
```

1    Does the government really need both of

2    these witnesses?  And are their depositions really

3    not sufficient?

4         MR. WERTKIN:  Well, Your Honor, we do mostly

5    with regard to documents and getting documents

6    in. That's a big focus on it.  I think that if we

7    could, you know, some of the objections that have

8    been raised to documents, that would be a big factor

9    for us in terms of getting these witnesses here.

10         So, that's a big factor for us.  And we

11    would view, you know, their testimony to be

12    reasonably important.  They're both current AseraCare

13    employees and especially Mr. Rucker's name appears on

14    a lot of documents that we intend to use at trial.

15         THE COURT:  We talked yesterday about the

16    plain language rule of construction.  There's also a

17    rule of construction that basically says that, as far

18    as possible, statutes are to be construed in a way

19    that makes sense.  I think that the only way that the

20    statute really makes sense is not only can subpoenas

21    be served that are compelling attendance at trial,

22    that they also be enforced.  So I'm going to deny the

23    motion.

24         However, I am going to condition it on the

25    government's adequately reimbursing or paying for

1    trial or for travel expenses, lost wages, if there

2    are any, I don't know if there would be, but in

3    accordance with the concept in Rule 45, whatever the

4    subcategory is.

5         So that one will be denied with that

6    condition.

7         MR. LEMBKE:  Your Honor, so you know, the

8    Rucker documents deal with the cap issue, so that

9    ties into a later motion in limine.

10        THE COURT:  Yeah.  So he may or may not be

11   needed, depending on how I rule on that.

12        The equitable claims.  I think, Mr. Olson,

13   you were going to let me know what the government's

14   position was on the payment by mistake.

15        MR. OLSON:  Yes, Your Honor.  Thank you for

16   the opportunity to look at that further.

17        Having a chance to do that, we stand by our

18   filing and we do not contest that it's an equitable

19   claim.

20        THE COURT:  So both the payment by mistake

21   and the unjust enrichment claims are equitable; they,

22   therefore, are matters for the Court to decide and

23   they will not be submitted to the jury for a

24   determination.

25        That doesn't affect the right to trial by

1   jury on the legal claims and certainly if there are

2   overlapping facts, they all come in.

3           We're moving right along.  That's two down

4   and it's not even 10:00 o'clock.

5           The Advanced Med issue, I think that's where

6   we may bog down a little bit this morning.

7           And I think it's significant to step back

8   and look at the original motion in limine that was

9   filed by the defendant on this.  And that was filed

10  -- it's document 332, and it was filed back, if I'm

11  not mistaken, before trial began on July 13th.

12          At that time, the issue involved primarily

13  Kenny Barrett and his ability to testify as to how

14  those exhibits were created, whether he had

15  sufficient personal knowledge to do it, and also the

16  concern about the government's objections based upon

17  work product and privilege and whether he should be

18  allowed to testify.

19          As to that motion, I know it's been

20  supplemented, but as to the grounds stated in that

21  motion, I am going to deny the motion in limine as to

22  Kenny Barrett and his testimony.

23          Things have changed a lot, and we're going

24  to have to work through to where we are today.  But

25  it just seemed to me logical to at least start at

 1   that point.

 2           I will, however, if the government decides

 3   to bring him to testify at trial, he will, of course,

 4   not be allowed to testify as to any of the things

 5   that the government refused to allow him to testify

 6   about in his deposition.  I think that's clear and

 7   understandable.

 8           But then we've got some more recent

 9   developments that kind of change and make more

10   complex the issue about those trial exhibits that

11   were identified in document 332 that Kenny Barrett

12   prepared.

13           We have the defendant's supplement to the

14   motion in limine, document 454, that was filed

15   October 17th after the government disclosed on

16   October 16th that several people, in addition to

17   Kenny Barrett, might be called to testify about loss

18   calculation.  That was Dr. Miescke -- is that close?

19           MR. WERTKIN:  That's right on.

20           THE COURT:  Okay.  If I miss it at trial,

21   tell him I at least got it right once.  Maria --

22           MS. GUNASEKERA:  Marya Karimova.

23           THE COURT:  Karimova, Brad Landtroop, in

24   addition to Kenny Barrett.

25           We had some conversation yesterday about

1    Dr. Miescke, who was disclosed as the statistical

2    expert who was going to do all the extrapolation and

3    explain about the sampling and all that kind of

4    stuff.

5         But he was not disclosed as doing anything

6    regarding these loss calculation documents and things

7    that Kenny Barrett did.

8         I cannot allow an expert, at the very

9    midnight hour, to be allowed to expand the scope of

10   his work and testimony beyond what he was disclosed

11   to do.

12        So the motion in limine as it applies to

13   Dr. Miescke testifying about the loss calculation

14   documents or what he did in his revised report, that

15   I reviewed last night, and I hope somebody is going

16   to be able to explain it to me some time as to what

17   all that stuff means, but in terms of loss

18   calculations that he may have done since the jury's

19   answers to interrogatories, in my opinion, that's way

20   beyond the scope of what he was disclosed to testify

21   about.

22        So I am going to grant the motion in limine

23   as to Dr. Miescke and loss calculation testimony that

24   is beyond the scope of what he disclosed in his prior

25   reports.

1          I'm not sure that I know enough about

2    Marya Karimova to know whether, as the maintainer of

3    Advanced Med's national claims history, that would

4    include her ability to testify about loss

5    calculations, even if she had been previously

6    disclosed to do that.

7          Is maintainer the same thing as custodian?

8    I mean, what was she originally disclosed or not

9    disclosed until June 23 to testify about?

10          MS. GUNASEKERA:  She was, Your Honor, you're

11    correct, maintainer, another word for that could be

12    custodian.

13          She, essentially, performs the same type of

14    work as Mr. Barrett at Advanced Med, so Mr. Barrett

15    is a colleague of hers.  In a way, she essentially

16    filled his role when he left Advanced Med.

17          THE COURT:  Was she identified at any time

18    as being a replacement for Kenny Barrett prior to

19    October 16th?

20          MS. GUNASEKERA:  Not prior to that time,

21    Your Honor, because we thought that we could use

22    Kenny Barrett's original loss calculations through

23    trial.

24          THE COURT:  Through Kenny Barrett.

25          MS. GUNASEKERA:  Through Kenny Barrett.  We

1    did not anticipate, as we said yesterday, Your Honor,

2    that Kenny or another representative from Advanced

3    Med would need to revisit those loss calculations.

4         But now, Ms. Karimova has taken that

5    responsibility because she works for the same

6    database that Mr. Barrett worked with and has

7    performed the same calculations.

8         THE COURT:  So she's the one who has now

9    done that?

10        MS. GUNASEKERA:  She has, Your Honor,

11   because Mr. Landtroop has not been at work due to

12   personal family issues.

13        THE COURT:  I think disclosing somebody as a

14   custodian of records versus disclosing that person as

15   someone who is doing the calculations or has done

16   calculations or will redo the calculations or will

17   substitute for Kenny Barrett is not the same thing as

18   saying she's filling in for him.

19        And as we discussed yesterday, Mr. Barrett

20   has been gone from Advanced Med since June of 2014.

21        MS. GUNASEKERA:  Understood, Your Honor.

22   And again, I don't mean to repeat myself, but we

23   didn't anticipate that the loss calculations would

24   have to be revised.

25        And so, at that time, that's why we didn't

1   -- we weren't as explicit about that.  But in

2   reality, Your Honor, Ms. Karimova does do the same

3   work that Mr. Barrett did.  And once we got the jury

4   decision, she was in the best position to be able to

5   revise or identify the new loss amounts.

6          It's not really a calculation, it's an

7   identification of the new loss amounts.

8          THE COURT:  But she never was disclosed as

9   anyone having information about any of the facts that

10  were going to be at issue in the trial, only as the

11  custodian of records.

12         So the defense has had no opportunity to

13  depose her about how she would or did those

14  recalculations; right?

15         MS. GUNASEKERA:  That's correct, Your Honor.

16  Because at the time that we disclosed her, she hadn't

17  performed that identification of the loss amount.

18         I mean, I know, it's a little bit the cart

19  before the horse, and I understand that the position

20  that we're in and that's why -- and I understand Your

21  Honor's comments about, you know, at the eleventh

22  hour taking a deposition, but we are more than

23  willing to have her available to be deposed now that

24  she has done the work.

25         She couldn't have been deposed prior to,

1  Your Honor, because she hadn't identified a new loss

2  amount.

3        THE COURT:  But she could have been

4  identified as the person who would be a substitute

5  witness for Kenny Barrett.

6        MS. GUNASEKERA:  But we didn't know we would

7  need one, Your Honor.

8        THE COURT:  But that's not my problem that

9  the government did not anticipate.

10        MR. WERTKIN:  Well, we did identify her as a

11  substitute for Kenny Barrett in that letter.  Maybe I

12  am missing something.

13        MS. GUNASEKERA:  No, no.  We did,

14  essentially -- I mean, our word choice was perhaps

15  not as clear as it may could have been, Your Honor.

16        THE COURT:  You're talking about the June

17  23rd --

18        MS. GUNASEKERA:  The June 23rd, yes.

19        THE COURT:  I see Chris Turner and Brad

20  Landtroop disclosed as maintainer of Advanced claims.

21  Where is Karimova?

22        MR. LEMBKE:  Next paragraph, Your Honor, as

23  you know.

24        THE COURT:  Oh.

25        MR. CHRISTIE:  And Mr. Landtroop was not

1   disclosed on February 28th; that is not correct.

2          MS. GUNASEKERA:  I don't believe I said

3   that.

4          MR. CHRISTIE:  That's what the letter says.

5   The letter is incorrect.  Mr. Landtroop was not

6   disclosed February 28th, 2014.

7          THE COURT:  And then if Mr. Landtroop is not

8   available to testify, Marya Karimova will testify in

9   his place as maintainer of the records as custodian.

10         MR. WERTKIN:  Okay.

11         THE COURT:  That doesn't say anything about

12  Ms. Karimova replacing Kenny Barrett or Brad

13  Landtroop or Chris Turner replacing Kenny Barrett.

14         MR. WERTKIN:  That's right.

15         THE COURT:  How many patients were there

16  actually recalculations --

17         MS. GUNASEKERA:  That's a good question,

18  Your Honor.

19         THE COURT:  -- to do for?

20         MS. GUNASEKERA:  I want to say it was at

21  least half, but maybe it wasn't that many.  Give me a

22  moment, Your Honor.  Let me find the worksheet.

23         I didn't total it up, Your Honor, but I want

24  to say it could have been as many as half.

25         THE COURT:  And that would be based upon

1   what?

2         MS. GUNASEKERA:  So, there were several

3   instances where the jury actually found a month shy

4   of what Dr. Liao found, or even not just a month, but

5   a month or two or three shy of what Dr. Liao found as

6   a period of ineligibility.  And then for those

7   instances where the jury found -- just to take an

8   example, that a patient was ineligible until March

9   6th, but Dr. Liao found the patient ineligible

10  through March, and the claims data for that patient

11  ended on March 20th, we credited that month to

12  AseraCare because it was not -- it didn't coincide

13  exactly.  So we did not believe we could count that

14  as a loss.

15        So that's another bucket where that would be

16  different than what was calculated before.

17        THE COURT:  But I think that would be

18  something important for the government to look at and

19  decide how you're going to present your damages,

20  because I really, as I said, I cannot allow the

21  expert witness to expand the scope of his testimony

22  and his work beyond what had been previously

23  disclosed.

24        I don't think there was adequate disclosure

25  that Ms. Karimova would be called for anything other

1  than custodian of records stuff until October 16th.

2  And I see a real problem with that.

3           Again, you know, the government should have

4  looked ahead.  It seems to me like there were several

5  points where there were some red flags raised in

6  terms of how the government was going to be able to

7  prove damages.

8           First I think was when Mr. Barrett left in

9  June of 2014 to go to Costa Rica.  I don't even think

10 that the Federal Claims Act statute would give us

11 jurisdiction to subpoena him in Costa Rica.  It's not

12 that broad now, is it, Mr. Wertkin?

13          MR. WERTKIN:  Actually, I don't know the

14 Department's position on that, Your Honor.

15          THE COURT:  I think that is beyond the

16 reading of it.

17          So that should have created a red flag, what

18 are we going to do when the person who did the

19 calculations is out of the country.

20          Then, you know, when we bifurcated it in May

21 of this year, we had conversations about how, you

22 know, I anticipated the possibility that there would

23 be a need to recalculate the losses claimed by the

24 government.  That was another red flag.  How are we

25 going to prove our damages.

1             And then at some point, you know, maybe

2    during trial itself, the government recognized that

3    the jury was going to have to make those

4    determinations about dates of ineligibility,

5    something that the government didn't, you know,

6    really put out there in terms of what you were

7    claiming those dates to be.  At least, you know, at

8    that point a red flag could have come up in terms of

9    what are we going to do if their dates don't coincide

10   with the dates that we calculated.

11            Even at that point to at least alert the

12   defense that we're going to have to do something

13   different, you know, I don't know what could have

14   been done then, but we at least had two weeks while

15   the jury was working on their answers that we could

16   have at least discussed alternatives at that point.

17            But at this date, I just -- it's just way

18   too late and too prejudicial to the defense to be

19   bringing in new people to testify about the loss

20   calculations.

21            MR. WERTKIN:  Your Honor, may I ask or it's

22   kind of a question, kind of a comment.  If we had all

23   had this all mapped out back in June or May, when we

24   did bifurcation, and said, okay, Ms. Karimova will be

25   the one who is going to now do the work of Kenny

1  Barrett and that had been put in a letter or

2  whatever, it would have still been about a year after

3  discovery but at that point.  Ms. Karimova wouldn't

4  have done anything at that point.  It would just

5  merely be identifying her as someone who on October,

6  we probably would have said September, maybe back

7  then, but in October this is the person who is going

8  to do that work.

9        I don't think that there would have been

10  anything that would have been done at that point

11  because -- well, she wouldn't have done any work and

12  there would be nothing to depose her on or anything

13  like that because nothing would be done.  It would

14  just be this is the person at that late date.

15        We're now at that date.  So, I would argue

16  or suggest that it's harmless error to the extent

17  that -- because nothing would have been done at that

18  time during that time period.

19        THE COURT:  You don't know that.

20        MR. WERTKIN:  Well, what would have been

21  done, I guess, is the question.  What could have been

22  done?

23        THE COURT:  Well, the defendants may have

24  wanted to depose her to find out the breadth of her

25  knowledge, the scope of her work, whether she had

1  reviewed Mr. Barrett's work, if she understood how

2  that was done.

3       There could have been opportunities

4  for getting a deposition that would have at least

5  given the defense some information about this woman,

6  about the scope of her knowledge, about whether she

7  agreed or disagreed with how Mr. Barrett did his

8  work.  I don't know.

9       But they could have had that opportunity

10  then and perhaps reserved the right to depose her

11  before she took the stand merely on actually what she

12  did to recalculate those loss calculations.

13       MR. WERTKIN:  That's my point, Your Honor,

14  that last part that you were -- I understand that

15  they could have said, who are you and where do you

16  work and what's your history.  But they couldn't have

17  asked her until, I guess it was done yesterday,

18  right, they couldn't have asked her until yesterday

19  what she did in terms of revising Kenny Barrett's

20  work.

21       THE COURT:  Did you hear what I said?  They

22  could have asked her about Kenny Barrett's work,

23  whether she agreed with his process, what the process

24  was, to get the general information about processes

25  that would have been gone through.

1      MR. WERTKIN:  But it would have been the
2  same -- so, they did depose Kenny Barrett, as you
3  read yesterday.
4      THE COURT:  But they didn't depose Karimova,
5  because they didn't know that she was a potential
6  witness.
7      MR. WERTKIN:  Right, Your Honor.  And my
8  suggestion or our argument is that in terms of the
9  balance -- as the Court is doing a balancing test
10 here, on the one hand is the opportunity of the
11 defendants to take, you know, to do a background
12 deposition on a witness, if they were identified.
13     On the other hand is potentially, you know,
14 taking away 50 percent of the claims at issue.
15     I mean, we're talking -- as Your Honor
16 knows, we are trying to be the stewards of the
17 taxpayers here and taking on balance, the opportunity
18 to take a pre -- a pre-work deposition, like a
19 background deposition, about what someone else did
20 that they have already deposed versus, you know,
21 cutting out half of the alleged false claims damages
22 in this case, we would argue that on balance
23 Ms. Karimova should be permitted to testify.  And we
24 will make her available for multiple days of
25 depositions.

1          Now that we've moved the trial and she

2     wouldn't be testifying until at least the second or

3     third week, you know, we think that on balance and we

4     ask the Court to allow her to testify or allow her to

5     be deposed about her work that she finished

6     yesterday.

7          MR. LEMBKE:  Your Honor, the Court

8     instructed the jury that the fact that the government

9     is a party is of no difference.  The government is

10    treated the same as anyone else.

11         The government had an obligation to disclose

12    everyone with knowledge in their Rule 26 disclosures.

13    If Ms. Karimova had knowledge, she could have, and we

14    would argue, should have been disclosed if she had

15    the same knowledge as Kenny Barrett.

16         For whatever reason, the government decided

17    they were going to disclose Kenny Barrett.  And the

18    notion that is being put forward now that, oh, this

19    -- number one, that this might impact some of their

20    damages, that's of no moment to the question.

21         In fact, there are three important words

22    here, burden of proof.

23         They have the burden of proof in this case.

24    They also had discovery obligations.  They also had

25    duty of supplementation obligations.

1           And to cavalierly come in here and say, oh,

2     well, it's perfectly fine.  Remember, it's perfectly

3     fine, you wouldn't have really gotten anything out of

4     talking to her before, and there was sort of the

5     hidden assumption in this is she absolutely would

6     have said exactly the same thing as Kenny Barrett.

7           There's no basis for that.  And the key is,

8     in a case where they are seeking tens of millions of

9     dollars in damages, they're now saying all of this

10    should be excused.

11          And, remember, this is against the backdrop

12    of having -- their having prevented Mr. Barrett from

13    telling us very basic answers about calculations.

14          So what might we have learned from a

15    deposition of Ms. Karimova?  Maybe the reasons why

16    they made some changes.

17          Decisions have consequences.  Rules have

18    consequences when you don't follow them.

19          Your Honor, we think the Court is exactly

20    right here on this issue.  Karimova is coming along

21    too late.

22          MS. GUNASEKERA:  Your Honor, alternatively,

23    because the claims data has been exchanged as an

24    exhibit, alternatively, we could call the claims data

25    personnel and they would be able to testify as to the

1  specific periods of loss, but that would be a very

2  time consuming, overwhelming, frankly, for the jury.

3  As we've already explained to Your Honor, I think

4  Your Honor has seen how voluminous this claims data

5  is.

6          And so this is all a means of judicial

7  economy.  That was where this began with having

8  Dr. Miescke do the work to begin with and in the

9  interest of doing work that largely is consistent

10  with work that we have already produced to AseraCare.

11          MR. WERTKIN:  And just to put a finer point

12  on it, we do have people who are going to come and

13  testify about the claims data and the accuracy and

14  where it came from.

15          Like we said, this is just moving from one

16  box to the other.  So what we could do is, the claims

17  data people, can go box by box --

18          THE COURT:  Were the claims data people

19  disclosed as witnesses?

20          MR. CHRISTIE:  No, Your Honor, no.

21          MR. LEMBKE:  No, Your Honor.  And to say

22  someone is a custodian and then they're going to come

23  in and interpret is very different.

24          THE COURT:  Uh-huh.

25          MR. WERTKIN:  We identified under Rule 26

1   that we would be calling -- we identified them by

2   their department or whatever it was.

3            MS. GUNASEKERA:  Right.

4            MR. CHRISTIE:  The last day of discovery,

5   they served a disclosure that said they were going to

6   have documents; that is all.

7            MS. GUNASEKERA:  And the reason being, Your

8   Honor, is that up until that point, we thought that

9   we would be able to come to a stipulation with

10  AseraCare about the accuracy of claims data but we

11  were unable to do that and we understand why.

12           MR. WERTKIN:  The point is, we adequately

13  disclosed our claims data people.

14           THE COURT:  As custodians?  Let me see the

15  actual disclosure.

16           MS. GUNASEKERA:  I don't have it with me.

17           MR. CHRISTIE:  It's the ninth supplemental

18  disclosures served on February 28th, the last day of

19  discovery.

20           THE COURT:  While you look for that, I will

21  take a break.

22                    (Brief recess.)

23           THE COURT:  Okay.  I've gotten from both

24  sources the government's ninth supplemental

25  disclosures from February 28th, 2014.

1    I'm beginning with number 14, and going

2  through a whole bunch of them, through 21, it's

3  listing of either custodian of records or maintainer

4  of stuff for a whole bunch of different folks.

5    Number 16, I assume, is the one that's

6  relevant here, custodian of records of Advanced Med

7  Corp.

8    MR. WERTKIN:  Actually, I would focus the

9  Court's attention on number 21, Your Honor, as a

10  place to start.

11    And just so you know, this production was

12  made against the backdrop of, you know, Medicare

13  thinks they paid AseraCare a certain amount and

14  usually that kind of thing is not in dispute.

15    You find out whether the claims are false

16  but the amount of money is usually not typically an

17  issue in these kinds of cases.  So when it became

18  clear toward the end of discovery that we may not be

19  able to reach an agreement on the amount of money,

20  that's when, you know, we disclosed these folks, as

21  you said, 14 through 21, as a way.

22    I still hold out hope that we're not going

23  to have to put on tons and tons of evidence about

24  something that's not in dispute but -- so number 21

25  would be -- so that's the backdrop of which we --

1      THE COURT:  We do at least have a moving

2  number.  The number is different now than it was

3  pretrial.

4      MR. WERTKIN:  Well, it depends on what

5  you're talking about.

6      The amount of money that AseraCare -- so,

7  for a certain patient on --

8      THE COURT:  Yeah, but we've got fewer

9  patients.

10      MR. WERTKIN:  Exactly, right.

11      THE COURT:  So the number has changed.

12      MR. WERTKIN:  What I'm talking about, when I

13  say against the backdrop, I just mean, if AseraCare

14  is paid $210 for Alice P. on this day, we can argue

15  whether that $210 should be part of the case or not,

16  we should argue about -- but the fact of AseraCare

17  receiving $210 from the government on that day for

18  that patient, we understand that kind of thing cannot

19  be in dispute.

20      So the underlying claims data, like the fact

21  of the payment, that's still -- that's something that

22  we hope we can get a stipulation about but, you know,

23  these folks would be the people that we would want to

24  bring on to show that on a certain day, AseraCare

25  received this amount of money.

```
 1            And then we asked Kenny Barrett to say,
 2   okay, in light of the fact that Alice P. received --
 3   that AseraCare received $210 for Alice P. on this
 4   day, what's the loss?  That's what he did.
 5            He said oh, okay, here's the box on the
 6   excel spreadsheet that shows how much was paid on
 7   that date, assuming Dr. Liao is right, I'm going to
 8   move it to this box.
 9            So that's all that was happening.  So we --
10            THE COURT:  Right.  But you disclosed, in
11   number 21, maintainer of Advanced Med's national
12   claims history.
13            MR. WERTKIN:  Correct.
14            THE COURT:  And I assume that that is now
15   Ms. Karimova.
16            MS. TAPIE:  It actually might be Mr. Chris
17   Turner, who was -- you know, we disclosed these
18   people by category and then supplemented with a
19   follow-up communication to counsel about here are the
20   names of the people that may be filling that role if
21   needed at trial.
22            THE COURT:  Okay.  And there was Chris
23   Turner and Mr. Landtroop, and then if I'm not
24   mistaken, more recently, it became Mr. Landtroop or
25   Ms. Karimova.  Was Chris Turner in that recent list?
```

1          MS. TAPIE:  No, Your Honor, Chris Turner --

2          THE COURT:  Chris Turner was just now.

3          MS. TAPIE:  No, Your Honor.  He would not

4    have been -- he would not have been testifying about

5    the loss amounts like Kenny Barrett.

6          He would have simply been talking about the

7    initial pulling of the sample, the data or Advanced

8    Med's step in the process of, you know, describing

9    the reliability of that data that was pulled for the

10   initial sample.

11         MR. WERTKIN:  I don't want to get too far

12   afield.

13         So the point that we are trying to make, and

14   I think the reason why this all came up, is that, you

15   know, one thing that we could do is -- so let's just

16   think about it as this is all the data and then

17   there's that one category line, right, that one or

18   two columns.

19         We think we're pretty solid on this part of

20   it.  And because all it is is moving it from one line

21   to the other, we could have the maintainer of records

22   who can testify as to their source and maintenance,

23   reliability and accuracy, say, okay, what is it in

24   that box and what is it in that box and what is it in

25   that box and then, you know, just -- the jury can

1    infer that if they were paid this amount of money on

2    this date, and the claims were false, that that was

3    the damages.

4          So we have -- so the point is that, I think,

5    that Eva was trying to raise earlier --

6          MS. GUNASEKERA:  It's a much more tedious

7    process, Your Honor, so we would have to put in all

8    the claims data.

9          THE COURT:  I don't care how you prove your

10   damages.  That's not for me to decide.

11         For me to decide is whether you get to use

12   people that you didn't disclose previously to do it.

13         I've already decided you can't use your

14   expert to do something he was not disclosed to do.

15         So, as far as I'm concerned, it's up to you

16   to figure out how you can prove your damages using

17   witnesses that have previously been disclosed for

18   that purpose and exhibits that, you know, have

19   previously been disclosed and/or something in some

20   way but that's not for me to decide.

21         MR. WERTKIN:  Which takes us back to this

22   balancing act again.  On the one hand, you have -- so

23   Marya Karimova can come in and testify about those

24   columns and do it --

25         THE COURT:  She can testify about what she

1    was disclosed to testify about.

2              MR. WERTKIN:  I'm --

3              THE COURT:  The source of the information,

4    the maintenance of the information, the reliability

5    of the information and its accuracy, as the

6    maintainer of the documents.

7              MR. WERTKIN:  Right.  What I'm -- I'm

8    actually making a proposal, Your Honor, and I

9    understand your ruling, I'm just throwing out --

10   because, as you said, how are we going to work

11   through this.

12             So, we understand that Ms. Karimova was --

13   we understand your position about what she was

14   disclosed for.  But I'm proposing to go beyond that,

15   if I may.

16             If she came in and testified about those two

17   lines, it would take, I don't know, half an hour or

18   so, who knows.

19             If she's limited, though, where only she can

20   testify as to what she was disclosed for, which was

21   everything else, it could take --

22             MS. GUNASEKERA:  Days.

23             MR. WERTKIN:  -- days or weeks, depending on

24   -- have you seen those spreadsheets?  You have to go

25   through every single benefit period, every single

1    month.  So it could take -- and this is what the

2    testimony would be:  Ms. Karimova, what does it say

3    on box 42?  What does it say on box 43?  What does it

4    say on box 44?  $210.  $210.

5         MR. LEMBKE:  She wasn't disclosed for that,

6    Your Honor.  She wasn't disclosed that she was going

7    to come in and identify amounts paid for particular

8    patients in the sample.

9         She was disclosed that she was going to come

10   in and say, here's a complete spreadsheet; it came

11   from this; this is how it's maintained; it's reliable

12   and accurate; period.

13        They did not say, she's the one who is going

14   to identify amounts paid for Agnes B. to AseraCare.

15        If they wanted to disclose that, they could

16   have.

17        And it was Kenny Barrett who was disclosed

18   for that and the only person they ever disclosed for

19   that is Kenny Barrett.

20        MR. WERTKIN:  May I respond to that, Your

21   Honor?

22        THE COURT:  Yes.

23        MR. WERTKIN:  Because that is not a fair

24   reading of this.  If I wanted to say -- whoever was

25   doing the examination wants to say, Ms. Karimova, is

1   the amount on box 42 accurate, she could say that,

2   certainly we disclosed her for that.

3           MS. GUNASEKERA:  For that date.

4           MR. WERTKIN:  For that date for that

5   patient, is that amount accurate.  She's -- that's

6   well within -- that's what she was -- that's -- if

7   they can test the claims data, we would have to do

8   that.  Now, we wouldn't do it on a line-by-line

9   basis.  We wouldn't -- if she could testify as to the

10  conclusion line, we would not have to go and do it on

11  a line-by-line basis.  But we can, certainly, we

12  would think it's well within what was disclosed for

13  her.

14          THE COURT:  I've never heard of disclosing a

15  custodian of records to be one to testify beyond

16  these are the records, they're kept in the normal

17  course, they're accurate, they're based on this

18  information and, therefore, this document would be

19  admissible.  That's what --

20          MR. WERTKIN:  I understand that, Your Honor.

21  But 16 -- so 16 and 21 are different disclosures.

22  And part of it is the issue -- but we did identify

23  separately the custodian of records for Advanced Med

24  and --

25          THE COURT:  You just told me earlier that

1  the maintainer was the same thing as the custodian.

2          MS. GUNASEKERA:  I may have misspoke when I

3  said that, Your Honor, without having looked at our

4  actual supplemental disclosures.

5          THE COURT:  What's the difference between a

6  custodian and maintainer?

7          MS. GUNASEKERA:  Based on the description we

8  included here, Your Honor, we state the custodian is

9  going to testify, just as you stated, as to the basis

10  and authenticity of the records, to admit the records

11  at trial, if necessary.

12          But then the maintainer of the claims data

13  could further testify as to the data source,

14  maintenance, reliability and accuracy as to those

15  claims for --

16          THE COURT:  It doesn't say as to those

17  claims for those patients.  If it had said that, that

18  may have alerted the defense that this is someone who

19  may be doing Kenny Barrett's job.

20          But there never was a disclosure that any of

21  these would be doing what you're now saying they're

22  going to do to calculate the loss to the government.

23          MR. WERTKIN:  Right.  And to be clear, Your

24  Honor, I mean, she wouldn't be doing what Kenny

25  Barrett did because you -- we would be precluded from

1  doing that.  We understand.  So --

2       MS. GUNASEKERA:  Instead, Your Honor, she

3  wouldn't be creating those two final columns.  If we

4  stand by Your Honor's ruling.  Instead, she would be

5  testifying as to the accuracy of the amount paid to

6  AseraCare on a particular date of service for which

7  the jury found that patient ineligible.

8       And so that's the testimony that we would be

9  eliciting from her.

10       MR. WERTKIN:  Here's how we would imagine

11  doing it.  This is why, I think, on balance, this

12  goes back to the balancing test.  On balance it makes

13  sense because we could either have her go beyond --

14  we are recognizing that, and I just want to make that

15  absolutely clear -- that we could either have her go

16  beyond and do what Kenny Barrett did and be deposed

17  about it, you know, because on balance it's harmless

18  error.  Or, she could --

19       THE COURT:  It's your position it's harmless

20  error --

21       MR. WERTKIN:  That's our position.

22       THE COURT:  -- to do something in the middle

23  of what may be a six month trial.

24       MR. WERTKIN:  That's our position, that's

25  right.  And I just want to be clear that we

1  understand that we're asking the Court for permission

2  to do this.

3          So, that would be one option.  But

4  certainly, we think that -- and Your Honor said it

5  doesn't matter how we prove our damages, we could

6  kind of do what Matt did in his examination of the

7  experts in the medical side, which is write down all

8  the amounts on a demonstrative and, at that point,

9  the jury could see all the amounts and the jurors can

10 infer from that what the loss was.

11         Now, we don't think that's an efficient way

12 of doing it but it would certainly be within what was

13 disclosed.

14         MR. LEMBKE:  Your Honor --

15         THE COURT:  Yes.

16         MR. LEMBKE:  First of all, I'm unaware of

17 any balancing test for compliance with discovery

18 obligations.  You either comply or you don't.

19         You either follow the Court's orders as to

20 when you make your disclosures or you don't.

21         You don't get to balance it because this is

22 really important to our case, and the fact that we

23 didn't meet our obligation, you really ought to let

24 us off the hook again.

25         Now, Your Honor, there is no way any

 1  reasonable person could read a standard custodian of

 2  records disclosure and say that was going to be

 3  someone who was going to come in and testify as to

 4  patient by patient which boxes are the relevant

 5  boxes.  That's what they disclosed Mr. Barrett for.

 6  And to suggest that now we should have known that

 7  maybe Karimova -- and he says, well, we could get

 8  Karimova to do what Barrett did.  I think the Court

 9  has said they can't do that.

10       So, they're trying to get through the back

11  door the same way and it just wasn't disclosed.

12       A document custodian comes in and says, this

13  is the record, this is how we compiled it, it's

14  accurate and reliable.

15       You don't go through and then put your case

16  in through a document custodian.

17       MR. WERTKIN:  We've been accused, a number

18  of times, about trying to get things in the back

19  door.  And in this particular case, I don't think

20  it's the back door.  It's still the front.  However

21  --

22       THE COURT:  It's not the front door when you

23  haven't disclosed the person as being the person or

24  the door via which you're going to present your loss

25  calculations.

1    MR. WERTKIN:  That's right, Your Honor, and

2    that's the point.  We were not presenting her and we

3    wouldn't be presenting her for the loss calculations.

4    We wouldn't.  We would be presenting her for the

5    accuracy of the information.

6         And the way that we would present the case

7    -- she was going to testify, Your Honor, in a much

8    more summary fashion about what these amounts were.

9    She wasn't going to go claim by claim.  But if she

10   could --

11        THE COURT:  She was not disclosed as a fact

12   witness; right?

13        MR. LEMBKE:  Right.

14        THE COURT:  She was disclosed as the

15   maintainer of the document.

16        MR. WERTKIN:  Well, Your Honor, she was

17   disclosed as someone who is going to testify as to

18   the source, maintenance, reliability and accuracy of

19   the data at issue in this case.  That's how she was

20   disclosed.

21        So, what I'm saying, Your Honor, is that

22   it's not the back door.  It's up a ladder and across

23   a tree and down a thing and in the front door --

24        THE COURT:  It's not in the front door.  In

25   the front door is when you disclose Kenny Barrett is

1    the person who is going to talk about how this loss

2    calculation data was done.  That's the front door.

3    So that the defendant can then depose that person who

4    is going to come in to the front door.

5           It's not by saying that someone that we

6    disclosed under the general description of a document

7    custodian is now going to come in and testify as to

8    dollar amounts that constitute the government's loss

9    amount.  That may be up and around some ladders and

10   through some windows but it's not coming in the front

11   door.

12          MR. WERTKIN:  Respectfully, Your Honor --

13          MS. GUNASEKERA:  Your Honor, I think, you

14   know, we're trying to find, as Your Honor had

15   commented yesterday, a way to do this.

16          So, as we can -- so, to the extent that

17   Ms. Karimova cannot now testify as to the work that

18   she completed yesterday as to the loss calculation,

19   she can still testify as to the accuracy of the

20   amount paid to AseraCare for the periods of

21   ineligibility that the jury -- and we would maintain,

22   respectfully, Your Honor, that we did disclose that

23   based on what you read for the maintainer of the

24   national claims database of Advanced Med's

25   representative, that she can testify --

```
 1              THE COURT:  She can testify as to the source
 2    of the data, the maintenance of it, the reliability
 3    of it, and that it is accurate.
 4              But there's nothing that says here that
 5    she's going to testify as to precise amounts that
 6    were paid for individual patients.  That would be a
 7    fact witness.  And she was not disclosed as a fact
 8    witness.
 9              MS. GUNASEKERA:  The only claims data at
10    issue, Your Honor, as the claims data for the
11    patients, the sample patients, and the universe of
12    patients --
13              THE COURT:  This doesn't say anything about
14    claims data or universe of patients.
15              MS. GUNASEKERA:  It's the national claims
16    database that she would be testifying about.
17              MR. WERTKIN:  Yeah.  Your Honor, just to
18    clarify.  She was disclosed as a fact witness, Your
19    Honor, as the maintainer --
20              THE COURT:  Where?
21              MR. WERTKIN:  On the beginning, it said, the
22    United States makes the following, ninth supplemental
23    disclosures pursuant to Rule 26(a)(1) and 26(e) of
24    the Federal Rules of Civil Procedure.  And then 21,
25    we list maintainer of Advanced Med national claims
```

1  history separate and apart from custodian of records

2  Advanced Med Corp.

3          So we would maintain that we did -- she was

4  disclosed as a fact witness.

5          THE COURT:  And how did you disclose Kenny

6  Barrett?  How was he described?

7          Was he described as someone who was going to

8  testify about the source, maintenance, reliability

9  and accuracy of the national claims data?  Or was he

10 described as one who was going to do loss

11 calculations and explain how that was done?

12         MR. WERTKIN:  Right.

13         MS. GUNASEKERA:  Mr. Barrett was never

14 disclosed, Your Honor, as someone who was doing loss

15 calculation because it wasn't a loss calculation that

16 he did.  It was actually --

17         THE COURT:  What was he described as doing?

18         MS. GUNASEKERA:  Identification of the

19 amount that was paid for a patient during a period of

20 ineligibility that was identified by the government's

21 expert.

22         THE COURT:  Because he was described in that

23 way, in that fashion, that that was what he was going

24 to testify about, how the heck was the defense

25 supposed to know that this person described in the

1   category of maintainer of Advanced Med's national

2   claims history would then come in and testify to that

3   precise category or that information that Mr. Barrett

4   was disclosed to testify about?

5          MR. WERTKIN:  Just to be clear -- and I'm

6   sorry, I'm not being clear.  We would not be -- we

7   would not be putting Ms. Karimova, under our

8   auspices of 21, in the shoes of Kenny Barrett.  If

9   Your Honor rules we can't do that, we would not be

10  doing that.

11         What we would be -- Ms. Karimova -- if

12  there's a dispute over the claims data, she's got to

13  come in and testify as to the spreadsheets and the

14  claims data.  And --

15         THE COURT:  She can testify for the purpose

16  of getting that document admitted; right?

17         MR. LEMBKE:  Absolutely.

18         THE COURT:  Because that's what she's

19  disclosed to do.

20         MR. LEMBKE:  But not box by box or line by

21  line.

22         MR. WERTKIN:  And the reliability and the

23  accuracy of the information.

24         THE COURT:  She can testify it's reliable

25  and it's accurate and it's admitted into evidence.

1              MR. WERTKIN:  So, if you have a spreadsheet

2    and she can testify that all of the amounts on that

3    whole spreadsheet are accurate and reliable, then we

4    are not aware of any rule that would prohibit her

5    from -- if she can do the whole thing, certainly you

6    can do a box by box.

7              So, what we would do is we would ask the

8    jury in the closing, we would argue that they could

9    infer from the claims data that they were presented

10   and their findings, in this case, that those were

11   loss amounts.

12             We wouldn't -- if Your Honor rules that we

13   can't have Ms. Karimova stand in the shoes of

14   Mr. Barrett, we would not have her testify that those

15   are loss amounts.  We would do that.  We would not be

16   able to -- we would not be allowed based on those

17   rulings.

18             However, we would, under -- we would be

19   completely consistent with our obligation, she could

20   testify as to what's in the boxes and we could argue

21   to the jury that they should infer that those are

22   loss amounts.

23             We do not want to do it that way.  We don't

24   think that's -- that's certainly not an efficient way

25   of doing it.

1          And that's why we're asking that the Court

2     allow Mr. Karimova to stand in the shoes of

3     Mr. Barrett at this point.

4          THE COURT:  The person identified as the

5     maintainer can testify as to the source, maintenance,

6     reliability and accuracy of the information contained

7     in the documents that are to be admitted.

8          MR. WERTKIN:  Right.

9          THE COURT:  That's the extent of it.

10          MR. WERTKIN:  Right.  Exactly.  That's what

11     we're saying.

12          THE COURT:  That's the extent of it.

13          MR. WERTKIN:  Right.

14          THE COURT:  And the document is admitted.

15     She doesn't go line by line by line by line.

16          MR. WERTKIN:  So, I mean, what's -- for the

17     record, what's the basis for that ruling?

18          THE COURT:  Because she's identified as a

19     person who is going to testify about that and no

20     more.

21          MR. WERTKIN:  Again, if she can testify as

22     to the lines one through 100 as everything -- if she

23     can say --

24          THE COURT:  She can testify as to the

25     document.

1      MR. WERTKIN:  To the document, but she can't
2  -- is it the Court's ruling that she can't testify as
3  to what's in the document as being reliable or
4  accurate?
5      MR. LEMBKE:  Your Honor, these spreadsheets
6  are something on the order of 25,000 pages long.  And
7  in any case, say someone was identified as a
8  custodian of some report that was 5,000 pages long,
9  the custodian comes in and says, that's the report,
10  it's accurate, it's in our files, we offer it, it's
11  in.
12      THE COURT:  And the custodian steps down.
13      MR. LEMBKE:  Done.  The custodian doesn't go
14  through and say, now, let's turn to Page 716, Line 3,
15  is the word accurately there?  Yes, it's there.  Is
16  that accurate?  Yeah.
17      You don't do that.  That is not what is
18  fairly within the contemplation of disclosing someone
19  as a custodian of records or a --
20      THE COURT:  Or maintainer of records.
21      MR. LEMBKE:  Or a maintainer.  That's right.
22  And what's going on here is, as Your Honor noted
23  earlier, there were all of those paragraphs that are
24  really hard to understand that involves analysis in
25  what Miescke did.  And there was all that analysis

1  that they claimed privilege on.

2      The custodian gets in the document as a

3  whole.  But how they do the analysis of it, Miescke

4  can't do it and, you know, Your Honor has ruled.

5      MR. WERTKIN:  May I respond?  It would take

6  two things that we would think would be very

7  problematic to make that finding.

8      One is that the custodian, under number 16,

9  is the same as the maintainer under 21.  And we think

10  that would be error.

11      The second thing would be, to say that the

12  maintainer could testify as to the accuracy of the

13  entire document but not the contents of the documents

14  -- and we just don't think that that would be a

15  correct ruling in order to prevent the government

16  from doing that.

17      Like I said, we don't want to do it that

18  way, Your Honor, but it would be within the bounds of

19  the rules and this is admissible evidence and we

20  could argue to the jury at the end of the case that

21  they should infer loss amounts from that testimony.

22      So that's the position that we take.

23      THE COURT:  I don't think that -- I think

24  that goes to an illogical stretch of the disclosure

25  of what the maintainer was to testify about.

1        And I don't think that that's error.  I

2  think that's an appropriate interpretation of your

3  disclosures.

4        I think it's an appropriate interpretation

5  of the obligation to make disclosures as to who is

6  going to be the one testifying as to critical

7  information for the government.

8        So that's my ruling.

9        MR. LEMBKE:  Thank you, Your Honor.

10       MS. GUNASEKERA:  Alternatively, Your Honor,

11  because Mr. Barrett was initially disclosed for this

12  purpose, I would assume, and I'm only asking, because

13  I assume we can do this, out of an abundance of

14  caution, Mr. Barrett should be able to testify on the

15  stand as to the specific loss to the government using

16  the claims spreadsheets.

17       THE COURT:  As to what he did when he did

18  it.

19       MS. GUNASEKERA:  But as Your Honor had

20  anticipated, the United States would necessarily have

21  to revise the loss calculations, as it has now done,

22  so Mr. Barrett should be entitled to testify as to

23  those revised periods of ineligibility.

24       THE COURT:  That he did not calculate and

25  that you told me yesterday he would not have access

1   to or be eligible to do.

2          MS. GUNASEKERA:  Well, no, I'm saying at

3   trial.  I mean, we do have permission to -- and we

4   would have to jump through many hoops to do this, but

5   to have him come back, potentially, to testify at

6   trial.  As we represented --

7          MR. WERTKIN:  To do the work.  To do the

8   work.

9          THE COURT:  You told me yesterday he could

10  not do the work.

11         MS. GUNASEKERA:  No, because --

12         THE COURT:  Because he was no longer with

13  them.

14         MS. GUNASEKERA:  That's correct, Your Honor.

15  No longer employed by Advanced Med.  So it's not as

16  though we can send him the worksheets while he's in

17  Costa Rica on a mission, but we did, as we

18  represented in our opposition to the motion in

19  limine, state that if we had to, we would subpoena

20  him or call him back to testify at trial.

21         THE COURT:  I don't think a subpoena will

22  work.

23         MS. GUNASEKERA:  I understand, Your Honor.

24  But to the extent he consents, we may not need to

25  subpoena him, per se.

1              But out of an abundance of caution, and I'm

2    assuming he would be entitled to do this, because he

3    has been disclosed and this is the work that he has

4    done, he would --

5              THE COURT:  He can testify as to the work

6    that he has done, the work for which he was deposed.

7              MR. LEMBKE:  That he did himself.

8              MS. GUNASEKERA:  But now we have new periods

9    of ineligibility, Your Honor, and so he should now be

10   able to testify as to what AseraCare was paid based

11   on these same claims data spreadsheets that

12   Ms. Karimova was going to testify to.

13             THE COURT:  That he did not do, that he

14   doesn't have personal knowledge about.

15             MS. GUNASEKERA:  Not the worksheets that

16   she's done, but just using the example that we've

17   been talking about this whole time, which is taking

18   the massive claims data spreadsheet, he can now

19   testify that as of these dates this is how much

20   AseraCare was paid.

21             MR. WERTKIN:  Right.  So he would be the

22   one --

23             MS. GUNASEKERA:  He would be the one to

24   offer that testimony.

25             MR. WERTKIN:  -- to go through the

1 spreadsheet and identify the loss amount.

2        MR. LEMBKE:  Your Honor, first of all, we

3 understood the Court's ruling this morning that if he

4 was prevented from testifying to something by the

5 assertion of privilege or attorney/client work

6 product, he was not going to be allowed to get on the

7 stand.

8        THE COURT:  To talk about that.

9        MR. LEMBKE:  To talk about that.

10        THE COURT:  I overruled your motion in

11 limine to preclude him from testifying as a whole.  I

12 found he did have sufficient personal knowledge of

13 the information that he did, but that I would not

14 allow the government to elicit testimony about

15 information that it did not let the defense ask him

16 about or not allowed him to answer.

17        MR. LEMBKE:  Now, Your Honor, so we

18 understand that ruling.  And we think that's --

19        THE COURT:  So his testimony here would

20 still have to be based on things about which he has

21 personal knowledge.

22        MS. GUNASEKERA:  Understood, Your Honor.

23        MR. LEMBKE:  And the problem they're now

24 getting at, it's as though I hire accountant one to

25 do the work.  Accountant one goes out of the country.

1    Accountant two updates the report that accountant one

2    has no involvement in and then they bring accountant

3    one in at trial to tell us what accountant two did.

4            You can't do that.  He can do what he did,

5    but he can't come in and testify what Ms. Karimova or

6    Dr. Miescke or anyone else did.

7            MS. GUNASEKERA:  And we agree with that,

8    Your Honor, that is not what we're suggesting.

9            What we're suggesting is that Mr. Barrett,

10   as to those patients for which periods of

11   ineligibility did not change, Mr. Barrett would

12   testify as to what he previously did.

13           As to those patients for which the periods

14   of ineligibility did change, Mr. Barrett should be,

15   and we would argue, should be allowed to testify at

16   trial based on the big claims data worksheet what

17   AseraCare was paid for those dates of ineligibility.

18           Not using Ms. Karimova's work, not using

19   Dr. Miescke's work, but using the massive spreadsheet

20   that he originally used and had knowledge of when he

21   originally prepared the loss calculation, he should

22   be --

23           THE COURT:  So basically doing it live --

24           MS. GUNASEKERA:  Exactly.

25           THE COURT:  -- in court.

1          MS. GUNASEKERA:  Exactly.

2          MR. LEMBKE:  Here's the problem, Your Honor,

3     before this trial starts, we're supposed to get the

4     updated report.  But that means Dr. Miescke won't be

5     able to give us an updated report because Mr. Barrett

6     --

7          THE COURT:  Until after Mr. Barrett

8     testifies.

9          MR. LEMBKE:  Until after Mr. Barrett

10     testifies.  That is trial by ambush.

11          And the fact that they've got this problem

12     is not our problem.  It's their problem.

13          And the notion that Mr. Barrett is going to

14     come in and do it on the scene, and I will say, Your

15     Honor, just so there's no surprise, a lot of the

16     analysis that he would be applying live and in person

17     is going to involve things that he didn't tell us

18     about the first time.  So it's going to be a big

19     problem for him to do a lot of what they're going to

20     want him to do because these changes involve the

21     instructions he was given by the Department of

22     Justice that they wouldn't tell us about.

23          So I'm just telling you that's going to be

24     an issue.

25          But the notion that they're going to --

1    we're going to give an opening statement without them

2    having given us their damages number, that is totally

3    inappropriate.

4          And the fact that Mr. Barrett can't do the

5    analysis, other than on the stand, is not our

6    problem.  But it is a huge problem for us to begin

7    phase two without them telling us here's the number.

8          MR. WERTKIN:  We have two very easy

9    solutions to that.

10         Number one, Dr. Miescke can give you the

11   report before the thing based on the assumptions that

12   we give him just like any other expert would do.

13         MS. GUNASEKERA:  That we've already

14   produced.

15         MR. WERTKIN:  It would be the same

16   calculation, it would just be based -- and he could

17   do it based on assumptions of loss, because he's

18   going to be talking about extrapolation.  That's not

19   a problem.

20         Also, Kenny Barrett -- or at least I can't

21   see a problem necessarily, because we'll give you the

22   report, it will be the same numbers, it will be just

23   based on assumption of loss as opposed to the

24   calculation.  That's basically what he did anyway

25   because he said I took the pricer at its word.

1        Putting that issue aside, Kenny Barrett can

2    -- all he would be doing again is saying, this is the

3    box, so this is the loss.  This is the box, so this

4    is the loss.  And that falls well outside the issues

5    that we were -- about privilege.

6        So that's what he would be doing on the

7    stand.

8        MR. LEMBKE:  Your Honor, part of the problem

9    is, he has to decide things like, well, if Dr. Liao

10   or the jury comes back in the middle of a month, do I

11   do this way or that way and how did I do that and

12   that's all the kind of thing they wouldn't let him

13   testify about.

14       MR. WERTKIN:  He doesn't have to do that,

15   Your Honor, all he has to do is say, what does that

16   box say, so what does the loss mean.  What does that

17   box say, and what does that loss mean.

18       THE COURT:  Where does he get the dates for

19   the loss?

20       MR. WERTKIN:  What do you mean?

21       THE COURT:  The periods of ineligibility

22   that the jury found, which is the only information

23   the jury has as to dates.  The government has made

24   some determination as to how you're going to treat

25   parts of months or whatever that the jury found the

1   person to be ineligible, and you've also made

2   decisions that some of the dates are lesser than the

3   dates that Dr. Liao presented.  Again, information

4   that the jury doesn't have.

5          So somebody is going to have to tell

6   Mr. Barrett what the dates are that he's to pull the

7   calculations for, and that's what he was not allowed

8   to explain to Mr. Christie in his deposition.

9          MS. GUNASEKERA:  That's not entirely

10  accurate as to the privilege arguments that they are

11  making.

12         Your Honor, actually, correspondence was

13  exchanged with Dr. Miescke about the fact that --

14  about the fact that the United States is not going to

15  count as a loss certain months for certain patients

16  and that was done during discovery.  And that letter

17  was produced as part of Dr. Miescke's production to

18  the defendant.  So they have been aware of that.  And

19  Dr. Miescke would be in the position to testify as

20  to, I did not include those months for purposes of an

21  overpayment in extrapolation.

22         THE COURT:  Dr. Miescke is not the one we're

23  talk about testifying.

24         MS. GUNASEKERA:  Right.

25         THE COURT:  What we're trying to find out is

 1   how Mr. Barrett is going to know what dates to

 2   calculate on the stand live and in court in front of

 3   the jury when that information hasn't been previously

 4   disclosed to the jury in terms of what dates the

 5   government is actually using, and you say it's been

 6   disclosed to the defense through Dr. Miescke

 7   disclosures or whatever, but has it been disclosed to

 8   the defense that those are the dates that Mr. Barrett

 9   was using or was directed to use or that he will be

10   using here at trial?

11            MR. WERTKIN:  The dates are on the verdict

12   form.

13            THE COURT:  No, they're not.  Those are not

14   the dates that you are using.

15            MR. WERTKIN:  I see what you're saying,

16   yeah.

17            THE COURT:  The only dates that the jury

18   knows are the dates that it found for periods of

19   ineligibility.

20            And they don't -- they're not identical to

21   the ones that the government is using.

22            MR. WERTKIN:  That's right, Your Honor.

23            MS. GUNASEKERA:  So what actually happened

24   during the rest of discovery was that Mr. Barrett

25   dated the worksheets and produced those worksheets

1  with the loss column.  So, when he produced that loss

2  column, he was drawing no conclusions or expert

3  analysis as to what parts of that loss should be

4  counted in the extrapolation.  That was part of

5  Dr. Miescke's expertise and specific direction that

6  the DOJ gave to him as to --

7        THE COURT:  The Department of Justice gave

8  to Dr. Miescke.

9        MS. GUNASEKERA:  During discovery, correct,

10  Your Honor.

11        MR. LEMBKE:  Exactly.

12        MS. GUNASEKERA:  So that was always in

13  Mr. Miescke's expertise to testify about.

14        MR. CHRISTIE:  This is the first time we've

15  heard this.

16        MS. GUNASEKERA:  We produced a letter.

17        MR. CHRISTIE:  The letter told why the

18  changes had been made, that Barrett made changes.

19  And those were the changes I tried to ask questions

20  about at the deposition, some of the changes, and

21  that was a fraction of the changes that you would not

22  let me ask questions about.

23        MS. GUNASEKERA:  We're mixing the changes,

24  but the specific letter that I am referencing, Your

25  Honor, is a letter that was specific to this which

1   actually gives AseraCare an extra month, so to speak.

2         We did not count that month as a loss.  So
3   if a patient became ineligible in the middle of a
4   month, we did not start counting a loss until the
5   subsequent month.  There was correspondence written
6   about this.  Dr. Miescke took that into account in
7   the expert analysis and Dr. Miescke is in a position
8   to testify about that.

9         MR. LEMBKE:  Your Honor, Dr. Miescke isn't
10  -- he was given the number from Barrett from which --
11  which is now effectively -- well, then it was the
12  124, to then do the extrapolation.

13        Miescke starts with the base number already
14  there.

15        Now, the problem we've got here is, I
16  thought it was crystal clear when we started this
17  that at the end of phase two, there would be a
18  recalculation and we would be told, almost
19  immediately, what is the new damages number and what
20  is the new extrapolation number by the person who did
21  the analysis and would be testifying.

22        Now we're told that we're not going to be
23  given that number, you know, Miescke can't do it.
24  Barrett can't do it until he gets on the stand.

25        So, in the middle of trial, we're going to

1    be at, you know, given the number for the 104.  That

2    is not the way it was supposed to work.

3            MR. WERTKIN:  This is -- it's very revealing

4    that there's no dispute about those numbers.

5            MR. LEMBKE:  We're not saying that.

6            MR. WERTKIN:  That's the point.  This is all

7    based on -- this is all based on a technicality

8    trying to get around this.

9            THE COURT:  It's not a technicality to

10   disclose your witnesses in advance of trial.

11           MR. LEMBKE:  Who have to testify to $159

12   million in damages.  And Jeff keeps suggesting, you

13   just ought to stipulate to this.

14           We don't have the burden.  And the

15   suggestion that there's no dispute -- we've never

16   said there's no -- Judge, if you go to the pretrial

17   order, we do not stipulate to this.  So, you know --

18           THE COURT:  It's always been in dispute.

19           MR. LEMBKE:  Yes.

20           MS. MARTIN:  Yes.

21           MR. WERTKIN:  I am saying -- all I'm saying,

22   Your Honor, is you can't -- I'm just trying to

23   undercut the idea that there's some kind of surprise,

24   that there would be some kind of surprise here.

25           The number that Dr. Miescke provided last

1   night is not going to change.  It's the same number.

2           MR. LEMBKE:  How do we know that?

3           MR. WERTKIN:  Because the facts are not in

4   dispute.

5           MR. LEMBKE:  Barrett hasn't done that.  The

6   facts are in dispute.

7           MR. WERTKIN:  I don't want to go down that

8   road.

9           THE COURT:  I've made my rulings based upon

10  the defendant's motions in limine or the motion in

11  limine and the supplement and the government is just

12  going to have to figure out how to make it work.

13          MR. WERTKIN:  Just to update, Your Honor, on

14  the scheduling, we actually think that -- you asked

15  us around how long we thought our case would be, it's

16  going -- I think that we will have Kenny Barrett

17  coming in and testifying about the loss amounts on a

18  claim by claim -- about the new loss amounts.  He

19  will be able to testify about the ones he's already

20  done that haven't changed on a summary fashion but he

21  will be coming in and testifying live about the loss

22  amounts that have been changed in not a summary

23  fashion.  And that will take a significant amount of

24  time.

25          THE COURT:  Well, that still remains to be

1   seen.

2          MR. LEMBKE:  Your Honor, I just want to make

3   it clear on the record, we object to the presentation

4   by Mr. Barrett of a damages number that we have not

5   been provided based on his analysis before the trial

6   begins -- before phase two begins.

7          That was always the contemplation and

8   Dr. Miescke can't do it.  We are entitled to know

9   from the person who is going to be offering the

10  damages testimony from the stand what the number is

11  before we start.

12         Your Honor, we believe that before Monday at

13  8:30, we need Mr. Barrett's analysis or his testimony

14  should not be allowed because it will be an unfair

15  surprise.

16         THE COURT:  As to any new numbers.

17         MR. LEMBKE:  As to any new numbers.

18         MR. WERTKIN:  And we can --

19         MS. GUNASEKERA:  Your Honor, we absolutely

20  object to that.  Mr. Barrett should absolutely be

21  entitled to recalculate the loss amount.

22         I mean, if this is Your Honor's ruling, you

23  know, we're going to try to move mountains to see if

24  he is going to be in a position where he can do that

25  and still incorporate the loss that the jury found,

1   the false claims that the jury found as to those

2   patients where it didn't exactly match with

3   Dr. Liao's period of ineligibility, because otherwise

4   --

5            THE COURT:  Or, or, the period that the

6   government decided on its own it was going to use as

7   the loss period or the ineligibility period, which

8   has never been presented in evidence to the jury.

9            MS. GUNASEKERA:  Right.  The one month

10   allowance, Your Honor.

11            MR. LEMBKE:  No, more than that.

12            MS. GUNASEKERA:  And all of those, Your

13   Honor, we actually did to the benefit of AseraCare,

14   so it's a little puzzling why they're upset or making

15   --

16            THE COURT:  No.  I'm the one that's making

17   the deal because you're using, as a loss period,

18   dates that were not presented to the jury as loss

19   periods.  You're changing that.  It's different from

20   what Dr. Liao testified to.

21            We went through that when the government

22   presented the requested verdict form that already had

23   dates in it that were different from Dr. Liao's

24   testimony.

25            It's not my fault that the government didn't

1  look ahead and consider what you were going to have

2  to do to prove your damages and how you were going to

3  do it and disclose that information to the defendant

4  in a timely fashion.

5         MR. WERTKIN:  And I understand the Court's

6  ruling and we will need some time to think about this

7  and come up with -- and regroup.

8         However, we do believe that Kenny Barrett,

9  as appropriately disclosed as a witness to talk about

10  things, will be able to testify on the stand box by

11  box about what the patients are --

12         THE COURT:  But the defense does have a

13  right to know what the government's damages are and

14  how they have been calculated prior to the beginning

15  of phase two.

16         MR. WERTKIN:  Yes, Your Honor.

17         MR. LEMBKE:  By the person who calculated

18  them so we know what we're going to get.

19         MR. WERTKIN:  Right.  Dr. Miescke is the one

20  who is going to calculate our damages.

21         THE COURT:  I've already told you he doesn't

22  get to do that.  That's beyond the scope of what he

23  was disclosed to do.

24         MR. LEMBKE:  For the 104.

25         THE COURT:  Yes.

1        MR. WERTKIN:  The ruling is that Dr. Miescke

2   can't testify as to the damages in this case?  Is

3   that what --

4        THE COURT:  That's not what I just said.

5        MR. WERTKIN:  What did you just say?

6        THE COURT:  He cannot testify as to the

7   stuff that Kenny Barrett was disclosed to testify to.

8        MR. WERTKIN:  Right.

9        THE COURT:  For those calculations that he

10  did not do prior to his reports.  I think there was

11  more than one, wasn't there?  And before his

12  deposition.  And things that are outside the scope of

13  what he was disclosed as an expert to do.

14       MR. WERTKIN:  Right.  I just want to make

15  sure that we're clear on that.  He's not going to

16  testify to that.  He was given assumptions, the first

17  time around, and he made some extrapolations,

18  assumptions about what the data was for 104 and he

19  accepted those assumptions and then he extrapolated

20  them out.  And that's still okay; right?

21       What he did the first time is still -- I

22  guess I don't even need to ask.

23       He can do what he did the first time; right?

24  That's still on the table?

25       THE COURT:  Yeah.  But the first time he

1  didn't do any of the stuff that Kenny Barrett did.

2          MR. WERTKIN:  Right.

3          THE COURT:  So the second time, we're now at

4  trial, he can't do what Kenny Barrett did because he

5  was not disclosed as doing what Kenny Barrett did.

6          MR. WERTKIN:  We're going to have Kenny

7  Barrett do what he did and then Miescke is going to

8  do what he did.

9          THE COURT:  But there's going to be a

10  disclosure of that to the defense before we start

11  Monday morning at 8:30.

12          MR. WERTKIN:  Okay.  Thank you.

13          THE COURT:  All right.

14          MR. LEMBKE:  Your Honor, we would ask that

15  the disclosure come by Saturday night so we have it

16  at least one full day to process it.

17          THE COURT:  I think that's realistic.  Can

18  you do that?

19          MS. GUNASEKERA:  We need to figure it out,

20  Your Honor.

21          MR. WERTKIN:  We will do our best.

22          MS. GUNASEKERA:  We need some time to

23  regroup, as Mr. Wertkin said.

24          THE COURT:  All right.  We had some other

25  issues that were identified as priorities in the

1   joint status report.

2           I had wanted to talk about the CAP issue and

3   the TIP letters.

4           MR. LEMBKE:  Yes, Your Honor.

5           THE COURT:  I've heard a lot, from time to

6   time, about the CAPs and how they work and how they

7   don't work and how CMS instructs hospice to consider

8   the CAPs and their effect on admissibility and all

9   that kind of stuff.  Quite frankly, I have never been

10  able to completely understand how they work.

11          It seems to me that the information about

12  the CAP will be extremely confusing to the jury and

13  it seems to me that the government's got plenty of

14  other evidence to show knowledge that it makes that

15  information on the CAPs less probative and very

16  confusing.

17          Can we do without that information and still

18  establish your claim or your proof of knowledge?

19          MR. WERTKIN:  I'm sorry, Your Honor, but no

20  and emphatically no.

21          The CAP is going to be a central piece of

22  this case for the government, Your Honor.  The CAP --

23  AseraCare adopted a CAP strategy that they knew or

24  should have known was causing the submission of false

25  claims.  That is a central part of our case.

1          THE COURT:  I thought a central part of the

2    case on knowledge was the aggressive marketing, was

3    the Palmetto reports, was the testimony from the

4    whistleblowers and all those other things to show

5    knowledge?

6          We have so many central parts to this case,

7    how can they all be central to the issue of

8    knowledge?

9          Why can we not look at ways to simplify the

10   case for the jury as opposed to confuse them more?

11         MR. WERTKIN:  Thank you, Your Honor.  If I

12   may, the CAP is actually a way of simplifying this

13   case for the jury.

14         This is a document that has been identified

15   as Government's Exhibit 780.  And you can see in the

16   cover email, it talks about, I can't thank you enough

17   for your participation and excitement about the

18   opportunity to, quote, get out of CAP.

19         And then if you turn the next page, this is

20   CAP strategy for the region four red targets in

21   Alabama.

22         Now, Your Honor just ticked off a number of

23   different things that is central to the United

24   States' case.

25         Well, if you look under Decatur at number 5,

 1  ride with meals on wheels.  I think that's what Your

 2  Honor was talking about about the excessive

 3  marketing.

 4          If you're talking about number 8 under

 5  Decatur, don't wait for doctor referrals, that would

 6  be what the nurses are going to testify about going

 7  around the doctors.

 8          Under Foley, if you go to number 3, expand

 9  GL Synergy, GL stands for Golden Living.

10          And if you go down to number 7 under Mobile,

11  develop team competition.  This is, again, I think

12  the excessive marketing you were just referring to.

13          Now, you can see all of these different

14  things are listed under the heading CAP strategy.

15          So, CAP really, I think, far from being

16  confusing is a unifying concept that will help bring

17  all of these different things together and help the

18  jury understand what's going on, Your Honor.

19          THE COURT:  Who is going to testify as to

20  what CAP is and how it functions?

21          MR. WERTKIN:  Well, we actually have a

22  number of witnesses who are going to be able to do

23  that.  From the government's side, Your Honor, I'm

24  not sure -- at this point, I don't think we've made a

25  decision in terms of who is going to testify.

1          THE COURT:  Wait a minute.  It's a central

2    part of your case and you haven't decided who is

3    going to testify about it?

4          MR. WERTKIN:  Well, all the AseraCare

5    witnesses are going to testify as to their

6    understanding of how CAP worked and how CAP drove the

7    submission of a false claim.

8          We think that their strategy was to make

9    decisions about patients based on CAP instead of

10   based on their eligibility.

11         So CAP is, you know, and we believe that we

12   can show, Your Honor, that AseraCare knew that their

13   CAP strategy, as outlined in this document, was

14   causing the submission of false claims and they

15   recklessly disregarded that information.

16         And that's a basis of our case, Your Honor,

17   that's why CAP is hugely important.

18         MR. LEMBKE:  Your Honor, let me just

19   briefly, as I understand what CAP is all about.  The

20   whole CAP program is is that Medicare wants hospices

21   not to have an overwhelming number of long-stay

22   patients.  They want -- and so, as the average length

23   of stay gets up, you get into CAP.  And that means

24   you may have to give money back at the end of the

25   time period at issue, if you've got this length of

1   stay average that's too long.

2          So Medicare, in the Federal Register,

3   encourages, tells hospices they should manage

4   according to the CAP and you should have a balance of

5   short-term patients and longer term patients.  So you

6   might go out and try to get -- so they want new

7   admissions that will be for shorter terms, which is

8   cancer patients and things like that.

9          THE COURT:  And aren't the vast majority of

10  hospice admits for brief periods of time?

11         MR. LEMBKE:  It depends upon where the

12  agency is and what their cancer mix is.

13         And in smaller towns where AseraCare was,

14  where you're not around a big medical center, I think

15  there's not as many of the short-term cancer stays,

16  but I think for the industry as a whole, yes.

17         So what you've got here is Medicare

18  encouraging you to managing your CAPs so you don't

19  get too many long stays.

20         So what does that involve?  That means going

21  out and trying to get more short-term stay patients,

22  totally eligible, there's -- so what they want to

23  spend a lot of time talking about is going out and

24  doing exactly what Medicare said we should do and get

25  eligible people with a short-term to come on and then

1   encouraging you to constantly evaluate long-stay

2   patients to see whether they are really eligible.

3           So the notion that there's some big negative

4   to managing for CAP is directly contrary to what

5   Medicare tells hospices to do.

6           And the problem with all of this is, it is

7   going to be extraordinarily confusing and it doesn't

8   -- when they say it's to go out and get more false

9   claims, no.  It's to go out -- it's to manage the

10  balance of your patients.

11          And I think that the probative value of that

12  in the grand scheme of things in this case is going

13  to be much less than the confusing nature of it and

14  the prejudicial affect of it by virtue of the

15  confusing nature of it.

16          THE COURT:  What does CAP stand for?

17          MR. WERTKIN:  Actually, it's not an acronym,

18  Your Honor.

19          THE COURT:  So why is it always in all CAPs?

20          MR. WERTKIN:  You know, it's just a

21  convention that AseraCare used.

22          THE COURT:  So what does it mean?

23          MR. LEMBKE:  It means there's a CAP on how

24  much you can be paid in a given year.

25          MR. WERTKIN:  So, Your Honor, Mr. Lembke is

1  right that there is -- that Medicare encourages the

2  hospice providers to have a balance of patients.  And

3  that's essentially, you know, all -- I'm not sure for

4  the purposes of this conversation we can get into the

5  details of it.

6          If the agency has too many patients who are

7  on for longer than 180 days, it's more likely than

8  not that they would be running up against CAP and

9  they would have to pay money back.

10         So that's generally how, you know, what CAP

11 refers to.

12         THE COURT:  So wouldn't that be more of an

13 incentive not to have these patients that we looked

14 at in phase one on hospice?

15         MR. WERTKIN:  Yes, Your Honor.  And if you

16 look -- so there's two ways that hospice can manage

17 their CAP in our view.  They can try to make sure

18 that all their patients are eligible or they could

19 try to gain the system.

20         If you look at the exhibit I just gave to

21 you, you can see under number 3 for Decatur, it says,

22 target first time Medicare admits.

23         So, if you are letting in too many eligible

24 patients, then you need to adjust your strategy to

25 get people that are in their first benefit period

1  because, you know, it gets into someone who is on

2  Medicare for their first benefit period is a credit

3  to your CAP.

4          If they're on for their 25th benefit period,

5  it's a negative impact on the CAP.

6          So CAP explains --

7          THE COURT:  So, there again, that's an

8  incentive not to keep people on for more than 365

9  days and the only patients that the government has

10  identified as being ineligible are ones that were on

11  hospice for more than 365 days.

12          MR. WERTKIN:  Or, it also encourages

13  admitting ineligible patients who are on their first

14  benefit period.

15          THE COURT:  But there has been no evidence

16  offered, and this case has not been about, any

17  patients who were admitted on their first period who

18  were ineligible.

19          MR. WERTKIN:  Many, Your Honor, many

20  patients.  When Dr. Liao testified --

21          THE COURT:  Identify one.

22          MR. WERTKIN:  When Dr. Liao testified that a

23  patient was ineligible from the time of their

24  admission to the time of their discharge, that

25  patient is ineligible from day one on the first

1   benefit period.

2        MR. LEMBKE:  It doesn't make any sense what

3   the government is saying, Your Honor, because what

4   they're really trying to do is put a cloud over

5   patients that are not at issue in this case because

6   they weren't on for more than 365 days.

7        And the ones who were on for more than 365

8   days, there's every incentive to get them off and,

9   yet, they stayed, sometimes for three years.

10        So, this is going to be extraordinarily

11   difficult for the jury to comprehend and it's going

12   to eat up a lot of time about something that -- I

13   mean, if this is a central part of the government's

14   case, that's a surprise to us because it really runs

15   counter to what the incentive was for the hospice in

16   terms of getting people off of service, if they were

17   on for more than a year.

18        MS. TAPIE:  Your Honor, I think Mr. Lembke

19   has laid out pretty well what AseraCare's explanation

20   will be.  And I think it's for the jury to decide

21   whether AseraCare was managing the CAP in a way that

22   gave it knowledge of submitting false claims.

23        I think here the focus is on what AseraCare

24   knew and what AseraCare understood about the CAP.

25   And we have it in emails; we have it in training

1    presentations.

2           Frankly, it would be really prejudicial to

3    the government's case not to be able to even mention

4    CAP because CAP drove business decisions that

5    AseraCare was making nationwide.

6           So, you know, emails are not going to make

7    sense, instructions to employees to go out and find

8    short length of stay patients or go out and find

9    first time Medicare, none of that stuff makes sense

10   to the jury without the context of CAP.

11          And we don't think we need to burden the

12   jury with a super complex explanation of how the CAP

13   works in the regs.  It's really what did AseraCare

14   communicate to its employees, what was AseraCare's

15   understanding of the CAP and how did they behave.

16          Clearly, there are two sides to the story

17   and they can argue, you know, how the CAP benefits in

18   their case but we should also argue how the CAP

19   supports ours as well.

20          MR. LEMBKE:  Do you see the creep of where

21   we're going?  When they start wanting to be critical

22   of going out and trying to find short-term patients,

23   short-term patients have nothing to do with the

24   claims at issue here.  And what they're trying to do

25   is expand it to put everything AseraCare did, I mean,

1    even though the government encourage you to go out

2    and get this mix of patients, they're going to

3    criticize AseraCare for going out and getting

4    short-term -- focusing on short-term admits, even

5    though short-term admits aren't at issue in the case.

6          THE COURT:  I don't see how the effort to

7    get short-term admits to balance the CAP has anything

8    to do with AseraCare's knowledge that it had 104

9    patients on hospice for more than 365 days who are

10   not eligible for hospice.

11         MS. TAPIE:  Your Honor, it's a motivation

12   combined with what they were instructing their

13   employees to do.  So when they are not giving that

14   instruction to employees on a normal basis but only

15   when there is this threat of CAP are we concerned

16   about going and getting short-term patients.

17         We think it's extremely probative and very

18   revealing about what the intention was behind the

19   admissions that AseraCare was making.

20         THE COURT:  But short-term patients who are

21   not at issue in 104 that were false.

22         MS. TAPIE:  AseraCare's knowledge and its

23   business practices are at issue, Your Honor, and

24   AseraCare was giving instructions related to all the

25   patients that they were admitting to its employees

1   and, again, sometimes that was go out and find

2   short-term patients who were in CAP, but otherwise

3   we're looking for these types of patients, we think

4   it's absolutely relevant.

5          Just to add, Your Honor, the instruction or

6   what Mr. Lembke said about Medicare encouraging

7   hospices to get this balance of patients, Medicare

8   also encourages hospices to avoid the CAP by really

9   tightening up its eligibility criteria, by really

10  focusing on the patients it's bringing in and showing

11  that they are eligible.

12         So, we think, as Mr. Wertkin put it, okay,

13  had a game or system of, okay, go out and get

14  short-term patients this times, other times we want

15  you to get first time Medicare and other types of

16  patients, as opposed to saying, we're really trying

17  to tighten up our eligibility across the board,

18  everyone, and that's how we're going to get out of

19  CAP.

20         We think that's significant for the jury to

21  consider about AseraCare's knowledge in this case.

22         MR. LEMBKE:  They're basically wanting to

23  attack everything we've done, whether it has anything

24  to do with these 104 and the knowledge of them or not

25  and we're going to be here until New Years if we have

1    to defend ourselves at every agency.

2         And this was not a nationwide issue.  It was

3    a very small subset of agencies that even had a CAP

4    issue over or were in CAP.

5         But the bigger issue is this notion of we're

6    going to start attacking AseraCare for admitting

7    short-term patients, I mean, that is so far afield

8    from what this second phase is about.  And as Your

9    Honor has indicated, we understand there's going to

10   be plenty of evidence that's going to clearly come

11   in, and we may not like a lot of the evidence that's

12   coming in, but it's coming in.

13        But this is something that just expands the

14   breadth and scope of the case in a way that the

15   probative value really does not exceed the prejudice

16   by a wide margin.

17        THE COURT:  I'm going to grant the motion in

18   limine as to CAP.  Whether certain marketing comes in

19   through some other fashion, we'll see.  But in terms

20   of emails and things dealing with CAP, which have to

21   do with admitting short-term patients, I'm going to

22   grant the motion on that, because we're here dealing

23   with falsity of long-term patients.

24        MR. WERTKIN:  Your Honor, just for

25   clarification, is this ruling under Rule 402?  Are

1    you ruling this information is irrelevant?

2           THE COURT:  Under 402 and 403.

3           MR. WERTKIN:  So you're ruling this

4    information about CAP is irrelevant to this case?

5           THE COURT:  And also 403, that it's more

6    confusing to the jury than probative and there's

7    plenty of other evidence that you can use to get into

8    the knowledge of the falsity of the 104 long-term

9    patients at issue.

10          MR. WERTKIN:  I'm just trying to make sure

11   the record is clear because, Your Honor, this is

12   obviously a huge, huge ruling.

13          Is the Court undertaking a balancing test or

14   just ruling that the case is irrelevant -- that the

15   information is irrelevant?

16          THE COURT:  Both.  Okay.

17          MR. WERTKIN:  Okay.  Thank you.

18          MS. TAPIE:  I am asking for clarification,

19   too, Your Honor.

20          Is your ruling on CAP being out limited to

21   the short-term patients that they sought or does it

22   also expand to when they would search for first time

23   Medicare patients or when they would discharge

24   patients who have been on for a long time due to CAP?

25          There were a number of ways that AseraCare

1   responded to the CAP, as we've been discussing.

2          THE COURT:  Right.

3          MS. TAPIE:  What I'm understanding from your

4   order is, you are excluding evidence that AseraCare

5   sought short-term -- short length of stay patients in

6   response to the CAP.  Other things that AseraCare did

7   in response to the CAP was it sought out Medicare

8   patients who were in their very first benefit period

9   who had never been on hospice before, and also

10  discharged patients who are closely evaluated for

11  discharge patients who have been on hospice for a

12  long time who were having a negative impact on the

13  CAP.

14         THE COURT:  How does that affect the 104

15  that were long-term patients that were ineligible?

16  You say that they discharged patients who had been on

17  for a long time.

18         MS. TAPIE:  Yes.

19         THE COURT:  But they didn't discharge the

20  104 that you say were ineligible who have been on for

21  a very long time.

22         MS. TAPIE:  Some of them they did, Your

23  Honor, some of them they did discharge.  And we think

24  that offering the jury an explanation or a reason as

25  to why a patient, who was as sick as some of these

1   patients, and according to Drs. Cooney and Melvin who

2   remained eligible even on the day that they were

3   discharged, CAP is a possible explanation.  And I

4   think to not --

5          THE COURT:  I don't think we need to have an

6   explanation for that when the jury has already made

7   its determination on those things.

8          MS. TAPIE:  But on knowledge, Your Honor.

9          MS. MARTIN:  Your Honor, but discharge of

10  eligible patients is not a false claim.  That doesn't

11  go to knowledge of any sort of false claim.  And so

12  that -- it just goes to the relevancy point, as well

13  as the prejudice part.

14         MS. TAPIE:  If the jury were to say,

15  AseraCare did not have knowledge and the second they

16  did, they discharged, it's --

17         MR. WERTKIN:  Right.

18         MS. TAPIE:  We think we need to be able to

19  offer that there might be a different explanation for

20  this.

21         MR. WERTKIN:  Basically, AseraCare knew that

22  patients -- and I'm sorry to go back over it again,

23  but this is going to come up potentially with every

24  single witness who is going to explain their story

25  based on CAP.  And we're going to be at the bench

1   again where they're going to say, why did you do this
2   and they're going to say, based on CAP.
3           So this is going to come up time and time
4   again, so I just want to make sure we're fleshing it
5   out.
6           If a patient --
7           THE COURT:  We're not going to have
8   testimony about CAP affecting admission of short-term
9   patients.
10          We're not going to have information about
11  CAP resulting in the discharge of long-term patients.
12          MR. WERTKIN:  That is the point I was going
13  to address.  So a patient --
14          THE COURT:  We're not going to have
15  testimony about CAP.  You can have testimony about
16  certain other marketing strategies for the purpose of
17  getting in patients whether they were eligible or
18  not, which is what this case is about, ineligible
19  patients admitted and the knowledge that they were
20  ineligible.
21          But getting in short-term patients to
22  balance the CAP is not relevant.  And if it is, it's
23  extremely prejudicial and very, very confusing to the
24  jury with regard to the patients that the defense --
25  that the government chose to use to demonstrate false

1   claims, which were the ones that were on hospice for

2   more than 365 days.

3          MR. WERTKIN:  If a patient was on for 13

4   months, okay -- because we're going to be presenting

5   evidence, Your Honor, that AseraCare kept admitting

6   patients and keeping patients on hospice month after

7   month after month.

8          Why did the patient after -- if they're

9   ineligible from day one and they're ineligible from

10  day 180 and they're ineligible from day 365, why was

11  AseraCare discharging them all of a sudden at month

12  13?

13         That's a question that the jury is going to

14  want to know.  That's a question that's highly

15  relevant to the case.  And the answer, Your Honor, is

16  the CAP program.  You admit ineligible patients, you

17  keep them as long as you can, when they start being a

18  burden on CAP, you get them off.

19         This is the CAP strategy that they knew was

20  causing the submission of false claims.

21         And despite knowing that, continued to

22  engage in the strategy as laid out in the document

23  that I just gave to you.

24         So --

25         THE COURT:  That document didn't say

1   anything about discharging patients because of CAP.

2   It does say evaluate readmits, whatever that means,

3   or that means recerts.

4         MR. LEMBKE:  What that means, Your Honor, is

5   if someone has been on hospice and they get better

6   and they're discharged and they come back on months

7   or even a couple of years later, I believe, they

8   don't count -- the earlier time period can count

9   against your CAP.

10         MS. MARTIN:  And it also can count against,

11   if my memory is correct, it can count against

12   AseraCare's CAP, even if they go on with another

13   hospice.  So it carries over in terms of how the CAP

14   is credited.

15         THE COURT:  So there was no benefit and

16   could be a detriment in discharging a patient on this

17   date and then readmitting them a few months later as

18   we saw happened a time or two.

19         MR. WERTKIN:  The facts at trial will

20   contradict that statement, just to let you know.

21   That's not the story that the witnesses and the

22   documents in our case tell.  That is not the case.

23         MS. MARTIN:  What is not the case?

24         MR. WERTKIN:  That --

25         THE COURT:  That readmits don't count?

1          MR. WERTKIN:  Yeah.  If one hospice, okay,

2    discharges somebody and then that person gets

3    readmitted, it still is their benefit period and the

4    new hospice takes the CAP hit.

5          MR. LEMBKE:  That's what I just said.

6          MR. WERTKIN:  All right.  The new hospice

7    takes the CAP hit.

8          THE COURT:  Or if --

9          MR. LEMBKE:  Or if AseraCare is the --

10         THE COURT:  -- AseraCare is the one that had

11   them originally and readmit, they take the CAP hit

12   for readmitting that patient.

13         MR. WERTKIN:  But if they go to a different

14   hospice, the new hospice takes the CAP hit.  So you

15   keep the person on for eight benefit periods --

16         THE COURT:  We weren't talking about that.

17         MR. WERTKIN:  Okay.

18         MS. MARTIN:  Maybe I was not clear.  I was

19   talking about against the benefit period.

20         MR. WERTKIN:  Again, it has a big effect,

21   though.  It's not like, I thought -- if the patient

22   goes back to AseraCare, yeah, it doesn't matter.

23         But if you keep the patient on for eight

24   benefit periods and then discharge them, AseraCare is

25   now free and clear, a new hospice, if that person

1  wants to go to a new hospice, that new hospice has to

2  take the CAP hit.  So it does matter.  It's not as

3  though AseraCare is now charged -- is hurt in any way

4  by keeping this patient on for eight benefit periods

5  and then discharging them.

6          You asked if CAP has to do with discharging

7  patients -- this is Exhibit Number -- identified as

8  Exhibit Number 805.  And if you can turn to the

9  second page, Your Honor, this is region four

10 marketing focus.

11         You can look at number 6, one of the

12 marketing focuses is get out of CAP.  And again, Your

13 Honor, that is a central -- this is going to come up

14 over and over and over and over again.

15         If you look at -- talking about getting out

16 of CAP, (a) by weekly discharge planning, that's what

17 we're talking about, discharging people that were

18 ineligible when they came on and they were just as

19 ineligible in month one as they were in month 14, but

20 why did you kick them off?  Because they are in --

21         THE COURT:  At the same time that there's

22 ongoing ineligibility training.

23         MR. WERTKIN:  Right.  And that's their side

24 of the story.  That's why we think that --

25         THE COURT:  I think I've made my ruling and

1   I think it's clear.  Discharging the patient is not

2   what this case is about.  It's about keeping --

3   admitting ineligible patients and keeping them on

4   past their eligibility period.

5        MR. WERTKIN:  Your Honor, respectfully, this

6   is about AseraCare's knowledge of submitting false

7   claims.  And if CAP is related to the knowledge, it's

8   relevant.

9        I mean, Your Honor, I just -- can we agree

10  at least to hold this in reserve because I do think

11  that, Your Honor, this is very, very relevant to

12  whether the patients or whether AseraCare had

13  knowledge.

14       THE COURT:  I've made my ruling as to

15  short-term admits because I see that has absolutely

16  no relevance to the issues presented in this case

17  which are the patients that are on for more than 365

18  days.

19       If you can show me that there's some

20  relevance in terms of discharging patients that have

21  been on for a long period of time to the presenting

22  of false claims for patients who are ineligible who

23  have been on for a long period of time, I may

24  reconsider that.  But I'm going to have to see it

25  before it goes to the jury.

1          MR. WERTKIN:  Understood.

2          THE COURT:  But as to this other stuff, it

3    doesn't come in.

4          MR. WERTKIN:  I understand.

5          MS. TAPIE:  Just another point of

6    clarification.  There are incentive plans that were

7    designed around CAP that sometimes applied to

8    clinical employees, as well as sales employees, and

9    that would be another category that we think would be

10   relevant to their knowledge.

11         THE COURT:  When I made my first statement

12   about this, I said that doesn't mean that some other

13   marketing things don't come in under some different

14   ways, but in terms of really emphasizing and

15   explaining CAP, I don't know.  But we'll look at

16   marketing things.  But I don't know that we need to

17   get into the CAP-driven decisions.

18         We can talk about what they do in the

19   market, if they were marketing in ways that were

20   designed to admit inadmissible patients, we will look

21   at that.

22         MS. MARTIN:  Your Honor, on those incentive

23   plans than Carolyn just said, they do mention first

24   time Medicare beneficiaries, so they fall in the

25   general concept we're talking about here in terms of

1   short-term patients or first time Medicare

2   beneficiaries.

3          So I think they would fall within the scope

4   of what we've been discussing.

5          THE COURT:  I will need to look at them.

6          MR. WERTKIN:  And short-term patients is

7   different from first time Medicare, too, so we will

8   flesh those out for you, Your Honor, as we go along.

9          THE COURT:  But I think the focus needs to

10  be on did AseraCare know they were admitting people

11  who were ineligible, who stayed for a really long

12  time, and did they know when they were recertifying

13  them that they were false and they kept recertifying

14  them despite their knowledge that these patients were

15  false.

16         MR. OLSON:  May I ask for one more point of

17  clarification?  One other category that falls within

18  this group, that CAP being mentioned in an email, are

19  emails just about not short-term admits, the need for

20  short-term admits, but admissions generally,

21  instructions, we need this number of admissions.

22  Will the Court at least be willing to consider those

23  separately?

24         THE COURT:  Yeah.  We've talked before about

25  admission goals and things of that nature and to the

1    extent that that shows efforts to get patients

2    regardless of their eligibility, I will consider

3    that.  But this CAP thing is where I see a whole lot

4    of problem because of what you were showing me then

5    in terms of emphasis on getting those short-term

6    people in to balance the long-term admits, which I

7    don't think is relevant to the claims here in terms

8    of AseraCare having 104 patients that were on for

9    more than 365 days who were ineligible for some or

10   all of their portions of stay.

11            MR. WERTKIN:  There were 2,181.  But we

12   understand your ruling.

13            THE COURT:  The jury found 104 were

14   ineligible.

15            MR. WERTKIN:  I'm just saying what our

16   universe size was, universe of 2,181.  It's going to

17   be our new 104.  I've memorized it.

18            MR. LEMBKE:  That's going to be hard since

19   129 of those have already been deemed eligible.

20            MR. WERTKIN:  Well, I think --

21            MS. TAPIE:  They're not new 104, it's just

22   the universe from where the 233 came from.

23            MR. WERTKIN:  Right.  It's going to be the

24   new 233.  It's the number -- it doesn't matter.  I'm

25   just going to stop talking.

1      MR. LEMBKE:  We're going to have a lot to

2  talk about that here in a little while.

3      THE COURT:  Okay.

4      MR. LEMBKE:  Or tomorrow or whenever we're

5  back.

6      THE COURT:  I'm really fading.  I'm sorry.

7  I wanted to talk about the TIP letters.

8      I've got some real concern about those in

9  terms of not being a random sample and not dealing

10  with some of the agencies that are at issue and some

11  other stuff, but we will talk about that later.

12      Why don't we come back at 1:00 and see if

13  maybe we can get another hour in and then talk about

14  those TIP letters.

15      MR. LEMBKE:  Agreed.  Thank you, Judge.

16      THE COURT:  Thank you.

17          (Lunch recess.)

18          (Back on the record.)

19      THE COURT:  I want to, in essence, clarify

20  the ruling on CAP to make sure we understand.

21      I am going to grant the motion in limine to

22  the extent that we're talking about meeting or

23  beating the CAP by recruiting short-term patients

24  that were eligible and all that kind of stuff, but

25  I'm going to hold it as to issues that involve the

1   CAP on the other end.  And I think I really need to

2   see what evidence you're proposing to use on that

3   category and figure out if there's any way that it's

4   relevant to ineligible patients for more than 365

5   days that are the ones that are at issue here.  Does

6   that make sense?

7          MS. TAPIE:  So we would need to approach

8   before mentioning it at all?

9          THE COURT:  And preferably, let me know

10  before you get the witness on the stand the stuff you

11  want to elicit or show me the document or things of

12  that nature.

13         MR. WERTKIN:  In terms of just generally,

14  during opening statement, for instance, you're going

15  to hear about CAP and it was important in what

16  happened in terms of what happened in this case.

17         THE COURT:  No, I don't think so.  Huh-uh.

18  Not if I'm saying I may not let any of it in at all.

19  You don't talk about it in opening statement.

20         MR. WERTKIN:  Okay.

21         THE COURT:  As to the TIP letters.  And,

22  frankly, this may be as far as we get today.

23         MS. WOODKE:  Your Honor, do you mind if I

24  take up a quick issue from yesterday?  I wasn't

25  yesterday and I need clarification on the scope of

7096

1   your ruling regarding Maggie Lester from my office

2   and her ability to come to the courtroom.

3          It's my understanding that she is not

4   permitted to the come to the courtroom; is that

5   correct?

6          THE COURT:  The problem there, Lane, is that

7   she's local, grew up in Alabama, unlike the other

8   lawyers who have been in and out for the other side,

9   was never identified to the jury.

10         If there's somebody on the jury who, you

11  know, was from Luverne, knew her parents, knew her as

12  a kid -- we don't know because we weren't given an

13  opportunity to ask the jury about that.

14         So, if she is in any way identified with the

15  government and the defense didn't have an opportunity

16  to question about it, that could really be a problem.

17         MS. WOODKE:  So even if she's sitting in the

18  gallery of the courtroom?

19         THE COURT:  Well, she was sitting right

20  behind the government with other government

21  attorneys.

22         MS. WOODKE:  Right.  Which she has done with

23  me previously through a lot of the hearing.

24         THE COURT:  But she's now attorney of record

25  who was not identified to the jury before voir dire.

1          MS. WOODKE:  Does this apply to other

2     attorneys in our office?  For instance, Erin Everitt,

3     who is an attorney of record who was not voir dired

4     who has been coming in and out of the case throughout

5     the trial.

6          THE COURT:  Why weren't they voir dired?

7          MS. WOODKE:  Because she was not going to be

8     trial counsel.  There are people that have worked on

9     this case that are not trial counsel, so they didn't

10    need to be voir dired.  They weren't going to be in

11    front of the jury.

12         THE COURT:  Well, we had people from the

13    other side that weren't going to be in front of the

14    jury but that were going to be in the courtroom and

15    that we voir dired them about.

16         I thought we got all the names of anybody

17    that was going to be in the courtroom related with

18    either side.

19         MS. WOODKE:  It was my understanding it was

20    attorneys who were going to be sitting at counsel

21    table in the courtroom, not attorneys that would be

22    coming in and out of the courtroom during the

23    pendency of the trial.

24         MR. LEMBKE:  I can represent to you, I'm

25    virtually certain, that the defense identified a

1    group of lawyers, as I said yesterday, when Lane

2    wasn't here, expressly during voir dire to you as

3    lawyers who will be in and out but not speaking.

4              THE COURT:  Uh-huh.

5              MS. WOODKE:  I was identified as an attorney

6    that was going to be in and out, because my

7    understanding it was people who were going to be

8    sitting at trial counsel table was my understanding

9    of who would be voir dired for the jury.

10             THE COURT:  But you were identified because

11   you were counsel of record --

12             MS. WOODKE:  And going to be --

13             THE COURT:  -- in this case.  Anybody who is

14   counsel of record should be identified and voir dired

15   with the jury.

16             MS. WOODKE:  So, I guess I'm just trying to

17   clarify, does it specifically only apply to Maggie or

18   does it apply to other particular attorneys in my

19   office, specifically Erin Everitt?

20             We're just trying to get a clarification on

21   who is permitted in the courtroom and not in the

22   courtroom.  And just to make it clear to the Court,

23   we object to the courtroom being closed to those

24   particular lawyers.

25             THE COURT:  If they are attorney of record,

1 they should have been voir dired with the jury. And

2 if they were not, I have problems with them being in

3 the courtroom in a way that would identify them with

4 the government.

5        MS. WOODKE: Should we have voir dired Lloyd

6 Peeples because he came in and sat with the

7 government, he was an attorney of record, but he is

8 no longer with the United States?

9        THE COURT: Well, he's no longer attorney of

10 record.

11        MS. WOODKE: Well, the United States just

12 wants to make clear that we object to the closing of

13 the courtroom as to Maggie Lester and any other

14 attorneys that were not voir dired who are not

15 sitting at counsel table.

16        THE COURT: She can do any work behind the

17 scenes. If we just keep adding attorneys,

18 particularly ones that have local contacts -- and

19 guess what, they're the daughter of one of the

20 jurors' best friends and the influence or the effect

21 that that could have that the attorneys for the

22 defense was not able to ask them about, you're just

23 asking for questions and issues on appeal.

24        I'm trying to avoid that. I want to try

25 this dadgum case one time and no more.

1        MS. WOODKE:  I understand your ruling, Your

2   Honor.  The Department cannot acquiesce to the

3   closure of the courtroom to particular lawyers in our

4   office.

5        THE COURT:  That's fine.  You don't have to

6   acquiesce, you just have to obey.

7        MS. WOODKE:  Yes, ma'am.  I understand.

8        THE COURT:  Anything else?  I hate doing

9   that.  But I don't want to give the defense an issue

10  to raise on appeal.

11       I mean, they could then question the jury

12  after the case is all over and find out that there's

13  a close relationship to an attorney who they've been

14  recognized has been for the government but they

15  weren't allowed to ask the jury about.  That's the

16  problem I want to avoid.

17       MR. WERTKIN:  For attorneys who are not

18  counsel of record that have made an appearance in the

19  case but are working on the case, that are doing work

20  on the case, they haven't made an appearance, writing

21  memos, support work, that kind of thing, does the

22  same rule apply?  Are they also barred from the

23  courtroom?

24       MR. LEMBKE:  Your Honor, I think, if I may,

25  yesterday, I thought the Court made -- Ms. Lester

1  began at Page 6904 of the transcript by representing,

2  I have been the past, since we started trial, sitting

3  on the front row with Lane and I understand that

4  it's, you know, I guess association.

5       And that's what led to this is the fact that

6  she was seated in a place to clearly identify

7  herself, and I know the Court said yesterday that

8  Ms. Davis could sit in the back where she was not

9  clearly identified with the government.  And so we

10  had understood that, you know, if someone who is not

11  clearly identified with the government, meaning where

12  they're sitting in the courtroom, can come in and

13  listen.

14       It was the fact that Ms. Lester was counsel

15  of record and had been sitting on a regular basis

16  where the association is clear, as we understood,

17  that was the basis for the Court's concern.

18       THE COURT:  Does that clarify it?

19       MS. WOODKE:  I disagree with it and I object

20  to it, but I hear what the ruling is and I understand

21  what you've just said.

22       MS. VANCE:  So is the Court's ruling

23  essentially what Mr. Lembke has just put forth that

24  lawyers may not sit in that front row behind of the

25  lawyers trying the case, so to speak, but may sit in

1    the remainder of the courtroom?

2            THE COURT:  If they're not clearly

3    identified with one side or the other.

4            I mean, we went to great extent, Joyce,

5    early on to make sure that we weren't going to have

6    any issues with the jury.

7            MS. VANCE:  Sure.  No, I understand.  We

8    just want to make sure we don't do anything that

9    would violate your order.

10           So, as to Maggie Lester, is the ruling that

11   she can't be in the courtroom at all or she can't sit

12   behind the trial team?

13           THE COURT:  As to her, it was that she

14   cannot be in the courtroom at all because she's

15   already identified herself with the government and

16   the government side and was not voir dired.

17           MS. VANCE:  And that same ruling would apply

18   to Erin Everitt?

19           THE COURT:  I don't know Erin Everitt, I

20   don't know what the issues are with her.  But there

21   should not be any attorney who was not given an

22   opportunity or that either side didn't have an

23   opportunity to voir dire the jury about who is in the

24   courtroom in a manner that associates that person

25   with a particular side.

1          MS. VANCE:  You know, I'm not sure, not
2    having been there how this --
3          THE COURT:  Ms. Vance, I'm sorry, I don't
4    think you're an attorney of record in this record,
5    are you?
6          MS. VANCE:  Well, I'm attorney of record in
7    all of our cases and sign the pleadings in all of our
8    cases.
9          THE COURT:  I didn't see you on the docket
10   sheet, but then again --
11         MS. VANCE:  For the civil decision.  I just
12   want to make sure we don't violate the order which
13   is, in essence, my concern.  So we typically voir
14   dire --
15         THE COURT:  See, the problem is, we're
16   trying to go back and correct something that should
17   have been done six weeks ago when the jury was voir
18   dired; and that is to make sure that there's no one
19   in the courtroom that is identified as an attorney
20   involved in the representation of either side that we
21   didn't have a chance to ask the jury about to avoid
22   issues down the road.
23         MS. VANCE:  And I appreciate your concern.
24   And the only issue that I have that lingers for me is
25   we typically, when we voir dire, say, do you know

 1   Lane Woodke or Jenny Smith or Joyce Vance or anyone

 2   else in the U.S. Attorney's office.  I'm not sure if

 3   that language was used here.  And if that might help

 4   with some of your concerns.

 5            THE COURT:  It was, but at the time,

 6   Ms. Lester was not in the U.S. Attorney's Office for

 7   one thing.

 8            MS. VANCE:  That's fine.  We know the scope

 9   of your ruling and we can comply with it.

10            THE COURT:  Nobody that was not voir dired

11   should be in the position where they are identified

12   as representing one of the parties.

13            The TIP letters, which, as I understand,

14   there is one that has been identified as possibly

15   coming up in the first week of trial; right?

16            MR. LEMBKE:  That's correct, Your Honor.

17            THE COURT:  That was in the --

18            MR. LEMBKE:  I think that's the only one we

19   expect for week one on the list and that was in our

20   submission this morning.

21            THE COURT:  Right.  It's Government's

22   Exhibit 62.  Do we have that anywhere available for

23   me to look at?

24            MR. WERTKIN:  Yes, Your Honor.

25            THE COURT:  Do you have a copy that doesn't

1   cut off some of the information?

2           MR. OLSON:  Unfortunately, no, Your Honor,

3   that is how we produced it or gathered it.

4           MR. LEMBKE:  And just for the Court's

5   reference, it's our understanding that this letter is

6   almost a year before the first patient of the 104

7   from Evansville was on service.

8           THE COURT:  Am I correct in reviewing this

9   that it's for two claims for the same patient?

10          MR. OLSON:  It appears that way, Your Honor.

11          MS. MARTIN:  Yes.

12          MR. LEMBKE:  The service dates are in 2007,

13  which would make it two years before.

14          MS. MARTIN:  Right.

15          THE COURT:  How does that go to show notice

16  in 2009?

17          MR. OLSON:  Well, Your Honor, the Evansville

18  agency had patients in the universe during the 2007

19  to 2009 time frame.  And our understanding is with

20  respect to our burden to prove knowledge, we need to

21  prove knowledge for the universe of patients, not

22  just the 104 sampling.  And this document directly

23  goes to knowledge or it's relevant to knowledge of

24  AseraCare with respect to that agency and that time

25  frame.

1             It is reporting on -- it is limited to one

2    patient, but findings for that patient, that

3    documentation did not support the terminal prognosis

4    which is the issue of whether the claim was payable

5    or not.

6             THE COURT:  Is Betty W. part of the

7    universe?

8             MR. OLSON:  I cannot answer that.

9             MR. WERTKIN:  We can do some research on

10   that, Your Honor.

11            MR. LEMBKE:  I guess what I would say to

12   that is the government will have no evidence there is

13   any ineligible patient from this agency that was on

14   service at any point other than the one found by the

15   jury in the 104.

16            They're not going to put on any evidence

17   that anyone prior to 2009 from that agency was

18   ineligible.

19            MR. WERTKIN:  No.

20            THE COURT:  But they're asking that the jury

21   infer that there was a similar percentage, which is

22   now less than 50, in that universe that were

23   ineligible.

24            MR. LEMBKE:  Yes.  But unless I'm wrong,

25   they're not going to tell the jury that any of them

1    was from this agency or any other agency, let alone

2    are they going to tell them that any of the ones at

3    that agency were ineligible.

4          And this is -- there's a significant issue

5    with extrapolating whether doctors did not properly

6    exercise clinical judgment with no medical expert

7    opinion testimony and no medical records.

8          There's a difference between extrapolating

9    damages, which we don't agree you can do that in this

10   case, but extrapolating falsity, eligibility issues,

11   we don't think you can do that.

12         But they're certainly not going to be

13   putting on any evidence to establish that there's

14   anyone ineligible at that agency.

15         MR. OLSON:  Our view of our burden on

16   knowledge because of the method that we are proving

17   this case, with respect to falsity, I agree with

18   Mr. Lembke's characterization of how we're proving

19   falsity.

20         Because that is how we're proving falsity,

21   we need to prove knowledge on a corporate-wide basis,

22   including the Evansville agency in this time frame,

23   that this document goes directly to the knowledge of

24   the Evansville agency.

25         And in presenting evidence generally on

1    knowledge, that's the type -- the evidence we are

2    presenting is corporate-wide evidence.

3            MR. LEMBKE:  The problem, Your Honor, is if

4    there's no one at the Evansville agency that they've

5    proved in that time frame is ineligible, then it

6    really isn't relevant.

7            THE COURT:  It shows that there was

8    knowledge February 11th of 2008, that one patient did

9    not have sufficient documentation in her medical

10   records to support a finding of ineligibility -- of

11   eligibility.

12           MR. OLSON:  Precisely.  That is what this

13   letter shows, on a precise basis.

14           Now, this fits in with other testimony that

15   we believe we will be presenting about knowledge of

16   the Evansville agency with respect to the results of

17   the ADR process, the review process, that the review

18   wasn't limited to this one patient, but this is a

19   document that goes to what that agency learned from

20   Palmetto through Palmetto's review of claims in the

21   ADR process.

22           THE COURT:  Do you have any Palmetto reviews

23   that are within the time -- I mean, okay.  I can't

24   remember exactly what the date was in the

25   Indianapolis --

```
 1              MS. MARTIN:  Evansville.

 2              THE COURT:  Evansville, yeah.

 3              MS. MARTIN:  The first patient --

 4              MR. WERTKIN:  The dates for Evansville are

 5   going to be the same -- our sample is January '07 --

 6   January 1st, 2007 to February 2012; right?

 7              THE COURT:  I appreciate that, Mr. Wertkin,

 8   but that was not what I was asking.

 9              MR. WERTKIN:  Okay.  I'm sorry.

10              MS. MARTIN:  The first patient was April of

11   2009.

12              THE COURT:  So, February 2008, when they get

13   this teaching and instruction letter, theoretically,

14   I know the government wouldn't believe this, but,

15   theoretically, couldn't the Evansville agency have

16   taken this to heart and looked more carefully at its

17   documentation to make sure that it had sufficient

18   documentation.

19              So merely providing information of knowledge

20   in February of 2008 that it needed to clean up its

21   act doesn't translate necessarily to knowledge that

22   it was, in fact, submitting a false claim in 2009.

23              I understand you're saying that this goes to

24   all the other false claims that y'all have not made

25   any effort to prove were false but are asking the
```

1   jury now to infer that they are false, but --

2          MR. WERTKIN:  May I just jump in there

3   because I just want to make sure we don't go down a

4   path that we don't want to go down.

5          We put on evidence about the sample patients

6   in phase one and the jury came back and they made

7   their findings.

8          We are going to put on statistical sampling

9   -- that is evidence.  We're actually not asking --

10  we're asking the jury to find, based on that hard

11  evidence, that what was going on with those 223

12  patients was also going on with the 2,181.

13         So I got a list of the Evansville patients

14  that were on during that time period.  I don't have

15  them for anybody else, so I'm glad we're talking

16  about Evansville first, but I think you mentioned

17  that the date of the document was February 2008, you

18  know, so --

19         THE COURT:  I asked whether Betty W. was one

20  of those --

21         MS. MARTIN:  She is not.

22         THE COURT:  -- patients in the universe.

23         MR. MARTIN:  She is not.

24         MR. WERTKIN:  That's right.  So, with regard

25  to Margaret D., for example, who was on service in

1   February of 2008 at the Evansville agency, so we're

2   not asking the jury to make a specific finding about

3   Margaret D. but Margaret D. is part of the universe,

4   so she would be one of the patients that the jury

5   would be finding, you know, would be considering when

6   they're talking about the 2,181 patients.

7           Our burden, the way that we understand it,

8   for falsity, we're using the verdict form for phase

9   one and all the evidence to support it, plus the

10  statistician.  For knowledge, we have the burden of

11  showing for 2,181.

12          Your Honor is correct that they could --

13  AseraCare could argue that they got this TIP letter

14  and either the TIP letter was wrong, it didn't have

15  the right information, it didn't reflect what was

16  going on, they could argue that they cleaned up their

17  act -- of course, I'm not sure what they're going to

18  argue, but for us, we're using that to meet our

19  burden in the knowledge portion that Margaret D.

20  and all the other Evansville patients on during that

21  time frame and shortly before that time period and

22  after that time period, that the company knew or

23  should have known that false claims were being

24  submitted for a portion of the patients at

25  Evansville.

1          MR. LEMBKE:  Your Honor, may I respond to

2     that?

3          THE COURT:  You may.

4          MR. LEMBKE:  This notion of our burden on

5     falsity is just to show a statistical sample but our

6     burden on knowledge is otherwise -- I think that's

7     just something the government has made up.  That's

8     how they have chosen to try to put on sufficient

9     proof.

10         But yesterday Your Honor ruled, as you know,

11    that in order to go to the jury, you've got to have

12    medical expert evidence that a claim, a patient is

13    ineligible.

14         Here, not only do we not have Dr. Liao or

15    any other medical expert to testify to that, the jury

16    doesn't have the first medical record.

17         So on the question of whether a patient is

18    eligible, whether the claim is false, when clinical

19    judgment is the standard, they're not putting forward

20    any testimony as to any period of time as to any of

21    these 1,948 patients who are in the universe outside

22    of the sampling.

23         In addition, in light of the fact that only

24    45 percent of the sample was deemed to be eligible

25    even in part, in whole or in part, out of the 233 --

1          THE COURT:  Ineligible.

2          MR. LEMBKE:  Ineligible, excuse me,

3    ineligible.  If you look at Margaret D., based on the

4    results of the sample, it is more likely than not

5    that she is eligible in full because 55 percent of

6    the sample was deemed eligible in full.

7          So, we think there is -- there's going to be

8    a failure of proof in this case on eligibility for

9    people in the universe outside of the sample.

10         THE COURT:  We're talking, I think, right

11   now about evidence for knowledge; right?

12         MR. WERTKIN:  Yes, Your Honor.

13         THE COURT:  Okay.  Which brings me back

14   still to, this isn't tied to any patient that's even

15   within the universe.

16         MR. WERTKIN:  That's right, Your Honor.  And

17   in terms of knowledge, you know, we're -- and this is

18   something -- actually, I'm pretty sure we talked

19   about this case already when we went through our

20   interrogatory responses when we were sitting here in

21   phase one and we were all reading those.  And what

22   we've maintained from the beginning is that we are

23   going to show knowledge that -- that knowledge

24   doesn't have to be a particularized knowledge about a

25   specific claim.

1          This is based on the Grand Union case that
2   the Eleventh Circuit issued that says that you do not
3   need to show individually that -- you don't have to
4   show that a particular employer/agent acted knowingly
5   with respect to alleged false claims.  You can show
6   that the corporate entity had knowledge.
7          And this is a case that has been -- this was
8   in 1983, but it's been continually used by courts
9   within the Eleventh Circuit to show that you do not
10  have to -- the certifying person, you don't even have
11  to show, necessarily, if someone signed a particular
12  claim, that person doesn't even have to have
13  knowledge if you can show that the corporate entity
14  had knowledge.
15         So I'm doing it inartfully, but what I'm
16  just trying to say is that you do not have to tie
17  knowledge to the particular claim in order to show
18  knowledge in the Eleventh Circuit, so in this
19  particular instance, this is just relevant evidence
20  to show what the corporate entity knew at the time
21  and the argument can be made that they didn't know
22  about -- we're going to argue that these issues
23  prevailed and we're going to put on other evidence to
24  support that.  And the other side can argue that this
25  was one instance and there's no, you know, it only

1  happened for this one person and that, we think, is

2  just a matter for the jury to weigh.

3          MR. LEMBKE:  Your Honor, there are sort of

4  layers of evidence -- of relevant evidence of

5  knowledge.

6          Let's just take an example that is totally

7  hypothetical, that the president of the company

8  issued some directive that every agency was to admit

9  ten people who are ineligible today.

10          Well, that would be corporate knowledge or

11  someone at the regional level knows something on a

12  regional basis or the corporate level or a

13  company-wide basis, that's raw knowledge.

14          THE COURT:  That's corporate knowledge.

15          MR. LEMBKE:  That's corporate knowledge.

16  But when we're getting down to anecdotal incidents in

17  particular agencies well outside the time period of

18  any of the patients who have been found in the 104 to

19  be ineligible, I don't think that is relevant

20  evidence to corporate knowledge of what was going on

21  in Evansville at the relevant time period.

22          You know, the jury has to find with the 104

23  there was knowledge.  And it can be done

24  individually.  They say it can be done on a more

25  corporate basis.  But we're still looking at

1  knowledge of these particular 104.

2          They're saying they can use evidence not

3  tied to the 104.  You don't have to show that I knew

4  that Agnes B. was -- they're saying, well, if you

5  knew that every -- blah, blah, blah, you know what

6  I'm saying -- but it --

7          THE COURT:  Right.

8          MR. LEMBKE:  -- still has to be a basis to

9  say that there was knowledge of Agnes B.'s -- that

10 the claim was false.

11         My point is --

12         THE COURT:  And it can be circumstantial and

13 --

14         MR. LEMBKE:  Right.

15         THE COURT:  For example, if this document

16 was at the same time that Agnes B. was in hospice or

17 some time around that, then -- at the same location

18 where Agnes B. was, then this could certainly give

19 rise to an inference that the people who were

20 involved in the certification process for Agnes B.

21 knew that there was a likelihood that they were

22 submitting a claim that was false because it didn't

23 have the documentation or meet the other requirements

24 that was pointed out in the TIP letter.

25         MR. WERTKIN:  Right.  I'm not sure if I'm

1   misunderstanding.

2          We agree, there are different kinds of

3   knowledge, you can establish knowledge in many

4   different ways.

5          Our burden is to show the 2,181 -- AseraCare

6   had knowledge of the 2,181.  That's our burden.  And

7   that's our universe.

8          THE COURT:  And you're claiming that

9   AseraCare made 2,100 false claims?

10          MR. WERTKIN:  Well, we don't have the final

11   numbers yet, because we don't have the final report

12   yet.  But what we're claiming is that there are 2,181

13   patients in the sample, and we're going to argue --

14          THE COURT:  In the universe.

15          MR. WERTKIN:  In the universe.

16          THE COURT:  And you're going to argue that

17   AseraCare presented false claims for 2100 patients?

18          MR. WERTKIN:  No.  What we're saying is that

19   in that universe of claims, we are arguing that

20   AseraCare violated the False Claims Act.  And they

21   violated the False Claims Act in (a)(1)(A) and

22   (a)(1)(B).  They caused a false claim to be submitted

23   or a record or statement to be submitted.

24          We are arguing that the damages associated

25   with that using, you know, the extrapolation that

1  Dr. Miescke is going to do, is whatever that number

2  is.  So we have the burden of showing that for that

3  universe --

4                    (Brief pause)

5            MS. TAPIE:  To show knowledge for the

6  universe.  Our burden is more than the 104 on

7  knowledge.  As to all the false claims for the

8  universe and --

9            THE COURT:  That's what I'm trying to figure

10  out, because Mr. Wertkin keeps saying 2100, and

11  that's the first time I've had any inkling that the

12  government is claiming that there were 2,100 patients

13  for which there were false claims.

14            MS. TAPIE:  It's a percentage of those

15  patients.

16            THE COURT:  Right, right.

17            MR. LEMBKE:  But, Your Honor, it's actually

18  not -- the way they're doing it, not only are they

19  not going to tell us the names outside of the 104 who

20  they say are ineligible, they're not even going to

21  tell us the number.  All they're going to do is tell

22  us the damages.

23            So they're not going to say there are 516 or

24  any other number.  They're just going to say, there's

25  some group in this 2,181, we're not going to tell you

```
 1  who they are, we're not going to tell you --
 2          THE COURT:  What agency they're from.
 3          MR. LEMBKE:  What agency they're from, we're
 4  not going to tell you who their doctors were, we're
 5  not going to tell you the documents in their file,
 6  we're not going to show you any medical records,
 7  we're not going to tell you the period we're claiming
 8  ineligibility.  We're just going to have you assume,
 9  without any medical evidence, that they're false as
10  these other 104 were false and then extrapolate
11  damages.
12          MR. WERTKIN:  We will quibble with some
13  minor points.  But that's what Your Honor ruled in
14  summary judgment.
15          THE COURT:  Roughly, that 45 percent of the
16  2,100 would be false.
17          MR. WERTKIN:  Right.  So, from the very
18  beginning, we have been, hopefully, very transparent
19  that this was exactly -- we were using statistical
20  sampling and the whole point of the statistical
21  sampling is you don't have to have a trial about
22  thousands and thousands of claims.  You put on the
23  sample and, in this case, we're showing falsity by
24  the sample and the extrapolation.
25          So, that's how we've always done it.  And
```

1   that's the point of the Court correctly, in our view,

2   endorsing the summary judgment phase.  And that's how

3   we --

4          THE COURT:  I wouldn't say that I endorsed.

5          MR. WERTKIN:  Well, actually, you know what

6   -- that is fair.  I do believe that --

7          MR. LEMBKE:  I don't recall an Eleventh

8   Circuit endorsing it either.

9          MR. WERTKIN:  I recently read the

10  transcript, and the Court did say that there was --

11  didn't wholly endorse it, but cited the Rosin case,

12  the United States vs. Rosin case.  In light of that

13  case, the use of statistical sampling was proper.

14          And so you're right, Your Honor, we are not

15  going to ask the jury to find which patients -- we

16  don't, of course, they're not going to hear any

17  evidence on that.  So that's absolutely correct.

18          But for our knowledge burden, which goes

19  back to the TIP letter, our knowledge is during that

20  time frame --

21          THE COURT:  We're getting back to the issue.

22          MR. WERTKIN:  We have the burden of showing,

23  during that time period in Evansville, that the

24  company had knowledge and the TIP letter goes to that

25  and that's why we think it's relevant.

1          MR. LEMBKE:  Let me note, Your Honor,
2     Dr. Miescke isn't going to say he's extrapolating
3     falsity; he's only extrapolating damages.
4          THE COURT:  That's interesting.
5          MS. MARTIN:  Yes.
6          THE COURT:  So how do you have damages
7     without falsity?
8          MR. WERTKIN:  Your Honor, Dr. Miescke is a
9     statistician, so he's going to testify about the
10    statistical properties that allow -- the science
11    behind extrapolating out conclusions from, you know,
12    from a smaller sample.  I mean, that's what he's
13    going to testify about.  That's how statistical
14    sampling works and it's used all over the country in
15    many different types of cases.  And this is how --
16    this is how it's done.
17         So he's going to do it consistent with that.
18    He's a statistician.  He's a professor of --
19         THE COURT:  I remember reading his --
20         MR. WERTKIN:  Right.  He's a Ph.D.
21    statistician and he is going to just testify about
22    the principle extrapolation and how to extrapolate.
23         THE COURT:  Is he extrapolating damages or
24    is he extrapolating falsity?
25         MR. OLSON:  He's extrapolating the payment,

1   which I think damages and falsity, those are legal

2   terms, and I think from his extrapolation the jury

3   can infer falsity.

4          THE COURT:  But doesn't it go the other way?

5   Doesn't the jury have to find falsity before the jury

6   finds a damage amount?

7          MR. OLSON:  That is correct.  But they can

8   rely on the same evidence for that.

9          Our position is they can rely on the

10  statistical sampling and the extrapolation, the

11  science of statistical extrapolation, to find

12  liability beyond the sample and also to make their

13  damages claim.

14         MR. WERTKIN:  At this point now, Your Honor,

15  we're now back in the world where it's knowingly

16  submitted false claims.  So we're now back in that

17  world.

18         And in that universe, we plan on putting

19  evidence on to show that AseraCare knowingly

20  submitted false claims for the entire period, and

21  we're planning on using Dr. Miescke's final tally,

22  which we'll get, hopefully, very soon to show what

23  the damages are in this case.

24         THE COURT:  And you've got 1,081 pages of

25  TIP letters?

7123

1          MR. OLSON:  That is a separate exhibit.  We

2     haven't made a final decision whether we plan to

3     offer that or not.  That is a grouping of a pool of

4     the TIP letters from our file.

5          THE COURT:  For the record, that's

6     Government's Exhibit 218?

7          MR. OLSON:  That's correct, Your Honor.

8          THE COURT:  Who are you going to have

9     testify about this TIP letter that is Government's

10    Exhibit 62 that you plan on offering within the first

11    week?

12         MR. OLSON:  Your Honor, we would plan to use

13    that exhibit with Jacqueline Fehe, F-E-H-E.  She was

14    former director of clinical services, she was

15    director of clinical services at the time of this

16    letter at the Evansville agency and was involved with

17    the ADR process.

18         MR. LEMBKE:  For the record, Ms. Fehe left

19    the Evansville agency in December of 2008.  As we

20    indicated, the first four of the 104 didn't come on

21    until April of '09.

22         MR. OLSON:  Your Honor, the United States

23    does plan on calling additional witnesses to cover

24    later time frames and that really addresses your

25    point earlier about knowledge over the period.  We do

7124

1   plan on presenting evidence over the period and some

2   of that came in -- some relevant evidence for that

3   came in in phase one.

4          THE COURT:  I'm going to withhold ruling on

5   this, but I want to see it before it's mentioned, and

6   that goes for all the TIP letters before or at least

7   at this point before any of them are mentioned,

8   before they're trotted out in opening statements, I

9   want to see them.  I want to see how it ties in

10  before I make a ruling on that.

11         MR. OLSON:  Thank you, Your Honor.

12         THE COURT:  I need to leave in just a

13  minute.

14         I did want to kind of mention something that

15  is in the defense's email, I assume the government

16  got it as well, about evidentiary issues.

17         MR. WERTKIN:  Yes, we conferred about it.

18         THE COURT:  I didn't place a time and place

19  restriction on testimony in phase two.  There may be

20  some that's so far away in time to anything that's

21  really relevant here that we may need to draw some

22  lines on.  But unlike in phase one, that was not kind

23  of a preliminary ruling, we'll be looking at the

24  ordinary rules of relevance and any rules that would

25  exclude it and any rules it would have to meet to

 1 | make it there.

 2 |         So I just wanted to clarify that a little

 3 | bit.

 4 |         With that, I think I'm going to call it a

 5 | day with y'all, unless there's something we need to

 6 | take up quickly before I get out of here.

 7 |         MR. LEMBKE:  When do you want to gather

 8 | again, Your Honor?  Well, when are we gathering

 9 | again, Your Honor?

10 |         THE COURT:  A long pause a to when I want.

11 | I need to look real briefly at the other things we

12 | need to take up.  The Court agrees reports are going

13 | to be fun to deal with.

14 |         Matt, I certainly give you any right to

15 | object to lack of personal knowledge or whatever on

16 | either -- I would like to see this Government's

17 | Exhibit 860 that you've mentioned in there.

18 |         MR. LEMBKE:  We will submit that, Your

19 | Honor.

20 |         THE COURT:  Have you discussed that with the

21 | government in terms of -- I don't know whether it

22 | would be appropriate, if there's a redaction.

23 |         MR. WERTKIN:  Why don't we discuss that.

24 | That might be -- we'll talk about it.

25 |         THE COURT:  And then we still need to talk

7126

```
 1    about -- take up the issue of the parent and
 2    affiliated companies and preliminary instructions to
 3    the jury.
 4            MR. LEMBKE:  Right.
 5            THE COURT:  As I recall, I think we are
 6    fairly far away on that.
 7            MR. LEMBKE:  There's a new submission, Your
 8    Honor, where the way we've done it --
 9            THE COURT:  I haven't seen that.
10            MR. LEMBKE:  If it says joint, we're in
11    agreement on the section; and then what comes next,
12    we have counter, and then we have another joint, then
13    we have another counter, and then another joint.
14            So we've actually, I think, narrowed it
15    somewhat.
16            THE COURT:  Did y'all actually agree on some
17    of it?
18            MR. WERTKIN:  Your Honor, I think after
19    midnight is when the parties are -- we should try to
20    settle this case in a meeting that starts at 12:01 in
21    the morning.
22            THE COURT:  Do you know Judge Ott?
23            MS. WOODKE:  We've been here until 1:00.
24            MR. WERTKIN:  So there are lines, if it's
25    between the lines, then you can -- so joint, and then
```

1  this is one section between the lines, and then it goes

2  back to joint, and then there's another line and then --

3         THE COURT:  Y'all actually have submitted

4  something to me finally that includes something that

5  you really agree on?

6         MR. WERTKIN:  Yes.

7         THE COURT:  All right.  We're making

8  progress.  If we keep at this for another couple of

9  months, maybe we will be able to agree on a lot more.

10        I will look at that.  We will talk about

11 those things that I just mentioned, and I hope

12 somebody has a list of them so I can be prepared.

13        Off the record.

14        (Discussion off the record.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

    I hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-referenced matter.


_____
Teresa Roberson, RPR, RMR
Julie Martin, RPR, RMR